**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------x
                                                             :
In re                                                        :          Chapter 11 Case No.
                                                             :
BEARINGPOINT, INC., <u>et</u> <u>al.</u>,                   :          09 - _____  (   )
                                                             :
        Debtors.                                             :          (Joint Administration Requested)
                                                             :
-------------------------------------------------------------x

### DECLARATION OF JOHN DEGROOTE
### <u>PURSUANT TO LOCAL BANKRUPTCY RULE 1007-2</u>

I, John DeGroote, hereby declare as follows:

1.    I serve as Executive Vice President and Chief Legal Officer of BearingPoint, Inc. ("<u>BE</u>"), a Delaware corporation and the parent company of the above-captioned debtors and debtors in possession (collectively, the "<u>Debtors</u>," and together with their non-debtor affiliates, "<u>BearingPoint</u>").  I have been employed by BearingPoint since 2000, and as Chief Legal Officer since December 2008.  In my capacity as Chief Legal Officer of BE, I am familiar with the day-to-day operations, businesses, and financial affairs of BearingPoint.

2.    I submit this declaration pursuant to Rule 1007-2 of the Local Bankruptcy Rules for the Southern District of New York (the "<u>Local Rules</u>") (i) to assist the Court and other interested parties in understanding the circumstances that compelled the commencement of these chapter 11 cases and (ii) in support of the Debtors' petitions under chapter 11 of title 11 of the United States Code (the "<u>Bankruptcy Code</u>") filed on the date hereof (the "<u>Commencement Date</u>"), and the relief, in the form of motions and applications, that the Debtors have requested of the Court (the "<u>First Day Pleadings</u>").

3.    Except as otherwise indicated, all facts set forth in this declaration are based upon personal knowledge, my discussion with other members of the Debtors' senior

management and advisors, my review of relevant documents, or my opinion based upon experience, knowledge, and information concerning the operations of BearingPoint.  If called upon to testify, I would testify to the facts set forth in this declaration.  I am authorized to submit this declaration.

## Commencement of Reorganization Proceedings

4.      On the date hereof, BE and a number of its subsidiaries commenced reorganization cases in this Court pursuant to chapter 11 of the Bankruptcy Code in order to restructure their debt obligations.  This declaration is intended to provide a summary overview of BearingPoint and this restructuring.  Part I provides an overview of BearingPoint's businesses.  Part II provides a description of BearingPoint's organizational structure, capital structure, and financial performance.  Part III provides a discussion of the events that compelled the commencement of these reorganization cases, BearingPoint's prepetition negotiations with its creditor groups, and the proposed restructuring plan.  Part IV sets forth, pursuant to Rule 6003 of the Federal Rules of Bankruptcy Procedure, the immediate and irreparable harm the Debtors would face if unable to implement the relief sought in certain Motions immediately.  Part V contains information required by Local Rule 1007-2.

## I.

## BearingPoint's Businesses

Background

5.      Based in McLean, Virginia, with executive offices in New York City, BearingPoint is one of the world's leading providers of management and technology consulting services.  BearingPoint began as the consulting arm of KPMG LLP ("KPMG"), with KPMG creating a distinct business unit for its consulting services in 1997.  BE was incorporated as a

business corporation under the laws of the State of Delaware in 1999.  On January 31, 2000,

KPMG transferred its consulting business to BearingPoint, and, on February 8, 2001, BE

completed its initial public offering and began to trade on the NASDAQ National Market.  On

October 2, 2002, the company changed its name to "BearingPoint, Inc." from "KPMG

Consulting, Inc." and BE's common stock began to trade on the New York Stock Exchange

("NYSE") under the symbol "BE."

6.      BearingPoint provides management and technology consulting services to

numerous government organizations, as well as Forbes Global 2000 companies and other global

corporations.  BearingPoint's core services, which include management consulting, technology

solutions, application services and managed services, are designed to help its clients generate

revenue, increase cost-effectiveness, manage regulatory compliance, integrate information and

transition to "next-generation" technology.  BearingPoint believes that it differentiates its

services from others through its results, approach and people.  BearingPoint's collaborative and

flexible approach, including its passionate and dedicated people who bring both deep

management and technology experience to bear on solving its clients' issues, is well recognized

for producing innovative and effective solutions.

BearingPoint's Clients

7.      BearingPoint serves more than 2,000 clients worldwide, including all

fifteen United States federal cabinet-level departments, twenty-three U.S. states, each of the top-

ten global technology hardware manufacturers, each of the top-ten global drug and biotech

companies, many of the world's largest global banks, and a host of other government agencies and global corporations.[1]

8.      During 2007 and 2006, BearingPoint's revenue from the U.S. Federal government, inclusive of government sponsored enterprises, accounted for approximately 28.4% and 28.5%, respectively, of BearingPoint's total revenue.  For 2007 and 2006, BearingPoint's revenue from the U.S. Department of Defense alone accounted for approximately 11.0% and 11.3%, respectively, of BearingPoint's total revenue.

BearingPoint's Employees

9.      To service these clients, as of February 5, 2009, BearingPoint employs approximately 15,200 employees worldwide, of which approximately 13,500 are billable professionals.  BearingPoint's professionals possess significant industry experience, understand the latest technology, and apply to solve its clients' business challenges.  As a management and technology consulting company, BearingPoint's success largely depends on its ability to attract, motivate and retain world-class professional talent.

BearingPoint's Operations

10.      Historically, in North America, BearingPoint has delivered consulting services through its Public Services, Commercial Services and Financial Services industry groups, which provide significant industry-specific knowledge and service offerings. Outside of North America, BearingPoint is organized on a geographic basis — Europe, the Middle East and Africa ("EMEA"), the Asia Pacific region, and Latin America (including Mexico).

a.   ——————————————

[1] Based on companies that received BearingPoint services during January – December 2007.  Top-ten companies are as published by Forbes in its 2008 Global 2000 list.

*North American Operations*

11.     Historically, BearingPoint's North American operations have been managed on an industry basis, enabling BearingPoint to capitalize on its significant industry-specific knowledge base.  This focus enhances its ability to monitor global trends and observe best practice behavior, to design specialized service offerings relevant to the marketplaces in which BearingPoint's clients operate, and to build sustainable solutions. All of BearingPoint's industry groups provide management consulting, technology solutions, application services and managed services to their respective clients.

12.     Historically, BearingPoint's three North American industry groups have been:

a.     *Public Services* serves a broad range of both public and private clients, including agencies of the U.S. Federal government such as the Departments of Defense, Homeland Security, and Health and Human Services; provincial, state and local governments; public healthcare companies and private sector healthcare agencies; aerospace and defense companies; and higher education institutions.

b.     *Commercial Services* supports a highly diversified range of clients, including those in the world's leading life sciences and energy markets, as well as technology, consumer markets, manufacturing, transportation, communications and private and public utilities.

c.      *Financial Services* directs its solutions to many of the world's leading banking, insurance, securities, real estate, hospitality and professional services institutions.

*International Operations*

13.     BearingPoint's operations outside of North America are organized on a geographic basis, with alignment to its three North American industry groups — enabling consistency in its global strategy and execution.  BearingPoint believes that its unique global footprint provides BearingPoint with opportunities to increase profitability by leveraging its global delivery model for multi-national clients.  BearingPoint's three geographic regions outside its North American practice include: (i) EMEA; (ii) Asia Pacific region; and (iii) Latin America.

14.     BearingPoint's operations outside the United States are not part of the chapter 11 filings.  It is expected that these entities will continue to operate in the ordinary course of business continuing to provide top-quality services to their clients.

## II.

**Organizational Structure, Significant Debt Obligations and Financial Performance**

Organizational Structure

15.     The corporate structure chart, attached hereto as Exhibit A, provides a general overview of the relationship of the Debtors to each other.

16.     As demonstrated on Exhibit A, BearingPoint is a global organization with subsidiaries and affiliates around the globe.  BearingPoint has offices throughout the United States, Canada, Europe, Asia, the Middle East, Latin America, and Australia.  BearingPoint, Inc. is the ultimate parent of the BearingPoint family of companies.

17.    The Debtors in these chapter 11 cases consist of BE, its wholly-owned

subsidiaries BearingPoint, LLC ("BE LLC"), BearingPoint Global, Inc., BearingPoint Global

Operations, Inc. ("BE GOI"), and BearingPoint International I Inc. ("BE International"), and

certain wholly-owned subsidiaries of BE LLC, BE GOI, and BE International.

Capital Structure

18.    BE is a public reporting company under Section 12(b) of the Securities

and Exchange Act of 1934.  Its common stock (the "Common Stock") was, until recently (as

described below), publicly traded under the symbol "BE" on the NYSE.  It currently trades on

the OTC Bulletin Board under the symbol "BGPT."  As of the date hereof, there are

approximately 4.4 million shares of Common Stock outstanding, which reflects a one-for-fifty

reverse stock split which became effective on December 10, 2008 and is more fully discussed

below.

19.    The following chart summarizes the significant indebtedness of the

Debtors as of the Commencement Date.

| Type of Debt | Principal Value | Obligor(s) | Guarantors | Liens | First Put Right[2] |
|---|---|---|---|---|---|
| Secured Credit Facility - Term Loan | $294,750,000[3] | BE, and BE LLC | Certain domestic subsidiaries of the Obligors as set forth in the Credit Agreement | First priority lien on substantially all of the assets of the Obligors and the Guarantors as set forth in the Security Agreement dated May, 18, 2007 | Not applicable |
| Secured Credit | $171,500,000[4] | BE, and BE LLC | Certain domestic | First priority lien | Not applicable |

a.    _____

[2] In addition to the put rights that arise on a specific date, holders of the Series A Debentures, Series B Debentures and Series C Debentures (each as defined below) can also require BE to redeem the debentures for cash upon the occurrence of a "designated event" (as defined in the indentures and discussed below).

[3] As of February 13, 2009.

