THIS IS NOT A SOLICITATION OF ACCEPTANCE OR REJECTION OF THE PLAN. ACCEPTANCES OR REJECTIONS MAY NOT BE SOLICITED UNTIL A DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT.  THIS DISCLOSURE STATEMENT IS BEING SUBMITTED FOR APPROVAL BUT HAS NOT BEEN APPROVED BY THE BANKRUPTCY COURT.

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------x
                                              :
**In re**                                       :          **Chapter 11 Case No.**
                                              :
**BEARINGPOINT, INC., et al.,**                :          **09-_____ (____)**
                                              :
          **Debtors.**                          :          **(Joint Administration Requested)**
                                              :
-------------------------------------------------------------x


# DISCLOSURE STATEMENT FOR
## DEBTORS' JOINT PLAN OF REORGANIZATION
## UNDER CHAPTER 11 OF THE BANKRUPTCY CODE


WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
(212) 310-8000

Attorneys for Debtors
    and Debtors in Possession


Dated:  February [18], 2009


**THE DEBTORS BELIEVE THAT THE PLAN WILL MAXIMIZE THE RECOVERY FOR THEIR CREDITORS AND ALL PARTIES IN INTEREST, ENABLE THE DEBTORS TO REORGANIZE SUCCESSFULLY, AND ACCOMPLISH THE OBJECTIVES OF CHAPTER 11 AND THAT ACCEPTANCE OF THE PLAN IS IN THE BEST INTERESTS OF THE DEBTORS AND THEIR CREDITORS.  THE DEBTORS URGE CREDITORS TO VOTE TO ACCEPT THE PLAN.**

## SUMMARY OF PLAN

BearingPoint, Inc. and its affiliated debtors commenced these chapter 11 cases on February 18, 2009 to implement the terms of an agreement in principle with their secured lenders to restructure their debt. The agreement is embodied in their chapter 11 plan,[1] which they filed with their petitions. As such, these are "pre-arranged" or "pre-negotiated" chapter 11 cases. The Debtors believe that the Plan can be confirmed given the support of their secured lenders.

The Plan treats all creditors in accordance with their relative priorities under the Bankruptcy Code (as defined below). Their secured bank lenders are converting their existing term loan into an exit term loan and $50 million in preferred stock. They also continue to provide a synthetic letter of credit facility. The unsecured creditors will receive all of the common stock of the reorganized company, subject to dilution for common stock issued to management and employees under incentive plans to be implemented. General unsecured creditors, other than those that are classified as "Convenience Claims,"[2] will receive "Class 3 Common Stock," while senior noteholders will receive "Class 1 Common Stock" and junior noteholders will receive "Class 2 Common Stock." The three classes of common stock are equal except that, in recognition of the prepetition subordination agreement between the senior noteholders and the junior noteholders, the senior noteholders are entitled to receive the distributions that would otherwise be paid to the junior noteholders and certain voting rights of the junior noteholders, until the holders of the Class 2 Common Stock receive distributions equal to $240 million, which is the principal amount of the senior noteholders' prepetition claims. Importantly, the holders of common stock are not entitled to any distribution (and are subject to further restrictions on transfer) until the preferred stock is paid the full amount of its liquidating preference ($50 million plus accrued and unpaid dividends).

The Debtors believe that the Plan is the best alternative available to the Debtors at this time and maximizes value for all creditors. The Plan will enable the Debtors to stabilize their businesses and do what they do best – provide excellent client service – without the distractions that their financial situation has created. As such, the Debtors urge all creditors to vote to accept the Plan.

---

[1] The chapter 11 plan is the Debtors' Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code, dated February [18], 2009 (as may be amended, the "Plan")

[2] Convenience Claims, which are claims below $[A] or claims above $[A] that elect to reduce such claims to $[A], are entitled to receive cash equal to [_]% of their claims.

SUMMARY OF PLAN .......................................................................................... 2

I.      Introduction............................................................................................... 1

        A.      Important Dates............................................................................... 2

        B.      Voting Procedures............................................................................ 2

        C.      Confirmation Hearing ...................................................................... 3

II.     Overview of Chapter 11 and the Plan ....................................................... 4

III.    Overview of the Debtors' Operations and Chapter 11 Cases ................... 9

        A.      Corporate Structure ......................................................................... 9

        B.      Overview of the Debtors' Operations ............................................ 10

                1.      North American Operations ................................................. 10

                        a.      Public Services.......................................................... 10

                        b.      Commercial Services ................................................ 10

                        c.      Financial Services ..................................................... 11

                2.      International Operations....................................................... 11

                3.      BearingPoint's Clients ........................................................ 11

                4.      Government Contract Work.................................................. 11

                5.      Employees and Labor Matters ............................................. 11

        C.      Significant Prepetition Indebtedness............................................. 12

                1.      The Secured Credit Facility ................................................. 13

                2.      Junior Notes ........................................................................ 14

                3.      Series C Notes ..................................................................... 15

                4.      FFL Notes ............................................................................ 15

        D.      Events Leading to the Chapter 11 Cases........................................ 16

                1.      Significant Indebtedness ..................................................... 16

                2.      Goodwill Impairment........................................................... 17

                3.      NYSE Delisting ................................................................... 17

                4.      Going-Concern Qualification................................................ 17

                5.      DCAA Audit ........................................................................ 17

                6.      Inability to Timely File Financial Statements...................... 18

                7.      Customer Defection and Employee Attrition ....................... 18

        E.      Turnaround Efforts......................................................................... 18

                1.      Pre-Bankruptcy Restructuring Negotiations ....................... 18

                2.      The Restructuring Negotiations ........................................... 19

IV.  The Reorganization Cases..............................................................................20

    A.  First Day Motions .....................................................................................20

        1.  Case Administration Motions ......................................................20

        2.  Employee Motions .......................................................................20

        3.  Critical Obligations .....................................................................20

        4.  Business Operations .....................................................................20

        5.  Financial Operations ....................................................................20

        6.  Restrictions on Trading ...............................................................21

    B.  Cash Collateral Stipulation ......................................................................21

    C.  Creditors' Committee................................................................................21

    D.  The Schedules and Bar Date ....................................................................21

V.  The Plan of Reorganization ...............................................................................22

    A.  Introduction...............................................................................................22

    B.  Classification and Treatment of Claims and Equity Interests Under the Plan of Reorganization.............................................................................22

    C.  Unclassified Claims .................................................................................24

        1.  Administrative Expense Claims...................................................24

        2.  Professional Compensation and Reimbursement Claims ............24

        3.  Indenture Trustee Fees ................................................................25

        4.  Priority Tax Claims......................................................................25

    D.  Claims Classified Pursuant to Section 1123 of the Bankruptcy Code.....25

        1.  Class 1 –Priority Non-Tax Claims ..............................................25

        2.  Class 2 – Secured Tax Claims ....................................................26

        3.  Class 3 – Secured Credit Facility Term Loan Claims..................26

        4.  Class 4 – Secured Letter of Credit Facility Claims.....................27

        5.  Class 5 – Other Secured Claims..................................................27

        6.  Class 6 – Senior Noteholder Claims ...........................................27

        7.  Class 7 – Junior Noteholder Claims............................................28

        8.  Class 8 – General Unsecured Claims..........................................28

        9.  Class 9 – Convenience Class Claims...........................................28

        10. Class 10 – Equity Interests..........................................................28

    E.  Means of Implementation .........................................................................29

        1.  The New Secured Credit Facility................................................29

2.      Settlement of Claims.................................................................. 29

3.      Intercompany Claims.................................................................. 31

4.      Issuance of New Preferred Stock .............................................. 31

5.      Issuance of New Common Stock ............................................... 33

        a.      Class 1 Common Stock.................................................... 34

        b.      Class 2 Common Stock.................................................... 34

        c.      Class 3 Common Stock.................................................... 35

6.      Merger/Dissolution/Consolidation............................................. 35

7.      Cancellation of Existing Agreements and Equity Interests ......... 35

8.      Surrender of Existing Securities ................................................ 35

9.      Incurrence of New Indebtedness................................................ 36

10.     Amendment to the Amended and Restated Articles of
        Incorporation............................................................................ 36

F.      Distributions under the Plan.................................................................. 37

        1.      Distributions on Allowed General Unsecured Claims and Allowed
                Convenience Class Claims........................................................... 37

        2.      Date of Distributions................................................................. 37

        3.      Disbursing Agent/Rights and Powers of Disbursing
                Agent/Expenses of Disbursing Agent.......................................... 37

        4.      Delivery of Distribution.............................................................. 37

        5.      Unclaimed Distributions ............................................................ 38

        6.      Distribution Record Date ........................................................... 38

        7.      Manner of Payment.................................................................... 38

        8.      Cash Distributions/No Fractional Shares..................................... 38

        9.      Setoff and Recoupment.............................................................. 38

        10.     Interest on Claims/Dividends...................................................... 39

        11.     No Distribution in Excess of Allowed Amounts ......................... 39

        12.     Distributions After the Effective Date ........................................ 39

        13.     Allocation of Plan Distributions Between Principal and Interest 39

G.      Procedures for Treating Disputed Claims Under the Plan....................... 39

        1.      Objections ................................................................................. 39

        2.      No Distributions Pending Allowance .......................................... 40

        3.      Distributions After Allowance .................................................... 40

4.      Resolution of Administrative Expense Claims and Claims......... 40

5.      Estimation of Claims/Interest ..................................................... 40

H.      Executory Contracts and Unexpired Leases ........................................... 40

1.      Assumption or Rejection of Executory Contracts and Unexpired
        Leases............................................................................................ 40

2.      Approval of Assumption or Rejection  of Executory Contracts and
        Unexpired Leases .......................................................................... 41

3.      Inclusiveness ................................................................................. 41

4.      Cure of Defaults............................................................................ 41

5.      Bar Date for Filing Proofs of Claim Relating to Executory
        Contracts and Unexpired Leases Rejected Pursuant to the Plan.. 42

6.      Indemnification and Reimbursement Obligations. ...................... 42

7.      Insurance Policies/Compensation and Benefit Plans/Retiree
        Benefits ......................................................................................... 42

I.      Corporate Governance and Management of the Reorganized Debtors ... 42

1.      New Board of Reorganized BE...................................................... 42

2.      Officers of the Reorganized Debtors. ........................................... 43

3.      Filing of New Organizational Documents .................................... 43

4.      Adoption of New Management Incentive Plan and Employee
        Incentive Plan................................................................................ 43

J.      Conditions Precedent to Effective Date ................................................. 43

1.      Conditions Precedent to Effectiveness.......................................... 43

2.      Waiver of Conditions .................................................................... 44

3.      Satisfaction of Conditions ............................................................ 44

K.      Effect of Confirmation .......................................................................... 44

1.      Continued Vesting of Assets......................................................... 44

2.      Binding Effect ............................................................................... 45

3.      Discharge of Claims and Termination of Equity Interests........... 45

4.      Discharge of Debtors .................................................................... 45

5.      Injunction or Stay.......................................................................... 45

6.      Terms of Injunction or Stay .......................................................... 46

7.      Reservation of Causes of Action/Reservation of Rights.............. 46

8.      Exculpation ................................................................................... 46

9.      Limited Releases........................................................................... 46

|  |  | 10. | Causes of Action/Avoidance Actions/Objections | 47 |
|  | L. |  | Jurisdiction and Governing Law | 47 |
|  |  | 1. | Retention of Jurisdiction | 47 |
|  |  | 2. | Governing Law | 48 |
|  | M. |  | Miscellaneous Provisions | 48 |
|  |  | 1. | Effectuating Documents and Further Transactions | 48 |
|  |  | 2. | Withholding and Reporting Requirements | 49 |
|  |  | 3. | Corporate Action | 49 |
|  |  | 4. | Continuing Exclusivity Period | 49 |
|  |  | 5. | Plan Supplement/Exhibits and Schedules | 49 |
|  |  | 6. | Payment of Statutory Fees | 50 |
|  |  | 7. | Post-Confirmation Date Professional Fees and Expenses | 50 |
|  |  | 8. | Dissolution of the Creditors' Committee | 50 |
|  |  | 9. | Exemption from Transfer Taxes | 50 |
|  |  | 10. | Expedited Tax Determination | 50 |
|  |  | 11. | Substantial Consummation | 50 |
|  |  | 12. | Severability of Plan Provisions | 50 |
|  |  | 13. | Notices. | 51 |
|  |  | 14. | Section Headings | 51 |
|  | N. |  | Modification, Revocation, or Withdrawal of the Plan | 51 |
|  |  | 1. | Modification of Plan | 51 |
|  |  | 2. | Revocation or Withdrawal of the Plan | 52 |
| VI. |  |  | Projections and Valuation Analysis | 52 |
|  | A. |  | Introduction | 52 |
|  |  | 1. | Pro Forma Financial Projections | 52 |
|  |  | 2. | Summary of Significant Assumptions | 54 |
|  |  | 3. | Process for Preparation of Financial Projections | 55 |
|  |  | 4. | Balance Sheet Assumptions | 56 |
|  |  | 5. | Income Statement Assumptions | 57 |
|  |  | 6. | Financial Projections | 59 |
|  | B. |  | Valuation | 61 |
|  | C. |  | Financial Information | 61 |
| VII. |  |  | Certain Factors to be Considered | 62 |

A.    Certain Bankruptcy Law Considerations .................................................. 62

    1.    Risk of Non-Confirmation of the Plan of Reorganization ........... 62

    2.    Non-Consensual Confirmation .................................................... 62

    3.    Risk of Non-Occurrence of the Effective Date ........................... 62

    4.    Debtors Could Withdraw the Plan ............................................... 62

    5.    Risks Related to the Chapter 11 Case Itself ............................... 62

    6.    Conversion into a Chapter 7 Case ............................................... 63

B.    Additional Factors To Be Considered ..................................................... 63

    1.    Risk of Economic Deterioration ................................................. 63

    2.    The Debtors Have No Duty to Update ......................................... 63

    3.    No Representations Outside This Disclosure Statement Are Authorized .................................................................................... 63

    4.    Claims Could Be More Than Projected ...................................... 63

    5.    Projections and Other Forward-Looking  Statements Are Not Assured, and Actual Results May Vary ...................................... 63

    6.    No Legal or Tax Advice is Provided to You By This Disclosure Statement .................................................................. 64

    7.    No Admission Made .................................................................... 64

    8.    Certain Tax Consequences ........................................................... 64

C.    Business Factors and Competitive Conditions ........................................ 64

    1.    Demand ........................................................................................ 64

    2.    Operating Results ........................................................................ 64

    3.    Competitive Conditions .............................................................. 65

    4.    Business Relationships ................................................................ 65

    5.    Sales to United States Government ............................................. 65

    6.    Reliance on Key Personnel. ......................................................... 67

    7.    Customers .................................................................................... 67

    8.    Risks of International Operations ................................................ 67

    9.    Services ........................................................................................ 67

    10.    Intellectual Property .................................................................... 68

    11.    Variances from Projections .......................................................... 68

D.    Additional Risks ....................................................................................... 69

VIII.    Certain Tax Consequences of the Plan ............................................................ 70

A.    Consequences to the Debtor.................................................... 71

1.    Cancellation of Debt Income ....................................... 71

2.    Potential Limitations on NOL Carryforwards and Other Tax Attributes................................................................ 72

3.    Alternative Minimum Tax ........................................... 73

B.    Consequences to Holders of Certain Claims ........................... 74

1.    Consequences to Holders of Secured Credit Facility Term Loan Claims, Senior Noteholder Claims and Junior Noteholder Claims .................................................................... 74

2.    Consequences to Holders of General Unsecured Claims ............ 76

3.    Consequences *to Holders of Convenience Class Claims.*............. 76

4.    Character of Gain or Loss ........................................... 76

5.    Payment of Accrued Interest......................................... 77

6.    Ownership and Disposition of the Exit Facility Term Loan........ 77

7.    Ownership and Disposition of New Preferred Stock and New Common Stock........................................................ 79

8.    Information Reporting and Backup Withholding ........................ 82

IX.    Securities Law Matters .................................................................. 83

A.    New BearingPoint Securities. .................................................. 83

B.    Hart-Scott-Rodino Compliance. ............................................... 83

C.    Transfer and Securities Laws Restrictions............................... 83

1.    Issuance and Resale of the New Preferred Stock, Class 1 Common Stock, Class 2 Common Stock and Class 3 Common Stock under the Plan.................................................................. 83

2.    Lack of Trading Market. ............................................. 85

D.    Dividend Policies ................................................................ 85

X.    Confirmation of the Plan of Reorganization ........................................ 86

A.    Confirmation Hearing ........................................................... 86

B.    Objections ......................................................................... 86

C.    Requirements for Confirmation of the Plan of Reorganization ............... 87

1.    Requirements of Section 1129(a) of the Bankruptcy Code ......... 87

a.    General Requirements.................................... 87

b.    Best Interests Test. ....................................... 88

c.    Liquidation Analysis..................................... 89

d.      Feasibility.......................................................................... 89

2.      Requirements of Section 1129(b) of the Bankruptcy Code ......... 90

a.      No Unfair Discrimination ................................................. 90

b.      Fair and Equitable Test .................................................... 90

3.      Alternative to Confirmation and Consummation of the Plan ...... 91

a.      Liquidation Under Chapter 7 ........................................... 91

b.      Alternative Plan of Reorganization .................................. 91

4.      Nonconsensual Confirmation ...................................................... 91

XI.      Conclusion ........................................................................................... 93

# I.    INTRODUCTION

On February [18], 2009, BearingPoint, Inc. ("**BE**") and its affiliated debtors and debtors in possession (collectively, the "**Debtors**," and with their non-Debtor affiliates "**BearingPoint**") commenced voluntary petitions under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**").  The chapter 11 cases are pending before the Honorable _____, United States Bankruptcy Judge of the United States Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**").

These are "pre-arranged" or "pre-negotiated" chapter 11 cases in that the Debtors reached an agreement in principle regarding the terms of a plan of reorganization with their secured lenders prior to the filing of their chapter 11 cases.[3]  To emerge from bankruptcy, the Debtors have proposed a Joint Plan of Reorganization under Chapter 11 of the Bankruptcy Code, dated February [18], 2009 (as may be amended, the "**Plan**"), a copy of which is attached hereto as **Exhibit "A"**.[4]  To provide a summary and explanation of the Plan, the Debtors have prepared this disclosure statement (the "**Disclosure Statement**") which, among other things, describes the Plan and the distributions contemplated thereunder.  The Bankruptcy Court shall hold a hearing to consider confirmation of the Plan (the "**Confirmation Hearing**") on _____, 2009 at __:__ _.m. (prevailing Eastern Time)** or as soon thereafter as counsel may be heard.

**THE DEBTORS BELIEVE THAT THE PLAN WILL MAXIMIZE THE RECOVERY FOR THEIR CREDITORS AND ALL PARTIES IN INTEREST AND ACCOMPLISH THE OBJECTIVES OF CHAPTER 11 AND THAT ACCEPTANCE OF THE PLAN IS IN THE BEST INTERESTS OF THE DEBTORS AND THEIR CREDITORS.  THE DEBTORS URGE CREDITORS TO VOTE TO ACCEPT THE PLAN.**

On _____, 2009, after notice and a hearing, the Bankruptcy Court approved this Disclosure Statement as containing adequate information of a kind and in sufficient detail to enable a hypothetical investor of the relevant classes to make an informed judgment whether to accept or reject the Plan.  The Bankruptcy Court's approval of this Disclosure Statement does not, however, constitute a determination by the Bankruptcy Court as to the fairness or merits of the Plan.

Annexed as exhibits to this Disclosure Statement are copies of the following documents:

- The Plan (**Exhibit "A"**);

- Order of the Bankruptcy Court, dated _____, 2009 (the "**Disclosure Statement Order**"), approving, among other things, this Disclosure Statement and establishing certain procedures with respect to the solicitation and tabulation of votes to accept or reject the Plan (annexed without exhibits) (**Exhibit "B"**) **[to be provided]**;

- BE's Annual Report on Form 10-K for the fiscal year ended December 31, 2008 (annexed without exhibits) (**Exhibit "C"**) **[to be provided]**;

---

[3] The terms of the agreement in principle are set forth in the Term Sheet attached hereto as **Exhibit E**.  [The Term Sheet is in substantially final form].

[4] Capitalized terms used not defined herein shall have the same meaning ascribed to them in Plan.

- BearingPoint's Liquidation Analysis (**Exhibit "D"**) **[to be provided]**; and

- BearingPoint Plan Term Sheet (in substantially final form) (**Exhibit "E"**).

For holders of Claims entitled to vote to accept or reject the Plan, the Debtors also have enclosed with this Disclosure Statement, among other things, (a) a ballot and (b) voting instructions as how to properly complete and submit your vote.

Each holder of a Claim entitled to vote on the Plan should read the Disclosure Statement, the Plan, the Disclosure Statement Order, and the voting instructions in their entirety before voting on the Plan. These documents contain important information concerning your Claim.

The Disclosure Statement Order, a copy of which is annexed hereto as **Exhibit "B"**, sets forth in detail, among other things, the deadlines, procedures, and instructions for voting to accept or reject the Plan and for filing objections to confirmation of the Plan.

## A.    Important Dates

Please take note of the following important dates –

The deadline to file an objection or response to the Plan is _____, 2009 at 4:00 p.m. **(prevailing Eastern Time)** (the "**Objection Deadline**")

The deadline to submit ballots is _____, 2009 at 4:00 p.m. (prevailing Eastern **Time)** (the "**Voting Deadline**"). **For a ballot to be counted, the Debtors' voting agent must receive the ballot by the Voting Deadline.**

The Confirmation Hearing to consider confirmation of the plan shall be _____, 2009 at __:__ _.m. **(prevailing Eastern Time)**.

No solicitation of votes to accept the Plan may be made except pursuant to section 1125 of the Bankruptcy Code.

## B.    Voting Procedures

If you are entitled to vote to accept or reject the Plan, the Debtors have enclosed a ballot with this Disclosure Statement. If you hold more than one Claim, you will receive individual ballots for each Claim. Please use the individual ballots to vote each individual Claim. For detailed voting instructions, please refer to the voting instructions enclosed with this Disclosure Statement and the ballot.

TO BE COUNTED, YOUR BALLOT MUST BE RECEIVED BY THE VOTING DEADLINE OF _____, 2009 AT 4:00 P.M. (PREVAILING EASTERN TIME).

If you are a holder of a Claim entitled to vote on the Plan and you did not receive a ballot, received a damaged ballot, or lost your ballot or if you have any questions concerning the Disclosure Statement, the Plan, or the procedures for voting on the Plan, please call the Garden City Group at [1-800-_].

C.    **Confirmation Hearing**

Pursuant to section 1128 of the Bankruptcy Code, the Confirmation Hearing will be held on _____, 2009 at __:__ _.m. (**prevailing Eastern Time**) before the Honorable _____, Room ___, United States Bankruptcy Court for the Southern District of New York, Alexander Hamilton House, One Bowling Green, New York, New York 10004.

The Objection Deadline to object or respond to the confirmation of the Plan is _____, 2009 at 4:00 p.m. (**prevailing Eastern Time**). Objections and responses, if any, must be served and filed as to be received on or before the Objection Deadline in the manner described in the Disclosure Statement Order and below in Section X.A of this Disclosure Statement. The Confirmation Hearing may be adjourned from time to time without further notice except for the announcement of the adjournment date made at the Confirmation Hearing or at any subsequent adjourned Confirmation Hearing.

**The statements contained in this Disclosure Statement are as of the date hereof unless specified otherwise. Changes in the information contained herein, however, may occur after the date hereof**.

**Prior to voting, please carefully read, review, and consider all information in this Disclosure Statement in its entirety including all accompanying materials and exhibits. For your convenience, this Disclosure Statement summarizes the terms of the Plan. If any inconsistency exists between the Plan and the Disclosure Statement, the Plan controls.**

**Do not rely upon the Disclosure Statement for any other purpose other purpose other than determining whether to accept or reject the Plan. Nothing contained herein is (a) an admission of any fact or liability by any party, (b) admissible in any proceeding involving the Debtors or any other party, or (c) conclusive evidence of the tax or other legal effects of the Plan on the Debtors or holders of Claims or Equity Interests. Certain of the statements contained herein, by nature, are forward-looking and contain estimates and assumptions. There is no assurance that such statements will reflect actual outcomes.**

The Debtors believe that the Plan will enable them to reorganize successfully and accomplish the objectives of chapter 11 and that acceptance of the Plan is in the best interests of the Debtors and their creditors.

Accordingly, the Debtors encourage all creditors to vote to accept the Plan.

IRS CIRCULAR 230 NOTICE:  TO ENSURE COMPLIANCE WITH IRS CIRCULAR 230, HOLDERS OF CLAIMS AND EQUITY INTERESTS ARE HEREBY NOTIFIED THAT: (A) ANY DISCUSSION OF FEDERAL TAX ISSUES CONTAINED OR REFERRED TO IN THIS DISCLOSURE STATEMENT IS NOT INTENDED OR WRITTEN TO BE USED, AND CANNOT BE USED, BY HOLDERS OF CLAIMS OR EQUITY INTERESTS FOR THE PURPOSE OF AVOIDING PENALTIES THAT MAY BE IMPOSED ON THEM UNDER THE TAX CODE; (B) SUCH DISCUSSION IS WRITTEN IN CONNECTION WITH THE PROMOTION OR MARKETING BY THE DEBTORS OF THE TRANSACTIONS OR MATTERS ADDRESSED HEREIN; AND (C) HOLDERS OF CLAIMS AND EQUITY INTERESTS SHOULD SEEK ADVICE BASED ON THEIR PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.

## II.    OVERVIEW OF CHAPTER 11 AND THE PLAN

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code. Under chapter 11 of the Bankruptcy Code, a debtor is authorized to reorganize its business for the benefit of itself, its creditors, and other stakeholders.  In addition to permitting the rehabilitation of a debtor, another goal of chapter 11 is to promote equality of treatment for similarly situated creditors with respect to the distribution of a debtor's assets.

The commencement of a chapter 11 case creates an estate that is comprised of all of the legal and equitable interests of the debtor as of the commencement date.  The Bankruptcy Code provides that the debtor may continue to operate its business and remain in possession of its property as a "debtor in possession."

The consummation of a plan of reorganization is the principal objective of a chapter 11 reorganization case.  A plan of reorganization sets forth the means for satisfying claims against and interests in a debtor.  Confirmation of a plan of reorganization by the bankruptcy court, once the plan is consummated, binds the debtor, any issuer of securities under the plan, any person acquiring property under the plan, and any creditor or equity interest holder of a debtor to the terms of the confirmed plan. Subject to certain limited exceptions, the order approving confirmation of a plan discharges a debtor from any debt that arose prior to the date of confirmation of the plan and substitutes therefor the obligations specified under the confirmed plan.

Certain holders of claims against and interests in a debtor may vote to accept or reject the plan.  Prior to soliciting acceptances of the proposed plan, however, section 1125 of the Bankruptcy Code requires a debtor to prepare a disclosure statement containing adequate information of a kind, and in sufficient detail, to enable a hypothetical investor of the relevant classes to make an informed judgment regarding the plan.  The Debtors are submitting this Disclosure Statement to holders of Claims against the Debtors to satisfy the requirements of section 1125 of the Bankruptcy Code.

The following table briefly summarizes the classification and treatment of Administrative Expense Claims, Claims and Equity Interests under the Plan:

| Class | Type of Claim or Equity Interest | Treatment | Approximate Allowed Amount[5] | Approximate Percentage Recovery |
|---|---|---|---|---|
| -- | Administrative Expense Claims | Paid in full, in Cash, in an amount equal to such Allowed unpaid Claim on or as soon as reasonably practicable following the later of the Effective Date, the date on which such Claim becomes an allowed Claim, or the date on which such Claim becomes payable under any agreement relating thereto;  Claims incurred in the ordinary course of business will be paid in full or performed, as applicable, in the ordinary course of business. | Undetermined (including any amounts incurred and payable in the ordinary course of business) | 100% |
| -- | Professional Compensation and Reimbursement Claims | Paid in full, in Cash, in an amount equal to such allowed Claim. | Undetermined | 100% |
| -- | Indenture Trustee Fees | Paid in full, in Cash, by the Reorganized Debtors on the Effective Date. | Undetermined | 100% |
| -- | Priority Tax Claims | Either (a) be paid in full, in Cash, the full amount of such Allowed unpaid Claim on or as soon as reasonably practicable following the later of the Effective Date or the date on which such claim becomes an Allowed Claim or (b) commencing on the Effective Date, or as soon thereafter is practicable, and continuing over a period not exceeding five (5) years from and after the Commencement Date, equal semi-annual Cash payments in an aggregate amount equal to such Claim. | Undetermined | 100% |

---

[5] The amounts set forth herein are the Debtors' estimates based on the Debtors' books and records.  The Bar Date (as defined below) has not yet occurred.  Actual amounts will depend upon the amounts of Claims timely filed before the Bar Date, final reconciliation and resolution of all Administrative Expense Claims and Claims, and the negotiation of cure amounts.  Accordingly, the actual amounts may vary from the amounts set forth herein.

| Class | Type of Claim or Equity Interest | Treatment | Approximate Allowed Amount[5] | Approximate Percentage Recovery |
|---|---|---|---|---|
| 1 | Priority Non-Tax Claims | Unimpaired. Paid in full, in Cash, on or as soon as reasonably practicable following the later of the Effective Date or the date on which such Claim became an Allowed Claim. | Undetermined[6] | 100% No vote (deemed to accept) |
| 2 | Secured Tax Claims | Unimpaired. Either (a) be paid in full, in Cash, the full amount of such Allowed unpaid Claim on or as soon as reasonably practicable following the later of the Effective Date or the date on which such claim becomes an Allowed Claim or (b) commencing on the Effective Date, or as soon thereafter is practicable, and continuing over a period not exceeding five (5) years from and after the Commencement Date, equal semi-annual Cash payments in an aggregate amount equal to such Claim. | Undetermined | 100% No vote (deemed to accept) |
| 3 | Secured Credit Facility Term Loan Claims | Impaired. The Secured Credit Facility will be converted into the Exit Facility. Each holder of an Allowed Secured Credit Facility Term Loan Claim shall receive its Class 3 Pro Rata Share of the Exit Facility Term Loan, and its Class 3 Pro Rata Share of the New Preferred Stock. | $295,374,944 | 93 - 100% |
| 4 | Secured Letter of Credit Facility Claims | Impaired. The Secured Credit Facility will be converted into the Exit Facility. Each holder of an Allowed Secured Letter of Credit Facility Claim shall receive its Class 4 Pro Rata Share of the Exit Letter of Credit Facility, and its Class 4 Pro Rata Share of the excess of Credit Linked Deposits (as defined in the Secured Credit Facility) under the Secured Credit Facility over the amount of Credit Linked Deposits required under the Exit Facility Term Loan. | $0[7] | 100% No vote (deemed to accept) |

---

[6] The Debtors have contemporaneously filed a motion seeking to pay prepetition amounts owing to employees for wages and benefits. Should this relief be granted, the Debtors estimate that there will be no priority non-tax claims.

[7] These claims are contingent as of the Effective Date.

| Class | Type of Claim or Equity Interest | Treatment | Approximate Allowed Amount[5] | Approximate Percentage Recovery |
|---|---|---|---|---|
| 5 | Other Secured Claims | Unimpaired. Each such Allowed Claim will be reinstated, or each holder of such Claim will receive (a) cash in the full amount of the Claim, (b) proceeds of the sale or disposition of its collateral securing such Claim, to the extent of the value of the holder's secured interest in the collateral, (c) the collateral securing such Claim and any required interest, or (d) any other distribution necessary to satisfy the requirements of section 1124 of the Bankruptcy Code. | Undetermined[8] | 100%<br><br>No vote (deemed to accept) |
| 6 | Senior Noteholder Claims | Impaired. Each holder of such Allowed Claim will receive [x] shares of New Class 1 Common Stock for each dollar of such holder's Allowed Claim which will be held in the Voting Trust. | $240,000,000 | 0 – 28% |
| 7 | Junior Noteholder Claims | Impaired. Each holder of such Allowed Claim will receive [x] shares of New Class 2 Common Stock for each dollar of such holder's Allowed Claim which will be held in the Voting Trust. | $450,000,000 | 0% |
| 8 | General Unsecured Claims | Impaired. Each holder of such Allowed Claim will receive [x] shares of New Class 3 Common Stock for each dollar of such holder's Allowed Claim which will be held in the Voting Trust. | $90,000,000-$110,000,000 | 0 - 10% |
| 9 | Convenience Class Claims | Impaired. Each holder of such Allowed Claim, on or as soon as reasonably practicable following the later of the Effective Date or the date on which such claim becomes an allowed Claim, will receive Cash equal to [___]% of the Allowed Claim. | [__] | [__] |
| 10 | Equity Interests | Impaired. No distribution. | $0 | 0%<br><br>No vote (deemed to reject) |

---

[8] The Debtors estimate the amount of Other Secured Claims to be de minimus.

For detailed historical and projected financial information and valuation estimates, see Section VI, entitled "PROJECTIONS AND VALUATION ANALYSIS," and Exhibits D and E to this Disclosure Statement.

### III.    OVERVIEW OF THE DEBTORS' OPERATIONS AND CHAPTER 11 CASES

A.    <u>Corporate Structure</u>

BE is the ultimate parent of the BearingPoint family of companies, which is a global organization with subsidiaries around the world, including offices throughout the United States, Canada, Europe, Asia, Africa, the Middle East, Latin America (including Mexico), and Australia.  Besides the corporate headquarters, BearingPoint occupies approximately 52 additional offices in the United States and approximately 50 offices in Latin America, Canada, the Asia Pacific region, and EMEA (as defined below). The chart below provides a general overview of BearingPoint's prepetition corporate structure, including all of the Debtors (outlined) and several non-Debtor entities:

The Debtors in these chapter 11 cases consist of BE, its wholly-owned subsidiaries BearingPoint, LLC ("**BE LLC**"), BearingPoint Global, Inc., BearingPoint Global Operations, Inc. ("**BE GOI**"), and BearingPoint International I Inc. ("**BE International**"), and certain wholly-owned subsidiaries of BE LLC, BE GOI, and BE International.

BearingPoint is a public reporting company under Section 12(b) of the Securities and Exchange Act of 1934.  Its common stock (the "**Common Stock**") was, until recently (as described below), publicly traded under the symbol "BE" on the New York Stock Exchange (the "**NYSE**").  It currently trades on the OTC Bulletin Board under the symbol "BGPT."  As of December 31, 2008 there were approximately 4.4 million shares of Common Stock outstanding.

Below is a chart showing the relationship of the Debtors to each other.



## B.    Overview of the Debtors' Operations

Based in McLean, Virginia, with executive offices in New York City, BearingPoint is one of the world's leading providers of management and technology consulting services. BearingPoint began as the consulting arm of KPMG LLP ("**KPMG**"), with KPMG creating a distinct business unit for its consulting services in 1997. BE was incorporated as a business corporation under the laws of the State of Delaware in 1999. On January 31, 2000, KPMG transferred its consulting business to BearingPoint, and, on February 8, 2001, BE completed its initial public offering and began to trade on the NASDAQ National Market. On October 2, 2002, the company changed its name to "BearingPoint, Inc." from "KPMG Consulting, Inc." and BE's common stock began to trade on the NYSE under the symbol "BE."

BearingPoint's core services, which include management consulting, technology solutions, application services and managed services, are designed to help its clients generate revenue, increase cost-effectiveness, manage regulatory compliance, integrate information and transition to "next-generation" technology. BearingPoint believes that it differentiates its services from others through its results, approach and people. BearingPoint's collaborative and flexible approach, including its passionate and dedicated people who bring both deep management and technology experience to bear on solving its clients' issues, is well recognized for producing innovative and effective solutions.

Historically, in North America, BearingPoint has delivered consulting services through its Public Services, Commercial Services and Financial Services industry groups, which provide significant industry-specific knowledge and service offerings. Outside of North America, BearingPoint is organized on a geographic basis — Europe, the Middle East and Africa ("**EMEA**"), the Asia Pacific region, and Latin America (including Mexico).

### 1.    North American Operations

Historically, BearingPoint's North American operations have been managed on an industry basis, enabling BearingPoint to capitalize on its significant industry-specific knowledge base. This focus enhances its ability to monitor global trends and observe best practice behavior, to design specialized service offerings relevant to the marketplaces in which BearingPoint's clients operate, and to build sustainable solutions. All of BearingPoint's industry groups provide management consulting, technology solutions, application services and managed services to their respective clients.

Historically, BearingPoint's three North American industry groups have been:

*a.*    *Public Services.*

Public Services serves a broad range of both public and private clients, including agencies of the U.S. Federal government, such as the Departments of Defense, Homeland Security, and Health and Human Services; provincial, state and local governments; public healthcare companies and private sector healthcare agencies; aerospace and defense companies; and higher education institutions.

*b.*    *Commercial Services*

Commercial Services supports a highly diversified range of clients, including those in the world's leading life sciences and energy markets, as well as technology, consumer markets, manufacturing, transportation, communications, and private and public utilities.

    ***c.***    *Financial Services*

Financial Services directs its solutions to many of the world's leading banking, insurance, securities, real estate, hospitality and professional services institutions.

## 2. International Operations

BearingPoint's operations outside of North America are organized on a geographic basis, with alignment to our three North American industry groups — enabling consistency in our global strategy and execution. BearingPoint believes that its unique global footprint provides BearingPoint with opportunities to increase profitability by leveraging its global delivery model for multi-national clients. BearingPoint's three geographic regions outside its North American practice include: (i) EMEA; (ii) Asia Pacific region; and (iii) Latin America (including Mexico).

BearingPoint's operations based outside the United States are not part of the chapter 11 filings. Since the Commencement Date, these entities will continue to operate in the ordinary course of business.

## 3. BearingPoint's Clients

BearingPoint provides management and technology consulting services to numerous government organizations, as well as Forbes Global 2000 companies and other global corporations. BearingPoint serves more than 2,000 clients worldwide, including all fifteen United States federal cabinet-level departments, twenty-three states, each of the top-ten global technology hardware manufacturers, each of the top-ten global drug and biotech companies, many of the worlds largest global banks, and many other government agencies and global corporations.[9]

## 4. Government Contract Work

During 2007 and 2006, BearingPoint's revenue from the U.S. Federal government, inclusive of government sponsored enterprises, accounted for approximately 28.4% and 28.5%, respectively, of BearingPoint's total revenue. For 2007 and 2006, BearingPoint's revenue from the U.S. Department of Defense alone accounted for approximately 11.0% and 11.3%, respectively, of BearingPoint's total revenue.

## 5. Employees and Labor Matters

BearingPoint employs approximately 15,200 full-time employees, of which approximately 13,500 are billable professionals.

BearingPoint's professionals possess significant industry experience, understand the latest technology and apply it to solve clients' business challenges. As a management and technology consulting company, BearingPoint's success largely depends on its ability to attract, motivate and retain world-class professional talent, particularly professionals with advanced information technology skills necessary to perform the services that BearingPoint offers. BearingPoint is committed to the long-term development of its employees and strives to enhance its employees' commitment to its clients, culture,

---

[9] Based on companies that received BearingPoint services during January – December 2007. Top ten companies are as published by Forbes in its 2008 Global 2000 list.

and values through a comprehensive performance management system, innovative training programs, and a competitive compensation structure that rewards individual performance and teamwork.

       For 2007, BearingPoint's voluntary annualized attrition rate was 24.7%, a slight improvement over its attrition rate of 25.6% in 2006. Reducing attrition remains a top priority, and BearingPoint has taken steps to enhance its ability to attract and retain its employees.

## C.    Significant Prepetition Indebtedness

       The following chart illustrates the Debtors' significant prepetition indebtedness, as of February 10, 2009:

| Type of Debt | Principal Value | Obligor(s) | Guarantors | Liens | First Put Right[10] |
|---|---|---|---|---|---|
| Secured Credit Facility - Term Loan | $294,750,000 | BE, and BE LLC | Certain domestic subsidiaries of the Obligors as set forth in the Credit Agreement (the Debtors other than BE and BE LLC) | First priority lien on substantially all of the assets of the Obligors and the Guarantors as set forth in the Security Agreement dated May 18, 2007 | Not applicable |
| Secured Credit Facility - Synthetic Letter of Credit (Letters of Credit Outstanding) | $171,500,000[11] ($84,388,501)[12] | BE, and BE LLC | Certain domestic subsidiaries of the Obligors as set forth in the Credit Agreement (the Debtors other than BE and BE LLC) | First priority lien on substantially all of the assets of the Obligors and the Guarantors as set forth in the Security Agreement dated May 18, 2007 | Not applicable |
| Priority Subordinated Debentures (Series C) | $200,000,000 | BE | None | Unsecured | April 15, 2009 |
| Priority Subordinated Debentures (FFL SPA) | $40,000,000 | BE | None | Unsecured | July 15, 2010 (Maturity Date) |

---

[10] In addition to the put rights that arise on a specific date, holders of the Series A Notes, Series B Notes, and Series C Notes (each as defined below) can also require BE to redeem the debentures for cash upon the occurrence of a "designated event" (as defined in the indentures and discussed below).

[11] This represents a cash deposit to refund issuing banks for draws under any letters of credit, and, as such, is currently a contingent claim against the Debtors.

[12] This represents the aggregate face amount of undrawn letters of credit issued under the LC Facility (as defined below), and, as such, is currently a contingent claim against the Debtors.

| Junior Subordinated Debentures (Series A) | $250,000,000 | BE | None | Unsecured | December 15, 2011 |
| Junior Subordinated Debentures (Series B) | $200,000,000 | BE | None | Unsecured | December 15, 2014 |

The instruments evidencing these obligations are described below.  In addition to the prepetition indebtedness described below, the Debtors estimate general unsecured claims of approximately $90-100 million.

## 1.    The Secured Credit Facility

Pursuant to that certain Credit Agreement, dated May 18, 2007 (as amended and restated on June 1, 2007, the "**Security Credit Facility**") among BE and BearingPoint, LLC, as borrowers (together, the "**Borrowers**"), and certain of BE's subsidiaries, as guarantors (the "**Guarantors**"), Wells Fargo N.A. as successor administrative and collateral agent to UBS AG, Stamford Branch, and the lenders (the "**Prepetition Secured Lenders**"), issuing banks, and other agents party thereto, the Borrowers obtained (i) a term loan (the "**Term Loan**") with an aggregate principal amount of $300.0 million and (ii) commitments to issue credit-linked deposit letters of credit (the "**LC Facility**") in the aggregate amount of $200.0 million (the "**Letters of Credit**").  The Term Loan matures and the commitments to issue the Letters of Credit expire on May 18, 2012.  Under the LC Facility, the issuing banks issue letters of credit on behalf of BearingPoint and its subsidiaries to support their obligations in favor of third party beneficiaries.  If a letter of credit is drawn by a third party beneficiary, the issuing bank is obligated to fund the draw, and the Borrowers are obligated to reimburse the issuing bank.  The Prepetition Secured Lenders have deposited cash (the "**Credit-Linked Deposit**") to backstop any unreimbursed obligations of the Borrowers.  If the Borrowers fail to reimburse the issuing banks, the administrative agent reimburses the Issuing Banks from the Credit-Linked Deposit.  Following withdrawal from a Credit-Linked Deposit, the Borrowers may elect to reimburse the Credit-Linked Deposit (provided that no payment or insolvency event of default is continuing) or to convert the withdrawn amount into a loan with substantially the same terms as the Term Loan.

Pursuant to that certain Security Agreement dated May 18, 2007 (the "**Security Agreement**") by and between the Borrowers, the Guarantors, and Wells Fargo N.A. as successor collateral agent to UBS AG, Stamford Branch, the Borrowers' obligations under the Amended and Restated Credit Agreement are secured by (i) a first priority lien on substantially all of the assets of the Borrowers and each of the Guarantors and (ii) a pledge of 65% of the stock in certain of BE's first-tier foreign subsidiaries.

The Borrowers used the Term Loans proceeds for general corporate purposes, including the repayment of certain debt obligations.  The Borrowers used the Letters of Credit to backstop any unreimbursed obligations of BearingPoint.

As of the Commencement Date, under the Secured Credit Facility, approximately $295.37 million of principal under the Term Loan (including accrued interest) is outstanding.[13]  As of the Commencement Date, the aggregate face amount of undrawn letters of credit issued under the LC Facility is approximately $85.35 million (including accrued interest). The LC Facility includes a cash deposit of $171.50 million to refund issuing banks for draws under any letters of credit.

The terms of the Secured Credit Facility generally restrict BE's ability to dispose of assets, incur additional indebtedness and issue equity securities, and requires the net cash proceeds from certain asset sales, casualty events, debt issuances and 50% of equity offerings, to be used to prepay amounts outstanding under the Term Loan and/or to collateralize outstanding letters of credit under the LC Facility.

## 2.    Junior Notes

On December 22, 2004, BE issued $400.0 million of convertible[14] subordinated debentures pursuant to that certain Indenture, dated December 22, 2004 among BE and the Bank of New York, as indenture trustee (as amended, the "**Junior Indenture**").  The offering consisted of $225.0 million aggregate principal amount of 2.50% Series A Convertible Subordinated Debentures due December 15, 2024 (the "**Series A Notes**") and $175.0 million aggregate principal amount 2.75% Series B Convertible Subordinated Debentures due December 15, 2024 (the "**Series B Notes**" and, together with the Series A Notes, the "**Junior Notes**"). On January 5, 2005, BE issued an additional $25.0 million aggregate principal amount of its Series A Notes and an additional $25.0 aggregate principal amount of its Series B Notes upon the exercise in full of an option granted to the initial purchasers.  Interest on the Junior Notes is payable semi-annually on June 15 and December 15 of each year. The Junior Notes are unsecured and are subordinated to the Series C Notes, the FFL Notes, and future senior debt.[15]

The holders of the Junior Notes may require BE to repurchase all or a portion of the Junior Notes not previously converted, purchased or redeemed by BE on the occurrence of a designated event, at a repurchase price equal to 100% of the principal amount of the Junior Notes, plus any accrued and unpaid interest and accrued and unpaid liquidated damages, if any, to, but not including, the

---

[13] Any draw downs under the letter of credit facility that are not reimbursed by BearingPoint are added as additional indebtedness under the Term Loan.  As of the date hereof, $28,500,000 in unreimbursed letter of credit draw downs has been so added.

[14] The Junior Notes are initially convertible into fully paid and nonassessable shares of BE's common stock. Holders of the Junior Notes may exercise the right to convert the Junior Notes prior to their maturity only under certain circumstances, including when BE's stock price reaches a specified level for a specified period of time, upon notice of redemption, and upon certain specified corporate transactions.  Upon conversion of the Junior Notes, BE will, under certain circumstances, have the right to deliver, in lieu of shares of common stock, cash or a combination of cash and shares of common stock.

[15] Beginning on December 23, 2011, BE, at its option, may redeem the Series A Notes, and beginning on December 23, 2014, BE, at its option, may redeem the Series B Notes, in each case for cash at any time as a whole, or from time to time in part, at a redemption price equal to 100% of the principal amount of the Junior Notes redeemed plus accrued and unpaid interest and accrued and unpaid liquidated damages, if any of the Junior Notes to (but excluding) the redemption date. The Series A Notes shall also be purchased by BE at the option of the holder on December 15, 2011, December 15, 2014 and December 15, 2019 and Series B Notes shall be purchased by BE at the option of the holder on December 15, 2014 and December 15, 2019, in each case at a purchase price in cash equal to 100% of the principal amount of the Junior Notes, plus any accrued and unpaid interest and accrued and unpaid liquidated damages, if any, on the Junior Notes to (but excluding) the repurchase date.

designated event repurchase date. The list of designated events (the "**Designated Events**") includes certain change of control transactions and a termination of trading occurring if BE 's common stock is no longer listed for trading on a United States national securities exchange nor approved for trading on the NASDAQ National Market.  As discussed in more detail below, on November 13, 2008 BE received notice from the NYSE that it would suspend the trading of BE's stock effective as of November 17, 2008. After the suspension of trading, BearingPoint shares were quoted only in the over-the-counter market. BearingPoint has appealed the NYSE determination to delist the stock, which appeal was scheduled for hearing on March 31, 2009.  If BearingPoint were to have lost the appeal, this would have qualified as a "designated event."

### 3.    Series C Notes

On April 27, 2005, BE issued $200.0 million aggregate principal amount of 5.00% Convertible[16] Senior Subordinated Debentures Due 2025 (the "**Series C Notes**") pursuant to that certain Indenture, dated April 27, 2005 among BE and The Bank of New York, as indenture trustee (as amended, the "**Series C Indenture**").  Interest on the Series C Notes is payable semi-annually on April 15 and October 15 of each year.  The Series C Notes are unsecured and are subordinated to BE 's existing and future senior debt, *pari passu* with the FFL Notes (defined below), and senior to the Junior Notes.

The Series C Notes will be redeemable at BE's option on or after April 15, 2009 at a redemption price in cash equal to 100% of the principal amount of the Series C Notes plus accrued and unpaid interest and additional interest, if any, on the Series C Notes to, but not including, the redemption date (the "**April 2009 Put Right**").[17]

The holders of the Series C Notes may require BE to repurchase all or a portion of the Series C Notes not previously converted, purchased or redeemed by BE on the occurrence of a Designated Event, at a repurchase price equal to 100% of the principal amount of the Series C Notes, plus any accrued and unpaid interest and accrued and unpaid additional interest, if any, to, but not including, the designated event repurchase date.

### 4.    FFL Notes

On July 15, 2005, BE issued, pursuant to that certain Securities Purchase Agreement, dated July 15, 2005 (the "**FFL SPA**"), $40 million aggregate principal amount of its 0.50% Convertible[18] Senior Subordinated Debentures due July 10, 2010 (the "**FFL Notes**," together with the Series C Notes, the "**Senior Notes**") and common stock warrants (the "**FFL Warrants**") to purchase up to 3,500,000

---

[16] The Series C Notes are convertible at the holder's option into fully paid and nonassessable shares of BE 's common stock.  Upon conversion of the Series C Notes, BE will have the right to deliver, in lieu of shares of common stock, cash or a combination of cash and shares of common stock.

[17] The Series C Notes shall also be purchased by BE at the option of the holder on April 15, 2009, April 15, 2015 and April 15, 2020, in each case at a purchase price in cash equal to 100% of the principal amount of the Series C Notes, plus any accrued and unpaid interest and accrued and unpaid additional interest, if any, on the Series C Notes, to (but excluding) such repurchase date.

[18] The FFL Notes are convertible at the option of the holder any time on or after July 15, 2006 into fully paid and non-assessable shares of BE 's common stock at the conversion price in effect at the time of conversion.  Upon conversion of the FFL Notes, BE will, under certain circumstances, have the right to deliver, in lieu of shares of common stock, cash or a combination of both.

shares of BE 's common stock.  Interest on the FFL Notes is payable semi-annually on January 15 and July 15 of each year. The FFL Notes are subordinate to all existing and future senior debt, *pari passu* with the Series C Notes, and senior to the Junior Notes.  BE shall, on July 15, 2010, redeem the FFL Notes at a redemption price equal to 100% of the outstanding principal amount plus an amount equal to all accrued but unpaid interest to the redemption date.

The holders of the FFL Notes may require BE to redeem all or a portion of the FFL Notes not previously converted or redeemed upon the occurrence of a Designated Event, at a repurchase price equal to 100% of the outstanding principal amount of the portion of the FFL Notes, plus an amount equal to all accrued and unpaid interest on such principal amount to, but not including, the designated event repurchase date.

## D.    Events Leading to the Chapter 11 Cases

As described below in more detail, in the last several years, BearingPoint has faced a number of challenges, which taken together, have had a negative impact on BearingPoint's overall financial performance and have culminated in the need for these chapter 11 cases.  All of these issues have caused employee and client concerns regarding BearingPoint's future, and has impacted BearingPoint's ability to retain clients and employees.

### 1.    Significant Indebtedness

Commencing with its first acquisition of an international practice (Mexico) in December 1999, BearingPoint began executing a strategy to develop a global business platform primarily through acquisition.  Through the end of 2002, BearingPoint had completed approximately 30 acquisitions, group hires or other similar transactions.  In order to make these acquisitions, BearingPoint assumed a significant debt load, which BearingPoint believed it would be able to service through revenue generated by its operations.  BearingPoint's current debt load, which consists primarily of the Secured Credit Facility, the Junior Notes, and the Senior Notes, was assumed, in part, for the purposes of restructuring BearingPoint's acquisition debt.

As already described, beginning in 2009, BearingPoint will begin to become subject to significant required payments under the Secured Credit Facility and certain of the notes.  In particular, the holders of the Series C Notes may require BearingPoint, at the option of the holders on April 15, 2009, to repurchase the Series C Notes, at a purchase price equal to 100% of the principal amount of $200 million, plus any accrued and unpaid interest.  BearingPoint's failure to repurchase the debentures pursuant to the put right would cause a cross default under BearingPoint's Junior Notes, the FFL Notes, and the Secured Credit Facility.  This cross default would, in turn, cause payment of all amount outstanding on these facilities to accelerate.

BearingPoint's current cash resources cannot meet the obligations to honor the repurchase rights of a substantial number of holders of its notes.  The failure to pay a note holder's put price would be an event of default under the Indentures.  The trustee must give notice of an event of default within 90 days of occurrence under the Indentures.  If such an event of default remains uncured and unwaived, the trustee or the holders of at least 25% of the applicable series may declare all of the debentures immediately due and payable.  Such acceleration of the notes could also lead to an event of default under the Secured Credit Facility.

## 2.        Goodwill Impairment

In 2004 and 2005, in connection with BE's goodwill impairment test, BE determined there were significant decreases in fair value for its EMEA and Commercial Services reporting units.  In 2004, a goodwill impairment loss of approximately $397 million was recognized in the EMEA reporting unit, and in 2005, a goodwill impairment loss of approximately $64 million and $102 million were recognized in the Commercial Services and EMEA reporting units, respectively.

## 3.        NYSE Delisting

Based on the factors discussed above, among other reasons, the value of BearingPoint stock dropped dramatically. On July 16, 2008, BE was notified by the NYSE that the average per share price of its common stock was below the NYSE's continued listing standard relating to minimum average share price, which requires that BE's common stock trade at a minimum average closing price of $1.00 over a consecutive 30 trading-day period.  On October 28, 2008, the NYSE notified BE that it had fallen below the continued listing standard relating to the minimum average market capitalization.  The NYSE's continued listing standard applicable to BE's market capitalization requires BE's average market capitalization be at least $100 million over any consecutive 30 trading-day period.  Due to this decline in its stock price, on November 13, 2008, BE received notice from the NYSE that it would suspend the trading of BE stock effective as of November 17, 2008, and would pursue applicable procedures to delist BE stock, because the stock was trading at "abnormally low" levels.  After the suspension of trading, BE shares were quoted only in the over-the-counter market.  On December 1, 2008, BE appealed the NYSE determination to delist the stock (the "**Appeal**").  The delisting of BE's stock was pending the outcome of the Appeal, which was scheduled for hearing on March 31, 2009.  As a result of BearingPoint's decision to file a voluntary petition for reorganization relief under chapter 11, however, BE anticipates that the NYSE will issue a notice to delist BE's common stock.  BE does not expect to appeal the NYSE's decision to delist BE's common stock.

## 4.        Going-Concern Qualification

In connection with the filing of BearingPoint's annual financial statements, BearingPoint's accountants, Ernst & Young LLP ("**E&Y**") must perform an annual audit.  As a result of liquidity concerns in connection with the April 2009 Put Right and uncertainties regarding pending NYSE delisting, BearingPoint's annual audit may contain a going concern qualification.  The failure by BearingPoint to obtain an unqualified annual audit would have resulted in a default under the Secured Credit Facility.  BearingPoint's failure to satisfy its obligations under the Secured Credit Facility when due by maturity or an event of default would have lead to an event of default under the Junior Notes and the Senior Notes.

## 5.        DCAA Audit

As discussed above, BearingPoint provides services to a number of United States governmental agencies.  In connection therewith, the U.S. Defense Contract Audit Agency (the "**DCAA**") performs periodic audits of BearingPoint's financial capability (each, a "**DCAA Audit**") to determine whether BearingPoint's financial condition is acceptable for performing government contracts.  The delisting of BE's common stock from the NYSE, the failure to make the April 2009 Put Right, or a going concern qualification contained in E&Y's audit opinion could each result in the DCAA issuing an adverse audit opinion.  In such a case, it would be difficult for U.S. government contracting officers to determine that BearingPoint is a "responsible contractor," which is a requirement to be awarded new contracts and

task orders with U.S. Government agencies.  BearingPoint believes that a restructuring of its capital structure through the contemplated restructuring proposal will result in a favorable DCAA Audit, which will enable U.S. Government contracting officers to determine that BearingPoint is a financially responsible contractor and allow the award of new government contracts and task orders.

### 6.        Inability to Timely File Financial Statements

Further, in 2004, as part of BE's separation from KPMG, BE transitioned to new financial and accounting systems.  Difficulties in implementation of these systems contributed to BE's inability to timely file its SEC periodic reports, a substantial increase in BE's expenses, including finance, accounting and audit costs, and to the material weaknesses identified in BE's fiscal years 2004 through 2007 audits.  Further, management concluded that its internal control over financial reports was not effective during that specified period, and increased expenditures were necessary to establish an effective set of internal controls.  BE did not timely file its financial statements beginning with the filing of the financial statements for the year ended December 31, 2004.  BE became current on December 3, 2007 with the filing of its financial statements for the quarterly period ended September 30, 2007, and has been timely since the filing of its annual report for the year ended December 31, 2007.

Moreover, in October 2006, a New York State court held that BearingPoint's failure to file its financial statements on a timely basis with the SEC was a default under the indenture relating to the Series B Debentures.  To resolve the uncertainties created by the court's ruling, BE amended the various indentures, which included an increase in the interest rate paid to the holders of the Junior Subordinated Debentures.

### 7.        Customer Defection and Employee Attrition

Because of these issues, certain existing customers, while acknowledging satisfaction with BearingPoint's services and professionals, have expressed reluctance to continue to do business with BearingPoint, creating an additional hurdle to overcome in retaining customers; this issue has also contributed to difficulties in obtaining new customers.  For these and related reasons, as of September 30, 2008, the annualized employee attrition rate for the third quarter of 2008 was 25.4%.

## E.        **Turnaround Efforts**

### 1.        **Pre-Bankruptcy Restructuring Negotiations**

To enhance stockholder value, BearingPoint has continually discussed and reviewed its business, strategic direction, performance, and prospects in the context of developments in the markets in which BearingPoint operates.  Specifically, commencing in 2004, BearingPoint has worked with financial advisors in connection with its review and consideration of various strategic alternatives and financing options.  Throughout 2006 and 2007, BearingPoint's ability to obtain financing in the capital and debt markets was limited by its inability to file it financial statements on a current or timely basis.  Nonetheless, management continued to explore methods to increase stockholder value.  In 2008, BearingPoint again embarked on a comprehensive restructuring effort.  To address the foregoing financial difficulties, in January 2008, BearingPoint engaged Greenhill & Co., Inc. ("**Greenhill**") to advise the Board with respect to strategic alternatives, a strategic transaction involving a sale of all or a portion of BearingPoint's assets, or an equity investment in BearingPoint.  While approximately 25 strategic and financial buyers have approached BearingPoint or Greenhill with an interest in buying parts of BearingPoint, all proposals that were furnished either appeared impractical or were unlikely to be consummated in time to address the April 2009 Put Right.  As a result, no sales of portions of

BearingPoint's business have occurred and the likelihood of consummating either a comprehensive sale of BearingPoint or discrete asset sales was low.

On October 23, 2008, BearingPoint's board of directors (the "**Board**") authorized discussions with holders of the Senior Notes and Junior Notes with the objective of restructuring part of BearingPoint's subordinated debt and possibly exchanging other existing subordinated debt for common stock of BearingPoint.

Effective as of November 11, 2008, BearingPoint appointed Kenneth A. Hiltz, a managing director of AlixPartners, LLP ("**AlixPartners**"), an internationally known business and financial advisory firm, as its new Chief Financial Officer. BearingPoint had previously retained AlixPartners to assist it in developing its 2009 business plan, participate in its discussions to restructure its indebtedness, and lead a number of key cash management initiatives. AlixPartners has a reputation and track record of improving a company's performance and drive bottom line results and successful corporate turnarounds.

BearingPoint has also been pursuing cost cutting initiatives and has successfully reduced costs, directly related to the closing of BearingPoint's financial statements, as well as other savings. This has led to a decrease of $20.4 million from selling, general, and administrative expenses of $160.3 million in the third quarter of 2007 to $139.9 million in the third quarter of 2008.[19]

BearingPoint continues to drive higher operating margins through targeting revenue growth in strategic markets and through differentiated solutions, managing its costs of service by monitoring its utilization rates, broadening its "people pyramid" and enhancing its mix of off-shore and on-shore service delivery, and continuing to achieve infrastructure cost reductions through 2008. This also involved monitoring the metrics critical to driving profitability and positive cash flow, and by holding its employees accountable for their performance. BearingPoint achieved gross profits of $144.5 million in the third quarter, compared to $132.6 million in the third quarter of 2007, resulting in a gross margin of 18% in the third quarter of 2008 compared to 15.4% in the third quarter of 2007.

BearingPoint's operations also continued to significantly improve despite one of the most challenging economic environments in history. For the first nine months of 2008, BearingPoint dramatically improved its year-over-year Operating Income (Loss) and Net Loss by 179% and 84% respectively. In addition, BearingPoint achieved an operating profit for each of its three fiscal quarters for 2008, with operating income increasing by $4.6 million to $32.3 million in the third quarter of 2008, compared to an operating loss of $27.7 million in the third quarter of 2007, marking the third consecutive quarter of operating profit.

## 2.    The Restructuring Negotiations

In October 2008, the Board authorized senior management, along with BearingPoint's advisors, began to meet and negotiate with various creditor groups in an attempt to restructure its debt. Specifically, they gave management presentations to and held negotiating sessions with principals and advisors of the following: (i) a steering committee of lenders under the Secured Credit Facility (the "**Lender Group**"), (ii) a committee of holders accounting for approximately 75% of the Series C Notes (the "**Series C Committee**"), (iii) the holders of the FFL Notes (the "**FFL Holders**") and (iv) a

---

[19] To be updated for details around reductions in SG&A expense through budgeting process, revised deals with KPMG, real estate sales, etc.

committee of holders of the Series A Notes and the Series B Notes (the "**Series A/B Committee**"). Through these negotiations, BearingPoint and the Lender Group reached an agreement in principle on the terms of a comprehensive debt restructuring to be implemented through these chapter 11 cases.

## IV.    THE REORGANIZATION CASES

### A.    <u>First Day Motions</u>[20]

On the Commencement Date, or shortly thereafter, the Debtors filed a series of motions seeking various relief from the Bankruptcy Court designed to minimize any disruption of business operations and to facilitate their reorganization.

#### 1.    Case Administration Motions

The Debtors submitted motions for orders: (i) authorizing the joint administration of the chapter 11 cases, (ii) establishing certain notice and case management procedures, (iii) authorizing the mailing of initial notices and all other mailings directly to parties in interest and the waiver of the requirement to file a list of creditors, (iv) authorizing the payment for goods and services ordered prepetition but delivered or performed postpetition, and (v) retaining and appointing the Garden City Group as the Debtors' claims and noticing agent and as an agent of the Bankruptcy Court  In addition, the Debtors submitted applications to retain legal, financial, and restructuring advisors.

#### 2.    Employee Motions

The Debtors submitted motions for authorization to satisfy certain outstanding obligations related to its employees including those relating to:  (i) wages, compensation, and employee benefits, (ii) employee severance, (iii) employee retention bonuses, and (iv) the assumption of managing director agreements.

#### 3.    Critical Obligations

The Debtors submitted motions for authorization to satisfy certain outstanding obligations related to its general business operations relating to:  (i) sales and use taxes, and (ii) certain customer practices.

#### 4.    Business Operations

To improve and continue their business operations, the Debtors submitted motions for authorization to:  (i) continue certain workers' compensation and other insurance policies, (ii) reject certain executory contracts and unexpired leases of real and personal property, and (iii) prohibit utilities from discontinuing service.

#### 5.    Financial Operations

---

[20] The Disclosure Statement will be amended to reflect the issued orders, if such relief is granted.

The Debtors submitted a motion for authorization to (i) maintain their existing bank accounts and forms, (ii) continue to use existing investment guidelines, and (iii) continue their centralized cash management system.

### 6.    Restrictions on Trading

The Debtors submitted a motion seeking to establish notification procedures and restrictions on trading in equity interests in and claims against the Debtors in order to preserve, to the extent possible, the potential value of the Debtors' net operating losses, built-in losses and other tax attributes, both during the pendency of the bankruptcy case and following the Effective Date of the Plan. The notification procedures and trading restrictions, if imposed, would apply immediately to investors that beneficially own or seek to acquire (i) at least 4.75% of the outstanding shares of BE Common Stock or (ii) Secured Credit Facility Term Loan Claims, Senior Noteholder Claims, Junior Noteholder Claims or General Unsecured Claims, in combinations or amounts specified in the proposed procedures and restrictions. For purposes of the proposed procedures and restrictions, beneficial ownership is measured in accordance with special U.S. federal income tax rules that, among other things, take into account indirect ownership, ownership by related parties and, in certain cases, options to acquire Common Stock or Claims.

### B.    Cash Collateral Stipulation

To enable the continued operation of their businesses, avoid short-term liquidity concerns, and preserve the going-concern value of their estates, the Debtors, together with their attorneys and financial advisors, negotiated a stipulation with their Prepetition Secured Lenders regarding the terms and conditions for the use of the Prepetition Secured Lenders' cash collateral to backstop up to $20 million in letters of credit and to fund operations. The Debtors filed a motion requesting entry of an order approving the stipulation.

### C.    Creditors' Committee

On February __, 2009, the U.S. Trustee, pursuant to its authority under section 1102 of the Bankruptcy Code, appointed the Creditors' Committee.

The current members of the Creditors' Committee are:

The Creditors' Committee has the following advisors:

<u>Attorneys</u>                                        <u>Financial Advisors</u>

The Debtors intend to consult with the Creditors' Committee concerning the administration of the chapter 11 cases, their operations, and transactions outside of the ordinary course of business.

### D.    The Schedules and Bar Date

On February ___, 2009, the Debtors filed their schedules of assets and liabilities, schedules of current income and expenditures, schedules of executory contracts and unexpired leases, and statements of financial affairs.

On February ___, 2009, the Debtors requested that the Bankruptcy Court enter an order (the "**Bar Date Order**") establishing _____, 2009 at 5:00 p.m. (prevailing Eastern Time) as the last date and time (the "**Bar Date**") for each person or entity other than an Government Unit (as defined by section 101(27)) to file proofs of Claim based on prepetition Claims against any of the Debtors, and _____, 2009 at 5:00 p.m. (prevailing Eastern Time) as the last date and time (the "**Governmental Bar Date**") for Governmental Units to file proofs of Claim based upon prepetition Claims against any of the Debtors.

Upon the Court's approval and entry of the Bar Date Order, the Debtors shall publish a notice of the Bar Date and Government Bar Date (the "**Bar Date Notice**") in The Wall Street Journal (National Edition) and The Washington Post on February __, 2009 and mailed a proof of claim form and the Bar Date Notice to, among others, all known holders of Claims.

After the expiration of the Bar Date, the Debtors will have a more accurate estimate of the amount of General Unsecured Claims.

## V.    THE PLAN OF REORGANIZATION

## A.    Introduction

The Debtors believe that (i) through the Plan, holders of Allowed Claims will receive a greater recovery from the estates of the Debtors than the recovery that they would receive in a liquidation of the Debtors under chapter 7 of the Bankruptcy Code and (ii) the Plan will afford the Debtors the opportunity and ability to continue in business as a viable going concern and preserve ongoing employment for the Debtors' employees.

The Plan is annexed hereto as **Exhibit "A"** and forms a part of this Disclosure Statement. The summary of the Plan set forth below is qualified in its entirety by reference to the provisions of the Plan.

Statements as to the rationale underlying the treatment of Claims and Equity Interests under the Plan are not intended to, and shall not, waive, compromise or limit any rights, claims or causes of action in the event the Plan is not confirmed.

## B.    Classification and Treatment of Claims and
Equity Interests Under the Plan of Reorganization

One of the key concepts under the Bankruptcy Code is that only claims and equity interests that are "allowed" may receive distributions under a chapter 11 plan. This term is used throughout the Plan and the descriptions below. In general, an "allowed" claim or "allowed" equity interest simply means that the debtor agrees, or in the event of a dispute, that the Bankruptcy Court determines, that the claim or equity interest, and the amount thereof, is in fact a valid obligation of the debtor. Section 502(a) of the Bankruptcy Code provides that a timely filed claim or equity interest is automatically "allowed" unless the debtor or other party in interest objects. However, section 502(b) of the Bankruptcy Code specifies certain claims that may not be "allowed" in bankruptcy even if a proof of claim is filed. These include, but are not limited to, claims that are unenforceable under the governing agreement between a debtor and the claimant or applicable non-bankruptcy law, claims for unmatured

interest, property tax claims in excess of the debtor's equity in the property, claims for services that exceed their reasonable value, real property lease and employment contract rejection damage claims in excess of specified amounts, late-filed claims, and contingent claims for contribution and reimbursement. In addition, Bankruptcy Rule 3003(c)(2) prohibits the allowance of any claim or equity interest that either is not listed on the debtor's schedules or is listed as disputed, contingent or unliquidated, if the holder has not filed a proof of claim or equity interest before the established deadline.

The Bankruptcy Code requires that, for purposes of treatment and voting, a chapter 11 plan divide the different claims against, and equity interests in, the debtor into separate classes based upon their legal nature.  Claims of a substantially similar legal nature are not necessarily classified together, nor are equity interests of a substantially similar legal nature necessarily classified together.  Because an entity may hold multiple claims and/or equity interests which give rise to different legal rights, the "claims" and "equity interests" themselves, rather than their holders, are classified.

Consistent with these requirements, the Plan divides the Allowed Claims against, and Allowed Equity Interests in, the Debtors into the following Classes:

| Class | Claims/Interests |
|-------|------------------|
| 1 | Priority Non-Tax Claims |
| 2 | Secured Tax Claims |
| 3 | Secured Credit Facility Term Loan Claims |
| 4 | Secured Letter of Credit Facility Claims |
| 5 | Other Secured Claims |
| 6 | Senior Noteholder Claims |
| 7 | Junior Noteholder Claims |
| 8 | General Unsecured Claims |
| 9 | Convenience Class Claims |
| 10 | Equity Interests |

Under a chapter 11 plan of reorganization, the separate classes of claims and equity interests must be designated either as "impaired" (affected by the plan) or "unimpaired" (unaffected by the plan).  If a class of claims is "impaired," the Bankruptcy Code affords certain rights to the holders of such claims, such as the right to vote on the plan, and the right to receive, under the chapter 11 plan, no less value than the holder would receive if the debtor were liquidated in a case under chapter 7 of the Bankruptcy Code.  Under section 1124 of the Bankruptcy Code, a class of claims or interests is "impaired" unless the plan (i) does not alter the legal, equitable and contractual rights of the holders or (ii) irrespective of the holders' acceleration rights, cures all defaults (other than those arising from the debtor's insolvency, the commencement of the case or nonperformance of a nonmonetary obligation), reinstates the maturity of the claims or interests in the class, compensates the holders for actual damages incurred as a result of their reasonable reliance upon any acceleration rights, and does not otherwise alter their legal, equitable, and contractual rights.  Typically, this means that the holder of an unimpaired claim will receive on the later of the consummation date or the date on which amounts owing are actually due and payable, payment in full, in cash, with postpetition interest to the extent appropriate and provided for under the governing agreement (or if there is no agreement, under applicable nonbankruptcy law), and the remainder of the debtor's obligations, if any, will be performed as they come due in accordance with their terms.  Thus, other than with respect to its right to accelerate the debtor's obligations, the holder of an unimpaired claim will be placed in the position it would have been in had the debtor's case not been commenced.

Pursuant to 1126(f) of the Bankruptcy Code, holders of unimpaired claims or interests are "conclusively presumed" to have accepted the plan. Accordingly, their votes are not solicited. Under the Debtors' Plan, the following classes are unimpaired, and therefore, the holders of such Claims and Equity Interests are "conclusively presumed" to have voted to accept the Plan: Priority Non-Tax Claims (Class 1), Secured Tax Claims (Class 2), Secured Letter of Credit Facility Claims (Class 4), and Other Secured Claims (Class 5).

Under certain circumstances, a class of claims or equity interests may be deemed to reject a plan of reorganization. For example, a class is deemed to reject a plan of reorganization under section 1126(g) of the Bankruptcy Code if the holders of claims or interests in such class do not receive or retain property under the plan on account of their claims or equity interests. Under this provision of the Bankruptcy Code, the following classes are deemed are deemed to reject the Plan because they receive no distribution and retain no property interest under the Plan: Equity Interests (Class 10). Because such classes are deemed to reject the Plan, the Debtors are required to demonstrate that the Plan satisfies the requirements of section 1129(b) of the Bankruptcy Code with respect to such Classes. Among these are the requirements that the plan be "fair and equitable" with respect to, and not "discriminate unfairly" against, the claims and equity interests in such Classes. For a more detailed description of the requirements for confirmation, see <u>Section X</u>, entitled "Requirements for the Confirmation of the Plan of Reorganization."

## C.    <u>Unclassified Claims</u>

### 1.    **Administrative Expense Claims**

Administrative Expense Claims are the actual and necessary costs and expenses of the Debtors' Reorganization Cases that are allowed under and in accordance with sections 330, 365, 503(b), 507(a)(2) and 507(b) of the Bankruptcy Code. Such expenses will include, but are not limited to, actual and necessary costs and expenses of preserving the Debtors' estates, actual and necessary costs and expenses of operating the Debtors' businesses, indebtedness or obligations incurred or assumed by the Debtors in Possession during the Reorganization Cases and compensation for professional services rendered and reimbursement of expenses incurred. Claims allowed under section 503(b)(9) for goods delivered in the 20 days prior to the Commencement Date are treated as Administrative Expense Claims.

Except to the extent that a holder (i) has been paid by the Company, in whole or in part, prior to the Effective Date or (ii) agrees to a less favorable treatment, each holder of an Allowed Administrative Expense Claim shall be paid in full, in cash, the full amount of its unpaid claim on or as soon as reasonably practicable following the later to occur of (a) the Effective Date or as soon thereafter as is reasonably practicable and (b) the date on which such claim becomes allowed.

Notwithstanding the forgoing, (a) any Allowed Administrative Expense Claim based on a liability incurred by the Debtors in the ordinary course of business by the Debtors shall be paid in full and performed by the Debtors or Reorganized Debtors as the case may be, in the ordinary course of business in accordance with the terms and conditions of any agreements governing, instruments evidencing or other documents relating to such transactions, and (b) any Allowed Administrative Expense Claim may be paid on such other terms as may be agreed on between the holder of such Claim and the Debtors.

### 2.    **Professional Compensation and Reimbursement Claims**

Professional Compensation and Reimbursement Claims are all Claims of entities seeking compensation for services rendered or reimbursement of expenses incurred through and including the

Effective Date under sections 330, 331, 503(b)(2), 503(b)(3), 503(b)(4) or 503(b)(5) of the Bankruptcy Code.

All such entities shall (a) file, on or before the date that is ninety (90) after the Effective Date their respective applications for final allowances of compensation for services rendered and reimbursement of expenses incurred and (b) be paid in full, in Cash, in such amounts as are Allowed by the Bankruptcy Court in accordance with the order relating to or allowing any such Administrative Expense Claim or upon such other terms as may be mutually agreed upon between the holder of such Administrative Expense Claim and the Debtors.

The Debtors are authorized to pay compensation for services rendered or reimbursement of expenses incurred after the Confirmation Date in the ordinary course of business and without the need for Bankruptcy Court approval.

### 3.    Indenture Trustee Fees

The Indenture Trustee Fees shall be paid in Cash on the Effective Date by the Reorganized Debtors, without the need for application to, or approval of, the Bankruptcy Court.

To the extent that the Indenture Trustee provides services related to distributions pursuant to the Plan (including, but not limited to, the services referenced in Section 6.8 of the Plan), such Indenture Trustee will receive from the Reorganized Debtors, without further Bankruptcy Court approval, reasonable compensation for such services and reimbursement of reasonable expenses, including, but not limited to, reasonable attorneys' fees and expenses, incurred in connection with such services. These payments will be made on terms agreed to by the Indenture Trustee and the Reorganized Debtors.

### 4.    Priority Tax Claims

A Priority Tax Claim is any Claim of a government unit of the kind entitled to priority in payment as specified in sections 502(i) and 507(a)(8) of the Bankruptcy Code.

On the later of (i) the Effective Date or (ii) the date such Priority Tax Claim becomes an Allowed Priority Tax Claim, or as soon as practicable thereafter, except to the extent that a holder of an Allowed Priority Tax Claim agrees to a less favorable treatment, each holder of an Allowed Priority Tax Claim shall receive in full satisfaction, settlement, and release of and in exchange for such Allowed Priority Tax Claim, in the sole discretion of the Debtors (a) Cash in an amount equal to such Allowed Priority Tax Claim, (b) equal semi-annual Cash payments aggregating an amount equal to such Allowed Priority Tax Claim, together with interest for a period after the Effective Date at a fixed-annual rate determined under applicable non-bankruptcy law, over a period not exceeding five years after the Commencement Date, subject to the Reorganized Debtors' sole option to prepay the entire amount of the Allowed Priority Tax Claim; provided that the payments under this clause (b) shall represent a percentage recovery at least equal to that expected to be received by holders of Allowed General Unsecured Claims.

## D.    Claims Classified Pursuant to Section 1123 of the Bankruptcy Code

### 1.    Class 1 –Priority Non-Tax Claims

Priority Non-Tax Claims include Claims granted priority in payment as specified in sections 507(a)(4), (5), (6) or (7) of the Bankruptcy Code, including certain wage, salary, and other compensation obligations to employees of the Debtors up to a statutory cap of $10,950 per employee.

The Debtors estimate that on the Effective Date, the allowed amount of such Priority Non-Tax Claims will aggregate approximately $[_____].

Class 1 is Unimpaired by the Plan.  Each holder of an Allowed Priority Non-Tax Claim is conclusively presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan.

Except to the extent that a holder of an Allowed Priority Non-Tax Claim (i) has been paid by the Debtors, in whole or in part, prior to the Effective Date, or (ii) agrees to a less favorable treatment, each holder of an Allowed Priority Non-Tax Claim shall receive, in full satisfaction of such Claim, Cash in the full amount of the claim, on or as soon as reasonably practicable after the later of (a) the Effective Date, or as soon thereafter as reasonably practicable, and (b) the date such claim becomes Allowed.

## 2.    Class 2 – Secured Tax Claims

Secured Tax Claims include any Secured Claim that, absent its secured status, would be entitled to priority in right of payment under section 507(a)(8) of the Bankruptcy Code (determined irrespective of any time limitations therein) and including any related Secured Claim for penalties.  The Debtors estimate that on the Effective Date, the allowed amount of such Other Priority Claims will aggregate approximately $[_____].

Class 2 is Unimpaired by the Plan.  Each holder of an Allowed Secured Tax Claim is conclusively presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan.

Except to the extent that a holder has been paid by the Company prior to the Effective Date or agrees to a to a to a less favorable treatment, each holder shall receive, at the sole option of the Company, (a) cash in the full amount of the claim on or as soon as reasonably practicable following the later to occur of (i) the Effective Date and (ii) the date on which such claim becomes allowed, (b) equal semi-annual cash payments in the full amount of such claim, together with interest for a period after the Effective Date at a fixed-annual rate determined under applicable non-bankruptcy law, commencing upon the later of the Effective Date and the date such claim becomes allowed, or as soon thereafter as is practicable, and continuing over a period not exceeding five years from and after the Commencement Date, or (c) such other terms determined by the Bankruptcy Court to provide the holder deferred cash payments having a value, as of the Effective Date, equal to such claim.

## 3.    Class 3 – Secured Credit Facility Term Loan Claims

Secured Credit Facility Term Loan Claims include any Claim arising under the Secured Credit Facility Term Loan.  The Debtors estimate that on the Effective Date, the allowed amount of such claims will aggregate approximately $323,250,000.

Class 3 is impaired by the Plan.  Each holder of an Allowed Secured Credit Facility Term Loan Claim is entitled to vote to accept or reject the Plan.

On the Effective Date, or as soon as reasonably practicable thereafter, the Secured Credit Facility shall be converted into the Exit Facility.  Each holder of an Allowed Secured Credit Facility Term Loan Claim shall receive its Class 3 Pro Rata Share of the Exit Facility Term Loan, and its Class 3 Pro Rata Share of the New Preferred Stock.

4.        **Class 4 – Secured Letter of Credit Facility Claims**

Secured Letter of Credit Facility Claims include any Claim arising under the Secured Letter of Credit Facility.  The Debtors estimate that on the Effective Date, the allowed amount of such claims will aggregate approximately $84,388,501.

Class 4 is unimpaired by the Plan.  Each holder of an Allowed Secured Letter of Credit Facility Claim is conclusively presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan.

On the Effective Date, or as soon as reasonably practicable thereafter, the Secured Letter of Credit Facility shall be converted into the Exit Facility.  Each holder of an Allowed Secured Letter of Credit Facility Claim shall receive its Class 4 Pro Rata Share of the Exit Letter of Credit Facility, and its Class 4 Pro Rata Share of the excess of Credit Linked Deposits (as defined in the Secured Credit Facility) under the Secured Credit Facility over the amount of Credit Linked Deposits required under the Exit Facility Term Loan.

5.        **Class 5 – Other Secured Claims**

Other Secured Claims include any Secured Claim other than a Secured Tax Claim, a Secured Credit Facility Term Loan Claim, or a Secured Letter of Credit Claim.  The Debtors estimate that on the Effective Date, the allowed amount of such claims will aggregate approximately $[_____].

Class 5 is Unimpaired by the Plan.  Each holder of an Allowed Other Secured Claim is conclusively presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan.

Except to the extent that a holder of an Allowed Other Secured Claim agrees to a less favorable treatment, at the sole option of the Debtors, (i) each allowed other secured claim shall be reinstated and rendered unimpaired in accordance with section 1124(2) of the Bankruptcy Code, or (ii) each holder of an Allowed Other Secured Claim shall receive, in full satisfaction of such Claim, either (a) cash in the full amount of the Claim, including any interest required to be paid pursuant to section 506(b) of the Bankruptcy Code, (b) the proceeds of the sale or disposition of its collateral securing such Claim to the extent of the value of the holder's secured interest in such collateral, (c) the collateral securing such Claim and any interest on such Claim required to be paid pursuant to section 506(b) of the Bankruptcy Code, or (d) such other distribution as necessary to satisfy the requirements of section 1124 of the Bankruptcy Code.

6.        **Class 6 – Senior Noteholder Claims**

Senior Noteholder Claims include (a) all Claims arising under the FFL SPA and (b) all Claims arising under the Series C Notes issued pursuant to the Series C Indenture.  The Debtors estimate that on the Effective Date, the allowed amount of such claims will aggregate approximately $240,000,000.

Class 6 is impaired by the Plan.  Each holder of an Allowed Senior Noteholder Claim is entitled to vote to accept or reject the Plan.

On the Effective Date, or as soon as reasonably practicable thereafter, each holder of a Senior Noteholder Claim shall receive [x] shares of New Class 1 Common Stock for each dollar of such holder's Allowed Claim, which will be held in the Voting Trust, as described in <u>Section V.E.5</u>, entitled "The Reorganization Plan—Means of Implementation—Issuance of New Common Stock."

7.     **Class 7 – Junior Noteholder Claims**

Junior Noteholder Claims include all Claims arising under the Junior Notes issued pursuant to the Junior Indenture.  The Debtors estimate that on the Effective Date, the allowed amount of such claims will aggregate approximately $450,000,000.

Class 7 is impaired by the Plan.  Each holder of an Allowed Junior Noteholder Claim is entitled to vote to accept or reject the Plan.

On the Effective Date, or as soon as reasonably practicable thereafter, each holder of a Junior Noteholder Claim shall receive [x] shares of New Class 2 Common Stock for each dollar of such holder's Allowed Claim, which will be held in the Voting Trust, as described in <u>Section V.E.5</u>, entitled "Reorganization Plan—Means of Implementation—Issuance of New Common Stock."

8.     **Class 8 – General Unsecured Claims**

General Unsecured Claims include any general unsecured Claim **other than** an Administrative Expense Claim, Professional Compensation and Reimbursement Claim, Priority Tax Claim, Priority Non-Tax Claim, Secured Tax Claim, Secured Credit Facility Claim, Term Loan Claim, Secured Letter of Credit Facility Claim, Other Secured Claim, Senior Noteholder Claim, Junior Noteholder Claim, Convenience Class Claim, or Intercompany Claim.  The Debtors estimate that on the Effective Date, the allowed amount of such claims will aggregate approximately $[_____], which will be held in the Voting Trust, as described in <u>Section V.E.5</u>, entitled "The Reorganization Plan— Means of Implementation—Issuance of New Common Stock."

Class 8 is impaired by the Plan.  Each holder of an Allowed General Unsecured Claim is entitled to vote to accept or reject the Plan.

On the Effective Date, or as soon as reasonably practicable thereafter, each holder of a General Unsecured Claim shall receive [x] shares of New Class 3 Common Stock for each dollar of such holder's Allowed Claim, which will be held in the Voting Trust, as described in <u>Section V.E.5</u>, entitled "The Reorganization Plan—Means of Implementation—Issuance of New Common Stock."

9.     **Class 9 – Convenience Class Claims**

Convenience Class Claims are any general unsecured Claim that is (a) allowed in an amount of $[___] or less or (b) the holder of the general unsecured Claim elects to reduce its claim to $[___] or less.

Class 9 is impaired by the Plan.  Each holder of an Allowed Convenience Claim is entitled to vote to accept or reject the Plan.

Each holder of a Convenience Class Claim shall receive, as soon as reasonably practicable after the later of the Effective Date and the date such Convenience Class Claim becomes an Allowed Claim, Cash equal to [___]% of the Allowed amount of such Claim.

10.     **Class 10 – Equity Interests**

Equity Interests include all instruments evidencing an ownership interest in the Debtors, whether or not transferable, and all options, warrants or rights, contractual or otherwise, to acquire any such interests, all as of the Effective Date.

Class 10 is impaired by the Plan.  Each holder of an Equity Interest is deemed to reject the Plan and is not entitled to vote to accept or reject the Plan.

On the Effective Date, the Equity Interests shall be cancelled and extinguished and the holders of Equity Interests shall not be entitled to, and shall not receive or retain, any property or interest in property on account of such Equity Interests under the Plan.

## E.    **Means of Implementation**

### 1.    **The New Secured Credit Facility[21]**

BearingPoint and the Prepetition Secured Lenders have agreed in principle to the principal terms for a new secured credit facility (the "New Secured Credit Facility") which will replace the Secured Credit Facility and provide: (i) a term loan in the amount of (A) $272,000,000 plus (B) the sum of any letters of credit issued prior to the Commencement Date that have been drawn subsequent to the date of execution of a plan support agreement and prior to the date on which all the conditions precedent to the effectiveness of the Chapter 11 plan shall have occurred (the "Plan Effective Date") and that have not been reimbursed by BearingPoint prior to the Plan Effective Date plus (C) accrued interest outstanding under the Secured Credit Facility as of the Plan Effective Date (the "Term Loan") and (ii) a synthetic letter of credit facility of $130,000,000 (the "LC Facility") which shall consist of (A) $84,053,079 of letters of credit issued and outstanding, including any letters of credit which have been drawn during the Cases and have not been reimbursed by BearingPoint prior to the Commencement Date (the "Pre-Filing Date LCs"), (B) letters of credit issued during the Cases, that were back-stopped during the Cases by the use of cash collateral, and which letters of credit shall not exceed $20 million (the "Cash Collateralized LCs") and (C) letters of credit to be issued after the Plan Effective Date ("Post-Emergence LCs").   On the Plan Effective Date, letters of credit cash collateralized during the Cases will be issued under the LC Facility to replace any letters of credit issued during the Cases.   Any cash collateral used to secure letters of credit during the Cases shall be returned to BearingPoint upon the issuance of such replacement letters of credit.

Under the Term Loan interest will be payable in arrears on the unpaid principal amount of the Term Loan at a rate per annum equal to (A) 8% payable-in-kind quarterly and (B) at BearingPoint's election: (x) LIBOR plus 6.00% or (y) the Base Rate plus 5.00%, in each case, payable in cash monthly. A letter of credit facility fee will be payable quarterly in arrears on  (A) the aggregate amount of credit-linked deposits at a rate per annum equal to 6.125% payable in cash (including any term loans deemed made by the Prepetition Secured Lenders under the LC Facility as a result of drawn letters of credit reimbursed with credit linked deposits) and (B) the amount of letters of credit outstanding under the LC Facility at a rate per annum equal to 8.00% payable-in-kind in the form of PIK Notes (as defined below) (the "PIK Fee").  Interest will be payable on any loans deemed made by Prepetition Secured Lenders under the LC Facility as a result of drawn letters of credit reimbursed with credit-linked deposits ("LC Loans") at a rate per annum equal to LIBOR plus 6.00% payable in cash and 8.00% payable-in-kind in the form of PIK Notes.  The PIK Notes shall mean a note with the same maturity date as the LC Facility and with interest payable quarterly at a rate per annum equal to 8% payable-in-kind.

From and after the occurrence of a payment or bankruptcy event of default, or, at the election of the Agent at the direction of steering committee, any other event of default, all amounts under

---

[21] The New Secured Credit Facility is defined in the Plan as the "Exit Facility."

the definitive documentation shall bear interest at the applicable interest rate (including those obligations which are determined by reference to the rate applicable to any other obligation) plus 2% per annum and any letter of credit fees shall be increased by 2% per annum.

       The New Secured Credit Facility contemplates customary affirmative, negative and financial covenants binding on the Reorganized BE. Specifically, the financial covenants will be tested monthly through December 31, 2009, and tested quarterly thereafter (with financial definitions to be agreed upon, and with levels containing a cushion of 15% (or such other cash amount acceptable to the Prepetition Secured Lenders and BearingPoint) from BearingPoints's projections, which projections shall be acceptable to the Prepetition Secured Lenders), including, without limitation: (i) maximum ratios of total debt to EBITDAR; (ii) minimum EBITDAR; and (iii) minimum liquidity.

       The New Secured Credit Facility will mature thirty-six months after the Plan Effective Date. The Post-Emergence LCs, any Cash Collateralized LCs that are replaced with letters of credit under the LC Facility ("Replacement LCs"), and any LC Loans deemed made as a consequence of a draw upon a Post-Emergence LC or a Replacement LC (collectively, the "First Lien LC Facility"), will be secured by a first priority security interest in all assets of Reorganized BE, including, without limitation, all deposit and bank accounts wherever located, together with a pledge of all stock of Parent, BearingPoint and each of its direct and indirect domestic subsidiaries, (and 65% of all first-tier foreign subsidiaries; provided however, the Collateral shall not include the remaining 35% stock interests in the first-tier foreign subsidiaries (the "Additional Foreign Stock") unless a mutual determination is made by the Debtors and Agent (or if no agreement, a determination by this Court) that a pledge of the Additional Foreign Stock would not cause a material adverse effect on the Debtors) (the "Collateral"); provided however, that the First Lien LC Facility shall not include (i) any LC Loans deemed made as a consequence of a draw upon a Pre-Filing Date LC, (ii) any letter of credit issued after the Plan Effective Date to replace a Pre-Filing Date LC, if such Pre-Filing Date LC contains an "evergreen" renewal provision and the issuer thereof has not renewed such Pre-Filing Date LC pursuant to such provision, and (iii) any Pre-Filing Date LCs or any other obligations under the LC Facility (clauses (i)-(iii), collectively, the "Second Lien LC Facility").

       The Second Lien LC Facility shall be *pari passu* with the Term Loan. The Term Loan and the Second Lien LC Facility will be secured by a second priority security interest in the Collateral, second in priority only to the liens securing the First Lien LC Facility.

       Additionally, from and after the Plan Effective Date, all inter-company advances by a loan party (other than allocations for shared services or overhead) shall be reflected through the issuance of secured inter-company notes (other than inter-company transactions between loan parties), which notes, to the extent legally and practically possible shall be pledged to the Agent, on behalf of itself and the Prepetition Secured Lenders, in each case subject to exceptions and limitations to be agreed upon. Such inter-company notes shall be pledged as part of the Collateral through perfected control account agreements and local pledges in compliance with the laws of the relevant foreign jurisdictions.

       The Agent, on behalf of the Prepetition Secured Lenders under the First Lien LC Facility, shall reallocate to the Prepetition Secured Lenders under the Term Loan an amount equal to 50% of the PIK Compensation received by such Prepetition Secured Lenders under the First Lien LC Facility.

       The New Secured Credit Facility will also be subject to customary and standard mandatory prepayments, including but not limited to: Customary and standard including, but not limited to, the following: (i) 100% of the net cash proceeds of asset sales and extraordinary receipts; (ii) 100% of the net cash proceeds of issuances or placements of equity and debt and (iii) 65% of Excess Cash (to be defined), adjusted for any net cash proceeds from asset sales or debt or equity issuances and debt repayments.

The availability of the New Secured Credit Facility will be conditioned upon the satisfaction of conditions precedent usual and customary for financings of this kind, and such other conditions deemed by Agent and the Prepetition Secured Lenders to be appropriate for the transaction, including, without limitation: (i) occurrence of the Plan Effective Date; (ii) the issuance of an opinion by the Defense Contract Audit Agency that contains no adverse opinion with respect to BearingPoint; and (iii) amounts in the Credit-Linked Deposit Account (as defined in the Prepetition Secured Credit Facility) in excess of amounts under the LC Facility shall have been returned to the Prepetition Secured Lenders under the Prepetition Letter of Credit Facility.

The New Secured Credit Facility will have customary events of default for facilities and transactions of this type and others to be reasonably specified by the Agent relating to BearingPoint and its subsidiaries (subject, where appropriate, to thresholds and grace periods to be agreed upon), including, without limitation, nonpayment of principal, interest or other amounts; violation of covenants; incorrectness of representations and warranties in any material respect; cross default and cross acceleration; bankruptcy; material judgments; ERISA events; actual or asserted invalidity of guarantees or security documents; failure to obtain approval for new federal government contracts following the issuance of a failed, negative or adverse viability audit from the DCAA, and such failure is not cured within ten days; and change of control.

The BearingPoint Plan Term Sheet included as Exhibit E to this Disclosure Statement describes the agreed to terms of the New Secured Credit Facility.

## 2.    Settlement of Claims

Pursuant to Bankruptcy Rule 9019, in consideration for the classification, distribution, and other benefits provided under the Plan, upon the Effective Date, the provisions of the Plan shall constitute a good-faith compromise and settlement of all Claims or controversies resolved pursuant to the Plan.  All Plan distribution made to creditors holding Allowed Claims in any class are intended to be and shall be final, and no Plan distribution to the holder of a Claim in one class shall be subject to being shared with or reallocated to the holders of any Claim in another class by virtue of any prepetition collateral trust agreement, shared collateral agreement, subordination agreement, other similar inter-creditor arrangement or deficiency claim.

## 3.    Intercompany Claims

Notwithstanding anything to the contrary in the Plan, Intercompany Claims will be reduced, reinstated or discharged to the extent determined appropriate by the Debtors or the Reorganized Debtors, after consultation with the Secured Lenders.  Any such transaction may be effected on or subsequent to the Effective Date without any further action by the Debtors, the Debtors in Possession, or the Reorganized Debtors.

## 4.    Issuance of New Preferred Stock

Reorganized BE is authorized under the Plan to issue new preferred stock with a face value of $50.0 million (the "New Preferred Stock") on the Effective Date without the need for any further corporate action and without any further action by holders of Claims or Equity Interests. The New Preferred Stock will have a liquidation preference equal to 100% of the issue price, plus any accrued and unpaid dividends.

The New Preferred Stock outstanding may be converted at anytime, at the option of the holders, into a number of shares of Class 3 Common Stock equal to 100% of the liquidation preference

minus the percentage of the liquidation preference already received by such holder, divided by the fair market value per share of the Class 3 Common Stock at the time of conversion, as determined by an investment banking firm of national repute selected by the New Board (as defined herein). Dividends will be 13.5% paid in-kind and will accrue daily.

After the repayment in full of any outstanding amounts under the New Secured Credit Facility (including principal, accrued and unpaid interest, fees, costs and expenses), the New Preferred Stock may be redeemed at the option of the holders (i) upon a change of control (as defined in the definitive documentation regarding the New Preferred Stock), or (ii) upon a sale of any of Reorganized BE's (or any of its subsidiaries') securities or material assets, other than asset sales in the ordinary course of business that do not constitute (in one or any series of transactions) a sale of substantially all of the assets of Reorganized BE as compared to its assets as of the date of emergence.

Subject to the optional conversion rights described above, after the repayment in full of all outstanding amounts under the New Secured Credit Facility (or upon a waiver by the lenders thereto), the New Preferred Stock may be redeemed at the option of Reorganized BE, at any time or from time to time, in whole or in part, at a redemption price equal to the liquidation preference or the pro rata portion thereof.

Reorganized BE will provide to the holders of New Preferred Stock any and all EBITDA or cash position reports as are provided to the Prepetition Secured Lenders.

The New Preferred Stock will rank senior to all other capital stock of Reorganized BE with respect to dividends, liquidation, asset sales, etc. As long as the Preferred Stock is outstanding, no dividends or other payment shall be made by Reorganized BE on account of any class of New Common Stock (as defined below). While the New Preferred Stock is outstanding, approval of the holders of the New Preferred Stock, voting as a separate class, shall be required for any action which, among other things: (i) alters or changes the rights, preferences or privileges of the New Preferred Stock in a manner adverse to the holders of New Preferred Stock, (ii) creates any new class or series of shares of capital stock having a preference over or on parity with the New Preferred Stock or Class 3 Common Stock, (iii) reclassifies shares of capital stock into shares having a preference over or on parity with the New Preferred Stock or Class 3 Common Stock, (iv) authorizes any dividend or distribution with respect to equity securities ranking junior or on parity with the New Preferred Stock, (v) effects any redemption or repurchase of any shares of capital stock, other than the New Preferred Stock, of Reorganized BE, (vi) increases or decreases the authorized number of shares of New Preferred Stock, (vii) effects a change of control or a sale of any of Reorganized BE's (or any of its subsidiaries') securities or material assets, other than asset sales in the ordinary course of business that do not constitute (in one or any series of transactions) a sale of substantially all of the assets of Reorganized BE as compared to its assets as of the date of emergence, (viii) would constitute a merger of the Company, including pursuant to Section 251(g) of the Delaware General Corporation law, (ix) increases the funded debt of Reorganized BE and its consolidated subsidiaries above the amount that is outstanding as of the Effective Date, (x) effects a liquidation of Reorganized BE or any of its subsidiaries or (xi) effects a bankruptcy, insolvency or similar proceeding of Reorganized BE or any of its subsidiaries.

The certificate of incorporation of Reorganized BE shall provide that as long as the New Preferred Stock is outstanding, the holders of the New Preferred Stock shall have the continuing right to nominate and elect five of the seven directors of the board of directors of Reorganized BE (the "New Board"). The holders of the New Preferred Stock shall vote its shares to elect the CEO of Reorganized BE as one of its directors.

The New Preferred Stock will be freely transferable, subject to applicable law, but any such transfer will not be permitted to the extent it would cause (i) the number of record holders of the New Preferred Stock to be at or in excess of 300 or (ii) a change in more than 50% ownership in the New Preferred Stock (in the aggregate), and such change would have a material and adverse tax consequence to Reorganized BearingPoint (subject, in the case of clause (ii), to the board of director's right to permit such transfers under certain circumstances). If there are not any material NOLs, built-in losses or other valuable tax attributes to preserve, then the restrictions in the foregoing clause (ii) will not be implemented.

The holders of New Preferred Stock will designate an authorized representative to act on behalf of all such holders with respect to the New Preferred Stock, and in such agreement such holders will agree amongst themselves (i) as to certain provisions regarding the transfer and voting of the New Preferred Stock to ensure that the holders of New Preferred Stock are representative of the holders of the indebtedness under the New Secured Credit Facility and (ii) to share, pro rata, in any transfers of New Preferred Stock that are permitted in the event the 50% transfer limitation set forth in clause (ii) in the preceding paragraph is applicable. The New Preferred Stock will have the same covenants as the New Secured Credit Facility.

Subject to the optional conversion rights described above, any holder or group of holders of New Common Stock shall retain the right to pay down the New Secured Credit Facility for par plus accrued interest and buy the New Preferred Stock for cash in the amount of the liquidation preference; provided, however, that without the consent of the holders of the New Preferred Stock, such pay down and such buy out must occur simultaneously. Such pay down and buy out right of the holders of Common Stock shall expire on the date that is one year from the Commencement Date.

## 5.    Issuance of New Common Stock

Reorganized BearingPoint is authorized under the Plan to issue new common stock (the "New Common Stock") on the Effective Date without the need for any further corporate action and without any further action by holders of Claims or Equity Interests. The New Common Stock will consist of [X] authorized shares of new class 1 common stock (the "Class 1 Common Stock"), [X] authorized shares of new class 2 common stock (the "Class 2 Common Stock"), and [X] authorized shares of new class 3 common stock (the "Class 3 Common Stock").

The holders of Class 1 Common Stock, Class 2 Common Stock, and Class 3 Common Stock shall be entitled to receive the same per share dividend payments, liquidating distributions and will have the same per share voting rights (one vote per share, subject to the voting rights of the New Preferred Stock while it is outstanding), subject to the exceptions as described below.

Notwithstanding anything to the contrary herein, the holders of each class of New Common Stock shall be entitled to a class vote (i.e., blocking rights) on any proposed amendment to the Reorganized BearingPoint's certificate of incorporation that would adversely affect any of the rights and preferences of such class. In addition, the approval of a majority of the holders of each class of New Common Stock shall be required for any action which, (i) creates any new class or series of shares of capital stock, or (ii) increases or decreases the authorized number of shares of New Common Stock.

Prior to the fifth anniversary of the Effective Date, so long as the New Preferred Stock is outstanding, shares of each class of New Common Stock (and any interest in the voting trust described herein) shall only be transferable, directly or indirectly, by operation of law.

All shares of New Common Stock shall be placed in a voting trust on the Effective Date, and the trustee of such voting trust shall vote all of the subject shares in accordance with the direction of such holders of such Common Stock; provided, however, that as long as the New Preferred Stock is outstanding, the trustee shall automatically (and without any action on the part of any stockholder) vote all of the subject shares in accordance with the direction of the holders of New Preferred Stock (other than the election and removal of directors as provided herein) with respect to any corporate action that requires such a vote.  The trust shall distribute all shares of New Common Stock in the voting trust, if any, to such holders on the earlier of (i) the date the New Preferred Stock is no longer outstanding and (ii) the fifth anniversary of the Effective Date.

As long as the New Preferred Stock is outstanding, at any time following such time as Reorganized BearingPoint determines to seek approval of the New Board (if such approval is required) with respect to any sale, transfer or disposition of, directly or indirectly, assets, liabilities, other risks or securities of Reorganized BearingPoint requiring the approval of the New Board (it being understood that such approval shall not be a requirement for the exercise of the call rights described herein), the holders of New Preferred Stock shall have the right to purchase all, but not less than all, of the New Common Stock from the trustee of the voting trust for no consideration other than a contingent, deferred purchase price payment equal to an amount in excess of all amounts received by holders of New Preferred Stock and New Common Stock (taking into account amounts paid to the Prepetition Secured Lenders as repayment of amounts under the New Secured Credit Facility) in excess of (i) amounts necessary to repay in cash in full the outstanding principal amounts of the Term Loan and the LC Facility, plus accrued and unpaid interest, fees costs and expense thereunder, and (ii) amounts constituting the full liquidation preference in respect of the New Preferred Stock.  In addition, Reorganized BearingPoint's certificate of incorporation will include "forced sale" provisions that automatically effects the transfer of New Common Stock upon the execution of the call rights described herein.

### a.    Class 1 Common Stock

The Class 1 Common Stock shall be distributed to the Senior Noteholders. Each holder of a Senior Noteholder Claim shall receive [X] shares of Class 1 Common Stock.

Immediately after the Effective Date, holders of Class 1 Common Stock shall receive the any dividend payments, liquidating distributions and the voting rights that would otherwise be provided to the holders of Class 2 Common Stock (other than the rights of the holders of Class 2 Common Stock to nominate and elect directors as described below). Once the holders of Class 1 Common Stock have received dividends and liquidating distributions in the aggregate amount of $240 million (the "Equity Triggering Event"),  the holders of Class 1 Common Stock shall receive the same per share dividends, liquidating distributions and voting rights as the other two classes of New Common Stock.

Prior to the occurrence of the Equity Triggering Event, if there is any New Preferred Stock outstanding, the holders of Class 1 Common Stock shall have the right to nominate and elect two directors; if there is not any New Preferred Stock outstanding, the holders of Class 1 Common Stock shall have the right to nominate and elect four directors.  Following the occurrence of the Equity Triggering Event, all directors shall be nominated and elected on a one vote per share basis by the holders of Class 1 Common Stock, Class 2 Common Stock and Class 3 Common Stock, voting together and not as separate classes (subject, in all cases, to any rights of the New Preferred Stock to elect directors).

### b.    Class 2 Common Stock

The Class 2 Common Stock shall be distributed to the Junior Noteholders. Each holder of a Junior Noteholder Claim shall receive [X] shares of Class 2 Common Stock.

Immediately after the Effective Date, holders of Class 2 Common Stock will not receive any dividend payments, liquidating distributions or voting rights (other than the right to nominate and elect directors as described below). Following the occurrence of the Equity Triggering Event the holders of Class 2 Common Stock shall receive the same per share dividends, liquidating distributions and voting rights as the other two classes of New Common Stock.

Prior to the occurrence of the Equity Triggering Event, if there is any New Preferred Stock outstanding, the holders of Class 2 Common Stock shall not have the right to nominate or elect any directors; if there is not any New Preferred Stock outstanding, the holders of Class 2 Common Stock shall have the right to nominate and elect two directors. Following the occurrence of the Equity Triggering Event, all directors shall be nominated and elected on a one vote per share basis by the holders of Class 1 Common Stock, Class 2 Common Stock and Class 3 Common Stock, voting together and not as separate classes (subject, in all cases, to any rights of the New Preferred Stock to elect directors).

### c.    *Class 3 Common Stock*

The Class 3 Common Stock shall be distributed to the holders of General Unsecured Claims. Each holder of a General Unsecured Claim shall receive [X] shares of Class 3 Common Stock.

Prior to the occurrence of the Equity Triggering Event, if there is any New Preferred Stock outstanding, the holders of Class 3 Common Stock shall not have the right to nominate or elect any directors; if there is not any New Preferred Stock outstanding, the holders of Class 3 Common Stock shall have the right to nominate and elect one director. Following the occurrence of the Equity Triggering Event, all directors shall be nominated and elected on a one vote per share basis by the holders of Class 1 Common Stock, Class 2 Common Stock and Class 3 Common Stock, voting together and not as separate classes (subject, in all cases, to any rights of the New Preferred Stock to elect directors).

### 6.    Merger/Dissolution/Consolidation

On or as of the Effective Date or as soon as practicable thereafter and without the need for any further action, the Reorganized Debtors may: (i) cause any or all of the Reorganized Debtors or to be merged into one or more of the Reorganized Debtors, dissolved or otherwise consolidated, (ii) cause the transfer of assets between or among the Reorganized Debtors, or (iii) engage in any other transaction in furtherance of the Plan.

### 7.    Cancellation of Existing Agreements and Equity Interests

Except (a) as otherwise expressly provided in the Plan, (b) with respect to executory contracts or unexpired leases that have been assumed by the Debtors, (c) for purposes of evidencing a right to distributions under the Plan, or (d) with respect to any Claim that is reinstated and rendered unimpaired under the Plan, on the Effective Date, the Secured Credit Facility, the FFL SPA, the Series A Note, the Series B Note, the Series C Note and any indentures pursuant to which such notes were issued, all Equity Interests and other instruments evidencing any Claims against the Debtors or Equity Interests in the Debtors shall be deemed automatically cancelled without further act or action under any applicable agreement, law, regulation, order or rule and the obligations of the Debtors thereunder shall be discharged.

### 8.    Surrender of Existing Securities

Each holder of the Series A Note, Series B Note or the Series C Note shall surrender such note(s) to the Indenture Trustee, or in the event such note(s) are held in the name or, or by a nominee of,

the Depository Trust Company, the Disbursing Agent shall seek the cooperation of the Depository Trust Company to provide appropriate instructions to the Indenture Trustee.  No distributions under the Plan shall be made for or on behalf of any such holder unless and until such note is received by the Indenture Trustee or appropriate instructions from the Depository Trust Company shall be received by the Indenture Trustee, or the loss, theft or destruction of such note is established to the reasonable satisfaction of the Indenture Trustee, which satisfaction may require such holder to submit (a) a lost instrument affidavit and (b) an indemnity bond holding the Debtors, Reorganized Debtors, Disbursing Agent, and Indenture Trustee harmless in respect of such note and any distributions made in respect thereof.

Each holder of an FFL Note shall surrender such note(s) to Reorganized BE.  No distributions under the Plan shall be made for or on behalf of any such holder unless and until such note is received by Reorganized BE, or the loss, theft or destruction of such note is established to the reasonable satisfaction of Reorganized BE, which satisfaction may require such holder to submit (a) a lost instrument affidavit and (b) an indemnity bond holding the Debtors, Reorganized Debtors, and Disbursing Agent, harmless in respect of such note and any distributions made in respect thereof.

Upon compliance with this Section by a holder of any note, such holder shall, for all purposes under the Plan, be deemed to have surrendered such note.  Any holder of Series A Note, Series B Notes, Series C Notes, or FFL Note that fails to surrender such note or satisfactorily explain its non-availability to the Indenture Trustee or Reorganized BE, as applicable, within one (1) year of the Effective Date shall be deemed to have no further Claim against the Debtors, the Reorganized Debtors (or their property) or the Indenture Trustee in respect of such Claim and shall not participate in any distributions under the Plan.  All property in respect of such forfeited distributions, including interest thereon, shall be promptly returned to the Reorganized Debtors by the Indenture Trustee and any such security shall be cancelled.

## 9.    Incurrence of New Indebtedness

The Reorganized Debtors' entry into the Exit Facility and the incurrence of the indebtedness thereunder on the Effective Date is authorized by the Plan without the need for any further corporate action and without any further action by holders of Claims or Equity Interests.

## 10.    Amendment to the Amended and Restated Certificate of Incorporation

On the Effective Date, Reorganized BE will adopt an amendment to its Amended and Restated Certificate of Incorporation (the "Reorganized BearingPoint Certificate of Incorporation") and an amendment to its Amended and Restated Bylaws and will file the Reorganized BearingPoint Certificate of Incorporation with the Secretary of State of Delaware.  In addition, on or before the Effective Date, pursuant to and only to the extent required by section 1123(a)(6) of the Bankruptcy Code, the Reorganized BearingPoint Certificate of Incorporation, will be amended as necessary to satisfy the provisions of the Bankruptcy Code. On the Effective Date, the Board of Directors of BearingPoint shall be deemed to have adopted the amended Bylaws, subject to confirmation of the Plan.

The Reorganized BearingPoint Certificate of Incorporation will provide for the issuances of the three classes of New Common Stock and the New Preferred Stock, each with the rights and characteristics described above.

In addition, the Reorganized BearingPoint Certification of Incorporation will include a "forced sale" provision and restrictions on transfer of the New Common Stock as described in Section V.E.5 "The Plan of Reorganization—Means of Implementation—Issuance of New Common Stock."

F.    **Distributions under the Plan**

1.    **Distributions on Allowed General Unsecured Claims
and Allowed Convenience Class Claims**

Distributions with respect to holders of Allowed General Unsecured Claims and Allowed Convenience Class Claims shall be made on the Effective Date and at periodic intervals thereafter as Disputed Claims become Allowed.

2.    **Date of Distributions**

In the event that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date.

3.    **Disbursing Agent/Rights and Powers of
Disbursing Agent/Expenses of Disbursing Agent**

All distributions under the Plan shall be made by Reorganized BE as Disbursing Agent or such other entity designated by Reorganized BE as a Disbursing Agent.

The Disbursing Agent shall be empowered to (a) effect all actions and execute all agreements, instruments and other documents necessary to perform its duties under the Plan, (b) make all distributions contemplated by the Plan, (c) employ professionals to represent it with respect to its responsibilities and (d) exercise such other powers as may be vested in the Disbursing Agent by order of the Bankruptcy Court, pursuant to the Plan or as deemed by the Disbursing Agent to be necessary and proper to implement the provisions of the Plan.

Except as otherwise ordered by the Bankruptcy Court, any reasonable fees and expenses incurred by the Disbursing Agent (including, without limitation, taxes and reasonable attorneys fees and expenses) on or after the Effective Date shall be paid in Cash by the Reorganized Debtors in the ordinary course of business.

4.    **Delivery of Distribution**

Subject to Bankruptcy Rule 9010, all distributions to any holder of an Allowed Claim or Allowed Administrative Expense Claim shall be made at the address of such holder as set forth on the Schedules filed with the Bankruptcy Court or on the books and records of the Debtors or their agents, as applicable, unless the Debtors or Reorganized Debtors have been notified in writing of a change of address, including, without limitation, by the filing of a proof of Claim by such holder that contains an address for such holder different than the address of such holder as set forth on the Schedules.  Nothing in this Plan shall require the Reorganized Debtors to attempt to locate any holder of an Allowed Claim.

The Prepetition Agent shall be the Disbursing Agent for the Secured Letter of Credit Facility Claims and the Secured Credit Facility Term Loan Claims Distributions under the Plan to holders of Allowed Secured Letter of Credit Facility Claims and Allowed Secured Credit Facility Term Loan Claims shall be made by the Reorganized Debtors to the Prepetition Agent, which, in turn shall make distributions to the holders of such Allowed Claims.  Upon delivery of the distributions set forth in

Sections 4.3(b) and 4.4(b) of the Plan to the Prepetition Agent, the Reorganized Debtors shall be released of all liability with respect to the delivery of such distributions.

The Indenture Trustee shall be the Disbursing Agent for the Series A Notes, Series B Notes and the Series C Notes.  Distributions under the Plan to holders of Allowed Junior Noteholder Claims and Allowed Series C Noteholder Claims shall be made by the Reorganized Debtors to the Indenture Trustee, which, in turn, shall make the distributions to the holders of such Allowed Claims.  Upon delivery of the distributions set forth in Article IV of the Plan, to the Indenture Trustee, the Reorganized Debtors shall be released of all liability with respect to the delivery of such distributions.

## 5.    Unclaimed Distributions

All distributions under the Plan that are unclaimed for a period of one (1) year after distribution thereof shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code and revested in the Reorganized Debtors and any entitlement of any holder of any Claims to such distributions shall be extinguished and forever barred.

## 6.    Distribution Record Date

With respect to holders of all General Unsecured Claims against the Debtors, and all Convenience Class Claims against the Debtors on the Distribution Record Date, the Claims register shall be closed and any transfer of any Claim therein shall be prohibited.  The Debtors and the Reorganized Debtors shall have no obligation to recognize any transfer of any such Claims occurring after the close of business on such date.

## 7.    Manner of Payment

At the option of the Disbursing Agent, any Cash payment to be made under the Plan may be made by a check or wire transfer or as otherwise required or provided in applicable agreements.  All distributions of Cash to the creditors of each of the Debtors under the Plan shall be made by, or on behalf of, the applicable Debtor.

## 8.    Cash Distributions/No Fractional Shares

No payment of Cash less than fifty dollars ($50) shall be made to any holder of an Allowed Claim unless a request therefor is made in writing to the Reorganized Debtors.

No fractional shares of New Common Stock shall be distributed and no Cash shall be distributed in lieu of such fractional shares.  When any distribution pursuant to the Plan on account of an Allowed Claim would otherwise result in the issuance of a number of shares of New Common Stock that is not a whole number, the actual distribution of shares of New Common stock shall be rounded as follows: (a) fractions of one-half (½) or greater shall be rounded to the next higher whole number and (b) fractions of less than one-half (½) shall be rounded to the next lower whole number with no further payment therefor.  The total number of authorized shares of New Class 1 Common Stock, New Class 2 Common Stock, or New Class 3 Common Stock to be distributed to holders of Allowed Claims shall be adjusted as necessary to account for the foregoing rounding.

## 9.    Setoff and Recoupment

The Debtors may, but shall not be required to, setoff against or recoup from any Claim and the payments to be made pursuant to the Plan in respect of such Claim any Claims of any nature

whatsoever that the Debtors may have against the claimant, but neither the failure to do so nor the allowance of any Claim under the Plan shall constitute a waiver or release by the Debtors or Reorganized Debtors of any such claim they may have against such claimant.

### 10.    Interest on Claims/Dividends

Unless otherwise specifically provided for in the Plan or the Confirmation Order, postpetition interest shall not accrue or be paid on any Claims, and no holder of a Claim shall be entitled to interest accruing on or after the Commencement Date on any Claim.  Unless otherwise specifically provided for in the Plan or the Confirmation Order, interest shall not accrue or be paid upon any Claim in respect of the period from the Commencement Date to the date a final distribution is made thereon if and after such Claim becomes an Allowed Claim.

No holder of a Claim that is entitled to shares of any of the New Common Stock shall be entitled to dividends on such shares unless such holder's Claim is an Allowed Claim as of the applicable record date for such dividends.

### 11.    No Distribution in Excess of Allowed Amounts

Notwithstanding anything to the contrary in the Plan, no holder of an Allowed Claim shall receive in respect of such Claim any distribution of a value as of the Effective Date in excess of the Allowed amount of such Claim.

### 12.    Distributions After the Effective Date

Distributions made after the Effective Date to holders of Disputed Claims that are not Allowed Claims as of the Effective Date but which later become Allowed Claims shall be deemed to have been made on the Effective Date.

### 13.    Allocation of Plan Distributions Between Principal and Interest

To the extent that any Allowed Claim entitled to a distribution under the Plan consists of indebtedness and other amounts (such as accrued but unpaid interest thereon), such distribution shall be allocated first to the principal amount of the Claim (as determined for federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of the Claim, to such other amounts.

## G.    Procedures for Treating Disputed Claims Under the Plan

### 1.    Objections

Except as otherwise provided in Section 7.2 of the Plan, as of the Effective Date, objections to, and requests for estimation of, Administrative Expense Claims and Claims against the Debtors may be interposed and prosecuted only by the Reorganized Debtors.  Such objections and requests for estimation shall be served on the respective claimant and filed with the Bankruptcy Court on or shall be served and filed (i) on or before the ninetieth (90th) day following the later of (x) the Effective Date and (y) the date that a proof of Claim is filed or amended or a Claim is otherwise asserted or amended in writing by or on behalf of a holder of such Claim, or (ii) such later date as may be fixed by the Bankruptcy Court whether fixed before or after the date specified in clauses (x) and (y) above.

### 2. No Distributions Pending Allowance

Notwithstanding any other provision of the Plan, if any portion of a Claim or Administrative Expense Claim is Disputed, no payment or distribution provided under the Plan shall be made on account of such Claim or Administrative Expense Claim unless and until such Disputed Claim or Disputed Administrative Expense Claim becomes Allowed.

### 3. Distributions After Allowance

To the extent that a Disputed Claim or Disputed Administrative Expense Claim ultimately becomes an Allowed Claim or Allowed Administrative Expense Claim, distributions (if any) shall be made to the holder of such Allowed Claim or Allowed Administrative Expense Claim in accordance with the provisions of the Plan.

### 4. Resolution of Administrative Expense Claims and Claims

On and after the Effective Date, the Reorganized Debtors shall have the authority to compromise, settle, otherwise resolve or withdraw any objections to Administrative Expense Claims and Claims against the Debtors and to compromise, settle or otherwise resolve any Disputed Administrative Expense Claims and Disputed Claims against the Debtors without approval of the Bankruptcy Court.

### 5. Estimation of Claims/Interest

The Debtors or the Reorganized Debtors may at any time request that the Bankruptcy Court estimate any Contingent Claim, Unliquidated Claim or Disputed Claim pursuant to section 502(c) of the Bankruptcy Code regardless of whether any of the Debtors or the Reorganized Debtors previously objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court will retain jurisdiction to estimate any Claim at any time during litigation concerning any objection to any Claim, including, without limitation, during the pendency of any appeal relating to any such objection. In the event that the Bankruptcy Court estimates any Contingent Claim, Unliquidated Claim or Disputed Claim, the amount so estimated shall constitute either the Allowed amount of such Claim or a maximum limitation on such Claim, as determined by the Bankruptcy Court. If the estimated amount constitutes a maximum limitation on the amount of such Claim, the Debtors or the Reorganized Debtors may pursue supplementary proceedings to object to the allowance of such Claim. All of the aforementioned objection, estimation and resolution procedures are intended to be cumulative and not exclusive of one another. Claims may be estimated and subsequently compromised, settled, withdrawn or resolved by any mechanism approved by the Bankruptcy Court.

To the extent that a Disputed Claim becomes an Allowed Claim after the Effective Date, the holder of such Claim shall not be entitled to any interest thereon.

## H. Executory Contracts and Unexpired Leases

### 1. Assumption or Rejection of Executory Contracts and Unexpired Leases

Pursuant to sections 365(a) and 1123(b)(2) of the Bankruptcy Code, all executory contracts and unexpired leases that exist between the Debtors and any person or entity shall be deemed rejected by the Debtors as of the Effective Date, except for any executory contract or unexpired lease (i) that has been assumed or rejected pursuant to an order of the Bankruptcy Court entered prior to the Effective Date and (ii) as to which a motion for approval of the assumption of such executory contract or unexpired lease has been filed and served prior to the Confirmation Date, or (iii) that is specifically

designated as a contract or lease to be assumed on Schedules 8.01(A) (executory contracts) or 8.01(B) (unexpired leases), which schedule shall be contained in the Plan Supplement; *provided*, *however*, that the Debtors reserve the right, on or prior to the Confirmation Date, to amend Schedules 8.01(A) and 8.01(B) to delete any executory contract or unexpired lease therefrom or add any executory contract or unexpired lease thereto, in which event such executory contract(s) or unexpired lease(s) shall be deemed to be, respectively, either rejected or assumed as of the Effective Date.  The Debtors shall provide notice of any amendments to Schedules 8.01(A) and/or 8.01(B) to the parties to the executory contracts and unexpired leases affected thereby.  The listing of a document on Schedules 8.01(A) or 8.01(B) shall not constitute an admission by the Debtors that such document is an executory contract or an unexpired lease or that the Debtors have any liability thereunder.

2.      **Approval of Assumption or Rejection
        of Executory Contracts and Unexpired Leases**

            Entry of the Confirmation Order shall, subject to and upon the occurrence of the Effective Date, constitute (a) the approval, pursuant to sections 365(a) and 1123(b)(2) of the Bankruptcy Code, of the assumption of the executory contracts and unexpired leases assumed pursuant to Section 8.1 of the Plan, (b) the extension of time, pursuant to section 365(d)(4) of the Bankruptcy Code, within which the Debtors may assume, assume and assign or reject the unexpired nonresidential leases through the date of entry of an order approving the assumption, assumption and assignment or rejection of such executory contracts and unexpired leases and (c) the approval, pursuant to sections 365(a) and 1123(b)(2) of the Bankruptcy Code, of the rejection of the executory contracts and unexpired leases rejected pursuant to Section 8.1 of the Plan.

3.      **Inclusiveness**

            Unless otherwise specified on Schedules 8.01(A) or 8.01(B) of the Plan Supplement, each executory contract and unexpired lease listed or to be listed therein shall include any and all modifications, amendments, supplements, restatements or other agreements made directly or indirectly by any agreement, instrument or other document that in any manner affects such executory contract or unexpired lease, without regard to whether such agreement, instrument or other document is listed on Schedules 8.01(A) or 8.01(B).

4.      **Cure of Defaults**

            Except to the extent that different treatment has been agreed to by the non-debtor party or parties to any executory contract or unexpired lease on Schedule 8.01(A) or 8.01(B) to be assumed pursuant to Section 8.1 of the Plan, the Debtors shall, pursuant to the provisions of sections 1123(a)(5)(G) and 1123(b)(2) of the Bankruptcy Code and consistent with the requirements of section 365 of the Bankruptcy Code, which shall include, on Schedule 8.01(A) or 8.01(B) the cure amount as to each executory contract or unexpired lease to be assumed.  The parties to such executory contracts or unexpired leases to be assumed or assumed and assigned by the Debtors shall have until the objection deadline to the Plan to file and serve any objection to assumption or the cure amounts listed by the Debtors.  If there are any objections filed, the Bankruptcy Court shall hold a hearing on a date to be set by the Bankruptcy Court.  Notwithstanding Section 8.1 of the Plan, the Debtors shall retain their rights to reject any of their executory contracts or unexpired leases that are subject to a dispute concerning amounts necessary to cure any defaults through the Effective Date.

5. **Bar Date for Filing Proofs of Claim Relating to Executory Contracts and Unexpired Leases Rejected Pursuant to the Plan.**

Proofs of Claim for damages arising out of the rejection of an executory contract or unexpired lease pursuant to Section 8.1 of the Plan must be filed with the Bankruptcy Court and served upon the attorneys for the Debtors or, on and after the Effective Date, the Reorganized Debtors, no later than thirty (30) days after the later of (a) notice of entry of an order approving the rejection of such executory contract or unexpired lease, (b) notice of entry of the Confirmation Order, (c) notice of an amendment to Schedules 8.01(A) or (B) of the Plan Supplement (solely with respect to the party directly affected by such modification), or (d) notice of the Debtors' election to reject under Section 8.1 of the Plan.  **All such proofs of Claim not filed within such time will be forever barred from assertion against the Debtors and their estates or the Reorganized Debtors and their property.**

6. **Indemnification and Reimbursement Obligations.**

Subject to the occurrence of the Effective Date, the obligations of the Debtors as of the Commencement Date to indemnify, defend, reimburse or limit the liability of directors, officers or employees who are directors, officers or employees of the Debtors on or after the Confirmation Date, respectively, against any claims or causes of action as provided in the Debtors' articles of organization, certificates of incorporation, bylaws, other organizational documents or applicable law, shall survive confirmation of the Plan, remain unaffected thereby and not be discharged, irrespective of whether such indemnification, defense, reimbursement or limitation is owed in connection with an event occurring before or after the Commencement Date.

7. **Insurance Policies/Compensation and Benefit Plans/Retiree Benefits**

Unless specifically rejected by order of the Bankruptcy Court, all of the Debtors' insurance policies and any agreements, documents or instruments relating thereto, are treated as executory contracts that are assumed under the Plan.  Nothing contained in this section shall constitute or be deemed a waiver of any cause of action that the Debtors may hold against any entity, including, without limitation, the insurer, under any of the Debtors' policies of insurance.

Notwithstanding anything contained in the Plan to the contrary, unless rejected by order of the Bankruptcy Court, the Reorganized Debtors shall continue to honor, in the ordinary course of business, all employee compensation and Benefit Plans of the Debtors, including Benefit Plans and programs subject to sections 1114 and 1129(a)(13) of the Bankruptcy Code, entered into before or after the Commencement Date and not since terminated.

On and after the Effective Date, pursuant to section 1129(a)(13) of the Bankruptcy Code, the Reorganized Debtors shall continue to pay all retiree benefits of the Debtors (within the meaning of and subject to section 1114 of the Bankruptcy Code) for the duration of the period for which the Debtors had obligated themselves to provide such benefits and subject to the right of the Reorganized Debtors to modify or terminate such retiree benefits in accordance with the terms thereof.

I. **Corporate Governance and Management of the Reorganized Debtors**

1. **New Board of Reorganized BE**

On the Effective Date, the management, control and operation of Reorganized BE and the other Reorganized Debtors shall become the general responsibility of the New Board of Reorganized BE.

The New Board of Reorganized BE shall initially consist of 7 directors: the Chief Executive Officer ("CEO") of Reorganized BE shall be a director, the Prepetition Secured Lenders shall select 4 directors, and the Series C Noteholders shall select 2 directors. The initial members of the New Board shall not be employees or investors of the Prepetition Secured Lenders, a Senior Noteholder, a Junior Noteholder, or any affiliate of the foregoing. One of the directors selected by the Series C Noteholders shall be appointed to any compensation committee established by the New Board. All initial members of the New Board shall be reasonably acceptable to the Debtors.

The ongoing directors shall be nominated and elected as provided for herein. Reorganized BE's certificate of incorporation shall provide that the directors of Reorganized BE shall not be employees or investors of Reorganized BE (other than the CEO), the Prepetition Secured Lenders, any entity holding greater than 10% of the New Common Stock or 10% of the New Preferred Stock, or any affiliate of the foregoing.

## 2.    Officers of the Reorganized Debtors.

The Debtors shall select the initial officers, including the CEO, of Reorganized BE in consultation with the Prepetition Secured Lenders and the Senior Noteholders. Such officers shall serve in accordance with applicable non-bankruptcy law, any employment agreement with the Reorganized Debtors and the New Organizational Documents.

## 3.    Filing of New Organizational Documents

On the Effective Date, or as soon thereafter as practicable, to the extent necessary, the Reorganized Debtors shall file their New Organizational Documents, as required or deemed appropriate, with the appropriate Persons in their respective jurisdictions of incorporation or establishment.

## 4.    Adoption of New Management Incentive Plan and Employee Incentive Plan

On the Effective Date, Reorganized BE shall be deemed to have adopted the New Management Incentive Plan and Employee Incentive Plan. Entry of the Confirmation Order shall constitute an approval of the New Management Incentive Plan and Employee Incentive Plan.

## J.    Conditions Precedent to Effective Date

## 1.    Conditions Precedent to Effectiveness

The Effective Date shall not occur and the Plan shall not become effective unless and until the following conditions are satisfied in full or waived in accordance with Section 10.2 of the Plan:

(a)    The Confirmation Order, in form and substance acceptable to the Debtors and the Prepetition Secured Lenders shall have been entered and is a Final Order;

(b)    The Confirmation Order shall enjoin all parties in interest that are receiving a distribution under the Plan from interfering, directly or indirectly, with the exercise by the Prepetition Secured Lenders of rights conferred upon them pursuant to the Master Agreement;

(c)    The payment in full, in Cash, of all invoices for reasonable fees and expenses (including the Agency Fee and any fees owing under the terms of any engagement letters) of the legal and financial advisors incurred by each of the Prepetition Secured Lenders[, the ad hoc group of Senior Noteholders, and the ad hoc group of Junior Noteholders] that remain unpaid as of the Effective Date,

[and, with respect to the Junior Noteholders and their advisors, subject to a cap in the amount of [$_____]];

(d)    The conditions precedent to the effectiveness of the Exit Facility are satisfied or waived by the parties thereto and the Reorganized Debtors have access to letters of credit under the Exit Letter of Credit Facility;

(e)    All actions and all agreements, instruments or other documents necessary to implement the terms and provisions of the Plan are effected or executed and delivered, as applicable, in form and substance satisfactory to the Debtors;

(f)    All authorizations, consents and regulatory approvals, if any, required by the Debtors in connection with the consummation of the Plan are obtained and not revoked; and

(g)    As of the Effective Date, Reorganized BE shall not have any obligation hereunder to (i) list the New Common Stock on any stock exchange or quotation system and/or (ii) become be a reporting company under the Securities Exchange Act of 1934.

## 2.    Waiver of Conditions

Each of the conditions precedent in Section 10.1 of the Plan may be waived, in whole or in part, upon written notice, signed by the Debtors.  Any such waivers may be effected at any time, without notice, without leave or order of the Bankruptcy Court and without any formal action.

## 3.    Satisfaction of Conditions

Except as expressly provided or permitted in the Plan, any actions required to be taken on the Effective Date shall take place and shall be deemed to have occurred simultaneously, and no such action shall be deemed to have occurred prior to the taking of any other such action.  In the event that one or more of the conditions specified in Section 10.1 of the Plan have not occurred or otherwise been waived pursuant to Section 10.2 of the Plan, (a) the Confirmation Order shall be vacated, (b) the Debtors and all holders of Claims and interests, including any Equity Interests, shall be restored to the status quo ante as of the day immediately preceding the Confirmation Date as though the Confirmation Date never occurred and (c) the Debtors' obligations with respect to Claims and Equity Interests shall remain unchanged and nothing contained in the Plan shall constitute or be deemed a waiver or release of any Claims or Equity Interests by or against the Debtors or any other person or to prejudice in any manner the rights of the Debtors or any person in any further proceedings involving the Debtors.

## K.    Effect of Confirmation

## 1.    Continued Vesting of Assets

On the Effective Date, pursuant to sections 1141(b) and (c) of the Bankruptcy Code, the Debtors, their properties and interests in property and their operations shall be released from the custody and jurisdiction of the Bankruptcy Court, and all property of the estates of the Debtors shall continue to vest in the Reorganized Debtors free and clear of all Claims, Liens, encumbrances, charges and other interests, except as provided in the Plan.  From and after the Effective Date, the Reorganized Debtors may operate their business and may use, acquire and dispose of property free of any restrictions of the Bankruptcy Code, the Bankruptcy Rules or the Local Bankruptcy Rules, subject to the terms and conditions of the Plan.

2.        **Binding Effect**

Subject to the occurrence of the Effective Date, on and after the Confirmation Date, the provisions of the Plan shall bind any holder of a Claim against, or Equity Interest in, the Debtors and such holder's respective successors and assigns, whether or not the Claim or interests including any Equity Interest of such holder is impaired under the Plan, whether or not such holder has accepted the Plan and whether or not such holder is entitled to a distribution under the Plan.

3.        **Discharge of Claims and Termination of Equity Interests**

Except as provided in the Plan, the rights afforded in and the payments and distributions to be made under the Plan shall terminate all Equity Interests and discharge all existing debts and Claims of any kind, nature or description whatsoever against or in the Debtors or any of their assets or properties to the fullest extent permitted by section 1141 of the Bankruptcy Code.  Except as provided in the Plan, upon the Effective Date, all existing Claims against the Debtors and Equity Interests shall be, and shall be deemed to be, discharged and terminated, and all holders of such Claims and Equity Interests shall be precluded and enjoined from asserting against the Reorganized Debtors, their successors or assignees or any of their assets or properties, any other or further Claim or Equity Interest based upon any act or omission, transaction or other activity of any kind or nature that occurred prior to the Effective Date, whether or not such holder has filed a proof of Claim or proof of Equity Interest and whether or not the facts or legal bases therefor were known or existed prior to the Effective Date.

4.        **Discharge of Debtors**

Upon the Effective Date, in consideration of the distributions to be made under the Plan and except as otherwise expressly provided in the Plan, each holder (as well as any trustees and agents on behalf of each holder) of a Claim or Equity Interest and any Affiliate of such holder shall be deemed to have forever waived, released and discharged the Debtors, to the fullest extent permitted by section 1141 of the Bankruptcy Code, of and from any and all Claims, Equity Interests, rights and liabilities that arose prior to the Effective Date.  Upon the Effective Date, all such persons shall be forever precluded and enjoined, pursuant to section 524 of the Bankruptcy Code, from prosecuting or asserting any such discharged Claim against or terminated Equity Interest in the Debtors.

5.        **Injunction or Stay**

Except as otherwise expressly provided in the Plan or in the Confirmation Order, all Persons or entities who have held, hold or may hold Claims against or Equity Interests in the Debtors are permanently enjoined, from and after the Effective Date, from (a) commencing or continuing in any manner any action or other proceeding of any kind on any such Claim or Equity Interest against any of the Reorganized Debtors, (b) the enforcement, attachment, collection or recovery by any manner or means of any judgment, award, decree or order against any Reorganized Debtor with respect to such Claim or Equity Interest, (c) creating, perfecting or enforcing any encumbrance of any kind against any Reorganized Debtor or against the property or interests in property of any Reorganized Debtor with respect to such Claim or Equity Interest, (d) asserting any right of setoff, subrogation or recoupment of any kind against any obligation due to any Reorganized Debtor or against the property or interests in property of any Reorganized Debtor with respect to such Claim or Equity Interest and (e) pursuing any claim released pursuant to this Article X of the Plan.

### 6.    Terms of Injunction or Stay

Unless otherwise provided in the Confirmation Order, all injunctions or stays arising under or entered during the Reorganization Cases under section 105 or 362 of the Bankruptcy Code, or otherwise, that are in existence on the Confirmation Date shall remain in full force and effect until the Effective Date, provided, however, that no such injunction or stay shall preclude enforcement of parties' rights under the Plan and the related documents.

### 7.    Reservation of Causes of Action/Reservation of Rights

(a)    Except as provided in the Plan, nothing contained in the Plan or the Confirmation Order shall be deemed to be a waiver or the relinquishment of any rights or causes of action that the Debtors may have under any provision of the Bankruptcy Code or any applicable nonbankruptcy law, including, without limitation, (i) any and all Claims against any person or entity, to the extent such person or entity asserts a crossclaim, counterclaim, and/or Claim for setoff which seeks affirmative relief against the Debtors, their officers, directors, or representatives and (ii) the turnover of any property of the Debtors' Estates.

(b)    Nothing contained in the Plan or the Confirmation Order shall be deemed to be a waiver or relinquishment of any claim, cause of action, right of setoff, or other legal or equitable defense which the Debtors had immediately prior to the Commencement Date, against or with respect to any Claim left unimpaired by the Plan.

### 8.    Exculpation

**None of the Debtors and their respective officers, directors, employees, accountants, financial advisors, investment bankers, agents, restructuring advisors, and attorneys, and each of their respective agents and representatives (but solely in their capacities as such) shall have or incur any liability for any Claim, cause of action or other assertion of liability for any act taken or omitted to be taken in connection with, or arising out of, the Restructuring Cases, the formulation, dissemination, confirmation, consummation or administration of the Plan, property to be distributed under the Plan or any other act or omission in connection with the Restructuring Cases, the Plan, the Disclosure Statement or any contract, instrument, document or other agreement related thereto; provided, however, that the foregoing shall not affect the liability of any Person that otherwise would result from any such act or omission to the extent such act or omission is determined by a Final Order to have constituted willful misconduct or gross negligence.**

### 9.    Limited Releases.

**Effective as of the Confirmation Date but subject to the occurrence of the Effective Date, and in consideration of the services of (a) the present and former directors, officers, members, affiliates, agents, financial advisors, restructuring advisors, attorneys and representatives of or to the Debtors who acted in such capacities after the Commencement Date (but not limited to such postpetition actions); (b) the Indenture Trustee; and (c) the Released Parties and their respective officers, directors, agents, advisors, and professionals in connection with the Reorganization Cases; (x) the Debtors; (y) each holder of a Claim that votes to accept the Plan (or is deemed to accept the Plan) and (z) to the fullest extent permissible under applicable law, as such law may be extended or integrated after the Effective Date, each holder of a Claim or Equity Interest that does not vote to accept the Plan, shall release unconditionally and forever each present or former director, officer, member, employee, affiliate, agent, financial advisor, restructuring advisor, attorney and representative (and their respective affiliates) of the Debtors who acted in such capacity after the**

**Commencement Date, the Released Parties, and each of their respective officers, directors, agents, advisors, and professionals (but, in each case, solely in their capacities as such) from any and all Claims or causes of action whatsoever in connection with, related to, or arising out of the Reorganization Cases, the pursuit of confirmation of the Plan, the consummation thereof, the administration thereof or the property to be distributed thereunder; *provided, however*, that the foregoing shall not operate as a waiver of or release from any causes of action arising out of the willful misconduct, intentional fraud, or criminal conduct of any such person or entity.**

### 10.    Causes of Action/Avoidance Actions/Objections

Other than any releases granted in the Plan, by the Confirmation Order and by Final Order of the Bankruptcy Court, as applicable, from and after the Effective Date, the Reorganized Debtors shall have the right to prosecute any and all avoidance or equitable subordination actions, recovery causes of action and objections to Claims under sections 105, 502, 510, 542 through 551, and 553 of the Bankruptcy Code that belong to the Debtors or Debtors in Possession.

## L.    Jurisdiction and Governing Law

### 1.    Retention of Jurisdiction

The Bankruptcy Court shall have exclusive jurisdiction of all matters arising out of, or related to, the Reorganization Cases and the Plan pursuant to, and for the purposes of, sections 105(a) and 1142 of the Bankruptcy Code, including, without limitation:

(a)    To hear and determine pending applications for the assumption or rejection of executory contracts or unexpired leases, the allowance of Claims and Administrative Expense Claims resulting therefrom and any disputes with respect to executory contracts or unexpired leases relating to facts and circumstances arising out of or relating to the Reorganization Cases;

(b)    To determine any and all adversary proceedings, applications and contested matters;

(c)    To ensure that distributions to holders of Allowed Claims and Equity Interests are accomplished as provided in the Plan;

(d)    To consider Claims or the allowance, classification, priority, compromise, estimation, or payment of any Claim, Administrative Expense Claim, or Interest;

(e)    To hear and determine all applications for compensation and reimbursement of expenses under sections 330, 331 and 503(b) of the Bankruptcy Code;

(f)    To hear and determine any timely objections to, or requests for estimation of Disputed Administrative Expense Claims and Disputed Claims, in whole or in part;

(g)    To enter and implement such orders as may be appropriate in the event the Confirmation Order is for any reason stayed, revoked, modified or vacated;

(h)    To resolve disputes as to the ownership of any Administrative Expense Claim, Claim or Equity Interest;

(i)      To issue such orders in aid of execution of the Plan, to the extent authorized by section 1142 of the Bankruptcy Code;

(j)      To consider any amendments to or modifications of the Plan or to cure any defect or omission, or reconcile any inconsistency, in any order of the Bankruptcy Court, including, without limitation, the Confirmation Order;

(k)      To hear and determine disputes or issues arising in connection with the interpretation, implementation or enforcement of the Plan, the Confirmation Order, any transactions or payments contemplated by the Plan, any agreement, instrument, or other document governing or relating to any of the foregoing or any settlement approved by the Bankruptcy Court;

(l)      To hear and determine matters concerning state, local and federal taxes in accordance with sections 346, 505 and 1146 of the Bankruptcy Code (including, without limitation, any request by the Debtors prior to the Effective Date or request by the Reorganized Debtors after the Effective Date for an expedited determination of tax under section 505(b) of the Bankruptcy Code);

(m)      To hear and determine all disputes involving the existence, scope and nature of the discharges granted under the Plan, the Confirmation Order or the Bankruptcy Code;

(n)      To issue injunctions and effect any other actions that may be necessary or appropriate to restrain interference by any person or entity with the consummation, implementation or enforcement of the Plan, the Confirmation Order or any other order of the Bankruptcy Court;

(o)      To determine such other matters and for such other purposes as may be provided in the Confirmation Order;

(p)      To hear and determine any rights, Claims or causes of action held by or accruing to the Debtors pursuant to the Bankruptcy Code or pursuant to any federal or state statute or legal theory;

(q)      To recover all assets of the Debtors and property of the Debtors' estates, wherever located;

(r)      To enter a final decree closing the Reorganization Cases; and

(s)      To hear any other matter not inconsistent with the Bankruptcy Code.

## 2.      Governing Law

Except to the extent that the Bankruptcy Code or other federal law is applicable, or to the extent an exhibit to the Plan or Plan Supplement provides otherwise (in which case the governing law specified therein shall be applicable to such exhibit), the rights, duties, and obligations arising under the Plan shall be governed by, and construed and enforced in accordance with, the laws of the State of New York without giving effect to its principles of conflict of laws.

## M.    Miscellaneous Provisions

### 1.      Effectuating Documents and Further Transactions

On or before the Effective Date, and without the need for any further order or authority, the Debtors may execute, as appropriate, such agreements and other documents that are in form and

substance satisfactory to them as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.  The Reorganized Debtors are authorized to execute, deliver, file, or record such contracts, instruments, releases, indentures and other agreements or documents and take such actions as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan and any securities issued pursuant to the Plan.

**2.      Withholding and Reporting Requirements**

In connection with the Plan and all instruments issued in connection therewith and distributed thereon, any party issuing any instrument or making any distribution under the Plan shall comply with all applicable withholding and reporting requirements imposed by any federal, state or local taxing authority, and all distributions under the Plan shall be subject to any such withholding or reporting requirements.  Notwithstanding the above, each holder of an Allowed Claim that is to receive a distribution under the Plan shall have the sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed on such holder by any governmental unit, including income, withholding and other tax obligations, on account of such distribution.  Any party issuing any instrument or making any distribution under the Plan has the right, but not the obligation, to not make a distribution until such holder has made arrangements satisfactory to such issuing or disbursing party for payment of any such tax obligations.

**3.      Corporate Action**

On the Effective Date, all matters provided for under the Plan that would otherwise require approval of the stockholders or directors of one or more of the Debtors or Reorganized Debtors, as the case may be, shall be in effect from and after the Effective Date pursuant to the applicable general corporation law of the states in which the Debtors or the Reorganized Debtors are incorporated or established, without any requirement of further action by the stocholders or directors of the Debtors or the Reorganized Debtors.  On the Effective Date, or as soon thereafter as is practicable, the Reorganized Debtors shall, if required, file their amended articles of organization or certificates of incorporation, as the case may be, with the Secretary of State of the state in which each such entity is (or will be) organized, in accordance with the applicable general business law of each such jurisdiction.

**4.      Continuing Exclusivity Period**

Subject to further order of the Bankruptcy Court, until the Effective Date, the Debtors shall, pursuant to section 1121 of the Bankruptcy Code, retain the exclusive right to amend the Plan and to solicit acceptances thereof.

**5.      Plan Supplement/Exhibits and Schedules**

The Plan Supplement and the documents contained therein shall be in form, scope and substance satisfactory to the Debtors, shall be filed with the Bankruptcy Court no later than ten (10) Business Days before the deadline for voting to accept or reject the Plan, provided that the documents included therein may thereafter be amended and supplemented prior to execution, so long as no such amendment or supplement materially affects the rights of holders of Claims.  The Plan Supplement and the documents contained therein are incorporated into and made a part of the Plan as if set forth in full in the Plan.

All exhibits and schedules to the Plan, including the Plan Supplement, are incorporated into and are a part of the Plan as if set forth in full in the Plan.

6.        **Payment of Statutory Fees**

All fees payable under section 1930 of chapter 123 of title 28 of the United States Code, as determined by the Bankruptcy Court at the Confirmation Hearing, shall be paid on the Effective Date.

7.        **Post-Confirmation Date Professional Fees and Expenses**

From and after the Confirmation Date, BE, shall, in the ordinary course of business and without the necessity for any approval by the Bankruptcy Court, pay the reasonable fees and expenses of professional persons thereafter incurred by them.

8.        **Dissolution of the Creditors' Committee**

On the Effective Date, any Creditors' Committee appointed in the Reorganization Cases shall be dissolved and the members thereof shall be released and discharged of and from all further authority, duties, responsibilities and obligations related to and arising from and in connection with the Reorganization Cases, and the retention or employment of such Creditors' Committee's attorneys, accountants and other agents, if any, shall terminate other than for purposes of (i) filing and prosecuting applications for final allowances of compensation for professional services rendered and reimbursement of expenses incurred in connection therewith, and (ii) reviewing and objecting to the applications of other parties for the allowance of compensation for professional services rendered and reimbursement of expenses incurred in connection therewith.

9.        **Exemption from Transfer Taxes**

Pursuant to section 1146(a) of the Bankruptcy Code, the issuance, transfer or exchange of notes or equity securities under or in connection with the Plan, the creation of any mortgage, deed of trust or other security interest, the making or assignment of any lease or sublease or the making or delivery of any deed or other instrument of transfer under, in furtherance of, or in connection with the Plan shall not be subject to any stamp, real estate transfer, mortgage recording or other similar tax.

10.        **Expedited Tax Determination**

The Debtors and the Reorganized Debtors are authorized to request an expedited determination of taxes under section 505(b) of the Bankruptcy Code for any or all returns filed for, or on behalf of, the Debtors for any and all taxable periods (or portions thereof) ending after the Commencement Date through and including the Effective Date.

11.        **Substantial Consummation**

On the Effective Date, the Plan shall be deemed to be substantially consummated under sections 1101 and 1127(b) of the Bankruptcy Code.

12.        **Severability of Plan Provisions**

In the event that, prior to the Confirmation Date, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void or unenforceable, the Bankruptcy Court shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void or unenforceable, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding any such holding, alteration or interpretation, the remainder of the terms and provisions

of the Plan shall remain in full force and effect and shall in no way be affected, impaired or invalidated by such holding, alteration or interpretation.  The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable in accordance with its terms.

### 13.    Notices.

All notices, requests and demands to or upon the Debtors shall be in writing (including by facsimile transmission) to be effective and, unless otherwise expressly provided in the Plan, shall be deemed to have been duly given or made when actually delivered or, in the case of notice by facsimile transmission, when received and telephonically confirmed, addressed as follows:

BearingPoint, Inc.
1676 International Drive
McLean, Virginia  22102
Attn:    John DeGroote
Telephone:  (703) 747-3000
Facsimile:  (703) 747-3215

- and –

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, New York  10153
Attn:    Marcia L. Goldstein
Telephone:  (212) 310-8000
Facsimile:  (212) 310-8007

- and –

Weil, Gotshal & Manges LLP
700 Louisiana Street, Suite 1600
Houston, Texas 77002
Attn:    Alfredo R. Pérez
Telephone:  (713) 546-5000
Facsimile:  (713) 224-9511

### 14.    Section Headings

The section headings contained in the Plan are for reference purposes only and shall not affect in any way the meaning or interpretation of the Plan.

### N.    Modification, Revocation, or Withdrawal of the Plan

### 1.    Modification of Plan

Alterations, amendments or modifications of or to the Plan may be proposed in writing by the Debtors at any time prior to the Confirmation Date, provided that the Plan, as altered, amended or modified satisfies the conditions of sections 1122 and 1123 of the Bankruptcy Code and the Debtors shall have complied with section 1125 of the Bankruptcy Code.  The Plan may be altered, amended or modified at any time after the Confirmation Date and before substantial consummation, provided that the

Plan, as altered, amended or modified, satisfies the requirements of sections 1122 and 1123 of the Bankruptcy Code and the Bankruptcy Court, after notice and a hearing, confirms the Plan, as altered, amended or modified, under section 1129 of the Bankruptcy Code and the circumstances warrant such alterations, amendments or modifications. A holder of a Claim that has accepted the Plan shall be deemed to have accepted the Plan, as altered, amended or modified, if the proposed alteration, amendment or modification does not materially and adversely change the treatment of the Claim of such holder.

Prior to the Effective Date, the Debtors may make appropriate technical adjustments and modifications to the Plan of Reorganization without further order or approval of the Bankruptcy Court, provided that such technical adjustments and modifications do not adversely affect in a material way the treatment of holders of Claims or Equity Interests.

For the avoidance of doubt, the foregoing shall not effect a waiver of any rights that any party may have with respect to modification of the Plan under section 1127 of the Bankruptcy Code.

## 2. Revocation or Withdrawal of the Plan

The Debtors reserve the right to revoke or withdraw the Plan prior to the Confirmation Date. If the Debtors revoke or withdraw the Plan prior to the Confirmation Date, then the Plan shall be deemed null and void. In such event, nothing contained in the Plan shall constitute or be deemed a waiver or release of any Claims or Equity Interests by or against the Debtors or any other person or to prejudice in any manner the rights of the Debtors or any person in any further proceedings involving the Debtors.

## VI.    PROJECTIONS AND VALUATION ANALYSIS

## A.    Introduction

This section provides summary information concerning the projected financial performance of BearingPoint and certain assumptions about these projections.

## 1.    Pro Forma Financial Projections

BearingPoint believes that the Plan meets the Bankruptcy Code's feasibility requirement that Plan confirmation is not likely to be followed by liquidation, or the need for further financial reorganization of BearingPoint or any successor under the Plan.

In connection with the development of the Plan, and for the purposes of determining whether the Plan satisfies the feasibility standard, BearingPoint analyzed its ability to satisfy its financial obligations while maintaining sufficient liquidity and capital resources. In this regard, the management of BearingPoint developed and refined its business plan and prepared financial projections for the calendar years ending December 31, 2009 through 2012 (collectively, the "Projections"). BearingPoint does not, as a matter of course, publish its business plans and strategies or projections or its anticipated financial position or results of operations. Accordingly, BearingPoint does not anticipate that it will, and disclaims any obligation to, furnish updated business plans or projections to holders of claims or interests after the Confirmation Date, or to include such information in documents required to be filed with the Securities and Exchange Commission (if any) or otherwise make such information public.

In connection with the planning and development of the Plan, the Projections were prepared by BearingPoint to present the anticipated impact of the Plan. The Projections assume that the Plan will be implemented in accordance with its stated terms. Since the Projections are based on forecasts

of key economic variables such as the demand for management and technology consulting services, BearingPoint's ability to restructure its operations in an efficient manner and the ability to preserve its client base and billing rates, the estimates and assumptions underlying the Projections are inherently uncertain.  Though considered reasonable by BearingPoint as of the date hereof, the Projections are subject to significant business, economic and competitive uncertainties.  Accordingly, such projections, estimates and assumptions are not necessarily indicative of current values or future performance, which may be significantly less favorable or more favorable than as set forth.

ALTHOUGH EVERY EFFORT WAS MADE TO BE ACCURATE, THE PROJECTIONS ARE ONLY AN ESTIMATE, AND ACTUAL RESULTS MAY VARY CONSIDERABLY FROM THE PROJECTIONS.  IN ADDITION, THE UNCERTAINTIES WHICH ARE INHERENT IN THE PROJECTIONS INCREASE FOR LATER YEARS IN THE PROJECTION PERIOD, DUE TO INCREASED DIFFICULTY ASSOCIATED WITH FORECASTING LEVELS OF ECONOMIC ACTIVITY AND BEARINGPOINT PERFORMANCE AT MORE DISTANT POINTS IN THE FUTURE.  CONSEQUENTLY, THE PROJECTED INFORMATION INCLUDED HEREIN SHOULD NOT BE REGARDED AS A REPRESENTATION BY BEARINGPOINT, BEARINGPOINT'S ADVISORS, OR ANY OTHER PERSON THAT THE PROJECTED RESULTS WILL BE ACHIEVED.  THE PROJECTIONS WERE NOT PREPARED WITH A VIEW TOWARDS PUBLIC DISCLOSURE OR COMPLIANCE WITH GENERALLY ACCEPTED ACCOUNTING PRINCIPLES, THE PUBLISHED GUIDELINES OF THE SECURITIES AND EXCHANGE COMMISSION OR THE AMERICAN INSTITUTE OF CERTIFIED PUBLIC ACCOUNTANTS REGARDING PROJECTIONS OR FORECASTS.  THE PROJECTIONS HAVE NOT BEEN AUDITED OR REVIEWED BY BEARINGPOINT'S INDEPENDENT CERTIFIED ACCOUNTANTS. IMPAIRED CREDITORS ARE CAUTIONED NOT TO PLACE UNDUE RELIANCE ON THE FOLLOWING PROJECTIONS IN DETERMINING WHETHER TO VOTE TO ACCEPT OR REJECT THE PLAN.

The Projections assume that (i) the Plan will be confirmed and consummated in accordance with its terms, (ii) there will be no material change in legislation or regulations, or the administration thereof, that will have an unexpected effect on the operations of Reorganized BE, (iii) there will be no change in generally accepted accounting principles in the United States that will have a material effect on the reported financial results of Reorganized BE, and (iv) there will be no material contingent or unliquidated litigation or indemnity claims applicable to Reorganized BearingPoint.  To the extent that the assumptions inherent in the Projections are based upon future business decisions and objectives, they are subject to change.  In addition, although they are presented with numerical specificity and considered reasonable by BearingPoint when taken as a whole, the assumptions and estimates underlying the Projections are subject to significant business, economic and competitive uncertainties and contingencies, many of which will be beyond the control of Reorganized BearingPoint.  Accordingly, the Projections are only an estimate and, therefore, necessarily speculative in nature.  It can be expected that some or all of the assumptions in the Projections will not be realized and that actual results will vary from the Projections, which variations may be material and are likely to increase over time.  The Projections should therefore not be regarded as a representation by BearingPoint or any other person that the results set forth in the Projections will be achieved.  In light of the foregoing, readers are cautioned not to place undue reliance on the Projections.  The Projections should be read together with the information in [Section IV] to this Disclosure Statement.

**SAFE HARBOR STATEMENT UNDER THE PRIVATE SECURITIES LITIGATION REFORM ACT OF 1995.**  The Projections contain statements which constitute "forward-looking statements" within the meaning of the Securities Act and the Securities Exchange Act of 1934 (the "Exchange Act"), as amended by the Private Securities Litigation Reform Act of 1995. "Forward-looking statements" in the Projections include the intent, belief or current expectations of

BearingPoint and members of their management team with respect to the timing of, completion of and scope of the current restructuring, reorganization plan, strategic business plan, bank financing, and debt and equity market conditions and BearingPoint's future liquidity, as well as the assumptions upon which such statements are based. While BearingPoint believes that the expectations are based on reasonable assumptions within the bounds of their knowledge of their business and operations, parties in interest are cautioned that any such forward-looking statements are not guarantees of future performance, and involve risks and uncertainties, and that actual results may differ materially from those contemplated by such forward-looking statements. Important factors currently known to management that could cause actual results to differ materially from those contemplated by the forward-looking statements in the Projections include, but are not limited to, further adverse developments with respect to BearingPoint's liquidity position or operations of BearingPoint's business, adverse developments in BearingPoint's efforts to renegotiate its funding and adverse developments in the bank financing or public or private markets for debt or equity securities, or adverse developments in the timing or results of BearingPoint's strategic business plan (including the time line to emerge from chapter 11), the difficulty in retaining key employees and clients and the ability of BearingPoint to realize the anticipated general and administrative expense savings and other reductions presently contemplated, the ability of BearingPoint to return BearingPoint's operations to profitability, the level and nature of any restructuring and other one-time charges, the difficulty in estimating costs relating to exiting certain markets and consolidating and closing certain operations, and the possible negative effects of a change in applicable legislation.

## 2.    Summary of Significant Assumptions

BearingPoint's management and the Company's advisors developed the Projections based on: (i) current and projected market conditions in each of BearingPoint's respective markets, (ii) cost savings opportunities within various administrative departments, (iii) the ability to maintain sufficient working capital to self-fund operations or access to financing sources to fund any deficiencies, and (iv) confirmation of the Plan.

For presentation purposes, it is assumed that BearingPoint emerges from chapter 11 on May 31, 2009 (which may not be the actual emergence date), thus completing the financial restructuring of BearingPoint.

As discussed in [Section II.G]., Reorganized BearingPoint expects to enter into an Exit Facility, consisting of two (2) separate sub-facilities of up to $400-415 million upon emergence from its chapter 11 case. The Exit Facility will contain a first priority security interest in all assets of the Company, together with a pledge of all stock of Parent, BearingPoint and each of its domestic subsidiaries and a security interest in 65% (and if certain conditions are met, 100%) of the stock of all first-tier foreign subsidiaries so long as it does not have a material adverse effect on BearingPoint. The two (2) separate sub-facilities of the Exit Facility will likely consist of the following: (i) a $276 million Term Loan; (ii) a $130 million Synthetic Letter of Credit Facility. For detailed information on the Exit Facility, see [Section II.G.13].

The Projections assume the following amortization schedule: the Term Loan will be paid down with surplus cash; the Term Loan will amortize at a rate of $750,000 per quarter, beginning on September 30, 2009, until March 31, 2010, at which point quarterly amortization will increase to $5,000,000. The Exit Facility is projected to have a term of three (3) years. The actual amount of proceeds required could differ materially from this estimate, as could the amortization schedule and term ultimately obtained. The final terms of the Exit Facility are subject to further negotiation with BearingPoint's potential exit lenders and future market conditions. The Projections assume that the Exit Facility has interest which both payable-in-kind and paid in cash (see [Section II.G.5.]).

The Projections contemplate the issuance of $50 million of Preferred Stock to the Secured Lenders, as discussed in [Section II.G].  The Preferred Stock will be senior in priority to all forms of Common Stock.  The Projections assume that the Preferred Stock has dividends payable-in-kind. For detailed information on the Preferred Stock, see [Section II.G.13].

The Projections contemplate the issuance of [  ] shares of Class 1 Common Stock to the Senior Noteholders for each dollar of allowable claims.

The Projections contemplate the issuance of [  ] shares of Class 2 Common Stock to the Senior A/B Noteholders for each dollar of allowable claims.  The Class 2 Common Stock shall be junior to Class 1 Common Stock.

The Projections assume that the Unsecured Creditors' Trust will receive an estimated [  ] shares of Class 3 Common Stock at emergence for each dollar of allowable claims  (after payment on the Effective Date of allowed Convenience Claims). The Class 2 Common Stock shall be junior to Class 1 Common Stock and Class 2 Common Stock.  For more information on the distributions to the Unsecured Creditors' Trust, see [Section VIII.E].

"Fresh Start Accounting" principles, which BearingPoint may be required to adopt upon emergence from chapter 11 have not been reflected in the Projections.  Fresh Start Accounting requires, among other things, that BearingPoint's assets and liabilities be recorded at fair value on the Effective Date.

## 3.    Process for Preparation of Financial Projections

The accompanying forecasted Consolidated Financial Statements have been prepared in accordance with the Company's annual budgeting and periodic forecasting policies and procedures and reflect adjustments (consisting of normal, recurring adjustments) which are, in the opinion of management, necessary for reasonable presentation of projected results for period.

The projections are based on historical trends combined with projections of key performance drivers and economic variables such as available demand for our services, current available professional staff, anticipated utilization rates, realizable rates per hour and our ability to successfully restructure our current debt obligations expeditiously with limited disruptions to the company's customers or employees.  Although management believes that the assumptions underlying the forecasts and projections contained herein are reasonable, in consideration of the current industry and macro-economic environment, and other matters, many of which are beyond the control of management, there can be no assurances that such forecasts will, in fact, be realized.  Actual results may vary from the information provided, and such variations may be material.  The projections were substantially completed in December 2008.

Certain adjustments have been made to the projections to reflect the impact of the restructuring, including the company projected capital structure. Professional consultant utilization rates are estimated to decrease by approximately 2.0% during 2009 due to the loss of some client business associated with the restructuring, although in the aggregate the projections assume only modest operating impacts caused by a Chapter 11 filing.  A long protracted chapter 11 proceeding could cause the company to deviate from its projections. For the remainder of the projection period, performance is projected based on numerous balance sheet and income statement assumptions developed by management and the Company's advisors.  Significant assumptions are described below.

### 4.    Balance Sheet Assumptions

*a.*    Cash:  At emergence, there is forecasted cash of $184.6 million.  Post restructuring.  The Projections reflect some of the estimated amounts paid as a result of implementing the Plan, such as legal and advisory fees and amounts owed to the Convenience Class.

*b.*    Accounts Receivable / Unbilled Revenue:  Accounts receivable / unbilled revenue represents amounts due from clients and amounts not yet billed to clients for services performed for which revenue has been recognized. For the projection period, the balance of accounts receivable/unbilled revenue is based on projected deferred revenue as a percentage of net revenue and cash collection targets established by management.

*c.*    Prepaid Expenses:  Prepaid expenses include amounts paid in advance for insurance, rent, value-added taxes and other expenses which will be used within the next year.  For the projection period, the balance of prepaid expenses is consistent with historical seasonal trends.

*d.*    Other Current Assets:  Other current assets consists of deferred project expenses and other miscellaneous assets.

*e.*    Property, Plant & Equipment ("PP&E"):  PP&E, net represents equipment, leasehold improvements and capitalized software and is amortized over the useful life of such assets.  PP&E is presented net of accumulated depreciation on the balance sheet.  Increases that occur throughout the projection period represent annual capital expenditures reduced by annual depreciation.  Projected annual capital expenditures are projected to be $16,000,000 per year during the projection period.

*f.*    Goodwill:  Goodwill represents the amount by which the cost of acquired net assets in a business acquisition exceeds the fair value of net identifiable assets on the date of purchase.  This will be adjusted if the Company adopts Fresh Start Accounting.

*g.*    Other Long-Term Assets: Other long-term assets consists of deferred project expenses, deferred financing costs and other miscellaneous assets.

*h.*    Accounts Payable:  Projected accounts payable are based on maintaining historical credit terms provided by BearingPoint's vendors, and are forecasted to increase during the 2010-2012 projection period as BearingPoint emerges from chapter 11 and gains better terms with creditors.  Days payable outstanding are forecasted to increase from a current level of 32 to 47 at the end of 2012.

*i.*    Accrued Payroll & Related Liabilities: Accrued payroll and related liabilities consists of accrued compensation, accrued personal days and accrued benefits and taxes.

*j.*    Accrued Bonus: Accrued Bonus includes accruals for annual and longer term bonus for all employees of the Company.

*k.*    Deferred Revenue: Deferred Revenue represents collections in excess of revenue recognized for which payments have been received. For the projection period, the balance of deferred revenue is based on an assumed percentage of net revenue consistent with historical trends.

*l.*    Other Current Liabilities: Other current liabilities include value added tax accruals and other miscellaneous liabilities.

*m.*    Accrued Employee Benefits: Accrued employee benefits consists of long term pension and retiree medical benefits. For the projection period, the balance of accrued employee benefits is assumed to be a percentage of total costs of service, which is consistent with historical trends.

*n.*    Other Liabilities: Other liabilities include income tax accruals, deferred revenue and other miscellaneous liabilities.

*o.*    Term Loan: The senior secured debt will consist of an estimated $276 million Term Loan and a $130 million Synthetic Letter of Credit Facility. For a detailed discussion of Reorganized BearingPoint's Exit Facility, see [Section II.G.13].

*p.*    Preferred Stock: Includes initial Preferred Stock with a face value of $50 million and payment-in-kind dividends at an annual rate of 13.5%. For discussion of the Preferred Stock, see [Section II.G.5].

Stockholders' equity represents a combination of BearingPoint's common stock, retained earnings, additional paid-in-capital, and other related accounts. The projected changes throughout the projection period represent the net income or net loss for BearingPoint for the related period. Adjustments to stockholders' equity made to effectuate the Plan include the adoption of Fresh-Start Reporting, and recognition of gains due to retirement of debt.

## 5.    Income Statement Assumptions

*a.*    Revenues: Gross Revenue includes fees received for the Company's service offerings, consultant reimbursements of travel and out-of-pocket expenses with equivalent amounts of expense recorded in other direct contract expenses and fees received for the sale of hardware and software with the cost of such hardware and software included in other direct contract expenses. Net Revenue represents gross revenue less other direct contract expenses. Projections for 2009 are based on management estimates including an estimate of the impact of restructuring. For 2010-2012, projections are based on an annual net revenue growth rate of 6.0%. Revenue growth during this period is projected to occur from gradual improvements in professional consultant utilization and annual increases of 2.0% to net billing rates resulting from a projected increase in demand for management and technology consulting services, and projected win rate of new business.

*b.*    Other Direct Contract Expenses: Other direct contract expenses include costs directly attributable to client engagements. These costs include out-of-pocket costs such as travel and subsistence for client service professional staff, costs of hardware and software, and costs of subcontractors. The expenses are forecasted

as a percentage of gross revenue.  For the projection period, the assumed expenses percentage of gross revenue is consistent with historical trends.

c.      Professional Compensation:  Professional compensation consists of payroll costs and related benefits associated with client service professional staff (including tax equalization for employees on foreign and long-term domestic assignments and other costs).  For the projection period, average annual professional compensation (excluding incentive compensation) is projected to be increased by 3.0% annually.

d.      Other Costs of Service:  Other Costs of Service consists of costs attributable to the support of client service professional staff, depreciation and amortization costs related to assets used in revenue-generating activities, bad debt expense relating to accounts receivable, and other costs attributable to serving the Company's client base.  The expenses are forecasted as a percentage of net revenue.

e.      Selling, General and Administrative Expense:  Selling, general and administrative expenses include costs related to marketing, sales force compensation and other expenses related to managing and growing the Company's business.  The expenses are forecasted as a percentage of net revenue.  For the projection period, the assumed expenses percentage of net revenue is held constant through December 2010 and decreased by 2.0% annually from 2011-2012.

f.      Infrastructure:  Infrastructure consists of costs to support the business from an operational perspective and includes finance and accounting, information systems, occupancy costs and charges related to exiting facilities, human resources, marketing and other costs to support the business.  For the projection period, infrastructure expense is expected to be reduced through cost reduction initiatives until an expense target of 16.0% of net revenue is reached.

g.      Bonus Expense: Bonus expense includes annual and longer term bonus for all employees of the Company.

h.      Stock Expense: Stock expense includes all costs related to the Company's various stock compensation programs.

i.      Other Income/Loss: Other income/loss includes foreign exchange mark-to-market adjustments on intercompany loan and trade accounts. Additionally, the projections include a $20,000,000 loss from estimated unforeseen contract losses and increased operating costs during 2009, as a result of uncertainty resulting from the restructuring.

j.      Restructuring Expenses:  Restructuring expenses include costs associated with the Company's debt restructuring efforts and severance programs.  Restructuring expenses are comprised of Postpetition Credit Agreement fees and professional fees related to BearingPoint's chapter 11 filing, in addition to severance costs.

*k.*    Interest Expense:  Includes payments on the Exit Facility.  The Exit Facility interest contains both cash and payment-in-kind interest.  For further information on the Exit Facility, see [Section II.G.4].

*l.*    Taxes:   For the projection period, assumed effective tax rates by geographic region are consistent with historical trends.

*m.*    Preferred Dividends:  Preferred dividends includes payment-in-kind dividend payments at a rate of 13.5% on the Preferred Stock.  For further information on the Preferred Stock, see [Section II.G.5].

## 6.    Financial Projections[22]

Each of the following tables summarizes management's Projections for the four fiscal years ending December 31, 2009, 2010, 2011 and 2012.

The Projections include Projected Condensed Consolidated Statement of Operations, Projected Condensed Consolidated Balance Sheet, and Projected Condensed Consolidated Statement of Cash Flows.

**BearingPoint, Inc.**
Projected Condensed Consolidated Statement of Operations
(in millions)
(Unaudited)

| | For the year ending December 31, | | | |
|---|---|---|---|---|
| | **2009** | **2010** | **2011** | **2012** |
| Gross Revenue | $2,937.9 | $3,114.7 | $3,300.1 | $3,496.7 |
| Other Direct Contract Expenses | 627.7 | 666.5 | 704.3 | 744.6 |
| Net Revenue | 2,310.2 | 2,448.1 | 2,595.8 | 2,752.1 |
| Professional Compensation | 1,385.7 | 1,417.7 | 1,492.0 | 1,565.6 |
| Other Costs of Service | 154.9 | 162.1 | 169.2 | 176.7 |
| SG&A | 97.5 | 100.0 | 100.4 | 100.5 |
| Operating Income (Loss) | 672.1 | 768.3 | 834.2 | 909.4 |
| Infrastructure | 449.6 | 445.0 | 440.0 | 440.0 |
| Bonus Expense, Net | 75.0 | 65.0 | 70.0 | 75.0 |
| Stock Expense | 69.8 | 40.0 | 42.0 | 44.0 |
| Other (Income)/Loss | 20.0 | 0.0 | 0.0 | 0.0 |
| Restructuring Expenses | 66.5 | 2.1 | 2.1 | 2.1 |
| Net Interest Expense | 48.4 | 62.1 | 52.9 | 19.4 |
| Net Income (Loss) Before Income Taxes and Preferred Dividends | (57.2) | 154.1 | 227.2 | 328.9 |
| Income Taxes | 51.4 | 81.9 | 117.7 | 150.8 |
| Preferred Dividends | 4.0 | 7.3 | 8.3 | 9.4 |
| Net Income (Loss) | ($112.6) | $64.8 | $101.2 | $168.6 |

---

[22] The projected financial information contained in this section is based on estimates and assumptions made by management and is subject to ongoing review and modification by senior management to BearingPoint .  Actual results for the years presented will vary from the projected information and such variations may be material.

**BearingPoint, Inc.**
Projected Condensed Consolidated Balance Sheets
(in millions)
(Unaudited)

| | For the year ending December 31, | | | |
|---|---|---|---|---|
| | **2009** | **2010** | **2011** | **2012** |
| **Assets** | | | | |
| Current Assets: | | | | |
|   Cash & Cash Equivalents | $327.8 | $515.4 | $614.2 | $683.2 |
|   Accounts Receivable/Unbilled Revenue | 571.7 | 580.3 | 589.0 | 597.7 |
|   Deferred Income Tax Asset | 8.9 | 8.9 | 8.9 | 8.9 |
|   Prepaid Expenses | 58.1 | 58.1 | 58.1 | 58.1 |
|   Other Current Assets | 32.5 | 32.5 | 32.5 | 32.5 |
|     Total Current Assets | 999.1 | 1,195.3 | 1,302.7 | 1,380.4 |
| PP&E, Net | 88.6 | 74.6 | 60.5 | 46.5 |
| Goodwill | 479.9 | 479.9 | 479.9 | 479.9 |
| Deferred Tax Assets | 19.3 | 19.3 | 19.3 | 19.3 |
| Other Long-Term Assets | 80.8 | 80.8 | 80.8 | 80.8 |
|     Total Assets | $1,667.6 | $1,849.7 | $1,943.1 | $2,006.8 |
| **Liabilities & Stockholders' Equity** | | | | |
| Current Liabilities: | | | | |
|   Accounts Payable | 128.1 | 175.8 | 180.8 | 186.7 |
|   Accrued Payroll and Related Liabilities | 245.4 | 245.7 | 246.0 | 246.3 |
|   Accrued Bonus | 58.1 | 49.6 | 70.0 | 75.0 |
|   Deferred Revenue | 85.5 | 85.5 | 90.6 | 96.0 |
|   Deferred Income Taxes | 42.7 | 42.7 | 42.7 | 42.7 |
|   Other Current Liabilities | 77.0 | 76.3 | 75.6 | 74.9 |
|     Total Current Liabilities | 636.7 | 675.6 | 705.6 | 721.6 |
| Senior Secured Term Loan | 287.4 | 290.5 | 170.1 | 0.0 |
| LC Facility PIK Notes | 5.5 | 15.3 | 25.9 | 0.0 |
| Accrued Employee Benefits | 127.3 | 130.5 | 137.2 | 143.9 |
| Lease Accrual | 0.0 | 0.0 | 0.0 | 0.0 |
| Deferred Tax, non current | 12.9 | 12.9 | 12.9 | 12.9 |
| Other Liabilities | 312.9 | 327.9 | 342.9 | 357.9 |
|     Total Liabilities | $1,382.7 | $1,452.8 | $1,394.7 | $1,236.4 |
| Preferred Equity | 54.0 | 61.3 | 69.6 | 79.0 |
| Common Equity | 230.8 | 335.6 | 478.8 | 691.5 |
|     Total Stockholders' Equity | $284.8 | $397.0 | $548.4 | $770.5 |
|     Total Liabilities & Stockholders' Equity | $1,667.6 | $1,849.7 | $1,943.1 | $2,006.8 |

**BearingPoint, Inc.**
Projected Condensed Consolidated Statement of Cash Flows
(in millions)
(Unaudited)

| | For the year ending December 31, | | | |
|---|---|---|---|---|
| | **2009** | **2010** | **2011** | **2012** |
| Cash Flows from Operating Activities: | | | | |
| Net Income | ($112.6) | $64.8 | $101.2 | $168.6 |
| Depreciation/Amortization | 37.5 | 30.0 | 30.0 | 30.0 |
| Stock-based Compensation | 69.8 | 40.0 | 42.0 | 44.0 |
| Amortization of Warrants | 1.0 | 0.0 | 0.0 | 0.0 |
| Preferred PIK Dividends | 4.0 | 7.3 | 8.3 | 9.4 |
| Change in Working Capital | (81.3) | 30.3 | 21.4 | 7.3 |
| Change in Other Assets/Liabilities | (79.1) | 18.2 | 21.7 | 21.7 |
| Adjustment for GUCS Conversion | 108.4 | 0.0 | 0.0 | 0.0 |
| Adjustment for Convenience Class | (3.0) | 0.0 | 0.0 | 0.0 |
| Cash Flow from Operations | (55.3) | 190.7 | 224.6 | 281.0 |
| | | | | |
| Cash Flows from Investing Activities: | | | | |
| Capital Expenditures | (16.0) | (16.0) | (16.0) | (16.0) |
| Cash Flow from Investing Activities | (16.0) | (16.0) | (16.0) | (16.0) |
| | | | | |
| Cash Flows from Financing Activities: | | | | |
| Proceeds from Issuance of LT Debt | 292.9 | 12.9 | (109.8) | (196.1) |
| (Repayment) of LT Debt | (293.6) | 0.0 | 0.0 | 0.0 |
| Issuance/(Repurchase) of Equity | 50.0 | 0.0 | 0.0 | 0.0 |
| Cash Flow from Financing | 49.4 | 12.9 | (109.8) | (196.1) |
| | | | | |
| Beginning Cash Balance | 349.8 | 327.8 | 515.4 | 614.2 |
| Net Change in Cash | (22.0) | 187.6 | 98.8 | 69.0 |
| Ending Cash Balance | $327.8 | $515.4 | $614.2 | $683.2 |

## B.    Valuation

[To be provided]

## C.    Financial Information

The Form 10-K for the fiscal year ended December 31, 2008, and the related consolidated statements of operations and consolidated statements of cash flows of BearingPoint and its affiliates are contained in Exhibits C to this Disclosure Statement, and the full text of which is incorporated herein by reference. This financial information is provided to permit the holders of Claims and Equity Interests to better understand the Debtors' historical business performance and the impact of the Reorganization Cases on the Debtors' business. The Form 10-K for the fiscal year ended December 31, 2008, that BearingPoint files electronically with the SEC is available under the Filings & Forms (EDGAR) section at www.sec.gov.

# VII.    CERTAIN FACTORS TO BE CONSIDERED

## A.    Certain Bankruptcy Law Considerations

### 1.    Risk of Non-Confirmation of the Plan of Reorganization

Although the Debtors believe that the Plan will satisfy all requirements necessary for confirmation by the Bankruptcy Court, there can be no assurance that the Bankruptcy Court will reach the same conclusion or that modifications of the Plan will not be required for confirmation or that such modifications would not necessitate resolicitation of votes.

### 2.    Non-Consensual Confirmation

In the event any impaired class of claims or equity interests does not accept a plan of reorganization, a bankruptcy court may nevertheless confirm such plan at the proponent's request if at least one impaired class has accepted the plan (with such acceptance being determined without including the vote of any "insider" in such class), and as to each impaired class that has not accepted the plan, the bankruptcy court determines that the plan "does not discriminate unfairly" and is "fair and equitable" with respect to the dissenting impaired Classes.  See section X.C.(B) below, entitled "CONFIRMATION OF THE PLAN OF REORGANIZATION - Requirements for Confirmation of the Plan of Reorganization - Requirements of Section 1129(b) of the Bankruptcy Code."  Because Class 9 (Equity Interests) is deemed to reject the Plan, these requirements must be satisfied with respect to this Class.  Should any other class vote to reject the Plan, then these requirements must be satisfied with respect to those Classes as well. The Debtors believe that the Plan satisfies these requirements.

### 3.    Risk of Non-Occurrence of the Effective Date

Although the Debtors believe that the Effective Date will occur soon after the Confirmation Date, there can be no assurance as to such timing.  Under the Plan, the Effective Date must occur within ___ days of the date of the Confirmation Order.  Moreover, if each of the conditions to consummation and the occurrence of the Effective Date has not been satisfied or duly waived on or before _____, 2009, or such later date as may be consented to by the parties, the Bankruptcy Court may vacate the Confirmation Order, in which event the Plan would be deemed null and void.

### 4.    Debtors Could Withdraw the Plan

Under the Plan, the Debtors could withdraw the Plan with respect to any Debtors and proceed with confirmation of the Plan with respect to any other Debtors.

### 5.    Risks Related to the Chapter 11 Case Itself

The commencement of the chapter 11 case could adversely affect the relationships between the Debtors and their customers, employees, vendors, and others.  There is a risk, for example, that customers would be less likely to purchase the Debtors' consulting services, that employees could be distracted from performance of their duties or more easily attracted to other career opportunities, and that vendors could terminate their relationship with the Debtors or require financial assurances or enhanced performance.

### 6.    Conversion into a Chapter 7 Case

If no reorganization plan can be confirmed, or if the Bankruptcy Court otherwise finds that it would be in the best interest of creditors, the chapter 11 case may be converted to a case under chapter 7 of the Bankruptcy Code, pursuant to which a trustee would be appointed or elected to liquidate the Debtors' assets for distribution in accordance with the priorities established by the Bankruptcy Code. A discussion of the effects that a Chapter 7 liquidation would have on the recoveries of holders of claims and interests and a liquidation analysis are set forth in Exhibit D.

## B.    Additional Factors To Be Considered

### 1.    Risk of Economic Deterioration

In the event that economic conditions in general and in the consulting industry specifically decline suddenly and precipitously, the Debtors could potentially be unable to operate their business. In addition, a further tightening of the credit markets could prevent a successful restructuring. Under such circumstances, the Debtors will not be able to confirm the Plan.

### 2.    The Debtors Have No Duty to Update

The statements contained in this Disclosure Statement are made by the Debtors as of the date hereof, unless otherwise specified herein, and the delivery of this Disclosure Statement after that date does not imply that there has been no change in the information set forth herein since that date. The Debtors have no duty to update this Disclosure Statement unless otherwise ordered to do so by the Bankruptcy Court.

### 3.    No Representations Outside This Disclosure Statement Are Authorized

No representations concerning or related to the Debtors, the Reorganization Cases, or the Plan are authorized by the Bankruptcy Court or the Bankruptcy Code, other than as set forth in this Disclosure Statement. Any representations or inducements made to secure your acceptance or rejection of the Plan that are other than as contained in, or included with, this Disclosure Statement should not be relied upon by you in arriving at your decision.

### 4.    Claims Could Be More Than Projected

The Bar Date for filing proofs of Claim has not yet occurred. The Allowed amount of Claims in each class could be significantly more than projected, which in turn, could cause the value of distributions to be reduced substantially.

### 5.    Projections and Other Forward-Looking
####       Statements Are Not Assured, and Actual Results May Vary

Certain of the information contained in this Disclosure Statement is, by nature, forward looking, and contains estimates and assumptions which might ultimately prove to be incorrect, and contains projections which may be materially different from actual future experiences. There are uncertainties associated with any projections and estimates, and they should not be considered assurances or guarantees of the amount of funds or the amount of Claims in the various Classes that might be allowed.

**6.      No Legal or Tax Advice is Provided to You By This Disclosure Statement**

The contents of this Disclosure Statement should <u>not</u> be construed as legal, business or tax advice.  Each creditor or Equity Interest holder should consult his, her, or its own legal counsel and accountant as to legal, tax and other matters concerning his, her, or its Claim or Equity Interest.

This Disclosure Statement is <u>not</u> legal advice to you.  This Disclosure Statement may <u>not</u> be relied upon for any purpose other than to determine how to vote on the Plan or object to confirmation of the Plan.

**7.      No Admission Made**

Nothing contained herein shall constitute an admission of, or be deemed evidence of, the tax or other legal effects of the Plan on the Debtors or on holders of Claims or Equity Interests.

**8.      Certain Tax Consequences**

For a discussion of certain U.S. federal income tax considerations to the Debtors and certain holders of Claims in connection with the implementation of the Plan, see "Certain Federal Income Tax Consequences of the Plan."

**C.      <u>Business Factors and Competitive Conditions</u>**

**1.      Demand**

BearingPoint's business tends to lag behind economic cycles, consequently, it may experience rapid decreases in demand at the onset of significant economic downturns while the benefits of economic recovery may take longer to realize.

BearingPoint's contracts funded by U.S. Federal government agencies, inclusive of government sponsored enterprises, accounted for approximately 28.4% of its revenue in 2007. BearingPoint depends particularly on contracts funded by clients within the Department of Defense, which accounted for approximately 11.0% of its revenue in 2007.  BearingPoint's business could be materially harmed if the U.S. Federal government reduces its spending or reduces the budgets of its departments or agencies as a result of the nation's financial crisis.

**2.      Operating Results**

BearingPoint's operating results will suffer if it is not able to maintain its billing and utilization rates or control its costs.

Factors affecting the rates BearingPoint is able to charge for its services include its clients' perception of its ability to add value through its services, its ability to access and use lower-cost service delivery personnel, as compared to the ability of its competitors to do so, introduction of new services or products by BearingPoint or its competitors, pricing policies of its competitors and general economic conditions in the United States and abroad.

Factors affecting BearingPoint's utilization rates include seasonal trends, primarily as a result of its hiring cycle and holiday and summer vacations, its ability to transition employees from completed projects to new engagements, its ability to forecast demand for its services and thereby

maintain an appropriately balanced and sized workforce, its ability to manage attrition, and its ability to mobilize its workforce quickly or economically, especially outside the United States.

### 3.    Competitive Conditions

In recent years BearingPoint has experienced exceptionally high levels of Selling, General and Administrative expenses ("SG&A") as a percentage of revenue, primarily as a result of continuing issues related to its North American financial reporting systems and its internal controls, higher than average costs associated with hiring and retaining its employees, and other assorted costs, including legal expenses associated with various disputes and litigation.  BearingPoint's ability to reduce future SG&A expenses is dependent, among other things, on improving its controls around the financial closing process, remediating deficiencies in its internal controls, reducing the amount of time and effort spent to substantiate the accuracy and completeness of its financial results, reducing redundant systems and activities, streamlining the input and capture of data, hiring and retaining skilled finance and accounting personnel while decreasing the number of personnel required to support its financial close process, including reliance on contractors, achieving further reductions in the number of offices and square feet of space occupied by BearingPoint and achieving further cost savings in its various corporate services, including legal, information technology and human resources.  If BearingPoint is unable to achieve these objectives, offset these costs through other expense reductions, or if it encounters additional difficulties or setbacks in achieving these objectives, its SG&A expenses could significantly exceed current expected levels, and, consequently, materially and adversely affect its competitive position, financial condition, results of operation, and cash flows.

Systems integration consulting constitutes a significant part of BearingPoint's business.  Historically, these markets have included a large number of participants and have been highly competitive.  Recent increases in the number and availability of competing global delivery alternatives for systems integration work create ever increasing pricing pressures in these markets. BearingPoint frequently competes with companies that have greater global delivery capabilities and alternatives, financial resources, name recognition and market share than it does.  If BearingPoint is unable to maintain its billing rates through delivering unique and differentiated systems integration solutions and control its costs through proper management of its workforce, global delivery centers and other available resources, it may lose the ability to compete effectively for this significant portion of its business.

### 4.    Business Relationships

BearingPoint's most significant joint marketing relationships are with Oracle Corporation, Microsoft Corporation, SAP AG, Hewlett-Packard Company and IBM Corporation.  These relationships enable BearingPoint to increase revenue by providing it additional marketing exposure, expanding it sales coverage, increasing the training of its professionals and developing and co-branding service offerings that respond to customer demand.  The loss of one or more of these relationships could adversely affect its business by terminating current joint marketing and product development efforts or otherwise decreasing its revenue and growth prospects.  Because most of its significant joint marketing relationships are nonexclusive, if BearingPoint's competitors are more successful in, among other things, building leading-edge products and services, these entities may form closer or preferred arrangements with other consulting organizations, which could materially reduce its revenue.

### 5.    Sales to United States Government

BearingPoint depends on contracts with U.S. Federal government agencies, particularly with the Department of Defense, for a significant portion of its revenue and consequently, it is exposed to various risks inherent in the government contracting process, including the following:

(A)     BearingPoint's government contracts are subject to laws and regulations that provide government clients with rights and remedies not typically found in commercial contracts, which are unfavorable to it.  Most government contracts contain a "termination for convenience" clause.  This clause grants the governmental contracting officer an extremely broad right to terminate the contractor's performance without the Federal government being liable for breach-of-contract damages.  Thus, even though the automatic stay protects BearingPoint from the contracts being terminated without court approval in the chapter 11 cases, the government can terminate these contracts after the confirmation of the plan, for no reason at all.

(B)     BearingPoint's failure to obtain and maintain necessary security clearances may limit its ability to perform classified work for government clients, which could cause it to lose business. In addition, security breaches in sensitive government systems that it has developed could damage its reputation and eligibility for additional work and expose it to significant losses.

(C)     The U.S. Federal government audits and reviews BearingPoint's performance on contracts, pricing and cost allocation practices, cost structure, systems, and compliance with applicable laws, regulations, and standards.  If the government finds that its costs are not reimbursable, have not been properly determined, or are based on outdated estimates of its costs, BearingPoint may not be allowed to bill for all or part of those costs, or it may have to refund cash that it has already collected, which may materially affect its operating margin and the expected timing of its cash flows.

(D)     Government contracting officers have wide latitude in their ability to conclude as to the financial responsibility of companies that contract with agencies of the U.S. Federal government.  Officers who conclude that a company is not financially responsible may withhold new engagements and terminate recently contracted engagements for which significant expenditures and outlays already may have been made.  For instance, as discussed above, the DCAA is currently performing an audit of BearingPoint's financial capabilities.

(E)     If the government uncovers improper or illegal activities in the course of audits or investigations, BearingPoint may be subject to civil and criminal penalties and administrative sanctions, including termination of contracts, forfeiture of profits, suspension of payments, fines and suspension or debarment from doing business with U.S. Federal government agencies.  These consequences could materially and adversely affect its revenue and operating results.  The inherent limitations of internal controls, even when adequate, may not prevent or detect all improper or illegal activities.

(F)     Government contracts, and the proceedings surrounding them, are often subject to more extensive scrutiny and publicity than other commercial contracts.  Negative publicity related to BearingPoint's government contracts, regardless of its accuracy, may further damage its business by affecting its ability to compete for new contracts.

The impact of any of these occurrences or conditions could affect not only BearingPoint's business with the agency or department involved, but also other agencies and departments within the U.S. Federal

government. Depending on the size of the project or the magnitude of the budget reduction, potential costs, penalties or negative publicity involved, any of these occurrences or conditions could have a material adverse effect on its business or its results of operation.

**6.      Reliance on Key Personnel.**

BearingPoint's success depends largely on its general ability to attract, develop, motivate and retain highly skilled professionals.  Competition for skilled personnel in the consulting and technology services business is intense.  The continuing loss of significant numbers of its professionals or the inability to attract, hire, develop, train and retain additional skilled personnel for these or other reasons could have a serious negative effect on BearingPoint, including its ability to obtain and successfully complete important engagements and thus maintain or increase its revenue.

**7.      Customers**

BearingPoint's clients typically retain BearingPoint on a non-exclusive, engagement-by-engagement basis, rather than under exclusive long-term contracts. Most of its consulting engagements are less than twelve months in duration.  Most of its contracts can be terminated by its clients upon short notice and without significant penalty.  Large client projects involve multiple engagements or stages, and there are risks that a client may choose not to retain BearingPoint for additional stages of a project or that a client will cancel or delay additional planned engagements.  These terminations, cancellations or delays could result from factors unrelated to BearingPoint's work product or the progress of the project, but could be related to business or financial conditions of the client or the economy generally.  When contracts are terminated, cancelled or delayed, BearingPoint loses the associated revenue, and it may not be able to eliminate associated costs in a timely manner.  Consequently, its operating results in subsequent periods may be adversely impacted.

**8.      Risks of International Operations**

BearingPoint's results of operation are affected by its ability to manage risks inherent in it doing business abroad.  These risks include exchange rate fluctuation, regulatory concerns, terrorist activity, restrictions with respect to the movement of currency, access to highly skilled workers, political and economic stability, unauthorized and improper activities of employees and its ability to protect its intellectual property.  Despite BearingPoint's best efforts, it may not be in compliance with all regulations around the world and may be subject to penalties and fines as a result. these penalties and fines may materially and adversely affect its performance.

**9.      Services**

The effort and cost associated with the completion of BearingPoint's systems integration, software development and implementation or other services are difficult to estimate and, in some cases, may significantly exceed the estimates made at the time it commences the services.  BearingPoint often provides these services under level-of-effort and fixed-price contracts.  The level-of-effort contracts are usually based on time and materials or direct costs plus a fee.  Under these arrangements, BearingPoint is able to bill its client based on the actual cost of completing the services, even if the ultimate cost of the services exceeds its initial estimates.  However, if the ultimate cost exceeds its initial estimate by a significant amount, it may have difficulty collecting the full amount that it is due under the contract, depending upon many factors, including the reasons for the increase in cost, its communication with the client throughout the project, and the client's satisfaction with the services.  As a result, it could incur losses with respect to these services even when they are priced on a level-of-effort basis. If BearingPoint provides these services under a fixed-price contract, it bears the risk that the ultimate cost of the project

will materially exceed the price to be charged to the client.  If it fails to accurately estimate its costs or the time required to perform under a contract, its ability to generate profits on these contracts may be materially and adversely affected.

BearingPoint's success depends, in part, on its ability to develop service offerings that keep pace with rapid and continuing changes in technology, evolving industry standards and changing client preferences. Its success also depends on its ability to develop and implement ideas for the successful application of existing and new technologies. BearingPoint  may not be successful in addressing these developments on a timely basis, or its ideas may not be successful in the marketplace. Also, products and technologies developed by its competitors may make its services or product offerings less competitive or obsolete.  Any of these circumstances could have a material adverse effect on its ability to obtain and successfully complete client engagements.

## 10.    Intellectual Property

BearingPoint's success depends, in part, upon its plan to develop, capture and protect re-usable proprietary methodologies and other intellectual property.  BearingPoint relies upon a combination of trade secrets, confidentiality policies, nondisclosure and other contractual arrangements, and patent, copyright and trademark laws to protect its intellectual property rights.  Its efforts in this regard may not be adequate to prevent or deter infringement or other misappropriation of its intellectual property, and it may not be able to detect the unauthorized use of, or take appropriate and timely action to enforce, its intellectual property rights.

Depending on the circumstances, BearingPoint may be required to grant a specific client certain intellectual property rights in materials developed in connection with an engagement, in which case it would seek to cross-license the use of such rights.  In limited situations, however, it foregoes certain intellectual property rights in materials it helps create, which may limit its ability to re-use such materials for other clients.  Any limitation on its ability to re-use such materials could cause it to lose revenue-generating opportunities and require it to incur additional cost to develop new or modified materials for future projects.

## 11.    Variances from Projections

The fundamental premise of the Plan is the deleveraging of the Debtors and the implementation and realization of the Debtors' business plan, as reflected in the projections contained in this Disclosure Statement.  The projections reflect numerous assumptions concerning the anticipated future performance of the Reorganized Debtors, some of which may not materialize.  Such assumptions include, among other items, assumptions concerning the general economy, the ability to make necessary capital expenditures, the ability to establish market strength, [consumer purchasing trends and preferences,] and the ability to stabilize and grow the company's sales base and control future operating expenses.  The Debtors believe that the assumptions underlying the projections are reasonable.  However, unanticipated events and circumstances occurring subsequent to the preparation of the projections may affect the actual financial results of the Reorganized Debtors.  Therefore, the actual results achieved throughout the periods covered by the projections necessarily will vary from the projected results, and such variations may be material and adverse.

Moreover, because the market and economic conditions upon which the value of the classes of Common Stock will be based are beyond the control of the Debtors, the actual results that will be achieved cannot be assured.

**D.**     <u>**Additional Risks**</u>

More detailed discussions of the risks associated with the Debtor's business are set forth in BearingPoint's upcoming Form 10-K to be filed with the Securities and Exchange Commission ("<u>**SEC**</u>") in March 2009, under the heading "Risk Factors."

## VIII.   CERTAIN TAX CONSEQUENCES OF THE PLAN

The following discussion summarizes certain U.S. federal income tax consequences of the implementation of the Plan to the Debtors and certain holders of Claims.  This discussion does not address the U.S. federal income tax consequences of the implementation of the Plan to holders of Claims that are unimpaired or otherwise entitled to payment in full in cash under the Plan or to holders of Equity Interests.  For purposes of the following discussion, the Term Loan, the term loans issued in connection with the LC Facility (the "**LC Loans**"), the Senior Notes and the Junior Notes are referred to as "**Existing Debt**."

The discussion of U.S. federal income tax consequences set forth below is based on the Internal Revenue Code of 1986, as amended (the "**Tax Code**"), U.S. Department of Treasury regulations promulgated or proposed thereunder, judicial authorities, published positions of the Internal Revenue Service ("**IRS**") and other applicable authorities, all as in effect on the date of this document and all of which are subject to change or differing interpretations (possibly with retroactive effect).  The U.S. federal income tax consequences of the contemplated transactions are complex and are subject to significant uncertainties.  The Debtors have not requested a ruling from the IRS or any other tax authority, or an opinion of counsel, with respect to any of the tax aspects of the contemplated transactions, and the discussion below is not binding upon the IRS or such other authorities.  Thus, no assurance can be given that the IRS or such other authorities would not assert, or that a court would not sustain, a different position from any discussed herein.

This summary does not address foreign, state or local tax consequences of the contemplated transactions, nor does it purport to address the U.S. federal income tax consequences of the transactions to special classes of taxpayers (*e.g.*, foreign persons or entities, small business investment companies, regulated investment companies, real estate investment trusts, banks and certain other financial institutions, insurance companies, tax-exempt organizations, holders that are, or hold Existing Debt through, pass-through entities, persons whose functional currency is not the U.S. dollar, dealers in securities or foreign currency, and persons holding Existing Debt as a hedge against, or that is hedged against, currency risk or as part of a straddle, constructive sale or conversion transaction).  If a partnership (or another entity that is treated as a partnership for federal income tax purposes) holds Existing Debt, the tax treatment of a partner (or other equity owner) generally will depend upon the status of such partner (or other owner) and upon the activities of the partnership.  Moreover, the following discussion does not address U.S. federal taxes other than income taxes, nor does it apply to any person that acquires any of the consideration issued pursuant to the Plan in the secondary market.

This discussion also assumes that the Term Loan, the LC Loans, the Senior Notes, the Junior Notes, the Exit Facility Term Loan, the New Preferred Stock and the New Common Stock are, or will be, held as "capital assets" (generally, property held for investment) within the meaning of section 1221 of the Tax Code, and that the various debt and other arrangements to which the Debtors are parties will be respected for U.S. federal income tax purposes in accordance with their form.

**The following summary of certain U.S. federal income tax consequences is for informational purposes only and is not a substitute for careful tax planning and advice based upon the individual circumstances pertaining to a holder of Claims.**

**IRS Circular 230 Notice:  To ensure compliance with IRS Circular 230, holders of Claims and Equity Interests are hereby notified that: (A) any discussion of federal tax issues contained or referred to in this Disclosure Statement is not intended or written to be used, and cannot be used, by holders of Claims or Equity Interests for the purpose of avoiding penalties that may be imposed on them under the Tax Code; (B) such discussion is written in connection with the**

promotion or marketing by the Debtors of the transactions or matters addressed herein; and (C) holders of Claims and Equity Interests should seek advice based on their particular circumstances from an independent tax advisor.

## A.    Consequences to the Debtor

BPI is the common parent of an affiliated group of corporations for U.S. federal income tax purposes that includes certain domestic corporate subsidiaries (together, the "**BPI Group**"). The BPI Group files a single consolidated federal income tax return that takes into account the operations of all of its domestic subsidiaries (some of which are treated as partnerships or disregarded entities for U.S. federal income tax purposes). The BPI Group reported, in its most recent Form 10-K filed by BPI and its subsidiaries, consolidated net operating loss ("**NOL**") carryforwards for U.S. federal income tax purposes of approximately $564 million, as of the end of 2007. The BPI Group believes that further operating losses were incurred during the taxable year ended December 31, 2008. The amount of the BPI Group's consolidated NOL carryforwards and other tax attributes remain subject to audit and adjustment by the IRS.

As discussed below, in connection with the implementation of the Plan, the amount of the BPI Group's consolidated NOL carryforwards may be significantly reduced or eliminated, and other tax attributes of the BPI Group may be reduced. In addition, the BPI Group's subsequent utilization of any NOL carryforwards, built-in losses or other tax attributes (if any) remaining following the Effective Date may be severely restricted.

### 1.    Cancellation of Debt Income

In general, the Tax Code allows a debtor in a bankruptcy case to exclude from its gross income the amount of any cancellation of debt ("COD") income realized pursuant to a confirmed chapter 11 plan. In general, a debtor's COD income is equal in amount to the excess of (i) the adjusted issue price of the discharged debt (i.e., generally, the issue price of the debt, plus the accrued original issue discount thereon, minus the cash payments thereon other than payments of qualified stated interest) over (ii) the sum of the amount of cash, the issue price of the debt and the fair market value of other property issued in satisfaction of such debt. Certain statutory or judicial exceptions can generally apply to limit the amount of COD incurred for U.S. federal income tax purposes (e.g., where the cash payment of the cancelled debt would have given rise to a tax deduction).

The debtor that excludes COD income realized pursuant to a confirmed chapter 11 plan must reduce certain of its tax attributes – such as NOL carryforwards and current year NOLs, capital loss carryforwards, tax credits, and tax basis in assets – by the amount of its excluded COD income. If advantageous, the debtor can elect to reduce the basis of depreciable property prior to reducing its NOL carryforwards or other tax attributes. Where the debtor joins in the filing of a consolidated federal income tax return, applicable Treasury regulations require, in certain circumstances, that the tax attributes of the consolidated subsidiaries of the debtor and other members of the group also be reduced. Any reduction in tax attributes in respect of excluded COD income is effected at the end of the taxable year in which the debt is discharged.

The Debtors will incur substantial COD as a result of the implementation of the Plan. The amount of COD incurred depends, in significant part, on the issue price of the Exit Facility Term Loan (determined as described in "Ownership and Disposition of the Exit Facility Term Loan—Stated Interest and Original Issue Discount") and the fair market value, as of the Effective Date, of the New Preferred Stock and the New Common Stock issued in respect of the Claims. It is anticipated that the BPI

Group's consolidated NOL carryforwards will be significantly reduced or eliminated entirely.  In the latter event, other tax attributes also may be required to be reduced.

## 2.    Potential Limitations on NOL Carryforwards and Other Tax Attributes.

a.    *In General*.  Under section 382 of the Tax Code, if a corporation (or consolidated group) undergoes an "ownership change" and the corporation does not qualify for (or elects out of) the special bankruptcy exception discussed below, the amount of its NOL carryforwards, current year net operating loss and "built-in losses" (discussed below) that may be utilized to offset future taxable income is subject to an annual limitation.  In general, an ownership change occurs if the holders of 5% or more (by value) of a company's stock increase their aggregate ownership in the company by more than 50 percentage points over the applicable statutory testing period (generally three years).

In general, the amount of the annual limitation to which a corporation (or consolidated group) that undergoes an ownership change would be subject is equal to the product of (i) the fair market value of the stock of the corporation (or, in the case of a consolidated group, its common parent) immediately before the ownership change (with certain adjustments) and (ii) the "long-term tax-exempt rate" in effect for the month in which the ownership change occurs.  (By way of illustration, the long-term tax-exempt rate for ownership changes occurring in February, 2009, is 5.49%).  As discussed below, this annual limitation may be increased to the extent that the corporation (or consolidated group) has a "net unrealized built-in gain" as of the date of the ownership change and recognizes such built-in gain during the five-year period beginning on such date.  If the corporation (or consolidated group) undergoes an ownership change pursuant to a confirmed bankruptcy plan, the annual limitation generally is based on the value of its stock immediately after (rather than immediately before) the ownership change, after giving effect to the surrender of creditors' claims; in no event, however, can the stock value for this purpose exceed the pre-change gross value of the corporation's assets.

Any portion of the annual limitation that is not used in a given year may be carried forward, thereby adding to the annual limitation for the subsequent taxable year.  However, if the corporation (or the consolidated group) does not continue its historic business or use a significant portion of its historic assets in a new business for at least two years after the ownership change, or possibly if certain shareholders claim worthless stock deductions and continue to hold their stock in the corporation (or the parent of the consolidated group) at the end of the taxable year, the annual limitation resulting from the ownership change is reduced to zero, thereby precluding any utilization of the corporation's pre-change losses, absent any increases due to recognized built in gains discussed below.

BPI will undergo an ownership change under section 382 of the Tax Code on the Effective Date.  Accordingly, if BPI does not qualify for or elects out of the special bankruptcy exception described below, the annual taxable income of the BPI Group that may be offset by any remaining NOL carryforwards, built-in losses and certain other tax attributes (including current year NOLs) allocable to periods prior to the Effective Date (collectively, "pre-change losses") will be limited based on the fair market value of BPI's stock immediately after such ownership change.  This limitation would apply in addition to, and not in lieu of, any limitations under section 382 that would apply if a prior ownership change were determined to have occurred and the attribute reduction required in respect of excluded COD income realized by reason of consummation of the Plan.  There can be no assurance that an ownership change of the Debtors will not have occurred prior to the date hereof or prior to the Effective Date.

Accordingly, the impact of an ownership change of the BPI Group pursuant to the Plan depends generally upon, among other things, the availability and election of the special bankruptcy exception described below, as well as the amount of pre-change losses remaining after the reduction of attributes due to the COD, the value of both the stock and assets of the BPI Group at such time, the

continuation of its businesses, the amount and timing of future taxable income and the impact of prior
ownership changes, if any.

b.      *Built-In Gains and Losses.*  Section 382 of the Tax Code can operate to limit the
deduction of built-in losses recognized subsequent to the date of the ownership change.  If a loss
corporation (or consolidated group) has a net unrealized built-in loss (i.e., the excess of the tax basis in its
assets over the fair market value of its assets) at the time of an ownership change (taking into account
most assets and items of "built-in" income, gain, loss and deduction), then any built-in losses recognized
during the following five years (up to the amount of the original net unrealized built-in loss) generally
will be treated as pre-change losses and similarly will be subject to the annual limitation.

Conversely, if the loss corporation (or consolidated group) has a net unrealized built-in
gain at the time of an ownership change, any built-in gains recognized (or, according to an IRS notice,
treated as recognized) during the following five years (up to the amount of the original net unrealized
built-in gain) generally will increase the annual limitation in the year recognized, such that the loss
corporation (or consolidated group) would be permitted to use its pre-change losses against such built-in
gain income in addition to its regular annual allowance.

Although the rule applicable to net unrealized built-in losses generally applies to
consolidated groups on a consolidated basis, certain corporations that join the consolidated group within
the preceding five years may not be able to be taken into account in the group computation of net
unrealized built-in loss.  Such corporations would nevertheless be taken into account in determining
whether the consolidated group has a net unrealized built-in gain.  In general, a loss corporation's (or
consolidated group's) net unrealized built-in gain or loss will be deemed to be zero unless it is greater
than the lesser of (i) $10 million or (ii) 15% of the fair market value of its assets (with certain
adjustments) before the ownership change.

The BPI Group expects to have a net unrealized built-in loss immediately before the
Effective Date.

c.      *Special Bankruptcy Exception*.  An exception to the foregoing annual limitation
rules generally applies where qualified creditors of a debtor corporation receive, in respect of their claims,
at least 50% of the vote and value of the stock of the reorganized debtor (or a controlling corporation if
also in bankruptcy) pursuant to a confirmed chapter 11 plan.  Under this exception, a debtor's pre-change
losses are not limited on an annual basis but, instead, are required to be reduced by the amount of any
interest deductions claimed, during the three years preceding the effective date of the reorganization, in
respect of all debt that is converted into stock in the bankruptcy proceeding.  Moreover, if this exception
applies, any subsequent ownership change of the debtor within a two-year period after the consummation
of the chapter 11 plan will preclude the debtor's future utilization of any pre-change losses existing at the
time of the subsequent ownership change.  The Debtors currently contemplate that, assuming they are
eligible therefor, they will avail themselves of this exception, and are seeking orders restricting the
trading of BPI Stock and Claims that would be entitled to a distribution of New Preferred Stock or New
Common Stock pursuant to the Plan so as to preserve the availability of such exception.

## 3.      Alternative Minimum Tax

In general, a U.S. federal alternative minimum tax ("AMT") is imposed on a
corporation's alternative minimum taxable income at a 20% rate to the extent that such tax exceeds the
corporation's regular U.S. federal income tax.  For purposes of computing taxable income for AMT
purposes, certain tax deductions and other beneficial allowances are modified or eliminated.  In particular,
even though a corporation otherwise might be able to offset all of its taxable income for regular tax

purposes by available NOL carryforwards, only 90% of a corporation's taxable income for AMT purposes may be offset by available NOL carryforwards (as computed for AMT purposes).

In addition, if a corporation (or consolidated group) undergoes an "ownership change" within the meaning of section 382 of the Tax Code and is in a net unrealized built-in loss position (as determined for AMT purposes) on the date of the ownership change, the corporation's (or consolidated group's) aggregate tax basis in its assets would be reduced for certain AMT purposes to reflect the fair market value of such assets as of the change date.

Any AMT that a corporation pays generally will be allowed as a nonrefundable credit against its regular federal income tax liability in future taxable years when the corporation is no longer subject to the AMT.

## B.    Consequences to Holders of Certain Claims

### 1.    Consequences to Holders of Secured Credit Facility Term Loan Claims, Senior Noteholder Claims and Junior Noteholder Claims

The following discussion describes the consequences of the implementation of the Plan to (i) a holder of Secured Credit Facility Term Loan Claims upon the conversion Secured Credit Facility Term Loan Claims into the Exit Facility Term Loan and New Preferred Stock; (ii) a holder of Senior Noteholder Claims upon the exchange of such Claims for Class 1 Common Stock; and (iii) a holder of Junior Noteholder Claims upon the exchange of such Claims for Class 2 Common Stock.

a.    *In General*.  The U.S. federal income tax consequences to a holder of Existing Debt upon an exchange of such Existing Debt for the consideration provided for in the Plan depend, in part, on whether the holder's Existing Debt constitutes a "security" for U.S. federal income tax purposes, and if so, whether any of the consideration received in exchange therefor also constitutes "stock" or "securities" for U.S. federal income tax purposes (such that the exchange would qualify for "recapitalization" treatment under the Tax Code).  This determination is made separately for each class of Claims.

The term "security" is not defined in the Tax Code or in the Treasury regulations issued thereunder and has not been clearly defined by judicial decisions.  The determination of whether a particular debt obligation constitutes a "security" depends on an overall evaluation of the nature of the debt.  One of the most significant factors considered in determining whether a particular debt is a security is its original term.  In general, debt obligations issued with a weighted average maturity at issuance of less than five years do not constitute securities, whereas debt obligations with a weighted average maturity at issuance of ten years or more constitute securities.  However, additional authorities have stressed that time alone is not decisive; the "security" inquiry requires an overall evaluation of the nature of the debt, the degree of participation and continuing interest in the affairs of the business, the extent of the proprietary interest compared to the similarity of the note to a cash payment, and the purposes of the advance.

The Term Loan had an original term-to-maturity of five years.  The FFL Notes also had an original term-to-maturity of five years; in addition, the FFL Notes contain additional terms, such as a conversion right, that could be understood to confer an additional degree of participation and continuing interest in the affairs of BPI.  The L/C Loans likely have original terms-to-maturity of less than five years.  Each of the Series A Notes, the Series B Notes and the Series C Notes have original terms-to-maturity of slightly less than twenty years.  The Exit Facility Term Loan will have a new term-to-maturity of three years.  Holders of Secured Credit Facility Term Loan Claims, Senior Noteholder Claims, and Junior

Noteholder Claims are urged to consult their tax advisors regarding the status for U.S. federal income tax purposes of their respective Existing Debt.

Additionally, the IRS has ruled that new debt instruments with a term of less than five years issued in exchange for and bearing the same terms (other than interest rate) as debt instruments that constitute securities should also be classified as securities for this purpose since the new debt represented a continuation of the holder's investment in the corporation in substantially the same form. The features of the Exit Facility Term Loan depart from those of the Term Loan in ways not contemplated by the aforementioned IRS ruling and, as a result, the IRS ruling may not apply in determining whether the Exit Facility Term Loan could be treated as a security for federal income tax purposes. Holders of Secured Credit Facility Term Loan Claims are urged to consult their tax advisors concerning the potential application of this ruling.

A holder of a Secured Credit Facility Term Loan Claim generally would realize gain or loss in respect of such Claim in an amount equal to the difference between (i) the sum of the issue price of the Exit Facility Term Loan and the fair market value of the New Preferred Stock issued in exchange for such Claim (other than the portion of such consideration issued in respect of accrued but unpaid interest on such Claim) and (ii) the holder's adjusted tax basis in such Claim (other than the basis in respect of any Claim for accrued but unpaid interest). A holder of a Senior Noteholder Claim or Junior Noteholder Claim generally would realize gain or loss in respect of such Claim in an amount equal to the difference between (i) the fair market value of the New Common Stock issued in exchange for such Claim (other than the portion of such consideration issued in respect of accrued but unpaid interest on such Claim) and (ii) the holder's adjusted tax basis in such Claim (other than the basis in respect of any Claim for accrued but unpaid interest). Such gain or loss generally would be recognized for federal income tax purposes to the extent described below.

b. *If the Existing Debt Is Not a Security*. If the holder's Existing Debt does not constitute a security for federal income tax purposes, the holder generally would recognize its realized gain or loss on the exchange of its Claims pursuant to the Plan (determined as described above). *See* "— Character of Gain or Loss," below. For a discussion of the tax consequences of any Claim allocable to accrued but unpaid interest, see "— Payment of Accrued Interest," below.

In such case, a holder's tax basis in the Exit Facility Term Loan received would equal the issue price of such Debt, and a holder's tax basis in any New Preferred Stock or New Common Stock received would equal the fair market value of such Stock on the date of the exchange. A holder's holding period in such Loan and Stock should begin the day following the exchange date.

c. *If the Existing Debt Is a Security*. If the holder's Existing Debt constitutes a security for federal income tax purposes, the holder would not recognize any loss on the exchange of its Claims pursuant to the Plan, but would be required to recognized the gain (if any) that it realizes on such exchange (determined as described above) to the extent of the amount of any consideration that does not constitute either stock or a security (e.g., in the case of a debt instrument that does not constitute a security, the issue price of such debt), other than the amount thereof received in respect of a Claim for accrued but unpaid interest. *See* "—Character of Gain or Loss" below. For a discussion of the tax consequences of any Claim allocable to accrued but unpaid interest, see "— Payment of Accrued Interest," below.

In such case, a holder's aggregate tax basis in any stock or securities received (other than in respect of accrued but unpaid interest) should equal the holder's aggregate adjusted tax basis in the Existing Debt exchanged therefor, increased by any gain recognized in the exchange, and decreased by the "issue price" of any debt instrument received in the exchange that does not constitute a security. In

general, a holder's holding period in any stock or securities received will include the holder's holding period in the Existing Debt exchanged, except to the extent of any such consideration treated as received in respect of accrued but unpaid interest.

### 2.      Consequences to Holders of General Unsecured Claims

Holders of General Unsecured Claims should recognize gain or loss in an amount equal to the difference between (i) the sum of the fair market value of any New Common Stock received (other than in respect of any Claim for accrued but unpaid interest) and (ii) the holder's adjusted tax basis in its Claim (other than any basis attributable to accrued but unpaid interest). *See* "—Character of Gain or Loss," below. For a discussion of the tax consequences of any Claim allocable to accrued but unpaid interest, see "— Payment of Accrued Interest," below. Any New Common Stock received will have a basis equal to its fair market value on the date of the exchange, and a holding period that begins the day following the exchange date.

### 3.      Consequences *to Holders of Convenience Class Claims.*

Holders of Convenience Class Claims should recognize gain or loss in an amount equal to the difference between (i) the amount of cash received by such holder in satisfaction of its claim (other than any Claim for accrued but unpaid interest) and (ii) the holder's adjusted tax basis in its Claim (other than any basis attributable to accrued but unpaid interest). *See* "— Character of Gain or Loss, below. For a discussion of the tax consequences of any Claim allocable to accrued but unpaid interest, see "— Payment of Accrued Interest," below.

### 4.      Character of Gain or Loss

Where gain or loss is recognized by a holder in respect of the satisfaction and exchange of its Claim, the character of such gain or loss as long-term or short-term capital gain or loss or as ordinary income or loss will be determined by a number of factors, including, among others, the tax status of the holder, whether the Claim constitutes a capital asset in the hands of the holder and how long it has been held, whether the Claim was acquired at a market discount, and whether and to what extent the holder previously had claimed a bad debt deduction. Each holder of a Claim is urged to consult its tax advisor for a determination of the character of any gain or loss recognized in respect to the satisfaction of its Claim.

Holders of Claims that recognize capital losses as a result of the distributions under the Plan will be subject to limits on their use of capital losses. For non-corporate holders, capital losses may be used to offset any capital gains (without regard to holding periods) plus ordinary income to the extent of the lesser of (1) $3,000 ($1,500 for married individuals filing separate returns) and (2) the excess of the capital losses over the capital gains. Non-corporate holders may not carry unused capital losses back, but may carry them forward and apply them to capital gains and a portion of their ordinary income for an unlimited number of years. For corporate holders, losses from the sale or exchange of capital assets may only be used to offset capital gains. Corporate holders that have more capital losses than can be used in a tax year may be allowed to carry over unused capital losses for the five taxable years following the capital loss year, and are allowed to carry back unused capital losses to the three taxable years preceding the capital loss year.

A holder that purchased its Existing Debt from a prior holder at a "market discount" (relative to the adjusted issue price of the Existing Debt at the time of acquisition) may be subject to the market discount rules of the Tax Code. Under those rules, any gain recognized on the exchange of such Existing Debt generally would be treated as ordinary income to the extent of the market discount accrued

during the holder's period of ownership, unless the holder elected to include the market discount in income as it accrued.

If a holder's exchange qualifies in whole or in part for nonrecognition treatment (as described above in paragraph B.1.c.) the Tax Code provides that any accrued market discount, to the extent not recognized as ordinary income on the exchange, carries over to any consideration received in exchange therefor that consists of stock or securities, such that any gain recognized by the holder upon a subsequent disposition of such stock or securities would be treated as ordinary income to the extent of any accrued market discount not previously included in income. To date, specific regulations implementing this rule have not been issued.

### 5.    Payment of Accrued Interest

In general, to the extent that any consideration received pursuant to the Plan by a holder of an Allowed Claim is received in satisfaction of accrued interest or original issue discount ("**OID**") during its holding period, such amount will be taxable to the holder as interest income (if not previously included in the holder's gross income). Conversely, a holder generally recognizes a deductible loss to the extent any accrued interest claimed or amortized OID was previously included in its gross income and is not paid in full. However, the IRS has privately ruled that a holder of a security of a corporate issuer, in an otherwise tax-free exchange, could not claim a current deduction with respect to any unpaid OID. Accordingly it is also unclear whether, by analogy, a holder of a Claim that does not constitute a security would be required to recognize a capital loss, rather than an ordinary loss, with respect to previously included OID that is not paid in full.

The Plan provides that consideration received in respect of a Claim is allocable first to the principal amount of such Claim (as determined for federal income tax purposes) and then, to the extent of any excess, to the remainder of the Claim, including any Claim for accrued but unpaid interest (in contrast, for example, to a pro rata allocation of a portion of the consideration received between principal and interest, or an allocation first to accrued but unpaid interest). There is no assurance that the IRS will respect such allocations for federal income tax purposes. Each holder of a Claim is urged to consult its tax advisor regarding the allocation of consideration and the deductibility of unpaid interest or OID for federal income tax purposes.

### 6.    Ownership and Disposition of the Exit Facility Term Loan.

a.    *Stated Interest and Original Issue Discount.*  A holder of the Exit Facility Term Loan will be required to include stated interest on the Exit Facility Term Loan (as applicable) in income in accordance with the holder's regular method of accounting to the extent such stated interest is "qualified stated interest." Stated interest is "qualified stated interest" if it is payable in cash at least annually. Thus, the cash interest payable on the Exit Facility Term Loan is expected to be treated as qualified stated interest.

The remainder of the stated interest payable on the Exit Facility Term Loan is payable by the issuance of additional notes ("PIK interest"); the amount of PIK interest payable on the Exit Facility Term Loan will be included in the determination of the OID on such debt, as discussed below. Accordingly, the Exit Facility Term Loan will be issued with OID to the extent of the PIK interest and, depending on the "issue price" of the Exit Facility Term Loan (discussed below), the Exit Facility Term Loan may be issued with additional OID.

A debt instrument generally has OID if its "stated redemption price at maturity" exceeds its "issue price" by more than a *de minimis* amount. A debt instrument's stated redemption price at

maturity includes all principal and interest payable over the term of the instrument other than qualified stated interest. Thus, the PIK interest will be included in the stated redemption price of the Exit Facility Term Loan at maturity and taxed as part of OID.

The "issue price" of the Exit Facility Term Loan depends on whether, at any time during the 60-day period ending 30 days after the exchange date, either the Exit Facility Term Loan or the Term Loan or L/C Loans exchanged for the Exit Facility Term Loan are treated as having been traded on an "established market." If the Exit Facility Term Loan is treated for this purpose as traded on an established market, the issue price of such Exit Facility Term Loan will equal (or approximate) the fair market value of such debt as of the Effective Date. If the Exit Facility Term Loan is not treated as traded on an established market, but the Term Loan or L/C Loans are treated as so traded, the issue price of the Exit Facility Term Loan will equal or approximate the fair market value of the New Term or L/C Loans as of the Effective Date. In either case, the Exit Facility Term Loan will be treated as issued with OID (in addition to any OID resulting from the PIK interest) to the extent that the issue price is less than its principal amount. Depending on the fair market value of the Exit Facility Term Loan or Term Loan or L/C Loans, the total amount of OID could be substantial.

Pursuant to applicable Treasury regulations, an "established market" need not be a formal market. It is sufficient that the debt appear on a system of general circulation (including a computer listing disseminated to subscribing brokers, dealers or traders) that provides a reasonable basis to determine fair market value by disseminating either recent price quotations or actual prices of recent sales transactions. Also, under certain circumstances, debt is considered to be publicly traded when price quotations for such debt are readily available from dealers, brokers or traders. If neither the Exit Facility Term Loan nor the Term Loan or L/C Loans are traded on an established market, the issue price for the Exit Facility Term Loan should be the stated principal amount of the debt. In general, BPI's determination of the issue price of the Exit Facility Term Loan will be binding on all holders, other than a holder that explicitly discloses its inconsistent treatment in a statement attached to its timely filed tax return for the taxable year in which the exchange occurs.

A holder of Exit Facility Term Loan generally will be required to include any OID in income over the term of the Loan (for so long as the Loan continues to be owned by the holder) in accordance with a constant yield-to-maturity method, regardless of whether the holder is a cash or accrual method taxpayer, and regardless of whether and when the holder receives cash payments of interest on the Loan. Accordingly, a holder could be treated as receiving interest income in advance of a corresponding receipt of cash. Any OID that a holder includes in income will increase the tax basis of the holder in its debt. A holder of Exit Facility Term Loan will not be separately taxable on any cash payments of interest that have already been taxed under the OID rules, but will reduce its tax basis in such debt by the amount of such payments (i.e., payments other than payments of qualified stated interest).

In compliance with applicable Treasury regulations, the IRS and holders of Exit Facility Term Loan issued with OID will be furnished with information describing the amount of accrued OID.

b.      *Acquisition Premium*. The amount of OID includible in a holder's gross income with respect to the Exit Facility Term Loan will be reduced if the Loan is acquired (or deemed to be acquired) at an "acquisition premium." A debt instrument is acquired at an "acquisition premium" if the holder's tax basis in the debt is greater than the issue price of the debt. In general, acquisition premium would be expected to arise only if the Exit Facility Term Loan constitutes a security and was received in exchange for Existing Debt that also constitutes a security. Otherwise, a holder's initial tax basis in the Exit Facility Term Loan should equal the issue price of the debt.

If a holder has acquisition premium, the amount of any OID includible in its gross income with respect to such debt in any taxable year will be reduced by an allocable portion of the acquisition premium (generally determined by multiplying the annual OID accrual with respect to such debt by a fraction, the numerator of which is the amount of the acquisition premium, and the denominator of which is the total OID).

Prospective holders should consult their own tax advisors regarding the application of the "acquisition premium" rules under the Tax Code.

c.    *Sale, Exchange or Other Disposition of the Exit Facility Term Loan.*  Except as discussed below with respect to market discount, any gain or loss recognized by a holder on a sale, exchange or other disposition of the Exit Facility Term Loan generally should be capital gain or loss in an amount equal to the difference, if any, between the amount realized by the holder and the holder's adjusted tax basis in the Exit Facility Term Loan immediately before the sale, exchange, redemption or other disposition (increased for any OID accrued through the date of disposition, which OID would be includible as ordinary income).  Any such gain or loss generally should be long-term capital gain or loss if the holder's holding period in the Exit Facility Term Loan is more than one year at that time.

In the case of an exchange of Existing Debt that qualifies as a recapitalization for U.S. federal income tax purposes, the Tax Code provides that any accrued market discount in respect of the Existing Debt in excess of the gain recognized in the exchange should not be currently includible in income.  Instead, such accrued market discount would carry over to any consideration received in exchange therefore that is stock or securities, such that any gain recognized by the holder upon a subsequent disposition or repayment of such stock or securities would be treated as ordinary income to the extent of any accrued market discount not previously included in income.  To date, specific Treasury regulations implementing this rule have not been issued.

If a holder of accrued market discount debt did not elect to include market discount in income as it accrued and thus, under the market discount rules, was required to defer all or a portion of any deductions for interest on debt incurred or maintained to purchase or carry such debt, such deferred amounts would become deductible at the time of a later taxable disposition, up to the amount of gain that the holder recognizes in the disposition.

## 7.    Ownership and Disposition of New Preferred Stock and New Common Stock

a.    *Distributions.*  Distributions with respect to New Preferred Stock, including distributions, if any, paid "in kind" in the form of additional stock ("PIK stock"), generally will be treated as taxable dividends to the extent paid out of BPI's current or accumulated earnings and profits as determined under federal income tax principles ("earnings and profits").  PIK stock distributions will for these purposes be valued on the date of the distribution.  Distributions with respect to New Common Stock (including New Common Stock, if any, issued upon conversion of the New Preferred Stock), other than certain pro rata distributions of common shares, generally will be taxable as a dividend to the extent paid out of earnings and profits.

To the extent the amount of any distribution exceeds the BPI's available earnings and profits with respect to such distribution, the excess will be applied against and will reduce the holder's adjusted tax basis (on a dollar-for-dollar basis) in respect of the stock as to which the distribution was made (but not below zero).  Any remaining excess will be treated as gain or loss from the sale or exchange of such stock, with the consequences discussed below.  *See* "—Character of Gain or Loss," below.

Under certain circumstances, holders of preferred stock may have non-cash taxable income by reason of being treated as having received a constructive distribution. This result could occur due to an excess of the liquidation value of the preferred stock over the issue price of such stock (i.e., its fair market value at the time of issuance) or, under certain circumstances, due to the accumulation of dividends not paid in cash. In addition, the presence or absence of an adjustment to the conversion price at which the New Preferred Stock is convertible into New Common Stock (such as under the anti-dilution provisions) may also result in constructive distributions to the holders of the New Preferred Stock (or, in certain cases, to existing holders of New Common Stock), which would be taxable similar to an ordinary distribution on stock. Holders of New Preferred Stock should consult with their tax advisors concerning the application of these constructive distribution rules to the New Preferred Stock.

b.      *Dividends to Non-Corporate Shareholders.* Dividends are generally taxed as ordinary income; however, under current law, dividends received by non-corporate holders prior to 2011 may qualify for taxation at lower rates applicable to long-term capital gains, provided certain holding period and other requirements are satisfied. Non-corporate holders should consult their own tax advisors regarding the applicability of such lower rates under their particular factual situation.

c.      *Dividends to Corporate Shareholders.* In general, a distribution to a corporate shareholder that is treated as a dividend for federal income tax purposes will qualify for the 70% dividends received deduction that is available to corporate shareholders that own less than 20% of the voting power or value of the outstanding stock of the distributing corporation (other than certain preferred stock not applicable here). A corporate shareholder holding 20% or more of the distributing corporation may be eligible for an 80% dividends received deduction. No assurance can be given that BPI will have sufficient earnings and profits (as determined for federal income tax purposes) to cause distributions to be eligible for a dividends received deduction. Dividend income that is not subject to regular federal income tax as a consequence of the dividends received deduction may be subject to the federal alternative minimum tax.

The dividends received deduction is only available if certain holding periods and taxable income requirements are satisfied. The length of time that a shareholder has held stock is reduced for any period during which the shareholder's risk of loss with respect to the stock is diminished by reason of the existence of certain options, contracts to sell, short sales or similar transactions. In addition, to the extent that a corporation incurs indebtedness that is directly attributable to an investment in the stock on which the dividend is paid, all or a portion of the dividends received deduction may be disallowed.

In general, for the first two years of a corporation's holding period, the tax basis of its stock is reduced (but not below zero) by the non-taxed portion of any "extraordinary dividend" received with respect to such stock (generally, the portion of an extraordinary dividend for which a dividends received deduction is allowed). In addition, certain distributions may be treated as extraordinary dividends without regard to the corporation's holding period (such as in the case of preferred stock where the issue price of such stock exceeded, at issuance, its liquidation or stated redemption price). In the event that the non-taxed portion of an extraordinary dividend exceeds the corporate holder's tax basis in its stock, such excess is treated as current gain from the sale or exchange of the stock. Generally, an "extraordinary dividend" is a dividend that (i) equals or exceeds 5% of the holder's adjusted basis in preferred stock (treating all dividends having ex-dividend dates within an 85-day period as a single dividend) or (ii) exceeds 20% of the holder's adjusted basis in the stock (treating all dividends having ex-dividend dates within a 365-day period as a single dividend). For these purposes, any deemed dividends arising by reason of the application of section 305 of the Tax Code are taken into account. Under certain circumstances, if the holder so elects, the fair market value of the stock as of the day before the ex-dividend date may be substituted for the holder's basis in applying these tests.

d.    *Sale, Exchange or Other Disposition.*  Except to the extent of any market discount that has carried over to the stock (as discussed below), and unless a non-recognition provision applies, any gain or loss realized by a holder on a sale, exchange, or other disposition of New Preferred Stock or New Common Stock generally should be capital gain or loss in an amount equal to the difference, if any, between the amount realized and the holder's adjusted tax basis in the stock immediately before the sale, exchange, or other disposition.  Any such gain or loss generally should be long-term if the holder's holding period for its stock is more than one year at that time.

In the case of a redemption of stock for cash or property, the federal income tax treatment of the redemption to a shareholder depends on the particular facts relating to such holder at the time of the redemption.  If the redemption of such stock (i) is "not essentially equivalent to a dividend" with respect to the holder, (ii) is "substantially disproportionate" with respect to the holder (generally defined as a greater than 20% reduction in a shareholder's relative voting stock of a corporation) or (iii) results in a "complete termination" of all of such holder's equity interest in the corporation, then the receipt of cash or property by such holder will be respected as a sale or exchange of its stock and taxed accordingly.  In applying these tests, certain constructive ownership rules apply to determine stock ownership.  If the redemption does not qualify for sale or exchange treatment, the holder will instead be treated as having received a distribution on such stock (in an amount that generally will be equal to the amount of cash and the fair market value of property received in the redemption) with the general consequences described above under "—Distributions."  If the holder does not retain any actual stock ownership in the company following such redemption, the holder's may lose its tax basis completely (in that the tax basis would shift to the stock constructively, but not actually, owned by the holder).  If such distribution is taxable as a dividend to a corporate shareholder, it will be subject to the "extraordinary dividend" provisions of the Tax Code (*see* "—Distributions to Corporate Shareholders," above), and if such a redemption is not pro rata as to all shareholders or if the redemption is treated as a dividend solely by reason of the constructive ownership rules for options, the "extraordinary dividend" provisions will apply irrespective of whether the corporate holder held the stock for two years or more.

As discussed above under "—Consequences to Holders of Certain Claims – *Character of Gain or Loss*," any accrued market discount not recognized in connection with the effectiveness of the Plan generally would carry over to any consideration received in exchange therefor that constitutes stock or securities, such that any gain recognized by the holder upon a subsequent disposition of the New Common Stock would be treated as ordinary income to the extent of any accrued market discount not previously included in income.  Similarly, any gain recognized by the holder upon a subsequent disposition of the New Common Stock would be treated as ordinary income to the extent of any accrued market discount preserved in such stock upon conversion of the New Preferred Stock.  Different rules may apply to the treatment of accrued market discount in the event the disposition qualifies for certain non-recognition treatment or, as discussed below, upon a subsequent conversion of such New Preferred Stock into New Common Stock.

e.    *Conversion of New Preferred Stock into Class 3 Common Stock.*  For federal income tax purposes, a holder generally will not recognize gain or loss upon the conversion of its New Preferred Stock to Class 3 Common Stock, except in respect of (1) any cash paid to a holder in lieu of fractional shares and (2) any New Common Stock received attributable to any dividend arrearages.

A holder that receives cash in lieu of a fractional share will recognize capital gain or loss (except with respect to any accrued market discount carried over to the fractional share), equal to the difference between the amount of cash received and the holder's tax basis in the stock exchanged allocable to the fractional share.  Any Class 3 Common Stock received attributable to dividend arrearages generally should be treated as a distribution on the New Preferred Stock, with the consequences described above, under "—Distributions."

A holder's aggregate tax basis in the Class 3 Common stock received upon conversion generally will be equal to the holder's aggregate tax basis in the New Preferred Stock converted (less the portion of the holder's basis allocable to any fractional share as to which the holder receives cash). A holder's holding period in the Class 3 Common Stock received, other than any such stock received attributable to any dividend arrearages, will include the holding period of the New Preferred Stock exchanged. The tax basis of any New Common Stock received that is attributable to any dividend arrearages will be equal to its fair market value on the date of the exchange, and the holding period of such stock will commence on the day after the conversion.

## 8.    Information Reporting and Backup Withholding

Payments of interest or dividends (including accruals of OID) and any other reportable payments, possibly including amounts received pursuant to the Plan and payments of proceeds from the sale, retirement or other disposition of Exit Facility Term Loan, New Preferred Stock or New Common Stock, may be subject to "backup withholding" (currently at a rate of 28%) if a recipient of those payments fails to furnish to the payor certain identifying information. Backup withholding is not an additional tax. Any amounts deducted and withheld should generally be allowed as a credit against that recipient's U.S. federal income tax, provided that appropriate proof is provided under rules established by the IRS. Furthermore, certain penalties may be imposed by the IRS on a recipient of payments that is required to supply information but does not do so in the proper manner. Backup withholding generally should not apply with respect to payments made to certain exempt recipients, such as corporations and financial institutions. Information may also be required to be provided to the IRS concerning payments, unless an exemption applies. Holders should consult their tax advisors regarding their qualification for exemption from backup withholding and information reporting and the procedures for obtaining such an exemption.

Treasury regulations generally require disclosure by a taxpayer on its U.S. federal income tax return of certain types of transactions in which the taxpayer participated, including, among other types of transactions, certain transactions that result in the taxpayer's claiming a loss in excess of certain thresholds. Holders are urged to consult their tax advisors regarding these regulations and whether the exchanges contemplated by the Plan would be subject to these regulations and require disclosure on the holders' tax returns.

**THE FOREGOING SUMMARY HAS BEEN PROVIDED FOR INFORMATIONAL PURPOSES ONLY. ALL HOLDERS OF CLAIMS RECEIVING A DISTRIBUTION UNDER THE PLAN ARE URGED TO CONSULT THEIR TAX ADVISORS CONCERNING THE FEDERAL, STATE, LOCAL AND FOREIGN TAX CONSEQUENCES APPLICABLE UNDER THE PLAN.**

# IX.    SECURITIES LAW MATTERS

## A.    New BearingPoint Securities.

For a summary of the New Preferred Stock, Class 1 Common Stock, Class 2 Common Stock and Class 3 Common Stock, see Section IV above.

## B.    Hart-Scott-Rodino Compliance.

Any shares of the New Preferred Stock, the Class 1 Common Stock, the Class 2 Common Stock, the Class 3 Common Stock, and any other securities to be distributed under the Plan to any entity required to file a Premerger Notification and Report Form under the Hart-Scott-Rodino Antitrust Improvement Act of 1976, as amended, will not be distributed until the notification and waiting periods applicable under such Act to such entity shall have expired or been terminated. All creditors are advised to consult their own legal advisors regarding whether they would be required to file a Premerger Notification and Report Form under their own circumstances.

## C.    Transfer and Securities Laws Restrictions

### 1.    Issuance and Resale of the New Preferred Stock, Class 1 Common Stock, Class 2 Common Stock and Class 3 Common Stock under the Plan.

Section 1145 of the Bankruptcy Code generally exempts from registration under the Securities Act of 1933 (the "Securities Act") the offer or sale, under a chapter 11 plan of reorganization, of a security of a debtor, of an affiliate participating in a joint plan with the debtor, or of a successor to a debtor under a plan, if such securities are offered or sold in exchange for a claim against, or equity interest in, such debtor or affiliate.  In reliance upon this exemption, the New Preferred Stock, Class 1 Common Stock, Class 2 Common Stock and Class 3 Common Stock issued to holders of claims against the Debtors generally will be exempt from the registration requirements of the Securities Act, and state and local securities laws.  Accordingly, such securities may be resold without registration under the Securities Act or other federal securities laws pursuant to the exemption provided by Section 4(1) of the Securities Act, unless the holder is an "underwriter" with respect to such securities, as that term is defined in section 1145(b) of the Bankruptcy Code.  In addition, such securities generally may be resold without registration under state securities laws pursuant to various exemptions provided by the respective laws of the several states.  However, recipients of new securities issued under the Plan are advised to consult with their own legal advisors as to the availability of any such exemption from registration under state law in any given instance and as to any applicable requirements or conditions to such availability.

Section 1145(b) of the Bankruptcy Code defines "underwriter" for purposes of the Securities Act as one who (a) purchases a claim with a view to distribution of any security to be received in exchange for the claim other than in ordinary trading transactions, (b) offers to sell securities issued under a plan for the holders of such securities, (c) offers to buy securities issued under a plan from persons receiving such securities, if the offer to buy is made with a view to distribution, or (d) is a control person of the issuer of the securities.

Holders of securities issued under the Plan that are deemed to be "underwriters", including holders who are deemed to be "affiliates" within the meaning of the Securities Act, will be unable freely to transfer or to sell their securities except pursuant to (i) "ordinary trading transactions" by a holder that is not an "issuer" within the meaning of section 1145(b), (ii) an effective registration of such securities under the Securities Act and under equivalent state securities or "blue sky" laws or

(iii) pursuant to the provisions of Rule 144 under the Securities Act, if available, or another available exemption from registration requirements.

Certificates evidencing shares of the New Preferred Stock, the Class 1 Common Stock, the Class 2 Common Stock and the Class 3 Common Stock received by holders of at least 10% of the respective class of securities of Reorganized BearingPoint will bear a legend substantially in the form below:

> THE SHARES OF [NEW PREFERRED STOCK][CLASS 1 COMMON STOCK][CLASS 2 COMMON STOCK][CLASS 3 COMMON STOCK] REPRESENTED BY THIS CERTIFICATE MAY NOT BE SOLD, OFFERED FOR SALE OR OTHERWISE TRANSFERRED UNLESS REGISTERED OR QUALIFIED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR UNDER THE SECURITIES LAWS OF ANY STATE OR OTHER JURISDICTION OR UNLESS BEARINGPOINT, INC. RECEIVES AN OPINION OF COUNSEL REASONABLY SATISFACTORY TO IT THAT SUCH REGISTRATION OR QUALIFICATION IS NOT REQUIRED.

In connection with the Plan, the BE will file a Form 15 with the Securities and Exchange Commission (the "SEC") pursuant to Rule 12h-3 of the Securities and Exchange Act of 1934 (the "Exchange Act") to suspend its duty to file periodic reports with the SEC with respect to each class of its securities on the basis that there are less than 300 record holders of each such class of securities. If at the beginning of any subsequent fiscal year, there are 300 or more record holders of any class of securities of BE, the suspension of the obligation to file periodic reports under the Exchange Act will be discontinued with respect to such class of securities.

To ensure that BE is not subject to reporting requirements under the Exchange Act, the Plan contemplates that BE's Certificate of Incorporation will contain certain restrictions on the transfer of the Class 1 Common Stock, the Class 2 Common Stock and the Class 3 Common Stock, that are intended to maintain the suspension of BE's reporting obligations under the Exchange Act. The New Preferred Stock will be freely transferable, subject to certain transfer restrictions to maintain the suspension of BE's reporting obligations under the Exchange Act and to preserve certain net operating losses.

In order to restrict the number of record holders of the Common Stock, BE's Amended Certificate of Incorporation will provide the following transfer restrictions on the Class 1 Common Stock, Class 2 Common Stock and Class 3 Common Stock. Prior to the fifth anniversary of the Effective Date, so long as the New Preferred Stock is outstanding, shares of each class of Common Stock (and any interest in the voting trust described herein) will only be transferable, directly or indirectly, by operation of law. All shares of BE's Common Stock will be placed in a voting trust on the Effective Date, and the trustee will vote all of the subject shares in accordance with the direction of such holders of Common Stock. As long as the New Preferred Stock is outstanding, however, the trustee will automatically (and without any action on the part of any stockholder) vote all of the subject shares in accordance with the direction of the holders of New Preferred Stock (other than with respect to the election and removal of directors) with respect to any corporate action that requires such a vote.

The New Preferred Stock will be freely transferable, subject to applicable law, but any such transfer will not be permitted to the extent it would cause (i) the number of record holders of the New Preferred Stock to be at or in excess of 300 or (ii) a change in more than 50% ownership in the New Preferred Stock (in the aggregate), and such change would have a material and adverse tax consequence to Reorganized BearingPoint (subject, in the case of clause (ii), to the board of director's right to permit

such transfers under certain circumstances).  If there are not any material NOLs, built-in losses or other valuable tax attributes to preserve, then the restrictions in the foregoing clause (ii) will not be implemented.

### 2.        Lack of Trading Market.

The New Preferred Stock, Class 1 Common Stock, Class 2 Common Stock and Class 3 Common Stock will not be listed on a national securities exchange or the NASDAQ market system upon the Effective Date and, due to the transfer restrictions to be imposed (see Section V.5.), there will not be an active trading market for such securities for the foreseeable future.  Furthermore, once the New Preferred Stock and the New Common Stock are transferable, there may not be an active trading market and there can be no assurance that a holder of such securities will be able to sell such interests in the future or as to the price at which any such sale may occur.  If a trading market were to exist, such securities could trade at prices higher or lower than the value ascribed to such securities herein depending upon many factors including, but not limited to, the prevailing interest rates, markets for similar securities, general economic and industry conditions and the performance of, and investor expectations for, the Debtors.

### D.        <u>Dividend Policies</u>

The Debtors do not anticipate that BE will pay dividends on the BE Common Stock in the near future.

## X.    CONFIRMATION OF THE PLAN OF REORGANIZATION

### A.    Confirmation Hearing

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court, after appropriate notice, to hold a hearing on confirmation of a plan of reorganization.  As set forth in the Disclosure Statement Order, the Bankruptcy Court has scheduled the confirmation hearing for _____, 2009.  The confirmation hearing may be adjourned from time-to-time by the Bankruptcy Court without further notice except for an announcement of the adjourned date made at the confirmation hearing or any subsequent adjourned confirmation hearing.

### B.    Objections

Any objection to confirmation of the Plan must be in writing, must conform to the Bankruptcy Rules, must set forth the name of the objector, the nature and amount of Claims or interests held or asserted by the objector against the Debtors' estate or property, the basis for the objection and the specific grounds therefore, and must be filed with the Bankruptcy Court, with a copy to Chambers, together with proof of service thereof, and served upon (i) Weil, Gotshal & Manges LLP, 767 Fifth Avenue, New York, New York 10153 (Attn:  Marcia L. Goldstein, Esq.) and 700 Louisiana Street, Suite 1600, Houston, Texas 77002 (Attn:  Alfredo R. Pérez, Esq.), as counsel for the Debtors, (ii) the U.S. Trustee (Attn:  Serene Nakano, Esq..); (iii) Paul, Hastings, Janofsky & Walker LLP, Park Avenue Tower, 75 East 55th Street, First Floor, New York, New York 10022 (Attn: Luc Despins, Esq. and Leslie A. Plaskon, Esq.), as counsel for Wells Fargo Foothill, LLC, the administrative agent for the Debtors' prepetition secured lenders, (iv) Ropes & Gray LLP, 1211 Avenue of the Americas, New York, New York 10036-8704 (Attn:  Mark R. Somerstein, Esq. and Mark I. Bane, Esq.), as counsel for the informal committee of holders of the Series A Notes and the Series B Notes, (v) Bracewell & Giuliani LLP, 1177 Avenue of the Americas, 19th Floor, New York, New York, 10036-2714 (Attn:  Mark B. Joachim, Esq. and Robert T. Carey, Esq.), as counsel for the informal committee of holders of the Series C Notes, (vi) The Bank of New York, 101 Barclay Street, 8W, New York, New York 10286 (Attn:  Corporate Trust Division – Corporate Finance Unit), as trustee under the indentures governing the Series A Notes, the Series B Notes, and the Series C Notes, (vii) Friedman Fleischer & Lowe LLC, One Maritime Plaza, Suite 1000, San Francisco, California 94111 (Attn:  Spencer C. Fleischer), as representative of the purchasers (the "**Purchasers**") under the FFL Notes, (viii) Bingham McCutchen LLP, 299 Park Avenue, New York, New York 10022 (Attn:  Neil W. Townsend, Esq.), as counsel for the Purchasers, (ix) the holders of the thirty largest unsecured claims against the Debtors (on a consolidated basis), and (x) all parties on the Master Service List pursuant to the Case Management Order, so as to be received no later than _____, 2009.

Objections to confirmation of the Plan of Reorganization are governed by Bankruptcy Rule 9014.  UNLESS AN OBJECTION TO CONFIRMATION IS TIMELY SERVED AND FILED, IT MAY NOT BE CONSIDERED BY THE BANKRUPTCY COURT.

## C.    Requirements for Confirmation of the Plan of Reorganization

### 1.    Requirements of Section 1129(a) of the Bankruptcy Code

#### a.    General Requirements

At the confirmation hearing, the Bankruptcy Court will determine whether the following confirmation requirements specified in section 1129 of the Bankruptcy Code have been satisfied:

(A)    The Plan complies with the applicable provisions of the Bankruptcy Code.

(B)    The Debtors have complied with the applicable provisions of the Bankruptcy Code.

(C)    The Plan has been proposed in good faith and not by any means proscribed by law.

(D)    Any payment made or promised by the Debtors or by a Person issuing securities or acquiring property under the Plan for services or for costs and expenses in, or in connection with, the Chapter 11 Cases, or in connection with the Plan and incident to the Chapter 11 Cases, has been disclosed to the Bankruptcy Court, and any such payment made before confirmation of the Plan is reasonable, or if such payment is to be fixed after confirmation of the Plan, such payment is subject to the approval of the Bankruptcy Court as reasonable.

(E)    The Debtors have disclosed the identity and affiliations of any individual proposed to serve, after confirmation of the Plan, as director or officer of the Debtors, an affiliate of the Debtors participating in a Plan with the Debtors, or a successor to the Debtors under the Plan of Reorganization, and the appointment to, or continuance in, such office of such individual is consistent with the interests of creditors and equity holders and with public policy, and the Debtors have disclosed the identity of any insider that will be employed or retained by the Debtors, and the nature of any compensation for such insider.

(F)    Any governmental regulatory commission with jurisdiction, after confirmation of the Plan, over the rates of the Debtors, as applicable, has approved any rate change provided for in the Plan, or such rate change is expressly conditioned on such approval.

(G)    With respect to each class of claims or equity interests, each holder of an impaired claim or impaired equity interest either has accepted the Plan or will receive or retain under the Plan on account of such holder's claim or equity interest, property of a value, as of the Effective Date, that is not less than the amount such holder would receive or retain if the Debtors were liquidated on the Effective Date under chapter 7 of the Bankruptcy Code.  See discussion of "Best Interests Test" below.

(H)    Except to the extent the Plan meets the requirements of section 1129(b) of the Bankruptcy Code (discussed below), each class of claims or equity interests has either accepted the Plan or is not impaired under the Plan.

(I)     Except to the extent that the holder of a particular claim has agreed to a different treatment of such claim, the Plan provides that administrative expenses and priority claims other than priority tax claims will be paid in full on the Effective Date and that priority tax claims will receive on account of such claims deferred cash payments, over a period not exceeding five (5) years after the date of assessment of such claims, of a value, as of the Effective Date, equal to the allowed amount of such claims.

(J)     At least one class of impaired claims has accepted the Plan, determined without including any acceptance of the Plan by any insider holding a claim in such class.

(K)     Confirmation of the Plan is not likely to be followed by the need for further financial reorganization of the Debtors or any successor to the Debtors under the Plan, unless such liquidation or reorganization is proposed in the Plan.  See discussion of "Feasibility" below.

(L)     All fees payable under section 1930 of title 28, as determined by the court at the hearing on confirmation of the applicable Plan, have been paid or the applicable Plan provides for the payment of all such fees on the Effective Date of the applicable Plan.

(M)     The Debtors have not obligated themselves to provide such benefits, if any for the continuation, after the Effective Date, of payment of all "retiree benefits" (as defined in section 1114 of the Bankruptcy Code).

### b.      Best Interests Test.

 As described above, the Bankruptcy Code requires that each holder of an impaired claim or equity interest either (i) accepts the Plan or (ii) receives or retains under the Plan property of a value, as of the Effective Date, that is not less than the value such holder would receive or retain if the Debtors were liquidated under chapter 7 of the Bankruptcy Code on the Effective Date.

 The first step in meeting this test is to determine the dollar amount that would be generated from the liquidation of the Debtors' assets and properties in the context of a chapter 7 liquidation case.  The gross amount of Cash available would be the sum of the proceeds from the disposition of the Debtors' assets and the Cash held by the Debtors at the time of the commencement of the chapter 7 case.  The next step, is to reduce that total by the amount of any claims secured by such assets, the costs and expenses of the liquidation, and such additional administrative expenses and priority claims that may result from the termination of the Debtors' business and the use of chapter 7 for the purposes of liquidation.  Any remaining net Cash would be allocated to creditors and shareholders in strict priority in accordance with section 726 of the Bankruptcy Code (see discussion below).  Finally, taking into account the time necessary to accomplish the liquidation, the present value of such allocations may be compared to the value of the property that is proposed to be distributed under the Plan on the Effective Date.

 The Debtors' costs of liquidation under chapter 7 would include the fees payable to a chapter 7 trustee in bankruptcy, as well as those that might be payable to attorneys and other professionals that such a trustee may engage, plus any unpaid expenses incurred by the Debtors during the chapter 11 case and allowed in the chapter 7 case, such as compensation for attorneys, financial advisors, appraisers, accountants and other professionals, and costs and expenses of members of any statutory committee of unsecured creditors appointed by the United States Trustee pursuant to section 1102 of the Bankruptcy

Code and any other committee so appointed.  Moreover, in a chapter 7 liquidation, additional claims would arise by reason of the breach or rejection of obligations incurred and executory contracts or leases entered into by the Debtors both prior to, and during the pendency of, the chapter 11 cases.

The foregoing types of claims, costs, expenses, fees and such other claims that may arise in a liquidation case would be paid in full from the liquidation proceeds before the balance of those proceeds would be made available to pay pre-chapter 11 priority and unsecured claims.  Under the absolute priority rule, no junior creditor would receive any distribution until all senior creditors are paid in full, with interest, and no equity holder receives any distribution until all creditors are paid in full, with interest.  The Debtors believe that in a chapter 7 case, holders of General Unsecured Claims and Convenience Class Claims would receive no distributions of property.  Accordingly, the Plan satisfies the rule of absolute priority.

After consideration of the effects that a chapter 7 liquidation would have on the ultimate proceeds available for distribution to creditors in a chapter 11 case, including (i) the increased costs and expenses of a liquidation under chapter 7 arising from fees payable to a trustee in bankruptcy and professional advisors to such trustee, (ii) the erosion in value of assets in a chapter 7 case in the context of the expeditious liquidation required under chapter 7 and the "forced sale" atmosphere that would prevail and (iii) substantial increases in claims which would be satisfied on a priority basis, the Debtors have determined that confirmation of the Plan will provide each creditor and equity holder with a recovery that is not less than it would receive pursuant to a liquidation of the Debtors under chapter 7 of the Bankruptcy Code.

Moreover, the Debtors believe that the value of any distributions from the liquidation proceeds to each class of allowed claims in a chapter 7 case would be the same or less than the value of distributions under the Plan because such distributions in a chapter 7 case may not occur for a substantial period of time.  In this regard, it is possible that distribution of the proceeds of the liquidation could be delayed for a year or more after the completion of such liquidation in order to resolve the claims and prepare for distributions.  In the event litigation were necessary to resolve claims asserted in the chapter 7 case, the delay could be further prolonged and administrative expenses further increased.

**The Debtors' liquidation analysis is an estimate of the proceeds that may be generated as a result of a hypothetical chapter 7 liquidation of the assets of the Debtors.  The analysis is based upon a number of significant assumptions which are described.  The liquidation analysis does not purport to be a valuation of the Debtors' assets and is not necessarily indicative of the values that may be realized in an actual liquidation.**

### c.    *Liquidation Analysis*

The Debtors' chapter 7 liquidation analysis and assumptions are set forth in Exhibit D to this Disclosure Statement.

### d.    *Feasibility*

The Bankruptcy Code requires a debtor to demonstrate that confirmation of a plan of reorganization is not likely to be followed by the liquidation or the need for further financial reorganization of a debtor unless so provided by the plan of reorganization.  For purposes of determining whether the Plan meets this requirement, the Debtors have analyzed their ability to meet their financial obligations as contemplated thereunder.  As part of this analysis, the Debtors have prepared the projections contained in Section [__], entitled "[__]".  These projections are based upon the assumption that the Plan will be confirmed by the Bankruptcy Court, and for projection purposes, that the Effective

Date of the Plan and its substantial consummation will take place in [May 2009]. The projections include balance sheets, statements of operations and statements of cash flows. Based upon the projections, the Debtors believe they will be able to make all payments required to be made pursuant to the Plan.

### 2.    Requirements of Section 1129(b) of the Bankruptcy Code

The Bankruptcy Court may confirm the Plan over the rejection or deemed rejection of the Plan by a class of claims or equity interests if the Plan "does not discriminate unfairly" and is "fair and equitable" with respect to such class.

#### a.    *No Unfair Discrimination*

This test applies to classes of claims or equity interests that are of equal priority and are receiving different treatment under a plan of reorganization. The test does not require that the treatment be the same or equivalent, but that such treatment be "fair."

#### b.    *Fair and Equitable Test*

This test applies to classes of different priority (e.g., unsecured versus secured) and includes the general requirement that no class of claims receive more than 100% of the allowed amount of the claims in such class. As to the dissenting class, the test sets different standards, depending on the type of claims or interests in such class:

(A)    Secured Claims. Each holder of an impaired secured claim either (i) retains its Liens on the property (or if sold, on the proceeds thereof) to the extent of the allowed amount of its secured claim and receives deferred cash payments having a value, as of the effective date of the plan, of at least the allowed amount of such claim or (ii) receives the "indubitable equivalent" of its allowed secured claim.

(B)    Claims. Either (i) each holder of an impaired unsecured claim receives or retains under the plan property of a value equal to the amount of its allowed unsecured claim or (ii) the holders of claims and interests that are junior to the claims of the dissenting class will not receive or retain any property under the plan of reorganization.

(C)    Equity Interests. Either (i) each equity interest holder will receive or retain under the plan of reorganization property of a value equal to the greater of (a) the fixed liquidation preference or redemption price, if any, of such stock and (b) the value of the stock, or (ii) the holders of interests that are junior to the equity interests of the dissenting class will not receive or retain any property under the plan of reorganization.

The Debtors believe the Plan will satisfy both the "no unfair discrimination" requirement and the "fair and equitable" requirement notwithstanding that Class 10 (Equity Interests) is deemed to reject the Plan, because as to Class 10 (Equity Interests), there is no class of equal priority receiving more favorable treatment and no class that is junior to such a dissenting class will receive or retain any property on account of the claims or equity interests in such class.

Should Class 8 (General Unsecured Claims) or Class 9 (Convenience Class Claims) vote to reject the Plan, the Debtors believe the Plan would nonetheless satisfy both the "no unfair discrimination" requirement and the "fair and equitable" requirement notwithstanding that Classes 8 or 9

vote to reject the Plan, because as to Classes 8 and 9, there is no class of equal priority receiving more favorable treatment and the only class junior to such a dissenting class – Class 10 (Equity Interests) – will not receive or retain any property on account of the claims or equity interests in such class.

### 3.    Alternative to Confirmation and Consummation of the Plan

If the Plan is not confirmed and consummated, the alternatives to the Plan include (i) liquidation of the Debtors under chapter 7 of the Bankruptcy Code and (ii) an alternative chapter 11 plan of reorganization.

#### a.    *Liquidation Under Chapter 7*

If no plan can be confirmed, the Debtors' chapter 11 cases may be converted to cases under chapter 7 of the Bankruptcy Code, pursuant to which a trustee would be appointed to liquidate the assets of the Debtors for distribution in accordance with the priorities established by the Bankruptcy Code.  A discussion of the effects that a chapter 7 liquidation would have on the recovery of holders of claims and equity interests and the Debtors' liquidation analysis are set forth in Section X above, entitled "CONFIRMATION OF THE PLAN OF REORGANIZATION -- Requirements for Confirmation of the Plan of Reorganization -- Consensual Confirmation -- Best Interests Test."  The Debtors believe that liquidation under chapter 7 would result in smaller distributions being made to creditors than those provided for in the Plan because of (i) the likelihood that the assets of the Debtors would have to be sold or otherwise disposed of in a less orderly fashion over a shorter period of time, (ii) additional administrative expenses involved in the appointment of a trustee and (iii) additional expenses and claims, some of which would be entitled to priority, which would be generated during the liquidation and from the rejection of leases and other executory contracts in connection with a cessation of the Debtors' operations.  In a chapter 7 liquidation, the Debtors believe that there would be no distribution to the holders of General Unsecured Claims or Convenience Class Claims or the holders of Equity Interests.

#### b.    *Alternative Plan of Reorganization*

If the Plan of Reorganization is not confirmed, the Debtors (or if the Debtors' exclusive period in which to file a plan of reorganization has expired, any other party in interest) could attempt to formulate a different chapter 11 plan of reorganization.  Such a plan of reorganization might involve either a reorganization and continuation of the Debtors' business or an orderly liquidation of its assets under chapter 11.  With respect to an alternative plan, the Debtors have explored various alternatives in connection with the formulation and development of the Plan.  The Debtors believe that the Plan, as described herein, enables creditors and equity holders to realize the most value under the circumstances. In a liquidation under chapter 11, the Debtors' assets would be sold in an orderly fashion over a more extended period of time than in a liquidation under chapter 7, possibly resulting in somewhat greater (but indeterminate) recoveries than would be obtained in chapter 7.  Further, if a trustee were not appointed, because such appointment is not required in a chapter 11 case, the expenses for professional fees would most likely be lower than those incurred in a chapter 7 case.  Although preferable to a chapter 7 liquidation, the Debtors believe that any alternative liquidation under chapter 11 is a much less attractive alternative to creditors and equity holders than the Plan because of the greater return provided by the Plan.

### 4.    Nonconsensual Confirmation.

If any impaired class of Claims entitled to vote shall not accept the Plan by the requisite statutory majority provided in section 1126(c) of the Bankruptcy Code, the Debtors reserve the right to amend the Plan in accordance with section V.N of the Plan or undertake to have the Bankruptcy Court confirm the Plan under section 1129(b) of the Bankruptcy Code or both.  With respect to impaired classes

of claims that are deemed to reject the Plan, the Debtors shall request that the Bankruptcy Court confirm the Plan pursuant to section 1129(b) of the Bankruptcy Code.

# XI.    CONCLUSION

The Debtors believe that confirmation and implementation of the Plan is in the best interests of all creditors, and urge holders of impaired Claims in Classes 3, 4, 6, 7, 8, and 9 to vote to accept the Plan and to evidence such acceptance by returning their ballots so that they will be received no later than 4:00 p.m. (prevailing Eastern Time) on _____, 2009.

Dated: [February 16], 2009

Respectfully submitted,

BEARINGPOINT, INC.
BEARINGPOINT, LLC
BE NEW YORK HOLDINGS, INC.
BEARINGPOINT AMERICAS, INC.
BEARINGPOINT BG, LLC
BEARINGPOINT ENTERPRISE HOLDINGS, LLC
BEARINGPOINT GLOBAL OPERATIONS, INC.
BEARINGPOINT GLOBAL, INC.
BEARINGPOINT INTERNATIONAL I, INC.
BEARINGPOINT ISRAEL, LLC
BEARINGPOINT PUERTO RICO, LLC
BEARINGPOINT RUSSIA, LLC
BEARINGPOINT SOUTH PACIFIC, LLC
BEARINGPOINT SOUTHEAST ASIA LLC
BEARINGPOINT TECHNOLOGY PROCUREMENT
    SERVICES, LLC
BEARINGPOINT USA, INC.
I2 MID ATLANTIC LLC
I2 NORTHWEST LLC
METRIUS, INC.
OAD ACQUISITION CORP.
OAD GROUP, INC.
PELOTON HOLDINGS, L.L.C.
SOFTLINE ACQUISITION CORP.
SOFTLINE CONSULTING AND
    INTEGRATORS, INC.

By: _____

Name:  John DeGroote
Title:    Executive Vice President and
            Chief Legal Officer

**Exhibit A**

**(Chapter 11 Plan)**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
--------------------------------------------------------x
In re                                    :
                                         :    Chapter 11 Case No.
**BEARINGPOINT, INC., et al.**           :
                                         :    09-[_____] [(_____)]
                                         :
        Debtors.                         :
                                         :    (Jointly Administered)
--------------------------------------------------------x

**DEBTORS' JOINT PLAN OF REORGANIZATION**
**UNDER CHAPTER 11 OF THE BANKRUPTCY CODE**

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York  10153
(212) 310-8509

Attorneys for the Debtors and
        Debtors in Possession

Dated: February 18, 2009

# TABLE OF CONTENTS

**Page**

Article I        DEFINITION AND INTERPRETATION ............................................... 2

A.    Definitions.......................................................................................................... 2

1.1    Administrative Expense Claim ................................................. 2

1.2    Affiliate ...................................................................................... 2

1.3    Agent........................................................................................... 2

1.4    Agency Fee ................................................................................ 2

1.5    Allowed....................................................................................... 2

1.6    Avoidance Actions .................................................................... 3

1.7    Ballots ........................................................................................ 3

1.8    Bankruptcy Code ...................................................................... 3

1.9    Bankruptcy Court...................................................................... 3

1.10    Bankruptcy Rules ..................................................................... 3

1.11    BE ............................................................................................... 3

1.12    BearingPoint .............................................................................. 3

1.13    BearingPoint Subsidiary Debtors............................................ 3

1.14    Benefit Plans ............................................................................. 4

1.15    Business Day .............................................................................. 4

1.16    Cash............................................................................................. 4

1.17    Causes of Action ....................................................................... 4

1.18    Claim........................................................................................... 4

1.19    Class ........................................................................................... 4

1.20    Class 3 Pro Rata Share ............................................................. 4

1.21    Class 4 Pro Rata Share ............................................................. 4

1.22    Collateral.................................................................................... 5

1.23    Commencement Date ................................................................ 5

1.24    Confirmation Date ..................................................................... 5

1.25    Confirmation Hearing ............................................................... 5

1.26    Confirmation Order.................................................................... 5

1.27    Contingent Claim ...................................................................... 5

i

# TABLE OF CONTENTS
## (continued)

Page

| | | |
|---|---|---|
| 1.28 | Convenience Class Claim | 5 |
| 1.29 | Creditors' Committee | 6 |
| 1.30 | Debtors | 6 |
| 1.31 | Debtors in Possession | 6 |
| 1.32 | Disbursing Agent | 6 |
| 1.33 | Disclosure Statement | 6 |
| 1.34 | Disclosure Statement Order | 6 |
| 1.35 | Disputed | 6 |
| 1.36 | Disputed Claim Amount | 7 |
| 1.37 | Distribution Record Date | 7 |
| 1.38 | Effective Date | 7 |
| 1.39 | Equity Interest | 7 |
| 1.40 | Estates | 7 |
| 1.41 | Estimated Amount | 7 |
| 1.42 | Exit Facility | 7 |
| 1.43 | Exit Letter of Credit Facility | 7 |
| 1.44 | Exit Facility Term Loan | 7 |
| 1.45 | FFL Note | 8 |
| 1.46 | FFL Noteholder | 8 |
| 1.47 | FFL Noteholder Claims | 8 |
| 1.48 | FFL SPA | 8 |
| 1.49 | Final Order | 8 |
| 1.50 | General Unsecured Claim | 8 |
| 1.51 | Indenture Trustee | 9 |
| 1.52 | Indenture Trustee Fees | 9 |
| 1.53 | Intercompany Claim | 9 |
| 1.54 | Junior Noteholder Claim | 9 |
| 1.55 | Lien | 9 |
| 1.56 | Local Bankruptcy Rules | 9 |

ii

# TABLE OF CONTENTS
### (continued)

Page

1.57   Master Agreement ................................................................ 9

1.58   New Board ........................................................................... 9

1.59   New Class 1 Common Stock ................................................. 9

1.60   New Class 2 Common Stock ................................................. 9

1.61   New Class 3 Common Stock ................................................. 9

1.62   New Common Stock ............................................................ 10

1.63   New Employee Incentive Plan ............................................ 10

1.64   New Equity Securities ........................................................ 10

1.65   New Management Incentive Plan ........................................ 10

1.66   New Organizational Documents ......................................... 10

1.67   New Preferred Stock .......................................................... 10

1.68   Non-Debtor Subsidiary ...................................................... 10

1.69   Other Secured Claim .......................................................... 10

1.70   Person ................................................................................ 10

1.71   Plan ................................................................................... 10

1.72   Plan Supplement ................................................................ 11

1.73   Plan Support Agreement .................................................... 11

1.74   Prepetition Agent .............................................................. 11

1.75   Priority Non-Tax Claim ..................................................... 11

1.76   Priority Tax Claim ............................................................ 11

1.77   Released Parties ................................................................ 11

1.78   Reorganization Cases ........................................................ 11

1.79   Reorganized BearingPoint LLC ......................................... 11

1.80   Reorganized BE ................................................................ 11

1.81   Reorganized Debtors ......................................................... 12

1.82   Schedules .......................................................................... 12

1.83   Secured Claim ................................................................... 12

1.84   Secured Credit Facility ...................................................... 12

1.85   Secured Credit Facility Term Loan .................................... 12

iii

# TABLE OF CONTENTS
### (continued)

**Page**

| | | | |
|---|---|---|---|
| 1.86 | Secured Credit Facility Term Loan Claim | | 12 |
| 1.87 | Secured Lenders | | 12 |
| 1.88 | Secured Letter of Credit Facility | | 13 |
| 1.89 | Secured Letter of Credit Facility Claim | | 13 |
| 1.90 | Secured Tax Claim | | 13 |
| 1.91 | Senior Noteholder Claims | | 13 |
| 1.92 | Series A Note | | 13 |
| 1.93 | Series A Noteholder | | 13 |
| 1.94 | Series A Noteholder Claim | | 13 |
| 1.95 | Series B Note | | 13 |
| 1.96 | Series B Noteholder | | 14 |
| 1.97 | Series B Noteholder Claim | | 14 |
| 1.98 | Series C Note | | 14 |
| 1.99 | Series C Noteholder | | 14 |
| 1.100 | Series C Noteholder Claim | | 14 |
| 1.101 | Tax Code | | 14 |
| 1.102 | Unimpaired | | 14 |
| 1.103 | Unliquidated Claim | | 14 |
| 1.104 | U.S. Trustee | | 14 |
| 1.105 | Voting Record Date | | 14 |
| 1.106 | Voting Trust | | 14 |
| B. | Interpretation; Application of Definitions and Rules of Construction | | 14 |
| Article II | PROVISIONS FOR PAYMENT OF ADMINISTRATIVE EXPENSES AND PRIORITY TAX CLAIMS | | 15 |
| 2.1 | Administrative Expense Claims | | 15 |
| 2.2 | Professional Compensation and Reimbursement Claims | | 15 |
| 2.3 | Indenture Trustee Fees | | 16 |
| 2.4 | Priority Tax Claims | | 16 |
| Article III | classification of claims and equity interests, impairment, voting | | 17 |
| Article IV | treatment of claims and equity interests | | 18 |

iv

## TABLE OF CONTENTS
### (continued)

Page

| 4.1 | Priority Non-Tax Claims (Class 1) | 18 |
| 4.2 | Secured Tax Claims (Class 2) | 18 |
| 4.3 | Secured Credit Facility Term Loan Claims (Class 3) | 19 |
| 4.4 | Secured Letter of Credit Facility Claims (Class 4) | 19 |
| 4.5 | Other Secured Claims (Class 5) | 19 |
| 4.6 | Senior Noteholder Claims (Class 6) | 19 |
| 4.7 | Junior Noteholder Claims (Class 7) | 20 |
| 4.8 | General Unsecured Claims (Class 8) | 20 |
| 4.9 | Convenience Class Claims (Class 9) | 20 |
| 4.10 | Equity Interests (Class 10) | 20 |
| Article V | Means of implementation | 21 |
| 5.1 | Settlement of Claims | 21 |
| 5.2 | Intercompany Claims | 21 |
| 5.3 | Issuance of New Common Stock | 21 |
| 5.4 | Issuance of New Preferred Stock | 21 |
| 5.5 | Exemption from Securities Laws | 22 |
| 5.6 | Merger/Dissolution/Consolidation | 22 |
| 5.7 | Cancellation of Existing Agreements and Equity Interests | 22 |
| 5.8 | Surrender of Existing Securities | 22 |
| 5.9 | Incurrence of New Indebtedness | 23 |
| Article VI | provisions governing voting and distributions | 23 |
| 6.1 | Voting of Claims | 23 |
| 6.2 | Nonconsensual Confirmation | 23 |
| 6.3 | Distributions on Allowed General Unsecured Claim and Allowed Convenience Class Claims | 24 |
| 6.4 | Date of Distributions | 24 |
| 6.5 | Disbursing Agent | 24 |
| 6.6 | Rights and Powers of Disbursing Agent | 24 |
| 6.7 | Expenses of Disbursing Agent | 24 |
| 6.8 | Delivery of Distributions | 24 |

## TABLE OF CONTENTS
### (continued)

Page

| | | |
|---|---|---|
| 6.9 | Unclaimed Distributions | 25 |
| 6.10 | Distribution Record Date | 25 |
| 6.11 | Manner of Payment | 25 |
| 6.12 | Cash Distributions | 26 |
| 6.13 | No Fractional Shares | 26 |
| 6.14 | Setoffs and Recoupment | 26 |
| 6.15 | Interest on Claims, Dividends | 26 |
| 6.16 | No Distribution In Excess of Allowed Amounts | 27 |
| 6.17 | Distributions After the Effective Date | 27 |
| 6.18 | Allocation of Plan Distributions Between Principal and Interest | 27 |
| Article VII | procedures for treating disputed Claims under plan of reorganization | 27 |
| 7.1 | Objections | 27 |
| 7.2 | No Distributions Pending Allowance | 27 |
| 7.3 | Distributions After Allowance | 28 |
| 7.4 | Resolution of Administrative Expense Claims and Claims. | 28 |
| 7.5 | Estimation of Claims | 28 |
| 7.6 | Interest | 28 |
| Article VIII | executory contracts and unexpired leases | 29 |
| 8.1 | Assumption or Rejection of Executory Contracts and Unexpired Leases | 29 |
| 8.2 | Approval of Assumption or Rejection of Executory Contracts and Unexpired Leases | 29 |
| 8.3 | Inclusiveness | 29 |
| 8.4 | Cure of Defaults | 30 |
| 8.5 | Bar Date for Filing Proofs of Claim Relating to Executory Contracts and Unexpired Leases Rejected Pursuant to the Plan | 30 |
| 8.6 | Indemnification and Reimbursement Obligations | 30 |
| 8.7 | Insurance Policies | 31 |
| 8.8 | Compensation and Benefit Plans | 31 |

## TABLE OF CONTENTS
### (continued)

Page

| | | |
|---|---|---|
| 8.9 | Retiree Benefits | 31 |
| Article IX | CORPORATE GOVERNANCE AND MANAGEMENT OF THE REORGANIZED DEBTORS | 31 |
| 9.1 | General | 31 |
| 9.2 | New Board of Reorganized BE | 31 |
| 9.3 | Officers of the Reorganized Debtors | 32 |
| 9.4 | Filing of New Organizational Documents | 32 |
| 9.5 | Adoption of New Management Incentive Plan and New Employee Incentive Plan | 32 |
| Article X | conditions precedent to the effective date | 32 |
| 10.1 | Conditions Precedent to Effectiveness | 32 |
| 10.2 | Waiver of Conditions | 33 |
| 10.3 | Satisfaction of Conditions | 33 |
| Article XI | effect of confirmation | 34 |
| 11.1 | Continued Vesting of Assets | 34 |
| 11.2 | Binding Effect | 34 |
| 11.3 | Discharge of Claims and Termination of Equity Interests | 34 |
| 11.4 | Discharge of the Debtors | 35 |
| 11.5 | Injunction or Stay | 35 |
| 11.6 | Terms of Injunction or Stay | 35 |
| 11.7 | Reservation of Causes of Action/Reservation of Rights | 35 |
| 11.8 | Exculpation | 36 |
| 11.9 | Limited Releases | 36 |
| 11.10 | Causes of Action/Avoidance Actions/Objections | 37 |
| Article XII | retention of jurisdiction | 37 |
| Article XIII | miscellaneous provisions | 39 |
| 13.1 | Effectuating Documents and Further Transactions | 39 |
| 13.2 | Withholding and Reporting Requirements | 39 |
| 13.3 | Corporate Action | 39 |
| 13.4 | Modification of Plan | 40 |

# TABLE OF CONTENTS
### (continued)

**Page**

13.5     Revocation or Withdrawal of the Plan .................................................... 40

13.6     Continuing Exclusivity Period ................................................................ 40

13.7     Plan Supplement .................................................................................... 40

13.8     Payment of Statutory Fees ..................................................................... 41

13.9     Post-Confirmation Date Professional Fees and Expenses ...................... 41

13.10    Dissolution of the Creditors' Committee ................................................ 41

13.11    Exemption from Transfer Taxes ............................................................. 41

13.12    Expedited Tax Determination ................................................................. 41

13.13    Exhibits/Schedules ................................................................................ 42

13.14    Substantial Consummation ..................................................................... 42

13.15    Severability of Plan Provisions .............................................................. 42

13.16    Governing Law ...................................................................................... 42

13.17    Notices .................................................................................................. 42

13.18    Section Headings ................................................................................... 43

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York  10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Marcia L. Goldstein

WEIL, GOTSHAL & MANGES LLP
700 Louisiana Street, Suite 1600
Houston, Texas  77002
Telephone: (713) 546-5000
Facsimile: (713) 224-9511
Alfredo R. Pérez

Attorneys for Debtors
and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------x

| | | |
|---|---|---|
| | : | |
| **In re** | : | **Chapter 11 Case No.** |
| | : | |
| **BEARINGPOINT, INC., <u>et al.</u>** | : | **09-_____ (_____)** |
| | : | |
| **Debtors.** | : | **(Joint Administration Requested)** |
| | : | |

---------------------------------------------------------x

**DEBTORS' JOINT PLAN OF REORGANIZATION**
**<u>UNDER CHAPTER 11 OF THE BANKRUPTCY CODE</u>**

BearingPoint, Inc., BE New York Holdings, Inc., BearingPoint Americas, Inc., BearingPoint BG, LLC, BearingPoint Enterprise Holdings, LLC, BearingPoint Global Operations, Inc., BearingPoint Global, Inc., BearingPoint International I, Inc., BearingPoint Israel, LLC, BearingPoint Puerto Rico, LLC, BearingPoint Russia, LLC, BearingPoint South Pacific, LLC, BearingPoint Southeast Asia LLC, BearingPoint Technology Procurement Services, LLC, BearingPoint USA, Inc., BearingPoint, LLC, i2 Mid Atlantic LLC, i2 Northwest LLC, Metrius, Inc., OAD Acquisition Corp., OAD Group, Inc., Peloton Holdings, L.L.C., Softline Acquisition Corp., and Softline Consulting and Integrators, Inc. propose the following chapter 11 plan pursuant to section 1121(a) of the Bankruptcy Code:

# ARTICLE I

## DEFINITION AND INTERPRETATION

**A.     Definitions.**

1.1     ***Administrative Expense Claim*** means any Claim constituting a cost or expense of administration of the Reorganization Cases Allowed under and in accordance with, as applicable, sections 330, 365, 503(b), 507(a)(2) and 507(b) of the Bankruptcy Code, including, without limitation, (a) any actual and necessary costs and expenses, incurred after the Commencement Date, of preserving the Debtors' Estates, (b) any actual and necessary costs and expenses, incurred after the Commencement Date, of operating the Debtors' businesses, (c) any indebtedness or obligations incurred or assumed by the Debtors in Possession during the Reorganization Cases and (d) any compensation for professional services rendered and reimbursement of expenses incurred to the extent Allowed by Final Order.  Any fees or charges assessed against the estates of the Debtors under section 1930 of chapter 123 of title 28 of the United States Code is excluded from the definition of Administrative Expense Claim and shall be paid in accordance with Section 13.8 of the Plan.

1.2     ***Affiliate*** has the meaning set forth in section 101(2) of the Bankruptcy Code.

1.3     ***Agent*** means Wells Fargo Bank, N.A., in its capacity as administrative agent and collateral agent under the Exit Facility.

1.4     ***Agency Fee*** means the fee paid to the Agent pursuant to the Exit Facility.

1.5     ***Allowed*** means, with reference to any Claim against the Debtors, (a) any Claim against any Debtor that has been listed by such Debtor in its Schedules (as such Schedules may be amended by the Debtors from time to time in accordance with Bankruptcy Rule 1009) as liquidated in amount and not disputed or contingent and for which no contrary proof of Claim has been filed or no timely objection to allowance or request for estimation has been interposed, (b) any timely filed proof of Claim (i) as to which no objection has been or is interposed in accordance with Section 7.1 of the Plan or such other applicable period of limitation fixed by the Bankruptcy Code, the Bankruptcy Rules, the Local Bankruptcy Rules or the Bankruptcy Court and as to which any such applicable period of limitation has expired or (ii) as to which any objection

has been determined by a Final Order to the extent such objection is determined in favor of the respective holder of such Claim, (c) any Claim expressly allowed by a Final Order or under the Plan, (d) any Claim that is compromised, settled or otherwise resolved pursuant to the authority granted to the Reorganized Debtors pursuant to a Final Order of the Bankruptcy Court or under Section 7.4 of the Plan; *provided, however,* that (a) Claims allowed solely for the purpose of voting to accept or reject the Plan pursuant to an order of the Bankruptcy Court shall not be considered "Allowed Claims" and (b) "Allowed Claim" shall not include any Claim subject to disallowance in accordance with section 502(d) of the Bankruptcy Code.  Unless otherwise specified in the Plan or by order of the Bankruptcy Court, "Allowed Administrative Expense Claim" or "Allowed Claim" shall not, for any purpose under the Plan, include interest on such Claim from and after the Commencement Date.

1.6    ***Avoidance Actions*** means any actions commenced, or that may be commenced before or after the Effective Date, pursuant to section 544, 545, 547, 548, 550, or 551 of the Bankruptcy Code.

1.7    ***Ballots*** means the forms distributed to each holder of an impaired Claim that is entitled to vote to accept or reject the Plan on which is to be indicated acceptance or rejection of the Plan.

1.8    ***Bankruptcy Code*** means title 11 of the United States Code, as amended from time to time, as applicable to the Reorganization Cases.

1.9    ***Bankruptcy Court*** means the United States Bankruptcy Court for the Southern District of New York or any other court of the United States having jurisdiction over the Reorganization Cases.

1.10    ***Bankruptcy Rules*** means the Federal Rules of Bankruptcy Procedure as promulgated by the United States Supreme Court under section 2075 of title 28 of the United States Code, as amended from time to time.

1.11    ***BE*** means BearingPoint, Inc.

1.12    ***BearingPoint*** means the Debtors and their non-debtor affiliates.

1.13    ***BearingPoint Subsidiary Debtors*** means the following subsidiaries of BE: BE New York Holdings, Inc., BearingPoint Americas, Inc., BearingPoint BG, LLC, BearingPoint Enterprise Holdings, LLC, BearingPoint Global Operations, Inc.,

BearingPoint Global, Inc., BearingPoint International I, Inc., BearingPoint Israel, LLC, BearingPoint Puerto Rico, LLC, BearingPoint Russia, LLC, BearingPoint South Pacific, LLC, BearingPoint Southeast Asia LLC, BearingPoint Technology Procurement Services, LLC, BearingPoint USA, Inc., BearingPoint, LLC, i2 Mid Atlantic LLC, i2 Northwest LLC, Metrius, Inc., OAD Acquisition Corp., OAD Group, Inc., Peloton Holdings, L.L.C., Softline Acquisition Corp., and Softline Consulting and Integrators, Inc.

1.14   ***Benefit Plans*** means all employee benefit plans, policies and programs sponsored by any of the Debtors, including without limitation, all incentive and bonus arrangements, medical and health insurance, life insurance, dental insurance, disability benefits and coverage, leave of absence, savings plans, retirement plans, and retiree benefits (as such term is defined in section 1114 of the Bankruptcy Code).  Benefit Plans shall not include any equity, bonus, stock, option or similar plans in effect on or prior to the Commencement Date.

1.15   ***Business Day*** means any day other than a Saturday, Sunday or any other day on which commercial banks in New York, New York are required or authorized to close by law or executive order.

1.16   ***Cash*** means lawful currency of the United States of America, including but not limited to bank deposits, checks and other similar items.

1.17   ***Causes of Action*** means any and all Claims, Avoidance Actions, and rights of the Debtors, including claims of a Debtor against another Debtor or affiliate.

1.18   ***Claim*** *has the* meaning set forth in section 101(5) of the Bankruptcy Code.

1.19   ***Class*** means any group of substantially similar Claims or Equity Interests classified by the Plan pursuant to section 1122 of the Bankruptcy Code.

1.20   ***Class 3 Pro Rata Share*** means the ratio (expressed as a percentage) of the amount of an Allowed Secured Credit Facility Term Loan Claim to the aggregate amount of all Allowed Secured Credit Facility Term Loan Claims.

1.21   ***Class 4 Pro Rata Share*** means the ratio (expressed as a percentage) of the amount of an Allowed Secured Letter of Credit

Facility Claim to the aggregate amount of all Allowed Secured
Letter of Credit Facility Claims.

1.22 ***Collateral*** means any property or interest in property of the Estates
of any of the Debtors that is subject to a Lien, charge or other
encumbrance to secure the payment or performance of a Claim,
which Lien, charge or other encumbrance is not subject to
avoidance or otherwise invalid under the Bankruptcy Code or
applicable state law.

1.23 ***Commencement Date*** means February [__], 2009, the date on
which each of the Debtors filed their voluntary petitions under
Chapter 11 of the Bankruptcy Code.

1.24 ***Confirmation Date*** means the date on which the clerk of the
Bankruptcy Court enters the Confirmation Order on the docket
with respect to the Reorganization Cases.

1.25 ***Confirmation Hearing*** means the hearing conducted by the
Bankruptcy Court pursuant to section 1128(a) of the Bankruptcy
Code to consider confirmation of the Plan, as such hearing may be
adjourned or continued from time to time.

1.26 ***Confirmation Order*** means the order or orders of the Bankruptcy
Court confirming the Plan pursuant to section 1129 of the
Bankruptcy Code.

1.27 ***Contingent Claim*** means any Claim, the liability for which
attaches or is dependent upon the occurrence or happening of, or is
triggered by, an event, which event has not yet occurred, happened
or been triggered as of the date on which such Claim is sought to
be estimated or an objection to such Claim is filed, whether or not
such event is within the actual or presumed contemplation of the
holder of such Claim and whether or not a relationship between the
holder of such Claim and the applicable Debtor now or hereafter
exists or previously existed.

1.28 ***Convenience Class Claim*** means (i) an unsecured Claim that is
Allowed in an amount of $[AMOUNT] or less, unless the holder of
such Claim elects on its Ballot to have such Claim be treated as a
General Unsecured Claim, or (ii) an unsecured Claim in an amount
greater than $[AMOUNT], the holder of which elects on its Ballot
to reduce the Allowed amount of such Claim to $[AMOUNT].

1.29    ***Creditors' Committee*** means any statutory committee of unsecured creditors appointed in the Reorganization Cases pursuant to section 1102(a) of the Bankruptcy Code.

1.30    ***Debtors*** means BE and the BearingPoint Subsidiary Debtors.

1.31    ***Debtors in Possession*** means the Debtors in their capacity as debtors in possession in the Reorganization Cases under sections 1107(a) and 1108 of the Bankruptcy Code.

1.32    ***Disbursing Agent*** means Reorganized BE or any entity in its capacity as a disbursing agent under Sections 6.5 and 6.6 of the Plan.

1.33    ***Disclosure Statement*** means that certain disclosure statement relating to the Plan, including, without limitation, all exhibits and schedules thereto, as the same may be amended, supplemented or otherwise modified from time to time, as approved by the Bankruptcy Court pursuant to section 1125 of the Bankruptcy Code.

1.34    ***Disclosure Statement Order*** means the order of the Bankruptcy Court approving, among other things, the Disclosure Statement and establishing certain procedures with respect to the solicitation and tabulation of votes to accept or reject the Plan.

1.35    ***Disputed*** means, with reference to any Administrative Expense Claim or Claim, any such Administrative Expense Claim or Claim (a) to the extent neither Allowed nor disallowed under the Plan or a Final Order nor deemed Allowed under section 502, 503 or 1111 of the Bankruptcy Code, (b) which has been or hereafter is listed by a Debtor on its Schedules as unliquidated, disputed or contingent and which has not been resolved by written agreement of the parties or a Final Order or (c) as to which the Debtors or any other party in interest has interposed a timely objection and/or request for estimation in accordance with the Bankruptcy Code, the Bankruptcy Rules and the Local Bankruptcy Rules, which objection or request for estimation has not been withdrawn or determined by a Final Order.  Prior to the earlier of the time an objection has been timely filed and the expiration of the time within which to object to such Claim set forth herein or otherwise established by order of the Bankruptcy Court, a Claim shall be considered a Disputed Claim to the extent that the amount of the Claim specified in a proof of Claim exceeds the amount of the Claim scheduled by the Debtor as not disputed, contingent or unliquidated.

1.36    ***Disputed Claim Amount*** means the Estimated Amount of a
Disputed Claim, or, if no Estimated Amount exists, the amount set
forth in the proof of claim relating to such Disputed Claim as the
liquidated amount of such Disputed Claim.

1.37    ***Distribution Record Date*** means the date that is five (5) Business
Days from and after the Confirmation Date.

1.38    ***Effective Date*** means a Business Day selected by the Debtors on
or after the Confirmation Date, on which (a) no stay of the
Confirmation Order is in effect and (b) the conditions precedent to
the effectiveness of the Plan specified in Section 10.1 of the Plan
shall have been satisfied or waived as provided in Section 10.2 of
the Plan.

1.39    ***Equity Interest*** means the interest of any holders of equity
securities of any of the Debtors represented by issued and
outstanding shares of common or preferred stock or other
instrument evidencing a present ownership interest in any of the
Debtors, whether or not transferable, or any option, warrant,
contractual or otherwise to acquire any such interest, including, but
not limited to, the warrants issued in connection with the FFL
SPA.

1.40    ***Estates*** means the estates created pursuant to section 541 of the
Bankruptcy Code upon the filing of the Reorganization Cases.

1.41    ***Estimated Amount*** means the estimated dollar value of an
Unliquidated Claim, Disputed Claim, or Contingent Claim
pursuant to section 502(c) of the Bankruptcy Code or as otherwise
agreed to between the holder of such Claim and the applicable
Debtor, or as otherwise determined by Bankruptcy Court.

1.42    ***Exit Facility*** means the Exit Letter of Credit Facility and the Exit
Facility Term Loan.

1.43    ***Exit Letter of Credit Facility*** means the synthetic letter of credit
facility portion of that certain credit facility which will be entered
into on the Effective Date, among (i) Reorganized BE and
Reorganized BearingPoint LLC, as borrowers, (ii) Wells Fargo
Bank, N.A., as administrative agent and collateral agent, and (iii)
the Secured Creditors as lenders, the terms of which are described
in the Disclosure Statement.

1.44    ***Exit Facility Term Loan*** means the term loan portion of that
certain credit facility which will be entered into on the Effective

Date, among (i) Reorganized BE and Reorganized BearingPoint LLC, as borrowers, (ii) Wells Fargo Bank, N.A., as administrative agent and collateral agent, and (iii) the Secured Creditors as lenders, the terms of which are described in the Disclosure Statement.

1.45    ***FFL Note*** means a note issued pursuant to the FFL SPA.

1.46    ***FFL Noteholder*** means a holder of an FFL Note.

1.47    ***FFL Noteholder Claims*** means the Claim of an FFL Noteholder under the FFL SPA.

1.48    ***FFL SPA*** means that certain Securities Purchase Agreement dated as of July 15, 2005, with the purchasers set forth in the agreement, pursuant to which BE issued $40.0 million aggregate principal amount of 0.50% Convertible Senior Subordinated Debentures, due July 2010, and common stock purchase warrants.

1.49    ***Final Order*** means an order or judgment of a court of competent jurisdiction that has been entered on the docket maintained by the clerk of such court and has not been reversed, vacated or stayed and as to which (a) the time to appeal, petition for certiorari or move for a new trial, reargument or rehearing has expired and as to which no appeal, petition for certiorari or other proceedings for a new trial, reargument or rehearing shall then be pending or (b) if an appeal, writ of certiorari, new trial, reargument or rehearing thereof has been sought, (i) such order or judgment shall have been affirmed by the highest court to which such order was appealed, certiorari shall have been denied or a new trial, reargument or rehearing shall have been denied or resulted in no modification of such order and (ii) the time to take any further appeal, petition for certiorari, or move for a new trial, reargument or rehearing shall have expired; provided, however, that the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules or the Local Bankruptcy Rules, may be filed relating to such order shall not prevent such order from being a Final Order.

1.50    ***General Unsecured Claim*** means any Claim against the Debtors (as applicable) other than an Administrative Expense Claim, Professional Compensation and Reimbursement Claim, Priority Tax Claim, Priority Non-Tax Claim, Secured Tax Claim, Secured Credit Facility Claim, Term Loan Claim, Secured Letter of Credit Facility Claim, Other Secured Claim, Senior Noteholder Claim,

Junior Noteholder Claim, Convenience Class Claim, or Intercompany Claim.

1.51    ***Indenture Trustee*** means the Bank of New York and/or its successor, in either case in its or their capacity as the indenture trustee for either the Series A Notes, the Series B Notes, or the Series C Notes.

1.52    ***Indenture Trustee Fees*** means the reasonable and customary fees and expenses of the Indenture Trustee as provided in the indentures for the Series A Notes, the Series B Notes and the Series C Notes (as applicable), including, without limitation, reasonable attorneys' fees and disbursements incurred by the Indenture Trustee, whether prior to or after the Effective Date.

1.53    ***Intercompany Claim*** means any Claim against any Debtor held by another Debtor or by a Non-Debtor Subsidiary or Affiliate.

1.54    ***Junior Noteholder Claim*** means a Series A Noteholder Claim or a Series B Noteholder Claim.

1.55    ***Lien*** has the meaning set forth in section 101(37) of the Bankruptcy Code.

1.56    ***Local Bankruptcy Rules*** means the Local Bankruptcy Rules of the United States Bankruptcy Court for the Southern District of New York, as amended from time to time.

1.57    ***Master Agreement*** means that certain master agreement, by and between the holders of the New Equity Securities, that will provide for, among other things, the voting trust arrangements, the transfer restrictions, and call rights.

1.58    ***New Board*** means the board of directors of Reorganized BE, the members of which will be disclosed in the Plan Supplement.

1.59    ***New Class 1 Common Stock*** means that certain class of common stock of BE to be issued under the Plan, as further described in the Disclosure Statement.

1.60    ***New Class 2 Common Stock*** means that certain class of common stock of BE to be issued under the Plan, as further described in the Disclosure Statement.

1.61    ***New Class 3 Common Stock*** means that certain class of common stock of BE to be issued under the Plan, as further described in the Disclosure Statement.

1.62    ***New Common Stock*** means collectively the New Class 1 Common Stock, the New Class 2 Common Stock, and the New Class 3 Common Stock.

1.63    ***New Employee Incentive Plan*** means the employee equity incentive plan, which shall be substantially in the form set forth in the Plan Supplement.

1.64    ***New Equity Securities*** means any equity securities of Reorganized BE represented by issued and outstanding shares of the New Common Stock, the New Preferred Stock, or any other instrument evidencing a present ownership interest in Reorganized BE.

1.65    ***New Management Incentive Plan*** means the management equity incentive plan, which shall be substantially in the form set forth in the Plan Supplement.

1.66    ***New Organizational Documents*** means each certificate of incorporation, certificate of formation, limited liability company agreement, bylaws, and other organizational document for each of the Reorganized Debtors, in each case, which shall be in substantially the form included in the Plan Supplement.

1.67    ***New Preferred Stock*** means that certain class of preferred stock of BE to be issued under the Plan, as further described in the Disclosure Statement.

1.68    ***Non-Debtor Subsidiary*** means any direct or indirect subsidiary of BE that is not a Debtor.

1.69    ***Other Secured Claim*** means a Secured Claim other than a Secured Tax Claim, Secured Credit Facility Term Loan Claim, or a Secured Letter of Credit Facility Claim.

1.70    ***Person*** means an individual, partnership, corporation, limited liability company, cooperative, trust, unincorporated organization, association, joint venture, government unit or agency or political subdivision thereof or any other form of legal entity or enterprise.

1.71    ***Plan*** means this Joint Plan of Reorganization, including, without limitation, the exhibits and schedules hereto or contained in the Plan Supplement, as the same may be amended or modified from time to time in accordance with the provisions of the Bankruptcy Code and the terms hereof.

1.72    ***Plan Supplement*** means the supplement or supplements to the Plan containing certain documents relevant to the implementation of the Plan, which shall be in form and substance reasonably acceptable to the Debtors and shall include, but is not limited to, the lists of the initial members of the New Board, the list of the initial officers of the Reorganized Debtors, the list of executory contracts and unexpired leases to be assumed pursuant to the Plan, the forms of the New Common Stock, the form of the New Preferred Stock, the New Organizational Documents, the bylaws of Reorganized BE, [the commitment letter for the Exit Facility] and the [New Employee Incentive Plan.]

1.73    ***Plan Support Agreement*** means that certain agreement, dated February [__], 2009, by and between the Debtors and certain of their creditors pursuant to which such creditors agreed, subject to certain conditions, to support the Plan.

1.74    ***Prepetition Agent*** means Wells Fargo Foothill, LLC in its capacity as administrative agent and collateral agent under the Secured Credit Facility..

1.75    ***Priority Non-Tax Claim*** means a Claim entitled to priority in payment as specified in section 507(a)(4), (5), (6) or (7) of the Bankruptcy Code.

1.76    ***Priority Tax Claim*** means any Claim of a governmental unit of the kind entitled to priority in payment as specified in sections 502(i) and 507(a)(8) of the Bankruptcy Code.

1.77    ***Released Parties*** means the Secured Lenders that have executed a Plan Support Agreement, the Senior Noteholders that have executed a Plan Support Agreement, and the Junior Noteholders that have executed a Plan Support Agreement.

1.78    ***Reorganization Cases*** means the cases commenced by the Debtors under chapter 11 of the Bankruptcy Code, styled as "In re BearingPoint, Inc., et al." which have been jointly administered by order of the Bankruptcy Court under case number 09-_____ (____).

1.79    ***Reorganized BearingPoint LLC*** means BearingPoint LLC on or after the Effective Date.

1.80    ***Reorganized BE*** means BE on or after the Effective Date.

1.81    ***Reorganized Debtors*** means the Debtors on or after the Effective Date.

1.82    ***Schedules*** means, collectively, the schedules of assets and liabilities, schedules of executory contracts and unexpired leases, schedules of current income and expenditures and statements of financial affairs filed by the Debtors under section 521 of the Bankruptcy Code, Bankruptcy Rule 1007 and the Official Bankruptcy Forms in the Reorganization Cases, as may have been amended or supplemented from time to time in accordance with Bankruptcy Rule 1009 or orders of the Bankruptcy Court.

1.83    ***Secured Claim*** means any Claim that is secured by a Lien on property in which a Debtors' estates has an interest to the extent of the value of such property, as determined in accordance with section 506(a) of the Bankruptcy Code, or, in the event that such Claim is subject to a permissible setoff under section 553 of the Bankruptcy Code, to the extent of such permissible setoff, or, in either case as otherwise agreed upon in writing by the Debtors and the holder of such Claim.

1.84    ***Secured Credit Facility*** means the Secured Letter of Credit Facility and the Secured Credit Facility Term Loan.

1.85    ***Secured Credit Facility Term Loan*** means the term loan portion of that certain amended and restated credit agreement, dated as of May 18, 2007, as amended and restated on June 1, 2007, among (i) BE and BearingPoint LLC as borrowers, (ii) BE New York Holdings, Inc., BearingPoint Americas, Inc., BearingPoint, BG, LLC, BearingPoint, Enterprise Holdings, LLC, BearingPoint Global Operations, Inc., BearingPoint Global, Inc., BearingPoint International I, Inc., BearingPoint Israel, LLC, BearingPoint Puerto Rico, LLC, BearingPoint Russia, LLC, BearingPoint South Pacific, LLC, BearingPoint Southeast Asia LLC, BearingPoint Technology Procurement Services, LLC, BearingPoint USA, Inc., i2 Mid Atlantic LLC, i2 Northwest LLC, Metrius Inc., OAD Acquisition Corp., OADGroup, Inc., Peloton Holdings, L.L.C., Softline Acquisition Corp., Softline Consulting, and Integrators, Inc. as guarantors, (iii) Wells Fargo Foothill, LLC, as administrative agent, and (iv) other lenders, issuing banks, and parties thereto.

1.86    ***Secured Credit Facility Term Loan Claim*** means any Claim arising under the Secured Credit Facility Term Loan.

1.87    ***Secured Lenders*** means the lender parties under the Secured Credit Facility.

1.88    ***Secured Letter of Credit Facility*** means the letter of credit portion of that certain amended and restated credit agreement, dated as of May 18, 2007, as amended and restated on June 1, 2007, among (i) BE and BearingPoint LLC as borrowers, (ii) BE New York Holdings, Inc., BearingPoint Americas, Inc., BearingPoint, BG, LLC, BearingPoint, Enterprise Holdings, LLC, BearingPoint Global Operations, Inc., BearingPoint Global, Inc., BearingPoint International I, Inc., BearingPoint Israel, LLC, BearingPoint Puerto Rico, LLC, BearingPoint Russia, LLC, BearingPoint South Pacific, LLC, BearingPoint Southeast Asia LLC, BearingPoint Technology Procurement Services, LLC, BearingPoint USA, Inc., i2 Mid Atlantic LLC, i2 Northwest LLC, Metrius Inc., OAD Acquisition Corp., OADGroup, Inc., Peloton Holdings, L.L.C., Softline Acquisition Corp., Softline Consulting, and Integrators, Inc. as guarantors, (iii) Wells Fargo Foothill, LLC, as administrative agent, and (iv) other lenders, issuing banks, and parties thereto.

1.89    ***Secured Letter of Credit Facility Claim*** means any Claim arising under the Secured Letter of Credit Facility.

1.90    ***Secured Tax Claim*** means any Secured Claim that, absent its secured status, would be entitled to priority in right of payment under section 507(a)(8) of the Bankruptcy Code (determined irrespective of any time limitations therein) and including any related Secured Claim for penalties.

1.91    ***Senior Noteholder Claims*** means FFL Noteholder Claims and Series C Noteholder Claims.

1.92    ***Series A Note*** means a note issued pursuant to that certain indenture, dated as of December 22, 2004, with the Bank of New York as trustee, pursuant to which BE issued $225.0 million aggregate principal amount of 2.50% Series A Convertible Subordinated Debentures, due December 15, 2024.

1.93    ***Series A Noteholder*** means a holder of the Series A Note.

1.94    ***Series A Noteholder Claim*** means a Claim of a Series A Noteholder under a Series A Note.

1.95    ***Series B Note*** means a note issued pursuant to that certain indenture, dated as of December 22, 2004, with the Bank of New York as trustee, pursuant to which BE issued $175.0 million principal amount of 2.75% Series B Convertible Subordinated Debentures, due December 15, 2024.

1.96  ***Series B Noteholder*** means a holder of a Series B Note.

1.97  ***Series B Noteholder Claim*** means a Claim of a Series B Noteholder under a Series B Note.

1.98  ***Series C Note*** means a note issued pursuant to that certain indenture, dated as of April 27, 2005, with the Bank of New York as trustee, pursuant to which BE issued $200.0 million aggregate principal amount of 5.00% Convertible Senior Subordinated Debentures, due April 15, 2025.

1.99  ***Series C Noteholder*** means a holder of the Series C Note.

1.100  ***Series C Noteholder Claim*** means a Claim of a Series C Noteholder under a Series C Note.

1.101  ***Tax Code*** means the Internal Revenue Code of 1986, as amended.

1.102  ***Unimpaired*** means, with respect to any Claim, that such Claim is not impaired within the meaning of section 1124 of the Bankruptcy Code.

1.103  ***Unliquidated Claim*** means any Claim, the amount of liability for which has not been fixed, whether pursuant to agreement, applicable law or otherwise, as of the date on which such Claim is asserted or sought to be estimated.

1.104  ***U.S. Trustee*** means the United States Trustee appointed under section 581 of title 28 of the United States Code to serve in the Southern District of New York.

1.105  ***Voting Record Date*** means, _____ ___, 2009 for all creditors entitled to vote on the Plan.

1.106  ***Voting Trust*** means that certain trust created to hold all shares of New Common Stock as of the Effective Date, as further described in the Disclosure Statement.

**B.     Interpretation; Application of Definitions and Rules of Construction.**

Unless otherwise specified, all Section, Article, schedule or exhibit references in the Plan are to the respective Section in, Article of or schedule or exhibit to the Plan or the Plan Supplement, as the same may be amended, waived or modified from time to time.  The words "herein," "hereof," "hereto," "hereunder" and other words of similar import refer to the Plan as a whole  and not to any particular section, subsection or clause contained in the Plan.  A term used herein that is not defined herein shall have the meaning ascribed to that term in the Bankruptcy Code.  The rules of construction

contained in section 102 of the Bankruptcy Code shall apply to the construction of the Plan.  In the event that a particular term of the Plan of Reorganization (including any exhibits or schedules hereto) conflicts with a particular term of the definitive documentation required to be implemented pursuant to the terms of the Plan of Reorganization or any settlement or other agreement contemplated hereunder, the definitive documentation shall control and shall be binding on the parties thereto.  The headings in the Plan are for convenience of reference only and shall not limit or otherwise affect the provisions hereof.  In computing any period of time prescribed or allowed by the Plan, unless otherwise expressly provided, the provisions of Bankruptcy Rule 9006(c) shall apply.

## ARTICLE II

## PROVISIONS FOR PAYMENT OF ADMINISTRATIVE EXPENSES AND PRIORITY TAX CLAIMS

2.1     *Administrative Expense Claims.*

Except to the extent that any entity entitled to payment of any Allowed Administrative Expense Claim agrees to a less favorable treatment, or has been paid during the Reorganization Cases, on the latest of (i) the Effective Date, (ii) the date on which its Administrative Expense Claim becomes an Allowed Administrative Expense Claim, or (iii) the date on which its Administrative Expense Claim becomes payable under any agreement relating thereto, or as soon as practicable thereafter, each holder of an Allowed Administrative Expense Claim shall receive, in full satisfaction, settlement, and release of and in exchange for such Allowed Administrative Expense Claim, Cash equal to the unpaid portion of its Allowed Administrative Expense Claim. Notwithstanding the forgoing, (a) any Allowed Administrative Expense Claim based on a liability incurred by the Debtors in the ordinary course of business by the Debtors shall be paid in full and performed by the Debtors or Reorganized Debtors as the case may be, in the ordinary course of business in accordance with the terms and conditions of any agreements governing, instruments evidencing or other documents relating to such transactions, and (b) any Allowed Administrative Expense Claim may be paid on such other terms as may be agreed on between the holder of such Claim and the Debtors; *provided, further*, that if any such ordinary course expense is not billed or a request for payment is not made within ninety (90) days after the Effective Date, such ordinary course expense shall be barred.

2.2     *Professional Compensation and Reimbursement Claims.*

All entities seeking awards by the Bankruptcy Court of compensation for services rendered or reimbursement of expenses incurred through and including the Confirmation Date under sections 330, 331, 503(b)(2), 503(b)(3), 503(b)(4) or 503(b)(5) of the Bankruptcy Code shall (a) file, on or before the date that is sixty (60) after the Effective Date their respective applications for final allowances of compensation for professional services rendered and reimbursement of expenses incurred and (b) be paid in

full, in Cash, in such amounts as are Allowed by the Bankruptcy Court in accordance with the order relating to or allowing any such Administrative Expense Claim or upon such other terms as may be mutually agreed upon between the holder of such Administrative Expense Claim and the Debtors.  The Debtors, are authorized to pay compensation for services rendered or reimbursement of expenses incurred after the Confirmation Date in the ordinary course of business and without the need for Bankruptcy Court approval.

### 2.3    *Indenture Trustee Fees.*

The Indenture Trustee Fees shall be paid in Cash on the Effective Date by the Reorganized Debtors, without the need for application to, or approval of, the Bankruptcy Court.

To the extent that the Indenture Trustee provides services related to distributions pursuant to the Plan (including, but not limited to, the services referenced in Section 6.8, herein ("Delivery of Distributions" of the Plan), such Indenture Trustee will receive from the Reorganized Debtors, without further Bankruptcy Court approval, reasonable compensation for such services and reimbursement of reasonable expenses, including, but not limited to, reasonable attorneys' fees and expenses, incurred in connection with such services.  These payments will be made on terms agreed to by the Indenture Trustee and the Reorganized Debtors.

### 2.4    *Priority Tax Claims.*

On the later of (i) the Effective Date or (ii) the date such Priority Tax Claim becomes an Allowed Priority Tax Claim, or as soon as practicable thereafter, except to the extent that a holder of an Allowed Priority Tax Claim agrees to a less favorable treatment, each holder of an Allowed Priority Tax Claim shall receive in full satisfaction, settlement, and release of and in exchange for such Allowed Priority Tax Claim, in the sole discretion of the Debtors (a) Cash in an amount equal to such Allowed Priority Tax Claim, (b) equal semi-annual Cash payments aggregating an amount equal to such Allowed Priority Tax Claim, together with interest for a period after the Effective Date at a fixed annual rate determined under applicable non-bankruptcy law, over a period not exceeding five (5) years after the Commencement Date, subject to the Reorganized Debtors' sole option to prepay the entire amount of the Allowed Priority Tax Claim; provided that the first payment under this clause (b) shall represent a percentage recovery at least equal to that expected to be received by holders of Allowed General Unsecured Claims and subject to the sole option of the Debtors to prepay the entire amount of the Allowed Priority Tax Claim.

# ARTICLE III

## CLASSIFICATION OF CLAIMS AND
## EQUITY INTERESTS, IMPAIRMENT, VOTING

The following table designates the classes of Claims against and Equity Interests in the Debtors and specifies which of those classes are impaired or unimpaired by the Plan and entitled to vote to accept or reject the Plan in accordance with section 1126 of the Bankruptcy Code or deemed to accept or reject the Plan.

| Class | Designation | Impairment | Entitled to Vote |
|---|---|---|---|
| BearingPoint Class 1 | Priority Non-Tax Claims | Unimpaired | No (deemed to accept) |
| BearingPoint Class 2 | Secured Tax Claims | Unimpaired | No (deemed to accept) |
| BearingPoint Class 3 | Secured Credit Facility Term Loan Claims | Impaired | Yes |
| BearingPoint Class 4 | Secured Letter of Credit Facility Claims | Unimpaired | No (deemed to accept) |
| Bearing Point Class 5 | Other Secured Claims | Unimpaired | No (deemed to accept) |
| BearingPoint Class 6 | Senior Noteholder Claims | Impaired | Yes |
| BearingPoint Class 7 | Junior Noteholder Claims | Impaired | Yes |
| BearingPoint Class 8 | General Unsecured Claims | Impaired | Yes |

| BearingPoint Class 9 | Convenience Class Claims | Impaired | Yes |
|---|---|---|---|
| BearingPoint Class 10 | Equity Interests | Impaired | No (deemed to reject) |

## ARTICLE IV

## TREATMENT OF CLAIMS AND EQUITY INTERESTS

4.1    *Priority Non-Tax Claims (Class 1)*

(a)    Impairment and Voting.  Class 1 is Unimpaired by the Plan.  Each holder of an Allowed Priority Non-Tax Claim is conclusively presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan.

(b)    Distributions.  Except to the extent that a holder of an Allowed Priority Non-Tax Claim (i) has been paid by the Debtors, in whole or in part, prior to the Effective Date, or (ii) agrees to a less favorable treatment, each holder of an Allowed Priority Non-Tax Claim shall receive, in full satisfaction of such Claim, Cash in the full amount of the claim, on or as soon as reasonably practicable after the later of (a) the Effective Date, or as soon thereafter as reasonably practicable, and (b) the date such claim becomes Allowed.

4.2    *Secured Tax Claims (Class 2)*

(a)    Impairment and Voting.  Class 2 is unimpaired by the Plan.  Each holder of an Allowed Secured Tax Claim is conclusively presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan.

(b)    Distributions.  Except to the extent that a holder of an Allowed Secured Tax Claim has been paid by the Debtors prior to the Effective Date or agrees to a to a less favorable treatment, each holder shall receive, at the sole option of the Debtors, (a) Cash in the full amount of the Claim on or as soon as reasonably practicable following the later to occur of (i) the Effective Date and (ii) the date on which such Claim becomes Allowed, (b) equal semi-annual Cash payments in the full amount of such Claim, together with interest for a period after the Effective Date at a fixed annual rate determined under applicable non-bankruptcy law, commencing upon the later of the Effective Date and the date such Claim becomes Allowed, or as soon thereafter as is practicable, and continuing over a period not exceeding five (5) years from and after the Commencement Date, or (c) such other terms determined by the Bankruptcy Court to provide the holder deferred Cash payments having a value, as of the Effective Date, equal to such Claim.

4.3     ***Secured Credit Facility Term Loan Claims (Class 3)***

(a)     <u>Impairment and Voting.</u>  Class 3 is impaired by the Plan.  Each holder of an Allowed Secured Credit Facility Term Loan Claim is entitled to vote to accept or reject the Plan.

(b)     <u>Distributions.</u>  On the Effective Date, or as soon as reasonably practicable thereafter, the Secured Credit Facility shall be converted into the Exit Facility. Each holder of an Allowed Secured Credit Facility Term Loan Claim shall receive its Class 3 Pro Rata Share of the Exit Facility Term Loan, and its Class 3 Pro Rata Share of the New Preferred Stock.

4.4     ***Secured Letter of Credit Facility Claims (Class 4)***

(a)     <u>Impairment and Voting.</u>  Class 4 is unimpaired by the Plan.  Each holder of an Allowed Secured Letter of Credit Facility Claim is conclusively presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan.

(b)     <u>Distributions.</u>  On the Effective Date, or as soon as reasonably practicable thereafter, the Secured Credit Facility shall be converted into the Exit Facility. Each holder of an Allowed Secured Letter of Credit Facility Claim shall receive its Class 4 Pro Rata Share of the Exit Letter of Credit Facility, and its Class 4 Pro Rata Share of the excess of Credit Linked Deposits (as defined in the Secured Credit Facility) under the Secured Credit Facility over the amount of Credit Linked Deposits required under the Exit Facility Term Loan.

4.5     ***Other Secured Claims (Class 5)***

(a)     <u>Impairment and Voting.</u>  Class 5 is unimpaired by the Plan.  Each holder of an Allowed Other Secured Claim is conclusively presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan.

(b)     <u>Distributions.</u>  Except to the extent that a holder of an Allowed Other Secured Claim agrees to a less favorable treatment, at the sole option of the Debtors, (i) each allowed other secured claim shall be reinstated and rendered unimpaired in accordance with section 1124(2) of the Bankruptcy Code, or (ii) each holder of an Allowed Other Secured Claim shall receive, in full satisfaction of such Claim, either (a) cash in the full amount of the Claim, including any interest required to be paid pursuant to section 506(b) of the Bankruptcy Code, (b) the proceeds of the sale or disposition of its collateral securing such Claim to the extent of the value of the holder's secured interest in such collateral, (c) the collateral securing such Claim and any interest on such Claim required to be paid pursuant to section 506(b) of the Bankruptcy Code, or (d) such other distribution as necessary to satisfy the requirements of section 1124 of the Bankruptcy Code.

4.6     ***Senior Noteholder Claims (Class 6)***

(a)    <u>Impairment and Voting.</u>  Class 6 is impaired by the Plan.  Each holder of an Allowed Senior Noteholder Claim is entitled to vote to accept or reject the Plan.

(b)    <u>Distributions.</u>  On the Effective Date, or as soon as reasonably practicable thereafter, each holder of a Senior Noteholder Claim shall receive [x] shares of New Class 1 Common Stock for each dollar of such holder's Allowed Claim, which shall be held in the Voting Trust as further described in the Disclosure Statement.

### 4.7    *Junior Noteholder Claims (Class 7)*

(a)    <u>Impairment and Voting.</u>  Class 7 is impaired by the Plan.  Each holder of an Allowed Junior Noteholder Claim is entitled to vote to accept or reject the Plan.

(b)    <u>Distributions.</u>  On the Effective Date, or as soon as reasonably practicable thereafter, each holder of a Junior Noteholder Claim shall receive [x] shares of New Class 2 Common Stock for each dollar of such holder's Allowed Claim, which shall be held in the Voting Trust as further described in the Disclosure Statement.

### 4.8    *General Unsecured Claims (Class 8)*

(a)    <u>Impairment and Voting.</u>  Class 8 is impaired by the Plan.  Each holder of an Allowed General Unsecured Claim is entitled to vote to accept or reject the Plan.

(b)    <u>Distributions.</u>  On the Effective Date, or as soon as reasonably practicable thereafter, each holder of a General Unsecured Claim shall receive [x] shares of New Class 3 Common Stock for each dollar of such holder's Allowed Claim, which shall be held in the Voting Trust as further described in the Disclosure Statement.

### 4.9    *Convenience Class Claims (Class 9)*

(a)    <u>Impairment and Voting.</u>  Class 9 is impaired by the Plan.  Each holder of an Allowed Convenience Claim is entitled to vote to accept or reject the Plan.

(b)    <u>Distributions.</u>  Each holder of a Convenience Class Claim shall receive, as soon as reasonably practicable after the later of the Effective Date and the date such Convenience Class Claim becomes an Allowed Claim, Cash equal to [___]% of the Allowed amount of such Claim.

### 4.10    *Equity Interests (Class 10)*

(a)    <u>Impairment and Voting.</u>  Class 10 is impaired by the Plan.  Each holder of an Equity Interest is deemed to reject the Plan and is not entitled to vote to accept or reject the Plan.

(b)    <u>Distributions.</u>  On the Effective Date, the Equity Interests shall be cancelled and extinguished and the holders of Equity Interests shall not be entitled to, and shall not receive or retain, any property or interest in property on account of such Equity Interests under the Plan.

## ARTICLE V

## MEANS OF IMPLEMENTATION

5.1    *Settlement of Claims.*

Pursuant to Bankruptcy Rule 9019, in consideration for the classification, distribution, and other benefits provided under the Plan, upon the Effective Date, the provisions of the Plan shall constitute a good-faith compromise and settlement of all Claims or controversies resolved pursuant to the Plan.  All Plan distribution made to creditors holding Allowed Claims in any class are intended to be and shall be final, and no Plan distribution to the holder of a Claim in one class shall be subject to being shared with or reallocated to the holders of any Claim in another class by virtue of any prepetition collateral trust agreement, shared collateral agreement, subordination agreement, other similar inter-creditor arrangement or deficiency claim.

5.2    *Intercompany Claims.*

Notwithstanding anything to the contrary herein, Intercompany Claims will be reduced, reinstated, or discharged to the extent determined appropriate by the Debtors or the Reorganized Debtors, after consultation with the Secured Lenders.  Any such transaction may be effected on or subsequent to the Effective Date without any further action by the Debtors, the Debtors in Possession, or the Reorganized Debtors.

5.3    *Issuance of New Common Stock.*

The issuance by Reorganized BE of the New Class 1 Common Stock, the New Class 2 Common Stock, and the New Class 3 Common Stock on the Effective Date is hereby authorized without the need for any further corporate action and without any further action by holders of Claims or Equity Interests.  The New Common Stock shall consist of (i) [_____] authorized shares of the New Class 1 Common Stock of Reorganized BE, (ii) [_____] authorized shares of the New Class 2 Common Stock of Reorganized BE, and (iii) [_____] authorized shares of the New Class 3 Common Stock of Reorganized BE.

5.4    *Issuance of New Preferred Stock.*

The issuance by Reorganized BE of the New Preferred Stock on the Effective Date is hereby authorized without the need for any further corporate action and without any further action by the holders of Claims or Equity Interests.  The New

Preferred Stock shall consist of [_____] authorized shares in the amount of $50 million.

### 5.5 *Exemption from Securities Laws.*

To the maximum extent provided by section 1145 of the Bankruptcy Code and applicable non-bankruptcy law, the issuance under the Plan of the New Common Stock and the New Preferred Stock will be exempt from registration under the Securities Act of 1933, as amended, and all rules regulation promulgated thereunder.

### 5.6 *Merger/Dissolution/Consolidation.*

On or as of the Effective Date or as soon as practicable thereafter and without the need for any further action, the Reorganized Debtors may: (i) cause any or all of the Reorganized Debtors or to be merged into one or more of the Reorganized Debtors, dissolved or otherwise consolidated, (ii) cause the transfer of assets between or among the Reorganized Debtors, or (iii) engage in any other transaction in furtherance of the Plan.

### 5.7 *Cancellation of Existing Agreements and Equity Interests.*

Except (a) as otherwise expressly provided in the Plan, (b) with respect to executory contracts or unexpired leases that have been assumed by the Debtors, (c) for purposes of evidencing a right to distributions under the Plan, or (d) with respect to any Claim that is reinstated and rendered unimpaired under the Plan, on the Effective Date, the Secured Credit Facility, the FFL SPA, the Series A Note, the Series B Note, the Series C Note and any indentures pursuant to which such notes were issued, all Equity Interests and other instruments evidencing any Claims against the Debtors or Equity Interests in the Debtors shall be deemed automatically cancelled without further act or action under any applicable agreement, law, regulation, order or rule and the obligations of the Debtors thereunder shall be discharged.

### 5.8 *Surrender of Existing Securities.*

Each holder of the Series A Note, Series B Note or the Series C Note shall surrender such note(s) to the Indenture Trustee, or in the event such note(s) are held in the name or, or by a nominee of, the Depository Trust Company, the Disbursing Agent shall seek the cooperation of the Depository Trust Company to provide appropriate instructions to the Indenture Trustee.  No distributions under the Plan shall be made for or on behalf of any such holder unless and until such note is received by the Indenture Trustee or appropriate instructions from the Depository Trust Company shall be received by the Indenture Trustee, or the loss, theft or destruction of such note is established to the reasonable satisfaction of the Indenture Trustee, which satisfaction may require such holder to submit (a) a lost instrument affidavit and (b) an indemnity bond holding the Debtors, Reorganized Debtors, Disbursing Agent, and Indenture Trustee harmless in respect of such note and any distributions made in respect thereof.

Each holder of an FFL Note shall surrender such note(s) to Reorganized BE.  No distributions under the Plan shall be made for or on behalf of any such holder unless and until such note is received by Reorganized BE, or the loss, theft or destruction of such note is established to the reasonable satisfaction of Reorganized BE, which satisfaction may require such holder to submit (a) a lost instrument affidavit and (b) an indemnity bond holding the Debtors, Reorganized Debtors, and Disbursing Agent, harmless in respect of such note and any distributions made in respect thereof.

Upon compliance with this Section by a holder of any note, such holder shall, for all purposes under the Plan, be deemed to have surrendered such note.  Any holder of Series A Note, Series B Notes, Series C Notes, or FFL Note that fails to surrender such note or satisfactorily explain its non-availability to the Indenture Trustee or Reorganized BE, as applicable, within one (1) years of the Effective Date shall be deemed to have no further Claim against the Debtors, the Reorganized Debtors (or their property) or the Indenture Trustee in respect of such Claim and shall not participate in any distributions under the Plan.  All property in respect of such forfeited distributions, including interest thereon, shall be promptly returned to the Reorganized Debtors by the Indenture Trustee and any such security shall be cancelled.

5.9     *Incurrence of New Indebtedness.*

The Reorganized Debtors' entry into the Exit Facility and the incurrence of the indebtedness thereunder on the Effective Date is hereby authorized without the need for any further corporate action and without any further action by holders of Claims or Equity Interests.

## ARTICLE VI

## PROVISIONS GOVERNING VOTING AND DISTRIBUTIONS

6.1     *Voting of Claims.*

Each holder of an Allowed Claim in an impaired class of Claims that is entitled to vote on the Plan pursuant to Article III and Article IV of the Plan shall be entitled to vote separately to accept or reject the Plan, as provided in such order as is entered by the Bankruptcy Court establishing procedures with respect to the solicitation and tabulation of votes to accept or reject the Plan, or any other order of the Bankruptcy Court.

6.2     *Nonconsensual Confirmation.*

If any impaired class of Claims entitled to vote shall not accept the Plan by the requisite statutory majority provided in section 1126(c) of the Bankruptcy Code, the Debtors reserve the right to amend the Plan in accordance with Section 13.4 of the Plan or undertake to have the Bankruptcy Court confirm the Plan under section 1129(b) of the Bankruptcy Code or both.  With respect to impaired classes of Claims that are deemed to

reject the Plan, the Debtors shall request that the Bankruptcy Court confirm the Plan pursuant to section 1129(b) of the Bankruptcy Code.

6.3 ***Distributions on Allowed General Unsecured Claim and Allowed Convenience Class Claims.***

Distributions with respect to holders of Allowed General Unsecured Claims and Allowed Convenience Class Claims shall be made on the Effective Date and at periodic intervals thereafter as Disputed Claims become Allowed.

6.4 ***Date of Distributions.***

In the event that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date.

6.5 ***Disbursing Agent.***

All distributions under the Plan shall be made by Reorganized BE as Disbursing Agent or such other entity designated by Reorganized BE as a Disbursing Agent.

6.6 ***Rights and Powers of Disbursing Agent.***

The Disbursing Agent shall be empowered to (a) effect all actions and execute all agreements, instruments and other documents necessary to perform its duties under the Plan, (b) make all distributions contemplated hereby, (c) employ professionals to represent it with respect to its responsibilities and (d) exercise such other powers as may be vested in the Disbursing Agent by order of the Bankruptcy Court, pursuant to the Plan or as deemed by the Disbursing Agent to be necessary and proper to implement the provisions hereof.

6.7 ***Expenses of Disbursing Agent.***

Except as otherwise ordered by the Bankruptcy Court, any reasonable fees and expenses incurred by the Disbursing Agent (including, without limitation, taxes and reasonable attorneys fees and expenses) on or after the Effective Date shall be paid in Cash by the Reorganized Debtors in the ordinary course of business.

6.8 ***Delivery of Distributions.***

(a) Subject to Bankruptcy Rule 9010, all distributions to any holder of an Allowed Claim or Allowed Administrative Expense Claim shall be made at the address of such holder as set forth on the Schedules filed with the Bankruptcy Court or on the books and records of the Debtors or their agents, as applicable, unless the Debtors or Reorganized Debtors have been notified in writing of a change of address, including,

without limitation, by the filing of a proof of Claim by such holder that contains an address for such holder different than the address of such holder as set forth on the Schedules.  Nothing in this Plan shall require the Reorganized Debtors to attempt to locate any holder of an Allowed Claim.

(b)    Distributions by the Prepetition Agent.  The Prepetition Agent shall be the Disbursing Agent for the Secured Letter of Credit Facility Claims and the Secured Credit Facility Term Loan Claims Distributions under the Plan to holders of Allowed Secured Letter of Credit Facility Claims and Allowed Secured Credit Facility Term Loan Claims shall be made by the Reorganized Debtors to the Prepetition Agent, which, in turn shall make distributions to the holders of such Allowed Claims.  Upon delivery of the distributions set forth in Sections 4.3(b) and 4.4(b) of the Plan to the Prepetition Agent, the Reorganized Debtors shall be released of all liability with respect to the delivery of such distributions.

(c)    Distributions by Indenture Trustee

The Indenture Trustee shall be the Disbursing Agent for the Series A Notes, Series B Notes and the Series C Notes.  Distributions under the Plan to holders of Allowed Junior Noteholder Claims and Allowed Series C Noteholder Claims shall be made by the Reorganized Debtors to the Indenture Trustee, which, in turn, shall make the distributions to the holders of such Allowed Claims.  Upon delivery of the distributions set forth in Article IV of the Plan, to the Indenture Trustee, the Reorganized Debtors shall be released of all liability with respect to the delivery of such distributions.

6.9    ***Unclaimed Distributions.***

All distributions under the Plan that are unclaimed for a period of one (1) year after distribution thereof shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code and revested in the Reorganized Debtors and any entitlement of any holder of any Claims to such distributions shall be extinguished and forever barred.

6.10    ***Distribution Record Date.***

With respect to holders of all General Unsecured Claims against the Debtors, and all Convenience Class Claims against the Debtors on the Distribution Record Date, the Claims register shall be closed and any transfer of any Claim therein shall be prohibited.  The Debtors and the Reorganized Debtors shall have no obligation to recognize any transfer of any such Claims occurring after the close of business on such date.

6.11    ***Manner of Payment.***

At the option of the Disbursing Agent, any Cash payment to be made hereunder may be made by a check or wire transfer or as otherwise required or provided

in applicable agreements.  All distributions of Cash to the creditors of each of the Debtors under the Plan shall be made by, or on behalf of, the applicable Debtor.

### 6.12    *Cash Distributions.*

No payment of Cash less than fifty dollars ($50) shall be made to any holder of an Allowed Claim unless a request therefor is made in writing to the Reorganized Debtors.

### 6.13    *No Fractional Shares.*

No fractional shares of New Common Stock shall be distributed and no Cash shall be distributed in lieu of such fractional shares.  When any distribution pursuant to the Plan on account of an Allowed Claim would otherwise result in the issuance of a number of shares of New Common Stock that is not a whole number, the actual distribution of shares of New Common stock shall be rounded as follows: (a) fractions of one-half (½) or greater shall be rounded to the next higher whole number and (b) fractions of less than one-half (½) shall be rounded to the next lower whole number with no further payment therefor.  The total number of authorized shares of New Class 1 Common Stock, New Class 2 Common Stock, or New Class 3 Common Stock to be distributed to holders of Allowed Claims shall be adjusted as necessary to account for the foregoing rounding.

### 6.14    *Setoffs and Recoupment.*

The Debtors may, but shall not be required to, setoff against or recoup from any Claim and the payments to be made pursuant to the Plan in respect of such Claim any Claims of any nature whatsoever that the Debtors may have against the claimant, but neither the failure to do so nor the allowance of any Claim hereunder shall constitute a waiver or release by the Debtors or Reorganized Debtors of any such claim they may have against such claimant.

### 6.15    *Interest on Claims, Dividends.*

Unless otherwise specifically provided for in the Plan or the Confirmation Order, postpetition interest shall not accrue or be paid on any Claims, and no holder of a Claim shall be entitled to interest accruing on or after the Commencement Date on any Claim.  Unless otherwise specifically provided for in the Plan or the Confirmation Order, interest shall not accrue or be paid upon any Claim in respect of the period from the Commencement Date to the date a final distribution is made thereon if and after such Claim becomes an Allowed Claim.

No holder of a Claim that is entitled to shares of any of the New Common Stock shall be entitled to dividends on such shares unless such holder's Claim is an Allowed Claim as of the applicable record date for such dividends.

6.16    *No Distribution In Excess of Allowed Amounts.*

Notwithstanding anything to the contrary herein, no holder of an Allowed Claim shall receive in respect of such Claim any distribution of a value as of the Effective Date in excess of the Allowed amount of such Claim.

6.17    *Distributions After the Effective Date*.

Distributions made after the Effective Date to holders of Disputed Claims that are not Allowed Claims as of the Effective Date but which later become Allowed Claims shall be deemed to have been made on the Effective Date.

6.18    *Allocation of Plan Distributions Between Principal and Interest.*

To the extent that any Allowed Claim entitled to a distribution under the Plan consists of indebtedness and other amounts (such as accrued but unpaid interest thereon), such distribution shall be allocated first to the principal amount of the Claim (as determined for federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of the Claim, to such other amounts.

## ARTICLE VII

## PROCEDURES FOR TREATING DISPUTED
## CLAIMS UNDER PLAN OF REORGANIZATION

7.1    *Objections.*

Except as otherwise provided in Section 7.2, as of the Effective Date, objections to, and requests for estimation of, Administrative Expense Claims and Claims against the Debtors may be interposed and prosecuted only by the Reorganized Debtors. Such objections and requests for estimation shall be served on the respective claimant and filed with the Bankruptcy Court on or shall be served and filed (i) on or before the ninetieth (90th) day following the later of (x) the Effective Date and (y) the date that a proof of Claim is filed or amended or a Claim is otherwise asserted or amended in writing by or on behalf of a holder of such Claim, or (ii) such later date as may be fixed by the Bankruptcy Court whether fixed before or after the date specified in clauses (x) and (y) above..

7.2    *No Distributions Pending Allowance.*

Notwithstanding any other provision hereof, if any portion of a Claim or Administrative Expense Claim is Disputed, no payment or distribution provided hereunder shall be made on account of such Claim or Administrative Expense Claim unless and until such Disputed Claim or Disputed Administrative Expense Claim becomes Allowed.

7.3    ***Distributions After Allowance.***

To the extent that a Disputed Claim or Disputed Administrative Expense Claim ultimately becomes an Allowed Claim or Allowed Administrative Expense Claim, distributions (if any) shall be made to the holder of such Allowed Claim or Allowed Administrative Expense Claim in accordance with the provisions of the Plan.

7.4    ***Resolution of Administrative Expense Claims and Claims.***

On and after the Effective Date, the Reorganized Debtors shall have the authority to compromise, settle, otherwise resolve or withdraw any objections to Administrative Expense Claims and Claims against the Debtors and to compromise, settle or otherwise resolve any Disputed Administrative Expense Claims and Disputed Claims against the Debtors without approval of the Bankruptcy Court.

7.5    ***Estimation of Claims.***

The Debtors or the Reorganized Debtors may at any time request that the Bankruptcy Court estimate any Contingent Claim, Unliquidated Claim or Disputed Claim pursuant to section 502(c) of the Bankruptcy Code regardless of whether any of the Debtors or the Reorganized Debtors previously objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court will retain jurisdiction to estimate any Claim at any time during litigation concerning any objection to any Claim, including, without limitation, during the pendency of any appeal relating to any such objection.  In the event that the Bankruptcy Court estimates any Contingent Claim, Unliquidated Claim or Disputed Claim, the amount so estimated shall constitute either the Allowed amount of such Claim or a maximum limitation on such Claim, as determined by the Bankruptcy Court.  If the estimated amount constitutes a maximum limitation on the amount of such Claim, the Debtors or the Reorganized Debtors may pursue supplementary proceedings to object to the allowance of such Claim.  All of the aforementioned objection, estimation and resolution procedures are intended to be cumulative and not exclusive of one another.  Claims may be estimated and subsequently compromised, settled, withdrawn or resolved by any mechanism approved by the Bankruptcy Court.

7.6    ***Interest.***

To the extent that a Disputed Claim becomes an Allowed Claim after the Effective Date, the holder of such Claim shall not be entitled to any interest thereon.

# ARTICLE VIII

## EXECUTORY CONTRACTS AND UNEXPIRED LEASES

8.1    ***Assumption or Rejection of Executory Contracts and Unexpired Leases.***

Pursuant to sections 365(a) and 1123(b)(2) of the Bankruptcy Code, all executory contracts and unexpired leases that exist between the Debtors and any person or entity shall be deemed rejected by the Debtors as of the Effective Date, except for any executory contract or unexpired lease (i) that has been assumed or rejected pursuant to an order of the Bankruptcy Court entered prior to the Effective Date and (ii) as to which a motion for approval of the assumption of such executory contract or unexpired lease has been filed and served prior to the Confirmation Date,  or (iii) that is specifically designated as a contract or lease to be assumed on Schedules 8.01(A) (executory contracts) or 8.01(B) (unexpired leases), which schedule shall be contained in the Plan Supplement; *provided*, *however*, that the Debtors reserve the right, on or prior to the Confirmation Date, to amend Schedules 8.01(A) and 8.01(B) to delete any executory contract or unexpired lease therefrom or add any executory contract or unexpired lease thereto, in which event such executory contract(s) or unexpired lease(s) shall be deemed to be, respectively, either rejected or assumed as of the Effective Date.  The Debtors shall provide notice of any amendments to Schedules 8.01(A) and/or 8.01(B) to the parties to the executory contracts and unexpired leases affected thereby.  The listing of a document on Schedules 8.01(A) or 8.01(B) shall not constitute an admission by the Debtors that such document is an executory contract or an unexpired lease or that the Debtors have any liability thereunder.

8.2    ***Approval of Assumption or Rejection of Executory Contracts and Unexpired Leases.***

Entry of the Confirmation Order shall, subject to and upon the occurrence of the Effective Date, constitute (a) the approval, pursuant to sections 365(a) and 1123(b)(2) of the Bankruptcy Code, of the assumption of the executory contracts and unexpired leases assumed pursuant to Section 8.1 of the Plan, (b) the extension of time, pursuant to section 365(d)(4) of the Bankruptcy Code, within which the Debtors may assume, assume and assign or reject the unexpired nonresidential leases through the date of entry of an order approving the assumption, assumption and assignment or rejection of such executory contracts and unexpired leases and (c) the approval, pursuant to sections 365(a) and 1123(b)(2) of the Bankruptcy Code, of the rejection of the executory contracts and unexpired leases rejected pursuant to Section 8.1 of the Plan.

8.3    ***Inclusiveness.***

Unless otherwise specified on Schedules 8.01(A) or 8.01(B) of the Plan Supplement, each executory contract and unexpired lease listed or to be listed therein shall include any and all modifications, amendments, supplements, restatements or other

agreements made directly or indirectly by any agreement, instrument or other document that in any manner affects such executory contract or unexpired lease, without regard to whether such agreement, instrument or other document is listed on Schedules 8.01(A) or 8.01(B).

### 8.4 *Cure of Defaults.*

Except to the extent that different treatment has been agreed to by the non-debtor party or parties to any executory contract or unexpired lease on Schedule 8.01(A) or 8.01(B) to be assumed pursuant to Section 8.1 of the Plan, the Debtors shall, pursuant to the provisions of sections 1123(a)(5)(G) and 1123(b)(2) of the Bankruptcy Code and consistent with the requirements of section 365 of the Bankruptcy Code, which shall include, on Schedule 8.01(A) or 8.01(B) the cure amount as to each executory contract or unexpired lease to be assumed. The parties to such executory contracts or unexpired leases to be assumed or assumed and assigned by the Debtors shall have until the objection deadline to the Plan to file and serve any objection to assumption or the cure amounts listed by the Debtors. If there are any objections filed, the Bankruptcy Court shall hold a hearing on a date to be set by the Bankruptcy Court. Notwithstanding Section 8.1 of the Plan, the Debtors shall retain their rights to reject any of their executory contracts or unexpired leases that are subject to a dispute concerning amounts necessary to cure any defaults through the Effective Date.

### 8.5 *Bar Date for Filing Proofs of Claim Relating to Executory Contracts and Unexpired Leases Rejected Pursuant to the Plan.*

Proofs of Claim for damages arising out of the rejection of an executory contract or unexpired lease pursuant to Section 8.1 must be filed with the Bankruptcy Court and served upon the attorneys for the Debtors or, on and after the Effective Date, the Reorganized Debtors, no later than thirty (30) days after the later of (a) notice of entry of an order approving the rejection of such executory contract or unexpired lease, (b) notice of entry of the Confirmation Order, (c) notice of an amendment to Schedules 8.01(A) or (B) of the Plan Supplement (solely with respect to the party directly affected by such modification), or (d) notice of the Debtors' election to reject under Section 8.1 of the Plan. **All such proofs of Claim not filed within such time will be forever barred from assertion against the Debtors and their estates or the Reorganized Debtors and their property.**

### 8.6 *Indemnification and Reimbursement Obligations.*

Subject to the occurrence of the Effective Date, the obligations of the Debtors as of the Commencement Date to indemnify, defend, reimburse or limit the liability of directors, officers or employees who are directors, officers or employees of the Debtors on or after the Confirmation Date, respectively, against any claims or causes of action as provided in the Debtors' articles of organization, certificates of incorporation, bylaws, other organizational documents or applicable law, shall survive confirmation of the Plan, remain unaffected thereby and not be discharged, irrespective of whether such

indemnification, defense, reimbursement or limitation is owed in connection with an event occurring before or after the Commencement Date.

### 8.7    *Insurance Policies.*

Unless specifically rejected by order of the Bankruptcy Court, all of the Debtors' insurance policies and any agreements, documents or instruments relating thereto, are treated as executory contracts that are assumed under the Plan.  Nothing contained in this section shall constitute or be deemed a waiver of any cause of action that the Debtors may hold against any entity, including, without limitation, the insurer, under any of the Debtors' policies of insurance.

### 8.8    *Compensation and Benefit Plans.*

Notwithstanding anything contained in the Plan to the contrary, unless rejected by order of the Bankruptcy Court, the Reorganized Debtors shall continue to honor, in the ordinary course of business, all employee compensation and Benefit Plans of the Debtors, including Benefit Plans and programs subject to sections 1114 and 1129(a)(13) of the Bankruptcy Code, entered into before or after the Commencement Date and not since terminated.

### 8.9    *Retiree Benefits.*

On and after the Effective Date, pursuant to section 1129(a)(13) of the Bankruptcy Code, the Reorganized Debtors shall continue to pay all retiree benefits of the Debtors (within the meaning of and subject to section 1114 of the Bankruptcy Code) for the duration of the period for which the Debtors had obligated themselves to provide such benefits and subject to the right of the Reorganized Debtors to modify or terminate such retiree benefits in accordance with the terms thereof.

## ARTICLE IX

## CORPORATE GOVERNANCE AND MANAGEMENT
## OF THE REORGANIZED DEBTORS

### 9.1    *General.*

On the Effective Date, the management, control and operation of Reorganized BE and the other Reorganized Debtors shall become the general responsibility of the New Board of Reorganized BE

### 9.2    *New Board of Reorganized BE.*

The New Board of Reorganized BE shall initially consist of 7 directors: the Chief Executive Officer ("CEO") of Reorganized BE shall be a director, the Secured Lenders shall select 4 directors, and the Series C Noteholders shall select 2 directors. The initial members of the New Board shall not be employees or investors of the Secured

Lenders, a Senior Noteholder, a Series A/B Noteholder, or any affiliate of the foregoing. One of the directors selected by the Series C Noteholders shall be appointed to any compensation committee established by the New Board. All initial members of the New Board shall be reasonably acceptable to the Debtors.

The ongoing directors shall be nominated and elected as provided for in the Disclosure Statement. Reorganized BE's certificate of incorporation shall provide that the directors of Reorganized BE shall not be employees or investors of Reorganized BE (other than the CEO), the Secured Lenders, any entity holding greater than 10% of the New Common Stock or 10% of the New Preferred Stock, or any affiliate of the foregoing.

### 9.3    *Officers of the Reorganized Debtors.*

The Debtors shall select the initial officers, including the CEO, of Reorganized BE in consultation with the Secured Lenders and the Senior Noteholders. Such officers shall serve in accordance with applicable non-bankruptcy law, any employment agreement with the Reorganized Debtors and the New Organizational Documents.

### 9.4    *Filing of New Organizational Documents.*

On the Effective Date, or as soon thereafter as practicable, to the extent necessary, the Reorganized Debtors shall file their New Organizational Documents, as required or deemed appropriate, with the appropriate Persons in their respective jurisdictions of incorporation or establishment.

### 9.5    *Adoption of New Management Incentive Plan and New Employee Incentive Plan.*

On the Effective Date, Reorganized BE shall be deemed to have adopted the New Management Incentive Plan and New Employee Incentive Plan. Entry of the Confirmation Order shall constitute an approval of the New Management Incentive Plan and the New Employee Incentive Plan.

## ARTICLE X

## CONDITIONS PRECEDENT TO THE EFFECTIVE DATE

### 10.1    *Conditions Precedent to Effectiveness.*

The Effective Date shall not occur and the Plan shall not become effective unless and until the following conditions are satisfied in full or waived in accordance with Section 10.2 of the Plan:

(a)    The Confirmation Order, in form and substance acceptable to the Debtors and the Secured Lenders shall have been entered and is a Final Order;

(b)    The Confirmation Order shall enjoin all parties in interest that are receiving a distribution under the Plan from interfering, directly or indirectly, with the exercise by the Secured Lenders of rights conferred upon them pursuant to the Master Agreement;

(c)    The payment in full, in Cash, of all invoices for reasonable fees and expenses (including the Agency Fee and any fees owing under the terms of any engagement letters) of the legal and financial advisors incurred by each of the Secured Lenders[, the ad hoc group of Senior Noteholders, and the ad hoc group of Junior Noteholders] that remain unpaid as of the Effective Date, [and, with respect to the Junior Noteholders and their advisors, subject to a cap in the amount of [$_____]];

(d)    The conditions precedent to the effectiveness of the Exit Facility are satisfied or waived by the parties thereto and the Reorganized Debtors have access to letters of credit under the Exit Letter of Credit Facility;

(e)    All actions and all agreements, instruments or other documents necessary to implement the terms and provisions of the Plan are effected or executed and delivered, as applicable, in form and substance satisfactory to the Debtors;

(f)    All authorizations, consents and regulatory approvals, if any, required by the Debtors in connection with the consummation of the Plan are obtained and not revoked; and

(g)    As of the Effective Date, Reorganized BE shall not (i) list the New Common Stock on any stock exchange or quotation system and/or (ii) become be a reporting company under the Securities Exchange Act of 1934.

## 10.2    *Waiver of Conditions.*

Each of the conditions precedent in Section 10.1 hereof may be waived, in whole or in part, upon written notice, signed by the Debtors.  Any such waivers may be effected at any time, without notice, without leave or order of the Bankruptcy Court and without any formal action.

## 10.3    *Satisfaction of Conditions.*

Except as expressly provided or permitted in the Plan, any actions required to be taken on the Effective Date shall take place and shall be deemed to have occurred simultaneously, and no such action shall be deemed to have occurred prior to the taking of any other such action.  In the event that one or more of the conditions specified in Section 10.1 of the Plan have not occurred or otherwise been waived pursuant to Section 10.2 of the Plan, (a) the Confirmation Order shall be vacated, (b) the Debtors and all holders of Claims and interests, including any Equity Interests, shall be restored to the status quo ante as of the day immediately preceding the Confirmation Date as though the Confirmation Date never occurred and (c) the Debtors' obligations with respect to Claims

and Equity Interests shall remain unchanged and nothing contained herein shall constitute or be deemed a waiver or release of any Claims or Equity Interests by or against the Debtors or any other person or to prejudice in any manner the rights of the Debtors or any person in any further proceedings involving the Debtors.

## ARTICLE XI

## EFFECT OF CONFIRMATION

### 11.1    *Continued Vesting of Assets.*

On the Effective Date, pursuant to sections 1141(b) and (c) of the Bankruptcy Code, the Debtors, their properties and interests in property and their operations shall be released from the custody and jurisdiction of the Bankruptcy Court, and all property of the estates of the Debtors shall continue to vest in the Reorganized Debtors free and clear of all Claims, Liens, encumbrances, charges and other interests, except as provided in the Plan.  From and after the Effective Date, the Reorganized Debtors may operate their business and may use, acquire and dispose of property free of any restrictions of the Bankruptcy Code, the Bankruptcy Rules or the Local Bankruptcy Rules, subject to the terms and conditions of the Plan.

### 11.2    *Binding Effect.*

Subject to the occurrence of the Effective Date, on and after the Confirmation Date, the provisions of the Plan shall bind any holder of a Claim against, or Equity Interest in, the Debtors and such holder's respective successors and assigns, whether or not the Claim or interests including any Equity Interest of such holder is impaired under the Plan, whether or not such holder has accepted the Plan and whether or not such holder is entitled to a distribution under the Plan.

### 11.3    *Discharge of Claims and Termination of Equity Interests.*

Except as provided in the Plan, the rights afforded in and the payments and distributions to be made under the Plan shall terminate all Equity Interests and discharge all existing debts and Claims of any kind, nature or description whatsoever against or in the Debtors or any of their assets or properties to the fullest extent permitted by section 1141 of the Bankruptcy Code.  Except as provided in the Plan, upon the Effective Date, all existing Claims against the Debtors and Equity Interests shall be, and shall be deemed to be, discharged and terminated, and all holders of such Claims and Equity Interests shall be precluded and enjoined from asserting against the Reorganized Debtors, their successors or assignees or any of their assets or properties, any other or further Claim or Equity Interest based upon any act or omission, transaction or other activity of any kind or nature that occurred prior to the Effective Date, whether or not such holder has filed a proof of Claim or proof of Equity Interest and whether or not the facts or legal bases therefor were known or existed prior to the Effective Date.

11.4    *Discharge of the Debtors.*

Upon the Effective Date, in consideration of the distributions to be made under the Plan and except as otherwise expressly provided in the Plan, each holder (as well as any trustees and agents on behalf of each holder) of a Claim or Equity Interest and any Affiliate of such holder shall be deemed to have forever waived, released and discharged the Debtors, to the fullest extent permitted by section 1141 of the Bankruptcy Code, of and from any and all Claims, Equity Interests, rights and liabilities that arose prior to the Effective Date.  Upon the Effective Date, all such persons shall be forever precluded and enjoined, pursuant to section 524 of the Bankruptcy Code, from prosecuting or asserting any such discharged Claim against or terminated Equity Interest in the Debtors.

11.5    *Injunction or Stay.*

Except as otherwise expressly provided herein or in the Confirmation Order, all Persons or entities who have held, hold or may hold Claims against or Equity Interests in the Debtors are permanently enjoined, from and after the Effective Date, from (a) commencing or continuing in any manner any action or other proceeding of any kind on any such Claim or Equity Interest against any of the Reorganized Debtors, (b) the enforcement, attachment, collection or recovery by any manner or means of any judgment, award, decree or order against any Reorganized Debtor with respect to such Claim or Equity Interest, (c) creating, perfecting or enforcing any encumbrance of any kind against any Reorganized Debtor or against the property or interests in property of any Reorganized Debtor with respect to such Claim or Equity Interest, (d) asserting any right of setoff, subrogation or recoupment of any kind against any obligation due to any Reorganized Debtor or against the property or interests in property of any Reorganized Debtor with respect to such Claim or Equity Interest and (e) pursuing any claim released pursuant to this Article X of the Plan.

11.6    *Terms of Injunction or Stay.*

Unless otherwise provided in the Confirmation Order, all injunctions or stays arising under or entered during the Reorganization Cases under section 105 or 362 of the Bankruptcy Code, or otherwise, that are in existence on the Confirmation Date shall remain in full force and effect until the Effective Date, provided, however, that no such injunction or stay shall preclude enforcement of parties' rights under the Plan and the related documents.

11.7    *Reservation of Causes of Action/Reservation of Rights.*

(a)    Except as provided in the Plan, nothing contained in the Plan or the Confirmation Order shall be deemed to be a waiver or the relinquishment of any rights or causes of action that the Debtors may have under any provision of the Bankruptcy Code or any applicable nonbankruptcy law, including, without limitation, (i) any and all Claims against any person or entity, to the extent such person or entity asserts a crossclaim,

counterclaim, and/or Claim for setoff which seeks affirmative relief against the Debtors, their officers, directors, or representatives and (ii) the turnover of any property of the Debtors' Estates.

(b)    Nothing contained in the Plan or the Confirmation Order shall be deemed to be a waiver or relinquishment of any claim, cause of action, right of setoff, or other legal or equitable defense which the Debtors had immediately prior to the Commencement Date, against or with respect to any Claim left unimpaired by the Plan.

11.8    *Exculpation.*

**None of the Debtors and their respective officers, directors, employees, accountants, financial advisors, investment bankers, agents, restructuring advisors, and attorneys, and each of their respective agents and representatives (but solely in their capacities as such) shall have or incur any liability for any Claim, cause of action or other assertion of liability for any act taken or omitted to be taken in connection with, or arising out of, the Restructuring Cases, the formulation, dissemination, confirmation, consummation or administration of the Plan, property to be distributed under the Plan or any other act or omission in connection with the Restructuring Cases, the Plan, the Disclosure Statement or any contract, instrument, document or other agreement related thereto; provided, however, that the foregoing shall not affect the liability of any Person that otherwise would result from any such act or omission to the extent such act or omission is determined by a Final Order to have constituted willful misconduct or gross negligence.**

11.9    *Limited Releases.*

**Effective as of the Confirmation Date but subject to the occurrence of the Effective Date, and in consideration of the services of (a) the present and former directors, officers, members, employees, affiliates, agents, financial advisors, restructuring advisors, attorneys and representatives of or to the Debtors who acted in such capacities after the Commencement Date (but not limited to such postpetition actions); (b) the Indenture Trustee; and (c) the Released Parties and their respective officers, directors, agents, advisors, and professionals in connection with the Reorganization Cases; (x) the Debtors; (y) each holder of a Claim that votes to accept the Plan (or is deemed to accept the Plan) and (z) to the fullest extent permissible under applicable law, as such law may be extended or integrated after the Effective Date, each holder of a Claim or Equity Interest that does not vote to accept the Plan, shall release unconditionally and forever each present or former director, officer, member, employee, affiliate, agent, financial advisor, restructuring advisor, attorney and representative (and their respective affiliates) of the Debtors who acted in such capacity after the Commencement Date, the Released Parties, and each of their respective officers, directors, agents, advisors, and professionals (but, in each case, solely in their capacities as such) from any and all Claims or causes of action whatsoever in connection with, related to, or arising out of the**

**Reorganization Cases, the pursuit of confirmation of the Plan, the consummation thereof, the administration thereof or the property to be distributed thereunder; *provided, however*, that the foregoing shall not operate as a waiver of or release from any causes of action arising out of the willful misconduct, intentional fraud, or criminal conduct of any such person or entity.**

11.10    *Causes of Action/Avoidance Actions/Objections.*

Other than any releases granted herein, by the Confirmation Order and by Final Order of the Bankruptcy Court, as applicable, from and after the Effective Date, the Reorganized Debtors shall have the right to prosecute any and all avoidance or equitable subordination actions, recovery causes of action and objections to Claims under sections 105, 502, 510, 542 through 551, and 553 of the Bankruptcy Code that belong to the Debtors or Debtors in Possession.

## ARTICLE XII

## RETENTION OF JURISDICTION

The Bankruptcy Court shall have exclusive jurisdiction of all matters arising out of, or related to, the Reorganization Cases and the Plan pursuant to, and for the purposes of, sections 105(a) and 1142 of the Bankruptcy Code, including, without limitation:

(a)    To hear and determine pending applications for the assumption or rejection of executory contracts or unexpired leases, the allowance of Claims and Administrative Expense Claims resulting therefrom and any disputes with respect to executory contracts or unexpired leases relating to facts and circumstances arising out of or relating to the Reorganization Cases;

(b)    To determine any and all adversary proceedings, applications and contested matters;

(c)    To ensure that distributions to holders of Allowed Claims and Equity Interests are accomplished as provided herein;

(d)    To consider Claims or the allowance, classification, priority, compromise, estimation, or payment of any Claim, Administrative Expense Claim, or Interest;

(e)    To hear and determine all applications for compensation and reimbursement of expenses under sections 330, 331 and 503(b) of the Bankruptcy Code;

(f)    To hear and determine any timely objections to, or requests for estimation of Disputed Administrative Expense Claims and Disputed Claims, in whole or in part;

(g)     To enter and implement such orders as may be appropriate in the event the Confirmation Order is for any reason stayed, revoked, modified or vacated;

(h)     To resolve disputes as to the ownership of any Administrative Expense Claim, Claim or Equity Interest;

(i)     To issue such orders in aid of execution of the Plan, to the extent authorized by section 1142 of the Bankruptcy Code;

(j)     To consider any amendments to or modifications of the Plan or to cure any defect or omission, or reconcile any inconsistency, in any order of the Bankruptcy Court, including, without limitation, the Confirmation Order;

(k)     To hear and determine disputes or issues arising in connection with the interpretation, implementation or enforcement of the Plan, the Confirmation Order, any transactions or payments contemplated hereby, any agreement, instrument, or other document governing or relating to any of the foregoing or any settlement approved by the Bankruptcy Court;

(l)     To hear and determine matters concerning state, local and federal taxes in accordance with sections 346, 505 and 1146 of the Bankruptcy Code (including, without limitation, any request by the Debtors prior to the Effective Date or request by the Reorganized Debtors after the Effective Date for an expedited determination of tax under section 505(b) of the Bankruptcy Code);

(m)     To hear and determine all disputes involving the existence, scope and nature of the discharges granted under the Plan, the Confirmation Order or the Bankruptcy Code;

(n)     To issue injunctions and effect any other actions that may be necessary or appropriate to restrain interference by any person or entity with the consummation, implementation or enforcement of the Plan, the Confirmation Order or any other order of the Bankruptcy Court;

(o)     To determine such other matters and for such other purposes as may be provided in the Confirmation Order;

(p)     To hear and determine any rights, Claims or causes of action held by or accruing to the Debtors pursuant to the Bankruptcy Code or pursuant to any federal or state statute or legal theory;

(q)     To recover all assets of the Debtors and property of the Debtors' estates, wherever located;

(r)     To enter a final decree closing the Reorganization Cases; and

(s)    To hear any other matter not inconsistent with the Bankruptcy Code.

## ARTICLE XIII

## MISCELLANEOUS PROVISIONS

13.1    *Effectuating Documents and Further Transactions.*

On or before the Effective Date, and without the need for any further order or authority, the Debtors shall file with the Bankruptcy Court or execute, as appropriate, such agreements and other documents that are in form and substance satisfactory to them as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.  The Reorganized Debtors are authorized to execute, deliver, file, or record such contracts, instruments, releases, indentures and other agreements or documents and take such actions as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan and any securities issued pursuant to the Plan.

13.2    *Withholding and Reporting Requirements.*

In connection with the Plan and all instruments issued in connection therewith and distributed thereon, any party issuing any instrument or making any distribution under the Plan shall comply with all applicable withholding and reporting requirements imposed by any federal, state or local taxing authority, and all distributions under the Plan shall be subject to any such withholding or reporting requirements. Notwithstanding the above, each holder of an Allowed Claim that is to receive a distribution under the Plan shall have the sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed on such holder by any governmental unit, including income, withholding and other tax obligations, on account of such distribution.  Any party issuing any instrument or making any distribution under the Plan has the right, but not the obligation, to not make a distribution until such holder has made arrangements satisfactory to such issuing or disbursing party for payment of any such tax obligations.

13.3    *Corporate Action.*

On the Effective Date, all matters provided for under the Plan that would otherwise require approval of the managers or directors of one or more of the Debtors or Reorganized Debtors, as the case may be, shall be in effect from and after the Effective Date pursuant to the applicable general corporation law of the states in which the Debtors or the Reorganized Debtors are incorporated or established, without any requirement of further action by the managers or directors of the Debtors or the Reorganized Debtors. On the Effective Date, or as soon thereafter as is practicable, the Reorganized Debtors shall, if required, file their amended articles of organization or certificates of incorporation, as the case may be, with the Secretary of State of the state in which each

such entity is (or will be) organized, in accordance with the applicable general business law of each such jurisdiction.

### 13.4  *Modification of Plan.*

Alterations, amendments or modifications of or to the Plan may be proposed in writing by the Debtors at any time prior to the Confirmation Date, provided that the Plan, as altered, amended or modified satisfies the conditions of sections 1122 and 1123 of the Bankruptcy Code and the Debtors shall have complied with section 1125 of the Bankruptcy Code.  The Plan may be altered, amended or modified at any time after the Confirmation Date and before substantial consummation, provided that the Plan, as altered, amended or modified, satisfies the requirements of sections 1122 and 1123 of the Bankruptcy Code and the Bankruptcy Court, after notice and a hearing, confirms the Plan, as altered, amended or modified, under section 1129 of the Bankruptcy Code and the circumstances warrant such alterations, amendments or modifications.  A holder of a Claim that has accepted the Plan shall be deemed to have accepted the Plan, as altered, amended or modified, if the proposed alteration, amendment or modification does not materially and adversely change the treatment of the Claim of such holder.

Prior to the Effective Date, the Debtors may make appropriate technical adjustments and modifications to the Plan of Reorganization without further order or approval of the Bankruptcy Court, provided that such technical adjustments and modifications do not adversely affect in a material way the treatment of holders of Claims or Equity Interests.

For the avoidance of doubt, the foregoing shall not effect a waiver of any rights that any party may have with respect to modification of the Plan under section 1127 of the Bankruptcy Code.

### 13.5  *Revocation or Withdrawal of the Plan.*

The Debtors reserve the right to revoke or withdraw the Plan prior to the Confirmation Date.  If the Debtors revoke or withdraw the Plan prior to the Confirmation Date, then the Plan shall be deemed null and void.  In such event, nothing contained herein shall constitute or be deemed a waiver or release of any Claims or Equity Interests by or against the Debtors or any other person or to prejudice in any manner the rights of the Debtors or any person in any further proceedings involving the Debtors.

### 13.6  *Continuing Exclusivity Period.*

Subject to further order of the Bankruptcy Court, until the Effective Date, the Debtors shall, pursuant to section 1121 of the Bankruptcy Code, retain the exclusive right to amend the Plan and to solicit acceptances thereof.

### 13.7  *Plan Supplement.*

The Plan Supplement and the documents contained therein shall be in form, scope and substance satisfactory to the Debtors, shall be filed with the Bankruptcy Court no later than ten (10) Business Days before the deadline for voting to accept or reject the Plan, provided that the documents included therein may thereafter be amended and supplemented prior to execution, so long as no such amendment or supplement materially affects the rights of holders of Claims.  The Plan Supplement and the documents contained therein are incorporated into and made a part of the Plan as if set forth in full herein.

13.8    ***Payment of Statutory Fees.***

All fees payable under section 1930 of chapter 123 of title 28 of the United States Code, as determined by the Bankruptcy Court at the Confirmation Hearing, shall be paid on the Effective Date.

13.9    ***Post-Confirmation Date Professional Fees and Expenses.***

From and after the Confirmation Date, BE, shall, in the ordinary course of business and without the necessity for any approval by the Bankruptcy Court, pay the reasonable fees and expenses of professional persons thereafter incurred by them.

13.10    ***Dissolution of the Creditors' Committee.***

On the Effective Date, any Creditors' Committee appointed in the Reorganization Cases shall be dissolved and the members thereof shall be released and discharged of and from all further authority, duties, responsibilities and obligations related to and arising from and in connection with the Reorganization Cases, and the retention or employment of such Creditors' Committee's attorneys, accountants and other agents, if any, shall terminate other than for purposes of (i) filing and prosecuting applications for final allowances of compensation for professional services rendered and reimbursement of expenses incurred in connection therewith, and (ii) reviewing and objecting to the applications of other parties for the allowance of compensation for professional services rendered and reimbursement of expenses incurred in connection therewith.

13.11    ***Exemption from Transfer Taxes.***

Pursuant to section 1146(a) of the Bankruptcy Code, the issuance, transfer or exchange of notes or equity securities under or in connection with the Plan, the creation of any mortgage, deed of trust or other security interest, the making or assignment of any lease or sublease or the making or delivery of any deed or other instrument of transfer under, in furtherance of, or in connection with the Plan shall not be subject to any stamp, real estate transfer, mortgage recording or other similar tax.

13.12    ***Expedited Tax Determination.***

The Debtors and the Reorganized Debtors are authorized to request an expedited determination of taxes under section 505(b) of the Bankruptcy Code for any or all returns filed for, or on behalf of, the Debtors for any and all taxable periods (or portions thereof) ending after the Commencement Date through and including the Effective Date.

### 13.13    *Exhibits/Schedules.*

All exhibits and schedules to the Plan, including the Plan Supplement, are incorporated into and are a part of the Plan as if set forth in full herein.

### 13.14    *Substantial Consummation.*

On the Effective Date, the Plan shall be deemed to be substantially consummated under sections 1101 and 1127(b) of the Bankruptcy Code.

### 13.15    *Severability of Plan Provisions.*

In the event that, prior to the Confirmation Date, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void or unenforceable, the Bankruptcy Court shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void or unenforceable, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding any such holding, alteration or interpretation, the remainder of the terms and provisions of the Plan shall remain in full force and effect and shall in no way be affected, impaired or invalidated by such holding, alteration or interpretation. The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable in accordance with its terms.

### 13.16    *Governing Law.*

Except to the extent that the Bankruptcy Code or other federal law is applicable, or to the extent an exhibit to the Plan or Plan Supplement provides otherwise (in which case the governing law specified therein shall be applicable to such exhibit), the rights, duties, and obligations arising under the Plan shall be governed by, and construed and enforced in accordance with, the laws of the State of New York without giving effect to its principles of conflict of laws.

### 13.17    *Notices.*

All notices, requests and demands to or upon the Debtors shall be in writing (including by facsimile transmission) to be effective and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when

actually delivered or, in the case of notice by facsimile transmission, when received and telephonically confirmed, addressed as follows:

BearingPoint, Inc.
1676 International Drive
McLean, Virginia  22102
Attn: John DeGroote
Telephone:  (703) 747-3000
Facsimile:  (703) 747-3215

- and -

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, New York  10153
Attn:   Marcia L. Goldstein
Telephone:  (212) 310-8000
Facsimile:  (212) 310-8007

- and –

Weil, Gotshal & Manges LLP
700 Louisiana Street, Suite 1600
Houston, Texas 77002
Attn:   Alfredo R. Pérez
Telephone:  (713) 546 5000
Facsimile:  (713) 224 9511

13.18   ***Section Headings.***

The section headings contained in the Plan are for reference purposes only and shall not affect in any way the meaning or interpretation of the Plan.

Dated: February [__], 2009

Respectfully submitted,

BEARINGPOINT, INC.
BE NEW YORK HOLDINGS, INC.
BEARINGPOINT AMERICAS, INC.
BEARINGPOINT BG, LLC
BEARINGPOINT ENTERPRISE HOLDINGS, LLC
BEARINGPOINT GLOBAL OPERATIONS, INC.
BEARINGPOINT GLOBAL, INC.
BEARINGPOINT INTERNATIONAL I, INC.
BEARINGPOINT ISRAEL, LLC
BEARINGPOINT PUERTO RICO, LLC
BEARINGPOINT RUSSIA, LLC
BEARINGPOINT SOUTH PACIFIC, LLC
BEARINGPOINT SOUTHEAST ASIA LLC
BEARINGPOINT TECHNOLOGY
        PROCUREMENT SERVICES, LLC,
BEARINGPOINT USA, INC.
BEARINGPOINT, LLC
I2 MID ATLANTIC LLC
I2 NORTHWEST LLC
METRIUS, INC.
OAD ACQUISITION CORP.
OAD GROUP, INC.
PELOTON HOLDINGS, L.L.C.
SOFTLINE ACQUISITION CORP.
SOFTLINE CONSULTING AND
        INTEGRATORS, INC.

By: _____
        Name:  John DeGroote
        Title:    Executive Vice President
                    and Chief Legal Officer

**Exhibit B**

**(Disclosure Statement Order)**

**TO BE PROVIDED**

**Exhibit C**

**(Annual Form 10-K)**

**TO BE PROVIDED**

**Exhibit D**

**(The Debtors' Liquidation Analysis)**

**TO BE PROVIDED**

**Exhibit E**

**(BearingPoint, Inc. Plan Term Sheet)**

**BearingPoint, Inc.**

**PLAN TERM SHEET**

**As of February [__], 2009**

The following is a summary (the "Plan Term Sheet") of certain material terms of a proposed Pre-Arranged plan of reorganization (the "Pre-Arranged Plan") of the Company (as defined below) under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"). This Plan Term Sheet does not contain all the terms, conditions, and other provisions of the Pre-Arranged Plan and the transactions contemplated by this Plan Term Sheet are subject to conditions to be set forth in definitive documents. This Plan Term Sheet is proffered in the nature of a settlement proposal in furtherance of settlement discussions and is entitled to protection from any use or disclosure to any party or person pursuant to Federal Rule of Evidence 408 and any other rule of similar import. This Plan Term Sheet and the information contained herein are strictly confidential and contain material non-public information. This Plan Term Sheet does not constitute an offer of securities, nor is it an offer or solicitation for any chapter 11 plan, and is being presented for discussion and settlement purposes only.

The "Plan Effective Date" shall mean the date on which all the conditions precedent to the effectiveness of the Pre-Arranged Plan and the conditions set forth herein shall have occurred, which date shall have occurred no later than [_____], 2009.

It is anticipated that prior to filing chapter 11 petitions, to the extent practicable, the Company will enter into one or more plan support agreements (each, a "Plan Support Agreement") with the Company's creditors that will agree to support the Pre-Arranged Plan based on this Plan Term Sheet, which shall be Exhibit A to such Plan Support Agreements. It is further anticipated that the Plan Support Agreement will contain Milestones (as defined below) for the Debtors' chapter 11 cases (the "Cases") filed in the Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court").

I.    **Parties**

| | |
|---|---|
| **Debtors** | BearingPoint, Inc. ("BE"), and certain of its subsidiaries (collectively, the "Company" or the "Debtors"), including, without limitation, all Borrowers and Guarantors under the Secured Credit Facility (as defined below). |
| **Secured Creditors** | The lender parties (collectively, the "Secured Creditors") under the certain amended and restated credit agreement, dated as of May 18, 2007, which was amended and restated on June 1, 2007 (the "Secured Credit Facility"), among (i) BE and BearingPoint LLC ("BE LLC"; together with BE, collectively, the "Borrowers"), (ii) BE New York Holdings, Inc., BearingPoint Americas, Inc., |

BearingPoint BG, LLC, BearingPoint Enterprise Holdings, LLC, BearingPoint Global Operations, Inc., BearingPoint Global, Inc., BearingPoint International I, Inc., BearingPoint Israel, LLC, BearingPoint Puerto Rico, LLC, BearingPoint Russia, LLC, BearingPoint South Pacific, LLC, BearingPoint Southeast Asia LLC, BearingPoint Technology Procurement Services, LLC, BearingPoint USA, Inc., i2 Mid Atlantic LLC, i2 Northwest LLC. Metrius, Inc., OAD Acquisition Corp., OAD Group, Inc., Peloton Holdings, L.L.C., Softline Acquisition Corp., Softline Consulting, and Integrators, Inc., as guarantors (the "Guarantors"), (iii) Wells Fargo Bank, N.A., as administrative agent (the "Agent"), and (iv) other lenders, issuing banks, and parties thereto.  The Secured Creditors include the Term Loan Lenders, the LC Lenders, and the Issuing Banks (as each such term is defined in the Secured Credit Facility).  References in this Plan Term Sheet to the "Steering Committee" refer to the informal committee of the Secured Creditors, as it may, from time to time, be constituted.

The Secured Credit Facility consists of a term loan (the "Prepetition Term Loan") in the aggregate principal amount of $300.0 million, and a synthetic letter of credit facility (the "Prepetition Letter of Credit Facility") in the aggregate principal amount of $200.0 million.

As of February 13, 2009, (x) obligations under the Prepetition Term Loan consist of principal in the amount of $294,750,000 and accrued and unpaid interest, fees, costs and expenses thereunder, (y) issued and outstanding Letters of Credit issued under the Prepetition Letter of Credit Facility total approximately $84,388,501 plus accrued and unpaid fees, costs, and expenses thereunder and (z) obligations constituting LC Loans (as defined in the Secured Credit Facility) in the principal amount of $28,500,000, plus accrued and unpaid interest, fees, costs and expenses thereunder.

**Series C Noteholders**          Holders of the $200.0 million aggregate principal amount of 5.00% Convertible Senior Subordinated Debentures due April 15, 2025 debentures (the "Series C Noteholders" and the claims of such Series C Noteholders (including any claims arising out of the purchase or sale of such securities), the "Series C Noteholder Claims") issued by BE under that certain Indenture, dated as of April 27, 2005, with The Bank of New York as trustee.

**FFL Noteholders**               Holders of the $40.0 million aggregate principal amount of 0.50% Convertible Senior Subordinated Debentures due July 2010 (the "FFL Noteholders" and together with the Series C Noteholders, the

"Senior Noteholders" and the claims of such Senior Noteholders (including any claims arising out of the purchase or sale of such securities), the "Senior Noteholder Claims") issued under that certain securities purchase agreement, dated as of July 15, 2005, between BE and certain purchasers (the "FFL SPA").

| | |
|---|---|
| **Series A/B Noteholders** | Holders of the debentures (the "Series A/B Noteholders" and the claims of such Series A/B Noteholders (including any claims arising out of the purchase or sale of such securities), the "Series A/B Noteholder Claims") issued by BE under that certain Indenture, dated as of December 22, 2004 and a supplemental Indenture dated as of November 7, 2006, with The Bank of New York as trustee, including: (i) the 2.50% Series A Convertible Subordinated Debentures due December 15, 2024 in the aggregate principal amount of $250.0 million and (ii) the 2.75% Series B Convertible Subordinated Debentures due December 15, 2024 in the aggregate principal amount of $200.0 million. |
| **General Unsecured Claims** | Holders of general unsecured claims ("General Unsecured Creditors") and the claims of such General Unsecured Creditors against the Debtors, other than the Senior Noteholders, the Series A/B Noteholders, the holders of the Intercompany Claims, and certain holders that elect to be Convenience Class Creditors (as defined below) (the "General Unsecured Claims"). |
| **Equityholders** | Holders of equity interests in BE (the "Equityholders"), including holders of common stock or any type of preferred stock, and holders of any options or warrants to acquire any such equity interests (including, but not limited to, the warrants issued under the FFL SPA), and any claims arising out of the purchase or sale of such security. |

## II.    Cash Collateral

| | |
|---|---|
| **Cash Collateral** | The Debtors will enter into a stipulation (the "Cash Collateral Stipulation") with the Secured Creditors regarding the use of cash collateral for the purposes of obtaining letters of credit (such use of cash collateral, the "Use of Cash Collateral") and general operating purposes during the Cases on terms and conditions acceptable to such Secured Creditors, which terms and conditions shall include appropriate incentives for the Secured Creditors to provide such Use of Cash Collateral.  In addition to such terms and conditions, the Use of Cash Collateral shall provide that upon the occurrence of a Material Event (as defined below), the continued Use of Cash Collateral shall be subject to the Secured Creditors approval of a |

new budget to be prepared by the Debtors, which budget shall include new terms and/or conditions to the continued Use of Cash Collateral.

*Amount*                    $20 million

*Adequate Protection*       Pursuant to sections 361, 363(c) and 364(d)(1) of the Bankruptcy Code, the Agent, for the benefit of itself and the Secured Creditors, shall be granted the following adequate protection (the "Adequate Protection") of the prepetition security interests of Agent, for the benefit of itself and the Secured Creditors, for, and equal in amount to, the diminution in the value (the "Diminution in Value") of the pre-petition security interests of Agent, for the benefit of itself and the Secured Creditors, calculated in accordance with section 506(a) of the Bankruptcy Code, whether or not such Diminution in Value results from the sale, lease or use by the Debtors of the collateral securing the Secured Credit Facility (including, without limitation, cash collateral), or the stay of enforcement of any prepetition security interest arising from section 362 of the Bankruptcy Code, or otherwise.

(a) Adequate Protection Lien.  As security for and solely to the extent of the Diminution in Value of the prepetition security interests of Agent, for the benefit of itself and the Secured Creditors, the Agent shall be granted, for the benefit of itself and the Secured Creditors, effective and perfected as of the date the stipulation ordering the Use of Cash Collateral has been entered with the Bankruptcy Court, and without the necessity of the execution of mortgages, security agreements, pledge agreements, financing statements or other agreements, a security interest in and lien on the Collateral (as defined in the Secured Credit Facility), including, in addition to, but not in limitation of, the Collateral, all deposit and bank accounts wherever located, together with a pledge of all stock of Parent, the Company and each of its direct and indirect domestic subsidiaries (and 65% of all first-tier foreign subsidiaries; provided, however, (i) the Debtors are precluded from granting a lien to any party on the remaining 35% of the first-tier foreign subsidiaries and (ii) if it is ultimately determined if both the Debtors and the Agent that the granting of a lien on the remaining 35% of the first-tier foreign subsidiaries would not have a material adverse effect on the Debtors, the Collateral shall also include the lien on the remaining 35% of the first-tier foreign subsidiaries; provided further, however, that if the Debtors and the Agent are unable to agree on the determination in (ii), the Bankruptcy Court shall make the determination) (the "Adequate Protection Liens"), which Adequate Protection Liens

shall rank in the same relative priority and right as do the security interests and liens of the Secured Credit Facility. The Adequate Protection Liens shall be subject to the Carve-out (as defined below).

(b) Super-Priority Claim. To the extent of any Diminution in Value of the prepetition security interests of Agent, for the benefit of itself and the Secured Creditors, the Agent, for the benefit of itself and the Secured Creditors, shall be granted a superpriority administrative expense claim as provided for in section 507(b) of the Bankruptcy Code, which claim shall be subject to the Carve-out..

(c) Fees and Expenses. The Agent shall receive (for the benefit of itself and the Secured Creditors) from the Debtors current cash payments of all reasonable professional fees and expenses, including, without limitation, the reasonable fees and disbursements of counsel, financial and other consultants for the Agent promptly upon receipt of invoices therefore.

(d) Monitoring of Prepetition Collateral. The Agent shall be permitted to retain expert consultants and financial advisors at the expense of the Debtors, which consultants and advisors, along with employees and other representatives of the Agent, shall be given reasonable access to the Debtors' premises and its records during normal business hours (without unreasonable interference with the proper operation of the Debtors' business) for purposes of monitoring the business of the Debtors and the value of the Collateral, and the Debtors shall cooperate, consult with, and provide to such persons all such non-privileged information as they may request.

(e) Financial Reporting. The Debtors shall continue to provide the Agent with financial and other reporting substantially in compliance with the Secured Credit Facility and any reporting described herein, which other reporting described herein includes, without limitation, a calculation of the Company's rolling 2 week and week end North American cash balance (excluding any amounts with respect to "VEBA" and "imprest" accounts) to be delivered in connection with any Compliance Certificate (as defined below).

(f) Interest. As additional adequate protection, the Agent, for the benefit of itself and the Secured Creditors, shall receive, on a monthly basis, current cash payments of interest and letter of credit and other fees on the Secured Credit Facility at the

existing applicable non-default contract rate.

| | |
|---|---|
| *Termination Date* | The earlier of (x) the Plan Effective Date, (y) the date on which cash collateral is used in a manner contrary to the Cash Collateral Stipulation and (z) 120 days from the Filing Date (as defined below). |
| *Representations and Warranties* | Standard and customary. |
| *Material Event* | "Material Event" shall mean the Company's failure to (i) obtain approval for new federal government contracts following the issuance of a failed, negative or adverse viability audit from the Defense Contract Audit Agency (the "DCAA"), and such failure is not cured within ten days, (ii) comply with Cash Variance Test (as defined below) (iii) meet any of the Milestones, and (iv) pursue, approve or effect any sale, transfer or disposition of any of the Debtors' (or any of its subsidiaries) assets, liabilities or securities that is recommended by the Agent at the direction of the Steering Committee (each, an "Approved Disposition"), unless the Debtors obtain an order from the Bankruptcy Court that finds adequate protection for the Agent and the Secured Creditors pursuant to section 363 of the Bankruptcy Code for continued use of cash collateral in the Cases. |
| *Carve-out* | The Adequate Protection of the prepetition security interests of Agent, for the benefit of itself and the Secured Creditors, described in this Plan Term Sheet shall be subject to: (i) unpaid fees of the clerk of the Bankruptcy Court and the U.S. Trustee; (ii) allowed professional fees and expenses of the Debtors and any statutory committee and reasonable expenses of any member of any statutory committee (collectively, the "Professional Fees") incurred to the extent consistent with the Cash Collateral Budget, but unpaid, prior to delivery of a notice of a Termination Event (such Professional Fees, the "Accrued Claims" and such notice, the "Carve-Out Notice"); (iii) Professional Fees incurred subsequent to delivery of the Carve-Out Notice to the extent consistent with the Cash Collateral Budget in an aggregate amount not to exceed $6,000,000; and (iv) the approved professional fees and expenses incurred by any court appointed chapter 7 Trustee up to an aggregate amount of $50,000 ((i) through (iv), collectively, the "Carve Out").  The Carve Out shall exist at all times, but only be triggered and payable upon the occurrence of (1) a Termination Event and (2) the Agent's delivery of a Carve-Out Notice to the Debtors, counsel for the Debtors and counsel to any statutory committee. |

*Covenants*

Usual and customary, and such other covenants deemed by Agent and the Secured Creditors to be appropriate for the transaction, including, without limitation:

(a)  the preparation by the Company and receipt by Agent and the Secured Creditors of a rolling 13 week cash flow budget (delivered as a condition to the Use of Cash Collateral), which shall reflect projected cash receipts, operating disbursements, payroll disbursements, non-operating disbursements and cash balances, in form and substance acceptable to Agent and the Secured Creditors (the "Initial Cash Collateral Budget");

(b) the preparation by the Company, and approval by the Agent at the direction of the Steering Committee, of additional rolling 13 week cash flow budgets for each 13 week period subsequent to the period covered by the Initial Cash Collateral Budget (any such budget, a "Subsequent Cash Collateral Budget") (as used in this Plan Term Sheet, the term "Cash Collateral Budget" refers to the Initial Cash Collateral Budget or any Subsequent Cash Collateral Budget, as the context requires);

(b)  the delivery by the Company on Friday of each week of a Cash Collateral Budget variance report/reconciliation, in form reasonably acceptable to Agent and the Secured Creditors, (i) showing actual cash receipts and disbursements for the immediately preceding week, noting therein all variances, including, without limitation, variances to cash balance on a week to week basis, and variances to EBITDAR on a month to month basis, in each case, from values set forth for such period in the Cash Collateral Budget, and shall include explanations for all material variances and (ii) certified by an officer of BE;

(c)  delivery by the Company, on a weekly basis, of "flash" reports setting forth in reasonable detail the financial condition of the Company, including, without limitation, details on operating statistics and sales/bookings;

(d)  pursuant to a compliance certificate  delivered on every Friday (each, a "Compliance Certificate"), the Company  shall not permit the Company's average week end North American cash balance (excluding  any amounts with respect to "VEBA" and "imprest" accounts)  for each of the immediately preceding 2  weeks to be less than 90% of the Company's average North American week end cash balance (excluding  any amounts with respect to "VEBA" and "imprest" accounts) set forth  for such period in the Cash Collateral Budget (the "Cash Variance  Test"); provided that (i)  none of the Debtors' cash (other than $1 million

for purposes of ordinary course transactions related to intercountry contracts) shall be permitted to be distributed or transferred to any foreign subsidiaries of Debtors during the Cases and (ii) no cash transferred out of the ordinary course by any foreign subsidiaries of Debtors to Canada or any of the Debtor's foreign accounts, in each case, shall count for purposes of compliance with the Cash Variance Test**;**

(e) Debtors shall be required to obtain the consent of the Agent at the direction of the Steering Committee prior to (i) the issuance of any letter of credit (including any postpetition letters of credit) in a face amount exceeding $5,000,000, (ii) the issuance of any letter of credit (including any postpetition letters of credit) for the benefit of a non-debtor in a face amount exceeding $1,000,000, or (iii) the transfer of Cash Collateral outside of the ordinary course of business to any non-debtor foreign affiliate in excess of $1,000,000; and

(f) all motions and other filings with the Bankruptcy Court, including the entry of orders with respect to "first day" motions and any other proposed orders (including, without limitation, the order confirming the Pre-Arranged Plan and incorporating the "plan supplement"), shall be in form and substance acceptable to the Secured Creditors, with such motions and other filings not to be inconsistent with the terms and provisions of this Plan Term Sheet.

| | |
|---|---|
| *General Statement Regarding this Plan Term Sheet and the Cash Collateral Stipulation* | To the extent that any terms and conditions with respect to the Use of Cash Collateral described in this Plan Term Sheet differ from the terms and conditions described in the Cash Collateral Stipulation, the terms and conditions as described in the Cash Collateral Stipulation shall govern. |

## III.    <u>Treatment of Claims and Interests</u>

| | |
|---|---|
| **Cash Collateral Claims** | Subject to the terms of the order approving the Use of Cash Collateral (which order may contain certain incentives for the Secured Creditors to arrange such Use of Cash Collateral), the letters of credit issued and outstanding under the Use of Cash Collateral and any other principal amount payable thereunder shall be treated on the terms and conditions set forth in the New Secured Credit Facility (as defined in Annex A). |

**Administrative and
Priority Claims**

- *Administrative Expense
  Claims*

  Except to the extent that a holder (i) has been paid by the
  Company, in whole or in part, prior to the Plan Effective Date or
  (ii) agrees to a less favorable treatment, each holder of an allowed
  administrative expense claim shall be paid in full, in cash, the full
  amount of its unpaid claim on or as soon as reasonably practicable
  following the later to occur of (a) the Plan Effective Date or as
  soon thereafter as is reasonably practicable and (b) the date on
  which such claim becomes allowed.

- *Secured Tax and
  Priority Tax Claims*

  Except to the extent that a holder has been paid by the Company
  prior to the Plan Effective Date or agrees to a to a less favorable
  treatment, each holder shall receive, at the sole option of the
  Company, (a) cash in the full amount of the claim on or as soon as
  reasonably practicable following the later to occur of (i) the Plan
  Effective Date and (ii) the date on which such claim becomes
  allowed, (b) equal semi-annual cash payments in the full amount of
  such claim, together with interest at a fixed annual rate equal to
  [__] % (or such other rate as may be determined by the Bankruptcy
  Court to provide the holder deferred cash payments having a value,
  as of the Plan Effective Date, equal to such claim), commencing
  upon the later of the Plan Effective Date and the date such claim
  becomes allowed, or as soon thereafter as is practicable, and
  continuing over a period not exceeding five years from and after
  the Plan Effective Date, or (c) such other terms determined by the
  Bankruptcy Court to provide the holder deferred cash payments
  having a value, as of the Plan Effective Date, equal to such claim.

- *Other Priority Claims*

  Except to the extent that a holder (i) has been paid by the
  Company, in whole or in part, prior to the Plan Effective Date or
  (ii) agrees to a less favorable treatment, each holder of an allowed
  other priority claim shall receive, in full satisfaction of such other
  unpaid priority claim, cash in the full amount of the claim, on or as
  soon as reasonably practicable after the later of (i) the Plan
  Effective Date or as soon thereafter as is reasonably practicable,
  and (ii) the date such claim becomes allowed.

**Secured Claims**

- *Secured Creditors*

  On the Plan Effective Date, the Secured Credit Facility shall be
  converted into:  (i) a senior secured credit facility (the "New
  Secured Credit Facility"), the terms of which are set forth on
  Annex A and (ii) shares of preferred stock (the "New Preferred
  Stock") of the reorganized BE (the "Reorganized BE") (in such

denominations as shall be determined by the Secured Creditors) having a stated liquidation preference of $50.0 million in the aggregate, the terms of which are set forth on Annex B.  Amounts in the Credit-Linked Deposit Account (as defined in the Prepetition Secured Credit Facility) in excess of amounts under the LC Facility (as defined below) will be returned to Secured Creditors on the Plan Effective Date.

- *Other Secured Claims*

Except to the extent that a holder agrees to a less favorable treatment, at the sole option of the Company, (i) each allowed other secured claim shall be reinstated and rendered unimpaired in accordance with section 1124(2) of the Bankruptcy Code, or (ii) each holder shall receive, in full satisfaction of such claim, either (w) cash in the full amount of the claim, including any interest required to be paid pursuant to section 506(b) of the Bankruptcy Code, (x) the proceeds of the sale or disposition of its collateral securing such claim to the extent of the value of the holder's secured interest in such collateral, (y) the collateral securing such claim and any interest on such claim required to be paid pursuant to section 506(b) of the Bankruptcy Code, or (z) such other distribution as necessary to satisfy the requirements of section 1124 of the Bankruptcy Code.

**Unsecured Claims**

- *Senior Noteholders*

Each holder of a Senior Noteholder Claim shall receive [X] shares of new class 1 senior common stock (the "Class 1 Common Stock") for each dollar of its allowed claim.  The material terms of the Class 1 Common Stock are set forth in Annex C.

- *Series A/B Noteholders*

Each holder of a Series A/B Noteholder Claim shall receive [X][1] shares of new class 2 junior common stock (the "Class 2 Common Stock") for each dollar of its allowed claim.  The material terms of the Class 2 Common Stock are set forth in Annex C.

- *General Unsecured Creditors*

Each holder of a General Unsecured Claim shall receive [X] shares of new class 3 common stock (the "Class 3 Common Stock"; and together with the Class 1 Common Stock and the Class 2 Common Stock, collectively, the "New Common Stock") for each dollar of its allowed claim.  The material terms of the Class 3 Common Stock are set forth in Annex C.

---

[1] X shall be the same number in the distributions to Senior Noteholders, Series A/B Noteholders, and General Unsecured Creditors.

- *Convenience Class Creditors*

Each holder of a General Unsecured Claim that is allowed in an amount of $[A] [2] or less shall be considered a convenience class creditor (a "<u>Convenience Class Creditor</u>") unless such holder elects on its ballot to be treated as a General Unsecured Creditor.  Each holder of a General Unsecured Claim that is allowed in an amount of greater than $[A] can elect on its ballot to reduce its allowed claim to $[A] and be treated as a Convenience Class Creditor.

Each Convenience Class Creditor shall receive, as soon as reasonably practicable after the later of the Plan Effective Date and the date the claim of such Convenience Class Creditor becomes an allowed claim, Cash equal to [B]% of the allowed amount of such claim.

- *Intercompany Claims*

On or as soon as practicable after the Plan Effective Date, all Intercompany Claims will be reduced, reinstated, or discharged to the extent determined appropriate by the Debtors, after consultation with and approval by the Secured Creditors, which approval shall not be unreasonably withheld.  Any such transaction may be effected on or subsequent to the Plan Effective Date without any further action by the stockholders of the reorganized Debtors.

**Equity Interests**

Holders of equity interests in the Company will not receive or retain any property or interest on account of their interests and all such interests will be cancelled and extinguished.

IV.    <u>Other Plan Provisions</u>

**Governance**

The Board of Directors of Reorganized BE shall initially consist of 7 directors:  the CEO of the company shall be a director, the Secured Creditors (the holders of the New Preferred Stock as of the Plan Effective Date) shall select 4 directors, and the Series C Noteholders (the holders of the Class 1 Common Stock as of the Plan Effective Date) shall select 2 directors.  The initial directors shall not be employees or investors of the Secured Creditors, a Senior Noteholder, a Series A/B Noteholder, or any affiliate of the foregoing.  One of the directors selected by the Series C Noteholders shall be appointed to the compensation committee established by the Board.  All initial directors shall be reasonably

---

[2] Appropriate threshold to be determined by Company and approved of by the Secured Creditors, which approval of the Secured Creditors shall not be unreasonably withheld.

acceptable to the Company.

The ongoing directors shall be nominated and elected as provided for in Annexes B and C.   The certificate of incorporation shall provide that, the directors of Reorganized BE shall not be employees or investors of Reorganized BE (other than the CEO), the Secured Creditors, any entity holding greater than 10% of the common stock of Reorganized BE, or any affiliate of the foregoing, and the Master Agreement (as defined and described below) will contain the agreement of the parties to effect the foregoing.

The Company shall select the initial officers, including the CEO, of Reorganized BE, subject to the approval of the Secured Creditors.

**No Public Company/Listing**

Reorganized BE shall not have any obligation hereunder to (i) list the New Common Stock on any stock exchange or quotation system and/or (ii) become be a reporting company under the Securities Exchange Act of 1934.  Reorganized BE may (but shall not be obligated to) become such a reporting company only after (x) the New Secured Credit Facility shall be permanently repaid in cash in full by an amount not less than the outstanding principal amount of the Exit Term Loan and Exit LC Facility (each as defined in Annex A), plus accrued and unpaid interest, fees, costs, and expenses thereunder and (y) the New Preferred Stock is no longer outstanding.  The New Common Stock will be subject to transfer and other restrictions set forth herein in order to effectuate the foregoing.  In addition, the certificate of incorporation of Reorganized BE will include restrictions on transfer sufficient to ensure that Reorganized BE does not inadvertently become subject to the Securities Exchange Act of 1934, as provided herein.  As of the Plan Effective Date, Reorganized BE shall be a private company not subject to reporting under the securities laws.  The Secured Creditors will use commercially reasonable efforts to assist the Debtors in accomplishing this condition

**Master Agreement**

Holders of all equity securities (including the New Preferred Stock and the New Common Stock) shall enter into (or shall otherwise be subject to) a master agreement (the "Master Agreement") that will provide for the voting trust arrangements, the transfer restrictions, call rights and other terms and provisions contemplated by this Plan Term Sheet, including the terms and conditions set forth in Annex B and Annex C hereto.  The Pre-Arranged Plan shall provide that all holders of New Common Stock shall be bound by the terms and provisions of such a Master Agreement.

| | |
|---|---|
| **Releases and Exculpations** | The Debtors will release the Secured Creditors, and the respective officers, directors, agents, advisors, and professionals of the Debtors and the Secured Parties from all claims arising before the Plan Effective Date other than claims based upon willful misconduct, intentional fraud, gross negligence or criminal conduct as determined by a final order entered by a court of competent jurisdiction. |
| | The Pre-Arranged Plan will include standard exculpation for individuals and professionals participating in the Cases. |
| | The Secured Parties will release the Debtors and their respective officers, directors, employees, agents, advisors and professionals from all claims arising on or before the Plan Effective Date, other than claims based upon willful misconduct, intentional fraud, gross negligence or criminal conduct as determined by a final order entered by a court of competent jurisdiction. |
| **Management Incentive Plan and Employee Incentive Plan** | Up to 20% in the aggregate of the New Common Stock will be reserved in the form of grants, options or other instruments on Class 3 Common Stock, for allocation as directed by the Post-Plan Effective Date Board of Directors (i) pursuant to a management equity incentive plan (the "MIP") and (ii) to senior-level employees pursuant to an employee incentive plan (the "EIP").  In addition, each of the MIP and the EIP will include certain other incentives, to be agreed upon by the Secured Creditors. |
| **Milestones[3]** | "Milestones" shall mean the following milestones related to the Cases: |

- Debtors file chapter 11 petitions in the Bankruptcy Court (the "Filing Date") by February 20, 2009.

- Debtors file Pre-Arranged Plan and disclosure statement (the "Disclosure Statement") in support of the Pre-Arranged Plan by February 20, 2009.

- Bankruptcy Court approval of Disclosure Statement by March 31, 2009.

- Bankruptcy Court confirmation of the Pre-Arranged Plan by May 12, 2009.

---

[3] Any of the milestones are subject to the Bankruptcy Court's calendar availability and may be modified or extended with the consent of the Secured Creditors.

- Plan Effective Date by May 26, 2009.

**Conditions to Plan Effective Date**

The Pre-Arranged Plan shall include customary conditions to the Plan Effective Date, which shall include, among others, the following:

1.  The Bankruptcy Court shall have entered an order confirming the Pre-Arranged Plan in accordance with Section 1129 of the Bankruptcy Code, which order shall be in full force and effect, and shall not have been stayed, reversed, vacated or otherwise modified in any manner that is materially adverse to the Secured Creditors (without the consent of the Agent at the direction of the Steering Committee). The Pre-Arranged Plan (together with all exhibits and other attachments thereto, as any of the foregoing shall be, with the consent of the Agent at the direction of the Steering Committee, amended, modified or supplemented from time to time or any of the terms and conditions thereof waived) shall be in form and substance reasonably acceptable to the Agent at the direction of the Steering Committee. Without limitation to the foregoing, the Agent, if any, at the direction of the Steering Committee, shall be satisfied with (i) the Pre-Arranged Plan's treatment of all debt-like liabilities, (ii) the treatment of all  directors and officers' indemnification claims, if any, (which for purposes of clarity shall not be treated as administrative expense priority claims to the extent such claims arise for conduct occurring prior to the Filing Date) and (iii) other than pursuant to a plan of reorganization, the Debtors' assumption or rejection of any material executory contract (other than contracts relating to employee contracts) or unexpired lease shall be subject to the prior written consent of the Agent  (as directed by the Required Lenders), which written consent may be communicated, among other manners, by counsel to the Agent by email.  .

The order confirming the Pre-Arranged Plan shall, among other things, (i) provide that the holders of all equity securities (including the New Preferred Stock and the New Common Stock) shall be bound by the terms of the Master Agreement  and (ii) enjoin all parties in interest receiving a distribution under the Pre-Arranged Plan from interfering, directly or indirectly, with the exercise by the Secured Creditors of rights conferred upon them pursuant to the Master Agreement.

2.  The payment in full, in cash, of all invoices for reasonable fees and expenses (including the Agency Fee (as defined in Annex A below) and any fees owing under the terms of any engagement letters) of the legal and financial advisors incurred by the Secured

Creditors.

3.  Finalization of all definitive documentation regarding the transactions contemplated by this Plan Term Sheet, including, without limitation, the New Secured Credit Facility, the Certificate of Designation with respect to the New Preferred Stock, the MIP, the EIP, the Master Agreement and the issuance of the New Preferred Stock and the New Common Stock, all on terms and conditions acceptable to the Secured Creditors.

**Conditions to Term Sheet Effectiveness**

The effectiveness of this Plan Term Sheet shall be conditioned upon the following:

1.  <u>Pre-Arranged Plan and Disclosure Statement</u>.  Finalization of the Pre-Arranged Plan and Disclosure Statement, including all documents related to or contemplated thereby,  in a form acceptable to the Secured Creditors.

2.  <u>Financial Reporting</u>.  Receipt by representatives of the Secured Creditors, in a format acceptable to such representatives, of a rolling 13 week cash flow budget, which shall reflect projected cash receipts, operating disbursements, payroll disbursements, non-operating disbursements and cash balances and shall be in form and substance acceptable to such representatives (the "<u>Budget</u>"), the Initial Cash Collateral Budget, and a business plan acceptable to Secured Creditors, which business plan shall include, without limitation, a detailed account of the treatment of all unsecured liabilities, and projected cash usage and issuance of letters of credit.

**Other**

Other provisions shall be more fully disclosed in the Pre-Arranged Plan and Disclosure Statement; provided that no provision in the Pre-Arranged Plan and Disclosure Statement may be materially inconsistent with the terms in this Plan Term Sheet.

The Debtors shall consult and work closely with representatives of the Secured Creditors with regard to their decisions regarding the assumption or rejection of executory contracts, including customer contracts, and unexpired leases, retention and prosecution of avoidance actions, and any and all motions and decisions regarding the same or other material matters, including, without limitation, any motions with respect to employment contracts and employee compensation.  The Debtors shall not increase the bonuses to be paid to any employee under existing plans (or establish new or modified plans) without the consent of the Agent (as directed by the Required Lenders).  Nothing contained herein shall affect the

Agent's and the Secured Lenders' other consent rights or their rights to object to any proposed employee incentive program or to the assumption of executory contracts or unexpired leases.

## Annex A

**Material Terms of New Secured Credit Facility**

| | |
|---|---|
| Borrowers: | Reorganized BE, a Delaware corporation, and Reorganized BE LLC, a Delaware limited liability company (collectively, the "Borrowers"). |
| Administrative Agent and Collateral Agent: | Wells Fargo Bank, N.A. (the "Agent"). |
| Lenders: | Secured Creditors (the "Lenders") |
| Amount and Type: | (i) A term loan in the amount of (A) $272,000,000 plus (B) the sum of any letters of credit issued prepetition that have been drawn subsequent to the date of execution of the Plan Support Agreement and prior to the Plan Effective Date and that have not been funded by the Company/Debtors prior to the Plan Effective Date plus (C) accrued interest outstanding under the Secured Credit Facility as of the Plan Effective Date (the "Term Loan") |
| | (ii) a synthetic letter of credit facility of $130 million (the "LC Facility"), which shall consist of (A) $84,053,079 of letters of credit issued and outstanding, including any letters of credit which have been drawn during the Cases and have not been reimbursed by the Company prior to the Filing Date (the "Pre-Filing Date LCs"), (B) letters of credit issued during the Cases that were back-stopped during the Cases by the Use of Cash Collateral, and which letters of credit shall not exceed $20 million (the "Cash Collateralized LCs") and (C) letters of credit to be issued after the Plan Effective Date ("Post-Emergence LCs"). |
| | On the Plan Effective Date, letters of credit cash collateralized during the Cases will be issued under the LC Facility to replace any letters of credit issued during the Cases.  Any cash collateral used to secure letters of credit during the Cases shall be returned to Reorganized BE upon the issuance of such replacement letters of credit. |
| Pricing: | (i) Interest will be payable in arrears on the unpaid principal amount of the Term Loan at a rate per annum equal to (A) 8% payable-in-kind quarterly and (B) at the Borrowers' election: (x) LIBOR plus 6.00% or (y) the Base Rate plus 5.00%, in each case, payable in cash monthly. |
| | (ii) A letter of credit facility fee will be payable quarterly in arrears on (A) the aggregate amount of credit-linked deposits at a rate per annum equal to 6.125% payable in cash (including any term loans deemed made by the Lenders under the LC Facility as a result of drawn letters of credit reimbursed with credit linked |

|  | deposits) and (B) the amount of letters of credit outstanding under the LC Facility at a rate per annum equal to 8.00% payable-in-kind in the form of PIK Notes (as defined below) (the "PIK Fee").<br><br>(iii) Interest will be payable on any loans deemed made by Lenders under the LC Facility as a result of drawn letters of credit reimbursed with credit-linked deposits ("LC Loans")) at a rate per annum equal to LIBOR plus 6.00% payable in cash and 8.00% payable-in-kind in the form of PIK Notes (the "PIK Interest"; together with the PIK Fee, the "PIK Compensation").<br><br>The PIK Notes shall mean a note with the same maturity date as the LC Facility and with interest payable quarterly at a rate per annum equal to 8% payable-in-kind. |
|---|---|
| Default Rate: | From and after the occurrence of a payment or bankruptcy event of default, or, at the election of the Agent at the direction of Steering Committee, any other event of default, all amounts under the definitive documentation shall bear interest at the applicable interest rate (including those obligations which are determined by reference to the rate applicable to any other obligation) plus 2% per annum and any letter of credit fees (as defined below) shall be increased by 2% per annum. |
| Letter of Credit Fees: | Fees under the LC Facility shall be of the same types and rates as those under the Secured Credit Facility. |
| Maturity: | 36 months. |
| Amortization: | The Term Loan shall amortize as follows:  (i) $750,000 per quarter on a quarterly basis for the quarters ended September 30, 2009 and December 31, 2009, and (ii) $5,000,000 per quarter on a quarterly basis beginning with the quarter ended March 31, 2010 and for each quarter thereafter.  Any proceeds received from mandatory prepayments shall be applied in inverse order of maturity to amortization payments due. |
| Reduction of LC Facility | The commitment under the LC Facility shall be reduced (and amounts in the Credit-Linked Deposit Account (as defined in the Prepetition Secured Credit Facility) correspondingly returned to the Lenders) by the expiration and non-renewal of any letters of credit that are not associated with the Company's customer contracts and were issued to provide credit support for the Company in anticipation of and during the Cases. |
| Libor Floor: | 3.00% |
| Agency Fee: | $150,000 per annum (the "Agency Fee") |
| Initial Amendment Fee: | 1% of principal and accrued interest outstanding under the |

| | |
|---|---|
| | Prepetition Term Loan as of the Plan Effective Date plus 2.5% of the amount of the Prepetition Letter of Credit Facility as of the Plan Effective Date. |
| Security and Priority: | The Post-Emergence LCs, any Cash Collateralized LCs that are replaced with letters of credit under the LC Facility ("Replacement LCs"), and any LC Loans deemed made as a consequence of a draw upon a Post-Emergence LC or a Replacement LC (collectively, the "First Lien LC Facility"), will be secured by a first priority security interest in all assets of the Company, including, without limitation, all deposit and bank accounts wherever located, together with a pledge of all stock of Parent, the Company and each of its direct and indirect domestic subsidiaries (and 65% of all first-tier foreign subsidiaries; provided, however, (i) the Company will be precluded from granting a lien to any party on the remaining 35% of the first-tier foreign subsidiaries and (ii) if it is ultimately determined by both the Company and the Agent that the granting of a lien on the remaining 35% of the first-tier foreign subsidiaries would not have a material adverse effect on the Company, the Collateral shall also include the lien on the remaining 35% of the first-tier foreign subsidiaries; provided further, however, that if the Company and the Agent are unable to agree on the determination in (ii), the Bankruptcy Court shall make the determination) (the "Collateral"); provided however, that the First Lien LC Facility shall not include (i) any LC Loans deemed made as a consequence of a draw upon a Pre-Filing Date LC, (ii) any letter of credit issued after the Plan Effective Date to replace a Pre-Filing Date LC, if such Pre-Filing Date LC contains an "evergreen" renewal provision and the issuer thereof has not renewed such Pre-Filing Date LC pursuant to such provision, and (iii) any Pre-Filing Date LCs or any other obligations under the LC Facility (clauses (i)-(iii), collectively, the "Second Lien LC Facility"). |
| | The Second Lien LC Facility shall be *pari passu* with the Term Loan. The Term Loan and the Second Lien LC Facility will be secured by a second priority security interest in the Collateral, second in priority only to the liens securing the First Lien LC Facility. |
| | Additionally, from and after the Plan Effective Date, all inter-company advances by a Loan Party (other than allocations for shared services or overhead) shall be reflected through the issuance of secured inter-company notes (other than inter-company transactions between Loan Parties), which notes, to the extent legally and practically possible shall be pledged to the Agent, on behalf of itself and the Lenders, in each case subject to |

| | |
|---|---|
| | exceptions and limitations to be agreed upon. Such inter-company notes shall be pledged as part of the Collateral through perfected control account agreements and local pledges in compliance with the laws of the relevant foreign jurisdictions.<br><br>The Agent, on behalf of the Lenders under the First Lien LC Facility, shall reallocate to the Lenders under the Term Loan an amount equal to 50% of the PIK Compensation received by such Lenders under the First Lien LC Facility. |
| Mandatory Prepayments: | Customary and standard including, but not limited to, the following:<br>• 100% of the net cash proceeds of asset sales and extraordinary receipts<br>• 100% of the net cash proceeds of issuances or placements of equity and debt<br>• 65% of Excess Cash (to be defined), adjusted for any net cash proceeds from asset sales or debt or equity issuances and debt repayments. |
| Conditions Precedent to Closing | The availability of the New Secured Credit Facility will be conditioned upon the satisfaction of conditions precedent usual and customary for financings of this kind, and such other conditions deemed by Agent and the Lenders to be appropriate for the transaction, including, without limitation:<br><br>1.  Occurrence of the Plan Effective Date;<br><br>2.  The issuance of an opinion by the Defense Contract Audit Agency that contains no adverse opinion with respect to the Company; and<br><br>3.  Amounts in the Credit-Linked Deposit Account (as defined in the Prepetition Secured Credit Facility) in excess of amounts under the LC Facility shall have been returned to the Secured Creditors under the Prepetition Letter of Credit Facility. |
| Affirmative Covenants: | Usual for facilities and transactions of this type and others to be reasonably specified by the Agent with exceptions to be agreed upon (to be applicable to Parent and its domestic subsidiaries), including, without limitation, maintenance of corporate existence and rights; performance of obligations; delivery of consolidated and consolidating financial statements, management reports, reports to shareholders, reports setting forth in reasonable detail the financial condition of the Company, including, without limitation, details on utilization and sales/bookings, and other information, including information required under the PATRIOT |

| | |
|---|---|
| | Act; delivery of notices of default, litigation, ERISA events and material adverse change; delivery of monthly report, in form and substance reasonably acceptable to the Agent and Lenders, related to EBITDAR, key income statement, balance sheet and cash flow items, along with a certification by an officer of the Debtors; maintenance of properties in good working order; maintenance of satisfactory insurance; obtain ratings from S&P and Moody's; compliance with laws; inspection of books and properties; hedging arrangements satisfactory to the Agent; further assurances; payment of taxes; the Company shall provide, on a weekly basis, evidence, in form and substance satisfactory to the Agent and the Lenders, that the Company continues to receive from the DCAA approval to obtain new federal government contracts. |
| Representations/Warranties: | Usual for facilities and transactions of this type and others to be reasonably specified by the Agent with exceptions to be agreed, including, without limitation, corporate status; legal, valid and binding documentation; no consents; accuracy of financial statements, confidential information memorandum and other information; no material adverse change; absence of undisclosed liabilities, litigation and investigations; no violation of agreements or instruments; compliance with laws (including PATRIOT Act, ERISA, margin regulations, environmental laws and laws applicable to sanctioned persons); payment of taxes; of ownership of properties; inapplicability of the Investment Company Act; solvency; effectiveness of governmental approvals; labor matters; environmental and other regulatory matters; validity, priority and perfection of security interests in the collateral; and treatment as senior debt under all subordinated debt and as sole designated senior debt thereunder. |
| Financial Covenants: | Usual for facilities and transactions of this type, each tested monthly through December 31, 2009, and tested quarterly thereafter (with financial definitions to be agreed upon, and with levels containing a cushion of 15% (or such other cash amount acceptable to Lenders and the Company) from the Company's projections, which projections shall be acceptable to the Lenders), including, without limitation:<br><br>• maximum ratios of total debt to EBITDAR;<br><br>• minimum EBITDAR; and<br><br>• minimum liquidity. |
| Negative Covenants: | Usual for facilities and transactions of this type and others to be reasonably specified by the Agent with exceptions to be agreed (to be applicable to Parent and its subsidiaries), including, without limitation, prohibitions on dividends on, and redemptions and |

|  | repurchases of, equity interests and other restricted payments (other than payment-in-kind dividends on and redemptions of the New Preferred Stock); prohibitions on prepayments, redemptions and repurchases of debt (other than loans under the New Secured Credit Facility); limitations on liens and sale-leaseback transactions; limitations on loans and investments; limitations on debt, guarantees and hedging arrangements; limitations on mergers, acquisitions and asset sales, including, without limitation, that any asset sale the proceeds of which exceed $20,000,000 requires the prior written consent of the Agent at the direction of the Steering Committee; limitations on transactions with affiliates; limitations on changes in business conducted by Parent and its subsidiaries; limitations on restrictions on ability of subsidiaries to pay dividends or make distributions; limitations on amendments of debt and other material agreements; and limitations on capital expenditures. |
|---|---|
| Events of Default: | Usual for facilities and transactions of this type and others to be reasonably specified by the Agent relating to Parent and its subsidiaries (subject, where appropriate, to thresholds and grace periods to be agreed upon), including, without limitation, nonpayment of principal, interest or other amounts; violation of covenants; incorrectness of representations and warranties in any material respect; cross default and cross acceleration; bankruptcy; material judgments; ERISA events; actual or asserted invalidity of guarantees or security documents; failure to obtain approval for new federal government contracts following the issuance of a failed, negative or adverse viability audit from the DCAA, and such failure is not cured within ten days; and change of control. |
| Other Terms: | Except as specifically provided herein, the terms of the New Secured Credit Facility shall be similar to the terms under the Secured Credit Facility. |
|  | The Lenders shall be entitled to receive, whether through a merger, consolidation, sale of assets or any other sale transaction (or series thereof), an aggregate amount equal to the amount of all outstanding principal, interest and fees owed to such lenders under the New Secured Credit Facility. |

**Annex B**

**Material Terms of New Preferred Stock**

| | |
|---|---|
| Issue Price | $50.0 million |
| Liquidation Preference | 100% of issue price plus any accrued and unpaid dividends (the "Liquidation Preference"). |
| Optional Conversion | At any time the New Preferred Stock outstanding at the time may be converted, at the option of the holder of the New Preferred Stock into a number of shares of Class 3 Common Stock equal to (a) 100% of the Liquidation Preference minus the percentage of the Liquidation Preference already received by the holder of the New Preferred Stock, divided by (b) the fair market value per share of the Class 3 Common Stock at the time of conversion, as determined by an investment banking firm of national repute selected by the Board of Directors of Reorganized BE. |
| Dividends | 13.5% paid-in-kind.  Dividends shall accrue daily (based on a 360 day year). |
| Mandatory Redemption | At the option of the holder (i) upon a Change of Control (as defined in the definitive documentation regarding the New Preferred Stock), or (ii) upon a sale of any of Reorganized BE's (or any of its subsidiaries') securities or material assets, other than asset sales in the ordinary course of business that do not constitute (in one or any series of transactions) a sale of substantially all of the assets of BE as compared to its assets as of the date of emergence), after the repayment in full of any outstanding amounts under the New Secured Credit Facility (including principal, accrued and unpaid interest, fees, costs and expenses). |
| Optional Redemption | Subject to the Optional Conversion rights described above, at any time after the repayment in full of all outstanding amounts under the New Secured Credit Facility (or upon a waiver by the lenders thereto), at the option of Reorganized BE, at any time or from time to time, in whole or in part, at a redemption price, payable in cash, equal to the Liquidation Preference or the pro rata portion thereof. |
| Ranking | Senior to all other capital stock of Reorganized BE with respect to dividends, liquidation, asset sales, etc.  As long as the Preferred Stock is outstanding, no dividends or other payment |

| | shall be made by Reorganized BE on account of any class of Common Stock. |
|---|---|
| EBITDA/Cash Position Reports | Reorganized BE shall provide to the holders of New Preferred Stock any and all EBITDA or cash position reports as are provided to the Secured Creditors as contemplated hereunder. |
| Voting | In addition to the voting rights under the Board Rights below, as long as the New Preferred Stock is outstanding, approval of the holder of the New Preferred Stock, voting as a separate class, shall be required for any action which, among other things: (i) alters or changes the rights, preferences or privileges of the New Preferred Stock in a manner adverse to the holders of New Preferred Stock, (ii) creates any new class or series of shares of capital stock having a preference over or on parity with the New Preferred Stock or Class 3 Common Stock, (iii) reclassifies shares of capital stock into shares having a preference over or on parity with the New Preferred Stock or Class 3 Common Stock, (iv) authorizes any dividend or distribution with respect to equity securities ranking junior or on parity with the New Preferred Stock, (v) effects any redemption or repurchase of any shares of capital stock, other than the New Preferred Stock, of Reorganized BE, (vi) increases or decreases the authorized number of shares of New Preferred Stock, (vii) effects a Change of Control or a sale of any of Reorganized BE's (or any of its subsidiaries') securities or material assets, other than asset sales in the ordinary course of business that do not constitute (in one or any series of transactions) a sale of substantially all of the assets of BE as compared to its assets as of the date of emergence), (viii) would constitute a merger of the Company, including pursuant to Section 251(g) of the Delaware General Corporation law, (iv) increases the funded debt of Reorganized BE and its consolidated subsidiaries above the amount that is outstanding as of the Plan Effective Date, (x) effects a liquidation of Reorganized BE or any of its Subsidiaries or (xi) effects a bankruptcy, insolvency or similar proceeding of Reorganized BE or any of its Subsidiaries. |
| Board Rights | The certificate of incorporation of Reorganized BE shall provide that as long as the New Preferred Stock is outstanding, the holder of the New Preferred Stock shall have the continuing right to nominate and elect five of the seven directors of the Board. The holder of the New Preferred Stock shall vote its shares to elect the CEO of the Company as one of its directors. |
| Transferability | [The New Preferred Stock shall be freely transferable, subject to |

| | |
|---|---|
| | applicable law and provided that any such transfer shall not be permitted to the extent it would cause the number of record holders of the New Preferred Stock to be at or in excess of 300.]**[Open issue]** |
| Covenants | Same as New Secured Credit Facility. |
| Stockholder Representative | The holders of New Preferred Stock shall designate an authorized representative to act on behalf of all such holders with respect to the New Preferred Stock, and in such agreement such holders will agree amongst themselves as to certain provisions regarding the transfer of the New Preferred Stock to ensure that the holders of New Preferred Stock are representative of the holders of the indebtedness under the New Secured Credit Facility. |
| Buy-Out Right | Subject to the Optional Conversion rights described above, any holder or group of holders of Common Stock shall retain the right to pay down the New Secured Credit Facility for par plus accrued interest and buy the New Preferred Stock for cash in the amount of the Liquidation Preference; provided, however, that (i) without the consent of the holder of the New Preferred Stock, such pay down and such buy out must occur simultaneously, and (ii) such pay down and buy out right of the holders of Common Stock shall expire on the date that is 1 year from the Filing Date.[4] |

---

[4] To be included in the New Preferred Stock and New Secured Credit Facility in the form of a call right.

**Annex C**

**Material Terms of Common Stock**

The certificate of incorporation of Reorganized BE shall provide, among other applicable terms contemplated by this Plan Term Sheet:

- The Class 1 Common Stock, Class 2 Common Stock, and Class 3 Common Stock shall be entitled to receive the same per share dividends and distributions, and have the same per share voting rights, except that until the holders of Class 1 Common Stock have received dividends and distributions of $240 million in the aggregate (the "Equity Triggering Event"), (i) all dividends and distributions that would otherwise have been distributed on account of the Class 2 Common Stock shall instead be distributed to holders of Class 1 Common Stock and (ii) all voting rights that would otherwise be exercisable by the holders of Class 2 Common Stock shall instead be exercisable by the holders of the Class 1 Common Stock (other than the right of the holders of the Class 2 Common Stock to elect directors as described below).

- Prior to the occurrence of the Equity Triggering Event, if the New Preferred Stock is outstanding, the holders of Class 1 Common Stock shall have the right to nominate and elect 2 directors, and the holders of Class 2 Common Stock and Class 3 Common Stock shall not have the right to nominate or elect any directors. Prior to the occurrence of the Equity Triggering Event, if the New Preferred Stock is not outstanding, the holders of Class 1 Common Stock shall have the right to nominate and elect 4 directors, the holders of Class 2 Common Stock shall have the right to nominate and elect 2 directors, and the holders of Class 3 Common Stock shall have the right to nominate and elect 1 director. Following the occurrence of the Equity Triggering Event, all directors shall be nominated and elected on a one vote per share basis by the holders of Class 1 Common Stock, Class 2 Common Stock and Class 3 Common Stock (i.e., without regard to class) (subject, in all cases, to any rights of the New Preferred Stock to elect directors).

- Except as set forth herein, and subject to the voting rights of the holder of the New Preferred Stock while it is outstanding, each holder of a share of Common Stock have one vote per share.

- Notwithstanding anything to the contrary herein, the holders of each class of Common Stock shall be entitled to a class vote (i.e., blocking rights) on any proposed amendment to the Company's restated certificate of incorporation that would adversely affect any of the rights and preferences of such class. In addition, the approval of a majority of the holders of Common Stock (in each class) shall be required for any action which, among other things, (i) creates any new class or series of shares of capital stock, or (ii) increases or decreases the authorized number of shares of Common Stock.

- Prior to the fifth anniversary of the Plan Effective Date, so long as the New Preferred Stock is outstanding, shares of each class of Common Stock (and any interest in the voting trust described herein) shall be transferable, directly or indirectly, only by operation of law, but in all cases subject to the certificate of incorporation of Reorganized BE.

- All shares of Common Stock shall be placed in a voting trust on the Plan Effective Date, and the trustee shall vote all of the subject shares in accordance with the direction of such holders of such Common Stock; provided, however, that as long as the New Preferred Stock is outstanding, the trustee shall automatically (and without any action on the part of any stockholder) vote all of the subject shares in accordance with the direction of the holders of New Preferred Stock (other than the election and removal of directors as provided herein) with respect to any corporate action that requires such a vote.   The trust shall distribute all shares of Common Stock in the voting trust, if any, to such holders on the earlier of (i) the date the New Preferred Stock is no longer outstanding and (ii) the fifth anniversary of the Plan Effective Date.

- As long as the New Preferred Stock is outstanding, at any time following such time as Reorganized BE determines to seek Board approval (if such approval is required) with respect to any sale, transfer or disposition of, directly or indirectly, assets, liabilities, other risks or securities of Reorganized BE requiring Board approval (it being understood that such Board approval shall not be a requirement for the exercise of the call rights described herein), the holders of New Preferred Stock shall have the right to purchase all, but not less than all, of the Common Stock from the trustee of the voting trust for no consideration other than a contingent, deferred purchase price payment equal to an amount in excess of all amounts received by holders of New Preferred Stock and Common Stock (taking into account amounts paid to the Secured Creditors as repayment of amounts under the New Secured Credit Facility) in excess of (i) amounts necessary to repay in cash in full the outstanding principal amounts of the Term Loan and the LC Facility, plus accrued and unpaid interest, fees costs and expense thereunder, and (ii) amounts constituting the full Liquidation Preference in respect of the New Preferred Stock (the "Preferred Stock Call Rights").  The Preferred Stock Call Rights shall be included in a master agreement that includes provisions for the voting arrangements (including the establishment of a voting trust), transfer restrictions and the Preferred Stock Call Rights, in each case, as provided herein.  In addition, Reorganized BE's certification of incorporation will include a "forced sale" provisions that automatically effects the transfer of New Common Stock upon the execution of the Preferred Stock Call Rights.