**BRYAN CAVE LLP**
1290 Avenue of the Americas
New York, New York 10104
(212) 541-2000
Lawrence P. Gottesman (LG-7061)
Michelle McMahon (MM-8130)

*Attorneys for The Bank of New York Mellon, as Indenture Trustee for 5.00% Convertible Senior Subordinated Debentures due April 15, 2025*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------------x

|  |  |  |
|---|---|---|
|  | : | Chapter 11 |
| **In re:** | : |  |
|  | : | Case No. 09-10691 (REG) |
| **BEARINGPOINT, INC., <u>et al.</u>,** | : |  |
|  | : | Jointly Administered |
| **Debtors.** | : |  |

-------------------------------------------------------------------x

**OBJECTION OF THE BANK OF NEW YORK MELLON AS INDENTURE TRUSTEE TO THE DEBTORS' MOTION PURSUANT TO SECTIONS 105(a) AND 362 OF THE BANKRUPTCY CODE (I) ESTABLISHING NOTIFICATION PROCEDURES REGARDING RESTRICTIONS ON CERTAIN TRANSFERS OF CLAIMS AGAINST AND EQUITY INTERESTS IN THE DEBTORS AND (II) <u>SCHEDULING A FINAL HEARING</u>**

The Bank of New York Mellon (f/k/a The Bank of New York) ("BNYM"), by and through its undersigned attorneys, hereby objects to the relief requested in the Debtors' Motion Pursuant to Sections 105(a) and 362 of the Bankruptcy Code (I) Establishing Notification Procedures Regarding Restrictions on Certain Transfers of Claims Against and Equity Interests in the Debtors and (II) Scheduling a Final Hearing (Docket No. 22) (the "Transfer Motion"). In support of this objection, BNYM state as follows:

<u>**PRELIMINARY STATEMENT**</u>

1.      BNYM is indenture trustee under an Indenture dated April 27, 2005 (the "Indenture"), pursuant to which BearingPoint, Inc. ("BearingPoint"), one of the above-

captioned debtors, issued $200 million in aggregate principal amount of 5.00% Convertible Senior Subordinated Debentures due April 15, 2025 (the "Senior Subordinated Notes").

2.        Pursuant to the Transfer Motion, among other things, the Debtors seek entry of a final order establishing certain notification procedures and granting the Debtors the right to veto certain transfers of Claims[1] prior to the effective date of their Chapter 11 Plan on the theory that such restrictions are necessary to protect net operating losses (the "NOLs") that might be used to shelter future income.

3.        BNYM objects to the relief sought by the Transfer Motion. First, restricting the transfer of Claims is unnecessary to protect the Debtors' NOLs when less burdensome alternatives are available. Second, in light of the pace of the Debtors' bankruptcy case, the time periods proposed by the Transfer Motion are unreasonable. Third, the proposed order should be clarified to make evident that no obligations are imposed on BNYM with respect to the enforcement of any such restrictions in a final order.

## FACTUAL BACKGROUND

### The Chapter 11 Cases

4.        On February 18, 2008 (the "Petition Date"), BearingPoint, and certain affiliates of BearingPoint (collectively with BearingPoint, the "Debtors") filed voluntary petitions for relief commencing cases (the "Cases") under 11 U.S.C. §§ 101 *et seq.,* (the "Bankruptcy Code") with the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court").

---

[1] Capitalized terms used but not defined herein have the meanings ascribed to such terms in the Transfer Motion.

C037780/0230868/1523835.1

5.    On February 27, 2009, the United States Trustee appointed an official committee of unsecured creditors (the "Committee") pursuant to section 1102 of the Bankruptcy Code. BNYM is a member of the Committee.

***The Subordinated Notes***

6.    BNYM serves as indenture trustee with respect to the Senior Subordinated Notes pursuant to that certain Indenture dated as of April 27, 2005 between BearingPoint, and BNYM as trustee.[2]

7.    As of the Petition Date, the entire principal amount of the Senior Subordinated Notes, plus interest and certain other amounts including fees and expenses due to BNYM, was outstanding and unpaid.

