Proposed Hearing Date for Bidding Procedures Hearing: April 1, 2009 at a time to be set by the Court
Proposed Objection Deadline for Bidding Procedures Hearing: March 31, 2009 at 12:00 p.m. (Eastern Time)
Proposed Date of Auction: April 15, 2009 at 10:00 a.m. (Eastern Time)
Proposed Sale Approval Hearing: April 17, 2009 at 9:00 a.m. (Eastern Time)
Proposed Objection Deadline as to Sale: April 10, 2009 at 12:00 p.m. (Eastern Time)
Proposed Objection Deadline as to Auction and Selection of Successful Bidder: April 16, 2009 at 12:00 p.m. (Eastern Time)

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Marcia L. Goldstein

WEIL, GOTSHAL & MANGES LLP
700 Louisiana Street, Suite 1600
Houston, Texas 77002
Telephone: (713) 546-5000
Facsimile: (713) 224-9511
Alfredo R. Pérez

Attorneys for Debtors
and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------------x

In re                          :        Chapter 11 Case No.

BEARINGPOINT, INC., et al.,    :        09 - 10691 (REG)

          Debtors.            :        (Jointly Administered)

---------------------------------------------------------------x

**DEBTORS' MOTION FOR ORDERS PURSUANT TO SECTIONS 363(b), (f), AND (m), 365 AND 105(a) OF THE BANKRUPTCY CODE AND BANKRUPTCY RULES 2002, 6004, 6006, AND 9014 FOR (i) APPROVAL OF PROCEDURES IN CONNECTION WITH THE SALE OF CERTAIN OF THE DEBTORS' ASSETS FREE AND CLEAR OF LIENS, CLAIMS, ENCUMBRANCES, AND INTERESTS, (ii) AUTHORIZATION TO ENTER INTO A STALKING HORSE AGREEMENT IN CONNECTION THEREWITH, (iii) APPROVAL OF THE PAYMENT OF STALKING HORSE PROTECTIONS, (iv) APPROVAL OF THE STALKING HORSE AGREEMENT, (v) AUTHORIZATION TO SELL CERTAIN OF THE DEBTORS' ASSETS, (vi) THE SETTING OF RELATED AUCTION AND HEARING DATES, (vii) AUTHORIZATION TO ENTER INTO AN ALLOCATION AGREEMENT, AND (viii) APPROVAL OF PROCEDURES RELATED TO ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES AND THE FORM AND MANNER THEREOF**

# TABLE OF CONTENTS

**Page**

Relief Requested ........................................................................................................ 1

Sale of Assets .......................................................................................................... 3

PART I – THE STALKING HORSE AGREEMENT ...................................... 4

PART II – BIDDING PROCEDURES ORDER ............................................... 8

    A. The Stalking Horse Agreement ................................................................ 8

    B. The Bidding Procedures .......................................................................... 9

    C. Notice and Other Procedures................................................................. 12

    D. Assumption and Assignment of Executory Contracts and Unexpired Leases .......... 14

PART III – ALLOCATION AGREEMENT ................................................... 16

PART IV– APPLICABLE AUTHORITY ....................................................... 17

    A. A Sale of The Debtors' Assets Under Section 363 of the Bankruptcy Code is
       Warranted....................................................................................... 17

    B. Sale of Assets Free and Clear of Liens, Claims, Encumbrances and Interests ......... 19

    C. The Successful Bidder Should be Afforded All Protections Under Section
       363(m) as a Good Faith Purchaser ....................................................... 21

    D. The Stalking Horse Protections Should be Approved ............................... 22

    E. The Bidding Procedures are Reasonable and Appropriate......................... 25

    F. Assumption and Assignment of Executory Contracts and Unexpired Leases ......... 26

    G. The Court Should Authorize BE to Enter into the Allocation Agreement ............... 28

    H. The Court Should Waive or Reduce the Periods Required By Rules 6004(h)
       and 6006(d) of the Federal Rules of Bankruptcy Procedure............................ 29

Jurisdiction.............................................................................................................. 30

Notice ...................................................................................................................... 30

# TABLE OF AUTHORITIES

## Cases

In re Abbotts Dairies of Penn., Inc., 788 F.2d 143 (3d Cir. 1986) ..........................21

Allstate Insurance Co. v. Hughes, 174 B.R. 884 (S.D.N.Y. 1994)..........................21

Am. Living Sys. v. Bonapfel (In re All Am. of Ashburn, Inc.), 56 B.R. 186 (Bankr. N.D. Ga. 1986), aff'd, 805 F.2d 1515 (11th Cir. 1986) ..........................20

In re Betty Owens Sch., Inc., 1997 WL 188127 (S.D.N.Y. 1997) ..........................18

In re Bon Ton Restaurant & Pastry Shop, Inc., 53 B.R. 789 (Bankr. N.D. Ill. 1985) ..................26

In re Bygaph, Inc., 56 B.R. 596 (Bankr. S.D.N.Y. 1986)..........................27

COR Route 5 Co., LLC v. The Penn Traffic Co. (In re The Penn Traffic Co.), 524 F.3d 373 (2d Cir. 2008)..........................26

In re Calpine Corp., 356 B.R. 585, 594 (Bankr. S.D.N.Y. 2007)..........................28

Carlisle Homes, Inc. v. Arrari (In re Carlisle Homes, Inc.), 103 B.R. 524 (Bankr. D. N.J. 1989) ..........................26

In re Chateaugay Corp., 973 F.2d 141 (2d Cir. 1992) ..........................17, 28

In re Chateaugay Corp., 1993 WL 159969 (S.D.N.Y. 1993) ..........................21

Citicorp Homeowners Serv., Inc. v. Elliot (In re Elliot), 94 B.R. 343 (E.D. Pa. 1988) ................20

Committee of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.), 722 F.2d 1063 (2d Cir. 1983)..........................17, 28

Comm. of Asbestos-Related Litigants v. Johns Manville Corp. (In re Johns-Manville Corp.), 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986)..........................29

In re Decora Industrial, Inc., Case No. 00-44591, 2002 WL. 32332749 (D. Del. May 20, 2002) ..........................18

In re Delaware and Hudson Ry. Co., 124 B.R. 169 (D. Del. 1991)..........................18

In re Enron Corp., 2003 WL 21755006 (AJG) (Bankr. S.D.N.Y. 2003)..........................20

In re Fleming Cos., 499 F.3d 300 (3d Cir. 2007)..........................26

Fulton State Bank v. Schipper (In Re Schipper), 933 F.2d 513, 515 (7th Cir. 1991)..................28

ii

_Futuresource LLC v. Reuters Ltd._, 312 F.3d 281 (7th Cir. 2002) ..................................19

_Hargrave v. Township of Pemberton (In re Tabone, Inc.)_, 175 B.R. 855 (Bankr. D.N.J. 1994) ..................................................................................................................20

_Institutional Creditors of Cont'l Airlines, Inc. v. Cont'l Airlines, Inc. (In re Cont'l Airlines, Inc.)_, 780 F.2d 1223, 1226 (5th Cir. 1986) ..................................28

_In re Natco Industrial, Inc._, 54 B.R. 436 (Bankr. S.D.N.Y. 1985) ..................................26

_Official Committee of Sub. Bondholders v. Integrated Resources, Inc. (In re Integrated Resources, Inc.)_, 147 B.R. 650 (S.D.N.Y. 1992), _appeal dismissed_, 3 F.3d 49 (2d Cir. 1993) ................................................................................17, 18, 22, 23

_Rubinstein v. Alaska Pacific Consortium (In re New England Fish Co.)_, 19 B.R. 323 (Bankr. W.D. Wash. 1982) ..................................................................................21

_In re Stein & Day, Inc._, 113 B.R. 157 (Bankr. S.D.N.Y. 1990) ..................................22

_Smith v. Van Gorkom_, 488 A.2d 858, 872 (Del. 1985) ..................................17

_In re Trans World Airlines, Inc._, 322 F.3d 283 (3d Cir. 2003) ..................................20

_In re Vitanza_, 1998 WL 808629 (Bankr. E.D. Pa. 1998) ..................................27

## Statutes

11 U.S.C. § 363(b) ..................................................................................2, 17, 21, 28

11 U.S.C. § 363(m) ..................................................................................21, 22

11 U.S.C. § 365(f)(2) ..................................................................................26

28 U.S.C. §§ 1334 ..................................................................................30

28 U.S.C. §§ 1408 ..................................................................................30

28 U.S.C. §§ 1409 ..................................................................................30

28 U.S.C. §§ 157 ..................................................................................30

## Rules

Fed. R. Bankr. P. 6004(f)(1) ..................................................................................17

Fed. R. Bankr. P. 6004(h) ..................................................................................29, 30

Fed. R. Bankr. P. 6006(d) .................................................................................29, 30

**Bankruptcy Case Orders**

In re Adelphia Business Solutions, Inc., et al., Ch. 11 Case No. 02-11389 (Bankr.
S.D.N.Y. Dec. 16, 2002) (REG) [Docket No. 760] .......................................23

In re Adelphia Business Solutions, Inc., et al., Ch. 11 Case No. 02-11389 (Bankr.
S.D.N.Y. Jan. 23, 2003) (REG) [Docket No. 833] .......................................23

In re Bally Total Fitness of Greater New York, Inc., Ch. 11 Case No. 07-12395 (BRL)
(Bankr. S.D.N.Y. Aug. 21, 2007) [Docket No. 269] ...............................23, 24

In re Footstar, Inc., Ch. 11 Case No. 04-22350 (ASH) (Bankr. S.D.N.Y. Mar. 15, 2004)
[Docket No. 154] ..............................................................................23

In re Footstar, Inc.. Ch. 11 Case No. 04-22350 (ASH) (Bankr. S.D.N.Y. Apr. 6, 2004)
[Docket No. 316] ..............................................................................23

In re Fortunoff Fine Jewelry and Silverware, LLC, Ch. 11 Case No. 08-10353 (JMP)
(Bankr. S.D.N.Y. February 22, 2008) [Docket No. 190] ...........................23, 24

In re G+G Retail, Inc., Ch. 11 Case No. 06-10152 (RDD) (Bankr. S.D.N.Y. Jan. 30,
2006) [Docket No. 58] .......................................................................23, 24

In re Twinlab Corp., et al., Ch. 11 Case No. 03-15564 (RDD) (Bankr. S.D.N.Y. Sept. 26
2003) [Docket No. 81] .......................................................................23, 24

TO THE HONORABLE ROBERT E. GERBER
UNITED STATES BANKRUPTCY JUDGE:

BearingPoint, Inc. ("*BE*") and certain of its affiliates, as debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "*Debtors*," and together with their non-debtor affiliates, "*BearingPoint*"),[1] seek this Court's approval of (i) the proposed bidding procedures pursuant to which the Debtors will conduct an auction for all or certain of their assets and (ii) the sale of such assets, and respectfully represent:

### Relief Requested

1.     By this Motion, the Debtors seek entry of two orders:

(a)     The Debtors request entry of an order(s), on an expedited basis, substantially in the form attached hereto as <u>Exhibit A</u> (the "*Bidding Procedures Order*"), (i) approving procedures (the "*Bidding Procedures*," the form of which is attached hereto as <u>Exhibit B</u>) for submitting bids for all or certain of BearingPoint's assets, as further described herein and in the Bidding Procedures, (the "*Bid Assets*"); (ii) approving the "stalking horse" agreement, attached hereto as <u>Exhibit C</u>, with Deloitte LLP ("*Deloitte*" or the "*Stalking Horse Bidder*") (the "*Stalking Horse Agreement*") for the sale of certain of the Bid Assets subject to the outcome of the auction (the "*Auction*") scheduled for April 15, 2009; (iii) authorizing the Debtors to (A) pay Deloitte a fee (the "*Break-Up Fee*") of $10.5 million when and if payable pursuant to the terms and conditions of the Stalking Horse Agreement; (B) reimburse Deloitte for its reasonable and documented out-of-pocket costs and expenses incurred in connection with the

---

[1] More information regarding the Debtors' business, their pre-arranged restructuring plan, and the background of these chapter 11 cases, including information on BearingPoint's efforts to sell all or a portion of its assets prior to the filing of these chapter 11 cases can be found in the Declaration of John DeGroote Pursuant to Rule 1007-2 of the Local Bankruptcy Rules for the Southern District of New York in Support of First-Day Motions and Applications, filed on February 18, 2009,(the "*DeGroote Declaration*") the date the Debtors filed their chapter 11 petitions (the "*Commencement Date*").

Stalking Horse Agreement, in an amount not to exceed $1,500,000 (the "***Expense Reimbursement***") when and if payable pursuant to the terms and conditions of the Stalking Horse Agreement; <u>provided</u>, <u>however</u>, that in certain circumstances where the Breakup Fee is not due and owing, the amount of the Expense Reimbursement may be up to $2,500,000 or up to $5,000,000 (the "***Expense Reimbursement***," and together with the Termination Fee, the "***Stalking Horse Protections***"); and (C) enter into an agreement with the Agent (as defined below) establishing procedures to determine the allocation of the Adjusted Purchase Price (as defined in the Stalking Horse Agreement) (the "***Allocation Agreement***") substantially in the form attached hereto as <u>Exhibit D</u>; (iv) approving procedures (the "***Cure Procedures***") for the assumption and assignment of contracts (the "***Contracts***") and leases (the "***Leases***") to any purchaser(s) of the Debtors' Bid Assets, and/or to resolve any objections thereto; (v) scheduling the Auction for April 15, 2009 and a hearing to approve any such sale (the "***Sale Approval Hearing***") with respect to any bid(s) accepted by the Debtors on April 17, 2009; and (vi) approving the notice (the "***Sale Notice***"), substantially in the form annexed hereto as <u>Exhibit E</u> of the Auction and the Sale Approval Hearing, establishing the dates, times and places of the Auction and the Sale Hearing.

        (b)     At the Sale Approval Hearing, the Debtors will request entry of an order (the "***Sale Order***"), pursuant to sections 363(b), (f), and (m), 365, and 105(a) of title 11 of the United States Code (the "***Bankruptcy Code***") and Rules 6004, 6006, and 9014 of the Federal Rules of Bankruptcy Procedure (the "***Bankruptcy Rules***") approving (i) the Asset Purchase

Agreement(s) (as defined below) with the party or parties submitting the highest or otherwise best Bids (as defined below); and (ii) the Sale(s) (as defined below).[2]

## Sale of Assets

2.    In 2008, BearingPoint embarked on a comprehensive restructuring effort, including exploring various strategic alternatives, such as a transaction involving a sale of all or a portion of BearingPoint's assets. An extensive sale process was initiated during which approximately 25 strategic and financial buyers expressed an interest in buying all or parts of BearingPoint. The proposals that BearingPoint received in connection with those efforts either provided insufficient value or appeared impractical. As a result, the Debtors filed for chapter 11 relief.

3.    Following the Commencement Date, BearingPoint continued to explore strategic transactions for the purpose of maximizing value for all parties in interest. BearingPoint initiated a sales process during which a number of potential buyers expressed interest in BearingPoint assets. After extensive review of these proposals, the Debtors, along with their advisors, have determined that Deloitte's offer presents the Debtors with significant value for substantially all of the assets in BearingPoint's Public Services Industry Group (the "*PS Group*") plus certain other assets as set forth in the Stalking Horse Agreement. Furthermore, Deloitte's offer, which targets assets in the PS Group, allows the Debtors to realize additional value through subsequent sales of assets excluded from Deloitte's offer, including BearingPoint's assets outside of the PS Group.

---

[2] As soon as practicable after the conclusion of the Auction, but no later than before the Sale Approval Hearing, the Debtors shall file a final form of order approving the Sale as agreed upon between the Debtors and the Successful Bidder(s) (as defined below).

4. As such, the Debtors seek to effectuate a sale based on the offer received from Deloitte. The Debtors believe that a sale in which the PS Group remains largely intact will allow for a more seamless transition of the PS Group assets. Except as otherwise provided in definitive documentation with respect to the sale of the Bid Assets (the "*Sale*"), all of the Debtors' rights, title and interest in and to the Bid Assets shall be sold free and clear of all pledges, liens, security interests, encumbrances, claims, charges, options and interests thereon and against except for any liabilities expressly assumed by the purchaser in accordance with section 363 of the Bankruptcy Code with such claims and interests attaching to the sale proceeds and/or paid to the secured creditors as approved by this Court.

## PART I – THE STALKING HORSE AGREEMENT

5. As set forth above, the Debtors are requesting authority to enter into the Stalking Horse Agreement, which both provides a uniform asset purchase agreement to be used by any Qualified Bidder (as defined below) in connection with its purchase of the Bid Assets (an "*Asset Purchase Agreement*"), as well as provides Deloitte with the Stalking Horse Protections. The pertinent terms of the Stalking Horse Agreement are provided in the table below for summary and notice purposes only and to the extent any terms are inconsistent with the Stalking Horse Agreement, the Stalking Horse Agreement controls:[3]

| *Structure:* | Sellers will sell to Buyer all assets used by Sellers primarily in the Business (the provision of professional services by Sellers under the Designated Client Contracts and the pursuit of and provision of professional services by Sellers under the Designated Client Proposals), other than the Excluded Assets (the "*Acquired Assets*"), and Buyer will assume certain liabilities (the "*Transaction*"). The Acquired Assets including |
| --- | --- |

[3] Capitalized terms used, but not defined herein, shall have the meaning ascribed to them in the Stalking Horse Agreement. The description of the Stalking Horse Agreement below is intended as a summary and is qualified in its entirety by the Stalking Horse Agreement.

| | |
|---|---|
| | certain of the client contracts, subject to adjustment pursuant to the terms of the Stalking Horse Agreement. |
| **Purchase Price:** | The purchase price is $350 million. The purchase price will be adjusted at closing up or down (upward only if the closing date is after May 7, 2009) based on any difference between target and actual amounts of accounts receivable and unbilled revenue less any deferred revenue associated with the Acquired Assets. |
| **Good Faith Deposit** | Promptly after the entry by the Bankruptcy Court of the Bidding Procedures Order, Buyer shall deliver to an escrow agent jointly selected by Sellers and Buyers cash or a letter of credit in the amount of $17,500,000 as an earnest money deposit (the "**Deposit**"), to be held in escrow pursuant to the terms and conditions of a customary escrow agreement which shall provide for a release of the Deposit as provided in the Staking Horse Agreement. |
| **Closing Conditions:** | Buyer's and Sellers' obligation to consummate the Transaction is subject to certain closing conditions including, but not limited to: <br><br> • expiration of any applicable waiting period under the HSR Act; <br> • entry of a final order by the Bankruptcy Court approving the Transaction; <br> • the entry of the bidding procedures order by the Bankruptcy Court; and <br> • retention by Buyer of a certain minimum percentage of professionals. |
| **Termination:** | The Stalking Horse Agreement may be terminated by mutual consent of the parties. <br><br> The Stalking Horse Agreement may be terminated by Buyer or Sellers if: <br><br> • the Closing doesn't occur by the earlier of (i) May 15, 2009 and (ii) 10 days after the Sale Order becomes a final order (the "**Termination Date**"); if closing doesn't occur by that date due to a second request pursuant to the HSR Act, the Termination Date will automatically be extended by one week and the Buyer will have the option to extend the date for another 38 days; or <br> • Sellers select a bid made by a person other than Buyer as the "highest and best offer" according to the bidding procedures order and the Bankruptcy Court enters an |

|  | order approving the sale to such person or the Bankruptcy Court enters an order approving the sale to any other Person. |
|  | Buyer may terminate the Stalking Horse Agreement if: |
|  | <ul><li>Buyer is in compliance with its obligations under the Purchase Agreement and Sellers breach their representations, warranties or covenants and such breach would result in a failure of a closing condition that is not or cannot be cured;</li><li>Sellers repudiate the Stalking Horse Agreement;</li><li>any of the closing conditions become incapable of being satisfied (other than as a result of a breach by Buyer) between signing and closing;</li><li>Sellers file documents with the Bankruptcy Court or enter into an agreement relating to the sale of a material portion of the Acquired Assets or the confirmation of a stand-alone plan of reorganization;</li><li>any of the Sellers' secured lenders exercise their rights under section 363(k) of the Bankruptcy Code.</li><li>the Bankruptcy Court does not enter the bidding procedures order by April 6, 2009, or the order has been entered by such date but is then currently stayed; or</li><li>the Bankruptcy Court does not enter an order approving the Transaction by April 23, 2009, or the order has been entered by such date but is then currently stayed, or the approval order does not become final within ten days thereafter.</li></ul> |
|  | Sellers may terminate the Stalking Horse Agreement if Sellers are in compliance with their obligations under the Stalking Horse Agreement and Buyer breaches its representations, warranties or covenants and such breach results in a failure of a closing condition that is not or cannot be cured. |
| ***Termination Fee and Expenses:*** | Sellers must pay to Buyer the Break-Up Fee equal to $10.5 million and the reasonable and documented out-of-pocket expenses of Buyer, subject to a $1.5 million cap, in the following circumstances: <ul><li>Buyer terminates the Stalking Horse Agreement because Sellers are in material breach of their covenants;</li><li>Buyer terminates the Stalking Horse Agreement because Sellers repudiate the Stalking Horse Agreement;</li></ul> |

| | |
|---|---|
| | • Buyer terminates the Stalking Horse Agreement because Sellers file pleadings with the Bankruptcy Court or enter into an agreement relating the sale of a material portion of the Acquired Assets or the confirmation of a stand-alone plan of reorganization;<br><br>• Buyer terminates the Stalking Horse Agreement because the following closing conditions are incapable of being satisfied: (i) Sellers' compliance with covenants in all material respects; (ii) Employee Condition; and (iii) the delivery certain closing documents; or<br><br>• Buyer or Sellers terminate the Stalking Horse Agreement because Sellers select a bid made by a person other than Buyer as the "highest and best offer" according to the bidding procedures order and the Bankruptcy Court enters an order approving the sale to such person.<br><br>Sellers must pay Buyer's reasonable and documented out-of-pocket expenses, subject to a $5.0 million cap, in the following circumstances:<br><br>• Buyer terminates the Stalking Horse Agreement because of Sellers' breach of representations that would reasonably be expected to cause a Material Value Diminution.<br><br>Sellers must pay Buyer's reasonable and documented out-of-pocket expenses, subject to a $2.5 million cap, if Buyer or Seller terminates as a result of:<br><br>• the failure of the HSR closing condition;<br><br>• Buyer terminates the Stalking Horse Agreement because the Bankruptcy Court has not entered an order approving of the Transaction pursuant to the Stalking Horse Agreement by May 15, 2009;<br><br>• a legal prohibition on the consummation of the transaction; or<br><br>• the closing not having been consummated by the Termination Date. |
| *Novation of Government Prime Contracts:* | Promptly following consummation of the Transaction, Sellers are required to request, to the extent required by law, that the responsible contracting officer at governmental contracting counterparties (i) recognize Buyer as the successor in interest to all the applicable government contracts included in the |

| | |
|---|---|
| | Acquired Assets and (ii) if required, enter into a novation agreement with Buyer and the appropriate governmental entity. Buyer and Sellers must use reasonable best efforts to obtain all consents and approvals required for any such novation agreement and share all information necessary for that purpose. If the governmental entity that is the respective contractual counterparty declines to enter into any such novation, Sellers agree to enter into a subcontract with Buyer whereby Buyer performs for and in the place of Sellers with respect to such Assumed Liabilities. |
| *Employee Matters:* | Prior to closing, Buyer will offer employment or admission as a principal, as the case may be, to substantially all employees who provide services in connection with the Business (other than corporate and related services) on terms generally applicable to similarly situated personnel of Buyer.<br><br>Subject to certain limitations, Buyer will pay to any employee hired by Buyer who participates in certain specified bonus plans the amount such employee would have been entitled to receive under such bonus plans prior to the Transaction. |
| *Regulatory Matters:* | Buyer and Sellers will use reasonable best efforts to take all actions necessary under any applicable law (including the HSR Act) so as to enable the closing to occur as soon as reasonably practicable. Buyer will not be required to dispose of any of its assets or to limit its ability to conduct any of its businesses in order to obtain regulatory approval. |
| *Representations and Warranties:* | The Stalking Horse Agreement contains representations and warranties of Sellers regarding the Business and the Acquired Assets. In particular, Sellers make extensive representations with respect to their government contracts. The representations and warranties do not survive the closing and there is no indemnification for breaches of representation and warranties. |

## PART II – BIDDING PROCEDURES ORDER

6.      To facilitate an orderly sale of the Bid Assets, the Debtors request that the Court approve the Bidding Procedures, including the manner in which the Sale Notice is provided, and the Assignment Procedures (as defined below).

### A.     The Stalking Horse Agreement

7.      The Debtors propose that in connection with the submission of a Qualified Bid (as defined below) for the Bid Assets, each Qualified Bidder (as defined below) be required to submit a form of the Stalking Horse Agreement and Schedules and Exhibits thereto, which shall be modified by the Qualified Bidder only to the extent necessary to reflect proposed changes, and marked to show such changes made by the Qualified Bidder.

### B.     The Bidding Procedures

8.      The Debtors believe that the Bidding Procedures provide an appropriate framework for selling the Bid Assets and will enable the Debtors to review, analyze and compare all bids received to determine which bids are in the best interests of the Debtors' estates and creditors.  The Bidding Procedures are as follows:[4]

| | |
|---|---|
| *Assets to be Sold* | The Debtors are offering the Bid Assets for sale which include: (i) the assets included in the Stalking Horse Agreement (the "***Deloitte Bid Assets***"); or (ii) all or any portion of the Deloitte Bid Assets together with any of the Debtors' assets not included in the Stalking Horse Agreement. |
| *Qualifying Bidders* | To qualify as a "Qualified Bidder" with respect to bids on the Bid Assets, a bidder must submit a "Qualified Bid" (as described below) by the Bid Deadline and: <ul><li>offer to purchase the Bid Assets and assume some or all of the Assumed Liabilities (as defined in the Stalking Horse Agreement);</li><li>provide a copy of the Qualified Bidder's proposed Stalking Horse Agreement and the Schedules and Exhibits thereto, which shall be modified by the Qualified Bidder from the form of the Stalking Horse Agreement only to the extent necessary to reflect proposed changes, together with a marked copy of the Stalking Horse Agreement and Schedules and Exhibits thereto reflecting such changes;</li></ul> |

---

[4] The Bidding Procedures described below are intended as a summary and are qualified in their entirety by the Bidding Procedures set forth in <u>Exhibit B</u> and in the Stalking Horse Agreement.  The bid of any bidder failing to comply with the Bidding Procedures may not be considered by the Debtors, in their discretion, after consultation with the Agent (as defined below) and the Creditors' Committee (as defined below).

|  |  |
|---|---|
|  | - must not subject its bid to any conditions less favorable to the Debtors than those provided for in the Stalking Horse Agreement; |
|  | - agree to not revoke its bid until the closing of a purchase of the Bid Assets by the Qualified Bidder that the Debtors determine to have made the highest or otherwise best bid (the "***Successful Bidder***") and agree to serve as a backup bidder; |
|  | - stipulate or otherwise provide evidence that such Qualified Bidder's submission, execution, delivery and closing of the marked up versions of the Stalking Horse Agreement and the Schedules and Exhibits thereto has been authorized and approved by the Qualified Bidder's board of directors (or comparable governing body); |
|  | - state that such Qualified Bidder is financially capable of consummating the transactions contemplated by the Stalking Horse Agreement, and otherwise provide such other information that will allow the Debtors and their advisors to make a reasonable determination as to the Qualified Bidder's ability to consummate the transactions contemplated by the Stalking Horse Agreement, including the Adequate Assurance Package (as defined below); and |
|  | - not seek any transaction or breakup fee, expense reimbursement, or similar type of payment; and |
|  | - be accompanied by a Good Faith Deposit (as defined below). |
| ***The Asset Purchase Form*** | Each Qualified Bidder shall be required to submit a form of the Stalking Horse Agreement and Schedules and Exhibits thereto, which shall be modified by the Qualified Bidder only to the extent necessary to reflect proposed changes, and marked to show such changes made by the Qualified Bidder. |
| ***Qualified Bids and Overbids*** | A Qualified Bid with respect to the Bid Assets is one that:<br><br>- is a proposal determined by the Debtors, in the good faith opinion of its board of directors, as the case may be, after consultation with the Debtors' investment bankers and financial advisors and Agent, not to be materially more burdensome or conditional than the terms of the Stalking Horse Agreement and one that has a value greater than or equal to the sum of (x) the value, as reasonably determined by the Debtors' financial advisor, of the Stalking Horse Agreement plus (y) Twelve Million Dollars ($12,000,000) (i.e., the sum of the Breakup Fee and the maximum amount (in certain circumstances) of the Expense Reimbursement) plus (z) at least Two Million Five Hundred Thousand Dollars ($2,500,000); and<br><br>- is accompanied by such Qualified Bidder's Good Faith Deposit (by means of a certified bank check from a U.S. bank or by wire transfer of |

| | |
|---|---|
| | immediately available funds). <br><br> Overbids above the initial $2,500,000 bid increment will be at the Debtors' discretion. |
| **Bid Deadline** | Any person or entity wanting to participate in the Auction, other than the Stalking Horse Bidder, must submit a Qualified Bid for the Bid Assets on or before **April 13, 2009 at 4:00 p.m. (Eastern Time)** (the "**Bid Deadline**"). |
| **Good Faith Deposit** | In order to become a Qualified Bidder, all Bidders will be required to submit a good faith deposit (the "**Good Faith Deposit**") with the Debtors on or before the Bid Deadline. Such Good Faith Deposits shall be equal to five percent (5%) of the Qualified Bidder's proposed purchase price and should be payable to an Escrow Agent to be designated by the Debtors. Good Faith Deposits of all Qualified Bidders shall be held in a separate interest-bearing account for the Debtors' benefit until consummation of a transaction involving any other bidder for the Bid Assets. If a Successful Bidder fails to consummate an approved sale of the Bid Assets because of a breach or failure to perform on the part of such Successful Bidder, such bidder's deposit will be held by the Debtor subject to a ruling by the Bankruptcy Court that the Debtor should be permitted to retain such deposit on account of any damages caused by such bidder's breach. All other deposits will be returned promptly after the closing of the sale of the Bid Assets to the Successful Bidder (or, in the case of Deloitte, in accordance with the terms of the Stalking Horse Agreement). Notwithstanding anything in the Bidding Procedures to the contrary, the terms under which Deloitte provided a Good Faith Deposit and the terms of its use, release and return to Deloitte shall be governed by the Stalking Horse Agreement. |
| **Auction** | In the event that the Debtors timely receive more than one Qualified Bid, the Debtors shall conduct an Auction. Any bidder submitting a Qualified Bid may appear and submit its highest or best bid at the Auction. The Auction may be adjourned without further notice by announcement at the Auction and/or the Sale Approval Hearing in open court without further notice. |

| | |
|---|---|
| *Breakup Fee and Expense Reimbursement* | In the event that the Stalking Horse Agreement is terminated under certain circumstances described in the Stalking Horse Agreement to the extent provided in the Bidding Procedures Order, the Debtors shall promptly, and in any event within one (1) Business Day, pay the Stalking Horse Bidder the Breakup Fee and the Expense Reimbursement as, when and to the extent provided in the Stalking Horse Agreement. |
| *Adequate Assurance Package* | If any Qualified Bid other than the Stalking Horse Bid requires the assumption and assignment of Contracts, then such offeror must identify such Contracts to be assumed and assigned and provide evidence of its ability to provide adequate assurance of future performance of such Contracts along with the Qualified Bid (an "*Adequate Assurance Package*"). |

9. The Debtors reserve the right to: (i) determine in their reasonable discretion (after consultation with the Agent (as defined below) and the Creditors' Committee (as defined below)), which bid is the highest or best bid; and (ii) reject at any time prior to entry of a Court order approving an offer other than the Stalking Horse Bid, without liability, any offer that the Debtors in their reasonable discretion (after consultation with the Agent and the Creditors' Committee) deem to be (x) inadequate or insufficient, (y) not in conformity with the requirements of the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, or procedures set forth therein or herein, or (z) contrary to the best interests of the Debtors and their estates.

10. The Debtors believe that the Bidding Procedures are fair and appropriate and will maximize the recovery for the Debtors and their estates in connection with the Sale. The Bidding Procedures contemplate an open auction process with minimum barriers to entry, and the proposed deadlines provide interested parties with sufficient time to perform due diligence on the Bid Assets. Moreover, the Debtors completed a comprehensive process prior to the Commencement Date to seek out all potential interested parties in the assets and provided

interested parties with diligence information. Accordingly, approval of the Bidding Procedures, including the dates established thereby for the Auction and the Sale Hearing, is warranted.

### C.     Notice and Other Procedures

11.     The Debtors request approval of the following notice and other procedures:

(a)     Sale Notice:  On or before April 3, 2009, the Debtors will serve notice of the Auction and Sale Approval Hearing (the "*Sale Notice*") by first class mail on all creditors and parties in interest, including all parties on the Master Service List, in accordance with the Order Pursuant to Section 105(a) of the Bankruptcy Code and Bankruptcy Rules 1015(c) and 9007 Implementing Certain Notice and Case Management Procedures, dated March 5, 2009 (the "*Case Management Order #2*") [Docket No. 117], as well as on all applicable federal, state and local taxing and regulatory authorities (the "*Notice Parties*").  The form of Sale Notice is annexed hereto as Exhibit E.

(b)     Date, Time, and Place of Auction:  The Debtors propose that the Auction, if one is required, be conducted at the offices of Weil, Gotshal & Manges LLP, 767 Fifth Avenue, New York, New York 10153 on **April 15, 2009, commencing at 10:00 a.m. (Eastern Time)** to determine the highest or otherwise best bid with respect to the Bid Assets.

(c)     Date, Time, and Place of the Sale Approval Hearing:  The Debtors propose that the Sale Approval Hearing be held in the United States Bankruptcy Court for the Southern District of New York, One Bowling Green, New York, NY 10004, on **April 17, 2009 at 9:00 a.m. (Eastern Time)** or such other date and time that the Court may direct.  The Sale Approval Hearing may be adjourned without further notice by announcement at the Sale Approval Hearing.

(d)     Objection Deadline to Sale Order(s):  Objections to the relief sought in the Sale Order shall be in writing, filed and served in accordance with the Case Management Order #2, so as to be actually received by (i) Weil, Gotshal & Manges LLP, 767 Fifth Avenue, New York, New York 10153, (Attn: Marcia L. Goldstein, Esq. and Alfredo R. Pérez, Esq.), as counsel to the Debtors, (ii) the Office of the United States Trustee for the Southern District of New York, 33 Whitehall St., 21st Floor, New York, New York 10004 (Attn: Serene Nakano, Esq.), (iii) Paul, Hastings, Janofsky & Walker LLP, Park Avenue Tower, 75 East 55th Street, First Floor, New York, New York 10022 (Attn:  Luc Despins, Esq. and Leslie A. Plaskon, Esq.), as counsel for Wells Fargo Bank, N.A., the administrative agent for the Debtors' prepetition secured lenders (the "*Agent*"), (iv)  Bingham McCutchen LLP, 299 Park Avenue, New York, New York 10022 (Attn:  Jeffrey Sabin, Esq., Neil W. Townsend, Esq. and Sabin Willett, Esq.), as counsel for the Official Committee of Unsecured Creditors appointed in these chapter 11 cases (the "*Creditors' Committee*"), (v) Kramer Levin Naftalis & Frankel LLP, 1177 Avenue of the Americas, New York, NY 10036 (Attn: Robert T. Schmidt, Esq.), as counsel to the Stalking Horse Bidder, and (vi) all parties on the Master Service List pursuant to the Case Management Order #2 (collectively, the "*Objection Notice Parties*") by **[April 10, 2009] at _____ __.m. (Eastern Time)** by the Objection Notice Parties; provided, however, that objections as to the Auction or the selection of the highest or otherwise best bid shall be in writing, filed and served in accordance with the Case Management Order #2, so as to be actually received by the Objection Notice Parties by **[April 16, 2009] at ___:__  (Eastern Time)**.

**D.     Assumption and Assignment of Executory Contracts and Unexpired Leases**

12.     To facilitate and effect the sale of the Bid Assets, the Debtors also seek authority to assume and assign certain Contracts and Leases to the purchaser(s) of any of the

Debtors' Bid Assets. Due to the nature of the bidding process, the Debtors are not now able to identify which Contracts and Leases may require assumption and assignment. As such, the Debtors further seek authority to establish a process (the "***Assignment Procedures***") to (i) determine the amount of any cure obligations, if any, necessary to be paid in accordance with section 365 of the Bankruptcy Code for those Contracts and Leases that may be assumed, and (ii) establish objection procedures for the counterparties to the Contracts and Leases proposed to be assumed and assigned. Failure by the Debtors to cure those Contracts and Leases in accordance with the terms of the Notice of Assignment and Cure (as defined below), shall constitute a default under the Stalking Horse Agreement. The proposed Assignment Procedures are as follows:

(a)     <u>Notice of Assignment Procedures</u>. As soon as practicable after the entry of the Bidding Procedures Order, the Debtors will file an assignment schedule (the "***Assignment Schedule***"), under seal,[5] with the Court. The Debtors will serve each of the non-debtor counterparties to the Contracts and Leases a notice (the "***Notice of Assignment and Cure***"), by first class mail, that will include (i) the title of the Contract or Lease to be assumed, (ii) the name of the counterparty to the Contract or Lease, (iii) any applicable cure amounts, (iv) the identity of the assignee, and (v) the deadline by which any such Contract or Lease counterparty must object.

(b)     <u>Objection to Assumption and/or Assignment of Contracts and Leases and/or Cure Procedures</u>. Any objections to the assumption and/or assignment of any

---

[5] The Debtors believe that in order to preserve confidentiality and ensure maximum value for their assets, it is necessary to file the Assignment Schedule under seal. As described above, because counterparties to the Contracts and Leases will receive notice of the proposed assumption and assignment and cure amounts, no party will be prejudiced by the filing under seal of the Assignment Schedule.

Contract or Lease identified on the Notice of Assignment and Cure, including to the cure amount set forth on such notice, must be in writing, filed with the Court, and be actually received by the Notice Parties in accordance with the Case Management Order #2 no later than ten (10) days after the Assignment Schedule is mailed to the affected party (the "***Assignment and Cure Objection Deadline***"), and must set forth a specific default under the Contract or Lease and claim a specific monetary amount that differs from the amount, if any, specified by the Debtors in the Notice of Assignment of Cure.

(c)     <u>Resolution of Objections</u>.  If no objections are received by the Assignment and Cure Objection Deadline, then the assumption and assignment are authorized and the cure amounts set forth on the Notice of Assignment and Cure shall be binding upon the nondebtor party to the Contract or Lease for all purposes and will constitute a final determination of total cure amounts required to be paid to the contract or lease counterparty in connection with the assignment to the Successful Bidder.  In addition, each non-debtor party to such unexpired Contract or Lease shall be forever barred from objecting to the cure information set forth in the Notice of Assignment and Cure, including, without limitation, the right to assert any additional cure or other amounts with respect to the Contract or Lease arising or relating to any period prior to such assumption or assignment.  If no objections to the assumption or assumption and assignment are received by the Assignment and Cure Objection Deadline, counsel for the Debtors may submit to the Court a declaration of no objection and a form of order (collectively, the "***Declaration of No Objection***") granting the requested assumption and/or assignment of the Contract or Lease, and serve such Declaration of No Objection on the counterparty to the Contract or Lease.  The order approving such assumption and/or assignment may then be entered by the Court twenty-four (24) hours after the Declaration of No Objection is filed.

13.     If a timely objection is received and such objection cannot otherwise be resolved by the parties, the Court may hear such objection at a later date set by the Court. The pendency of a dispute relating to cure amounts will not prevent or delay the assumption and assignment of any Contracts or Leases. If an objection is filed only with respect to the cure amount listed on the Notice of Assignment and Cure, the Debtors may file a Declaration of No Objection as to assumption and assignment only and the dispute with respect to the cure amount will be resolved consensually, if possible, or, if the parties are unable to resolve their dispute, before the Court. The Debtors intend to cooperate with the counterparties to Contracts or Leases to attempt to reconcile any difference in a particular cure amount.

## PART III – ALLOCATION AGREEMENT

14.     The Debtors request authority to enter into the Allocation Agreement with the Agent for the benefit of the Debtors' prepetition secured lenders. Pursuant to the Allocation Agreement, the Adjusted Purchase Price (as defined in the Stalking Horse Agreement) and other relevant items shall be allocated for purposes of the Stalking Horse Agreement and for federal, state, local and foreign tax purposes in accordance with a statement (the "***Allocation Statement***") to be delivered by Deloitte to BE and certain of its subsidiaries. The Allocation Agreement further provides for procedures by which BE and the Agent must follow in the event that a dispute arises with respect to the allocation.

## PART III – APPLICABLE AUTHORITY

**A.      A Sale of The Debtors' Assets Under
Section 363 of the Bankruptcy Code is Warranted**

15.     Ample authority exists for the approval of the proposed sale of the Debtors' assets. Section 363 of the Bankruptcy Code, which authorizes a debtor to use or sell

assets of the estate other than in the ordinary course of business, free and clear of liens, claims and encumbrances, provides, in relevant part, as follows:

> (b)(1) The trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate . . .

See 11 U.S.C. § 363(b)(1); see Fed. R. Bankr. P. 6004(f)(1) ("All sales not in the ordinary course of business may be by private sale or by public auction.").

16.     The decision to sell assets outside the ordinary course of business is based upon the sound business judgment of the debtor. See, e.g., In re Chateaugay Corp., 973 F.2d 141 (2d Cir. 1992); Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.), 722 F.2d 1063, 1071 (2d Cir. 1983). See also Official Comm. of Sub. Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.), 147 B.R. 650, 656 (S.D.N.Y. 1992), appeal dismissed, 3 F.3d 49 (2d Cir. 1993), quoting Smith v. Van Gorkom, 488 A.2d 858, 872 (Del. 1985) ("the business judgment rule 'is a presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action was in the best interests of the company,'" which has continued applicability in bankruptcy).

17.     In the circumstances of valid business justifications, applicable principles of law attach to a debtor's decision a strong presumption "that in making a business decision[,] the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company." In re Integrated Res., Inc., 147 B.R. at 656 (S.D.N.Y. 1992) (holding that the Delaware business judgment rule has "vitality by analogy" in chapter 11, especially where the debtor is a Delaware corporation) (quotations omitted). Once a court is satisfied that there is a sound business justification for the proposed sale, the court must then determine whether (i) the debtor-in-possession has provided the

interested parties with adequate and reasonable notice, (ii) the sale price is fair and reasonable, and (iii) the purchaser is proceeding in good faith. In re Betty Owens Sch., Inc., 1997 WL 188127 (S.D.N.Y. 1997); accord In re Delaware and Hudson Ry. Co., 124 B.R. 169, 176 (D. Del. 1991); In re Decora Indus., Inc., Case No. 00-44591, 2002 WL 32332749 at *3 (D. Del. May 20, 2002).

18.     Ample business justification exists in this case to approve the proposed Bidding Procedures and any Sale effectuated in accordance therewith. The Debtors have considered all alternatives, with the assistance of their advisors, and determined that a sale of the Bid Assets is in the best interests of their estates and creditors. Furthermore, the Bidding Procedures proposed herein will ensure that the Debtors receive the maximum value for their Bid Assets. The Debtors believe that the Sale must be completed in accordance with the expedited timeframe described herein to preserve and maximize the value of the Debtors' assets before they significantly decline in value.

**B.     Sale of Assets Free and Clear of Liens, Claims, Encumbrances and Interests**

19.     In the interest of attracting the best offers, the sale of the assets should be free and clear of any and all liens, claims, and encumbrances in accordance with section 363(f) of the Bankruptcy Code, with any such liens, claims and encumbrances paid to the secured creditors and/or attaching to the proceeds of the Sale. Pursuant to section 363(f) of the Bankruptcy Code, a debtor in possession may sell property of the estate "free and clear of any interest in such property of an entity other than the estate" if any one of the following conditions is satisfied:

- applicable nonbankruptcy law permits sale of such property free and clear of such interest;

- such entity consents;

- such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;

- such interest is in bona fide dispute; or

- such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

20. The Debtors request that the Court authorize the sale of the Bid Assets free and clear of all liens, claims, encumbrances, and other interests (collectively, "*Liens*"), other than any liabilities expressly assumed by the purchaser. The sale of the Bid Assets pursuant to the Bidding Procedures will satisfy section 363(f) of the Bankruptcy Code because any entities holding Liens on the Bid Assets will have received notice of this and the Sale Notice. All parties in interest will be given sufficient opportunity to object to the relief requested in this, and any such entity that does not object to the Sale should be deemed to have consented. See Futuresource LLC v. Reuters Ltd., 312 F.3d 281, 285-86 (7th Cir. 2002) ("It is true that the Bankruptcy Code limits the conditions under which an interest can be extinguished by a bankruptcy sale, but one of those conditions is the consent of the interest holder, and lack of objection (provided of course there is notice) counts as consent. It could not be otherwise; transaction costs would be prohibitive if everyone who *might* have an interest in the bankrupt's assets had to execute a formal consent before they could be sold.") (internal citations omitted); Hargrave v. Township of Pemberton (In re Tabone, Inc.), 175 B.R. 855, 858 (Bankr. D.N.J. 1994) (failure to object to sale free and clear of liens, claims and encumbrances satisfies section 363(f)(2)); Citicorp Homeowners Serv., Inc. v. Elliot (In re Elliot), 94 B.R. 343, 345 (E.D. Pa. 1988) (same); see also In re Enron Corp. 2003 WL 21755006 at *2 (AJG) (Bankr. S.D.N.Y. 2003) (order deeming all parties who did not object to proposed sale to have consented under section 363(f)(2)). As such, to the extent that no party holding a Lien objects to the relief

requested in the Sale Order, the sale of the Bid Assets free and clear of all Liens except any liabilities expressly assumed by the Successful Bidder satisfies section 363(f)(2) of the Bankruptcy Code.

21.     In addition, the Debtors submit that the Bid Assets may be sold free and clear of all successor liability claims. Notwithstanding reference to the conveyance free and clear of "any interest," in section 363(f) of the Bankruptcy Code, that section has been interpreted to allow the sale of a debtor's assets free and clear of successor liability claims as well. See, e.g., In re Trans World Airlines, Inc. 322 F.3d 283, 288-90 (3d Cir. 2003) (sale of assets pursuant to section 363(f) of the Bankruptcy Code barred successor liability claims for employment discrimination and rights under travel voucher program); Am. Living Systems v. Bonapfel (In re All Am. of Ashburn, Inc.), 56 B.R. 186, 189-90 (Bankr. N.D. Ga. 1986), aff'd, 805 F.2d 1515 (11th Cir. 1986) (sale pursuant to section 363(f) barred successor liability for products defect claim); Rubinstein v. Alaska Pacific Consortium (In re New England Fish Co.), 19 B.R. 323, 328 (Bankr. W.D. Wash. 1982) (sale pursuant to section 363(f) was free and clear of successor liability claims for employment discrimination and civil rights violations).

22.     Accordingly, the Debtors request that the Bid Assets be transferred to the Successful Bidder free and clear of all liens, claims, encumbrances, and interests except for any liabilities expressly assumed by the Successful Bidder, with such liens, claims, encumbrances, and interests to attach to the net sale proceeds of the Bid Assets and/or paid to the secured creditors.

### C. The Successful Bidder Should be Afforded All Protections Under Section 363(m) as a Good Faith Purchaser

23. Section 363(m) of the Bankruptcy Code protects a good-faith purchaser's interest in property purchased from the debtor notwithstanding that the sale conducted under section 363(b) is later reversed or modified on appeal. Specifically, section 363(m) states that:

> The reversal or modification on appeal of an authorization under [section 363(b)] … does not affect the validity of a sale … to an entity that purchased … such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale … were stayed pending appeal.

11 U.S.C. § 363(m). Section 363(m) "fosters the 'policy of not only affording finality to the judgment of the bankruptcy court, but particularly to give finality to those orders and judgments upon which third parties rely.'" In re Chateaugay Corp., 1993 WL 159969 at 3 (S.D.N.Y. 1993) (quoting In re Abbotts Dairies of Penn., Inc., 788 F.2d 143, 147 (3d Cir. 1986)). See also Allstate Ins. Co. v. Hughes, 174 B.R. 884, 888 (S.D.N.Y. 1994) ("Section 363(m) . . . provides that good faith transfers of property will not be affected by the reversal or modification on appeal of an unstayed order, whether or not the transferee knew of the pendency of the appeal"); In re Stein & Day, Inc., 113 B.R. 157, 162 (Bankr. S.D.N.Y. 1990) ("pursuant to 11 U.S.C. § 363(m), good faith purchasers are protected from the reversal of a sale on appeal unless there is a stay pending appeal").

24. The selection of Deloitte as the Stalking Horse Bidder was the product of arm's-length, good faith negotiations. The selection of the Successful Bidder will be the product of arm's-length, good-faith negotiations in an anticipated competitive purchasing process. The Debtors intend to request at the Sale Approval Hearing a finding that Deloitte and/or any other

Successful Bidder is a good-faith purchaser entitled to the protections of section 363(m) of the Bankruptcy Code.

**D.      The Stalking Horse Protections Should be Approved**

25.      In connection with the Asset Sale, the Debtors are seeking authorization to pay (i) the Break-Up Fee and (ii) the Expense Reimbursement described herein and in accordance with the terms of the Stalking Horse Agreement.

26.      Courts in this district routinely approve the use of break-up fees and expense reimbursement, where warranted, in bankruptcy cases. See, e.g., In re Integrated Resources, Inc., 147 B.R. 650  (approving break-up fee and expense reimbursement in connection with chapter 11 plan).  Specifically, the courts in this district have held break-up fees should be approved as long as (i) the relationship between the parties is not tainted by self-dealing, (ii) the fee does not hamper bidding, and (iii) the amount of the fee is reasonable in relation to the size of the transaction.  Id. at 657.

27.      Approval of break-up fees and expense reimbursements as a form of bidder protection in connection with a sale of assets pursuant to section 363 of the Bankruptcy Code has become a recognized practice in chapter 11 cases because it enables a debtor to ensure a sale to a contractually committed buyer at a price the debtor believes is fair, while providing the debtor with the potential of obtaining an enhanced recovery through an auction process. See, e.g., In re Integrated Res., Inc., 147 B.R. 650 (approving break-up fee and expense reimbursement); In re Fortunoff Fine Jewelry and Silverware, LLC, Ch. 11 Case No. 08-10353 (JMP) (Bankr. S.D.N.Y. February 22, 2008) [Docket No. 190] (approving break-up fee of 2.8%); In re Bally Total Fitness of Greater New York, Inc., Ch. 11 Case No. 07-12395 (BRL) (Bankr. S.D.N.Y. Aug. 21, 2007) [Docket No. 269] (approving break-up fee of 4.3% and expense

reimbursement); In re G+G Retail, Inc., Ch. 11 Case No. 06-10152 (RDD) (Bankr. S.D.N.Y. Jan. 30, 2006) [Docket No. 58] (approving break-up fee of 3%); In re Footstar, Inc., Ch. 11 Case No. 04-22350 (ASH) (Bankr. S.D.N.Y. Mar. 15, 2004) [Docket No. 154] (authorizing the debtors to enter into purchase agreements with break-up fees not to exceed 2% with respect to first sale); Id. (Apr. 6, 2004) [Docket No. 316] (authorizing the debtors to enter into purchase agreements with break-up fees with respect to second sale); In re Twinlab Corp., et al., Ch. 11 Case No. 03-15564 (RDD) (Bankr. S.D.N.Y. Sept. 26 2003) [Docket No. 81] (approving break-up fee of 5% and expense reimbursement); In re Adelphia Business Solutions, Inc., et al., Ch. 11 Case No. 02-11389 (REG) (Bankr. S.D.N.Y. Dec. 16, 2002) [Docket No. 760] (approving break-up fee of 2.5% and expense reimbursement with respect to first sale); Id. (Jan. 23, 2003) [Docket No. 833] (approving break-up fee and expense reimbursement with respect to second sale). In each of these cases, (i) the underlying application for which the order was entered was on notice, (ii) except in Fortunoff[6] and Footstar,[7] no objections were filed that pertained to the break-up fees or expense reimbursements sought (iii) all orders entered were final orders, and (iv) in each order the court found sufficient cause to merit the break-up fees and/or expense reimbursements and accordingly authorized such fees.[8] The extent to which the judge focused upon the provision is not clear from the orders. A copy of the above cited orders are attached hereto as Exhibit F.

---

[6] In Fortunoff, the official committee of unsecured creditors objected to the break-up fee (Dec. 12, 2008) [Docket No. 84].

[7] In Footstar, General Electric filed an objection to the first bidding procedures motion that primarily related to certain procedural aspects of the sale, but also added that the break-up fee "may be excessive or inappropriate, but without additional information as to value of assets proposed to be sold, the propriety of the break-up fee cannot be determined." (Mar. 11, 2004) [Docket No. 96].

[8] In several cases the court made more specific findings of facts. In both Fortunoff and Twinlab, the court found that the break-up fees and expense reimbursements were (a) an actual and necessary cost of preserving estates, (b) commensurate to the real and substantial benefit conferred upon Debtors' estates by buyer, (c) reasonable and appropriate in light of size and nature of transaction, (d) necessary to induce

28.     Bankruptcy courts have approved bidding incentives similar to the

Stalking Horse Protection under the "business judgment rule," pursuant to which courts typically

grant deference to the actions of a corporation's board of directors taken in good faith and in the

exercise of honest judgment.

29.     Here, the Stalking Horse Protections meet the "business judgment rule"

standard. First, the Break-Up Fee is fair and reasonable in amount, particularly in view of the

substantial efforts that have been and will be made be expended by Deloitte. The Break-Up Fee

provided for in the Stalking Horse Agreement, and payable pursuant to the terms of the Stalking

Horse Agreement, is approximately 3% of the purchase price, which, as set forth above, is

consistent with break-up fees approved by courts in this and other districts. The Break-Up Fee

will enable the Debtors to secure an adequate floor for the Auction and, thus, insist that

competing bids be materially higher or otherwise better than the Stalking Horse Agreement, a

clear benefit to the Debtors' estates.

30.     Second, only documented, reasonable costs and expenses will be

reimbursed. In sum, the Debtors' ability to offer both the Expense Reimbursement and the

Break-Up Fee will enable them to ensure the sale of the Debtors' assets to a contractually-

---

the buyer to pursue a sale transaction. Additionally, the <u>Fortunoff</u> and <u>Twinlab</u> courts concluded that
these fees (a) provided a material benefit to the Debtors and their creditors by increasing the likelihood
that the best possible price would be received, and (b) represented the best method for maximizing value
for the benefit of the Debtors' estates. In <u>G&G</u>, the court found that (a) compelling and sound business
justifications existed for authorizing the payment of the break-up fee, (b) the break-up fee was fair and
reasonable and justified in light of benefit to Debtors' estate and creditors by the sale contemplated in the
purchase agreement, (c) the Debtors' agreement to pay the break-up fee was made in good faith, and (d)
payment was in best interests of estate. In <u>Bally</u>, the court found that the relief requested was in best
interests of Debtors' estates, creditors, and other parties in interest. With respect to the remaining orders,
the courts did not make any specific findings of fact pertaining to the break-up fees or expense
reimbursements other than the general statement that the order was made upon a finding of sufficient
cause.

committed bidder at a price that they believe to be fair while, at the same time, providing them with the potential of even greater recovery to the estates.

31.     The Debtors submit that the proposed Stalking Horse Protection will not chill bidding, are reasonable, and their availability to the Debtors will enable the Debtors to maximize the value of their estates.  Accordingly, the Debtors should be authorized to offer the Stalking Horse Protection as the Debtors' deem necessary in their business judgment.  The Debtors further submit that payment of the Break-up Fee and/or Expense Reimbursement, upon the conditions set forth in the Stalking Horse Agreement, are actual and necessary costs of preserving the Debtors' estates and as such, shall constitute an administrative expense within the meaning of section 503(b) and 507(a) of the Bankruptcy Code.

**E.     The Bidding Procedures are Reasonable and Appropriate**

32.     The Debtors believe that the Bidding Procedures will ensure that the bidding process with respect to the Auction is fair and reasonable and will yield the maximum value for their estates and creditors.

33.     In addition, the Bidding Procedures set deadlines for conducting an Auction and holding a hearing with respect to the sales proposed herein.  The deadlines are a compromise between the dates requested by Deloitte and the dates the Debtors suggested.  The Debtors believe that value will be maximized by conducting a prompt sale.  Thus, the Debtors believe that they must be permitted to conduct the sale process in the manner and on the timetable set forth herein and in the Bidding Procedures.

34.     Accordingly, the Debtors believe the Court should approve the Bidding Procedures, including the dates established thereby for the Auction and the Sale Approval Hearing.

**F. Assumption and Assignment of Executory Contracts and Unexpired Leases**

35.     As stated above, to facilitate and effect the sale of the Bid Assets, the Debtors also seek authority to assume and assign certain Contracts and Leases to the purchaser(s) of any of the assets. Section 365 of the Bankruptcy Code allows the debtor to maximize the value of the debtor's estate by assuming and assigning executory contracts or unexpired leases that benefit the estate and by rejecting those that do not. See COR Route 5 Co., LLC v. The Penn Traffic Co. (In re The Penn Traffic Co.), 524 F.3d 373, 382 (2d Cir. 2008). Section 365 of the Bankruptcy Code authorizes the proposed assumptions and assignments, provided that the defaults under such contracts and leases are cured and adequate assurance of future performance is provided. See 11 U.S.C. § 365(f)(2).

36.     The words "adequate assurance of future performance" must be given a "practical, pragmatic construction" in "light of the proposed assumption." In re Fleming Cos., 499 F.3d 300 (3d Cir. 2007) (internal citations omitted). See also Carlisle Homes, Inc. v. Arrari (In re Carlisle Homes, Inc.), 103 B.R. 524, 538 (Bankr. D. N.J. 1989); In re Natco Indus., Inc., 54 B.R. 436, 440 (Bankr. S.D.N.Y. 1985) (adequate assurance of future performance does not mean absolute assurance that debtor will thrive and pay rent); In re Bon Ton Rest. & Pastry Shop, Inc., 53 B.R. 789, 803 (Bankr. N.D. Ill. 1985) ("Although no single solution will satisfy every case, the required assurance will fall considerably short of an absolute guarantee of performance.").

37.     Among other things, adequate assurance may be given by demonstrating the assignee's financial health and experience in managing the type of enterprise or property assigned. See In re Bygaph, Inc., 56 B.R. 596, 605-06 (Bankr. S.D.N.Y. 1986) (adequate assurance of future performance is present when prospective assignee of a lease from debtor has

financial resources and has expressed a willingness to devote sufficient funding to business in order to give it strong likelihood of succeeding; chief determinant of adequate assurance is whether rent will be paid). See also In re Vitanza, 1998 WL 808629, at *26 (Bankr. E.D. Pa. 1998) ("The test is not one of guaranty but simply whether it appears that the rent will be paid and other lease obligations met.").

38.     As set forth above, any bid, other than the bid provided in Stalking Horse Agreement, that requires the assumption and assignment of Contracts and/or Leases must be submitted with an Adequate Assurance Package containing the identity of such Contracts and Leases and evidence of such Qualified Bidder's ability to provide adequate assurance of future performance.

39.     While the Debtors do not yet know which Contracts and Leases will require assumption and assignment, they will provide the parties to any such Contracts with notice and an opportunity to object, as well as adequate assurance. The Cure Procedures will ensure that all parties against whom relief is sought will have ample notice of such relief and an opportunity to contest any asserted cure amount, as well as the adequacy of the adequate assurance provided. Consequently, the Debtors submit that the Cure Procedures are fair and reasonable and warrant court approval

G.      **The Court Should Authorize BE to Enter into the Allocation Agreement**

40.     Section 363(b)(1) of the Bankruptcy Code provides, in relevant part, "the trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate."

41.     Although section 363 of the Bankruptcy Code does not set forth a standard for determining when it is appropriate for a court to authorize a transaction outside the ordinary

course of business, courts in the Second Circuit and others, in applying this section, have required that such transaction be based upon the sound business judgment of the debtor. See, e.g., In re Chateaugay Corp., 973 F.2d 141, 143 (2d Cir. 1992) (affirming approval of transaction under section 363(b) on the grounds that the transaction was supported by a "good business reason"); Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.), 722 F.2d 1063, 1070 (2d Cir. 1983) (requiring "sound business justifications" for transaction under section 363(b)); In re Calpine Corp., 356 B.R. 585, 594 (Bankr. S.D.N.Y. 2007) (requiring "good business reason" for 363(b) authorization). See also Fulton State Bank v. Schipper (In Re Schipper), 933 F.2d 513, 515 (7th Cir. 1991) (debtor required to provide an "articulated business justification" for 363(b) transactions); Institutional Creditors of Cont'l Airlines, Inc. v. Cont'l Airlines, Inc. (In re Cont'l Airlines, Inc.), 780 F.2d 1223, 1226 (5th Cir. 1986) (same).

42.     It is generally understood that "[w]here the debtor articulates a reasonable basis for its business decisions (as distinct from a decision made arbitrarily or capriciously), courts will generally not entertain objections to the debtor's conduct." Comm. of Asbestos-Related Litigants v. Johns Manvill Corp. (In re Johns-Manville Corp.), 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986).

43.     The Debtors believe that a reasonable basis exists to enter into the Allocation Agreement. The Secured Creditors (as defined in the Allocation Agreement) may have an interest in, and be effected by, the transaction contemplated in the Stalking Horse Agreement. Pursuant to the *Interim Order Pursuant to Sections 105, 361, 363 and 364 of the Bankruptcy Code (A) Authorizing the Debtors' Use of Cash Collateral by Consent, (B) Authorizing Postposition Letter of Credit Financing, (C) Granting Adequate Protection and (D) Scheduling a Final Hearing Pursuant to Bankruptcy Rule 4001* (the "**Cash Collateral Order**")

[Doc. No. 37] entered by this Court on February 19, 2009, the Debtors may not use sell or otherwise dispose of the Secured Creditors' collateral without their consent and without an order of this Court. As such, the Debtors believe that entry into the Allocation Agreement is in support of the Secured Creditors' rights under the Cash Collateral Order and applicable law.

### H. The Court Should Waive or Reduce the Periods Required By Rules 6004(h) and 6006(d) of the Federal Rules of Bankruptcy Procedure

44.     Pursuant to Interim Rule 6004(h) (formerly Rule 6004(g)) of the Bankruptcy Rules), unless the court orders otherwise, all orders authorizing the sale of property pursuant to section 363 of the Bankruptcy Code are automatically stayed for 10 days after entry of the order. Fed. R. Bankr. P. 6004(h).[9] The purpose of Bankruptcy Rule 6004(h) is to provide sufficient time for an objecting party to appeal before the order is implemented. See Advisory Committee Notes to Fed. R. Bankr. P. 6004(h). Similarly, Bankruptcy Rule 6006(d) stays all orders authorizing a debtor to assign an executory contract or unexpired lease pursuant to section 365(f) of the Bankruptcy Code for 10 days, unless the court orders otherwise. Fed. R. Bankr. P. 6006(d).

45.     To preserve the value of the Debtors' estates and limit the costs of administering and preserving the Bid Assets, it is critical that the Debtors close the sale of the Bid Assets as soon as possible after all closing conditions have been met or waived. Accordingly, the Debtors hereby request that the Court waive the 10-day stay periods under Bankruptcy Rules 6004(h) and 6006(d), or in the alternative, if an objection to the sale of the Bid Assets or to the assignment of any Contract or Lease is filed, reduce the stay period to the

---

[9] Bankruptcy Rule 6004(h) is an interim bankruptcy rule adopted pursuant to standing General Order M-308 of the United States Bankruptcy Court for the Southern District of New York, signed on October 11, 2005 by Chief Judge Stuart M. Bernstein.

minimum amount of time reasonably required by the objecting party to file its appeal; <u>provided,</u> <u>however</u> that the Stalking Horse Bidder is under no obligation to close absent a final order of the Court.

## <u>Jurisdiction</u>

46.    Pursuant to 28 U.S.C. §§ 157 and 1334 and Standing Order M-61 of the United States District Court for the Southern District of New York, dated July 10, 1984 (Ward, Acting C.J.), the Court has jurisdiction to consider and grant the relief requested herein.  A proceeding to consider and grant such relief is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## <u>Notice</u>

47.    The Debtors shall serve notice of this Motion to the Notice Parties in accordance with the Case Management Order #2.  The Debtors submit that, in view of the facts and circumstances, such notice is sufficient and no other or further notice need be provided.

48.    No previous request for the relief sought herein has been made by the Debtors to this or any other court.

WHEREFORE, the Debtors respectfully request that the Court grant the relief requested herein and such other and further relief as is just and appropriate.

Dated: March 23, 2009
      New York, New York

                    _____
                    Marcia L. Goldstein

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

           and

Alfredo R. Pérez

WEIL, GOTSHAL & MANGES LLP
700 Louisiana Street, Suite 1600
Houston, Texas 77002
Telephone: (713) 546-5000
Facsimile: (713) 224-9511

Attorneys for Debtors
and Debtors in Possession

# Exhibit A

**Proposed Bidding Procedures Order**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------x
                    :

In re                      :     Chapter 11 Case No.
                    :

BEARINGPOINT, INC., et al.,    :     09 - 10691 (REG)
                    :

    Debtors.             :     (Jointly Administered)
                    :

---------------------------------------------------------------x

**ORDER PURSUANT TO SECTIONS 363(b), (f), AND (m), 365 AND 105(a) OF THE
BANKRUPTCY CODE AND BANKRUPTCY RULES 2002, 6004, 6006, AND 9014 (i)
APPROVING PROCEDURES IN CONNECTION WITH THE SALE OF CERTAIN OF
THE DEBTORS' ASSETS FREE AND CLEAR OF LIENS, CLAIMS, ENCUMBRANCES,
AND INTERESTS, (ii) AUTHORIZING THE DEBTORS TO ENTER INTO A STALKING
HORSE AGREEMENT IN CONNECTION THEREWITH, (iii) APPROVING THE
PAYMENT OF STALKING HORSE PROTECTIONS, (iv) APPROVING THE STALKING
HORSE AGREEMENT, (v) AUTHORIZING THE DEBTORS TO SELL CERTAIN OF
THE THEIR ASSETS, (vi) SETTING RELATED AUCTION AND HEARING DATES, (vii)
AUTHORIZING THE DEBTORS TO ENTER INTO AN ALLOCATION AGREEMENT,
AND (viii) APPROVING PROCEDURES RELATED TO
ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS
AND UNEXPIRED LEASES AND APPROVING THE FORM AND MANNER THEREOF**

Upon the motion (the "**Motion**"), dated March 23, 2009, of BearingPoint, Inc.

("**BearingPoint**") and certain of its affiliates, as debtors and debtors in possession in the above-

captioned chapter 11 cases (collectively, the "**Debtors**"), pursuant to sections 105, 363 and 365

of chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**") and Rules 6004 and

6006 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), for (i) approval

of procedures (the "**Bidding Procedures**") in connection with the sale of BearingPoint's public

services industry group, in whole or in part (the "**Bid Assets**"), (ii) authorization to enter into a

Stalking Horse Agreement (as defined below) in connection therewith, (iii) approval of the

payment of Stalking Horse Protections (as defined below), and (iv) the setting of related auction

and sale hearing dates, all as more fully described in the Motion; and the Court having held a

hearing to consider the relief requested herein (the *Bidding Procedures Hearing*") with the appearances of all interested parties noted in the record of the Bidding Procedures Hearing; and upon the record of the Hearing, and all of the proceedings before the Court, the Court finds and determines the following:

**FOUND AND DETERMINED THAT:**

     A.    The Court has jurisdiction to consider the Motion and the relief requested therein in accordance with 28 U.S.C. §§ 157 and 1334 and the Standing Order M-61 of the United States District Court for the Southern District of New York, dated July 10, 1984 (Ward, Acting C.J.). Venue of these cases and the Motion in this district is proper under 28 U.S.C. §§ 1408 and 1409.

     B.    The Debtors have provided due and proper notice of the Motion and Hearing to the Notice Parties[1] in accordance with the Order Pursuant to Section 105(a) of the Bankruptcy Code and Bankruptcy Rules 1015(c) and 9007 Implementing Certain Notice and Case Management Procedures, dated March 5, 2009 [Docket No. 117], and no further notice is necessary. A reasonable opportunity to object or be heard regarding the relief requested in the Motion (including, without limitation, with respect to the Bidding Procedures and Stalking Horse Protections (as defined below)) has been afforded to all interested persons and entities, including but not limited to the Notice Parties.

     C.    The Debtors' proposed notice of the Bidding Procedures, the Auction and the hearing to approve any sale of the Debtors' Bid Assets (the "*Sale Approval Hearing*") is appropriate and reasonably calculated to provide all interested parties with timely and proper notice, and no other or further notice is required.

---

[1] Capitalized terms used, but not defined, herein shall have the meaning ascribed to them in the Motion.

D.     The Bidding Procedures substantially in the form attached to the Motion as Exhibit B are fair, reasonable, and appropriate and are designed to maximize the recovery from any sale of the Debtors' Bid Assets (the "*Sale*").  The Bidding Procedures were negotiated in good faith between the Debtors and the Stalking Horse Bidder (as defined below).

E.     The Debtors have demonstrated a compelling and sound business justification for authorization to (i) enter into the agreement (the "*Stalking Horse Agreement*") with Deloitte LLP ("*Deloitte*" or the "*Stalking Horse Bidder*"), attached as Exhibit C to the Motion, for the sale of the Bid Assets and (ii) pay the fee (the "*Break-Up Fee*") and expense reimbursement (the "*Expense Reimbursement*," and together with the Break-Up Fee, the "*Stalking Horse Protections*"), under the terms and conditions set forth in Section 7 of the Stalking Horse Agreement.

F.     The Stalking Horse Protections are fair and reasonable and provide a benefit to the Debtors' estates and creditors.

G.     The Debtors' payment of either or both (i) the Break-Up Fee and/or (ii) the Expense Reimbursement, under this Order and upon the conditions set forth in Section 7 of the Stalking Horse Agreement is (a) an actual and necessary cost of preserving the Debtors' estates, within the meaning of section 503(b) and 507(a) of the Bankruptcy Code, (b) of substantial benefit to the Debtors' estates and creditors and all parties in interest herein, (c) reasonable and appropriate and (d) material inducements for, and conditions necessary to ensure that the Stalking Horse Bidder will continue to pursue its proposed agreement to undertake any Sale.

H.     On or about April 3, 2009, the Debtors will serve notice of the Auction and the Sale Approval Hearing (the "*Sale Notice*") on the Notice Parties in accordance with the

Order Pursuant to Section 105(a) of the Bankruptcy Code and Bankruptcy Rules 1015(c) and 9007 Implementing Certain Notice and Case Management Procedures, dated March 5, 2009 [Docket No. 117] on the Notice Parties.

I.    Entry of this Order is in the best interests of the Debtors and their estates, creditors, and interest holders and all other parties-in-interest herein.

J.    The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014.

K.    To the extent any of the following findings of fact constitute conclusions of law, they are adopted as such.  To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

**ORDERED, ADJUDGED AND DECREED THAT:**

1.    The Bidding Procedures attached to the Motion as <u>Exhibit B</u> are APPROVED, fully incorporated into this Order and the Debtors are authorized and directed to act in accordance therewith.  The failure to specifically include a reference to any particular provision of the Bidding Procedures in this Order shall not diminish or impair the effectiveness of such provision.

2.    All objections to the Motion or the relief requested therein that have not been withdrawn, waived, settled, or specifically addressed in this Order, and all reservations of rights included in such objections, are overruled in all respects on the merits.

3.    The form of Sale Notice attached to the Motion as <u>Exhibit E</u> is approved.

NY2:\1978777\14\16#%114!.DOC\22638.0013

4.     Service of the Sale Notice on the Notice Parties in the manner described herein and in the Motion constitutes good and sufficient notice of the Auction and the Sale Approval Hearing.  No other or further notice is required.

5.     To constitute a "***Qualified Bid***," a bid (other than the Stalking Horse Agreement) must be received by the Bid Deadline (as defined in the Bidding Procedures) and comply with the applicable provisions of the Bidding Procedures; provided, however, that if any such Qualified Bid is conditioned upon the assumption and assignment of Contracts (as defined below) or Leases (as defined below), then such offeror must identify such Contracts and/or Leases to be assumed and assigned and provide evidence of its ability to provide adequate assurance of future performance of such Contracts or Leases along with such Qualified Bid (an "***Adequate Assurance Package***").  The Stalking Horse Agreement is a Qualified Bid.  The Stalking Horse Bidder shall be deemed to be a Qualified Bidder.

6.     The Auction shall be conducted at the offices of Weil, Gotshal & Manges LLP, 767 Fifth Avenue, New York, New York 10153 on [**April 15, 2009**] at _____ __.**m. (Eastern Time)**.

7.     Objection Deadline to Sale Order(s).  Objections to the relief sought in the Sale Order shall be in writing, filed and served in accordance with the Case Management Order #2, so as to be actually received by (i) Weil, Gotshal & Manges LLP, 767 Fifth Avenue, New York, New York 10153, (Attn: Marcia L. Goldstein, Esq. and Alfredo R. Pérez , Esq.), as counsel to the Debtors, (ii) the Office of the United States Trustee for the Southern District of New York, 33 Whitehall St., 21st Floor, New York, New York 10004 (Attn:  Serene Nakano, Esq.), (iii) Paul, Hastings, Janofsky & Walker LLP, Park Avenue Tower, 75 East 55th Street, First Floor, New York, New York 10022 (Attn:  Luc Despins, Esq. and Leslie A. Plaskon, Esq.),

as counsel for Wells Fargo Bank, N.A., the administrative agent for the Debtors' prepetition secured lenders (the "*Agent*"), (iv) Bingham McCutchen LLP, 299 Park Avenue, New York, New York 10022 (Attn: Jeffrey Sabin, Esq., Neil W. Townsend, Esq. and Sabin Willett, Esq.), as counsel for the Official Committee of Unsecured Creditors appointed in these chapter 11 cases (the "*Creditors' Committee*"), (v) Kramer Levin Naftalis & Frankel LLP, 1177 Avenue of the Americas, New York, NY 10036 (Attn: Robert T. Schmidt, Esq.), as counsel to the Stalking Horse Bidder, and (vi) all parties on the Master Service List pursuant to the Case Management Order #2 (collectively, the "*Objection Notice Parties*") by [**April 10, 2009**] **at _____ __.m. (Eastern Time)** by the Objection Notice Parties; provided, however, that objections as to the Auction or the selection of the highest or otherwise best bid shall be in writing, filed and served in accordance with the Case Management Order #2, so as to be actually received by the Objection Notice Parties by [**April 16, 2009**] **at ___:__ (Eastern Time)**.

8.     The Sale Approval Hearing shall be held in the United States Bankruptcy Court for the Southern District of New York, Courtroom 621, One Bowling Green, New York, NY 10004, on [**April 17, 2009**] **at _____ __.m. (Eastern Time)** or such other date and time that the Court may later direct; provided, however, that the Sale Approval Hearing may be adjourned, from time to time, without further notice to creditors or parties in interest other than by announcement of the adjournment in open Court or on the Court's docket.

9.     As soon as practicable after the conclusion of the Auction, but no later than before the Sale Approval Hearing, the Debtors shall file a final form of order approving the Sale as agreed upon between the Debtors and the Successful Bidder(s).

10.     Stalking Horse Agreement.  The Debtors are authorized to enter into the Stalking Horse Agreement.

11.     The Stalking Horse Bidder shall be entitled to receive the Expense Reimbursement and/or the Break-Up Fee in accordance with the terms and conditions of the Stalking Horse Agreement. The Expense Reimbursement and Break-Up Fee, once earned in accordance with Section 7 of the Stalking Horse Agreement, shall (i) be administrative expenses in the Debtors' chapter 11 cases pursuant to sections 503(b), 507(a)(1) and 507(b) of the Bankruptcy Code until paid to the Stalking Horse Bidder, provided, however, that all such amounts shall have the priority and be paid solely in the manner set forth in Section 7 of the Stalking Horse Agreement.

12.     Assignment Procedures. The assignment procedures set forth in the Motion (the "*Assignment Procedures*") are hereby approved. As soon as practicable after the date this Order is entered, the Debtors will file with the Court an assignment schedule (the "*Assignment Schedule*") identifying the Contracts and Leases that will be assumed and assigned pursuant to the Stalking Horse Agreement, under seal, and in the form and substance reasonably acceptable to the Stalking Horse Bidder. The Debtors will serve each of the non-debtor counterparties to the Contracts and Leases a notice in the form of Exhibit __ hereto, which shall be in form and substance reasonably acceptable to the Stalking Horse Bidder (the "*Notice of Assignment and Cure*"), by first class mail, that will include (i) the title of the Contract or Lease to be assumed, (ii) the name of the counterparty to the Contract or Lease, (iii) any applicable cure amounts, (iv) the identity of the assignee, and (v) the deadline by which any such Contract or Lease counterparty must object.

13.     Any objections to the assumption and/or assignment of any Contract or Lease identified on the Notice of Assignment and Cure, including to the cure amount set forth on such notice, must be in writing, filed with the Court, and be actually received by the Notice

Parties in accordance with the Case Management Order #2 no later than ten (10) days after the Assignment Schedule is mailed to the affected party (the "**Assignment and Cure Objection Deadline**"), and must set forth a specific default under the Contract or Lease and claim a specific monetary amount that differs from the amount, if any, specified by the Debtors in the Notice of Assignment of Cure.

14.     <u>Resolution of Objections to Assumption and/or Assignment of Contracts and Leases</u>. If no objections are received by the Assignment and Cure Objection Deadline, then the assumption and assignment are authorized and the cure amounts set forth on the Notice of Assignment and Cure shall be binding upon the nondebtor party to the Contract or Lease for all purposes and will constitute a final determination of total cure amounts required to be paid to the contract or lease counterparty in connection with the assignment to the Successful Bidder. In addition, each non-debtor party to such unexpired Contract or Lease shall be forever barred from objecting to the cure information set forth in the Notice of Assignment and Cure, including, without limitation, the right to assert any additional cure or other amounts with respect to the Contract or Lease arising or relating to any period prior to such assumption or assignment. If no objections to the assumption or assumption and assignment are received by the Assignment and Cure Objection Deadline, counsel for the Debtors may submit to the Court a declaration of no objection and a form of order (collectively, the "**Declaration of No Objection**") granting the requested assumption and/or assignment of the Contract or Lease, and serve such Declaration of No Objection on the counterparty to the Contract or Lease. The order approving such assumption and/or assignment may then be entered by the Court twenty-four (24) hours after the Declaration of No Objection is filed.

15. If a timely objection is received and such objection cannot otherwise be resolved by the parties, the Court may hear such objection at a later date set by the Court. The pendency of a dispute relating to cure amounts will not prevent or delay the assumption and assignment of any Contracts or Leases. If an objection is filed only with respect to the cure amount listed on the Notice of Assignment and Cure, the Debtors may file a Declaration of No Objection as to assumption and assignment only and the dispute with respect to the cure amount will be resolved consensually, if possible, or, if the parties are unable to resolve their dispute, before the Court. The Debtors intend to cooperate with the counterparties to Contracts or Leases to attempt to reconcile any difference in a particular cure amount.

16. BE is authorized to enter into the Allocation Agreement with Wells Fargo, N.A., in its capacity as Agent.

17. Notwithstanding Bankruptcy Rules 6004, 6006 or otherwise, this Order shall be effective and enforceable immediately upon entry and its provisions shall be self-executing.

18. All time periods set forth in this Order shall be calculated in accordance with Bankruptcy Rule 9006(a).

19. To the extent this Order is inconsistent with any prior order or pleading with respect to the Motion in these cases, the terms of this Order shall govern.

20.     This Court shall retain jurisdiction over any matters related to or arising from the implementation or interpretation of this Order.  To the extent any provisions of this Order shall be inconsistent with the Motion, the terms of this Order shall control.

Dated:  New York, New York
            _____, 2009

                              _____

                              UNITED STATES BANKRUPTCY JUDGE

# Exhibit B

**Bidding Procedures**

## BIDDING PROCEDURES

Set forth below are the bidding procedures (the "***Bidding Procedures***") to be employed in connection with an auction (the "***Auction***") for the sale (the "***Sale***") of (i) the assets included in the Stalking Horse Agreement (as defined below) (the "***Deloitte Bid Assets***") between Deloitte LLP ("***Deloitte***" or the "***Stalking Horse Bidder***") and BearingPoint, Inc. ("***BE***," and together with its debtor and non-debtor affiliates, "***BearingPoint***"); or (ii) all or any portion of the Deloitte Bid Assets plus any of the Debtors' assets not included in the Stalking Horse Agreement (together with the Deloitte Bid Assets, the "***Bid Assets***"). At a hearing following the Auction (the "***Sale Approval Hearing***"), the Debtors will seek entry of an order (the "***Sale Order***") from the United States Bankruptcy Court for the Southern District of New York (the "***Bankruptcy Court***") authorizing and approving the Sale to the Qualified Bidder (as defined below) that the Debtors[1] determine to have made the highest or otherwise best bid (the "***Successful Bidder***").

### Assets to be Sold

By Motion dated March 23, 2009, the Debtors have requested authority to sell the Bid Assets, which are comprised in whole or in part of assets of BearingPoint's public services industry group. Except as otherwise provided in definitive documentation with respect to the Sale, all of the Debtors' rights, title and interest in and to any Bid Assets sold in connection with, or as a result of, the Sale shall be sold free and clear of all pledges, liens, security interests, encumbrances, claims, charges, options and interests thereon and against in accordance with section 363 of the Bankruptcy Code.

### The Bidding Process

After consultation with the Agent, the Debtors shall: (i) determine whether any person is a Qualified Bidder (as defined below); (ii) provide reasonable assistance to Interested Parties in conducting their due diligence investigations subject to the provisions below; (iii) receive offers from proposed bidders; and (iv) negotiate any offers made to purchase the Bid Assets. Any person who wishes to participate in the Auction must be a Qualified Bidder. Neither the Debtors nor their representatives shall be obligated to furnish any information of any kind to any person who has not executed a confidentiality agreement as provided for below. Notwithstanding the foregoing or anything else in these Bidding Procedures, the Stalking Horse

---

[1] Capitalized terms not defined herein shall have the meanings ascribed to them in the Debtors' *Motion for Orders pursuant to Sections 363(b), (f), and (m), 365 and 105(a) of the Bankruptcy Code and Bankruptcy Rules 2002, 6004, 6006, and 9014 For (i) Approval of Procedures in Connection with the Sale of Certain of the Debtors' Assets Free and Clear of Liens, Claims, Encumbrances, and Interests, (ii) Authorization to Enter Into a Stalking Horse Agreement in Connection Therewith, (iii) Approval of the Payment of Stalking Horse Protections, (iv) Approval of the Stalking Horse Agreement, (v) Authorization to Sell Certain of the Debtors' Assets, (vi) the Setting of Related Auction and Hearing Dates, (vii) Authorization to Enter into an Allocation Agreement, (viii) Approval of Procedures Related to Assumption and Assignment of Executory Contracts and Unexpired Leases and Form and Manner Thereof.*

Bidder is hereby deemed to be a Qualified Bidder for all purposes and at all times, and the bid embodied in the Stalking Horse Agreement (including any subsequent bids at the Auction) is hereby deemed to be a Qualified Bid (as defined herein) for the Bid Assets, for all purposes and at all times.

BE has entered into an agreement (the "***Stalking Horse Agreement***") with Deloitte for the sale of the Deloitte Bid Assets, as described in the Motion and the Stalking Horse Agreement. The Stalking Horse Agreement is attached as Exhibit E to the Motion and has been filed on the main docket of these cases. Pursuant to the Stalking Horse Agreement and these Bidding Procedures, the Debtors have agreed to provide the Stalking Horse Bidder with the following bid protections: (i) a breakup fee in the amount of $10,500,000 (the "***Breakup Fee***"); and (ii) reimbursement of reasonable, documented out of pocket costs and expenses (including fees and expenses of counsel, financial advisors and other professionals and consultants, and Deloitte's share of the HSR Act filing fee) incurred by the Stalking Horse Bidder in connection with the Stalking Horse Agreement and the transactions contemplated thereby, in an amount not to exceed $1,500,000 (the "***Expense Reimbursement***"); provided, however, that in certain circumstances where the Breakup Fee is not due and owing, the amount of the Expense Reimbursement may be up to $5,000,000. The Breakup Fee and the Expense Reimbursement will be paid as, when and to the extent provided in the Stalking Horse Agreement, and as approved by the Bankruptcy Court in the bidding procedures order.

To facilitate the Auction and assist the Debtors and other interested parties in assessing the terms of each bid, those prospective bidders who are interested in bidding on the Bid Assets must utilize the Stalking Horse Agreement and the Schedules and Exhibits thereto to prepare their bids and mark all proposed changes to such agreement and schedules as part of their bid.

## Bid Deadline

Any person or entity wanting to participate in the Auction, other than the Stalking Horse Bidder, must submit a Qualified Bid (as defined below) for the Bid Assets on or before **April 13, 2009 at 4:00 p.m. (Eastern Time)** (the "***Bid Deadline***") in writing to (i) Greenhill & Co., LLC, 300 Park Avenue, New York, NY 10022 (Attn: Dhiren Shah, Bradley A. Robins, and Birger Kuno Berendes), investment bankers and financial advisors to the Debtors, and (ii) Paul, Hastings, Janofsky & Walker LLP, Park Avenue Tower, 75 East 55th Street, First Floor, New York, New York 10022 (Attn: Luc Despins, Esq. and Leslie A. Plaskon, Esq.), attorneys to the Agent. The Debtors shall deliver to the Stalking Horse Bidder copies of all bids submitted to them for the purchase of any of their assets, in each case substantially contemporaneously with the Debtors' receipt thereof.

## Qualified Bids

To qualify as a "Qualified Bidder" with respect to bids on the Bid Assets, a bidder must submit a "Qualified Bid" (as described below) by the Bid Deadline and: (i) offer to purchase the Bid Assets and assume some or all of the Assumed Liabilities (as defined in the Stalking Horse Agreement); (ii) provide a copy of the Qualified Bidder's proposed Asset Purchase Agreement and the Schedules and Exhibits thereto, which shall be modified by the

Qualified Bidder from the form of the Stalking Horse Agreement only to the extent necessary to reflect proposed changes, together with a marked copy of the Stalking Horse Agreement and Schedules and Exhibits thereto reflecting such changes; (iii) must not subject its bid to any conditions less favorable to the Debtors than those provided for in the Stalking Horse Agreement; (iv) agree to not revoke its bid until the closing of a purchase of the Bid Assets by the Successful Bidder and agree to serve as a Backup Bidder (as defined below); (v) stipulate or otherwise provide evidence that such Qualified Bidder's submission, execution, delivery and closing of the marked up versions of the Stalking Horse Agreement and the Schedules and Exhibits thereto has been authorized and approved by the Qualified Bidder's board of directors (or comparable governing body); (vi) state that such Qualified Bidder is financially capable of consummating the transactions contemplated by the Stalking Horse Agreement, and otherwise provide such other information that will allow the Debtors and their advisors to make a reasonable determination as to the Qualified Bidder's ability to consummate the transactions contemplated by the Stalking Horse Agreement, including the Adequate Assurance Package (as defined below); (vii) not seek any transaction or breakup fee, expense reimbursement, or similar type of payment; and (viii) be accompanied by a Good Faith Deposit (as defined below).

A Qualified Bid with respect to the Bid Assets is one that: (i) is a proposal determined by the Debtors, in the good faith opinion of its board of directors, as the case may be, after consultation with the Debtors' investment bankers and financial advisors and Agent, not to be materially more burdensome or conditional than the terms of the Stalking Horse Agreement and one that has a value greater than or equal to the sum of (x) the value, as reasonably determined by the Debtors' financial advisor, of the Stalking Horse Agreement plus (y) Twelve Million Dollars ($12,000,000) (i.e., the sum of the Breakup Fee and the maximum amount (in certain circumstances) of the Expense Reimbursement) plus (z) at least Two Million Five Hundred Thousand Dollars ($2,500,000); and (ii) is accompanied by such Qualified Bidder's Good Faith Deposit (by means of a certified bank check from a U.S. bank or by wire transfer of immediately available funds).

Overbids above the initial $2,500,000 bid increment will be at the Debtors' discretion.

If no timely Qualified Bid is submitted, the Debtors shall not hold the Auction, and instead shall request at the Sale Approval Hearing that the Bankruptcy Court approve the sale of the Bid Assets to the Stalking Horse Bidder pursuant to the Stalking Horse Agreement.

All Qualified Bids will be considered but the Debtors reserve the right to reject any and all bids other than the highest or otherwise best bid. Bids will be evaluated on numerous grounds.

Each bidder shall be deemed to acknowledge and represent that it has had an opportunity to conduct any and all due diligence regarding the Bid Assets that are the subject of the Auction prior to making any such bids; that it has relied solely upon its own independent review, investigation and/or inspection of any documents and/or the assets in making its bid; and that it did not rely upon any written or oral statements, representations, promises, warranties or guaranties whatsoever, whether express, implied, by operation of law or otherwise, regarding the

Bid Assets, or the completeness of any information provided in connection therewith, except as expressly stated in these Bidding Procedures or, as to the Successful Bidder, the asset purchase agreement with such Successful Bidder.

## Good Faith Deposits

In addition to all other provisions hereof, in order to become a Qualified Bidder, all Bidders will be required to submit a good faith deposit (the "***Good Faith Deposit***") with the Debtors on or before the Bid Deadline. Such Good Faith Deposits shall be equal to five percent (5%) of the Qualified Bidder's proposed purchase price and should be payable to an Escrow Agent to be designated by the Debtors. Good Faith Deposits of all Qualified Bidders shall be held in a separate interest-bearing account for the Debtors' benefit until consummation of a transaction involving any other bidder for the Bid Assets. If a Successful Bidder fails to consummate an approved sale of the Bid Assets because of a breach or failure to perform on the part of such Successful Bidder, such bidder's deposit will be held by the Debtor subject to a ruling by the Bankruptcy Court that the Debtor should be permitted to retain such deposit on account of any damages caused by such bidder's breach. All other deposits will be returned promptly after the closing of the sale of the Bid Assets to the Successful Bidder (or, in the case of Deloitte, in accordance with the terms of the Stalking Horse Agreement). Notwithstanding anything herein to the contrary, the terms under which Deloitte provided a Good Faith Deposit and the terms of its use, release and return to Deloitte shall be governed by the Stalking Horse Agreement.

## Due Diligence

The Debtors may afford any potential bidder the opportunity to conduct a reasonable due diligence review in the manner determined by the Debtors in their discretion. The Debtors shall not be obligated to furnish any due diligence information after the Bid Deadline.

The Debtors either have provided or intend to use reasonable efforts to provide to all parties that have either expressed an interest in purchasing the Bid Assets or who the Debtors believe may have an interest in purchasing the Bid Assets (each an "***Interested Party***" and, collectively, the "***Interested Parties***"), certain information in connection with the proposed Sale, including, among other things, these proposed Bidding Procedures and the Stalking Horse Agreement, but the failure to deliver any such information to any Interested Parties shall not affect the validity, effectiveness or finality of the Auction or this sale process. Should any Interested Party desire additional or further information, such Interested Party will be required to enter into a confidentiality agreement satisfactory to the Debtors in their business judgment. Upon execution of the confidentiality agreement, the Interested Party will be given access (through a virtual data room or otherwise the "***Data Room***") to various financial data and other relevant and confidential information, subject to the Debtors right to exclude such access for competitive concerns.

**The Auction**

In the event that the Debtors timely receive more than one Qualified Bid, the Debtors shall conduct an Auction. The Auction will be conducted at the offices of Weil, Gotshal & Manges LLP, 767 Fifth Avenue, New York, New York 10153 on **April [15], 2009, commencing at 10:00 a.m. (prevailing Eastern Time)** to determine the highest or otherwise best bid with respect to the Bid Assets. Any bidder submitting a Qualified Bid may appear and submit its highest or best bid at the Auction. The Auction may be adjourned by announcement at the Auction without further notice.

**Auction Procedures**

By 5:00 p.m. on the day preceding the start of the Auction, the Debtors will give all Qualified Bidders a copy of what they believe to be the highest or otherwise best Qualified Bid and will inform each Qualified Bidder who has expressed its intent to participate in the Auction the identity of all Qualified Bidders that may participate in the Auction. Only Qualified Bidders are eligible to participate in the Auction. The following parties shall be permitted to attend the Auction: (i) the Creditors' Committee and their respective counsel and advisors;(ii) the Agent and its professionals; and (iii) the Prepetition Secured Lenders and their professionals. Bidding at the Auction shall begin initially with the highest or otherwise best bid announced by the Debtors, after consultation with the Agent and consultation with the Creditors' Committee, and shall subsequently continue in such minimum increments as the Debtors determine after consultation with the Agent and the Creditors' Committee.

Bidding will continue with respect to the Auction until the Debtors (after consultation with the Agent and consultation with the Creditors' Committee) determine that they have received the highest or otherwise best bid for the Bid Assets. Any subsequent bids by Deloitte will be credited with the full amount of the Breakup Fee and the Expense Reimbursement. After the Debtors so determine, the Auction will be closed. The bidding at the Auction will be transcribed by a court reporter. Each Qualified Bidder shall be required to confirm that it has not engaged in any collusive behavior with respect to the bidding, the Auction or the Sale.

The Debtors, after consultation with the Agent (at the direction of the required Prepetition Secured Lenders) and the Creditors' Committee, will then determine and announce which Qualified Bid has been determined to be the highest or otherwise best bid. In determining which Qualified Bid is the Successful Bid, the Debtors will consider, at each stage of the Auction, the net economic effect upon the Debtors' estates after the payment of the Breakup Fee or Expense Reimbursement, if applicable; provided, however, that economic considerations shall not be the sole criteria upon which the Debtors may base their decision and the Debtors shall take into account all factors they believe to be relevant in an exercise of their business judgment.

**Breakup Fee and Expense Reimbursement**

In the event that the Stalking Horse Agreement is terminated under the circumstances described in the Stalking Horse Agreement to the extent approved in the bidding procedures order, the Debtors shall promptly, and in any event within one (1) Business Day, pay

the Stalking Horse Bidder the Breakup Fee and the Expense Reimbursement as, when and to the extent provided in the Stalking Horse Agreement.

The Debtors' obligation to pay the Breakup Fee and the Expense Reimbursement shall be the joint and several obligation of the Debtors, shall survive termination of the Stalking Horse Agreement, dismissal or conversion of any of the Bankruptcy Cases, and confirmation of any plan of reorganization or liquidation, and shall constitute an administrative expense of the Debtors under Sections 503(b) and 507(a) of the Bankruptcy Code.

## Adequate Assurance Package

If any Qualified Bid other than the Stalking Horse Bid requires the assumption and assignment of Contracts, then such offeror must identify such Contracts to be assumed and assigned and provide evidence of its ability to provide adequate assurance of future performance of such Contracts along with the Qualified Bid (an "*Adequate Assurance Package*").

## Reservation Of Rights

### a. Determination of Highest and Best Bid

The Debtors reserve the right to: (i) determine in their reasonable discretion (after consultation with the Agent and the Creditors' Committee), which bid is the highest or best bid; and (ii) reject at any time prior to entry of a Court order approving an offer other than the Stalking Horse Bid, without liability, any offer that the Debtors in their reasonable discretion (after consultation with the Agent and the Creditors' Committee) deem to be (w) inadequate or insufficient, (x) not in conformity with the requirements of the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, or procedures set forth therein or herein, (y) not a Qualified Bid, or (z) contrary to the best interests of the Debtors and their estates.

The selection of a Successful Bidder shall be within the reasonable business judgment of the Debtors (after consultation with the Agent (at the direction of the required Prepetition Secured Lenders) and the Creditors' Committee) and subject to the approval of the Bankruptcy Court. Economic considerations shall not be the sole criteria upon which the Debtors may base their decision. The presentation of a particular bid to the Bankruptcy Court for approval does not constitute the Debtors' acceptance of the bid. The Debtors will be deemed to have accepted a bid only when the bid has been approved by the Bankruptcy Court at the Sale Approval Hearing. At or before the Sale Approval Hearing, the Debtors, after consultation with the Agent and the Creditors' Committee, may impose such other terms and conditions on the Qualified Bidders, other than the Stalking Horse Bidder, as the Debtors may determine to be in the best interests of the Debtors, their estates, their creditors, and other parties in interest.

### b. Modification of Bidding Procedures

The Debtors, in consultation with the Agent and the Creditors' Committee, reserve the right to (i) extend the deadlines set forth in these Bidding Procedures and/or adjourn the Auction and/or the Sale Approval Hearing in open court without further notice, (ii) withdraw any asset(s) (the "*Withdrawn Assets*") from the Sale at any time prior to or during the Auction to make subsequent attempts to market the same, and to request separate hearing(s) by this Court to

approve the sale(s) of some or all of the Withdrawn Assets, (iii) reject any or all bids if, in the Debtors' reasonable business judgment, no bid is for a fair and adequate price, and (iv) seek approval of any separate agreement to sell some or all of the Withdrawn Assets at the Sale Approval Hearing, and (v) modify the Auction and the Bidding Procedures set forth herein, as may be determined to be in the best interests of the Debtors' estates or creditors; provided however, that no such action by the Debtors pursuant to this paragraph shall effect the economic interests, timing or other benefits to Deloitte under the Stalking Horse Agreement. Any such modification shall be announced prior to the start of the Auction. The Auction, the Bidding Procedures and all bids are subject to such other terms and conditions as are announced by the Debtors during the course of the Auction.

### c.   Closing with Stalking Horse or Backup Bidder

If for any reason the entity or entities that submit(s) the highest or otherwise best bid(s) fails to consummate the purchase of the Bid Assets, or any part thereof, the offeror of the second highest or best bid will automatically be deemed to have submitted the highest or best bid (the "*Backup Bidder*") and to the extent the Debtors consent (after consultation with the Agent (at the direction of the required Prepetition Secured Lenders) and the Creditors' Committee), the Debtors and such offeror are authorized to effect the sale of the Bid Assets to such offeror(s) as soon as is commercially reasonable. If such failure to consummate the purchase is the result of a breach by the winning offeror, the Debtors reserve the right to seek all available damages from the defaulting offeror, including, but not limited to, with respect to the Good Faith Deposit. To the extent the Stalking Horse Bidder has terminated the Stalking Horse Agreement as provided therein, the Stalking Horse Bidder shall not be obligated to be a Backup Bidder.

### d.   Debtors' Secured Creditors

Nothing in these Bid Procedures shall or shall be deemed to (i) amend or modify the Interim Cash Collateral Stipulation, or the rights and remedies of the parties thereunder or under applicable bankruptcy law, or (ii) except for their consent to the Stalking Horse Agreement or a topping bid thereunder, constitute the consent of the secured lenders to any other sale or disposition of their respective collateral. All rights under section 363(k) of the Bankruptcy Code are preserved; provided, however, that (i) if the secured lenders exercise such rights, the Stalking Horse Bidders shall be entitled to the Breakup Fee and the Expense Reimbursement pursuant to the Stalking Horse Agreement, and (ii) the secured lenders shall not have the right to (x) assign any such rights, (y) transfer or otherwise assign any interest in or any economic benefit from any such rights to any person or entity, or (z) exercise any such rights in connection with or in anticipation of any transfer, disposal or other assignment of any of the Bid Assets or any interest therein.

## Sale Approval Hearing

The Sale Approval Hearing will be held on **April 17, 2009 at _____ __.m.** at the United States Bankruptcy Court for the Southern District of New York, One Bowling Green, New York, New York 10004, before the Honorable Robert E. Gerber, United States Bankruptcy Judge. The Sale Approval Hearing may be adjourned, from time to time, without further notice

to creditors or parties in interest other than by announcement of the adjournment in open Court or on the Court's docket.

Dated: March 23, 2009

# Exhibit C

**Stalking Horse Agreement**

**ASSET PURCHASE AGREEMENT**

by and among

DELOITTE LLP

as Buyer

and

BEARINGPOINT, INC.

and

THE SUBSIDIARIES OF BEARINGPOINT THAT ARE SIGNATORIES HERETO

as Sellers

Dated as of March 23, 2009

# TABLE OF CONTENTS

1.  SALE OF ASSETS; PURCHASE PRICE...................................................................1
    1.01  Sale of Assets........................................................................................1
    1.02  Liabilities.............................................................................................5
    1.03  Purchase Price......................................................................................6
    1.04  Closing.................................................................................................8
    1.05  Post-Closing Adjustment......................................................................8
    1.06  Transfer Expenses..............................................................................11
    1.07  Allocation of Purchase Price...............................................................11
    1.08  Closing Deliverables..........................................................................11
    1.09  Good Faith Deposit............................................................................14

2.  REPRESENTATIONS AND WARRANTIES OF SELLERS...........................15
    2.01  Making of Representations and Warranties.........................................15
    2.02  Organization.......................................................................................15
    2.03  Authority.............................................................................................15
    2.04  Accounts Receivable..........................................................................16
    2.05  Assets.................................................................................................17
    2.06  Intellectual Property...........................................................................17
    2.07  Litigation............................................................................................18
    2.08  Compliance with Law.........................................................................18
    2.09  Customers and Suppliers....................................................................18
    2.10  Real Property......................................................................................18
    2.11  Contracts............................................................................................19
    2.12  Government Contracts.........................................................................20
    2.13  Finder's Fee........................................................................................24

3.  COVENANTS OF SELLERS..........................................................................24
    3.01  Making of Covenants and Agreements................................................24
    3.02  Confidential Information.....................................................................24
    3.03  Conduct of Business...........................................................................24
    3.04  Taxes..................................................................................................25
    3.05  Notices................................................................................................26
    3.06  Non-Solicitation of Competing Bids...................................................26
    3.07  Non-Solicitation of Employees and Customers...................................27
    3.08  Non-Use of Licensed Marks...............................................................28
    3.09  Additional Seller Information..............................................................28

4.  REPRESENTATIONS AND WARRANTEES OF BUYER...............................28
    4.01  Making of Representations and Warranties.........................................28
    4.02  Organization.......................................................................................28
    4.03  Authority.............................................................................................28
    4.04  Financing............................................................................................29
    4.05  Finder's Fee........................................................................................29

| | | | |
|---|---|---|---|
| 5. | **COVENANTS OF BUYER.** | | 29 |
| | 5.01 | Making of Covenants and Agreements | 29 |
| | 5.02 | Confidentiality | 29 |
| | 5.03 | Letters of Credit | 29 |
| 6. | **CONDITIONS.** | | 30 |
| | 6.01 | Conditions to the Obligations of Buyer | 30 |
| | 6.02 | Conditions to Obligations of Sellers | 31 |
| 7. | **TERMINATION OF AGREEMENT; RIGHTS TO PROCEED.** | | 31 |
| | 7.01 | Termination | 31 |
| | 7.02 | Effect of Termination | 33 |
| | 7.03 | Right to Proceed | 34 |
| 8. | **TERMINATION OF WARRANTIES; AS IS TRANSACTION.** | | 34 |
| | 8.01 | No Survival of Representations and Warranties | 34 |
| | 8.02 | No Other Representations and Warranties; As Is Transaction | 34 |
| 9. | **ADDITIONAL COVENANTS AND AGREEMENTS.** | | 35 |
| | 9.01 | Reasonable Best Efforts; Consents to Assignment. | 35 |
| | 9.02 | Submission for Bankruptcy Court Approval | 37 |
| | 9.03 | Bidding Procedures Order; Approval Order. | 38 |
| | 9.04 | Novation of Government Prime Contracts. | 39 |
| | 9.05 | Access and Information. | 40 |
| | 9.06 | Contracts and Proposals; Exclusion of Contracts; Updated Schedules. | 41 |
| | 9.07 | Collection of Accounts Receivable. | 44 |
| | 9.08 | Employee Matters, Wages and Benefits. | 45 |
| | 9.09 | Tax Matters and Apportioned Obligations. | 47 |
| 10. | **MISCELLANEOUS.** | | 48 |
| | 10.01 | Fees and Expenses | 48 |
| | 10.02 | Governing Law; Consent to Jurisdiction | 48 |
| | 10.03 | Waiver of Right to Trial by Jury | 49 |
| | 10.04 | Notices | 49 |
| | 10.05 | Entire Agreement | 50 |
| | 10.06 | Assignability; Binding Effect; Third Party Beneficiaries | 50 |
| | 10.07 | Construction. | 51 |
| | 10.08 | Execution in Counterparts; Facsimile | 51 |
| | 10.09 | Amendments, Supplements, Etc | 51 |
| | 10.10 | Publicity and Disclosures. | 52 |
| | 10.11 | Extension; Waiver | 52 |
| | 10.12 | Severability | 52 |
| | 10.13 | Further Assurances. | 52 |
| | 10.14 | Specific Performance | 53 |
| 11. | **DEFINITIONS.** | | 53 |

KL2 2597071.9

**EXHIBITS**

| | |
|---|---|
| Exhibit A | Form of Transition Services Agreement |
| Exhibit B | Form of Cross-License Agreement |
| Exhibit C | Form of Patent Assignment |
| Exhibit D | Form of Trademark License Agreement |
| Exhibit E | Form of Copyright Assignment |
| Exhibit F | Form of Domain Name Assignment |
| Exhibit G | Description of Bidding Procedures |
| Exhibit H | Form of Subcontract Agreement |
| Exhibit I | Form of Landlord Estoppel Certificate |

# ASSET PURCHASE AGREEMENT

This ASSET PURCHASE AGREEMENT (this "Agreement"), is entered into as of March 23, 2009, by and among DELOITTE LLP, a Delaware limited liability partnership ("Buyer"), BEARINGPOINT, INC., a Delaware corporation ("BearingPoint"), and each of the Subsidiaries of BearingPoint that are signatories hereto (BearingPoint and each of the Subsidiaries of BearingPoint that are signatories hereto are sometimes herein referred to collectively as "Sellers" and individually as a "Seller").

## W I T N E S S E T H

WHEREAS, subject to the terms and conditions hereof, (a) Sellers desire to sell, transfer and assign to Buyer (or to one or more of its designees) and Buyer desires to purchase (or to cause one or more of its designees to purchase) from Sellers, the properties and assets of Sellers used primarily in or held for use primarily in the Business (as defined below), other than the Excluded Assets (as defined below) and (b) Sellers desire to transfer and assign to Buyer (or one or more of its designees) and Buyer (or one or more of its designees) desires to assume from Sellers certain liabilities of Sellers relating to the Business;

WHEREAS, on February 18, 2009, Sellers filed voluntary petitions for relief under Chapter 11 of Title 11 (the "Bankruptcy Cases") of the United States Bankruptcy Code, §§ 101, et seq. (as amended) (the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court"), and have jointly administered cases pending under Case no. 09-10691 (REG);

WHEREAS, Sellers are currently operating the Business and managing their property as debtors-in-possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code;

WHEREAS, upon the terms and subject to the conditions set forth herein, Sellers intend to request that the Bankruptcy Court authorize and approve the transactions contemplated by this Agreement pursuant to Sections 105, 363 and 365 of the Bankruptcy Code; and

WHEREAS, unless the context otherwise requires or as otherwise defined herein, capitalized terms used in this Agreement shall have the meanings set forth in Article 11 hereto.

NOW, THEREFORE, in consideration of these premises and the mutual covenants and agreements set forth herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged by each party, the parties hereto agree as follows:

## 1. SALE OF ASSETS; PURCHASE PRICE.

### 1.01 *Sale of Assets*.

(a)    Acquired Assets Other Than IP Assets.  Upon the terms and subject to the conditions set forth in this Agreement, each Seller agrees to sell, assign, transfer, convey and deliver to Buyer and/or one or more designees of Buyer (as designated by Buyer in its sole discretion) and Buyer agrees to purchase, or cause one or more of its designees to purchase from each such Seller, all rights, title and interests of such Seller in all of the rights, properties and

assets of each such Seller used primarily in or held for use primarily in the Business on the Closing Date (other than any (x) Intellectual Property, (y) Licenses and (z) Excluded Assets) (collectively, the "Acquired Non-IP Assets"), including all rights, title and interests of such Seller in the following, free and clear of all Encumbrances (other than Assumed Liabilities) in accordance with the Approval Order:

(i)     Assumed Contracts. All of Sellers' rights, title and interests under (A) the Contracts set forth on Schedule 1.01(a)(i)(A) (the "Designated Client Contracts"), (B) the Related Contracts, (C) the Contracts relating to Sellers' North American Public Service Unit which are neither Client Service Contracts nor Related Contracts as set forth on Schedule 1.01(a)(i)(C) (the "Other Business Contracts"), (D) the leases, subleases and licenses of real property (including any and all amendments, extensions, modifications and renewals thereof) set forth on Schedule 1.01(a)(i)(D) (the "Designated Real Property Leases") (collectively, the "Assumed Contracts");

(ii)     Designated Client Proposals. The Client Proposals set forth on Schedule 1.01(a)(ii) (the "Designated Client Proposals");

(iii)     Accounts Receivable. All accounts receivable and unbilled revenue arising from or relating to the Designated Client Contracts, determined in accordance with GAAP applied in a manner consistent with the BearingPoint Financials ("Accounts Receivable");

(iv)     Goodwill. All goodwill and general intangibles associated with the assets, properties and rights of any Seller to the extent they relate primarily to the Business, and all of Sellers' rights (both legal and equitable) to protect their rights and interests with respect to Clients to the extent they relate primarily to the Acquired Assets and the Assumed Liabilities;

(v)     Equipment and Personal Property. All (A) equipment, computers, furniture, supplies, fixtures and other tangible personal property of any Seller (x) located at the Leased Premises, (y) located at any client site under a Designated Client Contract or (z) located at any third party site (other than a client site) if such tangible personal property is used primarily in the Business, (B) personal computers used by the Transferred Employees, wherever located and (C) all leasehold improvements made to the Leased Premises;

(vi)     Security Deposits. All security deposits of any Seller relating to the Designated Real Property Leases;

(vii)     Permits. All Permits held by Sellers, to the extent transferable, necessary to conduct the Business;

(viii)     Telephone and Fax Numbers. All telephone numbers and fax numbers assigned to the Leased Premises or any Transferred Employees;

(ix)     Causes of Action, etc. All claims, causes of action, choses in action and rights of recovery, off-set and subrogation against third Persons to the extent

2

relating to the Acquired Assets or the Assumed Liabilities and all avoidance actions against any counterparties to any Assumed Contracts or Designated Client Proposals, to the extent related to the Assumed Contracts or Designated Client Proposals; and

(x)     Records and Documentation.  Subject to Section 1.01(c)(vii) hereto, all books, records and files (including accounting and financial records, cost accounting records and files and correspondence relating to Assumed Contracts) of the Business, lists of Clients and lists of prospective clients of Sellers' North American Public Service Unit, working papers, analytical models, Work Product, correspondence, memoranda and other documentation primarily related to the Business or otherwise related to the assets referred to in clauses (i) through (xi) of this Section 1.01(a) (collectively, the "Acquired Records").

(b)     IP Assets.  Upon the terms and subject to the conditions set forth in this Agreement (including Section 1.01(c)(ix) hereto), each Seller agrees to sell, assign, transfer, convey and deliver to Buyer and/or one or more designees of Buyer (as designated by Buyer in its sole discretion) and Buyer agrees to purchase, or cause one or more of its designees to purchase from each such Seller, all rights, title and interests of such Seller in all Intellectual Property owned by such Seller and used primarily in or held for use primarily in the Business on the Closing Date (other than (x) any Intellectual Property licensed or sublicensed to such Seller pursuant to any License, and (y) any Excluded Assets set forth on Schedule 1.01(c)(ix)) including the Intellectual Property identified on Schedule 1.01(b) (collectively, the "Business IP").  For the avoidance of doubt, the Business IP shall include, in each case, to the extent applicable, (A) all documentation and media constituting, describing or relating to such Business IP, including memoranda, manuals, technical specifications and other records wherever created and regardless of form, in each case to the extent owned by, and in the possession of, Sellers on the Closing Date; and (B) the right to sue for past, present, or future infringement and to collect and retain all damages and profits related to the Business IP.

(c)     Excluded Assets.  The purchase of the Acquired Assets by Buyer and sale of the Acquired Assets by Sellers contemplated by this Agreement shall not include any of the following assets (collectively, the "Excluded Assets"):

(i)     Assets Unrelated to the Business.  Assets, properties, rights and claims of every kind and description of any Seller that are neither used primarily in nor held for use primarily in the Business;

(ii)     Cash and Cash Equivalents; Prepaid Expenses.  Without prejudice to Buyer's rights pursuant to Section 9.07 hereto, any cash, cash equivalents, bank accounts and lockboxes of any Seller, any deposits of, and any rights or interests in, Sellers' cash management system, and all prepaid expenses of the Business as of the Closing Date;

(iii)     Marketable Securities.  Any marketable securities of any Seller;

(iv)     Certain Contracts.  All Contracts to which any Seller is a party other than the Assumed Contracts;

(v)     Certain Proposals.  All client proposals other than Designated Client Proposals;

(vi)     Taxes.  Any claim, right or interest of any Seller in or to any refund, rebate, abatement or other recovery for Taxes, together with any interest due thereon, for any Tax period (or portion thereof) ending on or prior to the Closing Date, except to the extent such refund, rebate, abatement or other recovery arises as a result of Buyer's conduct, operation or ownership of the Business and/or the Acquired Assets for any Tax period (or portion thereof) beginning after the Closing Date;

(vii)     Certain Records and Documentation.  Any books and records that any Seller is, in its good faith determination, required by Law to retain, including Tax Returns, financial statements and corporate or other entity filings; provided that Sellers shall deliver to Buyer copies of such books and records that relate to the Business or the Acquired Assets, in accordance with Section 9.05(c) hereto;

(viii)     Owned Real Property.  Any and all real property owned by any Seller;

(ix)     Certain Intellectual Property.  (A) All Intellectual Property (excluding Trademarks) and Licenses set forth on Schedule 1.01(c)(ix), and (B) all Trademarks owned by Sellers except for those Trademarks set forth on Schedule 1.01(b) (but subject to Section 3.08 hereto and the Trademark License Agreement);

(x)     Intercompany Contracts.  All Contracts between any Seller or any Affiliate of any Seller, on the one hand, and any Seller or any Affiliate of any Seller, on the other hand, and all inter-company receivables owed by any Seller or an Affiliate of any Seller to any Seller or an Affiliate of any Seller;

(xi)     Certain Tangible Assets.  All equipment, computers (including all copies of software installed on any such computers, servers or other electronic equipment, and any documentation and media constituting, describing or relating to such copies, including manuals, technical specifications and the like; provided that in the event any such software is Business IP, such software is not an Excluded Asset), furniture, supplies, fixtures and other tangible personal property of any Seller which are not located at the Leased Premises (other than (x) the tangible personal property located at any client site under a Designated Client Contract, (y) the tangible personal property located at any third party site (other than a client site) to the extent that such tangible personal property is substantially used in the Business and (z) the personal computers used by the Transferred Employees);

(xii)     Sellers' Rights Under Agreement.  Each Seller's rights under the Transaction Agreements to which any Seller and Buyer or any of its Affiliates is a party;

(xiii)     Equity Interests.  Any shares of capital stock, partnership, membership or other debt or equity securities or other interests in any Person;

4

(xiv)    Insurance Policies.  All insurance policies of Sellers and all claims, credits, causes of action or rights thereunder and proceeds thereof, including any prepaid and unearned premiums;

(xv)    Avoidance Actions.  Avoidance actions to the extent not expressly set forth in Section 1.01(a) hereto;

(xvi)    Other.  All other properties, rights and assets set forth on Schedule 1.01(c)(xvi); and

(xvii)    Certain Claims.  Any claims, causes of action, choses in action and rights of recovery, offset and subrogation to the extent (A) primarily related to any asset described in (i) through (xvi) above or (B) available as a defense, counterclaim, cross-claim, offset or third-party claim in connection with any Excluded Liability.

**1.02    _Liabilities_.**

(a)    Assumed Liabilities.  Upon the terms and subject to the conditions of this Agreement, Buyer agrees, effective at the Closing, that Buyer or its designees shall assume only the following obligations or liabilities: all obligations and liabilities arising from the Assumed Contracts from and after the Closing (the "Assumed Liabilities").  The assumption of liabilities by any party hereunder shall not enlarge any rights of third parties under contracts or arrangements with Buyer (or its designees) or Sellers and nothing herein shall prevent any party from contesting in good faith with any third party any of such liabilities.  As provided for in Section 1.02(b) hereto, an Assumed Liability shall not include a liability for Taxes on Seller's gain, if any, from the sale of the Business.

(b)    Excluded Liabilities.  Notwithstanding anything contained in this Agreement to the contrary, neither Buyer nor any of its Affiliates will assume or agree or undertake to pay, satisfy, discharge or perform in respect of, and will not be deemed by virtue of the execution and delivery of this Agreement or any document delivered at the Closing pursuant to this Agreement, or as a result of the consummation of the transactions contemplated by this Agreement, to have assumed, or to have agreed to pay, satisfy, discharge or perform in respect of, any liability, obligation, indebtedness or Taxes of any Seller or or of any other Person or in any way relating to the Business (whether primary or secondary, direct or indirect, known or unknown, absolute or contingent, matured or unmatured, or otherwise) or Seller's gain, if any, from the sale of the Business on the Closing Date other than the Assumed Liabilities (such liabilities and obligations retained by Sellers, including all liabilities and obligations with respect to the Excluded Assets, being referred to herein as the "Excluded Liabilities").  Sellers shall themselves retain and, as between Sellers and Buyer, shall remain solely liable for, all of the Excluded Liabilities.  Notwithstanding anything to the contrary in this Agreement, the term "Excluded Liabilities" includes:

(i)    all liabilities or obligations of any Seller owing to any current or former Affiliates, directors, officers, personnel, independent contractors, agents or other representatives of any Seller or its agents or representatives, except to the extent that such liabilities or obligations from and after the Closing are Assumed Liabilities;

(ii)  all liabilities or obligations relating to any compensation or benefits of any current or former director, officer, personnel, independent contractor, agent, or other representative of any Seller or any Seller Benefit Plans, including, in respect of workers' compensation or claims relating to employment of personnel by, or provision of services by personnel to, any Seller, including all retirement, severance, deferred compensation, incentive, stock option, vacation, sick leave, bonus, commission, unemployment, partnership or other payments, distributions or benefits payable to or accrued in favor of such Persons on, prior to or after the Closing Date, whether or not pursuant to any Seller Benefit Plans and whether or not such Persons become personnel of Buyer or its designee;

(iii)  all liabilities or obligations relating to any Excluded Asset;

(iv)  all liabilities or obligations relating to any claim of any third party arising out of the ownership or operation of the Acquired Assets or the conduct or operation of the Business prior to the Closing or the activities of any Seller in connection with the Acquired Assets or the Business prior to the Closing;

(v)  all liabilities or obligations relating to any lease of real property other than the Designated Real Property Leases;

(vi)  all liabilities or obligations of any Seller for Taxes and all liabilities or obligations for Taxes relating to the Business or the Acquired Assets on or prior to Closing, except to the extent that such liabilities or obligations from and after the Closing are Assumed Liabilities;

(vii)  all liabilities or obligations relating to any other assets, operations, products, businesses or activities of any Seller that are not used or held for use in the Business or part of the Acquired Assets;

(viii)  all liabilities and obligations relating to the failure of any Seller to comply with any "bulk sales," "bulk transfer" or similar Law;

(ix)  all liabilities and obligations for legal or accounting fees and any other expenses incurred by any Seller in connection with this Agreement or the consummation of the transactions contemplated herein, including any fees, expenses or other payments incurred or owed by any Seller to any agent, broker, investment banker or other firm or Person retained or employed by any Seller in connection with the transactions contemplated herein; and

(x)  all liabilities or obligations to pay cure costs with respect to Assumed Contracts.

**1.03  _Purchase Price_.**

(a)  As the total and complete consideration for the sale by Sellers to Buyer (or one or more of its designees) of the Acquired Assets, in addition to the assumption by Buyer (or one or more of its designees) of the Assumed Liabilities, at the Closing Buyer will deliver (or

cause its designees to deliver) an aggregate purchase price equal to Three Hundred Fifty Million Dollars ($350,000,000) (the "Purchase Price"), payable in cash, subject to adjustment as provided herein.

(b)     Pre-Closing Statement.  Sellers shall prepare and deliver to Buyer not less than three (3) Business Days prior to the Closing Date a certificate of Sellers, dated as of such delivery date and duly executed on behalf of each Seller by an authorized executive officer thereof (the "Closing Statement"), certifying as to Sellers':

(i)     reasonable good faith estimate of (x) Accounts Receivable, net of allowance for doubtful accounts (determined in accordance with GAAP in a manner consistent with the BearingPoint Financials), and (y) Deferred Revenue, each as of the close of business on the Closing Date and, if the Closing Date is after May 7, 2009, as of May 7, 2009; and

(ii)     calculation of the difference of (x) the Accounts Receivable net of allowance for doubtful accounts (determined in accordance with GAAP in a manner consistent with the BearingPoint Financials) as set forth in the Closing Statement minus (y) the Deferred Revenue as set forth in the Closing Statement (the "Estimated Comparison Amount") and, if the Closing Date is after May 7, 2009, as of May 7, 2009 (the "May 7 Estimated Target Amount"); provided that the amounts set forth in the Closing Statement, including the Estimated Comparison Amount and the May 7 Estimated Target Amount, shall be determined taking into account the terms relating thereto set forth in Sections 9.06(c), 9.06(f) and 9.06(i) hereto.  The Closing Statement shall further set forth in reasonable detail the basis for such determination as well as Sellers' calculation of the difference between the Estimated Comparison Amount and Target Comparison Amount, if any.  The Closing Statement shall be subject to Buyer's reasonable agreement in writing; provided that Buyer shall promptly deliver its reasonable agreement in writing unless Buyer's reasonable good faith estimate of the Estimated Comparison Amount or the May 7 Estimated Target Amount differs from Sellers' estimate, in which case Buyer shall promptly deliver Buyer's estimates and a statement setting forth in reasonable detail the basis for such determination.  Sellers shall provide to Buyer such additional back-up or supporting data relating to the preparation of the Closing Statement and the calculation of the Estimated Comparison Amount and/or the May 7 Estimated Target Amount, as the case may be, as Buyer may reasonably request.

If the Closing Date is after May 7, 2009 and the Estimated Comparison Amount is greater than the Target Comparison Amount, then the amount paid to Sellers on the Closing Date pursuant to Section 1.03(c)(i) hereto shall be increased by the amount of such excess.  If the Closing Date is on or before May 7, 2009 and the Estimated Comparison Amount is greater than the Target Comparison Amount or the Estimated Comparison Amount is equal to the Target Comparison Amount, the amount paid to Sellers on the Closing Date pursuant to Section 1.03(c)(i) hereto shall neither be increased nor decreased pursuant to this Section 1.03(b).  Regardless of when the Closing Date is, if the Target Comparison Amount is greater than the Estimated Comparison Amount, then the amount paid to Sellers on the Closing Date pursuant to Section 1.03(c)(i) hereto shall be decreased by the amount of such excess.

(c)     Closing Date Payment.  On the Closing Date, the Deposit shall be delivered to the Sellers in accordance with Section 1.09 hereto and Buyer shall pay:

(i)     to Sellers, an amount equal to $350 million ($350,000,000), adjusted as provided in Section 1.03(b) hereto, less the Deposit (subject to Section 1.09(b) hereto, if applicable) and the Escrow Amount (the "Closing Date Cash Payment"); and

(ii)     to the Escrow Agent on behalf of Sellers, an amount equal to $25 million ($25,000,000) (the "Escrow Amount").  Pursuant to the Escrow Agreement, the Escrow Amount shall be held by Escrow Agent in a designated escrow account (the "Escrow Account") to be held for the sole purpose of securing the Seller Reconciliation Payment, if any, to be made pursuant to Section 1.05 hereto and shall be released from the Escrow Account in accordance with Section 1.05 hereto and the Escrow Agreement.

**1.04     _Closing_.**  The closing of the purchase and sale of the Acquired Assets (and the assumption of the Assumed Liabilities) provided for in this Agreement (the "Closing") shall take place at the offices of Kramer Levin Naftalis & Frankel LLP at 1177 Avenue of the Americas, New York, New York 10036 commencing at 10:00 a.m. Eastern Daylight Time on the Business Day following the satisfaction or, if applicable, waiver of the conditions to closing set forth in Article 6 hereto, or at such other time and date as may be otherwise mutually agreed upon by the parties (the "Closing Date").  Except as otherwise expressly provided in the Transaction Agreements, all matters at the Closing shall be considered to take place simultaneously and no delivery of any documents shall be deemed complete until all transactions and deliveries of documents are completed. The Closing shall be effective as of 11:59 p.m. Eastern Daylight Time on the Closing Date.

**1.05     _Post-Closing Adjustment_.**

(a)     Delivery of Post-Closing Statement.  In no event later than thirty (30) days after the Closing Date, Buyer shall prepare and deliver to Sellers a statement (the "Post-Closing Statement") of Buyer's determination of:

(i)     the actual (x) Accounts Receivable, net of allowance for doubtful accounts (determined in accordance with GAAP in a manner consistent with the BearingPoint Financials), and (y) Deferred Revenue, each as of the close of business on the Closing Date and, if the Closing Date is after May 7, 2009, as of May 7, 2009; and

(ii)     the calculation of the difference of (x) the Accounts Receivable, net of allowance for doubtful accounts (determined in accordance with GAAP in a manner consistent with the BearingPoint Financials), as set forth in the Post-Closing Statement minus (y) the Deferred Revenue as set forth in the Post-Closing Statement (the "Actual Comparison Amount") and, if the Closing Date is after May 7, 2009, as of May 7, 2009 (the "May 7 Actual Target Amount"); provided that the amounts set forth in the Post-Closing Statement, including the Actual Comparison Amount and the May 7 Actual Target Amount, shall be determined taking into account the terms relating thereto set forth in Sections 9.06(c), 9.06(f) and 9.06(i) hereto.  The Post-Closing Statement shall

8

further set forth in reasonable detail the basis for such determination as well as Buyer's calculation of the Seller Reconciliation Payment (and any amounts to be released from the Escrow Account) or the Buyer Reconciliation Payment, as the case may be. Buyer shall provide to Sellers such additional back-up or supporting data relating to the preparation of the Post-Closing Statement and the calculation of the Actual Comparison Amount and/or the May 7 Actual Target Amount as Sellers may reasonably request.

(b)     Acceptance Period; Delivery of Dispute Notice.  Sellers may, within thirty (30) days following receipt of the Post-Closing Statement, provide Buyer with written notice (a "Dispute Notice") of their disagreement with the calculation of the Actual Comparison Amount or the May 7 Actual Target Amount reflected on the Post-Closing Statement. If no such notice is delivered to Buyer by Sellers within such period, the Post-Closing Statement and the calculation of the Actual Comparison Amount and the May 7 Actual Target Amount reflected thereon shall be deemed final and binding upon the parties hereto. A Dispute Notice shall set forth Sellers' determination of the Actual Comparison Amount and/or the May 7 Actual Target Amount and, in reasonable detail, the basis for such determination, and shall specify in reasonable detail the specific areas of Sellers' disagreement with the Post-Closing Statement and the reasons therefor. Any items set forth on the Post-Closing Statement that Sellers do not specify in the Dispute Notice that they disagree with shall be deemed final and shall be binding upon the parties hereto. Buyer and Sellers shall endeavor in good faith to resolve any such disagreement within fifteen (15) days (the "Negotiating Period") following the delivery by Sellers of such Dispute Notice. Any resolution (including any partial resolution) of such a disagreement shall be set forth in a writing executed by Buyer and Sellers, and any such resolution shall be final and binding on the parties hereto.

(c)     Determination of Disputes by Neutral Firm.  If Buyer and Sellers are unable to completely resolve any such disagreement within the Negotiating Period, the unresolved issues (and only such unresolved issues) (such unresolved issues collectively, the "Dispute") shall be promptly submitted for resolution to a recognizable, reputable and impartial certified public accounting firm that is mutually acceptable to Buyer and Sellers (the "Neutral Firm"). If Buyer and Sellers cannot agree upon a Neutral Firm within ten (10) days, the New York City office of the American Arbitration Association shall choose a recognized, reputable and impartial certified public accounting firm (other than any Affiliate of Buyer, PricewaterhouseCoopers LLP, Ernst & Young LLP, KPMG LLP, Grant Thornton LLP and Lattimore, Black, Morgan & Cain P.C. or their respective Affiliates) to act as the Neutral Firm. The Neutral Firm shall be instructed to resolve any outstanding Dispute. The parties shall instruct the Neutral Firm to render its determination within thirty (30) days of the referral of such Dispute thereto, and the determination of the Neutral Firm shall be final and binding upon the parties hereto for all purposes of this Agreement. Neither Buyer nor Sellers shall have any ex parte communications or meetings with the Neutral Firm without reasonable prior notice (which notice shall provide the other party a reasonable opportunity to participate in such communications or meetings), to Buyer (in the case of Sellers) or Sellers (in the case of Buyer). The fees and expenses of the Neutral Firm shall be borne by Buyer, on the one hand, and Sellers, on the other hand, in the same proportion that the aggregate dollar amount subject to Dispute which is not resolved in favor of Buyer and Sellers, as applicable, bears to the total dollar amount subject to the Dispute resolved by the Neutral Firm.  For illustration purposes only, (A) if the total amount of the Dispute is $100,000, and Sellers are awarded $50,000 by the Neutral Firm, Buyer and

9

Sellers shall bear the Neutral Firm's fees and expenses equally; and (B) if the total amount of the Dispute is $100,000, and Sellers are awarded $25,000 by the Neutral Firm, Sellers shall bear seventy-five percent (75%) and Buyer shall bear twenty-five percent (25%) of the Neutral Firm's fees and expenses.

      (d)    <u>Post-Closing Reconciliation</u>.

        (i)    If the Corrected Closing Date Cash Payment is greater than the Closing Date Cash Payment, the Reconciliation Payment shall be paid by Buyer to Sellers ("<u>Buyer Reconciliation Payment</u>"). If the Corrected Closing Date Cash Payment is less than the Closing Date Payment, the Reconciliation Payment shall be paid by Sellers to Buyer ("<u>Seller Reconciliation Payment</u>"). If the Corrected Closing Date Cash Payment is equal to the Closing Date Payment, all funds in the Escrow Account shall be released to the Sellers in accordance with the terms and conditions of the Escrow Agreement and no other payment shall be required under this <u>Section 1.05(d)</u>). The Seller Reconciliation Payment, if any, shall be paid to Buyer as follows: first, to the extent of the Escrow Amount in accordance with the Escrow Agreement, and if the Escrow Amount is insufficient to cover the full amount of the Seller Reconciliation Payment, then Sellers shall pay to Buyer by wire transfer of immediately available funds an amount equal to the difference between the Seller Reconciliation Payment and the Escrow Amount within five (5) Business Days of the date in which the Actual Comparison Amount is finally determined pursuant to <u>Section 1.05(b)</u> hereto or <u>Section 1.05(c)</u> hereto, as the case may be. Payment of the Buyer Reconciliation Payment, if any, shall be made by wire transfer of immediately available funds within five (5) Business Days of the date in which the Actual Comparison Amount is finally determined pursuant to <u>Section 1.05(b)</u> hereto or <u>Section 1.05(c)</u> hereto, as the case may be.

        (ii)    In accordance with the Escrow Agreement, any amount remaining in the Escrow Account following payment of the Seller Reconciliation Payment or the Buyer Reconciliation Payment, as applicable shall be released to Sellers.

        (iii)    The "<u>Corrected Closing Date Cash Payment</u>" shall be equal to Three Hundred Fifty Million Dollars ($350,000,000), less the Deposit (subject to <u>Section 1.09(b)</u> hereto, if applicable) and the Escrow Amount, adjusted as follows:

          (A)    If the Closing Date is after May 7, 2009 and the Actual Comparison Amount is greater than the Target Comparison Amount, then the amount of the Corrected Closing Date Cash Payment as calculated above shall be increased by the amount of such excess;

          (B)    If the Closing Date is on or before May 7, 2009 and the Actual Comparison Amount is greater than the Target Comparison Amount or the Actual Comparison Amount is equal to the Target Comparison Amount, the amount of the Corrected Closing Date Cash Payment calculated above shall neither be increased nor decreased; and

(C)    Regardless of when the Closing Date is, if the Target Comparison Amount is greater than the Actual Comparison Amount, then the amount of the Corrected Closing Date Cash Payment calculated above shall be decreased by the amount of such excess.

(iv)    The "Reconciliation Payment" shall be equal to the difference (expressed as a positive number), if any, between the Corrected Closing Date Cash Payment determined based on the Actual Comparison Amount as finally determined pursuant to Section 1.05(b) or Section 1.05(c) hereto, as the case may be, and the Closing Date Cash Payment.

**1.06**    ***Transfer Expenses***.  All federal, state, local and foreign sales, transfer, stamp, documentary and notarial taxes, fees and other duties (collectively, "Transfer Expenses"), if any, under applicable Law incurred in connection with the sale and transfer of the Acquired Assets pursuant to this Agreement will be borne and paid by Sellers and Sellers shall promptly reimburse Buyer (or its designee) for any Transfer Expenses which Buyer (or its designee) is required to pay under applicable Law in connection herewith.  Sellers shall, at their sole cost and expense, file all necessary Tax Returns and other documentation required by applicable Law with respect to such Transfer Expenses.

**1.07**    ***Allocation of Purchase Price***.  The Adjusted Purchase Price and other relevant items shall be allocated for purposes of this Agreement and for federal, state, local and foreign tax purposes in accordance with a statement to be delivered by Buyer to Sellers as soon as reasonably practicable after the Closing Date (the "Allocation Statement").  The Allocation Statement shall be prepared in a manner consistent with (x) the requirements of Section 1060 of the Internal Revenue Code of 1986, as amended (the "Code"), and any corresponding requirements of any state, local or foreign Tax laws (y) the principles, methodology and preliminary estimate prepared by Buyer and delivered to Sellers no less than three (3) Business Days prior to the Closing Date and which are reasonably acceptable to Sellers.  Neither Sellers, Buyer nor any Affiliate of any of them shall take any position on any Tax Return that is inconsistent with the allocation set forth on the Allocation Statement, and Sellers and Buyer agree to file any Tax Returns required to be filed in connection with such allocation consistently with the foregoing.  If, within ten (10) days after the delivery of the Allocation Statement, Sellers notify Buyer in writing that Sellers objects to the allocation set forth in the Allocation Statement, Buyer and Sellers shall use reasonable best efforts to resolve such dispute within twenty (20) days.  If Buyer and Sellers are unable to resolve such dispute within twenty (20) days, Buyer and Sellers shall resolve such dispute in the manner described in Section 1.05(c) hereto.

**1.08**    ***Closing Deliverables***.

(a)    At the Closing, Sellers shall deliver, or cause to be delivered, to Buyer or one or more of its designees, the following:

(i)    the officer's certificate contemplated by Section 6.01(a) hereto;

(ii)     Assignment and Assumption Agreements as provided by Buyer in form and substance reasonably acceptable to Sellers, duly executed by each Seller (the "Assignment and Assumption Agreements");

(iii)    Bills of Sale as provided by Buyer in form and substance reasonably acceptable to Sellers, duly executed by each Seller (the "Bills of Sale");

(iv)     a Transition Services Agreement duly executed by each Seller, substantially in the form attached hereto as Exhibit A (the "Transition Services Agreement");

(v)     an Escrow Agreement duly executed by each Seller and an escrow agent to be mutually agreed upon by Buyer and Seller (the "Escrow Agent"), in form and substance mutually agreed by Buyer and Sellers (the "Escrow Agreement");

(vi)     a Cross-License Agreement duly executed by each applicable Seller, substantially in the form attached hereto as Exhibit B (the "Cross-License Agreement");

(vii)    a Patent Assignment duly executed by each applicable Seller, in substantially the form attached hereto as Exhibit C (the "Patent Assignment");

(viii)   a Trademark License Agreement duly executed by Dallas Project Holdings Limited, substantially in the form attached hereto as Exhibit D (the "Trademark License Agreement");

(ix)     a Copyright Assignment duly executed by each applicable Seller, in substantially the form attached hereto as Exhibit E (the "Copyright Assignment");

(x)     a Domain Name Assignment duly executed by each applicable Seller, in substantially the form attached hereto as Exhibit F (the "Domain Name Assignment");

(xi)     each Seller of owned or leased real property located in the United States shall deliver an affidavit of non-foreign status, dated as of the Closing Date, in form and substance as required under the Treasury Regulations issued pursuant to Section 1445 of the Code and reasonably acceptable to Buyer;

(xii)    the Subcontract Agreement duly executed by each applicable Seller;

(xiii)   the Acquired Records, to the extent not located at the Leased Premises; and

(xiv)    such other duly executed documents, instruments and certificates as may be reasonably necessary to be delivered by any Seller pursuant to this Agreement.

KL2 2597071.9

(b)     At the Closing, Buyer shall deliver, or cause to be delivered, the following:

(i)     to Sellers, the officer's certificate contemplated by <u>Section 6.02(a)</u> hereto;

(ii)     to Sellers, an amount equal to the Closing Date Cash Payment by wire transfer of immediately available funds to the account or accounts designated by Sellers in writing no less than three (3) Business Days prior to the Closing Date;

(iii)     to the Escrow Agent on behalf of Sellers, an amount in cash equal to the Escrow Amount by wire transfer of immediately available funds in accordance with the Escrow Agreement;

(iv)     to Sellers, Assignment and Assumption Agreements duly executed by Buyer and/or its designee;

(v)     to Sellers, the Escrow Agreement duly executed by Buyer;

(vi)     to Sellers, the Transition Services Agreement duly executed by Buyer;

(vii)     to Sellers, the Cross-License Agreement duly executed by Buyer and/or its designee;

(viii)     to Sellers, the Trademark License Agreement, duly executed by Buyer and/or its designee;

(ix)     to Sellers, the Patent Assignment, duly executed by Buyer and/or its designee;

(x)     to Sellers, the Copyright Assignment, duly executed by Buyer and/or its designee;

(xi)     to Sellers, the Domain Name Assignment duly executed by Buyer and/or its designee;

(xii)     to Sellers, the Subcontract Agreement, duly executed by Buyer and/or its designee;

(xiii)     to Sellers, copies of any consents, waivers and approvals (including approvals from Governmental Authorities) obtained by Buyer or its Affiliates that are required for the consummation of the transactions contemplated by this Agreement; and

(xiv)     to Sellers, such other duly executed documents, instruments and certificates as may be reasonably necessary to be delivered by Buyer or its Affiliates pursuant to this Agreement.

13

**1.09** _**Good Faith Deposit**_.

(a)     Promptly after the entry by the Bankruptcy Court of the Bidding Procedures Order, Buyer shall deliver to an escrow agent jointly selected by Sellers and Buyers (the "Deposit Escrow Agent") cash or a letter of credit in the amount of Seventeen Million Five Hundred Thousand Dollars ($17,500,000) as an earnest money deposit (the "Deposit"), to be held in escrow pursuant to the terms and conditions of a customary escrow agreement which shall provide for a release of the Deposit as provided in this Section 1.09.

(b)     If the Closing occurs, Sellers and Buyer shall jointly instruct the Deposit Escrow Agent to release the Deposit to Sellers at the Closing as partial payment of the Purchase Price; provided that in the event that the Deposit is in the form of a letter of credit, either such letter of credit shall provide for a draw down by Sellers in the amount of the Deposit at Closing or Buyer, at its sole option, may deliver to Sellers at Closing, in addition to the Closing Date Cash Payment, a cash payment equal to the amount of the Deposit.  In the event that Buyer exercises such option, Sellers and Buyer shall jointly instruct the Deposit Escrow Agent to release the Deposit to Buyer.

(c)     If the Closing does not occur and (i) this Agreement is terminated by Sellers pursuant to Section 7.01(c)(i) hereto as a result of Buyer's material breach of its representations, warranties, covenants or agreements under this Agreement, (ii) Sellers file a suit for damages against Buyer in a court of competent jurisdiction not later than thirty (30) days after such termination of this Agreement and (iii) a final, non-appealable order is issued by a court of competent jurisdiction with respect to the amount of damages for which Buyer is liable for such material breach (the "Adjudicated Damages"), (x) Sellers shall be entitled to instruct the Deposit Escrow Agent to, in the event that the Deposit is in the form of cash, release such portion of the Deposit in an amount equal to the Adjudicated Damages or, in the event the Deposit is in the form of a letter of credit, draw on a portion of the Deposit in an amount equal to the Adjudicated Damages and release funds in such amount to the Sellers and (y) Buyer shall be entitled to instruct the Deposit Escrow Agent to release to Buyer the remainder of the Deposit, if any, in each case, as promptly as practicable, but in no event later than five (5) Business Days following the Deposit Escrow Agent's receipt of such instructions; provided that in the event the claim for damages submitted to a court of competent jurisdiction by Sellers is less than Seventeen Million Five Hundred Thousand Dollars ($17,500,000), then Buyer shall be entitled to, in the event that the Deposit is in the form of cash, instruct the Deposit Escrow Agent to release that portion of the Deposit which exceeds the damages claimed by Sellers or, in the event that the Deposit is in the form of a letter of credit, to replace the Deposit with a substitute letter of credit in an amount that is no less than the amount of such claim for damages, in each case, as promptly as practicable, but in no event later than five (5) Business Days following the Deposit Escrow Agent's receipt of such instructions.

(d)     If the Closing does not occur and (i) this Agreement is terminated  for any reason other than pursuant to Section 7.01(c)(i) hereto or (ii) Sellers do not file suit for damages against Buyer in a court of competent jurisdiction on or before thirty (30) days after termination of this Agreement pursuant to Section 7.01(c)(i) hereto, Buyer shall be entitled to instruct the Deposit Escrow Agent to release the Deposit, as promptly as practicable, but in no event later

KL2 2597071.9

than five (5) Business Days following the Deposit Escrow Agent's receipt of such instructions, to Buyer.

(e)     Pending its release pursuant to the foregoing provisions of this Section 1.09, the Deposit, to the extent that such Deposit is in the form of cash, shall be held by the Deposit Escrow Agent in an interest bearing escrow account. Notwithstanding anything contained herein to the contrary, any interest which has accrued with respect to the Deposit shall be released to the Buyer from time to time in accordance with Buyer's instructions to the Deposit Escrow Agent.

(f)     Sellers and Buyer agree to prepare, execute and deliver such written instructions as the other party or the Deposit Escrow Agent may reasonably request to ensure that the Deposit is released in accordance with this Section 1.09.

(g)     Nothing in this Section 1.09 shall be deemed to constitute a limitation on damages or limit any remedies otherwise available to any Seller.

## 2.     REPRESENTATIONS AND WARRANTIES OF SELLERS.

**2.01     _Making of Representations and Warranties_**.  As a material inducement to Buyer to enter into this Agreement and consummate the transactions contemplated hereby, each Seller jointly and severally hereby makes to Buyer the representations and warranties contained in this Article 2 as of the date hereof and as of the Closing Date.

**2.02     _Organization_**.  Each Seller has been duly organized and is validly existing and in good standing under the Laws of the jurisdiction of its organization.  Subject to the applicable provisions of applicable bankruptcy and insolvency law each Seller has the requisite power (corporate and other) and authority to own or lease its assets and to conduct its business in the manner and in the places where such properties are owned or leased or such business is currently conducted.  Each Seller is duly qualified or licensed to do business and is in good standing in each jurisdiction in which the ownership or use of its assets or conduct of its business requires it to be so qualified or licensed and in good standing except where any such failure to be so qualified or licensed and in good standing would not, individually or in the aggregate, have a Material Value Diminution.

**2.03     _Authority_**.

(a)     Each Seller has the authority and power (corporate and other) to execute, deliver and perform the Transaction Agreements and each other document and instrument contemplated thereby to be executed and delivered by such Seller and subject to the entry by the Bankruptcy Court of the Bidding Procedures Order (in the case of Section 7.02(b) hereto) and the Approval Order (in the case of all other provisions), to carry out the transactions contemplated hereby and thereby.  The execution, delivery and performance by each Seller of the Transaction Agreements have been duly authorized by all necessary action of such Seller and subject to the entry by the Bankruptcy Court of the Bidding Procedures Order (in the case of Section 7.02(b) hereto) and the Approval Order (in the case of all other provisions), no other action on the part of such Seller is required in connection therewith.

(b)     Subject to the entry by the Bankruptcy Court of the Bidding Procedures Order (in the case of Section 7.02(b) hereto) and the Approval Order (in the case of all other provisions), the Transaction Agreements and each other document and instrument contemplated thereby to which a Seller is a party, assuming due authorization, execution and delivery by the other parties hereto and thereto, constitute, or when executed and delivered by such Seller will constitute, valid and binding obligations of such Seller enforceable against such Seller in accordance with their terms.  Except (x) for the entry by the Bankruptcy Court of the Bidding Procedures Order and the Approval Order, (y) as may be required pursuant to the HSR Act or (z) as set forth on Schedule 2.03(b), no material consent, approval or authorization of, or declaration, filing or registration with, any Governmental Authority or any other Person is required to be made or obtained by Sellers in connection with the execution, delivery or performance of this Agreement by Sellers or the consummation of the transactions contemplated hereby.  Subject to the entry by the Bankruptcy Court of the Bidding Procedures Order (in the case of Section 7.02(b) hereto) and the Approval Order (in the case of all other provisions), except as set forth on Schedule 2.03(b), the execution, delivery and performance by each Seller of the Transaction Agreements:

(i)     does not and will not violate any provision of the charter or bylaws (or comparable organizational documents) of any Seller;

(ii)     except as may be required pursuant to the HSR Act, does not violate in any material respect (x) any material law, rule, regulation, code, plan, judgment, injunction, ruling, order, writ, decree or award, (including final determinations under arbitration proceedings) or other restriction of any court, arbitrator or Governmental Authority ("Law") or (y) any material Permit applicable to Sellers or require any Seller to obtain prior to the Closing any material approval, consent or waiver of, or make any filing with, any Person or Governmental Authority that has not been obtained or made; and

(iii)     does not and will not (A) result in a material breach of, constitute a material default under, accelerate any material obligation under, or give rise to a right of termination of any material indenture or loan or credit agreement or any other material Contract, instrument, mortgage, lien, lease, permit, authorization, order, writ, judgment, injunction, decree, determination or arbitration award by which any of the Acquired Assets are bound or affected or (B) result in the creation or imposition of any material Encumbrance on any of the Acquired Assets.

**2.04     _Accounts Receivable_.**

(a)     Set forth on Schedule 2.04(a) is a true and complete list of all Accounts Receivable as of February 28, 2009 and the aging thereof.  All Accounts Receivable have arisen in connection with bona fide transactions and in respect of services performed in a professional manner in all material respects in accordance with the material terms of the relevant engagement. All Accounts Receivable have been recorded in the ordinary course of business consistent with past practice in all material respects.  There is no material claim for nonpayment or offset of any Accounts Receivable or portion thereof.  Except as expressly provided for in the applicable Assumed Contract, no Seller has granted, or agreed to grant, any material rebates, concessions,

discounts, write-offs or allowances with respect to any Accounts Receivable or with respect to any current Client engagements or proposed engagements.

(b) Except as set forth on Schedule 2.04(b), as to each Client engagement under an Assumed Contract that is a fixed or capped fee engagement, the proportion of the fees received by Sellers or consisting of Accounts Receivable, with respect to services already performed in respect to such engagement represents in all material respects an equitable allocation of the overall fees for such engagements based on the costs incurred by Sellers with respect to the services already performed and the costs that remain to be incurred by Buyer to complete such engagement.

(c) Schedule 2.04(c) sets forth a true and complete list of Deferred Revenue for each Designated Client Contract as of the date specified on such Schedule.

**2.05** *Assets*. The Acquired Assets, together with any services provided to Buyer under the Transition Services Agreement, and the rights of Buyer under the Cross-License Agreement and the Trademark License Agreement, collectively, constitute all of the assets, property, rights and systems of Sellers used primarily in or held for use primarily in, or necessary for the conduct or operation of the Business, and are sufficient for the continued conduct of the Business after the Closing Date in substantially the same manner as the Business is currently being conducted. Sellers own and hold good and valid title, leasehold title or license to, as the case may be, all the Acquired Assets, free and clear of any Encumbrances, except for Permitted Liens. At Closing, Sellers will convey (or cause to be conveyed) to Buyer good and valid title to all the Acquired Assets, free and clear of any Encumbrances (other than the Assumed Liabilities) in accordance with the Approval Order.

**2.06** *Intellectual Property*.

(a) Schedule 2.06(a) sets forth a true and complete list of all Business IP that is Registered (each identified as a Patent, Trademark or Copyright). Where applicable, the following is provided for each item listed on Schedule 2.06(a): owner's name, registration number, serial number or other identification and the applicable jurisdiction.

(b) To Sellers' Knowledge, all material Business IP is valid, subsisting and enforceable.

(c) To Sellers' Knowledge, in the conduct of the Business, no Seller is violating, nor has any Seller violated, any Intellectual Property of another Person in any material respect. No suit, action, reissue, reexamination, interference, arbitration, mediation, opposition, cancellation or other proceeding to which any Seller is a party (collectively, "Suit") is pending concerning any claim or position that any Seller has violated, in the conduct of the Business, any Intellectual Property of another Person, nor, to Sellers' Knowledge, has any such Suit been threatened in writing.

(d) To Sellers' Knowledge, no Person is violating any Business IP in any material respect. No Suit is pending concerning the Business IP, including any Suit concerning a claim or position that the Business IP has been violated or is invalid, unenforceable,

17

unpatentable, unregisterable, cancelable, not owned or not owned exclusively by any Seller, nor, to Sellers' Knowledge, has any such Suit been threatened in writing.

(e)     Sellers own or otherwise hold valid rights to use all Business IP.

(f)     To Sellers' Knowledge, Sellers have timely made all filings and payments with the appropriate foreign and domestic agencies required to maintain in subsistence all material Business IP that is Registered and to confirm and effect Sellers' ownership thereof.

(g)     Sellers have taken all reasonable measures to protect the secrecy, confidentiality and value of all Trade Secrets included in the Business IP which are material to the Business, including entering into appropriate confidentiality agreements with all officers, directors, employees, and other Persons with access thereto, in accordance with customary practice in Sellers' industry.

**2.07**   **_Litigation_**.  Except as set forth on <u>Schedule 2.07</u> and except for the Bankruptcy Cases and any motion, application, pleading or order filed in the Bankruptcy Cases that relate to any Transaction Agreements, the Bidding Procedures Order and/or the Approval Order, there is no pending or, to Sellers' Knowledge, threatened material action, suit, proceeding, claim, opposition, challenge, charge or investigation before any court or other Governmental Authority affecting any of the Acquired Assets, Assumed Liabilities or the Business or that relates to this Agreement or any other Transaction Agreement.  Except to the extent that it would not subject Buyer or its Affiliates to any liability or materially restrict the ownership or impair the use of the Acquired Assets or the operation of the Business by Buyer after the Closing, there are no outstanding judgments, writs, injunctions, orders, decrees or settlements that apply, in whole or in part, to the Acquired Assets, the Assumed Liabilities or the Business, in any material respect.

**2.08**   **_Compliance with Law_**.  Except as set forth in <u>Schedule 2.08</u>, Sellers are in compliance in all material respects with all Laws, orders and settlements applicable to the conduct or operations of the Business.

**2.09**   **_Customers and Suppliers_**.  Except as set forth on <u>Schedule 2.09</u>, since January 1, 2008 until the date hereof, there has not been and there exists no actual or, to Sellers' Knowledge, threatened termination, cancellation or material limitation of, or material and adverse modification to or change in, the business relationship between (a) any Seller, on the one hand, and any customer or customers, on the other hand, whose agreements with Sellers are, individually or in the aggregate, material to the Business or the Acquired Assets, or (b) any Seller, on the one hand, and any supplier, on the other hand whose agreements with Sellers, are individually or in the aggregate, material to the Business or the Acquired Assets.

**2.10**   **_Real Property_**.

(a)     There are no security deposits for any of the Designated Real Property Leases.  Each Seller enjoys peaceful and undisturbed possession and access to the leased premises demised pursuant to the Designated Real Property Leases (the "<u>Leased Premises</u>") in all material respects and has a valid and binding leasehold interest in each of the Leased Premises free and clear of any Encumbrances other than Permitted Liens and Encumbrances that may exist against the fee interest owned by the landlord thereto the existence of which, and

which if violated or defaulted, would not reasonably be expected to be material and have the effect of terminating or canceling or otherwise materially and adversely affecting the rights of the tenant under any Designated Real Property Lease. To Sellers' Knowledge, the Leased Premises have no material defects, and no other facts or conditions exist, which would reasonably be expected to materially impair the day to day use or occupancy thereof for the conduct of the Business. All requisite certificates of occupancy and other Permits or approvals required with respect to the improvements therein and the occupancy and use thereof have been obtained and are currently in effect and no such permits or approvals will be required as a result of the transactions contemplated by this Agreement, to be issued after the date hereof in order to permit Buyer, following the Closing, to continue to operate such Leased Premises in substantially the same manner that such Leased Premises are operated on the date hereof. Sellers have received no written notification that they are in violation of any applicable building, zoning, health or other Law which would reasonably be expected to materially adversely affect the use or operations of any Leased Premises, except for any written notifications that pertain to violations that have been cured or resolved. Sellers have made available to Buyer a correct and complete copy of each Designated Real Property Lease, including any and all amendments, extensions, modifications and renewals thereof.

(b)     No owned real property of Sellers is included in the Acquired Assets or the Assumed Liabilities. There exists no Contract with respect to any Sellers' occupancy of, or any other interest of any Seller in, the Leased Premises other than under the Designated Real Property Leases.

(c)     With respect to each Designated Real Property Lease: (i) there are no material disputes with respect to such Designated Real Property Lease and Sellers have received no written notice of any default thereunder (or condition or event, which, after notice or a lapse of time or both, would constitute a default thereunder), other than any default arising solely as a result of the commencement of the Bankruptcy Cases; (ii) to Sellers' Knowledge, there are no material defaults (or condition or event, which, after notice or a lapse of time or both, would constitute a material default thereunder) under any Designated Real Property Lease on the part of the landlord thereunder, other than any default arising solely as a result of the commencement of the Bankruptcy Cases; and (iii) no security deposit or portion thereof deposited with respect to such Designated Real Property Lease has been applied in respect of a material breach or default thereunder which has not been redeposited in full.

**2.11    _Contracts_.**

(a)     Schedule 2.11(a) sets forth a true and complete list of each subcontractor that Sellers paid between January 1, 2008 and February 28, 2009 and identifies the Designated Client Contract with respect to which such subcontractors performed services. Sellers have made available to Buyer a correct and complete copy of each Assumed Contract, or in the case of an oral Assumed Contract, a correct and complete summary thereof.

(b)     Except as set forth on Schedule 2.11(b), each Assumed Contract is, assuming the due authorization, execution and delivery by the other parties thereto, a legal, valid and binding agreement of each Seller party thereto, enforceable in accordance with its terms subject, as to the enforcement of remedies, to the applicable provisions of bankruptcy law and is

in full force and effect. Except as set forth on Schedule 2.11(b), each Seller party to an Assumed Contract has performed, in all material respects, the obligations required to be performed by it under such Assumed Contract. To Sellers' Knowledge, there is no default by any other party to any Assumed Contract. Except as set forth on Schedule 2.11(b) and this Agreement, no Seller has assigned, delegated or otherwise transferred, or entered into any agreement to so assign, delegate or otherwise transfer, any of its rights or obligations with respect to any Assumed Contract.

(c)     Except as set forth on Schedule 2.11(c) and except as has resulted solely from Sellers' commencement of the Bankruptcy Cases, to Sellers' Knowledge no Seller is in default or breach of any Commercial Client Contract and no party to any Commercial Client Contract has given any Seller notice of its intention to cancel or terminate any Commercial Client Contract.

(d)     All Assumed Contracts which place material restrictions on a Seller or any other Person, including the ability to engage in any business in any place, or to solicit clients or solicit Persons for employment or as independent contractors, are set forth on Schedule 2.11(d).

(e)     To the Seller's Knowledge, Schedule 2.11(e) sets forth a list of substantially all of the Teaming Agreements.

(f)     Schedule 2.11(f) sets forth a true and complete list of all surety bonds maintained by a Seller pursuant to the requirements of a Designated Client Contract (such Schedule indicating, for each Designated Client Contract, the applicable amount of such surety bond and issuing institution).

(g)     Schedule 2.11(g) sets forth a true and complete list of all letters of credit maintained by a Seller pursuant to the requirements of a Designated Client Contract (such Schedule indicating, for each Designated Client Contract, the applicable amount of such letter of credit and issuing institution) (the "Relevant LCs").

(h)     No Seller is a party to any labor or collective bargaining agreement with respect to any Transferred Employee.

**2.12    *Government Contracts*.**

Except as set forth on Schedule 2.12:

(a)     To Sellers' Knowledge, (i) each Government Contract was legally awarded and (ii) no Government Contract is the subject of bid or award protest proceedings. To Sellers' Knowledge, no threatened action or ongoing audit exists which would reasonably be expected to give rise to a material claim for price adjustment of any Government Contract under the Truth in Negotiations Act or under any other price reduction provision, agreement or commitment, including a "Price Reductions" clause, "favorite nation" clause.

(b)     To Sellers' Knowledge, no Seller is in material violation of any statutory and regulatory requirements pertaining to the Government Contracts, including, as amended, the Anti-Kickback Act, Armed Services Procurement Act, False Claims Act, Federal Procurement

and Administrative Services Act, Federal Acquisition Regulation (the "FAR"), FAR cost principles, Cost Accounting Standards, Procurement Integrity Act, Program Fraud Civil Remedies Act, Small Business Act and Truth in Negotiations Act. To Sellers' Knowledge, Sellers have complied in all material respects with all material terms and conditions, including all clauses, provisions, specifications, and quality assurance, testing and inspection requirements of the Government Contracts, whether incorporated expressly, by reference or by operation of law. To Sellers' Knowledge, all facts set forth in or acknowledged by any representations, certifications or disclosure statements made or submitted by or on behalf of any Seller in connection with any Government Contract and its quotations, bids and proposals for Government Contracts were current, accurate and complete in all material respects as of the date of their submission. To Sellers' Knowledge, Sellers have complied in all material respects with all applicable representations, certifications and disclosure requirements under all Government Contracts and each of its quotations, bids and proposals for Government Contracts. Sellers have developed and implemented a government contracts compliance program which includes corporate policies and procedures to promote compliance in all material respects with applicable government procurement statutes, regulations and material contract requirements. To Sellers' Knowledge, no facts exist that could reasonably be expected to give rise to a material liability of any Seller under the False Claims Act. To Sellers' Knowledge, no Seller has undergone or is undergoing any material review, inspection, investigation, survey or examination of records relating to any Government Contract, including any Government Contract with respect to which provision of professional services has been completed. To Sellers' Knowledge, no formally announced audit, review, inspection, investigation, survey or examination of records described on Schedule 2.12(b) has revealed any fact, occurrence, or practice which could affect the Acquired Assets, or continued eligibility to receive and perform Government Contracts. To Sellers' Knowledge, no Seller has made any payment, directly or indirectly, to any Person in violation of Laws, including Laws relating to bribes, gratuities, kickbacks, lobbying expenditures, political contributions and contingent fee payments. To Sellers' Knowledge, Sellers have complied in all material respects with all applicable material requirements under each Government Contract relating to the safeguarding of and access to classified information. Sellers' cost accounting systems and, to Sellers' Knowledge its purchasing systems are in material compliance with all applicable material government procurement statutes and regulations and with the requirements of the Government Contracts (or any of them).

(c)     There are neither any outstanding material claims nor disputes against any Seller relating to any Government Contract nor, to Sellers' Knowledge, any facts or allegations that could reasonably be expected to give rise to such a claim or dispute in the future. To Sellers' Knowledge, no Seller has been or is currently under any material administrative, civil or criminal investigation or indictment disclosed to Sellers involving alleged false statements, false claims or other misconduct relating to any Government Contract or quotations, bids and proposals for Government Contracts, and to Sellers' Knowledge, there is no basis for any such investigation or indictment. No Seller has been or is currently a party to any material administrative or civil litigation involving alleged false statements, false claims or other misconduct relating to any Government Contract or quotations, bids or proposals for Government Contracts and to Sellers' Knowledge, there is no reasonable basis for any such proceeding. To Sellers' Knowledge, neither the U.S. Government nor any prime contractor or higher-tier subcontractor under a Government Contract has withheld or set off, or attempted to withhold (other than the hold-backs pursuant to contracts in the ordinary course of business) or

21

set-off, material amounts of money otherwise acknowledged to be due to a Seller under a Government Contract. To Sellers' Knowledge, neither the U.S. Government nor any prime contractor or higher-tier subcontractor under an outstanding Government Contract has questioned or disallowed any material costs claimed by a Seller under any Government Contract, and to Sellers' Knowledge, there is no fact or occurrence that could be a reasonable basis for disallowing any such costs.

(d)     Neither the U.S. Government nor any prime contractor or higher-tier subcontractor under a Government Contract nor any other Person has notified any Seller, either in writing or to Sellers' Knowledge other than in writing, of any actual or alleged material violation or material breach of any statute, regulation or material contract term. To Sellers' Knowledge, except as has resulted solely from Sellers' commencement of the Bankruptcy Cases, no Seller has received any material show cause, cure, deficiency, default or similar notices relating to any Government Contract and there exist no facts or allegations that would reasonably be expected to give rise to such a notice in the future. Neither any Seller nor any director, officer, employee, consultant or Affiliate thereof has been or is now suspended, debarred, or proposed for suspension or debarment from government contracting, and to Sellers' Knowledge, no facts exist which would reasonably be expected to give rise to such suspension or debarment or proposed suspension or debarment. To Sellers' Knowledge, no determination of non-responsibility has been issued against any Seller with respect to any Designated Client Proposal.

(e)     No Seller has received any written cure notice, show cause notice, notice of termination, or to Sellers' Knowledge any other notice indicating an intent to terminate a Government Contract for default. No Seller has received any written notice of termination or, to Sellers' Knowledge any notice indicating an intent to terminate any material Government Contract for convenience.

(f)     To Sellers' Knowledge, there has been no allegation, charge, finding, investigation or report (internal or external to any Seller) to the effect that any Seller has sold material goods or services to a Governmental Entity that are, or were, not clearly described in the statement of work of a Government Contract pursuant to which the goods or services were delivered to the Governmental Entity.

(g)     No Seller has made any assignment of any Government Contract or of any right, title or interest in or to any Government Contract to any Person. No Seller has entered into any financing arrangements in which the revenues or other benefits under any one or more Government Contract(s) have been conveyed, sold or otherwise transferred in whole or in part to any other Person.

(h)     Sellers are in compliance in all material respects with all applicable Laws with respect to the possession and maintenance of all government-furnished property (as defined in the FAR) in respect to the Government Contracts.

(i)     (i) as of the date of this Agreement, other than a review by a Governmental Authority that has not been disclosed to a Seller by such Governmental Authority, no Seller is undergoing any audit, review or agreed upon procedures inspection by any administrative contracting officer, the U.S. Defense Contract Audit Agency ("DCAA") or the

U.S. General Services Administration in respect of any Government Contracts, and (ii) no Seller has had any material adjustments arising out of any of the above-referenced audits, reviews or procedure inspections since December 31, 2001 in respect to any Government Contracts.

(j)     Sellers are, in respect to the Government Contracts, in compliance with all applicable Laws regarding national security, including those obligations specified in the National Industrial Security Program Operating Manual, DOD 5220.22-M (January 1995), and any supplements, amendments or revised edition thereof.

(k)     Sellers are, in respect to the Government Contracts, in compliance in all material respects with all applicable Laws and contractual obligations regarding application and data security, including The Federal Information Security Management Act of 2002, as amended, and the regulations and mandates issued thereunder.

(l)     Except to the extent that such disclosure is prohibited by applicable Law, Schedule 2.12(l) sets forth a true and complete list of all material facility security clearances held by any Seller in respect to the Government Contracts.

(m)     To Sellers' Knowledge, each Business Employee possessed (during the time of performance) all of the required credentials (e.g., education and experience) and security clearances specified in or required by such Government Contract. To Sellers' Knowledge, there is no existing information, fact, condition or circumstance that would cause any Seller to lose its facility security clearances in respect of any Government Contracts.

(n)     Sellers are in compliance in all material respects with all Laws regarding U.S. export control, including in respect of U.S. Department of State International Trafficking in Arm Regulations, U.S. Department of Commerce Export Administration regulations, U.S./Canada Joint Certification Program and U.S. Customs requirements.

(o)     No facts, events or other circumstances exist, that violates or otherwise constitutes a basis on which the U.S. Government or any other Person might reasonably claim to violate, the covenant against contingent fees under any Government Contract, or 10 U.S.C. § 2506, 41 U.S.C. § 254 or FAR 52.183-5.

(p)     Schedule 2.12(p) sets forth a true and complete list of all Government Contracts as of the date set forth on Schedule 2.12(p) that are "fixed price" and Sellers neither believe nor have a reasonable basis to believe that the costs associated with completing the performance of any such fixed price Government Contract after the Closing Date will exceed the fixed price to be earned and paid thereunder after the Closing Date.

(q)     As of the date hereof, the aggregate At-Risk Amounts do not exceed $250,000, and Schedule 2.12(q) sets forth, as of the date hereof, each Government Contract in respect of which there is an At-Risk Amount, and the amount and the aging thereof.

(r)     Sellers have established and implemented all policies, procedures and programs, and made all required disclosures of matters that are required to be disclosed, by FAR 52.203-13.

23

(s)     To Sellers' Knowledge, Sellers are, in respect to the Government Contracts, in compliance in all material respects with all applicable Laws regarding "organizational conflicts of interest" and, to Sellers' Knowledge, Schedule 2.12(s) sets forth certain "OCI" mitigation plans of Sellers in respect of the Business or any Government Contracts.

**2.13     _Finder's Fee_**.  Except for Greenhill & Co., LLC and AlixPartners, LLC, whose fees and expenses shall be the sole responsibility of Sellers, Sellers have not incurred or become liable for any broker's commission or finder's fee which would be payable by Buyer relating to or in connection with the transactions contemplated by this Agreement and Sellers shall indemnify and hold Buyer harmless from and against any liability with respect to any and all such commissions and fees.

**3.     <u>COVENANTS OF SELLERS</u>**.

**3.01     _Making of Covenants and Agreements_**.  Each Seller jointly and severally hereby makes the covenants and agreements set forth in this Article 3.

**3.02     _Confidential Information_**.  Each Seller shall, and shall cause its Subsidiaries, officers, directors, agents and representatives to, hold in strict confidence and not to disclose to any other Person, any Business Confidential Information, directly or indirectly, or otherwise use any Business Confidential Information for its or their own purpose or for the benefit of any Person other than Buyer at Buyer's request, unless such disclosure (w) is made prior to Closing and in the ordinary course of business consistent with past practice, (x) has been authorized in writing by Buyer, (y) is necessary to permit Sellers to continue to provide access to the electronic data room containing information regarding the Business to Persons having access to such data room on the date hereof in accordance with Section 3.06 hereto, or (z) after entry of the Bidding Procedures Order and before Closing, is made to a Qualified Bidder (as defined in the Bidding Procedures Order) in accordance with the Bidding Procedures Order.  If Sellers or any of their representatives are required by Law to disclose any Business Confidential Information, Sellers shall provide Buyer with prompt written notice, unless notice is prohibited by Law, of any such request or requirement so that Buyer may seek a protective order or other appropriate remedy. If, failing the entry of a protective order, Sellers are, based on the advice of their counsel, legally required to disclose such Business Confidential Information, Sellers may disclose that portion of Business Confidential Information that counsel advises that Sellers are legally required to disclose and will exercise reasonable best efforts to obtain assurance to the extent possible that confidential treatment will be accorded to that portion of Business Confidential Information that is being disclosed.  In any event, Sellers will not oppose action by Buyer to obtain an appropriate protective order or other reliable assurance that confidential treatment will be accorded Business Confidential Information. Notwithstanding anything in this Agreement to the contrary, except as expressly set forth in Section 3.07 hereto, nothing in this Agreement shall in any way restrict the use of Residuals by Sellers or their respective Subsidiaries, officers, directors, agents or representatives.

**3.03     <u>Conduct of Business</u>**.  Except as expressly permitted in this Section 3.03 or as required by Law, Sellers agree that, between the date of this Agreement and the Closing Date, Sellers shall operate the Business in the ordinary course consistent with past practice and Sellers

24

shall use their reasonable best efforts to preserve and protect the Acquired Assets and the current business organizations of the Business, comply in all material respects with all applicable Laws and use their reasonable best efforts to preserve their current relationship with the customers, clients, contractors and others having business dealings with respect to the Business. Without limiting the generality of the foregoing, Sellers shall not, without the prior written consent of Buyer:

(a)     grant a participation or security interest in, mortgage, pledge or otherwise encumber or subject to an Encumbrance any of the Acquired Assets, other than in the ordinary course of business consistent with past practice;

(b)     sell, assign, lease, transfer or convey any Acquired Asset to any Person, other than in the ordinary course of business consistent with past practice; provided that Sellers shall not in any event sell, assign, lease, transfer or convey any (x) Designated Real Property Lease or (y) Client Service Contract or Client Proposal other than those set forth on Schedule 3.03(b);

(c)     amend, modify, cancel or waive any of their rights under any Assumed Contract, other than in the ordinary course of business consistent with past practice; provided that Sellers shall not in any event amend, modify, cancel or waive any of their material rights under any Designated Real Property Lease;

(d)     terminate the employment of any Business Employee above the level of Managing Director (other than for cause);

(e)     (i) abandon or cancel any of the Business IP, or otherwise take or permit third parties under its control to take any action, or omit to take any action, which would reasonably be expected to have a materially adverse effect on the validity, enforceability or value of any Business IP or Sellers' rights therein and thereto or (ii) sell or assign its interest in, grant any license under, or enter into any other agreement with respect to any Business IP, other than in the ordinary course of business consistent with past practice or pursuant to the Bidding Procedures Order;

(f)     other than as required by Law or existing plans or agreements grant any increase to the base compensation of any Business Employee or otherwise adopt, modify or terminate any employee benefit plan, program or arrangement with respect to Business Employees, except for compensation increases granted to non-executive Business Employees in the ordinary course of business consistent with past practice;

(g)     bill or collect its receivables other than in the ordinary course of business consistent with past practice; or

(h)     commit to any of the foregoing.

**3.04**     *Taxes*.  Without the prior written consent of Buyer (which consent shall not be unreasonably withheld, conditioned or delayed), no Seller nor any Affiliate of any Seller shall, to the extent it may affect or relate to any of the Acquired Assets in the hands of Buyer, make or change any Tax election, change any annual Tax accounting period, adopt or change any method

25

of Tax accounting, file any amended Tax Return, enter into any closing agreement, settle any Tax claim or assessment, surrender any right to claim a Tax refund, consent to any extension or waiver of the limitation period applicable to any Tax claim or assessment or take or omit to take any other action, if any such action or omission would have the effect, with respect to the Acquired Assets, of increasing the Tax liability or reducing any Tax Asset of Buyer or any Affiliate of Buyer. For purposes of this Agreement, "Tax Asset" shall mean any net operating loss, net capital loss, Tax credit or any other Tax attribute which could reduce Taxes (including deductions and credits related to alternative minimum Taxes).

### 3.05 *Notices*.

(a)    From time to time (but in no event on less than a weekly basis and in any event, not later than five (5) Business Days prior to the Closing Date), Sellers shall provide written notice to Buyer of any change in any of the information contained in the representations and warranties made by Sellers in Article 2 or Schedules referred to herein or attached hereto and shall promptly furnish any information which Buyer may reasonably request in relation to such change; provided that such notice shall not operate to in any way modify or cure any breach of the representations and warranties made by Sellers in Article 2 or Schedules referred to herein or attached hereto.

(b)    Sellers shall promptly notify Buyer of any litigation, arbitration or administrative proceeding pending or, to Sellers' Knowledge, threatened against any Seller which challenges the transactions contemplated by this Agreement.

### 3.06 *Non-Solicitation of Competing Bids*.

From the date hereof until the Bankruptcy Court shall have entered the Bidding Procedures Order, Sellers shall not, and shall cause their representatives and Affiliates not to, (a) initiate contact with, solicit or encourage submission of, or discuss, negotiate or assist with, any inquiries, proposals or offers by, any Person (other than Buyer and its Affiliates, agents and representatives) in connection with any sale or other disposition of the Acquired Assets or (b) provide any Person (other than Buyer and its Affiliates, agents and representatives) with access to the books, records, operating data, contracts, documents or other information relating to the Business; provided that the foregoing shall not require Sellers to terminate any Person's access, as in effect on the date hereof, to the electronic data room containing information regarding the Business, the Acquired Assets and the Assumed Liabilities. Sellers shall promptly notify Buyer of any proposal or offer from a third party to acquire, directly or indirectly, all or any substantial portion of the assets, properties, rights and interests of any Seller relating to Sellers' North American Public Service Unit (each, a "Competing Bid") received by Sellers in writing after the date hereof until the Bankruptcy Court shall have entered the Bidding Procedures Order, and Sellers shall communicate to Buyer the material terms of any such Competing Bid but not the identity of the party making such Competing Bid. From and after entry of the Bidding Procedures Order, Sellers shall communicate to Buyer the material terms of Competing Bids in accordance with the terms of the Bidding Procedures Order.

**3.07**   *Non-Solicitation of Employees and Customers*.

(a)    Except on behalf of Buyer to the extent Sellers may hereafter agree in writing, for a period of three (3) years from the Closing Date, no Seller shall for itself or for any other Person, directly or indirectly:

(i)    seek to provide services in connection with any rebid or recompete with respect to any Designated Client Contract, propose to enter into any successor Contract to any Designated Client Contract, persuade or seek to persuade any customer or any purchaser of services of Sellers' North American Public Services Business as conducted by Buyer and its Affiliates or related entities in North America after the Closing to cease to do business or to reduce the amount of business which it has customarily done with Sellers' North American Public Services Business as conducted by Buyer and its Affiliates or related entities in North America after the Closing or contemplates doing with Sellers' North American Public Services Business as conducted by Buyer and its Affiliates or related entities in North America after the Closing, whether or not the relationship between Sellers' North American Public Services Business as conducted by Buyer and its Affiliates or related entities in North America after the Closing and such customer was originally established in whole or in part through the efforts of a Seller; provided that nothing in this Section 3.07(a)(i) shall preclude any Seller from fulfilling the terms of any Contract (x) to which such Seller is a party as of the Closing Date and which is not an Assumed Contract or (y) arises out of or otherwise relates to a Client Proposal which has been submitted on or before the Closing Date which is not a Designated Client Proposal;

(ii)    so long as Buyer is in compliance with all of its obligations under the Transaction Agreements in all material respects, take any action which is intended by the senior management of Sellers to harm, disparage, defame, slander, or lead to unwanted or unfavorable publicity to Buyer or any of its Affiliates or other member firms of Deloitte Touche Tohmatsu; or

(iii)    assist, permit, entice, induce, encourage or allow any of its Subsidiaries or personnel or the personnel of its Subsidiaries to do any activity which, were it done by a Seller, would violate any provision of this Section 3.07(a).

(b)    Each Seller agrees that, for a period of three (3) years following the Closing Date, neither it nor its Subsidiaries will directly or indirectly recruit, solicit or hire any Transferred Employee, nor shall such Seller or its Subsidiaries encourage any Transferred Employee to terminate his or her employment or relationship with Buyer or its Affiliates; provided that this Section 3.07(b) shall not prohibit such Seller from recruiting, soliciting or hiring Transferred Employees after such Transferred Employees have been terminated by Buyer or its Affiliates (other than in connection with a transfer of such Transferred Employees to Buyer or one of its Affiliates), if such Seller or its Affiliates did not directly or indirectly have any communications prior to such termination regarding the prospect of employment after the Closing with Seller or its Affiliates with such Transferred Employees.

27

**3.08** *Non-Use of Licensed Marks*. Without limiting Sellers' obligations under Section 3.07 hereto, from the Closing Date, no Seller shall use or permit any other Person to use, directly or indirectly, within the Territory, any of the Licensed Marks in connection with the services rendered by Sellers' North American Public Services Business as conducted immediately prior to the Closing Date; provided that, notwithstanding anything in this Section 3.08 to the contrary, nothing in this Section 3.08 is intended to restrict Sellers' right to use, or permit others to use, directly or indirectly, the Licensed Marks (a) on behalf of Buyer in connection with providing services to Buyer under the Transition Services Agreement, or (b) for a period of five (5) years only, which period shall begin on the Closing Date, in connection with the wind down of the portions of Sellers' North American Public Services Business that have not been acquired by Buyer pursuant to this Agreement (including, for the avoidance of doubt, any Contracts which are not Assumed Contracts and any Client Proposals which are not Designated Client Proposals). For the purposes of this Section 3.08, "Territory" shall mean the United States and Canada, and their respective territories and possessions.

**3.09** *Additional Seller Information*. Within fifteen (15) days after the date hereof, Sellers shall deliver a list of all (i) Related Subcontracts, (ii) Reseller Contracts, (iii) Teaming Agreements to the extent that such Teaming Agreements have not already been listed on Schedule 2.11(e) and (iv) "OCI" mitigation plans of Sellers in respect of the Business or any Government Contracts.

**4.**     **REPRESENTATIONS AND WARRANTEES OF BUYER**.

**4.01** *Making of Representations and Warranties*. As a material inducement to Sellers to enter into this Agreement and consummate the transactions contemplated hereby, Buyer hereby makes the representations and warranties to Sellers contained in this Article 4 as of the date hereof and as of the Closing Date.

**4.02** *Organization*. Buyer has been duly organized and is validly existing and in good standing under the Laws of the State of Delaware with all requisite limited liability partnership power to own or lease its properties and to conduct its business in the manner and in the places where such properties are owned or leased or such business is conducted by it.

**4.03** *Authority*. Buyer has the requisite right, authority and limited liability partnership power to execute, deliver and perform the Transaction Agreements and each other document and instrument contemplated thereby to be executed and delivered by Buyer and to carry out the transactions contemplated hereby and thereby. The execution, delivery and performance by Buyer of the Transaction Agreements have been duly authorized by all necessary limited liability partnership action of Buyer and no other action on the part of Buyer is required in connection therewith. The Transaction Agreements constitute, or when executed and delivered will constitute, valid and binding obligations of Buyer enforceable in accordance with their terms, except as limited by (i) applicable bankruptcy, insolvency, reorganization, moratorium or other laws of general application affecting enforcement of creditors' rights and (ii) general principles of equity that restrict the availability of equitable remedies. The execution, delivery and performance by Buyer of the Transaction Agreements:

KL2 2597071.9

(a)     does not and will not violate any provision of the organizational documents of Buyer;

(b)     except as may be required pursuant to the HSR Act, does not and will not violate Laws applicable to Buyer which require Buyer to obtain any approval, consent or waiver of, or make any filing with, any Person or Governmental Authority which has not been obtained or made.; and

(c)     does not result in a material breach of, constitute a material default under, accelerate any material obligation under, or give rise to a right of termination of any material indenture or loan or credit agreement or any other material Contract, instrument, mortgage, lien, lease, permit, authorization, order, writ, judgment, injunction, decree, determination or arbitration award by which Buyer is bound.

**4.04**     *Financing*.  Buyer has and on the Closing Date Buyer will have sufficient funds on hand to consummate the transactions contemplated by this Agreement.  Buyer acknowledges that it shall not be a condition to the obligations of Buyer to consummate the transactions contemplated hereby that Buyer have sufficient financial resources for payment of the Purchase Price.

**4.05**     *Finder's Fee*.  Except for Houlihan Lokey Howard & Zukin Capital, Inc., whose fees and expenses shall be the sole responsibility of Buyer, Buyer has not incurred or become liable for any broker's commission or finder's fee which would be payable by any Seller relating to or in connection with the transactions contemplated by this Agreement.

**5.**     **COVENANTS OF BUYER**.

**5.01**     *Making of Covenants and Agreements*.  Buyer hereby makes the covenants and agreements set forth in this Article 5.

**5.02**     *Confidentiality*.  The terms of the Confidentiality Agreement shall continue in full force and effect until the Closing, at which time Buyer's confidentiality obligations shall terminate only in respect of that portion of the items in the Confidentiality Agreement relating to the Acquired Assets and the Business that is the subject of the transactions contemplated by this Agreement and to the extent necessary for Buyer to comply with its obligations pursuant to Section 9.08 hereto.  Except as set forth in the foregoing sentence, all of the confidentiality provisions of the Confidentiality Agreement shall continue in full force and effect after the Closing and will survive any termination of this Agreement.  Upon the Bankruptcy Court's entry of the Approval Order, the non-solicitation provisions of the Confidentiality Agreement shall terminate to the extent that such provisions have not already terminated in accordance with this Section 5.02.

**5.03**     *Letters of Credit*.  As soon as practicable after the Closing Date, Buyer agrees to use commercially reasonable efforts to cause the counterparty to any Assumed Contract which is supported by an outstanding Relevant LC to release and terminate the Relevant LC. If it elects to do so, Buyer may replace such Relevant LC or instead obtain a back-to-back letter of credit acceptable to the current issuing bank naming the current issuing bank as beneficiary with respect to such Relevant LC (a "Back-to-Back Letter of Credit"). If no Back-to-Back Letter of

Credit has been issued with respect to an outstanding Relevant LC and amounts are drawn under such outstanding Relevant LC after the Closing Date, Buyer shall reimburse the issuer of such Relevant LC for any such amounts pursuant to the terms of such Relevant LC, solely to the extent that Seller would be obligated to reimburse or pay such amounts pursuant to the terms of the Relevant LC documents and Buyer shall be subrogated to all rights of such issuer and Seller in respect of any such amounts provided Buyer shall have no right of reimbursement or other recourse that the issuer has against any letter of credit lender in respect of such amounts. Notwithstanding the foregoing, if amounts are drawn under a Relevant LC prior to the Closing Date and Buyer is refunded any amounts in respect of such drawing, Buyer agrees to promptly turn over such amounts to Seller and such amounts shall not be applied to satisfy obligations of Buyer under the Assumed Contract arising after the Closing Date.

## 6. **CONDITIONS.**

**6.01** *Conditions to the Obligations of Buyer*. Subject to <u>Section 7.03</u> hereto, the obligation of Buyer to consummate this Agreement and the transactions contemplated hereby are subject to the fulfillment, prior to or at the Closing, of the following conditions precedent:

(a)    <u>Representations; Warranties; Covenants</u>. Each of the representations and warranties of Sellers contained in this Agreement shall be true and correct (without regard for any materiality qualifiers therein) as of the date hereof and at and as of the Closing with the same effect as though such representations and warranties had been made at and as of such time, other than representations and warranties that speak as of another specified date or time prior to the date hereof (which need only be true and complete as of such date and time), in each case with only such exceptions that have not had and would not reasonably be expect to have, individually or in the aggregate, a Material Value Diminution. All of the covenants and agreements to be complied with and performed by Sellers on or prior to the Closing Date shall have been complied with or performed in all material respects. Sellers shall have delivered to Buyer a certificate, dated as of the Closing Date, executed on behalf of each Seller by an authorized executive officer thereof, certifying that the conditions specified above have been fulfilled.

(b)    <u>Regulatory Approvals</u>. All filings required to be made under the HSR Act shall have been made and any applicable waiting period thereunder shall have expired or been terminated.

(c)    <u>Bankruptcy Court Orders</u>.

(i)    The Bankruptcy Court shall have entered the Bidding Procedures Order; and

(ii)    The Bankruptcy Court shall have entered the Approval Order and such Approval Order shall have become a Final Order.

(d)    <u>No Injunction; Absence of Certain Litigation</u>. No Law or preliminary or permanent injunction issued by any court of competent jurisdiction restraining or prohibiting the transactions contemplated hereby shall be in effect and no action or proceeding by any Governmental Authority to obtain such an injunction shall be pending or threatened.

KL2 2597071.9

(e)   Personnel Retention.  The conditions specified on Schedule 6.01(e) shall have been satisfied.

(f)   Closing Deliverables.  Buyer shall have received the Closing deliverables of Sellers pursuant to Section 1.08(a) hereto.

6.02   *Conditions to Obligations of Sellers*.  Subject to Section 7.03 hereto, the obligations of Sellers to consummate this Agreement and the transactions contemplated hereby is subject to the fulfillment, prior to or at the Closing, of the following conditions precedent:

(a)   Representations; Warranties; Covenants.  Each of the representations and warranties of Buyer contained in this Agreement shall be true and correct in all material respects (without regard for any materiality qualifiers therein) as of the date hereof and at and as of the Closing with the same effect as though such representations and warranties had been made at and as of such time, other than representations and warranties that speak as of another specified date or time prior to the date hereof (which need only be true and complete as of such date and time). All of the covenants and agreements to be complied with and performed by Buyer on or prior to the Closing Date shall have been complied with or performed in all material respects. Buyer shall have delivered to Sellers a certificate, dated as of the Closing Date, executed by an authorized executive officer of Buyer, certifying in such detail as Sellers may reasonably request that the conditions specified above have been fulfilled.

(b)   Regulatory Approvals.  All filings required to be made under the HSR Act shall have been made and any applicable waiting period thereunder shall have expired or been terminated.

(c)   No Injunction; Absence of Certain Litigation.  No Law or preliminary or permanent injunction issued by any court of competent jurisdiction restraining or prohibiting the transaction contemplated hereby shall be in effect and no action or proceeding by any Governmental Authority to obtain such an injunction shall be pending or threatened, except for such actions or proceedings which would not be reasonably likely to prohibit Sellers from consummating the transactions contemplated by this Agreement or performing their obligations hereunder.

(d)   Bankruptcy Court Approval.  The Approval Order shall have been entered by the Bankruptcy Court and such Approval Order shall have become a Final Order.

(e)   Closing Deliverables.  Sellers shall have received the Closing deliverables of Buyer pursuant to Section 1.08(b) hereto.

7.   **TERMINATION OF AGREEMENT; RIGHTS TO PROCEED**.

7.01   *Termination*.  At any time prior to the Closing, this Agreement may be terminated as follows:

(a)   by mutual written consent of Buyer and Sellers;

31

(b)     by Buyer, provided that, as of the date of termination of this Agreement by Buyer, the condition specified in Section 6.02(a) hereto is satisfied, (i) if, as of such date of termination, the condition specified in Section 6.01(a) hereto is not satisfied and any such breach shall have remained uncured for a period of ten (10) Business Days after Buyer shall have given written notice of such breach to Sellers (provided that no cure period shall be required for a breach which by its nature cannot reasonably be expected to be cured within such time period), (ii) if Sellers shall have explicitly repudiated this Agreement and such repudiation shall have remained uncured for a period of ten (10) Business Days after Buyer shall have given written notice thereof to Sellers, (iii) if any of the conditions to the obligations of Buyer set forth in Section 6.01 hereto shall have become incapable of fulfillment other than as a result of a breach by Buyer of any covenant or agreement contained in this Agreement, and such condition is not waived by Buyer or (iv) if (A) any Seller has filed any pleading or entered into any agreement (other than this Agreement and the pleadings filed in connection herewith or any "higher and better offer" obtained pursuant to the Bidding Procedures Order) relating or otherwise regarding (x) the sale, transfer, lease or other disposition, directly or indirectly, of a material portion of the Acquired Assets or (y) confirmation of a stand-alone plan of reorganization or (B) any of Sellers' secured lenders exercise rights under Section 363(k) of the Bankruptcy Code;

(c)     by Sellers, provided that, as of the date of termination of this Agreement by Sellers, the condition specified in Section 6.01(a) hereto is satisfied, (i) if, as of such date of termination, the condition specified in Section 6.02(a) hereto is not satisfied and any such breach shall have remained uncured for a period of ten (10) Business Days after Sellers shall have given written notice of such breach to Buyer (provided that no cure period shall be required for a breach which by its nature cannot reasonably be expected to be cured within such time period) or (ii) if any of the conditions to the obligations of Sellers set forth in Section 6.02 hereto shall have become incapable of fulfillment other than as a result of a breach by a Seller of any covenant or agreement contained in this Agreement, and such condition is not waived by Sellers;

(d)     by Buyer, if the Bankruptcy Court has not entered the Bidding Procedures Order by April 6, 2009 or the Bidding Procedures Order has been entered but stayed as of such date;

(e)     by Buyer, if the Bankruptcy Court has not entered the Approval Order by April 23, 2009, or the Approval Order has been entered but stayed as of such date, or the Approval Order has not become a Final Order within ten (10) days thereafter;

(f)     by Buyer or Sellers in the event Sellers select a bid made by a Person other than Buyer as the "highest and best offer" in accordance with the Bidding Procedures Order and the Bankruptcy Court enters an order approving the sale to such Person or in the event the Bankruptcy Court enters an order approving the sale to any other Person; or

(g)     by Buyer, on the one hand, or Sellers, on the other hand, if the Closing has not occurred on or before the earlier of (i) May 15, 2009 and (ii) the date that is ten (10) days after the date on which the Approval Order has become a Final Order (the "Termination Date"); provided further that (x) no party shall be entitled to terminate this Agreement pursuant to this Section 7.01(g) if such party's failure to fulfill any of its obligations under this Agreement has been the primary cause of the failure of the Closing to occur on or before such date and (y) if any

32

party or Affiliate thereof receives a Second Request pursuant to the HSR Act prior to the Termination Date (as determined prior to giving effect to this proviso) then the Termination Date shall be postponed to the date that is seven (7) days after the date that would otherwise be the Termination Date, provided further that during such seven (7) day period, the Buyer, at its sole discretion, may further postpone the Termination Date by an additional thirty-eight (38) days.

**7.02**    ***Effect of Termination***.

(a)    If this Agreement is terminated as permitted by Section 7.01 hereto, this Agreement shall become null and void and of no further force and effect, except for the following provisions, which shall remain in full force and effect: Sections 1.09 and 7.02 and Article 10 hereto; provided that nothing in this Section 7.02 shall be deemed to release any party from any liability for any intentional breach by such party of the terms and provisions of this Agreement or impair the right of any party to compel specific performance by any other party of its obligations under this Agreement prior to such termination.

(b)    Notwithstanding the foregoing,

(i)    in the event this Agreement is terminated pursuant to (A) Sections 7.01(b)(i) (solely as a result of a breach of any covenant or agreement which causes the condition in Section 6.01(a) to not be met as of the date of termination), 7.01(b)(ii), 7.01(b)(iv), or 7.01(f) hereto or (B) Section 7.01(b)(iii) hereto by virtue of the failure of the conditions set forth in Sections 6.01(a) (solely as a result of the breach of any covenant or agreement), 6.01(e) or 6.01(f) hereto to be satisfied or waived, the Break-Up Fee and the Expense Reimbursement shall be paid by Sellers to Buyer;

(ii)    in the event this Agreement is terminated pursuant to (A) Section 7.01(b)(i) hereto (solely as a result of a breach of a representation or warranty which causes the condition in Section 6.01(a) to not be met as of the date of termination) or (B) Section 7.01(b)(iii) hereto by virtue of the failure of the condition set forth in Section 6.01(a) (solely as a result of the breach of a representation or warranty) hereto to be satisfied or waived, the Expense Reimbursement shall be paid by Sellers to Buyer;

(iii)    in the event this Agreement is terminated pursuant to (A) Section 7.01(b)(iii) hereto by virtue of the failure of the conditions set forth in Sections 6.01(b), 6.01(c)(ii) or 6.01(d) hereto to be satisfied or waived, (B) Section 7.01(c)(ii) hereto by virtue of the failure of the conditions set forth in Sections 6.02(b), 6.02(c) or 6.02(d) hereto to be satisfied or waived or (E) Sections 7.01(e) or 7.01(g) hereto, the Expense Reimbursement shall be paid by Sellers to Buyer.

(c)    To the extent payable pursuant to this Section 7.02, the Break-Up Fee and the Expense Reimbursement shall be paid by Sellers to Buyer by wire transfer of immediately available funds promptly upon termination of this Agreement and, in the case of such termination by Sellers, as a condition to the effectiveness of such termination. Sellers' obligation to pay the Break-Up Fee and the Expense Reimbursement pursuant to this Section 7.02 shall be joint and several, survive termination of this Agreement, dismissal or conversion of any of the Bankruptcy Cases and confirmation of any plan of reorganization or liquidation, and shall constitute an

administrative expense of Sellers under Section 364(c)(1) of the Bankruptcy Code with priority over any and all administrative expenses of the kind specified in Sections 503(b) or 507(b) of the Bankruptcy Code.

**7.03** *__Right to Proceed__*. Anything in this Agreement to the contrary notwithstanding, if any of the conditions specified in Section 6.01 hereto have not been satisfied, Buyer shall have the right to proceed with the transactions contemplated hereby without waiving any of its rights hereunder, and if any of the conditions specified in Section 6.02 hereto have not been satisfied, Sellers shall have the right to proceed with the transactions contemplated hereby without waiving any of their rights hereunder.

## 8.  **TERMINATION OF WARRANTIES; AS IS TRANSACTION**.

**8.01** *__No Survival of Representations and Warranties__*. All representations and warranties in the Transaction Agreements shall terminate upon and shall not survive (a) the Closing or (b) any termination of this Agreement pursuant to Section 7.01 hereto. After the Closing, no Seller will have any liability for, and neither Buyer nor any Affiliate of Buyer will have any right to make a claim or seek damages with respect to, any breach, whenever occurring, of any representation or warranty of any Seller which terminates upon the Closing as provided in the preceding sentence.

**8.02** *__No Other Representations and Warranties; As Is Transaction__*. EXCEPT FOR THE REPRESENTATIONS AND WARRANTIES SET FORTH HEREIN, SELLERS ARE NOT MAKING ANY OTHER REPRESENTATIONS OR WARRANTIES, WRITTEN OR ORAL, STATUTORY, EXPRESS OR IMPLIED, CONCERNING SELLERS THE BUSINESS, THE ACQUIRED ASSETS, THE ASSUMED LIABILITIES OR THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT, AND IT IS UNDERSTOOD THAT BUYER, WITH SUCH EXCEPTIONS, TAKES THE ACQUIRED ASSETS "AS IS" AND "WHERE IS". BUYER ACKNOWLEDGES THAT EXCEPT AS EXPRESSLY PROVIDED IN THIS AGREEMENT, SELLERS HAVE NOT MADE, AND SELLERS HEREBY EXPRESSLY DISCLAIM AND NEGATE, AND BUYER HEREBY EXPRESSLY WAIVES, ANY REPRESENTATION OR WARRANTY, EXPRESS, IMPLIED, AT COMMON LAW, BY STATUTE OR OTHERWISE RELATING TO, AND BUYER HEREBY EXPRESSLY WAIVES AND RELINQUISHES ANY AND ALL RIGHTS, CLAIMS AND CAUSES OF ACTION AGAINST SELLERS AND THEIR AFFILIATES AND EACH OF THEIR REPRESENTATIVES IN CONNECTION WITH THE ACCURACY, COMPLETENESS OR MATERIALITY OF ANY INFORMATION, DATA OR OTHER MATERIALS (WRITTEN OR ORAL) HERETOFORE FURNISHED TO BUYER OR ITS REPRESENTATIVES BY OR ON BEHALF OF SELLERS OR ANY OF THEIR AFFILIATES OR ANY OF THEIR RESPECTIVE REPRESENTATIVES IN CONNECTION THEREWITH. WITHOUT LIMITING THE FOREGOING, SELLERS ARE NOT MAKING ANY REPRESENTATION OR WARRANTY TO BUYER WITH RESPECT TO ANY FINANCIAL PROJECTION OR FORECAST RELATING TO THE BUSINESS, THE ACQUIRED ASSETS OR THE ASSUMED LIABILITIES. BUYER FURTHER ACKNOWLEDGES THAT BUYER HAS CONDUCTED AN INDEPENDENT INSPECTION AND INVESTIGATION OF THE BUSINESS AND THE ACQUIRED ASSETS AND ALL SUCH OTHER MATTERS RELATING TO OR AFFECTING THE BUSINESS AND THE ACQUIRED ASSETS AS

34

BUYER DEEMED NECESSARY OR APPROPRIATE AND THAT IN PROCEEDING WITH THE TRANSACTION CONTEMPLATED BY THIS AGREEMENT, EXCEPT FOR ANY REPRESENTATIONS AND WARRANTIES EXPRESSLY SET FORTH IN THIS AGREEMENT, BUYER IS DOING SO BASED SOLELY UPON SUCH INDEPENDENT INSPECTIONS AND INVESTIGATIONS.

9. **ADDITIONAL COVENANTS AND AGREEMENTS**.

   9.01 ***Reasonable Best Efforts; Consents to Assignment***.

   (a)    Upon the terms and subject to the conditions of this Agreement, each of the parties hereto shall use its reasonable best efforts to take, or cause to be taken, all actions, and to do, or cause to be done, all things necessary, proper or advisable under applicable Laws to consummate and make effective the transactions contemplated by this Agreement as promptly as practicable, including (i) the prompt preparation and filing of all forms, registrations and notices required to be filed to consummate the transactions contemplated by this Agreement and the taking of such reasonable actions as are necessary to obtain any requisite approvals, consents, orders, exemptions or waivers by any Governmental Authority or any other Person, including filings pursuant to the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended (the "HSR Act") and any actions necessary to cause the expiration of the notice periods under the HSR Act; provided that such reasonable best efforts shall not include Buyer agreeing to hold separate or divest (including through an independent trustee, if necessary) particular assets or categories of assets, or operations, of the Business, Buyer or any of its Affiliates or agreeing to any limitations or restrictions on its conduct in order for the Closing to occur and (ii) using reasonable best efforts to cause the satisfaction of all conditions to Closing (other than conditions as to the performance by the other party of its obligations). Each party shall promptly consult with the others with respect to, provide any necessary information with respect to, and provide the other parties (or their counsel) copies of, all filings made by such party with any Governmental Authority or any other Person or any other information supplied by such party to a Governmental Authority or any other Person in connection with this Agreement and the transactions contemplated by this Agreement. Buyer and Sellers shall make all filings under the HSR Act as promptly as practicable following the entry of the Bidding Procedures Order.

   (b)    Each party hereto shall promptly inform the others of any communication from any Governmental Authority regarding any of the transactions contemplated by this Agreement and promptly provide the others with copies of all related correspondence or filings. If any party or Affiliate thereof receives a request for additional information or documentary material from any such Governmental Authority with respect to the transactions contemplated by this Agreement (a "Second Request"), then such party will endeavor in good faith to make, or cause to be made, as soon as reasonably practicable and after consultation with the other parties hereto, an appropriate response in compliance with such request. Each party hereto shall provide any necessary information and reasonable assistance as the others may request in connection with its preparation of any additional necessary filings or submissions to any Governmental Authority, including any additional filings necessary under the HSR Act.

   (c)    Each party hereto shall use its reasonable best efforts to resolve objections, if any, as may be asserted by any Governmental Authority with respect to the transactions

contemplated by this Agreement, including under the HSR Act. In connection therewith, if any administrative or judicial action or proceeding is instituted (or threatened to be instituted) challenging any transaction contemplated by this Agreement as violative of the HSR Act, each of the parties hereto shall cooperate and use its reasonable best efforts to contest and resist any such action or proceeding and to have vacated, lifted, reversed, or overturned any decree, judgment, injunction or other order, whether temporary, preliminary or permanent that is in effect and that prohibits, prevents, or restricts consummation of the transactions contemplated by this Agreement, unless Sellers and Buyer shall agree in writing that litigation is not in their respective best interests.

(d)     If this Agreement and the sale of the Acquired Assets to Buyer on the terms and conditions hereof are determined to be the "highest and best offer" in accordance with the Bidding Procedures Order, Sellers shall use reasonable best efforts to obtain Bankruptcy Court approval of the assumption by Sellers and the assignment to Buyer of the Assumed Contracts. Sellers shall pay all cure costs relating to the Assumed Contracts.

(e)     Except to the extent otherwise provided in <u>Section 9.04</u> hereto, in the event that any and all novations, transfer or other agreements, consents, approvals or waivers necessary for the assignment, transfer or novation of any Assumed Contracts, or any claim, right or benefit arising thereunder or resulting therefrom, shall not have been obtained prior to the Closing Date, then as of the Closing, this Agreement, to the extent permitted by Law, shall constitute full and equitable assignment by Sellers to Buyer of all of Sellers' right, title and interest in and to, and all of Sellers' obligations and liabilities under, such Assumed Contracts, and Buyer shall be deemed Sellers' agent for the purpose of completing, fulfilling and discharging all of Sellers' liabilities under any such Assumed Contracts. Each of the parties hereto shall use reasonable best efforts to provide Buyer with the benefits of such Assumed Contracts, and to relieve Sellers of the performance and other obligations thereunder, including entry into subcontracts for the performance thereof; <u>provided</u> that, in connection with such reasonable efforts, no Seller shall be required to (i) incur, admit or consent to any liability or obligation or (ii) make more than a nominal out-of-pocket expenditure.

(f)     Prior to the Closing, Sellers shall inform and consult with, and not take any material action without the prior written consent (which consent shall not be unreasonably withheld or delayed) of, Buyer in respect of (i) submitting any incurred cost materials to the U.S. Government, including any administrative contracting officer or DCAA, regarding Government Contracts and finalizing any indirect cost rates regarding Government Contracts for any period prior to the Closing and (ii) any DCAA inquiries, reviews or audits regarding any Government Contracts.

(g)     Except to the extent otherwise provided in <u>Section 9.04</u> hereto, if Sellers shall be unable to make the equitable assignment described in <u>Section 9.01(e)</u> hereto, or if such attempted assignment would give rise to any right of termination, or would otherwise adversely affect the rights of Sellers or Buyer under such Assumed Contracts, Sellers and Buyer shall continue to cooperate and use reasonable best efforts to provide Buyer with all such rights; <u>provided</u> that, in connection with such reasonable efforts, no Seller shall be required to (i) incur, admit or consent to any liability or obligation or (ii) make more than a nominal out-of-pocket expenditure. To the extent that any such consents and waivers are not obtained, or until the

36

impediments to such assignment are resolved, Sellers shall use reasonable best efforts to (i) provide to Buyer, at the request of Buyer, the benefits of any such Assumed Contract to the extent related to the Business or the Acquired Assets, (ii) cooperate in any lawful arrangement designed to provide such benefits to Buyer and (iii) enforce, at the request of and for the account of Buyer, at Buyer's expense, any rights of Sellers arising from any such Assumed Contracts against any third Person (including any Governmental Authority) including the right to elect to terminate in accordance with the terms thereof upon the advice of Buyer. To the extent that Buyer is provided the benefits of any Assumed Contract referred to herein (whether from Sellers or otherwise), Buyer shall perform at the reasonable direction of Sellers and for the benefit of any third Person (including any Governmental Authority) the obligations of Sellers thereunder or in connection therewith, and Buyer agrees to pay, perform and discharge all obligations and liabilities of Sellers relating to such performance or failure to perform, after the Closing Date.

(h)     Without limiting any of the other rights of Buyer hereunder, between the date hereof and the Closing, Sellers shall reasonably assist and cooperate with Buyer, at Buyer's sole cost and expense, in arranging for Buyer and Sellers to meet with Clients to be identified based on consultation between Buyer and Sellers, including:

(i)     Sellers' Administrative Contracting Officer and other U.S. Government contracting officers with respect to the potential novation of certain Government Contracts as requested by Buyer;

(i)     the Government of the Province of British Columbia regarding the proposed assignment of the BC Contract from Sellers to Buyer; and

(ii)     the Texas Department of Information Resources regarding the proposed assignment of the Texas Online Contracts from Sellers to Buyer.

**9.02**     *Submission for Bankruptcy Court Approval*. As promptly as practicable, but in no event later than two (2) Business Days after the date hereof, Sellers shall file with the Bankruptcy Court, and seek an expedited hearing on, a motion seeking (a) entry of an order of the Bankruptcy Court approving the bidding procedures described in Exhibit G and otherwise in form and substance satisfactory to Sellers and Buyer and authorizing the observance and performance of the terms of Section 7.02(b) hereto (the "Bidding Procedures Order") and (b) the approval of this Agreement and the sale of the Acquired Assets to Buyer on the terms and conditions hereof if determined to be the "highest and best offer" in accordance with the Bidding Procedures Order. Sellers agree to provide to Buyer a draft of the Bidding Procedures Order, and Buyer agrees to promptly advise Sellers in writing of any changes that it requires for such draft Bidding Procedures Order to be in form and substance satisfactory to Buyer. Sellers and Buyer shall thereafter cooperate to reach agreement on a form of Bidding Procedures Order that is satisfactory to each party (and any other parties in interest) and such agreed form of Bidding Procedures Order shall be submitted to the Bankruptcy Court for its approval. Sellers shall deliver to Buyer prior to filing, and as early in advance as is practicable to permit adequate and reasonable time for Buyer and its counsel to review and comment, a draft of the motion seeking approval of the form of Bidding Procedures Order, and such motion when filed by Sellers with the Bankruptcy Court shall be reasonably acceptable to Buyer. If, after the filing of such motion, Sellers propose any changes to the form of Bidding Procedures Order, Sellers shall promptly

37

notify Buyer. If prior to, during or after the hearing on the motion seeking approval of the form of Bidding Procedures Order, the Bankruptcy Court makes any such changes or any other modifications to such form of Bidding Procedures Order, Sellers and Buyer shall be required to raise any objections thereto in writing prior to entry of the Bidding Procedures Order, so long as they are provided an adequate opportunity to do so. Unless Sellers or Buyer raise any such objections in writing prior to entry of the Bidding Procedures Order (provided that Sellers and Buyer are provided with an adequate opportunity to do so), such Bidding Procedures Order shall be deemed to be in form and substance satisfactory to each party for all purposes, including Sections 6.01(c)(i) and 7.01(d) hereto.

**9.03** *__Bidding Procedures Order; Approval Order__.*

(a) Sellers shall at all times comply with and perform the terms of the Bidding Procedures Order.

(b) The sale of the Acquired Assets to Buyer pursuant to this Agreement and the other transactions contemplated by this Agreement require the approval of the Bankruptcy Court, pursuant to Sections 105, 363 and 365 of the Bankruptcy Code. If this Agreement and the sale of the Acquired Assets to Buyer on the terms and conditions hereof are determined to be the "highest and best offer" in accordance with the Bidding Procedures Order, Buyer and Sellers agree to use reasonable best efforts to cause the Bankruptcy Court to enter an order of the Bankruptcy Court approving the sale of the Acquired Assets to, and assumption of Assumed Liabilities by, Buyer, which order shall be in form and substance satisfactory to Sellers and Buyer (the "Approval Order"). Sellers agree to provide to Buyer a draft of the Approval Order, and Buyer agrees to promptly advise Sellers in writing of any changes that it requires for such draft Approval Order to be in form and substance satisfactory to Buyer. Sellers and Buyer shall thereafter cooperate to reach agreement on a form of Approval Order that is satisfactory to each party (and any other parties in interest) and such agreed form of Approval Order shall be submitted to the Bankruptcy Court for its approval. If Sellers thereafter propose any changes to such form of Approval Order, Sellers shall promptly notify Buyer. If prior to, during or after the hearing on the motion seeking approval of such form of Approval Order, the Bankruptcy Court makes any such changes or any other modifications to such form of Approval Order, Sellers and Buyer shall be required to raise any objections thereto in writing prior to entry of the Approval Order, so long as they are provided an adequate opportunity to do so. Unless Sellers or Buyer raise any such objections in writing prior to entry of the Approval Order (provided that Sellers and Buyer are provided with an adequate opportunity to do so), such Approval Order shall be deemed to be in form and substance satisfactory to each party for all purposes, including Sections 6.01(c)(ii), 6.02(d) and 7.01(e) hereto.

(c) For purposes of this Agreement, a "Final Order" means an order or a judgment entered by the Bankruptcy Court (i) that has not been reversed, stayed, modified, amended or vacated and (ii) as to which the time for filing a notice of appeal, a petition for review or a motion for reargument or rehearing has expired.

(d) Sellers covenant and agree that if the Approval Order is entered, the terms of any plan submitted by Sellers to the Bankruptcy Court for confirmation shall not conflict with, supercede, abrogate, nullify, modify or restrict the terms of this Agreement and the rights of

Buyer hereunder, or in any way prevent or interfere with the consummation or performance of the transactions contemplated by this Agreement including any transaction that is contemplated by or approved pursuant to the Approval Order.

(e)     If the Approval Order or any other orders of the Bankruptcy Court relating to this Agreement shall be appealed by any Person (as defined in Section 101(41) of the Bankruptcy Code) or petition for certiorari or motion for rehearing or reargument shall be filed with respect thereto, Sellers agree to take all action as may be reasonable and appropriate to defend against such appeal, petition or motion and Buyer agrees to cooperate in such efforts and each party hereto agrees to use its reasonable efforts to obtain an expedited resolution of such appeal; provided that nothing herein shall preclude the parties hereto from consummating the transactions contemplated herein if the Approval Order shall have been entered and has not been stayed and Buyer, in its sole discretion, waives in writing the condition that the Approval Order be a Final Order.

**9.04**     _Novation of Government Prime Contracts_.

(a)     Promptly following the date hereof, Sellers will, in accordance with, and to the extent required by, the FAR Part 42, Subpart 42.12, submit in writing to each responsible contracting officer with respect to each Government Contract a request, in form and substance reasonably acceptable to Buyer, of the U.S. Government or Governmental Entity, as the case may be, and Buyer shall reasonably cooperate with Sellers with respect to the submission of any such request, to (i) recognize Buyer as the successor in interest to all of the Government Prime Contracts and (ii) if required, enter into a novation agreement (a "Novation Agreement") in substantially the form contemplated by such regulations and in form and substance reasonably acceptable to Buyer, including providing those legal opinions required by FAR Part 42. Buyer, on the one hand, and Sellers, on the other hand, will each use reasonable best efforts to promptly obtain all consents, approvals and waivers required for the purpose of processing, entering into and completing a Novation Agreement with regard to each respective Government Prime Contract, including responding to requests for information by the U.S. Government with regard to such Novation Agreement. Buyer, on the one hand, and Sellers, on the other hand, will each use reasonable best efforts to provide all information and take all other actions necessary to execute and consummate such Novation Agreements.

(b)     If the U.S. Government declines to enter into a Novation Agreement in accordance with, and to the extent required by, FAR, Part 42, Subpart 42.12 recognizing the transfer of the Government Prime Contracts to Buyer, or until such time as the U.S. Government recognizes such transfer by entering into a Novation Agreement, nothing in this Agreement will constitute a transfer, assignment, attempted transfer or an attempted assignment thereof.

(c)     Effective upon the Closing and until such time as the U.S. Government recognizes the transfer of Sellers' rights and obligations under the Government Prime Contracts to Buyer, in accordance with, and to the extent required by, the FAR Part 42, Subpart 42.12, Sellers shall subcontract with Buyer, pursuant to a subcontract, for Buyer to perform for and in the place of Sellers, to the extent that such obligations are included in the Assumed Liabilities, any and all operations and provide any and all services and other performance obligations under the Government Prime Contracts as of the Closing Date, including any and all amendments,

39

options, modifications, purchase orders issued thereunder and such other terms and conditions as may have been duly incorporated in the Government Prime Contracts, which shall be substantially in the form attached hereto as Exhibit H (the "Subcontract Agreement"). Notwithstanding the foregoing, Sellers shall not be so obligated hereunder to subcontract to Buyer any Government Prime Contract for which novation is not required.  Each Seller shall maintain its existence until all of the Government Prime Contracts have been duly terminated or duly transferred to Buyer pursuant to a Novation Agreement.

### 9.05 *Access and Information.*

(a)     Prior to the Closing Date, Sellers shall permit Buyer and its representatives, at Buyer's sole cost and expense, to have full access, during regular business hours and upon reasonable advance notice, to the properties, officers and employees of Sellers (and shall use their reasonable best efforts to cause their outside independent accountants to be available to Buyer on the same basis), and shall furnish, or cause to be furnished, to Buyer any financial and operating data, work papers and other information and documents regarding costs submissions of Sellers to the DCAA, tax information, books and records, contracts and documents and other information that is available with respect to Sellers and the Acquired Assets as Buyer shall from time to time reasonably request (including any work papers of Sellers' accountants).

(b)     From and after the Closing Date, Buyer and Sellers agree to furnish or cause to be furnished to each other, upon reasonable request, as promptly as practicable, such information and reasonable assistance relating to the Business and the Acquired Assets (including reasonable access to books and records and employees who have direct knowledge regarding the Business and the Acquired Assets) as is reasonably necessary for (i) the filing of all Tax returns, the making of any election relating to Taxes, the preparation for any audit by any taxing authority, and the prosecution or defense of any claim, suit or proceeding relating to any Tax; (ii) the filing, negotiation or settlement of any and all final indirect rate proposals submitted or to be submitted to DCAA or other Governmental Entity, or any audit initiated by DCAA or other Governmental Entity (including access to, without limitation, any and all books and records and financial and cost information and other evidence sufficient to reflect properly all costs claimed to have been incurred or anticipated to be incurred directly or indirectly by Sellers prior to the Closing Date in performance of contracts acquired by Buyer) of Sellers; or (iii) or for any other reasonable purpose relating to Sellers' ownership of the Acquired Assets, Assumed Liabilities and/or the Business prior to the Closing.  Buyer and Sellers shall retain all such books and records for a period of at least six (6) years following the Closing Date.  On or after the end of such period, each party shall provide the other with at least ten (10) Business Days prior written notice before destroying any such books and records, during which period the party receiving such notice can elect to take possession, at its own expense, of such books and records.  Sellers and Buyer shall cooperate with each other in the conduct of any audit or other proceeding involving the Acquired Assets or the Business; provided that, in connection with such reasonable efforts, no Seller shall be required to (i) incur, admit or consent to any liability or obligation or (ii) make more than a nominal out-of-pocket expenditure.

(c)     At or prior to the Closing, Sellers shall deliver to Buyer copies of the books and records relating to the Business or the Acquired Assets which are to be retained by

Sellers following the Closing pursuant to <u>Section 1.01(c)(vii)</u> hereto. Without prejudice to any of the other rights and remedies of Buyer hereunder, in the event Buyer or Sellers determine that any item constituting an Acquired Record was not delivered to Buyer at the Closing, or is not otherwise located at the Leased Premises, Sellers shall promptly deliver such Acquired Records to Buyer upon receipt of notice from Buyer or such determination of Sellers.

(d)     Promptly following the Bankruptcy Court's entry of the Approval Order, upon Buyer's request, Sellers shall cause all Persons, other than Buyer and its Affiliates and representatives, who (x) have had access to the electronic data room containing information regarding Sellers' North American Public Service Unit, the Business, the Acquired Assets and the Assumed Liabilities or (y) have received confidential information with respect the Sellers' North American Public Service Unit, the Business, the Acquired Assets and the Assumed Liabilities pursuant to a confidentiality or non-disclosure agreement entered into in connection with the sale of the Business (other than the Confidentiality Agreement) (each, a "<u>Business Confidentiality Agreement</u>"), to (i) promptly destroy or return to Sellers all documentation regarding Sellers' North American Public Service Unit, the Business, the Acquired Assets and the Assumed Liabilities, including all Business Confidential Information, obtained through such access or otherwise or pursuant to the applicable Business Confidentiality Agreements, as the case may be, and (ii) destroy all written material, memoranda, notes, copies, excerpts and other writings or recordings whatsoever prepared by such Person or its representatives based upon, containing or otherwise reflecting any such information. For a period of one (1) year from the Closing Date, upon the request of Buyer, Sellers shall use their commercially reasonable efforts to protect the Business Confidential Information through the enforcement of the Business Confidentiality Agreements.

**9.06**     <u>*Contracts and Proposals; Exclusion of Contracts; Updated Schedules*</u>.

(a)     Prior the Closing Date, Sellers shall notify Buyer in writing promptly of any (i) submission by a Seller of a New Client Proposal or (ii) entry by a Seller into a New Client Service Contract, including with such notice a copy of such New Client Proposal, New Client Service Contract, as the case may be.

(b)     Prior to the Closing Date, Buyer may reasonably request from Sellers additional information with respect to any Client Service Contract which is not set forth on <u>Schedule 1.01(a)(i)(A)</u> on the date hereof, including any New Client Service Contract (each, an "<u>Unlisted Client Service Contract</u>") or any Client Proposal which is not set forth on <u>Schedule 1.01(a)(ii)</u> on the date hereof, including any New Client Proposal (collectively, an "<u>Unlisted Client Proposal</u>"), along with identification and copies of all Additional Related Contracts in respect to such Unlisted Client Service Contract or Unlisted Client Proposal, which list and copies shall promptly be delivered to Buyer. Further, Buyer may, prior to Closing Date, notify Sellers in writing that Buyer has determined, in its sole discretion, that if such Unlisted Client Service Contract or Unlisted Client Proposal were assumed by Buyer or its Affiliates performance by Buyer or its Affiliates thereof would be inconsistent with or in violation of Buyer's Independence Obligations. Following receipt of such notice, if and as requested by Buyer, Sellers shall use their commercially reasonable efforts to assist Buyer in resolving such potential inconsistencies or violations in a manner satisfactory to Buyer in its sole discretion.

(c)     Prior to the Closing Date, Buyer shall have the right, but not the obligation, to notify Sellers in writing of its decision to:

(i)     include any Unlisted Client Service Contract on Schedule 1.01(a)(i)(A), as a "Designated Client Contract";

(ii)     include any Unlisted Client Proposal on Schedule 1.01(a)(ii), as a "Designated Client Proposal";

(iii)     include any Additional Related Contract in respect to any Unlisted Client Service Agreement or Unlisted Client Proposal identified pursuant to clause (i) or (ii) above on Schedule 11(c), as a "Related Contract"; provided that Buyer is under no obligation to include on Schedule 11(c) any or all of the Additional Related Contracts which are related to any Unlisted Client Service Agreement or Unlisted Client Proposal identified pursuant to clauses (i) or (ii) above.  In the event that Buyer does not choose to include an Additional Related Contract on Schedule 11(c) pursuant to this clause (iii), then such Additional Related Contract shall be retained by Sellers as an Excluded Asset;

provided that with respect to the determination of the amount of Accounts Receivable and Deferred Revenue for purposes of Sections 1.03(b) and 1.05 hereto, amounts arising pursuant to any Additional Existing Client Contract shall not be taken into account.

(d)     Prior to the entry by a Seller into any New Teaming Agreement or New Subcontract, such Seller shall notify Buyer in writing of the same and of the proposed counterparty to such New Teaming Agreement or New Subcontract, as the case may be. Promptly following receipt of such notice, Buyer shall notify Sellers whether Buyer has determined, in its sole discretion, whether, if such New Teaming Agreement or New Subcontract, as the case may be, were assumed by Buyer or its Affiliates, performance by Buyer or its Affiliates thereof would be inconsistent with or in violation of Buyer's Independence Obligations. In the event Buyer determines, in its sole discretion, that such New Teaming Agreement or New Subcontract, as the case may be, would subject Buyer or its Affiliates to such potential inconsistencies or violations and Buyer promptly so requests, Sellers shall not enter into such New Teaming Agreement or New Subcontract, as the case may be.

(e)     In the event that Buyer determines prior to the Closing Date, in its sole discretion, that if any Related Contract or Additional Related Contract were assumed by Buyer or its Affiliates, performance by Buyer or its Affiliates thereof would be inconsistent with or in violation of Buyer's Independence Obligations, if and as requested by Buyer, Sellers shall use their commercially reasonable efforts to assist in resolving such potential inconsistencies or violations in a manner satisfactory to Buyer, in its sole discretion, including rejecting such Related Contract or Additional Related Contract, as the case may be, effective as of, and contingent upon, the Closing.

(f)     Prior to Closing Date, Buyer may notify Sellers in writing that Buyer has determined, in its sole discretion, that if any Designated Client Contract (a "Prohibited Client Contract") or Prohibited Subcontract were assumed by Buyer or its Affiliates, performance by Buyer or its Affiliates thereof would be inconsistent with or in violation of Buyer's Independence

42

Obligations. Following receipt of such notice, Sellers shall cooperate in good faith with Buyer and shall use their commercially reasonable efforts to assist in attempting to resolve such potential inconsistencies or violations in a manner satisfactory to Buyer, in its sole discretion, including, in the case of a Prohibited Subcontract, rejecting such Prohibited Subcontract, effective as of, and contingent upon, the Closing. Prior to the Closing, Buyer may notify Sellers in writing that Buyer has determined, in its sole discretion, that Buyer will not take assignment at Closing of the Designated Client Contract related to such Prohibited Subcontract or such Prohibited Client Contract, as the case may be, and that such Designated Client Contract related to such Prohibited Subcontract or Prohibited Client Contract, as the case may be, shall be removed from Schedule 1.01(a)(i)(A) and shall be retained by Seller as an Excluded Asset, provided that with respect to the determination of the amount of Accounts Receivable and Deferred Revenue for purposes of Sections 1.03(b) and 1.05 hereto, amounts arising pursuant to any Direct Prohibited Client Contract treated as an Excluded Asset pursuant to this Section 9.06(f) shall be taken into account, notwithstanding its treatment otherwise as an Excluded Asset.

(g) Prior to the Closing Date, Buyer shall have the right to notify Sellers in writing of its decision to require the removal of any Designated Client Proposal, Other Business Contract or Related Contract from Schedule 1.01(a)(ii), Schedule 1.01(a)(i)(C) or Schedule 11(c), as the case may be. In the event that Buyer exercises its rights pursuant to this Section 9.06(g), then such Designated Client Proposal, Other Business Contract or Related Contract shall be retained by Sellers as an Excluded Asset.

(h) During the period between the date hereof and the Closing Date, Sellers shall use their commercially reasonable efforts to assist Buyer in modifying the Designated Real Property Leases listed in Schedule 9.06(h) in a manner as may be requested by Buyer, in its sole discretion. In the event that Buyer determines, in its sole discretion, that any Designated Real Property Lease listed on Schedule 9.06(h) has not been modified in a manner satisfactory to Buyer, in its sole discretion, Buyer may, by providing notice to the Sellers prior to the Closing Date, require the removal of such Designated Real Property Lease from Schedule 1.01(a)(i)(D). In the event that Buyer exercises its rights pursuant to this Section 9.06(h), then such Designated Real Property Lease shall be retained by Sellers as an Excluded Asset. Sellers also agree to use their reasonable best efforts to obtain, prior to the Closing Date, properly completed, executed landlord estoppel certificates, in the form attached hereto as Exhibit I, from each of the landlords under each of the Designated Real Property Leases.

(i) Prior to the Closing Date, Buyer shall have the right to direct Sellers in writing to assign at the Closing any Client Service Contract and any Related Contract, Additional Related Contract or Other Business Contract relating to such Client Service Contract to Buyer's designee (which may or may not be an Affiliate of Buyer), subject to the delivery to Sellers of designee's adequate assurance of performance of such designee. In the event Buyer elects to direct Sellers to assign any Client Service Contract and any Related Contract, Additional Related Contract or Other Business Contract to Buyer's designee at Closing, Buyer may elect for such assignment to include the assignment by Sellers to such designee of all accounts receivable and unbilled revenue arising from or relating to such Client Service Contract; provided that notwithstanding such assignment, such accounts receivable shall be included in the definition of "Accounts Receivable" for the purposes of Section 9.07 hereto and the representations and warranties of Sellers; provided further that with respect to the determination of the amount of

Accounts Receivable and Deferred Revenue for purposes of Sections 1.03(b) and 1.05 hereto amounts arising pursuant to (i) any Additional Existing Client Contract which is assigned to a designee shall not be taken into account and (ii) any Client Service Contract which is assigned to a designee and is either a Designated Client Contract (other than any Additional Existing Client Contract) or a New Client Service Contract shall be taken into account. Further, notwithstanding such assignment, the parties agree that for purposes of Section 6.01(a) hereto and the representations and warranties of Sellers contained herein, "Designated Client Contracts" shall be deemed to include the Unlisted Client Service Contracts being assigned pursuant to this Section 9.06(i) and "Related Contracts" shall be deemed to include the Additional Related Contracts being assigned pursuant to this Section 9.06(i).

(j)     No less than three (3) Business Days prior to the Closing Date, Sellers shall deliver to Buyer the following updated Schedules (collectively, the "Updated Schedules"):

(i)     updates to Schedules 1.01(a)(i)(A), 1.01(a)(i)(C), 1.01(a)(ii), 1.01(a)(i)(D), or 11(c) required by Buyer pursuant to this Section 9.06;

(ii)     updates to exclude from Schedule 1.01(a)(i)(A) any Client Service Contract that will have been completed prior to Closing, which Client Service Contracts shall be retained by Sellers as Excluded Assets;

(iii)     updates to Schedule 11(c) to exclude any Related Contract treated as a Related Contract solely because such Related Contract is related to a Client Service Contract which is being excluded from Schedule 1.01(a)(i)(A) pursuant to this Section 9.06, which Related Contracts shall be retained by Sellers as Excluded Assets;

(iv)     updates to Schedule 2.11(f) to add all surety bonds maintained by a Seller pursuant to the requirements of any Designated Client Contracts added pursuant to this Section 9.06; and

(v)     updates to Schedule 2.11(g) to add all letters of credit maintained by a Seller pursuant to the requirements of any Designated Client Contracts added pursuant to this Section 9.06.

Upon acceptance of the Updated Schedules by Buyer, in its sole discretion, the Updated Schedules shall amend the original corresponding Schedules.

(k)     For the avoidance of doubt, no change to any Schedule pursuant to this Section 9.06 shall result in a adjustment to the Purchase Price.

### 9.07   *Collection of Accounts Receivable*.

(a)     As of the Closing Date, each Seller hereby (i) authorizes Buyer or its designee to open any and all mail addressed to any Seller relating to the Business or the Acquired Assets and delivered to the offices of the Business or otherwise to Buyer or its designee if received on or after the Closing Date and (ii) appoints Buyer, its designee or its attorney-in-fact to endorse, cash and deposit any monies, checks or negotiable instruments received by Buyer or its designee after the Closing Date with respect to Accounts Receivable or accounts receivable

relating to work performed by Buyer after the Closing, as the case may be, made payable or endorsed to a Seller or a Seller's order, for Buyer's or its designee's own account.

(b)     As of the Closing Date, Sellers agree that any monies, checks or negotiable instruments received by any Seller after the Closing Date with respect to Accounts Receivable or accounts receivable relating to work performed by Buyer after the Closing, as the case may be, shall be held in trust by such Seller for Buyer's or its designee's benefit and account, and immediately upon receipt by a Seller of any such payment, such Seller shall pay over to Buyer or its designee the amount of such payments without any right of set off or reimbursement.

(c)     Except to the extent provided otherwise in Section 6(a) of the Subcontract Agreement, as of the Closing Date, Buyer or its designee shall have the sole authority to bill and collect Accounts Receivable and accounts receivable relating to work performed by Buyer after the Closing and Sellers shall not instigate or threaten to instigate any claims or litigation in connection with such collection efforts.

(d)     Notwithstanding anything to the contrary contained in Section 10.06 hereto, any designees of Buyer who acquire any Accounts Receivable hereunder shall be express third party beneficiaries of this Section 9.07.

**9.08**   *Employee Matters, Wages and Benefits*.

(a)     Transferred Employees.  Prior to the Closing Date, Buyer (or its designee) shall offer employment or admission as principal, as the case may be, to substantially all of the Business Employees in accordance with terms and conditions generally applicable to similarly situated personnel of Buyer, which offers shall be subject to Buyer's satisfaction with the results of Buyer's customary pre-employment or pre-admission procedures, as the case may be, (including Buyer's customary screening and background checks), with such employment or admission, as the case may be, commencing on the first (1st) Business Day after the Closing Date. Such offers will be contingent upon a Business Employee's agreement to restrictive covenants including non-solicitation, non-hire and confidentiality that are consistent with such covenants as are generally applicable to personnel of Buyer or its designees who are of a similar level of seniority. The parties will reasonably cooperate to coordinate the termination of employment with Sellers and the transfer of any Business Employees who accept an offer of employment or admission, as the case may be, and execute all documents required for employment or admission, as the case may be, with Buyer (or its designee) (the "Transferred Employees"). Each Seller agrees to use reasonable best efforts to provide all relevant information necessary to assist Buyer in the transfer of the Transferred Employees, including all relevant payroll and withholding tax information with respect to the Transferred Employees; provided that Buyer shall not have access to personnel records of any Seller which in Seller's good faith opinion cannot be disclosed to Buyer pursuant to applicable Law. Nothing contained herein shall be construed to limit or affect any right of Buyer or its designees to terminate any Transferred Employee at any time or for any reason with or without cause. Effective upon Closing, each Seller hereby waives and releases each Transferred Employee from any and all contractual, common law or other restrictions enforceable by Sellers on the employment, activities or other conduct of such individual after such individual's termination of employment with Sellers (other

than any obligation not to disclose confidential information of Sellers and their clients to Persons other than Buyer and its designees) to the extent necessary for such Transferred Employee to accept Buyer's (or its designee's) offer of employment or admission as a principal, as the case may be. Sellers and Buyer agree to cooperate in good faith to identify Additional Business Employees to whom Buyer may choose to extend offers of employment or admission as principal and facilitate such offers and, with respect to any such Additional Business Employees to whom Sellers agree such offers may be extended, Sellers agree to provide waivers of the non-solicitation provisions of the Confidentiality Agreement sufficient to permit Buyer to make such offers of employment or admission as principal, as the case may be and, effective upon employment or admission by Buyer, terminate the restrictions referenced in the prior sentence above with respect to each Additional Business Employee who receives an offer of employment or admission as a principal to the extent necessary for Buyer to make such offer; provided that nothing herein shall require Sellers to permit Buyer to extend an offer of employment to any Additional Business Employee who, in Sellers' reasonable judgment, is reasonably necessary to the continued operation of the business of Sellers following the Closing; and provided further that in the event that before or after the Closing an Additional Business Employee's responsibilities consist primarily of providing services in connection with the Business or, after the Closing, the Acquired Assets and the Assumed Contracts, Sellers shall cooperate with and assist Buyer as it reasonably requests in securing the employment or admission of such employee so long as Buyer agrees to enter into a reasonable arrangement to assure Sellers access to the assistance of and services from such employee necessary for Sellers' continuing operations.

(b)  Retention Employees.

(i)  Notwithstanding Section 9.08(a) hereto, and subject, with respect to each Bonus Plan, to such Bonus Plan having been assumed by Sellers on or before the Closing Date pursuant to the applicable Bonus Motion, Buyer agrees that all offers of employment or admission, as the case may be, to Retention Employees will contain an offer to pay to such Retention Employee his or her amounts previously awarded, but not yet due and payable to such Retention Employee under any applicable Bonus Plan(s) at such time and in such incremental amounts as provided for in such Bonus Plan(s); provided that the aggregate amount to be paid by Buyer and its designees in respect of (w) the Retention Bonus Agreements shall not exceed Seven Million Two Hundred Thousand Dollars ($7,200,000), (x) the 2008 Short Term Plan shall not exceed Seven Million Seven Hundred Thousand Dollars ($7,700,000) and (y) the Navy ERP Plan shall not exceed Three Hundred Thousand Dollars ($300,000), in each case subject to (A) such Retention Employee's fulfillment of the requirements and contingencies set forth in Section 9.08(a) hereto applicable to employment and admission offers, as the case may be, made to all Business Employees generally, (B) such Retention Employee's delivering to Buyer and Sellers an unconditional waiver and release of any and all obligations of Sellers to pay any amount to such Retention Employee pursuant to such Bonus Plans, which release shall be in form and substance agreed upon by Buyer and Sellers and (C) such Retention Employee being employed by Buyer or its designee or being a principal of Buyer or its designee, as the case may be, on each date in which a particular award payment is due as provided under the applicable Bonus Plan or is involuntarily terminated from employment without cause (as such term is defined by Buyer in its employment or admission arrangements) prior to the date such particular award is due.

(ii)     As promptly as practicable, but in no event later than two (2) Business Days after the date hereof, Sellers shall, and BearingPoint shall cause its other affiliated debtors to, file with the Bankruptcy Court amendments to each of BearingPoint' and its affiliated debtors' motions to assume each Bonus Plan (the "<u>Bonus Motions</u>") to provide that Retention Employees who are offered employment by Buyer or its designee and commence employment with Buyer or its designee following the Closing pursuant to the terms and conditions of this Agreement, including the preceding paragraph, shall be excluded from each Bonus Motion.

(c)     <u>Employment Liabilities</u>.  Sellers (as applicable) shall retain liability to the Transferred Employees for vacation, personal and sick days accrued but not taken as of the Closing Date.  Sellers shall be fully responsible for any employment or labor liability incurred, accrued or otherwise arising from any event occurring prior to the Closing concerning employment and employee benefits, including severance payments, accrued payroll, pensions and other retirement plan obligations, COBRA rights, WARN Act liability, incentive compensation program obligations, deferred compensation program obligations, retiree health benefits and all liability with respect to Laws relating to wages, benefits, hours, collective bargaining, discrimination, civil rights, safety and health, workers' compensation and the collection and payment of withholding and/or social security taxes and similar taxes and any other liability associated with the termination of such Transferred Employees by Sellers.

(d)     <u>Waiver of Restrictions on Conduct</u>.  With respect to each Transferred Employee, for such time as such Transferred Employee is employed by Buyer or its designees, (i) Sellers hereby waive and release such individual from any and all contractual, common law or other restrictions enforceable by Sellers on the employment, activities or other conduct of such individual after such individual's termination of employment with Sellers (other than any obligation not to disclose confidential information of Sellers and their clients to Persons other than Buyer and its designees) and (ii) Sellers hereby waive and release, and shall cause their Affiliates to waive and release, any other employee or former employee of a Seller or its Affiliates who is employed by Buyer from any restriction on working with such Transferred Employee.

(e)     <u>No Third Party Beneficiaries</u>.  Nothing in this <u>Section 9.08</u>, expressed or implied, shall confer upon any current or former director, officer, employee, independent contractor, agent or other service provider of any Seller or any of its Affiliates (including the Transferred Employees and other personnel of the Business) any rights or remedies (including any right to employment or continued employment for any specified period) of any nature or kind whatsoever.  Without limiting the generality of <u>Section 10.06</u> hereto, it is expressly agreed that the provisions of this <u>Section 9.08</u> (i) are not intended to be for the benefit of, or otherwise be enforceable by, any third Person, including any Transferred Employee or other personnel of the Business and (ii) shall not be considered as an amendment to, or an undertaking to amend, any Seller Benefit Plan for any purpose.

**9.09    _Tax Matters and Apportioned Obligations_.**

(a)     All real property taxes, personal property taxes and similar ad valorem obligations levied with respect to the Acquired Assets for a taxable period which includes (but

does not end on) the Closing Date (collectively, the "Apportioned Obligations") shall be apportioned between Seller and Buyer based on the number of days of such taxable period included in the Pre Closing Tax Period (defined below) and the number of days of such taxable period after the Closing Date (any such portion of such taxable period, the "Post-Closing Tax Period"). Seller shall be liable for the proportionate amount of such taxes that is attributable to the Pre Closing Tax Period, and Buyer shall be liable for the proportionate amount of such taxes that is attributable to the Post Closing Tax Period. For purposes of this section, "Pre-Closing Tax Period" means (i) any Tax Period ending on or before the Closing Date and (ii) with respect to a Tax Period that commences before but ends after the Closing Date, the portion of such period up to and including the Closing Date.

(b)       Apportioned Obligations and Transfer Expenses described in Section 1.06 hereto shall be timely paid, and all applicable filings, reports and returns shall be filed, as provided by applicable Law. The paying party shall be entitled to reimbursement from the non-paying party in accordance with Section 1.06 or Section 9.09(a) hereto, as the case may be. Upon payment of any such Apportioned Obligation or Tax, the paying party shall present a statement to the non-paying party setting forth the amount of reimbursement to which the paying party is entitled under Section 1.06 or Section 9.09(a) hereto, as the case may be, together with such supporting evidence as is reasonably necessary to calculate the amount to be reimbursed. The non-paying party shall make such reimbursement promptly but in no event later than ten (10) days after the presentation of such statement.

## 10.    MISCELLANEOUS.

**10.01    _Fees and Expenses_.** Except as set forth in Section 7.02(b) hereto, Buyer shall pay its own expenses and costs associated with the preparation of this Agreement and the consummation of the transactions contemplated hereby. Sellers shall pay all of their fees and expenses in connection with the preparation of this Agreement and the consummation of the transactions contemplated hereby, and no expenses of Sellers relating in any way to the transactions contemplated hereby, including legal, accounting or other professional expenses and any broker's commission or finder's fee, shall be charged to, paid by or reflected in Buyer's account. Notwithstanding the foregoing, (a) the filing fees relating to filings under the HSR Act will be borne fifty percent (50%) by Buyer, on the one hand, and fifty percent (50%) by Sellers, on the other hand and (b) all Transfer Expenses will be paid by Sellers as provided in Section 1.06 hereto.

**10.02    _Governing Law; Consent to Jurisdiction_.** This Agreement shall be governed, including as to validity, interpretation and effect, by, and construed in accordance with, the internal Laws of the State of New York applicable to agreements made and fully performed within the State of New York. Each of the parties hereto irrevocably submits to the exclusive jurisdiction of any state or federal courts sitting in New York, New York. To the fullest extent permitted by applicable Law, each party hereto (a) agrees that, except as otherwise provided in Section 1.05(c) and 1.07 hereto, any claim, action or proceeding by such party seeking any relief whatsoever arising out of, or in connection with the Transaction Agreements or the transactions contemplated by this Agreement shall be brought only in (i) the Bankruptcy Court, if brought prior to the entry of a final decree closing the Bankruptcy Cases, and (ii) in the federal courts in the Southern District of New York and the state courts of the State of New York, County of

Manhattan (collectively, the "New York Courts"), if brought after entry of such final decree closing the Bankruptcy Cases, and shall not be brought, in each case, in any other State or Federal court in the United States of America or any court in any other country, (b) agrees to submit to the exclusive jurisdiction of the Bankruptcy Court or the New York Courts, as applicable, pursuant to the preceding clauses (a)(i) and (ii), for purposes of all claims, actions or proceedings arising out of, or in connection with the Transaction Agreements or the transactions contemplated by this Agreement, (c) waives and agrees not to assert any objection that it may now or hereafter have to the laying of the venue of any such claim, action or proceeding brought in such a court or any claim that any such claim, action or proceeding brought in such a court has been brought in an inconvenient forum, (d) agrees that mailing of process or other papers in connection with any such claim, action or proceeding in the manner provided in Section 10.04 hereto shall be valid and sufficient service thereof, and (e) agrees that a final judgment in any such claim, action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by applicable Law.

**10.03** *Waiver of Right to Trial by Jury*. EACH PARTY HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY LAW, ANY AND ALL RIGHTS IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY CLAIM, ACTION OR PROCEEDING OR COUNTERCLAIM (WHETHER BASED UPON CONTRACT, TORT OR OTHERWISE) RELATING TO THE TRANSACTION AGREEMENTS OR ANY OF THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY.

**10.04** *Notices*. All notices, requests, demands, consents and other communications hereunder among the parties hereto shall be in writing and shall be deemed given: (a) upon personal delivery; (b) three (3) Business Days after being mailed by certified or registered mail, postage prepaid, return receipt requested; (c) one (1) Business Day after being sent via a nationally recognized overnight courier service; or (d) upon receipt of electronic or other confirmation of transmission if sent via facsimile to the parties hereto, their successors in interest or their assignees at the following addresses and facsimile numbers, or at such other addresses or facsimile numbers as the parties may designate by written notice in accordance with this Section 10.04:

    (a)    if to Buyer:

Deloitte LLP
1633 Broadway
New York, NY 10019
Fax: (212) 492-4201
Attn: Joe Echevarria, Managing Partner

with a copy (which shall not constitute notice) to:

Deloitte LLP
1633 Broadway
New York, NY 10019
Fax: (212) 492-4201
Attn: Office of General Counsel, Matthew Ross

and

Kramer Levin Naftalis & Frankel LLP
1177 Avenue of the Americas
New York, New York 10036
Fax: (212) 715-8000
Attn: Thomas E. Molner

(b)    if to Sellers:

BearingPoint, Inc.
1676 International Drive
McLean, Virginia 22102
Fax: (214) 292-8844
Attn: Chief Legal Officer

with a copy (which shall not constitute notice) to:

Davis Polk & Wardwell
450 Lexington Avenue
New York, NY 10017
Fax: 212-450-3350
Attn: John A. Bick

Any notice given hereunder may be given on behalf of any party by his counsel or other authorized representatives.

**10.05 _Entire Agreement_**. This Agreement, including the Schedules and Exhibits hereto, and the Confidentiality Agreement, contain the entire agreement and understanding of the parties hereto with respect to the subject matter hereof and thereof, and supersede all previous written or oral negotiations, commitments, understandings and writings.

**10.06 _Assignability; Binding Effect; Third Party Beneficiaries_**. This Agreement and the rights and obligations of the parties hereunder shall not be assigned, delegated or otherwise transferred, by Buyer or by Sellers; provided that Buyer may assign all or any portion of its rights and obligations hereunder to one or more Affiliates or related parties of Buyer so long as Buyer remains fully liable for all of its obligations hereunder. Sellers agree to enter into such amendments to, or restatements of, this Agreement and the Exhibits hereto as may be reasonably required to give effect to this Section 10.06, so long as such amendments or restatements do not adversely affect the rights of Sellers hereunder or thereunder. This Agreement shall be binding upon and enforceable by, and shall inure to the benefit of, the parties hereto and their respective successors, administrators and permitted assigns. Except as set forth in Section 9.07 hereto and the issuers of letters of credit and the related lenders in respect of such letters of credit (who are express third party beneficiaries of the provisions thereof, entitled to enforce the provisions thereof as if each such Person was a party hereto), nothing expressed or referred to in this Agreement will be construed to give any Person other than the parties hereto any legal or equitable right, remedy or claim under or with respect to this Agreement or any provision of this Agreement.

**10.07** *Construction*.

(a)    All Article, Section, Schedule and Exhibit references used in this Agreement are to Articles, Sections, Schedules and Exhibits to this Agreement unless otherwise specified. The Schedules and Exhibits attached to this Agreement constitute a part of this Agreement and are incorporated herein for all purposes.

(b)    If a term is defined as one part of speech (such as a noun), it shall have a corresponding meaning when used as another part of speech (such as a verb). Terms defined in the singular have the corresponding meanings in the plural, and vice versa. Unless the context of this Agreement clearly requires otherwise, words importing the masculine gender shall include the feminine and neutral genders and vice versa. The term "includes" or "including" shall mean "including without limitation," whether or not so stated. The words "hereof," "hereto," "hereby," "herein," "hereunder" and words of similar import, when used in this Agreement, shall refer to this Agreement as a whole and not to any particular section or article in which such words appear. The phrase "the date of this Agreement," "date hereof" and terms of similar import, unless the context otherwise requires, shall be deemed to refer to the date set forth in the preamble of this Agreement.

(c)    Whenever this Agreement refers to a number of days, such number shall refer to calendar days unless Business Days are specified. Whenever any action must be taken hereunder on or by a day that is not a Business Day, then such action may be validly taken on or by the next day that is a Business Day.

(d)    The parties hereto acknowledge that each party hereto and its attorney has reviewed this Agreement and that any rule of construction to the effect that any ambiguities are to be resolved against the drafting party, or any similar rule operating against the drafter of an agreement, shall not be applicable to the construction or interpretation of this Agreement. Any controversy over construction of this Agreement shall be decided without regard to events of authorship or negotiation.

(e)    Titles and headings to sections herein are inserted for convenience of reference only, and are not intended to be a part of or to affect the meaning or interpretation of this Agreement.

(f)    All references to currency herein shall be to, and all payments required hereunder shall be paid in, Dollars.

(g)    All accounting terms used herein and not expressly defined herein shall have the meanings given to them under GAAP.

**10.08** *Execution in Counterparts; Facsimile*.  This Agreement may be executed in two (2) or more counterparts, each of which will be deemed an original, but all of which together will constitute one (1) and the same agreement. Any counterpart may be executed by facsimile signature and such facsimile signature shall be deemed an original.

**10.09** *Amendments, Supplements, Etc*.  This Agreement may be amended or supplemented at any time by additional written agreements as may mutually be determined by

Buyer and Sellers to be necessary, desirable or expedient to further the purposes of this Agreement or to clarify the intention of the parties hereto.

**10.10** ***Publicity and Disclosures***. Neither Buyer, on the one hand, nor Sellers, on the other hand, shall issue any press release or make any public disclosure, either written or oral, concerning this Agreement or the transactions contemplated hereby without obtaining the prior written approval of the other party, which approval shall not be unreasonably withheld, conditioned or delayed, unless in the sole judgment of the disclosing party, disclosure is otherwise required by applicable Law or by the Bankruptcy Court with respect to filings to be made with the Bankruptcy Court in connection with this Agreement or by the applicable rules of any national securities exchange or over-the-counter market on which Buyer or Seller lists securities; provided that the party intending to make such disclosure shall use its reasonable best efforts to consult with the other party with respect to the text thereof.

**10.11** ***Extension; Waiver***. Any party hereto may, by written notice to the other parties hereto (a) extend the time for performance of any of the obligations of any other party under this Agreement, (b) waive any inaccuracies in the representations or warranties of any other party contained in this Agreement, (c) waive compliance with any of the conditions or covenants of any other party contained in this Agreement or (d) waive or modify performance of any of the obligations of any other party under this Agreement; provided that no such party hereto may, without the prior written consent of the other parties hereto, make or grant such extension of time, waiver of inaccuracies or compliance or waiver or modification of performance with respect to its representations, warranties, conditions or covenants hereunder. Except as provided in the immediately preceding sentence, no action taken pursuant to this Agreement will be deemed to constitute a waiver of compliance with any representations, warranties, conditions or covenants contained in this Agreement and will not operate or be construed as a waiver of any subsequent breach, whether of a similar or dissimilar nature.

**10.12** ***Severability***. If any provision of this Agreement is held to be illegal, invalid or unenforceable under any present or future Law, and if the rights or obligations under this Agreement of Sellers, on the one hand, and Buyer, on the other hand, will not be materially and adversely affected thereby, (a) such provision will be fully severable, (b) this Agreement will be construed and enforced as if such illegal, invalid or unenforceable provision had never comprised a part hereof, (c) the remaining provisions of this Agreement will remain in full force and effect and will not be affected by the illegal, invalid or unenforceable provision or by its severance from this Agreement and (d) in lieu of such illegal, invalid or unenforceable provision, there will be added automatically as a part of this Agreement a legal, valid and enforceable provision as similar in terms to such illegal, invalid or unenforceable provision as may be possible.

**10.13** ***Further Assurances***. From time to time after the Closing, without additional consideration, each party hereto will (or, if appropriate, cause its Affiliates to) execute and deliver such further instruments and take such other action as may be necessary or reasonably requested by the other party to make effective the transactions contemplated by this Agreement and to provide the other party with the intended benefits of this Agreement. Without limiting the foregoing, upon reasonable request of Buyer, Sellers shall and shall cause their Affiliates to, as applicable, execute, acknowledge and deliver all such further assurances, deeds, assignments, consequences, powers of attorney and other instruments and paper as may be required to sell,

transfer, convey, assign and deliver to Buyer all right, title and interest in, to and under the Acquired Assets. If any party to this Agreement shall, following the Closing, have in its possession any asset or right (including with respect to any Intellectual Property) which under this Agreement should have been delivered to any other party, such party shall promptly deliver such asset or right to such other party. Further, in the event that, subsequent to the Closing, Buyer determines that (i) one or more Client Service Contracts existed on or prior to the Closing Date, the existence of which was not disclosed to Buyer prior to the Closing and (ii) such Client Service Contracts have not terminated and have not been transferred to a third party, then, upon the request of Buyer, Sellers shall (x) cooperate in good faith with Buyer to transfer such Client Service Contracts to Buyer without additional consideration and (y) permit Buyer to make offers of employment or admission as principal to those employees of the Sellers who provide services to the Sellers in connection with such Client Service Contracts.

**10.14** *__Specific Performance__*. The parties hereto agree that if any of the provisions of this Agreement were not performed in accordance with their specific terms or were otherwise breached, irreparable damage would occur, no adequate remedy at law would exist and damages would be difficult to determine, and that the parties hereto shall be entitled to specific performance of the terms hereof (without the posting of any bond), in addition to any other remedy at law or equity.

## 11.   __DEFINITIONS__.

As used herein the following terms have the following meanings:

"__2008 Short Term Plan__" shall mean the 2008 BearingPoint Short Term Incentive Plan, effective January 1, 2008.

"__Acquired Assets__" shall mean the Acquired Non-IP Assets, together with the Business IP.

"__Additional Business Employee__" shall mean an employee of a Seller who provides non-billable services to such Seller in connection with the Business as part of Sellers' corporate services organization or otherwise, comprised of employees performing legal/paralegal, contract review, Purchasing, Government Financial Accounting (GFAC), Program Control Organization (PCO), Learning and Training, Marketing and Communications, Human Resource Management, Talent Acquisition, Finance and Accounting functions.

"__Additional Existing Client Contract__" shall mean any Unlisted Client Service Contract which is added to Schedule 1.01(a)(ii) pursuant to Section 9.06(c) hereto which is not also a New Client Service Contract.

"__Additional Related Contract__" shall mean, with respect to any Unlisted Client Service Contract or Unlisted Client Proposal, all Contracts of Sellers (other than Client Service Contracts) relating to the provision of professional services by Sellers under such Unlisted Client Service Contract, the anticipated provision of professional services under Contracts that would be awarded if the Unlisted Client Proposal is accepted, the development of such Unlisted Client Proposal or the pursuit of Contract awards in connection with such Unlisted Client Proposal, including any Contracts pursuant to which a Seller retains a subcontractor.

"Adjusted Purchase Price" shall mean the aggregate net amount paid by Buyer to Sellers (or to the Escrow Agent and subsequently paid over by the Escrow Agent to Sellers pursuant to the Escrow Agreement), pursuant to Sections 1.03 and 1.05 hereto.

"Affiliate" shall mean, with respect to any Person, any other Person that directly or indirectly controls, is controlled by or is under common control with such Person. For such purposes, the term "control" means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract or otherwise.

"At-Risk Amounts" shall mean any unbilled amounts or other claims for money due to a Seller for all periods through and including the Closing Date arising from the rendering of services or the performance by a Seller pursuant to a Designated Client Contract for which billing did not occur prior to the Closing Date, either because the underlying Designated Client Contract had not yet been awarded, an option to extend the period of performance had not been exercised, or the requisite funding had not yet been contractually obligated by the counterparty.

"BearingPoint Financials" shall mean the consolidated financial statements of BearingPoint and its consolidated Subsidiaries contained in (a) the Form 10-Q filed with respect to the fiscal quarter ended September 30, 2008 and (b) the Form 10-K filed with respect to the fiscal year ended December 31, 2007.

"BC Contract" shall mean those certain Contracts between Sellers and the Government of the Province of British Columbia having an assigned contract number within Sellers' contracts system of CON021492.

"Bonus Plans" shall mean the 2008 Short Term Plan, the Navy ERP Plan and the Retention Bonus Agreement.

"Break-Up Fee" shall mean ten million five hundred thousand dollars ($10,500,000).

"Business" shall mean the provision of professional services by Sellers under the Designated Client Contracts and the pursuit of and provision of professional services by Sellers under the Designated Client Proposals.

"Business Confidential Information" shall mean all non-public, confidential or proprietary information of the Business which is either marked as such or given the nature of the information or circumstances surrounding its disclosure, ought reasonably to be understood to be non-public, confidential or proprietary information, including confidential matters consisting of "know-how," Intellectual Property, customer lists, details of Contracts, pricing policies, operational and service methods, marketing plans or strategies, Client or vendor information, budgets, service development techniques or plans, business acquisition plans, new personnel acquisition plans, technical processes, designs and design projects and inventions and projects of Sellers; provided that any Business Confidential Information that (a) was or becomes generally available to the public other than as a result of a disclosure by Sellers in violation of this Agreement or (b) was or becomes available to Sellers on a non-confidential basis from a source other than Buyer or the representatives of Buyer; provided further that such source was not, to

the best of Sellers' Knowledge, bound by any agreement or obligation to keep such information confidential, shall not be deemed Business Confidential Information.

"Business Day" shall mean any day other than a Saturday, Sunday or a day on which banks in New York, New York are authorized or obligated by Law or executive order to close.

"Business Employee" shall mean an employee of a Seller who provides services to such Seller in connection with the Business, other than any Additional Business Employee.

"Buyer's Independence Obligations" shall mean the obligations of Buyer, its Affiliates or related entities pursuant to the applicable rules and regulations of any Governmental Authority or professional entity (including the Securities and Exchange Commission, the Public Company Accounting Oversight Board and the American Institute of Certified Public Accountants) relating to auditor independence.

"Client Proposals" shall mean quotes, bids or proposals, whether contemplated, submitted or in preparation for submission, for the provision of professional services by Sellers' North American Public Services Unit.

"Client Service Contracts" shall mean Contracts for the provision of professional services (whether as prime contractor or subcontractor or for the provision of professional services to a higher tier subcontractor) to clients by Sellers' North American Public Service Unit.

"Clients" shall mean the current clients of the Business.

"COBRA" shall mean the Consolidated Omnibus Budget Reconciliation Act of 1986, as amended.

"Commercial Client Contracts" shall mean the Designated Client Contracts other than the Government Contracts.

"Confidentiality Agreement" shall mean that certain Confidentiality Agreement, dated as of February 13, 2009, between BearingPoint and Buyer.

"Contract" shall mean any mortgage, note, bond, indenture, lien, lease, franchise, license, permit, agreement, contract, contract right, real property lease, equipment or other personal property lease, license, purchase order, sales order, obligation, trust, instrument, arrangement or other commitment, obligation or understanding, written or oral, to which a Person is a party or by which a Person or its assets or properties are bound.

"Deferred Revenue" shall mean current deferred revenue arising under the Designated Client Contracts, determined in accordance with GAAP applied in a manner consistent with the BearingPoint Financials, excluding any such deferred revenue which does not constitute "negative unbilled" deferred revenue in accordance with the principles used in determining negative unbilled deferred revenue in BearingPoint' historical reconciliation of current deferred revenue accounts set forth in its Deferred Revenue Roll Forward Statement for January 31, 2009, dated as of February 23, 2009, set forth on Schedule 11(a).

"<u>Direct Prohibited Client Contract</u>" shall mean any Prohibited Client Contract where the identity of the counterparty to such Prohibited Client Contract would give rise to the inconsistency with or violation of Buyer's Independence Obligations.

"<u>Dollars</u>" shall mean United States dollars.

"<u>Encumbrance</u>" shall mean any title defect, mortgage, lien, pledge, charge, security interest, claim, contractual restriction, easement, right-of-way or option.

"<u>Expense Reimbursement</u>" shall mean an amount, not to exceed (i) one million five hundred thousand dollars ($1,500,000) in the case of expense reimbursement pursuant to <u>Section 7.02(b)(i)</u> hereto, (ii) five million dollars ($5,000,000) in the case of expense reimbursement pursuant to <u>Section 7.02(b)(ii)</u> hereto or (iii) two million five hundred thousand dollars ($2,500,000) in the case of expense reimbursement pursuant to <u>Section 7.02(b)(iii)</u> hereto, in each case equal to Buyers' reasonable and documented out-of-pocket costs and expenses (including (x) fees and expenses of counsel, financial advisors and other professionals and consultants, (y) its share of the HSR Act filing fee and (z) expenses for professional personnel of Buyer or its Subsidiaries performing services with respect to the transactions contemplated by the Transaction Agreements based upon Buyer's customary cost rates for internal projects) incurred by Buyer in connection with this Agreement and the transactions contemplated hereby.

"<u>GAAP</u>" shall mean U.S. generally accepted accounting principles.

"<u>Government Contracts</u>" shall mean Government Prime Contracts and Government Subcontracts.

"<u>Government Prime Contracts</u>" shall mean the Designated Client Contracts between any Seller and the U.S. Government.

"<u>Government Subcontracts</u>" shall mean (a) Designated Client Contracts between a Seller and any prime contractor of the U.S. Government in connection with such prime contractor's Contract with the U.S. Government, including teaming agreements, or (b) any Assumed Contract with a third Person subcontractor with respect to a Government Prime Contract or any Contract described in clause (a) above, including teaming agreements.

"<u>Governmental Authority</u>" shall mean any nation or government, any federal, state, city, town, municipality, county, local or other political subdivision thereof or thereto and any department, commission, board, bureau, instrumentality, agency or other governmental entity or quasi-governmental entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government or any federal, state, local or foreign court, tribunal, arbitrator or registrar.

"<u>Governmental Entity</u>" shall mean the U.S., any state or other political subdivision thereof and any other domestic governmental or quasi-governmental entity exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to government, including any government authority, agency, department, board, commission, court, tribunal or instrumentality of the U.S., any state of the U.S., or any political subdivision of any of the foregoing.

"Intellectual Property" shall mean any and all foreign and domestic (a) trademarks, service marks, brand names, d/b/a's, Internet domain names, logos, symbols, trade dress, trade names, and other indicia of origin, all applications and registrations for all of the foregoing, and all goodwill associated therewith and symbolized thereby, including all extensions, modifications and renewals of same (collectively, "Trademarks"); (b) inventions, whether patentable or not, and any and all patents and patent applications, including divisionals, continuations, continuations-in-part, including renewals, extensions and reissues (collectively, "Patents"); (c) confidential and proprietary information, trade secrets and know-how, including all proprietary processes, schematics, databases, formulae, drawings, prototypes, models, designs and customer lists (collectively, "Trade Secrets"); (d) published and unpublished works of authorship, whether copyrightable or not, copyrights therein and thereto, and registrations and applications therefore, including all renewals, extensions, restorations and reversions thereof (collectively, "Copyrights"), including any and all Copyrights that consist of computer programs and/or software programs (including all source code, object code, firmware, programming tools and/or related documentation), machine readable databases and compilations, including any and all data and collections of data, and all content contained on internet site(s); (e) proprietary methodologies and solutions, which may include Copyrights, Trade Secrets or Patents (collectively, "Solutions"); and (f) all other intellectual property rights and claims or causes of action arising out of or related to any infringement, misappropriation or other violation of any of the foregoing, including rights to recover for past, present and future violations thereof in the case of items (a) through (d) above.

"Knowledge" shall mean the knowledge any Person would have after due inquiry.

"License" shall mean all licenses, sublicenses or agreements or instruments involving any Intellectual Property, including (a) licenses by Sellers to any Person of any Intellectual Property, and (b) all licenses by any other Person to any Seller of any Intellectual Property (except with respect to generally available "off-the-shelf" software).

"Licensed Marks" shall mean any and all trademarks, service marks, brand names, d/b/a's, logos, symbols, trade dress and trade names owned by Sellers or their Affiliates which use, or are used in combination with, the "BearingPoint" name. For the avoidance of doubt, the Licensed Marks do not include any URLs.

"Material Value Diminution" shall mean any change, event, occurrence or state of facts that has resulted in or would reasonably be expected to result in diminution in the aggregate value of the Business to be acquired by Buyer and its designees including the Acquired Assets and the Assumed Liabilities, taken as a whole, by more than Seventeen Million Five Hundred Thousand Dollars ($17,500,000), excluding any such diminution or increase resulting from (a) changes in GAAP or changes in the regulatory accounting requirements applicable to any industry in which any Seller or its Subsidiaries operates which occur or become effective after the date hereof, (b) changes in the financial or securities markets or general economic or political conditions in the United States, (c) changes (including changes of applicable Law) or conditions generally affecting the industry in which any Seller or its Subsidiaries operates and not specifically relating to or having a materially disproportionate effect on such Seller and its Subsidiaries, taken as a whole, (d) acts of war, sabotage or terrorism or natural disasters involving the United States of America that do not have a materially disproportionate effect on

such Seller and its Subsidiaries, taken as a whole, (e) the announcement or pendency of the transactions contemplated by this Agreement (including any impact on customers or employees), including the conduct of the auction process as contemplated by the Bidding Procedures, (f) any failure by Sellers and their Subsidiaries to meet any internal or published budgets, projections, forecasts or predictions of financial performance for any period; provided that this clause (f) shall not be construed as providing that the change, event, occurrence or state of facts giving rise to such change or failure does not constitute or contribute to a Material Value Diminution, (g) any action taken (or omitted to be taken) as required by this Agreement or at the request of the other parties to this Agreement, (h) any action of any Seller pursuant to any order of the Bankruptcy Court entered prior to the date hereof or (i) any matter to the extent resulting in an adjustment to the Purchase Price pursuant to this Agreement; provided that this clause (i) shall not be construed as providing that such matter to the extent not resulting in such an adjustment does not constitute or contribute to a Material Value Diminution.

"Navy ERP Plan" shall mean the Navy ERP Retention Bonus Program of BearingPoint, dated November 1, 2008.

"New Client Proposal" shall mean a Client Proposal submitted by Sellers to a Client or potential client between the date hereof and the Closing Date.

"New Client Service Contract" shall mean a Client Service Contract entered into by Sellers between the date hereof and the Closing Date, whether as a result of a Client Proposal or otherwise.

"New Subcontract" shall mean any subcontract entered into by a Seller between the date hereof and the Closing Date with respect to a New Client Contract.

"New Teaming Agreement" shall mean any teaming agreement entered into by a Seller between the date hereof and the Closing Date with respect to a New Client Proposal or a New Client Contract.

"Permitted Liens" shall mean (a) liens for Taxes not yet due and payable, (b) statutory liens which secure payments not yet due that arise, and are customarily discharged, in the ordinary course of the business and (c) the Encumbrances set forth on Schedule 11(b).

"Person" shall mean any individual corporation, partnership (general or limited), limited liability company, limited liability partnership, firm, joint venture, association, joint-stock company, trust, estate, unincorporated organization, Governmental Authority or other entity.

"Permits" shall mean all material permits, licenses, authorizations, approvals, entitlements, accreditations, certifications, franchises, consents, orders and registrations of all Governmental Authorities and any other Person which are necessary for Sellers to own, lease, manage or operate the Business as of the date hereof.

"Prohibited Subcontract" shall mean any Contract pursuant to which a Seller retains a subcontractor in connection with the performance of any Designated Client Contract, the assumption and performance of which by Buyer or its Affiliates would be inconsistent with or in violation of Buyer's Independence Obligations.

"Registered" shall mean issued, registered, renewed or the subject of a pending application.

"Related Contracts" shall mean all Contracts of Sellers (other than Client Service Contracts or Licenses) (i) relating to the provision of professional services by Sellers under the Designated Client Contracts, including (x) Reseller Contracts and (y) Related Subcontracts or (ii) which are Teaming Agreements, in each case, which are listed on Schedule 11(c), which shall include all Contracts listed on Schedule 2.11(e) and the list delivered by Sellers to Buyer in accordance with Section 3.09 hereto, except to the extent that any such Contracts are designated by Buyer to be excluded from Schedule 11(c) as an Excluded Asset pursuant to Section 9.06 hereto; provided that such Contracts which are not Related Subcontracts, Reseller Contracts or Teaming Agreements and which either (A) are entered into in the ordinary course of business consistent with past practice do not involve the annual payment or receipt of at least twenty-five thousand Dollars ($25,000) or (B) are entered into in the ordinary course of business consistent with past practice which are cancelable on thirty (30) days or less notice without payment or penalty and do not involve annual payment or receipt of at least fifty thousand Dollars ($50,000), shall, in each case, be deemed "Related Contracts" regardless of whether listed on Schedule 11(c), unless designated by Buyer to be excluded as an Excluded Asset pursuant to Section 9.06 hereto.

"Related Subcontracts" shall mean Contracts pursuant to which Sellers retain a subcontractor in connection with the provision of professional services by Sellers under the Designated Client Contract.

"Reseller Contracts" shall mean all Contracts pursuant to which Seller is required to resell any products in connection with any Designated Client Contract.

"Residuals" shall mean that Business Confidential Information which may be retained in the unaided memory of those directors, officers, employees, agents and representatives of Sellers or their Affiliates who have had access to the Business Confidential Information prior to the Closing Date.

"Retention Bonus Agreements" shall mean those certain 2009 Cash Retention Bonus Plan Agreements, dated January 7, 2009, between Sellers and certain Business Employees.

"Retention Employees" shall mean those Business Employees who participate in one (1) or more Bonus Plans.

"Schedules" shall mean the disclosure schedules dated the date hereof regarding this Agreement that have been provided by Sellers to Buyer, as amended pursuant to Sections 9.06 or 10.09 hereto.

"Seller Benefit Plans" shall mean (a) each current "employee benefit plan," as defined in Section 3(3) of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), covering a Business Employee and (b) each current stock purchase, stock option, stock appreciation or other stock-based compensation, pension, profit-sharing, retirement, hospitalization, salary continuation, tuition assistance or other medical, life or other insurance,

severance, change-in-control, fringe benefit, bonus, incentive and deferred compensation plan, agreement, program, policy or other arrangement covering a Business Employee.

"Subsidiary" shall mean, with respect to any Person at any time, any corporation, partnership, joint venture, association, limited liability company, limited liability partnership, joint-stock company, trust or estate, unincorporated organization or other entity of which (or in which) more than fifty percent (50%) of: (a) the issued and outstanding shares of capital stock having ordinary voting power to elect a majority of the board of directors of such corporation (irrespective of whether at the time shares of capital stock of any other class or classes of such corporation shall or might have voting power upon the occurrence of any contingency), (b) the interest in the capital or profits of such partnership, joint venture, limited liability company or limited liability partnership or (c) the beneficial interest in such trust or estate, is, at such time, directly or indirectly owned or controlled by such Person, by such Person and one or more of its other Subsidiaries or by one or more of such Person's other Subsidiaries.

"Target Comparison Amount" shall mean:

(a) if the Closing Date is on or before May 7, 2009, $176 million ($176,000,000); and

(b) if the Closing date is after May 7, 2009:

(i) for purposes of Section 1.03(b) hereto, the greater of $176 million ($176,000,000) and the May 7 Estimated Target Amount; and

(ii) for purposes of Section 1.05(d) hereto, the greater of $176 million ($176,000,000) and the May 7 Actual Target Amount.

"Tax" or "Taxes" shall mean any and all federal, state, county, local, foreign and other taxes, assessments, duties or charges of any kind whatsoever, including franchise, income, sales, use, *ad valorem*, gross receipts, value added, profits, license, minimum, alternative minimum, environmental, withholding, payroll, employment, excise, property, customs and occupation taxes, including any liability for the payment of any Taxes as a result of being a member of any affiliated, consolidated, combined or unitary group pursuant to Section 1.1502-6 of the Treasury Regulations promulgated under the Code or similar state, local or foreign legislative, administrative or judicial provisions and any liability for Taxes as a result of being a transferee pursuant to Section 6901 of the Code or similar state, local, or foreign legislative, administrative or judicial provisions, together with any interest, fine, penalty, addition to tax and other amounts imposed with respect thereto.

"Tax Return" shall mean all material returns, reports, statements and forms required to be filed by any applicable federal, state, local or foreign tax Laws relating to the Business and/or the Acquired Assets.

"Teaming Agreements" shall mean teaming agreements or similar teaming arrangements including Contracts relating to (i) the anticipated provision of professional services under

Contracts which would be award if the Designated Client Proposal are accepted, (ii) the development of Designated Client Proposals or (iii) pursuit of Contract awards in connection with Designated Client Proposals.

"Texas Online Contracts" shall mean those certain Contracts between Sellers and the Texas Department of Information Resources having an assigned contract number within Sellers' contracts system of CON016527, 006181 and 038709.

"Transaction Agreements" shall mean this Agreement, together with the Assignment and Assumption Agreements, Bills of Sale, Transition Services Agreement, Escrow Agreement, Cross-License Agreement, Trademark License Agreement, Patent Assignment, Copyright Assignment, Domain Name Assignment, Subcontract Agreement, and Novation Agreement.

"URL" shall mean universal resource locator, the computer internet address of a website.

"U.S. Government" shall mean the federal government of the U.S. and any agencies, instrumentalities and departments thereof.

"WARN Act" shall mean the Worker Adjustment and Retraining Notification Act of 1988, as amended.

"Work Product" shall mean all billing files, technical data, and working paper files generated by any Seller for Clients.

In addition to the foregoing definitions, the following terms shall have the definitions specified in the section of the Agreement listed in the following table:

| Defined Term | Section |
|---|---|
| Accounts Receivable | 1.01(a)(iii) |
| Acquired Non-IP Assets | 1.01(a) |
| Acquired Records | 1.01(a)(x) |
| Actual Comparison Amount | 1.05(a)(ii) |
| Adjudicated Damages | 1.09(c) |
| Agreement | Preamble |
| Allocation Statement | 1.07 |
| Apportioned Obligations | 9.09(a) |
| Approval Order | 9.03(b) |
| Assignment and Assumption Agreements | 1.08(a)(ii) |
| Assumed Contracts | 1.01(a)(i) |
| Assumed Liabilities | 1.02(a) |
| Back-to-Back Letter of Credit | 5.03 |
| Bankruptcy Cases | Recitals |
| Bankruptcy Code | Recitals |
| Bankruptcy Court | Recitals |
| BearingPoint | Preamble |
| Bills of Sale | 1.08(a)(iii) |
| Bidding Procedures Order | 9.02 |

| Defined Term | Section |
|---|---|
| Bonus Motions | 9.08(b)(ii) |
| Business Confidentiality Agreement | 9.05(d) |
| Business IP | 9.05(d) |
| Buyer | 1.01(b) |
| Buyer Reconciliation Payment | Preamble |
| Closing | 1.05(d)(i) |
| Closing Date | 1.04 |
| Closing Date Cash Payment | 1.04 |
| Closing Statement | 1.03(c)(i) |
| Code | 1.03(b) |
| Competing Bid | 1.07 |
| Copyright Assignment | 3.06 |
| Copyrights | 1.08(a)(ix) |
| Corrected Closing Date Cash Payment | Article 11 |
| Cross-License Agreement | 1.05(d)(iii) |
| DCAA | 1.08(a)(vi) |
| Deposit | 2.12(i) |
| Deposit Escrow Agent | 1.09(a) |
| Designated Client Contracts | 1.09(a) |
| Designated Client Proposals | 1.01(a)(i)(A) |
| Designated Real Property Leases | 1.01(a)(ii) |
| Dispute | 1.01(a)(i)(D) |
| Dispute Notice | 1.05(c) |
| Domain Name Assignment | 1.05(b) |
| ERISA | 1.08(a)(x) |
| Escrow Account | Article 11 |
| Escrow Agent | 1.03(c)(ii) |
| Escrow Agreement | 1.08(a)(v) |
| Escrow Amount | 1.08(a)(v) |
| Estimated Comparison Amount | 1.03(c)(ii) |
| Excluded Assets | 1.03(c)(ii) |
| Excluded Liabilities | 1.01(c) |
| FAR | 1.02(b) |
| Final Order | 2.12(b) |
| HSR Act | 9.03(c) |
| Law | 9.01(a) |
| Leased Premises | 2.03(b)(ii) |
| May 7 Actual Target Amount | 2.10(a) |
| May 7 Estimated Target Amount | 1.05(a)(ii) |
| Negotiating Period | 1.03(b)(ii) |
| Neutral Firm | 1.05(b) |
| New York Courts | 1.05(c) |
| Novation Agreement | 10.02 |
| Other Business Contracts | 9.04(a) |
| Patent Assignment | 1.01(a)(i)(C) |
| | 1.08(a)(vii) |

KL2 2597071.9

<u>Defined Term</u>                                                                                     <u>Section</u>

Patents ..........................................................................................................Article 11
Post-Closing Statement ........................................................................... 1.05(a)
Post-Closing Tax Period ........................................................................... 9.09(a)
Pre-Closing Tax Period ............................................................................ 9.09(a)
Prohibited Client Contract ........................................................................9.06(f)
Purchase Price .......................................................................................... 1.03(a)
Reconciliation Payment ...................................................................... 1.05(d)(iv)
Related Contracts .................................................................................... 11(c)
Relevant LC .............................................................................................. 2.11(g)
Second Request ......................................................................................... 9.01(b)
Seller .....................................................................................................Preamble
Seller Reconciliation Payment ............................................................. 1.05(d)(i)
Sellers ...................................................................................................Preamble
Solutions ...........................................................................................Article 11
Subcontract Agreement...........................................................................9.04(c)
Suit .......................................................................................................... 2.06(c)
Tax Asset .....................................................................................................3.04
Termination Date .................................................................................... 7.01(g)
Territory ......................................................................................................3.08
Trade Secrets..............................................................................................Article 11
Trademark License Agreement............................................................ 1.08(a)(viii)
Trademarks ...........................................................................................Article 11
Transfer Expenses ........................................................................................1.06
Transferred Employees ............................................................................ 9.08(a)
Transition Services Agreement.......................................................... 1.08(a)(iv)
Unlisted Client Proposal .......................................................................... 9.06(b)
Unlisted Client Service Contract .............................................................. 9.06(b)
Updated Schedules......................................................................................9.06(j)

**[REMAINDER OF THIS PAGE INTENTIONALLY LEFT BLANK]**

IN WITNESS WHEREOF the parties hereto have caused this Agreement to be executed as of the date first set forth above.

DELOITTE LLP

By: _____
    Name: Jack Russi
    Title: National Managing Partner, Corporate
           Development

BEARINGPOINT, INC.

By: _____
    Name:
    Title:

BEARINGPOINT AMERICAS, INC.

By: _____
    Name: John DeGroote
    Title: Director

BEARINGPOINT GLOBAL OPERATIONS, INC.

By: _____
    Name: John DeGroote
    Title: Director

IN WITNESS WHEREOF the parties hereto have caused this Agreement to be executed as of the date first set forth above.

DELOITTE LLP

By: _____

Name: Jack Russi

Title: National Managing Partner, Corporate Development

BEARINGPOINT, INC.

By: _____

Name: F. Edwin Harbach

Title: Chief Executive Officer

BEARINGPOINT AMERICAS, INC.

By: _____

Name: John DeGroote

Title: Director

BEARINGPOINT GLOBAL OPERATIONS, INC.

By: _____

Name: John DeGroote

Title: Director

BE NEW YORK HOLDINGS, INC.

By: _____
    Name:  John DeGroote
    Title:  Director


METRIUS, INC.

By: _____
    Name:  John DeGroote
    Title:  Director


OAD GROUP, INC.

By: _____
    Name:  John DeGroote
    Title:  Director


BEARINGPOINT SOUTHEAST ASIA LLC

By: BearingPoint, LLC, its Sole Member

By: _____
    Name:  John DeGroote
    Title:  Vice President & Secretary

I2 NORTHWEST LLC

By: BearingPoint, Inc., its Sole Member

By: _____
   Name: John DeGroote
   Title:  Vice President & Secretary

BEARINGPOINT, LLC

By: BearingPoint, Inc., its Sole Member

By: _____
   Name: John DeGroote
   Title:  Executive Vice President & Chief Legal
          Officer

I2 MID ATLANTIC LLC

By: BearingPoint, LLC, its Sole Member

By: _____
   Name: John DeGroote
   Title:  Vice President & Secretary

BEARINGPOINT BG, LLC

By: BearingPoint Global Operations, Inc., its Sole
    Member

By: _____
   Name: John DeGroote
   Title:  Director

BEARINGPOINT ENTERPRISE HOLDINGS,
LLC

By: BearingPoint, LLC, it Sole Member

By: _____
    Name: John DeGroote
    Title:   Vice President & Secretary


PELOTON HOLDINGS, LLC

By: BearingPoint, LLC, its Sole Member

By: _____
    Name: John DeGroote
    Title:   Vice President & Secretary


BEARINGPOINT RUSSIA, LLC

By: BearingPoint, LLC, its Sole Member

By: _____
    Name: John DeGroote
    Title:   Vice President & Secretary


BEARINGPOINT PUERTO RICO, LLC

By: BearingPoint Americas, Inc., its Sole Member

By: _____
    Name: John DeGroote
    Title:   Vice President & Secretary

BEARINGPOINT ISRAEL, LLC

By: BearingPoint, LLC, its Sole Member

By: _____
    Name: John DeGroote
    Title:  Vice President & Secretary


BEARINGPOINT SOUTH PACIFIC, LLC

By: BearingPoint, LLC, its Sole Member

By: _____
    Name: John DeGroote
    Title:  Vice President & Secretary


DALLAS PROJECT HOLDINGS LIMITED

By: _____
    Name: John DeGroote
    Title:  Director


OAD ACQUISITION CORP

By: _____
    Name: John DeGroote
    Title:  Director

BEARINGPOINT GLOBAL, INC.

By: _____
    Name: John DeGroote
    Title:  Director


SOFTLINE CONSULTING AND INTEGRATORS
INC.

By: _____
    Name: John DeGroote
    Title:  Director


SOFTLINE ACQUISITION CORP.

By: _____
    Name: John DeGroote
    Title:  Director


BEARINGPOINT INTERNATIONAL I, INC.

By: _____
    Name: John DeGroote
    Title:  Director


BEARINGPOINT USA, INC.

By: _____
    Name: John DeGroote
    Title:  Director

BEARINGPOINT LP

By: BearingPoint Canada Holding I, its General
    Partner

By: _____
    Name: John DeGroote
    Title:  Vice President & Secretary

# EXHIBIT A

# FORM OF TRANSITION SERVICES AGREEMENT

# EXHIBIT B

# FORM OF CROSS-LICENSE AGREEMENT

KL2 2597071.9

# EXHIBIT C

# FORM OF PATENT ASSIGNMENT

KL2 2597071.9

# EXHIBIT D

# FORM OF TRADEMARK LICENSE AGREEMENT

# EXHIBIT E

# FORM OF COPYRIGHT ASSIGNMENT

KL2 2597071.9

## EXHIBIT F

## FORM OF DOMAIN NAME ASSIGNMENT

**EXHIBIT G**

**DESCRIPTION OF BIDDING PROCEDURES**

KL2 2597071.9

# EXHIBIT H

# FORM OF SUBCONTRACT AGREEMENT

# EXHIBIT I

## FORM OF LANDLORD ESTOPPEL CERTIFICATE

KL2 2597071.9
(NY) 02943/005/APA/apa.doc

# Exhibit D

**Allocation Agreement**

March 23, 2009

Wells Fargo Bank N.A.
[            ]
[            ]


Ladies and Gentlemen:

Reference is made to (a) that certain Asset Purchase Agreement, dated as of March 22, 2009, by and among Deloitte LLP, a Delaware limited liability partnership ("Buyer"), and BearingPoint, Inc., a Delaware corporation (the "Company"), and the subsidiaries of the Company that are signatories thereto (the "Agreement") and (b) that certain Credit Agreement, dated as of May 18, 2007, and amended and restated as of June 1, 2007 (and, as amended from time to time thereafter, the "Credit Agreement"), by and among Wells Fargo Bank, N.A. ("Wells Fargo"), as Successor Administrative Agent and Collateral Agent under the Credit Agreement (in such capacity, the "Agent"), the Company, the guarantors party thereto, the lenders from time to time party thereto, and certain agents, arrangers and managers party thereto. The Agent has advised us that the holders of the indebtedness outstanding under the Credit Agreement (the "Secured Creditors") have established a committee (the "Steering Committee") to act solely in an advisory capacity with respect to the interests of the Secured Creditors.

The Company hereby acknowledges that the Secured Creditors may have interest in, and be effected by, the matters set forth in Section 1.07 of the Agreement and agrees that it shall (i) promptly provide to the Agent the Allocation Statement (as defined in the Agreement) and any related materials and information received by the Company pursuant to Section 1.07, all of which shall be subject to your obligations to maintain the confidentiality thereof, and (ii) not agree to any allocation of the Adjusted Purchase Price (as defined in the Agreement) pursuant to Section 1.07 of the Agreement, including the acceptance of any item set forth on the Allocation Statement delivered by the Buyer in accordance with the terms of the Agreement, without the prior input and written consent of the Agent (acting on behalf, and at the direction, of the Steering Committee) (which consent shall not be unreasonably withheld, conditioned or delayed).

This letter agreement may not be modified, changed or discharged, in whole or in part, except by an agreement in writing signed by each party hereto. Any assignment of this letter agreement by a party hereto without the prior written consent of the other party hereto shall be void. This letter agreement will be binding upon and inure to the benefit of the parties hereto and their respective successors and permitted assigns.

This letter agreement shall be governed, including as to validity, interpretation and effect, by, and construed in accordance with, the internal laws of the State of New York applicable to agreements made and fully performed within the State of New York. Each of the parties hereto irrevocably submits to the exclusive jurisdiction of any state or federal courts sitting in New

1

York, New York.  To the fullest extent permitted by applicable law, each party hereto (i) agrees that any claim, action or proceeding by such party seeking any relief whatsoever arising out of, or in connection with this letter agreement shall be brought only in (x) the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court"), if brought prior to the entry of a final decree closing the Company's voluntary petitions for relief under Chapter 11 of Title 11 of the United States Bankruptcy Code, §§ 101, et seq. (as amended), and (y) in the federal courts in the Southern District of New York and the state courts of the State of New York, County of Manhattan (collectively, the "New York Courts"), if brought after entry of such final decree, and shall not be brought, in each case, in any other state or federal court in the United States of America or any court in any other country, (ii) agrees to submit to the exclusive jurisdiction of the Bankruptcy Court or the New York Courts, as applicable, pursuant to the preceding clauses (i) and (ii), for purposes of all claims, actions or proceedings arising out of, or in connection with this letter agreement, (iii) waives and agrees not to assert any objection that it may now or hereafter have to the laying of the venue of any such claim, action or proceeding brought in such a court or any claim that any such claim, action or proceeding brought in such a court has been brought in an inconvenient forum, and (iv) agrees that a final judgment in any such claim, action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by applicable law.

*[Signature Page Follows]*

Please indicate your agreement to the foregoing by signing a copy of this letter agreement in the space provided below and returning it to the undersigned.

**BearingPoint, Inc.**

By: _____
Name:
Title:

**ACCEPTED AND AGREED
AS OF THE DATE HEREOF:**

**Wells Fargo, N.A.,** in its capacity as Agent

By:_____
Name: Michael Pinzon
Title: Vice President

Please indicate your agreement to the foregoing by signing a copy of this letter agreement in the space provided below and returning it to the undersigned.

**BearingPoint, Inc.**

By:_____

Name:

Title:

**ACCEPTED AND AGREED
AS OF THE DATE HEREOF:**

**Wells Fargo Bank, N.A., solely** in its capacity as Agent

By:_____

Name:  Michael Pinzon

Title:   Vice President

# __Exhibit E__

**Proposed Notice of Sale Approval Hearing**

Proposed Date of Auction: April 15, 2009 at 10:00 a.m. (Eastern Time)
Proposed Sale Approval Hearing: April 17, 2009 at 9:00 a.m. (Eastern Time)
Proposed Objection Deadline as to Sale: April 10, 2009 at 12:00 p.m. (Eastern Time)
Proposed Objection Deadline as to Auction and Selection of Successful Bidder: April 16, 2009 at 12:00 p.m. (Eastern Time)

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------x

|  |  |  |
|---|---|---|
| In re | : | Chapter 11 Case No. |
|  | : |  |
| BEARINGPOINT, INC., et al., | : | 09 - 10691 (REG) |
|  | : |  |
| Debtors. | : | (Jointly Administered) |
|  | : |  |

-------------------------------------------------------------x

## NOTICE OF (i) PROPOSED SALE OF CERTAIN OF
## THE DEBTORS' ASSETS FREE AND CLEAR OF LIENS, CLAIMS,
## AND ENCUMBRANCES, (ii) AUCTION AND (iii) SALE HEARING

   **PLEASE TAKE NOTICE** that on March 23, 2009, BearingPoint, Inc. ("*BearingPoint*") and certain of its affiliates, as debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "*Debtors*"), filed a motion (the "*Sale Motion*") with the United States Bankruptcy Court for the Southern District of New York (the "*Court*") seeking, among other things, (i) authority to sell assets, including, in whole or in part, BearingPoint's public services industry group, free and clear of all liens, claims, and encumbrances (the "*Sale*"), (ii) approval of certain procedures for the solicitation of bids and the conduct of an auction with respect to the Sale (the "*Bidding Procedures*") and (iii) scheduling of a hearing with the Court for approval of the Sale (the "*Sale Hearing*").

   **PLEASE TAKE FURTHER NOTICE that an auction (the "Auction") is currently scheduled to be conducted at the offices of Weil, Gotshal & Manges LLP, 767 Fifth Avenue, New York, New York 10153 on April 15, 2009 at 10:00 a.m. (Eastern Time), at which time all prospective bidders may bid and participate pursuant to the terms of the Bidding Procedures.** The Auction will continue until such time as the highest or otherwise best offer is determined. The Debtors may adopt rules for the Auction that will promote the goals of the Auction process and that are not inconsistent with any of the provisions of the Bidding Procedures. Only bidders who submit bids in accordance with the Bidding Procedures will be allowed to attend the Auction. A copy of the Sale Motion, which contains the Bidding Procedures, may be obtained by (a) contacting the attorneys for the Debtors, Weil Gotshal & Manges LLP, 767 Fifth Avenue, New York, New York 10153, Attn: Marcia Goldstein, Esq. and Alfredo R. Pérez, Esq., Telephone: (212) 310-8000; (b) accessing the Court's website at http://www.nysb.uscourts.gov (please note that a PACER password is needed to access documents on the Court's website); (c) viewing the docket of these cases at the Clerk of the Court, United States Bankruptcy Court for the Southern District of New York, Alexander Hamilton Custom House, One Bowling Green, New York, New York 10004; or (d) accessing the public website maintained by the Debtors' court-appointed claims and noticing agent in these cases at **http://www.bearingpointinfo.com**.

**PLEASE TAKE FURTHER NOTICE** that the Sale Hearing is currently scheduled to be held on [**April 17, 2009**] **at [\_\_\_] [\_].m. (Eastern Time)** at the United States Bankruptcy Court for the Southern District of New York, Alexander Hamilton Custom House, One Bowling Green, New York, New York 10004, before the Honorable Robert E. Gerber, United States Bankruptcy Judge, to consider the Debtors' selection of the highest or best bid and the Sale. The Sale Hearing may be adjourned, from time to time, without further notice to creditors or parties in interest other than by announcement of the adjournment in open Court or on the Court's docket.

**PLEASE TAKE FURTHER NOTICE THAT OBJECTIONS TO ANY RELIEF REQUESTED IN THE SALE MOTION, INCLUDING THE DEBTORS' REQUEST TO APPROVE THE SALE OF PURCHASED ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS AND ENCUMBRANCES, MUST BE PRESENTED AT THE SALE HEARING.**

This notice is qualified in its entirety by any order approving the Bidding Procedures (the "***Bidding Procedures Order***"). All persons and entities are urged to read the Bidding Procedures Order, when entered, and the provisions thereof carefully. To the extent that this notice is inconsistent with the Bidding Procedures Order, the terms of the Bidding Procedures Order shall govern.

Dated:   April \_\_, 2009
      New York, New York

# __Exhibit F__

Cited Orders

WEIL, GOTSHAL & MANGES LLP
Attorneys for Debtors and
Debtors in Possession
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Judy G.Z. Liu, Esq. (JL 6449)

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------------x
                                   :

In re                                  :     Chapter 11 Case No.
                                   :

ADELPHIA BUSINESS SOLUTIONS, INC., *et al.*,  :     02-11389 (REG)
                                   :

          Debtors.                :     (Jointly Administered)
                                   :

------------------------------------------------------------------x

**ORDER (A) AUTHORIZING AND SCHEDULING AN**
**AUCTION FOR THE SALE OF CERTAIN ASSETS RELATED TO DEBTOR'S**
**CLOSED MARKETS, (B) APPROVING THE TERMS AND**
**CONDITIONS OF SUCH AUCTION AND BREAK-UP FEE,**
**(C) APPROVING FORM AND MANNER OF NOTICE OF THE**
**(i) AUCTION AND SALE HEARING AND (ii) PROPOSED**
**ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY**
**CONTRACTS, AND (D) ESTABLISHING DATE AND TIME**
<u>**FOR HEARING TO CONSIDER APPROVAL OF PROPOSED SALE**</u>

        Upon the motion, dated November 25, 2002 (the "Motion"), of Adelphia

Business Solutions Operations, Inc., as debtor and debtor in possession ("ABSO" or the

"Debtor"), for orders (i) authorizing, pursuant to sections 105(a), 363(b) and (f), 365(a)

and 1146(c) of the Bankruptcy Code, ABSO to conduct an auction sale (the "Auction")

of certain assets related to the Closed Markets, including the Sale Assets and the

Assumed Contracts, as set forth in the proposed Sale Agreement, (ii) scheduling a date

for the Auction, (iii) approving, pursuant to Bankruptcy Rule 6004(f)(1), the terms and

conditions of the Auction, including bidding procedures and the Break-Up Fee (the "Bidding Procedures"), (iv) authorizing, pursuant to Bankruptcy Rule 2002, the form and manner of notice for the Auction and for notifying contract parties of the assumption and assignment to Gateway of the Assumed Contracts, (v) scheduling a date and time for a hearing to consider approval of the proposed sale resulting from the Auction (the "Sale Hearing"), (vi) establishing, pursuant to sections 105(a) and 365 of the Bankruptcy Code, cure amounts, if any, with respect to the Assumed Contracts, (vii) authorizing ABSO to assume and assign to the successful bidder the Assumed Contracts, (viii) approving the Agreement and the escrow arrangements, to be effective upon a Closing of the Sale Transaction, and (ix) granting other relief related to all of the foregoing; and a hearing having been held (the "Procedures Hearing") in respect of the Debtor's request for an order granting the relief requested in clauses (i) –(v) above (the "Preliminary Relief"); and it appearing that notice of the hearing has been provided to (i) the Office of the United States Trustee for the Southern District of New York, (ii) the attorneys for the Debtor's postpetition lender, (iii) the attorneys for the statutory committee of unsecured creditors, (iv) the attorneys for Adelphia Communications Corporation ("ACC"), (v) the attorneys for the Ad Hoc Committee of 12¼% bondholders, (vi) all nondebtor contract parties to the Assumed Contracts, (vii) all appropriate federal, state and local taxing authorities, and (viii) all parties having filed a notice of appearance in the Debtors' chapter 11 cases pursuant to Rule 2002 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"); and it appearing that such notice constitutes good and sufficient notice of the Motion and Preliminary Relief and that no other or further notice need be provided; and upon the Motion and the record of the Procedures Hearing and all

other proceedings had before the Court; and it appearing that an order granting the Preliminary Relief is in the best interests of the Debtor and other parties in interest; and it appearing that the Court has jurisdiction over this matter; and after due deliberation and sufficient cause appearing therefore, it is hereby

ORDERED that pursuant to Bankruptcy Rule 6004(f)(1), the Debtor is authorized to conduct the Auction of the Sale Assets and Assumed Contracts pertaining to the Closed Markets at the offices of Weil, Gotshal & Manges, LLP, 767 Fifth Avenue, New York, New York 10153 on January 6, 2003 at 10:00 a.m. (EST); and it is further

ORDERED that the Auction shall be conducted on the following terms and conditions (the "Auction Terms"):

- Initial bids for the Sale Assets must (a) be in writing; (b) at a minimum, exceed the sum of (i) the Purchase Price and the Aggregate Burn Reimbursement Amount plus (ii) the Minimum Overbid Amount (collectively, the "Minimum Bid"); (c) be received by (i) the attorneys for the Debtors, Weil, Gotshal & Manges LLP ("WG&M"), 767 Fifth Avenue, New York, New York 10153 (Attn: Judy G. Z. Liu, Esq.), (ii) the attorneys for the Debtor's postpetition lender, Jenkens & Glichrist Parker Chapin, LLP, the Chrysler Building, 405 Lexington Avenue, New York, New York 10174 (Attn: Hollace T. Cohen, Esq. and Jennifer Saffer, Esq.); (iii) the attorneys for the statutory committee of unsecured creditors, Kramer Levin Naftalis & Frankel, 919 Third Avenue, New York, New York 10022 (Attn: Mitchell A. Seider, Esq.); (iv) the attorneys for an ad hoc committee of holders of 12¼% bonds issued by Adelphia Business Solutions, Inc., Akin, Gump, Strauss, Hauer & Feld, LLP, 590 Madison Avenue, New York, New York 10022 (Attn: Ira S. Dizengoff, Esq. and Philip C. Dublin, Esq.), by no later than 5:00 p.m. (EST) on January 2, 2003 (the "Bid Deadline"). Parties that do not submit written bids by the Bid Deadline reflecting at least the Minimum Bid will not be permitted to participate at the Auction. Bids must be accompanied by an earnest money deposit equal to the amount of the Aggregate

Burn Reimbursement Amount,[1] the Earnest Money Deposit, and the Minimum Overbid Amount (collectively, the "Bid Deposit Amount").

- ABSO will only entertain bids that are on the same terms and conditions as those terms set forth in the Agreement and the documents set forth as exhibits thereto (and this Order).

- All bids must constitute a good faith, bona fide offer to purchase the Sale Assets for cash only (and the assumption of the Assumed Liabilities), and shall not be conditioned on obtaining financing and/or the outcome of due diligence by the bidder.

- All bids are irrevocable until the earlier to occur of: (i) the Closing, or (ii) thirty (30) days following the last date of the Auction (as the same may be adjourned).

- As a condition to making a competing bid, any competing bidder must provide the Debtor, on or before the Bid Deadline, with sufficient and adequate information to demonstrate, to the satisfaction of the Debtor, that such competing bidder (i) has the financial wherewithal and ability to consummate the Sale Transaction, and (ii) can provide all nondebtor contracting parties to the Assumed Contracts with adequate assurance of future performance as contemplated by section 365 of the Bankruptcy Code.

- The Debtor shall, after the Bid Deadline and prior to the Auction, evaluate all bids received, including Gateway's bid, and determine which bid reflects the highest or best offer for the Sale Assets (the "Pre-Auction Successful Bid"). The Debtor shall announce such determination at the outset of the Auction.

- Subsequent bids (after taking into account the Minimum Bid) at the Auction shall be made in increments of at least $25,000.00.

- Except as otherwise provided in a written offer that has been accepted by the Debtor, subject to satisfaction or waiver of the conditions to Closing set forth in the Agreement, the Closing shall take place at the offices of Weil, Gotshal & Manges LLP, promptly following entry of an order by the Court, substantially in the form

---

[1] Solely for the purpose of calculating the Bid Deposit Amount, interested bidders should assume that the Aggregate Burn Reimbursement Amount is $800,000.

annexed as Exhibit "D" to the Motion authorizing the sale of the Closed Markets to the Successful Bidder.

- The purchase price less the Bid Deposit Amount shall be paid by the Successful Bidder (if Gateway is not the Successful Bidder) by wire transfer at Closing. If for any reason the Successful Bidder fails to consummate the Sale Transaction, or any part thereof, the offeror of the second highest or best bid at the Auction for the Sale Assets will automatically be deemed to have submitted the highest or best bid. To the extent such offeror and the Debtor consent, the Debtor and such offeror are authorized to effect the Sale Transaction as soon as is commercially reasonable without further order of the Court.

- All bids for the purchase of the Sale Assets shall be subject to approval of the Court.

- The Debtor, in its sole discretion, may reject any bid not in conformity with these Bidding Procedures, the requirements of the Bankruptcy Code, the Bankruptcy Rules or the Local Bankruptcy Rules of the Court, or contrary to the best interests of the Debtor and parties in interest.

- No bids shall be considered by the Court unless a party submitted a competing bid in accordance with the Bidding Procedures and participated in the Auction.

- The Debtor reserves the right to change the location of the Auction and/or adjourn the Auction by announcing such adjournment at the Auction.

- Any sale shall be subject to the Senior DIP Lender's consent. The Senior DIP Lender reserves all of its rights with respect to any sale, including, without limitation, its right not to consent to any sale, to condition such consent, and to object to any sale.

- Such other terms and conditions as may be announced by the Debtor at the outset of the Auction, provided, however, that such terms and conditions are not inconsistent with the terms of the Motion and this Order. To the extent that there is any ambiguity as to what terms apply, the Motion and this Procedures Order shall control.

ORDERED that pursuant to section 363(b) of title 11 of the United States Code (the "Bankruptcy Code"), the Debtor is authorized to pay to Gateway a Break-Up

Fee in the amount of $267,500 (the "Break-Up Fee"), plus reimbursement for the Aggregate Burn Reimbursement Amount actually paid by Gateway, in the event that the Court approves an alternative transaction and such alternative transaction actually closes; and it is further

ORDERED that pursuant to Bankruptcy Rule 2002, notice of the proposed Sale Transaction, Auction and Sale Hearing shall be given by overnight delivery in the form annexed to the Sale Motion at Exhibit "E," on or prior to December 20, 2002, to (i) the United States Trustee, (ii) the attorneys for the Debtor's postpetition lender, (iii) the attorneys for the Creditors' Committee, (iv) the attorneys for an ad hoc committee of 12¼% bondholders, (v) the attorneys for Adelphia Communications Corporation, (vi) all nondebtor contracting parties with respect to the Assumed Contracts, (vii) all parties who have made written expressions of interest in acquiring the Sale Assets within six (6) months prior to the date of this Order, (viii) all appropriate federal, state and local taxing authorities, (ix) all known persons holding a lien on any of the Sale Assets, (x) all parties having filed a notice of appearance in the Debtor's chapter 11 case pursuant to Bankruptcy Rule 2002, shall constitute good and sufficient notice of the Sale Transaction, Auction, and Sale Hearing; and it is further

ORDERED that pursuant to Bankruptcy Rule 2002(1), the Debtor is authorized to publish, at least seven (7) days prior to the Auction, a notice of the Sale Transaction, Auction and Sale Hearing, once, in the form annexed to the Sale Motion at Exhibit "E," in the national editions of the New York Times and the Wall Street Journal; and it is further

ORDERED that pursuant to Bankruptcy Rule 2002(a)(2), (a) the Sale

Hearing shall be held on January 7, 2002, before the United States Bankruptcy Court,

Honorable Robert E. Gerber at 2:00 p.m. (EST), and (b) objections to approval of the

relief requested in the Sale Motion (other than the Preliminary Relief provided herein), if

any, shall be in writing, shall state the name of the objecting party, shall state with

particularity the reasons and basis for the objection, and shall be filed with the Court and

served upon (i) the attorneys for the Debtor, Weil, Gotshal & Manges LLP, 767 Fifth

Avenue, New York, New York 10153 (Attn: Judy G. Z. Liu, Esq.); (ii) the attorneys for

the Debtor's postpetition lender, Jenkens & Glichrist Parker Chapin, LLP, the Chrysler

Building, 405 Lexington Avenue, New York, New York 10174 (Attn: Hollace T. Cohen,

Esq. and Jennifer Saffer, Esq.); (iii) the attorneys for the statutory committee of

unsecured creditors, Kramer Levin Naftalis & Frankel, 919 Third Avenue, New York,

New York 10022 (Attn: Mitchell A. Seider, Esq.); (iv) the attorneys for an ad hoc

committee of holders of 12¼% bonds issued by Adelphia Business Solutions, Inc., Akin,

Gump, Strauss, Hauer & Feld, LLP, 590 Madison Avenue, New York, New York 10022

(Attn: Ira S. Dizengoff, Esq. and Philip C. Dublin, Esq.); (v) the attorneys for Gateway,

Inc., Purcell & Scott, Co., L.P.A., 6035 Memorial Drive, Dublin, Ohio 43017 (Attn:

David W. Babner, Esq.); and (vi) the Office of the United States Trustee, 33 Whitehall

Street, 21st floor, New York, New York 10004 (Attn: Tracy H. Davis, Esq.), so as to be

actually received by such persons no later than January 3, 2002 at 12:00 noon (EST).


Dated: New York, New York
        December _16_, 2002

**S/ Robert E. Gerber**
HONORABLE ROBERT E. GERBER
UNITED STATES BANKRUPTCY JUDGE

# UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------x
```
                                    :
In re                               :    Chapter 11 Case No.
                                    :
ADELPHIA BUSINESS SOLUTIONS, INC., et al.,  :    02-11389 (REG)
                                    :
        Debtors.                    :    (Jointly Administered)
                                    :
```
------------------------------------------------------------x

## ORDER (A) AUTHORIZING AND SCHEDULING AN AUCTION FOR THE SALE OF CERTAIN ASSETS RELATED TO THE DETROIT MARKET, (B) APPROVING THE TERMS AND CONDITIONS OF SUCH AUCTION, INCLUDING BREAK-UP FEE, (C) APPROVING FORM AND MANNER OF NOTICE OF THE (i) AUCTION AND SALE HEARING AND (ii) PROPOSED ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS, AND (D) ESTABLISHING DATE AND TIME FOR HEARING TO CONSIDER APPROVAL OF PROPOSED SALE

Upon the motion, dated January 10, 2003 (the "Motion"), of Adelphia Business Solutions Operations, Inc., as debtor and debtor in possession ("ABSO" or the "Debtor"), filed with this Court requesting orders (i) authorizing ABSO, pursuant to sections 105(a), 363(b) and (f), 365(a), and 1146(c) of the Bankruptcy Code, to conduct an auction sale (the "Auction") of certain assets related to the Detroit Market,[1] including the Sale Assets and the Assumed Contracts, as set forth in the proposed Sale Agreement, (ii) scheduling a date for the Auction, (iii) approving, pursuant to Bankruptcy Rule 6004(f)(1), the terms and conditions of the Auction, including bidding procedures and a Break-Up Fee (the "Bidding Procedures"), (iv) authorizing, pursuant to Bankruptcy Rule

---

[1] Unless otherwise defined herein, capitalized terms shall have the meanings ascribed to them in the Motion.

2002, the form and manner of notice for the Auction and for notifying contract parties of

the assumption and assignment to GVC of the Assumed Contracts, (v) scheduling a date

and time for a hearing to consider approval of the proposed sale resulting from the

Auction (the "Sale Hearing"), (vi) establishing, pursuant to sections 105(a) and 365 of the

Bankruptcy Code, Cure Amounts, if any, with respect to the Assumed Contracts, (vii)

authorizing ABSO to assume and assign to the Successful Bidder the Assumed Contracts,

(viii) approving the Agreement and the escrow arrangements, to be effective upon a

Closing of the Sale Transaction, and (ix) granting other relief related to all of the

foregoing; and a hearing having been held (the "Procedures Hearing") in respect of the

Debtor's request for an order granting the relief requested in clauses (i) –(v) above (the

"Preliminary Relief"); and it appearing that notice of the hearing has been provided to (i)

the Office of the United States Trustee for the Southern District of New York, (ii) the

attorneys for the Debtor's postpetition lender, (iii) the attorneys for the statutory

committee of unsecured creditors, (iv) the attorneys for Adelphia Communications

Corporation ("ACC"), (v) the attorneys for the Ad Hoc Committee of 12¼%

bondholders, (vi) all nondebtor contract parties to the Assumed Contracts, (vii) all

appropriate federal, state and local taxing authorities, and (viii) all parties having filed a

notice of appearance in the Debtors' chapter 11 cases pursuant to Rule 2002 of the

Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"); and it appearing that

such notice constitutes good and sufficient notice of the Motion and Preliminary Relief

and that no other or further notice need be provided; and upon the Motion and the record

of the Procedures Hearing and all other proceedings had before the Court; and it

appearing that an order granting the Preliminary Relief is in the best interests of the

Debtor and other parties in interest; and it appearing that the Court has jurisdiction over this matter; and after due deliberation and sufficient cause appearing therefor, it is hereby

ORDERED that pursuant to Bankruptcy Rule 6004(f)(1), the Debtor is authorized to conduct the Auction of the Sale Assets and Assumed Contracts pertaining to the Detroit Market at the offices of Weil, Gotshal & Manges, LLP, 767 Fifth Avenue, New York, New York 10153 on February 5, 2003 at 10:00 a.m. (EST); and it is further

ORDERED that the Auction shall be conducted on the following terms and conditions (the "Auction Terms"):

- Initial bids for the Sale Assets must (a) be in writing; (b) at a minimum, exceed the sum of (i) the Purchase Price plus (ii) the Minimum Overbid Amount (collectively, the "Minimum Bid"); (c) be received by (i) the attorneys for the Debtors, Weil, Gotshal & Manges LLP ("WG&M"), 767 Fifth Avenue, New York, New York 10153 (Attn: Judy G. Z. Liu, Esq.), (ii) the attorneys for the Debtor's postpetition lender, Jenkens & Glichrist Parker Chapin, LLP, the Chrysler Building, 405 Lexington Avenue, New York, New York 10174 (Attn: Hollace T. Cohen, Esq. and Jennifer Saffer, Esq.); (iii) the attorneys for the statutory committee of unsecured creditors, Kramer Levin Naftalis & Frankel, 919 Third Avenue, New York, New York 10022 (Attn: Mitchell A. Seider, Esq.); (iv) the attorneys for an ad hoc committee of holders of 12¼% bonds issued by Adelphia Business Solutions, Inc., Akin, Gump, Strauss, Hauer & Feld, LLP, 590 Madison Avenue, New York, New York 10022 (Attn: Ira S. Dizengoff, Esq. and Philip C. Dublin, Esq.), by no later than 5:00 p.m. (EST) on January 28, 2003 (the "Bid Deadline"). Parties that do not submit written bids by the Bid Deadline reflecting at least the Minimum Bid will not be permitted to participate at the Auction. Bids must be accompanied by an earnest money deposit equal to the amount of the Aggregate Burn Amount,[2] the Earnest Money Deposit, and the Minimum Overbid Amount (collectively, the "Bid Deposit Amount").

---

[2] Solely for the purpose of calculating the Bid Deposit Amount, interested bidders should assume that the Aggregate Burn Amount is $420,000.

- ABSO will only entertain bids that are on the same terms (or better) and conditions as those terms set forth in the Agreement and the documents set forth as exhibits thereto (and this Order).

- All bids must constitute a good faith, bona fide offer to purchase the Sale Assets for cash only (and the assumption of the Assumed Liabilities), and shall not be conditioned on obtaining financing and/or the outcome of due diligence by the bidder.

- All bids are irrevocable until the earlier to occur of: (i) the Closing, or (ii) thirty (30) days following the last date of the Auction (as the same may be adjourned).

- As a condition to making a competing bid, any competing bidder must provide the Debtor, on or before the Bid Deadline, with sufficient and adequate information to demonstrate, to the satisfaction of the Debtor, that such competing bidder (i) has the financial wherewithal and ability to consummate the Sale Transaction, and (ii) can provide all nondebtor contracting parties to the Assumed Contracts with adequate assurance of future performance as contemplated by section 365 of the Bankruptcy Code.

- The Debtor shall, after the Bid Deadline and prior to the Auction, evaluate all bids received, including GVC's bid, and determine which bid reflects the highest or best offer for the Sale Assets (the "Pre-Auction Successful Bid"). The Debtor shall announce such determination at the outset of the Auction.

- Subsequent bids (after taking into account the Minimum Bid) at the Auction shall be made in increments of at least $25,000.00.

- Except as otherwise provided in a written offer that has been accepted by the Debtor, subject to satisfaction or waiver of the conditions to Closing set forth in the Agreement, the Closing shall take place at the offices of Weil, Gotshal & Manges LLP, promptly following entry of an order by the Court, substantially in the form annexed as Exhibit "D" to the Motion authorizing the sale of the assets related to the Detroit Market to the Successful Bidder.

- The purchase price less the Bid Deposit Amount shall be paid by the Successful Bidder (if GVC is not the Successful Bidder) by wire transfer at Closing. If for any reason the Successful Bidder fails to consummate the Sale Transaction, or any part thereof, the offeror of the second highest or best bid at the Auction for the Sale Assets will automatically be deemed to have submitted the highest

or best bid. To the extent such offeror and the Debtor consent, the Debtor and such offeror are authorized to effect the Sale Transaction as soon as is commercially reasonable without further order of the Court.

- All bids for the purchase of the Sale Assets shall be subject to approval of the Court.

- The Debtor, in its sole discretion, may reject any bid not in conformity with these Bidding Procedures, the requirements of the Bankruptcy Code, the Bankruptcy Rules, or the Local Bankruptcy Rules of the Court, or contrary to the best interests of the Debtor and parties in interest.

- No bids shall be considered by the Court unless a party submitted a competing bid in accordance with the Bidding Procedures and participated in the Auction.

- The Debtor reserves the right to change the location of the Auction and/or adjourn the Auction by announcing such adjournment at the Auction.

- The Senior DIP Lender reserves all of its rights with respect to any sale, including, without limitation, its right not to consent to any sale, to condition such consent, and to object to any sale.

- Such other terms and conditions as may be announced by the Debtor at the outset of the Auction, provided, however, that such terms and conditions are not inconsistent with the terms of the Motion and this Order. To the extent that there is any ambiguity as to what terms apply, the Motion and this Procedures Order shall control.

ORDERED that pursuant to section 363(b) of the Bankruptcy Code, the

Debtor is authorized to pay to GVC a Break-Up Fee in the amount of $50,000, plus costs

and expenses incurred by GVC (not to exceed $30,000), in the event that the Court

approves an alternative transaction and such alternative transaction actually closes; and it

is further

ORDERED that pursuant to Bankruptcy Rule 2002, notice of the proposed

Sale Transaction, Auction, and Sale Hearing shall be given in the form annexed to the

Sale Motion at Exhibit "E," on or prior to January 24, 2003, to (i) the United States

Trustee, (ii) the attorneys for the Debtor's postpetition lender, (iii) the attorneys for the

Creditors' Committee, (iv) the attorneys for an ad hoc committee of 12¼% bondholders,

(v) the attorneys for Adelphia Communications Corporation, (vi) all nondebtor

contracting parties with respect to the Assumed Contracts, (vii) all parties who have made

written expressions of interest in acquiring the Sale Assets within six (6) months prior to

the date of this Order, (viii) all appropriate federal, state and local taxing authorities, (ix)

all known persons holding a lien on any of the Sale Assets, and (x) all parties having filed

a notice of appearance in the Debtor's chapter 11 case pursuant to Bankruptcy Rule 2002,

shall constitute good and sufficient notice of the Sale Transaction, Auction, and Sale

Hearing; and it is further

ORDERED that pursuant to Bankruptcy Rule 2002(1), the Debtor is

authorized to publish once, at least seven (7) days prior to the Auction, a notice of the

Sale Transaction, Auction, and Sale Hearing, substantially in the form annexed to the

Sale Motion at Exhibit "E," in the national editions of each of the New York Times and

the Wall Street Journal; and it is further

ORDERED that pursuant to Bankruptcy Rule 2002(a)(2), (a) the Sale

Hearing shall be held on February 6, 2003, before the United States Bankruptcy Court,

Honorable Robert E. Gerber at 9:45 a.m. (EST), and (b) objections to approval of the

relief requested in the Sale Motion (other than the Preliminary Relief provided herein), if

any, shall be in writing, shall state the name of the objecting party, shall state with

particularity the reasons and basis for the objection, and shall be filed with the Court and

served upon (i) the attorneys for the Debtor, Weil, Gotshal & Manges LLP, 767 Fifth

Avenue, New York, New York 10153 (Attn: Judy G. Z. Liu, Esq.); (ii) the attorneys for

the Debtor's postpetition lender, Jenkens & Glichrist Parker Chapin, LLP, the Chrysler

Building, 405 Lexington Avenue, New York, New York 10174 (Attn: Hollace T. Cohen,

Esq. and Jennifer Saffer, Esq.); (iii) the attorneys for the statutory committee of

unsecured creditors, Kramer Levin Naftalis & Frankel, 919 Third Avenue, New York,

New York 10022 (Attn: Mitchell A. Seider, Esq.); (iv) the attorneys for an ad hoc

committee of holders of 12¼% bonds issued by Adelphia Business Solutions, Inc., Akin,

Gump, Strauss, Hauer & Feld, LLP, 590 Madison Avenue, New York, New York 10022

(Attn: Ira S. Dizengoff, Esq. and Philip C. Dublin, Esq.); (v) Global Visions

Communications, Southfield Tech Center, 21355 Melrose Avenue, Suite D, Southfield,

Michigan 48075 (Attn: Scott Aschenbrenner); and (vi) the Office of the United States

Trustee, 33 Whitehall Street, 21st floor, New York, New York 10004 (Attn: Tracy H.

Davis, Esq.), so as to be actually received by such persons no later than January 31, 2003

at 12:00 noon (EST).


Dated: New York, New York
       *January 23*, 2003

                              *S/Robert E. Gerber*_____
                              HONORABLE ROBERT E. GERBER
                              UNITED STATES BANKRUPTCY JUDGE

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re: ) | Chapter 11 |
| ) | |
| BALLY TOTAL FITNESS OF ) | |
| GREATER NEW YORK, INC., et al., ) | Case No. 07-12395 (BRL) |
| ) | |
| Debtors. ) | Jointly Administered |
| ) | |

## ORDER (A) AUTHORIZING THE DEBTORS TO ENTER INTO
## THE INVESTMENT AGREEMENT AND THE NEW RESTRUCTURING SUPPORT
## AGREEMENT AND (B) BREAK-UP FEE AND EXPENSE REIMBURSEMENT

### ("NEW RESTRUCTURING AGREEMENTS ORDER")

Upon consideration of the motion (the "**Motion**")[1] of the Debtors[2] for entry of an order (i)

authorizing the Debtors to enter into (a) the Investment Agreement and (b) the New

Restructuring Support Agreement and (ii) approving the Break-Up Fee and Expense

Reimbursement provisions set forth in the Investment Agreement; and it appearing that the relief

requested is in the best interests of the Debtors' estates, their creditors, and other parties in

interest; and it appearing that this Court has jurisdiction over this matter pursuant to 28 U.S.C. §§

157 and 1334; and it appearing that this Motion is a core proceeding pursuant to 28 U.S.C. §

---

[1]  Capitalized terms used but not defined herein shall have the same meanings ascribed to them in the Motion.

[2]  The Debtors in these proceedings are: Bally Total Fitness of Greater New York, Inc., Bally Total Fitness Holding Corporation, Bally Total Fitness Corporation, Bally ARA Corporation, Bally Fitness Franchising, Inc., Bally Franchise RSC, Inc., Bally Franchising Holdings, Inc., Bally Real Estate I LLC, Bally REFS West Hartford, LLC, Bally Sports Clubs, Inc., Bally Total Fitness Franchising, Inc., Bally Total Fitness International, Inc., Bally Total Fitness of California, Inc., Bally Total Fitness of Colorado, Inc., Bally Total Fitness of Connecticut Coast, Inc., Bally Total Fitness of Connecticut Valley, Inc., Bally Total Fitness of Minnesota, Inc., Bally Total Fitness of Missouri, Inc., Bally Total Fitness of Philadelphia, Inc., Bally Total Fitness of Rhode Island, Inc., Bally Total Fitness of the Mid-Atlantic, Inc., Bally Total Fitness of the Midwest, Inc., Bally Total Fitness of the Southeast, Inc., Bally Total Fitness of Toledo, Inc., Bally Total Fitness of Upstate New York, Inc., BTF Cincinnati Corporation, BTF Europe Corporation, BTF Indianapolis Corporation, BTF Minneapolis Corporation, BTF/CFI, Inc., BTFCC, Inc., BTFF Corporation, Greater Philly No. 1 Holding Company, Greater Philly No. 2 Holding Company, Health & Tennis Corporation of New York, Holiday Health Clubs of the East Coast, Inc., Holiday/Southeast Holding Corp., Jack La Lanne Holding Corp., New Fitness Holding Co., Inc., Nycon Holding Co., Inc., Rhode Island Holding Company, Tidelands Holiday Health Clubs, Inc., and U.S. Health, Inc.

157; and adequate notice of the Motion and opportunity for objection having been given; and it appearing that no other notice need be given; and after due deliberation and sufficient cause therefor:

**NOW, THEREFORE, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED THAT:**

1. The Motion is granted in its entirety.

2. The Debtors are authorized to execute and deliver the Investment Agreement and the New Restructuring Support Agreement, and to execute, deliver, implement and fully perform any and all obligations, instruments, documents and papers contemplated under the Investment Agreement and the New Restructuring Support Agreement.

3. The Investment Agreement and the New Restructuring Support Agreement, and each of the terms and provisions thereof are hereby approved pursuant to section 363 of the Bankruptcy Code.

4. The Breakup Fee of $10 million and the Expense Reimbursement provisions in Section 8.2 of the Investment Agreement are approved in their entirety.

5. The No Solicitation/No Shop provision in Section 6.2 is approved in its entirety.

6. The Indemnification provision in Section 9.1 is approved in its entirety.

7. The Debtors are authorized and empowered to take all actions necessary or appropriate to implement the relief granted in this Order.

8. Notwithstanding the possible applicability of Fed. R. Bankr. P. 6004(h), 7062, 9014, or otherwise, the terms and conditions of this Order shall be immediately effective and enforceable upon its entry.

CH\965277.3

9.     The requirement set forth in Rule 9013-(b) of the Local Bankruptcy Rules for the Southern District of New York that any motion or other request for relief be accompanied by a memorandum of law is hereby deemed satisfied by the contents of the Motion or otherwise waived.

10.    This Court retains jurisdiction with respect to all matters arising from or related to the implementation of this Order.

Dated: August 21, 2007
        New York, New York

                              /s/Burton R. Lifland_____
                              United States Bankruptcy Judge

CH\965277.3

# UNITED STATES BANKRUPTCY COURT
# SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| BALLY TOTAL FITNESS OF | ) | |
| GREATER NEW YORK, INC., et al., | ) | Case No. 07-12395 (BRL) |
| | ) | |
| Debtors. | ) | Jointly Administered |
| | ) | |

## ORDER (A) AUTHORIZING THE DEBTORS TO ENTER INTO
## THE INVESTMENT AGREEMENT AND THE NEW RESTRUCTURING SUPPORT
## AGREEMENT AND (B) BREAK-UP FEE AND EXPENSE REIMBURSEMENT

### ("NEW RESTRUCTURING AGREEMENTS ORDER")

Upon consideration of the motion (the "**Motion**")[1] of the Debtors[2] for entry of an order (i)

authorizing the Debtors to enter into (a) the Investment Agreement and (b) the New

Restructuring Support Agreement and (ii) approving the Break-Up Fee and Expense

Reimbursement provisions set forth in the Investment Agreement; and it appearing that the relief

requested is in the best interests of the Debtors' estates, their creditors, and other parties in

interest; and it appearing that this Court has jurisdiction over this matter pursuant to 28 U.S.C. §§

157 and 1334; and it appearing that this Motion is a core proceeding pursuant to 28 U.S.C. §

---

[1]    Capitalized terms used but not defined herein shall have the same meanings ascribed to them in the Motion.

[2]    The Debtors in these proceedings are: Bally Total Fitness of Greater New York, Inc., Bally Total Fitness
Holding Corporation, Bally Total Fitness Corporation, Bally ARA Corporation, Bally Fitness Franchising, Inc.,
Bally Franchise RSC, Inc., Bally Franchising Holdings, Inc., Bally Real Estate I LLC, Bally REFS West
Hartford, LLC, Bally Sports Clubs, Inc., Bally Total Fitness Franchising, Inc., Bally Total Fitness International,
Inc., Bally Total Fitness of California, Inc., Bally Total Fitness of Colorado, Inc., Bally Total Fitness of
Connecticut Coast, Inc., Bally Total Fitness of Connecticut Valley, Inc., Bally Total Fitness of Minnesota, Inc.,
Bally Total Fitness of Missouri, Inc., Bally Total Fitness of Philadelphia, Inc., Bally Total Fitness of Rhode
Island, Inc., Bally Total Fitness of the Mid-Atlantic, Inc., Bally Total Fitness of the Midwest, Inc., Bally Total
Fitness of the Southeast, Inc., Bally Total Fitness of Toledo, Inc., Bally Total Fitness of Upstate New York,
Inc., BTF Cincinnati Corporation, BTF Europe Corporation, BTF Indianapolis Corporation, BTF Minneapolis
Corporation, BTF/CFI, Inc., BTFCC, Inc., BTFF Corporation, Greater Philly No. 1 Holding Company, Greater
Philly No. 2 Holding Company, Health & Tennis Corporation of New York, Holiday Health Clubs of the East
Coast, Inc., Holiday/Southeast Holding Corp., Jack La Lanne Holding Corp., New Fitness Holding Co., Inc.,
Nycon Holding Co., Inc., Rhode Island Holding Company, Tidelands Holiday Health Clubs, Inc., and U.S.
Health, Inc.

157; and adequate notice of the Motion and opportunity for objection having been given; and it appearing that no other notice need be given; and after due deliberation and sufficient cause therefor:

**NOW, THEREFORE, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED THAT:**

1. The Motion is granted in its entirety.

2. The Debtors are authorized to execute and deliver the Investment Agreement and the New Restructuring Support Agreement, and to execute, deliver, implement and fully perform any and all obligations, instruments, documents and papers contemplated under the Investment Agreement and the New Restructuring Support Agreement.

3. The Investment Agreement and the New Restructuring Support Agreement, and each of the terms and provisions thereof are hereby approved pursuant to section 363 of the Bankruptcy Code.

4. The Breakup Fee of $10 million and the Expense Reimbursement provisions in Section 8.2 of the Investment Agreement are approved in their entirety.

5. The No Solicitation/No Shop provision in Section 6.2 is approved in its entirety.

6. The Indemnification provision in Section 9.1 is approved in its entirety.

7. The Debtors are authorized and empowered to take all actions necessary or appropriate to implement the relief granted in this Order.

8. Notwithstanding the possible applicability of Fed. R. Bankr. P. 6004(h), 7062, 9014, or otherwise, the terms and conditions of this Order shall be immediately effective and enforceable upon its entry.

CH\965277.3

9.    The requirement set forth in Rule 9013-(b) of the Local Bankruptcy Rules for the Southern District of New York that any motion or other request for relief be accompanied by a memorandum of law is hereby deemed satisfied by the contents of the Motion or otherwise waived.

10.    This Court retains jurisdiction with respect to all matters arising from or related to the implementation of this Order.


Dated: August 21, 2007
       New York, New York


/s/Burton R. Lifland
United States Bankruptcy Judge

CH\965277.3

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

```
------------------------------------------------------------  x
In re                                                         :
                                                              :     Chapter 11 Case No.
FOOTSTAR, INC., et al.,                                       :     04-22350 (ASH)
                                                              :
                                                              :     (Jointly Administered)
                                      Debtors.                :
------------------------------------------------------------x
```

**ORDER PURSUANT TO SECTIONS 105(a) AND 363 OF THE BANKRUPTCY
CODE AND BANKRUPTCY RULES 6004 AND 9014 AUTHORIZING AND
APPROVING (i) AUCTION PROCEDURES FOR SUBMISSION AND
ACCEPTANCE OF COMPETING BIDS FOR EMPLOYMENT OF AGENT(S)
TO CONDUCT STORE CLOSING SALES, (ii) FORM AGENCY AGREEMENT,
(iii) TIME, DATE, AND PLACE OF THE AUCTION, (iv) FORM OF NOTICE OF
THE AUCTION AND STORE CLOSING SALES, AND (iv) DEBTORS' ENTRY
INTO BREAK-UP FEE ARRANGEMENT**

Upon the motion, dated March 5, 2004 (the "Motion"), of Footstar, Inc.

and certain of its direct and indirect subsidiaries, as debtors and debtors in possession

(collectively, the "Debtors"), pursuant to sections 105(a) and 363 of the title 11 of the

United States Code (the "Bankruptcy Code") and Rules 6006 and 9014 of the Federal

Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), for an order (A) authorizing

and approving (i) certain proposed auction procedures (the "Auction Procedures") for

submission and acceptance of competing bids for employment of a liquidating agent (the

"Agent") to facilitate store closing sales (the "Store Closing Sales") at certain of the

Debtors' stores (the "Stores") (ii) the form of agency agreement (the "Agency

Agreement") to be used in connection with the Debtors' employment of the Agent(s), (iii)

the time, date, and place of the auction (the "Auction") in connection with the

employment of a Agent(s), (iv) the form of notice of the Auction and notice of the Store

Closing Sales, and (v) the Debtors' entry into a customary "break-up fee" arrangement(s)

(the "Break-Up Fee") in the event the Debtors enter into a "stalking horse" Agency

Agreement(s) prior to the Auction, and (B) scheduling a hearing (the "Final Hearing), to

be held on March 18, 2004, at which the court will consider the entry of an order

authorizing and approving (i) the Debtors entry into the Agency Agreement(s) with the

party or parties submitting the highest and best offer(s) at the Auction and (ii) the Debtors

to conduct Store Closing Sales at the Stores (the "Sale Order"), all as more fully set forth

in the Motion; and the Court having subject matter jurisdiction to consider the Motion

and the relief requested therein pursuant to 28 U.S.C. § 1334 and the Standing Order of

Referral of Cases to Bankruptcy Court Judges of the District Court for the Southern

District of New York, dated July 19, 1984 (Ward, Acting C.J.); and consideration of the

Motion and the relief requested therein being a core proceeding pursuant to 28 U.S.C.

§ 157(b); and venue being proper before this Court pursuant to 28 U.S.C. §§ 1408 and

1409; and due and proper notice of the Motion having been provided; and it appearing

that no other notice need be given; and a hearing on the Motion having been held before

the Court on March 12, 2004; and upon the record of the Hearing; and upon the evidence

adduced at the Hearing before this Court relating to the procedural relief requested in the

Motion are in the best interest of the Debtors, its estate and creditors: and upon the record

of the Hearing; and any objections filed to the Motion having been resolved, withdrawn

or otherwise overruled by this Order; and after due deliberation, and sufficient cause

appealing therefor, it is hereby

ORDERED that the Auction shall be held on March 16, 2004 at 11:00

a.m. (Eastern Time) at the offices of Weil, Gotshal & Manges LLP, 767 Fifth Avenue,

New York, New York 10153, for consideration of qualifying bids from liquidators to act

as Footstar's exclusive agent(s) in connection with the Store Closing Sales; and it is further

ORDERED that the Final Hearing shall be held before the Honorable Adlai S. Hardin, United States Bankruptcy Judge, in Room 520 of the United States Bankruptcy Court for the Southern District of New York, 300 Quarropas Street, White Plains, New York 10601, on March 18, 2004 at 10:00 a.m. (Eastern Time), or as soon thereafter as counsel may be heard; and it is further

ORDERED that the following Auction Procedures are hereby approved and shall govern the submission and acceptance of competing bids at the Auction:

- On or about March 8, 2004, the Debtors distributed to most, if not all, of the major, nationally recognized liquidation firms, including Buxbaum Group, Gordon Brothers, Great American, Hilco Retail Trading, The Nassi Group, The Ozer Group, and SB Capital (collectively, the "Interested Parties") copies of the Agency Agreement (one for the Just For Feet Stores and one for the Footaction Stores) and a due diligence package consisting of various financial data and other relevant information in connection with the Stores. In addition, the Interested Parties were provided with the opportunity to visit a certain number of the Stores to obtain information regarding the Stores and the Merchandise located therein.

- On or before March 5, 2004, the Debtors mailed the Auction and Store Closing Notice (as defined below) by overnight mail to (a) the Office of the United States Trustee for the Southern District of New York (the "U.S. Trustee"), (b) counsel to the agent for the Debtors' DIP Lenders, (c) the 20 largest unsecured creditors, (d) the Debtors' secured creditors, and (e) all parties entitled to receive notice pursuant to this Court's order, dated March 3, 2004, establishing notice procedures in these chapter 11 cases (the "Notice Procedures Order"). On or before March 8, 2004, the Debtors will mail the Auction and Store Closing Notice by overnight mail to all counterparties to the leases of the Stores.

- On or before March 11, 2004, four Interested Parties submitted an executed "clean" version of the Agency Agreement(s), together with a blackline to reflect any proposed changes to the terms and conditions of the Agency

Agreement (the "Bids").[1] Bids were submitted so that they were <u>actually received</u> by no later than 12:00 noon (Eastern Time) on March 11, 2004 by Footstar, Inc., One Crosfield Avenue, West Nyack, New York 10994 (Attn: Maureen Richards, Esq.), with a copy to Weil, Gotshal & Manges LLP, 767 Fifth Avenue, New York, New York, 10153-0119 (Attn: Martin J. Bienenstock, Esq. and Paul M. Basta, Esq.). Bids submitted are unconditional and not contingent upon any event, including, without limitation, any additional due diligence investigation or inventory evaluation. Bids will not be shared among bidders. All Bids are irrevocable until seven (7) days after the Final Hearing. The Debtors may require that all Bids be accompanied by an earnest money deposit (the "Earnest Money Down Payment") equal to 5% of the total Guaranteed Amount in the form of a certified check or wire transfer payable to Footstar, Inc. Within 24 hours of the Auction, any successful bidder must supplement the initial Earnest Money Down Payment (through certified check or wire transfer), so that the total deposit equals 10% of the winning bid. Such deposit will be held by the Debtors, without interest, until the earlier to occur of (i) the time such Bid is officially rejected by the Debtors and (ii) seven (7) days after the Final Hearing. Such deposit will be forfeited in the event that any bidder for an accepted Bid defaults. Bids that meet the foregoing conditions shall be deemed "Qualified Bids."

- Prior to the Auction and following the submission of the Bids, the Debtors, with the consent of the DIP Lenders and the statutory committee of creditors appointed in the Debtors' chapter 11 cases (the "Committee"), may enter into an Agency Agreement(s), subject to higher and better offers at the Auction, with any liquidator that submits a Qualified Bid (the "Stalking Horse Bidder") to establish a minimum Bid (the "Stalking Horse Agreement") at the Auctions for the Just For Feet Stores and the Footaction Stores. The Stalking Horse Agreement(s) may contain certain customary terms and conditions, including expense reimbursement and a break-up fee in an amount to be determined by the Debtors, with the consent of the DIP Lenders and the Committee, but in no event shall such break-up fee exceed 2% of the Guaranteed Amount.[2] Prior to the Auction,

---

[1] While bidders may suggest modifications to the Agency Agreement, any such modifications deemed by the Debtors' estates to increase the obligations or burdens upon the Debtors (such as additional conditions) will be considered by the Debtors in determining whether to accept such Bid.

[2] As used herein, the "Guaranteed Amount" shall mean the estimated amount attributable to the Merchandise (as defined in the Motion) in the Stores, as determined by the results of an inventory taking, it being expressly understood that many of the Fixtures (as defined in the Motion) located at certain of the Stores are subject to a Master Lease Agreement between one or more of the Debtors and General Electric Capital Corp. and are owned by General Electric Capital Corp. and the Debtors are not seeking to sell such Fixtures.

the Debtors will distribute the Stalking Horse Agreement(s), if any, to the parties submitting the other Qualified Bids.

- The Auction will be conducted at the offices of Weil, Gotshal & Manges LLP, 767 Fifth Avenue, New York, New York 10153 on March 16, 2004 at 11:00 a.m. Bidding at the Auction will continue until such time as the highest or otherwise best offer is determined. The Debtors may adopt rules for the bidding process that, in their judgment, in consultation with the DIP Lenders and the Committee, will better promote the goals of the bidding process and that are not inconsistent with any of the provisions of the Procedures Order. The Debtors will select the highest or otherwise best Bid(s) after consultation with counsel to the DIP Lenders and the Committee at the conclusion of the Auction, subject to Court approval, and the winning bidder(s) will be required to enter into a definitive Agency Agreement(s) (as modified by the Bids submitted at the Auction) before the Auction is adjourned.

- The Debtors request that the Final Hearing be held before the Honorable Adlai S. Hardin, United States Bankruptcy Judge, at the United States Bankruptcy Court for the Southern District of New York, 300 Quarropas Street, White Plains, New York, 10601, on March 18, 2004 at 10:00 a.m. or such other date and time that the Court establishes. By separate motion, the Debtors have requested March 15, 2004 at 12:00 noon (Eastern Time) as the objection to (i) approval of the Agency Agreement(s) and (ii) approval of the Store Closing Sales.

- **THE BID OF ANY BIDDER FAILING TO COMPLY WITH THESE REQUIREMENTS MAY NOT BE CONSIDERED BY THE DEBTORS.**

and it is further

ORDERED that payment of the Break-Up Fee, if any, paid in accordance with the terms of the Auction Procedures is hereby authorized; and it is further

ORDERED that notices of the Auction and Store Closing Sales (the "Auction and Store Closing Sales Notice") shall be deemed good and sufficient if the Debtors serve, on March 8, 2004, by first class mail, copies of the Auction and Store Closing Sales Notice on (i) all Interested Parties (as defined in the Motion) identified by the Debtors, (ii) the Office of the United States Trustee for the Southern District of New

York, (iii) counsel to the agent for the Debtors' postpetition lenders, (iii) counsel to the Committee, (iv) all parties entitled to receive notice pursuant to the Notice Procedures Order (as defined in the Motion), (v) all known entities holding or asserting a security interest in or a lien against the Debtors' merchandise (the "Merchandise"), and (vi) all counterparties to the leases of the Stores; and it is further

ORDERED that all objections to the entry of the Final Order must be in writing, shall conform to the Federal Rules of Bankruptcy Procedure and the Local Rules of the Bankruptcy Court, and shall be filed with the Bankruptcy Court electronically in accordance with General Order M-242 (General Order M-242 and the User's Manual for the Electronic Case Filing System can be found at http://www.nysb.ucourts.gov, the official website for the Bankruptcy Court), by registered users of the Bankruptcy Court's case filing system and, by all other parties in interest, on a 3.5 inch disk, preferably in Portable Document Format (PDF), WordPerfect or any other Windows-based word processing format (with a hard-copy delivered directly to Chambers), and shall be served in accordance with General Order M-242, upon (i) Weil, Gotshal & Manges LLP, 767 Fifth Avenue, New York, New York 10153 (Attn: Martin J. Bienenstock, Esq. and Paul M. Basta, Esq.); (ii) Footstar, Inc., One Crosfield Avenue, West Nyack, New York 10994 (Attn: Maureen Richards, Esq.); (iii) the Office of the United States Trustee for the Southern District of New York, 33 Whitehall Street, 21st Floor, New York, New York 10004 (Attn: Richard Morrissey, Esq.); (iv) Bingham McCutchen LLP, 150 Federal Street, Boston, Massachusetts 02110 (Attn: Robert A.J. Barry, Esq.) and Bingham McCutchen LLP, 399 Park Avenue, New York, New York 10022 (Attn: Tina Brozman, Esq. and Jennifer MacKay, Esq.); (v) Riemer & Braunstein LLP, Three Center Plaza, 6th

Floor, Boston, Massachusetts 02108 (Attn: David S. Berman, Esq.), and (vi) Kronish

Lieb Weiner & Hellman LLP, 1114 Avenue of the Americas, New York, New York

10036 (Attn: Lawrence Gottlieb, Esq, and Cathy Hershcopf, Esq.), so as to be received

no later than March 15, 2004, at 12:00 Noon (Eastern Time); and it is further

ORDERED that the Auction and Final Hearing may be adjourned, from

time to time, without further notice to creditors or parties in interest other than by

announcement of the adjournment in open Court or on the Court's calendar on the date

scheduling the Final Hearing; and it is further

ORDERED that the Debtors, in consultation with the DIP Lenders and the

Committee, are hereby authorized to take such steps and incur such expenses as may be

reasonably necessary or appropriate to effectuate the terms of this Procedures Order.

ORDERED that the requirement pursuant to Local Rule 9013-1(b) that the

Debtors file a memorandum of law in support of the Application is hereby waived.

Dated: White Plains, New York
   March 15, 2004


      /s/ Adlai S. Hardin, Jr.
      UNITED STATES BANKRUPTCY JUDGE

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------- x
In re                                              :
                                                   :    Chapter 11 Case No.
FOOTSTAR, INC., et al.,                            :    04-22350 (ASH)
                                                   :
                                                   :    (Jointly Administered)
                                  Debtors.         :
-------------------------------------------------------x

ORDER PURSUANT TO SECTIONS 105(a) AND 363 OF THE
BANKRUPTCY CODE AND BANKRUPTCY RULES 6004 AND 9014
AUTHORIZING AND APPROVING (i) AUCTION PROCEDURES IN
CONNECTION WITH THE RECEIPT, ANALYSIS, AND IMPROVEMENT
OF BIDS FOR SALE OF DEBTORS ATHLETIC BUSINESS, (ii) TIME,
DATE, AND PLACE OF THE AUCTION AND THE SALE HEARING,
(iii) FORM OF NOTICE OF THE AUCTION AND THE SALE HEARING,
(iv) FORM OF ASSET PURCHASE AGREEMENT, AGENCY
AGREEMENT AND LEASE PURCHASE AGREEMENT TO BE
USED IN CONNECTION WITH THE SOLICITATION OF BIDS, AND
(v) DEBTORS' ENTRY INTO A BREAK-UP FEE ARRANGEMENT
[Related to Doc. No. 218]

Upon the Motion, dated March 26, 2004 (the "Sale Motion"), of Footstar,

Inc. and certain of its direct and indirect subsidiaries, as debtors and debtors in possession

(collectively, the "Debtors"), pursuant to sections 105, 363, 365 and 1146 of title 11 of

the United States Code (the "Bankruptcy Code") and Rules 2002, 6004 and 6006 of the

Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), requesting (A) entry of

an order (the "Procedures Order") authorizing and approving (i) certain proposed auction

procedures (the "Auction Procedures") in connection with the receipt, analysis, and

improvement of bids on the assets of the Debtors' Athletic business (the "Bids"), (ii) the

time, date, and place of the auction (the "Auction") and the hearing (the "Sale Hearing")

to consider entry of the Sale Order (as defined below), (iii) the form of notice of the

Auction and the Sale Hearing (the "Auction and Hearing Notice"), (iv) the form of asset

purchase agreement, agency agreement, and lease purchase agreement to be used in

connection with the solicitation of Bids, and (v) the Debtors' entry into customary

"break-up fee" arrangement(s) with "stalking horse" bidder(s) that may be identified

prior to or during the Auction and (B) following the Auction and the Sale Hearing, entry

of an order (the "Sale Order"), authorizing and approving (i) the Debtors' entry into (1)

an asset purchase agreement(s), (2) an agency agreement(s) and/or (3) a lease purchase

agreement(s), (ii) the sale(s) of any assets under such asset purchase agreement, agency

agreement and/or lease purchase agreement free and clear of all liens, claims, and

encumbrances to the party or parties submitting the highest or otherwise best Bid(s) at the

Auction, and (iii) the assumption(s) and assignment(s) of any executory contracts and

unexpired leases (the "Contracts and Leases") related to the Debtors' Athletic division

stores (the "Stores"), and other related relief,[1] all as more fully set forth in the Sale

Motion; and the Court having subject matter jurisdiction to consider the Sale Motion and

the relief requested therein pursuant to 28 U.S.C. § 1334 and the Standing Order of

Referral of Cases to Bankruptcy Court Judges of the District Court for the Southern

District of New York, dated July 19, 1984 (Ward, Acting C.J.); and consideration of the

Sale Motion and the relief requested therein being a core proceeding pursuant to 28

U.S.C. § 157(b); and venue being proper before this Court pursuant to 28 U.S.C. §§ 1408

and 1409; and due and proper notice of the Sale Motion having been provided; and it

appearing that no other notice need be provided; and a hearing on the Sale Motion having

been held before the Court on April 5, 2004; and upon the record of the Hearing and the

evidence adduced at the Hearing before this Court relating to the procedural relief

requested in the Sale Motion; and such relief being in the best interest of the Debtors,

---

[1] The Debtors reserve the right to reject any agreement not to be assumed or assigned.

their estates and creditors; and any objections to the Sale Motion having been resolved, withdrawn or otherwise overruled by this Order; and an ad hoc committee of equity holders (the "Ad Hoc Equity Committee") having requested consultation rights as set forth herein and the Debtors having agreed to provide such consultation rights; and after due deliberation, and sufficient cause appearing therefor, it is hereby

ORDERED, that the Debtors may sell the assets of their Athletic segment by Auction in accordance with the Auction Procedures, which procedures are hereby approved in their entirety; and it is further

ORDERED that the Auction shall be held on April 16, 2004 at 11:00 a.m. (Eastern Time) at the offices of Weil, Gotshal & Manges LLP, 767 Fifth Avenue, New York, New York 10153, for consideration of qualifying bids in connection with the sale of the assets of the Debtors' Athletic business; and it is further

ORDERED that the following Auction Procedures are hereby approved and shall govern the submission and acceptance of competing bids at the Auction:

- On or before March 30, 2004, the Debtors distributed to all parties that the Debtors believe will be interested, or that have expressed interests in purchasing Stores on a going concern basis, acting as liquidation agent with respect to any of the Stores, or in purchasing any of the Contracts and Leases (collectively, the "Interested Parties"), a due diligence package consisting of various financial data and other relevant information in connection with the Stores, as well as an applicable Form Agreement. In addition, the Debtors will provide Interested Parties with an opportunity to visit a certain number of Stores to obtain information regarding the Stores and/or the Merchandise located therein.[2]

---

[2] It is expressly understood that some of the Fixtures (as defined in the Motion) located at certain of the Stores may be subject to a Master Lease Agreement between one or more of the Debtors and General Electric Capital Corporation ("GECC") and, if so, are owned by GECC and the Debtors are not seeking to sell such Fixtures. GECC will be provided

- Bids and Adequate Assurance Packages (as defined below) must be submitted so that they are <u>actually received</u> by no later than 12:00 noon (Eastern Time) on April 12, 2004 by Footstar, Inc., One Crosfield Avenue, West Nyack, New York 10994 (Attn: Maureen Richards, Esq.), with copies to (i) Weil, Gotshal & Manges LLP, 767 Fifth Avenue, New York, New York, 10153-0119 (Attn: Martin J. Bienenstock, Esq. and Paul M. Basta, Esq.), (ii) Abacus Advisors Group, LLC, 745 Fifth Avenue Suite 1506 New York, NY 10151 (Attn: Alan Cohen) (iii) Credit Suisse First Boston LLC, Eleven Madison Avenue, New York, NY 10010 (Attn: Philippe L. Jacob), (iv) Bingham McCutchen LLP, 399 Park Avenue New York, New York 10022 (Attn: Tina L. Brozman, Esq.), (v) Riemer & Braunstein LLP, Three Center Plaza, 6th Floor Boston, Massachusetts 02108 (Attn: David S. Berman, Esq.) and (vi) Kronish Lieb Weiner & Hellman LLP, 1114 Avenue of the Americas New York, New York 10036-7798 (Attn: Cathy Hershcopf, Esq. and Jay R. Indyke, Esq.). Any party submitting a Bid must submit an executed "clean" version of the applicable Form Agreement, together with a blackline to reflect any proposed changes to the terms and conditions of the Bids.[3] If any Bid is conditioned upon the assumption and assignment of Contracts and/or Leases, then such bidder shall be required to identify such Contracts and/or Leases to be assumed and assigned and provide evidence of its ability to provide adequate assurance of future performance of such Contracts and/or Leases along with the Bid (an "Adequate Assurance Package").

- Bids must be unconditional and not contingent upon any event, including, without limitation, any due diligence investigation, the receipt of financing and further bidding approval, including from any board of directors, shareholders or otherwise. Bids will not be shared among bidders. All Bids are irrevocable until seven (7) days after the Sale Hearing. All Bids will be accompanied by an earnest money deposit (the "Earnest Money Down Payment") equal to 2.5% of the total proposed purchase price in the form of a certified check or wire transfer payable to Footstar, Inc. Within 24 hours after the Auction, any successful bidder and any party

---

with a copy of the final bid(s) selected pursuant to the Auction to the extent such bid(s) involve stores at which GECC's Fixtures are located.

[3] While bidders may suggest modifications to the Form Agreements, any such modifications deemed by the Debtors to increase the obligations or burdens upon the Debtors (such as additional conditions) will be considered by the Debtors in determining whether to accept such Bid.

submitting the second highest or otherwise best bid must supplement the initial Earnest Money Down Payment (through certified check or wire transfer), so that the total deposit equals 5% of their winning or second highest Bid. Such deposit will be held by the Debtors, without interest, until the earlier to occur of (i) the time such Bid is officially rejected by the Debtors and (ii) seven (7) days after the Sale Hearing. Such deposit will be forfeited in the event that any bidder for an accepted Bid defaults. Bids that meet the foregoing conditions shall be deemed "Qualified Bids."

- The Assets may be sold in a single sale to a single bidder or in parts to different bidders free and clear of liens, claims and encumbrances.

- Prior to the Auction and following the submission of the Bids, the Debtors, in consultation with the DIP Lenders, the Creditors' Committee, and the Ad Hoc Equity Committee, may enter into an Asset Purchase Agreement, Agency Agreement and/or Lease Purchase Agreement subject to higher or otherwise better offers at the Auction, with one or more entities that submit Qualified Bids (the "Stalking Horse Bidder(s)") to establish a minimum Bid (the "Stalking Horse Agreement") for some or all of the Debtors' assets. The Stalking Horse Agreement(s) may contain certain customary terms and conditions, including a break-up fee (inclusive of any expense reimbursement) of up to 2% of the proposed purchase price of the assets (or, in the case of an Agency Agreement, the estimated amount attributable to the Merchandise that will be sold pursuant to such agreement) that are subject to the applicable Stalking Horse Agreement(s) (the "Purchase Price"), or with the consent of the DIP Lenders and the Creditors' Committee, up to 3% of the Purchase Price. Prior to the Auction, the Debtors will distribute the appropriate Stalking Horse Agreement(s), if any, to the parties submitting the other Qualified Bids.

- The Auction will be conducted at the offices of Weil, Gotshal & Manges LLP, 767 Fifth Avenue, New York, New York 10153 on April 16, 2004 at 11:00 a.m. Bidding at the Auction will continue until such time as the highest or otherwise best offer is determined. The Debtors may adopt rules for the bidding process that, in their judgment, in consultation with the DIP Lenders, the Creditors' Committee, and the Ad Hoc Equity Committee will better promote the goals of the bidding process and that are not inconsistent with any of the provisions of the Procedures Order. The Debtors will select the highest or otherwise best Bid(s) after consultation with the DIP Lenders, the Creditors' Committee, and the Ad Hoc Equity

Committee at the conclusion of the Auction, subject to Court approval, and the winning bidder(s) will be required to enter into definitive agreements (as modified by the Bids submitted at the Auction) before the Auction is adjourned. Upon conclusion of the Auction, the Debtors will file a notice with the Court identifying the winning bidder(s).

- The Sale Hearing will be held before the Honorable Adlai S. Hardin, United States Bankruptcy Judge, at the United States Bankruptcy Court for the Southern District of New York, 300 Quarropas Street, White Plains, New York 10601, on the following dates, as applicable:

  o on April 21, 2004 at 10:00 a.m., but only if the Auction results in the Debtors' entry into an Agency Agreement(s) to liquidate the Merchandise in any or all of the Stores; and

  o on April 26, 2004 at 10:00 a.m. in respect of approval of the sale(s) of all other assets, including Contracts and Leases.

- The Debtors, in consultation with the Creditors' Committee, the DIP Lenders, and the Ad Hoc Equity Committee, reserve the right to (i) extend the deadlines set forth in the Auction Procedures and/or adjourn the Auction at the Auction and/or the Sale Hearing in open court without further notice, (ii) withdraw any asset(s), including any Leases (the "Withdrawn Assets"), from the sale at any time prior to or during the Auction, to make subsequent attempts to market the same, and to request separate hearing(s) by this Court to approve the sale(s) of some or all of the Withdrawn Assets, (iii) reject any or all Bids if, in the Debtors' reasonable judgment, no Bid is for a fair and adequate price, and (iv) seek approval of any separate agreement to sell some or all of the Withdrawn Assets at the Sale Hearing.

- If for any reason the entity or entities that submit(s) the highest or otherwise best Bid(s) fails to consummate the purchase of the Assets, or any part thereof, the offeror of the second highest or otherwise best Bid will automatically be deemed to have submitted the highest or otherwise best Bid and to the extent such offeror and the Debtors consent, the Debtors and such offeror are authorized to effect the sale of the assets, or any part thereof, to such offeror(s) as soon as is commercially reasonable without further order of the Bankruptcy Court. If such failure to consummate the purchase is the result of a breach by the winning bidder, the Earnest Money Down Payment shall be forfeited to the Debtors and the Debtors

specifically reserve the right to seek all available damages from the defaulting bidder.

- **THE BID OF ANY BIDDER FAILING TO COMPLY WITH THESE REQUIREMENTS MAY NOT BE CONSIDERED BY THE DEBTORS, IN THEIR REASONABLE DISCRETION, AFTER CONSULTATION WITH THE DIP LENDERS, THE CREDITORS' COMMITTEE, AND THE AD HOC EQUITY COMMITTEE.**

and it is further

ORDERED that the Debtors shall provide all counterparties to Contracts and Leases (the "Counterparties") with no less than seven (7) days' notice to object (the "Cure Amount Objections") to cure amounts (the "Cure Amounts") associated with the assumption of any Contracts and Leases; and it is further

ORDERED that the Debtors shall provide the Counterparties with no less than seven (7) days' notice to object to an Adequate Assurance Package (the "Adequate Assurance Objections"), but only to the extent that the Adequate Assurance Packages relate to a Counterparty's Contract or Lease; and it is further

ORDERED that in no event shall the Cure Amount Objections and the Adequate Assurance Objections be due less than six (6) days prior to the Sale Hearing scheduled on April 26, 2004; and it is further

ORDERED that nothing herein shall prevent any Counterparty to a Lease (each a "Landlord" and collectively, the "Landlords") from submitting a credit bid (a "Credit Bid") for such Landlord's Lease(s); provided, however, that the Landlords shall only be entitled to Credit Bid up to the amount that the Debtors assert or agree is the Cure Amount with respect to any Lease; provided further, however, that, to the extent a Landlord is the winning bidder and the Debtors consummate a sale with such Landlord,

such Landlord may apply to the purchase price the Cure Amount agreed to by the Debtors or established by the Court; and it is further

ORDERED that nothing herein shall disqualify a Credit Bid as a Qualified Bid if such Landlord uses the Cure Amount asserted or agreed to by the Debtors in lieu of an Earnest Money Deposit; and it is further

ORDERED that a Landlord's Credit Bid shall be treated as an Earnest Money Down Payment and shall be subject to all provisions of the Auction Procedures, including, but not limited to, forfeiture if a Landlord defaults on its Bid; and it is further

ORDERED that payment of the Break-Up Fee, if any, paid in accordance with the terms of the Auction Procedures is hereby authorized; and it is further

ORDERED that notice of the Auction and proposed sale shall be deemed good and sufficient notice if on March 26, 2004, the Debtors serve a copy of (A) this Sale Motion, by first class mail, upon (i) all Interested Parties, (ii) the office of the United States Trustee for the Southern District of New York, (iii) the Creditors' Committee, (iv) the DIP Lenders, (v) the Debtors' secured creditors, and (vi) all other parties that have requested notice pursuant to Bankruptcy Rule 2002 and (B) the Auction and Hearing Notice upon (i) all parties to executory contracts and unexpired leases that the Debtors believe will or may be assumed and assigned, (ii) all taxing authorities whose rights may be affected by the sale of assets, (iii) all government agencies entitled to receive notice of proceedings, and (iv) the Ad Hoc Equity Committee; and it is further

ORDERED that all other objections to the entry of the Sale Order must (a) be in writing, (b) conform to the Federal Rules of Bankruptcy Procedure and the Local Rules of the Bankruptcy Court, (c) be filed with the Bankruptcy Court

electronically in accordance with General Order M-242 (General Order M-242 and the User's Manual for the Electronic Case Filing System can be found at http://www.nysb.ucourts.gov, the official website for the Bankruptcy Court), by registered users of the Bankruptcy Court's case filing system and, by all other parties in interest, on a 3.5 inch disk, preferably in Portable Document Format (PDF), WordPerfect or any other Windows-based word processing format (with a hard-copy delivered directly to Chambers), and (d) be served in accordance with General Order M-242, upon (i) Weil, Gotshal & Manges LLP, 767 Fifth Avenue, New York, New York 10153 (Attn: Martin J. Bienenstock, Esq. and Paul M. Basta, Esq.); (ii) Footstar, Inc., One Crosfield Avenue, West Nyack, New York 10994 (Attn: Maureen Richards, Esq.); (iii) the Office of the United States Trustee for the Southern District of New York, 33 Whitehall Street, 21st Floor, New York, New York 10004 (Attn: Richard Morrissey, Esq.); (iv) Bingham McCutchen LLP, 150 Federal Street, Boston, Massachusetts 02110 (Attn: Robert A.J. Barry, Esq.) and Bingham McCutchen LLP, 399 Park Avenue, New York, New York 10022 (Attn: Tina Brozman, Esq. and Jennifer MacKay, Esq.); (v) Riemer & Braunstein LLP, Three Center Plaza, 6th Floor, Boston, Massachusetts 02108 (Attn: David S. Berman, Esq.), and (vi) Kronish Lieb Weiner & Hellman LLP, 1114 Avenue of the Americas, New York, New York 10036 (Attn: Cathy Hershcopf, Esq. and Jay R. Indyke, Esq.), so as to be received no later than April 19, 2004, at 12:00 Noon (Eastern Time); and it is further

ORDERED that the Auction and/or Sale Hearing may be adjourned, from time to time, without further notice to creditors or parties in interest other than by

announcement of the adjournment in open Court or on the Court's calendar; and it is

further

ORDERED that the Debtors, in consultation with the DIP Lenders, the

Creditors' Committee, and the Ad Hoc Equity Committee are hereby authorized to take

such steps and incur such expenses as may be reasonably necessary or appropriate to

effectuate the terms of this Procedures Order; and it is further

ORDERED, that this Order shall become effective immediately upon its

entry; and it is further

ORDERED that the requirement pursuant to Local Rule 9013-1(b) that the

Debtors file a memorandum of law in support of the Application is hereby waived.

Dated: White Plains, New York
       April 5, 2004


/s/ Adlai S. Hardin, Jr.
UNITED STATES BANKRUPTCY JUDGE

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - x

In re:                                                     :    Chapter 11
                                                           :
FORTUNOFF FINE JEWELRY AND                                 :    Case No. 08-10353 (JMP)
SILVERWARE, LLC, et al.                                    :
                                                           :
                                                           :
                           Debtors.                        :    Jointly Administered

- - - - - - - - - - - - - - - - - - - - - - - - - - x

## ORDER APPROVING BREAK UP FEE

Upon the motion (the "Bid Procedures Motion") of the above-captioned debtors and

debtors-in-possession (the "Debtors") for entry of an *Order (A) Approving Bid Procedures for*

*the Debtors' Assets* (the "Assets")*, (B) Authorizing Debtors to Offer Certain Bid Protections and*

*(C) Scheduling Final Sale Hearing and Approving Form and Manner of Notice Thereof Order*

(the "Bid Procedures Order")[1]; and it appearing that the Court has jurisdiction over the Bid

Procedures Motion pursuant to 28 U.S.C. §§ 157 and 1334; and it appearing that this is a core

proceeding pursuant to 28 U.S.C. § 157(a); and the Court having held a hearing on the Bid

Procedures Motion on February 13, 2008; and the Court having issued the Bid Procedures Order

on February 15, 2008, which among other things, approved the Bid Procedures and the Expense

Reimbursement and scheduled a hearing to further consider approval of the Break Up Fee

described in the form of agreement attached to the Bid Procedures Motion for the sale of the

Assets, (the "Agreement"); and the Court having held a hearing on February 22, 2008, to

consider approval of the Break Up Fee; and it appearing that approval of the Break Up Fee is in

the best interests of the Debtors' bankruptcy estates, their creditors and other parties-in-interest;

and after due deliberation and sufficient cause appearing therefor;

---

[1]       Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Bid
Procedures Motion or the form of Agreement (as defined below), as the case may be.

THE COURT HEREBY MAKES THE FOLLOWING FINDINGS:

A.     The Break Up Fee to be paid under the circumstances described in the Agreement to H Acquisition, LLC (the "Buyer") is (i) an actual and necessary cost and expense of preserving the Debtors' estates within the meaning of sections 503(b) and 507(a)(2) of the Bankruptcy Code, (ii) commensurate to the real and substantial benefit conferred upon the Debtors' estates by the Buyer, (iii) reasonable and appropriate, in light of the size and nature of the proposed sale transaction and comparable transactions, the commitments that have been made and the efforts that have been and will be expended by the Buyer, and (iv) necessary to induce the Buyer to continue to pursue the sale transaction and to continue to be bound by the Agreement.

B.     The Break Up Fee was a component of what induced the Buyer to submit a bid that will not only serve as a minimum floor bid on which the Debtors, their creditors and other bidders may rely, but also provide the Debtors with the opportunity to sell their businesses on a "going concern" basis for the benefit of all parties.  The Buyer has provided a material benefit to the Debtors and their creditors by increasing the likelihood that the best possible price for the Assets will be received.  Accordingly, the Break Up Fee in the amount set forth in Section 5.13(c) of the Agreement is reasonable and appropriate and represents the best method for maximizing value for the benefit of the Debtors' estates.

C.     The Buyer has obtained the ABL Commitment Letter (as defined in the Agreement) such that the Sellers do not have a right to terminate under section 7.01(a)(vii) of the Agreement and the Buyer does not have a right to terminate under section 7.01(a)(viii) of the Agreement.

IT IS HEREBY ORDERED THAT:

1. The relief requested in the Bid Procedures Motion with respect to the Break Up Fee is granted as set forth herein.

2. Immediately upon entry of this Order, the provisions of Article V, Article VIII and Section 7.03 of the Agreement that refer or apply to the Break Up Fee shall be binding upon the Debtors.

3. The Break Up Fee set forth in the Agreement is hereby approved. If the Buyer becomes entitled to receive the Break Up Fee in accordance with the terms of the Agreement, then the Buyer shall be, and hereby is, granted an allowed administrative claim in the Debtors' chapter 11 cases in an amount equal to the Break Up Fee, under sections 503(b) and 507(a)(2) of the Bankruptcy Code and such Break Up Fee shall be payable immediately upon termination of the Agreement and paid in accordance with the terms set forth therein.

4. The Debtors are authorized and directed, without further action or order by the Court, to pay the Break Up Fee in accordance with the terms and conditions of the Agreement and the Bid Procedures Order.

5. Notwithstanding the possible applicability of Interim Bankruptcy Rule 6004(h) and 7062 or otherwise, the terms and conditions of this Order shall be immediately effective and enforceable upon its entry, and no automatic stay of execution shall apply to this Order.

6. This Court shall retain jurisdiction to hear and determine all matters arising from or related to the implementation of this Order.

Dated: New York, New York
      February **22**, 2008

                                **S/ JAMES M. PECK**
                                HONORABLE JAMES M. PECK
                                UNITED STATES BANKRUPTCY JUDGE

UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re: | Chapter 11 |
| G+G RETAIL, INC. | Case No. 06-10152 (RDD) |
| Debtor. | |

## ORDER PURSUANT TO 11 U.S.C. §§ 105, 363, AND 1146(c), AND FED. R. BANKR. P. 2002, 6004 AND 6006 (A) ESTABLISHING COMPETITIVE BIDDING PROCEDURES IN CONNECTION WITH THE SALE OF SUBSTANTIALLY ALL OF THE DEBTOR'S ASSETS, (B) APPROVING BID PROTECTIONS, INCLUDING BREAK-UP FEE, (C) SCHEDULING AN AUCTION AND SALE HEARING AND ESTABLISHING OBJECTION DEADLINE WITH RESPECT TO APPROVAL OF SALE AND (D) AUTHORIZING AND APPROVING FORM AND MANNER OF NOTICE OF BIDDING PROCEDURES AND SALE HEARING

Upon the motion, dated January 25, 2006 (the "Motion"),[1] of G+G Retail, Inc.

(the "Debtor"), the debtor and debtor-in-possession in the above-captioned case, for, among other

things, the entry of an order pursuant to sections 105, 363 and 1146(c) of title 11 of the United

States Code, 11 U.S.C. §§ 101-1532, as amended (the "Bankruptcy Code") and Rules 2002, 6004

and 6006 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules")

(A) establishing competitive bidding procedures in connection with the Sale of the Acquired

Assets to Rave Acquisition, Inc., or a party making a higher or better offer, (B) approving bid

protections, including the Break-Up Fee, (C) scheduling an Auction and Sale Hearing and

objection deadline and (D) authorizing and approving the Notice of Auction and Sale Hearing;

and the Court having reviewed the Motion and having heard the statements of counsel with

regard to the relief requested therein at the January 27, 2006 hearing before the Court; and the

---

[1] Each capitalized term not otherwise defined herein shall have the meaning ascribed to it in the Motion.

Court having determined that the relief requested in the Motion is in the best interests of the

Debtor, its estate, its creditors and other parties in interest; and upon the record herein; and after

due deliberation thereon; and good and sufficient cause appearing therefor, it is hereby

## FOUND AND DETERMINED THAT:[2]

A.     The Court has jurisdiction over this matter pursuant to 28 U.S.C.

§§ 157(a) and 1334 and the Standing Order of Referral of Cases to Bankruptcy Court Judges of

the District Court for the Southern District of New York, dated July 10, 1984 (Ward, Acting

C.J.).

B.     The statutory predicates for the relief sought in the Motion and the basis

for the approvals and authorizations herein are Bankruptcy Code sections 105, 363, 365 and

1146(c) and Bankruptcy Rules 2002, 6004 and 6006.

C.     This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A),

(N), and (O).

D.     Venue of this case and the Motion in this district is proper under 28 U.S.C.

§§ 1408 and 1409.

E.     Good and sufficient notice of the relief sought in the Motion has been

given under the circumstances, and no further notice is required.  A reasonable opportunity to

object or be heard regarding the relief requested in the Motion (including, without limitation,

with respect to the proposed Bidding Procedures, as defined below, and the Break-Up Fee) has

been afforded to interested persons and entities including, but not limited to:  (i) the Office of the

---

[2]  Findings of fact shall be construed as conclusions of law and conclusions of law shall be construed as findings of fact when appropriate.  See Fed. R. Bankr. P. 7052.

United States Trustee for the Southern District of New York; (ii) the top 20 unsecured creditors of the Debtor as listed by the Debtor; (iii) counsel for CIT and Madeleine; (iv) the United States Attorney's Office; (v) the Securities and Exchange Commission; (vi) counsel for the Ad Hoc Committee of Unsecured Creditors; (vii) counsel for the Postpetition Lenders; and (viii) all other parties that have filed a notice of appearance and demand for service of papers in this bankruptcy case under Bankruptcy Rule 2002, as of the filing of the Motion, as well as various lessors who appeared at the hearing (the "Bidding Procedures Notice Parties").

F.      The Debtor's proposed notice of the Bidding Procedures (as defined below), the Auction (if necessary) and the Sale Hearing, set forth in the Motion as modified on the record, is appropriate and reasonably calculated to provide all interested parties with timely and proper notice, and no other or further notice is required.

G.      The bidding procedures substantially in the form attached hereto as Exhibit A (the "Bidding Procedures") are fair, reasonable and appropriate and are designed to maximize the sale price for the Debtor and its estate given the Debtor's exigent circumstances.

H.      The Debtor has demonstrated a compelling and sound business justification for authorizing the payment of the Break-Up Fee under the circumstances, timing and procedures set forth in the Motion.

I.      The Break-Up Fee is fair and reasonable, and approval thereof is justified in light of the benefit provided to the Debtor's estate and creditors by the Sale contemplated in the Purchase Agreement, as modified on the record.

J.      The Debtor's agreement to the Break-Up Fee is in good faith and in the exercise of the Debtor's honest business judgment that such payment is in the best interest of the

Debtor, its estate and other parties in interest. Such payment, under the conditions set forth in the Motion, the Purchase Agreement and in this Procedures Order, will be (a) an actual and necessary cost of preserving the Debtor's estate, within the meaning of Bankruptcy Code section 503(b), (b) of substantial benefit to the Debtor's estate, its creditors and all parties in interest herein, (c) reasonable and appropriate and (d) necessary to ensure that the Stalking Horse Bidder will continue to pursue its proposed Purchase Agreement.

     K.     The entry of this Procedures Order is in the best interests of the Debtor, its estate, its creditors and parties in interest; and it is therefore

ORDERED, ADJUDGED AND DECREED THAT:

     1.     The Bidding Procedures attached hereto as Exhibit A are hereby approved in all respects and shall apply with respect to, and shall govern all proceedings related to, (i) the Purchase Agreement and the other Sale Documents, (ii) the Auction and the Sale and (iii) all other Transactions.

     2.     All objections to the entry of this Procedures Order or to the relief provided herein that have not been withdrawn, waived, resolved or settled, are hereby denied and overruled on the merits with prejudice.

     3.     The Debtor is hereby authorized to take any and all actions necessary or appropriate to implement the Bidding Procedures.

     4.     The notice procedures for the Auction and Sale Hearing, as described in the Motion as modified on the record, are approved in all respects, and the form of Notice of Auction and Sale Hearing, in substantially the form attached hereto as Exhibit B, is hereby approved.

5.	The Auction is scheduled for 11:00 a.m. (Eastern) on February 14, 2006 at the offices of Pachulski, Stang, Ziehl, Young, Jones & Weintraub P.C., 780 Third Avenue, 36th Floor, New York, New York 10017-2024 unless rescheduled to a later date in accordance with the Bidding Procedures.

<u>Objections to the Sale of the Acquired Assets</u>.  Any objections to the Sale of the Acquired Assets must be in writing; conform to the requirements of the Bankruptcy Code, the Bankruptcy Rules and the Local Rules of the United States Bankruptcy Court for the Southern District of New York; set forth the name of the objector; set forth the nature and amount of the objector's claims against or interests in the Debtor's estate or property; state the legal and factual basis for the objection and the specific grounds therefor; be filed with the United States Bankruptcy Court for the Southern District of New York, One Bowling Green, New York, New York 10004-1408 on or before **12:00 p.m., noon, (Eastern) on February 13, 2006**; and be served so as to be <u>received</u> by (i) undersigned attorneys for the Debtor, Pachulski, Stang, Ziehl, Young, Jones & Weintraub P.C., 780 Third Avenue, 36th Floor, New York, New York 10017-2024 (Attn: William P. Weintraub, Esq.) and Pachulski, Stang, Ziehl, Young, Jones & Weintraub P.C., 919 North Market Street, 16th Floor, Wilmington, Delaware 19801 (Attn: Laura Davis Jones, Esq.); (ii) attorneys for CIT, Hahn & Hessen LLP, 488 Madison Avenue, New York, New York 10022 (Attn: Rosanne T. Matzat, Esq. and Joshua I. Divack, Esq.); (iii) attorneys for the Proposed Purchaser, Akin, Gump, Strauss & Hauer, LLP, 590 Madison Avenue, New York, New York 10022 (Attn: Stephen Kuhn, Esq.) and Akin, Gump, Strauss & Hauer, LLP, 1111 Louisiana Street, 44th Floor, Houston, Texas 77002 (Attn:  S. Margie Venus, Esq.), and attorneys for the Post-Petition Lenders, Skadden, Arps, Slate, Meagher & Flom LLP, One Rodney Square, 7th

Floor, Wilmington, Delaware 19801 (Attn: Gregg M. Galardi, Esq.); (iv) counsel for the Office

of the United States Trustee for the Southern District of New York, Office of the United States

Trustee for the Southern District of New York, 33 Whitehall Street, 21st Floor, New York, New

York 10004 (Attn: Tracy Hope-Davis, Esq.); and (v) if an Official Committee of Unsecured

Creditors (the "Committee") is appointed, to counsel to the Committee, and if no Committee has

been appointed, to counsel for the Ad Hoc Committee of Unsecured Creditors, Otterbourg,

Steindler, Houston & Rosen, P.C., 230 Park Avenue, New York, New York 10169-0075 (Attn:

Scott L. Hazan, Esq.) no later than **12:00 p.m., noon, (Eastern) on February 13, 2006, with a**

**copy to chambers**.

      6.    The Sale Hearing to consider approval of the Debtor's entry into

and consummation of a transaction with a Successful Bidder shall be held on

February 15, 2006 at 10:00 a.m. unless rescheduled, with any hearing to consider

the assumption and assignment of specific executory contracts and unexpired

leases to take place after separate notice.

      7.    The Debtor is hereby authorized and empowered to take such

steps, expend such sums of money and do such other things as may be necessary

to implement and effect the terms and requirements established by this Procedures

Order.

      8.    The Debtor shall e-mail or mail, by overnight delivery, a copy of

this Order with the exhibits thereto to the Bidding Procedures Notice Parties and

to all persons or entities who have expressed an interest in acquiring the Debtor's

assets, on or before January 30, 2006; and shall send a copy of the Notice attached

hereto as Exhibit B to all other known creditors and parties to executory contracts and unexpired leases by regular mail on or before January 31, 2006.

9.    The Debtor shall file with the Court and upon written request from creditors provide the names of Qualified Bidders received as of the Bid Deadline.

10.    As provided by Bankruptcy Rules 6004(g) and 6006(d), this Procedures Order shall not be stayed for ten days after the entry thereof and shall be effective and enforceable immediately upon the entry thereof.

11.     This Court shall retain jurisdiction over any matters related to or arising from the implementation of this Procedures Order, including (but not limited to) the right to amend this Procedures Order.

Dated:  January 30, 2006

/s/ ROBERT D. DRAIN
United States Bankruptcy Judge

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------x

| | |
|---|---|
| In re | : |
| | : |
| | : |
| TWINLAB CORPORATION, et al., | : |
| | : |
| Debtors. | : |
| | : |

Chapter 11 Case No.

03- 15564 (CB)

(Jointly Administered)

---------------------------------------------------------------x

## ORDER (A) APPROVING BIDDING PROCEDURES FOR SUBMISSION AND ACCEPTANCE OF COMPETING BIDS, AND UNDER CERTAIN CIRCUMSTANCES, PAYMENT OF A BREAK-UP FEE AND EXPENSE REIMBURSEMENT TO IDEASPHERE, INC. AND TL ACQUISITION CORP. ; (B)  SCHEDULING BIDDING DEADLINE, AUCTION DATE AND/OR SALE HEARING DATE;  (C) ESTABLISHING PROCEDURE FOR DETERMINING CURE AMOUNTS; AND (D) FIXING NOTICE PROCEDURES AND APPROVING FORM OF NOTICE

Upon the motion, dated September 4, 2003 (the "Motion"), of Twinlab

Corporation, Twin Laboratories Inc., and Twin Laboratories (UK) Ltd., as debtors and

debtors-in-possession (collectively, "Twinlab" or the "Debtors") for, inter alia, entry of

an order (i) approving the proposed bidding procedures annexed hereto as Exhibit A for

submission and acceptance of competing bids (the "Bidding Procedures") and, under

certain circumstances, payment of a break-up fee in the amount of $2,700,000 (the

"Break-Up Fee") and expense reimbursement subject to a cap of $1,000,000 (the

"Expense Reimbursement") to Ideasphere, Inc. ("Ideasphere") and TL Acquisition Corp.

(together with Ideasphere, the "Purchasers"); (ii) scheduling a bidding deadline, auction

date, and/or sale hearing date; (iii) establishing procedure for determining cure amounts;

and (iv) fixing notice procedures and approving forms of notice; and the Court having

reviewed the Motion; and the Court having jurisdiction to consider the Motion and the

relief requested therein pursuant to 28 U.S.C. § § 157 and 1334 and the Standing Order of

Referral of Cases to Bankruptcy Court Judges of the District Court for the Southern District of New York, dated July 19, 1984 (Ward, Acting C.J.); and consideration of the Motion and the relief requested therein being a core proceeding pursuant to 28 U.S.C. § 157(b); and venue being proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409; and it appearing that notice of the Motion was good and sufficient under the circumstances and that no other or further notice need be given; and the Court having reviewed the Motion and having heard the statements in support of the relief requested therein at a hearing before the Court (the "Hearing"); and it appearing that entry of this order is in the best interests of the Debtors, their estates, and all parties in interest; and upon the Motion and the record of the Hearing and all other proceedings had before the Court; and after due deliberation and good cause appearing therefor, it is hereby

FOUND AND DETERMINED THAT:[1]

A.    The Debtors have articulated good and sufficient reasons for this Court to grant the relief requested in the Motion regarding the bidding process (the "Bidding Procedure Relief"), including the Court's (i) approval of the Bidding Procedures, (ii) approval of payment of the Break-Up Fee and Expense Reimbursement as administrative expenses in accordance with the terms of the Purchase Agreement, (iii) determination of final Cure Amounts[2] in the manner described herein, and (iv) approval of and authorization to serve the Sale Notice (as defined below).

---

[1] Findings of fact shall be construed as conclusions of law and conclusions of law shall be construed as findings of fact when appropriate. See Fed. R. Bankr. P. 7052.

[2] Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Bidding Procedures and/or the Motion.

B.    The Debtors have articulated good and sufficient reasons for, and the best interests of their estates will be served by, this Court scheduling a subsequent hearing (the "Sale Hearing") to consider whether to grant the remainder of the relief requested in the Motion, including the approval of the sale of substantially all the assets (the "Assets") of the Debtors in accordance with either (i) that certain asset purchase agreement, attached as Exhibit A to the Motion (together with all exhibits and agreements attached thereto, the "Purchase Agreement"), by and between the Debtors and the Purchasers or (ii) such other agreement that may constitute the Successful Bid, and free and clear of all liens, claims, encumbrances, and interests (with the same to attach to the proceeds therefrom) pursuant to section 363 of title 11, United States Code (the "Bankruptcy Code") (the "Transaction").

C.    The Break-Up Fee and Expense Reimbursement to be paid under the circumstances as set forth in the Purchase Agreement are (1) an actual and necessary cost and expense of preserving the Debtors' estates, within the meaning of section 503(b) of the Bankruptcy Code, (2) commensurate to the real and substantial benefit conferred upon the Debtors' estates by the Purchasers, (3) reasonable and appropriate, in light of the size and nature of the proposed Transaction and comparable transactions, the commitments that have been made, and the efforts that have been and will be expended by the Purchasers, and (4) necessary to induce the Purchasers to continue to pursue the Transaction and to continue to be bound by the Purchase Agreement.

D.    Moreover, the estates' authorization to pay the Break-Up Fee and the Expense Reimbursement is an essential inducement and condition relating to the Purchasers' entry into, and continuing obligations under, the Purchase Agreement.

Unless they are assured that each of the Break-Up Fee and the Expense Reimbursement will be made in each of the circumstances described in the Purchase Agreement, the Purchasers are unwilling to remain obligated to purchase the Assets or be otherwise bound under the Purchase Agreement (including the obligation to maintain committed to their offer while such offer is subjected to higher or otherwise better offers as contemplated by the Bidding Procedures). The Debtors' promise to pay each of the Break-Up Fee and the Expense Reimbursement has induced the Purchasers to submit a bid that will serve as a minimum or floor bid on which the Debtors, their creditors, and other bidders can rely. The Purchasers have provided a material benefit to the Debtors and their creditors by increasing the likelihood that the best possible purchase price for the Assets will be received. Accordingly, the Bidding Procedures and the Break-Up Fee are reasonable and appropriate and represent the best method for maximizing value for the benefit of the Debtors' estates.

     E.    The Purchase Agreement and its terms were negotiated by the Debtors and the Purchasers in good faith and in an arms-length manner.

     NOW THEREFORE, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED THAT:

     1.    The Bidding Procedure relief sought in the Motion is GRANTED.

     2.    The Bidding Procedures, which are incorporated herein by reference, are hereby approved and shall govern all bids and bid proceedings relating to the Assets. The Debtors are authorized to take any and all actions necessary or appropriate to implement the Bidding Procedures.

3. Payment of the Break-Up Fee and the Expense Reimbursement under the circumstances set forth and in accordance with the terms of the Purchase Agreement is hereby approved. If the Purchase Agreement is terminated for any reason and if payment of the Expense Reimbursement and/or the Break-Up Fee is triggered under the terms of the Purchase Agreement, such payments shall be made in accordance with the terms of the Purchase Agreement. The Debtors are hereby authorized and directed, without need for further order of this Court, to pay Purchasers the Break-Up Fee and Expense Reimbursement in the manner and upon the terms as set forth in the Purchase Agreement. The Break-Up Fee and Expense Reimbursement shall be paid out of the Debtors' estates, and the claim or claims of the Purchasers to payment of either or both of the Break-Up Fee and Expense Reimbursement shall constitute an allowed administrative expense claim arising under Bankruptcy Code § § 503(b) and 507(a)(1) in the Debtors' Bankruptcy Cases. If the Auction results in the selection of a Successful Bidder other than Purchasers, then the Successful Bidder and/or the Debtors are each hereby directed to immediately cause to the Break-Up Fee and the Expense Reimbursement be paid to the Purchasers directly from the proceeds associated with the sale to such Successful Bidder.

4. The deadline for (a) submitting a Qualified Bid and/or (b) objecting to (i) approval of the Transaction, including the sale of the Assets free and clear of liens, claims, encumbrances, and interests pursuant to section 363 of the Bankruptcy Code, (ii) any Cure Amount, and/or (iii) the assumption by the Debtors and assignment to Purchasers or a Successful Bidder of a Purchased Contract (as defined in Schedule 2.5(b)

of the Purchase Agreement) shall be October 20, 2003, at 4:00 p.m. (Eastern Time) (the "Bidding and Objection Deadline").

5. As further described in the Bidding Procedures, the Debtors shall conduct the Auction on October 27, 2003 if a Qualified Bid (other than Purchasers' bid) is timely received at the United States Bankruptcy Court for the Southern District of New York, 1 Bowling Green, New York, New York, 10004, Room 601.

6. The Court shall conduct the Sale Hearing on October 27, 2003, immediately following the Auction, or, if no Auction is held, at 2 p.m., at which time, the Court will consider approval of the Transaction to the Successful Bidder. In the event the Purchasers are not the Successful Bidder, non-Debtor parties to the Purchased Contracts may raise objections to adequate assurance of future performance at the Sale Hearing.

7. In order to be considered, an objection to the Transaction, to any Cure Amount, or to the assumption by the Debtors and assignment to Ideasphere of a Purchased Contract must be filed and served upon (i) Twinlab, (ii) Weil, Gotshal & Manges LLP, 767 Fifth Ave New York, New York 10153 (Attention: Michael P. Kessler, Esq.), the attorneys for Twinlab, (iii) Kramer Levin Naftalis & Frankel, 919 Third Avenue, New York, New York 10022 (Attention: Kenneth H. Eckstein, Esq.), the attorneys for Ideasphere, and (iv) the attorneys for the official committee of unsecured creditors (the "Committee") c/o Kaye Scholer LLP, 425 Park Avenue, New York, New York 10022, Attention Richard G. Smolev, Esq., prior to the Bidding and Objection Deadline and must state with specificity the nature of such objection and, if applicable, the alleged Cure Amount (with appropriate documentation in support thereof). If an objection to a Cure Amount is timely filed and served, the Debtors may schedule a

hearing to consider such objection in the event it cannot be resolved among the parties at or prior to the Sale Hearing. If no objection to the Cure Amount for the respective Purchased Contract is timely filed and served, the Cure Amount set forth in the Notice shall be binding upon the respective non-Debtor party to the Purchased Contract for all purposes in the Debtors' chapter 11 cases, and the respective non-Debtor party shall be forever barred from objecting to the Cure Amount set forth in the Notice, including, without limitation, the right to assert any additional cure or other amount with respect to their respective Purchased Contract. In the event one or more Contracts (as defined in the Purchase Agreement) are added to Schedule 2.5(b) on or before the closing of the Sale Transaction, the Debtors will serve a notice of the amended Schedule 2.5(b) on the non-Debtor parties to such Contracts, and such non-Debtor parties shall have thirteen (13) days thereafter to object to the Cure Amount, unless such period is shortened by the Court, provided, however, that the Debtors and the Purchasers (or the Successful Bidder) shall be deemed to have reserved their right to reject an executory contract until such time as the Cure Amount is fixed and accepted.

8.     The effective date of any assumption and assignment of any Purchase Contract shall be the date on which the Sale closes. Accordingly, any Cure Amounts to be paid under any Purchase Contract will also be paid upon the closing of the Sale or as soon thereafter as the Cure Amount is fixed by the Court or agreed upon by the parties.

9.     As further described in the Bidding Procedures, no bid or bids shall be a Qualified Bid, or otherwise considered for any purposes, unless such bid has a cash component of at least an amount equal to the sum of (a) the cash component of

Purchasers' Bid, plus (b) the Break-Up Fee, plus (c) the Expense Reimbursement, plus (d) such portion of the $3,700,000 of Liabilities constituting Employee and Related Liabilities to the extent the Qualified Bid does not propose to assume all or any portion of such liabilities plus (e) in the case of the initial Qualified Bid, two million dollars ($2,000,000).

10.     The notices described in subparagraphs (a)-(c) below (collectively, the "Sale and Auction Notices") shall be good and sufficient, and no other or further notice shall be required if given as follows:

a.     The Debtors serve, within three (3) days after entry of the Bidding Procedures Order (the "Mailing Deadline"), by first-class mail, postage prepaid, copies of the Bidding Procedures Order and the Motion (to the extent not previously served) upon: (i) counsel to the Committee, Kaye Scholer LLP, (ii) CIT, (iii) Zions, (iv) any party who, in the past three years, expressed in writing to the Debtors an interest in the Assets, and who the Debtors and its representatives reasonably and in good faith determine potentially have the financial wherewithal to effectuate the transaction contemplated in the Purchase Agreement, (v) all parties who are known to claim interests in or liens upon the Assets, (vi) the Securities and Exchange Commission, (vii) the Internal Revenue Service, (viii) all applicable state attorneys general, local realty enforcement agencies, and local regulatory authorities, (ix) all applicable state and local taxing authorities, (x) all known holders of any actual or potential product liability claims against the Debtors; (xi) the U.S. Trustee; (xii) the counter parties to the Assumed Contracts; and (xiii) the entities set forth in the Debtors' Master Service List established pursuant to that certain Order Establishing Notice Procedures, dated September 13, 2003; and

b.     On or before the Mailing Deadline, the Debtors (or their agent) serves by first-class mail, postage prepaid, a notice of the auction and sale hearing (the "Sale Notice"), substantially in the form annexed to the Motion as Exhibit D, upon all other known creditors and equity security holders of the Debtors.

c.     On the Mailing Deadline, or as soon as practicable thereafter, the Debtors will publish the Sale Notice in The Wall Street Journal (National Edition ) and The New York Times (National Edition).

11.     The failure of any objecting person or entity to timely file its objection shall be a bar to the assertion, at the Sale Hearing or thereafter, of any objection to the Motion, or the consummation and performance of the Transaction contemplated by the Purchase Agreement, or an agreement with the Successful Bidder, if any (including the transfer free and clear of all liens, claims, encumbrances, and interests of each of the Assets transferred as part of the Transaction).

12.     The Court shall retain jurisdiction over any matter or dispute arising from or relating to the implementation of this Order.  The Debtors are hereby authorized and empowered to take such steps, expend such sums of money, and do such other things as may be necessary to implement and effect the terms and requirements of this Order.  Notwithstanding Bankruptcy Rules 6004(g) and 6006(d), this Order shall not be stayed for ten (10) days after the entry hereof and shall be effective and enforceable immediately upon signature hereof.

13.     The Sale Approval Hearing may be adjourned from time to time without further notice to creditors or parties in interest other than by announcement of the adjournment in open Court or on the Court's calendar on the date scheduled for the Sale Approval Hearing or any adjourned date, provided that nothing herein shall be determined to prejudice any rights or remedies of Purchasers contained in the Purchase Agreement.

Dated:     September 25, 2003
           New York, New York

                              /s/ Cornelius Blackshear
                              UNITED STATES BANKRUPTCY JUDGE