**BINGHAM McCUTCHEN LLP**
Jeffrey S. Sabin
399 Park Avenue
New York, NY 10022-4689
(212) 705-7000

-and-

Sabin Willett (*pro hac vice*)
Andrew J. Gallo (*pro hac vice*)
One Federal Street
Boston, MA 02110
(617) 951-8000

*Proposed Counsel for the Official
  Committee of Unsecured Creditors*

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re | Chapter 11 Case No. |
| BEARINGPOINT, INC., *et al.*, | 09-10691 (REG) |
| Debtors. | (Jointly Administered) |

**OBJECTION OF OFFICIAL COMMITTEE OF UNSECURED CREDITORS OF BEARINGPOINT, INC., *ET AL.*, TO EXPEDITED MOTION [DOC. NO. 272] OF THE DEBTORS PURSUANT TO BANKRUPTCY RULES 2002(A)(2) AND 9006(C) TO SHORTEN TIME WITH RESPECT TO HEARING ON DEBTORS' MOTION [DOC. NO. 271] TO ESTABLISH BID PROCEDURES AND FOR RELATED RELIEF**

The Official Committee of Unsecured Creditors of BearingPoint, Inc., et al. objects to the Debtors' Motion (Docket No. 272, the **"*Expedition Motion*"**) to shorten the notice period and fix the date and time for an expedited hearing on the *Motion for Orders pursuant to Sections 363(b), (f), and (m), 365 and 105(a) of the Bankruptcy Code and Bankruptcy Rules 2002, 6004, 6006, and 9014 For (i) Approval of Procedures in Connection with the Sale of Certain of the Debtors' Assets Free and Clear of Liens, Claims, Encumbrances, and Interests, (ii) Authorization to Enter Into a Stalking Horse Agreement in Connection Therewith, (iii) Approval of the Payment of Stalking Horse Protections, (iv) Approval of the Stalking Horse*

*Agreement, (v) Authorization to Sell Certain of the Debtors' Assets, (vi) the Setting of Related Auction and Hearing Dates, (vii) Authorization to Enter into an Allocation Agreement, and (viii) Approval of Procedures Related to Assumption and Assignment of Executory Contracts and Unexpired Leases and Approving the Form and Manner Thereof* (Docket No. 271, the "**Bidding Procedures Motion**"). As grounds, the Committee respectfully states:

## THE REQUEST FOR EXPEDITION

1. Bankruptcy Rules 2002(a)(2) and 9006(c)(1) authorize this Court to reduce the notice period required for a hearing, but only where cause is shown.

2. The hearing sought here is a potential game changer. If granted, the Bidding Procedures Motion may set these cases irrevocably on a path from which there is no return.

3. In the Bidding Procedures Motion the Debtors ask to approve a "stalking horse" agreement (the "**Stalking Horse Agreement**") with Deloitte LLP (**"Deloitte"**), pursuant to which Deloitte would purchase substantially all of the valuable assets in BearingPoint's cornerstone Public Services Industry Group (the "**PS Group**"). If approved, the expedited sale would eliminate any prospect of a significant balance-sheet restructuring, and inevitably propel the debtors into dismemberment through a series of discrete asset sales.

4. The Stalking Horse Agreement contains the familiar provision according to buyer a default power if the sale falls off of an arbitrary schedule. Deloitte *may* terminate the agreement if an order approving the Bidding Procedures Motion is not entered by April 6, 2009, or if an order approving a sale of the assets is not entered by April 23, 2009. No business-related significance to these particular dates has been explained.

5. This provision is the only cause recited in the Expedition Motion.

2

# THE EXPEDITION SOUGHT IS UNWARRANTED
# AND MAY HARM THE ESTATES

**A.     Lack of Cause.**

6.     As "cause," the Expedition Motion proffers only the routine provision described above, according to the buyer a discretionary termination right.  This is boilerplate in bankruptcy sales.  Stalking-horse bidders generally seek to mitigate the risk of an overbid through arbitrary deadlines.  What would be unusual, however, would for a bidder like Deloitte to exercise that right in the context of the limited additional time sought here.  The Committee understands Deloitte to have invested substantial time and money in the due diligence process.  Arbitrary abandonment of the transaction would abandon its own self interest.  Deloitte, as a seasoned and experienced commercial actor (represented in this case by savvy restructuring counsel at the Kramer Levin firm) understands that bankruptcy courts require parties in interest to be given a fair opportunity to assess what is happening.  Such actors generally build sufficient play into their contractual arrangements to survive the Court's blue pencil.  Nothing indicates that is not the case here.

7.     The Expedition Motion recites no other reason for haste.  The PS Group remained intact through a roiled pre-petition period and has continued for a month in chapter 11; earlier in March, its division head announced that business prospects were good.  The company was "operating as business as usual," he said, and it expected to file "restructuring documents by the end of [March], and the process should take about 90-105 days."[1]  A few more weeks is not going to affect that group in any perceptible way.  The most recent cash reporting shows the

---

[1] Brian Drew, *BearingPoint Past the Bankruptcy*, Federal News Radio, March 3, 2009, http://www.federalnewsradio.com/?nid=35&sid=1615545.

company meeting its budget. It continues to have ample cash to service its operational needs without the need for Debtor-in-possession financing.

