Proposed Hearing Date for CS Bidding Procedures Hearing: April 27, 2009 at 9:45 a.m. (Eastern Time)
Proposed Objection Deadline for CS Bidding Procedures Hearing: April 23, 2009 at 4:00 p.m. (Eastern Time)
Proposed Date of Auction: May 27, 2009 at 10:00 a.m. (Eastern Time)
Proposed Sale Approval Hearing: May 28, 2009 at a time to be set by the Court
Proposed Objection Deadline as to Sale: May 18, 2009 at 12:00 p.m. (Eastern Time)
Objections to the Auction and the Selection of the Successful Bidder: To be interposed at the Sale Hearing

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Marcia L. Goldstein
Joseph H. Smolinsky

WEIL, GOTSHAL & MANGES LLP
700 Louisiana Street, Suite 1600
Houston, Texas 77002
Telephone: (713) 546-5000
Facsimile: (713) 224-9511
Alfredo R. Pérez

Attorneys for Debtors
and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------------x
: 
<u>In re</u>                                                 :        **Chapter 11 Case No.**
: 
**BEARINGPOINT, INC., <u>et</u> <u>al</u>.,**               :        **09 - 10691 (REG)**
: 
    **Debtors.**                                           :        **(Jointly Administered)**
: 
---------------------------------------------------------------x

**DEBTORS' MOTION FOR ORDERS PURSUANT TO SECTIONS 363(b), (f), AND (m),
365 AND 105(a) OF THE BANKRUPTCY CODE AND BANKRUPTCY RULES
2002, 6004, 6006, AND 9014 FOR (i) APPROVAL OF PROCEDURES IN
CONNECTION WITH THE SALE OF CERTAIN COMMERCIAL SERVICES GROUP
ASSETS AND RELATED ASSETS FREE AND CLEAR OF LIENS, CLAIMS,
ENCUMBRANCES, AND OTHER INTERESTS, (ii) AUTHORIZATION TO ENTER
INTO A STALKING HORSE AGREEMENT IN CONNECTION THEREWITH, (iii)
AUTHORIZATION TO COMPLY WITH PRE-CLOSING COVENANTS, (iv)
APPROVAL OF THE PAYMENT OF STALKING HORSE PROTECTIONS, (v)
APPROVAL OF ASSET PURCHASE AGREEMENT, (vi) AUTHORIZATION TO SELL
CERTAIN OF THE DEBTORS' ASSETS, (vii) APPROVAL OF THE FORM AND
MANNER OF NOTICE OF SALE OF ASSETS; (viii) THE SETTING OF RELATED
AUCTION AND HEARING DATES, AND (ix) APPROVAL OF PROCEDURES
RELATED TO ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS
<u>AND UNEXPIRED LEASES AND THE FORM AND MANNER THEREOF</u>**

# TABLE OF CONTENTS

**Page**

Relief Requested ........................................................................................................................ 1

Sale of Assets ........................................................................................................................... 3

I. THE CS STALKING HORSE AGREEMENT ....................................................................... 5

II. CS BIDDING PROCEDURES ORDER ............................................................................... 9

    A. Form of Asset Purchase Agreement for Qualified Bid ............................................... 9

    B. The CS Bidding Procedures ..................................................................................... 9

    C. Notice Procedures .................................................................................................. 12

    D. Assumption and Assignment of Executory Contracts and Unexpired Leases .......... 14

III. APPLICABLE AUTHORITY ........................................................................................... 16

    A. A Sale of The Debtors' Assets Under Section 363 of the Bankruptcy Code is
       Warranted ............................................................................................................. 16

    B. Sale of Assets Free and Clear of Liens, Claims, Encumbrances and Interests .......... 18

    C. The Successful Bidder Should be Afforded All Protections Under  Section
       363(m) as a Good Faith Purchaser ...................................................................... 21

    D. The Stalking Horse Protections Should be Approved ............................................... 22

    E. The Debtors' Compliance with Their Pre-Closing Obligations Should Be
       Authorized ........................................................................................................... 26

    F. The CS Bidding Procedures are Reasonable and Appropriate .................................. 26

    G. Assumption and Assignment of Executory Contracts and Unexpired Leases .......... 27

    H. The Court Should Waive or Reduce the Periods Required By Rules 6004(h)
       and 6006(d) of the Federal Rules of Bankruptcy Procedure ............................... 28

Jurisdiction ............................................................................................................................. 29

Notice .................................................................................................................................... 30

## Exhibits

Exhibit A        Proposed CS Bidding Procedures Order
Exhibit B        CS Bidding Procedures
Exhibit C        CS Stalking Horse Agreement
Exhibit D        Proposed CS Sale Notice
Exhibit E        Contract Procedures
Exhibit F        Contract Notice
Exhibit G        Cited Orders

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

In re Abbotts Dairies of Penn., Inc., 788 F.2d 143 (3d Cir. 1986) ................................................21

Allstate Insurance Co. v. Hughes, 174 B.R. 884 (S.D.N.Y. 1994) ................................................21

America Living Systems v. Bonapfel (In re All America of Ashburn, Inc.), 56 B.R. 186
(Bankr. N.D. Ga. 1986), aff'd, 805 F.2d 1515 (11th Cir. 1986) ........................................20

In re Betty Owens Sch., Inc., 1997 WL. 188127 (S.D.N.Y. 1997) ................................................18

In re Bon Ton Restaurant & Pastry Shop, Inc., 53 B.R. 789 (Bankr. N.D. Ill. 1985) ..................27

In re Bygaph, Inc., 56 B.R. 596 (Bankr. S.D.N.Y. 1986) ..............................................................27

COR Route 5 Co., LLC v. The Penn Traffic Co. (In re The Penn Traffic Co.),
524 F.3d 373 (2d Cir. 2008) .................................................................................................27

Carlisle Homes, Inc. v. Arrari (In re Carlisle Homes, Inc.), 103 B.R. 524
(Bankr. D. N.J. 1989) ............................................................................................................27

In re Chateaugay Corp., 973 F.2d 141 (2d Cir. 1992) ..................................................................17

In re Chateaugay Corp., 1993 WL 159969 (S.D.N.Y. 1993) ........................................................21

Circus Time, Inc. v. Oxford Bank & Trust (In re Circus Time, Inc.), 5 B.R. 1
(Bankr. D. Me. 1979) .............................................................................................................19

Citicorp Homeowners Serv., Inc. v. Elliot (In re Elliot), 94 B.R. 343 (E.D. Pa. 1988) ...............20

Committee of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.),
722 F.2d 1063 (2d Cir. 1983) ................................................................................................17

In re Decora Industrial, Inc., Case No. 00-44591, 2002 WL 32332749
(D. Del. May 20, 2002) .........................................................................................................18

In re Delaware and Hudson Railway Co., 124 B.R. 169 (D. Del. 1991) ......................................18

In re Enron Corp., 2003 WL 21755006 (AJG) (Bankr. S.D.N.Y. 2003) ......................................20

In re Fleming Cos., 499 F.3d 300 (3d Cir. 2007) ..........................................................................27

Futuresource LLC v. Reuters Ltd., 312 F.3d 281 (7th Cir. 2002) ................................................19

# TABLE OF AUTHORITIES
## (continued)

Page(s)

Hargrave v. Township of Pemberton (In re Tabone, Inc.), 175 B.R. 855
(Bankr. D.N.J. 1994)..............................................................................................20

MacArthur Co. v. Johns-Manville Corp., 837 F.2d 89 (2d Cir. 1988) ........................19

In re Natco Industrial, Inc., 54 B.R. 436 (Bankr. S.D.N.Y. 1985) ..............................27

Official Committee of Sub. Bondholders v. Integrated Resources, Inc.
(In re Integrated Resources, Inc.), 147 B.R. 650 (S.D.N.Y. 1992),
appeal dismissed, 3 F.3d 49 (2d Cir. 1993) ......................................................17

In re Riverside Investment Partnership, 674 F.2d 634 (7th Cir. 1982)..........................19

Rubinstein v. Alaska Pacific Consortium (In re New England Fish Co.),
19 B.R. 323 (Bankr. W.D. Wash. 1982).............................................................21

In re Stein & Day, Inc., 113 B.R. 157 (Bankr. S.D.N.Y. 1990) ...................................21

In re Trans World Airlines, Inc., 322 F.3d 283 (3d Cir. 2003).....................................20

In re Vitanza, 1998 WL 808629 (Bankr. E.D. Pa.  1998)..............................................28

