**BINGHAM McCUTCHEN LLP**
Jeffrey S. Sabin
399 Park Avenue
New York, NY 10022
(212) 705-7000

-and-

Sabin Willett (*pro hac vice*)
Andrew J. Gallo (*pro hac vice*)
One Federal Street
Boston, MA 02110
(617) 951-8000

*Counsel for the Official Committee
of Unsecured Creditors*

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re<br><br>BEARINGPOINT, INC., *et al.*,<br><br>Debtors. | Chapter 11 Case No.<br><br>09-10691 (REG)<br><br>(Jointly Administered) |

**OBJECTION OF OFFICIAL COMMITTEE OF UNSECURED
CREDITORS TO DEBTORS' MOTION PURSUANT TO
SECTION 363(b) OF THE BANKRUPTCY CODE FOR
<u>AUTHORIZATION TO IMPLEMENT A KEY EMPLOYEE INCENTIVE PLAN</u>**

## TABLE OF CONTENTS

Page

I.  BACKGROUND ........................................................................................................... 1
II. OBJECTION ............................................................................................................... 4
    A.  Standard of Review ......................................................................................... 4
    B.  Argument ......................................................................................................... 7
        i.  The Debtors Cannot Meet the Standard for Approval of a KEIP Based Upon Already Completed Sales ...................................................... 7
            a.  Debtors Cannot Meet the Requirements of 503(c)(1) or (c)(2) ................................................................................................ 7
            b.  Section 503(c)(1) Is Applicable to the Sale Portion of the Revised KEIP ................................................................................ 8
            c.  The Sale Portion of the KEIP also Fails Under Section 503(c)(3) Because Not Every Proposed Recipient Is Necessary for Each of the Sales ...................................................... 10
        ii. The Proposed Cost Reduction Portion of the Revised KEIP Is Premature ............................................................................................. 11
        iii. Given Anticipated Recoveries, the Anticipated KEIPs Are Excessive ............................................................................................. 13

# TABLE OF AUTHORITIES

## CASES

In re Dana Corp., 351 B.R. 96 (Bankr. S.D.N.Y. 2006) .......................................................... 8, 9, 14

In re Dana Corp., 358 B.R. 567 (Bankr. S.D.N.Y. 2006) ....................................................... 4, 5, 6, 9

In re Global Home Prods., LLC, 369 B.R. 778 (Bankr. D. Del. 2007) .................................. 6, 7, 9

In re Nellson Nutraceutical, Inc., 369 B.R. 787 (Bankr. D. Del. 2007) .................................. 4, 6, 9

In re Nobex Corp., No. 05-20050, 2006 WL. 4063024 (Bankr. D. Del. Jan. 19, 2006) .................. 9

In re Pilgrim's Pride Corp., 401 B.R. 229, 2009 WL. 499257 (Bankr. N.D. Tex. Feb. 27, 2009) ........................................................................................................................................ 6

Integrated Res., Inc., 147 B.R. 650 (S.D.N.Y. 1992) .................................................................... 7

## STATUTES

11 U.S.C. § 101(31) ....................................................................................................................... 5

11 U.S.C. § 503(c)(1) ..................................................................................................................... 5

11 U.S.C. § 503(c)(2) ..................................................................................................................... 5

11 U.S.C. § 503(c)(3) ..................................................................................................................... 6

## MISCELLANEOUS

4 Collier on Bankruptcy ¶ 503.17 (15th ed. rev. 2009) ................................................................. 5

The Official Committee of Unsecured Creditors of BearingPoint, Inc. *et al.* (the "**Committee**"), objects to the Debtors' Motion Pursuant to Section 363(b) of the Bankruptcy Code for Authorization to Implement a Key Employee Incentive Plan [doc. no. 273] (the "**KEIP Motion**"). For the reasons set out below, the Committee believes the KEIP Motion is not ready for hearing and has strongly urged the Debtors to adjourn the hearing. Should the hearing go forward, the Committee will press its objection. As grounds for its objection, the Committee says:

## I. BACKGROUND

1. As filed, the KEIP Motion called for bonus payments to be made to twelve of the Debtors' top executives, including Debtors' CEO and COO (the "**KEIP**"). The stated "incentives" for the KEIP were solely based upon sales of the Debtors' business units.

