WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile:  (212) 310-8007
Marcia L. Goldstein
Joseph H. Smolinsky

WEIL, GOTSHAL & MANGES LLP
700 Louisiana Street, Suite 1600
Houston, Texas 77002
Telephone: (713) 546-5000
Facsimile:  (713) 224-9511
Alfredo R. Pérez

Attorneys for Debtors
and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

```
-------------------------------------------------------------x
                                      :
In re                                 :        Chapter 11 Case No.
                                      :
BEARINGPOINT, INC., et al.,           :        09 - 10691 (REG)
                                      :
         Debtors.                     :        (Jointly Administered)
                                      :
-------------------------------------------------------------x
```

**DEBTORS' MOTION FOR (A) AUTHORITY TO SELL AND
TAKE ALL STEPS NECESSARY TO CONSUMMATE (I) THE SALE OF ALL
THE ISSUED SHARE CAPITAL OF BEARINGPOINT EUROPE HOLDINGS B.V.,
(II) THE SALE OF CERTAIN INTELLECTUAL PROPERTY, AND (III) THE
LICENSE OF CERTAIN INTELLECTUAL PROPERTY, AND (B) RELATED RELIEF**

# Table of Contents

Relief Requested ........................................................................................................... 1

BearingPoint's Sale of Assets ...................................................................................... 2

I.  THE STOCK PURCHASE AGREEMENT ............................................................ 5

II.  APPLICABLE AUTHORITY ............................................................................... 11

    A. The Sale and License of the Acquired Assets Under Section 363 of the
        Bankruptcy Code is Warranted ............................................................................ 11

    B. Sale of Sale of BE EMEA by Private Sale is Warranted Under the
        Circumstances .................................................................................................... 13

    C. Sale Free and Clear of Liens, Claims, Encumbrances, and Interests ......................... 14

    D. The Successful Bidder Should be Afforded All Protections Under  Section
        363(m) as a Good Faith Purchaser ..................................................................... 17

    E. The Court Should Waive or Reduce the Period Required By Bankruptcy
        Rule 6004(h) ...................................................................................................... 18

Jurisdiction and Venue.................................................................................................. 18

Notice ......................................................................................................................... 19

## Exhibits

Exhibit A       Stock Purchase Agreement
Exhibit B       Cited Orders

Annex A        Proposed Sale Order

# Table of Authorities

**Cases**

In re Abbotts Dairies of Penn., Inc., 788 F.2d 143 (3rd Cir. 1986) .............................. 17

Allstate Insurance Co. v. Hughes, 174 B.R. 884 (S.D.N.Y. 1994)............................. 17

America Living Systems v. Bonapfel (In re All America of Ashburn, Inc.), 56 B.R. 186
    (Bankr. N.D. Ga. 1986), aff'd, 805 F.2d 1515 (11th Cir. 1986) ...................................... 16

In re Betty Owens Sch., 1997 WL. 188127 (S.D.N.Y. April 17, 1997) ...................................... 12

In re Chateaugay Corp., 973 F.2d 141 (2d Cir. 1992) ................................................ 11

In re Chateaugay Corp., 1993 WL. 159969 (S.D.N.Y. May 10, 1993) ...................................... 17

Circus Time, Inc. v. Oxford Bank & Trust (In re Circus Time, Inc.), 5 B.R. 1
    (Bankr. D. Me. 1979).................................................................................. 15

Citicorp Homeowners Serv., Inc. v. Elliot (In re Elliot), 94 B.R. 343 (E.D. Pa. 1988) ............. 16

Committee of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.), 722 F.2d 1063
    (2d Cir. 1983)................................................................................................ 11

In re Condere Corp., 228 B.R. 615 (Bankr. S.D. Miss. 1998)...................................... 13

In re Decora Industrial, Inc., Case No. 00-44591, 2002 WL 32332749 (Bankr. D. Del.
    May 20, 2002)................................................................................................ 12

In re Delaware and Hudson Railway Co., 124 B.R. at 166 ........................................ 12

In re Enron Corp., 2003 WL 21755006 (AJG) (Bankr. S.D.N.Y. 2003)................................... 16

Futuresource LLC v. Reuters Ltd., 312 F.3d 281 (7th Cir. 2002) .............................. 15

Hargrave v. Township of Pemberton (In re Tabone, Inc.), 175 B.R. 855
    (Bankr. D.N.J. 1994)........................................................................................ 16

In re Integrated Resources, Inc., 147 B.R. 650 (S.D.N.Y. 1992) , appeal dismissed, 3 F.3d
    49 (2d Cir. 1993). ................................................................................... 11, 12

MacArthur Co. v. Johns-Manville Corp., 837 F.2d 89 (2d Cir. 1988) ....................... 15

In re Riverside Investment Partnership, 674 F.2d 634 (7th Cir. 1982)....................... 15

Rubinstein v. Alaska Pacific Consortium (In re New England Fish Co.),
    19 B.R. 323 (Bankr. W.D. Wash. 1982)........................................................ 16

In re Stein & Day, Inc., 113 B.R. 157 (Bankr. S.D.N.Y. 1990) .................................................. 17

Smith v. Van Gorkom, 488 A.2d 858 (Del. 1985)........................................................................ 11

In re Trans World Airlines, Inc., 322 F.3d 283 (3d Cir. 2003)................................................... 16

**Statutes**

11 U.S.C. § 105................................................................................................................... 1, 13

11 U.S.C. § 363.................................................................. 1, 11, 13, 14, 15, 16, 17, 18

28 U.S.C. §§ 157........................................................................................................... 18, 19

28 U.S.C. §§ 1334............................................................................................................... 18

28 U.S.C. §§ 1408............................................................................................................... 19

28 U.S.C. §§ 1409............................................................................................................... 19

**Rules**

Fed. R. Bankr. P. 6004.................................................................................. 1, 11, 18

Fed. R. Bankr. P. 6006.......................................................................................................... 1

Fed. R. Bankr. P. 9014.......................................................................................................... 1

TO THE HONORABLE ROBERT E. GERBER
UNITED STATES BANKRUPTCY JUDGE:

BearingPoint, Inc. ("**BE**") and certain of its affiliates, as debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "**Debtors**," and together with their non-debtor affiliates, "**BearingPoint**"),[1] seek this Court's authority to sell the issued share capital (the "**Acquired Shares**") of BearingPoint Europe Holdings B.V. ("**BE EMEA**") and to sell or license (as applicable) certain related intellectual property, and to take any and all steps necessary to effectuate the sale and purchase of BE EMEA (the "**EMEA Sale**") and the related transactions, and respectfully represent:

**Relief Requested**

1.      By this Motion, the Debtors seek entry of an order (the "**Sale Order**"), attached hereto as <u>Annex A</u>, pursuant to sections 363 and, as applicable 105(a) of title 11 of the United States Code (the "**Bankruptcy Code**") and Rules 6004, 6006, and 9014 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**") (a) approving the Agreement for the Sale and Purchase of the Share Capital of BearingPoint Europe Holdings B.V. (the "**Stock Purchase Agreement**"),[2] by and among BE Holdings I CV, a non-debtor Dutch limited partnership (the "**BE Holdings**"), Caravane Holdings, LLC, a non-debtor Delaware limited liability company ("**Caravane**"), Debtor BearingPoint, LLC, a Delaware limited liability company ("**BE LLC**"), Echelon Holdings C.V., a non-debtor Dutch limited partnership ("**Echelon**"), Debtor Peloton Holdings, L.L.C. ("**Peloton**"), a Delaware limited liability

---

[1] More information regarding the Debtors' business and the background of these chapter 11 cases, including information on BearingPoint's efforts to sell all or a portion of its assets prior to the filing of these chapter 11 cases can be found in the *Declaration of John DeGroote Pursuant to Rule 1007-2 of the Local Bankruptcy Rules for the Southern District of New York in Support of First-Day Motions and Applications*, filed on February 18, 2009, the date the Debtors filed their chapter 11 petitions (the "**Commencement Date**").

[2] A copy of the Stock Purchase Agreement is attached hereto as <u>Exhibit A</u>.

company, BE (together with BE Holdings, Caravane, BE LLC, Echelon and Peloton, the "***Sellers***"), BE Partners B.V. (together with its designees or assignees, as applicable, the "***Buyer***"), and BE EMEA, dated July 17, 2009, (b) approving the private sale of BE EMEA pursuant to the Stock Purchase Agreement, and (c) authorizing the Debtors and their affiliates exercise their stock powers and take any and all actions necessary to consummate the transactions pursuant to the Stock Purchase Agreement and all transaction documents contemplated thereby (collectively, the "***Transaction Documents***"), including, inter alia, (i) the sale of certain related intellectual property (the "***Acquired IP***"), and (ii) the transfer and license of certain related intellectual property (the "***Licensed IP***," and together with the Acquired Shares and the Acquired IP, the "***Acquired Assets***") pursuant to the License Agreement[3] and BE Trademark License (collectively, the "***Transaction***").

### BearingPoint's Sales of Assets

2.　　As the Court is aware, the Debtors are currently in the process of selling their assets to realize value for their creditors.  The Debtors have marketed BearingPoint's assets since 2008, when BearingPoint embarked on a comprehensive restructuring effort, which included the exploration of various strategic alternatives, including a transaction involving a sale of all or a portion of BearingPoint's assets.  At this time, an extensive sale process was initiated during which approximately 25 strategic and financial buyers expressed an interest in buying all or parts of BearingPoint.  The proposals that BearingPoint received in connection with those efforts either provided insufficient value or appeared impractical.  As a result, the Debtors filed for chapter 11 relief.

---

[3] Capitalized terms used but not defined herein shall have the meaning ascribed to such term in the Stock Purchase Agreement.

3. Following the Commencement Date, BearingPoint continued to explore strategic transactions for the purpose of maximizing value for all parties in interest. BearingPoint initiated a sales process during which a number of potential buyers expressed interest in all or a portion of BearingPoint's assets. Since the Commencement date, BearingPoint has closed the sales of a significant portion of its assets and business entities. For example, the Debtors sold a substantial portion of assets related to their Public Services group to Deloitte LLP and a substantial portion of assets related to their Commercial Services group to PriceWaterhouseCoopers, LLP. In addition, BearingPoint has sold its Japanese entities, and is in the process of selling its Brazilian entity and its remaining Public Service and Commercial Service group assets.

4. BearingPoint now seeks to sell BE EMEA, which consists of its operations and rights to operate in Europe, the Middle East, and Africa. Although BE EMEA is neither a Debtor in these chapter 11 cases nor the direct subsidiary of a Debtor, BE EMEA represents substantially all of the assets of Debtor Peloton. In addition, although the beneficial interests of the shares of BE EMEA are held by its parent, non-debtor BE Holdings, the legal title in such shares are ultimately held 99% by Debtor BE LLC, and 1% by Debtor Peloton. The chart below illustrates the relationship of BE EMEA to the Debtor entities:



In addition, there is certain intellectual property owned by Debtor entities that is being transferred pursuant to the EMEA Sale. As such, the Debtors believe that this Court's authorization is necessary to consummate the EMEA Sale.

     5.     BearingPoint, through its professionals, has marketed BE EMEA for approximately one year. After extensive review of proposals received during the sales process for BE EMEA, the Debtors, along with their advisors, have determined that the offer presented in the Stock Purchase Agreement and other Transaction Documents represents the best offer received for the Acquired Assets. In addition to providing value in the form of cash, a note and the repatriation of cash from the Debtors' European subsidiaries, as a management buyout, this offer significantly reduces the risks and costs of implementation associated with the transaction. Furthermore, the Debtors believe that a prompt sale of BE EMEA is necessary to preserve its remaining value.

6.     As such, the Debtors seek to effectuate a sale based on the Stock Purchase Agreement and other Transaction Documents.  Except as otherwise provided in the Transaction Documents, all of the Debtors' rights, title and interest in and to the Acquired Shares and the Acquired IP shall be sold free and clear of all pledges, liens, security interests, encumbrances, claims, charges, options, and interests thereon and against (collectively, the "***Interests***") except for any liabilities expressly assumed by the purchaser in accordance with section 363 of the Bankruptcy Code with such Interests attaching to the sale proceeds and/or paid to the secured creditors as approved by this Court.

7.     In addition, the Debtors seek to release all Interests held by the Administrative Agent, the Collateral Agent, and each of the lenders party to the Amended and Restated Credit Agreement, dated as of June 1, 2007 amongst BE, BE LLC, the Guarantors, the Lead Arranger, the Issuing Banks, the Administrative Agent and the Collateral Agent, as amended from time to time (collectively, the "***Agents and the Secured Lenders***") with such Interests attaching to the sale proceeds and/or paid to the Agents and the Secured Lenders as approved by this Court.

## I.  THE STOCK PURCHASE AGREEMENT

8.     As set forth above, the Debtors are requesting authority to enter into the Stock Purchase Agreement and the related Transaction Documents.  Certain terms of the Stock Purchase Agreement and the Transaction Documents are provided in the table below for summary and notice purposes only and to the extent any terms are inconsistent with the Transaction Documents, the applicable Transaction Document controls:[4]

---

[4] Capitalized terms used, but not defined herein, shall have the meaning ascribed to such term in the Transaction Documents.  The description of the Transaction Documents below is intended as a summary and is qualified in its entirety by the Transaction Documents.

| | |
|---|---|
| **Purchase Price** | The purchase price is $5,000,000 payable at Completion. |
| **Settlement by BE EMEA** | On/prior to Completion the Target shall: |

- settle amounts owed by it to the Seller by payment to the Seller of:
  - $34 million (the "***Excess Cash Amount***"); and
  - $1,003,592 (the "***Row Cash Amount***")

issue a loan note for $15,000,000 to the Seller.

| | |
|---|---|
| **Closing Conditions** | The sale and purchase of the shares is subject to the following closing conditions being fulfilled: |

- entry of the Approval Order by the Bankruptcy Court, which shall have become a Final Order;
- the formation of a trust and the transfer of certain Intellectual Property Rights into that trust; and
- the release by the Target of certain financial institutions from letters of credit they had issued on behalf of the Sellers' Group.

If the Conditions are not satisfied or waived on/before September 14, 2009, both parties shall have the right to terminate the SPA by written notice to the other.

| | |
|---|---|
| **Excess Cash and Settlements** | Various intercompany payables and cross-charges (being charges for certain intergroup services and headquarter cost allocations) are owing between the Seller and the Target: |

- $8,119,583.03 has been paid Target to Seller prior to the parties entering into the SPA in payment of certain outstanding intercompany charges. A further $5,880,516.97 to be paid by a Target Group Company to a Seller Group Company within five business days after execution of the SPA.
- On Completion, all cross-charges and intercompany charges relating to services invoiced on/before April 30, 2009 will be consolidated in the Seller and the Target under an Assumption and Assignment Agreements. Following this consolidation:
  - Target will pay Seller the Excess Cash Amount and the ROW Cash Amount;
  - the remaining payables/receivables owed between Target and Seller in excess of the Excess Cash Amount and ROW Cash Amount shall be set-off against each other. In payment of any remaining payables owed by the Target to the Seller, the Target will issue a loan note of $15 million and any remaining amount will be contributed by the Seller to the equity of the Target pursuant to a contribution agreement.
- Cross-charges and intercompany payables relating to relating to services rendered up to May 31, 2009 (and not invoiced on or before April 30, 2009) invoiced prior to the Signing Date shall be paid in cash on or prior to Completion;

- cross-charges incurred between June 1, 2009 and Completion shall accrue at a monthly rate and shall be invoiced within 10 Business Days after Completion;

- Seller's Group Intercompany Charges and ROW Intercompany Charges for services rendered between June 1, 2009 and the end of the last full calendar month before Completion shall be invoiced within 10 Business Days after the end of each full calendar month and the Seller's Intercompany Charges and ROW Intercompany Charges relating to the month of Completion shall be invoiced within 10 Business Days after Completion.

**Signing and Completion documents**

On signing, the Seller, BearingPoint, Inc. and the Target will enter into the Transitional Services Agreement.

The documents to be executed/entered into immediately prior to Completion will include (but are not limited to) the following:

- Licence Agreement between Seller and the Target (the Seller shall procure the execution of the Licence Agreement by the other parties thereto);

- written confirmation from the Target and the Seller to the Purchaser that the Transitional Services Agreement is still in force and that between signing and Completion, it has been duly performed by all relevant parties;

- evidence from the Seller to the Purchaser that the Agreement for sharing marketing development costs between DPHL, BearingPoint, Inc. and the BearingPoint Limited dated June 28, 2003 has been terminated and that no liabilities remain outstanding;

- the Assumption and Assignment Agreements;

- the Set-off Agreement;

- the Loan Agreement; and

- the Contribution Agreement.

The BE Trademark Licence shall be delivered prior to Completion.

After Completion, the following documents will need to be entered into:

- the Transfer Agreement between the Seller, the Double Dutch CV Partners (the legal owners of the Target shares, owing to the corporate structure of the Seller Group) and the Purchaser pursuant to which, in accordance with Dutch law, the shares will be transferred to the Purchaser; and

- the Share Pledge Agreement between the Seller, the Double Dutch CV Partners, the Purchaser and the Target.

**Pre-Completion covenants**

The Seller gives certain covenants regarding the ability of employees, board members or directors of BE Group companies to represent Target Group Companies, the appointment of board members to the boards of Target Group Companies, power of bank accounts of Target Group

Companies, restrictions on payments or settlements made by Target Group Companies to BE Group Companies and the transfer or license of certain Intellectual Property Rights to third parties (including the encumbering of such rights) in a manner that would be prejudicial to the Target's rights under the Licence Agreement or the BE Trademark Licence.

| | |
|---|---|
| **Post –Completion covenants** | With effect from Completion, the Seller shall procure that no Seller Group Company represents that any member of the Target Group is part of the same corporate group as the BE Group Companies. |
| | Similarly, with effect from Completion, the Purchaser shall procure that no Target Group Company represents that any member of the Seller Group is part of the same corporate group as the Target Group Companies. |
| | The Target makes certain covenants regarding corporate credit card arrangements and its employees and shall indemnify the relevant BE Group Company against all losses incurred caused by a payment default. |
| **Letters of Credit and Guarantees** | The Target shall procure that all letters of credit issued by financial institutions on behalf of the Seller's Group shall be returned by the relevant Target Group Company to the relevant issuer or shall be cash collateralised by the relevant Target Group Company. |
| | The Target shall use its commercially reasonable endeavours to procure that BearingPoint, Inc. is released from all guarantees given by it in respect of the Target Group Company and, pending release, the Target shall indemnify BearingPoint, Inc. against liabilities under those guarantees. |
| **Trust structure** | It is a condition precedent to Completion of the SPA that the parties form and establish a trust and assign certain Intellectual Property Rights to that trust. The parties agree to assess the potential tax liabilities of the trust structure. In the event, that the tax liabilities are estimated to exceed $100,000 the parties may either opt to agree on appropriate sharing of the tax liabilities or seek to agree on an alternative arrangement (in which case the parties shall agree to waive the relevant condition precedent). |
| **Seller's and Double Dutch CV Partners' Warranties** | At signing the Seller and Double Dutch CV Partners will be required to make a number of customary warranties to the Purchaser and the Target (such warranties to be deemed to be repeated immediately before Completion). These warranties will include (but will not be limited to) statements relating to the parties' power and authority to enter into the transaction, the fact that they hold the shares and the fact that there are no encumbrances affecting any of the shares (with the exception of the Swiss Share Pledge). |
| **Purchaser's warranties** | At signing the Purchaser will be required to make a number of customary warranties to the Seller (such warranties to be deemed to be repeated immediately before Completion). These warranties will include (but will not be limited to) statements relating to the Purchaser's power to execute and deliver the SPA, the fact that there is no conflict with or default relating to the SPA and any agreement to which the Purchaser is a party, |

the constitutional documents of the Purchaser or any law.

| | |
|---|---|
| **Bankruptcy Court approval and termination rights** | The Seller shall file a motion with the Bankruptcy Court seeking entry of the Approval Order. The Seller and Purchaser shall use their best efforts to cause the Bankruptcy Court to enter a final order in substantially the same form as agreed in the SPA. |

The Purchaser may terminate the SPA if the Seller:

- modifies the Approval Order in any material respect without the written consent of the Purchaser; or

- breaches any material covenant or obligation under the SPA.

The Purchaser may also terminate the SPA if the Bankruptcy Court does not enter the Approval Order in a form satisfactory to the Purchaser within 30 days after the motion is filed with the Bankruptcy Court.

