*Execution Copy*

**ASSET PURCHASE AGREEMENT**

**dated as of July 2, 2009**

**between**

**ÉCLAT CONSULTING, LLC**

**and**

**BEARINGPOINT, INC.**

# TABLE OF CONTENTS

## ARTICLE 1
### ASSET PURCHASE

Section 1.01 . *Purchase and Sale of Assets.* ................................................................ 1
Section 1.02 . *Assumption of Liabilities.* .................................................................... 1
Section 1.03 . *Purchase Price.* .................................................................................... 2
Section 1.04 . *Closing.* ................................................................................................ 2
Section 1.05 . *Cure Costs.* .......................................................................................... 3
Section 1.06 . *Purchase Price Adjustments.* ............................................................... 3
Section 1.07 . *California Department of Motor Vehicles Contracts.* ...................... 3

## ARTICLE 2
### REPRESENTATIONS AND WARRANTIES OF SELLER

Section 2.01 . *Organization.* ...................................................................................... 3
Section 2.02 . *Authorization of Transaction.* .............................................................. 3
Section 2.03 . *Noncontravention.* ............................................................................... 4
Section 2.04 . *Ownership of Assets.* ........................................................................... 4
Section 2.05 . *Assigned Contracts.* ............................................................................. 4
Section 2.06 . *Litigation.* ............................................................................................ 4

## ARTICLE 3
### REPRESENTATIONS AND WARRANTIES OF BUYER

Section 3.01 . *Organization and Power.* ..................................................................... 5
Section 3.02 . *Authorization of the Transaction.* ....................................................... 5
Section 3.03 . *Noncontravention.* ............................................................................... 5
Section 3.04 . *Sufficient Funds.* . ............................................................................... 5

## ARTICLE 4
### PRE-CLOSING COVENANTS

Section 4.01 . *Efforts.* ................................................................................................ 6
Section 4.02 . *Operation of Business.* ......................................................................... 6
Section 4.03 . *Bankruptcy.* ......................................................................................... 6
Section 4.04 . *Employees.* ........................................................................................... 7
Section 4.05 . *Contracts.* ............................................................................................ 7
Section 4.06 . *Exclusivity.* .......................................................................................... 8

## ARTICLE 5
### CONDITIONS TO CLOSING

Section 5.01 . *Condition to Obligations of Each Party.* ........................................ 8
Section 5.02 . *Conditions to Obligations of Buyer.* ................................................ 9
Section 5.03 . *Conditions to Obligations of Seller.* ............................................. 10

## ARTICLE 6
### POST-CLOSING COVENANTS

Section 6.01 . *Sharing Of Data.* ........................................................................ 10
Section 6.02 . *Confidentiality.* ........................................................................... 11
Section 6.03 . *Subcontracting Arrangement.* ..................................................... 11

## ARTICLE 7
### TERMINATION

Section 7.01 . *Termination of Agreement.* ......................................................... 12
Section 7.02 . *Effect of Termination.* ................................................................ 12

## ARTICLE 8
### DEFINITIONS

Section 8.01 . *Definitions.* ................................................................................ 13

## ARTICLE 9
### MISCELLANEOUS

Section 9.01 . *Publicity and Disclosures.* .......................................................... 18
Section 9.02 . *No Third Party Beneficiaries.* ...................................................... 18
Section 9.03 . *Entire Agreement.* ....................................................................... 18
Section 9.04 . *Succession and Assignment.* ........................................................ 18
Section 9.05 . *Counterparts and Facsimile Signature.* ....................................... 18
Section 9.06 . *Headings.* .................................................................................... 18
Section 9.07 . *Notices.* ....................................................................................... 19
Section 9.08 . *Governing Law.* ........................................................................... 20
Section 9.09 . *Amendments and Waivers.* ........................................................... 20
Section 9.10 . *Severability.* ................................................................................ 20
Section 9.11 . *Expenses.* ..................................................................................... 20
Section 9.12 . *Submission to Jurisdiction.* ......................................................... 20
Section 9.13 . *Specific Performance.* .................................................................. 21
Section 9.14 . *Survival of Representations.* ........................................................ 21
Section 9.15 . *Construction.* ............................................................................... 22

Exhibits
Exhibit A          Assigned Contracts
Exhibit B          License Agreement
Exhibit C-1        Named Employees
Exhibit C-2        Potential Transferred Employees
Exhibit D          Assignment and Assumption Agreement
Exhibit E          Transition Services Agreement
Exhibit F          Subcontract Agreement
Exhibit G          Éclat Sales Order

## ASSET PURCHASE AGREEMENT

This Asset Purchase Agreement (this "**Agreement**") is entered into as of July 2, 2009 by and between Éclat Consulting, LLC, a Delaware limited liability company ("**Buyer**"), and BearingPoint, Inc., a Delaware corporation ("**Seller**"). Unless otherwise defined herein, capitalized terms used in this Agreement shall have the meanings set forth in Article 8.

WHEREAS, upon and subject to the terms and conditions of this Agreement, Seller desires to sell, transfer, convey and assign to Buyer and Buyer desires to purchase from Seller, the Acquired Assets (as defined below), and Buyer desires to assume from Seller the Assumed Liabilities (as defined below);

WHEREAS, on February 18, 2009, Seller and certain of its subsidiaries based in the United States filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**") (Jointly Administered Case No. 09-10691-reg) (the "**Chapter 11 Cases**");

WHEREAS, the Parties contemplate that the Acquired Assets will be sold, transferred, conveyed and assigned to Buyer pursuant to 11 U.S.C. §§ 363 and 365 as set forth in this Agreement and in accordance with the Legacy Contracts Sale Approval Order entered in the Chapter 11 Cases pursuant to the Legacy Contracts Sale Approval Motion and the Éclat Sales Order to be entered in the Chapter 11 Cases pursuant to the related motion to be filed with the Bankruptcy Court;

NOW, THEREFORE, in consideration of the mutual representations, warranties, covenants and undertakings herein contained, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows.

## ARTICLE 1
### ASSET PURCHASE

Section 1.01. *Purchase and Sale of Assets.* (a) Upon and subject to the terms and conditions of this Agreement, Buyer agrees to purchase from Seller, and Seller agrees to sell, transfer, convey, assign and deliver to Buyer, at the Closing for the consideration specified in Section 1.03, all of Seller's right, title and interest in the Acquired Assets.

(b) Notwithstanding Section 1.01(a), the Acquired Assets shall not include the Excluded Assets.

Section 1.02. *Assumption of Liabilities.* Upon and subject to the terms and conditions of this Agreement, Buyer agrees to assume, pay, perform and discharge when

due and become responsible for from and after the Closing all of the Assumed Liabilities. Except for the liabilities expressly assumed pursuant to this Section 1.02, Buyer does not assume any liabilities of Sellers.

