WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile:  (212) 310-8007
Marcia L. Goldstein
Joseph H. Smolinsky

WEIL, GOTSHAL & MANGES LLP
700 Louisiana Street, Suite 1600
Houston, Texas 77002
Telephone: (713) 546-5000
Facsimile:  (713) 224-9511
Alfredo R. Pérez

Attorneys for Debtors
and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------x
                          :

| | |
|---|---|
| **In re** | **Chapter 11 Case No.** |
| | |
| **BEARINGPOINT, INC., et al.,** | **09 - 10691 (REG)** |
| | |
|     **Debtors.** | **(Jointly Administered)** |

-------------------------------------------------------------x

**BEARINGPOINT, INC.'S MOTION PURSUANT TO BANKRUPTCY CODE
SECTIONS 363 AND 105 AND BANKRUPTCY RULES 2002, 6004, 9007 AND
9014 FOR AUTHORITY TO SELL EQUITY INTERESTS IN NON-DEBTOR
BEARINGPOINT MANAGEMENT CONSULTING (SHANGHAI) LTD.**

# TABLE OF CONTENTS

**Page**

Relief Requested ……………………………………………………………………………1

Sale of Assets ………………………………………………………………………………2

The Equity Purchase Agreement ……………………………………………………………..3

The Relief Requested is Warranted and in the
Best Interests of BE and its Estate ……………………………………………………………7

    A. Consummating the Sale Transactions Is
       a Sound Exercise of the Debtors' Business Judgment ……………………………..7

    B. Sale of the Equity Interests by Private Sale is
       Warranted under the Circumstances …………………………………………………9

    C. Sale Free and Clear of Liens, Claims,
       Encumbrances and Interests …………………………………………………………10

    D. Intercompany Obligations ………………………………………………………………10

    E. Protections as a Good Faith Buyer …………………………………………………11

    F. Expense Reimbursement …………………………………………………………………12

    G. Relief Under Bankruptcy Rule 6004(h) ………………………………………………14

Jurisdiction ………………………………………………………………………………14

Notice ……………………………………………………………………………………15

## **Exhibits**

Exhibit A         The Equity Purchase Agreement

Exhibit B-1      Private Sale Orders

Exhibit B-2      Expense Reimbursement Orders

Annex A         Proposed Order

# TABLE OF AUTHORITIES

**Page**

**Cases**

In re Abbotts Dairies of Penn., Inc., 788 F.2d 143 (3d Cir. 1986) ................................................11

Allstate Ins. Co. v. Hughes, 174 B.R. 884 (S.D.N.Y. 1994) ........................................................11

In re Bakalis, 220 B.R. 525 (Bankr. E.D.N.Y. 1998) ..................................................................11

In re Betty Owens Sch., 1997 U.S. Dist. LEXIS 5877 (S.D.N.Y. 1997).........................................8

In re Chateaugay Corp., 973 F.2d 141 (2d Cir. 1992) ...................................................................7

In re Chateaugay Corp., 1993 U.S. Dist. LEXIS 6130 (S.D.N.Y. 1993)......................................11

Cmty. Thrift & Loan v. Suchy (In re Suchy), 786 F.2d 900 (9th Cir. 1985)........................... 11-12

Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.), ,
    722 F.2d 1063 (2d Cir. 1983)...........................................................................................7

In re Condere Corp., 228 B.R. 615 (Bankr. S.D. Miss. 1998)........................................................9

In re Delaware and Hudson Ry. Co., 124 B.R. 169 (D. Del. 1991)................................................8

In re Gucci, 126 F.3d 380 (2d Cir. 1997)....................................................................................11

In re Integrated Res., Inc., 147 B.R. 650 (S.D.N.Y. 1992)......................................................8, 12

In re Johns-Manville Corp., 60 B.R. 612 (Bankr. S.D.N.Y. 1986).................................................8

In re Stein & Day, Inc., 113 B.R. 157 (Bankr. S.D.N.Y. 1990) ...................................................11

In re Decora Indus., Inc., Case No. 00-4459, 2002 WL. 32332749
    (Bankr. D. Del. May 20, 2002)........................................................................................8

Smith v. Van Gorkom, 488 A.2d 858 (Del. 1985).........................................................................8


**Statutes**

11 U.S.C. § 105................................................................................................................1

11 U.S.C. § 363......................................................................................................... 1, 7, 9-12

28 U.S.C. § 157..............................................................................................................14

28 U.S.C. § 1334............................................................................................................14

28 U.S.C. § 1408............................................................................................................14

28 U.S.C. § 1409............................................................................................................14

**Rules**

Rule 6004 of the Federal Rules of Bankruptcy Procedure ................................................ 1-2, 9, 14

**Bankruptcy Case Orders**

In re Lehman Bros. Holdings Inc., Ch. 11 Case No. 08-13555 (JMP)
    (Bankr. S.D.N.Y. Feb. 24, 2009)      ………………………………………………………9

In re Bally Total Fitness of Greater New York, Inc., Ch. 11 Case No. 07-12395 (BRL)
    (Bankr. S.D.N.Y. Aug. 21, 2007)   ………………………………………………………12

In re Twinlab Corp., et al., Ch. 11 Case No. 03-15564 (RDD)
    (Bankr. S.D.N.Y. Sept. 26 2003)   ………………………………………………………12

In re Adelphia Business Solutions, Inc., et al., Ch. 11 Case No. 02-11389 (REG)
    (Bankr. S.D.N.Y. Dec. 16, 2002)   ………………………………………………………12

In re Adelphia Business Solutions, Inc., et al., Ch. 11 Case No. 02-11389 (REG)
(Bankr. S.D.N.Y. Jan. 23, 2003)      ………………………………………………………12

TO THE HONORABLE ROBERT E. GERBER
UNITED STATES BANKRUPTCY JUDGE:

BearingPoint, Inc. ("***BE***," and together with certain of its affiliates, as debtors and debtors in possession in the above-captioned chapter 11 cases the "***Debtors***," and together with their non-debtor affiliates, "***BearingPoint***"),[1] seeks this Court's authorization to sell its equity interests (the "***Equity Interests***") in BearingPoint Management Consulting (Shanghai) Ltd. ("***BE Shanghai***"), a subsidiary of debtor BE, and to enter into related transactions, and respectfully represents:

## Relief Requested

1.      To maximize the value of its estate, BE seeks, pursuant to section 363 and 105(a) of title 11 of the United States Code (the "***Bankruptcy Code***") and Rule 6004 of the Federal Rules of Bankruptcy Procedure (the "***Bankruptcy Rules***"), an order (a) approving (i) that certain Equity Purchase Agreement dated as of September 29, 2009 (the "***EPA***"),[2] between Perot Systems TSI (Mauritius) PVT, LTD (the "***Buyer***") and BE (the "***Seller***") and (ii) certain related Ancillary Agreements (as defined below), (b) authorizing the private sale of the Equity Interests (the "***Sale***") pursuant to the terms set forth in the EPA, (c) authorizing BE to perform under the EPA and consummate those transactions contemplated in the EPA and the Ancillary Agreements (collectively with the Sale, the "***Sale Transactions***") and take such actions as are necessary in furtherance thereof, and (d) authorizing BE to, when and if payable pursuant to the terms and

---

[1] More information regarding the Debtors' business, their pre-arranged restructuring plan, and the background of these chapter 11 cases, including information on BearingPoint's efforts to sell all or a portion of its assets prior to the filing of these chapter 11 cases can be found in the Declaration of John DeGroote Pursuant to Rule 1007-2 of the Local Bankruptcy Rules for the Southern District of New York in Support of First-Day Motions and Applications, filed on February 18, 2009, the date the Debtors filed their chapter 11 petitions (the "***Commencement Date***").

[2] A copy of the EPA is attached hereto as <u>Exhibit A</u>.

conditions of the EPA, reimburse Buyer and its Affiliates (as defined in the EPA) for its reasonable and documented out-of-pocket expenses incurred in connection with the EPA, in an amount not to exceed $500,000 (the "***Expense Reimbursement***").  Additionally, to prevent a further decline in the value of BE Shanghai, BE requests that any order approving the Sale be effective immediately and that the Court waive the 10-day stay pursuant to Bankruptcy Rule 6004(h).  A proposed order will be filed prior to the hearing on the Motion.

### Sale of Assets

2.     As the Court is aware, the Debtors are currently in the process of selling their assets to realize value for their creditors.  The Debtors have marketed BearingPoint's assets since 2008, when BearingPoint embarked on a comprehensive restructuring effort, which included the exploration of various strategic alternatives, including a transaction involving a sale of all or a portion of BearingPoint's assets.  At this time, an extensive sale process was initiated during which approximately 25 strategic and financial buyers expressed an interest in buying all or parts of BearingPoint.  The proposals that BearingPoint received in connection with those efforts either provided insufficient value or appeared impractical.  As a result, the Debtors filed for chapter 11 relief.

3.     Following the Commencement Date, BearingPoint continued to explore strategic transactions for the purpose of maximizing value for all parties in interest.  To that end, BearingPoint initiated a sales process during which a number of potential buyers expressed interest in all or a portion of BearingPoint's assets.  Since the Commencement Date, BearingPoint has closed the sales of a significant portion of its assets and business entities.  For example, the Debtors sold a substantial portion of assets related to their Public Services group to Deloitte LLP and a substantial portion of assets related to their Commercial Services group to

PriceWaterhouseCoopers, LLP.  In addition, BearingPoint has sold, among other things, its Europe, Middle East and Africa group, its Brazilian entity and its Japanese entities, and is in the process of selling its remaining assets.

4.     BE now seeks to sell its wholly-owned equity interest in BE Shanghai. After an extensive marketing process beginning in approximately February 2009 and a review of at least six proposals and letters of interest received, BE has determined that Buyer's offer presents BE with the best value for the Equity Interests.  Moreover, due to the declining value of BE Shanghai's operations, BE has determined that a sale of the Equity Interests must be completed as quickly as possible.  As such, BE seeks to sell the Equity Interests by private sale to Buyer.  Buyer's offer provides BE with substantial value for the Equity Interests.  The Sale enables BE to sell the Equity Interests while its Shanghai operations still have significant value.

## The Equity Purchase Agreement

5.     The principal terms of the EPA and the Ancillary Agreements (as defined below) are as follows:[3]

| Purchase Price | The purchase price is $3,200,000, which shall be paid into an escrow account at Closing (less a Holdback of $250,000). |
| --- | --- |
| | The purchase price shall be released from escrow and paid to Seller following satisfaction of the Condition Subsequent.  If the Condition Subsequent is not satisfied within the timeframe prescribed in the EPA, the purchase price shall be released from escrow and paid to Buyer, and the transaction will unwind. |
| | The purchase price will be subject to adjustment based on the levels of Actual Cash/Cash Equivalents and Actual Net Assets as at Closing, as determined through the Final Balance Sheet.  The Holdback will be paid to Seller after determination of the Final Balance Sheet, less any amounts payable from Seller to Buyer as a result of the purchase price adjustments. |
| Closing Conditions | Buyer's and Seller's obligations to consummate the transaction are |

[3] This summary is qualified in its entirety by reference to the provisions of the EPA and any documents annexed thereto.  Unless otherwise defined herein, capitalized terms shall have the meanings ascribed to them in the EPA.

| | |
|---|---|
| | subject to certain closing conditions, including: |
| | • Entry of the Approval Order by the Bankruptcy Court; <br><br> • absence of any Applicable Law prohibiting the Closing; and <br><br> • granting of the China Approval. |
| | Buyer's obligations to consummate the transaction are subject to certain additional closing conditions, including: |
| | • (i) Seller performed in all material respects its obligations prior to Closing, (ii) the representations and warranties given by the Seller remaining true and correct at Closing; |
| | • The absence of a Material Adverse Effect or any event or circumstance that would be reasonably expected to result in a Material Adverse Effect; <br><br> • all Intercompany Loans, Intercompany Payables and Intercompany Receivables having been waived and/or settled in full, with certain Intercompany Loans having been deregistered with the relevant PRC authority; <br><br> • Seller having complied with certain undertakings in relation to obtaining an extension to the Beijing Lease; <br><br> • Seller having delivered a waiver from certain managing directors in respect of the non-payment of Performance Cash Awards; and |
| | • absence of termination of employment of Ronald Machan and Kirk Williams. |
| | At Closing, the parties are required to take specified actions including delivery of executed copies of Ancillary Agreements. |
| **Condition Subsequent** | Following Closing, the Company needs to obtain a new Business License reflecting the change of ownership of the Company. If the Condition Subsequent is not met by November 30, 2009 (which shall automatically be extended to December 31, 2009 if by November 30, 2009 the Business License has not been issued by the relevant PRC authority has not indicated in writing that it will not issue the Business License), the transaction will unwind. <br><br> In the period between Closing and issuance of the new Business License, Buyer will not permit the Company to undertake certain actions without the prior written consent of Seller, not to be unreasonably withheld or delayed. |
| **Termination** | The EPA may be terminated by mutual written consent of the parties. |
| | The EPA may be terminated by Buyer or Seller if: |
| | • the other party is in breach of its representations, warranties or covenants and such breach would result in a failure of a closing |

| | |
|---|---|
| | condition that is not cured within 10 business days; |
| | • the Closing does not occur prior to November 30, 2009; or |
| | • consummation of the transactions contemplated thereby would violate any non-appealable final order of any Governmental Authority. |
| | Buyer may terminate the EPA if: |
| | • the Approval Order is not entered by November 30, 2009 or if a Final Order is not obtained by November 30, 2009; or |
| | • the Bankruptcy Court converts the chapter 11 case to chapter 7 case, or files a plan that does not provide for the sale of the Equity Interests to Buyer, or it appoints a trustee. |
| **Limitation of Liability** | Buyer's and Seller's liability under the Agreement is capped at $750,000, save where the Buyer has failed to pay the Purchase Price on Closing, in which case the Buyer's liability will be limited to the Purchase Price. |
| **Expense Reimbursement** | Sellers must reimburse Buyer's and its Affiliates' actual and documented out-of-pocket expenses, subject to a $500,000 cap, if: |
| | • Buyer terminates the EPA because of Sellers' breach of its representations, warranties or covenants that cause a failure of a closing condition (unless primarily the result of Buyer's breach of any of its representations, warranties or covenants); |
| | • there is a Material Adverse Effect or any event or circumstance that would be reasonably expected to result in a Material Adverse Effect; |
| | • all Intercompany Loans, Intercompany Payables and Intercompany Receivables having not been waived and/or settled in full, or certain Intercompany Loans have not been deregistered with the relevant PRC authority; |
| | • Buyer terminates the EPA because the Bankruptcy Court has not entered the Approval Order by November 30, 2009 or if a Final Order is not obtained by November 30, 2009; |
| | • Buyer terminates the EPA because the Bankruptcy Court converts the chapter 11 case to chapter 7 case, or files a plan that does not provide for the sale of the Equity Interests to Buyer, or it appoints a trustee. |
| **Intercompany Loans, Intercompany Payables and Intercompany Receivables** | Seller shall cause the Company to waive and/or otherwise settle all Intercompany Loans, Intercompany Payables and Intercompany Receivables and deregister all Intercompany Loans with the relevant PRC authorities prior to Closing. Seller will generally bear the tax burden associated with the settlement of the intercompany balances. |
| **Regulatory Matters** | Buyer and Seller must use reasonable best efforts to take all actions necessary or desirable under Applicable Law to consummate the |

| | |
|---|---|
| | Closing. Additionally, following Closing, Buyer shall, and shall cause the Company to, use reasonable best efforts to obtain the Business License as soon as possible, and Seller will use reasonable best efforts to render assistance in this regard. |
| **Representations and Warranties** | The EPA contains customary representations and warranties regarding the Company and its business, including in respect of the Company's and the Seller's existence and power to enter into the transaction, the capitalisation of the Company, the Seller's ownership of the Equity Interests, the Company's tax matters, its ownership of its assets as set out in its Company Financial Statements, intellectual property used in the Business, the Company's permits, its employees, its compliance with laws, litigation, its financial statements, real estate, its banking relationships and its relationships with Former Affiliates.<br><br>The representations and warranties survive Closing. There is no indemnification for breaches of representations and warranties. |
| **Transition Services** | The Seller or its Affiliates will provide specified transition services to the Company from Closing until November 30, 2009. |
| **Cross License** | Seller grants to the Company a non-exclusive license to all intellectual property (other than trademarks and off-the-shelf software) used by the Company as of the Closing Date, but which intellectual property is not owned by or licensed directly to the Company as of the Closing Date, to the extent such intellectual property is licensable by Seller. The license is limited to use within China and for providing certain ancillary services outside of China. The Company grants a license back to the Seller to all intellectual property owned by or licensed directly to the Company as of the Closing Date (other than by the Seller, and other than trademarks and off-the-shelf software), to the extent licensable by the Company. The license is limited to use outside of China and for providing certain ancillary services inside China. |
| **Trademark License** | Dallas Project Holdings Limited (an Affiliate of Seller) grants to PSC Management Limited Partnership, for the sole purpose of sublicensing to the Company or another Affiliate in the PRC, (i) an exclusive license to use the "BearingPoint" trademarks and the "Bi Bo" trademarks in China in connection with the business of the Company, and (ii) a non-exclusive license to use the "BearingPoint" trademark outside of China in connection with providing certain ancillary services. All licenses are perpetual unless terminated other than the license regarding the "PROVENCOURSE" marks, which are for the term of the registrations. Dallas Project Holdings Limited reserves the right for itself, its Affiliates and its licensees to provide certain ancillary services in China, notwithstanding the exclusivity granted to the Company. |

6.     In addition, BE is requesting approval of certain agreements related to the EPA.  These agreements include, without limitation: (i) the Cross License Agreement, (ii) the Trademark License Agreement, and (iii) the Transition Services Agreement (collectively, the "***Ancillary Agreements***").  Finally, BE is requesting approval of the assignment to, and assumption by, BE's wholly-owned, non-debtor subsidiary, Dallas Project Holdings Limited of the Co-Existence Agreement (the "***CA Agreement***"), which provides for the use, by BE Shanghai, of the "BiBo" trademark.  The approval of the Ancillary Agreements and the assignment of the CA Agreement are necessary for BE to consummate the Sale Transactions, and to enable Buyer to operate BE Shanghai post-closing.

<div align="center">

**The Relief Requested is Warranted and in the
Best Interests of BE and its Estate**

</div>

**A.     Consummating the Sale Transactions Is a Sound Exercise of BE's Business Judgment**

7.     Ample authority exists for approval of the relief requested.  Section 363 of the Bankruptcy Code provides, in relevant part, that a debtor "after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate."  11 U.S.C. § 363(b)(1).

8.     Courts in this and other circuits, in applying this section, have required that the sale or disposition of a debtor's assets be based upon the sound business judgment of the debtor.  See In re Chateaugay Corp., 973 F.2d 141 (2d Cir. 1992) (holding that a judge determining a § 363(b) application must find from the evidence presented a good business reason to grant such application); Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.), 722 F.2d 1063, 1071 (2d Cir. 1983) (same).  It is generally understood that "[w]here the debtor articulates a reasonable basis for its business decisions (as distinct from a decision made

arbitrarily or capriciously), courts will generally not entertain objections to the debtor's conduct." In re Johns-Manville Corp., 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986). If a valid business justification exists, there is a strong presumption that "the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company." In re Integrated Res., Inc., 147 B.R. 650, 656 (S.D.N.Y. 1992) (quoting Smith v. Van Gorkom, 488 A.2d 858, 872 (Del. 1985)), appeal dismissed, 3 F.3d 49 (2d Cir. 1993). The burden of rebutting this presumption falls to parties opposing the proposed exercise of a debtor's business judgment. Id. (citing Aronson v. Lewis, 473 A.2d 805, 812 (Del. 1984)). Once a court is satisfied that there is a sound business justification for the proposed sale, the court must then determine whether (i) the debtor has provided interested parties with adequate and reasonable notice, (ii) the sale price is fair and reasonable, and (iii) the purchaser is proceeding in good faith. In re Betty Owens Sch., 1997 U.S. Dist. Lexis 5877 (S.D.N.Y. 1997); accord In re Delaware and Hudson Ry. Co., 124 B.R. 169, 176 (D. Del. 1991); In re Decora Indus., Inc., Case No. 00-4459, 2002 WL 32332749 at *3 (Bankr. D. Del. May 20, 2002).

9.     BE's decision to enter into the EPA, sell the Equity Interests, and consummate the Sale Transactions is an exercise of sound business judgment. As noted above, BE has evaluated and extensively marketed BE Shanghai with potential purchasers since approximately February 2009. In addition, due to the strain that uncertainty associated with its parent's bankruptcy proceeding places on BE Shanghai's operations, including ongoing employee attrition and significant risk of client attrition, BE believes that the Sale Transactions must be completed in accordance with the expedited timeframe described herein to preserve and maximize the value of Equity Interests. Moreover, BE submits that any auction process would,

besides jeopardizing the proceeds to be derived from the Sale, be duplicative of BE's marketing efforts, and thus would give rise to unnecessary administrative expenses.

**B.     Sale of the Equity Interests by Private Sale is Warranted under the Circumstances**

10.     Bankruptcy Rule 6004(f)(1) permits private sales by a debtor.  Courts, including this Court, often allow a chapter 11 debtor to sell assets outside the ordinary course of business by private sale when the debtors demonstrate that the sale is permissible pursuant to section 363(b) of the Bankruptcy Code.  See, e.g., In re Lehman Bros. Holdings Inc., Ch. 11 Case No. 08-13555 (JMP) (Bankr. S.D.N.Y. Feb. 24, 2009); In re Condere Corp., 228 B.R. 615 (Bankr. S.D. Miss. 1998).  In Lehman, (i) the underlying motion for which the order was entered was on notice, (ii) no objections were filed that pertained to the private sales (iii) the order entered was a final order, and (iv) the court found sufficient cause to merit the expense reimbursements and accordingly authorized the private sale.  The extent to which the judge focused upon the provision is not clear from the orders.  A copy of the above cited order is attached hereto as Exhibit B-1.

11.     BE's decision to pursue a private sale is supported by the exigent circumstances, including the potential decline of BE Shanghai's value due to, among other things, increased employee attrition and strained operations, as well as by BE's full exploration of other potential sale transactions of BE Shanghai.  The time and effort associated with marketing BE Shanghai for sale at a public auction would needlessly duplicate the previous efforts made by BE, would likely exceed any benefit of a public sale to BE, its estate or its creditors, as well as jeopardize BE's ability to maximize the proceeds resulting from such transaction due to the significant risk BE Shanghai will experience a sudden decline in value.

### C.  Sale Free and Clear of Liens, Claims, Encumbrances and Interests

12.  The sale of the Equity Interests should be free and clear of any and all liens, claims, encumbrances and other interests in accordance with section 363(f) of the Bankruptcy Code, with any such liens, claims, encumbrances and other interests attaching to the proceeds of the sale.  Pursuant to section 363(f) of the Bankruptcy Code, a debtor may sell property of its estate "free and clear of any interest in such property of an entity other than the estate" if applicable nonbankruptcy law permits sale of such property free and clear of such interest, if such entity consents, if such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property, if such interest is in bona fide dispute, or if such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.  11 U.S.C. § 363(f)(1) – (5).

13.  With respect to any party asserting a lien, claim, encumbrance or other interest against the Equity Interests, BE anticipates that it will be able to satisfy one or more of the conditions set forth in section 363(f).  Thus, the sale of the Equity Interests free and clear of liens, claims, encumbrances and other interests will satisfy the statutory prerequisites of section 363(f) of the Bankruptcy Code.