[4] This represents an aggregate of third-party cash deposits, as of February 13, 2009, to refund issuing banks for draws under any letters of credit and, as such, is currently a contingent claim against the Debtors.

| Type of Debt | Principal Value | Obligor(s) | Guarantors | Liens | First Put Right[2] |
|---|---|---|---|---|---|
| Facility - Synthetic Letter of Credit (Letters of Credit Outstanding) | ($84,388,501)[5] | | subsidiaries of the Obligors as set forth in the Credit Agreement | on substantially all of the assets of the Obligors and the Guarantors as set forth in the Security Agreement dated May, 18, 2007 | |
| Priority Subordinated (Series C) | $200,000,000 | BE | None | Unsecured | April 15, 2009 |
| Priority Subordinated (FFL SPA) | $40,000,000 | BE | None | Unsecured | July 15, 2010 (Maturity Date) |
| Junior Subordinated (Series A) | $250,000,000 | BE | None | Unsecured | December 15, 2011 |
| Junior Subordinated (Series B) | $200,000,000 | BE | None | Unsecured | December 15, 2014 |

The Secured Credit Facility

20.    BE together with Debtor BE LLC are borrowers and the other Debtors are

guarantors under a credit agreement, dated as of May 18, 2007, which was amended and restated

on June 1, 2007, with Wells Fargo Foothill, LLC ("Wells Fargo"), successor to UBS AG,

Stamford Branch, as administrative agent and the lenders (the "Secured Lenders"), issuing banks

(the "Issuing Banks"), and other parties thereto (as amended and restated, the "Secured Credit

Facility").  The Secured Credit Facility consists of (i) term loans (collectively, the "Term Loan")

in the initial principal amount of $300 million[6] and (ii) a credit-linked deposit letter of credit

facility pursuant to which an aggregate amount of $200 million in letter of credit commitments

were extended to the borrowers (the "LC Facility").  Proceeds of the Term Loan were used to

a.    _____

[5] This represents the aggregate face amount, as of February 13, 2009, of undrawn letters of credit issued under the LC Facility, and, as such, is currently a contingent claim against the Debtors.

[6] Any draw downs under the letter of credit facility that are not reimbursed by BearingPoint are added as additional indebtedness under the Term Loan.

fund general corporate purposes, including the repayment of certain debt obligations.  The LC

Facility is used to backstop any unreimbursed obligations of BearingPoint.

21.     The obligations under the Secured Credit Facility are secured pursuant to a

security agreement dated May 18, 2007 (the "Security Agreement") by and between BE, BE

LLC, certain of BE's material domestic subsidiaries (the "Guarantors")[7] and Wells Fargo as

collateral agent.  As set forth in the Security Agreement, the obligations under the 2007 Credit

Agreement are secured by first priority liens on substantially all of the assets of BE, BE LLC and

each of the Guarantors, including a pledge of 65% of the stock in certain of BE's first-tier

foreign subsidiaries.

22.     The LC Facility provides for the issuance of letters of credit by the Issuing

Banks.  Letters of credit may be issued to third parties for the account of BE, BE LLC, and any

subsidiaries of BE.  BE and BE LLC are jointly and severally liable for reimbursement

obligations in respect of letters of credit issued under the LC Facility.  The LC Facility lenders

under the Secured Credit Facility (the "LC Lenders") have funded a cash deposit to guarantee

reimbursement for any letter of credit draws funded by the Issuing Banks.  There are no

additional funding obligations of the LC Lenders with respect of any letters of credit.

23.     As of the Commencement Date, the aggregate outstanding obligations

with respect to Term Loans under the Secured Credit Facility were approximately $295,374,944

(including accrued interest).  In addition, as of the Commencement Date, the aggregate face

amount of undrawn letters of credit issued under the LC Facility were approximately

a. _____

[7] The Guarantors under the Security Agreement are each of the debtors in these chapter 11 cases, including BE New
York Holdings, Inc., which is listed in the Security Agreement under its former name of PeatMarwick, Inc.

$85,354,410 (including accrued interest) and there existed a cash deposit of $171,500,000 to refund Issuing Banks for draws under any letters of credit.

Series A and Series B Convertible Subordinated Debentures

24.     BE is also a party to an Indenture, dated as of December 22, 2004 and a supplemental Indenture, dated as of November 7, 2006, with The Bank of New York as trustee, pursuant to which two series of debentures were issued: (i) the 2.50% Series A Convertible Subordinated Debentures due December 15, 2024 (the "Series A Debentures") in the aggregate principal amount of $250.0 million, and (ii) the 2.75% Series B Convertible Subordinated Debentures due December 15, 2024 (the "Series B Debentures," and together with the Series A Debentures, the "Junior Subordinated Debentures") in the aggregate principal amount of $200.0 million.[8]  The Junior Subordinated Debentures are unsecured and are subordinated to the 2007 Credit Agreement and the Priority Subordinated Debentures (defined below).

25.     Beginning on December 23, 2011, BE, at its option, may redeem the Series A Debentures, and beginning on December 23, 2014, BE, at its option, may redeem the Series B Debentures, in each case for cash at any time as a whole, or from time to time in part, at a redemption price equal to 100% of the principal amount of the Junior Subordinated Debentures redeemed plus accrued and unpaid interest and accrued and unpaid liquidated damages, if any of the Junior Subordinated Debentures to (but excluding) the redemption date.

a.   _____

[8] At the option of the holders thereof, the Junior Subordinated Debentures are initially convertible into fully paid and nonassessable shares of BE's common stock.  Holders of the Junior Subordinated Debentures may exercise the right to convert the Junior Subordinated Debentures prior to their maturity only under certain circumstances, including when BE's stock price reaches a specified level for a specified period of time, upon notice or redemption, and upon certain specified corporate transactions.  Upon conversion of the Junior Subordinated Debentures, BE will, under certain circumstances, have the right to deliver, in lieu of shares of common stock, cash or a combination of cash and shares of common stock.

26.     In addition, each holder of the Series A Debentures has the right (a "Put Right") to cause BE to purchase its Series A Debentures on December 15, 2011, December 15, 2014 and December 15, 2019 and each holder of the Series B Debentures has a Put Right exercisable on December 15, 2014 and December 15, 2019, in each case at a purchase price in cash equal to 100% of the principal amount of the Junior Subordinated Debentures, plus any accrued and unpaid interest and accrued and unpaid liquidated damages, if any, on the Junior Subordinated Debentures to (but excluding) the repurchase date.

27.     Each holder of the Junior Subordinated Debentures also has the right (a "Designated Event Put Right") to require BE to repurchase all or a portion of the Junior Subordinated Debentures not previously converted, purchased or redeemed by BE on the occurrence of a "designated event," at a repurchase price equal to 100% of the principal amount of the Junior Subordinated Debentures, plus any accrued and unpaid interest and accrued and unpaid liquidated damages, if any, to, but not including, the designated event repurchase date. As set forth in more detail in the indenture, a "designated event" is either: (i) a "change in control," of BE, or (ii) a "termination of trading" of BE common stock.  A "termination of trading" will be deemed to have occurred if BE's common stock is neither listed for trading on a United States national securities exchange, nor approved for trading on the NASDAQ National Market.

April 2005 Convertible Senior Subordinated Debentures

28.     In addition, BE is party to an Indenture, dated as of April 27, 2005, with The Bank of New York as trustee, pursuant to which BE issued $200 million aggregate principal amount of 5.00% Convertible Senior Subordinated Debentures due April 15, 2025 (the "Series C

Debentures"). The Series C Debentures are unsecured and are subordinated to the Secured

Credit Facility, but are senior to the Junior Subordinated Debentures.[9]

29.     The Series C Debentures will be redeemable at BE's option on or after

April 15, 2009 at a redemption price in cash equal to 100% of the principal amount of the

Series C Debentures plus accrued and unpaid interest and additional interest, if any, on the

Series C Debentures to, but not including, the redemption date. Each holder of the Series C

Debentures has a Put Right on April 15, 2009 (the "April 2009 Put Right"), April 15, 2013, April

15, 2015, and April 15, 2020, in each case at a purchase price in cash equal to 100% of the

principal amount of the Series C Debentures, plus any accrued and unpaid interest and accrued

and unpaid additional interest, if any, on the Series C Debentures, to (but excluding) such

repurchase date.

30.     The holders of the Series C Debentures also hold a Designated Event Put

Right which may be exercised in the same manner and upon the same "designated events" as

Designated Event Put Right in the Junior Subordinated Debentures.

The FFL SPA

31.     BE is party to a Securities Purchase Agreement, dated as of July 15, 2005,

pursuant to which BE issued $40 million aggregate principal amount of its 0.50% Convertible

Senior Subordinated Debentures due July 2010 (the "FFL SPA," and together with the Series C

Debentures, the "Priority Subordinated Debentures") and common stock warrants (the "July

2005 Warrants") to purchase up to 3,500,000 shares[10] of BE's common stock under the FFL SPA

a.   _____

[9] The Series C Debentures are convertible at the holder's option into fully paid and nonassessable shares of BE's common stock. Upon conversion of the Series C Debentures, BE will have the right to deliver, in lieu of shares of common stock, cash or a combination of cash and shares of common stock.

[10] Based on pre-reverse stock split numbers.

to: (i) Friedman Fleischer & Lowe Capital Partners II, L.P; (ii) FFL Parallel Fund II, L.P; and

(iii) FFL Executive Partners II, L.P.  The notes issued pursuant to the FFL SPA bear an interest

rate of 0.50% per year and will mature on July 15, 2010.  The July 2005 Warrants became

exercisable on July 15, 2006 and have a five-year term.  The initial number of shares issuable

upon exercise of the July 2005 Warrants is 3,500,000 shares of common stock, and the initial

exercise price per share of common stock is $8.00.  The FFL SPA is subordinate to the 2007

Credit Agreement and senior to the Junior Subordinated Debentures.[11]

      32.    In addition, the purchasers under the FFL SPA hold a Designated Event

Put Right, which may be exercised in the same manner and upon the same "designated events"

as the holders of the Junior Subordinated Debentures and the Series C Debentures.

Financial Performance

      33.    For the three month period ending September 30, 2008, BearingPoint's

consolidated financial statements reflected revenue of $800,987,000 and a net loss of

$30,493,000.  As of September 30, 2008, BearingPoint's books and records, prepared in

accordance with generally accepted accounting principles, reflected assets totaling approximately

$1.76 billion and total liabilities of approximately $2.23 billion.