***The Debtors' Proposed Plan and Disclosure Statement***

8.    Contemporaneously with the filing of the petitions for relief, the Debtors filed their proposed Debtors' Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code (the "Plan") (Docket No. 24) and the Disclosure Statement for the Debtors' Joint Plan of Reorganization Under Chapter 11 (the "Disclosure Statement") (Docket No. 25).

9.    On March 2, 2009, the Debtors filed their proposed Debtors' Amended Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code (the "First Amended Plan") (Docket No. 81) and the Proposed Disclosure Statement for Debtors'

---

[2] The Bank of New York Mellow was formerly the indenture trustee for the 2.50% Series A Convertible Subordinated Debentures due December 15, 2024 in the aggregate principal amount of $250 million and the 2.75% Series B Convertible Subordinated Debentures due December 15, 2024 in the aggregate principal amount of $200 million (collectively, the "Junior Subordinated Noteholders") each issued by BearingPoint but resigned effective February 27, 2009.

C037780/0230868/1523835.1

Amended Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code (the "First Amended Disclosure Statement") (Docket No. 82).

10.     The Plan proposes that the Secured Lenders will convert their existing term loans into an exit term loan and receive $50 million in preferred stock. The Senior Subordinated Noteholders will receive "Class 1 Common Stock," while Junior Subordinated Noteholders will receive "Class 2 Common Stock." The Senior Subordinated Noteholders are entitled to receive the distributions that would otherwise be paid to the Junior Subordinated Noteholders and certain voting rights of the Junior Subordinated Noteholders, until the holders of the Class 2 Common Stock receive distributions equal to $240 million, which is the principal amount of the Senior Subordinated Noteholders claim prior to the Petition Date.[3]

11.     On February 27, 2009, the Debtors filed the Motion for an Order (I) Approving the Proposed Disclosure Statement and the Form and Manner of the Notice of the Disclosure Statement Hearing, (II) Establishing Solicitation and Voting Procedures, (III) Scheduling a Confirmation Hearing, and (IV) Establishing Notice and Objection Procedures for Confirmation of the Debtors' Proposed Plan (Docket No. 64).

12.     The hearing to consider confirmation of the Plan is scheduled for May 7, 2009 at 11:00 a.m. The hearing on the Disclosure Statement Motion is scheduled for March 30, 2009 at 11:00 a.m.

---

[3] All shares of common stock are to be placed in a voting trust on the effective date of the Plan and the trustee of such voting trust will vote the common shares (other than with respect to the election and removal of directors) with respect to any corporate action requiring a shareholder vote in accordance with the direction of the holders of the preferred stock. The voting trust will terminate on the earlier of the date that no preferred stock is outstanding and the fifth anniversary of the effective date of the Plan.

C037780/0230868/1523835.1

*The Transfer Motion*

13.     The Debtors filed the Transfer Motion for the stated purpose of protecting

their NOLs. The Debtors assert that, as of February 18, 2009, they have a consolidated

NOL carryforward of approximately $600 million.  Transfer Motion ¶ 16.  The Debtors

wish to avoid triggering § 382 of the Internal Revenue Code ("Section 382") so that they

might be able to use their NOLs to reduce their future federal income tax liability.

14.     In the Chapter 11 bankruptcy context the annual limitation on the

application of NOLs ordinarily imposed by Section 382 does not apply, if under a chapter 11

plan, pre-plan equity holders and "qualified creditors" receive at least 50% of the stock in the

reorganized debtor. *See* 26 U.S.C. § 382(l)(5)(A) (the "Safe Harbor").  A "qualified creditor is

a creditor who receives stock in the reorganized debtor in satisfaction of debt either (i) held

at least 18 months prior to the commencement of the bankruptcy case or (ii) that arose in

the ordinary course of the debtor's business and that has been held by the creditor at all

times. *See* 26 U.S.C § 382(l)(5)(E).  A creditor is also deemed to be a "qualified creditor" if, as

a result of a change in ownership under a chapter 11 plan, it does not become a 5%

shareholder in the debtor. *See* 26 C.F.R. § 1.382-9(d)(3).  Accordingly, a reorganization plan

under which claimholders receive new equity will not trigger 382 unless 5% claimholders

who were not creditors of the debtor prior to the bankruptcy case, in the aggregate, own

more than 50% of the equity in the reorganized debtor.