**B.      There is Substantial Risk That the Expedited Proceedings May Harm the Interests of Creditors.**

8.      Debtors assert that in the pre-petition period, "[a]n extensive sale process was initiated during which approximately 25 strategic and financial buyers expressed an interest in buying all or parts of BearingPoint." Expedition Motion ¶ 3. Certainly the process was long, but it was characterized by the debtors' refusal, ironically enough, to entertain the very process of marketing components of the business that they now pursue. At the time many creditors thought the refusal to proceed with an *orderly* sale process for discrete business units severely limited value. As they predicted, "[t]he proposals that BearingPoint received in connection with those efforts either provided insufficient value or appeared impractical." *Id*.

9.      Then the Debtors reversed field. These cases were filed in February with the announcement of a consensual restructuring plan with the secured lenders. Arm in arm, they described a restructuring under which the senior lenders would receive both a fully-performing secured note and control -- through a preferred stock issue -- of the reorganized debtors. Its purpose was transparent: to give the lenders the unfettered power to arrange a quick, post-exit sale, outside the noisome scrutiny of a bankruptcy court.

10.      The Debtors filed, and then on March 2 amended this plan. At the same time, without motion or Court authorization, the Debtors launched a hasty asset-marketing effort. Interested parties were hurried to a data room and pressed to cobble together bids. The Debtors' purpose was unclear, but it appears to have been in part tactical, to meet an anticipated plan objection that the assets had not been marketed, and in larger part to seed the marketplace so that the Senior Lenders could achieve a quick sale immediately upon exit.

11. Then the Debtors reversed field again, when the results, although in the Committee's view far short of enterprise value, were sufficient to suggest an even quicker exit for the lenders. Suddenly and abruptly the Debtors suspended their disclosure statement hearing, and sought rapidly to sell off the company's components under section 363 of the Bankruptcy Code.

12. A great deal of this disorderly process remains opaque to the Committee, including:

   a. The extent to which it has been guided, if not controlled, by the Senior Lenders,

   b. The extent to which arrangements have been agreed, formally or informally, between Deloitte and key management, and

   c. The extent to which the accelerated timetable degraded the values achieved.

13. The Committee has sought, but has not been provided with (a) conference calls or meetings with bidders for the PS Group in order to explore interest levels, time needed to complete diligence, and the level of cooperation from the Debtors and their advisors, (b) schedules of the contracts to be excluded from the sale, percentage of these contracts that are completed, the Debtors' costs associated with performing these contracts, and any determination that has been made with respect to the Debtors' assumption or rejection of these contracts, (c) new cash projections that extend through June 15th, and (d) any analysis of the tax consequences of the sale, or alternatives that may be more tax efficient.

14. Various Committee members and their advisors have received reports from disappointed bidders to the effect that, despite their efforts and expressed interest, (a) the

Debtors have not engaged with them at all, (b) there was insufficient time to complete their diligence, and/or, (c) given the tight time schedule, which was solely legislated by the Debtors, the Debtors would not be able to provide sufficient access to key personnel to support an orderly diligence and evaluation process. While sour grapes are an inevitable course in the diet of any accelerated sale, there has been insufficient time to test whether these complaints are more than that, and instead reflect a real skewing of the process toward a bidder favored by management, and a timeframe favored by the Senior Lenders.

15. The Committee has today served document requests and noticed depositions related to the relief urgently requested with regard to the new, expedited sale plans. We have been forced by the Debtors' calendar to schedule depositions for Thursday and Friday, but that gives neither party a fair opportunity to prepare, and the Committee no meaningful opportunity to address the Court with a presentation regarding the Bidding Procedures Motion.

16. The Committee would consent to an extension of an additional week for hearing on the bid procedures, provided that its expedited discovery requests can be met in that time.[2]

---

[2] The Committee is concerned regarding various aspects of the proposed bidding procedures set forth in the Bidding Procedures Motions, including, without limitation, the accelerated schedule between approval of the procedures and the auction . The Committee reserves all rights to raise its concerns and objections regarding the proposed bidding procedures in its objection to the Bid Procedures Motion at the hearing on that motion.

A/72914065.5

WHEREFORE, the Committee requests that the Court (i) deny the Expedition Motion, (ii) schedule the Bid Procedures Motion should to be heard on April 8, 2009, with objections thereto due by April 6, 2008 and (iii) grant such other and further relief as it deems just and proper.

Dated: March 24, 2009
      New York, New York

                             **BINGHAM McCUTCHEN LLP**

By: /s/ Jeffrey S. Sabin
Jeffrey S. Sabin
jeffrey.sabin@bingham.com
399 Park Avenue
New York, NY 10022
Tel: (212) 705-7000
Fax: (212) 752-5378

-and-

Sabin Willett
sabin.willett@bingham.com
Andrew J. Gallo
andrew.gallo@bingham.com
One Federal Street
Boston, MA 02110
Tel: (617) 951-8000
Fax: (617) 951-8736

*Proposed Counsel for the Official*
   *Committee of Unsecured Creditors*