## Statutes

11 U.S.C. § 363(b) ...............................................................................2, 3, 17, 21

11 U.S.C. § 363(m) ........................................................................................21, 22

11 U.S.C. § 365(f)(2) ............................................................................................27

28 U.S.C. §§ 1334..................................................................................................29

28 U.S.C. §§ 1408..................................................................................................29

28 U.S.C. §§ 1409..................................................................................................29

28 U.S.C. §§ 157....................................................................................................29

## Rules

Fed. R. Bankr. P. 6004(f)(1) .................................................................................17

Fed. R. Bankr. P. 6004(h) ................................................................................28, 29

Fed. R. Bankr. P. 6006(d) ...........................................................................................29, 30

**Bankruptcy Case Orders**

In re Adelphia Business Solutions, Inc., et al., Ch. 11 Case No. 02-11389 (Bankr.
S.D.N.Y. Dec. 16, 2002) (REG) [Docket No. 760] .......................................................23

In re Adelphia Business Solutions, Inc., et al., Ch. 11 Case No. 02-11389 (Bankr.
S.D.N.Y. Jan. 23, 2003) (REG) [Docket No. 833] .......................................................23

In re Bally Total Fitness of Greater New York, Inc., Ch. 11 Case No. 07-12395 (BRL)
(Bankr. S.D.N.Y. Aug. 21, 2007) [Docket No. 269] .............................................23, 24

In re Footstar, Inc. Ch. 11 Case No. 04-22350 (ASH) (Bankr. S.D.N.Y. Mar. 15, 2004)
[Docket No. 154] .........................................................................................................23

In re Footstar, Inc.. Ch. 11 Case No. 04-22350 (ASH) (Bankr. S.D.N.Y. Apr. 6, 2004)
[Docket No. 316] .........................................................................................................23

In re Fortunoff Fine Jewelry and Silverware, LLC, Ch. 11 Case No. 08-10353 (JMP)
(Bankr. S.D.N.Y. February 22, 2008) [Docket No. 190].............................................23

In re G+G Retail, Inc., Ch. 11 Case No. 06-10152 (RDD) (Bankr. S.D.N.Y. Jan. 30,
2006) [Docket No. 58] .................................................................................................23

In re Twinlab Corp., et al., Ch. 11 Case No. 03-15564 (RDD) (Bankr. S.D.N.Y. Sept. 26
2003) [Docket No. 81] .................................................................................................23

TO THE HONORABLE ROBERT E. GERBER
UNITED STATES BANKRUPTCY JUDGE:

BearingPoint, Inc. ("**BE**") and certain of its affiliates, as debtors and debtors in

possession in the above-captioned chapter 11 cases (collectively, the "**Debtors**," and together

with their non-debtor affiliates, "**BearingPoint**"),[1] seek this Court's approval of (i) the proposed

bidding procedures pursuant to which the Debtors will conduct an auction for all or certain of

their assets and (ii) the sale of such assets, and respectfully represent:

### Relief Requested

1.       By this Motion, the Debtors seek entry of two orders:

(a)       The Debtors request entry of an order, substantially in the form

attached hereto as Exhibit A (the "**CS Bidding Procedures Order**"), (i) approving procedures

(the "**CS Bidding Procedures**," the form of which is attached hereto as Exhibit B) for submitting

bids for certain of BearingPoint's Commercial Services Group (the "**CS Group**") assets and

related assets, as further described herein and in the CS Bidding Procedures, (the "**CS Bid**

**Assets**"); (ii) approving the "stalking horse" agreement (the "**CS Stalking Horse Agreement**[2],"

which contains the "**Stalking Horse Bid**"), attached hereto as Exhibit C, with

PricewaterhouseCoopers LLP, ("**PwC**" or the "**CS Stalking Horse Bidder**") for the sale of the

CS Bid Assets, subject to the outcome of the auction (the "**CS Auction**"); (iii) authorizing the

Debtors to, when and if payable pursuant to the terms and conditions of the CS Stalking Horse

---

[1] More information regarding the Debtors' business, their pre-arranged restructuring plan, and the background of these chapter 11 cases, including information on BearingPoint's efforts to sell all or a portion of its assets prior to the filing of these chapter 11 cases can be found in the Declaration of John DeGroote Pursuant to Rule 1007-2 of the Local Bankruptcy Rules for the Southern District of New York in Support of First-Day Motions and Applications, filed on February 18, 2009, the date the Debtors filed their chapter 11 petitions (the "**Commencement Date**").

[2] The GDC China Equity (as defined in the CS Stalking Horse Agreement) will be sold pursuant to the GDC China Subsidiary Agreement (as defined in the CS Stalking Horse Agreement) or a substantially similar agreement to be executed by a Successful Bidder other than PwC. A copy of the GDC China Subsidiary Agreement is attached hereto as Exhibit C-1.

Agreement, (A) pay PwC a fee (the "**_Termination Fee_**") of $750,000 (i.e. 3.0% of the Cash Purchase Price (as defined in the CS Stalking Horse Agreement) of $25,000,000); and (B) reimburse PwC for its reasonable and documented out-of-pocket costs and expenses incurred in connection with the CS Stalking Horse Agreement, in an amount not to exceed $500,000 (the "**_Expense Reimbursement_**," and together with the Termination Fee, the "**_Stalking Horse Protections_**"); (iv) authorizing, but not directing, the Debtors to comply with the Pre-Closing Obligations (as defined below), (v) approving procedures (the "**_Contract Procedures_**") for the assumption and assignment of contracts and leases (the "**_Contracts_**") to any purchaser(s) of the Debtors' CS Bid Assets, and/or to resolve any objections thereto; (vi) scheduling the CS Auction for May 27, 2009 and a hearing to approve any sale of CS Bid Assets (the "**_CS Sale Approval Hearing_**") with respect to any higher or otherwise better bid(s) accepted by the Debtors on May 28, 2009; and (vii) approving the form and manner of the notice, substantially in the form annexed hereto as <u>Exhibit D</u> (the "**_CS Sale Notice_**"), of the CS Auction and the CS Sale Approval Hearing.

(b)     At the CS Sale Approval Hearing, the Debtors will request entry of an order (the "**_CS Sale Order_**"), pursuant to sections 363(b), (f), and (m), 365, and 105(a) of title 11 of the United States Code (the "**_Bankruptcy Code_**") and Rules 6004, 6006, and 9014 of the Federal Rules of Bankruptcy Procedure (the "**_Bankruptcy Rules_**") approving (i) the Asset Purchase Agreement(s) (as defined below) with the party or parties submitting the highest and best bids (as defined below); and (ii) the CS Sale(s) (as defined below).[3]

---

[3] As soon as practicable after the conclusion of the Auction, but no later than before the Sale Approval Hearing, the Debtors shall file a form of order approving the Sale as agreed upon between the Debtors and the Successful Bidder(s) (as defined below).

**Sale of Assets**

2.      In 2008, BearingPoint embarked on a comprehensive restructuring effort, including exploring various strategic alternatives, such as a transaction involving a sale of all or a portion of BearingPoint's assets.  An extensive sale process was initiated during which approximately 25 strategic and financial buyers expressed an interest in buying all or parts of BearingPoint.  The proposals that BearingPoint received in connection with those efforts either provided insufficient value or appeared impractical.  As a result, the Debtors filed for chapter 11 relief.

3.      Following the Commencement Date, BearingPoint continued to explore strategic transactions for the purpose of maximizing value for all parties in interest. BearingPoint initiated a sales process during which a number of potential buyers expressed interest in all or a portion of BearingPoint's assets.  For example, on March 23, 2009, the Debtors filed their *Motion for Orders Pursuant to Sections 363(b), (f), and (m), 365 and 105(A) of the Bankruptcy Code and Bankruptcy Rules 2002, 6004, 6006, and 9014 for (i) Approval of Procedures in Connection With The Sale of Certain of the Debtors' Assets Free and Clear of Liens, Claims, Encumbrances, and Interests, (ii) Authorization to Enter into a Stalking Horse Agreement in Connection Therewith, (iii) Approval of the Payment of Stalking Horse Protections, (iv) Approval of the Stalking Horse Agreement, (v) Authorization to Sell Certain of the Debtors' Assets, (vi) the Setting of Related Auction and Hearing Dates, (vii) Authorization to Enter into an Allocation Agreement, and (viii) Approval of Procedures Related to Assumption and Assignment of Executory Contracts and Unexpired Leases and the Form and Manner Thereof* [Docket No. 271] (the "**PS Sale Motion**"), which, among other things, sought authority to sell certain of the Debtors' assets related to the Debtors' Public Services Industry Group (the

"**PS Bid Assets**").  On April 17, 2009, the Bankruptcy Court approved the sale of the PS Bid Assets to Deloitte LLP.