2. The Committee had significant issues with an incentive plan based solely on sales given that: (a) most of the individuals proposed to receive the KEIP were either not involved in the sales or only involved in certain of the sales; (b) such a plan ignores the bulk of this case, which will consist of the post-sale wind-down, and (c) at this point, such a plan is retention, as three of the four largest sales are already signed.

3. Also, the Committee had concerns about the size of the KEIP. The bonuses, which would be in addition to salary, are one times each executive's salary plus the full bonus the executive would receive, outside of bankruptcy, if all of their "targets" are met. A bonus that exceeds, by over 100%, the bonus that each of these employees would receive outside of bankruptcy is inappropriate.

4. The Committee expressed its concerns to the Debtors, and, since the filing of the KEIP Motion, the Debtors have submitted to the Committee multiple revised plans, including the

1

final revised plan which counsel for the Committee received at 10:00 last night (the "**Revised KEIP**").  The Revised KEIP removes four of the executives from the KEIP (because they are anticipated to go with the purchasers of the PS and CS Business Units) [1] and provides that 50% of the bonuses will be paid based upon sales of business units and 50% will be paid upon the Debtors' meeting certain metrics with respect to cost reduction and liquidation of assets following the sales.  The Revised KEIP does not reduce any of the bonus amounts.

5. The Debtors currently do not have a wind-down plan in place.  Accordingly, the Revised KEIP indicates that the baselines upon which most of the cost reductions will be measured for the purpose of the bonuses are "TBD" (i.e., to be determined).

6. Additionally, while negotiations over the Revised KEIP were playing out, the Debtors advised that they contemplate the submission of a second "incentive" plan, of considerable scope (the "**Second KEIP**").  Debtors have agreed to limit the total between the Revised KEIP and the Second KEIP to $14 million total – so the current estimate for the Second KEIP is approximately $7 million.  Again, because the wind-down plan is not in place, the Second KEIP is in its "very early stages" according to the Debtors' CFO.  It is anticipated that the Second KEIP will provide incentive to lower level employees necessary to complete the wind-down.

7. The Committee believes that this case – involving as it does a professional services business – presents one of the few examples where some sort of incentive plan may be likely to enhance creditor returns, although not in the form proposed.  While individual executives may play a material role in the achievement of specific objectives, the key groups would appear to be the consultants who would be necessary to effect the smaller dispositions, the

---

[1] The four removed executives from the KEIP are (i) Robin Lineberger, Executive Vice President, Public Services Business Unit; (ii) Tom DeGarmo, Executive Vice President, Commercial Services Business Unit; (iii) Brian Snarzyk, Executive Vice President, Global Solutions; and (iv) Raymond Winn III, Senior Vice President, Public Services and Chief Operating Officer, Public Services.

8. At this point, any "incentive plan" that has as its goals the sales of the Debtors' business units is primarily retention based. The single largest sale, the sale of the PS business unit, representing substantially all of the Debtors' assets has already been approved by the Court and is anticipated to close soon. The Debtors have signed agreements with respect to sales of their Japan business and the CS Unit, and motions have been filed with respect to those sales. Any bonus paid now based upon these sales is not incentive, and the Debtors have not met the higher standard imposed by the Bankruptcy Code for such a retention plan.

9. To the extent it is based upon the ultimate wind-down, the Revised KEIP is premature.

10. The Committee is in agreement that an incentive plan does need to be developed in relation to the wind-down, but such a plan should not be implemented piecemeal. A single, integrated plan that is tailored to a return for creditors and covers all employees for which bonuses are appropriate should be presented and analyzed. To the extent such a plan must be the subject of negotiated compromise, all interested parties should be part of a single, sensible compromise, as opposed to the executives having previously locked in a return.

11. There is no reason to approve an incentive plan now that is based upon a wind-down that has no shape. The Debtors have admitted that they cannot currently develop a detailed wind-down plan because they do not know which employees and which assets will be acquired by the purchasers of the North American business units (PS and CS). The Court should not pre-approve a plan where the key metrics are "TBD."