If the Target (or a Target Group Company) has defaulted on its obligation to pay the amount of $5,880,516.97 to the Seller within 7 Business Days of the date of the SPA (being 2 additional Business Days beyond the due date for this payment), the Seller may terminate the agreement.

**Employees and Pensions**

Each Target Group Company and BE Group Company shall remain responsible for all of its accrued employee and pensions obligations for all employees of such Target Group Company or the BE Group Company, as the case may be.

**Protective Covenants**

Subject to specific exceptions allowing the companies' to carry on normal business activities, the Seller agrees with the Purchaser and the Purchaser agrees with the seller that no member of their respective corporate groups will, for a period of 24 months after Completion, engage in competitive business activities in each other groups geographical sphere of operation or induce any person who is at Completion a customer of the other's corporate group to leave the employment of that company.

The Seller also specifically agrees with the Purchaser and each Target Group Company that it shall not and shall procure that no member of the BE Group shall for a period of 24 months after Completion engage in carrying on a business which is competitive with a Target Group Company in the territory in which a Target Group Company operates.

The covenant on the purchaser relating to non-solicitation of customers does not apply to BearingPoint Infonova GmbH.

**Press Release and Confidentiality**

The parties agree that neither of their respective group companies shall make any announcement regarding the transaction and ancillary matters before Completion.

Subject to the information required to be made public pursuant to the Bankruptcy Court proceedings, the parties agree to keep the transaction confidential.

The duty of confidentiality will only be waived in a number of limited circumstances including, but not limited to, the prior written consent of

the other party, to the extent required by law or if the information comes into the public domain otherwise than as a result of a breach of the SPA.

| | |
|---|---|
| **Assignment** | Prior written consent of the Seller and the Purchaser is required to assign or transfer any of the rights under the SPA unless the assignment or transfer is by: |

- the Purchaser to any of the Target Group Companies;
- the Target to any of the Target Group Companies or to the Purchaser;
- the Seller to any of the BE Group Companies.

| | |
|---|---|
| **Governing law and Jurisdiction** | The SPA will be governed by English law and the English courts will have exclusive jurisdiction to settle any disputes arising out of or in connection with it. |

9.    The Transaction Documents provide for, among other things, the transfer of certain of the Licensed IP from a non-debtor affiliate of the Debtors, Dallas Project Holdings Limited ("*DPHL*") into a trust (the "*Trust*"), which will in turn license such Licensed IP to BE EMEA pursuant to the BE Trademark License and to other parties.  The formation of the Trust and the license of the Licensed IP is a key component of the EMEA Sale.  Unlike certain of the Debtors' previous sales, the Debtors' intellectual property is a cornerstone of the EMEA Sale. As such, it is imperative the Debtors' create a mechanism pursuant to which the Buyer can be assured the continued use of the intellectual property, while at the same time ensuring that other parties entitled to use of the intellectual property can continue such use unabated.  The creation of the Trust achieves these goals.  Absent the formation of the Trust and the license of the Licensed IP, the Debtors would be unable to enter into the Stock Purchase Agreement with the Buyer and consummate the EMEA Sale.

10.    Furthermore, the creation of the Trust provides a tangible benefit for the Debtors and their estates, as DPHL and the Trust will enter into a Master License Agreement and Services Agreement pursuant to which DPHL will hold the master license for certain of the Licensed IP and DPHL will be hired by the trustee to service the Licensed IP.  As such, DPHL

will maintain the worldwide "BearingPoint" brand for the benefit of the Debtors' creditors and will receive sufficient consideration for the transfer of the Licensed IP to the Trust.  Accordingly, the Debtors submit that the creation of the Trust and the transfer of certain of the Licensed IP to the Trust is in the best interest of the Debtors, their estates and all parties in interest.

## II.  APPLICABLE AUTHORITY

### A.      The Sale and License of the Acquired Assets Under Section 363 of the Bankruptcy Code is Warranted

11.      Ample authority exists for the approval of the proposed sale and license of the Debtors' assets.  Section 363 of the Bankruptcy Code, which authorizes a debtor to use or sell assets of the estate other than in the ordinary course of business, free and clear of liens, claims and encumbrances, provides, in relevant part, as follows:

> (b)(1) The trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate . . .

See 11 U.S.C. § 363(b)(1); see Fed. R. Bankr. P. 6004(f)(1) ("All sales not in the ordinary course of business may be by private sale or by public auction.").

12.      The decision to sell assets outside the ordinary course of business is based upon the sound business judgment of the debtor.  See, e.g., In re Chateaugay Corp., 973 F.2d 141 (2d Cir. 1992); Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.), 722 F.2d 1063, 1071 (2d Cir. 1983).  See also Official Comm. of Sub. Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.), 147 B.R. 650, 656 (S.D.N.Y. 1992), appeal dismissed, 3 F.3d 49 (2d Cir. 1993), quoting Smith v. Van Gorkom, 488 A.2d 858, 872 (Del. 1985) ("the business judgment rule 'is a presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action was in the best interests of the company,'" which has continued applicability in bankruptcy).

13.     In the circumstances of valid business justifications, applicable principles of law attach to a debtor's decision a strong presumption "that in making a business decision[,] the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company." In re Integrated Res., Inc., 147 B.R. at 656 (S.D.N.Y. 1992) (holding that the Delaware business judgment rule has "vitality by analogy" in chapter 11, especially where the debtor is a Delaware corporation) (quotations omitted).  Once a court is satisfied that there is a sound business justification for the proposed sale, the court must then determine whether (i) the debtor-in-possession has provided the interested parties with adequate and reasonable notice, (ii) the sale price is fair and reasonable, and (iii) the purchaser is proceeding in good faith.  In re Betty Owens Sch., Inc., 1997 WL 188127 (S.D.N.Y. 1997); accord In re Delaware and Hudson Ry. Co., 124 B.R. 169, 176 (D. Del. 1991); In re Decora Indus., Inc., Case No. 00-44591, 2002 WL 32332749 at *3 (D. Del. May 20, 2002).

14.     Ample business justification exists in this case to approve the Stock Purchase Agreement and the Transaction Documents and to authorize the Debtors to exercise their stock powers and to take any and all action necessary to consummate the sale of BE EMEA in accordance with the Transaction Documents.  The Debtors have considered all alternatives, with the assistance of their advisors, and determined that a sale of BE EMEA in accordance with the Transaction Documents is in the best interests of their estates and creditors.  The Debtors have already obtained authorization to sell substantially all of their assets related to their Public Services and Commercial Services groups.  The EMEA Sale will allow the Debtors to sell their European, Middle Eastern, and African assets at a time that they still have significant value, while still providing for adequate review and notice.

15. The Debtors have provided adequate notice and a reasonable opportunity to be heard in connection with the EMEA Sale and have properly exercised their reasonable business judgment and have shown good and sufficient business justification under sections 363(b) and, as applicable, 105(a) of the Bankruptcy Code for the EMEA Sale outside a plan of reorganization. The Debtors should therefore be authorized to take any and all actions necessary to consummate the EMEA Sale in accordance with the Transaction Documents.

**B.** **Sale of BE EMEA by Private Sale is Warranted Under the Circumstances**

16. Bankruptcy Rule 6004(f)(1) permits private sales by a debtor. Courts, including this Court, often allow a chapter 11 debtor to sell assets outside the ordinary course of business by private sale when the debtors demonstrate that the sale is permissible pursuant to section 363(b) of the Bankruptcy Code. See, e.g., In re Lehman Bros. Holdings Inc., Ch. 11 Case No. 08-13555 (JMP) (Bankr. S.D.N.Y. Feb. 24, 2009); In re Condere Corp., 228 B.R. 615 (Bankr. S.D. Miss. 1998). In Lehman, (i) the underlying motion for which the order was entered was on notice, (ii) no objections were filed that pertained to the private sales (iii) the order entered was a final order, and (iv) in each order the court found sufficient cause to merit the expense reimbursements and accordingly authorized the private sale. The extent to which the judge focused upon the provision is not clear from the orders. A copy of the above cited order is attached hereto as Exhibit B.

17. The Debtors' decision to pursue a private sale is supported by both the exigent circumstances as well as the Debtors belief that they have explored all options with respect to potential purchasers of BE EMEA. The Debtors have marketed BE EMEA for approximately one year, and have had active negotiations with all potential purchasers. The Debtors believe, in their business judgment, that the deal represented by the Transaction

Documents presents the estates and each of the parties to the Transaction Documents not only with significant value for the Acquired Assets, but also a high likelihood that the deal will close, and that the Debtors' estates and their creditors will realize value from the transaction. The Debtors do not believe that the time and effort associated with marketing BE EMEA for sale at a public auction would increase value. Indeed, the Debtors believe that such marketing could result in the Debtors being unable to sell or license the Acquired Assets for as much value as they are receiving under the Transaction Documents. The Debtors decision to sell or license the Acquired Assets by private sale is supported by the Agents and the Secured Lenders, as well as the Unsecured Creditors' Committee.

### C. Sale Free and Clear of Liens, Claims, Encumbrances, and Interests

18. The sale of the Acquired Shares and Acquired IP should be free and clear of any and all Interests in accordance with section 363(f) of the Bankruptcy Code, with any such Interests attaching to the proceeds of the EMEA Sale. Pursuant to section 363(f) of the Bankruptcy Code, a debtor in possession may sell property of the estate "free and clear of any interest in such property of an entity other than the estate" if any one of the following conditions is satisfied:

- applicable nonbankruptcy law permits sale of such property free and clear of such interest;

- such entity consents;

- such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;

- such interest is in bona fide dispute; or

- such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

19.     The Debtors request that the Court authorize the sale of the Acquired

Shares and Acquired IP free and clear of all Interests, other than any liabilities expressly

assumed by the Buyer in accordance with the Transaction Documents.  Pursuant to section

363(f)(3), any Interest holders will be adequately protected, because their Interest will attach to

the net proceeds of the sale, and the total Purchase Price is greater than the aggregate value of all

such Interests.  See MacArthur Co. v. Johns-Manville Corp., 837 F.2d 89, 94 (2d Cir. 1988) ("It

has long been recognized that when a debtor's assets are disposed of free and clear of third-party

interests, the third party is adequately protected if his interest is assertable against the proceeds of

the disposition."); Circus Time, Inc. v. Oxford Bank & Trust (In re Circus Time, Inc.), 5 B.R. 1,

3 (Bankr. D. Me. 1979) (finding the Court's power to sell property free and clear of liens has

long been recognized); see also In re Riverside Inv. P'ship, 674 F.2d 634, 640 (7th Cir. 1982)

("Generally, in a 'free and clear' sale, the liens are impressed on the proceeds of the sale and

discharged at the time of sale").  Alternatively, parties that may hold Interest on the Acquired

Shares and Acquired IP could be compelled to accept a monetary satisfaction of such interests,

satisfying section 363(f)(5) of the Bankruptcy Code.  Finally, the sale of the Acquired Shares and

Acquired IP will satisfy section 363(f) of the Bankruptcy Code because any entities holding

Interests on the Acquired Shares or Acquired IP will have received notice of the sale and will be

given sufficient opportunity to object to the relief requested herein, and any such entity that does

not object to the EMEA Sale should be deemed to have consented.  See Futuresource LLC v.

Reuters Ltd., 312 F.3d 281, 285-86 (7th Cir. 2002) ("It is true that the Bankruptcy Code limits

the conditions under which an interest can be extinguished by a bankruptcy sale, but one of those

conditions is the consent of the interest holder, and lack of objection (provided of course there is

notice) counts as consent.  It could not be otherwise; transaction costs would be prohibitive if

everyone who *might* have an interest in the bankrupt's assets had to execute a formal consent before they could be sold.") (internal citations omitted); Hargrave v. Township of Pemberton (In re Tabone, Inc.), 175 B.R. 855, 858 (Bankr. D.N.J. 1994) (failure to object to sale free and clear of liens, claims and encumbrances satisfies section 363(f)(2)); Citicorp Homeowners Serv., Inc. v. Elliot (In re Elliot), 94 B.R. 343, 345 (E.D. Pa. 1988) (same); see also In re Enron Corp. 2003 WL 21755006 at *2 (AJG) (Bankr. S.D.N.Y. 2003) (order deeming all parties who did not object to proposed sale to have consented under section 363(f)(2)). As such, to the extent that no party holding an Interest objects to the relief requested herein, the sale of the Acquired Shares and Acquired IP free and clear of all Interests except any liabilities expressly assumed by the Buyer in accordance with the Transaction Documents satisfies section 363(f)(2) of the Bankruptcy Code. In sum, sale of the Acquired Shares and Acquired IP free and clear of all Interests will satisfy one or more of the statutory prerequisites of section 363(f) of the Bankruptcy Code.

20. The Debtors submit that, in addition to being sold free and clear of all other Interests, the Acquired Shares and Acquired IP may be sold free and clear of all claims based on a theory of successor liability or any similar theory. Notwithstanding reference to the conveyance free and clear of "any interest," in section 363(f) of the Bankruptcy Code, that section has been interpreted to allow the sale of a debtor's assets free and clear of successor liability claims as well. See, e.g., In re Trans World Airlines, Inc. 322 F.3d 283, 288-90 (3d Cir. 2003) (sale of assets pursuant to section 363(f) of the Bankruptcy Code barred successor liability claims for employment discrimination and rights under travel voucher program); Am. Living Systems v. Bonapfel (In re All Am. of Ashburn, Inc.), 56 B.R. 186, 189-90 (Bankr. N.D. Ga. 1986), aff'd, 805 F.2d 1515 (11th Cir. 1986) (sale pursuant to section 363(f) barred successor liability for products defect claim); Rubinstein v. Alaska Pacific Consortium (In re New England

Fish Co.), 19 B.R. 323, 328 (Bankr. W.D. Wash. 1982) (sale pursuant to section 363(f) was free

and clear of successor liability claims for employment discrimination and civil rights violations).

        21.      In addition, the Debtors submit that the Interests held by the Agents and

the Secured Lenders should be released with respect to all of the Acquired Assets.  Absent a

release of such Interests, the Debtors will be unable to consummate the sale of BE EMEA.

        22.      Accordingly, the Debtors request that (a) the Acquired Shares and

Acquired IP be transferred to the Buyer thereof free and clear of all Interests except for any

liabilities expressly assumed by the Buyer in accordance with the Transaction Documents, and

(b) the Interests of the Agents and Secured Lenders be released with respect to all of the

Acquired Assets, with such Interests to attach to the net sale proceeds of the Acquired Assets.

    **D.**      **The Successful Bidder Should be Afforded All Protections**
                  **Under Section 363(m) as a Good Faith Purchaser**

        23.      Section 363(m) of the Bankruptcy Code protects a good-faith purchaser's

interest in property purchased from the debtor notwithstanding that the sale conducted under

section 363(b) is later reversed or modified on appeal.  Specifically, section 363(m) states that:

> The reversal or modification on appeal of an authorization
> under [section 363(b)] … does not affect the validity of a
> sale … to an entity that purchased … such property in good
> faith, whether or not such entity knew of the pendency of
> the appeal, unless such authorization and such sale … were
> stayed pending appeal.

11 U.S.C. § 363(m).  Section 363(m) "fosters the 'policy of not only affording finality to the

judgment of the bankruptcy court, but particularly to give finality to those orders and judgments

upon which third parties rely.'"  In re Chateaugay Corp., 1993 WL 159969 at 3 (S.D.N.Y. 1993)

(quoting In re Abbotts Dairies of Penn., Inc., 788 F.2d 143, 147 (3d Cir. 1986)).  See also

Allstate Ins. Co. v. Hughes, 174 B.R. 884, 888 (S.D.N.Y. 1994) ("Section 363(m) . . . provides

that good faith transfers of property will not be affected by the reversal or modification on appeal

of an unstayed order, whether or not the transferee knew of the pendency of the appeal"); In re Stein & Day, Inc., 113 B.R. 157, 162 (Bankr. S.D.N.Y. 1990) ("pursuant to 11 U.S.C. § 363(m), good faith purchasers are protected from the reversal of a sale on appeal unless there is a stay pending appeal").

24.     The selection of BE Partners B.V. as the purchaser was the product of arm's-length, good faith negotiations.  The Debtors intend to request at the EMEA Sale Hearing a finding that BE Partners B.V. is a good-faith purchaser entitled to the protections of section 363(m) of the Bankruptcy Code.

**E.     The Court Should Waive or Reduce the Period Required By Bankruptcy Rule 6004(h)**

25.     Pursuant to Bankruptcy Rule 6004(h), unless the court orders otherwise, all orders authorizing the sale of property pursuant to section 363 of the Bankruptcy Code are automatically stayed for 10 days after entry of the order.  The purpose of Bankruptcy Rule 6004(h) is to provide sufficient time for an objecting party to appeal before the order is implemented.  See Advisory Committee Notes to Fed. R. Bankr. P. 6004(h).

26.     To preserve the value of the Debtors' estates and limit the costs of administering and preserving BE EMEA, it is critical that the Debtors close the sale of BE EMEA as soon as possible after all closing conditions have been met or waived.  Accordingly, the Debtors hereby request that the Court waive the ten day stay periods under Bankruptcy Rule 6004(h).

**Jurisdiction and Venue**

27.     Pursuant to 28 U.S.C. §§ 157 and 1334 and Standing Order M-61 of the United States District Court for the Southern District of New York, dated July 10, 1984 (Ward, Acting C.J.), the Court has exclusive jurisdiction to consider and grant the relief requested

herein.  A proceeding to consider and grant such relief is a core proceeding pursuant to 28 U.S.C.

§ 157(b).  Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## Notice

28.     The Debtors shall serve notice of this Motion to parties in interest in

accordance with Case Management Order #2.  The Debtors submit that, in view of the facts and

circumstances, such notice is sufficient and no other or further notice need be provided.

WHEREFORE, the Debtors respectfully request that the Court grant the relief

requested herein and such other and further relief as is just and appropriate.