Section 1.03. *Purchase Price.* The aggregate purchase price to be paid by Buyer for the Acquired Assets shall be (i) a cash amount equal to $15,100,000 (the "**Cash Purchase Price**"), (ii) a cash amount equal to the aggregate amount of all bonuses paid by Seller to the Transferred Employees on or about July 15, 2009 in an amount up to $425,000; provided, however, that if Buyer obtains the written consent of any managing director who is listed on Exhibit C-2 on or prior to July 15, 2009 to waive or forego any such performance or retention bonus due to such employee from Seller on July 15, 2009, then such amount shall not be paid by Seller on July 15, 2009 and, if the Closing occurs, (A) shall instead be paid by Buyer in accordance with the written agreement obtained from such managing director, and (B) under no circumstances will Seller be obligated to pay the amount of any such bonus designated for such managing director, and (iii) the assumption by Buyer at the Closing of the Assumed Liabilities.

Section 1.04. *Closing.* (a) The Closing shall take place at the offices of Baker Botts L.L.P, 2001 Ross Avenue, Dallas, Texas 75201 commencing at 9:00 a.m. Dallas, Texas time on the Business Day following the satisfaction or waiver of all the conditions set forth in Article 5 (other than those conditions that by their terms are to be satisfied at the Closing) or at such other place, time and date as may be mutually agreeable to the Parties (the "**Closing Date**").

(b)     At the Closing:

(i)     all Acquired Assets shall be sold, transferred, conveyed, assigned and delivered, as applicable, to Buyer;

(ii)     each of Buyer and Seller shall execute and deliver an Assignment and Assumption Agreement, in the form attached as Exhibit D hereto, pursuant to which Seller shall sell, transfer, convey, assign and deliver to Buyer the Acquired Assets and Buyer shall assume all Assumed Liabilities at the Closing;

(iii)     Seller shall transfer to Buyer all books, records (other than accounting records), files and other data (excluding any intellectual property of Seller) (or copies thereof) within the possession or control of the project teams for the Assigned Contracts to the extent relating solely or primarily to the Acquired Assets, except to the extent any such materials constitute an Excluded Asset and Seller shall be permitted to retain a copy of any such materials that are transferred to Buyer (the "**Books and Records**"); provided, however, that Buyer shall be permitted to copy any accounting or other books, records or files not residing with the project teams relating solely or primarily to the Acquired Assets at Buyer's expense upon reasonable request to Seller;

(iv)     each of Buyer and Seller shall execute and deliver the License Agreement, in the form attached as <u>Exhibit B</u> hereto;

(v)     each of Buyer and Seller shall execute and deliver the Transition Services Agreement, in the form attached as <u>Exhibit E</u> hereto;

(vi)     Buyer shall pay to Seller the Cash Purchase Price, by wire transfer of immediately available funds to an account designated by Seller; and

(vii)     Buyer and Seller shall provide such other customary closing deliverables as are reasonably necessary and requested by Buyer or Seller, as applicable.

Section 1.05. *Cure Costs.* At or prior to the Closing, Seller shall pay all Cure Costs.

Section 1.06. *Purchase Price Adjustments.* Seller shall deliver to Buyer a report setting forth the unbilled WIP and outstanding accounts receivables (which shall be in accordance with GAAP) relating to the assignable Contracts as of June 30, 2009. If the aggregate of the unbilled WIP and outstanding accounts receivables relating to the assignable Contracts as of June 30, 2009 reflected on such report is less than $16,000,000, the Cash Purchase Price shall be reduced by such difference (such adjusted amount, the **"Adjusted Cash Purchase Price"**); provided, however, that in no event will the Adjusted Cash Purchase Price be reduced to less than $14,200,000.

Section 1.07. *California Department of Motor Vehicles Contracts.* Buyer and Seller agree to use their reasonable best efforts to cause the California Department of Motor Vehicles Contracts to be an Assigned Contract and to cause Seller's Performance Bond to be released by the California Department of Motor Vehicles within 15 days after the Closing.

# ARTICLE 2
## REPRESENTATIONS AND WARRANTIES OF SELLER

As a material inducement to Buyer to enter into this Agreement and consummate the transactions contemplated hereby, Seller represents and warrants to Buyer as of the date hereof as follows:

Section 2.01. *Organization.* Seller is a corporation duly organized, validly existing and in good standing under the laws of its jurisdiction of organization.

Section 2.02. *Authorization of Transaction.* Subject to compliance with the Legacy Contracts Sale Approval Order, (a) Seller has all requisite corporate power and authority to execute and deliver each Transaction Agreement to which it is a party and to perform its obligations hereunder and thereunder; (b) the execution, delivery and

performance by Seller of each Transaction Agreement to which it is a party and the consummation by Seller of the transactions contemplated hereby and thereby have been duly and validly authorized by all necessary corporate action on the part of Seller; and (c) each Transaction Agreement to which Seller is a party has been duly and validly executed and delivered by Seller and constitutes a valid and binding obligation of Seller, assuming the due authorization, execution and delivery by Buyer, enforceable against Seller in accordance with its terms.

Section 2.03. *Noncontravention.* Subject to compliance with the Legacy Contracts Sale Approval Order and except as set forth on <u>Schedule 2.03</u>, neither the execution and delivery by Seller of any Transaction Agreement to which it is a party nor the consummation by Seller of the transactions contemplated hereby and thereby will (a) conflict with or violate any provision of the certificate of incorporation or by-laws of Seller, (b) other than as required by any applicable Governmental Entity consent or novation requirements, require on the part of Seller or any of its Subsidiaries any material notice to or filing with, or any material permit, authorization, consent or approval of, any Governmental Entity, (c) conflict with, result in a breach of, constitute (with or without due notice or lapse of time or both) a default under, result in the acceleration of obligations under, create in any Person the right to terminate, modify or cancel, or require any notice, consent or waiver under, any Assigned Contract, (d) result in the imposition of any Security Interest upon any of the Acquired Assets or (e) violate any material order, writ, injunction, judgment, decree or Law applicable to Seller or any of its Subsidiaries or any of their properties or assets.

Section 2.04. *Ownership of Assets.* Seller is the true and lawful owner of, and has good title to all of the Acquired Assets, free and clear of all Security Interests other than Permitted Liens. At the Closing, Seller will convey (or cause to be conveyed) to Buyer good and valid title to all the Acquired Assets free and clear of all Security Interests (other than the Assumed Liabilities) in accordance with the Legacy Contracts Sale Approval Order.

Section 2.05. *Assigned Contracts.* Each Assigned Contract is, assuming the due authorization, execution and delivery by the other parties thereto, a legal, valid, binding and enforceable agreement of Seller and, to the knowledge of Seller, is in full force and effect. Except as described on Schedule 2.05, neither Seller nor, to the knowledge of Seller, any other party, is in breach or violation of, or default under, any such Assigned Contract. Subject to the Legacy Contracts Sale Approval Order and any other consent or novation requirements of any applicable Governmental Entity, each such Assigned Contract is assignable by Seller to Buyer without the consent or approval of any Person.