### D.  Intercompany Obligations

14.  In connection with the Sale Transactions, the EPA provides for the waiver and/or settlement of any and all intercompany obligations or liabilities of BE Shanghai owed to the Seller, any of its affiliates (the "***Intercompany Obligations***").  If BE were unable to waive and/or settle the Intercompany Obligations, it would be unable to consummate the Sale Transactions, which would be detrimental to its estate and all parties in interest.  As such, BE should be authorized to waive and/or settle the Intercompany Obligations, and to enter into any

agreements to effectuate such waiver and/or settlement, so that the Sale Transactions can be consummated.

**E.      Protections as a Good Faith Buyer**

15.      Section 363(m) of the Bankruptcy Code protects a good-faith purchaser's interest in property purchased from the debtor notwithstanding that the sale conducted under section 363(b) is later reversed or modified on appeal.  Specifically, section 363(m) states that:

> The reversal or modification on appeal of an authorization under [section 363(b)] … does not affect the validity of a sale … to an entity that purchased … such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale … were stayed pending appeal.

11 U.S.C. § 363(m).  Section 363(m) "fosters the 'policy of not only affording finality to the judgment of the bankruptcy court, but particularly to give finality to those orders and judgments upon which third parties rely.'"  In re Chateaugay Corp., 1993 U.S. Dist. Lexis 6130, *9 (S.D.N.Y. 1993) (quoting In re Abbotts Dairies of Penn., Inc., 788 F.2d 143, 147 (3d Cir. 1986)). See also Allstate Ins. Co. v. Hughes, 174 B.R. 884, 888 (S.D.N.Y. 1994) ("Section 363(m) . . . provides that good faith transfers of property will not be affected by the reversal or modification on appeal of an unstayed order, whether or not the transferee knew of the pendency of the appeal"); In re Stein & Day, Inc., 113 B.R. 157, 162 (Bankr. S.D.N.Y. 1990) ("pursuant to 11 U.S.C. § 363(m), good faith purchasers are protected from the reversal of a sale on appeal unless there is a stay pending appeal").

16.      The sale of the Equity Interests is the result of arm's length, good faith negotiations with Buyer.  See In re Gucci, 126 F.3d 380 (2d Cir. 1997) (a good faith purchaser is shown by integrity of his conduct during the course of the sale proceedings); In re Bakalis, 220 B.R. 525, 537 (Bankr. E.D.N.Y. 1998) (a determination of bad faith must be based on untoward conduct by the purchaser, such as fraud or collusion) (citing Gucci, 126 F.3d 380); Cmty. Thrift

& Loan v. Suchy (In re Suchy), 786 F.2d 900, 902 (9th Cir. 1985) (a good faith purchaser is one that has not engaged in conduct involving fraud or collusion nor has sought to take grossly unfair advantage of other bidders).  The Buyer has not, in connection with the proposed transaction, engaged in any conduct that constitutes a lack of good faith.  Neither the Buyer nor any of its affiliates or insiders is associated with the Debtors in any way.  Accordingly, the Buyer is entitled to the protections of section 363(m) of the Bankruptcy Code.

**F.     Expense Reimbursement**

17.     In connection with the Sale Transactions, BE is seeking authorization to pay the Expense Reimbursement described herein if the EPA is terminated for certain reasons specified in the EPA.  Courts in this district routinely approve the use of expense reimbursement, where warranted, in bankruptcy cases.  See, e.g., In re Integrated Res., Inc., 147 B.R. at 657 (approving expense reimbursement in connection with chapter 11 plan).

18.     Approval of expense reimbursements in connection with sales pursuant to section 363 of the Bankruptcy Code has become a recognized practice in chapter 11 cases as a form of purchaser protection because it facilitates a debtor's ability to attract potential purchasers based on the latter's knowledge that they will at least be compensated for their expenses should the contemplated transaction fall apart for predetermined grounds.  See, e.g., In re Integrated Res., Inc., 147 B.R. 650 (approving expense reimbursement); In re Bally Total Fitness of Greater New York, Inc., Ch. 11 Case No. 07-12395 (BRL) (Bankr. S.D.N.Y. Aug. 21, 2007) [Docket No. 269] (same); In re Twinlab Corp., et al., Ch. 11 Case No. 03-15564 (RDD) (Bankr. S.D.N.Y. Sept. 26 2003) [Docket No. 81] (same); In re Adelphia Business Solutions, Inc., et al., Ch. 11 Case No. 02-11389 (REG) (Bankr. S.D.N.Y. Dec. 16, 2002) [Docket No. 760] (approving expense reimbursement with respect to first sale); Id. (Jan. 23, 2003) [Docket No. 833]

(approving expense reimbursement with respect to second sale). In each of these cases, (i) the underlying application for which the order was entered was on notice, (ii) no objections were filed that pertained to the expense reimbursements sought (iii) all orders entered were final orders, and (iv) in each order the court found sufficient cause to merit the expense reimbursements and accordingly authorized such reimbursements.[4]  The extent to which the judge focused upon the provision is not clear from the orders.  Copies of the above cited orders are attached hereto as Exhibit B-2.

19.     Bankruptcy courts have approved purchasing incentives similar to the Expense Reimbursement under the "business judgment rule," pursuant to which courts typically grant deference to the actions of a corporation's board of directors taken in good faith and in the exercise of honest judgment.

20.     Here, the Expense Reimbursement meets the "business judgment rule" standard.  First, the Expense Reimbursement is fair and reasonable in amount, particularly in view of the substantial efforts that have been and will be made and the actual expenditures of Buyer in connection due diligence and with consummating a transaction in China.  The Expense Reimbursement provided for in the EPA, and payable pursuant to the terms of the EPA, is

---

[4] In several cases the court made more specific findings of facts.  In Twinlab, the court found that the expense reimbursements were (a) an actual and necessary cost of preserving estates, (b) commensurate to the real and substantial benefit conferred upon Debtors' estates by buyer, (c) reasonable and appropriate in light of size and nature of transaction, (d) necessary to induce the buyer to pursue a sale transaction. Additionally, Twinlab court concluded that these fees (a) provided a material benefit to the Debtors and their creditors by increasing the likelihood that the best possible price would be received, and (b) represented the best method for maximizing value for the benefit of the Debtors' estates.  In Bally, the court found that the relief requested was in best interests of Debtors' estates, creditors, and other parties in interest.  With respect to the remaining orders, the courts did not make any specific findings of fact pertaining to the expense reimbursements other than the general statement that the order was made upon a finding of sufficient cause.

capped at $500,000.  Second, only actual and documented out-of-pocket costs and expenses will be reimbursed.

21.     BE submits that the proposed Expense Reimbursement is reasonable, and its availability to BE will enable BE to maximize the value of its estate.  Accordingly, BE should be authorized to offer the Expense Reimbursement as BE deems necessary in its business judgment.  BE further submits that payment of the Expense Reimbursement, upon the conditions set forth in the EPA, is an actual and necessary costs of preserving the BE's estate and as such, shall constitute an administrative expense within the meaning of section 503(b) and 507(a) of the Bankruptcy Code.

## G.     Relief Under Bankruptcy Rule 6004(h)

22.     Bankruptcy Rule 6004(h) provides that an "order authorizing the use, sale, or lease of property . . . is stayed until the expiration of 10 days after entry of the order, unless the court orders otherwise."  FED. R. BANKR. P. 6004(h).  BE seeks as prompt a closing as possible to preserve and maximize BE's recovery from the Sale before BE Shanghai's assets significantly decline in value.  In light of the foregoing, BE requests that any order approving the sale of the Equity Interests be effective immediately by providing that the 10-day stay is inapplicable.

## Jurisdiction

23.     Pursuant to 28 U.S.C. §§ 157 and 1334 and Standing Order M-61 of the United States District Court for the Southern District of New York, dated July 10, 1984 (Ward, Acting C.J.), the Court has exclusive jurisdiction to consider and grant the relief requested herein.  A proceeding to consider and grant such relief is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## Notice

24.     BE shall serve notice of this Motion to parties in interest in accordance with the Case Management Order #2.  BE submits that, in view of the facts and circumstances, such notice is sufficient and no other or further notice need be provided.

WHEREFORE, BE respectfully requests that the Court grant the relief requested herein and such other and further relief as is just and appropriate.

Dated: October 2, 2009
      New York, New York

<div style="margin-left:40%">

/s/ Alfredo R. Pérez
Marcia L. Goldstein
Joseph H. Smolinsky

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone:  (212) 310-8000
Facsimile:  (212) 310-8007

and

Alfredo R. Pérez

WEIL, GOTSHAL & MANGES LLP
700 Louisiana Street, Suite 1600
Houston, Texas  77002
Telephone: (713) 546-5000
Facsimile:  (713) 224-9511

Attorneys for Debtors
and Debtors in Possession

</div>

## Exhibit A

## The Equity Purchase Agreement

---

# EQUITY PURCHASE AGREEMENT

dated as of

September 29, 2009

between

**PEROT SYSTEMS TSI (MAURITIUS) PVT. LTD**

as Buyer

and

**BEARINGPOINT, INC.**

as Seller

relating to the purchase and sale

of

**100% of the Equity Interest**

of

**BearingPoint Management Consulting (Shanghai) Ltd.**

TABLE OF CONTENTS

ARTICLE 1
DEFINITIONS

Section 1.01 . *Definitions* ................................................................................ 2
Section 1.02 . *Other Definitional and Interpretative Provisions* ......................... 8

ARTICLE 2
PURCHASE AND SALE

Section 2.01 . *Purchase and Sale* ..................................................................... 9
Section 2.02 . *Payment to Escrow Account* ....................................................... 9
Section 2.03 . *Closing* ...................................................................................... 9
Section 2.04 . *Release of Payment to Buyer* ..................................................... 10
Section 2.05 . *Adjustment to Purchase Price* .................................................... 11
Section 2.06 . *Holdback* ................................................................................... 12
Section 2.07 . *Payments* ................................................................................... 13
Section 2.08 . *Escrow Account* ......................................................................... 13
Section 2.09 . *Absolute Sale* ............................................................................. 13

ARTICLE 3
REPRESENTATIONS AND WARRANTIES OF SELLER

Section 3.01 . *Existence and Power* ................................................................... 13
Section 3.02 . *Authorization* ............................................................................. 14
Section 3.03 . *Capitalization* ............................................................................. 14
Section 3.04 . *Ownership of the Equity Interest* ............................................... 15
Section 3.05 . *Noncontravention* ...................................................................... 15
Section 3.06 . *Tax Matters* ............................................................................... 15
Section 3.07 . *Ownership of Assets* ................................................................... 16
Section 3.08 . *Intellectual Property.* .................................................................. 16
Section 3.09 *Permits.* The Disclosure Letter sets forth a complete and
accurate list of all material Permits necessary to conduct the
Company's Business as it is now conducted. To the Knowledge of
the Company and Seller, each such Permit is in full force and effect.
The Company is in compliance in all material respects with the terms
of each such Permit. To the Knowledge of the Company and Seller,
no suspension or cancellation of such Permit is threatened and there
is no basis for believing that such Permit will not be renewable upon
expiration. To the Knowledge of the Company and Seller, each such
Permit will continue to be in full force and effect immediately
following the Closing as in effect prior to the Closing. ........................... 17

Section 3.10 . *Employee Matters* ........................................................................ 17
Section 3.11 . *Litigation* ..................................................................................... 19
Section 3.12 . *Legal Compliance* ........................................................................ 19
Section 3.13 . *Financial Statements* .................................................................... 21
Section 3.14 . *Real Estate* .................................................................................. 22
Section 3.15 . *Banking Relationships* .................................................................. 22
Section 3.16 . *Former Affiliates.*     To the Knowledge of the Seller and the
     Company, as of the time a Former Affiliate ceased to be an Affiliate
     of Parent Seller, such Former Affiliate was not a party to any
     contract or agreement with the Company. ............................................... 22

ARTICLE 4

REPRESENTATIONS AND WARRANTIES OF BUYER

Section 4.01 .     *Existence and Power* ................................................................. 23
Section 4.02 .     *Authorization* ........................................................................... 23
Section 4.03 .     *Noncontravention* ..................................................................... 23
Section 4.04 .     *Purchase For Investment* .......................................................... 23
Section 4.05 .     *Financing* ................................................................................. 23

ARTICLE 5

COVENANTS OF SELLER

Section 5.01 . *Waiver of Intercompany Loans, Intercompany Payables and
     Intercompany Receivables* ..................................................................... 24
Section 5.02 *Termination of Intercompany Agreements* ...................................... 24
Section 5.03 .     *Conduct of the Company* .......................................................... 25
Section 5.04 .     *Access to Information* ............................................................... 26
Section 5.05 .     *Resignations* ............................................................................ 27
Section 5.06 .     *Tax Covenant* ........................................................................... 27
Section 5.07 . *Confidentiality* ............................................................................. 28
Section 5.08 . *Supplemental Disclosure* ............................................................. 28
Section 5.09 . *Fulfillment of Conditions by Seller* ............................................... 28
Section 5.10 .     *Release by Seller* ..................................................................... 29
Section 5.11 .     *Co-existence Agreement.*     Prior to Closing, Seller shall
     assign the Coexistence Agreement (the "**Coexistence Agreement**")
     between Seller and Blackboard Inc., and its rights and obligations
     thereunder, to Dallas Project Holdings Limited ("**DPHL**") and shall
     cause DPHL to assume the rights and obligations of Seller under the
     Coexistence Agreement, which assignment shall be in form and
     substance satisfactory to Buyer (the "**CA Assignment**").     Prior to
     Closing and if not prior to Closing as soon as possible thereafter,
     Seller shall use reasonable best efforts to procure Blackboard Inc.'s

written acknowledgement to such assignment to and assumption by DPHL ................................................................................................. 29

Section 5.12 .   *Beijing Lease.*   Seller will (i) use its reasonable best efforts to obtain by Closing the consent of the landlord under the tenancy agreement (including its supplementary agreement) with Beijing Jia Ao Real Estate Development Co., Ltd. in relation to the office premises of the Company's Beijing branch (the "**Beijing Lease**") to the transfer of the Equity Interest as contemplated by this Agreement; and (ii) ensure that the Company (a) cooperates fully with, and fully involves, Buyer in negotiating the terms of an extension to the Beijing Lease, and (b) does not enter into any such extension or any new lease without the prior written consent of Buyer, such consent not to be unreasonably withheld or delayed. ........................................... 29

### ARTICLE 6
### COVENANTS OF BUYER

Section 6.01 .   *Confidentiality* .............................................................................. 30
Section 6.02 .   *Access; Seller's Confidentiality* .................................................... 30
Section 6.03 .   *Trademarks; Tradenames* ............................................................... 30
Section 6.04 .   *Fulfillment of Conditions by Buyer* ............................................... 30
Section 6.05 .   *Conduct of the Company* ................................................................ 31
Section 6.06 . *Sign on Bonuses.*   To the extent Buyer or the Company pays Sign-on Bonuses to Ronald Machan, Kirk Williams and/or Chenghua Wang, and for any reason Buyer or the Company actually receives back from such individuals all or part of such Sign-on Bonuses, Buyer shall promptly pay to Seller all such amounts so received. ........... 32

### ARTICLE 7
### COVENANTS OF BUYER AND SELLER

Section 7.01 .   *Reasonable Best Efforts; Further Assurances* ............................ 33
Section 7.02 .   *Certain Filings* ............................................................................. 33
Section 7.03 .   *Publicity* ....................................................................................... 33
Section 7.04 . *Application for China Approval and Business License* ................. 33
Section 7.05 . *Notification of Certain Matters* ....................................................... 34

### ARTICLE 8
### CONDITIONS TO CLOSING

Section 8.01 .   *Conditions to Obligations of Buyer and Seller* ........................... 34
Section 8.02 .   *Conditions to Obligation of Buyer* .............................................. 34
Section 8.03 .   *Conditions to Obligation of Seller* .............................................. 36
Section 8.04 .   *Condition Subsequent to the Closing* ........................................... 36

ARTICLE 9
BANKRUPTCY COVENANTS

Section 9.01 .   *Submission for Bankruptcy Court Approval* ............................... 36
Section 9.02 .   *Noncontravention* ........................................................................ 38

ARTICLE 10
EXCLUSIVITY

Section 10.01 .   *Exclusivity* ................................................................................. 38

ARTICLE 11 EFFECTIVENESS AND TERMINATION

Section 11.01 . *Contract Formation and Effectiveness* ......................................... 39
Section 11.02 . *Grounds for Termination Prior to the Closing* ............................. 39
Section 11.03 .   *Grounds for Termination After the Closing.* After the
            Closing this Agreement may be terminated by either Seller or Buyer
            if the Condition Subsequent shall not have been satisfied on or before
            30 November 2009, or such later date as Buyer and Seller may
            mutually agree in writing save that if on 30 November 2009, the
            Condition Subsequent has not been satisfied but the Shanghai
            Municipal Administration for Industry and Commerce has not
            indicated in writing to Buyer and/or Seller that it is unwilling to issue
            the Business License, Buyer and Seller shall extend the date of 30
            November 2009 to 31 December 2009, or such other date as Buyer and
            Seller may mutually agree in writing. ................................................. 40
Section 11.04 *Effect of Termination* ..................................................................... 40
Section 11.05 . *Expense Reimbursement* ............................................................. 41

ARTICLE 12
MISCELLANEOUS

Section 12.01 .   *Notices*....................................................................................... 41
Section 12.02 .   *Amendments and Waivers* ........................................................ 42
Section 12.03 .   *Expenses*.................................................................................... 42
Section 12.04 .   *Successors and Assigns*............................................................ 43
Section 12.05 .   *Governing Law*.......................................................................... 43
Section 12.06 .   *Disputes*..................................................................................... 43
Section 12.07 . *Counterparts* ............................................................................... 45
Section 12.08 . *Third Party Beneficiaries*............................................................. 45
Section 12.09 .   *Entire Agreement* ..................................................................... 45
Section 12.10 .   *Severability* ............................................................................... 45
Section 12.11 .   *Specific Performance* ............................................................... 46
Section 12.12 .   *Survival of Provisions*.............................................................. 46

Section 12.13 . *Languages* ................................................................................ 46

## EXHIBITS

Exhibit A                  Closing Date Pro Forma Balance Sheet
Exhibit B                  Information of Seller's Bank Account
Exhibit C                  Information of Buyer's Bank Account
Exhibit D                  Amended and Restated Articles of Association of the
                             Company

# EQUITY PURCHASE AGREEMENT

AGREEMENT (this "**Agreement**") dated as of September 29, 2009 between

**Perot Systems TSI (Mauritius) Pvt. Ltd**, a company incorporated under the laws of Mauritius, having its registered address at 4th Floor, Amod Building, 19 Poudriere Street, Port Louis, Mauritius ("**Buyer**")

      Name of the Legal Representative: Daniel Mark Karnuta
      Title: Director
      Nationality: American


and

**BearingPoint, Inc.**, a Delaware corporation, having its registered address at 100 Crescent Court, Suite 700, Dallas, Texas, 75201, United States of America ("**Seller**").

      Name of the Legal Representative: H. Martin Shandles
      Title: Deputy General Counsel
      Nationality: American


## W I T N E S S E T H :

WHEREAS, on February 18, 2009, Seller and certain of its affiliates (collectively the "**Debtors**"), filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code, §§ 101, et seq. (as amended) (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**"), and the cases are being jointly administered for procedural purposes only under Case no. 09-10691 (REG) (the "**Bankruptcy Cases**");

WHEREAS, Seller is the sole owner of all of the equity interests (the "**Equity Interest**") of BearingPoint Management Consulting (Shanghai) Ltd., a wholly foreign owned limited liability company incorporated in the PRC (the "**Company**"); and

WHEREAS, Seller desires to sell the Equity Interest to Buyer, and Buyer desires to purchase the Equity Interest from Seller, upon the terms and subject to the conditions hereinafter set forth, in a sale pursuant to Section 363 of the Bankruptcy Code.

NOW, THEREFORE, in consideration of these premises and the mutual covenants and agreements set forth herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged by each party, the parties hereto agree as follows:

ARTICLE 1
DEFINITIONS

Section 1.01.   *Definitions*. (a) As used herein, the following terms have the following meanings:

"**Actual Cash/Cash Equivalents**" means Company's unrestricted cash and cash equivalents in the amount set out in the line item "Cash/Cash Equivalents" in the Final Balance Sheet.

"**Actual Net Assets**" means the aggregate amount of the assets (excluding deferred tax assets), less the aggregate amount of the liabilities of the Company as at the Closing Date as shown in the Final Balance Sheet.

"**Affiliate**" means, with respect to any Person, any other Person directly or indirectly controlling, controlled by, or under common control with such Person; *provided* that the Company shall not be considered an Affiliate of Seller.

"**Agreed Net Assets**" means US$5,500,000.

"**Amended and Restated AOA**" means the Amended and Restated Articles of Association of the Company post-Closing signed by Buyer and to be submitted to Shanghai Municipal Commission of Commerce for obtaining the China Approval.

"**Applicable Law**" means, with respect to any Person, any federal, state or local law (statutory, common or otherwise), constitution, treaty, convention, ordinance, code, rule, regulation, order, injunction, judgment, decree, ruling or other similar requirement enacted, adopted, promulgated or applied by a Governmental Authority that is binding upon or applicable to such Person, as amended unless expressly specified otherwise.

"**Approval Order**" has the meaning set forth in Section 9.01.

"**Bankruptcy Cases**" has the meaning set forth in the Preamble.

"**Bankruptcy Code**" has the meaning set forth in the Preamble.

"**Bankruptcy Court**" has the meaning set forth in the Preamble.

"**Business Day**" means a day, other than Saturday, Sunday or other day on which commercial banks in New York, New York are authorized or required by Applicable Law to close, and other than October 1 through to 8, 2009 in China.

"**Business Information**" means the following, to the extent proprietary and pertaining to the Company's Business: trade secrets and confidential business information, know-how, manufacturing and product processes and techniques, proprietary research and development information, financial, marketing and business data, pricing and cost information, business and marketing plans and customer and supplier lists and information. For purposes of clarity, in the case of Business Information that contains portions pertaining to the Company's Business and portions not pertaining to the Company's Business, solely the portion pertaining to the Company's Business shall be considered Business Information.

"**Business License**" means the Company's business license to be issued by the Shanghai Municipal Administration for Industry and Commerce evidencing that Buyer is the 100% owner of the equity interest of the Company.

"**China**" or "**PRC**" means the People's Republic of China, excluding Hong Kong SAR, Macao SAR, and Taiwan for the purpose of this Agreement.

"**China Approval**" means the "Approval Reply" duly issued by Shanghai Municipal Commission of Commerce to approve this Agreement and the "Certificate of Approval" issued by Shanghai Municipal Commission of Commerce to the Company evidencing that Buyer holds 100% equity interest of the Company.

"**Closing Date**" means the date of the Closing.

"**Closing Date Pro Forma Balance Sheet**" means the Pro Forma Balance Sheet of the Company as at the Closing Date to be provided by Seller to Buyer at least five (5) Business Days prior to Closing, substantially in the form attached hereto as Exhibit A.

"**Company's Business**" means the business, operations and management of the Company and its assets as conducted on the date hereof (and, for purposes of Sections 3.08 (Intellectual Property) and 5.07 (Confidentiality) only, at any time during the one year period immediately preceding the Closing Date), including the Company's performance under and pursuant to Customer Contracts.

"**Company Intellectual Property**" means all Intellectual Property owned by, or licensed to, the Company as of the Closing Date. For the avoidance of doubt, "Company Intellectual Property" shall not include any Intellectual Property (i) owned by Seller or any of its Affiliates or (ii) licensed to Seller or any of its

Affiliates by a third party to the extent that the Company does not have its own separate license from such third party.

"**Confidentiality Agreement**" means the Confidentiality Agreement dated May 19, 2009 between Buyer and Seller, as amended by the two letter agreements entered into between Buyer and Seller on June 9, 2009 and July 14, 2009, respectively.