## III.

## Events Leading to the Chapter 11 Cases

      34.    In the last several years, BearingPoint has faced a number of challenges,

which, taken together, have had a negative impact on BearingPoint's overall financial

a. _____

[11] The FFL SPA is convertible at the option of the holder any time on or after July 15, 2006 into fully paid and non-assessable shares of BE's common stock at the conversion price in effect at the time of conversion.  Upon conversion of the FFL SPA, BE will, under certain circumstances, have the right to deliver, in lieu of shares of common stock, cash or a combination of both.

performance. Commencing with its first acquisition of an international practice (Mexico) in December 1999, BearingPoint began executing a strategy to develop a global business platform primarily through acquisition. Through the end of 2002, BearingPoint had completed approximately 30 acquisitions, group hires or other similar transactions. In order to make these acquisitions, BearingPoint assumed a significant debt load, which BearingPoint believed it would be able to service through revenue generated by its operations. BearingPoint's current debt load, which consists primarily of the Secured Credit Facility, the Junior Subordinated Debentures, and the Priority Subordinated Debentures, was assumed, in part, for the purposes of restructuring BearingPoint's acquisition debt. In addition, in 2004 and 2005, in connection with BE's goodwill impairment test, BE determined there were significant decreases in fair value for its EMEA and Commercial Services reporting units. In 2004, a goodwill impairment loss of approximately $397 million was recognized in the EMEA reporting unit, and in 2005, a goodwill impairment loss of approximately $64 million and $102 million were recognized in the Commercial Services and EMEA reporting units, respectively.

35. Further, in 2004, as part of BE's separation from KPMG, BE transitioned to new financial and accounting systems. Difficulties in implementation of these systems contributed to BE's inability to timely file its SEC periodic reports, a substantial increase in BE's expenses, including finance, accounting and audit costs, and to the material weaknesses identified in BE's fiscal years 2004 through 2007 audits. Further, management concluded that its internal control over financial reports was not effective during that specified period, and increased expenditures were necessary to establish an effective set of internal controls. BE did not timely file its financial statements beginning with the filing of its financial statements for the year ended December 31, 2004. BE became current on December 3, 2007 with the filing of its

financial statements for the quarterly period ended September 30, 2007, and has been timely

since the filing of its annual report for the year ended December 31, 2007.

36.     Moreover, in September 2006, a New York State court held that

BearingPoint's failure to file its financial statements on a timely basis with the SEC was a default

under the indenture relating to the Series B Debentures.  To resolve the uncertainties created by

the court's ruling, BE amended the various indentures, which included an increase in the interest

rate paid to the holders of the Junior Subordinated Debentures.

37.     Also, concern surrounding BE's ability to service its debt in the event of

acceleration of its various debt instruments and to make the April 2009 Put Right has negatively

impacted BearingPoint's ability to secure and retain both customers and employees.  Because of

these issues, certain existing customers, while acknowledging satisfaction with BearingPoint's

services and professionals, have expressed reluctance to continue to do business with

BearingPoint, creating an additional hurdle to overcome in retaining customers; this issue has

also contributed to difficulties in obtaining new customers.  For these and related reasons, as of

September 30, 2008, BearingPoint's annualized employee attrition rate for the third quarter of

2008 was 25.4%.

38.     The combination of these factors, along with the issues described below,

has created immediate liquidity concerns for BearingPoint.

April 2009 Put Right

39.     As set forth above, on April 15, 2009, the holders of the Series C

Debentures can exercise the April 2009 Put Right, which would obligate BE to redeem the notes

on that date.  BearingPoint's current cash resources are not sufficient to meet these obligations,

and a failure by BearingPoint to meet these obligations would result in a default under the Series

C Debentures.  Such a default would also cause a cross-default under the Secured Credit Facility,

the FFL SPA, and the Junior Subordinated Debentures.

<u>Pending NYSE Delisting</u>

40.     Based on the factors discussed above, among other reasons, the value of

BearingPoint stock dropped dramatically. On July 16, 2008, BE was notified by the NYSE that

the average per share price of its common stock was below the NYSE's continued listing

standard relating to minimum average share price, which requires that BE's common stock trade

at a minimum average closing price of $1.00 over a consecutive 30 trading-day period.  On

October 28, 2008, the NYSE notified BE that it had fallen below the continued listing standard

relating to the minimum average market capitalization.  The NYSE's continued listing standard

applicable to BE's market capitalization requires BE's average market capitalization be at least

$100 million over any consecutive 30 trading-day period.  Due to this decline in its stock price,

on November 13, 2008, BE received notice from the NYSE that it would suspend the trading of

BE's stock effective as of November 17, 2008, and would pursue applicable procedures to delist

BE stock, because the stock was trading at "abnormally low" levels.  After the suspension of

trading, BE shares were quoted only in the over-the-counter market.  On December 1, 2008, BE

appealed the NYSE determination to delist the stock (the "<u>Appeal</u>").  The delisting of BE's stock

is pending the outcome of the Appeal, which is currently scheduled for hearing on March 31,

2009.  While BearingPoint has been prosecuting its appeal vigorously and sought listing on

another national stock exchange, BearingPoint is not optimistic with respect to its likelihood of

success.

41.     BearingPoint also sought to address the suspension in trading and pending

delisting by splitting its stock, thereby raising its price.  To that end, on December 5, 2008, BE's

shareholders voted to approve a fifty-for-one reverse stock split of BE's stock, effective as of

December 10, 2008.  The NYSE, however, has asserted that, regardless of the stock split,

BearingPoint's average market capitalization has fallen below $25.0 million for 30 consecutive

days, which is an incurable default with respect to continued listing on the NYSE.

42.    If BearingPoint were to lose the Appeal, and BE's stock were to be

delisted, it would qualify as a "designated event" under certain of BearingPoint's indentures.  As

such, the Junior Subordinated Debentures and the Priority Subordinated Debentures could

demand that BE redeem all or a portion of such debentures – a total of more than $900 million

could become due within days of the delisting.  BearingPoint's current cash resources are not

sufficient to meet these obligations.  A failure by BearingPoint to meet these obligations would

result in a default and acceleration under the Junior Subordinated Debentures and the Series C

Debentures, which would lead to a cross-default under the 2007 Credit Agreement.

Going Concern Qualification

43.    In connection with the filing of BearingPoint's annual financial

statements, BearingPoint's accountants, Ernst & Young LLP ("E&Y") must perform an annual

audit.  As a result of liquidity concerns in connection with the April 2009 Put Right and

uncertainties regarding pending NYSE delisting, BearingPoint's annual audit may contain a

going concern qualification.  The failure by BearingPoint to obtain an unqualified annual audit

would result in a default under the Secured Credit Facility.  BearingPoint's failure to satisfy its

obligations under the Secured Credit Facility when due by maturity or an event of default would

lead to an event of default under the Junior Subordinated Debentures and the Priority

Subordinated Debentures.

DCAA Audit

44.     As discussed above, BearingPoint provides services to a number of United States governmental agencies.  In connection therewith, the U.S. Defense Contract Audit Agency (the "DCAA") performs periodic audits of BearingPoint's financial capability (each, a "DCAA Audit") to determine whether BearingPoint's financial condition is acceptable for performing government contracts.  The delisting of BE's common stock from the NYSE, the failure to make the April 2009 Put Right, or a going concern qualification contained in E&Y's audit opinion could each result in the DCAA issuing an adverse audit opinion.  In such a case, it would be difficult for U.S. government contracting officers to determine that BearingPoint is a "responsible contractor," which is a requirement to be awarded new contracts and task orders with U.S. Government agencies.  BearingPoint believes that a restructuring of its capital structure through the contemplated restructuring proposal should support a favorable DCAA Audit, which will enable U.S. Government contracting officers to determine that BearingPoint is a financially responsible contractor and allow the award of new government contracts and task orders.

Pre-Bankruptcy Restructuring Negotiations

45.     To enhance stockholder value, BearingPoint has continually discussed and reviewed its business, strategic direction, performance, and prospects in the context of developments in the markets in which BearingPoint operates.  Specifically, commencing in 2004, BearingPoint has worked with financial advisors in connection with its review and consideration of various strategic alternatives and financing options.  Throughout 2006 and 2007, BearingPoint's ability to obtain financing in the capital and debt markets was limited by its inability to file it financial statements on a current or timely basis.  Nonetheless, management

continued to explore methods to increase stockholder value.  In 2008, BearingPoint again

embarked on a comprehensive restructuring effort.  To address the foregoing financial

difficulties, in January 2008, BearingPoint engaged Greenhill & Co., Inc. ("Greenhill") to advise

the Board with respect to strategic alternatives, including a strategic transaction involving a sale

of all or a portion of BearingPoint's assets, or an equity investment in BearingPoint.  Greenhill

initiated an extensive sale process during which approximately 25 strategic and financial buyers

expressed an interest in buying all or parts of BearingPoint.  The proposals that BearingPoint

received in connection with those efforts either provided insufficient value, appeared impractical,

or were unlikely to be consummated in time to address the April 2009 Put Right.  As a result,

BearingPoint was unable to consummate a sale of any portion of its business and determined that

the likelihood of timely consummating either a comprehensive sale of BearingPoint or discrete

asset sales on acceptable terms was low.

     46.     On October 23, 2008, the Board authorized discussions with holders of the

Priority Subordinated Debentures and Junior Subordinated Debentures with the objective of

restructuring part of BearingPoint's subordinated debt and possibly exchanging other existing

subordinated debt for common stock of BearingPoint.

     47.     In October 2008, the Board authorized senior management, along with

BearingPoint's advisors to negotiate with various creditor groups in an attempt to restructure its

debt.  Specifically, they gave management presentations to and held negotiating sessions with

principals and advisors of the following:  (i) a steering committee of Secured Lenders, (ii) a

committee of holders accounting for approximately 75% of the Series C Debentures (the "Series

C Committee"), and (iii) a committee of holders of the Series A Debentures and the Series B

Debentures (the "Series A/B Committee").

48.     Following extensive negotiations with these groups, the Debtors were able to an reach agreement in principle with their Secured Lenders regarding the terms of a comprehensive debt restructuring.  Contemporaneously herewith, the Debtors have filed the Debtors' Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code (the "Pre-Arranged Plan") to implement the terms of their agreement with the Secured Lenders, as well as the accompanying disclosure statement (the "Disclosure Statement").