15.     The procedure proposed by the Debtors is purportedly designed to police

trading in Claims against the Debtor to ensure that the Debtors will be able to utilize the

Safe Harbor under Section 382.  Transfer Motion ¶ 21.  The Debtors' stated concern is that

Claims against the Debtors that are currently held by qualified creditors will be transferred

prior to consummation of a plan causing parties that did not own their Claims prior to the

Petition Date to hold more than 5% of the shares in the reorganized debtor. *Id.* If the new 5% holders are added together and more than 50% of the stock in the reorganized Debtors is controlled by non-qualifying creditors, annual loss limitations of Section 382 will be triggered thereby reducing the availability of the NOLs to shelter future taxable income.

16.     Pursuant to the Transfer Motion any person owning Claims in an amount sufficient to qualify as a Substantial Claimholder must file a Notice of Substantial Claimholder Status.[4] The Notice of Substantial Claimholder Status must be filed on or before the date that is the later of five business days after the entry of the Interim Order or five business days after that person qualifies as a Substantial Claimholder. Transfer Motion ¶ 25(b)(1).

17.     The Notification Procedures detailed in the Transfer Motion require that at least twenty business days prior to the proposed date of transfer of Claims that would result in an increase in the dollar amount of Claims beneficially owned by a Substantial Claimholder or a person becoming a Substantial Claimholder such person file a notice of intent to acquire Claims (the "Claims Acquisition Notice"). Transfer Motion ¶ 25(b)(2).

18.     As proposed by the Debtors Transfer Motion, the Debtors would retain unilateral authority to approve a Claim transfer pursuant to a Claims Acquisition Notice. A Claims Acquisition Notice that is not approved by the Debtors within fifteen days is be deemed rejected. Transfer Motion ¶ 25(b)(3).

19.     The proposed notice procedures (the "Notification Procedures") regarding the restriction on transfer of Claims provides for service of notice on all "holders" of Claims. Transfer Motion ¶ 26.

---

[4] Similar relief as described herein with respect to Claims is also sought with respect to equity interests in the Debtors.

# OBJECTION TO TRANSFER MOTION

*The Relief Sought by the Transfer Motion is Unnecessary to Protect the Debtors' NOLs*

20. BNYM hereby objects to the Transfer Motion because the restrictions on transfer of Claims and the Notification Procedures contemplated therein are extraordinary and unnecessary to achieve the Debtors' desired result.

21. BNYM does not object to reasonable and narrowly circumscribed measures that are actually necessary to protect the Debtors' NOLs. Nonetheless, such measures should be no broader than necessary, given the adverse effect that trading restrictions will have on the value of the Senior Subordinated Notes.

22. The notification and approval provisions contemplated in the Transfer Motion are not necessary since the Debtors' NOLs can be protected by a sell down remedy (the "Sell Down"). A Sell Down would allow the Debtors to retain, through an appropriate order of this Court, the ability to require any market purchaser of the Debtors' Claims to dispose of such Claims prior to the consummation of a plan of reorganization as necessary to bring those holders below the 5% threshold for post-plan equity ownership. The sanction for violating the Sell Down is simply that a non-complying creditor will not receive any equity securities in the reorganized company above the 5% threshold.

23. The Sell Down approach assures the Debtors that any market purchaser of the Debtors' Claims holds less than 5% of the equity of the Debtor following reorganization thereby affording the Debtors the right to the Safe Harbor. Thus, the Sell Down would enable the Debtors to protect their NOLs while permitting Substantial Claimholders to continue purchasing and selling Claims, and permitting the normal trading of Claims generally until a much later stage in these Cases.

C037780/0230868/1523835.1

24. This remedy has been advocated by The Bond Market Association and the Loan Syndications and Trading Association, two leading credit market organizations, is contained in the Model Order endorsed by those groups, and is fully adequate to protect the Debtors' interest in preserving their ability to utilize the NOLs.[5]

25. Imposing the proposed trading restrictions may create immediate diminution of value in the Claims by, among other things, reducing liquidity in the market for such Claims and imposing uncertainty in the underlying rights. The Sell Down, incorporated into the Model Order, recognizes and seeks to preserve the benefits to be derived from maintaining normal market activity for Claims to the greatest possible extent.