4. The Debtors now seek to sell their CS group, in whole or in part.  The CS group is primarily comprised of contracts with a highly diversified range of clients, including those in the world's leading life sciences and energy markets, as well as technology, consumer markets, manufacturing, transportation, communications and private and public utilities.  A sale of the CS Group in whole, as opposed to in parts, maximizes the value of these assets.

5. After extensive review of proposals received during the sales process for the assets in BearingPoint's CS Group and certain related assets, the Debtors, along with their advisors, have determined that PwC's offer presents the Debtors with significant value.  Furthermore, the Debtors believe that the PwC offer complements the sale contemplated in the PS Sale Motion as it enables the Debtors to sell their two main domestic divisions largely intact.

6. As such, the Debtors seek to effectuate a sale based on the offer received from PwC.  The Debtors believe that a sale in which the CS Group remains largely intact will allow for a more seamless transition of the CS Group assets and preserve value.  Except as otherwise provided in definitive documentation with respect to the sale of the CS Bid Assets (the "**CS Sale**"), all of the Debtors' rights, title and interest in and to the CS Bid Assets shall be sold free and clear of all pledges, liens, security interests, encumbrances, claims, charges, options, and interests thereon and against except for any liabilities expressly assumed by the purchaser in accordance with section 363 of the Bankruptcy Code with such claims and interests attaching to the sale proceeds and/or paid to the secured creditors as approved by this Court.

# I. THE CS STALKING HORSE AGREEMENT

7.     As set forth above, the Debtors are requesting authority to enter into the

CS Stalking Horse Agreement, which both provides a uniform asset purchase agreement to be

used by any Qualified Bidder (as defined below) in connection with its purchase of the CS Bid

Assets (an "***Asset Purchase Agreement***"), as well as provides PwC with the Stalking Horse

Protections.  The pertinent terms of the CS Stalking Horse Agreement are provided in the table

below for summary and notice purposes only and to the extent any terms are inconsistent with

the CS Stalking Horse Agreement, the CS Stalking Horse Agreement controls:[4]

| | |
|---|---|
| **Structure:** | Sellers will sell to PWC specified customer contracts of the CS Group, and the accounts receivable, work in progress, certain intellectual property and other assets related thereto (the "***Acquired Assets***"), and PWC will assume only (i) liabilities arising post-closing out of the customer contracts that it acquires and (ii) liabilities with respect to accrued vacation, sick and personal days (not to exceed 24 days) for those employees that become employees of PwC (the "***Transaction***").<br><br>PWC has also agreed to purchase the equity interests of BearingPoint Information Technologies (Shanghai) Limited ("***China GDC***"), a company owned by BearingPoint, Inc. that operates a global development center in China, and an affiliate of PwC has agreed to purchase substantially all of the assets of a separate global development center in India ("***India GDC***"). |
| **Intellectual Property Cross- License:** | Intellectual property that is not transferred to PwC but is used in CS/FS (to the extent licensable) will be licensed to PwC under a separate cross-license. The license will be non-exclusive, worldwide and unrestricted except that PwC will not be permitted to use the licensed intellectual property in the public services field within the U.S. and Canada. |
| **Purchase Price:** | The purchase price is $25 million, of which $2 million will be paid for the China GDC equity interests and $3 million will be paid for the India GDC assets.  Sellers are required to pay all costs required |

---

[4] Capitalized terms used, but not defined herein, shall have the meaning ascribed to them in the CS Stalking Horse Agreement.  The description of the CS Stalking Horse Agreement below is intended as a summary and is qualified in its entirety by the CS Stalking Horse Agreement.

| | |
|---|---|
| | to cure defaults under the customer contracts that PwC acquires. |
| **Good Faith Deposit:** | Promptly after entry of the bidding procedures order by the bankruptcy court, PwC will deposit $1.25 million in escrow as a good faith deposit for its obligations under the Purchase Agreement. |
| **Closing Conditions:** | PwC's and Sellers' obligations to consummate the transaction are subject to certain closing conditions, including: <br><br> • entry of a final order by the Bankruptcy Court approving the Transaction; <br><br> • accuracy of representations and warranties, generally except as would not have a Material Adverse Effect; <br><br> • compliance in all material respects with covenants and agreements; <br><br> • absence of certain pending or threatened legal proceedings; and <br><br> • Sellers' chapter 11 case has not been dismissed or converted to a chapter 7 proceeding, and no trustee or examiner has been appointed. |
| **Termination:** | The Purchase Agreement may be terminated by mutual written consent of the parties. <br><br> The Purchase Agreement may be terminated by PwC or Sellers if: <br><br> • the other party is in breach of its representations, warranties or covenants and such breach would result in a failure of a closing condition that is not cured within 10 business days; or <br><br> • the closing does not occur prior to June 30, 2009 (if the party seeking termination has fulfilled its obligations under the Purchase Agreement). <br><br> PwC may terminate the Purchase Agreement if: <br><br> • the Bankruptcy Court does not enter an order approving the bidding procedures order by May 5, 2009, or such order is stayed, withdrawn or rescinded as of such date; <br><br> • the Bankruptcy Court does not enter an order approving the transaction by June 10, 2009 or if a legal proceeding challenging the Bankruptcy Court's approval of the transaction is pending, or the approval order is stayed, withdrawn or rescinded, on or after June 15, 2009; <br><br> • the Bankruptcy Court dismisses Sellers' Chapter 11 case, |

| | |
|---|---|
| | converts the Chapter 11 case to Chapter 7 or appoints a trustee or examiner; or<br><br>• Definitive agreements with respect to the purchase of BearingPoint India and BearingPoint China are not entered into within ten business days after the date of the Purchase Agreement. |
| **Termination Fee and Expenses:** | Sellers must pay PwC a termination fee equal to $750,000 plus PwC's actual and documented out-of-pocket expenses, subject to a $500,000 cap, in the following circumstances:<br><br>• the Bankruptcy Court enters a final order (i) authorizing Sellers to sell (A) a substantial or material portion of the Acquired Assets or (B) the China GDC and all or any portion of the Acquired Assets to a party other than PwC or (ii) confirming a plan of reorganization that does not include the sale to PwC of a material portion of the Acquired Assets; or<br><br>• Sellers pursue a "stand-alone" restructuring plan or similar effort that does not include a sale of a substantial or material portion of the Acquired Assets.<br><br>Sellers must pay PWC's reasonable and documented out-of-pocket expenses, subject to a $500,000 cap, if:<br><br>• PwC or Sellers terminate the agreement because closing has not occurred by June 30, 2009 (unless primarily the result of PwC's breach of any of its representations, warranties or covenants);<br><br>• PwC terminates the Purchase Agreement because of Sellers' breach of its representations, warranties or covenants that cause a failure of a closing condition;<br><br>• PwC terminated the Purchase Agreement because the Bankruptcy Court does not enter the order approving the bidding procedures by May 5, 2009 or such order is stayed, withdrawn or rescinded as of such date;<br><br>• PwC terminates the Purchase Agreement because the Bankruptcy Court has not entered an order approving the Transaction by June 10, 2009 or if a legal proceeding challenging the Bankruptcy Court's approval of the transaction is pending on June 22, 2009 or the approval order shall have been withdrawn or rescinded; or<br><br>• PwC terminates the Purchase Agreement because the Bankruptcy Court dismisses BearingPoint's chapter 11 case, converts the chapter 11 case to chapter 7 or appoints a |

| | |
|---|---|
| | trustee or examiner. |
| **Employee Matters:** | Effective at the time of the closing, PwC may (but is not required to) offer employment to employees whose services are necessary for the continued performance by PwC of customer contracts it is acquiring, on terms determined by PwC but with compensation at market-competitive levels.<br><br>Prior to the closing, Sellers would be limited in their ability terminate, reassign and change the compensation for designated CS/FS employees.<br><br>At the closing, Sellers would release the CS/FS employees hired by PwC, as well as specified former CS/FS employees who are or will be PwC employees, from all of their employment, confidentiality, non-compete, non-solicitation and related obligations other than covenants not to disclose confidential information and covenants not to solicit for employment those who remain employees of Sellers after the Closing, and former CS/FS employees would not be released from covenants not to solicit any client that is a party to an Excluded Customer Contract to cease or refrain from doing business with Sellers for the type of business covered by such Excluded Customer Contract. |
| **Non-Solicit:** | For a period of three years after the closing, Sellers cannot (i) solicit or attempt to induce any employee who accepts PwC's offer of employment to terminate such employment with PWC, (ii) hire or attempt to hire any such employee (other than an employee whose employment with PwC has been terminated for at least 6 months) or (iii) persuade or attempt to persuade any party doing business with PwC under the customer contracts that PwC acquires from Sellers to cease doing business or decrease the amount of business it does with PwC. |
| **Regulatory Matters:** | PwC and Sellers must use reasonable best efforts to obtain all waivers, consents, approvals and other authorizations as may be required and to make any filing, registration or notice that is necessary to consummate the Transaction. |
| **Representations and Warranties:** | The Purchase Agreement contains customary representations and warranties regarding CS/FS and the Acquired Assets. The representations and warranties do not survive the closing and there is no indemnification for breaches of representations and warranties. |
| **Transition Services** | The Company will provide specified transition services to PwC for the first three months after closing and will use its reasonable best |

| | efforts to provide transition services for an additional three months thereafter. |
|---|---|

## II. CS BIDDING PROCEDURES ORDER

8.      To facilitate an orderly sale of the CS Bid Assets, the Debtors request that the Court approve the CS Bidding Procedures, including the Notice Procedures, and the Contract Procedures (as defined below).