12. A comprehensive, detailed incentive plan for the wind-down should be proposed once the parties know what the wind-down will look like. This plan should be based upon

returns to unsecured creditors.

## II. OBJECTION

### A. Standard of Review

13. By the middle part of this decade, rich bonus plans for insiders in chapter 11 had become commonplace. Typically referred to as "key employee retention plans," or "KERPs," these plans were premised on the charming theory that the management team that had led the debtor to distress was essential to its march to recovery; without their leadership, the debtor's distress would deepen. KERPs grew bolder, and the executives prospered.

14. Occasionally the theory was true. More often – or at least so Congress believed – it was pretext. So Congress called a halt in 2005 in the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 ("**BAPCPA**"). Or so Congress thought.

15. An adroit debtor's bar parried the statute with a new acronym. KERPs became KEIPs; "incentive" was drafted to replace the infirm "retention," and the world carried on very much as it had before. This case presents an example of the refurbished acronym.

16. As part of the BAPCPA, Congress amended section 503 of the Bankruptcy Code in 2005, by adding new section 503(c). "[I]t is widely acknowledged that [§ 503(c)] was a response to perceived abuses of the bankruptcy system by 'the executives of giant companies… who lined their own pockets, but left thousands of employees and retirees out in the cold.'" *In re Nellson Nutraceutical, Inc.*, 369 B.R. 787, 800 (Bankr. D. Del. 2007) (quoting Statement of Senator Edward Kennedy (March 1, 2005)). Section 503(c) generally "restricts transfers or payments by debtors to the extent that such payments are outside the ordinary course," with particular emphasis on payments to insiders. *In re Dana Corp.*, 358 B.R. 567, 575 (Bankr. S.D.N.Y. 2006) ("**Dana II**").

17. While section 503(c) does not foreclose a debtor from "*reasonably* compensating

4

employees, including 'insiders,' for their contributions to the debtors' reorganization," *Dana II*, 358 B.R. at 575 (emphasis in original), the "scope of the exceptions to the restrictions placed on insider retention and severance payments" appears to be "so narrowly drawn… that very few insider retention or severance plans will meet the necessary qualifications," such that "*these plans are likely to be eliminated as a common feature of chapter 11 cases*." 4 Collier on Bankruptcy ¶ 503.17 (15th ed. rev. 2009) (emphasis added).

18. Section 503(c)(1) prohibits a payment to, or an obligation incurred for the benefit of, an insider[2] "for the purpose of inducing such person to remain with the debtor's business," absent the Court's *evidentiary* finding that: (i) the transfer or obligation is "essential to retention of the person because the individual has a bona fide job offer from another business as the same or greater rate of compensation;" (ii) the services provided by the person are "essential to the survival of the business;" and (iii) the amount of the transfer is not greater than 10 times the mean transfer of a similar kind given to nonmanagement employees during the current calendar year or, if there have been no such transfers during the calendar year, not greater than 25 percent of "any similar transfer or obligation made to or incurred for the benefit of such insider for any purpose" during the prior calendar year. 11 U.S.C. § 503(c)(1).

19. Section 503(c)(2) prohibits a severance payment to an insider unless the evidence shows that the (i) "the payment is part of a program that is generally applicable to all full-time employees" and (ii) the amount is "not greater than 10 times the amount of the mean severance pay given to nonmanagement employees" during the current calendar year." 11 U.S.C. § 503(c)(2). A "severance" payment is "compensation for the termination of the employment relation, for reasons other than the displaced employees' misconduct, primarily to alleviate the

---

[2] Officers and directors of a corporation are "insiders." 11 U.S.C. § 101(31)(B).

consequent need for economic readjustment but also to recompense him for certain losses attributable to the dismissal." *Dana II*, 358 B.R. at 576 (quoting *Straus-Duparquet, Inc. v. Local Union No. 3, IBEW*, 386 F.2d 649, 651 (2d Cir. 1967)).