Dated: July 21, 2009
       New York, New York

  /s/ Alfredo R. Pérez
Marcia L. Goldstein
Joseph H. Smolinsky
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone:  (212) 310-8000
Facsimile:  (212) 310-8007

and

Alfredo R. Pérez
WEIL, GOTSHAL & MANGES LLP
700 Louisiana Street, Suite 1600
Houston, Texas  77002
Telephone: (713) 546-5000
Facsimile:  (713) 224-9511

Attorneys for Debtors
and Debtors in Possession

# Exhibit A

**Stock Purchase Agreement**

# AGREEMENT FOR THE SALE AND PURCHASE OF THE SHARE CAPITAL OF BEARINGPOINT EUROPE HOLDINGS B.V.

**DATED 17 JULY 2009**

**BE HOLDINGS I CV**

**CARAVANE HOLDINGS LLC**

**BEARINGPOINT LLC**

**PELOTON HOLDINGS, L.L.C.**

**ECHELON HOLDINGS C.V.**

**BEARINGPOINT, INC.**

**AND**

**BE PARTNERS B.V.**

**AND**

**BEARINGPOINT EUROPE HOLDINGS B.V.**

# CONTENTS

**Clause**                                                                                    **Page**

1.   Interpretation .........................................................................................................2
2.   Sale and Purchase of the Shares .............................................................................2
3.   Conditions Precedent ............................................................................................3
4.   Excess Cash and Settlements .................................................................................4
5.   Completion ...........................................................................................................5
6.   Post-Signing and Post-Completion Covenants .......................................................7
7.   Letters of Credit and Guarantees ..........................................................................10
8.   Seller's and Double Dutch CV Partners' Warranties ..............................................11
9.   Purchaser's Warranties ........................................................................................12
10.  Bankruptcy Court Approval .................................................................................13
11.  Termination Right ...............................................................................................13
12.  Effect of Termination ..........................................................................................14
13.  Employees and Pensions ......................................................................................14
14.  Protective Covenants ...........................................................................................14
15.  Press Releases and Confidentiality .......................................................................16
16.  Notices ...............................................................................................................18
17.  Assignments .......................................................................................................20
18.  Payments ............................................................................................................20
19.  General ...............................................................................................................21
20.  Whole Agreement ...............................................................................................22
21.  Governing Law and Jurisdiction ..........................................................................22

**Schedule**

Schedule 1 The Target ..................................................................................................24
Schedule 2 The Subsidiaries .........................................................................................25
Schedule 3 Completion ................................................................................................26
Schedule 4 Target Group Shares ...................................................................................27
Schedule 5 Interpretation .............................................................................................29
Schedule 6 ROW Group Companies .............................................................................34
Schedule 7 Wrong Pockets ...........................................................................................40
Schedule 8 Credit Notes ...............................................................................................42

**Appendix**                                                    Page

Appendix 1 Intercompany Account Settlement
Appendix 2 Trust Formation Principles
Appendix 3 BE Trademark Licence
Appendix 4 Settlement Schedule 31 May 2009
Appendix 5 Licence Agreement
Appendix 6 Transitional Services Agreement
Appendix 7 Assumption and Assignment Agreements
Appendix 8 Set Off Agreement
Appendix 9 Loan Agreement
Appendix 10 Contribution Agreement
Appendix 11 Certificate
Appendix 12 Transfer Agreement
Appendix 13 Share Pledge Agreement
Appendix 14 Letters of Credit
Appendix 15 BearingPoint, Inc. Guarantees
Appendix 16 Approval Order

**THIS AGREEMENT** is made on 17 July 2009

**BETWEEN**:

(1)     **BE HOLDINGS I CV**, a limited partnership formed under the laws of the Netherlands (registered number 24438649) whose registered address is at Schouwburgplein 30-34, 3012 CL Rotterdam, the Netherlands (the **Seller**), represented by its general partner, Caravane Holdings LLC;

(2)     **CARAVANE HOLDINGS LLC**, a limited liability company under the laws of Delaware, United States of America, having its registered office at 2711 Centerville Road, Suite 400, Wilmington, Delaware 19808, United States of America (**Caravane**), who for the purposes hereof acts:

      (i)      on its own behalf; and

      (ii)     as general partner of the Seller;

(3)     **BEARINGPOINT, LLC**, a limited liability company under the laws of Delaware, United States of America, having its registered office at 2711 Centerville Road, Suite 400, Wilmington, Delaware 19808, United States of America (**BearingPoint LLC**);

(4)     **ECHELON HOLDINGS C.V.**, a limited partnership under Dutch law (*commanditaire vennootschap*), having its formal registered address at c/o Premier Trust N.V., Schouwburgplein 30-34, 3012 CL Rotterdam, P.O. Box 21153, 3001 AD Rotterdam, the Netherlands (**Echelon**), represented by its general partner Peloton Holdings, L.L.C.;

(5)     **PELOTON HOLDINGS, L.L.C.**, a limited liability company under the laws of Delaware, United States of America, having its registered office at 2711 Centerville Road, Suite 400, Wilmington, Delaware 19808, United States of America (**Peloton**), who for the purposes hereof acts:

      (i)      on its own behalf; and

      (ii)     as general partner of Echelon Holdings C.V.;

(6)     **BEARINGPOINT, INC.** a Delaware Corporation, United States of America, having its registered office at 2711 Centerville Road, Suite 400, Wilmington, Delaware 19808, United States of America;

(7)     **BE PARTNERS B.V.**, a company incorporated under the laws of the Netherlands (registered number 34341123) whose registered office is at Strawinskylaan 3105 Atrium, 1077 ZX Amsterdam, the Netherlands (the **Purchaser**); and

(8)     **BEARINGPOINT EUROPE HOLDINGS B.V.**, a company incorporated under the laws of the Netherlands (registered number 24423399) whose registered address is at Schouwburgplein 30-34, 3012 CL Rotterdam, the Netherlands (the **Target**).

**BACKGROUND**:

(A)     It is the common intention of the Seller, Caravane, Echelon, Peloton and BearingPoint LLC that all the issued share capital of the Target is sold and transferred to the Purchaser on the terms and subject to the conditions set out in this agreement.

(B)     The Seller's shareholding in the Target is held on behalf of the Seller by its partners as follows:

   (i)     by Echelon: ninety-nine percent (99%); the undivided legal title to the assets of Echelon are held on behalf of Echelon by its partners as follows:

      -   by BearingPoint LLC: ninety-nine percent (99%); and

      -   by Peloton: one percent (1%); and

   (ii)    by Caravane: one percent (1%);

   Caravane, Echelon, Peloton and BearingPoint LLC being together herein referred to as the **Double Dutch CV Partners**.

(C)     BearingPoint, Inc., Peloton and BearingPoint LLC (but not Caravane) are subject to bankruptcy proceedings pursuant to Chapter 11 of Title 11 of the United States Code. Neither the Seller nor Echelon is subject to Dutch insolvency proceedings.

(D)     The Seller and the Double Dutch CV Partners wish to sell and the Purchaser wishes to purchase all the issued share capital of the Target on the terms and subject to the conditions set out in this agreement.

(E)     The individuals that comprise the European management of the BearingPoint Group that are or will be joining as shareholders of the Purchaser, wish, through the Purchaser as holding company, to continue the business activities of the Target and its subsidiaries under the name of BearingPoint after completion of the transactions contemplated by this agreement.

(F)     The Seller is acting under this agreement through Caravane who is acting on its own behalf, as a general partner of the Seller and with the full consent of the other Double Dutch CV Partners.

**IT IS AGREED** as follows:

## 1.     INTERPRETATION

1.1     In addition to terms defined elsewhere in this agreement, the definitions and other provisions in Schedule 5 apply throughout this agreement, unless the contrary intention appears.

1.2     In this agreement, unless the contrary intention appears, a reference to a clause, subclause or schedule or appendix is a reference to a clause, subclause, schedule or appendix of or to this agreement. The schedules and appendices form part of this agreement.

1.3     The headings in this agreement do not affect its interpretation.

## 2.     SALE AND PURCHASE OF THE SHARES

2.1     Subject to the Conditions being satisfied, the Seller and the Double Dutch CV Partners shall sell and the Purchaser shall purchase the Shares on Completion, free from all Encumbrances, equities and claims whatsoever and together with all rights attaching to them, including the right to receive all distributions and dividends declared, paid or otherwise made in respect of the Shares after Completion. For the avoidance of doubt, notwithstanding the Target's obligations to make payments pursuant to the Transaction Documents, (i) the profit earned by

the Target for the financial year ending 31 December 2009, as well as (ii) any profit earned by the Target in previous financial years which has not previously been distributed, shall be for the exclusive account of the Purchaser.

2.2 The Seller and the Double Dutch CV Partners covenant with the Purchaser that they have the right to sell and transfer the full legal and beneficial interests in the Shares to the Purchaser on the terms and subject to the conditions set out in this agreement.

2.3 Upon Completion, which is subject to the satisfaction or waiver (as applicable) of the Conditions, the Purchaser shall make a payment of $5 million in immediately available funds as consideration for the sale of the Shares (the **Purchase Price**). The Purchase Price shall be paid to the Seller or as directed by the Seller and the Seller and the Double Dutch CV Partners hereby confirm that (i) such payment to the Seller shall be valid and full discharge of the Purchaser's obligation to pay the Purchase Price and (ii) the Seller and the Double Dutch CV Partners will arrange between themselves the allocation of the Purchase Price.

2.4 On or prior to Completion, the Target shall, subject to and in accordance with the provisions of this agreement and its appendices:

(a) settle certain payables owed by it to the Seller by payment in cash to the Seller of the Excess Cash Amount and the ROW Cash Amount; and

(b) enter into the Loan Agreement.

## 3. CONDITIONS PRECEDENT

3.1 The sale and purchase of the Shares is conditional on:

(a) the Bankruptcy Court having entered the Approval Order which shall have become a Final Order;

(b) formation of the Trust to be established by the Seller (including the transfer of certain Intellectual Property Rights to the Trust) in accordance with Appendix 2; and

(c) the Target having complied with its obligations under subclause 7.1 of this agreement.

3.2 The Purchaser and the Seller shall use all reasonable endeavours to procure (so far as each of them is so able to procure) that each of the Conditions is satisfied as soon as possible after the date of this agreement and shall keep each other reasonably informed about the progress of satisfying the Conditions.

3.3 Without prejudice to subclause 3.2, the Seller and the Purchaser agree that all requests and enquiries from any court, trade body, governmental agency, Cayman Island legal counsel, the Trustee or the Enforcer (as such terms are defined in Appendix 2), which relate to the satisfaction of any of the Conditions, shall be dealt with by the Seller and the Purchaser in consultation with each other and the Seller and the Purchaser shall promptly co-operate with and provide all necessary information and assistance reasonably required by any such person upon being requested to do so by the other party.

3.4 The Seller and the Purchaser shall each notify the other promptly upon becoming aware that any of the Conditions have been fulfilled.

3.5    The Purchaser may waive by written declaration to the Seller (with a copy to the Target) the Condition in subclause 3.1(b) above. The Seller may waive by written declaration to the Purchaser (with a copy to the Target) the Condition in subclause 3.1(c) above.

3.6    The Seller and the Purchaser agree that they intend Completion to occur on or prior to 31 August 2009. If the Conditions are not satisfied (or waived, as applicable) in accordance with subclauses 3.1 and/or 3.5, on or before 14 September 2009, each of the Seller and the Purchaser shall have the right to terminate this agreement by written notice to the other (with a copy to the Target) save that if Completion has not occurred by such date as a result of a breach of this agreement, the breaching party shall not be entitled to exercise the right to terminate this agreement pursuant to this subclause 3.6.

3.7    Upon receipt of any notice pursuant to subclause 3.6 by the respective other party:

(a)    except for this subclause, clauses 1, 15, 16, 18, 19, 20 and 21 and the provisions of Schedule 5, all the provisions of this agreement shall lapse and cease to have effect; but

(b)    neither the lapsing of those provisions nor their ceasing to have effect shall affect any accrued rights or liabilities of either party in respect of damages for non-performance of any obligation under this agreement falling due for performance prior to such lapse and cessation.

4.    **EXCESS CASH AND SETTLEMENTS**

The Seller and the Target shall ensure that the Cross-charges and the Intercompany Charges between the BE Group on the one side and the Target Group on the other side shall be treated as follows:

(a)    an amount of $8,119,583.03 has been paid by the Target or any member of the Target Group to the Seller or a Seller's Group Company prior to the Signing Date in accordance with the Intercompany Account Settlement as set out in Appendix 1 to this agreement;

(b)    the Additional Amount shall be paid by the Target or any member of the Target Group to the Seller or, if directed by the Seller, to any Seller's Group Company within five Business Days after the Signing Date in accordance with the Intercompany Account Settlement as set out in Appendix 1 to this agreement;

(c)    all Cross-charges and Seller's Group Intercompany Charges relating to services invoiced on or before 30 April 2009 as well as the Credit Notes will be consolidated, on Completion, in the Seller and the Target pursuant to the Assumption and Assignment Agreements. Following such consolidation, on Completion:

(i)     the Target shall pay to the Seller on Completion, in fulfilment of payables to be identified by the Target and the Purchaser prior to Completion, the Excess Cash Amount and the ROW Cash Amount;

(ii)    the remaining payables and receivables owed between the Target and the Seller in excess of the Excess Cash Amount and the ROW Cash Amount shall be set off against each other pursuant to the Set-off Agreement;

(iii)   with respect to the then remaining payables owed by the Target to the Seller:

(A)  the Target and the Seller will enter into the Loan Agreement;

(B)  any then remaining amount will be contributed by the Seller to the equity of the Target pursuant to the Contribution Agreement;

(d)  the Cross-charges, Seller's Group Intercompany Charges and ROW Intercompany Charges relating to services rendered in any periods up to 31 May 2009 (and not invoiced on or before 30 April 2009) have been invoiced prior to the Signing Date. The Seller, the Target and the Purchaser have reviewed such invoices and certain credit notes and have agreed that the payments listed in Appendix 4 shall be made by the respective debtors to the respective creditors. The Seller shall ensure that the companies listed under the heading "BE Group" in Appendix 4 will pay the respective payables in cash on or prior to Completion and the Target shall ensure that the companies listed under the heading "Target Group" in Appendix 4 will pay the respective payables in cash on or prior to Completion;

(e)  the Cross-charges relating to the period between 1 June 2009 and Completion, which shall be paid pursuant to (f) below shall accrue at a rate of $1,050,000 per each full calendar month prior to Completion. If Completion occurs on or prior to the fifteenth day of any calendar month the applicable rate for such calendar month shall be $525,000; if Completion occurs after the fifteenth day of any calendar month the applicable rate for such calendar month shall be $1,050,000;

(f)  the Seller's Group Intercompany Charges and ROW Intercompany Charges relating to services rendered in the period between 1 June 2009 and the end of the last full calendar month prior to Completion shall be invoiced within 10 Business Days after the end of each full calendar month and the Seller's Group Intercompany Charges and the ROW Intercompany Charges relating to services rendered in the month in which Completion has occurred as well as the Cross-charges for the period from 1 June 2009 until Completion shall be invoiced within 10 Business Days after Completion. Any such invoices shall be paid within 30 days from the date of the respective invoice on a consolidated basis simultaneously on a date to be agreed upon between the Seller and the Target. The Seller shall ensure that any and all BE Group Companies pay in cash their respective payables on such agreed upon date and the Target shall ensure that any and all Target Group Companies pay in cash their respective payables on such agreed upon date; and

(g)  BearingPoint, Inc., the Seller and the Target shall ensure that all Cross-charges, Seller's Group Intercompany Charges and ROW Intercompany Charges, if any, relating to the services rendered in any periods prior to Completion and not invoiced as provided for in this clause 4 shall not be chargeable and that the Seller and the Target shall have no obligation to make any payment whatsoever to each other after Completion, with respect to such charges, or otherwise, other than in accordance with any Transaction Document.

## 5.  COMPLETION

5.1  Completion shall occur following completion of all action items (and not some only) listed in subclause 5.2. Completion shall take place at the Amsterdam office of the Seller's Solicitors at Apollolaan 15, 1077AB Amsterdam at 11 a.m. (CET) on the seventh Business Day immediately following the date on which the last of the Conditions to be satisfied or waived (as applicable) in accordance with clause 3 is satisfied or waived (as applicable) (or at such

other place, at such other time and/or on such other date as the Seller and the Purchaser may agree).

5.2 Immediately prior to Completion, the following pre-Completion actions shall be taken and completed in the following order:

(a) the Seller and the Target shall execute the Licence Agreement as attached hereto as Appendix 5 and the Seller shall procure the execution of the Licence Agreement by the other parties thereto;

(b) the Target and the Seller shall deliver to the Purchaser a written confirmation signed by all parties to the Transitional Services Agreement that the Transitional Services Agreement is still in force in the form set out in Appendix 6 and that, in the period between the Signing Date and Completion, it has been duly performed by all parties thereto in accordance with its terms and conditions in all material respects;

(c) the Seller shall deliver to the Purchaser a document evidencing that the Agreement for Sharing Marketing Development Costs between DPHL, BearingPoint, Inc. and BearingPoint Limited, dated 28 June 2003, has been terminated effective no later than as of Completion with no liabilities remaining outstanding;

(d) the Target shall deliver to the Seller a list of all payables of the Target that shall be fulfilled by payment in cash of the Excess Cash Amount and the ROW Cash Amount (as set forth in subclause 4(c)(i));

(e) the Seller and the Target shall procure the execution of the Assumption and Assignment Agreements (attached hereto as Appendix 7) by the parties to those agreements;

(f) the Seller and the Target shall enter into the Set-off Agreement (attached hereto as Appendix 8);

(g) the Seller and the Target shall enter into the Loan Agreement in the form set out in Appendix 9;

(h) the Seller and the Target shall enter into the Contribution Agreement (attached hereto as Appendix 10). The Seller, BearingPoint, Inc. (on behalf of itself and all members of the BE Group) and the Purchaser (on behalf of itself and all members of the Target Group) acknowledge and agree that entry into the Contribution Agreement shall be valid and full discharge of each and every liability owing between the Target and the Seller and between any member of the Target Group and any member of the BE Group as at 30 April 2009;

(i) the Seller shall procure that the companies listed under the heading "BE Group" in Appendix 4 shall pay in cash their respective payables owing to the Target Group Companies as set out in subclause 4(d);

(j) the Target shall procure that the companies listed under the heading "Target Group" in Appendix 4 shall pay in cash their respective payables owing to the Seller's Group Companies as set out in subclause 4(d);

(k) the Seller shall deliver to the Purchaser the executed BE Trademark Licence as attached in Appendix 3 by the parties thereto; and

(l) the Seller shall deliver to the Purchaser a certificate issued by John DeGroote in his capacity as general counsel to BearingPoint Inc. and as managing director of the Seller substantially in the form of Appendix 11;

(m) the Seller undertakes between the Signing Date and Completion to take such action as it deems necessary to rename each of those entities within the BE Group which are operating companies continuing to operate as going concerns as at Completion such that they do no longer have a trade name or business name that includes or is similar to any (i) Trademarks (as such term is defined in the Licence Agreement) assigned under the Licence Agreement or (ii) Trademarks (as such term is defined in the BE Trademark Licence) licensed under the BE Trademark Licence. To the extent the Seller has obtained in its possession as at Completion, it agrees to deliver to the Purchaser documents evidencing that such entities have been so renamed and to the extent the Seller is unable to deliver all relevant documents at Completion it will do so as soon as it is able following Completion; and

(n) the Seller shall deliver to the Purchaser a written confirmation that the entities referred to in the first sentence of paragraph (m), above have no licence or other rights to use any (i) Trademarks (as such term is defined in the Licence Agreement) assigned under the Licence Agreement or (ii) Trademarks (as such term is defined in the BE Trademark Licence) licensed under the BE Trademark Licence.

5.3 Following completion of all actions listed in subclause 5.2 above, all of the following actions (and not some only) shall be taken and completed in the order set out below:

(a) the Seller, the Double Dutch CV Partners and the Purchaser shall enter into the Transfer Agreement attached hereto as Appendix 12;

(b) the Target or any member of the Target Group shall pay in cash to the Seller (or to such members of the Seller's Group as the Seller may have indicated in writing to the Target and to the Purchaser at least five Business Days prior to Completion), the Excess Cash Amount and the ROW Cash Amount;

(c) the Purchaser shall pay in cash to the Seller the Purchase Price as specified in subclause 2.3;

(d) the Seller, the Double Dutch CV Partners, the Purchaser and the Target shall enter into the Share Pledge Agreement attached hereto as Appendix 13; and

(e) the Seller shall observe and perform the provisions of Part 1 of Schedule 3 and the Purchaser shall observe and perform the provisions of Part 2 of Schedule 3.

## 6. POST-SIGNING AND POST-COMPLETION COVENANTS

6.1 On the Signing Date, the Transitional Services Agreement as attached in Appendix 6 shall be entered into by the Seller, BearingPoint, Inc. and the Target.

6.2 Immediately after the Signing Date, BearingPoint, Inc. and the Seller shall use their commercially reasonable endeavours to deliver to the Purchaser written confirmation of the Secured Creditors that they have released and waived any liens held by them on the Intellectual Property Rights that are the subject of the Licence Agreement or the BE Trademark Licence.

6.3 Within five Business Days of the Signing Date, the Target shall pay, or procure the payment by any member of the Target Group, to the Seller of the Additional Amount.

6.4 With effect from the Signing Date, the Seller shall ensure that until the date when Completion occurs or the Seller or the Purchaser, as the case may be, has terminated this agreement pursuant to subclause 3.6:

(a) shareholder resolutions shall be passed in all relevant Target Group Companies to the effect that no person who is an employee, director or board member of any of the members of the BE Group is legally authorised to represent any Target Group Company in his or her sole capacity;

(b) there will be no new board members appointed in any of the Target Group Companies without the prior written approval of all board members of the Target;

(c) the Seller shall procure that the Target shall amend or procure the amendment of the terms of any power of attorney with respect of any bank account of the Target to the effect that no person who is an employee, director or board member of any member of the BE Group has a single power of attorney with respect to any such bank account and such power of attorney shall be amended to be a joint power of attorney; and

(d) subject to the Trust Formation Principles, none of the Intellectual Property Rights that (i) is listed in any schedule to the Licence Agreement or any schedule to the BE Trademark Licence, or (ii) that would otherwise be licensed or transferred to the Target under the Licence Agreement or the BE Trademark Licence or to the Trust pursuant to Appendix 2 hereto will (A) be transferred or licensed to any third party in a manner that would be prejudicial to the Target's rights under the Licence Agreement or the BE Trademark Licence, or (B) be made subject to any option, right to acquire, mortgage, charge, pledge, lien or any agreement to create any of the foregoing.

6.5 The parties agree that the schedules to:

(a) the Licence Agreement set out at paragraphs (i) to (v) inclusive below may be amended by the parties in accordance with Schedule 7 to this agreement until Completion:

(i) Schedule 2 (Assigned Rights);

(ii) Schedule 3 (Licensed Rights);

(iii) Schedule 4 (Excluded Assignee Rights);

(iv) Schedule 5 (Back-Licensed Rights);

(v) Schedule 7 (National Bearing Point Domain Names).