Section 2.06. *Litigation.* Except for the Chapter 11 Cases and any motion, application, pleading or order filed in the Chapter 11 Cases that relates to this Agreement, there is no Legal Proceeding that is pending or, to the knowledge of Seller, has been threatened that relates in any material respect to the Acquired Assets.

# ARTICLE 3
## REPRESENTATIONS AND WARRANTIES OF BUYER

As a material inducement to Seller to enter into this Agreement and consummate the transactions contemplated hereby, Buyer represents and warrants to Seller as follows:

Section 3.01. *Organization and Power.* Buyer is a limited liability company duly organized, validly existing and in good standing under the laws of the State of Delaware.

Section 3.02. *Authorization of the Transaction.* Buyer has all requisite power and authority to execute and deliver each Transaction Agreement to which it is a party and to perform its obligations hereunder and thereunder. The execution, delivery and performance by Buyer of each Transaction Agreement to which it is a party and the consummation by Buyer of the transactions contemplated hereby and thereby have been duly and validly authorized by all necessary action on the part of Buyer. Each Transaction Agreement to which Buyer is a party has been duly and validly executed and delivered by Buyer and each such Transaction Agreement constitutes a valid and binding obligation of Buyer, assuming the due authorization, execution and delivery by each Seller, enforceable against Buyer in accordance with its terms.

Section 3.03. *Noncontravention.* Neither the execution and delivery by Buyer of the Transaction Agreements to which it is a party nor the consummation by Buyer of the transactions contemplated hereby and hereby will (a) conflict with or violate any provision of the certificate of formation, limited liability company operating agreement or other governing documents of Buyer, (b) other than as required by any applicable Governmental Entity consent or novation requirements, require on the part of Buyer any material notice to or filing with, or material permit, authorization, consent or approval of, any Governmental Entity, (c) conflict with, result in breach of, constitute (with or without due notice or lapse of time or both) a default under, result in the acceleration of obligations under, create in any party any right to terminate, modify or cancel, or require any notice, consent or waiver under, any contract or instrument to which Buyer is a party or by which it is bound or to which any of its properties or assets is subject, or (d) violate any material order, writ, injunction, judgment, decree or Law applicable to Buyer or any of its properties or assets.

Section 3.04. *Sufficient Funds.* Buyer has or will have on the Closing Date sufficient funds on hand to consummate the transactions contemplated by this Agreement. Buyer acknowledges that it shall not be a condition to the obligations of Buyer to consummate the transactions contemplated hereby that Buyer have sufficient financial resources for payment of the Cash Purchase Price.

# ARTICLE 4
## PRE-CLOSING COVENANTS

Section 4.01. *Efforts.* Each Party agrees to use its reasonable best efforts to take all actions and to do all things necessary, proper or advisable to consummate the transactions contemplated by this Agreement, including using its reasonable best efforts to obtain all waivers, permits, consents, assignment authorizations, approvals or other authorizations from Governmental Entities (including filing a motion with the Bankruptcy Court seeking approval of the Éclat Sales Order), and to effect all registrations, filings and notices with or to Governmental Entities (including the Bankruptcy Court), as may be required for such Party to consummate the transactions contemplated by this Agreement; *provided*, that, in connection with using such reasonable best efforts, Seller shall not be required to (a) incur, admit or consent to any liability or obligation or (b) make more than a nominal out-of-pocket expenditure, other than payment of the Cure Costs.

Section 4.02. *Operation of Business.* Except as contemplated by this Agreement and to the extent not inconsistent with the Bankruptcy Code, the Bankruptcy Rules, the operation and information requirements of the Office of United States Trustee (the "**OIRR**"), or any orders entered by the Bankruptcy Court in the Chapter 11 Cases, during the period from the date of this Agreement through the Closing, Seller shall conduct the operation of the business to which the Acquired Assets relate in the Ordinary Course of Business. Without limiting the generality of the foregoing, prior to the Closing, Seller shall not, except as required by the Bankruptcy Code, Bankruptcy Rules, the OIRR, or any orders entered by the Bankruptcy Court in the Chapter 11 Cases, without the prior written consent of Buyer, which consent shall not be unreasonably withheld, conditioned or delayed

    (a)    sell, lease, license or dispose of any Acquired Assets;

    (b)    mortgage or pledge any of the Acquired Assets, or take any action or fail to take any action that would subject any of the Acquired Assets to any Security Interest other than Permitted Liens;

    (c)    other than in the Ordinary Course of Business, pay any obligation or liability, in each case related to the Acquired Assets or Assumed Liabilities;

    (d)    change its billings, collection, or disbursement practices with respect to work in progress or accounts receivable related to Assigned Contracts;

    (e)    amend, modify, terminate or waive any rights under, any Assigned Contract; or

    (f)    agree in writing or otherwise to take any of the foregoing actions.

Section 4.03. *Bankruptcy.* Seller shall, as soon as practicable after the execution of this Agreement, serve the Sale Notice (as defined in the Legacy Contract Sale

Approval Order) on the Counterparties and the Consent Parties (each as defined in the Legacy Contract Sale Approval Order). If any objection to the transactions contemplated by this Agreement is served in accordance with the Legacy Contract Sale Approval Order and such objection cannot otherwise be resolved by the parties, Seller will contact the Bankruptcy Court to obtain a hearing date to resolve the objection and use commercially reasonable efforts to resolve any such objection. Buyer and Seller agree to use commercially reasonable efforts to promptly submit for entry by the Bankruptcy Court on the docket of the Chapter 11 Cases a sales order, substantially in the form of Exhibit G hereto, that provides, among other things, for the protections under 11 U.S.C. §§ 363 (the "**Éclat Sales Order**").

Section 4.04. *Employees.*

(a)     Prior to the Closing Date, Buyer shall offer employment to each employee listed on Exhibit C-2 in accordance with terms and conditions generally applicable to similarly situated personnel of Buyer.
REDACTED
The Parties agree to reasonably cooperate to coordinate the termination of employment with Seller and the transfer to Buyer of any such employees who accept Buyer's offer of employment (collectively, the "**Transferred Employees**"); provided, that an employee shall only be considered a Transferred Employee if such employee accepts employment with Buyer and such employee is working on an Assigned Contract as of the Closing. Effective upon Closing, Seller hereby releases each Transferred Employee from his or her employment, confidentiality, non-compete, non-solicitation and related obligations to Seller or any Subsidiary of Seller other than (i) covenants not to disclose confidential information of Seller or any of its clients to any Person other than Buyer and (ii) covenants not to solicit for employment those individuals who are employees of Seller as of the Closing other than those employees of Seller listed on Exhibit C-2; provided, however, that the covenants described in clauses (ii) and (iii) shall terminate and be of no further force and effect as of December 31, 2009.

(b)     At the Closing, Buyer shall assume all of Seller's liabilities and obligations relating to accrued paid time off ("**PTO**") of Transferred Employees (the "**Assumed PTO**") and shall reimburse Seller for the aggregate amount of all bonuses due to the Transferred Employees paid by Seller on or about July 15, 2009 pursuant to the Seller's bonus compensation program pursuant to Section 1.03.