"**Cross-License Agreement**" means the Intellectual Property License Agreement to be entered into between the Company and the Seller on the Closing Date.

"**Customer Contract**" means any contract (whether firm or conditional), agreement, instrument, purchase order, sales order, understanding, commitment or other arrangement, whether written or oral, to which the Company is party, providing for the provision of consulting services or technology solutions by the Company.

"**Debtors**" has the meaning set forth in the Preamble.

"**Disclosure Letter**" means the disclosure letter in the agreed form to be entered into on the date of this Agreement.

"**Employment Related Liabilities**" means $249,560, being US$89,560 (in the aggregate) in respect of cash retention bonuses and US$160,000 (in the aggregate) in respect of sign on or other bonuses payable to Ronald Machan, Kirk Williams and Chenghua Wang (the "**Sign-on Bonuses**").

"**Escrow Account**" means the interest-bearing deposit account to be established in the joint names of Seller and Buyer with Wells Fargo in Texas (or such other bank as the parties may agree).

"**Escrow Agreement**" means an agreement in the form to be agreed between Buyer and Seller setting out the terms of operation of the Escrow Account.

"**Estimated Cash/Cash Equivalents**" means the amount set out in the line item "Cash/Cash Equivalents" in the Closing Date Pro Forma Balance Sheet.

"**Estimated Net Assets**" means the aggregate amount of the assets less the aggregate amount of the liabilities of the Company as at the Closing Date as shown in the Closing Date Pro Forma Balance Sheet.

"**Expense Reimbursement**" means an amount, not to exceed five hundred thousand U.S. dollars (US$500,000), equal to Buyer's reasonable and

documented out-of-pocket costs and expenses (including fees and expenses of counsel, financial advisors and other professionals and consultants) incurred by Buyer in connection with this Agreement and the transactions contemplated hereby.

"**Final Order**" means an order or a judgment entered by the Bankruptcy Court (i) that has not been reversed, stayed, modified, amended or vacated and (ii) as to which the time for filing a notice of appeal, a petition for review or a motion for re-argument or rehearing has expired.

"**Former Affiliate**" means a Person that is not an affiliate of Seller as of the execution and delivery of this Agreement but was an Affiliate of Seller at any time from and including February 18, 2009 to and including immediately prior to the execution and delivery of this Agreement.

"**GAAP**" means generally accepted accounting principles, as recognized by the American Institute of Certified Public Accountants and the Financial Accounting Standards Board, consistently applied and maintained on a consistent basis for the period or periods indicated.

"**Governmental Authority**" means any transnational, domestic or foreign federal, state or local, governmental authority, department, court, agency or official, including any political subdivision thereof.

"**Holdback**" means an amount equal to US$250,000.

"**Independent Accountants**" means KPMG LLP or Grant Thornton LLP.

"**Intellectual Property**" means all: (a) inventions, invention disclosures, patents, utility models, design registrations and certificates of invention and other governmental grants for the protection of inventions or industrial designs, and patent applications (including all related continuations, continuations-in-part, divisionals, reissues and reexaminations); (b) Trademarks; (c) copyrights and registrations and applications for registration thereof; (d) computer software, data and related documentation; (e) Business Information; and (f) other proprietary rights relating to any of the foregoing (including remedies against infringement thereof and rights of protection of interest therein under the Applicable Laws of all jurisdictions).

"**Intercompany Loans**" means all financial obligations or liabilities of the Company owed to Seller or any of Seller's Affiliates (i) for or in respect of moneys borrowed or raised, whether or not for cash, (ii) evidenced by bonds, debentures, notes, loan agreements or other similar instruments or (iii) for the deferred purchase price of property or services (including, for the avoidance of doubt, accounts payable).

"**Intercompany Payables**" means Intercompany Loans and any other financial obligations or liabilities of the Company owed to Seller or any of Seller's Affiliates at or prior to Closing, including amounts payable by the Company in respect of dividends payable and interest on net equity, but excluding Shareholder Loans.

"**Intercompany Receivables**" means financial obligations or liabilities owed by Seller and/or any of Seller's Affiliates to the Company at or prior to Closing.

"**Knowledge**" means that which is actually known by a Person. In the case of the Company, "**Knowledge**" means the "Knowledge" of Ronald Machan, Kirk Williams and Chenghua Wang (each a Managing Director of the Company), Zhen TAN (General Counsel, Greater China), Claudia CHEN (Finance Controller), and Tina XIA (Human Resources Senior Manager), in each case, with respect to matters encompassed within the responsibilities associated with their positions. In the case of Seller, "**Knowledge**" means the "Knowledge" of David Johnston (Chief Financial Officer), John DeGroote (President and Chief Legal Officer), and Sean Huurman (Head of Human Resources), in each case, with respect to matters encompassed within the responsibilities associated with their positions.

"**Legal Proceeding**" means any action, suit, proceeding, claim, opposition, challenge, charge or arbitration before any Governmental Authority.

"**Lenders**" means every creditor specifically listed on any of the Debtors' cash collateral or financing order as asserting secured claims or rights of setoff.

"**Licensed IP**" means all Intellectual Property licensed to the Company pursuant to the Cross-License Agreement, all Trademark rights and domain names licensed to the Company pursuant to the Trademark License Agreement and all Intellectual Property licensed to or available for use by the Company under the Transition Services Agreement.

"**Lien**" means, with respect to any property or asset, any mortgage, lien, pledge, charge, security interest or encumbrance in respect of such property or asset.

"**Material Adverse Effect**" means a material adverse effect on the business, assets or results of operations of the Company, except any such effect resulting from or arising in connection with (1) this Agreement or the transactions contemplated hereby, (2) changes or conditions affecting the industry in which the Company operates and not specifically relating to or having a material disproportionate effect on the Company, or (3) changes in economic,

regulatory or political conditions generally and not specifically relating to or having a materially disproportionate effect on the Company.

"**Maximum Cash Adjustment**" means an amount equal to US$10.4 million less an amount equal to the aggregate of the Purchase Price and the amount of the Employment Related Liabilities.

"**Performance Share Unit Award**" has the meaning set out in the Seller's Performance Share Unit Award Agreement.

"**Person**" means an individual, corporation, partnership, limited liability company, association, trust or other entity or organization, including a Governmental Authority.

"**Restricted Stock Unit**" has the meaning set out in the Seller's Restricted Stock Unit Agreement (as amended).

"**Shareholder Loans**" means Intercompany Loans comprised of shareholder loans (including accrued but unpaid interest) owed by the Company to Seller at or prior to Closing.

"**Tax**" means any tax, governmental fee or other like assessment or charge of any kind whatsoever (including, but not limited to, withholding on amounts paid to or by any Person), together with any interest, penalty, addition to tax or additional amount imposed by any governmental authority (domestic or foreign) responsible for the imposition of any such tax (a "**Taxing Authority**").

"**Trademarks**" means all registered trademarks and service marks, Internet domain names, logos, trade names, corporate names and doing business designations, all registrations and applications for registration of the foregoing, common law trademarks and services marks and trade dress, and all goodwill associated with any of the foregoing.

"**Trademark License Agreement**" means the Trademark License Agreement to be entered into between DPHL and PSC Management Limited Partnership on the Closing Date.

"**Transaction Agreements**" means this Agreement, the Confidentiality Agreement, the Cross-License Agreement, the Trademark License Agreement and the Transition Services Agreement.

"**Transition Services Agreement**" means the Transition Services Agreement to be entered into between Seller, BearingPoint New Zealand Pty Ltd. ("**BearingPoint NZ**") and the Company on the Closing Date.

(b)     Each of the following terms is defined in the Section set forth opposite such term:

| Term | Section |
| --- | --- |
| Agreement | Preamble |
| Alternative Proposal | Section 10.01 |
| BearingPoint NZ | Section 1.01 |
| Beijing Lease | Section 5.12 |
| Buyer | Preamble |
| CA Assignment | Section 5.11 |
| Closing | Section 2.03 |
| Coexistence Agreement | Section 5.11 |
| Company | Preamble |
| Company Securities | Section 3.03 |
| Condition Subsequent | Section 8.04 |
| DPHL | Section 5.11 |
| e-mail | Section 12.01 |
| Equity Interest | Preamble |
| Final Balance Sheet | Section 2.05 |
| OIRR | Section 5.03 |
| Purchase Price | Section 2.01 |
| Seller | Preamble |

Section 1.02.  *Other Definitional and Interpretative Provisions*.  The words "hereof", "herein" and "hereunder" and words of like import used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement.   The captions herein are included for convenience of reference only and shall be ignored in the construction or interpretation hereof.   References to Articles, Sections, Exhibits and Schedules are to Articles, Sections, Exhibits and Schedules of this Agreement unless otherwise specified.   All Exhibits annexed hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth in full herein.   Any capitalized terms used in any Exhibit but not otherwise defined therein, shall have the meaning as defined in this Agreement.   Any singular term in this Agreement shall be deemed to include the plural, and any plural term the singular.   Whenever the words "include", "includes" or "including" are used in this Agreement, they shall be deemed to be followed by the words "without limitation", whether or not they are in fact followed by those words or words of like import.   "Writing", "written" and comparable terms refer to printing, typing and other means of reproducing words (including electronic media) in a visible form.   References to any agreement or contract are to that agreement or contract as amended, modified or supplemented from time to time in accordance with the terms hereof and

thereof.   References from or through any date mean, unless otherwise specified, from and including or through and including, respectively.   References to "law", "laws" or to a particular statute or law shall be deemed also to include any and all Applicable Law.

<div align="center">

ARTICLE 2

PURCHASE AND SALE

</div>

Section 2.01.   *Purchase and Sale.*   Upon the terms and subject to the conditions of this Agreement, Seller agrees to sell to Buyer, and Buyer agrees to purchase from Seller, the Equity Interest at the Closing (the "**Transfer"**).   The purchase price for the Equity Interest is US$3,220,000 (the "**Purchase Price**"). The Purchase Price shall be paid as provided in Section 2.03.

Section 2.02.   *Payment to Escrow Account.*   On the Closing Date, Buyer shall pay to the Escrow Account the Purchase Price in cash less the Holdback.

Section 2.03.   *Closing.*   The closing (the "**Closing**") of the purchase and sale of the Equity Interest hereunder shall take place at the offices of   Allen & Overy LLP, Shanghai Office, 18 Floor, 118 Yin Cheng Middle Road, Shanghai, PRC, on the third Business Day after satisfaction of the conditions set forth in Sections 8.01, 8.02 and 8.03, or at such other time or place as Buyer and Seller may agree. At the Closing:

(a)      Buyer shall deposit into the Escrow Account the Purchase Price in cash less the Holdback.

(b)      Seller shall deliver to Buyer (i) the Trademark License Agreement duly signed by the authorized representative(s) of DPHL, (ii) the Transition Services Agreement and the side letter to the Transition Service Agreement, duly signed by the authorized representative(s) of Seller, BearingPoint NZ and the Company, (iii) the Cross-License Agreement duly signed by the authorized representative(s) of Seller and the Company and (iv) the unanimous written consent of the board of DPHL and the DPHL director's certificate referred to in Section 3.02.

(c)      Buyer shall deliver to Seller (i) the Trademark License Agreement duly signed by the authorized representative(s) of PSC Management Limited Partnership.

(d)      Seller, on behalf of itself and its bankruptcy estate, shall provide for a release in the Approval Order, and shall execute and deliver such a release to Buyer, that in all circumstances, the Debtors, for themselves and their executors, administrators, successors and assigns, fully, unconditionally and knowingly release and forever discharge Buyer and the Company and their respective employees, officers, directors, affiliates, successors and assigns from any and all

<div align="center">9</div>

claims, demands, losses, costs, expenses (including reasonable attorneys' fees and expenses), obligations, liabilities and/or damages of every kind and nature whatsoever, whether now existing or known, arising out of or relating in any way, directly or indirectly, to (i) the Equity Interest, (ii) the Transaction Agreements, (iii) the Company's Business and (iv) any due diligence undertaken in connection with the transactions contemplated under this Agreement.

(e)     Buyer and the Company on behalf of themselves and their respective employees, officers, directors, affiliates, successors and assigns shall provide for a release in the Approval Order, and shall execute and deliver the same to Seller, that in all circumstances, the Buyer and the Company and each of their respective affiliates, successors and assigns, fully, unconditionally and knowingly release and forever discharge the Debtors and their employees, officers, directors, affiliates, successors and assigns from any and all claims, demands, losses, costs, expenses (including reasonable attorneys' fees and expenses), obligations, liabilities and/or damages of every kind and nature whatsoever, whether now existing or known arising out of or relating in any way, directly or indirectly, to (i) the Equity Interest, (ii) the Transaction Agreements, and (iii) the Company's Business.

(f)     The Company shall deliver to Buyer its corporate seal and finance seals.

(g)     The Company shall deliver to Buyer a notice to the banks with which the Company has opened accounts, which shall be in a form satisfactory to Buyer and states that the instructions, mandates and authorizations issued by the Company to such banks shall be revoked as of the Closing Date.

(h)     Buyer and Seller shall provide such other duly executed documents, instruments or certificates as are reasonable necessary to be delivered pursuant to this Agreement.

Section 2.04. *Release of Payment to Buyer.*

In the event that the Condition Subsequent (as defined in Section 8.04) is satisfied within the timeframe set forth in Section 11.03, Buyer and Seller shall procure the release of all amounts in the Escrow Account to Seller within two Business Days after the satisfaction of the Condition Subsequent.

In the event that the Condition Subsequent is not satisfied within the timeframe set forth in Section 11.03, (i) Buyer and Seller shall procure that all amounts in the Escrow Account shall be released to Buyer, (ii) Buyer shall return all of the Equity Interest to Seller, and (iii) Buyer and Seller shall take every action as required by Applicable Law and use their best efforts to effectuate such return.

Section 2.05. *Adjustment to Purchase Price*.

(a)     Seller shall deliver to Buyer the Closing Date Pro Forma Balance Sheet at least 5 Business Days prior to the Closing Date.

(b)     As soon as practicable and in any event no later than 32 Business Days following the Closing Date, Buyer shall notify Seller of any item(s) which it wishes to dispute on the Closing Date Pro Forma Balance Sheet, together with the reasons for such dispute and a list of proposed adjustments.   If by the expiry of 32 Business Days following the Closing Date, no such notice is received by Seller or if Buyer has notified Seller that there are no item(s) it wishes to dispute, the Closing Date Pro Forma Balance Sheet shall constitute the "**Final Balance Sheet**" for the purposes of this Agreement.   The Closing Date Pro Forma Balance Sheet and the Final Balance Sheet will (i) be prepared in accordance with GAAP except with respect to the absence of footnote disclosure, accompanying notes, and other presentation items and to changes resulting from normal period-end adjustments for recurring accruals, which are not material individually or in the aggregate; and (ii) be based solely on transactions arising or resulting solely from the operation of the Company's business and will not include any amounts arising from the Buyer's acquisition of the Company.

(c)     If notice is received by Seller as to any item in dispute, Seller and Buyer shall attempt to agree in writing the item(s) disputed by Buyer.   If such item(s) are not agreed in writing between Seller and Buyer within 32 Business Days of the notification by Buyer to Seller of the dispute and the dispute is material, the item(s) in dispute shall be determined by the Independent Accountants. For the purposes of this Section 2.05(c) only, dispute shall be material where the aggregate figures proposed by Buyer differ by more than US$50,000 (or the equivalent in another currency) from the aggregate figures set out in the Closing Date Pro Forma Balance Sheet. Where dispute is not material and is not agreed in writing between Buyer and Seller, the amount of the relevant item as set out in the Closing Date Pro Forma Balance Sheet shall be the amount of the relevant item for the purposes of the Final Balance Sheet.

(d)     The Independent Accountants shall act on the following basis:

(i)     the Independent Accountants shall act as experts and not as arbitrators;

(ii)     the item(s) in dispute shall be notified to the Independent Accountants in writing by Seller and/or Buyer within five Business Days of the Independent Accountants' appointment;

(iii)     Seller and     Buyer   shall   each   provide   the Independent Accountants promptly with all information which

they reasonably require, and the Independent Accountants shall be entitled (to the extent they consider it appropriate) to base their opinion on such information and on the accounting and other records of the Company;

(iv)    the determination of the Independent Accountants shall (in the absence of manifest error) be final and binding on the parties; and

(v)    the costs of the determination, including fees and expenses of the Independent Accountants, shall be borne by the party that assigned amounts to items in dispute that were, on a net basis, furthest in amount from the amount finally resolved by the Independent Accountants and shared equally by the parties if neither party is furthest in amount from the amount finally resolved by the Independent Accountants.

(e)    The Closing Date Pro Forma Balance Sheet, adjusted to reflect the item(s) as agreed between Seller and Buyer in writing or as determined by the Independent Accountants, shall constitute the "**Final Balance Sheet**" for the purposes of this Agreement.

(f)    If the Actual Cash/Cash Equivalents less the aggregate of (i) $265,000 and (ii) the Employment Related Liabilities exceeds the Purchase Price, Buyer shall deliver to Seller the difference in an amount not to exceed the Maximum Cash Adjustment in cash by no later than the second Business Day following agreement or determination of the Final Balance Sheet.

(g)    If the Actual Cash/Cash Equivalents less the aggregate of (i) $265,000 and (ii) the Employment Related Liabilities is less than the Purchase Price, Seller shall deliver to Buyer the difference in cash by no later than the second Business Day following agreement or determination of the Final Balance Sheet.

(h)    If the Actual Net Assets is less than the Agreed Net Assets, Seller shall deliver to Buyer the difference in cash by no later than the second Business Day following agreement or determination of the Final Balance Sheet.

(i)    If the actual amount paid by Buyer or the Company under the Sign-on Bonuses is less than US$160,000, Buyer shall deliver to Seller the difference in cash by no later than the second Business Day following the actual payment of the Sign-on Bonuses.

Section 2.06. *Holdback*. Any payments due to Buyer from Seller under Section 2.05 (g) and (h) will be reduced by the amount of the Holdback.   In the event that the Holdback exceeds total payments due to Buyer from Seller under

Section 2.05 (g) and (h), Buyer will pay Seller the difference in cash by no later than the second Business Day following the later of the following two dates: (i) the date the Final Balance Sheet is agreed or determined in accordance with this Agreement, and (ii) the date the Condition Subsequent is satisfied within the timeframe set forth in Section 11.03.  If the Condition Subsequent is not satisfied within the timeframe set forth in Section 11.03, the Holdback will not be payable to Seller.

Section 2.07. *Payments*.  All payment to be made under this Agreement shall be made in US dollars in immediately available funds, and, except only for the amount to be paid to the Escrow Account pursuant to provisions of this Agreement and the Escrow Agreement, shall be paid by wire transfer to:

(a)     In the case of payments to Seller, to the account of Seller set forth in Exhibit B.

(b)     In the case of payments to Buyer, to the account of Buyer set forth in Exhibit C.

Section 2.08. *Escrow Account*.  The Escrow Account shall be operated in accordance with the terms of the Escrow Agreement.  The parties shall use all reasonable efforts to execute the Escrow Agreement as soon as practicable after the date of this Agreement.  If the parties, acting reasonably, are unable to agree the form of Escrow Agreement with Wells Fargo in Texas, the parties shall select another bank to act as escrow bank.

Section 2.09. *Absolute Sale*.  Seller's sale, transfer, conveyance, assignment and delivery of the Equity Interest to Buyer shall be free and clear of all Liens of any kind or character.  Starting from the Closing Date, Buyer will be entitled to all of the rights and bear all of the liabilities as a shareholder in accordance with the Amended and Restated AOA.

ARTICLE 3
REPRESENTATIONS AND WARRANTIES OF SELLER

Except as set forth in the Disclosure Letter, Seller represents and warrants to Buyer that   the statements contained in this Article 3 are true and correct as of the date of this Agreement and will be true and correct as of the Closing as though made as of the Closing, except to the extent such representations and warranties are specifically made as of a particular date (in which case such representations and warranties will be true and correct as of such date):

Section 3.01. *Existence and Power.*  Each of the Seller and the Company is duly formed, validly existing and, if applicable, in good standing under the laws of its jurisdiction of organization and has all powers and all

governmental licenses, authorizations, permits, consents and approvals required to carry on its business as now conducted, except for those licenses, authorizations, permits, consents and approvals the absence of which would not have a Material Adverse Effect.

Section 3.02. *Authorization*. The execution, delivery and performance by Seller of this Agreement, the other Transaction Agreements to which it is a party and the consummation of the transactions contemplated hereby and thereby are within Seller's corporate powers and, subject to entry by the Bankruptcy Court of the Approval Order, have been duly authorized by all necessary action on the part of Seller, and Seller shall deliver to Buyer a unanimous written consent of the board of Seller authorizing the execution, delivery and performance by Seller of this Agreement and the other Transaction Agreements to which it is a party and a director's certificate certifying that such consent is true, complete and accurate. At the time of their execution, the execution, delivery and performance by DPHL of the Trademark License Agreement and the CA Assignment and the consummation of the transactions contemplated thereby will be within DPHL's powers and will have been duly authorized by all necessary corporate action on the part of DPHL, and at Closing Seller shall procure the delivery to Buyer of a unanimous written consent of the board of DPHL authorizing the execution, delivery and performance by DPHL of the Trademark License Agreement and the CA Assignment and a director's certificate certifying that such consent is true, complete and accurate. The execution, delivery and performance by BearingPoint NZ of the Transition Service Agreement and the consummation of the transactions contemplated thereby are within BearingPoint NZ's powers and, subject to entry by the Bankruptcy Court of the Approval Order, will be duly authorized by all necessary corporate action on the part of BearingPoint NZ. Subject to entry by the Bankruptcy Court of the Approval Order, this Agreement constitutes, and each of the Transaction Agreements to which it is a party, when executed, will constitute, a valid and binding agreement of Seller.

Section 3.03. *Capitalization*.

(a) The Company has a registered capital of USD17,500,000 and a total investment of USD43,750,000, and as of the date hereof, the Equity Interest represents the entire registered capital of the Company.

(b) Seller has fully paid its capital contribution to the registered capital of the Company. The Seller's contributions have not been refunded or returned, in whole or in part. Except as set forth in this Section 3.03, there are no outstanding (i) equity interests or other equivalent securities of the Company, (ii) securities of the Company convertible into or exchangeable for equity interests or other equivalent securities of the Company, or (iii) options or other rights to acquire from the Company, or other obligation of the Company to issue, any

equity interests or other equivalent securities of the Company (the items in clauses 3.03(b)(i), 3.03(b)(ii) and 3.03(b)(iii) being referred to collectively as the "**Company Securities**").   There are no outstanding obligations of the Company to repurchase, redeem or otherwise acquire any Company Securities.

(c)     The Company does not own or control, directly or indirectly, any ownership interest in any Person or participate in any joint venture, partnership or similar arrangement.

Section 3.04.   *Ownership of the Equity Interest.* Through to the date immediately before the date of the China Approval, Seller is the sole registered owner of all of the Equity Interest, and the Equity Interest is and will be free and clear of any Lien.

Section 3.05.   *Noncontravention*.   Subject to the Approval Order, neither the execution and delivery by the Seller of this Agreement or any of the Transaction Agreements to which the Seller will be a party nor the consummation by the Seller of the transactions contemplated hereby or thereby will (a) conflict with or violate any provision of the charter, by-laws, articles of association or other governing documents of the Seller or the Company, (b) require on the part of the Seller any material notice to or filing with, or any material permit, authorization, consent or approval of, any Governmental Authority, (c) conflict with, result in a breach of, constitute (with or without due notice or lapse of time or both) a default under, result in the acceleration of obligations under, create in any party any right to terminate, modify or cancel, or require any notice, consent or waiver under, any material contract or instrument to which the Company is a party or by which it is bound or to which any of its material properties or assets is subject, (d) result in the imposition of any Lien upon the Equity Interest (or any part of it) or (e) violate any material Applicable Law.