49.     The Pre-Arranged Plan, which is described in detail in the Disclosure Statement, is a classic waterfall plan, providing for the following recoveries:[12]

| Creditor Group | Recovery |
| --- | --- |
| Secured Lenders under Term Loan | A term loan in the amount of (A) $272,000,000 plus (B) the sum of any letters of credit issued prepetition that have been drawn prior to the effective date of the Pre-Arranged Plan (the "Effective Date") and that have not been funded by the Debtors prior to the Effective Date plus (C) accrued interest outstanding under the Secured Credit Facility as of the Effective Date<br><br>Convertible Preferred Stock with the issue price of $50,000,000 |
| Secured Lenders under L/C Facility | A synthetic letter of credit facility in the amount of a synthetic letter of credit facility of $130,000,000, which shall consist of (A) $84,053,079 of letters of credit issued and outstanding, including any letters of credit which have been drawn during the chapter 11 cases and have not been reimbursed by the Debtors prior to the Commencement Date, (B) letters of credit issued during the chapter 11 cases (up to $20 million) and (C) letters of credit to be issued after the Effective Date. |
| Series C Debentures / FFL SPA | [X] shares of new class 1 common stock (the "Class 1 Common Stock") for each dollar of its allowed claim |
| Series A Debentures / Series B Debentures | [X] shares of new class 2 common stock (the "Class 2 Common Stock") for each dollar of its allowed claim |
| General Unsecured Claims | [X] shares of new class 3 common stock (the "Class 3 Common Stock") for each dollar of its allowed claim, subject to dilution for employee and management incentives |

a. _____

[12] All capitalized terms used but not defined herein shall have the meaning given to them in the Pre-Arranged Plan.

| Convenience Claims[13] | Cash equal to [B]% of the allowed amount of such claim. |
| Equity Interests in BE | No Recovery |

50.     The Class 1 Common Stock is senior to the Class 2 Common Stock in that, among other things, the holders of the Class 1 Common Stock are entitled to receive all dividends and distributions that would otherwise go to the holders of Class 2 Common Stock until the holders of Class 1 Common Stock receive $240 million in the aggregate of dividends and distributions.  This distribution roughly matches the seniority the Series C Debentures and FFL SPA have over the Series A Debentures and Series B Debentures.

51.     The Debtors are continuing to negotiate with the Series C Committee and the Series A/B Committee in an attempt to obtain their support for the Pre-Arranged Plan. However, because the Pre-Arranged Plan follows the absolute priority rule under the Bankruptcy Code, the Debtors believe that it is confirmable with the Secured Lenders' support, even if the Debtors do not obtain the support of other creditor groups for the Pre-Arranged Plan.

52.     Following careful consideration of all alternatives, the Debtors determined that the commencement of these pre-arranged chapter 11 cases, including the filing of the Pre-Arranged Plan, was a prudent and necessary step to maximize the going concern value of the Debtors' business.  Because they already have a deal negotiated with their Secured Lenders, the Debtors expect the chapter 11 cases to be relatively short, which should reduce the impact on their businesses.  Importantly, the proposed debt restructuring will enhance BearingPoint's

a.   _____

[13] Each holder of a General Unsecured Claim that is allowed in an amount of $[A] or less shall be considered a convenience class creditor (a "Convenience Class Creditor") unless such holder elects on its ballot to be treated as a General Unsecured Creditor.  Each holder of a General Unsecured Claim that is allowed in an amount of greater than $[A] can elect on its ballot to reduce its allowed claim to $[A] and be treated as a Convenience Class Creditor.

liquidity, reduce its leverage, and enhance its long-term growth prospects and its operating performance.  By doing so, BearingPoint will improve its ability to both retain existing clients, as well as attract new clients.  Furthermore, through the restructuring BearingPoint should slow its staff, employee and managing director attrition, thereby preserving its most important assets.  By deleveraging through a chapter 11 filing, BearingPoint intends to quickly emerge a stronger, healthier company, and be better situated to compete in the global economy.

## Conclusion

53.     Through the commencement of these chapter 11 cases, BearingPoint intends to restructure its debt obligations while continuing normal operations, including its high standards of client service.  As discussed above, BearingPoint has reached an agreement with its Secured Lenders, and is confident that it can emerge from chapter 11 quickly, in a strong financial position, and able to continue to provide the high level of service BearingPoint's clients have learned to expect.

## IV.

## The Debtors Require Relief to Avoid Immediate and Irreparable Harm

54.     It is my understanding that Bankruptcy Rule 6003 provides that to the extent "relief is necessary to avoid immediate and irreparable harm," a Bankruptcy Court may approve a motion to "pay all or part of a claim that arose before the filing of the petition" prior to twenty days after the Commencement Date.  Contemporaneously herewith, the Debtors have filed the First Day Pleadings, which seek various forms of relief from the Court.  Certain pleadings request that the Court authorize the Debtors to immediately pay all or part of a claim that arose prior to the date hereof.  As set forth in more detail below, in such instances, the relief sought is necessary to avoid immediate and irreparable harm to the Debtors.

Motion to Maintain Cash Management System

55.     Granting the Debtors the authority to continue using their existing cash management system and maintain their bank accounts is essential to preserve business continuity and avoid the disruption and delay to the Debtors' payroll, disbursement, and collection activities that would necessarily result from closing such bank accounts and the opening of new accounts. Moreover, the immediate confusion that would otherwise result, absent the relief requested herein, would severely impair the Debtors' operations, and consequently jeopardize the Debtors' reorganization efforts.

56.     Furthermore, in many instances, the only way in which the Debtors can effectively penetrate profitable markets abroad is through the maintenance of foreign bank accounts. Allowing the Debtors to maintain their foreign bank accounts will avoid a disruption in the Debtors' foreign operations and allow them to continue successfully competing and securing profitable engagements in abroad. Forcing the Debtors to close their foreign bank accounts would jeopardize the satisfactory completion of many foreign engagement and thus severely harm their operations and reputation in a multitude of markets.

57.     Additionally, although the direct costs of requiring the Debtors to change their business forms is not great, I believe such a change would depress collection of receivables and detrimentally impact the Debtors' reputation, harming operations and, by extension, the Debtors' estate.

58.     Finally, the Debtors should be allowed to continue using their investment accounts, as these are federally insured, and enable the Debtors to minimize their exposure to financial loss while ensuring liquidity and maximizing returns on the cash balances and reserves they maintain from time to time.

59.     Accordingly, I believe the relief requested herein is necessary to avoid immediate and irreparable harm that would result from requiring the Debtors to close their existing bank accounts and open new accounts.

Motion to Pay Employee Wages

60.     Because the Debtors are a professional services business, the Debtors' primary assets are its employees and other personnel.  To operate successfully, the Debtors must preserve and encourage employee morale, maintain low attrition rates, and ensure employees with institutional knowledge of the Debtors' clientele and operations continue to perform their jobs to the best of their abilities.  If the Debtors cannot satisfy prepetition employee obligations, in the ordinary course, the Debtors' ability to accomplish these goals would be severely compromised.

61.     The Debtors cannot operate without their employees and other personnel. Without the appropriate personnel, the Debtors cannot service their clients and, in turn, cannot generate any revenue.  In such circumstances, the Debtors' estates would be immediately and irreparably harmed and the value of the Debtors' estates would drop precipitously, irreversibly harming all parties in interest.

62.     To prevent such a calamity, the Debtors must reassure their employees and other personnel as to avoid unnecessary interruptions.  Absent the relief requested, the Debtors submit that their employees and other personnel and, accordingly, the primary assets of the Debtors' estate, shall literally walk out the door.

63.     Further, it is inequitable for the Debtors' employees to bear the burden of these chapter 11 cases where the Debtors must rely upon such employees for their continued survival.  Without the payment of employee-related prepetition obligations, the Debtors'

employees may suffer significant personal financial hardships.  For example, with respect to employee expense reimbursements, the Debtors' employees are jointly liable for the Debtors' obligation and incur significant personal obligations for the Debtors' benefit.  If the Debtors do not reimburse their employees for such expenses, Debtors' employees' personal financial health, including, among other things, the employee's personal credit ratings, may be threatened or harmed.  To request employees to continue to serve the Debtors with loyalty and dedication while imposing potentially harsh financial burdens upon the same employees by refusing to honor their prepetition obligations, the Debtors are in an untenable position.

64.     As such, the Debtors submit the relief requested in the Debtors' wage motion is in the best interest of the Debtors and their estates and absent the relief requested therein, the Debtors shall suffer immediate and irreparable harm as contemplated by Bankruptcy Rule 6003.

<u>Customer Practices</u>

65.     The cost pass-through customer practices are essential to the Debtors' business operations and the maintenance of goodwill with their customers.  Such practices enable the Debtors to both participate in profitable engagements they might not otherwise be able to secure and have access to certain support vendors, contractors, and subcontractors which amplify and enhance the Debtors' capabilities.

66.     The Customer Practices are typical of the manner in which consulting firms operate in the U.S. and around the globe.  Customers, in addition to vendors, contractors, and subcontractors, have come to expect such cost pass-through arrangements to be in place in their engagements with consulting firms, such as the Debtors.  In effect, many of the Debtors' governmental customers will not pay the Debtors for projects where third party support vendors

or staff are used until they are presented with invoices evidencing the Debtors' payments to third parties involved in a particular project. These customers, in effect, require a cost pass-through mechanism for their engagements, and not having such a practice would preclude the Debtors from participating in profitable engagements with these characteristics.

67.    Continuance of the Customer Practices will also reassure vendors and contractors providing goods and services in connection with the Debtors' projects of future performance, and secure their continued support to the Debtors' operations. Many such vendors and contractors, who greatly enhance the Debtors' delivery of services, might be reluctant to provide their goods or services if forced to wait until BearingPoint is ultimately reimbursed by the specific customer at-issue, and no longer be willing to lend the Debtors their much-needed support. The Debtors cannot afford to risk the successful completion of their engagements or the diminished ability to deliver services to their clients going forward that would result from their vendor and contractor base suffering significant attrition.