26. By contrast, the relief proposed by the Debtors is unnecessary to accomplish its stated purpose, and would grant the debtors, effective veto power over secondary market trading in Claims. The proposed trading restrictions would require market participants to solicit approval 20 businesses days before the acquisition takes place and then wait as many as an additional 15 business days or more to find out whether trades—which ordinarily settle in 3 days for debt securities—will be permitted to be consummated, and to declare trades in violation of this procedure void.

27. In addition, the proposed trading restrictions would shift inappropriately the balance of control between the Debtors and creditors in connection with the voting and eventual confirmation of a proposed plan of reorganization by granting the Debtors the right to prohibit acquisition by Substantial Claimholders. In the absence of trading restriction parties would be free to acquire claims and vote such claims in acceptance or rejection of a proposed plan of reorganization pursuant to the applicable provisions of Chapter 11. The trading restrictions contemplated by the Debtors' proposed Transfer

---

[5] A copy of the Model Order is annexed hereto as Exhibit 1.

C037780/0230868/1523835.1

Motion would enable the Debtors to discourage and/or prevent parties in interest from acquiring a potential blocking position with respect to a particular class of Claims. In that respect, the Model Order, which provides no such right to restrain Claim acquisition, represents a more appropriate means for protecting NOLs without tipping the balance of power in the reorganization process in a manner that is inconsistent with the general scheme of Chapter 11 as adopted by Congress.

28. Strikingly, *In re Northwest Airlines Corp., et al.,* Ch. 11 Case No. 05-17930 (ALG) Bankr. S.D.N.Y. 2005) and *In re Delta Air Lines, Inc. et al.,,* Ch. 11 Case No. 05-17923 (PCB) (Bankr. S.D.N.Y. 2005), upon which the Debtors' rely for support of their proposed restrictions, each adopted the Sell Down remedy in their final orders. *See also* Final Order Under 11 U.S.C. Sections 105, 362, and 541 and Fed.R. Bankr. P. 3001 (A) Establishing Notification Procedures Applicable to Substantial Holders of Claims and Equity Securities and (B) Establishing Notification and Hearing Procedures for Trading in Claims and Equity Securities, *In re Delphi Corporation*, Ch. 11 Case No. 05-44481 (RDD) (Bankr. S.D.N.Y 2005) (adopting the Sell Down remedy); Order Under 11 U.S.C. §§ 105, 362, and 541 and Bankruptcy Rule 3002 (A) Establishing Notification Procedures Applicable to Substantial Holders of Equity Securities, (B) Establishing Notification and Hearing Procedures for Trading in Equity Securities, and (C) Allowing a Hearing on the Prospective Application Therof, *In re Calphine Corporation et al.*, Ch. 11 Case No 05-60200 (BRL) (Bankr. S.D.N.Y. 2005)(interim order applied only to equity securities and contained no restrictions on trading in debt). This restraint reflects the increased awareness of all parties that restrictions on trading in debt should not be imposed lightly and problems, if any, can be resolved by a Sell Down.

C037780/0230868/1523835.1

29.    The Model Order provides a narrowly tailored means for the Debtors to protect their NOLs if and when such protection can be demonstrated to be appropriate and necessary in connection with the Debtors' plan of reorganization.  As such, the Model Order represents a proper exercise of the Court's injunctive powers because it enables participants in the claims market to continue normal trading activity in the meantime without the significant restrictions or burdens inherent in the Debtors approach.

**The Time Periods Proposed by the Transfer Motion are Unreasonable**

30.    BNYM objects to the time frame proposed by the Notification Procedures because the Debtors Case is likely to have concluded before any transfer of Claims is considered and approved by the Debtors.  The Debtors call for a period of up to thirty five business days during which a person would wait for approval to acquire or sell a Claim.  The Debtors already have a negotiated Plan.  A waiting period of thirty-five business days is likely to comprise a substantial portion of the lifespan of these Cases.