### A.      Form of Asset Purchase Agreement for Qualified Bid

9.      The Debtors propose that in connection with the submission of a Qualified Bid (as defined below) for the CS Bid Assets, each Qualified Bidder (as defined below) be required to submit a form of the CS Stalking Horse Agreement and Schedules and Exhibits thereto, which shall be modified by the Qualified Bidder only to the extent necessary to reflect proposed changes, and marked to show such changes made by the Qualified Bidder.

### B.      The CS Bidding Procedures

10.      The Debtors believe that the CS Bidding Procedures provide an appropriate framework for selling the CS Bid Assets and will enable the Debtors to review, analyze, and compare all bids received to determine which bids are in the best interests of the Debtors' estates and creditors.  The proposed CS Bidding Procedures are as follows:[5]

| *Assets to be Sold* | The Debtors intend to sell intend to sell (i) the Acquired Assets as set forth in the CS Stalking Horse Agreement, or (ii) 100% of the equity interests in BearingPoint Information Technologies (Shanghai) Limited and all or any portion of the Acquired Assets plus any of the Debtors' other assets related to its commercial services industry group. |
|---|---|
| *Qualifying* | A potential bidder who desires to be a Qualified Bidder must deliver the Required Bid Documents (as defined below) so as to be received by the Bid |

---

[5] The CS Bidding Procedures described below are intended as a summary and are qualified in their entirety by the CS Bidding Procedures set forth in Exhibit B and in the CS Stalking Horse Agreement.

| | |
|---|---|
| ***Bidders*** | Deadline (as defined below). |
| ***Required Bid Documents*** | All bids must include the following (the "***Required Bid Documents***"):<br><br>• a letter stating that the bidder's offer is irrevocable until consummation of a transaction involving any other bidder for the CS Bid Assets;<br><br>• an executed confidentiality agreement, which shall also inure to the benefit of any purchaser of the CS Bid Assets and which shall include an agreement not to solicit employees or customers for 12 months, and which shall be on terms that are not less favorable to the Sellers or more favorable to such Potential Bidder than the terms of any confidentiality agreement executed by the Sellers and the Buyer or its Affiliates or Member Firms;[6]<br><br>• a duly authorized and executed purchase agreement, including the purchase price for the CS Bid Assets, together with all exhibits and schedules marked to show those amendments and modifications to the CS Stalking Horse Agreement and the proposed Sale Order;<br><br>• a good faith deposit in the amount of the lesser of (i) five percent (5%) of the purchase price and (ii) $1,250,000; and<br><br>• written evidence of a firm commitment for financing, or other evidence of ability to consummate the proposed transaction without financing, that is satisfactory to the Sellers after consultation with the Creditors' Committee (as defined below); |
| ***Qualified Bids*** | A bid received from a Qualified Bidder will constitute a "***Qualified Bid***" only if it includes all of the Required Bid Documents and meets all of the below requirements:<br><br>• identifies the assets to be purchased and the contracts and leases to be assumed and assigned, which assets and contracts (i) must include (A) some or all of the Acquired Assets (as defined in the CS Stalking Horse Agreement) and (B) the GDC China Equity, and (ii) may include other assets and contracts related to the Debtors' commercial services industry group;<br><br>• sets forth the purchase price for the assets to be purchased and the contracts and leases to be assumed and assigned, which purchase price has a cash value greater than or equal to the sum of (x) the cash value, as reasonably determined by BearingPoint's financial advisor, of the Stalking Horse Bid offer plus (y) One Million Two Hundred and Fifty Thousand Dollars ($1,250,000) (i.e., the sum |

---

[6] Neither the Sellers nor their representatives shall be obligated to provide any information of any kind to any person who has not executed a confidentiality agreement as provided herein.

|  | of the Termination Fee and the maximum amount of the Expense Reimbursement (each as defined in the CS Stalking Horse Agreement)) plus (z) at least Two Hundred and Fifty Thousand Dollars ($250,000);<br><br>• is not conditioned on obtaining financing or on the outcome of unperformed due diligence or corporate, stockholder or internal approval;<br><br>• provides evidence, satisfactory to the Sellers, in their reasonable discretion (after consultation with the Agent (as defined below) and the Creditors' Committee) of the bidder's financial wherewithal and operational ability to consummate the transaction;<br><br>• is irrevocable until the Debtors have chosen the Successful Bid (as defined below) and the Alternate Bid (as defined below);<br><br>• sets forth the representatives who are authorized to appear and act on behalf of the contemplated transaction; and<br><br>is received on or before the Bid Deadline. |
|---|---|
| *Bid Deadline* | Any person or entity wanting to participate in the Auction, other than the CS Stalking Horse Bidder, must submit a Qualified Bid for the Bid Assets on or before **May 25, 2009 at 4:00 p.m. (Eastern Time)**. |
| *Good Faith Deposit* | Bidders must submit a good faith deposit in the amount of the lesser of (i) five percent (5%) of the purchase price and (ii) $1,250,000 which shall be held in a separate interest-bearing account for the Debtors benefit until consummation of a transaction involving the CS Bid Assets. |
| *CS Auction and Overbids* | In the event that the Debtors timely receive more than one Qualified Bid, they shall conduct the CS Auction on May 27,2009 at 10:00 a.m. Any bid increases at the CS Auction must be made in minimum increments of at least $250,000. |
| *Breakup Fee and Expense Reimbursement* | In the event that the CS Stalking Horse Agreement is terminated under certain circumstances described in the CS Stalking Horse Agreement the Debtors will pay to the Buyers a Termination Fee in an amount equal to $750,000 and an expense reimbursement in an amount up to $500,000. |

11.     The Debtors reserve the right to: (i) determine in their reasonable discretion (after consultation with the Agent and the Creditors' Committee), which Qualified Bid is the highest or best bid; and (ii) reject at any time prior to entry of a Court order approving an offer other than the Stalking Horse Bid, without liability, any offer that the Debtors in their reasonable discretion (after consultation with the Agent and the Creditors' Committee) deem to

be (x) inadequate or insufficient, (y) not in conformity with the requirements of the Bankruptcy Code, the Bankruptcy Rules, the Local Rules of the Bankruptcy Court for the Southern District of New York, or procedures set forth therein or herein, or (z) contrary to the best interests of the Debtors and their estates.  Bids that are not Qualified Bids will not be considered.  The CS Stalking Horse Bid is deemed to be a Qualified Bid, provided, however, that the CS Stalking Horse Bid must remain irrevocable (subject to the closing conditions and termination rights contained therein) until such time as the Debtors have chosen the Successful Bid or Alternate Bid (as each term is defined in the CS Bidding Procedures).

12.     The CS Bidding Procedures are similar to those proposed by the Debtors in the PS Sale Motion.  The Debtors believe that the CS Bidding Procedures are fair and appropriate and will maximize the recovery for the Debtors and their estates in connection with the CS Sale.  The CS Bidding Procedures contemplate an open auction process with minimum barriers to entry, and the proposed deadlines provide interested parties with sufficient time to perform due diligence on the CS Bid Assets.  Moreover, the Debtors completed a comprehensive process prior to the Commencement Date to seek out all potential interested parties in the assets and provided interested parties with diligence information.  Accordingly, approval of the CS Bidding Procedures, including the dates established thereby for the CS Auction and the CS Sale Approval Hearing, is warranted.