20. Finally, Section 503(c)(3) prevents the payment of "other transfers or obligations that are outside the ordinary course of business and not justified by the facts and circumstances of the case." 11 U.S.C. § 503(c)(3). The meaning of this provision is uncertain and has not been resolved by the courts of appeal. By its placement, one bankruptcy court has held, the evident intent of subsection (c)(3) is to ensure that sections (c)(1) and (c)(2) not be evaded through crafty structuring of "other transfers or obligations" to accomplish the severance-payment objective. *See In re Pilgrim's Pride Corp.*, 401 B.R. 229, 2009 WL 499257, at *4-5 (Bankr. N.D. Tex. Feb. 27, 2009). "Even if a good business reason can be articulated for a transaction, the court must still determine that the proposed transfer or obligation is justified in the case before it," and "must make its own determination that the transaction will serve the interests of creditors and the debtor's estate." *Pilgrim's Pride*, 2009 WL 499257 at *4-5.

21. In *Dana*, Judge Lifland took a view more comforting to insiders, noting that this test "appears to be no more stringent a test than the one courts must apply in approving any administrative expense under section 503(b)(1)(A)," so that "[a]ny expense must be an actual, necessary cost or expense of preserving the estate." *Dana II*, 358 B.R. at 576.

22. Although the law is unsettled, there is authority for the proposition that a plan with retention features may still pass muster, provided that its retention aspects are incidental to a more measurable estate-maximizing objective. While a plan that is primarily retentive is subject to the heightened requirements of section 503(c)(1) and (2), *Nellson*, 369 B.R. at 802; *In re Global Home Prods., LLC*, 369 B.R. 778, 785 (Bankr. D. Del. 2007), a plan may have some "retentive effect" without being primarily retentive. *Dana II*, 358 B.R. at 571. An incentive plan

6

that is not primarily retentive is reviewed by the more liberal business judgment standard of section 363 of the Bankruptcy Code. *Global*, 369 B.R. at 783; *see Integrated Res., Inc.*, 147 B.R. 650, 656 (S.D.N.Y. 1992) ("The business judgment rule's presumption shields corporate decision-makers and their decisions from judicial second-guessing when the following elements are present: (1) a business decision, (2) disinterestedness, (3) due care, (4) good faith, and (5) according to some courts and commentators, no abuse of discretion or waste of corporate assets.") (quotations and citations omitted).

23. In considering whether that standard is met, this Court should give particular weight to the views of the Committee and the U.S. Trustee. As a practical matter the views of the debtor are inseparable from the views of the favored executives themselves. Secured creditors are impacted, but to a much lesser extent than unsecured. With the case now a liquidation involving a series of sales to be followed by a wind-down, and secured creditors asserting rights to the moiety of the proceeds, it is largely the unsecured creditors who will enjoy the benefits – if any – of a plan or the burden of its failure. The U.S. Trustee of course presents the disinterested institutional view – important in these unsettled circumstances – as to the general propriety of such plans.

**B.** **Argument**

    **i.** **The Debtors Cannot Meet the Standard for Approval of a KEIP Based Upon Already Completed Sales.**

        *a.* *Debtors Cannot Meet the Requirements of 503(c)(1) or (c)(2).*

24. The Debtors have made none of the showings that would be necessary to justify the KEIP under sections 503(c)(1) or (c)(2). No showing has been made that any of the sums fall within the ten-times cap. No showing has been made that anyone requires an added incentive to achieve the sales, particularly those sales that have already been agreed. No one has shown that

A/73016202.3

management is likely to be lured away by competitors, and the current market is, of course, not a threat to job retention. *See, e.g.*, Deposition Transcript of Kenneth A. Hiltz ("**Hiltz Tr.**") 21:22-22:10 (no knowledge of whether any of the eight executives currently included in the KEIP has a job offer at the same or greater rate of compensation than receiving from Debtors).[3]

25. Thus the Debtors cannot prevail under either of sections 503(c)(1) or (2).

        *b.     Section 503(c)(1) Is Applicable to the Sale Portion of the Revised KEIP.*

26. The Committee argues below that the wind-down portion of the Revised KEIP should not be approved at this time because it is premature. Therefore, the only portion of the Revised KEIP that the Court should consider at this time is the portion based upon sales. Because the sales are substantially complete, the sale portion of the Revised KEIP must be considered pursuant to section 503(c)(1).