(b) The parties agree that the Schedules to the BE Trademark Licence set out at paragraphs (i) to (iii) inclusive below may be amended by the parties in accordance with Schedule 7 to this agreement until Completion:

(i) Schedule 1 (Licensed Trade Marks); and

(ii)     Schedule 2 Part A (National Bearing Point Domain Names);

(iii)    Schedule 2 Part B (Global Bearing Point Domain Names).

6.6    With effect from the Signing Date, the Seller shall use its best endeavours to ensure that during the period between the Signing Date and the date when Completion occurs or the Seller or the Purchaser, as the case may be, has terminated this agreement pursuant to subclause 3.6:

(a)    no person who is an employee, director or board member of any of the members of the BE Group who is legally authorised to represent any Target Group Company in his or her sole capacity will make use of such right, but will only act on behalf of any such Target Group Company together with another board member who is an employee of any Target Group Company, or, if there is no such other board member, after having obtained the prior written approval of all board members of the Target; and

(b)    no person who is an employee, director or board member of any member of the BE Group will dispose of any amounts credited to any bank account of any Target Group Company without the prior written approval of all board members of the Target.

6.7    With effect from the Signing Date, each of the Seller and the Target shall ensure that no other payments or settlements will be made by any Target Group Company to any BE Group Company save for those payments explicitly referred to in this agreement or any other Transaction Document as being payable prior to Completion. Any amounts paid or settled or otherwise transferred from any Target Group Company to any BE Group Company (which are not explicitly referred to in this agreement or in any Transaction Document as being payable prior to Completion) shall be deducted from the Excess Cash Amount and/or the ROW Cash Amount.

6.8    With effect from Completion, the Purchaser shall procure that no Target Group Company represents that the Seller or any other member of the BE Group is part of the same corporate group as the Target Group Companies.

6.9    With effect from Completion, the Seller shall procure that no BE Group Company represents that the Target or any other member of the Target's Group is part of the same corporate group as the BE Group Companies.

6.10   The Target shall procure that with effect from 30 September 2009, no person who is an employee or director of any member of the Target Group shall be a member of, or retain any rights in respect of, the corporate credit card services arrangements provided to members of the BE Group pursuant to the agreements in effect at Completion between the relevant BE Group Company and any affiliate of the American Express Company (jointly the **Amex Arrangements**). The Target shall indemnify the relevant BE Group Company against all losses incurred by such BE Group Company caused by a payment default occurring in the period between Completion and 30 September 2009 of any employee of any Target Group Company regarding the American Express Credit Cards used by such employee under the Amex Arrangements.

6.11   The Purchaser and the Seller agree that they will co-operate and assist each other at all times, in good faith and in a timely manner in order to obtain any third party consents or waivers which may be required to release any member of the BE Group from any liabilities or

obligations in respect of any member of the Target Group and to release any member of the Target Group from any liabilities or obligations in respect of any member of the BE Group.

## 7.  LETTERS OF CREDIT AND GUARANTEES

7.1  The Target shall procure with effect from Completion, that the letters of credit that Wells Fargo and each other financial institution has issued on behalf of any member of the Seller's Group as an account party (Wells Fargo and each such other financial institution, an **Issuer**) as identified in Appendix 14 shall either (a) be returned by the relevant Target Group Company to the respective Issuer or (b) be cash collateralized by Target or the relevant Target Group Company by providing cash collateral in the nominal amount of the respective letter of credit to such Issuer or Wells Fargo (as agent for the Secured Lenders, if so instructed by the respective Issuer). The Seller shall provide all such assistance and take all such action which is reasonably requested by the Target in order to complete the obligations of the Target pursuant to this subclause 7.1.

7.2  The Target shall use its commercially reasonable endeavours to procure with effect from Completion, or to the extent not procured with effect from Completion, shall procure as soon as reasonably practicable thereafter, that BearingPoint, Inc. is released from all guarantees which have been given by it in respect of any liability or obligation of any Target Group Company (as identified in Appendix 15) and pending such release the Target shall indemnify BearingPoint, Inc. against all liabilities under those guarantees (whether actual or contingent). The Seller and BearingPoint, Inc. shall provide all such assistance which is reasonably requested by the Target in order to complete the obligations of the Target pursuant to this subclause 7.2.

7.3  Each of BearingPoint, Inc. (on behalf of itself and the BE Group Companies) and the Target (on behalf of itself and the Target Group Companies) confirms that, with effect from Completion, no member of its group of companies shall have any outstanding obligations (whether actual or contingent) with respect to any liabilities, guarantees, indemnities or claims whatsoever in favour of any member of the other party's group of companies save in respect of any obligations arising under this agreement or any of the Transaction Documents.

7.4  With effect from the Signing Date, the parties will work with each other and their respective advisers to analyse the potential tax liabilities that will, or will be likely to, be incurred by members of the BE Group or members of the Target Group in connection with the initial establishment and formation of the Trust in accordance with the Trust Formation Principles (the **Estimated Tax Liabilities**). In the event the parties agree, acting reasonably, that Estimated Tax Liabilities exceed $100,000, then either the Seller or the Purchaser may within 3 Business Days of such agreement, require the parties to negotiate in good faith to seek to agree on (i) an appropriate sharing of the Estimated Tax Liabilities between the parties or (ii) an alternative arrangement which will, in the reasonable opinion of each party, provide substantially similar protection to the Intellectual Property Rights from the insolvency of DPHL (or similar event) as was afforded by the Trust. In the event the parties reach an agreement on an alternative arrangement (in the form of a written amendment to this agreement), they shall waive by joint declaration (in accordance with clause 3) the Condition set out at subclause 3.1(b). In the event the parties fail to agree an alternative structure by the time all other Conditions are satisfied and/or waived, Completion shall occur in accordance with the terms of this agreement.

## 8. SELLER'S AND DOUBLE DUTCH CV PARTNERS' WARRANTIES

8.1 The Seller warrants to the Purchaser and to the Target as at the Signing Date in terms of the following warranties (the **Seller Warranties**), and the Seller Warranties shall be deemed to be repeated immediately before Completion by reference to the facts and circumstances then existing as if references in the Seller Warranties to the Signing Date were references to the date of Completion, that:

   (a) the Seller and each BE Group Company has the authority and power to execute, deliver and perform its obligations under this agreement and each of the Transaction Documents to which it is a party, subject to the entry by the Bankruptcy Court of the Approval Order, to carry out the obligations contemplated in this agreement and each of the Transaction Documents. The execution, delivery and performance by the Seller of this agreement and each of the Transaction Documents has been duly authorised by all necessary action of the Seller and subject to the entry by the Bankruptcy Court of the Approval Order, no other action on the part of the Seller is required in connection therewith;

   (b) the Seller is validly existing under the laws of its place of incorporation with full power and authority to conduct its business as presently conducted;

   (c) subject to the entry by the Bankruptcy Court of the Approval Order, this agreement and the other Transaction Documents will, when executed (subject to the satisfaction or waiver (as applicable) of any relevant conditions precedent) constitute valid, binding and enforceable obligations of the Seller and of each of BE Group Company that is party to the Transaction Documents;

   (d) all authorisations from, and notices or filings with, any governmental or other authority (other than such referred to in subclause 3.1(a)) that are necessary to enable the Seller or any BE Group Company to execute, deliver and perform its obligations under this agreement and each of the other Transaction Documents to which it is a party have been obtained or made (as the case may be) and are in full force and effect and all conditions of each such authorisation have been complied with;

   (e) any and all Target Group Shares are directly or indirectly held by the Target;

   (f) the Shares and the Target Group Shares constitute the whole of the issued and allotted share capital of the Target and the Subsidiaries and are fully paid up unless otherwise explicitly mentioned in Schedule 4;

   (g) there is no Encumbrance on, over or affecting any of the Shares or any of the Target Group Shares with the exception of the Swiss Share Pledge;

   (h) the Seller and the Double Dutch CV Partners are entitled to transfer the full legal and beneficial ownership in the Shares to the Purchaser on the terms and subject to the conditions set out in this agreement and the Transfer Agreement; and

   (i) as of the Signing Date, the Seller has not filed a request for bankruptcy (*faillissement*) or for a suspension of payments (*surceance van betaling*) or any similar proceedings concerning the Seller with Dutch Courts or other competent authority. There exist no circumstances which would require an application for any such proceedings under applicable bankruptcy or insolvency laws nor do any circumstances exist according to any applicable bankruptcy or insolvency laws

which would justify the avoidance of this agreement or any other Transaction Documents or parts thereof. The Seller is solvent and is able to pay its obligations as they come due.

8.2 Each of the Double Dutch CV Partners severally warrants to the Purchaser and to the Target as at the Signing Date in terms of the following warranties (the **Double Dutch CV Partners Warranties**), and the Double Dutch CV Partners Warranties shall be deemed to be repeated immediately before Completion by reference to the facts and circumstances then existing as if references in the Double Dutch CV Warranties to the Signing Date were references to the date of Completion, that:

(a) the Shares constitute the whole of the issued and allotted share capital of the Target and are fully paid up;

(b) there is no Encumbrance on, over or affecting any of the Shares;

(c) the Seller and the Double Dutch CV Partners are entitled to transfer the full legal and beneficial ownership in the Shares to the Purchaser on the terms and subject to the conditions set out in this agreement and the Transfer Agreement; and

(d) as of the Signing Date, no bankruptcy, insolvency, judicial composition or similar proceedings concerning the Seller, Echelon or Caravane have been applied for. There exist no circumstances which would require an application for any such proceedings under any applicable bankruptcy or insolvency laws nor do any circumstances exist according to any applicable bankruptcy or insolvency laws which would justify the avoidance of this agreement or any other Transaction Documents or parts thereof. Caravane and Echelon are solvent and are able to pay their respective obligations as they come due.

## 9. PURCHASER'S WARRANTIES

The Purchaser warrants to the Seller as at the Signing Date in terms of the following warranties (the **Purchaser Warranties**), and the Purchaser Warranties shall be deemed to be repeated immediately before Completion by reference to the facts and circumstances then existing as if references in the Purchaser Warranties to the Signing Date were references to the date of Completion, that:

(a) it has the power to execute and deliver this agreement, and each of the other Transaction Documents to which it is or will be a party, and to perform its obligations under each of them and has taken all action necessary to authorise such execution and delivery and the performance of such obligations;

(b) this agreement constitutes, and each of the other Transaction Documents to which it is or will be a party will, when executed, constitute legal, valid and binding obligations of the Purchaser in accordance with their respective terms;

(c) the execution and delivery by the Purchaser of this agreement and of each of the other Transaction Documents to which it is or will be a party and the performance of the obligations of the Purchaser under it and each of them do not and will not conflict with or constitute a default under any provision of:

(i) any agreement or instrument to which the Purchaser is a party; or

(ii) the constitutional documents of the Purchaser; or

<ol type="i" start="3">
<li>(iii) any law, lien, lease, order, judgment, award, injunction, decree, ordinance or regulation or any other restriction of any kind or character by which the Purchaser is bound;</li>
</ol>

(d) all authorisations from, and notices or filings with, any governmental or other authority (other than such mentioned in subclause 3.1(a)) that are necessary to enable the Purchaser to execute, deliver and perform its obligations under this agreement and each of the other Transaction Documents to which it is or will be a party have been obtained or made (as the case may be) and are in full force and effect and all conditions of each such authorisation have been complied with;

(e) it is validly existing under the laws of the place of its incorporation with full power and authority to conduct its business as presently conducted; and

(f) it will have at Completion immediately available on an unconditional basis (subject only to Completion) the necessary resources to meet its obligations under this agreement.

## 10. BANKRUPTCY COURT APPROVAL

### 10.1 Submission for Bankruptcy Court Approval

Within two Business Days of the Signing Date, the Seller (or another member of the BE Group) shall file the motion with the Bankruptcy Court seeking entry of the Approval Order (**Motion**). The Motion shall request that a hearing on the Motion shall occur before the Bankruptcy Court no later than 25 days after the filing of the Motion.

### 10.2 Approval Order

(a) The Purchaser and the Seller agree to use their respective best efforts to cause the Bankruptcy Court to enter a Final Order substantially in the form set forth in Appendix 16 authorising the Debtors to take such steps necessary to cause the Seller to sell the Shares to the Purchaser in accordance with the terms and conditions of this agreement, which order shall be provided by the Purchaser and shall be in a form and substance satisfactory to the Seller and the Purchaser (the **Approval Order**). The Seller shall not modify, alter or amend the Approval Order in any respect without the written consent of the Purchaser and any modifications, alternations, or amendments to the Approval Order by the Bankruptcy Court shall be subject to the written consent of the Purchaser.

(b) For purposes of this agreement, a **Final Order** means an order or a judgment entered by the Bankruptcy Court (i) that has not been reversed, stayed, modified, amended or vacated and (ii) as to which the time for filing a notice of appeal, a petition for review or a motion for reargument or rehearing has expired.

## 11. TERMINATION RIGHT

### 11.1 If the Seller:

(a) modifies, amends or alters the Approval Order in any material respect without the written consent of the Purchaser; or

(b) breaches any other material covenant or material obligation under this agreement,

the Purchaser may terminate this agreement (other than clauses 1, 15, 16, 18, 19, 20, and 21 and the provisions of Schedule 5) by notice in writing to the Seller.

11.2 If the Bankruptcy Court does not enter the Approval Order in form and substance satisfactory to the Purchaser within 30 days after the date of the Motion is filed with the Bankruptcy Court, the Purchaser may terminate this agreement (other than clauses 1, 16, 18, 19, 20, and 21 and the provisions of Schedule 5) by notice in writing to the Seller.

11.3 If the Target or any other Target Group Company has defaulted on its obligation to make the payment of the Additional Amount for more than two Business Days after the due date pursuant to subclause 6.1, the Seller may terminate this agreement (other than clauses 1, 16, 18, 19, 20, and 21 and the provisions of Schedule 5) by notice in writing to the Purchaser.

## 12. EFFECT OF TERMINATION

If this agreement is terminated as permitted by subclauses 3.6, 11.2 or 11.3 above, with immediate effect from the date of such termination this agreement shall become null and void and will be of no further force and effect, except for the following clauses which will remain in full force and effect: 1, 15, 16, 18, 19, 20 and 21 and the provisions of Schedule 5.

## 13. EMPLOYEES AND PENSIONS

13.1 For the avoidance of doubt, the Target acknowledges and agrees that each Target Group Company shall remain responsible for all of its accrued obligations (including remuneration, pension entitlements and other benefits) for all of the employees of such Target Group Company. For the avoidance of doubt, the Seller acknowledges and agrees that each BE Group Company shall remain responsible for all of its accrued obligations (including remuneration, pension entitlements and other benefits) for all of the employees of such BE Group Company.

13.2 The Seller and the Target agree that with respect to any individuals who have employment contracts with both a member of the Seller's Group and a member of the Target Group, the parties shall use their reasonable endeavours to ensure that any such individuals will, as from Completion, have one employment contract with either a member of the Seller's Group or a member of the Target Group (as applicable).

## 14. PROTECTIVE COVENANTS

14.1 The Seller covenants with the Purchaser and each Target Group Company that it shall not and shall procure that no member of the BE Group shall (whether alone or jointly with another and whether directly or indirectly) for a period of 24 months after Completion be engaged, concerned or interested in the Territory in carrying on any business which is competitive with a business carried on by a Target Group Company at Completion.

14.2 The Seller covenants with the Purchaser and each Target Group Company that it shall not and it shall procure that no member of the BE Group shall (whether alone or jointly with another and whether directly or indirectly):

(a) for a period of 24 months after Completion induce or attempt to induce any person who is at Completion an employee of a Target Group Company to leave the employment of that Target Group Company; or

(b) for a period of 24 months after Completion induce or attempt to induce any person who is at Completion a customer of any Target Group Company, for services to be provided to such customer in the Territory.

14.3 The Purchaser covenants with the Seller and each BE Group Company that it shall not and it shall procure that no member of the Target Group shall (whether alone or jointly with another and whether directly or indirectly):

(a) for a period of 24 months after Completion induce or attempt to induce any person who is at Completion an employee of the BE Group to leave the employment of that company; or

(b) for a period of 24 months after Completion induce or attempt to induce any person who, to the knowledge of the Purchaser, is at Completion, a customer of any member of the BE Group, for services to be provided to such customer if and for so long as such customer is exclusively acting outside the Territory. The covenant under this paragraph (b) does however not apply to BearingPoint Infonova GmbH.

14.4 The restrictions in subclauses 14.1, 14.2 and 14.3 shall not:

(a) prevent any member of the BE Group, from holding shares or debentures in a listed company which confer not more than 5% of the votes which could normally be cast at a general meeting of that company;

(b) apply (or as the case may be shall cease to apply) to the extent that any member of the BE Group after Completion acquires any company or business and, as a result of that acquisition, acquires a company or business which falls within the terms of subclause 14.1 (the **Relevant Interest**) provided that the Relevant Interest does not comprise more than 10% of the annual revenues of the company or business acquired, with reference to the latest available audited accounts of such company or business;

(c) prevent the BE Group from carrying on the business or range of business carried on by the BE Group at Completion outside the Territory, subject to the provisions of the Licence Agreement;

(d) prevent any member of the BE Group, the Purchaser or any of the Target Group Companies from publishing any recruitment advertisement in any local or national newspaper or other publication or on any website, or from negotiating with any person who replies to any such advertisement or who initiates any contact with any BE Group, the Purchaser or any of the Target Group Companies; and

(e) prevent the Seller from entering, in accordance with and subject to the provisions of this agreement, into any agreement relating to the sale, transfer, lease or other disposition, directly or indirectly, of a portion or all of the business, shares or contracts of the Target Group to a buyer who is not the Purchaser.

14.5 Each of the restrictions in each paragraph or subclause above shall be enforceable independently of each of the others and its validity shall not be affected if any of the others is invalid.

14.6 If any of those restrictions is void but would be valid if some part of the restriction were deleted, the restriction in question shall apply with such modification as may be necessary to make it valid.

**15. PRESS RELEASES AND CONFIDENTIALITY**

15.1 The Purchaser shall not, and shall procure that no adviser or other person connected with the Purchaser shall make any press release or other form of announcement concerning the sale or purchase of the Shares or any related or ancillary matter before or on Completion without the prior consent of the Seller.

15.2 The Seller shall procure that no BE Group Company or Target Group Company, and no adviser or other person connected with any such company, shall make any announcement or press release concerning the sale or purchase of the Shares or any related or ancillary matter before or on Completion without the prior consent of the Purchaser.

15.3 The Seller and the Purchaser have, prior to the Signing Date, agreed a press release which shall be published jointly by the Seller and the Purchaser on or about the Signing Date. The Seller and the Purchaser furthermore shall agree on a press release to be published jointly by the Seller and the Purchaser on or about the date of Completion.

15.4 Subject to any information required to be made public pursuant to the Bankruptcy Court proceedings as set out in clause 10 of this agreement, the Purchaser and the Target:

    (a) shall keep confidential:

        (i) the provisions and subject matter of each Transaction Document; and

        (ii) all confidential information provided to it by or on behalf of the Seller or otherwise obtained by it in connection with this agreement which relates to the Seller or any other BE Group Company; and

    (b) shall procure that, if after Completion any member of the Target Group holds confidential information relating to the Seller or any other BE Group Company, that member of the Target Group shall after Completion keep that information confidential and shall return that information to the Seller or, to the extent practicable, destroy it (or delete if in electronic form), in either case without retaining copies.

15.5 Subject to any information required or permitted to be made public pursuant to the Bankruptcy Court proceedings as set out in clause 10 of this agreement, the Seller:

    (a) shall, and shall procure that each member of the BE Group shall and, on or before Completion, each member of the Target Group shall, keep confidential:

        (i) the provisions and subject matter of each Transaction Document; and

        (ii) all confidential information provided to it or a member of the Target Group, or a member of the BE Group, by or on behalf of the Purchaser or a member of the Target Group in connection with this agreement which relates to the Target Group, the Purchaser or any of the Purchaser's shareholders; and

    (b) shall, and shall procure that, if after Completion any member of the BE Group holds confidential information relating exclusively to the business or affairs of the Target Group, the Purchaser or any of the Purchaser's shareholders, that member of the BE Group shall after Completion keep that information confidential and shall return that information to the Purchaser or, to the extent practicable, destroy it (or delete if in

electronic form), in either case without retaining copies. The Target's rights under the Transitional Services Agreement remain unaffected.