(c)     Each of Buyer and Seller agrees to use its reasonable best efforts to finalize Exhibit C-2 as soon as practicable after the date of this Agreement, but in no event later than 5 Business Days prior to the Closing Date.

Section 4.05. *Contracts.*

(a)     On the fifth Business Day prior to the Closing Date, Seller shall provide Buyer with an updated version PS Projects Open for Bid Chart (with information as

recent as is reasonably practicable) with respect to each Assigned Contract. Seller shall provide such table via electronic mail and as required pursuant to Section 9.07.

(b)     Within two Business Days of receipt of the table described in Section 4.05(a), Buyer shall provide the Seller with the name of Contracts (if any) that Buyer elects to remove from the list of Assigned Contracts if Buyer reasonably believes that such Contract has (i) more burdens than it has economic benefits or (ii) has been substantially completed and there is no remaining amount owing thereunder. If Buyer elects remove a contract from Exhibit A pursuant to this Section 4.05, such Contract shall no longer be an Assigned Contract or an Acquired Asset. Any election by Buyer to remove an Assigned Contract shall not reduce the Cash Purchase Price as provided in Section 1.03. Buyer shall provide the list of Contracts that it has elected to remove from Exhibit A via electronic mail and as required pursuant to Section 9.07.

Section 4.06. *Exclusivity.* From and after the date hereof, Seller shall not (and it will not permit its respective directors, affiliates, officers, employees, partners, agents or representatives to) solicit, initiate or encourage the submission of any proposal or offer from any Person relating to the acquisition of any Acquired Asset or participate in any discussions or negotiations regarding, furnish any information with respect to, assist or participate in, or facilitate in any other manner any effort or attempt by any Person to acquire any Acquired Asset (other than with respect to any Contract that is removed from Exhibit A by Buyer pursuant to Section 4.05). Any discussions or negotiations regarding any alternative transaction with respect to the Acquired Assets with any party other than Buyer and that are ongoing as of the date of this Agreement shall be terminated by Seller and its representatives simultaneously with the execution of this Agreement. Seller shall notify Buyer within one Business Day if any Person makes any proposal, offer, inquiry, or contact with respect to any of the foregoing. Without waiving any rights granted to Buyer pursuant to this section, Buyer shall be entitled to any appropriate damages for breach of this provision (including, without limitation, reimbursement of out-of-pocket fees and expenses for enforcement of this provision and/or any other fees and expenses in connection with this transaction). The foregoing rights and obligations shall expire on the earlier of (i) the occurrence of any event that would prevent the satisfaction of any of the conditions to the obligations of the parties contained in Section 5.01 or Section 5.03, (ii) the Closing and (iii) termination of this Agreement.


ARTICLE 5
CONDITIONS TO CLOSING

Section 5.01. *Condition to Obligations of Each Party.* The obligation of each Party to consummate the transactions contemplated by this Agreement to be consummated at the Closing are subject to the satisfaction of the following conditions:

(a)     the Éclat Sales Order shall have been entered by the Bankruptcy Court and the Éclat Sales Order and the Legacy Contracts Sale Approval Order shall be in full force and effect and shall not have been violated, vacated, withdrawn, overruled, resolved or

stayed, modified, vacated, reversed, amended or revoked; provided, however, if the Éclat Sales Order is not entered by the Bankruptcy Court on or before July 23, 2009 and Buyer does not waive such condition to its obligations to consummate the transactions contemplated by this Agreement and as a result the Closing does not occur on or before July 24, 2009, then the thresholds set forth in Section 5.02(d)(i) and (d)(ii) shall be reduced to 65% and 60%, respectively;

(b)　　no objection regarding this Agreement or the transactions contemplated hereby shall have been served in accordance with the Legacy Contracts Sale Approval Order, the Éclat Sales Order, or any objections served in accordance with the Legacy Contract Sale Approval Order or the motion relating to the Éclat Sales Order shall have been resolved by the parties or overruled by order of the Bankruptcy Court; and

(c)　　no provision of applicable Law shall prohibit the consummation of the Closing.

Section 5.02. *Conditions to Obligations of Buyer.* The obligation of Buyer to consummate the transactions contemplated by this Agreement to be consummated at the Closing is subject to the satisfaction or waiver, to the extent permitted by Law, of the following additional conditions:

(a)　　the representations and warranties of Seller set forth in this Agreement shall be true and correct in all material respects as of the Closing as though made as of the Closing (except for any such representations and warranties that relate to an earlier date, which shall be true and correct in all material respects as of such earlier date);

(b)　　Seller shall have performed or complied in all material respects with its agreements and covenants required to be performed or complied with under this Agreement as of or prior to the Closing;

(c)　　the aggregate amount of the unbilled WIP and outstanding accounts receivables relating to the assignable Contracts as of June 30, 2009 reflected on the report delivered to Seller shall not be less than $14,500,000; provided, however, that if aggregate amount of the unbilled WIP and outstanding accounts receivables relating to the assignable Contracts as of June 30, 2009 reflected on the report delivered to Seller shall is less than $14,500,000, the Parties shall negotiate in good faith to determine an appropriate adjustment to the Cash Purchase Price;

(d)

*REDACTED*

(e)     Buyer shall have received the Closing deliverables of Seller pursuant to Section 1.04(b); and

(f)     Seller shall have satisfied its obligations to pay Cure Costs as provided in Section 1.05.

Section 5.03.  *Conditions to Obligations of Seller.*  The obligation of Seller to consummate the transactions contemplated by this Agreement to be consummated at the Closing is subject to the satisfaction or waiver, to the extent permitted by Law, of the following additional conditions:

(a)     the representations and warranties of Buyer set forth in this Agreement shall be true and correct in all material respects as of the Closing as though made as of the Closing;

(b)     Buyer shall have performed or complied in all material respects with its agreements and covenants required to be performed or complied with under this Agreement as of or prior to the Closing; and

(c)     Seller shall have received the Closing deliverables of Buyer pursuant to Section 1.04(b).

ARTICLE 6
POST-CLOSING COVENANTS

Section 6.01.  *Sharing Of Data.*  (a) Seller shall have the right for a period of not more than seven years following the Closing Date to have reasonable access to such books, records and accounts, including financial, tax and accounting records, correspondence, production records, employment records and other records that are transferred to Buyer pursuant to the terms of this Agreement for the limited purposes of concluding Seller's involvement with respect to the Acquired Assets and Assumed Liabilities prior to the Closing and for complying with their obligations under applicable Law.  Buyer shall have the right for a period of not more than seven years following the Closing Date to have reasonable access to those books, records and accounts, including financial, tax and accounting records (including the work papers of Seller's independent accountants), correspondence, production records, employment records and other records that are retained by Seller pursuant to the terms of this Agreement to the extent that any of the foregoing is needed by Buyer with respect to the Acquired Assets or Assumed Liabilities after the Closing and complying with its obligations under applicable Law.  Neither Buyer nor Seller shall destroy, or otherwise cease to retain, any such books, records or accounts retained by it without first providing the other Parties with 30 days

prior written notice and the opportunity to obtain or copy such books, records, or accounts during such 30-day period at such other Party's expense.