Section 3.06. *Tax Matters*. With regard to Tax matters related to the Company:

(a)     To the knowledge of the Company and Seller, (i) the Company or, as applicable, Seller on behalf of the Company, has properly filed on a timely basis all Tax returns required under Applicable Law, and all such Tax returns were true, correct and complete in all material respects, (ii) the Company or, as applicable, Seller on behalf of the Company, has paid on a timely basis all material Taxes that were due and payable and all Taxes the non-payment of which would result in any Lien, and (iii)   all material Taxes that Seller was required by Applicable Law to withhold or collect have been duly withheld or collected and, to the extent required, have been properly paid to the appropriate Governmental Authority.

(b)      The Company has delivered or made available to Buyer (i) complete and correct copies of all material Tax returns relating to Taxes in respect of the Company for the financial years ended December 31, 2006, December 31, 2007 and December 31, 2008 and (ii) complete and correct copies of all material reports of relevant Taxing Authorities, information document requests, notices of proposed deficiencies, deficiency notices, protests, petitions, closing agreements, settlement agreements and any similar documents   submitted by, received by or agreed to by or on behalf of the Company or the Seller relating to such Taxes for the financial years ended December 31, 2006, December 31, 2007 and December 31, 2008.   To the Knowledge of Seller and the Company, no examination or audit of any such Tax Return by any Governmental Authority is currently in progress or, to the Knowledge of the Company and Seller, threatened or contemplated the resolution of which would reasonably be expected to result in a material Tax liability.   Neither the Company nor Seller has been informed by any Tax Authority that the Tax Authority believes that the Company, or Seller on behalf of the Company or in connection with the Company's operations, was required to file any such Tax return that was not filed.

Section 3.07. *Ownership of Assets*.   The Company has good and valid title to all of its material owned tangible properties and assets reflected in the Company Financial Statements or which have been acquired after July 31, 2009, free and clear of all Liens, except for Liens (i) for current taxes not yet due and payable or that are being contested in good faith by appropriate proceedings and for which adequate reserves have been established in the Company Financial Statements in accordance with GAAP, (ii) set forth in the Company Financial Statements or (iii) that are not, individually or in the aggregate, material to the Company, other than properties and assets sold in the ordinary course of business with a book value of no greater than US$10,000 (in aggregate).   For the purposes of Section 3.07 only, the Company Financial Statements refer to the Company's GAAP prepared audited financial statement as at December 31, 2008 and the Company GAAP prepared unaudited financial statements as at and for the seven-month period ended July 31, 2009.

Section 3.08. *Intellectual Property*.

(a)      The Company Intellectual Property and the Licensed IP constitute all of the material Intellectual Property (other than generally available "off-the-shelf" software) that is currently used or held for use in the Company's Business.

(b)      To the Knowledge of the Company and the Seller, (i) all material Company Intellectual Property owned by the Company is valid, subsisting and enforceable and (ii) the Company owns or otherwise holds valid rights to use all material Company Intellectual Property.

(c)     To the Knowledge of the Company and the Seller, the Company is not infringing, violating or misappropriating any Intellectual Property rights of any Person in any material respect.     To the Knowledge of the Company and Seller, no Legal Proceeding to which the Company or Seller is a party is pending concerning any claim or position that the Company has violated (or that in the conduct of the Company's Business Seller has violated) any Intellectual Property of another Person, nor, to the Knowledge of the Seller and the Company, has any such Legal Proceeding been threatened in writing.

(d)     To the Knowledge of the Company and Seller, no Person is infringing, violating or misappropriating, in any material respect, any of the Company Intellectual Property owned by the Company.

(e)     To the Knowledge of the Company and Seller, the Company has taken all commercially reasonable measures to protect the secrecy, confidentiality and value of all material trade secrets included in the Company Intellectual Property owned by the Company.

Section 3.09    *Permits.* The Disclosure Letter sets forth a complete and accurate list of all material Permits necessary to conduct the Company's Business as it is now conducted. To the Knowledge of the Company and Seller, each such Permit is in full force and effect. The Company is in compliance in all material respects with the terms of each such Permit. To the Knowledge of the Company and Seller, no suspension or cancellation of such Permit is threatened and there is no basis for believing that such Permit will not be renewable upon expiration. To the Knowledge of the Company and Seller, each such Permit will continue to be in full force and effect immediately following the Closing as in effect prior to the Closing.

Section 3.10. *Employee Matters*.     To the Knowledge of the Company and the Seller, except as disclosed in the Disclosure Letter, the Company has complied with all Applicable Laws that relate to employment conditions, anti-discrimination in employment, wages and benefits, social welfare, work hours and conditions, occupational safety and health, collective bargaining and labor negotiations, work authorization, immigration, withholding and/or payment of income and payroll Taxes, withholding and/or payment of contributions for social welfare, social benefits or similar programs required by Applicable Law or a Governmental Authority, hiring and termination practices (including laws related to plant closures, mass layoffs and similar matters) and employee privacy (collectively, "**Employment Laws**") except as would not, individually or in the aggregate, have a Material Adverse Effect.     Without limiting the generality of the foregoing:

(a)     There are no Legal Proceedings pending or to the Knowledge of Seller and the Company, except as disclosed in the Disclosure Letter, threatened

in writing or reasonably anticipated relating to any Employment Laws involving any employee of the Company, including charges of unfair labor practices or discrimination complaints, which, if adversely determined, would, individually or in the aggregate, result in any material liability to the Company;

(b)     to the Knowledge of Seller and the Company, except as disclosed in the Disclosure Letter, there has been no Legal Proceeding pending, or threatened, during the twelve (12) months immediately preceding the date hereof that involved any material claim that any employee of the Company, in his or her capacity as such, or Seller, with respect to any employee of the Company, violated any Employment Law.  No Seller or any Subsidiary of a Seller, including the Company, has engaged in unfair labor practices contrary to the *Employment Contract Law of the PRC* or any other Applicable Law;

(c)     there is no union formed by employees of the Company;

(d)     neither the Company nor Seller with respect to employees of the Company is presently, nor to the Knowledge of the Company and Seller has the Company or Seller been in the past, a party to, or bound by, any collective bargaining agreement or union contract with respect to any employee of the Company; neither the Company nor Seller presently employs, nor to the Knowledge of the Company and the Seller has employed, in the past, any member of the union as an employee of the Company, and no collective bargaining agreement is being negotiated with respect to employees of the Company;

(e)     there are no organizing activities, strikes, work stoppages, slowdowns, lockouts or arbitrations, or other labor disputes pending or, to the Knowledge of the Company or the Seller, threatened against or involving the Company that have had or would reasonably be expected to have a Material Adverse Effect;

(f)     to the Company's and the Seller's Knowledge, no employee of the Company is a party to any confidentiality, non-competition, proprietary rights or other such agreement between such employee and any Person other than the Company that would be material to the performance of such employee's professional duties with the Company or the ability of the Company to conduct the Company's Business;

(g)     except as disclosed in the Disclosure Letter, as at the date of this Agreement, no employee of the Company has notified the Company in writing that he intends to terminate his employment relationship with the Company prior to or following the consummation of the transactions contemplated hereby. The Seller shall procure that in the period between the date of this Agreement and Closing, if an employee of the Company notifies the Company that he intends to

terminate his employment relationship with the Company, the Company shall promptly notify Buyer of such fact;

(h)     in its current relationships with third party vendors, contractors and subcontractors, the Company has not created employment relationships with the personnel of such vendors, contractors or subcontractors;

(i)     the amount of the Cash Retention Bonuses stated in Section 1.01 is true and accurate, and represents all the Cash Retention Bonuses that are due to the Company's managing directors by Seller, Seller's Affiliates, or the Company, whether vested or unvested, at the Closing; and

(j)     the Seller and Company have complied with all agreements, plans, documents related to stock options, Restricted Stock Units, Performance Share Unit Award, and any other kind of stock programs for the Company's employees.

Section 3.11. *Litigation*. Except for the Bankruptcy Cases and any motion, application, pleading or order filed in the Bankruptcy Cases that relate to this Agreement, the Transaction Agreements and/or the Approval Order: there is no material Legal Proceeding or, to the Knowledge of the Company and the Seller, any investigation, that is pending or has been threatened against the Company, nor against a customer of the Company related to services provided by the Company to such customer, or in any manner challenges or seeks to prevent, enjoin, alter or delay the transactions contemplated by this Agreement or the Transaction Agreements. Except to the extent that it would not subject Buyer or PSC Management Limited Partnership to any liability or restrict the ownership or impair the Company's use of its assets in any material respect, there is no judgment, order, injunction or decree outstanding against Seller or the Company that is related to the Company's assets or operations.

Section 3.12. *Legal Compliance*.   To the Knowledge of Seller and the Company, the Company is, and has at all times since July 24, 2001 been, in compliance in all material respects with Applicable Law.   To the Knowledge of Seller, Seller has not received any written notice or written communication from any Governmental Authority alleging noncompliance in any material respect, by the Company (or Seller in relation to the Company's activities) with any Applicable Law.   Except as disclosed in the Disclosure Letter, since September 29, 2004, neither Seller nor any of its Affiliates has conducted or initiated any internal investigation or made a voluntary disclosure to any Governmental Authority with respect to any alleged non-compliance with any Applicable Law by the Company. The Disclosure Letter contains a true copy of the Seller's group's FCPA Compliance Program and associated Procedures Document, and Standards of Business Conduct. Without limiting the generality of the foregoing: To the Knowledge of Seller and the Company, September 29, 2004, neither the Company nor any of its officers, directors, employees or agents (or any person acting on

behalf of any of the foregoing), has directly or indirectly, whether through a third-party intermediary or otherwise:

(i)     unlawfully paid, offered, given, promised to pay or authorized the payment of any funds or other things of value (including any fee, gift, sample, travel expense, entertainment, service, equipment, loan, debt forgiveness, donation, grant or other payment or support in cash or in kind, however characterized) to any: (1) officer or employee of any Governmental Authority, any commercial or similar entities that the government controls or owns, including any state-owned and state-operated companies or enterprises, any international organizations such as the United Nations or the World Bank, or any political party (collectively, hereinafter "**Government-Related Entity**"); (2) any person acting for or on behalf of any Government-Related Entity; (3) any candidate for political office; or (4) any agent or other person engaging in any of the above-described activities at the suggestion, request, direction or for the benefit of any of the above-described persons; or

(ii)     made any bribe, rebate, payoff, influence payment, kickback or other unlawful payment or made any other payment of a similar or comparable nature, to any Person, regardless of the form, whether in money, property or services,

in each case, to obtain favorable treatment in securing business or to obtain special concessions or to pay for favorable treatment for business secured or for special concessions already obtained;

(b)     neither the Company nor, to the Knowledge of Seller and the Company, any director, officer, employee, agent, or representative of the Company is involved in any manner concerning the ongoing investigations by the U.S. Securities and Exchange Commission ("**SEC**") or the U.S. Department of Justice ("**DOJ**") of possible instances of non-compliance with the United States Foreign Corrupt Practices Act ("**FCPA**"), as disclosed on pages 13 and F37 of Seller's Form 10-K Annual Report for the fiscal year ended December 31, 2008, filed with the SEC on June 5, 2009; and

(c)     to the Knowledge of the Seller and the Company, the Company is not presently the target of, has not received any notice concerning, and is not otherwise involved in any other government investigation involving alleged noncompliance with the FCPA or any other Applicable Law relating to anticorruption matters, including any such Applicable Laws of PRC.

Section 3.13. *Financial Statements*. Included in the Disclosure Letter are true, correct and complete copies of the Company's GAAP prepared audited financial statements at December 31, 2008 and at December 31, 2007, for the fiscal years then ended (the "**Audited Financial Statements**"), and the Company's GAAP prepared unaudited financial statements as at and for the seven-month period ended July 31, 2009 (the "**Interim Financial Statements**" and together with the Audited Financial Statements, the "**Company Financial Statements**"). Since July 31, 2009, the Company (i) has conducted its business in the ordinary course consistent with past practice and (ii) except as disclosed in the Disclosure Letter, prior to the date hereof, has not taken any of the actions that would be prohibited by Section 5.03 if taken after the date hereof.

(a)     The Company Financial Statements:

(i)     have been prepared in accordance with GAAP applied on a consistent basis throughout the periods indicated;

(ii)    fairly present the financial condition and operating results of the Company as of the dates, and for the periods, indicated therein in all material respects, in accordance with GAAP applied on a consistent basis throughout the periods; and

(iii)   do not omit any material liability, except for liabilities that are either (1) disclosed and adequately reserved against in the Interim Financial Statements, or (2) that have been incurred since July 31, 2009 in the ordinary course of business, nor would the consummation of the transactions contemplated hereunder or under the Transaction Documents create such a material liability that is not included in (1) or (2) above.

(b)     To the Knowledge of the Company and Seller, the Company keeps and maintains (i) books and records that, in reasonable detail, accurately and fairly reflect the transactions and assets of the Company and its business and operations, (ii) a system of internal accounting controls and related policies and procedures sufficient to provide reasonable assurances that transactions and expenditures are captured and reflected on the Company's books and records as necessary to permit preparation of financial statements in conformity with GAAP and to maintain accountability for assets, and (iii) disclosure controls and procedures to provide reasonable assurances that material information related to the Company, its operations and its business is made known to the Persons whose knowledge is included within the definition of "Knowledge" (in the case of the Company only) in this Agreement. To the Knowledge of the Company and Seller, there are no significant deficiencies or material weaknesses in the design or

operation of internal controls that are reasonably likely to adversely affect the ability of any part of the Company to record, process, summarize and report financial information. To the Knowledge of the Seller and the Company, there has been no, and there does not currently exist any, fraud, whether or not material, that involves management of the Company. To the Knowledge of the Seller and the Company, neither the Company nor Seller has received any complaint, allegation, assertion or claim regarding the accounting or auditing practices, procedures, methodologies or methods of the Company or any internal accounting controls related to the Company, its operations or its assets, including any claim that the Company or any Person involved in the Company's record-keeping, business or operations has engaged in fraud or any questionable accounting or auditing practices.

(c)     As of the Closing Date, Seller shall have caused all Intercompany Payables, Intercompany Receivables and Intercompany Loans to be settled without further liability to the Company.

Section 3.14. *Real Estate.* The Company does not currently own, nor has it ever owned any real estate property (including land use rights ("tu di shi yong quan" in Chinese) and ownership of houses ("fang wu suo you quan" in Chinese). The Disclosure Letter sets forth a complete and accurate list of all real estate property leased or subleased to the Company and all real estate property subleased by the Company to any third parties.   The Company has made available to the Buyer correct and complete copies of the leases and subleases, each as amended to date, pertaining to each of the properties which are listed in the Disclosure Letter. With respect to each property listed in the Disclosure Letter:

(a)     each lease or sublease is in full force and effect and is binding and enforceable against each of the parties thereto in accordance with its respective terms; and

(b)     neither the Company, nor, to the Knowledge of the Company or Seller, any other party to any lease or sublease, is in breach or default under any lease or sublease.

Section 3.15. *Banking Relationships*. Except as set forth in the Disclosure Letter, the Company has no relationships with banks or other financial institutions in which the Company has accounts, lines of credit or safety deposit boxes.

Section 3.16. *Former Affiliates.*   To the Knowledge of the Seller and the Company, as of the time a Former Affiliate ceased to be an Affiliate of Parent Seller, such Former Affiliate was not a party to any contract or agreement with the Company.

ARTICLE 4
REPRESENTATIONS AND WARRANTIES OF BUYER

Buyer represents and warrants to Seller that the statements contained in this Article 4 are true and correct as of the date of this Agreement and will be true and correct as of the Closing as though made at the Closing:

Section 4.01.    *Existence and Power*.    Buyer is a company duly incorporated, validly existing and, if applicable, in good standing under the laws of Mauritius and has all corporate powers and all material governmental licenses, authorizations, permits, consents and approvals required to carry on its business as now conducted.

Section 4.02.    *Authorization*.    The execution, delivery and performance by Buyer of this Agreement and the other Transaction Agreements to which it is a party and the consummation of the transactions contemplated hereby and thereby are within the corporate powers of Buyer and have been duly authorized by all necessary corporate action on the part of Buyer, and Buyer shall deliver to Seller all such necessary corporate approvals and other documents. This Agreement constitutes, and the other Transaction Agreements to which it is a party, when executed, will constitute, a valid and binding agreement of Buyer.

Section 4.03.    *Noncontravention*.    Neither the execution and delivery by Buyer of this Agreement or any other Transaction Document to which it is a party nor the consummation by Buyer of the transactions contemplated hereby or thereby will (a) conflict with or violate any provision of the charter, by-laws or other governing documents of Buyer, (b) require on the part of Buyer any material notice to or filing with, or material permit, authorization, consent or approval of, any Governmental Authority, (c) conflict with, result in breach of, constitute (with or without due notice or lapse of time or both) a default under, result in the acceleration of obligations under, create in any party any right to terminate, modify or cancel, or require any notice, consent or waiver under, any contract or instrument to which Buyer is a party or by which it is bound or to which any of its properties or assets is subject or (d) violate any material Applicable Law.

Section 4.04.    *Purchase For Investment.*    Buyer is purchasing the Equity Interest for investment for its own account and not with a view to, or for sale in connection with, any distribution thereof.    Buyer (either alone or together with its advisors) has sufficient knowledge and experience in financial and business matters so as to be capable of evaluating the merits and risks of its investment in the Equity Interest and is capable of bearing the economic risks of such investment.

Section 4.05.    *Financing.*    Buyer has, and shall have as of the Closing, sufficient cash, available lines of credit and other sources of immediately

available funds to pay the Purchase Price and any other amounts to be paid by it hereunder. Buyer acknowledges and agrees that Buyer's performance of its respective obligations under this Agreement is not in any way contingent upon the availability of financing to Buyer.

ARTICLE 5
COVENANTS OF SELLER

Seller agrees that:

Section 5.01. *Waiver of Intercompany Loans, Intercompany Payables and Intercompany Receivables*. Prior to Closing, Seller shall cause the Company to waive and/or otherwise settle all Intercompany Payables, Intercompany Receivables and Intercompany Loans and deregister all Intercompany Loans with the competent Government Authority in charge of foreign exchange matters, and for this purpose, if required by Applicable Law or the competent Government Authority, Seller shall and shall cause its Affiliates and the Company to, enter into settlement agreements to effectuate such deregistration, and (ii) provide for a release in the Approval Order that in all circumstances, Seller, for itself and its executors, administrators, successors and assigns, fully, unconditionally and knowingly releases and forever discharges Buyer and the Company and their respective employees, officers, directors, affiliates, successors and assigns from any and all claims, demands, losses, costs, expenses (including reasonable attorneys' fees and expenses), obligations, liabilities and/or damages of every kind and nature whatsoever, whether existing or known, arising out of or relation to in any way, directly or indirectly, to any Intercompany Payables, Intercompany Receivables and Intercompany Loans

Section 5.02 *Termination of Intercompany Agreements*.

(a) Prior to the Closing, Seller and its Affiliates shall have terminated, and caused the Company to terminate, without any payment by Seller and its Affiliates or the Company, any and all contracts or other agreements (in each case including any obligations or liabilities of any such party thereunder) between the Company, on the one hand, and the Seller or such Affiliates, on the other hand, other than the Transaction Agreements and the engagements listed in Schedule 3.16 of the Disclosure Letter.

(b) As of and following Closing, the Company, on the one hand, and the Seller and its Affiliates, on the other hand, shall have no remaining obligations or liabilities to each other under any contracts or agreements referenced in Section 5.02(a), in respect of Intercompany Payables, Intercompany Receivables or otherwise, other than the obligations set forth in this Agreement, the Transaction Agreements and the engagements listed in Schedule 3.16 of the Disclosure Letter, as evidenced by executed releases in form and substance reasonably satisfactory

to Seller (in case of amounts owed by the Seller or Seller's affiliates to the Company), and in form and substance reasonably satisfactory to Buyer (in case of amounts owed by the Company to Seller or Seller's affiliates).

Section 5.03.  *Conduct of the Company.* Except as contemplated by this Agreement or as required by Applicable Law (including the Bankruptcy Code, the rules thereunder, the operation and information requirements of the Office of United States Trustee (the "**OIRR**"), or any orders entered by the Bankruptcy Court in the Bankruptcy Cases), during the period from the date of this Agreement through the Closing, Seller shall cause the Company to: (i) conduct its business in the ordinary course consistent with past practice and in compliance in all material respects with all Applicable Laws; (ii) use its reasonable best efforts to preserve and protect the Company's assets; (iii) pay all Taxes as they become due, (iv) maintain insurance on the Company's assets in amounts and types in the ordinary course of business; and (v) use reasonable best efforts to preserve its relationships with employees and customers.   Without limiting the generality of the foregoing, from the date hereof until the Closing, except as set forth in the Disclosure Letter, as expressly permitted or required by this Agreement or as required by the Bankruptcy Code, the Bankruptcy Rules, the OIRR or any orders entered by the Bankruptcy Court in the Bankruptcy Cases, without the prior written consent of Buyer, which consent shall not be unreasonably withheld, conditioned or delayed, Seller will not permit the Company to:

(a)  adopt or propose any change in its Articles of Association, Certificate of Approval or the Company's current business license;

(b)  merge or consolidate with any other Person, make any investment in any other Person, extend any loan to any other Person (other than trade receivables extended to the Company's clients or customers in the ordinary course of business) or acquire a material amount of assets from any other Person;

(c)  sell, lease, license or otherwise dispose of any material assets except (i) pursuant to existing contracts or commitments, (ii) consistent with the terms and conditions of the Cross-License Agreement as if the Cross-License Agreement were in effect as of the date of this Agreement, or (iii) otherwise in the ordinary course consistent with past practice;

(d)  assume (i) any financial debt (other than trade payables to the Company's vendors or suppliers in the ordinary course of business) or (ii) any other material liability (including by way of a guaranty of third party debt) outside of the ordinary course of business;

(e)  settle or agree to settle any material Tax or material commercial claim or potential claim, in any case in an amount in excess of US$25,000 or the

equivalent amount in another currency individually, or US$100,000 or equivalent amount in another currency in aggregate;

(f)     make any capital expenditure in excess of US$25,000 or equivalent amount in another currency individually, or US$100,000 or equivalent amount in another currency in aggregate;

(g)     enter into any customer agreement with unlimited liability or non-compete terms or restrictions on its ability to conduct business in any location or industry sector;

(h)     transfer cash or other assets from the Company to Seller or any Affiliate of Seller, or declare, set aside, make or pay any dividend or distribution (whether in cash, stock or property);

(i)     enter into any retention or other bonus agreements, or increase employee salaries, other than in the ordinary course of the Company's Business as previously conducted without consideration to any bankruptcy proceedings;

(j)     materially alter its billing, collections, disbursement or reimbursement practices;

(k)     (i) amend or modify any material Customer Contract or any other material contract, in each case in a manner that is adverse to the Company, or (ii) terminate (except as required by Section 5.01 or Section 5.02) or waive any rights under, any material Customer Contract or any other material contract;

(l)     save in respect of the waiver of Intercompany Loans, Intercompany Receivables and Intercompany Payables contemplated in this Agreement, pay any loans owed to, or forgive any loans owed by, any Affiliate of any Seller or to any employee, officer or director of the Company or any Affiliate of any Seller;

(m)     enter into new performance bonus, retention bonus or other incentive scheme in relation to any of the Managing Directors of the Company during the timeframe of August 19, 2009 through to the Closing Date; or

(n)     agree or commit, in writing or otherwise, to do any of the foregoing.