68.    Accordingly, I believe the relief requested herein is necessary to avoid immediate and irreparable harm that would result from the failure to authorize the Debtors to continue the cost pass-through programs customary in the industry.

## V.

### Information Required by Local Bankruptcy Rule 1007-2

69.    Local Bankruptcy Rule 1007-2 requires certain information related to the Debtors, which is set forth below.

70.    Pursuant to Local Bankruptcy Rule 1007-2(a)(3), Schedule 1 hereto lists the following information with respect to each committee organized prior to the order for relief in the chapter 11 cases: the names and addresses of the members of, and the attorneys for each

committee, a brief description of the circumstances surrounding the formation of the committee, and the date of its formation.

71.    Pursuant to Local Bankruptcy Rule 1007-2(a)(4), Schedule 2 hereto lists the following information with respect to each of the holder's 30 largest unsecured claims (on a consolidated basis) against the Debtors, excluding claims of insiders: the creditor's name, address (including the number, street, apartment or suite number, and zip code, if not included in the post office address), and telephone number; the name(s) of persons(s) familiar with the Debtors' accounts, the amount of the claim, and an indication of whether the claim is contingent, unliquidated, disputed or partially secured.

72.    Pursuant to Local Bankruptcy Rule 1007-2(a)(5), Schedule 3 hereto provides the following information with respect to each of the holders of the five largest secured claims (on a consolidated basis) against the Debtors: the creditor's name, address (including the number, street, apartment or suite number, and zip code, if not included in the post office address), and telephone number; the amount of the claim; a brief description of the collateral securing the claim; an estimate of the value of the collateral and whether the claim or lien is disputed.

73.    Pursuant to Local Bankruptcy Rule 1007-2(a)(6), Schedule 4 hereto provides a summary of the Debtors' assets and liabilities.

74.    Pursuant to Local Bankruptcy Rule 1007-2(a)(7), Schedule 5 hereto provides the following information: the number and classes of shares of stock, debentures, and other securities of the Debtors that are publicly held and the number of holders thereof; the number and classes of shares of stock, debentures, and other securities of the Debtors that are held by the Debtors' directors and officers and the amounts so held.

75.     Pursuant to Local Bankruptcy Rule 1007-2(a)(8), Schedule 6 hereto provides a list of all of the Debtors' property in the possession or custody of any custodian, public officer, mortgagee, pledgee, assignee of rents, secured creditor, or agent for any such entity, giving the name, address, and telephone number of such entity and the location of the court in which any proceeding relating thereto is pending.

76.     Pursuant to Local Bankruptcy Rule 1007-2(a)(9), Schedule 7 hereto provides a list of the premises owned, leased or held under other arrangement from which the Debtors operate their businesses.

77.     Pursuant to Local Bankruptcy Rule 1007-2(a)(10), Schedule 8 hereto provides the location of the Debtors' substantial assets, the location of their books and records, and the nature, location, and value of any assets held by the Debtors outside the territorial limits of the United States.

78.     Pursuant to Local Bankruptcy Rule 1007-2(a)(11), Schedule 9 hereto provides a list of the nature and present status of each action or proceeding, pending or threatened, against the Debtors or their property.

79.     Pursuant to Local Bankruptcy Rule 1007-2(a)(12), Schedule 10 hereto provides a list of the names of the individuals who comprise the Debtors' existing senior management, their tenure with the Debtors, and a brief summary of their relevant responsibilities and experience.

80.     Pursuant to Local Bankruptcy Rule 1007-2(b)(1)-(2)(A), Schedule 11 hereto provides the estimated amount of weekly payroll to the Debtors' employees (not including officers, directors, and stockholders in their capacities as such) and the estimated amount to be

paid to officers, stockholders, directors, and financial and business consultants retained by the Debtors for the thirty (30) day period following the filing of the Debtors' chapter 11 petitions.

81.     Pursuant to Local Bankruptcy Rule 1007-2(b)(3), Schedule 12 hereto provides, for the thirty (30) day period following the filing of the chapter 11 petitions, a list of estimated cash receipts and disbursements, net cash gain or loss, and obligations and receivables expected to accrue that remain unpaid, other than professional fees.

82.     The foregoing is true and correct to the best of my knowledge, information, and belief.

I respectfully request that all of relief requested in the First Day Pleadings be granted and such other and further relief as may be just.

Dated:  February 18, 2009

BEARINGPOINT, INC., et al.

By:   /s/ John DeGroote
        John DeGroote
        Executive Vice President and
          Chief Legal Officer

## Schedule 1

### List of Committees

Pursuant to Local Rule 1007-2(a)(3), the following is a list of the names and addresses of the members of, and attorneys for, any committee organized prior to the order for relief in the chapter 11 case, and a brief description of the circumstances surrounding the formation of the committee and the date of formation.

| Committee | Members | Attorneys | Description | Date of Formation |
|---|---|---|---|---|
| Steering Committee | Certain of the Secured Lenders | Paul, Hastings, Janofsky & Walker LLP<br><br>Park Avenue Tower 75 E. 55th Street New York, NY 10002 | Committee was formed to facilitate the negotiation of a debt restructuring. | December 1, 2008 |
| Series C Noteholders | Certain of the Series C Noteholders | Bracewell & Guilliani LLP<br><br>1177 Avenue of the Americas 19th Floor New York, NY 10036 | Committee was formed to facilitate the negotiation of a debt restructuring. | November 17, 2008 |
| Junior Subordinated Noteholders | Certain of the Junior Subordinated Noteholders | Ropes & Gray LLP<br><br>1211 Avenue of the Americas New York, NY 10036 | Committee was formed to facilitate the negotiation of a debt restructuring. | November 21, 2008 |

## Schedule 2

### Consolidated List of 30 Largest Unsecured Claims (Excluding Insiders)[1]

Pursuant to Local Rule 1007-2(a)(4), the following is a list of creditors holding, as of February 16, 2009, the 30 largest noncontingent unsecured claims against BearingPoint, Inc. and its debtor affiliates, as debtors and debtors in possession on a consolidated basis.

Except as set forth above, the list of creditors has been prepared in accordance with Rule 1007(d) of the Federal Rules of Bankruptcy Procedure.  This list does not include (i) persons who come within the definition of "insider" set forth in section 101(31) of chapter 11 of title 11 of the United States Code or (ii) secured creditors unless the value of the collateral is such that the unsecured deficiency places the creditor among the holders of the 30 largest unsecured claims.

| | Name of Creditor | Complete Mailing Address of Creditor | Person(s) Familiar With Debtors' Account | Amount of Claim | Unliquidated, Disputed, or Partially Secured |
|---|---|---|---|---|---|
| 1. | The Bank of New York (Indenture Trustee under the Series A Notes) | 101 Barclay Street, 8W New York, NY 10286 | Attn: Corporation Trust Division - Corporate Finance Unit | $251,415,258.00 | |
| 2. | The Bank of New York (Indenture Trustee under the Series C Notes) | 101 Barclay Street, 8W New York, NY 10286 | Attn: Corporation Trust Division - Corporate Finance Unit | $203,398,611.00 | |
| 3. | The Bank of New York (Indenture Trustee under the Series B Notes) | 101 Barclay Street, 8W New York, NY 10286 | Attn: Corporation Trust Division - Corporate Finance Unit | $201,393,317.00 | |
| 4. | Friedman, Fleischer & Lowe Capital Partners II, L.P. (Purchaser under the FFL Notes) | One Maritime Plaza Suite 1000 San Francisco, CA 94111 | Attn: Spencer C. Fleischer 415-402-2100 | $37,886,126.00 | |
| 5. | AT&T Corp. | One AT&T Way Benminster, NJ 07921 | Attn: | $13,810,852.00 | |

a. _____

[1] The information herein is not and shall not constitute an admission of liability by, nor is it binding on, the Debtors. All claims may be subject to customary offsets, rebates, discounts, reconciliations, credits, and adjustments, which are not reflected in this list.

| | Name of Creditor | Complete Mailing Address of Creditor | Person(s) Familiar With Debtors' Account | Amount of Claim | Unliquidated, Disputed, or Partially Secured |
|---|---|---|---|---|---|
| 6. | PGA Tour Inc. | 112 PGA Tour Boulevard Ponte Verdra Beach, FL 32092 | Attn: | $3,543,938.00 | |
| 7. | UBS AG, Stamford Branch | 677 Washington Boulevard Stamford, CT 06901 | Attn: Christopher Gomes 203-719-4176 | $3,500,000.00 | |
| 8. | KPMG LLP – USA | Three Chestnut Ridge Road Montvale, NJ 07645 | Attn: | $1,873,698.00 | |
| 9. | KPMG LLP – USA | Three Chestnut Ridge Road Montvale, NJ 07645 | Attn: Alicia Widelski 201-307-7256 | $1,391,185.77 | |
| 10. | Sun Microsystems Inc. | Bank of America Lockbox Service 12120 Collection Center Dr. Chicago, IL 60693 | Attn: | $1,964,000.04 | |
| 11. | Judy Ethell | 823 Fairfield Lake Drive Chesterfield, MO 63017 | Attn: | $1,740,000.00 | |
| 12. | FFL Parallel Fund II, L.P. | One Maritime Plaza Suite 1000 San Francisco, CA 94111 | Attn: Spencer C. Fleischer 415-402-2100 | $1,418,122.00 | |
| 13. | Deltek Systems | P.O. Box 79581 Baltimore, MD 21279 | Attn: Sherri Perfater 515-783-4156 | $1,025,960.65 | |
| 14. | GW Consulting Inc. | 5870 Trinity Parkway Unit 300 Centreville, VA 20120 | Attn: Isabel Vasquez 703-592-1413 | $970,289.75 | |
| 15. | The West River Group GS | P.O. Box 376 25610 Chance Farm Court Royal Oak, MD 21662 | Attn: Taylor Rose 202-320-1785 | $937,341.74 | |
| 16. | Equant Inc. | P.O. Box 7247-7134 Philadelphia, PA 19170 | Attn: Erwann Revolt +353-1-402-5959 | $867,338.73 | |
| 17. | Hewlett Packard | P.O. Box 101149 Atlanta, GA 30392 | Attn: Mary Ellen Strei 718-788-0101 | $789,825.85 | |
| 18. | Morgan Business Consulting LLC | 21377 Scara Place Ashburn, VA 20148 | Attn: Cathy Goin 866-455-2424 x3 | $778,915.76 | |
| 19. | FFL Executive Partners II, L.P. | One Maritime Plaza Suite 1000 San Francisco, CA 94111 | Attn: Spencer C. Fleischer 415-402-2100 | $726,881.00 | |
| 20. | Cisco Systems Capital Corporation | 170 West Tasman Drive San Jose, CA 95134 | Attn: | $675,679.00 | |
| 21. | Siemens IT Solutions and Services Inc. | Dept CH 14235 Palatine, IL 60055 | Attn: Denna Austin 513-336-1246 | $644,517.53 | |
| 22. | Raya USA LLC | 1660 International Drive Suite 400 McLean, VA 22102 | Attn: | $639,810.73 | |