31.    The procedures proposed by the Debtors are more burdensome than typically ordered in other cases in this district.  *See In re Northwest Airlines Corp.* Ch. 11 Case No. 05-17930 (ALG) Bankr. S.D.N.Y. 2005)(claims holders that agree to sell down remedy not subject to notice provision); *In re Delta Air Lines, Inc.,* Ch. 11 Case No. 05-17923 (PCB) (Bankr. S.D.N.Y. 2005) (no restrictions imposed on claims trading but notification of trade must be given 15 days after trade is completed); *In re Delphi Corporation*, Ch. 11 Case No. 05-44481 (RDD) (Bankr. S.D.N.Y 2005)(no notification requirements or restriction on trading); *In re Calphine Corporation*, Ch. 11 Case No 05-60200 (BRL) (Bankr. S.D.N.Y. 2005) (no notification requirements or restriction on trading).

32.    Moreover, it is improper to give the Debtors complete discretion in determining which Claims transfers will be waived.  Orders limiting trading in claims can be

used to entrench management, repel unwanted investors and generally chill the interest of outside investors. The system proposed by the Debtors will only permit accumulation of Claims by investors "approved" by the Debtors and their management. In order to make this process fair for all investors, a final appeal must be available to this Court in order to ensure equal treatment in the approval process.

***The Transfer Motion Should Not Impose Any Obligations on BNYM***

33.     The Notification Procedures and the final order should be modified to expressly state that BNYM has no obligation to either notify Senior Subordinated Note holders of the Notification Procedures or police compliance with the Notification Procedures.

34.     The Notification Procedures provide for service of notice on all "holders" of Claims. Transfer Motion ¶ 26. As indenture trustee, BNYM is only able to forward the Debtors' notices to the Depository Trust Company ("DTC"). It is DTC, not BNYM, that has access to the names and contact information of the beneficial holders of the Senior Subordinated Notes. The Debtors, not BYNM, are the appropriate party to send the notices to the DTC. Thus, a final order entered by this Court should clarify the Debtors' obligation to serve the notices on the beneficial holders of the Claims.

35.     In addition, the final order entered by the Court should be clarified to make certain that BNYM is under no obligation to enforce any trading restrictions.

36.     If the Court decides to require BNYM to provide notification to the holders of the Senior Subordinated Notes, BNYM should be granted indemnification by the Debtors and be fully reimbursed by the Debtors for all expenses BNYM incurs with respect to the notification. The terms of this indemnity and reimbursement would have to be negotiated between the Debtors and BNYM. Accordingly, BNYM requests that if the Court

11

decides to enter a final order approving the Transfer Motion, such order should specifically

excuse BNYM from any obligation to provide notification until BNYM and the Debtors

have reached an indemnification and reimbursement agreement.

Dated: March 9, 2009

/s/Michelle McMahon

**BRYAN CAVE LLP**
Lawrence P. Gottesman, Esq.
Michelle McMahon (MM-8130)
1290 Avenue of the Americas
New York, New York 10104-3300
(212) 541-2000 (tel); (212) 541-4630 (fax)

Attorneys for The Bank of New York
Mellon, as Indenture Trustee for 5.00%
Convertible Senior Subordinated
Debentures due April 15, 2025

C037780/0230868/1523835.1

## <u>CERTIFICATE OF SERVICE</u>

I, Michelle McMahon, hereby certify that on March 9, 2009, a true and correct copy of the foregoing Objection Of The Bank Of New York Mellon As Indenture Trustee To The Debtors' Motion Pursuant To Sections 105(A) And 362 Of The Bankruptcy Code (i) Establishing Notification Procedures Regarding Restrictions On Certain Transfers Of Claims Against And Equity Interests In The Debtors And (ii) Scheduling A Final Hearing was served by first class United States mail on the parties listed below.

**Alfredo R. Perez**
Weil Gotshal & Manges
700 Louisiana, Suite 1600
Houston, TX 77002

**Stephanie W. Mai**
Bingham McCutchen LLP
399 Park Avenue
New York, NY 10022

**Serene K. Nakano**
U.S. Department of Justice
U.S. Trustee's Office
33 Whitehall Street, 21st Floor
New York, NY 10004

/s/Michelle McMahon
Michelle McMahon (MM-8130)

C037780/0230868/1523835.1

14