### C.     <u>Notice Procedures</u>

13.     The Debtors request approval of the following Notice Procedures:

(a)     <u>CS Sale Notice</u>:  Three (3) business days following entry of an Order approving the CS Bidding Procedures, the Debtors will serve notice of the CS Auction and CS Sale Approval Hearing (the "***CS Sale Notice***") by first class mail on all creditors and parties

in interest, including all counterparties to executory contracts and unexpired leases, and all parties on the Master Service List, in accordance with the Order Pursuant to Section 105(a) of the Bankruptcy Code and Bankruptcy Rules 1015(c) and 9007 Implementing Certain Notice and Case Management Procedures, dated March 5, 2009 (the "*Case Management Order #2*") [Docket No. 117], as well as on all applicable federal, state and local taxing and regulatory authorities (the "*Notice Parties*").  The form of CS Sale Notice is annexed hereto as <u>Exhibit D</u>.

       (b)    <u>Bid Deadline</u>:  The CS Sale Notice will set forth the deadline for the submission of Required Bid Documents as 12:00 noon (Eastern Time) on May 25, 2009 (the "*Bid Deadline*").

       (c)    <u>Date, Time, and Place of CS Auction</u>:  If the Debtors receive more than one Qualified Bid, the Debtors propose that the CS Auction be conducted at the offices of Weil, Gotshal & Manges LLP, 767 Fifth Avenue, New York, New York 10153 on **May 27, 2009, commencing at 10:00 a.m. (Eastern Time)** to determine the highest or otherwise best bid with respect to the CS Bid Assets.

       (d)    <u>Date, Time, and Place of the CS Sale Approval Hearing</u>:  The Debtors propose that the CS Sale Approval Hearing be held in the United States Bankruptcy Court for the Southern District of New York, One Bowling Green, New York, NY 10004, on **May 28, 2009 at [9:00] [a].m. (Eastern Time)** or such other date and time that the Court may direct.  The CS Sale Approval Hearing may be adjourned without further notice by announcement at the CS Sale Approval Hearing.

       (e)    <u>Objection Deadline to CS Sale Order(s)</u>:  Objections to the relief sought in the CS Sale Order shall be in writing, filed and served in accordance with the Case Management Order #2, so as to be actually received by (i) Weil, Gotshal & Manges LLP, 767

Fifth Avenue, New York, New York 10153, (Attn: Marcia L. Goldstein, Esq., Alfredo R. Pérez, Esq., and Joseph H. Smolinsky, Esq.), as counsel to the Debtors, (ii) the Office of the United States Trustee for the Southern District of New York, 33 Whitehall St., 21st Floor, New York, New York 10004 (Attn: Serene Nakano, Esq.), (iii) Paul, Hastings, Janofsky & Walker LLP, Park Avenue Tower, 75 East 55th Street, First Floor, New York, New York 10022 (Attn: Luc Despins, Esq. and Leslie A. Plaskon, Esq.), as counsel for Wells Fargo Bank, N.A., the administrative agent for the Debtors' prepetition secured lenders (the "***Agent***"), (iv) Bingham McCutchen LLP, 299 Park Avenue, New York, New York 10022 (Attn: Jeffrey Sabin, Esq., Neil W. Townsend, Esq. and Sabin Willett, Esq.), as counsel for the Official Committee of Unsecured Creditors appointed in these chapter 11 cases (the "***Creditors' Committee***"), (v) Wilmer Cutler Pickering Hale & Dorr LLP, 399 Park Avenue, New York, New York, 10022 (Attn: Andrew N. Goldman, Esq.) and Wilmer Cutler Pickering Hale and Dorr LLP, 60 State Street, Boston, Massachusetts 02109 (Attn: Mark Borden, Esq.), as counsel to the CS Stalking Horse Bidder, and (vi) all parties on the Master Service List pursuant to the Case Management Order #2 (collectively, the "***Objection Notice Parties***") by May 18, 2009 at 12:00 p.m. (Eastern Time) with respect to the CS Sale. Objections with respect to the Auction and the Successful Bidder shall be interposed at the CS Sale Hearing.

**D.**     **Assumption and Assignment of Executory Contracts and Unexpired Leases**

14.     To facilitate and effect the sale of the CS Bid Assets, the Debtors also seek authority to assume and assign certain Contracts to the purchaser(s) of any of the Debtors' CS Bid Assets. Due to the nature of the bidding process, the Debtors are not now able to identify which Contracts and Leases may require assumption and assignment. As such, the Debtors further seek authority to establish a process (the "***Contract Procedures***") to (i) determine the

existence of any defaults and the amount of any cure obligations, if any, necessary to be paid in accordance with section 365 of the Bankruptcy Code for those Contracts that may be assumed and assigned, and (ii) establish objection procedures for the counterparties to the Contracts and Leases proposed to be assumed and assigned. Failure by the Debtors to cure any individual contract will, among other things, result in PwC not being required to take assignment of such contract. The Contract Procedures are attached hereto as <u>Exhibit E</u> and are as follows:[7]

| | |
|---|---|
| *Initial Assumption, Assignment and Cure Notice* | As soon as practicable after the entry of the CS Bidding Procedures Order, the Debtors shall:<br><br>• file under seal with this Court an assignment schedule setting forth the executory contracts and unexpired leases that may be assumed and assigned in connection with the CS Bid Assets; and<br><br>• serve on each counterparty to any executory contract or unexpired lease then designated as an Assigned Contract in accordance with section 4.3 of the CS Stalking Horse Agreement, by email, mail, facsimile or overnight delivery service, a notice of assumption, assignment and cure substantially in the form attached to the CS Bidding Procedures Motion as Exhibit F (the "***Contract Notice***"); and<br><br>• include in such Contract Notice (i) the title of the contract or lease to be assumed, (ii) the name of the counterparty to the contract or lease, (iii) any applicable cure amount (the "***Cure Costs***") required to be paid under the Assigned Contract (as defined in the CS Stalking Horse Agreement), (iv) the identity of the assignee, and (v) the deadline by which any such contract or lease counterparty must object. |
| *Subsequent Assumption, Assignment and Cure Notices* | To the extent any Assigned Contracts are designated for assignment (i) in accordance with section 1.5 of the CS Stalking Horse Agreement and (ii) after the date of the Contract Notice described above, the Debtors shall send a subsequent Contract Notice to each counterparty to such Assigned Contract, by email, mail, facsimile or overnight delivery service, which shall include a detailed description for that particular Additional Assigned Contract of the Contract Defaults and Cure Costs, and which notice shall be sent as soon as |

---

[7] The Debtors believe that in order to preserve confidentiality and ensure maximum value for their assets, it is necessary to file the Assignment Schedule under seal. As described above, because counterparties to the Contracts and Leases will receive notice of the proposed assumption and assignment and cure amounts, no party will be prejudiced by the filing under seal of the Assignment Schedule.

| | |
|---|---|
| | practicable following such addition. |
| ***Objections to Assumption and Assignment*** | All objections to the assumption and assignment of Assigned Contracts shall be filed with the Court and be served so as to be received by the Objection Notice Parties no later than ten (10) days following service of the Contract Notice (the "***Contract Objection Deadline***"). |
| ***Objections to Contract Defaults and Cure Costs*** | All objections to the proposed Cure Costs and any assertion of defaults or other obligations for an Assigned Contract shall be filed with the Court and be served so as to be received by the Objection Notice Parties no later than the Contract Objection Deadline. If a timely objection is received and such objection cannot otherwise be resolved by the parties, the Court may hear such objection at a later date set by the Court. The pendency of a dispute relating to Cure Costs will not prevent or delay the assumption and assignment of any contracts designated as an Assigned Contract at Closing if the Buyer consents to such assumption and assignment notwithstanding the pendency of such dispute. |
| ***Effect of Failure to Object*** | Any counterparty to an Assigned Contract shall timely file and serve on the Objection Notice Parties any objections to: (i) the proposed assumption and sublease or assumption and assignment to the Buyer on the grounds that a default exists and is not proposed to be cured or on any other grounds; and/or (ii) if applicable, the proposed Cure Costs. If no objection has been timely received from a counterparty to an Assigned Contract by the applicable deadline, then:<br><br>• the counterparty to the Assigned Contract shall be deemed to have consented to the assumption and sublease or assumption and assignment of the Assigned Contract to the Buyer and shall be forever barred from asserting any objection with regard to such assumption or assignment;<br><br>• the counterparty to the Assigned Contract shall be deemed to have consented to the Cure Costs set forth in the Contract Notice which shall be controlling, notwithstanding anything to the contrary in any Assigned Contract, or any other document, and the counterparty to an Assigned Contract shall be forever barred from asserting any other claims related to such Assigned Contract against the Debtors or the Buyer, or the property of any of them. |

## III.  APPLICABLE AUTHORITY

### A.    A Sale of The Debtors' Assets Under
### Section 363 of the Bankruptcy Code is Warranted

15.    Ample authority exists for the approval of the proposed sale of the

Debtors' assets.  Section 363 of the Bankruptcy Code, which authorizes a debtor to use or sell

assets of the estate other than in the ordinary course of business, free and clear of liens, claims and encumbrances, provides, in relevant part, as follows:

> (b)(1) The trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate . . .

See 11 U.S.C. § 363(b)(1); see Fed. R. Bankr. P. 6004(f)(1) ("All sales not in the ordinary course of business may be by private sale or by public auction.").

16.     The decision to sell assets outside the ordinary course of business is based upon the sound business judgment of the debtor.  See, e.g., In re Chateaugay Corp., 973 F.2d 141 (2d Cir. 1992); Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.), 722 F.2d 1063, 1071 (2d Cir. 1983).  See also Official Comm. of Sub. Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.), 147 B.R. 650, 656 (S.D.N.Y. 1992), appeal dismissed, 3 F.3d 49 (2d Cir. 1993), quoting Smith v. Van Gorkom, 488 A.2d 858, 872 (Del. 1985) ("the business judgment rule 'is a presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action was in the best interests of the company,'" which has continued applicability in bankruptcy).

17.     In the circumstances of valid business justifications, applicable principles of law attach to a debtor's decision a strong presumption "that in making a business decision[,] the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company."  In re Integrated Res., Inc., 147 B.R. at 656 (S.D.N.Y. 1992) (holding that the Delaware business judgment rule has "vitality by analogy" in chapter 11, especially where the debtor is a Delaware corporation) (quotations omitted).  Once a court is satisfied that there is a sound business justification for the proposed sale, the court must then determine whether (i) the debtor-in-possession has provided the interested parties with adequate and reasonable notice, (ii) the sale price is fair and reasonable,

and (iii) the purchaser is proceeding in good faith.  <u>In re Betty Owens Sch., Inc.</u>, 1997 WL

188127 (S.D.N.Y. 1997); <u>accord</u> <u>In re Delaware and Hudson Ry. Co.</u>, 124 B.R. 169, 176 (D. Del.

1991); <u>In re Decora Indus., Inc.</u>, Case No. 00-44591, 2002 WL 32332749 at *3 (D. Del. May 20,

2002).

18.     Ample business justification exists in this case to approve the proposed CS

Bidding Procedures and any CS Sale effectuated in accordance therewith.  The Debtors have

considered all alternatives, with the assistance of their advisors, and determined that a sale of the

CS Bid Assets is in the best interests of their estates and creditors.  The Debtors have already

obtained authorization to sell the PS Bid Assets.  A concurrent sale of the CS Bid Assets will

allow the Debtors to sell these assets while they still have significant value.  Furthermore, the CS

Bidding Procedures proposed herein will ensure that the Debtors receive the maximum value for

their CS Bid Assets.

**B.     <u>Sale of Assets Free and Clear of Liens, Claims, Encumbrances and Interests</u>**

19.     In the interest of attracting the best offers, the sale of the assets should be

free and clear of any and all liens, claims, and encumbrances in accordance with section 363(f)

of the Bankruptcy Code, with any such liens, claims and encumbrances paid to the secured

creditors and/or attaching to the proceeds of the CS Sale.  Pursuant to section 363(f) of the

Bankruptcy Code, a debtor in possession may sell property of the estate "free and clear of any

interest in such property of an entity other than the estate" if any one of the following conditions

is satisfied:

- applicable nonbankruptcy law permits sale of such property free and clear
  of such interest;

- such entity consents;

- such interest is a lien and the price at which such property is to be sold is
  greater than the aggregate value of all liens on such property;

- such interest is in bona fide dispute; or

- such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

20. The Debtors request that the Court authorize the sale of the CS Bid Assets free and clear of all liens, claims, encumbrances, and other interests (collectively, "*Liens*"), other than any liabilities expressly assumed by the purchaser.  Pursuant to section 363(f)(3), any Lien holders will be adequately protected, because their Liens will attach to the net proceeds of the sale, and the total Purchase Price is greater than the aggregate value of all such Liens.  See MacArthur Co. v. Johns-Manville Corp., 837 F.2d 89, 94 (2d Cir. 1988) ("It has long been recognized that when a debtor's assets are disposed of free and clear of third-party interests, the third party is adequately protected if his interest is assertable against the proceeds of the disposition."); Circus Time, Inc. v. Oxford Bank & Trust (In re Circus Time, Inc.), 5 B.R. 1, 3 (Bankr. D. Me. 1979) (finding the Court's power to sell property free and clear of liens has long been recognized); see also In re Riverside Inv. P'ship, 674 F.2d 634, 640 (7th Cir. 1982) ("Generally, in a 'free and clear' sale, the liens are impressed on the proceeds of the sale and discharged at the time of sale").  Alternatively, parties that may hold Liens on the CS Bid Assets could be compelled to accept a monetary satisfaction of such interests, satisfying section 363(f)(5) of the Bankruptcy Code.  Finally, the sale of the CS Bid Assets pursuant to the CS Bidding Procedures will satisfy section 363(f) of the Bankruptcy Code because any entities holding Liens on the CS Bid Assets will have received notice of this and the CS Sale Notice.  All parties in interest will be given sufficient opportunity to object to the relief requested in this, and any such entity that does not object to the CS Sale should be deemed to have consented.  See Futuresource LLC v. Reuters Ltd., 312 F.3d 281, 285-86 (7th Cir. 2002) ("It is true that the Bankruptcy Code limits the conditions under which an interest can be extinguished by a

bankruptcy sale, but one of those conditions is the consent of the interest holder, and lack of objection (provided of course there is notice) counts as consent. It could not be otherwise; transaction costs would be prohibitive if everyone who *might* have an interest in the bankrupt's assets had to execute a formal consent before they could be sold.") (internal citations omitted); Hargrave v. Township of Pemberton (In re Tabone, Inc.), 175 B.R. 855, 858 (Bankr. D.N.J. 1994) (failure to object to sale free and clear of liens, claims and encumbrances satisfies section 363(f)(2)); Citicorp Homeowners Serv., Inc. v. Elliot (In re Elliot), 94 B.R. 343, 345 (E.D. Pa. 1988) (same); see also In re Enron Corp. 2003 WL 21755006 at *2 (AJG) (Bankr. S.D.N.Y. 2003) (order deeming all parties who did not object to proposed sale to have consented under section 363(f)(2)). As such, to the extent that no party holding a Lien objects to the relief requested in the CS Sale Order, the sale of the CS Bid Assets free and clear of all Liens except any liabilities expressly assumed by the Successful Bidder satisfies section 363(f)(2) of the Bankruptcy Code. In sum, sale of the CS Bid Assets free and clear of all Liens will satisfy one or more of the statutory prerequisites of section 363(f) of the Bankruptcy Code.

21.    The Debtors submit that, in addition to being sold free and clear of all other Liens, the CS Bid Assets may be sold free and clear of all claims based on a theory of successor liability or any similar theory. Notwithstanding reference to the conveyance free and clear of "any interest," in section 363(f) of the Bankruptcy Code, that section has been interpreted to allow the sale of a debtor's assets free and clear of successor liability claims as well. See, e.g., In re Trans World Airlines, Inc. 322 F.3d 283, 288-90 (3d Cir. 2003) (sale of assets pursuant to section 363(f) of the Bankruptcy Code barred successor liability claims for employment discrimination and rights under travel voucher program); Am. Living Systems v. Bonapfel (In re All Am. of Ashburn, Inc.), 56 B.R. 186, 189-90 (Bankr. N.D. Ga. 1986), aff'd,

805 F.2d 1515 (11th Cir. 1986) (sale pursuant to section 363(f) barred successor liability for products defect claim); <u>Rubinstein v. Alaska Pacific Consortium (In re New England Fish Co.)</u>, 19 B.R. 323, 328 (Bankr. W.D. Wash. 1982) (sale pursuant to section 363(f) was free and clear of successor liability claims for employment discrimination and civil rights violations).

22. Accordingly, the Debtors request that the CS Bid Assets be transferred to the Successful Bidder free and clear of all liens, claims, encumbrances, and other interests except for any liabilities expressly assumed by the Successful Bidder (with respect to PwC, the Assumed Liabilities as such term is defined in the CS Stalking Horse Agreement), with such liens, claims, encumbrances, and other interests to attach to the net sale proceeds of the CS Bid Assets and/or paid to the secured creditors.