27. In *In re Dana Corp.*, 351 B.R. 96, 100-02 (Bankr. S.D.N.Y. 2006) ("**Dana I**"), Judge Lifland ruled that while section 503(c)(3) does not prevent a court from evaluating a plan using the business judgment rule, it is "abundantly clear that, to the extent a proposed transfer falls within sections 503(c)(1) or (c)(2), then the business judgment rule does not apply, irrespective of whether a sound business purpose may actually exist." The KERP at issue in *Dana I* failed to meet the requirements of either section 503(c) or the business judgment rule under section 363 of the Bankruptcy Code. *Dana I*, 351 B.R. at 102-03. That plan included a "completion bonus" payable in part to executives regardless of the reorganization's outcome. The court found: "Without tying this portion of the bonus to anything other than staying with the company until the Effective Date, this Court cannot categorize a bonus of this size and form as an incentive bonus." *Dana I*, 351 B.R. at 102. Noting that "[i]f it walks like a duck (KERP) and

---

[3] Final versions of the deposition transcripts were not available to the Committee at the time this objection was prepared. Accordingly, all deposition citations are to the draft transcripts. To the extent that pagination in the final transcripts differs from the drafts, the Committee will endeavor to amend this objection prior to hearing.

quacks like a duck (KERP), it's a duck (KERP)," the court held that "this compensation scheme walks, talks and is a retention bonus." *Dana I*, 351 B.R. at 102.

28.     Judge Lifland ultimately approved an incentive plan in *Dana*, but only after the debtors "substantially watered down and modified" the original terms, in part by removing the guaranteed completion bonus, resulting in a proposal that both the unsecured creditors' committee and the equity holders' committee agreed was a "true incentivizing package for senior management and [was] wholly different than the initial proposal." *Dana II*, 358 B.R. at 571-72, 574.

29.     Similarly, the court in *In re Global Home Products* recognized that the business judgment rule applies only if a plan is "not primarily motivated to retain personnel or is not in the nature of severance." *Global*, 369 B.R. at 785. Plans "whose purpose is to retain employees," however, are "severely restricted" by sections 503(c)(1)-(2) of the Bankruptcy Code. *Id.*; *see also Nellson*, 369 B.R. at 802-03 (finding bonus program to be "for the primary purpose of motivating employees" and thus outside of section 503(c)(1) restrictions, where plan included target EBITDA that was a "stretch" which debtors failed to reach, and debtors determined that plan had motivated employees who did a "great job" and were not the reason target was not achieved); *In re Nobex Corp.*, No. 05-20050, 2006 WL 4063024, at *2-3 (Bankr. D. Del. Jan. 19, 2006) (finding plan not to be retentive where employees had committed to continue working for debtor even if no incentive plan were authorized and had not indicated any interest in terminating their employment, and sale-related incentive structure had support of unsecured creditors' committee).

30.     Kenneth Hiltz, the Debtors' CFO, testified that there are no "significant hurdles" to the closing of the sale of the PS Unit. *See* Hiltz Tr. 16:2-16:13 ("I don't believe there are significant hurdles to closing once [the PS Unit sale] is approved by the court."). The Court has

9

31. The sale of the Japan Unit accounts for 20% of the sale portion of each bonus. This sale also is nearly complete and scheduled to close by the end of this month. Hiltz Tr. at 18:24-19:25 ("I think at this point there is very little that needs to be done to close [the sale of Japan Unit], I am not aware of any material actions that need to be taken to close it at this point.").

32. An agreement for the sale of the CS Unit, which accounts for 20% of the sale portion of each bonus, has been signed and the Debtors have filed a motion to approve bidding procedures. The Committee is also informed that the Debtors are in advanced stage negotiations regarding a sale of the EMEA Unit (20% of the sale bonus).

33. Because the sales are all substantially complete, the sale portion of the Revised KEIP is like the "completion bonus" in *Dana* -- payment of the bonus will be virtually automatic. Accordingly, because the Debtors cannot meet the requirements of Section 503(c)(1), this portion of the Revised KEIP cannot be approved.