15.6 Nothing in this clause prevents any announcement or press release being made or any confidential information being disclosed (or being retained and not returned or destroyed):

(a) with the prior written approval of the other parties;

(b) to the extent required by law, any court of competent jurisdiction or any competent regulatory body, or pursuant to the rules of any applicable securities exchange but if a person is so required to make any announcement or to disclose any confidential information, the relevant party shall promptly notify the other party, where practicable and lawful to do so, before the announcement is made or disclosure occurs (as the case may be) and shall co-operate with the other party regarding the timing and content of such announcement or disclosure (as the case may be) or any action which the other party may reasonably elect to take to challenge the validity of such requirement;

(c) by the Purchaser or, on or after Completion, by any Target Group Company to the extent that the information is in or comes into the public domain otherwise than as a result of a breach of any undertaking or duty of confidentiality by the Purchaser or, on or after Completion, by any Target Group Company;

(d) by the Seller, by any other member of the BE Group or, before Completion, by any Target Group Company to the extent that the information is in or comes into the public domain otherwise than as a result of a breach of any undertaking or duty of confidentiality by the Seller, any other member of the BE Group before Completion, by any Target Group Company;

(e) by the Purchaser or, on or after Completion, by any Target Group Company to its professional advisers, auditors or bankers but, before any disclosure to any such person, the Purchaser shall procure that such person is made aware of the terms of this clause and shall use its best endeavours to procure that such person adheres to those terms as if such person were bound by the relevant provisions of this clause;

(f) prior to Completion, by the Seller to any other potential bidders in relation to the sale, transfer, lease or disposition of a portion or the whole of the business, shares or contracts of the Target Group;

(g) by the Seller to the creditors of the BE Group and their respective advisers;

(h) by the Purchaser to the creditors of the Purchaser or of the Target Group and their respective advisers;

(i) prior to Completion, by the Seller or the Target Group to any person who is an employee of any member of the BE Group or the Target Group;

(j) on or after Completion, by the Purchaser to any person who is an employee of any Target Group Company;

(k) by the Seller, by any other BE Group Company, by the Purchaser or by any Target Group Company to its professional advisers, auditors or bankers but, before any disclosure to any such person, the Seller and the Purchaser shall respectively procure that such person is made aware of the terms of this clause and shall use its

reasonable endeavours to procure that such person adheres to those terms as if such person were bound by the relevant provisions of this clause; or

(l) to enable the relevant party to enforce its rights under this agreement.

## 16. NOTICES

16.1 Any notice or other communication to be given under this agreement must be in writing (which includes fax and any other form of Electronic Communication) and must be delivered by hand, fax, email, registered post or courier to the party to whom it is to be given as follows:

(i) to the Seller, BearingPoint, Inc., or each of the Double Dutch CV Partners at:

100 Crescent Court
Suite 700
Dallas, Texas 75201

Email: John.DeGroote@bearingpoint.com

marked for the attention of John DeGroote

with a copy to
Allen & Overy LLP
One Bishops Square
London E1 6AD

Fax: +44 (0)20 3088 3333

Attention: Edward Barnett

(ii) to the Purchaser at:

Speicherstrasse 1
60327 Frankfurt am Main
Germany

Email: Rainer.Schoener@bearingpoint.com

marked for the attention of Rainer Schoener,

with a copy to:

Freshfields Bruckhaus Deringer LLP
Bockenheimer Anlage 44
60322 Frankfurt am Main
Germany

Fax: +49 (0)69 23 26 64

Attention: Britta Zierau

(iii)    to the Target at:

Equity Trust
Strawinskylaan 3105 Atrium
1077 ZX Amsterdam

Attention: W.P. Ruoff

with a copy to:

Allen & Overy LLP
One Bishops Square
London E1 6AD

Fax: +44 (0)20 3088 3333

Attention: Edward Barnett

and

Freshfields Bruckhaus Deringer LLP
Bockenheimer Anlage 44
60322 Frankfurt am Main
Germany

Fax: +49 (0)69 23 26 64

Attention: Britta Zierau

or at any such other address, fax number or email address of which it shall have given notice for this purpose to the other party under this clause. Any notice or other communication sent by post shall be sent by recorded delivery post (if the country of destination is the same as the country of origin) or by prepaid airmail (if the country of destination is not the same as the country of origin).

16.2    Any notice or other communication shall be deemed to have been given:

(i)      if delivered by hand, registered post or courier, on the date of delivery; or

(ii)     if sent by fax or email, on the date of transmission, if transmitted before 3.00 p.m. (local time at the country of destination) on any Business Day, and in any other case on the Business Day following the date of transmission.

16.3    In proving the giving of a notice or other communication, it shall be sufficient to prove that delivery was made or that the envelope containing the communication was properly addressed and posted by prepaid recorded delivery post or by prepaid airmail or that the fax was properly addressed and transmitted, as the case may be.

16.4    This clause shall not apply in relation to the service of any claim form, notice, order, judgment or other document relating to or in connection with any proceedings, suit or action arising out of or in connection with this agreement.

## 17. ASSIGNMENTS

17.1 Subject to subclause 17.2 below, none of the rights or obligations under this agreement may be assigned or transferred without the prior written consent of the Seller and the Purchaser and any such purported assignment or transfer shall be void.

17.2 Subclause 17.1 does not apply to the assignment or transfer of any rights under this agreement by:

(i) the Purchaser to any of the Target Group Companies;

(ii) the Target to any of the Target Group Companies or to the Purchaser;

(iii) the Seller to any of the BE Group Companies,

if and to the extent that such an assignment or transfer of rights does not (i) exclude, limit or otherwise jeopardise the other party's rights to set off any claims resulting from or in connection with this agreement or any other Transaction Document against the assigned or transferred rights, where such right of set-off is provided in this agreement or any other Transaction Document (as relevant) or (ii) otherwise alter the parties' rights and obligations in any matter under this agreement or any other Transaction Document.

## 18. PAYMENTS

18.1 Unless otherwise expressly stated (or as otherwise agreed in the case of a given payment), each payment to be made to the Seller or the Purchaser under this agreement shall be made in US Dollars by telegraphic transfer of the relevant amount into the relevant bank account as shown below (unless otherwise directed by the relevant party) on or before the date the payment is due for value on that date. All payments under this agreement shall be made in immediately available funds at the written direction of the payee party:

Seller's bank account:

| | |
|---|---|
| Account Name: | BE Holdings I C.V. |
| Bank Name: | Deutsche Bank Trust Company America |
| ABA Routing #: | 021 001 033 |
| Account #: | 04 883 170 |
| Swift Code: | BKTRUS33 |
| Address: | 60 Wall Street, NY, NY 10015-2518, USA |

Purchaser's bank account:

| | |
|---|---|
| Account Name: | BE Partners B.V. |
| Bank Name: | ING Bank N.V. |
| IBAN #: | NL21INGB0658055887 |
| Account #: | 65.80.55.887 |
| Swift Code: | INGBNL2AXXX |
| Address: | Bijlmerplein 888 1102 MG Amsterdam, Niederlande |

18.2 All sums payable under this agreement shall be paid free and clear of all deductions, withholdings, set-offs or counterclaims (together, **Withholdings**), save only as may be required by law. If any Withholdings are required by law the party making the payment shall be obliged to pay to the other party such sum as will after such Withholding has been made,

leave the other party with the same amount as it would have been entitled to receive in the absence of any such requirement to make a Withholding.

## 19. GENERAL

19.1 Each of the obligations, warranties, covenants and undertakings set out in this agreement (excluding any obligation which is fully performed at Completion) shall continue in force after Completion and shall not be affected by the waiver of any Condition or any notice given by the Purchaser in respect of any Condition.

19.2 Except as otherwise expressly provided in this agreement, each party shall pay the costs and expenses incurred by it in connection with the transactions contemplated by this agreement and its appendices, including, without limitation, any cost relating to the establishment of the Purchaser and the Transaction Documents (**Costs**). If Completion does not occur, the Seller shall bear its own Costs and any Costs incurred by or on behalf of Purchaser and/or Target Group shall be borne by the Target Group. The Purchaser shall bear all transfer taxes, stamp duty or other similar costs arising as a result of completion of the transactions contemplated by this agreement.

19.3 This agreement may be executed in any number of counterparts, and by each party on separate counterparts. Each counterpart is an original, but all counterparts shall together constitute one and the same instrument. Delivery of an executed counterpart signature page of this agreement by e-mail (PDF) or telecopy shall be as effective as delivery of a manually executed counterpart of this agreement. In relation to each counterpart, upon confirmation by or on behalf of the signatory that the signatory authorises the attachment of such counterpart signature page to the final text of this agreement, such counterpart signature page shall take effect together with such final text as a complete authoritative counterpart.

19.4 For a period of 3 months from the Completion, each of the Seller, the Dutch Double CV Partners, the Purchaser and the Target shall perform (or procure the performance of) all further acts and things and execute and deliver (or procure the execution and delivery of) such further documents, as may be required by law or as may be necessary to implement and give effect to this Agreement.

19.5 The rights of each party under this agreement:

(i) may be exercised as often as necessary;

(ii) except as otherwise expressly provided by this agreement, are cumulative and not exclusive of rights and remedies provided by law; and

(iii) may be waived only in writing and specifically.

Delay in exercising or non-exercise of any such right is not a waiver of that right.

19.6 Each member of the Target Group and the BE Group shall, where each Target Group Company or BE Group Company (as applicable) is a beneficiary under this agreement, have the right to enforce the relevant terms by reason of the Contracts (Rights of Third Parties) Act 1999. The rights of any such Target Group Company or BE Group Company are subject to (i) the rights of the parties to amend or vary this agreement without the consent of that Target Group Company or the BE Group Company (as applicable) and (ii) the other terms and conditions of this agreement.

19.7 Except where provided in subclause 19.6, a person who is not a party to this agreement may not enforce any of its terms under the Contracts (Rights of Third Parties) Act 1999.

## 20. WHOLE AGREEMENT

20.1 This agreement and the other Transaction Documents contain the whole agreement between the parties relating to the transactions contemplated by the Transaction Documents and supersede all previous agreements, whether oral or in writing, between the parties relating to these transactions. Except as required by statute, no terms shall be implied (whether by custom, usage or otherwise) into this agreement.

20.2 Each party acknowledges that in agreeing to enter into this agreement and the other Transaction Documents it has not relied on any express or implied representation, warranty, collateral contract or other assurance (except those repeated in the Transaction Documents) made by or on behalf of the other party before the entering into of this agreement. Each party waives all rights and remedies which, but for this subclause 20.2, might otherwise be available to it in respect of any such representation, warranty, collateral contract or other assurance.

20.3 Nothing in this clause limits or excludes any liability for fraud or remedy in respect of fraudulent misrepresentation.

20.4 No amendment of this agreement (or of any other Transaction Document) shall be valid unless it is in writing and duly executed by or on behalf of all of the parties to it.

20.5 Each of the provisions of this agreement and the other Transaction Documents is severable. If any such provision is held to be or becomes invalid or unenforceable in any respect under the law of any jurisdiction, it shall have no effect in that respect and the parties shall use all reasonable efforts to replace it in that respect with a valid and enforceable substitute provision the effect of which is as close to its intended effect as possible.

## 21. GOVERNING LAW AND JURISDICTION

21.1 This agreement and any non-contractual obligations arising out of or in connection with it shall be governed by English law.

21.2 The English courts have exclusive jurisdiction to settle any dispute arising out of or in connection with this agreement (including a dispute relating to any non-contractual obligations arising out of or in connection with this agreement) and the parties submit to the exclusive jurisdiction of the English courts.

21.3 Each of the Purchaser and the Target irrevocably appoints BearingPoint Limited of 3 More London Riverside, Norton Rose Building, 1stFloor, off Tooley Street, London SE1 2RE as its agent in England for service of process.

21.4 Each of the Seller, Caravane, BearingPoint LLC, Peloton and Echelon irrevocably appoints Jordans International of 20-22 Bedford Row, London WC1R 4JS as its agent in England for service of process

21.5 The parties waive any objection to the English courts on grounds that they are an inconvenient or inappropriate forum to settle any such dispute.

21.6 Each party irrevocably and unconditionally waives, to the fullest extent permitted by applicable law, any right it may have to a trial by jury in any legal action or proceeding

arising, directly or indirectly, out of or relating to this agreement or the transactions contemplated by it and for any counterclaim therein (in each case whether based on contract, tort or any other theory and whether predicated on common law, statute or otherwise). Each party (a) certifies that no representative, agent or attorney of the other party has represented, expressly or otherwise, that the other party would not, in the event of litigation, seek to enforce the foregoing waiver, and (b) acknowledges that it and the other party have been induced to enter into this agreement by, amongst other things, the mutual waivers and certifications in this clause.

**AS WITNESS** this agreement has been signed by the parties (or their duly authorised representatives) on the date stated at the beginning of this agreement.

## SCHEDULE 1

## THE TARGET

| | |
|---|---|
| *Company name:* | BearingPoint Europe Holdings B.V. |
| *Registered number:* | 24423399 |
| *Registered office:* | Strawinskylaan 3105, 1077 ZX Amsterdam, the Netherlands |
| *Date and place of incorporation:* | 22 October 2007, the Netherlands |
| *Directors:* | Mr. Harry Martin Shandles Velodrome Management BV Equity Trust Co. NV Mr. Willem Ruoff |
| *Secretary:* | [        ] |
| *Accounting reference date:* | 31 December |
| *Auditors:* | PricewaterhouseCoopers |
| *Authorised capital:* | €90,000 |
| *Issued capital:* | €18,000 |

# SCHEDULE 2

## THE SUBSIDIARIES

List of Subsidiaries of BearingPoint Europe Holdings B.V. (the **Target**)

| Country | BU | Entity Name |
|---|---|---|
| Austria | AUT02 | BearingPoint INFONOVA GmbH |
| | AUT03 | Kompetenzzentrum für wissensbasierte Anwendungen und System Forschungs-und Entwichklungs GmbH[1] |
| | AUT05 | BearingPoint GmbH |
| Belgium | BEL01 | BearingPoint Belgium s.p.r.l. |
| Bermuda | BMU01 | BearingPoint Ireland Limited |
| Denmark | DNK01 | BearingPoint Denmark ApS |
| Finland | FIN01 | BearingPoint Finland Oy |
| | FIN02 | BearingPoint Consulting 2002 Finland Oy |
| France | FRA01 | BearingPoint France SAS |
| Germany | DEU01 | BearingPoint Germany GmbH |
| | DEU02 | BearingPoint Holdings GmbH & Co. KG. |
| | DEU03 | BearingPoint GmbH |
| | DEU04 | BearingPoint Software Solutions GmbH |
| | DEU05 | BearingPoint Global Solutions Delivery GmbH |
| | DEU08 | Metis Projekt-vertriebs – GmbH |
| | DEU09 | BearingPoint INFONOVA GmbH |
| | | Siacon GmbH i.L.[2] |
| Hungary | HUN02 | BearingPoint Hungary No. 2 Services Limited Liability Company |
| Ireland | IRL01 | BearingPoint Ireland Limited *[Branch of BMU01]* |
| Italy | ITA01 | BearingPoint Italy Srl. |
| Korea | KOR04 | BearingPoint Global Solutions Delivery GmbH *[Branch Office of DEU03]* |
| Netherlands | NLD01 | BearingPoint B.V. |
| | NLD03 | BearingPoint Netherlands Holding B.V. |
| Norway | NOR01 | BearingPoint Norway AS |
| Romania | ROM01 | BearingPoint GmbH Germania Sucursala Romania *[Branch of DEU03]* |
| Russia | RUS04 | BearingPoint OOO |
| Sweden | SWE01 | BearingPoint Sweden AB |
| Switzerland | CHE01 | BearingPoint Switzerland AG |
| | CHE05 | BearingPoint Switzerland SA *[Branch of CHE01]* |
| Turkey | TUR01 | BearingPoint Global Solutions Danismanlik Ltd. Sirket + |
| United Kingdom | GBR01 | BearingPoint Limited |

---

[1] AUT02 holds 20% ownership, Institut für Informationsverarbeitung und Computergestützte neue Median der Technischen Universität Graz holds 35% ownership, Hyperwave Software Forschungs und Entwicklungsgesellschaft mbH holds 20% ownership, Technische Universitat Graz holds 15% ownership and JOANNEUM RESEARCH Forschungs gesellschaft mbH holds 10% ownership

[2] DEU03 holds 50% ownership, Bayrische Landesbank holds the other 50%.

# SCHEDULE 3

# COMPLETION

## PART 1

### SELLER'S OBLIGATIONS

At Completion the Seller shall procure the delivery to the Purchaser of:

(a)     such waivers or consents as may be necessary to enable the Purchaser or its nominee(s) to become the registered holder of all the Shares;

(b)     the deed of incorporation, record of minutes of meeting, and shareholder's registers of each Target Group Company (only to the extent such documentation is not already in the possession of the relevant Target Group Company); and

(c)     the written resignation, without compensation, of all employees, directors and officers of the BE Group who hold positions in any board or similar body in any member of the Target Group, including in particular Velodrome Management BV (being a director of the Target), in each case acknowledging under seal that the employee, director or officer has no claim against the relevant Target Group Companies, whether for loss of office or otherwise.

## PART 2

### PURCHASER'S OBLIGATIONS

At Completion the Purchaser shall procure the delivery to the Seller of:

(a)     written confirmation from the Target that it has complied with its obligations under subclause 7.2; and

(b)     the written resignation, without compensation, of all employees, directors and officers of the Target Group who hold, as at the date of this agreement, positions in any company in the BE Group, in each case acknowledging under seal that the employee has no claim against the relevant BE Group Companies, whether for loss of office or otherwise.

List of all Target Group Shares it being understood that the listed shareholders hold the indicated percentage of all issued shares in the share capital of the relevant Target Group Company

| Name of Subsidiary/BU | Shareholder / BU (percentage of all issued shares) | Share Capital |
|---|---|---|
| BearingPoint INFONOVA GmbH / AUT02 | BearingPoint GmbH / DEU03 (100%) | EUR 37,000 |
| Kompetenzzentrum für wissensbasierte Anwendungen und System Forschungs- und Entwicklungs GmbH / AUT03 | BearingPoint INFONOVA GmbH / AUT02 (20%) | EUR 145,400, paid in EUR 72,700 |
| BearingPoint GmbH / AUT05 | BearingPoint GmbH / DEU03 (100%) | EUR 364,000 |
| BearingPoint Belgium s.p.r.l. / BEL01 | BearingPoint Europe Holdings B.V. / NLD06 (100%) | EUR 20,000 |
| BearingPoint Ireland Limited / BMU01 | BearingPoint Europe Holdings B.V. / NLD06 (100%) | USD 12,000 |
| BearingPoint Denmark ApS / DNK01 | BearingPoint Europe Holdings B.V. / NLD06 (100%) | DKK 125,000 |
| BearingPoint Finland Oy / FIN01 | BearingPoint Europe Holdings B.V. / NLD06 (100%) | EUR 8,600 |
| BearingPoint Consulting 2002 Finland Oy / FIN02 | BearingPoint Europe Holdings B.V. / NLD06 (100%) | EUR 8,300 |
| BearingPoint France SAS / FRA01 | BearingPoint Europe Holdings B.V. / NLD06 (100%) | EUR 14,300,000 |
| BearingPoint Germany GmbH / DEU01 | BearingPoint Europe Holdings B.V. / NLD06 (100%) | EUR 25,000 |
| BearingPoint Holdings GmbH & Co. KG / DEU02 | BearingPoint Europe Holdings B.V. / NLD06 (100%) (as limited partner - *Kommanditist*) and BearingPoint Germany GmbH / DEU01 (as general partner – *Komplementärin*) | EUR 10,000,000 |
| BearingPoint GmbH / DEU03 | BearingPoint Holdings GmbH & Co. KG / DEU02 (100%) | EUR 8,400,000 |
| BearingPoint Software Solutions GmbH / DEU04 | BearingPoint Holdings GmbH & Co. KG / DEU02 (100%) | EUR 25,600 |
| BearingPoint Global Solutions Delivery GmbH / DEU05 | BearingPoint Software Solutions GmbH / DEU04 (100%) | EUR 25,000 |
| Metis Projekt- und Vertriebs-GmbH / DEU08 | BearingPoint GmbH / DEU03 (100%) | EUR 25,000 |

| Name of Subsidiary/BU | Shareholder / BU (percentage of all issued shares) | Share Capital |
|---|---|---|
| BearingPoint INFONOVA GmbH / DEU09 | BearingPoint INFONOVA GmbH / AUT02 (100%) | EUR 25,000 |
| Siacon GmbH | BearingPoint GmbH / DEU03 (50%) | EUR 25,000 |
| BearingPoint Hungary No. 2 Services Limited Liability Company / HUN02 | BearingPoint GmbH / DEU03 (100%) | HUF 3,000,000 |
| BearingPoint Ireland Limited / IRL01 | Branch of BearingPoint Ireland Limited / BMU01 | - |
| BearingPoint Italy S.r.l. / ITA01 | BearingPoint Holdings GmbH & Co. KG / DEU02 (95%) <br><br> BearingPoint Europe Holdings B.V. / NLD06 (5%) | EUR 30,000 |
| BearingPoint Global Solutions Delivery GmbH / KOR04 | Branch of BearingPoint GmbH / DEU03 | - |
| BearingPoint B.V. / NLD01 | BearingPoint Netherlands Holding B.V. / NLD03 (100%) | EUR 18,000 |
| BearingPoint Netherlands Holding B.V. / NLD03 | BearingPoint Europe Holdings B.V. / NLD06 (100%) | EUR 18,000 |
| BearingPoint Norway AS / NOR01 | BearingPoint Europe Holdings B.V. / NLD06 (100%) | NOK 1,100,000 |
| BearingPoint GmbH Germania Sucursala Romania / ROM01 | Branch of BearingPoint GmbH / DEU03 | - |
| BearingPoint OOO / RUS04 | BearingPoint GmbH / DEU03 (100%) | RUB 3,200,000 |
| BearingPoint Sweden AB / SWE01 | BearingPoint Europe Holdings B.V. / NLD06 (100%) | SEK 100,000 |
| BearingPoint Switzerland AG / CHE01 | BearingPoint Europe Holdings B.V. / NLD06 (100%) | CHF 4,120,000 |
| BearingPoint Switzerland SA / CHE05 | BearingPoint Switzerland AG, Branch of / CHE01 | - |
| BearingPoint Global Solutions Danismanlik Ltd. Sirketi / TUR01 | BearingPoint GmbH / DEU03 (50%) <br><br> BearingPoint Software Solutions GmbH / DEU04 (50%) | YTL 251,452.45 |
| BearingPoint Limited / GBR01 | BearingPoint Europe Holdings B.V. / NLD06 (app. 94.48%) <br><br> BearingPoint GmbH / DEU03 (app. 5.52%)[3] | GBP 365,856 |

---

[3] GBR01 has issued the total amount of 365,856 shares with a nominal value of GBP 1 each; 345,656 shares are held by NLD06 and 20,200 shares are held by DEU03.