(b)     Promptly upon request by Buyer made at any time following the Closing Date, Seller shall authorize the release to Buyer of all files pertaining to the Acquired Assets or Assumed Liabilities held by any federal, state, county or local authorities, agencies or instrumentalities.

Section 6.02. *Confidentiality.* Seller agrees that, without prior written consent of Buyer, (a) from and after the date hereof, it shall not in any manner directly or indirectly disclose to any Person, except to authorized representatives of Buyer, or use any Acquired Confidential Information for any purpose or reason; provided, however, that that until the Closing Date, Sellers may continue to disclose and use the Acquired Confidential Information in the Ordinary Course of Business; and (b) from and after the date hereof, it shall not in any manner directly or indirectly disclose to any Person or use any Buyer Confidential Information for any purpose or reason. "**Acquired Confidential Information**" shall mean information relating solely to the Acquired Assets or the Assumed Liabilities that has not been disclosed to the public and which constitutes confidential and proprietary business information. "**Buyer Confidential Information**" shall mean information relating to Buyer that has not been disclosed to the public and which constitutes confidential and proprietary business information of Buyer. Notwithstanding the foregoing, Acquired Confidential Information and Buyer Confidential Information does not include any information (i) that is or becomes publicly available, other than as a result of a disclosure by Seller in violation of this Agreement, (ii) which must be disclosed by Seller or any of its Affiliates under any applicable Law or by order of any Governmental Entity, or (iii) which Seller reasonably believes is required to be disclosed in connection with the defense of a lawsuit against Seller. In the event Seller or any of its Affiliates is requested or required (including but not limited to by oral questions, interrogatories, requests for information or documents in a legal proceeding, subpoena, civil investigative demand or other similar process) to disclose any Acquired Confidential Information or Buyer Confidential Information as described in subpart (ii) or subpart (iii) of the immediately preceding sentence, Seller shall provide Buyer with prompt written notice of any such request or requirement so that Buyer may seek a protective order or other appropriate remedy and/or waive compliance with the provisions of this Agreement.

Section 6.03. *Subcontracting Arrangement.* Effective upon the Closing Date and until such time as the applicable Governmental Entities provide any consents to transfer or novation necessary to consummate assignment or novation of the Assigned Contracts to Buyer, Seller shall subcontract with Buyer, pursuant to a subcontract, for Buyer to perform for and in place of Seller, to the extent that such obligations are included in the Assumed Liabilities, any and all operations and provide any and all services and other performance obligations under the Assigned Contracts as of the Closing Date, including any and all amendments, modifications, purchase orders issued thereunder and such other terms and conditions as may have been duly incorporated in the Assigned Contracts, which subcontract shall be substantially in the form attached hereto as <u>Exhibit F</u> (the

"**Subcontract Agreement**"). Notwithstanding the foregoing, Seller shall not be so obligated hereunder to subcontract to Buyer any Assigned Contract for which consent to transfer or novation is not required.

ARTICLE 7

TERMINATION

Section 7.01. *Termination of Agreement.* The Parties may terminate this Agreement prior to the Closing (whether before or after the entry of the Legacy Contracts Sale Approval Order), as provided below:

(a)    the Parties may terminate this Agreement by mutual written consent;

(b)    Buyer may terminate this Agreement by giving written notice to Seller if the conditions set forth in Sections 5.03(a) and 5.03(b) are satisfied but Seller is in material breach of any representation, warranty or covenant contained in this Agreement that would cause any condition set forth in Section 5.01 or 5.02 not to be satisfied; *provided, however*, that in the case of a material breach of a representation, warranty or covenant contained herein by Seller, Seller shall have 10 Business Days after receipt of notice from Buyer of such breach in which to cure such breach;

(c)    Seller may terminate this Agreement by giving written notice to Buyer if the conditions set forth in Sections 5.01, 5.02(a) and 5.02(b) are satisfied but Buyer is in material breach of any representation, warranty, or covenant contained in this Agreement that would cause any condition set forth in Section 5.01 or 5.03 not to be satisfied; *provided, however*, that in the case of a material breach of a representation, warranty or covenant contained herein by Buyer, Buyer shall have 10 Business Days after receipt of notice from Seller of such breach in which to cure such breach;

(d)    Buyer may terminate this Agreement by giving written notice to Seller if the Closing shall not have occurred on or before July 31, 2009 by reason of the failure of any condition precedent under Section 5.02; *provided*, that as of the date of such termination by Buyer the conditions set forth in Sections 5.03(a) and 5.03(b) are satisfied;

(e)    Seller may terminate this Agreement by giving written notice to Buyer if the Closing shall not have occurred on or before July 31, 2009 by reason of the failure of any condition precedent under Section 5.03; *provided*, that as of the date of such termination by Seller the conditions set forth in Sections  5.02(a) and 5.02(b) are satisfied; and

(f)    Buyer may terminate this Agreement by giving written notice to Seller if the conditions set forth in Section 5.01 are not satisfied on or before July 31, 2009.

Section 7.02. *Effect of Termination.* If this Agreement is terminated pursuant to Section 7.01, all obligations of the Parties hereunder shall terminate without any liability

on the part of Buyer to Seller or Seller to Buyer, as the case may be, except for any liability of any Party for its intentional breaches of this Agreement; *provided, however*, that this Section 7.02 and Article 9 shall survive any such termination.


# ARTICLE 8
### DEFINITIONS

Section 8.01. *Definitions.* For purposes of this Agreement, each of the following terms shall have the meaning set forth below.

**"Acquired Assets"** shall mean:

(a)     the Assigned Contracts;

(b)     the Acquired Receivables;

(c)     the Acquired WIP;

(e)     the Books and Records;

(f)     the tangible assets, including computers and other equipment, presently used by Seller to provide services solely under the Assigned Contracts, as set forth on Schedule 8.01; and

(g)     all records relating to the Transferred Employees (to the extent transferable to Buyer) or solely to the provision of services under any Assigned Contract.

**"Acquired Confidential Information"** shall have the meaning set forth in Section 6.02.

**"Acquired Receivables"** shall mean all trade and other accounts receivable and notes and loans receivable as determined in accordance with GAAP that are payable to Seller for products delivered or services provided pursuant to an Assigned Contract, together with (a) any security held by Seller for the payment thereof, as such exist as of the Closing (excluding the Cedars-Sinai Prepayment), (b) any monies, checks or instruments received by or on behalf of Seller after the Closing in respect thereof, and (c) all records supporting the provision of services to which the receivable relates.