Section 5.04.     *Access to Information*.

(a)     From the date hereof until the Closing Date, Seller will (a) give, and will cause the Company to give, Buyer, its counsel, financial advisors, auditors and other authorized representatives reasonable access to the offices, properties, books and records of the Company and to the books and records of

Seller relating to the Company, (b) furnish, and will cause the Company to furnish, to Buyer, its counsel, financial advisors, auditors and other authorized representatives such financial and operating data and other information relating to the Company as such Persons may reasonably request and (c) instruct the employees, counsel and financial advisors of Seller or the Company to cooperate with Buyer in its investigation of the Company.   Any investigation pursuant to this Section shall be conducted in such manner as not to interfere unreasonably with the conduct of the business of Seller or the Company.   Notwithstanding the foregoing, Buyer shall not have access to personnel records of the Company relating to individual performance or evaluation records, medical histories or other information which in Seller's good faith opinion is sensitive or the disclosure of which could subject the Company to risk of liability.

(b)     On and after the Closing Date and for a period of not more than seven (7) years thereafter, Seller will afford promptly to Buyer and its agents reasonable access to their books of account, financial and other records (including accountant's work papers), information, employees and auditors to the extent primarily related to the Company and necessary or useful for Buyer or, after the Closing Date, the Company in connection with any audit, investigation, dispute or litigation, in connection with Buyer's or, after the Closing Date, the Company's compliance with Applicable Law or any other reasonable business purpose relating to the Company; *provided*, that any such access by Buyer shall not unreasonably interfere with the conduct of the business of Seller.   Seller shall not destroy, or otherwise cease to retain any such books, records or accounts retained by it without first providing the Buyer with thirty (30) days prior written notice and the opportunity to obtain or copy such books, records or accounts during such thirty (30)-day period at the Buyer's expense.   Other than the costs of maintaining such information, Buyer shall bear all of the out-of-pocket costs and expenses (including attorneys' fees, but excluding reimbursement for general overhead, salaries and employee benefits) reasonably incurred in connection with its access to such information; provided, that such costs and expenses are communicated to Buyer in writing prior to their incurrence.

Section 5.05.   *Resignations.*   At or prior to the Closing Date, Seller will deliver to Buyer the resignations of all directors of the Company from their position as directors of the Company.

Section 5.06.   *Tax Covenant.*   All transfer, documentary, sales, use, stamp, registration and other such Taxes and fees (including any penalties and interest) incurred in connection with transactions contemplated by this Agreement (including any real property transfer Tax and any similar Tax) shall be borne and paid by Buyer, and Buyer will, at its own expense, file all necessary Tax returns and other documentation with respect to all such Taxes and fees, and, if required by Applicable Law, Seller will, and will cause its Affiliates to, join in the execution of any such Tax returns and other documentation; provided, however,

that the Seller shall be solely responsible for (i) income taxes imposed on Seller with respect to any gain realized upon the sale of the Equity Interests hereunder; (ii) any withholding or other Tax (other than income tax imposed on Company) imposed in connection with Intercompany Payables and Intercompany Receivables.

Section 5.07. *Confidentiality.* From and after the Closing, Seller shall not disclose or make use of (except to pursue its rights under this Agreement or any of the Transaction Agreements or as otherwise permitted hereunder or thereunder), and the Seller shall use its reasonable best efforts to cause all of its Affiliates and its and their respective officers, directors, managers, members, partners, employees, representatives and agents not to disclose or make use of, any Business Information (including any such information which constitutes financial information, technical information or data relating to products, services and customers), except to the extent that (i) such Business Information was public knowledge as of the date hereof or shall have become public knowledge other than through improper disclosure by Seller, any of its Affiliates or any of their respective officers, directors, managers, members, partners, employees, representatives or agents or (ii) such Person shall be compelled to disclose such Business Information by judicial or administrative process or by other requirements of Applicable Law (including the Bankruptcy Code, the Bankruptcy Rules, the OIRR or any orders entered by the Bankruptcy Court in the Bankruptcy Cases). For the avoidance of doubt, Seller's obligation in respect of an Affiliate and an Affiliate's officers, directors, managers, members, partners, employees, representatives and agents shall terminate once that Affiliate ceases to be an Affiliate of Seller.

Section 5.08. *Supplemental Disclosure.* During the period from the date hereof until Closing, Seller will promptly supplement or amend in writing the Disclosure Letter with respect to any matter of which Seller becomes aware that arises or is discovered after the date of this Agreement that, if existing or known at the date of this Agreement, would have been required to be set forth or listed in the Disclosure Letter, provided that no such supplemental or amended disclosure shall prejudice Buyer's right to terminate this Agreement pursuant to Section 11.02.

Section 5.09. *Fulfillment of Conditions by Seller.* Seller agrees not to take any action that would cause the conditions on the obligations of the parties to effect the transactions contemplated by this Agreement and the Transaction Agreements not to be fulfilled, including without limitation, by taking or causing to be taken any action that would cause the representations and warranties made by Seller in this Agreement not to be true and correct as of the Closing. Seller will take all reasonable steps within their power to cause to be fulfilled the conditions precedent to Buyer's obligations to consummate the transactions contemplated by this Agreement that are dependent on the actions of Seller.

Section 5.10. *Release by Seller*. In consideration of the Purchase Price, and other good and valuable consideration, effective upon the Closing, the Debtors, for themselves and their executors, administrators, successors and assigns, hereby fully, unconditionally and knowingly release and forever discharge the Company and any of its employees, officers, directors, successors and assigns from any and all claims, demands, losses, costs, expenses (including reasonable attorneys' fees and expenses), obligations, liabilities and/or damages of every kind and nature whatsoever, whether existing or known, arising out the operation or conduct of the Company's business or a transaction or circumstance occurring or existing or related to the period of time prior to the Closing, relating in any way, directly or indirectly, to the Company, this Agreement or the transactions contemplated hereby, that the Debtors may now have or may hereafter claim to have against the Company or any of such employees, officers, directors, successors or assigns, except (the "**Exception**") in relation to claim(s) raised by Buyer against Seller post-Closing in relation to any representation and warranty made by Seller to Buyer under this Agreement, where (a) an employee, officer or director of the Company who is included in the definition of Knowledge (as it relates to the Company) had, prior to the date of this Agreement, actual knowledge of the matter giving rise to the claim; (b) the employees, officers or directors of the Seller who are included in the definition of Knowledge (as it relates to the Seller) did not or could not reasonably have been expected to know about such matter; (c) the relevant person under (a) above acted in bad faith in not notifying Seller about such matter such that Seller could not disclose the matter, and (d) the non-disclosure of such matter prevented the Seller from disclosing such matter to Buyer in the Disclosure Letter, provided, however, that any claims of Seller against the Company in relation to the foregoing Exception shall only be to offset claims of Buyer against Seller in relation to the foregoing Exception and shall not be affirmative claims of Seller against the Company.

Section 5.11. *Co-existence Agreement*. Prior to Closing, Seller shall assign the Coexistence Agreement (the "**Coexistence Agreement**") between Seller and Blackboard Inc., and its rights and obligations thereunder, to Dallas Project Holdings Limited ("**DPHL**") and shall cause DPHL to assume the rights and obligations of Seller under the Coexistence Agreement, which assignment shall be in form and substance satisfactory to Buyer (the "**CA Assignment**"). Prior to Closing and if not prior to Closing as soon as possible thereafter, Seller shall use reasonable best efforts to procure Blackboard Inc.'s written acknowledgement to such assignment to and assumption by DPHL

Section 5.12. *Beijing Lease.* Seller will (i) use its reasonable best efforts to obtain by Closing the consent of the landlord under the tenancy agreement (including its supplementary agreement) with Beijing Jia Ao Real Estate Development Co., Ltd. in relation to the office premises of the Company's Beijing branch (the "**Beijing Lease**") to the transfer of the Equity Interest as contemplated by this Agreement; and (ii) ensure that the Company (a) cooperates

fully with, and fully involves, Buyer in negotiating the terms of an extension to the Beijing Lease, and (b) does not enter into any such extension or any new lease without the prior written consent of Buyer, such consent not to be unreasonably withheld or delayed.

ARTICLE 6
COVENANTS OF BUYER

Buyer agrees that:

Section 6.01. *Confidentiality.* The terms of the Confidentiality Agreement shall continue in full force and effect until the Closing, at which time Buyer's confidentiality obligations shall terminate only in respect of that portion of the Confidential Information (as defined therein) of the Company. Except as set forth in the foregoing sentence, all of the provisions of the Confidentiality Agreement shall continue in full force and effect after the Closing and will survive any termination of this Agreement.

Section 6.02. *Access; Seller's Confidentiality.* Buyer will cause the Company, on and after the Closing Date and for a period of not more than seven (7) years thereafter, to promptly afford to Seller and its agents reasonable access to its properties, books, records, employees and auditors to the extent necessary to permit Seller to determine any matter relating to its rights and obligations hereunder or to any period ending on or before the Closing Date; *provided*, that any such access by Seller shall not unreasonably interfere with the conduct of the business of Buyer. Buyer shall not destroy, permit the Company to destroy or otherwise cease to retain any such books, records or accounts retained by it without first providing Seller with thirty (30) days prior written notice and the opportunity to obtain or copy such books, records or accounts during such thirty (30)-day period at Seller's expense. Other than the costs of maintaining such information, Seller shall bear all of the out-of-pocket costs and expenses (including attorneys' fees, but excluding reimbursement for general overhead, salaries and employee benefits) reasonably incurred in connection with its access to such information; provided, that such costs and expenses are informed to Seller in writing prior to their incurrence.

Section 6.03. *Trademarks; Tradenames.* After the Closing, except as expressly permitted by the Trademark License Agreement, the Cross-License Agreement or the Transition Services Agreement, Buyer shall not permit the Company to use any trademarks or tradenames owned by Seller or any of its Affiliates.

Section 6.04. *Fulfillment of Conditions by Buyer.* Buyer agrees not to take any action that would cause the conditions on the obligations of the parties to effect the transactions contemplated by this Agreement not to be fulfilled,

including without limitation by taking or causing to be taken any action that would cause the representations and warranties made by Buyer in this Agreement not to be true and correct as of the Closing. Buyer will take all reasonable steps within its power to cause to be fulfilled the conditions precedent to the obligations of Seller to consummate the transactions contemplated by this Agreement that are dependent on the actions of Buyer.

Section 6.05. *Conduct of the Company.* Except as contemplated by this Agreement or as required by Applicable Law (including the Bankruptcy Code, the rules thereunder, the operation and information requirements of the OIRR, or any orders entered by the Bankruptcy Court in the Bankruptcy Cases), during the period from the Closing Date through to the satisfaction of the Condition Subsequent or the termination of this Agreement pursuant to Section 11.03, Buyer shall cause the Company to (i) conduct its business in compliance in all material respects with all Applicable Laws; (ii) use its reasonable best efforts to preserve and protect the Company's assets; (iii) pay all Taxes as they become due; (iv) maintain insurance on the Company's assets in amounts and types in the ordinary course of business; and (v) use reasonable best efforts to preserve its relationship with employees and customers. Without limiting the generality of the foregoing, from the Closing Date to the satisfaction of the Condition Subsequent or the termination of this Agreement pursuant to Section 11.03, except as expressly permitted or required by this Agreement or as required by the Bankruptcy Code, the Bankruptcy Rules, the OIRR or any orders entered by the Bankruptcy Court in the Bankruptcy Cases, without the prior written consent of Seller, which consent shall not be unreasonably withheld, conditioned or delayed, Buyer will not permit the Company to:

(a) merge or consolidate with any other Person, make any investment in any other Person, extend any loan to any other Person (other than trade receivables extended to the Company's clients or customers in the ordinary course of business) or acquire a material amount of assets from any other Person;

(b) sell, lease, license or otherwise dispose of any material assets except (i) pursuant to existing contracts or commitments, (ii) consistent with the terms and conditions of the Cross-License Agreement, or (iii) otherwise in the ordinary course consistent with past practice;

(c) assume (i) any financial debt (other than trade payables to the Company's vendors or suppliers in the ordinary course of business or debt owed to an Affiliate) or (ii) any other material liability (including by way of a guaranty of third party debt) outside of the ordinary course of business;

(d) settle or agree to settle any material Tax or material commercial claim or potential claim, in any case in an amount in excess of US$25,000 or the

equivalent amount in another currency individually, or US$100,000 or equivalent amount in another currency in aggregate;

    (e)    make any capital expenditure in excess of US$50,000 or equivalent amount in another currency individually, or US$200,000 or equivalent amount in another currency in aggregate;

    (f)    enter into any customer agreement with non-compete terms or restrictions on its ability to conduct business in any location or industry sector;

    (g)    transfer cash or other assets from the Company to Buyer or any Affiliate of Buyer (other than to repay debt owed to such Affiliate), or declare, set aside, make or pay any dividend or distribution (whether in cash, stock or property);

    (h)    enter into any retention or other bonus agreements, or increase employee salaries, other than in the ordinary course of the Company's Business as previously conducted without consideration to any bankruptcy proceedings;

    (i)    materially alter its billing, collections, disbursement or reimbursement practices in a manner that is adverse to the Company;

    (j)    (i) amend or modify any material Customer Contract or any other material contract, in each case in a manner that is adverse to the Company, or (ii) terminate or waive any rights under, any material Customer Contract or any other material contract; or

    (k)    agree or commit, in writing or otherwise, to do any of the foregoing.

    For the purposes of this Section 6.05 only, Buyer shall notify Seller in writing if it wants to seek Seller's consent to permit the Company to do any of the things set out in (a) to (k) above, and if Seller does not respond positively or negatively within two Business Days of the Buyer's notification, Seller shall be deemed to have given its written consent.

    Section 6.06. *Sign on Bonuses.*  To the extent Buyer or the Company pays Sign-on Bonuses to Ronald Machan, Kirk Williams and/or Chenghua Wang, and for any reason Buyer or the Company actually receives back from such individuals all or part of such Sign-on Bonuses, Buyer shall promptly pay to Seller all such amounts so received.

ARTICLE 7
COVENANTS OF BUYER AND SELLER

Buyer and Seller agree that:

Section 7.01.    *Reasonable Best Efforts; Further Assurances.*    Subject to the terms and conditions of this Agreement, Buyer and Seller will use their reasonable best efforts to take, or cause to be taken, all actions and to do, or cause to be done, all things necessary or desirable under Applicable Law to consummate the transactions contemplated by this Agreement.    Seller and Buyer agree, and Seller, prior to the Closing, and Buyer, after the Closing, agree to cause the Company, to execute and deliver such other documents, certificates, agreements and other writings and to take such other actions as may be necessary or desirable in order to consummate or implement expeditiously the transactions contemplated by this Agreement.

Section 7.02.    *Certain Filings.*    Seller and Buyer shall cooperate with one another (a) in determining whether any action by or in respect of, or filing with, any Governmental Authority is required, or any actions, consents, approvals or waivers are required to be obtained from parties to any material contracts, in connection with the consummation of the transactions contemplated by this Agreement and (b) in taking such actions or making any such filings, furnishing information required in connection therewith and seeking timely to obtain any such actions, consents, approvals or waivers.

Section 7.03.    *Publicity.*    Prior to the Closing, Buyer and Seller will maintain the confidentiality of the transactions contemplated by this Agreement and neither Buyer nor Seller will issue or make, or allow to have issued or made, any further press release or public announcement concerning the transactions contemplated by this Agreement, except as required by Applicable Law or stock market requirements.    Buyer and Seller will cooperate with each other in the development and distribution of all news releases and other public disclosures relating to the announcement promptly after the Closing of the transactions contemplated by this Agreement.    Neither Buyer nor Seller will issue or make, or allow to have issued or made, any press release or public announcement concerning the announcement of the transactions contemplated by this Agreement without giving the other party a reasonable opportunity to comment on such release or announcement in advance, and any such public announcement will be consistent with Applicable Law and stock market requirements.    The party issuing or making the press release or public announcement shall give reasonable consideration to all reasonable comments provided by the other party.

Section 7.04. *Application for China Approval and Business License*. Seller shall, or shall cause the Company to, submit this Agreement to the competent Government Authority for approval and use reasonable best efforts to

handle procedures in connection with the submission of applications for, and the granting of, any/all necessary approvals, certificates and licenses required in connection with this Agreement. Buyer shall use reasonable best efforts in rendering assistance in relation to such application for approval. After the Closing, Buyer shall, or shall cause the Company to, use reasonable best efforts to obtain the Business License as soon as practicable after the issuance of the China Approval. Seller shall use reasonable best efforts in rendering assistance in relation to obtaining the Business License.

Section 7.05. *Notification of Certain Matters*. Seller shall give prompt notice to Buyer of (a) the occurrence, or failure to occur, of any event that is reasonably likely to cause representations or warranties of the Seller or the Company contained in this Agreement to be untrue or inaccurate at any time during the period from the date hereof until Closing, and (b) any failure of Seller or the Company to comply with or satisfy any covenant, condition or agreement to be complied with or satisfied by it hereunder, and Buyer shall give prompt notice to Seller of (i) the occurrence, or failure to occur, of any event that is reasonably likely to cause representations or warranties of Buyer contained in this Agreement to be untrue or inaccurate at any time during the period from the date hereof until Closing, and (ii) any failure of Buyer to comply with or satisfy any covenant, condition or agreement to be complied with or satisfied by it hereunder.

ARTICLE 8
CONDITIONS TO CLOSING

Section 8.01. *Conditions to Obligations of Buyer and Seller*. The obligations of Buyer and Seller to consummate the Closing are subject to the satisfaction of the following conditions, any of which may be waived by Seller or Buyer in writing, in whole or in part:

(a) No provision of any Applicable Law shall prohibit the consummation of the Closing.

(b) The China Approval has been duly granted without substantially changing the terms of this Agreement and/or the Amended and Restated AOA, which are attached hereto as Exhibit D.

(c) The Bankruptcy Court shall have entered the Approval Order.

(d) The Escrow Agreement having been executed in a form satisfactory to Buyer and Seller (acting reasonably).

Section 8.02. *Conditions to Obligation of Buyer*. The obligation of Buyer to consummate the Closing is subject to the satisfaction of the following

further conditions, any of which may be waived by Buyer in writing, in whole or in part:

(a)     (i) Seller shall have performed in all material respects all of its obligations hereunder required to be performed by it on or prior to the Closing Date, (ii) the representations and warranties of Seller contained in Section 3.02, 3.03 and 3.04 shall be true and correct in all respects as of the Closing as though made at the Closing, (iii) all other representations and warranties of Seller set forth in this Agreement and in any certificate or other writing delivered by Seller pursuant hereto (disregarding all materiality qualifications contained therein) shall be true and correct   as of the Closing as though made at the Closing, except to the extent such representations and warranties are specifically made as of a particular date (in which case such representations and warranties shall be true and correct as of such date), save where the breach of a representation or warranty has not had and would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, and (iv) Buyer shall have received a certificate signed by the chief legal officer of Seller to the foregoing effect.   For the purposes of this Section 8.02(a) only, the Knowledge qualifications set out in Section 3.06(a), the second sentence in Section 3.08(c),   Section 3.08(e), the first sentence in Section 3.10, Section 3.10(d), the first paragraph of Section 3.12 and the first and second sentences of Section 3.13(b) shall be disregarded for the purposes of determining whether such representations and warranties of Seller are true and correct.

(b)     Notwithstanding anything in this Agreement to the contrary, and except for the Bankruptcy cases and the affect thereof on the Company's Business, since the date of this Agreement no Material Adverse Effect, or event or circumstance that would be reasonably expected to result in a Material Adverse Effect, shall have occurred and be continuing and Buyer shall have received a certificate signed by the chief legal officer of Seller to the foregoing effect.

(c)     No voluntary or involuntary termination of employment of Ronald Machan and Kirk Williams with the Company shall have occurred, and no notice of termination of employment in respect of either such individual shall have been given.

(d)     All Intercompany Loans, Intercompany Payables, and Intercompany Receivables have been fully waived and/or otherwise settled pursuant to Section 5.01, and the Shareholder Loans granted by Seller to the Company of the amounts USD1,800,000 pursuant to a Loan Agreement dated October 3, 2003, USD10,000,000 pursuant to a Loan Agreement dated July 15, 2004, and USD5,000,000 pursuant to a Loan Agreement dated March 15, 2005 have been duly de-registered with Shanghai Administration of Foreign Exchange.

(e)     Seller having complied with its obligations under Section 5.12.

(f)     Seller having complied with its obligations under Section 5.11.

(g)     Seller shall have delivered to Buyer a waiver in the agreed form duly signed by Ronald Machan, Kirk Williams and Chenghua Wang, which shall explicitly confirm that such managing directors understand and acknowledge that the Performance Cash Awards are not available to them as a result of the Performance Cash Awards being rejected by the Bankruptcy Court on April 24, 2009, and that they thereby release the Company from any and all liabilities in relation to such Performance Cash Awards.

Section 8.03.    *Conditions to Obligation of Seller.*    The obligation of Seller to consummate the Closing is subject to the satisfaction of the following further condition, which may be waived by Seller in writing, in whole or in part:

(a)     (i) Buyer shall have performed in all material respects all of its obligations hereunder required to be performed by it at or prior to the Closing Date, (ii) the representations and warranties of Buyer contained in this Agreement and in any certificate or other writing delivered by Buyer pursuant hereto shall be true and correct in all material respects as of the Closing, as though made at the Closing and (iii) Seller shall have received a certificate signed by the Company Secretary of Buyer to the foregoing effect.

Section 8.04.    *Condition Subsequent to the Closing*.    The condition subsequent to the Closing ("**Condition Subsequent**") refers to the issuance of the Business License by Shanghai Municipal Administration for Industry and Commerce to the Company. For the avoidance of doubt, the Condition Subsequent will be deemed to be satisfied on the date when the Business License is duly issued by Shanghai Municipal Administration for Industry and Commerce to the Company.

ARTICLE 9
BANKRUPTCY COVENANTS
Section 9.01.    *Submission for Bankruptcy Court Approval*.

(a)     This Agreement, and the sale of the Equity Interest to Buyer pursuant to this Agreement and the other transactions contemplated by this Agreement require the approval of the Bankruptcy Court, pursuant to Sections 105, 363 and 365 of the Bankruptcy Code.   Buyer and Seller agree to use reasonable best efforts to cause the Bankruptcy Court to enter an order approving this Agreement and the sale of the Equity Interest to Buyer, which order shall be in form and substance satisfactory to Seller and Buyer (the "**Approval Order**").

(b)     The Approval Order shall contain, but is not limited to containing provisions for the following:

(i)     payment of the Expense Reimbursement set forth in this Agreement;

(ii)     a finding of good faith in the negotiations and execution of this Agreement;

(iii)     a release of (i) all claims of the Debtors, Affiliates of the Debtors and Lenders against Buyer, the Company and the Equity Interest and (ii) a release and disavowal of all interests in the assets described as being transferred to Buyer including, but not limited to, those included Section 3.07 of this Agreement;

(iv)     the sale of the Equity Interest free and clear of all claims against the Equity interest;

(v)     the assumption by the Debtors of primary liability for any joint liabilities of the Debtors and the Company; and

(vi)     the CA Assignment and the assignment to DPHL and assumption by DPHL of the Coexistence Agreement.

(c)     As promptly as practicable, but in no event later than two (2) Business Days after the date hereof, Seller shall file with the Bankruptcy Court, and seek a hearing on, a motion seeking entry of the Approval Order, which order shall be in form and substance satisfactory to Seller and Buyer.   Seller agrees to provide to Buyer a draft of the Approval Order, and Buyer agrees to promptly advise Seller in writing of any changes that it requires for such draft Approval Order to be in form and substance satisfactory to Buyer.   Seller and Buyer shall thereafter cooperate to reach agreement on a form of Approval Order that is satisfactory to each party (and any other parties in interest) and such agreed form of Approval Order shall be submitted to the Bankruptcy Court for its approval.