| | Name of Creditor | Complete Mailing Address of Creditor | Person(s) Familiar With Debtors' Account | Amount of Claim | Unliquidated, Disputed, or Partially Secured |
|---|---|---|---|---|---|
| 23. | Federal Management Systems Inc. | 462 K Street NW Washington, DC 20001 | Attn: Joy Creavalle 202-842-3003 x407 | $588,652.23 | |
| 24. | Oracle USA Inc. | Dept CH 10699 Palatine, IL 60055 | Attn: Sriram Ravichandran 888-803-7414 | $548,270.91 | |
| 25. | IBM Credit LLC | North Castle Drive Armonk, NY 10504 | Attn: | $527,039.00 | |
| 26. | TEKsystems Inc. | P.O. Box 198568 Atlanta, GA 30384 | Attn: Kim Lacy 410-540-7234 | $520,892.26 | |
| 27. | GPI Plaza, LP | 5601 Granite Parkway Suite 800 Plano, TX 75024 | Attn: | $412,980.00 | |
| 28. | World Learning Inc. | 1990 M Street NW Washington, DC 20036 | Attn: | $378,481.94 | |
| 29. | Square One Armoring Services Company | 12370 SW 130th Street Miami, FL 33186 | Attn: | $320,020.00 | |
| 30. | Parsons Commercial Technology Group Inc. | 4701 Hedgemore Drive Charlotte, NC 28209 | Attn: Zaznin Jamal 905-944-8877 x2315 | $308,815.57 | |

**Schedule 3**

**Consolidated List of Creditors Holding 10 Largest Secured Claims[1]**

Pursuant to Local Rule 1007-2(a)(5), the following is a list of creditors holding, as of February 13, 1009, the 10 largest secured claims against BearingPoint, Inc. and its debtor affiliates, as debtors and debtors in possession on a consolidated basis.[2]

| Creditor | Contact | Mailing Address & Phone Number | Amount of Claim | Type of Collateral | Value of Collateral | Disputed |
|---|---|---|---|---|---|---|
| Wells Fargo Bank, N.A. | Attention: Michael Pinzon | 45 Broadway, 17th Floor New York, NY 10006 | $294,750,000[3] | Substantially, all of the Debtors' assets | Unknown | No |

a. _____

[1] The information herein is not and shall not constitute an admission of liability by, nor is it binding on, the Debtors.

[2] The Debtors do not know of ten holders of secured claims and are therefore listing all known holders of secured claims.

[3] This number does not include $84,388,501 in outstanding letters of credit, which are a contingent claim against the Debtors.

**Schedule 4**

**Condensed Consolidated Balance Sheet[1] (Preliminary, unaudited)
as of December 31, 2008 and December 31,2007**
(dollars in millions)

Pursuant to Local Rule 1007(a)(6), the following is a consolidated balance sheet, which summarizes the Debtors' assets and liabilities on a consolidated basis as of December 31, 2008.

a.

---

[1] This condensed consolidated balance sheet includes subsidiaries controlled by the Debtors and entities for which the Debtors are a primary beneficiary.

| | December 31, 2008[2] | December 31, 2007 |
|---|---|---|
| **Assets** | preliminary and unaudited | audited |
| **Current Assets** | | |
| Cash and cash equivalents | 349,663,651 | 467,320,668 |
| Restricted Cash | 3,467,977 | 364,658 |
| Accounts Receivable | 293,828,060 | 356,178,291 |
| Unbilled revenue | 238,147,134 | 319,131,715 |
| Income tax receivable | 10,381,107 | 8,868,703 |
| Deferred income taxes | 11,005,741 | 11,520,811 |
| Prepaid expenses | 45,187,886 | 37,133,001 |
| Other current assets | 22,760,614 | 38,122,776 |
| Total current assets | 974,442,170 | 1,238,640,623 |
| Property and equipment net | 111,437,953 | 113,770,608 |
| Goodwill | 479,567,310 | 494,656,441 |
| Deferred income taxes, less current portion | 18,883,461 | 25,178,678 |
| Other assets | 78,579,140 | 109,157,237 |
| **Total Assets** | **$1,662,910,034** | **$1,981,403,587** |
| **Liabilities And Stockholder Equity** | | |
| **Current liabilities** | | |
| Current portion of notes payable | 203,997,385 | 3,700,000 |
| Accounts Payable | 152,924,671 | 215,999,441 |
| Accrued payroll and employee benefits | 308,099,105 | 368,207,995 |
| Deferred revenue | 77,789,589 | 115,961,231 |
| Income tax payable | 40,853,837 | 58,304,231 |
| Current portion of accrued lease and facilities charge | 14,956,416 | 17,617,893 |
| Deferred income taxes | 13,541,233 | 15,022,025 |
| Legal liabilities | 6,590,843 | 8,716,229 |
| Other current liabilities | 79,387,874 | 108,362,997 |
| Total current liabilities | 898,140,953 | 911,892,041 |
| Notes payable, less current portion | 772,918,828 | 970,942,664 |
| Accrued employee benefits | 124,335,332 | 118,234,856 |
| Accrued lease and facilities charge, less current portion | 25,225,546 | 48,065,568 |
| Deferred income taxes, less current portion | 11,975,420 | 9,581,317 |
| Income tax reserve | 170,042,198 | |
| Other Liabilities | 151,355,554 | 391,976,383 |
| **Total Liabilities** | **2,153,993,830** | **2,450,692,829** |
| **Stockholders equity** | | |
| Common stock | 2,244,287 | 2,180,024 |
| Additional paid-in-capital | 1,476,611,638 | 1,438,374,753 |
| Accumulated deficit | -2,245,300,904 | -2,180,578,001 |
| Accumulated other comprehensive income | 313,637,459 | 308,857,392 |
| Treasury stock, at cost | -38,276,275 | -38,123,411 |
| Deferred Compensation | 0 | 0 |
| **Total stockholders' equity (deficit)** | **-491,083,795** | **-469,289,242** |
| **Total liabilities and stockholders' equity (deficit)** | **$1,662,910,034** | **$1,981,403,587** |

a.  ―――――――――――

[2] The preliminary financial information for the fiscal year ended December 31, 2008: (i) is preliminary and unaudited, (ii) is based on estimates and assumptions made by management and information collected from various company records; and (iii) is subject to ongoing review and modification by senior management of BearingPoint. Actual results for the fiscal year presented and for various operational metrics will vary from the preliminary information, estimates and projections provided to you, and such variations may be material.

## Schedule 5

### Publicly Held Securities

Pursuant to Local Rule 1007-2(a)(7), the following lists the number and classes of shares of stock, debentures, or other securities of BearingPoint, Inc. that are publicly held and the number of holders thereof, listing separately those held by each of the Debtors' officers and directors and the amounts so held.  Aside from BearingPoint, Inc., no other Debtor has issued stock, debentures, or other public securities.

### Common Stock

| Type of Security | Number of Shares | Approximate Number of Record Holders | As of |
|---|---|---|---|
| Common stock $.45 par value, as of February 13, 2009. | Approximately 4.41 million shares outstanding[1] | 178 | February 6, 2009 |

### Securities Held By the Debtors' Non-Employee Directors

| Name of Non-Employee Director | Number of Shares Owned | | | As of |
| | Shares Beneficially owned | Deferred Share Units | Stock Options | |
|---|---|---|---|---|
| D. C. Allred | 1,180 | 0 | 300 | January 10, 2009 |
| B. J. Bernard | 940 | 0 | 300 | January 10, 2009 |
| Frederic Brace | 300 | 300 | 0 | January 10, 2009 |
| J. S. Kanin-Lovers | 460 | 0 | 300 | January 10, 2009 |
| W. H. Kemna | 1,180 | 0 | 300 | January 10, 2009 |
| A. L. Lord | 1,100 | 0 | 300 | January 10, 2009 |
| R. C. McGeary | 13,688 | 0 | 9,458 | January 10, 2009 |
| E. R. Munson | 460 | 0 | 300 | January 10, 2009 |

a.    ―――――――――――――

[1] On December 10, 2008 Bearing Point effected a one-for-fifty reverse stock split.  Prior to the stock split, there were 220,688,470 shares outstanding.

| Name of Non-Employee Director | Number of Shares Owned | | | As of |
| --- | --- | --- | --- | --- |
| | Shares Beneficially owned | Deferred Share Units | Stock Options | |
| J. T. Stange | 1,200 | 0 | 400 | January 10, 2009 |

**Securities Held By the Debtors' Executive Officers**

| Name of Executive Officer | Number of Shares Owned | | | As of |
| --- | --- | --- | --- | --- |
| | Shares Beneficially owned | Deferred Share Units | Stock Options | |
| F. E. Harbach | 45,293 | 0 | 0 | January 10, 2009 |
| Kenneth Hiltz | 0 | 0 | 0 | January 28, 2009 |
| David Hunter | 35,478 | 0 | 5,778 | January 10, 2009 |

**Unsecured Notes**

| Type of Security | Approximate Number of Record Holders | As of |
|---|---|---|
| 2.50% Series A Convertible Subordinated Debentures due 2024 | 23 | September 30, 2008 |
| 2.75% Series B Convertible Subordinated Debentures due 2024 | 16 | September 30, 2008 |
| 5.00% Convertible Senior Subordinated Debentures due 2025 | 19 | September 30, 2008 |
| 0.50% Convertible Senior Subordinated Debentures due 2025 | 3 | September 30, 2008 |

**Schedule 6**

**Debtors' Property Not in the Possession of the Debtors**

   Pursuant to Local Rule 1007-2(a)(8), the following lists the all the Debtors' property in possession of any custodian, public officer, mortgagee, pledge, assignee of rents, or secured creditor, or agent of any such entity, giving the name, address, and telephone number of each such entity and the court in which any proceeding relating thereto is pending.