### C. The Successful Bidder Should be Afforded All Protections Under Section 363(m) as a Good Faith Purchaser

23. Section 363(m) of the Bankruptcy Code protects a good-faith purchaser's interest in property purchased from the debtor notwithstanding that the sale conducted under section 363(b) is later reversed or modified on appeal. Specifically, section 363(m) states that:

> The reversal or modification on appeal of an authorization under [section 363(b)] … does not affect the validity of a sale … to an entity that purchased … such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale … were stayed pending appeal.

11 U.S.C. § 363(m). Section 363(m) "fosters the 'policy of not only affording finality to the judgment of the bankruptcy court, but particularly to give finality to those orders and judgments upon which third parties rely.'" <u>In re Chateaugay Corp.</u>, 1993 WL 159969 at 3 (S.D.N.Y. 1993) (quoting <u>In re Abbotts Dairies of Penn., Inc.</u>, 788 F.2d 143, 147 (3d Cir. 1986)). <u>See also</u> <u>Allstate Ins. Co. v. Hughes,</u> 174 B.R. 884, 888 (S.D.N.Y. 1994) ("Section 363(m) . . . provides that good faith transfers of property will not be affected by the reversal or modification on appeal

of an unstayed order, whether or not the transferee knew of the pendency of the appeal"); In re Stein & Day, Inc., 113 B.R. 157, 162 (Bankr. S.D.N.Y. 1990) ("pursuant to 11 U.S.C. § 363(m), good faith purchasers are protected from the reversal of a sale on appeal unless there is a stay pending appeal").

24.     The selection of PwC as the CS Stalking Horse Bidder was the product of arm's-length, good faith negotiations.  In the interest of disclosure, the Debtors note that they have existing and potential business relationships with PwC outside the scope of the sale process. For example, the Debtors and PwC may collaborate with one another to attract certain joint business.  The Debtors do not believe that any such business relationship presents any limitation on PwC's status as a good-faith purchaser of the CS Bid Assets.  The selection of the Successful Bidder will be the product of arm's-length, good-faith negotiations in an anticipated competitive purchasing process.  The Debtors intend to request at the CS Sale Approval Hearing a finding that PwC and/or any other Successful Bidder is a good-faith purchaser entitled to the protections of section 363(m) of the Bankruptcy Code.

**D.     The Stalking Horse Protections Should be Approved**

25.     In connection with the CS Sale, the Debtors are seeking authorization to pay (i) the Termination Fee and (ii) the Expense Reimbursement described herein and in accordance with the terms of the CS Stalking Horse Agreement.

26.     Courts in this district routinely approve the use of termination fees and expense reimbursement, where warranted, in bankruptcy cases. See, e.g., In re Integrated Resources, Inc., 147 B.R. 650  (approving termination fee and expense reimbursement in connection with chapter 11 plan).  Specifically, the courts in this district have held termination fees should be approved as long as (i) the relationship between the parties is not tainted by self-

dealing, (ii) the fee does not hamper bidding, and (iii) the amount of the fee is reasonable in relation to the size of the transaction. Id. at 657.

27.     Approval of termination fees and expense reimbursements as a form of bidder protection in connection with a sale of assets pursuant to section 363 of the Bankruptcy Code has become a recognized practice in chapter 11 cases because it enables a debtor to ensure a sale to a contractually committed buyer at a price the debtor believes is fair, while providing the debtor with the potential of obtaining an enhanced recovery through an auction process. See, e.g., id.; In re Fortunoff Fine Jewelry and Silverware, LLC, Ch. 11 Case No. 08-10353 (JMP) (Bankr. S.D.N.Y. February 22, 2008) [Docket No. 190] (approving termination fee of 2.8%); In re Bally Total Fitness of Greater New York, Inc., Ch. 11 Case No. 07-12395 (BRL) (Bankr. S.D.N.Y. Aug. 21, 2007) [Docket No. 269] (approving termination fee of 4.3% and expense reimbursement); In re G+G Retail, Inc., Ch. 11 Case No. 06-10152 (RDD) (Bankr. S.D.N.Y. Jan. 30, 2006) [Docket No. 58] (approving termination fee of 3%); In re Footstar, Inc., Ch. 11 Case No. 04-22350 (ASH) (Bankr. S.D.N.Y. Mar. 15, 2004) [Docket No. 154] (authorizing the debtors to enter into purchase agreements with termination fees not to exceed 2% with respect to first sale); Id. (Apr. 6, 2004) [Docket No. 316] (authorizing the debtors to enter into purchase agreements with termination fees with respect to second sale); In re Twinlab Corp., et al., Ch. 11 Case No. 03-15564 (RDD) (Bankr. S.D.N.Y. Sept. 26 2003) [Docket No. 81] (approving termination fee of 5% and expense reimbursement); In re Adelphia Business Solutions, Inc., et al., Ch. 11 Case No. 02-11389 (REG) (Bankr. S.D.N.Y. Dec. 16, 2002) [Docket No. 760] (approving termination fee of 2.5% and expense reimbursement with respect to first sale); Id. (Jan. 23, 2003) [Docket No. 833] (approving termination fee and expense reimbursement with respect to second sale). In each of these cases, (i) the underlying application for which the order

was entered was on notice, (ii) except in <u>Fortunoff</u>[8] and <u>Footstar</u>,[9] no objections were filed that pertained to the termination fees or expense reimbursements sought (iii) all orders entered were final orders, and (iv) in each order the court found sufficient cause to merit the termination fees and/or expense reimbursements and accordingly authorized such fees.[10] The extent to which the judge focused upon the provision is not clear from the orders. A copy of the above cited orders are attached hereto as <u>Exhibit G</u>.

        28.     Bankruptcy courts have approved bidding incentives similar to the Stalking Horse Protection under the "business judgment rule," pursuant to which courts typically grant deference to the actions of a corporation's board of directors taken in good faith and in the exercise of honest judgment. Moreover, the CS Stalking Horse Protections are similar in both form and percentage to those provided for in the PS Sale Motion, which were approved by this Court on April 2, 2009.

---

[8] In <u>Fortunoff</u>, the official committee of unsecured creditors objected to the termination fee (Dec. 12, 2008) [Docket No. 84].

[9] In <u>Footstar</u>, General Electric filed an objection to the first bidding procedures motion that primarily related to certain procedural aspects of the sale, but also added that the termination fee "may be excessive or inappropriate, but without additional information as to value of assets proposed to be sold, the propriety of the termination fee cannot be determined." (Mar. 11, 2004) [Docket No. 96].

[10] In several cases the court made more specific findings of facts. In both <u>Fortunoff</u> and <u>Twinlab</u>, the court found that the termination fees and expense reimbursements were (a) an actual and necessary cost of preserving estates, (b) commensurate to the real and substantial benefit conferred upon Debtors' estates by buyer, (c) reasonable and appropriate in light of size and nature of transaction, (d) necessary to induce the buyer to pursue a sale transaction. Additionally, the <u>Fortunoff</u> and <u>Twinlab</u> courts concluded that these fees (a) provided a material benefit to the Debtors and their creditors by increasing the likelihood that the best possible price would be received, and (b) represented the best method for maximizing value for the benefit of the Debtors' estates. In <u>G&G</u>, the court found that (a) compelling and sound business justifications existed for authorizing the payment of the termination fee, (b) the termination fee was fair and reasonable and justified in light of benefit to Debtors' estate and creditors by the sale contemplated in the purchase agreement, (c) the Debtors' agreement to pay the termination fee was made in good faith, and (d) payment was in best interests of estate. In <u>Bally</u>, the court found that the relief requested was in best interests of Debtors' estates, creditors, and other parties in interest. With respect to the remaining orders, the courts did not make any specific findings of fact pertaining to the termination fees or expense reimbursements other than the general statement that the order was made upon a finding of sufficient cause.

29. Furthermore, here, the Stalking Horse Protections meet the "business judgment rule" standard. First, the Termination Fee is fair and reasonable in amount, particularly in view of the substantial efforts that have been and will be made be expended by PwC. The Termination Fee provided for in the CS Stalking Horse Agreement, and payable pursuant to the terms of the CS Stalking Horse Agreement, is approximately 3% of the Purchase Price, which, as set forth above, is consistent with termination fees approved by courts in this and other districts. The Termination Fee will enable the Debtors to secure an adequate floor for the CS Auction and, thus, insist that competing bids be materially higher or otherwise better than the CS Stalking Horse Agreement, a clear benefit to the Debtors' estates.

30. Second, only documented, reasonable costs and expenses will be reimbursed. In sum, the Debtors' ability to offer both the Expense Reimbursement and the Termination Fee will enable them to ensure the sale of the Debtors' assets to a contractually-committed bidder at a price that they believe to be fair while, at the same time, providing them with the potential of even greater recovery to the estates.