    *c.    The Sale Portion of the KEIP also Fails Under Section 503(c)(3) Because Not Every Proposed Recipient Is Necessary for Each of the Sales.*

34. Even if viewed through the lens of Section 503(c)(3), the sale portion of the KEIP is objectionable because, according to the Debtors' CFO, not all of the executives selected to receive the bonus have "material roles" with respect to the sales.

35. While Messrs. Harbach and DeGroote are involved in all the sale transactions, none of the other executives on the Revised KEIP list are.

36. Some of the other participants are expected to play a role in one or more, but not all, of the business unit sales. Mr. Martino is expected to play a role in the CS Unit sale but not

10

expected to have a material role in the sales of the PS Unit, Japan Unit, or EMEA Unit. *See* Hiltz Tr. 64:13-67:13. Mr. Goldfarb is expected to have a role in the sales of the PS Unit and CS Unit, but his role in the sales of the EMEA Unit and Japan Unit are not clear. *See* Hiltz Tr. 70:13-72:13.

37. Still other of the participants have no material role at all with respect to the sales. Mr. Roberts is expected to play a role in the post-sale wind-down following the PS Unit and CS Unit sales. *See* Hiltz Tr.59:16-63:14. Ms. Palmer and Mr. Berland are not expected to play a material role in any of the business unit sales. *See* Hiltz Tr. 68:4-70:11, 72:14-74:4. Mr. Hunter is not materially involved in the sales.

38. The Debtors' board of directors did not even attempt to connect individual bonuses to the achievement of particular sales. Jill Kanin-Lovers, the chair of the board's compensation committee, testified that the board "didn't talk about each individual and their impact on one particular sale," and instead focused on the "importance of having leadership there to be able to maximize the value of the asset for the overall corporation." Deposition Transcript of Jill Kanin-Lovers ("**Kanin-Lovers Tr.**") 12:3-13:16.

39. Bonus payments to executives who are not involved in a particular sale are not necessary to complete those sales, and, therefore, cannot be justified under Section 503(c)(3).

    **ii.**     **The Proposed Cost Reduction Portion of the Revised KEIP Is Premature.**

40. The Debtors do not have a clear picture of what the wind-down of these cases will entail. Neither buyer for the PS or CS Units has definitively identified those employees or contracts that it will take. Because of this, the Debtors have yet to develop a wind-down plan. Hiltz Tr. 37:12-37:21 (noting uncertainty of which support services will be required after business unit sales and thus when support activities tied to those operations can be terminated).

41. As Mr. Hiltz testified, because of the uncertainty surrounding what assets will be

left behind, the wind-down plan is only in "the early stages of development." Hiltz Tr. 7:18-8:10.

42. This uncertainty affects the Revised KEIP in two ways. First, the metrics that will serve as the baseline for the cost reduction portion of the Revised KEIP, other than the portion based upon letter of credit reduction, cannot be determined at this time. Hiltz Tr. 36:21-37:7 ("Q: Do you have any sort of estimate that you can provide us as to when you might be able to come up with these dollar figures on reduction target amounts? A: We're working on it, but until the facts that drive that are better known, those numbers are going to continue to change. I can't come up with the estimate until somebody tells me what I'm trying to estimate, until it is determined what it is we're trying to estimate.").

43. Second, as noted above, the Debtors have advised that a Second KEIP, designed to protect lower-level employees, is in the offing. However, the Debtors can provide virtually no detail as to the Second KEIP at this time. Hiltz Tr. 13:10-14:17 ("[N]ot only are the specific variables relative to the program itself still in question, but the universe that it is going to cover is changing, changing daily as people are continuing to look at this.").

44. The Debtors should not be seeking pre-approval of a plan where some of the key metrics are still subject to determination. While the Debtors have indicated that the as-yet undetermined cost-reduction metrics will be subject to future agreement with the Committee and the United States Trustee, they are asking for approval now for the plan nonetheless. If the Committee and the Debtors cannot reach agreement, the Debtors will ask the Court to set the baselines, but the entitlement to the bonus will not be in question. This is unfair. The Court and the Committee should only be asked to consider a plan when it can be viewed as a whole, with all the metrics in place.