1.　In this agreement:

**Additional Amount** means the amount of $5,880,516.97;

**Agreed Form** means, in relation to any document, the form of that document as attached in the respective appendix to this agreement;

**Amended and Restated Credit Agreement** means the amended and restated credit agreement dated as of 1 June 2007 amongst BearingPoint, Inc., BearingPoint LLC, the Guarantors, the Lead Arranger, the Issuing Banks, the Administrative Agent, the Collateral Agent and the Issuing Banks (each as defined therein);

**Amex Arrangements** has the meaning given to such term in subclause 6.10;

**Approval Order** has the meaning given to such term in subclause 10.2(a);

**Assumption and Assignment Agreements** means the agreements in the Agreed Form attached as Appendix 7;

**Bankruptcy Court** means the United States Bankruptcy Court for the Southern District of New York;

**BearingPoint Group** means BearingPoint, Inc. and all of its subsidiary undertakings including, without limitation, the Seller's Group, the ROW Group and the Target Group;

**BearingPoint, Inc.** means BearingPoint, Inc., a company incorporated under the laws of the State of Delaware, with its principal place of business at 100 Crescent Court, Suite 700, Dallas, Texas 75201;

**BE Group** means BearingPoint, Inc. and all subsidiary undertakings of BearingPoint, Inc. whether directly or indirectly owned, including in particular the Seller's Group Companies and the ROW Group Companies, but excluding the Target Group Companies;

**BE Group Companies** means each member of the BE Group and **BE Group Company** means any one of them;

**BE Trademark Licence** means the licence agreement between the Trust and the Target attached as Appendix 3 subject to (i) any amendments required by the Trustee prior to Completion (provided that such amendments do not substantially change the form of the licence attached as Appendix 5) and (ii) any amendments to the licence agreement made by the parties pursuant to clause 6.5 and Schedule 7;

**Business Day** means a day (other than a Saturday or Sunday) on which banks are generally open in London, Frankfurt, Amsterdam and New York for normal business;

**Completion** means completion of the sale and purchase of the Shares in accordance with this agreement;

**Conditions** means the conditions precedent to the sale and purchase of the Shares set out in clause 3;

**Credit Notes** means any amounts credited (but not yet issued) to any Target Group Company by any BE Group Company with respect to overpayments made by the Target Group Companies relating to services rendered by any BE Group Company prior to 30 April 2009 as shown in Schedule 8;

**Cross-charges** means the charges payable by the Target Group Companies to BearingPoint, Inc. or any other BE Group Company and relating to certain intergroup services and headquarter cost allocations;

**Debtors** means BearingPoint, Inc., BE New York Holdings, Inc., BearingPoint Americas, Inc., BearingPoint IBG, LLC, BearingPoint Enterprise Holdings, LLC, BearingPoint Global Operations, Inc., BearingPoint Global, Inc., BearingPoint International I, Inc., BearingPoint Israel, LLC, BearingPoint Puerto Rico, LLC, BearingPoint Russia, LLC, BearingPoint South Pacific, LLC, BearingPoint Southeast Asia LLC, BearingPoint Technology Procurement Services, LLC, BearingPoint USA, Inc., BearingPoint, LLC, i2 Mid Atlantic LLC, i2 Northwest LLC, Metrius, Inc., OAD Acquisition Corp., OAD Group, Inc., Peloton Holdings, L.L.C., Softline Acquisition Corp., and Softline Consulting and Integrators, Inc., currently debtors and debtors in possession under Chapter 11 of Title 11 of the United States Code in cases being jointly administered for procedural purposes only under case number 09-10691 (REG) in the United States Bankruptcy Court for the Southern District of New York;

**DPHL** means Dallas Project Holdings, Limited, a limited liability company formed under the laws of Barbados;

**Double Dutch CV Partners** has the meaning given to such term in Background (B);

**Double Dutch CV Partners Warranties** has the meaning given to such term in subclause 8.2;

**Electronic Communication** means an electronic communication as defined in the Electronic Communications Act 2000;

**Encumbrance** means any option, right to acquire, pre-emption rights, mortgage, charge, pledge, lien, hypothecation, security interest, title retention or any other form of security or encumbrance and any agreement or arrangement to create any of the foregoing;

**Excess Cash Amount** means the amount of $34 million;

**Final Order** has the meaning given such term in subclause 10.2(b);

**Intellectual Property Rights** means (i) copyright, patents, database rights and rights in trademarks, designs, know-how and confidential information (whether registered or unregistered), (ii) applications for registration, and rights to apply for registration, of any of the foregoing rights and (iii) all other intellectual property rights and equivalent or similar forms of protection existing anywhere in the world;

**Intercompany Account Settlement** means the spreadsheet attached in Appendix 1;

**Intercompany Charges** means all charges payable by the BE Group Companies and the Target Group Companies to each other and any payables resulting from intercompany loans,

including outstanding principal amounts and accrued interest, but excluding the Cross-charges;

**Licence Agreement** means the licence agreement between, amongst others, the Seller, Dallas Project Holdings, Limited, BearingPoint, Inc. and the Target which shall be in the form of the licence attached as Appendix 5 subject to any amendments to the licence agreement made by the parties pursuant to subclause 6.5 and Schedule 7;

**Loan Agreement** means the loan agreement in the Agreed Form, attached as Appendix 9;

**Motion** has the meaning given to such term in subclause 10.1;

**Purchase Price** means the amount of $5 million referred to in subclause 2.3;

**Purchaser's Solicitors** means Freshfields Bruckhaus Deringer LLP of Bockenheimer Anlage 44, 60322 Frankfurt am Main;

**Purchaser Warranties** has the meaning given to such term in clause 9;

**Rate of Exchange** means the Seller's rate of exchange for the purchase of euros in the London foreign exchange market with United States Dollars as at 11.00a.m. on the Business Day immediately prior to the Signing Date;

**Release of Lien** means a written notice delivered by the Agent (on behalf of the Secured Lenders) to the Seller, the Purchaser and the Target in form and substance satisfactory to the Agent (on behalf of the Secured Lenders) pursuant to which the Agent (on behalf of the Secured Lenders) irrevocably, unconditionally and without any consideration releases any and all liens that it may have with respect to any of the Intellectual Property Rights that are the subject of the Licence Agreement or the BE Trademark Licence;

**ROW Cash Amount** means the amount of $1,003,592;

**ROW Group** means all subsidiary undertakings of BearingPoint, Inc., whether directly or indirectly owned, but excluding (a) the Target Group Companies and (b) the Seller's Group Companies, it being understood that, on the Signing Date, the ROW Group includes the companies set forth in Schedule 6;

**ROW Group Companies** means each member of the ROW Group and **ROW Group Company** means any one of them;

**ROW Intercompany Charges** means the Intercompany Charges between the ROW Group Companies and the Target Group Companies;

**Secured Creditors** means De Lage Landen Financial Services Corporation, Cisco Systems Capital Corporation, Hewlett-Packard Financial Services Company and General Electric Capital Corporation-Trade Payables Services Division;

**Secured Lenders** means those secured lenders as defined in the Amended and Restated Credit Agreement;

**Seller's Group** means the Seller, Caravane Holdings LLC, Echelon Holdings C.V. (NLD08), BearingPoint, LLC (USA19) and Peloton Holdings L.L.C. as well as BearingPoint Inc. and all subsidiary undertakings of BearingPoint, Inc. from time to time, whether directly or indirectly owned, that are incorporated under US law or Bermudan law, it being understood

that, on the Signing Date, the Seller's Group comprises the following companies: BearingPoint, Inc. (USA01), BearingPoint Global Delaware LLC (USA07), BearingPoint International Bermuda Holdings Limited (BMU08), BearingPoint International Holdings Ltd. (BMU02), BearingPoint International Holdings II Ltd. (BMU04), BearingPoint KCA Holdings Ltd. (BMU07);

**Seller's Group Companies** means each member of the Seller's Group and **Seller's Group Company** means any one of them;

**Seller's Group Intercompany Charges** means the Intercompany Charges between the Seller's Group Companies and the Target Group Companies;

**Seller's Solicitors** means Allen & Overy LLP of One Bishops Square, London E1 6AD;

**Seller Warranties** has the meaning given to such term in subclause 8.1;

**Set-off Agreement** means the agreement in the Agreed Form, attached as Appendix 8;

**Share Pledge Agreement** means the agreement in the Agreed Form, attached as Appendix 13;

**Shares** means all the issued shares in the capital of the Target, as set out in Schedule 1;

**Signing Date** means the date on which this agreement has been signed by all of the parties to this agreement;

**Subsidiaries** means all the companies listed in Schedule 2 and **Subsidiary** means any of them;

**subsidiary undertaking** has the meaning given in section 1162 of the Companies Act 2006;

**Swiss Share Pledge** means the pledge granted over the shares in BearingPoint Switzerland AG by the Target to BearingPoint GmbH pursuant to the Share Pledge Agreement dated 19 March 2009;

**Target** has the meaning given to such term in Schedule 2;

**Target Group** means the Target and each of the Target Group Companies, taken as a whole;

**Target Group Companies** means the Target and the Subsidiaries and **Target Group Company** means any of them;

**Target Group Shares** means all issued shares in the capital of any and all Subsidiaries, as set out in Schedule 4;

**Territory** means all countries in Africa, as well as each of the following countries: Andorra, Armenia, Austria, Azerbaijan, Belarus, Belgium, Bosnia, Bulgaria, Croatia, Cyprus, Czech Republic, Denmark, Estonia, Finland, France, Former Yugoslav Republic of Macedonia, Germany, Georgia, Greece, Herzegovina, Hungary, Iceland, Ireland, Italy, Kazakhstan, Kosovo, Kyrgyzstan, Latvia, Liechtenstein, Lithuania, Luxembourg, Malta, Moldova, Monaco, Montenegro, Netherlands, Norway, Poland, Portugal, Romania, Russia, San Marino, Serbia, Slovakia, Slovenia, Spain, Sweden, Switzerland, Tadzhikistan, Turkey, Turkmenistan, Ukraine, United Kingdom, Uzbekistan and Vatican City State and in each case their respective territories and possessions;

**Transaction Documents** means this agreement, the Assumption and Assignment Agreements, the Licence Agreement, the Loan Agreement, the Set-off Agreement, the Transfer Agreement, the Share Pledge Agreement and the Transitional Services Agreement, the Trust Formation Principles and any other agreements executed or to be executed by the parties on the Signing Date or Completion;

**Transfer Agreement** means the agreement in the Agreed Form, attached as Appendix 12;

**Transitional Services Agreement** means the agreement in the Agreed Form, attached as Appendix 6;

**Trust** has the meaning given to such term in the Trust Formation Principles;

**Trust Formation Principles** means the principles set forth in Appendix 2; and

**Wells Fargo** means Wells Fargo Bank, N.A.

1.1    In this agreement any reference, express or implied, to an enactment (which includes any legislation in any jurisdiction) includes:

(a)    that enactment as amended, extended or applied by or under any other enactment (before or after signature of this agreement);

(b)    any enactment which that enactment re-enacts (with or without modification); and

(c)    any subordinate legislation made (before or after signature of this agreement) under that enactment, including (where applicable) that enactment as amended, extended or applied as described in subparagraph (a), or under any enactment which it re-enacts as described in subparagraph (b),

except to the extent that any legislation or subordinate legislation made or enacted after the date of this agreement would create or increase the liability of the Seller under this agreement.

1.2    In this agreement:

(a)    words denoting persons include bodies corporate and unincorporated associations of persons;

(b)    references to an individual or a natural person include his estate and personal representatives;

(c)    subject to clause 17, references to a party to this agreement include the successors or assigns (immediate or otherwise) of that party;

(d)    $ or **US Dollars** means United States Dollars;

(e)    € means euros; and

(f)    United States Dollars and euros shall be converted at the Rate of Exchange.

## SCHEDULE 6

## ROW GROUP COMPANIES

| Country | BU | Entity |
|---|---|---|
| Argentina | ARG01 | BearingPoint S.A. |
| Armenia | ARM01 | Barents Group, LLC *[Representative]* |
| | ARM02 | BearingPoint Global Operations, Inc. *[Representative]* |
| Aruba | ABW01 | BearingPoint Information Technology N.V. |
| | ABW02 | BearingPoint Management Consulting N.V. |
| Australia | AUS01 | BearingPoint Australia Pty. Ltd. |
| | AUS02 | BearingPoint BG Australia Pty. Ltd. |
| | AUS03 | BearingPoint 2002 Asia Pacific Pty. Ltd. |
| Azerbaijan | AZE01 | BearingPoint Global Operations, Inc. *[Branch]* |
| Barbados | BRB02 | Barents Group LLC *[Representative]* |
| | BRB01 | Dallas Project Holdings Limited |
| Brazil | BRA01 | BearingPoint S.A. |
| | BRA05 | BearingPoint S.A. *[Belo Horizonte City Branch]* |
| | BRA04 | BearingPoint S.A. *[Brasilia Branch]* |
| | BRA06 | BearingPoint S.A. *[Macae City Branch]* |
| | BRA03 | BearingPoint S.A. *[Rio de Janeiro City Branch]* |
| | BRA07 | BearingPoint S.A. *[Vitoria City Branch]* |
| | BRA02 | BearingPoint 2002 (Brasil) Ltda. |

| | | |
|---|---|---|
| **British Virgin Islands** | VGB01 | BearingPoint (Asia Pacific) Limited |
| | VGB02 | BearingPoint (Hong Kong) Limited |
| **Canada** <br> **(All provinces but Québec)** | CAN01 | BearingPoint LP <br> *[Also Registered in Alberta, British Columbia, Manitoba, New Brunswick, Newfoundland, Northwest Territories, Nova Scotia, Nunavut, Prince Edward Island, Saskatchewan, Yukon]* |
| **(In Québec)** | | BearingPoint S.E.C. *[Registered]* |
| **(All provinces but Québec)** | CAN07 (fka CAN02) | BearingPoint Canada Holding I, Inc. <br> *[Also Registered in Alberta, British Columbia, Manitoba, Newfoundland, Northwest Territories, Nova Scotia, Nunavut, Ontario, Prince Edward Island, Saskatchewan, Yukon]* |
| **(In Québec)** | | Holding I, BearingPoint Canada *[Registered]* |
| **(All provinces but Québec)** | CAN03 | BearingPoint Canada Holding II, Inc. <br> *[Also Registered in Alberta, British Columbia, Manitoba, Newfoundland, Northwest Territories, Nova Scotia, Nunavut, Ontario, Prince Edward Island, Saskatchewan, Yukon]* |
| **(In Québec)** | | Holding II, BearingPoint Canada *[Registered]* |
| | CAN06 | BearingPoint Technology Solutions, ULC *[Also Registered in British Columbia]* |
| **Cayman Islands** | CYM01 | BearingPoint Global Caymans I Limited |
| | CYM02 | BearingPoint Global Caymans II Limited |
| **Chile** | CHL01 | BearingPoint Chile Limitada |
| **China** | CHN01 | BearingPoint Management Consulting (Shanghai) Ltd. |
| | CHN03 | BearingPoint Management Consulting (Shanghai) Ltd., Beijing Branch *[Branch]* |
| | CHN02 | BearingPoint Information Technologies (Shanghai) Ltd. |
| | CHN05 | BearingPoint Information Technologies (Shanghai) Ltd., Dalian Branch *[Branch]* |

| | | |
|---|---|---|
| **Colombia** | COL01 | BearingPoint Americas, Inc. (Colombia) *[Branch]* |
| **Costa Rica** | CRI01 | BearingPoint S.A. |
| | CRI02 | BearingPoint Mexico S. de R.L. de C.V. *[Branch of Mexico entity]* |
| **Croatia** | HVR01 | BearingPoint Global Operations, Inc. *[Representative]* |
| **Curaçao** | ANT03 | BearingPoint (Netherlands Americas) N.V. |
| | ANT01 | BearingPoint Information Technology N.V. |
| | ANT02 | BearingPoint Management Consulting N.V. |
| | ANT04 | GDFFT Holding N.V. |
| | ANT05 | Paradawn N.V. |
| | ANT06 | Shijon N.V. |
| **Cyprus** | CYP01 | BearingPoint Technology Holdings Limited *[Branch]* |
| **Egypt** | EGY01 | Barents Group Egypt, Ltd. |
| **El Salvador** | SLV01 | BearingPoint Limitada |
| **Georgia** | GEO01 | Barents Group, LLC *[Representative]* |
| | GEO02 | BearingPoint Global Operations, Inc. *[Representative]* |
| **Guam** | USA37 (fka USA33) | BearingPoint Guam LLC |
| **Guatemala** | GTM01 | BearingPoint Guatemala, SA |
| **Hong Kong** | HKG02 | BearingPoint (Asia Pacific) Limited *[Branch]* |
| **Hungary** | HUN01 | BearingPoint Hungary Consulting LTD |
| **India** | IND01 | BearingPoint Business Consulting Private Limited |

| | | |
|---|---|---|
| **Indonesia** | IDN01 | PT Barents Indonesia |
| **Iraq** | IRQ01 | BearingPoint Global Operations, Inc. *[Representative]* |
| **Ireland** | IRL02 | BearingPoint Limited |
| **Israel** | ISR01 | BearingPoint Israel, LLC *[Registered]* |
| **Japan** | JPN02 | BearingPoint Co., Ltd. (Shinjuku-ku) |
| **Jordan** | JOR02 (fka JOR 01) | BearingPoint Jordan LLC. Co. |
| **Kazakhstan** | KAZ01 | BearingPoint Global Operations, Inc. *[Representative]* |
| **Kenya** | KEN01 | BearingPoint ECA Limited |
| **Korea** | KOR01 | BearingPoint, Inc. *[Korean company]* |
| | KOR02 | BearingPoint, Inc., Korea Branch *[Branch]* |
| **Macedonia** | MKD01 | BearingPoint, LLC Representative Office Skopie *[Representative]* |
| **Malaysia** | MYS01 | BearingPoint (ASPAC) Sdn. Bhd. |
| **Mexico** | MEX01 | BearingPoint Mexico S. de R.L. de C.V. |
| | MEX02 | BearingPoint Mexicana S.A. de C.V. |
| **Montenegro** | YUG01 | BearingPoint Economic Reform Project *[Non Government Organisation - NGO]* |
| **Netherlands** | NLD02 | BearingPoint Global Consulting Netherlands B.V. |
| | NLD10 | Velodrome Management B.V. |
| **New Zealand** | NZL01 | BearingPoint New Zealand Limited |
| **Pakistan** | PAK01 | BearingPoint Pakistan (Private) Limited |