**"Acquired WIP"** shall mean all recoverable costs and accrued profits with respect to an Assigned Contract based on time and materials incurred that have not been invoiced to the customer under such Assigned Contract as determined in accordance with GAAP, as such exists as of the Closing, together with any monies, checks or instruments received by or on behalf of Seller after the Closing in respect thereof and all timesheets and similar records supporting the provision of services to which the Acquired WIP relates.

"**Adjusted Cash Purchase Price**" shall have the meaning set forth in Section 1.06.

"**Affiliate**" shall mean, with respect to any Person, any other Person directly or indirectly Controlling, Controlled by or under common Control with such first Person.

"**Agreement**" shall have the meaning set forth in the first paragraph of this Agreement.

"**Assigned Contracts**" means the Contracts set forth on <u>Exhibit A</u> hereto; provided, however, that the term Assigned Contracts shall specifically exclude any Contracts removed from Exhibit A by Buyer in accordance with Section 4.05(b).

"**Assignment and Assumption Agreement**" means that certain Assignment and Assumption Agreement between Buyer and Seller, substantially in the form attached hereto as <u>Exhibit D</u>.

"**Assumed Liabilities**" shall mean only (i) those liabilities and obligations of Seller under any Assigned Contract that accrue and are required to be performed from and after the Closing, (ii) all liabilities and obligations of Seller relating to the aggregate amount of all bonuses that otherwise would have been paid by Seller to certain managing directors who agreed in writing to waive or forego any performance or retention bonus due to such employee from Seller on July 15, 2009 (such amount to be paid by Buyer in accordance with the written agreement obtained from such managing director), (iii) the Assumed PTO and (iv) all liabilities and obligations relating to the Cedars-Sinai Prepayment.

"**Assumed PTO**" shall have the meaning set forth in Section 4.04(b).

"**Bankruptcy Code**" shall have the meaning set forth in the recitals to this Agreement.

"**Bankruptcy Court**" shall have the meaning set forth in the recitals to this Agreement.

"**Bankruptcy Rules**" shall mean the Federal Rules of Bankruptcy Procedure.

"**Books and Records**" shall have the meaning set forth in **Error! Reference source not found.**.

"**Business Day**" shall mean any day other than (a) a Saturday or Sunday or (b) any other day on which commercial banks in New York City are authorized or required by law to close.

"**Buyer**" shall have the meaning set forth in the first paragraph of this Agreement.

"**Buyer Confidential Information**" shall have the meaning set forth in Section 6.02.

" **California Department of Motor Vehicles Contracts**" shall mean (i) the One-Time Costs Contract, dated August 9, 2007, between BearingPoint, Inc. and California Department of Motor Vehicles (CON034657) and (b) the Ongoing Maintenance and Support Services Contract, dated August 9, 2008, between BearingPoint, Inc. and California Department of Motor Vehicles (CON034657).

"**Cash Purchase Price**" shall have the meaning set forth in Section 1.03.

"**Cedars-Sinai Prepayment**" shall mean the $1,453,141 advance payment made by Cedars-Sinai Medical Center under the Assigned Contract with Cedars-Sinai Medical Center listed on Exhibit A.

"**Chapter 11 Cases**" shall have the meaning set forth in the recitals to this Agreement.

"**Closing**" shall mean the closing of the transactions contemplated by this Agreement.

"**Closing Date**" shall have the meaning set forth in Section 1.04(a).

"**Confidentiality Agreement**" shall mean the confidentiality agreement dated May 12, 2009 between Buyer and Seller.

"**Contract**" shall mean any contract, agreement, subcontract, indenture, note, bond, mortgage, loan, instrument, lease, sublease, conditional sales contract, purchase order, sales order, deed, license, grant, understanding, commitment or other arrangement and any amendment or modification thereto, whether written or oral, to which Seller is a party.

"**Control**" shall mean the power to direct the affairs of a Person by reason of ownership of voting stock (or other similar equity interest), by contract or otherwise.

"**Credit Agreement**" means the Credit Agreement dated as of May 18, 2007, as amended and restated on June 1, 2007, among Seller, BearingPoint, LLC, the guarantors party thereto, the lenders party thereto, UBS Securities LLC, Morgan Stanley Senior Funding, Inc., UBS AG, Stamford Branch and Wells Fargo Foothill, LLC.

"**Cure Costs**" shall mean all amounts due and to become due and all costs and other obligations otherwise required to cure all monetary defaults that may exist under any Assigned Contract as of the Closing, as determined pursuant to the Legacy Contracts Sale Approval Order.

"**Éclat Sales Order**" shall have the meaning set forth in Section 4.04.

"**Excluded Assets**" shall mean all assets, properties and rights of Seller that are not Acquired Assets.

"**GAAP**" shall mean United States generally accepted accounting principles.

"**Governmental Entity**" shall mean any government or political subdivision or regulatory authority, whether foreign or domestic, federal, state, provincial, territorial, local or municipal, or any agency or instrumentality of any such government or political subdivision or regulatory authority, or any foreign or domestic, federal, state, provincial, territorial, local or municipal court, arbitral or similar tribunal.

"**Law**" shall mean any statute, law (including common law), constitution, treaty, ordinance, code, order, decree, directive, judgment, rule, regulation and any other binding requirement or determination of any Governmental Entity of any jurisdiction.

"**Legacy Contracts Sale Approval Motion**" means the Motion for an Order Pursuant to Sections 363 and 365 of the Bankruptcy Code to Establish Procedures for the Assumption, Assignment and Sale of Certain Public Service and Commercial Service Contracts, as filed with the Bankruptcy Court on June 3, 2009.

"**Legacy Contracts Sale Approval Order**" means the Order Authorizing the Debtors to Establish Procedures for the Assumption, Assignment and Sale of Certain Public Service and Commercial Service Contracts entered pursuant to the Legacy Contracts Sale Approval Motion on the docket of the Chapter 11 Cases by the Bankruptcy Court on June 24, 2009.

"**Legal Proceeding**" shall mean any action, suit, proceeding, claim, opposition, challenge, charge or arbitration before any Governmental Entity.

"**License Agreement**" means the License Agreement dated as of the date hereof between Seller and Buyer, substantially in the form attached hereto as <u>Exhibit B</u>.

"**New York Courts**" shall have the meaning set forth in Section 9.12

"**OIRR**" shall have the meaning set forth in Section 4.02

"**Ordinary Course of Business**" shall mean the ordinary course of business consistent with past practice during the year ended December 31, 2008.

"**Parties**" shall mean Buyer and Seller.

"**Performance Bond**" shall mean the performance bond in the amount of $6,400,000 related to Seller's obligations under the California Department of Motor Vehicles Contracts.

"**Permitted Liens**" shall mean (a) liens for taxes not yet due and payable, (b) statutory liens which secure payments not yet due that arise, and are customarily

discharged, in the Ordinary Course of Business and (c) the Security Interests granted to secure amounts outstanding under the Credit Agreement and related obligations.

"**Person**" shall mean any individual, corporation, partnership, limited liability company, joint venture, trust, business association, unincorporated organization, entity or Governmental Entity.