(d)     If prior to, during or after the hearing on the motion seeking approval of such form of Approval Order, the Bankruptcy Court makes any such changes or any other modifications to such form of Approval Order, Seller and Buyer shall be required to raise any objections thereto in writing prior to entry of the Approval Order, so long as they are provided an adequate opportunity to do so. Unless Seller or Buyer raise any such objections in writing prior to entry of the Approval Order (provided that Seller and Buyer are provided with an adequate opportunity to do so), such Approval Order shall be deemed to be in form and substance satisfactory to each party for all purposes.

(e)     If the Approval Order or any other orders of the Bankruptcy Court relating to this Agreement shall be appealed by any Person (as defined in Section 101(41) of the Bankruptcy Code) or petition for certiorari or motion for rehearing or re-argument shall be filed with respect thereto, Seller agrees to take all action

as may be reasonable and appropriate to defend against such appeal, petition or motion and Buyer agrees to cooperate in such efforts and each party hereto agrees to use its reasonable efforts to obtain an expedited resolution of such appeal; provided that nothing herein shall preclude the parties hereto from consummating the transactions contemplated herein if the Approval Order shall have been entered and has not been stayed and Buyer, in its sole discretion, waives in writing the condition that the Approval Order be a Final Order.

(f)     Seller covenants and agrees that if the Approval Order is entered, the terms of any plan submitted by Seller to the Bankruptcy Court for confirmation shall not conflict with, supercede, abrogate, nullify, modify or restrict the terms of this Agreement and the rights of Buyer hereunder, or in any way prevent or interfere with the consummation or performance of the transactions contemplated by this Agreement including any transaction that is contemplated by or approved pursuant to the Approval Order.

Section 9.02.   *Noncontravention*.   The Seller covenants and agrees that the terms of any plan of reorganization or liquidation or proposed order of the Bankruptcy Court that may be filed, proposed or submitted or supported by the Seller after entry of the Approval Order or consummation of the transactions contemplated hereby shall not conflict with, supersede, abrogate, nullify, modify or restrict the terms of this Agreement, the Procedures Order or the Approval Order or the rights of Buyer hereunder or thereunder.

ARTICLE 10
EXCLUSIVITY

Section 10.01.   *Exclusivity*

(a)     From the date hereof until termination of this Agreement, Seller shall not, and shall cause Seller's Affiliates, and Seller's and Seller's Affiliates' respective officers, directors, managers, members, partners, employees, representatives and agents not to, directly or indirectly, (i) initiate, solicit, encourage or otherwise facilitate any inquiry, proposal, offer or discussion with, engage in negotiations or discussions with, or enter into any agreement or understanding with, any Person (other than Buyer) concerning any sale or other disposition of any of the Company's Equity Interest or any Company asset (an "**Alternative Proposal**") or (ii) furnish any non-public information concerning the Company, its Equity Interest or any of its assets (other than to Buyer or as required in by the Bankruptcy Court in connection with the approval of this Agreement).

(b)     Seller shall promptly notify any Person (other than Buyer) with which discussions or negotiations of the nature described in paragraph (a) above are pending on the date hereof that Seller is terminating such discussions or

negotiations. If, after the date hereof, Seller receives any inquiry, proposal or offer of the nature described in paragraph (a) above, Seller shall communicate to Buyer the material terms of any such inquiry, proposal or offer but not the identity of the party making such inquiry, proposal or offer.

<div align="center">

ARTICLE 11

EFFECTIVENESS AND TERMINATION

</div>

Section 11.01. *Contract Formation and Effectiveness.* This Agreement shall be formed when the Parties sign this Agreement.

This Agreement shall take effect as of the date of the later of the following two dates: (a) the date on which the China Approval is duly granted by Shanghai Municipal Commission of Commerce, and (b) the date on which the Closing occurs.

Section 11.02. *Grounds for Termination Prior to the Closing.* This Agreement may be terminated at any time prior to the Closing:

(a) by mutual written agreement of Seller and Buyer;

(b) by Buyer in the case of a breach by Seller of any representation, warranty or covenant contained in this Agreement that would cause any condition set forth in Section 8.01 or Section 8.02 not to be satisfied; provided, that in the case of any such breach of a representation, warranty or covenant that is capable of being cured before November 30, 2009, Seller shall have ten (10) Business Days after receipt of notice from Buyer of such breach (or until November 30, 2009 if such date is prior to the date that is ten Business Days after such notice) during which to cure such breach;

(c) by Buyer if the Approval Order is not entered by November 30, 2009 or if a Final Order is not obtained by November 30, 2009;

(d) by Seller in the case of a breach by the Buyer of any representation, warranty or covenant contained in this Agreement that would cause any condition set forth in Section 8.01 or Section 8.03 not to be satisfied; *provided*, that in the case of any such breach of a representation, warranty or covenant that is capable of being cured before November 30, 2009, Buyer shall have ten (10) Business Days after receipt of notice from Seller of such breach (or until November 30, 2009, if such date is prior to the date that is ten Business Days after such notice) during which to cure such breach;

(e) by Buyer, upon (i) conversion of any Bankruptcy Case to a case under Chapter 7 of the Bankruptcy Code; (ii) the filing of a plan under Chapter 11 of the Bankruptcy Code by Seller that does not provide for the sale of the Equity

Interest to the Buyer pursuant to this Agreement; or (iii) the appointment of a trustee under Chapter 11 of the Bankruptcy Code in any Bankruptcy Case;

(f)      by either Seller or Buyer if the Closing shall not have been consummated on or before November 30, 2009, or such other date as Buyer and Seller may mutually agree in writing; or

(g)      by either Seller or Buyer if consummation of the transactions contemplated hereby would violate any nonappealable final order, decree or judgment of any Governmental Authority having competent jurisdiction.

The party desiring to terminate this Agreement pursuant to Section 11.02 (b) through (g) shall give notice of such termination to the other party.

Section 11.03.    *Grounds for Termination After the Closing.* After the Closing this Agreement may be terminated by either Seller or Buyer if the Condition Subsequent shall not have been satisfied on or before 30 November 2009, or such later date as Buyer and Seller may mutually agree in writing save that if on 30 November 2009, the Condition Subsequent has not been satisfied but the Shanghai Municipal Administration for Industry and Commerce has not indicated in writing to Buyer and/or Seller that it is unwilling to issue the Business License, Buyer and Seller shall extend the date of 30 November 2009 to 31 December 2009, or such other date as Buyer and Seller may mutually agree in writing.

Section 11.04 *Effect of Termination.*    If this Agreement is terminated as permitted by Section 11.02 or Section 11.03, such termination shall be without liability of any party (or any stockholder, director, officer, employee, agent, consultant or representative of such party) to any other party to this Agreement; *provided* that if such termination shall result from the willful (a) failure by any party hereto to perform a covenant of this Agreement or (b) breach by any party hereto of any representation, warranty or agreement contained herein, such party shall be fully liable for any and all Damages incurred or suffered by the other party as a result of such failure or breach. Notwithstanding any other provision in this Agreement, the maximum liability of the Buyer and the Seller under this Agreement shall be limited to US$750,000 except where Buyer fails to pay the Purchase Price upon Closing in accordance with the terms of this Agreement, in which case the maximum liability of Buyer shall be limited to the Purchase Price. The provisions set out in Section 2.04, Sections 6.01, 7.03, this Section 11.04 and Article 12 shall survive any termination hereof pursuant to Section 11.02 or Section 11.03.    In the event that at the time of termination of this Agreement, the China Approval has been duly granted, Buyer shall return all of the Equity Interest to Seller, and Buyer and Seller shall take every action as required by Applicable Law and use their best efforts to effectuate such return**.**

Section 11.05. *Expense Reimbursement*. Notwithstanding the foregoing:

(a)     In the event this Agreement is terminated by virtue of the failure of the conditions set forth in Section 8.02(a), 8.02(b), 8.02(d), 11.02(b), 11.02(c) or 11.02(e), the Expense Reimbursement shall be paid by Seller to Buyer.

(b)     To the extent payable pursuant to this Section, the Expense Reimbursement shall by paid by Seller to Buyer by wire transfer of immediately available funds promptly upon termination of this Agreement. Seller's obligation to pay the Expense Reimbursement, pursuant to this Section, shall survive termination of this Agreement, dismissal or conversion of Seller's Bankruptcy Case or confirmation of any plan of reorganization or liquidation, and shall constitute administrative expenses of Seller under Section 364(c)(1) of the Bankruptcy Code with priority over any and all administrative expenses of the kind specified in Sections 503(b) or 507(b) of the Bankruptcy Code.

ARTICLE 12
MISCELLANEOUS

Section 12.01.     *Notices*.     All notices, requests and other communications to any party hereunder shall be in writing (including facsimile transmission and electronic mail ("**e-mail**") transmission, so long as a receipt of such e-mail is requested and received) and shall be given,

if to Buyer, to:

> Perot Systems Corporation
> 2300 W. Plano Parkway
> P O Box 269005
> Plano, TX 75075-8427
> USA
> Attention: President – Commercial Solutions
> E-mail: steve.curts@ps.net

With a copy to:

> Perot Systems Corporation
> 2300 W. Plano Parkway
> P O Box 269005
> Plano, TX 75075-8427
> USA
> Attention: General Counsel
> Fax: +1 (972) 577 6085
> E-mail: del.williams@ps.net

if to Seller, to:

>BearingPoint, Inc.
>100 Crescent Court
>Suite 700
>Dallas, TX   75201
>Attention:   President and Chief Legal Officer
>Facsimile No.: +1 (214) 292-8844
>E-mail:   john.degroote@bearingpoint.com

with a copy to:

>Allen & Overy, Shanghai office
>18th floor, Bank of Shanghai Tower,
>168 Yin Cheng Middle Road,
>Shanghai 200120, China
>
>Attention:   Richard Kim
>Facsimile No.:   (8621) 3896 5050
>E-mail:   Richard.Kim@allenovery.com

or such other address or facsimile number as such party may hereafter specify for the purpose by notice to the other parties hereto.   All such notices, requests and other communications shall be deemed received on the date of receipt by the recipient thereof if received prior to 5 p.m. in the place of receipt and such day is a Business Day in the place of receipt.   Otherwise, any such notice, request or communication shall be deemed not to have been received until the next succeeding Business Day in the place of receipt.

Section 12.02.   *Amendments and Waivers*.   (a) Any provision of this Agreement may be amended or waived if, but only if, such amendment or waiver is in writing and is signed, in the case of an amendment, by each party to this Agreement, or in the case of a waiver, by the party against whom the waiver is to be effective.

(b)       No failure or delay by any party in exercising any right, power or privilege hereunder shall operate as a waiver thereof nor shall any single or partial exercise thereof preclude any other or further exercise thereof or the exercise of any other right, power or privilege. The rights and remedies herein provided shall be cumulative and not exclusive of any rights or remedies provided by law.

Section 12.03.   *Expenses*.   Except as otherwise provided herein, all costs and expenses incurred in connection with this Agreement shall be paid by the party incurring such cost or expense.

Section 12.04. *Successors and Assigns*. The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns; *provided* that no party may assign, delegate or otherwise transfer any of its rights or obligations under this Agreement without the consent of each other party hereto.

Section 12.05. *Governing Law*. This Agreement shall be governed by and construed in accordance with the law of the PRC.

Section 12.06. *Disputes*. Disputes shall be resolved in accordance with the following:

(a)    <u>Arbitration</u>. The parties hereto agree, upon demand by any party, to submit to binding arbitration all claims, disputes and controversies between or among them (and their respective employees, officers, directors, attorneys, and other agents), whether in tort, contract or otherwise in any way arising out of or relating to this Agreement or the Transaction Agreements.

(b)    <u>Governing Rules</u>. Any arbitration proceeding will (i) proceed in a location in New York, New York selected by the American Arbitration Association *("**AAA**")*; (ii) be governed by the Federal Arbitration Act (Title 9 of the United States Code), notwithstanding any conflicting choice of law provision in any of the documents between the parties; and (iii) be conducted by the AAA, or such other administrator as the parties shall mutually agree upon, in accordance with the AAA's commercial dispute resolution procedures, unless the claim or counterclaim is at least $1,000,000.00 exclusive of claimed interest, arbitration fees and costs in which case the arbitration shall be conducted in accordance with the AAA's optional procedures for large, complex commercial disputes (the commercial dispute resolution procedures or the optional procedures for large, complex commercial disputes to be referred to herein, as applicable, as the "**Rules**"*)*. If there is any inconsistency between the terms hereof and the Rules, the terms and procedures set forth herein shall control. Any party who fails or refuses to submit to arbitration following a demand by any other party shall bear all costs and expenses incurred by such other party in compelling arbitration of any dispute. Nothing contained herein shall be deemed to be a waiver by any party that is a bank of the protections afforded to it under 12 U.S.C. § 91 or any similar applicable state law.

(c)    <u>No Waiver of Provisional Remedies</u>. The arbitration requirement does not limit the right of any party to obtain provisional or ancillary remedies, such as injunctive relief, before during or after the pendency of any arbitration proceeding. This exclusion does not constitute a waiver of the right or obligation of any party to submit any dispute to arbitration or reference hereunder.

(d)     <u>Arbitrator Qualifications and Powers</u>.   Any arbitration proceeding in which the amount in controversy is US$10,000,000.00 or less will be decided by a single arbitrator selected according to the Rules, and who shall not render an award of greater than US$10,000,000.00. Any dispute in which the amount in controversy exceeds US$10,000,000.00 shall be decided by majority vote of a panel of three arbitrators; <u>provided</u>, <u>however</u>, that all three arbitrators must actively participate in all hearings and deliberations.   The arbitrator will be a neutral attorney licensed in the State of New York with a minimum of ten years experience in the substantive law applicable to the subject matter of the dispute to be arbitrated.   The arbitrator will determine whether or not an issue is arbitratable and will give effect to the statutes of limitation in determining any claim.   In any arbitration proceeding the arbitrator will decide (by documents only or with a hearing at the arbitrator's discretion) any pre-hearing motions which are similar to motions to dismiss for failure to state a claim or motions for summary adjudication.   The arbitrator shall resolve all disputes in accordance with the substantive law governing this Agreement, and may grant any remedy or relief that a court of China or the State of New York could order or grant within the scope hereof and such ancillary relief as is necessary to make effective any award.   The arbitrator shall also have the power to award recovery of all costs and fees, to impose sanctions and to take such other action as the arbitrator deems necessary to the same extent a judge could pursuant to the Federal Rules of Civil Procedure, the New York Civil Practice Law and Rules or other applicable law. Judgment upon the award rendered by the arbitrator may be entered in any court having jurisdiction.   The institution and maintenance of an action for judicial relief or pursuit of a provisional or ancillary remedy shall not constitute a waiver of the right of any party, including the plaintiff, to submit the controversy or claim to arbitration if any other party contests such action for judicial relief.

(e)     <u>Discovery</u>.   In any arbitration proceeding, discovery will be permitted in accordance with the Rules.   All discovery shall be expressly limited to matters directly relevant to the dispute being arbitrated and must be completed no later than 20 days before the hearing date.   Any requests for an extension of the discovery periods, or any discovery disputes, will be subject to final determination by the arbitrator upon a showing that the request for discovery is essential for the party's presentation and that no alternative means for obtaining information is available.

(f)     <u>Class Proceedings and Consolidations</u>.   No party hereto shall be entitled to join or consolidate disputes by or against others in any arbitration, except parties who have executed the Transaction Agreements or any documents related thereto, or to include in any arbitration any dispute as a representative or member of a class, or to act in any arbitration in the interest of the general public or in a private attorney general capacity.

(g)  Payment Of Arbitration Costs And Fees.  The arbitrator shall award all costs and expenses of the arbitration proceeding being the costs of the tribunal and the arbitrator's fees, at his discretion. The costs and expenses of the arbitration proceeding referred to in the preceding sentence shall not include each party's own costs (including legal fees) and expenses in connection with the arbitration which shall be borne by each respective party.

(h)  Miscellaneous.  To the maximum extent practicable, the AAA, the arbitrators and the parties shall take all action required to conclude any arbitration proceeding within 180 days of the filing of the dispute with the AAA. No arbitrator or other party to an arbitration proceeding may disclose the existence, content or results thereof, except for disclosures of information by a party required in the ordinary course of its business or by applicable law or regulation.   If more than one agreement for arbitration by or between the parties potentially applies to a dispute, the arbitration provision most directly related to the Transaction Agreements or the subject matter of the dispute shall control. This arbitration provision shall survive termination, amendment or expiration of this Agreement or any of the Transaction Agreements or any relationship between the parties.

Section 12.07. *Counterparts.*  This Agreement may be signed in one or more counterparts, each of which will be deemed to be an original copy of this Agreement and all of which, when taken together, will be deemed to constitute one and the same agreement.   If signed in counterparts, until and unless each party has received a counterpart hereof signed by the other party hereto, this Agreement shall not be formed and no party shall have any right or obligation hereunder (whether by virtue of any other oral or written agreement or other communication).

Section 12.08. *Third Party Beneficiaries*.   No provision of this Agreement is intended to confer any rights, benefits, remedies, obligations, or liabilities hereunder upon any Person other than the parties hereto and their respective successors and assigns.

Section 12.09.   *Entire Agreement*.   The Transaction Agreements constitute the entire agreement between the parties with respect to the subject matter of this Agreement and supersedes all prior agreements and understandings, both oral and written, between the parties with respect to the subject matter of this Agreement.

Section 12.10.   *Severability*.   If any term, provision, covenant or restriction of this Agreement is held by a court of competent jurisdiction or other Governmental Authority to be invalid, void or unenforceable, the remainder of the terms, provisions, covenants and restrictions of this Agreement shall remain in full force and effect and shall in no way be affected, impaired or invalidated so

long as the economic or legal substance of the transactions contemplated hereby is not affected in any manner materially adverse to any party. Upon such a determination, the parties shall negotiate in good faith to modify this Agreement so as to effect the original intent of the parties as closely as possible in an acceptable manner in order that the transactions contemplated hereby be consummated as originally contemplated to the fullest extent possible.

Section 12.11. *Specific Performance*. The parties hereto agree that irreparable damage would occur if any provision of this Agreement were not performed in accordance with the terms hereof and that the parties shall be entitled to an injunction or injunctions to prevent breaches of this Agreement or to enforce specifically the performance of the terms and provisions hereof in the United States District Court for the Southern District of New York or any New York State court sitting in New York City, in addition to any other remedy to which they are entitled at law or in equity.

Section 12.12. *Survival of Provisions*. The representations, warranties, covenants and agreements contained in this Agreement and in any certificate or other writing delivered pursuant hereto shall not survive the Closing, except for covenants, terms or provisions of this Agreement that provide for continuing obligations after the expiration or termination of this Agreement will survive any expiration or termination of this Agreement, including Sections 2.04, 2.05, 2.06, 5.04(b), 5.06, Section 5.07, Section 5.08, 6.01, 6.02, 6.03, 7.01, 7.03, 7.04, 11.03, 11.04, and Article 12.

Section 12.13. *Languages*. This Agreement shall be written in both Chinese and English in six (6) original copies of each language version. Both language versions shall be equally authentic and are consistent in all substantial respects.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed by their respective authorized officers as of the day and year first above written.

Perot Systems TSI (Mauritius) Pvt. Ltd

By: _____
        Name:
        Title:

BearingPoint, Inc.

By: _____
        Name:
        Title:

**Exhibit A**
**Closing Date Pro Forma Balance Sheet**

**Exhibit B**
**Information of Seller's Bank Account**

| | |
|---|---|
| Bank Name: | Deutsche Bank |
| Name of the Account: | BearingPoint, Inc. |
| Address: | 60 Wall Street, 25th Floor, New York, NY, 10005-2858 |
| Account Number: | 00464470 |
| Routing Number: | 021001033 |
| SWIFT: | BKTRUS33 |

**Exhibit C**
**Information of Buyer's Bank Account**

| | |
|---|---|
| Bank Name: | HSBC |
| Name of the Account: | Perot Systems TSI (Mauritius) Pvt. Ltd. |
| Account Number: | 080-023427-020 |
| IBAN: | MU34 HSBC 0780 0800 2342 7020 000USD |
| BIC/SWIFT CODE: | HSBCMUMUOBU |
| Bank Address: | 6th Floor HSBC Centre |
| | 18 Cybercity, Ebene |
| | Mauritius |

**Exhibit D**
**Amended and Restated Articles of Association of the Company**

## **Exhibit B-1**

## **Private Sale Orders**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------------------x
                                            :

In re                                     :        **Chapter 11 Case No.**
                                              :

**LEHMAN BROTHERS HOLDINGS INC.**, *et al.*,   :        **08-13555 (JMP)**
                                              :

               **Debtors.**        :        **(Jointly Administered)**
                                              :
                                              :
---------------------------------------------------------------------x

### ORDER APPROVING MOTION OF BNC MORTGAGE LLC, PURSUANT TO SECTIONS 363(b), 365(a), and 554(a) OF THE BANKRUPTCY CODE AND RULES 6004, 6006, AND 9014 OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE, AUTHORIZING (I) THE REJECTION OF CERTAIN LEASES AND SUBLEASES OF NONRESIDENTIAL REAL PROPERTY AND (II) THE SALE OR ABANDONMENT OF *DE MINIMIS* ASSETS

Upon the motion, dated February 4, 2009 (the "Motion"), of BNC Mortgage LLC ("BNC"), as debtor and debtor-in-possession, pursuant to sections 363(b), 365(a), 554(a) of title 11 of the United States Code (the "Bankruptcy Code") and Rules 6004, 6006, and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") for authorization to (i) reject the leases set forth on Exhibit A annexed hereto (the "Leases " or "Leased Properties") and the subleases set forth on Exhibit B annexed hereto (the "Subleases" or "Subleased Properties") and (ii) sell or abandon certain miscellaneous assets, including fixtures, furniture, and other office equipment ("FF&E") without further authorization of the Court, all as more fully described in the Motion; and the Court having jurisdiction to consider the Motion and the relief requested therein in accordance with 28 U.S.C. §§ 157 and 1334 and the Standing Order M-61 Referring to Bankruptcy Judges for the Southern District of New York Any and All Proceedings Under Title 11, dated July 10, 1984 (Ward, Acting C.J.); and consideration of the Motion and the relief requested therein being a core proceeding pursuant to 28 U.S.C. § 157(b); and due and proper notice of the Motion having been provided in accordance with the procedures set forth in the

order entered September 22, 2008 governing case management and administrative procedures [Docket No. 285] and in the amended order entered February 13, 2009 governing case management and administrative procedures [Docket No. 2837] to (i) the United States Trustee for the Southern District of New York; (ii) the attorneys for the Official Committee of Unsecured Creditors; (iii) the Securities and Exchange Commission; (iv) the Internal Revenue Service; (v) the United States Attorney for the Southern District of New York; (vi) the landlords ands sublessees set forth in <u>Exhibit A</u> and <u>Exhibit B</u> to the Motion; and (vii) all parties who have requested notice in these chapter 11 cases, and it appearing that no other or further notice need be provided; and the debtors having filed a certificate of no objection; and the Court having found and determined that the relief sought in the Motion is in the best interests of BNC, its estates and creditors, and all parties in interest and that the legal and factual bases set forth in the Motion establish just cause for the relief granted herein; and after due deliberation and sufficient cause appearing therefor, it is

ORDERED that the Motion is hereby granted; and it is further

ORDERED that pursuant to section 365(a) of the Bankruptcy Code and Bankruptcy Rules 6006 and 9014, the rejection of the Leases, is hereby approved effective as the earlier of (i) the date BNC relinquishes possession of the Leased Properties or (ii) the date of this Order; and it is further

ORDERED that pursuant to section 365(a) of the Bankruptcy Code and Bankruptcy Rules 6006 and 9014, the rejection of the Subleases is hereby approved effective as the date of this Order; and it is further

ORDERED that all time periods set forth in this Order shall be calculated in accordance with Bankruptcy Rule 9006(a); and it is further

ORDERED that any rejection damage claim asserted by the counterparties to the Leases and Subleases shall be filed (subject to all of the BNC's rights, claims and defenses, including rights of setoff with respect to any such claims) on or before the final date for filing proofs of claim in BNC's chapter 11 case to be established by order of this Court, which proofs of claim shall be filed in accordance with the procedures set forth in such order; and it is further

ORDERED that the Debtors are authorized to sell the FF&E owned by BNC located at the Leased Properties and Subleased Properties without further authorization of the Court; and it is further

ORDERED that, pursuant to section 363(f) of the Bankruptcy Code, the sale of the FF&E shall be free and clear of all liens, claims and encumbrances, and any liens, claims and encumbrances thereon shall attach to the net proceeds of the sale of such FF&E with the same force and effect and asserted priority as such liens, claims and encumbrances had against the FF&E, subject to the rights, claims, defenses and objections, if any, of the BNC and all interested parties with respect thereto; and it is further

ORDERED that purchasers of the FF&E sold by BNC pursuant to this Order shall be entitled to the protections afforded by section 363(m) of the Bankruptcy Code in the event of a reversal or modification on appeal of this Order; and it is further

ORDERED that BNC is authorized to take all actions and execute all documents necessary or appropriate to effectuate the sale of any of the FF&E; and it is further

ORDERED that BNC is authorized, pursuant to section 554(a) of the Bankruptcy Code, in its sole discretion to abandon the FF&E; and it further

ORDERED that this Court shall retain jurisdiction to hear and determine all

matters arising from or related to the implementation, interpretation and/or enforcement of this

Order.