   The Debtors do not have any property in possession of any custodian, public officer, mortgagee, pledge, assignee of rents, or secured creditor, or agent of any such entity..

## Schedule 7

### Debtors' Owned and Leased Premises

Pursuant to Local Rule 1007-2(a)(9), the following lists the location of the premises owned, leased, or held under other arrangements from which the Debtors operate their business.

### Owned Property

The Debtors do not own any real property.

### Leased Property

| Leased Property Debtor | Lease Address | City | State | Zip Code | Country |
|---|---|---|---|---|---|
| BearingPoint, Inc. | ONE NORTH CENTRAL AVENUE | PHOENIX | AZ | 85004 | USA |
| BearingPoint, LLC | 1901 AVENUE OF THE STARS | LOS ANGELES | CA | 90067 | USA |
| BearingPoint, LLC | 500 EAST MIDDLEFIELD ROAD | MOUNTAIN VIEW | CA | 94043 | USA |
| BearingPoint, Inc. | 750 B STREET | SAN DIEGO | CA | 92101 | USA |
| BearingPoint, Inc. | 7676 HAZARD CENTER DRIVE | SAN DIEGO | CA | 92108 | USA |
| BearingPoint, LLC | 600 ANTON BOULEVARD | COSTA MESA | CA | 92626 | USA |
| BearingPoint, LLC | 355 SOUTH GRAND AVENUE | LOS ANGELES | CA | 90071 | USA |
| BearingPoint, Inc. | 1700 SEAPORT BOULEVARD PACIFIC SHORES CENTER BUILDING 5 | REDWOOD CITY | CA | 94063 | USA |
| BearingPoint, Inc. | 77 CAMPUS COMMON ROAD SUITE 200 | SACRAMENTO | CA | 95825 | USA |
| BearingPoint, Inc. | 6620-40 VIA DEL ORO | SAN JOSE | CA | 95119 | USA |
| BearingPoint, Inc. | 6399 FIDDLERS GREEN | ENGLEWOOD | CO | 80111 | USA |
| BearingPoint, Inc. | 6399 SOUTH FIDDLERS GREEN CIRCLE | ENGLEWOOD | CO | 80111 | USA |
| BearingPoint, Inc. | 6501 SOUTH FIDDLERS GREEN CIRCLE | ENGLEWOOD | CO | 80111 | USA |
| BearingPoint, Inc. | 1700 EAST PUTNAM AVENUE | GREENWICH | CT | 06870 | USA |

| Leased Property Debtor | Lease Address | City | State | Zip Code | Country |
|---|---|---|---|---|---|
| BearingPoint, LLC | 3001 SUMMER STREET | STAMFORD | CT | 06905 | USA |
| BearingPoint, Inc. | 90 STATE STREET | HARTFORD | CT | 06103 | USA |
| BearingPoint, LLC | ONE FINANCIAL PLAZA | HARTFORD | CT | 06103 | USA |
| BearingPoint, LLC | DC 2001 M STREET N.W. | DISTRICT OF COLUMBIA | DC | 20002 | USA |
| BearingPoint, Inc. | DC 80 M STREET | DISTRICT OF COLUMBIA | DC | 20003 | USA |
| BearingPoint, Inc. | DC 80 M STREET | DISTRICT OF COLUMBIA | DC | 20003 | USA |
| BEARINGPOINT | 201 SOUTH BISCAYNE BOULEVARD 28th FLOOR | MIAMI | FL | 33131 | USA |
| BearingPoint, LLC | 2908 THOMAS DRIVE | PANAMA CITY | FL | 32408 | USA |
| BearingPoint, Inc. | 2114 AIRPORT BOULEVARD | PENSACOLA | FL | 32504 | USA |
| BearingPoint, Inc. | 3800 ESPLANADE WAY | TALLAHASSEE | FL | 32311 | USA |
| BearingPoint, LLC | 115 PERIMETER CENTER | ATLANTA | GA | 30346 | USA |
| BearingPoint, Inc. | 270 PEACHTREE STREET | ATLANTA | GA | 30303 | USA |
| BearingPoint, LLC | 303 PEACHTREE CENTER | ATLANTA | GA | 30303 | USA |
| BearingPoint, LLC | 303 EAST WACKER DRIVE | CHICAGO | IL | 60601 | USA |
| BearingPoint, Inc. | 8725 WEST HIGGINS ROAD | CHICAGO | IL | 60631 | USA |
| BearingPoint, Inc. | 715 SEIBERT ROAD | OFALLON | IL | 62269 | USA |
| BearingPoint, Inc. | 8888 KEYSTONE CROSSING SUITE 1300 | INDIANAPOLIS | IN | 46240 | USA |
| BearingPoint, Inc. | 1250 POYDRAS STREET SUITE 950 | NEW ORLEANS | LA | 70112 | USA |
| BearingPoint, Inc. | 99 HIGH STREET | BOSTON | MA | 02110 | USA |
| BearingPoint, Inc. | TWO HAMPSHIRE STREET | FOXBORO | MA | 02035 | USA |

| Leased Property Debtor | Lease Address | City | State | Zip Code | Country |
|---|---|---|---|---|---|
| BearingPoint, Inc. | 135 NATIONAL BUSINESS PARKWAY | ANNAPOLIS JUNCTION | MD | 20701 | USA |
| BearingPoint, LLC | 8100 PROFESSIONAL PLACE | HYATTSVILLE | MD | 20785 | USA |
| BearingPoint, Inc. | 22454 THREE NOTCH ROAD | LEXINGTON PARK | MD | 20653 | USA |
| BearingPoint, Inc. | 1050 WILSHIRE BOULEVARD | TROY | MI | 48084 | USA |
| BearingPoint, LLC | 4200 WELLS FARGO CENTER, 90 SOUTH 7TH STREET | MINNEAPOLIS | MN | 55402 | USA |
| BearingPoint, Inc. | 30 EAST SEVENTH STREET WELLS FARGO PLACE | ST. PAUL | MN | 55101 | USA |
| BearingPoint, Inc. | 5912 HIGHWAY 49 | HATTIESBURG | MS | 39401 | USA |
| BearingPoint, Inc. | 201 SOUTH COLLLEGE STREET SUITE 1500 | CHARLOTTE | NC | 28244 | USA |
| BearingPoint, Inc. | 150 FAYETTEVILLE STREET MALL | RALEIGH | NC | 27626 | USA |
| BearingPoint, Inc. | 20 TRAFALGAR SQUARE | NASHUA | NH | 03063 | USA |
| BearingPoint, Inc. | 106 ALLEN ROAD BASKING RIDGE | LIBERTY CORNER | NJ | 07920 | USA |
| BearingPoint, Inc. | 25 INDEPENDENCE BOULEVARD | WARREN | NJ | 07059 | USA |
| BearingPoint, LLC | 54 STATE STREET | ALBANY | NY | 12207 | USA |
| BearingPoint, LLC | 1305 WALT WHITMAN ROAD | MELVILLE | NY | 11747 | USA |
| BearingPoint, Inc. | 3 WORLD FINANCIAL CENTER 200 VESEY STREET | NEW YORK | NY | 10285 | USA |
| BearingPoint, LLC | 757 THIRD AVENUE | NEW YORK | NY | 10017 | USA |
| BearingPoint, LLC | 600 SUPERIOR AVENUE EAST SUITE 1300 | CLEVELAND | OH | 44114 | USA |
| BearingPoint, LLC | TWO NATIONWIDE PLAZA | COLUMBUS | OH | 43215 | USA |
| BearingPoint, LLC | 1375 EAST NINTH STREET | CLEVELAND | OH | 44114 | USA |
| BearingPoint, LLC | 3139 RESEARCH BOULEVARD | DAYTON | OH | 45420 | USA |

| Leased Property Debtor | Lease Address | City | State | Zip Code | Country |
|---|---|---|---|---|---|
| BearingPoint, Inc. | 101 PARK AVENUE | OKLAHOMA CITY | OK | 73102 | USA |
| BearingPoint, Inc. | 100 MATSONFORD ROAD (RADNOR STORAGE) | RADNOR | PA | 19087 | USA |
| BearingPoint, Inc. | 30 NORTH THIRD STREET | HARRISBURG | PA | 17101 | USA |
| BearingPoint, Inc. | 100 MATSONFORD ROAD (RADNOR 1) | RADNOR | PA | 19087 | USA |
| BearingPoint, LLC | 100 MATSONFORD ROAD (RADNOR 2) | RADNOR | PA | 19087 | USA |
| BearingPoint, Inc. | 1201 MAIN STREET | COLUMBIA | SC | 29201 | USA |
| BearingPoint, Inc. | 301 CONGRESS AVENUE | AUSTIN | TX | 78701 | USA |
| BearingPoint, Inc. | 1600 SMITH STREET CONTINENTAL CENTER I | HOUSTON | TX | 77002 | USA |
| BearingPoint, Inc. | 7301 NORTH STATE HIGHWAY 161 | IRVING | TX | 75039 | USA |
| BearingPoint, Inc. | 14100 SAN PEDRO PACIFIC PLAZA, SUITE 700 | SAN ANTONIO | TX | 78232 | USA |
| BearingPoint, Inc. | 15000 CONFERENCE CENTER DRIVE | CHANTILLY | VA | 20151 | USA |
| BearingPoint, Inc. | 5109 LEESBURG PIKE SIX SKYLINE PLACE | FALLS CHURCH | VA | 22041 | USA |
| BearingPoint, Inc. | 4860 COX ROAD SUITE 200 | GLEN ALLEN | VA | 23060 | USA |
| BearingPoint, Inc. | 17010 DAHLGREN ROAD | KING GEORGE | VA | 22485 | USA |
| BearingPoint, Inc. | 295 BENDIX ROAD | VIRGINIA BEACH | VA | 23452 | USA |
| BearingPoint, Inc. | 17168 DAHLGREN ROAD | KING GEORGE | VA | 22485 | USA |
| BearingPoint, Inc. | 1725 DUKE STREET KIND STREET STATION | ALEXANDRIA | VA | 22314 | USA |
| BearingPoint, Inc. | 6354 WALKER LANE | ALEXANDRIA | VA | 22310 | USA |
| BearingPoint, LLC | 1660 INTERNATIONAL DRIVE, | MCLEAN | VA | 22102 | USA |
| BearingPoint, Inc. | 1676 INTERNATIONAL DRIVE | MCLEAN | VA | 22102 | USA |

| Leased Property Debtor | Lease Address | City | State | Zip Code | Country |
|---|---|---|---|---|---|
| BearingPoint, LLC | 8200 GREENSBORO ROAD | MCLEAN | VA | 22102 | USA |
| BearingPoint, Inc. | 8260 GREENSBORO DRIVE | MCLEAN | VA | 22102 | USA |
| BearingPoint, Inc. | 6564 LOISDALE COURT | SPRINGFIELD | VA | 22150 | USA |
| BearingPoint, Inc. | 6564 LOISDALE COURT (4TH FLOOR) | SPRINGFIELD | VA | 22150 | USA |
| BearingPoint, Inc. | 15885 NE 28TH | BELLEVUE | WA | 98008 | USA |