31. The Debtors submit that the proposed Stalking Horse Protections will not chill bidding, are reasonable, and their availability to the Debtors will enable the Debtors to maximize the value of their estates. Accordingly, the Debtors should be authorized to offer the Stalking Horse Protection as the Debtors' deem necessary in their business judgment. The Debtors further submit that payment of the Termination Fee and/or Expense Reimbursement, upon the conditions set forth in the CS Stalking Horse Agreement, are actual and necessary costs of preserving the Debtors' estates and as such, shall constitute a first priority administrative expense within the meaning of section 503(b) and 507(a) of the Bankruptcy Code.

### E. The Debtors' Compliance with Their Pre-Closing Obligations Should Be Authorized

32.     In connection with the CS Sale, the Debtors are seeking authorization, but not direction, to perform their pre-closing obligations as described in the CS Stalking Horse Agreement (the "***Pre-Closing Obligations***"), and in accordance with the terms of the CS Stalking Horse Agreement.

### F. The CS Bidding Procedures are Reasonable and Appropriate

33.     The Debtors believe that the CS Bidding Procedures will ensure that the bidding process with respect to the CS Auction is fair and reasonable and will yield the maximum value for their estates and creditors.

34.     In addition, the CS Bidding Procedures set deadlines for conducting the CS Auction and holding a hearing with respect to the sales proposed herein.  As the Debtors have already obtained authorization to sell substantially all of the assets of their larger PS Group, the Debtors believe that value of the CS Bid Assets will be maximized and overhead costs minimized by conducting a prompt sale of the assets in the CS Group.  Thus, the Debtors believe that they should be permitted to conduct the sale process in the manner and on the timetable set forth herein and in the CS Bidding Procedures.

35.     Accordingly, the Debtors believe the Court should approve the CS Bidding Procedures, including the dates established thereby for the CS Auction and the CS Sale Approval Hearing.

### G. Assumption and Assignment of Executory Contracts and Unexpired Leases

36.     As stated above, to facilitate and effect the sale of the CS Bid Assets, the Debtors also seek authority to assume and assign certain Contracts to the purchaser(s) of any of the assets.  Section 365 of the Bankruptcy Code allows the debtor to maximize the value of the

debtor's estate by assuming and assigning executory contracts or unexpired leases that benefit the estate and by rejecting those that do not.  See COR Route 5 Co., LLC v. The Penn Traffic Co. (In re The Penn Traffic Co.), 524 F.3d 373, 382 (2d Cir. 2008).  Section 365 of the Bankruptcy Code authorizes the proposed assumptions and assignments, provided that the defaults under such contracts and leases are cured and adequate assurance of future performance is provided.  See 11 U.S.C. § 365(f)(2).

37.     The words "adequate assurance of future performance" must be given a "practical, pragmatic construction" in "light of the proposed assumption."  In re Fleming Cos., 499 F.3d 300 (3d Cir. 2007) (internal citations omitted).  See also Carlisle Homes, Inc. v. Arrari (In re Carlisle Homes, Inc.), 103 B.R. 524, 538 (Bankr. D. N.J. 1989); In re Natco Indus., Inc., 54 B.R. 436, 440 (Bankr. S.D.N.Y. 1985) (adequate assurance of future performance does not mean absolute assurance that debtor will thrive and pay rent); In re Bon Ton Rest. & Pastry Shop, Inc., 53 B.R. 789, 803 (Bankr. N.D. Ill. 1985) ("Although no single solution will satisfy every case, the required assurance will fall considerably short of an absolute guarantee of performance.").

38.     Among other things, adequate assurance may be given by demonstrating the assignee's financial health and experience in managing the type of enterprise or property assigned.  See In re Bygaph, Inc., 56 B.R. 596, 605-06 (Bankr. S.D.N.Y. 1986) (adequate assurance of future performance is present when prospective assignee of a lease from debtor has financial resources and has expressed a willingness to devote sufficient funding to business in order to give it strong likelihood of succeeding; chief determinant of adequate assurance is whether rent will be paid).  See also In re Vitanza, 1998 WL 808629, at *26 (Bankr. E.D. Pa.

1998) ("The test is not one of guaranty but simply whether it appears that the rent will be paid and other lease obligations met.").

39.     As set forth above, any bid, other than the bid provided in CS Stalking Horse Agreement, that requires the assumption and assignment of Contracts must contain the identity of such Contracts and Leases and evidence of such Qualified Bidder's ability to provide adequate assurance of future performance.  The Debtors submit that the package presented by PwC, as embodied in the CS Stalking Horse Bid, which includes, among other things, the payment of all cure costs by the Debtors and the assumption of the Assumed Liabilities by PwC provides adequate assurance.

40.     While the Debtors do not yet know which Contracts will require assumption and assignment, they will provide the parties to any such Contracts with notice and an opportunity to object, as well as information demonstrating adequate assurance.  The Contract Procedures will ensure that all parties against whom relief is sought will have ample notice of such relief and an opportunity to raise any defaults and to contest any asserted cure amount, as well as the adequacy of the adequate assurance provided.  Consequently, the Debtors submit that the Contract Procedures are fair and reasonable and warrant court approval.

**H.     The Court Should Waive or Reduce the Periods Required
        By Rules 6004(h) and 6006(d) of the Federal Rules of Bankruptcy Procedure**

41.     Pursuant to Interim Rule 6004(h) (formerly Rule 6004(g)) of the Bankruptcy Rules), unless the court orders otherwise, all orders authorizing the sale of property pursuant to section 363 of the Bankruptcy Code are automatically stayed for 10 days after entry of the order.  Fed. R. Bankr. P. 6004(h).[11]  The purpose of Bankruptcy Rule 6004(h) is to provide

---

[11] Bankruptcy Rule 6004(h) is an interim bankruptcy rule adopted pursuant to standing General Order M-308 of the United States Bankruptcy Court for the Southern District of New York, signed on October 11, 2005 by Chief Judge Stuart M. Bernstein.

sufficient time for an objecting party to appeal before the order is implemented.  See Advisory
Committee Notes to Fed. R. Bankr. P. 6004(h).  Similarly, Bankruptcy Rule 6006(d) stays all
orders authorizing a debtor to assign an executory contract or unexpired lease pursuant to
section 365(f) of the Bankruptcy Code for ten days, unless the court orders otherwise.

42.       To preserve the value of the Debtors' estates and limit the costs of
administering and preserving the CS Bid Assets, it is critical that the Debtors close the sale of the
CS Bid Assets as soon as possible after all closing conditions have been met or waived.
Accordingly, the Debtors hereby request that the Court waive the ten day stay periods under
Bankruptcy Rules 6004(h) and 6006(d), or in the alternative, if an objection to the sale of the CS
Bid Assets or to the assignment of any Contract is filed, reduce the stay period to the minimum
amount of time reasonably required by the objecting party to file its appeal; provided, however
that the CS Stalking Horse Bidder is under no obligation to close absent a final order of the
Court.

## Jurisdiction

43.       Pursuant to 28 U.S.C. §§ 157 and 1334 and Standing Order M-61 of the
United States District Court for the Southern District of New York, dated July 10, 1984 (Ward,
Acting C.J.), the Court has exclusive jurisdiction to consider and grant the relief requested
herein.  A proceeding to consider and grant such relief is a core proceeding pursuant to 28 U.S.C.
§ 157(b).  Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## Notice

44.       The Debtors shall serve notice of this Motion to parties in interest in
accordance with the Case Management Order #2.  The Debtors submit that, in view of the facts
and circumstances, such notice is sufficient and no other or further notice need be provided.

45.     No previous request for the relief sought herein has been made by the Debtors to this or any other court.

WHEREFORE, the Debtors respectfully request that the Court grant the relief requested herein and such other and further relief as is just and appropriate.

Dated: April 17, 2009
        New York, New York

                                        /s/ Joseph H. Smolinsky
                                        Marcia L. Goldstein
                                        Joseph H. Smolinsky

                                        WEIL, GOTSHAL & MANGES LLP
                                        767 Fifth Avenue
                                        New York, New York 10153
                                        Telephone:  (212) 310-8000
                                        Facsimile:  (212) 310-8007

                                                and

                                        Alfredo R. Pérez

                                        WEIL, GOTSHAL & MANGES LLP
                                        700 Louisiana Street, Suite 1600
                                        Houston, Texas  77002
                                        Telephone: (713) 546-5000
                                        Facsimile:  (713) 224-9511

                                        Attorneys for Debtors
                                        and Debtors in Possession