45. The Debtors should not be rushing through a plan for senior management that

12

leaves line employees as an afterthought.  That is utterly contrary to the vision that informed the BAPCPA amendments, which expressly rejects the preferring of senior insiders to nonmanagement employees.

46. Moreover, the Committee and the Court should not be put to analyzing a series of KEIPs, particularly where the Second KEIP will be considered only after the first is locked in place.  A single, integrated plan with clearly defined metrics that is tailored to a return for creditors should be presented and analyzed.  To the extent such a plan must be the subject of negotiated compromise, all interested parties can be part of a single, sensible compromise, as opposed to the executives having previously locked in a return.

47. Finally, no one has presented any kind of intelligible explanation as to how the wind-down would actually function, and who would be necessary to maximize its value.  In approving the KEIP, the board did not consider individual executives' expected contributions to cost reductions.  *See* Kanin-Lovers Tr. at 38:22-39:16 (no discussions at board level of which executives were necessary to close business unit sales or to accomplish cost reductions).  Thus the current record does not permit intelligent decision-making as to a plan designed – and designed solely, as the statute requires – to enhance creditor returns.

48. Accordingly, any KEIP based upon the as yet undefined wind-down must be rejected, without prejudice, to its renewal as part of a single, integrated plan for all employees deserving of bonuses related to the wind-down.

### iii. Given Anticipated Recoveries, the Anticipated KEIPs Are Excessive.

49. The bonuses in the Revised KEIP were calculated as one times each executive's salary plus the full bonus that could be paid to the executive outside of a bankruptcy if all of his or her yearly targets were met.  Additionally, portions of the Revised KEIP are uncapped and provide for bonuses in excess of those indicated should additional sales close or should

13

additional cost savings be achieved. A *starting point* that is more than 100% of the bonus that each executive would receive outside of a bankruptcy is inappropriate.[4]

50. The Debtors' current estimate is that the Second KEIP they will request could be as high as an additional $7 million, bringing the total KEIP in the case to $14 million. This is too rich given the outlook for unsecured creditors in this case.

51. The Debtors' reliance on court orders approving incentive plans in other cases is not helpful in evaluating this KEIP. As Judge Lifland noted in *Dana*, in response to debtors' comparing their compensation motion to compensation programs in other cases: "If this Court is to analyze the Compensation Motion pursuant to section 503(c), the Court must look to the specific circumstances of these cases, and these Debtors." *Dana I*, 351 B.R. at 101-02. The orders cited by Debtors are without context, *e.g.* only one attached order includes a copy of the relevant plan, and do not explain how the plans at issue were found to be appropriate in the circumstances of those cases.

52. The Committee remains willing to discuss, and will likely recommend approval of, a single, global incentive plan, whose sole object is providing the necessary incentives to maximize returns to the creditors. The Committee believes that such a plan should be tied to recoveries to unsecured creditors. The Debtors should be directed to present such a plan to the Committee as soon as possible once all parties have clarity as to what the ultimate wind-down of these cases will entail.

---

[4] The Committee has not received an adequate explanation as to why any bonus, let alone $1.5 million, is necessary for Mr. Hunter. Mr. Hunter is not involved in completing the sales, and it is not clear what role, if any, he is expected to play in lowering costs. *See* Hiltz Tr. 48:11-49:16 (opining that Alix Partners could lead efforts on cost reduction and wind-down going forward, and noting "I am not sure I can answer" whether Mr. Hunter is necessary in light of Alix Partners' involvement).

WHEREFORE, the Committee respectfully requests that the Court: (i) deny the KEIP Motion; and (ii) grant such other and further relief as is necessary and appropriate.

Dated: April 20, 2009
      New York, New York

**BINGHAM McCUTCHEN LLP**

By: /s/ Jeffrey S. Sabin
Jeffrey S. Sabin
jeffrey.sabin@bingham.com
399 Park Avenue
New York, NY 10022
Tel: (212) 705-7000
Fax: (212) 752-5378

-and-

Sabin Willett
sabin.willett@bingham.com
Andrew J. Gallo
andrew.gallo@bingham.com
One Federal Street
Boston, MA 02110
Tel: (617) 951-8000
Fax: (617) 951-8736

*Counsel for the Official Committee
of Unsecured Creditors*