| | | |
|---|---|---|
| **Panama** | PAN01 | BearingPoint Panama Inc. |
| **Peru** | PER01 | BearingPoint S.R.L. |
| | PER02 | BearingPoint 2002 Peru S.R.L. |
| **Philippines** | PHL01 | Barents Group LLC *[Representative]* |
| | PHL02 | BearingPoint Philippines Limited *[Branch]* |
| **Puerto Rico** | USA14 | BearingPoint Puerto Rico, LLC *[Branch]* |
| **Qatar** | QAT02 (fka QAT01) | BearingPoint Middle East FZ-LLC *[Branch of the UAE]* |
| **Russia** | RUS05 (fka RUS01) | BearingPoint Russia, LLC (fka Barents Group Russia, LLC) *[Representative]* |
| | RUS02 | Barents Group, LLC *[Representative]* |
| **Saudi Arabia** | SAU01 | BearingPoint Middle East FZ-LLC *[branch - TCR]* |
| | SAU02 | BearingPoint Saudi Arabia LLC |
| **Singapore** | SGP01 | BearingPoint Pte. Ltd. |
| | SGP02 | BearingPoint (Asia Pacific) Pte. Ltd. |
| | SGP03 | BearingPoint 2002 Asia Pacific Pte. Ltd. |
| | SGP04 | BearingPoint 2002 Singapore Pte. Ltd. |
| **Spain** | ESP01 | BearingPoint Business Consulting España SL |
| | ESP03 | BearingPoint Managed Services, S.L. |
| | ESP02 | BearingPoint Software Solutions, S.L. |
| **Suriname** | SUR01 | BearingPoint N.V. |
| **Taiwan** | TWN01 | BearingPoint Southeast Asia , L.L.C. *[Branch]* |

| | | |
|---|---|---|
| | TWN02 | BearingPoint (Asia Pacific) Limited *[Branch]* |
| **Tajikistan** | TYK01 | BearingPoint Global Operations, Inc. *[Representative]* |
| **Thailand** | THA01 | BearingPoint (Thailand) Ltd. |
| **Turkey** | TUR03 (fka TUR02) | BearingPoint LLC Turkiye Ankara Subesi *[Branch]* |
| **Ukraine** | UKR01 | Barents Group, LLC *[Representative]* |
| **United Arab Emirates** | ARE03 (fka ARE02) | BearingPoint Middle East FZ-LLC |
| **United Kingdom** | GBR02 | BearingPoint Europe Limited |
| | GBR03 | BearingPoint Spain Holdings Limited |
| **United States Virgin Islands** | USV01 | BearingPoint USVI, LLC |
| **Uruguay** | URY01 | BearingPoint S.A., Sucursal Uruguay *[Branch]* |
| **Uzbekistan** | UZB01 | BearingPoint Global Operations, Inc. *[Representative]* |
| **Venezuela** | VEN01 | BearingPoint Advisors Venezuela C.A. |
| **Vietnam** | VNM01 | BearingPoint, LP *[Representative]* |

## SCHEDULE 7

## WRONG POCKETS

1. **CONTENT OF SCHEDULES TO THE LICENCE AGREEMENT AND THE BE TRADEMARK LICENCE**

The parties agree that Schedules 2, 3, 4, 5 and 7 to the Licence Agreement should contain the following information:

(a) Schedule 2 (Assigned Rights) shall contain (i) Owned Intellectual Property Rights which at or before the Signing Date are used exclusively in the Business, (ii) Owned Know How which at or before the Signing Date is used exclusively in the Business, and (iii) Trademarks which subsist in the Territory and which at or before the Signing Date were used exclusively in the Business (but, for the avoidance of doubt, excluding any Non-Exclusive Marks);

(b) Schedule 3 (Licensed Rights) shall contain (i) Owned Intellectual Property Rights which are Licensable to the Assignee by a member of the Assignors' Group at Completion (excluding Assigned Intellectual Property Rights), and (ii) Owned Know How which is Licensable to the Assignee by a member of the Assignors' Group at Completion (excluding Assigned Know How);

(c) Schedule 4 (Excluded Assignee Rights) shall contain Intellectual Property Rights, Know How and Trademarks (i) owned by the Assignee or any of its Subsidiary Undertakings as of Completion, and (ii) not used in the Retained Business on or before the Signing Date;

(d) Schedule 5 (Back-Licensed Rights) shall contain Intellectual Property Rights, Know How and Trademarks (i) owned by the Assignee or any of its Subsidiary Undertakings as of Completion, (ii) used in the Retained Business on or before the Signing Date, and (iii) Licensable to any or all Assignors, but excluding (A) any Assigned Rights, and (B) any Excluded Assignee Rights; and

(e) Schedule 7 (National Bearing Point Domain Names) shall contain domain names owned by the Licensee which have a country code top-level domain belonging to the Territory (e.g., ".de", ".fr", "uk", etc., including "eu") or have the top-level domain ".com" and the second-level domain comprising the word "BearingPoint" together with the name of any country in the Territory in any language spoken in the Territory or the word "emea" or "Europe" or "eu" (e.g., www.bearingpointgermany.com" or www.bearingpoint.germany.com or "www.bearingpoint.emea.com" or www.germanybearingpoint.com)

The parties agree that Schedules 1 and 4 to the BE Trademark Licence should contain the following information:

(a) Schedule 1 (Licensed Trade Marks) shall contain any and all Trade Marks owned by the Licensor, including the Non-Exclusive Marks;

(b) Schedule 2 Part A (National Bearing Point Domain Names) shall contain domain names owned by the Licensee which have a country code top-level domain belonging to the Territory (e.g., ".de", ".fr", "uk", etc., including "eu") or have the top-level

domain ".com" and the second-level domain comprising the word "BearingPoint" together with the name of any country in the Territory in any language spoken in the Territory or the word "emea" or "Europe" or "eu" (e.g., www.bearingpointgermany.com" or "www.bearingpoint.germany.com" or "www.bearingpoint.emea.com" or www.germanybearingpoint.com);

(c)     Schedule 2 Part B (Global Bearing Point Domain Names) shall contain domain names owned by the Licensor which (i) include the word "BearingPoint" or variations thereof; and (ii) have no country code top-level domain (e.g., ".com", ".net") but excluding those domain names with the top level domain ".com" and the second-level domain comprising the word "BearingPoint" together with the name of any country in the Territory in any language spoken in the Territory or the word "emea" or "Europe" or "eu" (e.g., www.bearingpointgermany.com" or "www.bearingpoint.germany.com or "www.bearingpoint.emea.com" or www.germanybearingpoint.com)

All defined terms in this paragraph shall have the meanings given to them in the Licence Agreement or the BE Trademark Licence (as appropriate).

## 2.     AMENDMENT OF THE SCHEDULES TO THE LICENCE AGREEMENT

2.1     In the event that any of the parties identify that any information contained in any of the Schedules to the Licence Agreement or the BE Trademark Licence referred to in paragraph 1 above is incorrect (pursuant to paragraph 1 above), the relevant party identifying such information shall promptly notify (and, in any event, no later than seven calendar days prior to Completion) the other parties in writing of the identified information, together with written evidence reasonably demonstrating the identified information.

2.2     Following receipt of a notice pursuant to paragraph 2.1 above, if having examined the written evidence provided with any such notice the parties agree before Completion, that information is incorrectly contained in a Schedule to the Licence Agreement or the BE Trademark Licence referred to in paragraph 1 above (such agreement to be not unreasonably withheld by any party), the parties shall correct the relevant Schedule(s) to the Licence Agreement or the BE Trademark Licence referred to in paragraph 1 above by, as appropriate, (i) removing any incorrect item from the relevant Schedule(s), and/or (ii) moving such item from one Schedule to another Schedule) and/or (iii) amending the description of such item.

## CREDIT NOTES

## Credit Notes

|  | total |
|---|---|
| entity | |
| AUT02 | $ 1.249.216 |
| AUT05 | $ 700.285 |
| BEL01 | $ 422.540 |
| CHE01 | $ 1.939.557 |
| DEU03 | $ 3.265.987 |
| DNK01 | $ 129.922 |
| FIN01 | $ 380.092 |
| FRA01 | $ 8.547.472 |
| GBR01 | $ 5.971.881 |
| IRL01 | $ 445.162 |
| ITA01 | $ 173.618 |
| NLD01 | $ 744.876 |
| NOR01 | $ 572.765 |
| ROM01 | $ 0 |
| RUS04 | $ 1.976.577 |
| SWE01 | $ 467.586 |
| total | $ 26.987.536 |

**SIGNATORIES**

Signed for and on behalf of
BE HOLDINGS I C.V.
by CARAVANE HOLDINGS,
L.L.C., as general partner,
by: *John DeGroote*    )
        )

Signed by:
for Caravane HOLDINGS LLC

Signed for and on behalf of
Echelon C.V.
By PELOTON HOLDINGS LLC
as general partner,
by: *John DeGroote*    )

Signed by
for BearingPoint LLC

*John DeGroote*    )
        )
        )

Signed by
PELOTON HOLDINGS LLC    )
*John DeGroote*

Signed by
BEARINGPOINT, INC.    )

Signed by
for BE PARTNERS B.V.    )

Signed by
for BEARINGPOINT EUROPE
HOLDINGS B.V.    )

## SIGNATORIES

Signed for and on behalf of
**BE HOLDINGS I C.V.**
by CARAVANE HOLDINGS,
L.L.C., as general partner,
by: *John DeGroote* )
 )

Signed by:
for **Caravane HOLDINGS LLC**

Signed for and on behalf of
**Echelon C.V.**
By PELOTON HOLDINGS LLC
as general partner,
by: *John DeGroote* )
 )

Signed by
for **BearingPoint LLC**

*John DeGroote* )
 )
 )

Signed by
**PELOTON HOLDINGS LLC** )
*John DeGroote*

Signed by
**BEARINGPOINT, INC.** )
*F. Edwin Harbach*

Signed by
for **BE PARTNERS B.V.** )
...........................................

Signed by
for **BEARINGPOINT EUROPE
HOLDINGS B.V.** )
...........................................

SIGNATORIES

Signed for and on behalf of
BE HOLDINGS I C.V.
by:CARAVANE HOLDINGS,
L.L.C., as general partner,
by: *John DeGroote*

)
)

Signed by:
for Caravane HOLDINGS LLC

Signed for and on behalf of
Echelon C.V.
By PELOTON HOLDINGS LLC
as general partner,
by: *John DeGroote*

)
)

Signed by
for BearingPoint LLC

*John DeGroote*

)
)
)

Signed by
PELOTON HOLDINGS LLC

*John DeGroote*

)

Signed by
BEARINGPOINT, INC.

)

Signed by
for BE PARTNERS B.V.

Equity Trust Co N.V.
By: W.P. *[illegible]*
Proxyholder A
By: *Equity Trust Co N.V.*

Equity Trust Co. N.V.
By: J.R. Eydewijn
Proxyholder A

Signed by
for BEARINGPOINT EUROPE
HOLDINGS B.V.

)

By: *W.P. Kruff*
Title: *managing director B /*

ß

## SIGNATORIES

Signed for and on behalf of )
**BE HOLDINGS I C.V.** )
by CARAVANE HOLDINGS, .........................................
L.L.C., as general partner,
by:

Signed by:
for **Caravane HOLDINGS LLC**
)
Signed for and on behalf of )
**Echelon C.V.** .........................................
By PELOTON HOLDINGS LLC
as general partner,
by:

Signed by
for **BearingPoint LLC**
)
)
)
.........................................

Signed by )
**PELOTON HOLDINGS LLC** )
.........................................

Signed by )
**BEARINGPOINT, INC.** )
.........................................

Signed by )
for **BE PARTNERS B.V.** )
.........................................

Signed by
for **BEARINGPOINT EUROPE**
**HOLDINGS B.V.** )

*Representing VELODROME*
*Olivier CHATIN*

## SIGNATORIES

Signed for and on behalf of )
**BE HOLDINGS I C.V.** ) ...........................................................
by CARAVANE HOLDINGS,
L.L.C., as general partner,
by:

Signed by:
for **Caravane HOLDINGS LLC**
)
Signed for and on behalf of )..........................................................
**Echelon C.V.**
By PELOTON HOLDINGS LLC
as general partner,
by:

Signed by
for **BearingPoint LLC**
)
)
) ..........................................................

Signed by
**PELOTON HOLDINGS LLC** )
..........................................................

Signed by
**BEARINGPOINT, INC.** )
..........................................................

Signed by *PETER MOCKLER*
for **BE PARTNERS B.V.** )

Signed by
for **BEARINGPOINT EUROPE**
**HOLDINGS B.V.** )
..........................................................

## SIGNATORIES

Signed for and on behalf of )
**BE HOLDINGS I C.V.** )  ...........................................
by CARAVANE HOLDINGS,
L.L.C., as general partner,
by:

Signed by:
for **Caravane HOLDINGS LLC**
)
Signed for and on behalf of )  ...........................................
**Echelon C.V.**
By PELOTON HOLDINGS LLC
as general partner,
by:

Signed by
for **BearingPoint LLC**
)
)
)  ...........................................

Signed by
**PELOTON HOLDINGS LLC** )
...........................................

Signed by
**BEARINGPOINT, INC.** )
...........................................

Signed by A.A.D. Smeets
for **BE PARTNERS B.V.** )

Signed by A.A.D. Smeets
for **BEARINGPOINT EUROPE**
**HOLDINGS B.V.** )

# Exhibit B

**Cited Orders**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
----------------------------------------------------------------x
                                    :
In re                               :     Chapter 11 Case No.
                                    :
**LEHMAN BROTHERS HOLDINGS INC.**, *et al.*,  :     **08-13555 (JMP)**
                                    :
              Debtors.              :     **(Jointly Administered)**
                                    :
                                    :
----------------------------------------------------------------x

### ORDER APPROVING MOTION OF BNC MORTGAGE LLC, PURSUANT TO SECTIONS 363(b), 365(a), and 554(a) OF THE BANKRUPTCY CODE AND RULES 6004, 6006, AND 9014 OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE, AUTHORIZING (I) THE REJECTION OF CERTAIN LEASES AND SUBLEASES OF NONRESIDENTIAL REAL PROPERTY AND (II) THE SALE OR ABANDONMENT OF *DE MINIMIS* ASSETS

Upon the motion, dated February 4, 2009 (the "Motion"), of BNC Mortgage LLC ("BNC"), as debtor and debtor-in-possession, pursuant to sections 363(b), 365(a), 554(a) of title 11 of the United States Code (the "Bankruptcy Code") and Rules 6004, 6006, and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") for authorization to (i) reject the leases set forth on Exhibit A annexed hereto (the "Leases " or "Leased Properties") and the subleases set forth on Exhibit B annexed hereto (the "Subleases" or "Subleased Properties") and (ii) sell or abandon certain miscellaneous assets, including fixtures, furniture, and other office equipment ("FF&E") without further authorization of the Court, all as more fully described in the Motion; and the Court having jurisdiction to consider the Motion and the relief requested therein in accordance with 28 U.S.C. §§ 157 and 1334 and the Standing Order M-61 Referring to Bankruptcy Judges for the Southern District of New York Any and All Proceedings Under Title 11, dated July 10, 1984 (Ward, Acting C.J.); and consideration of the Motion and the relief requested therein being a core proceeding pursuant to 28 U.S.C. § 157(b); and due and proper notice of the Motion having been provided in accordance with the procedures set forth in the

order entered September 22, 2008 governing case management and administrative procedures [Docket No. 285] and in the amended order entered February 13, 2009 governing case management and administrative procedures [Docket No. 2837] to (i) the United States Trustee for the Southern District of New York; (ii) the attorneys for the Official Committee of Unsecured Creditors; (iii) the Securities and Exchange Commission; (iv) the Internal Revenue Service; (v) the United States Attorney for the Southern District of New York; (vi) the landlords ands sublessees set forth in <u>Exhibit A</u> and <u>Exhibit B</u> to the Motion; and (vii) all parties who have requested notice in these chapter 11 cases, and it appearing that no other or further notice need be provided; and the debtors having filed a certificate of no objection; and the Court having found and determined that the relief sought in the Motion is in the best interests of BNC, its estates and creditors, and all parties in interest and that the legal and factual bases set forth in the Motion establish just cause for the relief granted herein; and after due deliberation and sufficient cause appearing therefor, it is

ORDERED that the Motion is hereby granted; and it is further

ORDERED that pursuant to section 365(a) of the Bankruptcy Code and Bankruptcy Rules 6006 and 9014, the rejection of the Leases, is hereby approved effective as the earlier of (i) the date BNC relinquishes possession of the Leased Properties or (ii) the date of this Order; and it is further

ORDERED that pursuant to section 365(a) of the Bankruptcy Code and Bankruptcy Rules 6006 and 9014, the rejection of the Subleases is hereby approved effective as the date of this Order; and it is further

ORDERED that all time periods set forth in this Order shall be calculated in accordance with Bankruptcy Rule 9006(a); and it is further

ORDERED that any rejection damage claim asserted by the counterparties to the Leases and Subleases shall be filed (subject to all of the BNC's rights, claims and defenses, including rights of setoff with respect to any such claims) on or before the final date for filing proofs of claim in BNC's chapter 11 case to be established by order of this Court, which proofs of claim shall be filed in accordance with the procedures set forth in such order; and it is further

ORDERED that the Debtors are authorized to sell the FF&E owned by BNC located at the Leased Properties and Subleased Properties without further authorization of the Court; and it is further

ORDERED that, pursuant to section 363(f) of the Bankruptcy Code, the sale of the FF&E shall be free and clear of all liens, claims and encumbrances, and any liens, claims and encumbrances thereon shall attach to the net proceeds of the sale of such FF&E with the same force and effect and asserted priority as such liens, claims and encumbrances had against the FF&E, subject to the rights, claims, defenses and objections, if any, of the BNC and all interested parties with respect thereto; and it is further

ORDERED that purchasers of the FF&E sold by BNC pursuant to this Order shall be entitled to the protections afforded by section 363(m) of the Bankruptcy Code in the event of a reversal or modification on appeal of this Order; and it is further

ORDERED that BNC is authorized to take all actions and execute all documents necessary or appropriate to effectuate the sale of any of the FF&E; and it is further

ORDERED that BNC is authorized, pursuant to section 554(a) of the Bankruptcy Code, in its sole discretion to abandon the FF&E; and it further

ORDERED that this Court shall retain jurisdiction to hear and determine all matters arising from or related to the implementation, interpretation and/or enforcement of this Order.