"**PS Projects Open for Bid Chart**" shall mean that chart the Seller sent to the Buyer on June 23, 2009 which contains the following columns (i) Customer Name, (ii) Industry, (iii) Contract Number, (iv) Contract Type, (v) Contract Description, (vi) Project Status, (vii) Project Code (viii) Project Description, (ix) Start Date, (x) End Date, (xi) Employees Billable Hours, (xii) MTD Revenue, (xiii) Un-Billed, (xiv) Accounts Receivable, (xv) Total Investment, (xvi) Associated AP, and (xvii) ETC Rev less ETC Cost.

"**PTO**" shall have the meaning set forth in Section 4.04(b).

"**Security Interests**" shall mean any mortgage, pledge, security interest, encumbrance, claims, charge or other lien (whether arising by contract or by operation of law).

"**Seller**" shall have the meaning set forth in the first paragraph of this Agreement.

"**Subsidiary**" of any Person shall mean any other Person (i) more than 50% of whose outstanding shares or securities representing the right to vote for the election of directors or other managing authority of such other Person are, now or hereafter, owned or Controlled, directly or indirectly, by such first Person, but such other Person shall be deemed to be a Subsidiary only so long as such ownership or Control exists, or (ii) which does not have outstanding shares or securities with such right to vote, as may be the case in a partnership, joint venture or unincorporated association, but more than 50% of whose ownership interest representing the right to make the decisions for such other Person is, now or hereafter, owned or Controlled, directly or indirectly, by such first Person, but such other Person shall be deemed to be a Subsidiary only so long as such ownership or Control exists.

"**Transaction Agreements**" means this Agreement, the Assignment and Assumption Agreement, the Transition Services Agreement, the License Agreement and the Subcontract Agreement.

"**Transferred Employees**" shall have the meaning set forth in Section 4.04.

"**Transition Services Agreement**" means the Transition Services Agreement, substantially in the form attached hereto as <u>Exhibit E</u>.

# ARTICLE 9
## Miscellaneous

Section 9.01. *Publicity and Disclosures.* Neither Buyer, on the one hand, nor Seller, on the other hand, shall issue any press release or make any public disclosure, either written or oral, concerning this Agreement or the transactions contemplated hereby without obtaining the prior written approval of the other Party, which approval shall not be unreasonably withheld, conditioned or delayed, unless in the sole judgment of the disclosing Party, disclosure is otherwise required by applicable Law or by the Bankruptcy Court with respect to filings to be made with the Bankruptcy Court in connection with this Agreement or by the applicable rules of any national securities exchange or over-the-counter market on which Buyer or Seller lists securities; *provided* that the Party intending to make such disclosure shall use its reasonable best efforts to consult with the other Party with respect to the text thereof. Communications to any regulatory authority or Governmental Entity having regulatory authority over any Party shall not be deemed a press release or public disclosure hereunder.

Section 9.02. *No Third Party Beneficiaries.* This Agreement shall not confer any rights or remedies upon any person other than the Parties and their respective successors and permitted assigns and solely with respect to Buyer's obligations pursuant to Section 4.04 and Buyer's assumption of the Assumed Liabilities relating to accrued bonuses due to the Transferred Employees and the Assumed PTO, the Transferred Employees (who are express third party beneficiaries of Section 4.04 and Buyer's assumption of the Assumed Liabilities, entitled to enforce the relevant provisions of this Agreement as if each such Transferred Employee was a Party hereto).

Section 9.03. *Entire Agreement.* This Agreement and the other Transaction Agreements constitute the entire agreement among the Parties. This Agreement supersedes any prior understandings, agreements or representations by or among the Parties, written or oral, with respect to the subject matter hereof. The confidentiality provisions of the Confidentiality Agreement shall terminate effective as of the Closing with respect to the Acquired Assets and the Assumed Liabilities.

Section 9.04. *Succession and Assignment.* This Agreement shall be binding upon and inure to the benefit of the Parties named herein and their respective successors and permitted assigns. No Party may assign either this Agreement or any of its rights, interests, or obligations hereunder without the prior written approval of the other Parties.

Section 9.05. *Counterparts and Facsimile Signature.* This Agreement may be executed in two or more counterparts, each of which shall be deemed an original but all of which together shall constitute one and the same instrument. This Agreement may be executed by facsimile signature.

Section 9.06. *Headings.* The section headings contained in this Agreement are inserted for convenience only and shall not affect in any way the meaning or interpretation of this Agreement.

Section 9.07. *Notices.* All notices, requests, demands, claims, and other communications hereunder shall be in writing. Any notice, request, demand, claim, or other communication hereunder shall be deemed duly delivered four Business Days after it is sent by registered or certified mail, return receipt requested, postage prepaid, or one business day after it is sent for next Business Day delivery via a reputable nationwide overnight courier service, in each case to the intended recipient as set forth below:

If to Seller:

> BearingPoint, Inc.
> 100 Crescent Court
> Suite 700
> Dallas, TX 75201
> Fax: (214) 292-8844
> Attn: Chief Legal Officer

> with a copy to (which shall not constitute notice):

> Baker Botts L.L.P.
> 2001 Ross Avenue, Suite 600
> Dallas, Texas 75201
> Fax: (214) 661-4757
> Attn: John W. Martin

If to Buyer:

> Éclat Consulting, LLC
> 2010 Corporate Ridge, Suite 700
> McLean, VA 22102
> Fax: (703) 995-0379
> Attn: Greg J. Baroni, CEO

> with a copy to (which shall not constitute notice):

> Venable LLP
> 575 7th Street, N.W.
> Washington, DC 20004
> Fax: (202) 344-8300
> Attn: Arthur E. Cirulnick

Any Party may give any notice, request, demand, claim or other communication hereunder using any other means (including personal delivery, expedited courier, messenger service, telecopy, telex, ordinary mail or electronic mail), but no such notice, request, demand, claim or other communication shall be deemed to have been duly given unless and until it actually is received by the Party for whom it is intended. Any Party may change the address to which notices, requests, demands, claims and other

communications hereunder are to be delivered by giving the other Party or Parties notice in the manner herein set forth.

Section 9.08. *Governing Law.* This Agreement shall be governed, including as to validity, interpretation and effect, by, and construed in accordance with, the internal Laws of the State of New York applicable to agreements made and fully performed within the State of New York.

Section 9.09. *Amendments and Waivers.* The Parties may mutually amend any provision of this Agreement at any time prior to the Closing. No amendment of any provision of this Agreement shall be valid unless the same shall be in writing and signed by each of the Parties. No waiver by any Party of any right or remedy hereunder shall be valid unless the same shall be in writing and signed by the Party giving such waiver. No waiver by any Party with respect to any default, misrepresentation, or breach of warranty or covenant hereunder shall be deemed to extend to any other prior or subsequent default, misrepresentation or breach of warranty or covenant hereunder or affect in any way any rights arising by virtue of any prior or subsequent such occurrence.