Dated: February 24, 2009
        New York, New York

                              */s/ James M. Peck*_____
                              UNITED STATES BANKRUPTCY JUDGE

<u>**Exhibit B-2**</u>

**Expense Reimbursement Orders**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| BALLY TOTAL FITNESS OF | ) | |
| GREATER NEW YORK, INC., <u>et al.</u>, | ) | Case No. 07-12395 (BRL) |
| | ) | |
| Debtors. | ) | Jointly Administered |
| | ) | |

## ORDER (A) AUTHORIZING THE DEBTORS TO ENTER INTO THE INVESTMENT AGREEMENT AND THE NEW RESTRUCTURING SUPPORT AGREEMENT AND (B) BREAK-UP FEE AND EXPENSE REIMBURSEMENT

### ("NEW RESTRUCTURING AGREEMENTS ORDER")

Upon consideration of the motion (the "**Motion**")[1] of the Debtors[2] for entry of an order (i) authorizing the Debtors to enter into (a) the Investment Agreement and (b) the New Restructuring Support Agreement and (ii) approving the Break-Up Fee and Expense Reimbursement provisions set forth in the Investment Agreement; and it appearing that the relief requested is in the best interests of the Debtors' estates, their creditors, and other parties in interest; and it appearing that this Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334; and it appearing that this Motion is a core proceeding pursuant to 28 U.S.C. §

---

[1]   Capitalized terms used but not defined herein shall have the same meanings ascribed to them in the Motion.

[2]   The Debtors in these proceedings are: Bally Total Fitness of Greater New York, Inc., Bally Total Fitness Holding Corporation, Bally Total Fitness Corporation, Bally ARA Corporation, Bally Fitness Franchising, Inc., Bally Franchise RSC, Inc., Bally Franchising Holdings, Inc., Bally Real Estate I LLC, Bally REFS West Hartford, LLC, Bally Sports Clubs, Inc., Bally Total Fitness Franchising, Inc., Bally Total Fitness International, Inc., Bally Total Fitness of California, Inc., Bally Total Fitness of Colorado, Inc., Bally Total Fitness of Connecticut Coast, Inc., Bally Total Fitness of Connecticut Valley, Inc., Bally Total Fitness of Minnesota, Inc., Bally Total Fitness of Missouri, Inc., Bally Total Fitness of Philadelphia, Inc., Bally Total Fitness of Rhode Island, Inc., Bally Total Fitness of the Mid-Atlantic, Inc., Bally Total Fitness of the Midwest, Inc., Bally Total Fitness of the Southeast, Inc., Bally Total Fitness of Toledo, Inc., Bally Total Fitness of Upstate New York, Inc., BTF Cincinnati Corporation, BTF Europe Corporation, BTF Indianapolis Corporation, BTF Minneapolis Corporation, BTF/CFI, Inc., BTFCC, Inc., BTFF Corporation, Greater Philly No. 1 Holding Company, Greater Philly No. 2 Holding Company, Health & Tennis Corporation of New York, Holiday Health Clubs of the East Coast, Inc., Holiday/Southeast Holding Corp., Jack La Lanne Holding Corp., New Fitness Holding Co., Inc., Nycon Holding Co., Inc., Rhode Island Holding Company, Tidelands Holiday Health Clubs, Inc., and U.S. Health, Inc.

157; and adequate notice of the Motion and opportunity for objection having been given; and it appearing that no other notice need be given; and after due deliberation and sufficient cause therefor:

**NOW, THEREFORE, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED THAT:**

1.     The Motion is granted in its entirety.

2.     The Debtors are authorized to execute and deliver the Investment Agreement and the New Restructuring Support Agreement, and to execute, deliver, implement and fully perform any and all obligations, instruments, documents and papers contemplated under the Investment Agreement and the New Restructuring Support Agreement.

3.     The Investment Agreement and the New Restructuring Support Agreement, and each of the terms and provisions thereof are hereby approved pursuant to section 363 of the Bankruptcy Code.

4.     The Breakup Fee of $10 million and the Expense Reimbursement provisions in Section 8.2 of the Investment Agreement are approved in their entirety.

5.     The No Solicitation/No Shop provision in Section 6.2 is approved in its entirety.

6.     The Indemnification provision in Section 9.1 is approved in its entirety.

7.     The Debtors are authorized and empowered to take all actions necessary or appropriate to implement the relief granted in this Order.

8.     Notwithstanding the possible applicability of Fed. R. Bankr. P. 6004(h), 7062, 9014, or otherwise, the terms and conditions of this Order shall be immediately effective and enforceable upon its entry.

9.      The requirement set forth in Rule 9013-(b) of the Local Bankruptcy Rules for the

Southern District of New York that any motion or other request for relief be accompanied by a

memorandum of law is hereby deemed satisfied by the contents of the Motion or otherwise

waived.

10.      This Court retains jurisdiction with respect to all matters arising from or related to

the implementation of this Order.


Dated: August 21, 2007
       New York, New York


                                        /s/Burton R. Lifland
                                        United States Bankruptcy Judge

CH\965277.3

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------x
In re                                    :
                                         :     **Chapter 11 Case No.**
                                         :
**TWINLAB CORPORATION, et al.,**          :     **03- 15564 (CB)**
                                         :
               **Debtors.**               :     **(Jointly Administered)**
                                         :
-------------------------------------------------------------x

### ORDER (A) APPROVING BIDDING PROCEDURES FOR SUBMISSION AND ACCEPTANCE OF COMPETING BIDS, AND UNDER CERTAIN CIRCUMSTANCES, PAYMENT OF A BREAK-UP FEE AND EXPENSE REIMBURSEMENT TO IDEASPHERE, INC. AND TL ACQUISITION CORP. ; (B) SCHEDULING BIDDING DEADLINE, AUCTION DATE AND/OR SALE HEARING DATE; (C) ESTABLISHING PROCEDURE FOR DETERMINING CURE AMOUNTS; AND (D) FIXING NOTICE PROCEDURES AND APPROVING FORM OF NOTICE

Upon the motion, dated September 4, 2003 (the "Motion"), of Twinlab Corporation, Twin Laboratories Inc., and Twin Laboratories (UK) Ltd., as debtors and debtors-in-possession (collectively, "Twinlab" or the "Debtors") for, inter alia, entry of an order (i) approving the proposed bidding procedures annexed hereto as Exhibit A for submission and acceptance of competing bids (the "Bidding Procedures") and, under certain circumstances, payment of a break-up fee in the amount of $2,700,000 (the "Break-Up Fee") and expense reimbursement subject to a cap of $1,000,000 (the "Expense Reimbursement") to Ideasphere, Inc. ("Ideasphere") and TL Acquisition Corp. (together with Ideasphere, the "Purchasers"); (ii) scheduling a bidding deadline, auction date, and/or sale hearing date; (iii) establishing procedure for determining cure amounts; and (iv) fixing notice procedures and approving forms of notice; and the Court having reviewed the Motion; and the Court having jurisdiction to consider the Motion and the relief requested therein pursuant to 28 U.S.C. § § 157 and 1334 and the Standing Order of

Referral of Cases to Bankruptcy Court Judges of the District Court for the Southern District of New York, dated July 19, 1984 (Ward, Acting C.J.); and consideration of the Motion and the relief requested therein being a core proceeding pursuant to 28 U.S.C. § 157(b); and venue being proper before this Court pursuant to 28 U.S.C. § § 1408 and 1409; and it appearing that notice of the Motion was good and sufficient under the circumstances and that no other or further notice need be given; and the Court having reviewed the Motion and having heard the statements in support of the relief requested therein at a hearing before the Court (the "Hearing"); and it appearing that entry of this order is in the best interests of the Debtors, their estates, and all parties in interest; and upon the Motion and the record of the Hearing and all other proceedings had before the Court; and after due deliberation and good cause appearing therefor, it is hereby

FOUND AND DETERMINED THAT:[1]

A.      The Debtors have articulated good and sufficient reasons for this Court to grant the relief requested in the Motion regarding the bidding process (the "Bidding Procedure Relief"), including the Court's (i) approval of the Bidding Procedures, (ii) approval of payment of the Break-Up Fee and Expense Reimbursement as administrative expenses in accordance with the terms of the Purchase Agreement, (iii) determination of final Cure Amounts[2] in the manner described herein, and (iv) approval of and authorization to serve the Sale Notice (as defined below).

---

[1] Findings of fact shall be construed as conclusions of law and conclusions of law shall be construed as findings of fact when appropriate.  See Fed. R. Bankr. P. 7052.

[2] Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Bidding Procedures and/or the Motion.

B.     The Debtors have articulated good and sufficient reasons for, and the best interests of their estates will be served by, this Court scheduling a subsequent hearing (the "Sale Hearing") to consider whether to grant the remainder of the relief requested in the Motion, including the approval of the sale of substantially all the assets (the "Assets") of the Debtors in accordance with either (i) that certain asset purchase agreement, attached as Exhibit A to the Motion (together with all exhibits and agreements attached thereto, the "Purchase Agreement"), by and between the Debtors and the Purchasers or (ii) such other agreement that may constitute the Successful Bid, and free and clear of all liens, claims, encumbrances, and interests (with the same to attach to the proceeds therefrom) pursuant to section 363 of title 11, United States Code (the "Bankruptcy Code") (the "Transaction").

C.     The Break-Up Fee and Expense Reimbursement to be paid under the circumstances as set forth in the Purchase Agreement are (1) an actual and necessary cost and expense of preserving the Debtors' estates, within the meaning of section 503(b) of the Bankruptcy Code, (2) commensurate to the real and substantial benefit conferred upon the Debtors' estates by the Purchasers, (3) reasonable and appropriate, in light of the size and nature of the proposed Transaction and comparable transactions, the commitments that have been made, and the efforts that have been and will be expended by the Purchasers, and (4) necessary to induce the Purchasers to continue to pursue the Transaction and to continue to be bound by the Purchase Agreement.

D.     Moreover, the estates' authorization to pay the Break-Up Fee and the Expense Reimbursement is an essential inducement and condition relating to the Purchasers' entry into, and continuing obligations under, the Purchase Agreement.

Unless they are assured that each of the Break-Up Fee and the Expense Reimbursement will be made in each of the circumstances described in the Purchase Agreement, the Purchasers are unwilling to remain obligated to purchase the Assets or be otherwise bound under the Purchase Agreement (including the obligation to maintain committed to their offer while such offer is subjected to higher or otherwise better offers as contemplated by the Bidding Procedures). The Debtors' promise to pay each of the Break-Up Fee and the Expense Reimbursement has induced the Purchasers to submit a bid that will serve as a minimum or floor bid on which the Debtors, their creditors, and other bidders can rely. The Purchasers have provided a material benefit to the Debtors and their creditors by increasing the likelihood that the best possible purchase price for the Assets will be received. Accordingly, the Bidding Procedures and the Break-Up Fee are reasonable and appropriate and represent the best method for maximizing value for the benefit of the Debtors' estates.

E. The Purchase Agreement and its terms were negotiated by the Debtors and the Purchasers in good faith and in an arms-length manner.

NOW THEREFORE, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED THAT:

1. The Bidding Procedure relief sought in the Motion is GRANTED.

2. The Bidding Procedures, which are incorporated herein by reference, are hereby approved and shall govern all bids and bid proceedings relating to the Assets. The Debtors are authorized to take any and all actions necessary or appropriate to implement the Bidding Procedures.

3.     Payment of the Break-Up Fee and the Expense Reimbursement under the circumstances set forth and in accordance with the terms of the Purchase Agreement is hereby approved.  If the Purchase Agreement is terminated for any reason and if payment of the Expense Reimbursement and/or the Break-Up Fee is triggered under the terms of the Purchase Agreement, such payments shall be made in accordance with the terms of the Purchase Agreement.  The Debtors are hereby authorized and directed, without need for further order of this Court, to pay Purchasers the Break-Up Fee and Expense Reimbursement in the manner and upon the terms as set forth in the Purchase Agreement.  The Break-Up Fee and Expense Reimbursement shall be paid out of the Debtors' estates, and the claim or claims of the Purchasers to payment of either or both of the Break-Up Fee and Expense Reimbursement shall constitute an allowed administrative expense claim arising under Bankruptcy Code § § 503(b) and 507(a)(1) in the Debtors' Bankruptcy Cases.  If the Auction results in the selection of a Successful Bidder other than Purchasers, then the Successful Bidder and/or the Debtors are each hereby directed to immediately cause to the Break-Up Fee and the Expense Reimbursement be paid to the Purchasers directly from the proceeds associated with the sale to such Successful Bidder.

4.     The deadline for (a) submitting a Qualified Bid and/or (b) objecting to (i) approval of the Transaction, including the sale of the Assets free and clear of liens, claims, encumbrances, and interests pursuant to section 363 of the Bankruptcy Code, (ii) any Cure Amount, and/or (iii) the assumption by the Debtors and assignment to Purchasers or a Successful Bidder of a Purchased Contract (as defined in Schedule 2.5(b)

of the Purchase Agreement) shall be October 20, 2003, at 4:00 p.m. (Eastern Time) (the "Bidding and Objection Deadline").

5. As further described in the Bidding Procedures, the Debtors shall conduct the Auction on October 27, 2003 if a Qualified Bid (other than Purchasers' bid) is timely received at the United States Bankruptcy Court for the Southern District of New York, 1 Bowling Green, New York, New York, 10004, Room 601.

6. The Court shall conduct the Sale Hearing on October 27, 2003, immediately following the Auction, or, if no Auction is held, at 2 p.m., at which time, the Court will consider approval of the Transaction to the Successful Bidder. In the event the Purchasers are not the Successful Bidder, non-Debtor parties to the Purchased Contracts may raise objections to adequate assurance of future performance at the Sale Hearing.

7. In order to be considered, an objection to the Transaction, to any Cure Amount, or to the assumption by the Debtors and assignment to Ideasphere of a Purchased Contract must be filed and served upon (i) Twinlab, (ii) Weil, Gotshal & Manges LLP, 767 Fifth Ave New York, New York 10153 (Attention: Michael P. Kessler, Esq.), the attorneys for Twinlab, (iii) Kramer Levin Naftalis & Frankel, 919 Third Avenue, New York, New York 10022 (Attention: Kenneth H. Eckstein, Esq.), the attorneys for Ideasphere, and (iv) the attorneys for the official committee of unsecured creditors (the "Committee") c/o Kaye Scholer LLP, 425 Park Avenue, New York, New York 10022, Attention Richard G. Smolev, Esq., prior to the Bidding and Objection Deadline and must state with specificity the nature of such objection and, if applicable, the alleged Cure Amount (with appropriate documentation in support thereof). If an objection to a Cure Amount is timely filed and served, the Debtors may schedule a

hearing to consider such objection in the event it cannot be resolved among the parties at or prior to the Sale Hearing. If no objection to the Cure Amount for the respective Purchased Contract is timely filed and served, the Cure Amount set forth in the Notice shall be binding upon the respective non-Debtor party to the Purchased Contract for all purposes in the Debtors' chapter 11 cases, and the respective non-Debtor party shall be forever barred from objecting to the Cure Amount set forth in the Notice, including, without limitation, the right to assert any additional cure or other amount with respect to their respective Purchased Contract. In the event one or more Contracts (as defined in the Purchase Agreement) are added to Schedule 2.5(b) on or before the closing of the Sale Transaction, the Debtors will serve a notice of the amended Schedule 2.5(b) on the non-Debtor parties to such Contracts, and such non-Debtor parties shall have thirteen (13) days thereafter to object to the Cure Amount, unless such period is shortened by the Court, provided, however, that the Debtors and the Purchasers (or the Successful Bidder) shall be deemed to have reserved their right to reject an executory contract until such time as the Cure Amount is fixed and accepted.

8. The effective date of any assumption and assignment of any Purchase Contract shall be the date on which the Sale closes. Accordingly, any Cure Amounts to be paid under any Purchase Contract will also be paid upon the closing of the Sale or as soon thereafter as the Cure Amount is fixed by the Court or agreed upon by the parties.

9. As further described in the Bidding Procedures, no bid or bids shall be a Qualified Bid, or otherwise considered for any purposes, unless such bid has a cash component of at least an amount equal to the sum of (a) the cash component of

Purchasers' Bid, _plus_ (b) the Break-Up Fee, _plus_ (c) the Expense Reimbursement, plus

(d) such portion of the $3,700,000 of Liabilities constituting Employee and Related

Liabilities to the extent the Qualified Bid does not propose to assume all or any portion of

such liabilities plus (e) in the case of the initial Qualified Bid, two million dollars

($2,000,000).

       10.     The notices described in subparagraphs (a)-(c) below

(collectively, the "Sale and Auction Notices") shall be good and sufficient, and no other

or further notice shall be required if given as follows:

    a.     The Debtors serve, within three (3) days after entry of the Bidding Procedures Order (the "Mailing Deadline"), by first-class mail, postage prepaid, copies of the Bidding Procedures Order and the Motion (to the extent not previously served) upon: (i) counsel to the Committee, Kaye Scholer LLP, (ii) CIT, (iii) Zions, (iv) any party who, in the past three years, expressed in writing to the Debtors an interest in the Assets, and who the Debtors and its representatives reasonably and in good faith determine potentially have the financial wherewithal to effectuate the transaction contemplated in the Purchase Agreement, (v) all parties who are known to claim interests in or liens upon the Assets, (vi) the Securities and Exchange Commission, (vii) the Internal Revenue Service, (viii) all applicable state attorneys general, local realty enforcement agencies, and local regulatory authorities, (ix) all applicable state and local taxing authorities, (x) all known holders of any actual or potential product liability claims against the Debtors; (xi) the U.S. Trustee; (xii) the counter parties to the Assumed Contracts; and (xiii) the entities set forth in the Debtors' Master Service List established pursuant to that certain Order Establishing Notice Procedures, dated September 13, 2003; and

    b.     On or before the Mailing Deadline, the Debtors (or their agent) serves by first-class mail, postage prepaid, a notice of the auction and sale hearing (the "Sale Notice"), substantially in the form annexed to the Motion as Exhibit D, upon all other known creditors and equity security holders of the Debtors.

    c.     On the Mailing Deadline, or as soon as practicable thereafter, the Debtors will publish the Sale Notice in The Wall Street Journal (National Edition ) and The New York Times (National Edition).

11.     The failure of any objecting person or entity to timely file its objection shall be a bar to the assertion, at the Sale Hearing or thereafter, of any objection to the Motion, or the consummation and performance of the Transaction contemplated by the Purchase Agreement, or an agreement with the Successful Bidder, if any (including the transfer free and clear of all liens, claims, encumbrances, and interests of each of the Assets transferred as part of the Transaction).

12.     The Court shall retain jurisdiction over any matter or dispute arising from or relating to the implementation of this Order.  The Debtors are hereby authorized and empowered to take such steps, expend such sums of money, and do such other things as may be necessary to implement and effect the terms and requirements of this Order.  Notwithstanding Bankruptcy Rules 6004(g) and 6006(d), this Order shall not be stayed for ten (10) days after the entry hereof and shall be effective and enforceable immediately upon signature hereof.

13.     The Sale Approval Hearing may be adjourned from time to time without further notice to creditors or parties in interest other than by announcement of the adjournment in open Court or on the Court's calendar on the date scheduled for the Sale Approval Hearing or any adjourned date, provided that nothing herein shall be determined to prejudice any rights or remedies of Purchasers contained in the Purchase Agreement.