## Schedule 8

## Location of Substantial Assets, Books and Records, and Non-U.S. Assets

Pursuant to Local Rule 1007-2(a)(9), the following lists the location of the premises owned, leased, or held under other arrangements from which the Debtors operate their business.

### Location of Substantial Assets

The Debtors have assets worldwide, with substantial assets in Arizona, California, Connecticut, Florida, Georgia, Illinois, Louisiana, Maryland, Massachusetts, Michigan, Minnesota, Mississippi, New Hampshire, New Jersey, New York, North Carolina, Ohio, Oklahoma, Pennsylvania, South Carolina, Texas, Virginia, Washington, D.C., and Washington.

### Location of Books and Records

**Chicago**
8725 West Higgins Road
Chicago, IL 60631 USA

**Foxborough**
2 Hampshire Street
Foxborough, MA 02035 USA

**Atlanta/Perimeter**
115 Perimeter Center Place, Suite 380
Atlanta, GA 30346 USA

**Atlanta/Shared Services**
270 Peachtree Street NW
Atlanta, GA 30303 USA

**Dallas – Las Colinas**
7301 North State Highway 161, Suite 270
Irving, TX 75039 USA

**Tysons Corner**
1660 International Drive, 1st Floor
McLean, VA 22102 USA

### Location of Assets Not Located in the United States

The Debtors have significant assets worldwide, including significant assets held outside the United States through direct and indirect subsidiaries of BearingPoint, Inc.

## Schedule 9

## Pending Litigation

Pursuant to Local Rule 1007-2(a)(11), the following lists the nature and present status of each action or proceeding, pending or threatened, against the debtor or its property where a judgment against the debtor or a seizure of its property may be imminent.

| Action or Proceeding | Nature of the Action | Status of the Action |
|---|---|---|
| The United States (United States Agency for International Development) Docket: ASBCA No. 55555 | Appeal of decision disallowing costs incurred pursuant to contract for consulting services. Costs incurred for "danger pay" and "post differential pay." | Pending Decision in Appeal |
| The United States (United States Agency for International Development) Docket: ASBCA No. 55354 | Appeal of decision disallowing costs incurred pursuant to contract for consulting services. Costs incurred for security services for employees in Iraq. | Pending Decision in Appeal |
| Mary J. Craig | Wrongful termination class action | Motion to dismiss granted; notice of appeal filed |
| Larry Engle | Wrongful termination | Summary judgment granted in favor of Bearing Point; pending potential appeal |
| Global Straight Through Processing (GSTP) Bankruptcy Estate | Claims by receiver in foreign bankruptcy proceeding. | Pending Litigation |
| IMG Worldwide, Inc. | Breach of contract | Pending Litigation |
| Matrix Capital Management Funds | Securities class action | Pending Litigation |
| Charles Klausen | Wrongful termination | Pending Litigation |
| The Loran Group | Securities litigation | Pending Appeal |

| Action or Proceeding | Nature of the Action | Status of the Action |
|---|---|---|
| Thomas McKelvey | Breach of contract | Pending Arbitration |
| Kathleen Pickard | Discrimination | Pending Litigation |
| Harry L. You | Claim for amounts owed under employment agreement. | Pending Arbitration |
| Anthony DeSomma | Wrongful termination | Threatened Litigation |
| Karla Englund | Wrongful termination | Threatened Litigation |
| Peter Knoll | Wrongful termination | Demand for Arbitration Filed |
| Raed Tawil | Discrimination | Pending Litigation |
| Tennessee Department of Revenue | Tax claims | Notice of claim received; no formal procedures initiated |

**Schedule 10**

**Senior Management**

Pursuant to Local Rule 1007-2(a)(12), the following provides the names of the individuals who comprise the Debtors' existing senior management, a description of their tenure, and a brief summary of their relevant experience.

**BearingPoint, Inc.'s Senior Management**

| Name / Position | Experience / Responsibilities |
|---|---|
| **F. Edwin Harbach**<br>*Director and Chief Executive Officer* | F. Edwin Harbach has been Chief Executive Officer of BearingPoint, Inc. since January 8, 2007 and also its President since December 2007. Mr. Harbach also served as Member of the Office of the Chief Executive Officer from January 8, 2007 to December 2007. He was a Managing Partner and Member of the leadership team of Accenture. During his tenure at Accenture, Mr. Harbach served as Chief Information Officer, Managing Partner for Japan and Managing Partner of Client Satisfaction and Quality. He has more than 28 years of experience in the management and technology consulting industry. He has been a Director of BearingPoint, Inc. since December 2007. |
| **David Hunter**<br>*Chief Operating Officer* | Mr. Hunter has been Chief Operating Officer since March 2008. Mr. Hunter has more than 30 years of experience in the management and technology consulting industry. In addition, Mr. Hunter leads BearingPoint's Asia Pacific practice. Prior to joining BearingPoint, Mr. Hunter devoted much of his career to running and expanding Accenture's Asia Pacific business, as well as overseeing the Company's Government practice. At Accenture, he held a variety of senior positions including nine years as the chief executive officer of the Government Global Operating Group and the Asia Pacific region. He led the establishment of multiple government practices in the largest countries in the Asia Pacific region. Mr. Hunter has extensive global experience, having lived and worked in 15 countries around the globe and he currently resides in Sydney, Australia. In addition, he served on the boards of a number of Australian public companies as a non-executive director and has extensive experience in corporate governance. |

| Name / Position | Experience / Responsibilities |
|---|---|
| **Ken Hiltz**<br>*Chief Financial Officer* | Ken Hiltz has been Chief Financial Officer since November 2008.  He has extensive experience helping companies analyze and improve operational efficiency, reduce financial leverage and develop strategies to improve cash flow. Mr. Hiltz has recently served as CFO at Foster Wheeler Ltd., a global provider of engineering services and products, and Joy Global, Inc. (formerly known as Harnischfeger Industries, Inc.), a global manufacturer of mining equipment and pulp and papermaking machines. Mr. Hiltz is a Certified Management Accountant and CPA licensed in Michigan. He holds business degrees from Xavier University and the University of Detroit and is an alumnus of the Advanced Management Program at Harvard Business School. |
| **John DeGroote**<br>*Chief Legal Officer* | Mr. DeGroote has been Chief Legal Officer since December 2008. He joined the company as its Chief Litigation Counsel in 2000 and also served in a number of management capacities, including as its General Counsel/Contracts, Litigation and Risk. Prior to joining BearingPoint Mr. DeGroote practiced with McKool Smith, P.C., a Texas-based litigation firm, where he focused on complex commercial and intellectual property disputes for such clients as Affiliated Computer Services, CenturyTel, FlashNet and Excel Telecommunications. Prior to joining McKool Smith, Mr. DeGroote managed litigation, trademarks and various employment matters for First USA, Inc, a nationwide credit card concern, and ran strategic planning for Paymentech New Hampshire, Inc., an Internet/direct marketing affiliate of First USA. Mr. DeGroote began his career as an associate at Dallas-based Jackson Walker LLP, where he handled litigation for a global client base, including companies and organizations such as Ernst & Young, CompUSA Inc., Sterling Software and NationsBank. |

## Schedule 11

### Payroll

Pursuant to Local Rule 1007-2(b)(1)-(2)(A) and (C), the following provides the estimated amount of weekly payroll to the Debtors' employees (not including officers, directors, and stockholders) and the estimated amount to be paid to officers, stockholders, directors, and financial and business consultants retained by the Debtors, for the 30-day period following the filing of the chapter 11 petitions.

| | |
|---|---|
| **Payments to Employees (Not Including Officers, Directors and Stockholders)** | $77,571,477[1] |
| **Payments to Officers, Stockholders, and Directors** | $488,846[2] |
| **Payments to Financial and Business Consultants** | $2,000,000[3] |

a. _____

[1]    Includes the estimated weekly gross payroll for employees, not including officers, directors, and stockholders.

[2]    Comprises approximately $443,846 of payroll for executive officers, and $45,000 for directors' fees.

[3]    This does not include any payments to attorneys or auditors.

## Schedule 12

**Cash Receipts and Disbursements,
Net Cash Gain or Loss, Unpaid Obligations and Receivables**

Pursuant to Local Rule 1007-2(b)(3), the following provides, for the 30-day period following the filing of the chapter 11 petition, the estimated cash receipts and disbursements, net cash gain or loss, and obligations and receivables expected to accrue that remain unpaid, other than professional fees.

| | |
|---|---|
| **Cash Receipts** | $173,227,000 |
| **Cash Disbursements** | $163,199,000 |
| **Net Cash Gain or Loss** | $10,028,000 |
| **Unpaid Obligations** | $35,000,000 |
| **Unpaid Receivables** | $299,200,000 |

**Exhibit A**