Dated: February 24, 2009
New York, New York

_/s/ James M. Peck_____
UNITED STATES BANKRUPTCY JUDGE

# __Annex A__

**Proposed Order**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| BEARINGPOINT, INC., et al., | ) | Case No. 09-10691 |
| | ) | |
| Debtors.[1] | ) | Jointly Administered |
| | ) | |

## ORDER (A) AUTHORIZING DEBTORS TO SELL AND TAKE ALL STEPS NECESSARY TO CONSUMATE THE (I) SALE OF ALL THE ISSUED SHARE CAPITAL OF BEARINGPOINT EUROPE HOLDINGS B.V., (II) SALE OF CERTAIN INTELLECTUAL PROPERTY, AND (III) LICENSE OF CERTAIN INTELLECTUAL PROPERTY AND (B) GRANTING RELATED RELIEF

Upon consideration of the motion (the "***Sale Motion***") of the above-captioned debtors and debtors in possession (collectively, the "***Debtors***") with respect to that certain Agreement for the Sale and Purchase of the Share Capital of BearingPoint Europe Holdings B.V., dated [July 15], 2009 (the "***Stock Purchase Agreement***") among BE Holdings I CV (the "***BE Holdings***"), Caravane Holdings LLC ("***Caravane***"), BearingPoint LLC ("***BE LLC***"), Peloton Holdings, L.L.C. ("***Peloton***"), BearingPoint, Inc. ("***BE***"), Echelon Holdings C.V. ("***Echelon***" and collectively with BE Holdings, Caravane, BE LLC, BE, and Peloton, the "***Sellers***"), BearingPoint Europe Holdings B.V. ("***BE EMEA***"), and BE Partners B.V. (together with its designees or assignees, as applicable, the "***Buyer***") and other related transaction documents contemplated thereby (the "***Transaction Documents***") seeking, among other things, the entry of an order (the "***Sale Order***") (a) authorizing the Debtors to sell and take all steps necessary to

---

[1] The Debtors are BearingPoint, Inc., BE New York Holdings, Inc., BearingPoint LLC, BearingPoint Americas, Inc., BearingPoint BG, LLC, BearingPoint Enterprise Holdings, LLC, BearingPoint Global Operations, Inc., BearingPoint International I, Inc., BearingPoint Israel, LLC, BearingPoint Puerto Rico, LLC, BearingPoint Russia, LLC, BearingPoint South Pacific, LLC, BearingPoint Southeast Asia, LLC, BearingPoint Technology Procurement Services, Inc., BearingPoint USA, Inc., i2 Mid Atlantic LLC, i2 Northwest LLC, Metrius, Inc., OAD Acquisition Corp., OAD Group, Inc., Peloton Holdings, L.L.C., Softline Acquisition Corp., Softline Consulting and Integrators, Inc.

consummate the (i) sale of all of the issued share capital (the "***Acquired Shares***") of BE EMEA, (ii) sale of certain intellectual property (the "***Acquired IP***"), and (iii) license of certain related intellectual property (the "***Licensed IP***" and collectively with the Acquired Shares and the Acquired IP, the "***Acquired Assets***") pursuant to the License Agreement[2] and BE Trademark License (the "***Transaction***") and (b) granting related relief; and the Court's consideration of the Sale Motion, the relief requested therein, and the responses thereto (if any) being a core proceeding in accordance with 28 U.S.C. § 157(b); and upon consideration of the Declaration of [SELLERS' DECLARANT] in Support of the Sale Motion; and adequate notice of the Sale Motion having been given; and the appearances of all interested parties and all responses and objections to the Sale Motion, if any, having been duly noted in the Sale Hearing; and upon the record of the Sale Hearing, the Sale Motion, said responses and objections, if any; and after due deliberation and sufficient cause appearing therefor, it is hereby:

**FOUND AND DETERMINED THAT:**

A.     The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Rule 7052 of the Federal Rules of Bankruptcy Procedure (the "***Bankruptcy Rules***"), made applicable to this proceeding pursuant to Bankruptcy Rule 9014.[3]

B.     Notice of the Sale Motion, and the Sale Hearing has been given in accordance with Bankruptcy Rules 2002 and 6004, Local Rules 2002 and 6004 and such notice

---

[2]     Capitalized terms used herein but not otherwise defined shall have the meanings ascribed to them in the Stock Purchase Agreement.

[3]     Findings of fact shall be construed as, and constitute, conclusions of law and conclusions of law shall be construed as, and constitute, findings of fact when appropriate. <u>See</u> Fed. R. Banks. P. 7052. Any statements made by the Court from the bench at the Sale Hearing shall constitute additional conclusions of law and findings of fact as appropriate.

has constituted good and sufficient notice of the Sale Motion and the Sale Hearing to all parties in interest, including, without limitation, potential bidders for the Acquired Assets, parties who hold all of the following (collectively, the "***Interests***"): liens claims (as defined in section 101(5) of the Bankruptcy Code), encumbrances, obligations, liabilities, demands, guarantees, actions, suits, defenses, deposits, credits, allowances, options, rights, restrictions, limitations, contractual commitments, rights of first refusal, rights of setoff or recoupment, or interests of any kind or nature whether known or unknown, legal or equitable, matured or unmatured, contingent or noncontingent, liquidated or unliquidated, asserted or unasserted, whether arising prior to or subsequent to the commencement of these chapter 11 cases, whether imposed by agreement, understanding, law, equity or otherwise in the Acquired Assets; and no other or further notice of the Sale Motion, the Sale Hearing, or the entry of this Sale Order need be given.

C.    The Acquired Shares, and certain of the Acquired IP and Licensed IP constitute property of the Debtors' estates and title thereto is vested in the Debtors' estates within the meaning of section 541(a) of the Bankruptcy Code.

D.    Prior to the execution of the Stock Purchase Agreement, the Seller adequately marketed the Acquired Assets by soliciting higher and better offers, and a reasonable opportunity has been afforded any interested party to make a higher and better offer for the Acquired Assets.  No other person or entity or group of persons or entities has submitted a higher and better offer to purchase or license the Acquired Assets than the offer set forth in the Transaction Documents.

E.    Exigent circumstances and sound business reasons exist for the Transaction and the other transactions contemplated in the Transaction Documents.  Such business reasons include, but are not limited to, the facts that (i) there is substantial risk of

deterioration of the value of the Acquired Assets if the Transaction is not consummated quickly, (ii) the Transaction constitutes the highest and best offer for the Acquired Assets, (iii) the Transaction will present the best opportunity to realize value of the Acquired Assets on a going concern basis and avoid decline and devaluation of the Acquired Assets, and (iv) unless the Transaction is concluded expeditiously as provided for in the Sale Motion and pursuant to the Transaction Documents, potential creditor recoveries may be substantially diminished.

F.     The sale of the Acquired Shares and Acquired IP and the license of the Licensed IP and the consummation of the Transaction and other transactions pursuant to the Transaction Documents constitute the exercise of sound business judgment and fiduciary duties by the Debtors, the Sellers, and Dallas Project Holdings Limited ("***DPHL***") and such acts are in the best interests of the Debtors, their estates, and their creditors, the Sellers, and DPHL.

G.     The Debtors, the Sellers and DPHL, have the authority and power to execute, deliver and perform their obligations under each of the Transaction Documents to which they are a party.  The Debtors and Sellers have taken all corporate action necessary to authorize and approve each of the Transaction Documents, and the consummation of the transactions contemplated thereby.  No consents or approvals, other than those expressly provided for in the Transaction Documents, are required for the Debtors, Sellers, and DPHL to consummate the Transaction and other transactions under the Transaction Documents.

H.     The transfer of the Acquired Shares and Acquired IP to the Buyer will be a legal, valid, and effective transfer of the Acquired Shares and Acquired IP, and will vest with the Buyer and BE EMEA, as the case may be, with full title guarantee and all right, title and interest of Sellers, DPHL, the Debtors, and the Debtors' bankruptcy estates to the Acquired Shares and Acquired IP.

I.      Except as otherwise permitted in the Transaction Documents, the Transfer of any of the Licensed IP to the Trust in accordance with the Transaction Documents will vest the Trust with full title guarantee and all right, title and interest of Seller, the Debtors, the Debtors' bankruptcy estates, and DPHL to such Licensed IP.

J.      The price to be paid under the Stock Purchase Agreement and other consideration to be provided under the Transaction Documents (the "*Consideration*") represents the highest and best offer received, individually and collectively, by the Sellers, the Debtors, the Debtors' bankruptcy estates, and DPHL for the Acquired Assets and each of the transactions contemplated by the Transaction Documents.   The Consideration constitutes reasonably equivalent value under the Bankruptcy Code and Uniform Fraudulent Transfer Act, fair consideration under the Uniform Fraudulent Conveyance Act, and reasonably equivalent value, fair consideration and fair value under any other applicable laws, for the Acquired Assets.

K.      The transactions contemplated by the Transaction Documents are undertaken by the Debtors, Sellers, DPHL, BE EMEA, and the Buyer at arms' length, without collusion and in good faith within the meaning of section 363(m) of the Bankruptcy Code, and such parties are entitled to the protections of section 363(m) of the Bankruptcy Code.

L.      The Sellers, the Debtors, DPHL, BE EMEA, and the Buyer have not engaged in any actions or conduct that is prohibited by section 363(n) of the Bankruptcy Code. The Buyer is entitled to all protections and immunities of Section 363(n) of the Bankruptcy Code.

M.      The Buyer is not an "insider" of the Debtors, as that term is defined in section 101(31) of the Bankruptcy Code.

N.     The Transaction and other transactions contemplated by the Transaction Documents are in the best interests of the Sellers, the Debtors, their estates and creditors, and DPHL.

O.     Other than with respect to Swiss Share Pledge, the Debtors may sell the Acquired Shares and the Acquired IP (to the extent the Acquired IP is owned by the Debtors) free and clear of all Interests, with respect to each creditor asserting an Interest, one or more of the standards set forth in Bankruptcy Code sections 363(f)(1)-(5) has been satisfied.  Other than with respect to the Swiss Share Pledge, those holders of Interests who did not object or who withdrew their objections to the transactions contemplated by the Transaction Documents are deemed to have consented to the Sale Motion and the sale of the Acquired Shares and the Acquired IP to the Buyer and to BE EMEA, as the case may be,  pursuant to Bankruptcy Code section 363(f)(2).  Those holders of Interests who did object fall within one or more of the other subsections of Bankruptcy Code section 363(f) and are adequately protected by having their Interests, if any, attach to the proceeds of the transactions contemplated by the Transaction Documents in which such holders allege an Interest, in the same order of priority, with the same validity, force and effect that such holder had prior to the transactions contemplated by the Transaction Documents, and subject to any claims and defenses of the Debtors and their estates may possess with respect thereto.

P.     The Transaction and other transactions contemplated by the Transaction Documents do not amount to a consolidation, merger or *de facto* merger of the Buyer and BE EMEA, and the Debtors and/or the Debtors' estates.  There is not substantial continuity between the Buyer or BE EMEA, and the Debtors, there is no common identity between the Debtors and the Buyer or BE EMEA, neither the Buyer nor BE EMEA are mere continuations of the Debtors

or their estates, and neither the Buyer nor BE EMEA constitutes a successor to the Debtors or their estates. Except as set forth in the Transaction Documents, neither the Buyer nor BE EMEA shall have obligations with respect to any liabilities of the Debtors and the Debtors will release and forever discharge the Buyer and BE EMEA and its successors and assigns from any and all claims, causes of action, obligations, liabilities, demands, losses, costs and expenses of any kind, character or nature whatsoever, known or unknown, fixed or contingent, relating to the sale and license of the Acquired Assets, except for liabilities and obligations under the Transaction Documents.

Q. The Transaction and other transactions under the Transaction Documents outside of a plan of reorganization pursuant to the Transaction Documents neither impermissibly restructures the rights of the Debtors' creditors nor impermissibly dictates the terms of a liquidating plan of reorganization for the Debtors. The transactions under the Transaction Documents do not constitute a *sub rosa* plan.

Therefore, for all of the foregoing and after due deliberation, the Court hereby:

**ORDERS, ADJUDGES, AND DECREES THAT:**

1. The Sale Motion and the relief requested therein is granted and approved in all respects.

2. The Transaction Documents, and each of the transactions contemplated thereby shall be, and hereby are, authorized and approved in all respects.

3. All objections and responses concerning the Sale Motion are hereby resolved in accordance with the terms of this Sale Order and as set forth in the record of the Sale Hearing. To the extent any such objections or responses were not otherwise withdrawn, waived, or settled, they, and all reservations and rights therein, are overruled and denied.

4.     Pursuant to section 363(b) of the Bankruptcy Code, the Debtors are authorized to sell and take all steps necessary to consummate the Transaction in accordance with the Transaction Documents and to take any other actions contemplated by the Transaction Documents.

5.     Each of the Debtors, the Sellers, DPHL and the Buyer are hereby authorized to take all actions and execute all documents and instruments that the Debtors, the Sellers, DPHL, and the Buyer deem necessary or appropriate to implement and effect the transactions contemplated by the Transaction Documents.

6.     Except as expressly provided in the Transaction Documents or any written agreement directly between the Buyer or BE EMEA and a third party, neither the Buyer nor BE EMEA shall have liability for any claims, obligations, liens or liabilities of the Debtors, the Sellers, or DPHL, whether arising prior to, on or after Completion.

7.     Except as expressly provided in the Transaction Documents, neither the Buyer nor BE EMEA has assumed, and shall have no liability or obligation for any liabilities of the Debtors, the Sellers or DPHL, as a successor in interest or otherwise.  Except as permitted under the express terms of the Transaction Documents, the transfer of the Acquired Shares and Acquired IP from the Debtors, the Sellers, and DPHL will vest with the Buyer and BE EMEA, as the case may be, all right, title and interest of the Sellers, the Debtors and their bankruptcy estates, and DPHL to the Acquired Shares and Acquired IP free and clear of any and all Interests.

8.     Except as otherwise permitted in the Transaction Documents, the Transfer of the Licensed IP to the Trust in accordance with the Transaction Documents will vest the Trust with full title guarantee and all right, title and interest of Seller, the Debtors, the Debtors' bankruptcy estates, and DPHL to the Licensed IP free and clear of any and all Interests.

9.      At or prior to Completion, the Buyer shall pay the Purchase Price to BE Holdings, BE EMEA shall pay the ROW Cash Amount to BE Holdings and shall pay the Excess Cash Amount to BE Holdings or to one or more of the Debtors, and BE Holdings shall deliver the Purchase Price, the ROW Cash Amount and any Excess Cash Amount not already received by the Debtors to one or more of the Debtors.

10.      At or prior to Completion, BE EMEA and BE Holdings shall enter into the Loan Agreement, which shall be secured by the Share Pledge Agreement granting a security interest over all issued shares in the capital of BE EMEA to BE Holdings.

11.      The Consideration constitutes reasonably equivalent value under the Bankruptcy Code and Uniform Fraudulent Transfer Act, fair consideration under the Uniform Fraudulent Conveyance Act, and reasonably equivalent value, fair consideration and fair value under any other applicable laws, for the Acquired Assets.

12.      Neither the Buyer nor BE EMEA is and nor shall be deemed a successor to the Debtors or their estates as a result of the consummation of the Transaction and other transactions contemplated by the Transaction Documents or any other event occurring in the chapter 11 cases under any theory of law or equity, and, except as set forth in the Transaction Documents, neither the Buyer nor BE EMEA shall assume, or be deemed to assume, or in any way be responsible for any liability or obligation of any of the Debtors and/or their estates including, but not limited to, any successor liability, liability or responsibility for any claim against the Debtors or against an insider of the Debtors, or similar liability.

13.      Each and every federal, state, local and foreign governmental agency or department is hereby directed to accept any and all documents and instruments necessary and

appropriate to consummate the transactions contemplated by the Transaction Documents and this Sale Order.

14.     This Sale Order shall be binding upon and govern the acts of all entities, including without limitation, all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, administrative agencies, governmental departments, secretaries of state, federal, state, local and foreign officials, and all other persons or entities who may be required by operation of law, the duties of their office or contract to accept, file, register or otherwise record or release any documents or instruments, or who may be required to report to or insure title or state of title in or to any of the Acquired Shares or Acquired IP.

15.     The Buyer and BE EMEA, as the case may be, as a good faith purchaser of the Acquired Shares and Acquired IP and BE EMEA as a good faith licensee of the Licensed IP, each is hereby granted all of the protections provided to a good faith purchaser under section 363(m) of the Bankruptcy Code such that the reversal or modification on appeal of the Sale Order shall not affect the validity of the sale of the Acquired Shares or Acquired IP or the license of the Licensed IP as contemplated under the Transaction Documents.

16.     The transactions approved by this Order are not subject to avoidance pursuant to Bankruptcy Code section 363(n).

17.     Pursuant to sections 105(a) and 363 of the Bankruptcy Code, all "persons" (as that term is defined in section 101(41) of the Bankruptcy Code) are hereby enjoined from taking any action against the Buyer or the Buyer's affiliates (as they existed immediately prior to Completion) to recover any claim which such "person" has solely against the Debtors, the

Sellers, DPHL, or any other of the Debtors' affiliates (as they exist immediately following Completion).

18.     Effective upon Completion, pursuant to section 363 of the Bankruptcy Code, the sale of the Acquired Shares and Acquired IP to the Buyer (and its designees or assignees, as applicable) shall constitute a legal, valid, and effective transfer of the Acquired Shares and Acquired IP and shall vest the Buyer (and its designees or assignees, as applicable) with all right, title and interest of the Sellers, the Debtors and their estates, and DPHL in and to the Acquired Shares and Acquired IP free and clear of all Interests, pursuant to Bankruptcy Code section 363(f).

19.     For the avoidance of doubt, upon Completion all Interests of the Administrative Agent, the Collateral Agent, and each of the lenders party to the Amended and Restated Credit Agreement dated as of June 1, 2007 amongst BE, BE LLC, the Guarantors, the Lead Arranger, the Issuing Banks, the Administrative Agent (the "*Agent*") and the Collateral Agent, as amended from time to time (collectively the "*Agents and the Secured Lenders*") with respect to the Acquired Assets shall be released and the Agents and each of the Secured Lenders shall be deemed to have expressly consented to such release upon the entry of this Order. In connection with the foregoing, the Interests of the Agents and each of the Secured Lenders shall attach to the proceeds of the transactions contemplated by the Transaction Documents in which such holders allege an Interest, in the same order of priority, with the same validity, force and effect that such holder had prior to the transactions contemplated by the Transaction Documents, and subject to any claims and defenses of the Debtors and their estates may possess with respect thereto. Any proceeds from the EMEA Sale (or the repatriation of cash as a result of or in furtherance of such

sale) shall not be used by the Debtors absent consent of the Agent or further order of the Bankruptcy Court, given that the Agent has asserted an interest in such funds.

20.     Effective upon Completion, pursuant to section 363 of the Bankruptcy Code, the transfer of any of the Licensed IP to the Trust in accordance with the Transaction Documents will vest the Trust with full title guarantee and all right, title and interest of Sellers, the Debtors, the Debtors' bankruptcy estates, and DPHL to such Licensed IP.

21.     The Debtors are authorized to exercise their stock power to cause each of their non-debtor affiliates that are party to any of the Transaction Documents to take any and all actions necessary to comply with their obligations under the Transaction Documents.

22.     From and after the date of the entry of this Sale Order, the Debtors, the Sellers, DPHL, or any creditor or other party in interest shall not take or cause to be taken any action that would interfere with the transactions contemplated by the Transaction Documents in accordance with the terms of this Sale Order.

23.     Neither the Buyer nor BE EMEA has assumed or otherwise become obligated for any of the Debtors', Sellers', or DPHL's liabilities other than as set forth in the Transaction Documents.

24.     This Court shall retain exclusive jurisdiction to interpret and enforce the provisions of this Sale Order in all respects; provided, however, that in the event the Court abstains from exercising or declines to exercise such jurisdiction or is without jurisdiction with respect to this Sale Order, such abstention, refusal, or lack of jurisdiction shall have no effect upon, and shall not control, prohibit or limit the exercise of jurisdiction of any other court having competent jurisdiction with respect to any such matter.

25.     The Transaction Documents may be modified, amended or supplemented by the parties thereto, in a writing signed by such parties, in accordance with the terms thereof without further order of the Court, _provided_, that any (a) such modification, amendment or supplement does not have a material adverse effect on the Debtors' estates and has been agreed to between the Debtors and the Buyer and (b) such modification, amendment or supplement is filed with the Bankruptcy Court and provided on seventy-two (72) hours prior notice to its effectiveness to Bingham McCutchen LLP, as counsel for the Official Committee of Unsecured Creditors, and Paul, Hastings, Janofsky & Walker LLP, as counsel for the Administrative Agent for the Debtors' prepetition secured lenders.

26.     The provisions of this Sale Order are nonseverable and mutually dependent.

27.     This Sale Order shall inure to the benefit of the Buyer, BE EMEA, the Debtors, the Sellers, DPHL, and their respective successors and assigns, including but not limited to any chapter 11 or chapter 7 trustee that may be appointed in the Debtors' cases and shall be binding upon any trustee, party, entity or fiduciary that may be appointed in connection with these cases or any other or further cases involving the Debtors, the Sellers, or DPHL, whether under chapter 7 or chapter 11 of the Bankruptcy Code or other insolvency or similar proceeding.

28.     The provisions of this Sale Order and any actions taken pursuant hereto shall survive the entry of any order which may be entered confirming any chapter 11 plan of the Debtors, converting the Debtors' cases from chapter 11 to cases under chapter 7 of the Bankruptcy Code, or dismissing any of the Debtors' chapter 11 cases.

29.     Because time is of the essence, this Sale Order shall be effective and enforceable immediately upon entry and its provisions shall be self-executing, and the stay of orders

authorizing the sale, use, or lease of property of the estate, as set forth in Bankruptcy Rule 6004(h), shall not apply to this Sale Order.

30.     The Debtors and Seller are authorized to close the sale immediately upon entry of this Sale Order.


Dated:  _____, 2009        _____
            New York, New York                    THE HONORABLE ROBERT E. GERBER
                                                            UNITED STATES BANKRUPTCY JUDGE