Section 9.10. *Severability.* Any term or provision of this Agreement that is invalid or unenforceable in any situation in any jurisdiction shall not affect the validity or enforceability of the remaining terms and provisions hereof or the validity or enforceability of the offending term or provision in any other situation or in any other jurisdiction. If the final judgment of a court of competent jurisdiction declares that any term or provision hereof is invalid or unenforceable, the Parties agree that the court making the determination of invalidity or unenforceability shall have the power to limit the term or provision, to delete specific words or phrases, or to replace any invalid or unenforceable term or provision with a term or provision that is valid and enforceable and that comes closest to expressing the intention of the invalid or unenforceable term or provision, and this Agreement shall be enforceable as so modified.

Section 9.11. *Expenses.* Each Party shall bear its own costs and expenses (including legal fees and expenses) incurred in connection with this Agreement and the transactions contemplated hereby.

Section 9.12. *Submission to Jurisdiction.* To the fullest extent permitted by applicable Law, each Party hereto (a) agrees that any claim, action or proceeding by such Party seeking any relief whatsoever arising out of, or in connection with this Agreement or any Transaction Agreement or the transactions contemplated hereby and thereby shall be brought only in (i) the Bankruptcy Court, if brought prior to the entry of a final decree closing the Chapter 11 Cases, and (ii) in the federal courts in the Southern District of New York and the state courts of the State of New York, County of Manhattan (collectively, the "**New York Courts**"), if brought after entry of such final decree closing the Chapter 11 Cases, and shall not be brought, in each case, in any other State or Federal court in the United States of America or any court in any other country, (b) agrees to submit to the exclusive jurisdiction of the Bankruptcy Court or the New York Courts, as applicable, pursuant to the preceding clauses (a)(i) and (ii), for purposes of all claims,

actions or proceedings arising out of, or in connection with this Agreement or any Transaction Agreement or the transactions contemplated by this Agreement, (c) waives and agrees not to assert any objection that it may now or hereafter have to the laying of the venue of any such claim, action or proceeding brought in such a court or any claim that any such claim, action or proceeding brought in such a court has been brought in an inconvenient forum, (d) agrees that mailing of process or other papers in connection with any such claim, action or proceeding in the manner provided in Section 9.07 hereto shall be valid and sufficient service thereof and (e) agrees that a final judgment in any such claim, action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by applicable Law.

Section 9.13. *Specific Performance.* Each Party acknowledges and agrees that the other Party or Parties would be damaged irreparably in the event any of the provisions of this Agreement are not performed in accordance with their specific terms or otherwise are breached. Accordingly, each Party agrees that the other Party or Parties shall be entitled to an injunction or other equitable relief to prevent breaches of the provisions of this Agreement and to enforce specifically this Agreement and the terms and provisions hereof in any action instituted in the Bankruptcy Court, in addition to any other remedy to which it may be entitled, at law or in equity.

Section 9.14. *Survival of Representations.* None of the representations and warranties made by the Parties herein or the documents or certificates contemplated hereby shall survive the Closing and there shall be no liability of any Party for any breach of any such representation or warranty. EXCEPT FOR THE REPRESENTATIONS AND WARRANTIES SET FORTH HEREIN, SELLER IS NOT MAKING ANY OTHER REPRESENTATIONS OR WARRANTIES, WRITTEN OR ORAL, STATUTORY, EXPRESS OR IMPLIED, CONCERNING SELLER, THE ACQUIRED ASSETS, THE ASSUMED LIABILITIES OR THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT, AND IT IS UNDERSTOOD THAT BUYER, WITH SUCH EXCEPTIONS, TAKES THE ACQUIRED ASSETS "AS IS" AND "WHERE IS". BUYER ACKNOWLEDGES THAT EXCEPT AS EXPRESSLY PROVIDED IN THIS AGREEMENT, SELLER HAS NOT MADE, AND SELLER HEREBY EXPRESSLY DISCLAIMS AND NEGATES, AND BUYER HEREBY EXPRESSLY WAIVES, ANY REPRESENTATION OR WARRANTY, EXPRESS, IMPLIED, AT COMMON LAW, BY STATUTE OR OTHERWISE RELATING TO, AND BUYER HEREBY EXPRESSLY WAIVES AND RELINQUISHES ANY AND ALL RIGHTS, CLAIMS AND CAUSES OF ACTION AGAINST SELLER AND ITS AFFILIATES AND EACH OF THEIR REPRESENTATIVES IN CONNECTION WITH THE ACCURACY, COMPLETENESS OR MATERIALITY OF ANY INFORMATION, DATA OR OTHER MATERIALS (WRITTEN OR ORAL) HERETOFORE FURNISHED TO BUYER OR ITS REPRESENTATIVES BY OR ON BEHALF OF SELLER OR ANY OF THEIR AFFILIATES OR ANY OF THEIR RESPECTIVE REPRESENTATIVES IN CONNECTION THEREWITH. WITHOUT LIMITING THE FOREGOING, SELLER IS NOT MAKING ANY REPRESENTATION OR WARRANTY TO BUYER WITH RESPECT TO ANY FINANCIAL PROJECTION OR FORECAST RELATING TO THE ACQUIRED

ASSETS OR THE ASSUMED LIABILITIES. BUYER FURTHER ACKNOWLEDGES THAT BUYER HAS CONDUCTED AN INDEPENDENT INSPECTION AND INVESTIGATION OF THE ACQUIRED ASSETS AND ALL SUCH OTHER MATTERS RELATING TO OR AFFECTING THE ACQUIRED ASSETS AS BUYER DEEMED NECESSARY OR APPROPRIATE AND THAT IN PROCEEDING WITH THE TRANSACTION CONTEMPLATED BY THIS AGREEMENT, EXCEPT FOR ANY REPRESENTATIONS AND WARRANTIES EXPRESSLY SET FORTH IN THIS AGREEMENT, BUYER IS DOING SO BASED SOLELY UPON SUCH INDEPENDENT INSPECTIONS AND INVESTIGATIONS.

Section 9.15. *Construction.* (a) The language used in this Agreement shall be deemed to be the language chosen by the Parties to express their mutual intent, and no rule of strict construction shall be applied against any Party.

(b) Any reference to any federal, state, local, or foreign statute or law shall be deemed also to refer to all rules and regulations promulgated thereunder, unless the context requires otherwise.

(c) Any reference to "include," "includes" or "including" shall be interpreted to be followed by the phrase "without limitation."

(d) Any reference to $ shall be to U.S. dollars.

(e) Any reference to any Article, Section or paragraph shall be deemed to refer to an Article, Section or paragraph of this Agreement, unless the context clearly indicates otherwise.

[Remainder of Page Intentionally Left Blank]

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the date first above written.

ÉCLAT CONSULTING, LLC

By: _____

Name:  Greg J. Baroni
Title:   Chief Executive Officer

BEARINGPOINT, INC.

By: _____
     Name: F. Edwin Harbach
     Title:   Chief Executive Officer