Dated:     September 25, 2003
           New York, New York

/s/ Cornelius Blackshear _____
UNITED STATES BANKRUPTCY JUDGE

WEIL, GOTSHAL & MANGES LLP
Attorneys for Debtors and
Debtors in Possession
767 Fifth Avenue
New York, New York 10153
Telephone:  (212) 310-8000
Facsimile:  (212) 310-8007
Judy G.Z. Liu, Esq. (JL 6449)

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF NEW YORK

```
------------------------------------------------------------------x
                                      :
In re                                 :     Chapter 11 Case No.
                                      :
ADELPHIA BUSINESS SOLUTIONS, INC., et al.,  :     02-11389 (REG)
                                      :
                Debtors.              :     (Jointly Administered)
                                      :
------------------------------------------------------------------x
```

**ORDER (A) AUTHORIZING AND SCHEDULING AN
AUCTION FOR THE SALE OF CERTAIN ASSETS RELATED TO DEBTOR'S
CLOSED MARKETS, (B) APPROVING THE TERMS AND
CONDITIONS OF SUCH AUCTION AND BREAK-UP FEE,
(C) APPROVING FORM AND MANNER OF NOTICE OF THE
(i) AUCTION AND SALE HEARING AND (ii) PROPOSED
ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY
CONTRACTS, AND (D) ESTABLISHING DATE AND TIME
FOR HEARING TO CONSIDER APPROVAL OF PROPOSED SALE**

Upon the motion, dated November 25, 2002 (the "Motion"), of Adelphia

Business Solutions Operations, Inc., as debtor and debtor in possession ("ABSO" or the

"Debtor"), for orders (i) authorizing, pursuant to sections 105(a), 363(b) and (f), 365(a)

and 1146(c) of the Bankruptcy Code, ABSO to conduct an auction sale (the "Auction")

of certain assets related to the Closed Markets, including the Sale Assets and the

Assumed Contracts, as set forth in the proposed Sale Agreement, (ii) scheduling a date

for the Auction, (iii) approving, pursuant to Bankruptcy Rule 6004(f)(1), the terms and

conditions of the Auction, including bidding procedures and the Break-Up Fee (the "Bidding Procedures"), (iv) authorizing, pursuant to Bankruptcy Rule 2002, the form and manner of notice for the Auction and for notifying contract parties of the assumption and assignment to Gateway of the Assumed Contracts, (v) scheduling a date and time for a hearing to consider approval of the proposed sale resulting from the Auction (the "Sale Hearing"), (vi) establishing, pursuant to sections 105(a) and 365 of the Bankruptcy Code, cure amounts, if any, with respect to the Assumed Contracts, (vii) authorizing ABSO to assume and assign to the successful bidder the Assumed Contracts, (viii) approving the Agreement and the escrow arrangements, to be effective upon a Closing of the Sale Transaction, and (ix) granting other relief related to all of the foregoing; and a hearing having been held (the "Procedures Hearing") in respect of the Debtor's request for an order granting the relief requested in clauses (i) –(v) above (the "Preliminary Relief"); and it appearing that notice of the hearing has been provided to (i) the Office of the United States Trustee for the Southern District of New York, (ii) the attorneys for the Debtor's postpetition lender, (iii) the attorneys for the statutory committee of unsecured creditors, (iv) the attorneys for Adelphia Communications Corporation ("ACC"), (v) the attorneys for the Ad Hoc Committee of 12¼% bondholders, (vi) all nondebtor contract parties to the Assumed Contracts, (vii) all appropriate federal, state and local taxing authorities, and (viii) all parties having filed a notice of appearance in the Debtors' chapter 11 cases pursuant to Rule 2002 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"); and it appearing that such notice constitutes good and sufficient notice of the Motion and Preliminary Relief and that no other or further notice need be provided; and upon the Motion and the record of the Procedures Hearing and all

other proceedings had before the Court; and it appearing that an order granting the

Preliminary Relief is in the best interests of the Debtor and other parties in interest; and it

appearing that the Court has jurisdiction over this matter; and after due deliberation and

sufficient cause appearing therefore, it is hereby

ORDERED that pursuant to Bankruptcy Rule 6004(f)(1), the Debtor is

authorized to conduct the Auction of the Sale Assets and Assumed Contracts pertaining

to the Closed Markets at the offices of Weil, Gotshal & Manges, LLP, 767 Fifth Avenue,

New York, New York 10153 on January 6, 2003 at 10:00 a.m. (EST); and it is further

ORDERED that the Auction shall be conducted on the following terms

and conditions (the "Auction Terms"):

- Initial bids for the Sale Assets must (a) be in writing; (b) at a minimum, exceed the sum of (i) the Purchase Price and the Aggregate Burn Reimbursement Amount plus (ii) the Minimum Overbid Amount (collectively, the "Minimum Bid"); (c) be received by (i) the attorneys for the Debtors, Weil, Gotshal & Manges LLP ("WG&M"), 767 Fifth Avenue, New York, New York 10153 (Attn: Judy G. Z. Liu, Esq.), (ii) the attorneys for the Debtor's postpetition lender, Jenkens & Glichrist Parker Chapin, LLP, the Chrysler Building, 405 Lexington Avenue, New York, New York 10174 (Attn: Hollace T. Cohen, Esq. and Jennifer Saffer, Esq.); (iii) the attorneys for the statutory committee of unsecured creditors, Kramer Levin Naftalis & Frankel, 919 Third Avenue, New York, New York 10022 (Attn: Mitchell A. Seider, Esq.); (iv) the attorneys for an ad hoc committee of holders of 12¼% bonds issued by Adelphia Business Solutions, Inc., Akin, Gump, Strauss, Hauer & Feld, LLP, 590 Madison Avenue, New York, New York 10022 (Attn: Ira S. Dizengoff, Esq. and Philip C. Dublin, Esq.), by no later than 5:00 p.m. (EST) on January 2, 2003 (the "Bid Deadline"). Parties that do not submit written bids by the Bid Deadline reflecting at least the Minimum Bid will not be permitted to participate at the Auction. Bids must be accompanied by an earnest money deposit equal to the amount of the Aggregate

Burn Reimbursement Amount,[1] the Earnest Money Deposit, and the Minimum Overbid Amount (collectively, the "Bid Deposit Amount").

- ABSO will only entertain bids that are on the same terms and conditions as those terms set forth in the Agreement and the documents set forth as exhibits thereto (and this Order).

- All bids must constitute a good faith, bona fide offer to purchase the Sale Assets for cash only (and the assumption of the Assumed Liabilities), and shall not be conditioned on obtaining financing and/or the outcome of due diligence by the bidder.

- All bids are irrevocable until the earlier to occur of: (i) the Closing, or (ii) thirty (30) days following the last date of the Auction (as the same may be adjourned).

- As a condition to making a competing bid, any competing bidder must provide the Debtor, on or before the Bid Deadline, with sufficient and adequate information to demonstrate, to the satisfaction of the Debtor, that such competing bidder (i) has the financial wherewithal and ability to consummate the Sale Transaction, and (ii) can provide all nondebtor contracting parties to the Assumed Contracts with adequate assurance of future performance as contemplated by section 365 of the Bankruptcy Code.

- The Debtor shall, after the Bid Deadline and prior to the Auction, evaluate all bids received, including Gateway's bid, and determine which bid reflects the highest or best offer for the Sale Assets (the "Pre-Auction Successful Bid"). The Debtor shall announce such determination at the outset of the Auction.

- Subsequent bids (after taking into account the Minimum Bid) at the Auction shall be made in increments of at least $25,000.00.

- Except as otherwise provided in a written offer that has been accepted by the Debtor, subject to satisfaction or waiver of the conditions to Closing set forth in the Agreement, the Closing shall take place at the offices of Weil, Gotshal & Manges LLP, promptly following entry of an order by the Court, substantially in the form

---

[1] Solely for the purpose of calculating the Bid Deposit Amount, interested bidders should assume that the Aggregate Burn Reimbursement Amount is $800,000.

annexed as Exhibit "D" to the Motion authorizing the sale of the Closed Markets to the Successful Bidder.

- The purchase price less the Bid Deposit Amount shall be paid by the Successful Bidder (if Gateway is not the Successful Bidder) by wire transfer at Closing.  If for any reason the Successful Bidder fails to consummate the Sale Transaction, or any part thereof, the offeror of the second highest or best bid at the Auction for the Sale Assets will automatically be deemed to have submitted the highest or best bid.  To the extent such offeror and the Debtor consent, the Debtor and such offeror are authorized to effect the Sale Transaction as soon as is commercially reasonable without further order of the Court.

- All bids for the purchase of the Sale Assets shall be subject to approval of the Court.

- The Debtor, in its sole discretion, may reject any bid not in conformity with these Bidding Procedures, the requirements of the Bankruptcy Code, the Bankruptcy Rules or the Local Bankruptcy Rules of the Court, or contrary to the best interests of the Debtor and parties in interest.

- No bids shall be considered by the Court unless a party submitted a competing bid in accordance with the Bidding Procedures and participated in the Auction.

- The Debtor reserves the right to change the location of the Auction and/or adjourn the Auction by announcing such adjournment at the Auction.

- Any sale shall be subject to the Senior DIP Lender's consent.  The Senior DIP Lender reserves all of its rights with respect to any sale, including, without limitation, its right not to consent to any sale, to condition such consent, and to object to any sale.

- Such other terms and conditions as may be announced by the Debtor at the outset of the Auction, provided, however, that such terms and conditions are not inconsistent with the terms of the Motion and this Order.  To the extent that there is any ambiguity as to what terms apply, the Motion and this Procedures Order shall control.

ORDERED that pursuant to section 363(b) of title 11 of the United States Code (the "Bankruptcy Code"), the Debtor is authorized to pay to Gateway a Break-Up

Fee in the amount of $267,500 (the "Break-Up Fee"), plus reimbursement for the Aggregate Burn Reimbursement Amount actually paid by Gateway, in the event that the Court approves an alternative transaction and such alternative transaction actually closes; and it is further

ORDERED that pursuant to Bankruptcy Rule 2002, notice of the proposed Sale Transaction, Auction and Sale Hearing shall be given by overnight delivery in the form annexed to the Sale Motion at Exhibit "E," on or prior to December 20, 2002, to (i) the United States Trustee, (ii) the attorneys for the Debtor's postpetition lender, (iii) the attorneys for the Creditors' Committee, (iv) the attorneys for an ad hoc committee of 12¼% bondholders, (v) the attorneys for Adelphia Communications Corporation, (vi) all nondebtor contracting parties with respect to the Assumed Contracts, (vii) all parties who have made written expressions of interest in acquiring the Sale Assets within six (6) months prior to the date of this Order, (viii) all appropriate federal, state and local taxing authorities, (ix) all known persons holding a lien on any of the Sale Assets, (x) all parties having filed a notice of appearance in the Debtor's chapter 11 case pursuant to Bankruptcy Rule 2002, shall constitute good and sufficient notice of the Sale Transaction, Auction, and Sale Hearing; and it is further

ORDERED that pursuant to Bankruptcy Rule 2002(1), the Debtor is authorized to publish, at least seven (7) days prior to the Auction, a notice of the Sale Transaction, Auction and Sale Hearing, once, in the form annexed to the Sale Motion at Exhibit "E," in the national editions of the New York Times and the Wall Street Journal; and it is further

ORDERED that pursuant to Bankruptcy Rule 2002(a)(2), (a) the Sale Hearing shall be held on January 7, 2002, before the United States Bankruptcy Court, Honorable Robert E. Gerber at 2:00 p.m. (EST), and (b) objections to approval of the relief requested in the Sale Motion (other than the Preliminary Relief provided herein), if any, shall be in writing, shall state the name of the objecting party, shall state with particularity the reasons and basis for the objection, and shall be filed with the Court and served upon (i) the attorneys for the Debtor, Weil, Gotshal & Manges LLP, 767 Fifth Avenue, New York, New York 10153 (Attn: Judy G. Z. Liu, Esq.); (ii) the attorneys for the Debtor's postpetition lender, Jenkens & Glichrist Parker Chapin, LLP, the Chrysler Building, 405 Lexington Avenue, New York, New York 10174 (Attn: Hollace T. Cohen, Esq. and Jennifer Saffer, Esq.); (iii) the attorneys for the statutory committee of unsecured creditors, Kramer Levin Naftalis & Frankel, 919 Third Avenue, New York, New York 10022 (Attn: Mitchell A. Seider, Esq.); (iv) the attorneys for an ad hoc committee of holders of 12¼% bonds issued by Adelphia Business Solutions, Inc., Akin, Gump, Strauss, Hauer & Feld, LLP, 590 Madison Avenue, New York, New York 10022 (Attn: Ira S. Dizengoff, Esq. and Philip C. Dublin, Esq.); (v) the attorneys for Gateway, Inc., Purcell & Scott, Co., L.P.A., 6035 Memorial Drive, Dublin, Ohio 43017 (Attn: David W. Babner, Esq.); and (vi) the Office of the United States Trustee, 33 Whitehall Street, 21st floor, New York, New York 10004 (Attn: Tracy H. Davis, Esq.), so as to be actually received by such persons no later than January 3, 2002 at 12:00 noon (EST).

Dated: New York, New York
        December __16__, 2002

_**S/ Robert E. Gerber**_
HONORABLE ROBERT E. GERBER
UNITED STATES BANKRUPTCY JUDGE

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-----------------------------------------------------------------x
|  |  :  |  |
| In re | : | Chapter 11 Case No. |
|  | : |  |
| ADELPHIA BUSINESS SOLUTIONS, INC., *et al.*, | : | 02-11389 (REG) |
|  | : |  |
| Debtors. | : | (Jointly Administered) |
|  | : |  |
-----------------------------------------------------------------x

## ORDER (A) AUTHORIZING AND SCHEDULING AN AUCTION FOR THE SALE OF CERTAIN ASSETS RELATED TO THE DETROIT MARKET, (B) APPROVING THE TERMS AND CONDITIONS OF SUCH AUCTION, INCLUDING BREAK-UP FEE, (C) APPROVING FORM AND MANNER OF NOTICE OF THE (i) AUCTION AND SALE HEARING AND (ii) PROPOSED ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS, AND (D) ESTABLISHING DATE AND TIME FOR HEARING TO CONSIDER APPROVAL OF PROPOSED SALE

Upon the motion, dated January 10, 2003 (the "Motion"), of Adelphia

Business Solutions Operations, Inc., as debtor and debtor in possession ("ABSO" or the

"Debtor"), filed with this Court requesting orders (i) authorizing ABSO, pursuant to

sections 105(a), 363(b) and (f), 365(a), and 1146(c) of the Bankruptcy Code, to conduct

an auction sale (the "Auction") of certain assets related to the Detroit Market,[1] including

the Sale Assets and the Assumed Contracts, as set forth in the proposed Sale Agreement,

(ii) scheduling a date for the Auction, (iii) approving, pursuant to Bankruptcy Rule

6004(f)(1), the terms and conditions of the Auction, including bidding procedures and a

Break-Up Fee (the "Bidding Procedures"), (iv) authorizing, pursuant to Bankruptcy Rule

---

[1] Unless otherwise defined herein, capitalized terms shall have the meanings ascribed to them in the Motion.

2002, the form and manner of notice for the Auction and for notifying contract parties of the assumption and assignment to GVC of the Assumed Contracts, (v) scheduling a date and time for a hearing to consider approval of the proposed sale resulting from the Auction (the "Sale Hearing"), (vi) establishing, pursuant to sections 105(a) and 365 of the Bankruptcy Code, Cure Amounts, if any, with respect to the Assumed Contracts, (vii) authorizing ABSO to assume and assign to the Successful Bidder the Assumed Contracts, (viii) approving the Agreement and the escrow arrangements, to be effective upon a Closing of the Sale Transaction, and (ix) granting other relief related to all of the foregoing; and a hearing having been held (the "Procedures Hearing") in respect of the Debtor's request for an order granting the relief requested in clauses (i) –(v) above (the "Preliminary Relief"); and it appearing that notice of the hearing has been provided to (i) the Office of the United States Trustee for the Southern District of New York, (ii) the attorneys for the Debtor's postpetition lender, (iii) the attorneys for the statutory committee of unsecured creditors, (iv) the attorneys for Adelphia Communications Corporation ("ACC"), (v) the attorneys for the Ad Hoc Committee of 12¼% bondholders, (vi) all nondebtor contract parties to the Assumed Contracts, (vii) all appropriate federal, state and local taxing authorities, and (viii) all parties having filed a notice of appearance in the Debtors' chapter 11 cases pursuant to Rule 2002 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"); and it appearing that such notice constitutes good and sufficient notice of the Motion and Preliminary Relief and that no other or further notice need be provided; and upon the Motion and the record of the Procedures Hearing and all other proceedings had before the Court; and it appearing that an order granting the Preliminary Relief is in the best interests of the

Debtor and other parties in interest; and it appearing that the Court has jurisdiction over this matter; and after due deliberation and sufficient cause appearing therefor, it is hereby

ORDERED that pursuant to Bankruptcy Rule 6004(f)(1), the Debtor is authorized to conduct the Auction of the Sale Assets and Assumed Contracts pertaining to the Detroit Market at the offices of Weil, Gotshal & Manges, LLP, 767 Fifth Avenue, New York, New York 10153 on February 5, 2003 at 10:00 a.m. (EST); and it is further

ORDERED that the Auction shall be conducted on the following terms and conditions (the "Auction Terms"):

- Initial bids for the Sale Assets must (a) be in writing; (b) at a minimum, exceed the sum of (i) the Purchase Price plus (ii) the Minimum Overbid Amount (collectively, the "Minimum Bid"); (c) be received by (i) the attorneys for the Debtors, Weil, Gotshal & Manges LLP ("WG&M"), 767 Fifth Avenue, New York, New York 10153 (Attn: Judy G. Z. Liu, Esq.), (ii) the attorneys for the Debtor's postpetition lender, Jenkens & Glichrist Parker Chapin, LLP, the Chrysler Building, 405 Lexington Avenue, New York, New York 10174 (Attn: Hollace T. Cohen, Esq. and Jennifer Saffer, Esq.); (iii) the attorneys for the statutory committee of unsecured creditors, Kramer Levin Naftalis & Frankel, 919 Third Avenue, New York, New York 10022 (Attn: Mitchell A. Seider, Esq.); (iv) the attorneys for an ad hoc committee of holders of 12¼% bonds issued by Adelphia Business Solutions, Inc., Akin, Gump, Strauss, Hauer & Feld, LLP, 590 Madison Avenue, New York, New York 10022 (Attn: Ira S. Dizengoff, Esq. and Philip C. Dublin, Esq.), by no later than 5:00 p.m. (EST) on January 28, 2003 (the "Bid Deadline"). Parties that do not submit written bids by the Bid Deadline reflecting at least the Minimum Bid will not be permitted to participate at the Auction. Bids must be accompanied by an earnest money deposit equal to the amount of the Aggregate Burn Amount,[2] the Earnest Money Deposit, and the Minimum Overbid Amount (collectively, the "Bid Deposit Amount").

---

[2] Solely for the purpose of calculating the Bid Deposit Amount, interested bidders should assume that the Aggregate Burn Amount is $420,000.

- ABSO will only entertain bids that are on the same terms (or better) and conditions as those terms set forth in the Agreement and the documents set forth as exhibits thereto (and this Order).

- All bids must constitute a good faith, bona fide offer to purchase the Sale Assets for cash only (and the assumption of the Assumed Liabilities), and shall not be conditioned on obtaining financing and/or the outcome of due diligence by the bidder.

- All bids are irrevocable until the earlier to occur of: (i) the Closing, or (ii) thirty (30) days following the last date of the Auction (as the same may be adjourned).

- As a condition to making a competing bid, any competing bidder must provide the Debtor, on or before the Bid Deadline, with sufficient and adequate information to demonstrate, to the satisfaction of the Debtor, that such competing bidder (i) has the financial wherewithal and ability to consummate the Sale Transaction, and (ii) can provide all nondebtor contracting parties to the Assumed Contracts with adequate assurance of future performance as contemplated by section 365 of the Bankruptcy Code.

- The Debtor shall, after the Bid Deadline and prior to the Auction, evaluate all bids received, including GVC's bid, and determine which bid reflects the highest or best offer for the Sale Assets (the "Pre-Auction Successful Bid"). The Debtor shall announce such determination at the outset of the Auction.

- Subsequent bids (after taking into account the Minimum Bid) at the Auction shall be made in increments of at least $25,000.00.

- Except as otherwise provided in a written offer that has been accepted by the Debtor, subject to satisfaction or waiver of the conditions to Closing set forth in the Agreement, the Closing shall take place at the offices of Weil, Gotshal & Manges LLP, promptly following entry of an order by the Court, substantially in the form annexed as Exhibit "D" to the Motion authorizing the sale of the assets related to the Detroit Market to the Successful Bidder.

- The purchase price less the Bid Deposit Amount shall be paid by the Successful Bidder (if GVC is not the Successful Bidder) by wire transfer at Closing. If for any reason the Successful Bidder fails to consummate the Sale Transaction, or any part thereof, the offeror of the second highest or best bid at the Auction for the Sale Assets will automatically be deemed to have submitted the highest

or best bid. To the extent such offeror and the Debtor consent, the Debtor and such offeror are authorized to effect the Sale Transaction as soon as is commercially reasonable without further order of the Court.

- All bids for the purchase of the Sale Assets shall be subject to approval of the Court.

- The Debtor, in its sole discretion, may reject any bid not in conformity with these Bidding Procedures, the requirements of the Bankruptcy Code, the Bankruptcy Rules, or the Local Bankruptcy Rules of the Court, or contrary to the best interests of the Debtor and parties in interest.

- No bids shall be considered by the Court unless a party submitted a competing bid in accordance with the Bidding Procedures and participated in the Auction.

- The Debtor reserves the right to change the location of the Auction and/or adjourn the Auction by announcing such adjournment at the Auction.

- The Senior DIP Lender reserves all of its rights with respect to any sale, including, without limitation, its right not to consent to any sale, to condition such consent, and to object to any sale.

- Such other terms and conditions as may be announced by the Debtor at the outset of the Auction, provided, however, that such terms and conditions are not inconsistent with the terms of the Motion and this Order. To the extent that there is any ambiguity as to what terms apply, the Motion and this Procedures Order shall control.

ORDERED that pursuant to section 363(b) of the Bankruptcy Code, the

Debtor is authorized to pay to GVC a Break-Up Fee in the amount of $50,000, plus costs

and expenses incurred by GVC (not to exceed $30,000), in the event that the Court

approves an alternative transaction and such alternative transaction actually closes; and it

is further

ORDERED that pursuant to Bankruptcy Rule 2002, notice of the proposed

Sale Transaction, Auction, and Sale Hearing shall be given in the form annexed to the

Sale Motion at Exhibit "E," on or prior to January 24, 2003, to (i) the United States

Trustee, (ii) the attorneys for the Debtor's postpetition lender, (iii) the attorneys for the

Creditors' Committee, (iv) the attorneys for an ad hoc committee of 12¼% bondholders,

(v) the attorneys for Adelphia Communications Corporation, (vi) all nondebtor

contracting parties with respect to the Assumed Contracts, (vii) all parties who have made

written expressions of interest in acquiring the Sale Assets within six (6) months prior to

the date of this Order, (viii) all appropriate federal, state and local taxing authorities, (ix)

all known persons holding a lien on any of the Sale Assets, and (x) all parties having filed

a notice of appearance in the Debtor's chapter 11 case pursuant to Bankruptcy Rule 2002,

shall constitute good and sufficient notice of the Sale Transaction, Auction, and Sale

Hearing; and it is further

ORDERED that pursuant to Bankruptcy Rule 2002(1), the Debtor is

authorized to publish once, at least seven (7) days prior to the Auction, a notice of the

Sale Transaction, Auction, and Sale Hearing, substantially in the form annexed to the

Sale Motion at Exhibit "E," in the national editions of each of the New York Times and

the Wall Street Journal; and it is further

ORDERED that pursuant to Bankruptcy Rule 2002(a)(2), (a) the Sale

Hearing shall be held on February 6, 2003, before the United States Bankruptcy Court,

Honorable Robert E. Gerber at 9:45 a.m. (EST), and (b) objections to approval of the

relief requested in the Sale Motion (other than the Preliminary Relief provided herein), if

any, shall be in writing, shall state the name of the objecting party, shall state with

particularity the reasons and basis for the objection, and shall be filed with the Court and

served upon (i) the attorneys for the Debtor, Weil, Gotshal & Manges LLP, 767 Fifth

Avenue, New York, New York 10153 (Attn: Judy G. Z. Liu, Esq.); (ii) the attorneys for

the Debtor's postpetition lender, Jenkens & Glichrist Parker Chapin, LLP, the Chrysler

Building, 405 Lexington Avenue, New York, New York 10174 (Attn: Hollace T. Cohen,

Esq. and Jennifer Saffer, Esq.); (iii) the attorneys for the statutory committee of

unsecured creditors, Kramer Levin Naftalis & Frankel, 919 Third Avenue, New York,

New York 10022 (Attn: Mitchell A. Seider, Esq.); (iv) the attorneys for an ad hoc

committee of holders of 12¼% bonds issued by Adelphia Business Solutions, Inc., Akin,

Gump, Strauss, Hauer & Feld, LLP, 590 Madison Avenue, New York, New York 10022

(Attn: Ira S. Dizengoff, Esq. and Philip C. Dublin, Esq.); (v) Global Visions

Communications, Southfield Tech Center, 21355 Melrose Avenue, Suite D, Southfield,

Michigan 48075 (Attn: Scott Aschenbrenner); and (vi) the Office of the United States

Trustee, 33 Whitehall Street, 21st floor, New York, New York 10004 (Attn: Tracy H.

Davis, Esq.), so as to be actually received by such persons no later than January 31, 2003

at 12:00 noon (EST).


Dated: New York, New York
       *January 23*, 2003

                                      *S/Robert E. Gerber*
                                      HONORABLE ROBERT E. GERBER
                                      UNITED STATES BANKRUPTCY JUDGE