THIS IS NOT A SOLICITATION OF ACCEPTANCE OR REJECTION OF THE PLAN.
ACCEPTANCES OR REJECTIONS MAY NOT BE SOLICITED UNTIL A DISCLOSURE
STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT.  THIS
DISCLOSURE STATEMENT IS BEING SUBMITTED FOR APPROVAL BUT HAS NOT
BEEN APPROVED BY THE BANKRUPTCY COURT.

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------x
                                                        :
<u>In re</u>                                           :          **Chapter 11 Case No.**
                                                        :
**BEARINGPOINT, INC., <u>et</u> <u>al.</u>,**          :          **09 - 10691 (REG)**
                                                        :
                          **Debtors.**                 :          **(Jointly Administered)**
                                                        :
-------------------------------------------------------------x

**PROPOSED DISCLOSURE STATEMENT FOR**
**DEBTORS' SECOND AMENDED JOINT PLAN**
<u>**UNDER CHAPTER 11 OF THE BANKRUPTCY CODE**</u>

**WEIL, GOTSHAL & MANGES LLP**
767 Fifth Avenue
New York, New York 10153
(212) 310-8000

– and –

700 Louisiana Street, Suite 1600
Houston, Texas  77002
(713) 546-5000

Attorneys for Debtors
    and Debtors in Possession

Dated:  October [•], 2009

# TABLE OF CONTENTS

**Page**

I.     INTRODUCTION ........................................................................................................ 1

     A.     The Disclosure Statement ......................................................................... 1

     B.     The Debtors' Advisors .............................................................................. 4

     C.     Important Dates ........................................................................................ 4

     D.     Voting Procedures .................................................................................... 4

     E.     Holders of Claims Entitled to Vote ......................................................... 5

     F.     Confirmation Hearing .............................................................................. 6

II.     OVERVIEW OF THE PLAN .................................................................................. 6

     A.     Chapter 11 Plans in General .................................................................... 6

     B.     Summary of the Plan ................................................................................ 7

     C.     Summary of Distributions under the Plan ................................................ 8

III.     OVERVIEW OF THE DEBTORS' OPERATIONS AND KEY EVENTS LEADING TO THE CHAPTER 11 FILING ................................................... 13

     A.     Corporate Structure ............................................................................... 13

     B.     Overview of the Debtors' Historical Operations ................................... 14

     C.     Significant Prepetition Indebtedness ..................................................... 15

     D.     Key Events Leading To The Commencement Of The Chapter 11 Cases ...................... 19

IV.     THE CHAPTER 11 CASES ................................................................................. 23

     A.     First Day Relief ..................................................................................... 23

     B.     Key Events During Chapter 11 Cases .................................................... 24

V.     THE PLAN ........................................................................................................... 31

     A.     Introduction ............................................................................................ 31

     B.     The Liquidating Trust ............................................................................ 32

     C.     Preservation of Claims ........................................................................... 32

     D.     Substantive Consolidation ..................................................................... 33

     E.     Classification and Treatment of Claims and Equity Interests Under the Chapter 11 Plan ........................................................................ 35

     F.     Unclassified Claims ............................................................................... 36

     G.     Claims Classified Pursuant to Section 1123 of the Bankruptcy Code ............. 38

     H.     Means of Implementation ....................................................................... 43

# TABLE OF CONTENTS
## (continued)

| | | | |
|---|---|---|---|
| | I. | Distributions under the Plan | 49 |
| | J. | Procedures for Treating Disputed Claims Under the Plan | 52 |
| | K. | Executory Contracts and Unexpired Leases | 53 |
| | L. | Conditions Precedent to Effective Date | 56 |
| | M. | Effect of Confirmation | 56 |
| | N. | Jurisdiction and Governing Law | 59 |
| | O. | Miscellaneous Provisions | 61 |
| | P. | Modification, Revocation, or Withdrawal of the Plan | 64 |
| VI. | | CERTAIN FACTORS TO BE CONSIDERED | 65 |
| | A. | Certain Bankruptcy Law Considerations | 65 |
| | B. | Additional Factors To Be Considered | 66 |
| VII. | | CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN | 67 |
| | A. | Consequences To The Debtors | 68 |
| | B. | Consequences To Certain Holders Of Claims | 68 |
| | C. | Tax Treatment Of The Liquidating Trust And Holders Of Beneficial Interests | 70 |
| | D. | Information Reporting And Withholding | 71 |
| VIII. | | CONFIRMATION OF THE PLAN | 72 |
| | A. | Confirmation Hearing | 72 |
| | B. | Objections | 72 |
| | C. | Requirements for Confirmation of the Plan | 73 |
| IX. | | CONCLUSION | 79 |

# I.

# INTRODUCTION

On February 18, 2009 (the "***Commencement Date***"), Bearingpoint, Inc. ("***BE***"), and certain of its subsidiaries listed in the footnote below (collectively with BE, the "***Debtors***")[1] filed for relief under chapter 11 of title 11 of the United States Code (the "***Bankruptcy Code***") in the United States Bankruptcy Court for the Southern District of New York (the "***Bankruptcy Court***"). Their chapter 11 cases are being jointly-administered for procedural purposes only under chapter 11 Case Number 09-10691 (REG) (the "***Chapter 11 Cases***"). The Debtors have filed a plan of liquidation pursuant to chapter 11 of the Bankruptcy Code, which provides for, among other things, the treatment of the various classes of the Debtors' creditors.

## A.    THE DISCLOSURE STATEMENT

### 1.    Purpose of the Disclosure Statement

Pursuant to section 1125 of the Bankruptcy Code the Debtors submit this First Amended Disclosure Statement (the "***Disclosure Statement***")[2] to all holders of Claims against the Debtors to provide information in connection with the solicitation of acceptances of the Debtors' Second Amended Joint Plan Under Chapter 11 of the Bankruptcy Code, Dated October 5, 2009 (the "***Plan***"), a copy of which is attached hereto as **Exhibit A**. **Please note that to the extent any inconsistencies exist between this Disclosure Statement and the Plan, the Plan shall govern.**

The purpose of this Disclosure Statement is to provide holders of Claims with adequate information about (1) the Debtors' history and business, (2) the Chapter 11 Cases, (3) the Plan, (4) the rights of holders of Claims and Equity Interests under the Plan, and (5) other information necessary to enable holders of Claims to make an informed judgment as to whether to vote to accept the Plan. On [DATE], 2009, after notice and a hearing, the Bankruptcy Court approved this Disclosure Statement as containing adequate information of a kind and in sufficient detail to enable a hypothetical investor of the relevant classes to make an informed judgment as to whether to accept or reject the Plan. **The Bankruptcy Court's approval of this Disclosure Statement does not, however, constitute a determination by the Bankruptcy Court as to the fairness or merits of the Plan.**

**THIS DISCLOSURE STATEMENT CONTAINS IMPORTANT INFORMATION AND ALL CREDITORS ARE ADVISED AND ENCOURAGED TO READ THIS DISCLOSURE STATEMENT AND THE PLAN IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN, INCLUDING, WITHOUT LIMITATION, THE RISK FACTORS SET FORTH IN SECTION VI OF THIS DISCLOSURE STATEMENT.**

---

[1] The Debtors include BearingPoint, Inc. and BE New York Holdings, Inc., BearingPoint Americas, Inc., BearingPoint BG, LLC, BearingPoint Enterprise Holdings, LLC, BearingPoint Global Operations, Inc., BearingPoint Global, Inc., BearingPoint International I, Inc., BearingPoint Israel, LLC, BearingPoint Puerto Rico, LLC, BearingPoint Russia, LLC, BearingPoint South Pacific, LLC, BearingPoint Southeast Asia LLC, BearingPoint Technology Procurement Services, LLC, BearingPoint USA, Inc., BearingPoint, LLC, i2 Mid Atlantic LLC, i2 Northwest LLC, Metrius, Inc., OAD Acquisition Corp., OAD Group, Inc., Peloton Holdings, L.L.C., Softline Acquisition Corp., and Softline Consulting and Integrators, Inc.

[2] Capitalized terms used but not defined herein shall have the meaning ascribed to such term in the Plan (as defined below).

2. **Organization of the Disclosure Statement**

The Disclosure Statement is organized in the following manner:

| | |
|---|---|
| **SECTION I** | Is an overview of this Disclosure Statement and sets forth deadlines, dates, voting procedures and other important information. |
| **SECTION II** | Is a brief summary of the Plan and the treatment of Claims and Equity Interests pursuant to the Plan. |
| **SECTION III** | Describes the history of the BearingPoint companies and the key events leading to the filing for chapter 11 relief. |
| **SECTION IV** | Provides a summary of the Chapter 11 Cases. |
| **SECTION V** | Is an in depth summary of the Plan. |
| **SECTION VI** | Sets forth certain risk factors that should be considered prior to voting on the Plan. |
| **SECTION VII** | Contains certain United States federal tax consequences of the Plan. |
| **SECTION VIII** | Provides information regarding the confirmation of the Plan. |
| **SECTION IX** | Is the conclusion of the Disclosure Statement. |

3. **Exhibits to the Disclosure Statement**

| | |
|---|---|
| **EXHIBIT A** | The Plan |
| **EXHIBIT B** | Order of the Bankruptcy Court, dated [_____], 2009 (the "***Disclosure Statement Order***"), approving, among other things, this Disclosure Statement and establishing certain procedures with respect to the solicitation and tabulation of votes to accept or reject the Plan (annexed without exhibits). |
| **EXHIBIT C** | BE's Annual Report on Form 10-K for the fiscal year ended December 31, 2008 (annexed without exhibits). |
| **EXHIBIT D** | BearingPoint's Liquidation Analysis. |
| **EXHIBIT E** | Chart of BearingPoint's prepetition organizational structure. |

4. **Qualifications**

**(a)** Plan summaries and statements made in this Disclosure Statement are qualified in their entirety by reference to the Plan and the exhibits annexed to the Plan and this Disclosure Statement. In the event of any conflict between the description set forth in this Disclosure Statement and the terms of the Plan, the terms of the Plan will govern.

**(b)** This disclosure may not be relied upon for any purpose other than to determine how to vote on the Plan. No solicitation of votes to accept the Plan may be made except pursuant to section 1125 of the Bankruptcy Code.

**(c)** This Disclosure Statement has been prepared in accordance with section 1125 of the Bankruptcy Code and Rule 3016(b) of the Federal Rules of Bankruptcy Procedure and not necessarily in accordance with non-bankruptcy law.

**(d)** As to contested matters, adversary proceedings and other actions or threatened actions, this Disclosure Statement shall not constitute or be construed as an admission of any fact or liability, stipulation or waiver, but rather as a statement made in settlement

negotiations.  This Disclosure Statement will not be admissible in any non-bankruptcy proceeding involving the Debtors or any other party, nor will it be construed to be conclusive advice on the tax, securities, or other legal effects of the Plan as to holders of Claims against, or Equity Interests in, the Debtors and debtors-in-possession in these Chapter 11 Cases.

(e)       The statements contained in this Disclosure Statement are made as of the date hereof unless another time is specified herein, and the delivery of this Disclosure Statement shall not create an implication that there has been no change in the information stated since the date hereof.  Holders of Claims should carefully read this Disclosure Statement in its entirety, including the Plan, prior to voting on the Plan.

(f)       Summaries of certain provisions of agreements referred to in this Disclosure Statement do not purport to be complete and are subject to, and are qualified in their entirety by reference to, the full text of the applicable agreement, including the definitions of terms contained in such agreement.

## 5.        Recommendation

The Debtors believe that the Plan accomplishes the objectives of chapter 11 and that acceptance of the Plan is in the best interests of the Debtors and their creditors.

**THE DEBTORS URGE THEIR CREDITORS TO VOTE TO ACCEPT THE PLAN.  [THE CREDITORS COMMITTEE ALSO STRONGLY ENCOURAGES ALL CREDITORS TO VOTE IN FAVOR OF THE PLAN.  THE CREDITORS COMMITTEE WAS ACTIVELY INVOLVED IN THE FORMULATION OF THE PLAN AND BELIEVE THAT THE PLAN PROVIDES THE HIGHEST AND BEST RECOVERIES FOR THE DEBTORS' CREDITORS.]**

## 6.        IRS Circular 230 Notice:

**To ensure compliance with IRS Circular 230, holders of Claims and Equity Interests are hereby notified that: (a) any discussion of United States federal tax issues contained or referred to in this Disclosure Statement is not intended or written to be used, and cannot be used, by holders of Claims or Equity Interests for the purpose of avoiding penalties that may be imposed on them under the Internal Revenue Code; (b) such discussion is written in connection with the promotion or marketing by the Debtors of the transactions or matters addressed herein; and (c) holders of Claims and Equity Interests should seek advice based on their particular circumstances from an independent tax advisor.**

## B. THE DEBTORS' ADVISORS

The Debtors' legal advisor is Weil, Gotshal & Manges, LLP, their restructuring advisor is AlixPartners LLP, and their financial advisor and investment banker is Greenhill & Co., LLC.  They can be contacted at:

| AlixPartners LLP | Greenhill & Co., LLC | Weil, Gotshal & Manges, LLP |
|---|---|---|
| 2000 Town Center<br>Suite 2400<br>Southfield, Michigan  48705<br>(248) 358-4420<br>Attn:    Kenneth A. Hiltz | 300 Park Avenue<br>New York, New York  10022<br>(212) 389-1500<br>Attn:    Bradley A. Robins<br>            Birger Berendes | 767 Fifth Avenue<br>New York, New York  10153<br>(212) 310-8000<br>Attn:    Marcia L. Goldstein<br>            Damon P. Meyer |
| 9 West 57th Street<br>Suite 3420<br>New York, New York  10019<br>(212) 490-2500<br>Attn:    David C. Johnston | | 700 Louisiana Street<br>Suite 1600<br>Houston, Texas  77002<br>(713) 546-5000<br>Attn:    Alfredo R. Pérez |

## C. IMPORTANT DATES

Please take note of the following important dates:

The deadline to file an objection or response to the Plan is _____, 2009 at 4:00 p.m. (Eastern Time) (the "*Objection Deadline*")

The deadline to submit ballots is _____, 2009 at 4:00 p.m. (Eastern Time) (the "*Voting Deadline*").  **For a ballot to be counted, the Debtors' voting agent must receive the ballot by the Voting Deadline.**

The Confirmation Hearing to consider confirmation of the plan shall be _____, 2009 at __:__ _.m. (Eastern Time).

No solicitation of votes to accept the Plan may be made except pursuant to section 1125 of the Bankruptcy Code.

## D. VOTING PROCEDURES

As set forth in more detail herein, certain holders of Claims are entitled to vote to accept or reject the Plan.  For holders of Claims entitled to vote, the Debtors have enclosed with the Disclosure Statement, among other things, (a) a ballot and (b) voting instructions as to how to properly complete your ballot and submit your vote.  If you hold more than one Claim, you will receive individual ballots for each Claim.  Please use the individual ballots to vote each individual Claim.  For detailed voting instructions, please refer to the voting instructions enclosed with this Disclosure Statement and the ballot.

**TO BE COUNTED, YOUR BALLOT MUST BE RECEIVED BY THE VOTING DEADLINE OF _____, 2009 AT 4:00 P.M. (EASTERN TIME).**

If you are a holder of a Claim entitled to vote on the Plan and you did not receive a ballot, received a damaged ballot, or lost your ballot or if you have any questions concerning the Disclosure Statement, the Plan, or the procedures for voting on the Plan, please call The Garden City Group, Inc. at **(866) 397-6077**.

## E.     HOLDERS OF CLAIMS ENTITLED TO VOTE

Pursuant to the provisions of the Bankruptcy Code, only holders of allowed claims or equity interests in classes of claims or equity interests that are impaired and that are not deemed to have rejected a proposed plan are entitled to vote to accept or reject such proposed plan. Classes of claims or equity interests in which the holders of claims or equity interests are unimpaired under a chapter 11 plan are deemed to have accepted such plan and are not entitled to vote to accept or reject the plan. For a detailed description of the treatment of Claims and Equity Interests under the Plan, see Section V of this Disclosure Statement.

If a Class of Claims entitled to vote on the Plan rejects the Plan, the Debtors reserve the right to amend the Plan or request confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code or both. Section 1129(b) of the Bankruptcy Code permits the confirmation of a chapter 11 plan notwithstanding the rejection of such plan by one or more impaired classes of claims or equity interests. Under section 1129(b), a plan may be confirmed by a bankruptcy court if it does not "discriminate unfairly" and is "fair and equitable" with respect to each rejecting class. For a more detailed description of the requirements for confirmation of a nonconsensual plan, see Section VIII of this Disclosure Statement.

### 1.     Classes of Claims Entitled to Vote

Claims in Class 4a (Series C Noteholder Claims), Class 4b (FFL Noteholder Claims), Class 5 (Junior Noteholder Claims) and Class 6 (General Unsecured Claims) of the Plan are impaired and, to the extent Claims in such Classes are Allowed, the holders of such Claims will receive distributions under the Plan. As a result, holders of Claims in those Classes are entitled to vote to accept or reject the Plan.

**The Debtors recommend that holders of Claims in Classes 4a (Series C Noteholder Claims), 4b (FFL Noteholder Claims), 5 (Junior Noteholder Claims) and 6 (General Unsecured Claims) vote to accept the Plan.**

### 2.     Classes of Unimpaired Claims – Deemed to Accept

Claims in Class 1 (Priority Non-Tax Claims), Class 2 (Secured Tax Claims), and Class 3 (Other Secured Claims) of the Plan are unimpaired. As a result, holders of Claims in those Classes are conclusively presumed to have accepted the Plan.

### 3.     Other Subordinated Claims and Equity Interests – Deemed to Reject

Holders of Other Subordinated Claims (Class 7) and Equity Interests (Class 8) will not receive any distribution under the Plan and are therefore deemed to have rejected the Plan. With respect to the Classes that are deemed to have rejected the Plan, the Debtors intend to request confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code.

## F.  CONFIRMATION HEARING

Pursuant to section 1128 of the Bankruptcy Code, the Confirmation Hearing will be held on _____, 2009 at __:__ _.m. (Eastern Time) before the Honorable Robert E. Gerber, Room 621, United States Bankruptcy Court for the Southern District of New York, Alexander Hamilton House, One Bowling Green, New York, New York 10004.

The Objection Deadline to object or respond to the confirmation of the Plan is _____, 2009 at 4:00 p.m. (Eastern Time).  Objections and responses, if any, must be served and filed as to be received on or before the Objection Deadline in the manner described in the Disclosure Statement Order and below in Section VIII.A of this Disclosure Statement.  The Confirmation Hearing may be adjourned from time to time without further notice except for the announcement of the adjournment date made at the Confirmation Hearing or at any subsequent adjourned Confirmation Hearing.

# II.

# OVERVIEW OF THE PLAN

## A.  CHAPTER 11 PLANS IN GENERAL

This section of the Disclosure Statement summarizes the Plan, which is set forth in its entirety as Exhibit A hereto.  This summary is qualified in its entirety by reference to the Plan. Statements as to the rationale underlying the treatment of Claims and Equity Interests under the Plan are not intended to, and shall not, waive, compromise or limit any rights, claims or causes of action in the event the Plan is not confirmed.

**YOU SHOULD READ THE PLAN IN ITS ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN.**

In general, a chapter 11 plan of liquidation (i) divides claims and equity interests into separate classes, (ii) specifies the property that each class is to receive under the plan, and (iii) contains other provisions necessary to implement the plan.  Under the Bankruptcy Code, "claims" and "equity interests," rather than "creditors" and "shareholders," are classified because creditors and shareholders may hold claims and equity interests in more than one class.  Under section 1124 of the Bankruptcy Code, a class of claims is "impaired" under a plan unless the plan (i) leaves unaltered the legal, equitable, and contractual rights of each holder of a claim in such class, or (ii) to the extent defaults exist, provides for the cure of existing defaults, reinstatement of the maturity of claims in such class, compensates each holder of a claim in such class for any damages incurred as a result of reasonable reliance, and does not otherwise alter the legal equitable or contractual rights of each holder of a claim in such class.

Classes 4a, 4b, 5 and 6 are impaired under the Plan.  Holders of Claims in such Classes are entitled to vote to accept or reject the Plan to the extent and in the manner provided in the *Order (I) Approving the Proposed Disclosure Statement, (II) Establishing Solicitation and Voting Procedures, (III) Scheduling a Confirmation Hearing, and (IV) Establishing Notice and Objection Procedures for Confirmation of the Debtors' Second Amended Joint Plan*, entered by the Bankruptcy Court on [_____], 2009 [Docket No. _____] (the "***Voting Procedures Order***") or in any other order or orders of the Bankruptcy Court.  Ballots are being furnished herewith to all holders of Claims in Classes 4a, 4b, 5 and 6 that are entitled to vote to facilitate their voting to accept or reject the Plan.

A chapter 11 plan may also specify that certain classes of Claims or Equity Interests are to have their Claims or Equity Interests remain unaltered by the plan. Such classes are referred to as "unimpaired" and" because of the favorable treatment accorded to such classes, section 1126(f) of the Bankruptcy Code provides that they are conclusively deemed to have accepted the plan and, therefore, need not be solicited to vote to accept or reject the plan. Classes 1, 2 and 3 are unimpaired under the Plan, and holders of Claims in such Classes are deemed to have accepted the Plan. Accordingly, ballots are not being furnished to holders of claims in Classes 1, 2 or 3.

A chapter 11 plan may also specify that certain classes will not receive any distribution under the plan. Under section 1126(g) of the Bankruptcy Code, such classes are conclusively deemed to have rejected the plan and, therefore, need not be solicited to accept or reject the plan. Holders of Other Subordinated Claims (Class 7) and Equity Interests (Class 8) will not receive any recovery under the Plan on account of such Other Subordinated Claims or Equity Interests, and such Classes are, therefore, conclusively deemed to reject the Plan. Accordingly, ballots are not being furnished to holders of Other Subordinated Claims or Equity Interests in Classes 7 or 8, respectively.

## B.      SUMMARY OF THE PLAN

In 2008 BearingPoint embarked on a comprehensive restructuring effort, including exploring various strategic alternatives, such as a transaction involving a sale of all or a portion of BearingPoint's assets. An extensive sale process was initiated during which approximately 25 strategic and financial buyers expressed an interest in buying all or parts of BearingPoint. The proposals that BearingPoint received in connection with those efforts either provided insufficient value or appeared impractical. As a result, on February 18, 2009, the Debtors filed for relief under chapter 11 of the Bankruptcy Code in the Bankruptcy Court.

On the Commencement Date, the Debtors filed a plan of reorganization which sought to implement the terms of an agreement in principle with their secured lenders to restructure their debt. Thereafter, however, the Debtors determined that creditor recoveries would be maximized through sales of the Debtors' businesses. To that end, and as described more fully herein, since the Commencement Date, the Debtors have sold substantially all of their business and assets and are currently in negotiations to sell their remaining businesses and assets. Upon the liquidation of their businesses and assets, the Debtors would cease to operate as a going concern. The Plan establishes a liquidating trust to liquidate the Debtors' remaining assets, and make distributions to the Debtors' creditors.

The Plan treats all creditors in accordance with their relative priorities under the Bankruptcy Code. As discussed in more detail herein, under the Plan, the holders of secured claims are to receive (a) cash in the full amount of their allowed claim, (b) the proceeds of the sale or disposition of the collateral securing their allowed claim, (c) the collateral securing their allowed claim, or (d) such other distribution as necessary to satisfy the requirements of section 1124 of the Bankruptcy Code. The holders of allowed unsecured claims against the Debtors will receive beneficial interests in a liquidating trust. The beneficial interests will entitle the holders thereof to receive distributions from the liquidating trust ratably, with a mechanism in place to give effect to certain pre-petition subordination arrangements that operate as between (and only as between) noteholders in Classes 4a, 4b and 5. Specifically, holders of the Series A Notes and the Series B Notes are subordinated to the holders of the Series C Notes and the FFL Notes, and the Plan provides that distributions to holders of the Series A Notes and the Series B Notes will be made to holders of the Series C Notes and the FFL Notes until such a time as holders of the Series C Notes and the FFL Notes are paid in full.

Based upon the Debtors' estimate of the Allowed Claims in these Chapter 11 Cases, the Plan provides for a 100% recovery for holders of Other Secured Claims, 7.6% - 14.7% recovery for

holders of Series C Noteholder Claims and FFL Noteholder Claims, 2.6% - 5.1% recovery for holders of General Unsecured Claims, 0% recovery for holders of Junior Noteholder Claims, 0% recovery for holders of Other Subordinated Claims, and 0% recovery for Equity Interests. These projections are based on assumptions described herein and are not guaranteed. In accordance with the Supplemental Cash Collateral Order (as defined in the Plan), all claims of employees on account of the Debtors' paid time off policy will be paid in full. [The Plan is supported by the Creditors' Committee.]

## C. SUMMARY OF DISTRIBUTIONS UNDER THE PLAN

The Plan is a liquidating plan. As such, assets of the Debtors' estates will be reduced to cash and distributed by the Liquidating Trust. After payment in full of the unclassified Allowed Administrative Expense Claims, Allowed Professional Compensation and Reimbursement Claims, Allowed Priority Tax Claims, and of Allowed Claims in Classes 1, 2 and 3, the balance of the estates will be distributed ratably to holders of Allowed unsecured claims, which are classified in Classes 4a, 4b, 5 and 6. The unsecured claims are classified in separate Classes because the Plan contains a mechanism, described in detail in the chart below, that gives effect to prepetition subordination rights that govern the rights of noteholders in Classes 4a, 4b and 5. This mechanism has no effect on distributions to or recoveries of holders of Allowed General Unsecured Claims classified in Class 6.

The following table briefly summarizes the classification and treatment of Administrative Expense Claims, Claims and Equity Interests under the Plan:

| Class | Type of Claim or Equity Interest | Treatment | Approximate Allowed Amount[3] | Approximate Percentage Recovery[4] |
|---|---|---|---|---|
| -- | Administrative Expense Claims | Paid in full, in Cash, in an amount equal to such Allowed unpaid Claim on or as soon as reasonably practicable following the later of the Effective Date, the date on which such Claim becomes an Allowed Claim, or the date on which such Claim becomes payable under any agreement relating thereto; Claims incurred in the ordinary course of business will be paid in full or performed, as applicable, in the ordinary course of business. | Undetermined (including any amounts incurred and payable in the ordinary course of business) | 100% |

---

[3] The amounts set forth herein are the Debtors' estimates based on the Debtors' books and records. The Bar Date (as defined below) has not yet occurred. Actual amounts will depend upon the amounts of Claims timely filed before the Bar Date, final reconciliation and resolution of all Administrative Expense Claims and Claims, and the negotiation of cure amounts. Accordingly, the actual amounts may vary from the amounts set forth herein.

[4] Actual percentage recoveries will depend on the final valuation of the Debtors' enterprise. The ranges in the Disclosure Statement are based on certain assumption, which are subject to change. The Debtors will be including a valuation and updated numbers in this Disclosure Statement at a later date.

| Class | Type of Claim or Equity Interest | Treatment | Approximate Allowed Amount[3] | Approximate Percentage Recovery[4] |
|---|---|---|---|---|
| -- | Professional Compensation and Reimbursement Claims | Paid in full, in Cash, in an amount equal to such Allowed Claim. | Undetermined | 100% |
| -- | Priority Tax Claims | Either (a) paid in full, in Cash, in the full amount of such Allowed unpaid Claim on or as soon as reasonably practicable following the later of the Effective Date or the date on which such claim becomes an Allowed Claim or (b) commencing on the Effective Date, or as soon thereafter is practicable, and continuing over a period not exceeding five (5) years from and after the Commencement Date, paid in equal semi-annual Cash payments in an aggregate amount equal to such Claim, together with interest for a period after the Effective Date at a fixed-annual rate determined under applicable non-bankruptcy law. | $2,418,210 | 100% |
| 1 | Priority Non-Tax Claims | Unimpaired. Paid in full, in Cash, on or as soon as reasonably practicable following the later of the Effective Date or the date on which such Claim became an Allowed Claim. | $568,279 | 100% No vote (deemed to accept) |
| 2 | Secured Tax Claims | Unimpaired. Either (a) paid in full, in Cash, in the full amount of such Allowed unpaid Claim on or as soon as reasonably practicable following the later of the Effective Date or the date on which such claim becomes an Allowed Claim or (b) on such other terms determined by the Bankruptcy Court to provide the holder deferred Cash payments having a value, as of the Effective Date, equal to such Claim. | $436,799 | 100% No vote (deemed to accept) |

| Class | Type of Claim or Equity Interest | Treatment | Approximate Allowed Amount[3] | Approximate Percentage Recovery[4] |
|---|---|---|---|---|
| 3 | Other Secured Claims | Unimpaired. Each such Allowed Claim will be reinstated, or each holder of such Claim will receive (a) cash in the full amount of the Claim, (b) proceeds of the sale or disposition of its collateral securing such Claim, to the extent of the value of the holder's secured interest in the collateral, (c) the collateral securing such Claim and any required interest, or (d) any other distribution necessary to satisfy the requirements of section 1124 of the Bankruptcy Code. | $24,889 | 100%<br><br>No vote (deemed to accept) |
| 4a | Series C Noteholder Claims | Impaired. Each holder of such Allowed Claim will receive a Class C Beneficial Interest in the Liquidating Trust, which shall entitle its holder to receive (i) its Pro Rata Share of distributions from the Liquidating Trust, and (ii) until such a time as all holders of Allowed Senior Noteholder Claims (*i.e.* Allowed Series C Noteholder Claims and Allowed FFL Noteholder Claims) have received, in the aggregate, an amount equal to the amount, in the aggregate of all Allowed Senior Noteholder Claims, an additional amount equal to its Class 4 Pro Rata Share of distributions made from the Liquidating Trust on account of Class A/B Beneficial Interests. | $203,416,667 | 7.6% - 14.7%[5] |

---

[5] The Debtors current recovery analysis estimates approximately $24,200,000 in assets distributable to holders of Allowed Claims in Classes 4a, 4b, 5 and 6. Recovery percentages are based on this estimate. The amount of such distributable assets could increase to approximately $46,700,000 if the Debtors or Liquidating Trustee are able to realize and monetize all opportunities discussed herein (*i.e.* the release of outstanding Letters of Credit).

| Class | Type of Claim or Equity Interest | Treatment | Approximate Allowed Amount[3] | Approximate Percentage Recovery[4] |
|---|---|---|---|---|
| 4b | FFL Noteholder Claims | Impaired. Each holder of such Allowed Claim will receive a Class C Beneficial Interest in the Liquidating Trust, which shall entitle its holder to receive (i) its Pro Rata Share of distributions from the Liquidating Trust, and (ii) until such a time as all holders of Allowed Senior Noteholder Claims (*i.e.* Allowed Series C Noteholder Claims and Allowed FFL Noteholder Claims) have received, in the aggregate an amount equal to the amount, in the aggregate, of all Allowed Senior Noteholder Claims, an additional amount equal to its Class 4 Pro Rata Share of distributions made from the Liquidating Trust on account of Class A/B Beneficial Interests. | $40,101,111 | 7.6% - 14.7% |
| 5 | Junior Noteholder Claims | Impaired. Each holder of such Allowed Claim will receive a Class A/B Beneficial Interest in the Liquidating Trust, which shall entitle its holder to receive its Pro Rata Share of distributions from the Liquidating Trust, provided, however, that all distributions on account of Class A/B Beneficial Interests shall be made to holders of Allowed Senior Noteholder Claims in accordance with Sections 4.4 and 4.5 of the Plan until such time as all holders of Allowed Senior Noteholder Claims have received, in the aggregate, pursuant to clauses (i) and (ii) of Section 4.4(c) and Section 4.5(c), an amount equal to the amount, in the aggregate, of all Allowed Senior Noteholder Claims. Thereafter, a Class A/B Beneficial Interest shall entitle its holder to receive (i) its Pro Rata Share of distributions from the Liquidating Trust, and (ii) an additional amount equal to its Class 5 Pro Rata Share of distributions made from the Liquidating Trust on account of Class C Beneficial Interests. | $452,121,889 | 0% |

| Class | Type of Claim or Equity Interest | Treatment | Approximate Allowed Amount[3] | Approximate Percentage Recovery[4] |
|---|---|---|---|---|
| 6 | General Unsecured Claims | Impaired. Each holder of such Allowed Claim will receive a Class G Beneficial Interest in the Liquidating Trust, which shall entitle the holder thereof to receive its Pro Rata Share of distributions from the Liquidating Trust. | $225,171,340[6] | 2.6% - 5.1%[7] |
| 7 | Other Subordinated Claims | Impaired. No distribution. | 0% | 0% No vote (deemed to reject) |
| 8 | Equity Interests | Impaired. No distribution. | $0 | 0% No vote (deemed to reject) |

For a detailed liquidation analysis and valuation estimates, see Exhibit D to this Disclosure Statement.

THE DEBTORS BELIEVE THAT THE PLAN ACCOMPLISHES THE OBJECTIVES OF CHAPTER 11 AND THAT ACCEPTANCE OF THE PLAN IS IN THE BEST INTEREST OF THE DEBTORS AND THEIR CREDITORS. THE DEBTORS URGE CREDITORS TO VOTE TO ACCEPT THE PLAN. [THE CREDITORS' COMMITTEE ALSO STRONGLY ENCOURAGES ALL CREDITORS TO VOTE IN FAVOR OF THE PLAN. THE CREDITORS' COMMITTEE WAS ACTIVELY INVOLVED IN THE FORMULATION OF THE PLAN AND BELIEVES THAT THE PLAN PROVIDES THE HIGHEST AND BEST RECOVERIES FOR ALL OF THE DEBTORS' CREDITORS.]

---

[6] The schedules that the Debtors filed with the Bankruptcy Court set forth General Unsecured Claims in the amount of approximately $58,000,000. This amount, however, was as of the date of the filing of the Debtors schedules and was based on a restructuring of the Debtors. As of the date hereof, unsecured claims have been asserted against the Debtors in the approximate amount of $2,600,000,000. The Debtors currently estimate that many of these asserted claims will not be "Allowed" by the Bankruptcy Court and that General Unsecured Claims in the Allowed amount of $225,171,340 Recovery percentages herein are based on such estimate.

[7] See footnote 7.

**III.**

**OVERVIEW OF THE DEBTORS' OPERATIONS
AND KEY EVENTS LEADING TO THE CHAPTER 11 FILING**

**A.    CORPORATE STRUCTURE**

BE is the ultimate parent of the BearingPoint family of companies (collectively "***BearingPoint***"), which was a global organization with subsidiaries around the world.  As of December 31, 2008, besides the corporate headquarters, BearingPoint occupied approximately 80 additional offices in the United States and approximately 50 offices in Latin America, Canada, the Asia Pacific region, and EMEA (as defined below). The chart below provides a general overview of BearingPoint's prepetition corporate structure, including all of the Debtors (outlined) and several non-Debtor entities.

The Debtors in these Chapter 11 Cases consist of BE, its wholly-owned subsidiaries BearingPoint, LLC ("***BE LLC***"), BearingPoint Global, Inc., BearingPoint Global Operations, Inc. ("***BE GOI***"), and BearingPoint International I Inc. ("***BE International***"), and certain wholly-owned subsidiaries of BE LLC, BE GOI, and BE International.

BE is a public reporting company under Section 12(b) of the Securities and Exchange Act of 1934.  Its common stock (the "***Common Stock***") was, until November 17, 2008 (as described below), publicly traded under the symbol "BE" on the New York Stock Exchange (the "***NYSE***").  It currently trades on "Pink Sheets" and the OTC Bulletin Board under the symbol "BGPTQ."  As of December 31, 2008 there were approximately 4.4 million shares of Common Stock outstanding.

The following is a chart showing the relationship of the Debtors to each other.



## B. OVERVIEW OF THE DEBTORS' HISTORICAL OPERATIONS

Based in Dallas, Texas, with executive offices in New York City, BearingPoint was one of the world's leading providers of management and technology consulting services. BearingPoint began as the consulting arm of KPMG LLP ("**KPMG**"), with KPMG creating a distinct business unit for its consulting services in 1997. BE was incorporated as a business corporation under the laws of the State of Delaware in 1999. On January 31, 2000, KPMG transferred its consulting business to BearingPoint, and, on February 8, 2001, BE completed its initial public offering and began to trade on the NASDAQ National Market. On October 2, 2002, the company changed its name to "BearingPoint, Inc." from "KPMG Consulting, Inc." and BE's common stock began to trade on the NYSE under the symbol "BE."

Historically, in North America, BearingPoint delivered consulting services through its Public Services, Commercial Services and Financial Services industry groups, which provided significant industry-specific knowledge and service offerings. Outside of North America, BearingPoint was organized on a geographic basis — Europe, the Middle East and Africa ("**EMEA**"), the Asia Pacific region, and Latin America (including Mexico).

### 1. North American Operations

BearingPoint's North American operations were managed on an industry basis, enabling BearingPoint to capitalize on its significant industry-specific knowledge base. Prior to January 1, 2009, BearingPoint's three North American industry groups were:

#### (a) Public Services

Public Services served a broad range of both public and private clients, including agencies of the U.S. Federal government, such as the Departments of Defense, Homeland Security, and Health and Human Services; provincial, state and local governments; public healthcare companies and private sector healthcare agencies; aerospace and defense companies; and higher education institutions. As described in Section IV.B.4(a), the closing of the sale of a significant portion of BE's assets related to its North American Public Services business pursuant to the Deloitte Transaction (as defined in Section IV.B.4(a)) occurred on May 8, 2009.

#### (b) Commercial Services

Commercial Services supported a highly diversified range of clients, including those in life sciences and energy markets, as well as technology, consumer markets, manufacturing, transportation, communications, and private and public utilities. As described in Section IV.B.4(b), the closing of the sale of a substantial portion of BE's assets related to its CS Business (as defined in Section IV.B.4(b)) pursuant to the PwC US Transaction (as defined in Section IV.B.4(b)) occurred on June 15, 2009.

#### (c) Financial Services

Financial Services directed its solutions to many of the world's leading banking, insurance, securities, real estate, hospitality and professional services institutions. The Financial Services group was sold in conjunction with the Commercial Services group. As described in Section IV.B.4(b), the closing of the sale of a substantial portion of BE's assets related to its CS Business (which includes its Financial Services business) pursuant to the PwC US Transaction occurred on June 15, 2009.

2.      **International Operations**

BearingPoint's operations based outside the United States are not and have never been part of the chapter 11 filings. BearingPoint's three geographic regions outside its North American practice included:

(a)     **EMEA**

As described in Section IV.B.4(c), the closing of the sale of BE's EMEA practice pursuant to the EMEA Transaction (as defined in Section IV.B.4(c)) occurred on August 28, 2009.

(b)     **Asia Pacific region**

As described in Section IV.B.5(c), the closing of the sale of BearingPoint's consulting business in Japan pursuant to the PwC Japan Transaction (as defined in Section IV.B.5(c)) occurred on May 11, 2009.

Pursuant to the PwC China/India Transaction (as defined in Section IV.B.4(b)), BearingPoint has entered into agreements to sell two global development centers in the Asia Pacific region. The closing of the PwC China/India Transaction is expected to occur within the next several months. Additionally, BearingPoint is working toward a sale of their Chinese operations to Perot Systems. BearingPoint is also in separate negotiations with other parties and local management to sell various other Asia Pacific practices.

As described in Section IV.B.5(d), the closing of the sale of BE's consulting business in Australia pursuant to the Australia Transaction (as defined in Section IV.B.5(d)) occurred on September 4, 2009.

(c)     **Latin America (including Mexico)**

As described in Section IV.B.5(a), BE and certain of its subsidiaries entered into an agreement on July 9, 2009 for the sale of BE's consulting business in Brazil pursuant to the Brazil Transaction (as defined in Section IV.5(a)). The closing of the Brazil Transaction occurred on July 31, 2009.

As described below, BearingPoint is in negotiations with other parties and local management to sell its remaining Latin America practices.

C.     S̲IGNIFICANT̲ P̲REPETITION̲ I̲NDEBTEDNESS̲

The following chart illustrates the Debtors' significant prepetition indebtedness, as of February 10, 2009:

| Type of Debt | Principal Amount | Obligor(s) | Guarantors | Liens | First Put Right[8] |
|---|---|---|---|---|---|
| Secured Credit Facility - Term Loan | $323,250,000 | BE, and BE LLC | Certain domestic subsidiaries of the Obligors as set forth in the Credit Agreement (the Debtors other than BE and BE LLC) | First priority lien on substantially all of the assets of the Obligors and the Guarantors as set forth in the Security Agreement dated May 18, 2007 | Not applicable |
| Secured Credit Facility - Synthetic Letter of Credit (Letters of Credit Outstanding) | $171,500,000[9] ($84,388,501)[10] | BE, and BE LLC | Certain domestic subsidiaries of the Obligors as set forth in the Credit Agreement (the Debtors other than BE and BE LLC) | First priority lien on substantially all of the assets of the Obligors and the Guarantors as set forth in the Security Agreement dated May 18, 2007 | Not applicable |
| Priority Subordinated Debentures (Series C) | $200,000,000 | BE | None | Unsecured | April 15, 2009 |
| Priority Subordinated Debentures (FFL SPA) | $40,000,000 | BE | None | Unsecured | July 15, 2010 (Maturity Date) |
| Junior Subordinated Debentures (Series A) | $250,000,000 | BE | None | Unsecured | December 15, 2011 |
| Junior Subordinated Debentures (Series B) | $200,000,000 | BE | None | Unsecured | December 15, 2014 |

---

[8] In addition to the put rights that arise on a specific date, holders of the Series A Notes, Series B Notes, and Series C Notes (each as defined below) can also require BE to redeem the debentures for cash upon the occurrence of a "designated event" (as defined in the indentures and discussed below).

[9] This represents a cash deposit to refund issuing banks for draws under any letters of credit, and, as such, is currently a contingent claim against the Debtors.

[10] This represents the aggregate face amount of undrawn letters of credit issued under the LC Facility (as defined below), and, as such, is currently a contingent claim against the Debtors.

The instruments evidencing these obligations are described below. In addition to the prepetition indebtedness described below, the Debtors estimate general unsecured claims of approximately $225 million.

1.    **The Secured Credit Facility**

Pursuant to that certain Credit Agreement, dated May 18, 2007 (as amended and restated on June 1, 2007, the "*Security Credit Facility*") among BE and BearingPoint, LLC, as borrowers (together, the "*Borrowers*"), and certain of BE's subsidiaries, as guarantors (the "*Guarantors*"), Wells Fargo N.A, as successor administrative and collateral agent to UBS AG, Stamford Branch, and the lenders (the "*Secured Lenders*"), issuing banks, and other agents party thereto, the Borrowers obtained (i) a term loan (the "*Term Loan*") with an aggregate principal amount of $300.0 million and (ii) commitments to issue credit-linked deposit letters of credit (the "*LC Facility*") in the aggregate amount of $200.0 million (the "*Letters of Credit*"). The Term Loan was set to mature and the commitments to issue the Letters of Credit to expire on May 18, 2012. Under the LC Facility, the issuing banks issued letters of credit on behalf of BE and its subsidiaries to support their obligations in favor of third party beneficiaries. If a letter of credit was drawn by a third party beneficiary, the issuing bank was obligated to fund the draw, and the Borrowers were obligated to reimburse the issuing bank. The Secured Lenders had deposited cash (the "*Credit-Linked Deposit*") to backstop any unreimbursed obligations of the Borrowers. If the Borrowers had failed to reimburse the issuing banks, the administrative agent would have reimbursed the Issuing Banks from the Credit-Linked Deposit. Following withdrawal from a Credit-Linked Deposit, the Borrowers could have elected to reimburse the Credit-Linked Deposit (provided that no payment or insolvency event of default was continuing) or to convert the withdrawn amount into a loan with substantially the same terms as the Term Loan.

Pursuant to that certain Security Agreement dated May 18, 2007 (the "*Security Agreement*") by and between the Borrowers, the Guarantors, and Wells Fargo N.A. as successor collateral agent to UBS AG, Stamford Branch, the Borrowers' obligations under the Amended and Restated Credit Agreement were secured by (i) a first priority lien on substantially all of the assets of the Borrowers and each of the Guarantors and (ii) a pledge of 65% of the stock in certain of BE's first-tier foreign subsidiaries.

The Borrowers used the Term Loan proceeds for general corporate purposes, including the repayment of certain debt obligations. The Borrowers used the Letters of Credit to backstop any unreimbursed obligations of BearingPoint.

As of the Commencement Date, under the Secured Credit Facility, approximately $323.25 million of principal under the Term Loan (including drawn but unreimbursed letters of credit that had been converted to term loans under the Secured Credit Facility) was outstanding.[11] As of the Commencement Date, the aggregate face amount of undrawn letters of credit issued under the LC Facility was approximately $85.35 million (including accrued interest). The LC Facility includes a cash deposit of $171.50 million to refund issuing banks for draws under any letters of credit. As discussed in more detail herein, the Debtors have used the proceeds of the sales of certain of their businesses and assets to pay down the Secured Credit Facility, and, on or around September 22, 2009, the Debtors paid down the remaining amount of the Secured Credit Facility and the Secured Lenders' liens were released.

---

[11] Any draw downs under the letter of credit facility that were not reimbursed by BearingPoint were added as additional indebtedness under the Term Loan.

The terms of the Secured Credit Facility generally restricted BE's ability to dispose of assets, incur additional indebtedness and issue equity securities, and required the net cash proceeds from certain asset sales, casualty events, debt issuances and 50% of equity offerings, to be used to prepay amounts outstanding under the Term Loan and/or to collateralize outstanding letters of credit under the LC Facility.

The outstanding funded debt under the Secured Credit Facility was paid in full during the Chapter 11 Cases, and, as discussed in more detail herein, the Debtors cash collateralized the remaining outstanding Letters of Credit.

## 2. **Junior Notes**

On December 22, 2004, BE issued $400.0 million of convertible subordinated debentures pursuant to that certain Indenture, dated December 22, 2004 among BE and the Bank of New York, as indenture trustee (as amended, the "*Junior Indenture*"). The offering consisted of $225.0 million aggregate principal amount of 2.50% Series A Convertible Subordinated Debentures due December 15, 2024 (the "*Series A Notes*") and $175.0 million aggregate principal amount of 2.75% Series B Convertible Subordinated Debentures due December 15, 2024 (the "*Series B Notes*" and, together with the Series A Notes, the "*Junior Notes*"). On January 5, 2005, BE issued an additional $25.0 million aggregate principal amount of its Series A Notes and an additional $25.0 million aggregate principal amount of its Series B Notes upon the exercise in full of an option granted to the initial purchasers. Interest on the Junior Notes is payable semi-annually on June 15 and December 15 of each year. The Junior Notes are unsecured and are subordinated to any amounts owing under the Secured Credit Facility, to the Series C Notes, the FFL Notes, and existing and future senior debt.

The holders of the Junior Notes could have required BE to repurchase all or a portion of the Junior Notes not previously converted, purchased or redeemed by BE on the occurrence of a designated event, at a repurchase price equal to 100% of the principal amount of the Junior Notes, plus any accrued and unpaid interest and accrued and unpaid liquidated damages. The list of designated events (the "*Designated Events*") includes certain change of control transactions and a termination of trading occurring if BE's common stock is no longer listed for trading on a United States national securities exchange nor approved for trading on the NASDAQ National Market. On November 13, 2008 BE received notice from the NYSE that it would suspend the trading of BE's stock effective as of November 17, 2008. Thereafter, BE's stock was delisted by the NYSE effective as of March 19, 2009. Although the delisting of BE's stock qualified as a "designated event," the chapter 11 filing resulted in the acceleration of these debt obligations. Accordingly, they became automatically due and payable on the Commencement Date.

An informal Steering Committee of the holders of the Junior Notes, retained the law firm Ropes & Gray LLP and financial advisor Imperial Capital in connection with restructuring negotiations in these Chapter 11 Cases.

## 3. **Series C Notes**

On April 27, 2005, BE issued $200.0 million aggregate principal amount of 5.00% Convertible Senior Subordinated Debentures Due 2025 (the "*Series C Notes*") pursuant to that certain Indenture, dated April 27, 2005 among BE and The Bank of New York, as indenture trustee (as amended, the "*Series C Indenture*" and together with the Junior Indenture, the "*Indentures*"). Interest on the Series C Notes was payable semi-annually on April 15 and October 15 of each year. The Series C Notes are unsecured and are subordinated to BE's existing and future senior debt and any amounts owing under

the Secured Credit Facility, *pari passu* with the FFL Notes (defined below), and senior to the Junior Notes.

The holders of the Series C Notes could have required BE to purchase such notes on or after April 15, 2009 at a purchase price in cash equal to 100% of the principal amount of the Series C Notes plus accrued and unpaid interest and additional interest, if any, on the Series C Notes to, but not including, the purchase date (the "***April 2009 Put Right***").

The holders of the Series C Notes could have required BE to repurchase all or a portion of the Series C Notes not previously converted, purchased or redeemed by BE on the occurrence of a Designated Event, at a repurchase price equal to 100% of the principal amount of the Series C Notes, plus any accrued and unpaid interest and accrued and unpaid additional interest, if any, to, but not including, the designated event repurchase date.

An informal Steering Committee of the holders of the Series C Notes retained the law firm of Bracewell & Giuliani LLP and financial advisor Barclays Capital in connection with restructuring negotiations in these Chapter 11 Cases.

**4.      FFL Notes**

On July 15, 2005, BE issued, pursuant to that certain Securities Purchase Agreement, dated July 15, 2005 (the "***FFL SPA***"), $40 million aggregate principal amount of its 0.50% Convertible Senior Subordinated Debentures due July 10, 2010 (the "***FFL Notes***," together with the Series C Notes, the "***Senior Notes***") and common stock warrants (the "***FFL Warrants***") to purchase up to 3,500,000 shares of BE 's common stock.  Interest on the FFL Notes is payable semi-annually on January 15 and July 15 of each year. The FFL Notes are subordinate to all existing and future senior debt and any amount due under the Secured Credit Facility, *pari passu* with the Series C Notes, and senior to the Junior Notes.

An informal Steering Committee of the holders of the FFL Notes retained the law firm Bingham McCutchen LLP to represent them in connection with restructuring negotiations in these Chapter 11 Cases.

**D.      KEY EVENTS LEADING TO THE**
**COMMENCEMENT OF THE CHAPTER 11 CASES**

**1.      DECLINING PERFORMANCE**

In the last several years, BearingPoint faced a number of challenges, which taken together, had a negative impact on BearingPoint's overall financial performance and culminated in the need for these Chapter 11 Cases.  All of these issues caused employee and client concerns regarding BearingPoint's future, and impacted BearingPoint's ability to retain clients and employees.

**(a)      Significant Indebtedness**

Commencing with its first acquisition of an international practice (Mexico) in December 1999, BearingPoint began executing a strategy to develop a global business platform primarily through acquisition.  Through the end of 2002, BearingPoint had completed approximately 30 acquisitions, group hires or other similar transactions.  In order to make these acquisitions, BearingPoint assumed a significant debt load, which BearingPoint believed it would be able to service through revenue generated by its operations.  BearingPoint's current debt load, which consists primarily of the Secured Credit

Facility, the Junior Notes, and the Senior Notes, was assumed, in part, for the purposes of restructuring BearingPoint's acquisition debt.

As already described, beginning in 2009, BearingPoint became subject to significant required payments under the Secured Credit Facility and certain of the notes. In particular, the holders of the Series C Notes could have required BearingPoint, on April 15, 2009, to repurchase the Series C Notes. Failure to repurchase would have caused a cross default under BearingPoint's Junior Notes, the FFL Notes, and the Secured Credit Facility. This cross default would, in turn, have accelerated all the outstanding obligations under the notes and facilities.

BearingPoint's cash resources at the time could not have met the obligations to honor the repurchase rights of a substantial number of holders of its notes, which could also have led to an event of default under the Secured Credit Facility.

### (b) Goodwill Impairment

In 2004 and 2005, in connection with BE's goodwill impairment test, BE determined there were significant decreases in fair value for its EMEA and Commercial Services reporting units. In 2004, a goodwill impairment loss of approximately $397 million was recognized in the EMEA reporting unit, and in 2005, goodwill impairment losses of approximately $64 million and $102 million were recognized in the Commercial Services and EMEA reporting units, respectively.

### (c) NYSE Delisting

Based on the factors discussed above, among other reasons, the value of BearingPoint stock dropped dramatically. On July 16, 2008, BE was notified by the NYSE that the average per share price of its common stock was below the NYSE's continued listing standard (which requires that BE's common stock trade at a minimum average closing price of $1.00 over a consecutive 30 trading-day period). On October 28, 2008, the NYSE notified BE that it had fallen below the continued listing standard relating to the minimum average market capitalization. Due to this decline in its stock price, on November 13, 2008, BE received notice from the NYSE that it would suspend the trading of BE stock effective as of November 17, 2008, and would pursue applicable procedures to delist BE stock, because the stock was trading at "abnormally low" levels. After the suspension of trading, BE shares were quoted only in the over-the-counter market.[12]

### (d) Going-Concern Qualification

In connection with the filing of BearingPoint's annual financial statements, BearingPoint's accountants, Ernst & Young LLP ("*E&Y*"), performed an annual audit. E&Y's report on BearingPoint's 2008 consolidated financial statements states that uncertainties inherent in the bankruptcy process raise substantial doubt about BearingPoint's ability to continue as a going concern. The failure by BearingPoint to obtain an unqualified annual audit would have resulted in a default under the Secured Credit Facility. BearingPoint's failure to satisfy its obligations under the Secured Credit Facility when due by maturity or an event of default would have led to an event of default under the Junior Notes and the Senior Notes.

---

[12] BE appealed the NYSE determination to delist the stock, and the appeal was pending when BE filed the Chapter 11 Cases. Thereafter, it withdrew the appeal and the NYSE delisted BE's common stock, effective as of March 19, 2009.

(e)     **DCAA Audit**

BearingPoint provided services to a number of United States governmental agencies.  In connection therewith, the U.S. Defense Contract Audit Agency (the "***DCAA***") performed periodic audits of BearingPoint's financial capability (each, a "***DCAA Audit***") to determine whether BearingPoint's financial condition was acceptable for performing government contracts.  The delisting of BE's common stock from the NYSE, the failure to make the April 2009 Put Right, or a going concern qualification contained in E&Y's audit opinion could each have resulted in the DCAA issuing an adverse audit opinion.  In such a case, it would have been difficult for U.S. government contracting officers to determine that BearingPoint was a "responsible contractor," which is a requirement to be awarded new contracts and task orders with U.S. Government agencies.  In April 2009, the DCAA issued a report on its audit of BearingPoint's financial capability, which concluded that BearingPoint's financial condition was unfavorable for performing government contracts due to BearingPoint's filing for bankruptcy.  The DCAA examined BearingPoint's financial condition and capability and determined BE may not have had adequate financial resources to perform government contracts at that point in time and the near-term (up to one year) thereafter without extraordinary management actions.

(f)     **Inability to Timely File Financial Statements**

In 2004, as part of BE's separation from KPMG, BE transitioned to new financial and accounting systems.  Difficulties in implementation of these systems contributed to BE's inability to timely file its SEC periodic reports, substantial increases in BE's expenses, including finance, accounting and audit costs, and to the material weaknesses identified in BE's audits for fiscal years 2004 through 2007.  Management concluded that its internal control over financial reports was not effective during that specified period, and increased expenditures were necessary to establish an effective set of internal controls.  BE did not timely file its financial statements beginning with the filing of its Annual Report on Form 10-K for the year ended December 31, 2004.  BE became current on October 22, 2007 with the filing of its Quarterly Report on Form 10-Q for the quarterly period ended June 30, 2007, and thereafter had timely filed its SEC periodic reports until its failure to timely file its Annual Report on Form 10-K for the year ended December 31, 2008 and its Quarterly Reports on Form 10-Q for the quarterly periods ended March 31, 2009 and June 30, 2009.  This inability to timely file was due to the continuing demands on management's time and attention in connection with the Chapter 11 Cases and the Sale Transactions (as defined below), as well as the significant employee attrition BearingPoint has recently experienced.

In October 2006, a New York State court held that BearingPoint's failure to file its financial statements on a timely basis with the SEC was a default under the Junior Indenture.  To resolve the uncertainties created by the court's ruling, BE amended the Indentures, which included an increase in the interest rate paid to the holders of the Junior Notes.

(g)     **Customer Defection and Employee Attrition**

Certain existing customers, while acknowledging satisfaction with BearingPoint's services and professionals, had expressed reluctance to continue to do business with BearingPoint, creating an additional hurdle to overcome in retaining customers; this issue also contributed to difficulties in obtaining new customers.  For these and related reasons, BearingPoint experienced increased levels of employee attrition.  As of December 31, 2008, the annualized employee attrition rate for 2008 was 24.8%.

2.      **Turnaround Efforts**

(a)      **Pre-Bankruptcy Restructuring Negotiations**

To enhance stockholder value, BearingPoint continually discussed and reviewed its business, strategic direction, performance, and prospects in the context of developments in the markets in which BearingPoint operated.  Specifically, commencing in 2004, BearingPoint worked with financial advisors in connection with its review and consideration of various strategic alternatives and financing options.  Throughout 2006 and 2007, BearingPoint's ability to obtain financing in the capital and debt markets was limited by its inability to file financial statements on a current or timely basis.  Nonetheless, management continued to explore methods to increase stockholder value, embarking again in 2008 on a comprehensive restructuring effort.  To address the foregoing financial difficulties, in January 2008, BearingPoint engaged Greenhill & Co., Inc. ("**Greenhill**") to advise the Board with respect to strategic alternatives, a strategic transaction involving a sale of all or a portion of BearingPoint's assets, or an equity investment in BearingPoint.  While approximately 25 strategic and financial buyers approached BearingPoint or Greenhill with an interest in buying parts of BearingPoint, all proposals that were furnished at the time either appeared impractical or were unlikely to be consummated in time to address the April 2009 Put Right.  As a result, as of the Commencement Date,  no sales of portions of BearingPoint's business had occurred.

On October 23, 2008, the Board authorized discussions with holders of the Senior Notes and Junior Notes with the objective of restructuring part of BearingPoint's subordinated debt and possibly exchanging other existing subordinated debt for common stock of BearingPoint.

Effective as of November 11, 2008, BearingPoint appointed Kenneth A. Hiltz, a managing director of AlixPartners, LLP ("**AlixPartners**"), an internationally known business and financial advisory firm, as its new Chief Financial Officer.  BearingPoint had previously retained AlixPartners to assist it in developing its 2009 business plan, participate in its discussions to restructure its indebtedness, and lead a number of key cash management initiatives.  AlixPartners has a reputation and track record of improving a company's performance and drive bottom line results and successful corporate turnarounds.  On September 10, 2009, Mr. Hiltz ceased to serve as BearingPoint's Chief Financial Officer effective concurrently with the Board's appointment of David Johnston, a director with AlixPartners, as its Chief Financial Officer.  Mr. Hiltz continues to advise BearingPoint on a part-time basis.

BearingPoint also pursued cost cutting initiatives and successfully reduced costs directly related to the filing of its financial statements, as well as other savings.  This led to a decrease of $150.5 million from selling, general, and administrative expenses of $701.3 million in 2007 to $550.8 million in 2008.[13]

(b)      **The Restructuring Negotiations**

In October 2008, the Board authorized senior management, along with BearingPoint's advisors, to meet and negotiate with various creditor groups in an attempt to restructure its debt.  Specifically, they gave management presentations to and held negotiating sessions with principals and advisors of the following:  (i) a steering committee of lenders under the Secured Credit Facility (the

_____

[13] To be updated for details around reductions in SG&A expense through budgeting process, revised deals with KPMG, real estate sales, etc.

"*Lender Group*"), (ii) a committee of holders accounting for approximately 75% of the principal amount of the Series C Notes (the "*Series C Committee*"), (iii) the holders of the FFL Notes (the "*FFL Holders*") and (iv) a committee of holders of the Series A Notes and the Series B Notes (the "*Series A/B Committee*").  Through these negotiations, BearingPoint and the Lender Group reached an agreement in principle on the terms of a comprehensive debt restructuring to be implemented through these Chapter 11 Cases under the plan of reorganization filed on the Commencement Date.

However, as discussed in more detail in Sections IV.B.4 and IV.B.5, after the Commencement Date, BearingPoint continued to actively market its businesses and assets to potential bidders during the Chapter 11 Cases.  BearingPoint, along with its advisors, and in consultation with the Lender Group and the Creditors' Committee (as defined below) determined that creditor recovery would be increased by pursuing sales of BearingPoint's businesses and assets.  The current Plan has been proposed to reflect the Sale Transactions (as defined below).

**IV.**

**THE CHAPTER 11 CASES**

**A.**     **FIRST DAY RELIEF**

On the Commencement Date, or shortly thereafter, the Debtors filed a series of motions (the "*First Day Motions*") seeking various relief from the Bankruptcy Court designed to minimize any disruption of business operations.  Unless otherwise noted herein, all relief requested in the First Day Motions was granted by the Bankruptcy Court.

**1.**     **Case Administration Motions**

The Court entered orders: (i) authorizing the joint administration of the Chapter 11 Cases, (ii) establishing certain notice and case management procedures, (iii) authorizing the mailing of initial notices and all other mailings directly to parties in interest and the waiver of the requirement to file a list of creditors, (iv) authorizing the payment for goods and services ordered prepetition but delivered or performed postpetition, and (v) retaining and appointing the Garden City Group as the Debtors' claims and noticing agent and as an agent of the Bankruptcy Court.  In addition, the Debtors submitted applications to retain legal, financial, and restructuring advisors.

**2.**     **Employee Motions**

The Debtors submitted motions for authorization to satisfy certain outstanding obligations related to its employees including those relating to:  (i) wages, compensation, and employee benefits (the "*Wage Motion*"), (ii) employee severance, (iii) employee retention bonuses, and (iv) the assumption of managing director agreements.

**3.**     **Critical Obligations**

The Debtors submitted motions for authorization to satisfy certain outstanding obligations related to its general business operations relating to:  (i) sales and use taxes, and (ii) certain customer practices.

4. **Business Operations**

To improve and continue their business operations, the Debtors submitted motions for authorization to: (i) continue certain workers' compensation and other insurance policies, (ii) reject certain executory contracts and unexpired leases of real and personal property, and (iii) prohibit utilities from discontinuing service.

5. **Financial Operations**

The Court entered an order authorizing the Debtors to (i) maintain their existing bank accounts and forms, (ii) continue to use existing investment guidelines, and (iii) continue their centralized cash management system.

6. **Restrictions on Trading**

The Court entered a series of interim orders and a final order (collectively, the "***Trading Orders***") establishing notification procedures and restrictions on trading in equity interests in and claims against the Debtors in order to preserve, to the extent possible, the potential value of the Debtors' net operating losses, unrealized built-in losses and other tax attributes, during the pendency of the Chapter 11 Cases. The Trading Orders applied immediately to investors that beneficially owned or sought to acquire (i) at least 4.75% of the outstanding shares of BE Common Stock or (ii) certain claims against the Debtors, in combinations or amounts specified in the Trading Order.

## B. KEY EVENTS DURING CHAPTER 11 CASES

1. **Creditors' Committee**

On February 27, 2009, the U.S. Trustee, pursuant to its authority under section 1102 of the Bankruptcy Code, appointed the Creditors' Committee.

The current members of the Creditors' Committee are:

The Bank of New York Mellon
101 Barclay Street
New York, New York 10286
Attn: David M. Kerr

Law Debenture Trust Company of New York
400 Madison Ave.
New York, New York 10017
Attn: Robert Bice

Federal Management Systems, Inc.
462 K Street, NW
Washington, DC 20001
Attn: Aubrey A. Stephenson

Plainfield Special Situations Master Fund Ltd.
c/o Plainfield Asset Management LLC
55 Railroad Avenue
Greenwich, Connecticut 06830
Attn: Robert Friend

Friedman Fleischer & Lowe
Capital Partners II, L.P.
c/o Friedman Fleischer & Lowe, LLC
One Maritime Plaza, Suite 2200
San Francisco, California 94111
Attn: Christopher A. Masto

York Capital Management
767 Fifth Ave., 17th Floor
New York, New York 10153
Attn: Charles Hale

The Creditors' Committee has the following advisors:

| Attorneys | Financial Advisors |
|---|---|
| Bingham McCutchen LLP | Barclays Capital |
| 299 Park Avenue | Restructuring and Finance Group |
| New York, New York 10022 | 745 Seventh Avenue |
| Attn:  Jeffrey S. Sabin, Esq. | New York, New York  10019 |
|           P. Sabin Willett, Esq. | Attn:   Mark Shapiro |
|           Neil W. Townsend, Esq. |            Joseph Fletcher |
|           Andrew Gallo, Esq. | |

The Debtors have consulted with the Creditors' Committee concerning the administration of the Chapter 11 Cases, their operations, and transactions outside of the ordinary course of business.

**2.  The Schedules and Bar Date**

On March 5, 2009, the Debtors filed their schedules of assets and liabilities, schedules of current income and expenditures, schedules of executory contracts and unexpired leases, and statements of financial affairs.

On March 5, 2009, the Bankruptcy Court entered an order (the "***Bar Date Order***") establishing April 17, 2009 at 5:00 p.m. (Eastern Time) as the last date and time (the "***Bar Date***") for each person or entity other than an Governmental Unit (as defined by section 101(27)) to file proofs of Claim based on prepetition Claims against any of the Debtors, and August 17, 2009 at 5:00 p.m. (Eastern Time) as the last date and time (the "***Governmental Bar Date***") for Governmental Units to file proofs of Claim based upon prepetition Claims against any of the Debtors.  The Debtors published a notice of the Bar Date and Government Bar Date (the "***Bar Date Notice***") in The Wall Street Journal (National Edition) on March 20, 2009, and in The Washington Post on March 22, 2009 and mailed a proof of claim form and the Bar Date Notice to, among others, all known holders of Claims.

**3.  Sale of Substantially All of the Debtors' Assets**

The Debtors determined that creditor recoveries would be maximized by the sale of substantially all of their businesses and assets.  Further to its earlier restructuring efforts prior to the filing of these Chapter 11 Cases, Greenhill spent considerable time and effort marketing the Debtors' business units by identifying and negotiating with potential purchasers for the Debtors' business units.  These marketing efforts produced a number of potential purchasers, many of whom executed confidentiality agreements and engaged in a due diligence review of materials relevant to the assets and the Debtors.

In certain instances, the Debtors, with the Bankruptcy Court's approval, used bidding procedures (the "***Bidding Procedures***") to facilitate the sale of their businesses.  The Bidding Procedures were employed once the Debtors entered into an agreement with the stalking horse bidder (the "***Stalking Horse Bidder***").  The principal terms of the Bidding Procedures generally provided for (i) the execution of confidentiality agreements by potential purchasers; (ii) the submission of specified bidding information by potential purchasers, including an executed asset purchase agreement and certain financial information; (iii) a good faith deposit; and (iv) an auction to be held by the Debtors following the submission of all qualified bids in which all qualified bidders, including the Stalking Horse Bidder, could participate.  Furthermore, the Bidding Procedures also generally included certain purchaser protections ("***Purchaser Protections***"), such as a break-up or termination fee and an expense reimbursement fee, to be paid to the Stalking Horse Bidder in the event that the Stalking Horse Bidder was outbid at the auction.

The Purchaser Protections were designed to facilitate the Bidding Procedures and obtain the highest and best price for the assets. In each case, a sale hearing to approve any proposed sale was held by the Bankruptcy Court before any proposed sale was consummated by the Debtors.

**4.      Sales of Significant Businesses or Assets**

(a)      **Sale of BE's North American Public Services Business Unit**

On March 23, 2009, the Debtors filed a motion seeking approval of the sale of a substantial portion of the assets related to BE's North American Public Services business (the "***PS Business***"), free and clear of all liens, claims and encumbrances. BE and certain of its subsidiaries entered into an Asset Purchase Agreement (the "***PS Agreement***") with Deloitte LLP ("***Deloitte***"), dated March 23, 2009, as amended on April 3, 2009, for the sale of a substantial portion of the assets related to the PS Business, and Deloitte agreed to assume certain liabilities associated with these assets as set forth in the PS Agreement (the "***Deloitte Transaction***").

The assets purchased pursuant to the PS Agreement included, subject to certain exclusions, all assets used primarily, or held for use primarily, in the PS Business, including leases, equipment, intellectual property and a substantial portion of the client contacts of the PS Business (collectively, the "***PS Business Assets***").

Although the Deloitte Transaction was subject to Bidding Procedures and an auction, no other potential purchaser submitted a bid for the assets. As a result no auction was held. On April 17, 2009, the Bankruptcy Court entered an order approving the sale of a substantial portion of the assets related to the PS Business, pursuant to the terms and conditions of the PS Agreement. The total purchase price for the PS Business Assets was approximately $322 million, subject to certain adjustments as set forth in the PS Agreement. The consummation of the Deloitte Transaction occurred on May 8, 2009.

(b)      **Sale of BE's Commercial Services Business Unit**

On April 17, 2009, the Debtors filed a motion seeking approval of the sale of a substantial portion of the assets related to BE's Commercial Services business unit, including Financial Services (collectively, the "***CS Business***") and 100% of the equity interests in BearingPoint Information Technologies (Shanghai) Limited ("***BearingPoint GDC China***"), free and clear of all liens, claims and encumbrances. BE and certain of its subsidiaries entered into an Asset Purchase Agreement (the "***CS Agreement***") with PricewaterhouseCoopers LLP ("***PwC***"), dated April 17, 2009, for the sale of a substantial portion of the assets related to the CS Business, and PwC agreed to assume certain liabilities associated with these assets (the "***PwC US Transaction***"). The assets purchased pursuant to the CS Agreement include, subject to certain exclusions, specified customer contracts of the CS Business and the accounts receivable, work in progress, certain intellectual property and other related assets. In addition, affiliates of PwC also entered into definitive agreements to purchase 100% of the equity interests of BearingPoint GDC China, a subsidiary of BE that operates a global development center in China, and certain assets of a separate global development center in India (the "***PwC China/India Transaction***", and together with the PwC US Transaction, the "***PwC Commercial Services Transaction***").

On April 27, 2009, the Bankruptcy Court approved Bidding Procedures in connection with an auction of all or substantially all of the assets related to the CS Business and BearingPoint GDC China (the "***Auction***"). The Auction was held on May 27, 2009 and concluded on May 28, 2009. At a hearing on May 28, 2009, the Bankruptcy Court approved PwC as the winning bidder at the Auction. The aggregate purchase price for the PwC Commercial Services Transaction was $44 million (subject to certain contractual adjustments). The closing of the PwC US Transaction occurred on June 15, 2009, and,

as a result, PwC acquired the CS Business.  The purchase price for the PwC US Transaction was $39 million.  The closing of the PwC China/India Transaction is expected to occur within the next several months and is subject to customary closing conditions.

### (c)     Sale of BE's EMEA Business

On July 21, 2009, the Debtors filed a motion seeking approval of the sale of BE's EMEA practice, pursuant to a private sale (i.e., not subject to Bidding Procedures or an auction) and approval of that certain Agreement for the Sale and Purchase of the Share Capital of BearingPoint Europe Holdings B.V., BE's European holding company (the "*EMEA Share Sale Agreement*"), dated July 17, 2009, among BE, BE Holdings I CV, a subsidiary of BE, certain other affiliates of BE and BE Partners B.V., a newly formed company established by a significant majority of the managing directors of BE's EMEA practice for the purpose of acquiring the EMEA practice from BE (the "*Buyer*").  Under the terms of the EMEA Share Sale Agreement, the Buyer agreed to acquire all of BE's EMEA practice for an aggregate purchase price of approximately $69 million in total consideration (the "*EMEA Transaction*").  The EMEA practice will continue to operate under the BearingPoint name following the completion of the EMEA Transaction.

On August 13, 2009, the Bankruptcy Court entered an order approving the EMEA Transaction.  The consummation of the EMEA Transaction occurred on August 28, 2009.

### 5.     Other Sales

### (a)     Sale of BE's Brazil Business

On July 13, 2009, the Debtors filed a motion seeking authorization to sell their common stock in BearingPoint S.A. ("*BearingPoint Brazil*") pursuant to a private sale (i.e. not subject to Bidding Procedures or an auction), and approval of that certain Stock Purchase Agreement (the "*Brazil Stock Purchase Agreement*") among BE and certain of its subsidiaries, CSC Brazil Holdings LLC ("*CSC Brazil*") and Computer Sciences Corporation (together with CSC Brazil, "*CSC*"), dated July 9, 2009.  Pursuant to the Brazil Stock Purchase Agreement, CSC agreed to purchase BearingPoint Brazil, a wholly owned subsidiary of BE, through the purchase of all issued and outstanding shares of common stock of BearingPoint Brazil, for a purchase price of $7.9 million (the "*Brazil Transaction*").

The Bankruptcy Court approved the Brazil Transaction on July 23, 2009.  The consummation of the Brazil Transaction occurred on July 31, 2009.

### (b)     Sale of Legacy Contracts

Although the Debtors sold substantially all of their PS Business and CS Business contracts to Deloitte and PwC respectively, various independence issues prevented Deloitte and PwC from taking all of the PS Business and CS Business related contracts.  Accordingly, on June 3, 2009, the Debtors sought approval by the Bankruptcy Court of procedures that would allow the Debtors to assume, assign, and sell those contracts (the "*Legacy Contracts*") that remained with the estates following the sale of the Debtors' PS Business and CS Business.  On June 24, 2009, the Bankruptcy Court entered an order (the "*Legacy Contracts Order*") which authorized the Debtors to assume, assign, and sell their Legacy Contracts, without the need for Bankruptcy Court approval, pursuant to certain procedures.

On July 7, 2009, the Debtors filed a Motion seeking an order (the "*Supplemental Legacy Contracts Order*") supplementing the Legacy Contracts Order such that (i) the Debtors would be authorized to sell the Legacy Contracts free of any interests, other than any liabilities expressly assumed

by a purchaser, pursuant to section 363(f) of the Bankruptcy Code, with such interests attaching to the proceeds of the sale, and (ii) the purchasers of Legacy Contracts who purchase contracts pursuant to the Legacy Contracts Order would be provided protections afforded under section 363(m) of the Bankruptcy Code. On July 23, 2009, the Bankruptcy Court entered the Supplemental Legacy Contracts Order.

On July 2, 2009, BE entered into an Asset Purchase Agreement (the "***Keane APA***") with Keane, Inc. ("***Keane***"). Pursuant to the Keane APA, BE sold the majority of its legacy commercial services group assets to Keane for a cash amount equal to $5 million and the assumption by Keane of certain liabilities. The Keane APA closed on July 17, 2009.

On August 28, 2009, BE entered into an Asset Purchase Agreement (the "***Éclat APA***") with Éclat Consulting, LLC ("***Éclat***"). Pursuant to the Éclat APA, BE sold the majority of its legacy public services group assets to Éclat for a cash amount equal to $4 million, a note payable evidencing indebtedness in the aggregate principal amount of $7,373,310, and the assumption by Éclat of certain liabilities. The Éclat APA closed on August 28, 2009.

### (c)  Sale of BE's Consulting Business in Japan

On April 2, 2009, BearingPoint International Bermuda Holdings Limited, BE's indirect subsidiary, and PwC Advisory Co., Ltd ("***PwC Japan***"), the Japanese member firm of the PricewaterhouseCoopers global network of firms, entered into a Share Sale Agreement (the "***Share Sale Agreement***") for the sale of BE's consulting business in Japan to PwC Japan (the "***PwC Japan Transaction***"). Pursuant to the Share Sale Agreement, PwC Japan agreed to purchase BearingPoint Co., Ltd. (Chiyoda-ku) ("***BearingPoint Japan***"), an indirect, wholly owned subsidiary of BE, through the purchase of all issued and outstanding shares of BearingPoint Japan (the "***Shares***").

BE generated cash of approximately $45 million in connection with the PwC Japan Transaction, including approximately $38.4 million in cash for the Shares and $6.6 million in cash from the repayment of intercompany charges owed by BearingPoint Japan to BE, subject to adjustment. In addition, in connection with the PwC Japan Transaction, PwC Japan assumed the intercompany debt owed by certain non-Debtor subsidiaries of BE to BearingPoint Japan. The consummation of the PwC Japan Transaction occurred on May 11, 2009. As of the date hereof, approximately $12.5 million in proceeds from the sale remains in BE's non-debtor subsidiary BearingPoint International Bermuda Holdings Limited (Bermuda). The Debtors expect these funds to be repatriated to the Debtors for the benefit of their creditors.

### (d)  Sale of BE's Consulting Business in Australia

On August 6, 2009, BearingPoint Australia Pty Limited ("***BearingPoint Australia***"), a wholly owned subsidiary of BE, entered into a Business Sale Agreement (the "***Australian Business Sale Agreement***") with BPA MBO Pty Limited, BPA MBO Asset Pty Limited (as trustee for the BPA MBO Asset Unit Trust), BPA MBO Services Pty Limited and BPA MBO Trading Pty Limited (collectively, the "***MBO Team***") for the sale of BE's consulting business in Australia to local management (the "***Australia Transaction***"). Pursuant to the Australian Business Sale Agreement, the MBO team agreed to purchase the business of BearingPoint Australia through the purchase and assumption of certain assets and liabilities of BearingPoint Australia for the purchase price of AU$1,000 (exclusive of Australian Goods and Services Tax). Additional fees are payable by the MBO team pursuant to a Trademark License Agreement and Cross-License Agreement. The Australia Transaction was consummated on September 4, 2009.

(e)     **Sale of BE's Other International Businesses**

BE is in negotiations with other interested parties and local management to sell its Latin America practices (other than BearingPoint Brazil), various Asia Pacific practices (other than BearingPoint Japan, BearingPoint GDC China and BearingPoint Australia) and assets related to its Canadian subsidiaries, and is in the process of selling certain remaining assets that were not or will not be sold pursuant to other transactions. There can be no assurance that BE can enter into a definitive agreement regarding such sales or that any such transactions will be completed.

These potential transactions, together with the Deloitte Transaction, the PwC Japan Transaction, the PwC Commercial Services Transaction, the EMEA Transaction, the Brazil Transaction and the Australia Transaction and the other transactions referred to herein, are referred to collectively as the "***Sale Transactions***."

(f)     **Key Employee Incentive Plan**

On July 24, 2009, the Bankruptcy Court entered an order authorizing BE to implement, and the Board approved, a Key Employee Incentive Plan (the "***KEIP***"). The KEIP is intended, among other things, to retain and incent certain of BE's key employees to (i) preserve the value of BE's key assets to the benefit of BE's clients, employees and creditors and (ii) complete specific objectives regarding the transfer and/or monetization of these assets. The KEIP consists of three elements: (i) sale incentive payments to certain executives totaling $1.8 million in the aggregate, which has all been paid, (ii) enhanced severance payments to the Debtors' employees actively involved in the wind down of the Debtors' estates, that will be made in line with the termination of the employee's service out of funds which have already been escrowed, and (iii) wind down incentive payments based on reductions in outstanding letters of credit and overall recoveries that will be payable upon the achievement of certain delineated goals and distributions to creditors.

Pursuant to the KEIP and based on the closings of the Deloitte Transaction, the US Transaction, the PwC Japan Transaction and the EMEA Transaction, Ed Harbach, BE's former Chief Executive Officer, was entitled to receive and was paid $900,000 as a sales incentive payment. In connection with his severance agreement, Mr. Harbach will also be eligible to receive 5% of the total amount of wind-down incentive payments available for distribution under the KEIP.

6.     **California State Controller's Office Litigation**

On April 22, 2009, BearingPoint filed an adversary proceeding (the "***Proceeding***") against Defendants John Chiang, in his official capacity as the California State Controller (the "***Controller***"), the California State Controller's Office (the "***Controller's Office***"), and the California Department of General Services (the "***Department***," and together with the Controller, and the Controller's Office, the "***Defendants***") related to Defendants' breach of the contract with BearingPoint for the implementation of a new payroll and human resources computer system for the State of California. Through the Proceeding, BearingPoint seeks to recover amounts due to the Estates for Defendants' breach of the contract and to obtain a declaration that, among other things, the termination by Defendants was for convenience, not as a result of default, and that Defendants' demand for immediate payment of over $25 million on the performance bond related to the contract (and for which BearingPoint must indemnify the surety) is not appropriate and violates the automatic stay protections afforded BearingPoint. The Defendants have moved to dismiss or transfer, and assert counterclaims entitling them to draw on the outstanding letter of credit.

7. **Cash Collateral**

The Debtors filed a Motion on the first day of the Chapter 11 Cases to use Cash Collateral to pay the expenses of the operation of the Debtors' business and pay all required fees and cash collateralize certain postpetition letters of credit. On February 19, 2009, the Bankruptcy Court entered an order (the "***Interim Cash Collateral Order***") authorizing the Debtors to use Cash Collateral, pursuant to certain conditions, on an interim basis. Subsequent to entry of the Interim Cash Collateral Order, the Bankruptcy Court, on three separate occasions and upon request of the Secured Lenders, entered three bridge orders extending the Debtors' authority to use Cash Collateral pursuant to the terms of the Interim Cash Collateral Order until a final hearing was conducted on the Debtors' use of Cash Collateral. On April 20, 2009, the Bankruptcy Court entered an order (the "***Final Cash Collateral Order***") authorizing the Debtors to use Cash Collateral, pursuant to certain conditions, on a final basis.

Because of the Debtors' need to ensure that they have continued access to Cash Collateral so that sufficient liquidity exists to continue to efficiently and economically wind-down their businesses and to pay obligations on account of paid time off, severance, and the key employee incentive plan, the Bankruptcy Court entered a supplemental cash collateral order (the "***Supplemental Cash Collateral Order***") which continued the Debtors' authority to consensually use Cash Collateral and also addressed the payment of the aforementioned obligations and the pay down of the Secured Credit Facility.

8. **Employee Matters – Paid-Time Off and Severance**

On the first day of these Chapter 11 Cases, and prior to the formation of the Creditors' Committee, the Bankruptcy Court granted the Debtors' Wage Motion which authorized the Debtors to honor their obligations relating to wages, including paid time off ("***PTO***"), and severance. On May 12, 2009, the Creditors' Committee filed a motion (the "***Motion to Vacate***") to vacate the portion of the Wage Order that authorizes the Debtors to continue their PTO and severance policies. In the alternative, the Motion to Vacate requested a ruling that (a) any prepetition PTO obligations of the Debtors that do not fit within the statutory cap contained in section 507(a)(4) of the Bankruptcy Code were general unsecured obligations not entitled to administrative priority or other priority status and (b) payments under the Debtors' severance plan are not entitled to administrative priority. The Debtors objected to the Motion to Vacate.

On June 29, 2009, the Bankruptcy Court denied the Motion to Vacate.

On July 23, 2009, the Bankruptcy Court entered the Supplemental Cash Collateral Order, which reflected an agreement between the Debtors, the Creditors' Committee and the Secured Lenders and set forth the extent to which the Secured Lenders would permit Cash Collateral to be used by the Debtors. The Supplemental Cash Collateral Order, modified the injunction put into place by the Bankruptcy Court on May 20, 2009 prohibiting the payment of claims of the Debtors' current or former employees on account of their PTO, by authorizing the Debtors to pay $4 million of their PTO obligations per month until all claims on account of PTO are satisfied either through monthly payments or a lump-sum payment prior to the establishment of the Liquidating Trust.

9. **Outstanding Letters of Credit**

As discussed in Section III.C.1 above, in connection with the operation of their business, the Debtors secured Letters of Credit to backstop their obligations under certain contracts. Although most of these Letters of Credit have been released or transferred in connection with the sales of the Debtors' assets, a number of Letters of Credit remain outstanding. These outstanding Letters of Credit are secured by a bank account (the "***LC Cash Collateral Account***") which contains approximately $51,000,000 of the

Debtors' cash.[14]  If any of the Letters of Credit are drawn upon, the Debtors will be obligated to reimburse the issuing bank for the amount of the draw; conversely, if any of the Letters of Credit are released, a corresponding amount of funds will be transferred from the LC Cash Collateral Account to the Liquidating Trust for the benefit of the Debtors' creditors.  The Debtors estimate that approximately $22,000,000 will be transferred from the LC Cash Collateral Account to the Liquidating Trust.

10.  **Pay Down of Secured Credit Facility**

The Debtors have made the following disbursements to their Secured Lenders, and in doing so have paid down the Secured Credit Facility and cash collateralized the outstanding Letters of Credit:

| | | |
|---|---|---|
| • | May, 2009 | $255,000,000 |
| • | June, 2009 | $15,000,000 |
| • | July, 2009 | $15,000,000 |
| • | August, 2009 | $0 |
| • | September, 2009 | $90,799,060.83 |
| • | Total | $375,799,061.83 |

**V.**

**THE PLAN**

A.  I<small>NTRODUCTION</small>

This section of the Disclosure Statement summarizes the Plan, a copy of which is attached as Exhibit A hereto.  This summary is qualified in its entirety by reference to the Plan.

Statements as to the rationale underlying the treatment of Claims and Equity Interests under the Plan are not intended to, and shall not, waive, compromise or limit any rights, claims or causes of action in the event the Plan is not confirmed.

Capitalized terms not defined herein shall have the meaning ascribed to such term in the Plan.

**YOU SHOULD READ THE PLAN IN ITS ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN.**

In general, a chapter 11 plan of liquidation (i) divides claims and equity interests into separate classes, (ii) specifies the property that each class is to receive under the plan, and (iii) contains other provisions necessary to implement the plan.  Under the Bankruptcy Code, "claims" and "equity interests," rather than "creditors" and "shareholders," are classified because creditors and shareholders may hold claims and equity interests in more than one class.  Under section 1124 of the Bankruptcy Code, a class of claims is "impaired" under a plan unless the plan (i) leaves unaltered the legal, equitable, and contractual rights of each holder of a claim in such class, or (ii) to the extent defaults exist, provides for

---

[14] The LC Cash Collateral Account replaced the Credit Linked Deposits when the Debtors paid off the Secured Credit Facility.

the cure of existing defaults, reinstatement of the maturity of claims in such class, compensates each holder of a claim in such class for any damages incurred as a result of reasonable reliance, and does not otherwise alter the legal equitable or contractual rights of each holder of a claim in such class.

Classes 4a, 4b, 5 and 6, are impaired under the Plan. Holders of Claims in such Classes are entitled to vote to accept or reject the Plan to the extent and in the manner provided in the Voting Procedures Order or in any other order or orders of the Bankruptcy Court. Ballots are being furnished herewith to all holders of Claims in Classes 4a, 4b, 5 and 6 that are entitled to vote to facilitate their voting to accept or reject the Plan.

A chapter 11 plan of liquidation may also specify that certain classes of Claims or Equity Interests are to have their Claims or Equity Interests remain unaltered by the plan. Such classes are referred to as "unimpaired" and" because of the favorable treatment accorded to such classes, section 1126(f) of the Bankruptcy Code provides that they are conclusively deemed to have accepted the plan and, therefore, need not be solicited to vote to accept or reject the plan. Classes 1, 2 and 3 are unimpaired under the Plan, and holders of Claims in such Classes are deemed to have accepted the Plan. Accordingly, ballots are not being furnished to holders of claims in Classes 1, 2 or 3.

A chapter 11 plan of liquidation may also specify that certain classes will not receive any distribution under the plan. Under section 1126(g) of the Bankruptcy Code, such classes are conclusively deemed to have rejected the plan and, therefore, need not be solicited to accept or reject the plan. Holders of Other Subordinated Claims (Class 7) and Equity Interests (Class 8) will not receive any recovery under the Plan on account of such Other Subordinated Claims or Equity Interests, and such Classes are, therefore, conclusively deemed to reject the Plan. Accordingly, ballots are not being furnished to holders of Other Subordinated Claims or Equity Interests in Classes 7 and 8, respectively.

## B. THE LIQUIDATING TRUST

Pursuant to the Plan, all of the Debtors' assets will be transferred to a liquidating trust (the "**Liquidating Trust**") for the benefit of the Debtors' creditors. The assets of the Liquidating Trust will consist primarily of the remaining proceeds of the Sales following the paydown of the Secured Credit Facility, remaining Legacy Contracts, potential payments resulting from litigations in which the Debtors have asserted claims, including the California SCO Litigation, and the release of funds collateralizing outstanding letters of credit, to the extent such funds are released. The Liquidating Trust is described in more detail in the Plan and in Section V.H.5 hereof.

## C. PRESERVATION OF CLAIMS

The Plan reserves claims and rights of the Debtors, and their estates, creditors and shareholders (whether pursued derivatively or otherwise), against third parties. The releases contained in Section 10.8 of the Plan do not apply to claims, demands, debts, rights, causes of action or liabilities that are property of the Debtors' estates. That property will be assigned to the Liquidation Trustee, for the benefit of the beneficiaries of the Liquidation Trust, and may include claims against current or former directors or officers of the Debtors for fraud, negligence, corporate waste, abuse, mismanagement, or for breach of fiduciary or other duties. Some such claims may already have been partially pursued in the pre-petition period, and may be resumed by the Liquidation Trustee. The likelihood of success, merit, and collectability of such claims have not been assessed, and no assurances can be given to creditors in that regard. Claims may include, but are not limited to, causes of action arising from acts or omissions of current or former officers or directors in connection with the following transactions, potential transactions and events:

- The Debtors' pursuit of a potential buyer or merger partner for the BearingPoint enterprise, or any component thereof, including the evaluation (or failure to evaluate) of opportunities to maximize the value of the enterprise through such a transaction or series of transactions. The Debtors were formally and actively engaged in a sale process from at least as early as January 2008. The Plan expressly reserves to the Liquidating Trust claims arising out of this process as it may have developed from the beginning of 2007 through the Commencement Date.

- The Debtors' merger and acquisition of additional foreign and/or domestic subsidiaries beginning in December 1999. From its inception as a subsidiary of KPMG, the BearingPoint enterprise embarked on a program of acquisition to develop a global consulting presence. This growth required the assumption of a significant debt load and materially increased the overhead, operational, accounting, regulatory and other expenses of the enterprise. The Plan expressly reserves to the Liquidating Trust claims arising out of the pursuit of this strategy of merger and acquisition.

- The Debtors' operations, including accounting, internal controls and financial reporting, from the time of the assumption of KPMG's consulting business in January 2000 through the Commencement Date. As has been reported in subsequent filings with the Securities and Exchange Commission, the Debtors identified material weaknesses in their audits from 2004 through 2007, concluded that their internal controls were not effective, and failed to timely file financial reports for periods ending December 31, 2004 through March 31, 2007. The Plan expressly reserves to the Liquidating Trust claims arising out of these and other failures of the Debtors' operations, accounting and reporting functions.

- The Plan expressly reserves to the Liquidating Trust claims arising out of the assumption of secured debt and the granting of liens in connection with each of the Debtors' financings in 2004, 2005 and 2007.

- The pursuit of various golf-related ventures, including potential tournament and player sponsorships in 2007, by BearingPoint chief executive officer Harry You.

The above is set forth solely as a retention of rights, and nothing contained herein shall be construed as an indication that any of the above claims have merit, will be pursued, or that Debtors' believe there was any misconduct or is any liability in connection with the above transactions and events.

## D. SUBSTANTIVE CONSOLIDATION

Given the large number of separate legal entities, the Debtors believe it would be inefficient to propose, vote on and make distributions in respect of entity specific claims. Accordingly, through the Plan, the Debtors are proposing, solely for administrative convenience to substantively consolidate for certain purposes.

### 1. Substantive Consolidation in General

Substantive consolidation is an equitable remedy that a bankruptcy court may be asked to apply in chapter 11 cases of affiliated debtors, among other circumstances. Substantive consolidation involves the pooling of the assets and liabilities of the affected debtors. All of the debtors in the

substantively consolidated group are treated as if they were a single corporate and economic entity. Consequently, a creditor of one of the substantively consolidated debtors is treated as a creditor of the substantively consolidated group of debtors, and issues of individual corporate ownership of property and individual corporate liability on obligations are ignored.

Substantive consolidation of two or more debtors' estates generally results in (i) the deemed consolidation of the assets and liabilities of the debtors; (ii) the deemed elimination of intercompany claims, subsidiary equity ownership interests, multiple and duplicative creditor claims, joint and several liability claims and guarantees; and (iii) the payment of allowed claims from a common fund.

It is well established that section 105(a) of the Bankruptcy Code empowers a bankruptcy court to authorize substantive consolidation. The United States Court of Appeals for the Second Circuit, the circuit in which the Chapter 11 Cases are pending, has articulated a test for evaluating a request for substantive consolidation. *See United Sav. Bank v. Augie/Restivo Baking Co. (In re Augie/Restivo Baking Co.)*, 860 F.2d 515 (2d Cir. 1988). The test, as formulated by the Second Circuit, considers "(i) whether creditors dealt with the entities as a single economic unit and did not rely on their separate identity in extending credit … or (ii) whether the affairs of the debtors are so entangled that consolidation will benefit all creditors." *Id*. at 518. If either factor is satisfied, substantive consolidation is appropriate. In respect of the second factor, entanglement of the debtors "can justify substantive consolidation only where 'the time and expense necessary even to attempt to unscramble [the commingled affairs is] so substantial as to threaten the realization of any net assets for all the creditors,' … or where no accurate identification and allocation of assets is possible. In such circumstances, all creditors are better off with substantive consolidation." *Id.* at 519.

2.      **Substantive Consolidation of the Debtors**

The Debtors [and the Creditors' Committee] contend that the Debtors should be substantively consolidated for the limited purpose of voting, confirmation and distributions as provided in the Plan. The Debtors consist of a large number of separate legal entities and as such, it would be inefficient to propose, vote on and make distributions in respect of any entity specific claims.

As such, pursuant to the Plan, entry of the Confirmation Order shall constitute the approval, pursuant to section 105(a) of the Bankruptcy Code, effective as of the Effective Date, of the limited substantive consolidation of the Chapter 11 Cases for the purposes of voting, confirmation and distribution as provided in the Plan. On and after the Effective Date: (i) no distributions shall be made under the Plan on account of Intercompany Claims among the Debtors except at the discretion of the Liquidating Trustee; (ii) all guarantees by any of the Debtors of the obligations of any other Debtor arising prior to the Effective Date shall be deemed eliminated so that any Claim against any Debtor and any guarantee thereof executed by any other Debtor and any joint and several liability of any of the Debtors shall be deemed to be one obligation of the deemed consolidated Debtors; and (iii) each and every Claim filed or to be filed in the Chapter 11 Cases shall be deemed filed against the consolidated Debtors and shall be deemed one Claim against and obligation of the deemed consolidated Debtors.

For the avoidance of doubt, the limited substantive consolidation contemplated herein shall not be construed as the substantive consolidation for any purpose than that described above. **The Debtors believe that no creditor will receive a recovery inferior to that which it would receive if they proposed a plan that was completely separate as to each entity.** If any party in interest challenges the proposed consolidation, the Debtors, with the prior consent of the Creditors' Committee, reserve the right to establish, at the Confirmation Hearing, the ability to confirm the Plan on an entity-by-entity basis, or make the showing that the Debtors can be substantively consolidated under applicable law.

### 3. Settlement and Compromise

Pursuant to Bankruptcy Rule 9019, the Plan incorporates a proposed compromise and settlement of all issues relating to (i) the substantive consolidation of the Debtors and (ii) the amount, allowance, characterization and priority of Intercompany Claims between the various Debtors.

### E. CLASSIFICATION AND TREATMENT OF CLAIMS AND EQUITY INTERESTS UNDER THE CHAPTER 11 PLAN

One of the key concepts under the Bankruptcy Code is that only claims and equity interests that are "allowed" may receive distributions under a chapter 11 plan. This term is used throughout the Plan and the descriptions below. In general, an "allowed" claim or "allowed" equity interest simply means that the debtor agrees, or in the event of a dispute, that the Bankruptcy Court determines, that the claim or equity interest, and the amount thereof, is in fact a valid obligation of the debtor. Section 502(a) of the Bankruptcy Code provides that a timely filed claim or equity interest is automatically "allowed" unless the debtor or other party in interest objects. However, section 502(b) of the Bankruptcy Code specifies certain claims that may not be "allowed" in bankruptcy even if a proof of claim is filed. These include, but are not limited to, claims that are unenforceable under the governing agreement between a debtor and the claimant or applicable non-bankruptcy law, claims for unmatured interest, property tax claims in excess of the debtor's equity in the property, claims for services that exceed their reasonable value, real property lease and employment contract rejection damage claims in excess of specified amounts, late-filed claims, and contingent claims for contribution and reimbursement. In addition, Bankruptcy Rule 3003(c)(2) prohibits the allowance of any claim or equity interest that either is not listed on the debtor's schedules or is listed as disputed, contingent or unliquidated, if the holder has not filed a proof of claim or equity interest before the established deadline.

The Bankruptcy Code requires that, for purposes of treatment and voting, a chapter 11 plan divide the different claims against, and equity interests in, the debtor into separate classes based upon their legal nature. Claims of a substantially similar legal nature are not necessarily classified together, nor are equity interests of a substantially similar legal nature necessarily classified together. Because an entity may hold multiple claims and/or equity interests which give rise to different legal rights, the "claims" and "equity interests" themselves, rather than their holders, are classified.

Consistent with these requirements, the Plan divides the Allowed Claims against, and Allowed Equity Interests in, the Debtors into the following Classes:

| Class | Claims/Interests |
|-------|------------------|
| 1 | Priority Non-Tax Claims |
| 2 | Secured Tax Claims |
| 3 | Other Secured Claims |
| 4a | Series C Noteholder Claims |
| 4b | FFL Noteholder Claims |
| 5 | Junior Noteholder Claims |
| 6 | General Unsecured Claims |
| 7 | Other Subordinated Claims |
| 8 | Equity Interests |

Under a chapter 11 plan, the separate classes of claims and equity interests must be designated either as "impaired" (affected by the plan) or "unimpaired" (unaffected by the plan). If a class of claims is "impaired," the Bankruptcy Code affords certain rights to the holders of such claims, such as the right to vote on the plan, and the right to receive, under the chapter 11 plan, no less value than the

holder would receive if the debtor were liquidated in a case under chapter 7 of the Bankruptcy Code. Under section 1124 of the Bankruptcy Code, a class of claims or interests is "impaired" unless the plan (i) does not alter the legal, equitable and contractual rights of the holders or (ii) irrespective of the holders' acceleration rights, cures all defaults (other than those arising from the debtor's insolvency, the commencement of the case or nonperformance of a nonmonetary obligation), reinstates the maturity of the claims or interests in the class, compensates the holders for actual damages incurred as a result of their reasonable reliance upon any acceleration rights, and does not otherwise alter their legal, equitable, and contractual rights. Typically, this means that the holder of an unimpaired claim will receive, on the later of the consummation date or the date on which amounts owing are actually due and payable, payment in full, in cash, with postpetition interest to the extent appropriate and provided for under the governing agreement (or if there is no agreement, under applicable nonbankruptcy law), and the remainder of the debtor's obligations, if any, will be performed as they come due in accordance with their terms. Thus, other than with respect to its right to accelerate the debtor's obligations, the holder of an unimpaired claim will be placed in the position it would have been in had the debtor's case not been commenced.

Pursuant to 1126(f) of the Bankruptcy Code, holders of unimpaired claims or interests are "conclusively presumed" to have accepted the plan. Accordingly, their votes are not solicited. Under the Debtors' Plan, the following classes are unimpaired, and therefore, the holders of such Claims are "conclusively presumed" to have voted to accept the Plan: Priority Non-Tax Claims (Class 1), Secured Tax Claims (Class 2), and Other Secured Claims (Class 3).

Under certain circumstances, a class of claims or equity interests may be deemed to reject a plan. For example, a class is deemed to reject a plan under section 1126(g) of the Bankruptcy Code if the holders of claims or interests in such class do not receive or retain property under the plan on account of their claims or equity interests. Under this provision of the Bankruptcy Code, the following classes are deemed are deemed to reject the Plan because they receive no distribution and retain no property interest under the Plan: Other Subordinated Claims (Class 7) and Equity Interests (Class 8). Because such classes are deemed to reject the Plan, the Debtors are required to demonstrate that the Plan satisfies the requirements of section 1129(b) of the Bankruptcy Code with respect to such classes. Among these are the requirements that the plan be "fair and equitable" with respect to, and not "discriminate unfairly" against, the claims and equity interests in such Classes. For a more detailed description of the requirements for confirmation, see <u>Section VIII.C</u>, entitled "Requirements for the Confirmation of the Chapter 11 Plan."

## F.   <span style="font-variant: small-caps">Unclassified Claims</span>

### 1.   **Administrative Expense Claims**

Administrative Expense Claims are the actual and necessary costs and expenses of the Debtors' Chapter 11 Cases that are allowed under and in accordance with sections 330, 365, 503(b), 507(a)(2) and 507(b) of the Bankruptcy Code. Such expenses will include, but are not limited to, actual and necessary costs and expenses of preserving the Debtors' estates, actual and necessary costs and expenses of operating the Debtors' businesses, indebtedness or obligations incurred or assumed by the Debtors in Possession during the Chapter 11 Cases and compensation for professional services rendered and reimbursement of expenses incurred. Claims allowed under section 503(b)(9) for goods delivered in the 20 days prior to the Commencement Date are treated as Administrative Expense Claims.

Except to the extent that any entity entitled to payment of any Allowed Administrative Expense Claim agrees to a less favorable treatment, or has been paid during the Chapter 11 Cases, on the latest of (i) the Effective Date, (ii) the date on which its Administrative Expense Claim becomes an Allowed Administrative Expense Claim, or (iii) the date on which its Administrative Expense Claim

becomes payable under any agreement relating thereto, or as soon as practicable thereafter, each holder of an Allowed Administrative Expense Claim shall receive from the Liquidating Trust, in full satisfaction, settlement, and release of and in exchange for such Allowed Administrative Expense Claim, Cash equal to the unpaid portion of its Allowed Administrative Expense Claim.

Notwithstanding the forgoing, (a) any Allowed Administrative Expense Claim based on a liability incurred by the Debtors in the ordinary course of business by the Debtors shall be paid in full and performed by the Liquidating Trust, in the ordinary course of business in accordance with the terms and conditions of any agreements governing, instruments evidencing or other documents relating to such transactions, and (b) any Allowed Administrative Expense Claim may be paid on such other terms as may be agreed on between the holder of such Claim and the Debtors; *provided, further*, that if any such Administrative Expense Claim is not billed or a request for payment is not made within forty-five (45) days after the Effective Date, such Administrative Expense Claim shall be barred.

### 2. Professional Compensation and Reimbursement Claims

Professional Compensation and Reimbursement Claims are all Claims of entities seeking compensation for services rendered or reimbursement of expenses incurred through and including the Effective Date under sections 330, 331, 503(b)(2), 503(b)(3), 503(b)(4) or 503(b)(5) of the Bankruptcy Code.

All entities seeking awards by the Bankruptcy Court of compensation for services rendered or reimbursement of expenses incurred through and including the Confirmation Date under sections 330, 331, 503(b)(2), 503(b)(3), 503(b)(4) or 503(b)(5) of the Bankruptcy Code shall (a) file, on or before the date that is sixty (60) days after the Effective Date their respective applications for final allowances of compensation for professional services rendered and reimbursement of expenses incurred and (b) be paid in full by the Liquidating Trustee, in Cash, in such amounts as are Allowed by the Bankruptcy Court in accordance with the order relating to or allowing any such Administrative Expense Claim or upon such other terms as may be mutually agreed upon between the holder of such Administrative Expense Claim and the Debtors or, if on or after the Effective Date, the Liquidating Trustee.

The Liquidating Trust is authorized to pay compensation for services rendered or reimbursement of expenses incurred after the Confirmation Date in the ordinary course of business and without the need for Bankruptcy Court approval.

### 3. Indenture Trustee Fees

#### (a) Procedure for Fixing Indenture Trustee Fees

On or before the date that is thirty (30) days after the Effective Date, the Indenture Trustees shall serve on the Liquidating Trustee their respective final requests for reimbursement of Indenture Trustee Fees. The Liquidating Trustee shall have twenty (20) days from the date of service to file an objection to the requests on reasonableness grounds. A request for Indenture Trustee Fees shall be Allowed in the amount either (i) as submitted, if a timely objection is not filed by the Liquidating Trustee, (ii) as agreed to by the Liquidating Trustee and the respective Indenture Trustee, or (iii) as ordered by the Court following an objection.

### (b) Indenture Trustee for Series C Notes

Until such time as the Series C Noteholder Indenture Trustee Fees have been paid in full, all distributions from the Liquidating Trust that would otherwise be made to holders of Claims in Class 4(a) on account of their Class C Beneficial Interests will be paid directly to the Series C Noteholder Indenture Trustee without the need for, application to, or approval of, the Bankruptcy Court.

### (c) Indenture Trustee for Junior Notes

Until such time as the Allowed Junior Noteholder Indenture Trustee Fees have been paid in full, all distributions from the Liquidating Trust that would otherwise be made on account of Class A/B Beneficial Interests will be paid directly to the Junior Noteholder Indenture Trustee without the need for, application to, or approval of, the Bankruptcy Court. For the avoidance of doubt, until the Junior Noteholder Indenture Trustee Fees are paid in full, no holder of a Senior Noteholder Claim will be entitled to receive any distributions that would otherwise be made on account of Class A/B Beneficial Interests.

### 4. Priority Tax Claims

A Priority Tax Claim is any Claim of a governmental unit of the kind entitled to priority in payment as specified in sections 502(i) and 507(a)(8) of the Bankruptcy Code.

On the later of (i) the Effective Date or (ii) the date such Priority Tax Claim becomes an Allowed Priority Tax Claim, or as soon as practicable thereafter, except to the extent that a holder of an Allowed Priority Tax Claim agrees to a less favorable treatment, each holder of an Allowed Priority Tax Claim shall receive in full satisfaction, settlement, and release of and in exchange for such Allowed Priority Tax Claim, in the sole discretion of the Debtors, (a) Cash in an amount equal to such Allowed Priority Tax Claim, or (b) equal semi-annual Cash payments aggregating an amount equal to such Allowed Priority Tax Claim, together with interest for a period after the Effective Date at a fixed annual rate determined under applicable non-bankruptcy law, over a period not exceeding five (5) years after the Commencement Date, subject to the Liquidating Trustee's sole option to prepay the entire amount of the Allowed Priority Tax Claim; provided that the first payment under this clause (b) shall represent a percentage recovery at least equal to that expected to be received by holders of Allowed General Unsecured Claims and subject to the sole option of the Liquidating Trustee to prepay the entire amount of the Allowed Priority Tax Claim.

### 5. Employees' Paid Time-Off

Pursuant to the Supplemental Cash Collateral Order, the Debtors or the Liquidating Trust, as the case may be, shall make payments of $4 million per month for payment of claims of the Debtors' current or former employees on account of their paid time off until all claims on account of paid time off are satisfied either through such monthly payments or in a lump-sum payment prior to the termination of the Liquidating Trust.

## G. CLAIMS CLASSIFIED PURSUANT TO SECTION 1123 OF THE BANKRUPTCY CODE

### 1. Class 1 –Priority Non-Tax Claims

Priority Non-Tax Claims include Claims granted priority in payment as specified in sections 507(a)(4), (5), (6) or (7) of the Bankruptcy Code, including certain wage, salary, and other compensation obligations to employees of the Debtors up to a statutory cap of $10,950 per employee.

The Debtors estimate that on the Effective Date, the Allowed amount of such Priority Non-Tax Claims will aggregate approximately $568,279.00.

Class 1 is unimpaired by the Plan. Each holder of an Allowed Priority Non-Tax Claim is conclusively presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan.

Except to the extent that a holder of an Allowed Priority Non-Tax Claim (i) has been paid by the Debtors, in whole or in part, prior to the Effective Date, or (ii) agrees to a less favorable treatment, each holder of an Allowed Priority Non-Tax Claim shall receive from the Liquidating Trust, in full satisfaction of such Claim, Cash in the full amount of the claim, on or as soon as reasonably practicable after the later of (a) the Effective Date, and (b) the date such claim becomes Allowed.

## 2. **Class 2 – Secured Tax Claims**

Secured Tax Claims include any Secured Claim that, absent its secured status, would be entitled to priority in right of payment under section 507(a)(8) of the Bankruptcy Code (determined irrespective of any time limitations therein) and including any related Secured Claim for penalties. The Debtors estimate that on the Effective Date, the Allowed amount of such Secured Tax Claims will aggregate approximately $436,799.00.

Class 2 is unimpaired by the Plan. Each holder of an Allowed Secured Tax Claim is conclusively presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan.

Except to the extent that a holder of an Allowed Secured Tax Claim has been paid by the Debtors prior to the Effective Date or agrees to a less favorable treatment, each holder shall receive from the Liquidating Trust, at the sole option of the Debtors or, if after the Effective Date, the Liquidating Trustee, (a) Cash in the full amount of the Claim on or as soon as reasonably practicable following the later to occur of (i) the Effective Date and (ii) the date on which such Claim becomes Allowed or (b) such other terms determined by the Bankruptcy Court to provide the holder deferred Cash payments having a value, as of the Effective Date, equal to such Claim.

## 3. **Class 3 – Other Secured Claims**

Other Secured Claims include any Secured Claim other than a Secured Tax Claim. The Debtors estimate that on the Effective Date, the Allowed amount of such claims will aggregate approximately $24,889.00.

Class 3 is unimpaired by the Plan. Each holder of an Allowed Other Secured Claim is conclusively presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan.

Except to the extent that a holder of an Allowed Other Secured Claim agrees to a less favorable treatment, at the sole option of the Debtors or, if after the Effective Date, the Liquidating Trustee each holder of an Allowed Other Secured Claim shall receive from the Liquidating Trust, on or as soon as practicable after the later of the (a) Effective Date or (b) date on which such Claim becomes Allowed, in full satisfaction of such Claim, at the option of the Debtors, or, if after the Effective Date, the Liquidating Trustee (i) Cash in an amount equal to the Allowed amount of such Allowed Other Secured Claim; (ii) the proceeds of the sale or disposition of the Collateral securing such Allowed Other Secured Claim to the extent of the value of the holder's secured interest in such Collateral, (iii) the Collateral securing such Allowed Other Secured Claim, or (iv) such other distribution as necessary to satisfy the requirements of section 1124 of the Bankruptcy Code. In the event such a Claim is treated under clauses

(i) or (ii) of this Section, the Liens securing such Secured Other Secured Claim shall be deemed released as of the Effective Date.

In the event that such Class 3 Claim is to be satisfied by the proceeds of the sale or disposition of the Collateral securing such Allowed Other Secured Claim to the extent of the value of the holder's secured interest in such Collateral by the Liquidating Trust, each holder of an Allowed Other Secured Claim shall, for federal income tax purposes, be treated as having received on the Effective Date a Beneficial Interest in the Liquidating Trust and all parties (including the Debtors, the Liquidating Trustee, and the Liquidating Trust Beneficiaries) shall report consistently therewith for federal income tax purposes.

4.    **Class 4a – Series C Noteholder Claims**

Series C Noteholder Claims include all Claims arising under the Series C Notes issued pursuant to the Series C Indenture, including any claims of such Series C Noteholders arising out of the purchase or sale of such securities (which Claims are subordinated pursuant to section 510(b) of the Bankruptcy Code and are extinguished without recovery hereunder).  The Debtors estimate that on the Effective Date, the Allowed amount of such claims will aggregate approximately $203,416,667.00

Class 4a is impaired by the Plan.  Each holder of an Allowed Series C Noteholder Claim is entitled to vote to accept or reject the Plan.

On the later of (i) the Effective Date, and (ii) the date on which a Series C Noteholder Claim becomes an Allowed Claim, or, in each case, as soon thereafter as is reasonably practicable, each holder of a Series C Noteholder Claim shall receive a Class C Beneficial Interest in the Liquidating Trust. All distributions made to holders of Allowed Series C Noteholder Claims on account of their Class C Beneficial Interests will be paid directly to the Series C Indenture Trustee until such a time as the Series C Indenture Trustee Fees have been paid in full pursuant to the Plan.

A Class C Beneficial Interest shall entitle its holder to receive (i) its Pro Rata Share of distributions from the Liquidating Trust, and (ii) after the Junior Noteholder Indenture Trustee Fees are paid in full, an additional amount equal to its Class 4 Pro Rata Share of distributions made from the Liquidating Trust that would otherwise be made directly to holders of Junior Noteholder Claims on account of Class A/B Beneficial Interests, until such a time as all holders of Allowed Senior Noteholder Claims (*i.e.* Allowed Series C Noteholder Claims and Allowed FFL Noteholder Claims) have received, in the aggregate, pursuant to clause (i) and this clause (ii), an amount equal to the amount, in the aggregate, of all Allowed Senior Noteholder Claims.  Thereafter, any and all distributions made on account of Class A/B Beneficial Interests shall be paid directly to holders of Class A/B Beneficial Interests pursuant to Section 4.5(c).

5.    **Class 4b – FFL Noteholder Claims**

FFL Noteholder Claims include all Claims arising under the FFL SPA.  The Debtors estimate that on the Effective Date, the Allowed Amount of such claims will aggregate approximately $40,101,111.00.

Class 4b is impaired by the Plan.  Each holder of an Allowed FFL Noteholder Claim is entitled to vote to accept or reject the Plan.

On the later of (i) the Effective Date, and (ii) the date on which an FFL Noteholder Claim becomes an Allowed Claim, or, in each case, as soon thereafter as is reasonably practicable, each holder of an FFL Noteholder Claim shall receive a Class C Beneficial Interest in the Liquidating Trust.

A Class C Beneficial Interest shall entitle its holder to receive (i) its Pro Rata Share of distributions from the Liquidating Trust, and (ii) after the Junior Noteholder Indenture Trustee Fees are paid in full, an additional amount equal to its Class 4 Pro Rata Share of distributions made from the Liquidating Trust that would otherwise be made directly to holders of Junior Noteholder Claims on account of Class A/B Beneficial Interests, until such time as all holders of Allowed Senior Noteholder Claims (*i.e.* Allowed Series C Noteholder Claims and Allowed FFL Noteholder Claims) have received, in the aggregate, pursuant to clause (i) and this clause (ii), an amount equal to the amount, in the aggregate, of all Allowed Senior Noteholder Claims. Thereafter, any and all distributions made on account of Class A/B Beneficial Interests shall be paid directly to holders of Class A/B Beneficial Interests pursuant to Section 4.5(c).

**6.**      **Class 5 – Junior Noteholder Claims**

Junior Noteholder Claims include all Claims arising under the Junior Notes issued pursuant to the Junior Indenture, including any claims of such Junior Noteholders arising out of the purchase or sale of such securities (which Claims are subordinated pursuant to section 510(b) of the Bankruptcy Code and are extinguished without recovery hereunder). The Debtors estimate that on the Effective Date, the Allowed amount of such claims will aggregate approximately $452,121,889.00.

Class 5 is impaired by the Plan. Each holder of an Allowed Junior Noteholder Claim is entitled to vote to accept or reject the Plan.

On the later of (i) the Effective Date, and (ii) the date on which a Junior Noteholder Claim becomes an Allowed Claim, or, in each case, as soon thereafter as is reasonably practicable, each holder of a Junior Noteholder Claim shall receive a Class A/B Beneficial Interest in the Liquidating Trust. All distributions made on account of Class A/B Beneficial Interests will be paid directly to the Junior Noteholder Indenture Trustee until such a time as the Junior Indenture Trustee Fees have been paid in full pursuant to the Plan.

A Class A/B Beneficial Interest shall entitle its holder to receive its Pro Rata Share of distributions from the Liquidating Trust, provided, however, that all distributions on account of Class A/B Beneficial Interests shall be made directly to holders of Allowed Senior Noteholder Claims in accordance with Section 4.4 and 4.5 of the Plan until such time as all holders of Allowed Series C Noteholder Claims and Allowed FFL Noteholder Claims have received, in the aggregate, pursuant to clauses (i) and (ii) of Section 4.4(c) and Section 4.5(c), respectively, an amount equal to the amount, in the aggregate, of all Allowed Senior Noteholder Claims. Thereafter, a Class A/B Beneficial Interest shall entitle its holder to receive (i) its Pro Rata Share of distributions from the Liquidating Trust, and (ii) an additional amount equal to its Class 5 Pro Rata Share of distributions made from the Liquidating Trust on account of Class C Beneficial Interests, until all Allowed Junior Noteholder Claims are paid in full. For the avoidance of doubt, no holder of a Junior Noteholder Claim shall receive a distribution on account of its Class A/B Beneficial Interest until all Allowed Senior Noteholder Claims are paid in full.

**7.**      **Class 6 – General Unsecured Claims**

General Unsecured Claims include any Allowed Claim **other than** an Administrative Expense Claim, Professional Compensation and Reimbursement Claim, Priority Tax Claim, Priority Non-Tax Claim, Secured Tax Claim, Other Secured Claim, Series C Noteholder Claim, FFL Noteholder

Claim, Junior Noteholder Claim, Other Subordinated Claim or Intercompany Claim. The Debtors estimate that on the Effective Date, the Allowed amount of such claims will aggregate approximately $225,171,340.00.[15]

Class 6 is impaired by the Plan. Each holder of an Allowed General Unsecured Claim is entitled to vote to accept or reject the Plan.

On the later of (i) the Effective Date, and (ii) the date on which a General Unsecured Claim becomes an Allowed Claim, or, in each case, as soon thereafter as is reasonably practicable, each holder of a General Unsecured Claim shall receive a Class G Beneficial Interest in the Liquidating Trust. A Class G Beneficial shall entitle its holder to receive its Pro Rata Share of distributions from the Liquidating Trust, until all Allowed General Unsecured Claims are paid in full. As such, holders of Allowed General Unsecured Claims will receive distributions from the Liquidating Trust equal to a percentage recovery of the value of their Claim relative to the value of all Allowed Senior Noteholder Claims, Allowed Junior Noteholder Claims and other Allowed General Unsecured Claims. As stated above, the distributions to and recovery of holders of Allowed General Unsecured Claims are not affected by the mechanism in the Plan enforcing the prepetition subordination agreement between holders of Senior Noteholder Claims in Classes 4a and 4b (i.e. Series C Noteholder Claims and FFL Noteholder Claims) and holders of Junior Noteholder Claims in Class 5.

**8.**     **Class 7 – Other Subordinated Claims**

Other Subordinated Claims include any Claim against any of the Debtors subject to subordination, including, but not limited to, subordination under Section 510 of the Bankruptcy Code. These may include claims for damages brought by former equity holders under the federal securities laws.

Class 7 is impaired by the Plan. Each holder of an Other Subordinated Claim is deemed to reject the Plan and is not entitled to vote to accept or reject the Plan.

Each holder of an Allowed Other Subordinated Claim shall not receive any distribution under the Plan on account of such Other Subordinated Claim.

**9.**     **Class 8 – Equity Interests**

Equity Interests include all instruments evidencing an ownership interest in the Debtors, whether or not transferable, and all options, warrants or rights, contractual or otherwise, to acquire any such interests, all as of the Effective Date.

Class 8 is impaired by the Plan. Each holder of an Equity Interest is deemed to reject the Plan and is not entitled to vote to accept or reject the Plan.

On the Effective Date, the Equity Interests shall be cancelled and extinguished and the holders of Equity Interests shall not be entitled to, and shall not receive or retain, any property or interest in property on account of such Equity Interests under the Plan.

---

[15] See footnote 8.

## H. MEANS OF IMPLEMENTATION

### 1. Settlement of Claims

Pursuant to Bankruptcy Rule 9019, in consideration for the classification, distribution, and other benefits provided under the Plan, upon the Effective Date, the provisions of the Plan shall constitute a good-faith compromise and settlement of all Claims or controversies resolved pursuant to the Plan. All Plan distribution made to creditors holding Allowed Claims in any class are intended to be and shall be final, and, subject to the provisions of Article IV of the Plan, no Plan distribution to the holder of a Claim in one class shall be subject to being shared with or reallocated to the holders of any Claim in another class by virtue of any prepetition collateral trust agreement, shared collateral agreement, subordination agreement, other similar inter-creditor arrangement or deficiency claim.

### 2. Merger/Dissolution/Consolidation

On or as of the Effective Date or as soon as practicable thereafter and without the need for any further action, the Debtors or the Liquidating Trustee, as applicable may: (i) cause any or all of the Debtors to be merged into one or more of the Debtors, dissolved or otherwise consolidated, (ii) cause the transfer of assets between or among the Debtors, (iii) to the extent determined appropriate by the Debtors or the Liquidating Trustee, cause the reduction, reinstatement or discharge of any Intercompany Claim and any claim held against any Non-Debtor Subsidiary or Affiliate by any Debtor or by any other Non-Debtor Subsidiary or Affiliate or (iv) engage in any other transaction in furtherance of the Plan.

Current equity interests in BE's non-debtor subsidiaries may remain in BE and not be transferred to the Liquidating Trust until such non-debtor subsidiaries are liquidated. Upon such liquidation, the proceed would be distributed to the Liquidating Trust. The Debtors and the Creditors' Committee reserve the right to amend the Plan to effectuate this structure.

### 3. Cancellation and Termination of Existing Agreements and Equity Interests

Except (a) as otherwise expressly provided in the Plan, (b) with respect to executory contracts or unexpired leases that have been assumed by the Debtors, (c) for purposes of evidencing a right to distributions under the Plan, or (d) with respect to any Claim that is reinstated and rendered unimpaired under the Plan, on the Effective Date, the Secured Credit Facility, the FFL SPA, the Series A Notes, the Series B Notes, the Series C Notes and any indentures pursuant to which such notes were issued, all Equity Interests and other instruments evidencing any Claims against the Debtors or Equity Interests in the Debtors shall be deemed automatically cancelled and terminated without further act or action under any applicable agreement, law, regulation, order or rule and the obligations of the Debtors thereunder shall be discharged.

### 4. Release of Funds Securing Issued Letters of Credit

As soon as reasonably practicable, but not more than ten (10) days, following the release of any Letter of Credit by the party secured by such Letter of Credit, the LC Agent shall transfer funds equal in amount to 105% of the amount of the released Letter of Credit from the LC Cash Collateral Account to the Liquidating Trust. At such time as there are no remaining outstanding Letters of Credit, the LC Agent will transfer all remaining funds in the LC Cash Collateral Account to the Liquidating Trust.

If, at any point, the funds in the LC Cash Collateral Account exceed 105% of the amount of the outstanding Letters of Credit plus any fees owing to the LC Agent, the Liquidating Trustee shall

have the right to withdraw any excess funds, including, without limitation, interest income earned on the LC Cash Collateral Account and to transfer such funds to the Liquidating Trustee.

**5.**      <u>**The Liquidating Trust**</u>

    **(a)**      **Execution of the Liquidating Trust Agreement**

    On or before the Effective Date, the Liquidating Trust Agreement shall be executed by the Debtors and the Liquidating Trustee, and all other necessary steps shall be taken to establish the Liquidating Trust and the Beneficial Interests therein which shall be for the benefit of the Liquidating Trust Beneficiaries, as provided in Sections 4.3(c), 4.4, 4.5, 4.6 and 4.7 of the Plan, whether their Claims are Allowed on or after the Effective Date. In the event of any conflict between the terms of the Plan with respect to the Liquidating Trust and the terms of the Liquidating Trust Agreement, the terms of the Liquidating Trust Agreement shall govern. The Liquidating Trust Agreement may provide powers, duties and authorities in addition to those explicitly stated herein, but only to the extent that such powers, duties and authorities do not affect the status of the Liquidating Trust as a liquidating trust for United States federal income tax purposes.

    **(b)**      **Purpose of the Liquidating Trust**

    The Liquidating Trust shall be established for the sole purpose of liquidating and distributing its assets, in accordance with Treasury Regulation section 301.7701-4(d), with no objective to continue or engage in the conduct of a trade or business.

    **(c)**      **Liquidating Trust as Successor to BE and BE, LLC**

    The Liquidating Trust shall be a successor to BE and its subsidiary, BE LLC for all purposes relating to contracts entered into by BE or BE LLC subsequent to the Commencement Date or contracts not rejected in the Chapter 11 Cases. As such, counterparties to any such contracts transferred to the Liquidating Trust pursuant to the Plan, and counterparties to any subcontracts related to such contracts, shall be prohibited from terminating or otherwise altering the terms of such contracts as a result of the transfer of such contract to the Liquidating Trust.

    **(d)**      **Liquidating Trust Assets**

        (i)      The Liquidating Trust shall consist of the Liquidating Trust Assets. On the Effective Date, the Debtors shall transfer all of the Liquidating Trust Assets to the Liquidating Trust subject to the Administrative Expense Claims, Other Priority Claims, Priority Tax Claims, and Secured Tax Claims. Such transfer shall be exempt from any stamp, real estate transfer, mortgage reporting, sales, use or other similar tax. Upon delivery of the Liquidating Trust Assets to the Liquidating Trust, the Debtors and their successors and assigns shall be released from all liability with respect to the delivery of such distributions.

        (ii)      As soon as practicable, but not more than ten (10) days following the full or partial release or settlement of any Letter of Credit, any funds held in the LC Cash Collateral Account backstopping such Letter of Credit shall be released by the LC Agent to the Liquidating Trust. Upon such release, such funds shall be considered Liquidating Trust Assets for all purposes under the Plan.

### (e) Governance of the Liquidating Trust

The Liquidating Trust shall be governed by the Liquidating Trustee according to the Liquidating Trust Agreement.

### (f) The Liquidating Trustee

The Liquidating Trustee shall be designated by the Debtors, with the consent of the Creditors' Committee. In the event the Liquidating Trustee dies, is terminated or resigns for any reason, the Trust Advisory Board (as defined in the Liquidating Trust Agreement) shall designate a successor.

### (g) Role of the Liquidating Trustee

In furtherance of and consistent with the purpose of the Liquidating Trust and the Plan, the Liquidating Trustee shall, among other things, have the following rights, powers and duties (i) to hold, manage, convert to Cash, and distribute the Liquidating Trust Assets, including prosecuting and resolving the Claims belonging to the Liquidating Trust, (ii) hold the Liquidating Trust Assets for the benefit of the Liquidating Trust Beneficiaries that are entitled to distributions therefrom under the Plan, whether their Claims are Allowed on or after the Effective Date, (iii) in the Liquidating Trustee's reasonable business judgment, investigate, prosecute, settle and/or abandon rights, Causes of Action or litigation of the Liquidating Trust, (iv) monitor and enforce the implementation of the Plan, (v) file all tax and regulatory forms, returns, reports and other documents required with respect to the Liquidating Trust, (vi) in the Liquidating Trustee's reasonable business judgment object to Claims, and manage, control, prosecute and/or settle on behalf of the Liquidating Trust, objections to Claims on account of which the Liquidating Trustee (as Disbursing Agent) will be responsible (if Allowed) for making distributions under the Plan, (vii) take all actions necessary and create any documents necessary to wind up the affairs of the Debtors and their affiliates and implement the Plan, (viii) to hold, manage, and distribute Cash or non-Cash Liquidating Trust Assets obtained through the exercise of its power and authority, (ix) to act as a signatory to BE and/or BE LLC for all purposes, including those associated with the novation of contracts, and (x) take all necessary action and file all appropriate motions to obtain an order closing the Chapter 11 Cases. In all circumstances, the Liquidating Trustee shall act in the best interests of all beneficiaries of the Liquidating Trust and in furtherance of the purpose of the Liquidating Trust.

### (h) Liquidating Trustee's Tax Power for Debtors

Following the Effective Date, the Liquidating Trustee shall prepare and file (or cause to be prepared and filed), on behalf of the Debtors, all tax returns, reports, certificates, forms or similar statements or documents (collectively, "***Tax Returns***") required to be filed or that the Liquidating Trustee otherwise deems appropriate, including the filing of amended Tax Returns or requests for refunds.

Each of the Debtors shall execute on or prior to the Effective Date a power of attorney authorizing the Liquidating Trustee to correspond with any taxing authorities on behalf of such Debtor and to sign, collect, negotiate, settle and administer tax payments and Tax Returns described in the above paragraph hereof.

Following the Effective Date, the Liquidating Trustee shall have the sole right, at the Liquidating Trust's expense, to control, conduct, compromise and settle any tax contest, audit or administrative or court proceeding relating to any liability for taxes of the Debtors.

Following the Effective Date, the Liquidating Trust shall be entitled to the entire amount of any refunds and credits (including interest thereon) with respect to or otherwise relating to any taxes of the Debtors, including for any taxable period ending on or prior to, or including, the Effective Date.

### (i)    Nontransferability of the Liquidating Trust Interests

The Beneficial Interests shall not be certificated and shall not be transferable.

### (j)    Cash

The Liquidating Trustee may invest Cash (including any earnings thereon or proceeds therefrom) as permitted by section 345 of the Bankruptcy Code, provided, however, that such investments are investments permitted to be made by a liquidating trust within the meaning of Treasury Regulation section 301.7701-4(d), as reflected therein, or under applicable Internal Revenue Service guidelines, rulings, or other controlling authorities.

### (k)    Distribution of Liquidating Trust Assets

As soon as practicable following the Effective Date, the Liquidating Trustee shall make an initial distribution (the "***Initial Distribution***") to the holders of the Beneficial Interest of all Cash on hand in accordance with the Liquidating Trust Agreement (including any Cash received from the Debtors on the Effective Date, and treating as Cash for purposes of this section any permitted investments under Section 5.7(i) of the Plan) except such amounts (i) as would be distributable to a holder of a Disputed Claim if such Disputed Claim had been Allowed prior to the time of such distribution (but only until such Claim is resolved), (ii) as are reasonably necessary to meet contingent liabilities and to maintain the value of the Liquidating Trust Assets during liquidation, (iii) necessary to pay reasonable incurred and anticipated expenses (including, but not limited to, any taxes imposed on the Liquidating Trust or in respect of the Liquidating Trust Assets), and (iv) necessary to satisfy other liabilities and anticipated incurred by the Liquidating Trust in accordance with this Plan or the Liquidating Trust Agreement. The Liquidating Trustee is required to distribute to the Liquidating Trust Beneficiaries, at least once per twelve-month period, the Liquidating Trust's net income plus all net proceeds from the sale or other disposition of the Liquidating Trust Assets, except that the Liquidating Trustee may retain an amount of net proceeds or net income reasonably necessary to maintain the value of the Liquidating Trust Assets, to satisfy current and projected expenses of the Liquidating Trust, or to meet Claims and contingent liabilities (including Disputed Claims).

### (l)    Costs and Expenses of the Liquidating Trust

The costs and expenses of the Liquidating Trust, including the fees and expenses of the Liquidating Trustee and its retained professionals, shall be paid out of the Liquidating Trust Assets. Fees and expenses incurred in connection with the prosecution and settlement of any Claims shall be considered costs and expenses of the Liquidating Trust. Notice of any cost or expense of the Liquidating Trust above [$_____] that is not reflected in an approved budget, must be provided to the Trust Advisory Board and such expense must be approved by the Trust Advisory Board or further order of the Bankruptcy Court.

### (m)    Compensation of the Liquidating Trustee

The individual(s) serving as, or comprising the Liquidating Trustee shall be entitled to reasonable compensation approved by the Trust Advisory Board in an amount consistent with that of similar functionaries in similar roles.

**(n)**     **Retention of Professionals by the Liquidating Trustee**

The Liquidating Trustee may retain and compensate attorneys and other professionals to assist in its duties as Liquidating Trustee on such terms as the Liquidating Trustee deems appropriate without Bankruptcy Court approval.  Without limiting the foregoing, the Liquidating Trustee may retain any professional that represented parties in interest in the Chapter 11 Cases.

**(o)**     **Federal Income Tax Treatment of the Liquidating Trust**

**(i)**     <u>Liquidating Trust Assets Treated as Owned by Creditors.</u>

For all U.S. federal income tax purposes, all parties (including, without limitation, the Debtors, the Liquidating Trustee and the Liquidating Trust Beneficiaries) shall treat the transfer of the Liquidating Trust Assets to the Liquidating Trust as a transfer of the Liquidating Trust Assets directly to those holders of Allowed Claims receiving Beneficial Interests and, to the extent Liquidating Trust Assets are allocable to Disputed Claims, to the Liquidating Trust Claims Reserve, followed by the transfer by such beneficiaries to the Liquidating Trust of the Liquidating Trust Assets (other than the Liquidating Trust Assets allocable to the Liquidating Trust Claims Reserve) in exchange for Beneficial Interests.

Accordingly, those holders of Allowed Claims receiving Beneficial Interests shall be treated for United States federal income tax purposes as the grantors and owners of their respective share of the Liquidating Trust Assets (other than such Liquidating Trust Assets as are allocable to the Liquidating Trust Claims Reserve, discussed below).  The foregoing treatment shall also apply, to the extent permitted by applicable law, for state and local income tax purposes.

**(ii)**     <u>Tax Reporting</u>

The Liquidating Trustee shall file returns for the Liquidating Trust treating the Liquidating Trust as a grantor trust pursuant to Treasury Regulation section 1.671-4(a) and in accordance with Section 5.7(o) of the Plan.  The Liquidating Trustee shall also annually send to each holder of a Beneficial Interest a separate statement setting forth the holder's share of items of income, gain, loss, deduction or credit and will instruct all such holders to report such items on their United States federal income tax returns or to forward the appropriate information to their respective beneficial holders with instructions to report such items on their United States federal income tax returns.  The Liquidating Trustee shall also file (or cause to be filed) any other statements, returns or disclosures relating to the Liquidating Trust that are required by any governmental unit.

As soon as possible after the Effective Date, the Liquidating Trustee shall make a good-faith valuation of the Liquidating Trust Assets, and such valuation shall be made available from time to time, to the extent relevant, and shall be used consistently by all parties (including, without limitation, the Debtors, the Liquidating Trustee and the Liquidating Trust Beneficiaries) for all United States federal income tax purposes.

Allocations of Liquidating Trust taxable income among the Liquidating Trust Beneficiaries (other than taxable income allocable to the Liquidating Trust

Claims Reserve, discussed below) shall be determined by reference to the manner in which an amount of Cash representing such taxable income would be distributed (were such cash permitted to be distributed at such time) if, immediately prior to such deemed distribution, the Liquidating Trust had distributed all its assets (valued at their tax book value, and other than assets allocable to the Liquidating Trust Claims Reserve) to the holders of the Beneficial Interests, adjusted for prior taxable income and loss and taking into account all prior and concurrent distributions from the Liquidating Trust. Similarly, taxable loss of the Liquidating Trust shall be allocated by reference to the manner in which an economic loss would be borne immediately after a hypothetical liquidating distribution of the remaining Liquidating Trust Assets. The tax book value of the Liquidating Trust Assets for this purpose shall equal their fair market value on the Effective Date, adjusted in accordance with tax accounting principles prescribed by the Tax Code, the applicable Treasury Regulations, and other applicable administrative and judicial authorities and pronouncements.

Subject to definitive guidance from the Internal Revenue Service or a court of competent jurisdiction to the contrary (including the receipt by the Liquidating Trustee of a private letter ruling if the Liquidating Trustee so requests one, or the receipt of an adverse determination by the Internal Revenue Service upon audit if not contested by the Liquidating Trustee), the Liquidating Trustee shall (A) timely elect to treat any Liquidating Trust Assets allocable to, or retained on account of, Disputed Claims (the "***Liquidating Trust Claims Reserve***") as a "disputed ownership fund" governed by Treasury Regulation section 1.468B-9, and (B) to the extent permitted by applicable law, report consistently with the foregoing for state and local income tax purposes. All parties (including the Liquidating Trustee, the Debtors, and Liquidating Trust Beneficiaries) shall report for United States federal, state and local income tax purposes consistently with the foregoing.

The Liquidating Trustee shall be responsible for payment, out of the Liquidating Trust Assets, of any taxes imposed on the trust or its assets, including the Liquidating Trust Claims Reserve. In the event, and to the extent, any Cash retained on account of Disputed Claims in the Liquidating Trust Claims Reserve is insufficient to pay the portion of any such taxes attributable to the taxable income arising from the assets allocable to, or retained on account of, Disputed Claims, such taxes shall be (i) reimbursed from any subsequent Cash amounts retained on account of Disputed Claims, or (ii) to the extent such Disputed Claims have subsequently been resolved, deducted from any amounts otherwise distributable by the Liquidating Trustee as a result of the resolution of such Disputed Claims.

The Liquidating Trustee may request an expedited determination of taxes of the Liquidating Trust, including the Liquidating Trust Claims Reserve or the Debtors, under section 505(b) of the Bankruptcy Code for all returns filed for, or on behalf of, the Liquidating Trust or the Debtors for all taxable periods through the dissolution of the Liquidating Trust.

(p)     **Dissolution**

The Liquidating Trustee and the Liquidating Trust shall be discharged or dissolved, as the case may be, at such time as (i) all of the Liquidating Trust Assets have been distributed pursuant to the Plan and the Liquidating Trust Agreement, (ii) the Liquidating Trustee determines, in its sole discretion, that the administration of the Liquidating Trust Assets is not likely to yield sufficient additional Liquidating Trust proceeds to justify further pursuit and (iii) all distributions required to be made by the Liquidating Trustee under the Plan and the Liquidating Trust Agreement have been made, but in no event shall the Liquidating Trust be dissolved later than three (3) years from the Effective Date unless the Bankruptcy Court, upon motion within the six month period prior to the third anniversary (or at least six (6) months prior to the end of an extension period), determines that a fixed period extension (not to exceed three years, together with any prior extensions, without a favorable private letter ruling from the Internal Revenue Service that any further extension would not adversely affect the status of the trust as a liquidating trust for United States federal income tax purposes) is necessary to facilitate or complete the recovery and liquidation of the Liquidating Trust Assets. If at any time the Liquidating Trustee determines, in reliance upon such professionals as the Liquidating Trustee may retain, that the expense of administering the Liquidating Trust so as to make a final distribution to its beneficiaries is likely to exceed the value of the assets remaining in the Liquidating Trust, the Liquidating Trustee may apply to the Bankruptcy Court for authority to (i) reserve any amounts necessary to dissolve the Liquidating Trust, (ii) donate any balance to a charitable organization described in section 501(c)(3) of the Tax Code and exempt from United States federal income tax under section 501(a) of the Tax Code that is unrelated to the Debtors, the Liquidating Trust, and any insider of the Liquidating Trustee, and (iii) dissolve the Liquidating Trust.

(q)     **Indemnification of Liquidating Trustee**

The Liquidating Trustee or the individual(s) comprising the Liquidating Trustee, as the case may be, and the Liquidating Trustee's agents and professionals, shall not be liable for actions taken or omitted in its capacity as, or on behalf of, the Liquidating Trustee, except those acts arising out of its or their own willful misconduct or gross negligence, and each shall be entitled to indemnification and reimbursement for fees and expenses in defending any and all of its actions or inactions in its capacity as, or on behalf of, the Liquidating Trustee, except for any actions or inactions involving willful misconduct or gross negligence. Any indemnification claim of the Liquidating Trustee (and the other parties entitled to indemnification under this subsection) shall be satisfied solely from the Liquidating Trust Assets. The Liquidating Trustee shall be entitled to rely, in good faith, on the advice of its retained professionals.

I.     **DISTRIBUTIONS UNDER THE PLAN**

1.     **Voting of Claims**

Each holder of an Allowed Claim in an impaired class of Claims that is entitled to vote on the Plan shall be entitled to vote separately to accept or reject the Plan, as provided in such order as is entered by the Bankruptcy Court establishing procedures with respect to the solicitation and tabulation of votes to accept or reject the Plan, or any other order of the Bankruptcy Court.

2.     **Nonconsensual Confirmation**

If any impaired class of Claims entitled to vote shall not accept the Plan by the requisite statutory majority provided in section 1126(c) of the Bankruptcy Code, the Debtors, with the consent of the Creditors' Committee, reserve the right to amend the Plan or undertake to have the Bankruptcy Court confirm the Plan under section 1129(b) of the Bankruptcy Code or both. With respect to impaired classes

of Claims that are deemed to reject the Plan, the Debtors shall request that the Bankruptcy Court confirm the Plan pursuant to section 1129(b) of the Bankruptcy Code.

**3.      Distributions on Allowed Senior Noteholder Claims,**
**Allowed Junior Noteholder Claims, and Allowed General Unsecured Claims,**

Distributions to holders of Allowed Senior Noteholder Claims, Allowed Junior Noteholder Claims, and Allowed General Unsecured Claims shall be aggregated and treated as a single claim.  At the written request of the Disbursing Agent any creditor holding multiple Allowed Senior Noteholder Claims, Allowed Junior Noteholder Claims, or Allowed General Unsecured Claims shall provide to the Disbursing Agent a single address as to which any distributions shall be sent.

**4.      Date of Distributions**

In the event that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date.

**5.      Disbursing Agent/Rights and Powers of**
**Disbursing Agent/Expenses of Disbursing Agent**

All distributions under the Plan shall be made by the Liquidating Trustee as Disbursing Agent or such other entity designated by the Liquidating Trustee as a Disbursing Agent.

The Disbursing Agent shall be empowered to (a) effect all actions and execute all agreements, instruments and other documents necessary to perform its duties under the Plan, (b) make all distributions contemplated hereby, (c) employ professionals to represent it with respect to its responsibilities and (d) exercise such other powers as may be vested in the Disbursing Agent by order of the Bankruptcy Court, pursuant to the Plan or as deemed by the Disbursing Agent to be necessary and proper to implement the provisions hereof.

Except as otherwise ordered by the Bankruptcy Court, any reasonable fees and expenses incurred by the Disbursing Agent (including, without limitation, taxes and reasonable attorneys fees and expenses) on or after the Effective Date shall be paid in Cash by the Liquidating Trust in the ordinary course of business.

**6.      List of Record Holders**

Within ten (10) days after the Effective Date, the Indenture Trustees, as applicable, shall provide the Liquidating Trustee with lists of the names and addresses of the record holders of the Series A Notes, the Series B Notes and the Series C Notes as of the Effective Date, which lists may be used by the Liquidating Trustee for the purposes of all distributions.

**7.      Delivery of Distribution**

Subject to Bankruptcy Rule 9010, all distributions to any holder of an Allowed Claim or Allowed Administrative Expense Claim shall be made at the address of such holder (i) as set forth on the Schedules filed with the Bankruptcy Court, (ii) on the books and records of the Debtors or their agents, or (iii) as set forth on the lists of record holders of the Series A Notes, the Series B Notes or the Series C Notes provided by the Series C Noteholder Indenture Trustee or the Junior Noteholder Indenture Trustee,

as applicable, unless the Debtors or the Liquidating Trustee have been notified in writing of a change of address, including, without limitation, by the filing of a proof of Claim by such holder that contains an address for such holder different than the address of such holder as set forth on the Schedules. Nothing in this Plan shall require the Liquidating Trustee to attempt to locate any holder of an Allowed Claim.

8. **Unclaimed Distributions**

All distributions under the Plan that are unclaimed for a period of one (1) year after distribution thereof shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code and revested in the Liquidating Trust and any entitlement of any holder of any Claims to such distributions shall be extinguished and forever barred. The Liquidating Trustee shall have no further obligation to make any distribution to the holder of such Claim on account of such Claim, and any entitlement of any holder of such Claim to any such distributions shall be extinguished and forever barred; provided, however, that the holder of such Claim may receive future distributions on account of such Claim by contacting the Liquidating Trustee at some point prior to the final distribution from the Liquidating Trust.

9. **Distribution Record Date**

With respect to holders of all General Unsecured Claims against the Debtors on the Distribution Record Date, the Claims register shall be closed and any transfer of any Claim therein shall be prohibited. The Debtors and the Liquidating Trust shall have no obligation to recognize any transfer of any such Claims occurring after the close of business on such date.

10. **Manner of Payment**

At the option of the Disbursing Agent, any Cash payment to be made hereunder may be made by a check or wire transfer or as otherwise required or provided in applicable agreements. All distributions of Cash to the creditors of each of the Debtors under the Plan shall be made by, or on behalf of, the applicable Debtor.

11. **Cash Distributions**

Except with respect to the final distribution from the Liquidating Trust, no payment of Cash less than one hundred dollars ($100) shall be made to any holder of an Allowed Claim unless a request therefor is made in writing to the Liquidating Trustee.

12. **Setoff and Recoupment**

The Debtors may, but shall not be required to, setoff against or recoup from any Claim and from any payments to be made pursuant to the Plan in respect of such Claim any claims of any nature whatsoever that the Debtors may have against the claimant, but neither the failure to do so nor the allowance of any Claim hereunder shall constitute a waiver or release by the Debtors or the Liquidating Trustee of any such claim they may have against such claimant.

13. **Interest on Claims**

Unless otherwise specifically provided for in any of the Interim Cash Collateral Orders, the Final Cash Collateral Order, the Plan or the Confirmation Order, postpetition interest shall not accrue or be paid on any Claims, and no holder of a Claim shall be entitled to interest accruing on or after the Commencement Date on any Claim. Unless otherwise specifically provided for in the Plan or the Confirmation Order, interest shall not accrue or be paid upon any Claim in respect of the period from the

Commencement Date to the date a final distribution is made thereon if and after such Claim becomes an Allowed Claim.

**14.**     **No Distribution in Excess of Allowed Amounts**

Notwithstanding anything to the contrary herein, no holder of an Allowed Claim shall receive in respect of such Claim any distribution of a value as of the Effective Date in excess of the Allowed amount of such Claim.

**15.**     **Distributions After the Effective Date**

Distributions made after the Effective Date to holders of Disputed Claims that are not Allowed Claims as of the Effective Date but which later become Allowed Claims shall be deemed to have been made on the Effective Date.

**16.**     **Allocation of Plan Distributions Between Principal and Interest**

To the extent that any Allowed Claim entitled to a distribution under the Plan consists of indebtedness and other amounts (such as accrued but unpaid interest thereon), such distribution shall be allocated first to the principal amount of the Claim (as determined for United States federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of the Claim, to such other amounts.

**J.**     **PROCEDURES FOR TREATING DISPUTED CLAIMS UNDER THE PLAN**

**1.**     **Objections**

Except as otherwise provided in Section 7.2 of the Plan, as of the Effective Date, objections to, and requests for estimation of, Administrative Expense Claims and Claims against the Debtors may be interposed and prosecuted only by the Liquidating Trustee. Such objections and requests for estimation shall be served on the respective claimant and filed with the Bankruptcy Court on or shall be served and filed (i) on or before the one-hundred-and-twentieth (120th) day following the later of (x) the Effective Date and (y) the date that a proof of Claim is filed or amended or a Claim is otherwise asserted or amended in writing by or on behalf of a holder of such Claim, or (ii) such later date as may be fixed by the Bankruptcy Court whether fixed before or after the date specified in clauses (x) and (y) above.

**2.**     **No Distributions Pending Allowance**

Notwithstanding any other provision of the Plan, if any portion of a Claim or Administrative Expense Claim is Disputed, no payment or distribution provided under the Plan shall be made on account of such Claim or Administrative Expense Claim unless and until such Disputed Claim or Disputed Administrative Expense Claim becomes Allowed.

**3.**     **Distributions After Allowance**

To the extent that a Disputed Claim or Disputed Administrative Expense Claim ultimately becomes an Allowed Claim or Allowed Administrative Expense Claim, distributions (if any) shall be made to the holder of such Allowed Claim or Allowed Administrative Expense Claim in accordance with the provisions of the Plan.

4. **Resolution of Administrative Expense Claims and Claims**

On and after the Effective Date, the Liquidating Trustee shall have the authority to compromise, settle, otherwise resolve or withdraw any objections to Administrative Expense Claims and Claims against the Debtors, and Disputed Administrative Expense Claims and Claims against the Debtors, subject to the consent of the Trust Advisory Board for any Administrative Expense Claim or Claim over [$_____].

5. **Estimation of Claims/Interest**

The Debtors and, after the Effective Date, the Liquidating Trustee, may at any time request that the Bankruptcy Court estimate any Contingent Claim, Unliquidated Claim or Disputed Claim pursuant to section 502(c) of the Bankruptcy Code regardless of whether any of the Debtors or any other Person previously objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court will retain jurisdiction to estimate any Claim at any time during litigation concerning any objection to any Claim, including, without limitation, during the pendency of any appeal relating to any such objection. In the event that the Bankruptcy Court estimates any Contingent Claim, Unliquidated Claim or Disputed Claim, the amount so estimated shall constitute either the Allowed amount of such Claim or a maximum limitation on such Claim, as determined by the Bankruptcy Court. If the estimated amount constitutes a maximum limitation on the amount of such Claim, the Debtors or the Liquidating Trustee, as the case may be, may pursue supplementary proceedings to object to the allowance of such Claim. All of the aforementioned objection, estimation and resolution procedures are intended to be cumulative and not exclusive of one another. Claims may be estimated and subsequently compromised, settled, withdrawn or resolved by any mechanism approved by the Bankruptcy Court.

The amount of any Trust Assets allocable to, or retained on account of, Disputed Claims in the Liquidating Trust Claims Reserve shall be determined based on the estimation of such Disputed Claim pursuant to subsection (a) of Section 7.5 of the Plan.

To the extent that a Disputed Claim becomes an Allowed Claim after the Effective Date, the holder of such Claim shall not be entitled to any interest thereon.

K. **EXECUTORY CONTRACTS AND UNEXPIRED LEASES**

1. **Assumption or Rejection of Executory Contracts and Unexpired Leases**

Pursuant to sections 365(a) and 1123(b)(2) of the Bankruptcy Code, all executory contracts and unexpired leases that exist between the Debtors and any person or entity shall be deemed rejected by the Debtors as of the Effective Date, except for any executory contract or unexpired lease (i) that has been assumed or rejected pursuant to an order of the Bankruptcy Court entered prior to the Effective Date and (ii) as to which a motion for approval of the assumption of such executory contract or unexpired lease has been filed and served prior to the Confirmation Date, (iii) that is subject to deferred rejection in accordance with Section 8.2, or (iv) that is specifically designated as a contract or lease to be assumed on Schedules 8.01(A) (executory contracts) or 8.01(B) (unexpired leases), which schedules shall be contained in the Plan Supplement; *provided*, *however*, that the Debtors reserve the right, on or prior to the Confirmation Date, to amend Schedules 8.01(A) and 8.01(B) to delete any executory contract or unexpired lease therefrom or add any executory contract or unexpired lease thereto, in which event such executory contract(s) or unexpired lease(s) shall be deemed to be, respectively, either rejected or assumed as of the Effective Date, or subject to deferred rejection as applicable. The Debtors shall provide notice of any amendments to Schedules 8.01(A) and/or 8.01(B) to the parties to the executory contracts and

unexpired leases affected thereby. The listing of a document on Schedules 8.01(A) or 8.01(B) shall not constitute an admission by the Debtors that such document is an executory contract or an unexpired lease or that the Debtors have any liability thereunder.

### 2. Deferred Rejection of Executory Contracts

Pursuant to sections 365(a) and 1123(b)(2) of the Bankruptcy Code, and subject to the agreement of the parties to such executory contract, those executory contracts specifically designated as a contract subject to deferred rejection on Schedule 8.02 shall be rejected by the Debtors as of the date set forth on Schedule 8.02 or as of a date agreed to by the Debtors and the parties to the applicable executory contract. Schedule 8.02 shall be contained in the Plan Supplement; *provided*, *however*, that the Debtors reserve the right, on or prior to the Confirmation Date, to amend Schedule 8.02 to delete any executory contract therefrom or add any executory contract thereto, in which event such executory contract(s) shall become, or shall no longer be, subject to deferred rejection as of the Effective Date. The Debtors shall provide notice of any amendments to Schedule 8.02 to the parties to the executory contracts affected thereby. The listing of a document on Schedule 8.02 shall not constitute an admission by the Debtors that such document is an executory contract or that the Debtors have any liability thereunder.

### 3. Approval of Assumption or Rejection of Executory Contracts and Unexpired Leases

Entry of the Confirmation Order shall, subject to and upon the occurrence of the Effective Date, constitute (a) the approval, pursuant to sections 365(a) and 1123(b)(2) of the Bankruptcy Code, of the assumption of the executory contracts and unexpired leases assumed pursuant to Section 8.1 of the Plan, (b) the extension of time, pursuant to section 365(d)(4) of the Bankruptcy Code, within which the Debtors may assume, assume and assign or reject the unexpired nonresidential leases through the date of entry of an order approving the assumption, assumption and assignment or rejection of such executory contracts and unexpired leases, (c) the approval, pursuant to sections 365(a) and 1123(b)(2) of the Bankruptcy Code, of the rejection of the executory contracts and unexpired leases rejected pursuant to Section 8.1 of the Plan, and (d) the approval, pursuant to sections 365(a) and 1123(b)(2) of the Bankruptcy Code, of the deferred rejection of the executory contracts rejected pursuant to Section 8.2 of the Plan.

### 4. Inclusiveness

Unless otherwise specified on Schedules 8.01(A), 8.01(B) or 8.02 of the Plan Supplement, each executory contract and unexpired lease listed or to be listed therein shall include any and all modifications, amendments, supplements, restatements or other agreements made directly or indirectly by any agreement, instrument or other document that in any manner affects such executory contract or unexpired lease, without regard to whether such agreement, instrument or other document is listed on Schedules 8.01(A), 8.01(B) or 8.02.

### 5. Cure of Defaults

Except to the extent that different treatment has been agreed to by the non-debtor party or parties to any executory contract or unexpired lease on Schedule 8.01(A) or 8.01(B) to be assumed pursuant to Section 8.1 of the Plan, the Debtors shall, pursuant to the provisions of sections 1123(a)(5)(G) and 1123(b)(2) of the Bankruptcy Code and consistent with the requirements of section 365 of the Bankruptcy Code, within at least (20) days prior to the later of (a) the hearing on the Debtors' motion for assumption or assumption and assignment and (b) the Confirmation Hearing, file with the Bankruptcy Court and serve by first class mail on each non-debtor party to such executory contracts or unexpired

leases pursuant to Section 8.1 of the Plan, a notice which shall include, on Schedule 8.01(A) or 8.01(B), the cure amount as to each executory contract or unexpired lease to be assumed. The parties to such executory contracts or unexpired leases to be assumed or assumed and assigned by the Debtors shall have until the objection deadline to the Plan to file and serve any objection to assumption or the cure amounts listed by the Debtors. If there are any objections filed, the Bankruptcy Court shall hold a hearing on a date to be set by the Bankruptcy Court. Notwithstanding Section 8.1 of the Plan, the Debtors shall retain their rights to reject any of their executory contracts or unexpired leases that are subject to a dispute concerning amounts necessary to cure any defaults through the Effective Date.

6. **Bar Date for Filing Proofs of Claim Relating to**
**Executory Contracts and Unexpired Leases Rejected Pursuant to the Plan.**

Proofs of Claim for damages arising out of the rejection of an executory contract or unexpired lease pursuant to Section 8.1 of the Plan must be filed with the Bankruptcy Court and served upon the attorneys for the Debtors or on and after the Effective Date, the Liquidating Trustee, no later than thirty (30) days after the later of (a) notice of entry of an order approving the rejection of such executory contract or unexpired lease, (b) notice of entry of the Confirmation Order, (c) notice of an amendment to Schedules 8.01(A) or (B) of the Plan Supplement (solely with respect to the party directly affected by such modification), or (d) notice of the Debtors' election to reject under Section 8.1 of the Plan. **All such proofs of Claim not filed within such time will be forever barred from assertion against the Debtors and their estates or the Liquidating Trust and their property.**

7. **Bar Date for Filing Proofs of Claim Relating**
**To the Deferred Rejection of Executory Contracts.**

Proofs of Claim for damages arising out of the deferred rejection of an executory contract pursuant to Section 8.2 must be filed with the Bankruptcy Court and served upon the attorneys for the Debtors or on and after the Effective Date, the Liquidating Trustee, no later than thirty (30) days after the Effective Date. Damages resulting from such deferred rejection shall be calculated based on the rejection damages as of the earlier of (a) the date of rejection, or (b) thirty (30) days after the Effective Date. **All such proofs of Claim not filed within such time will be forever barred from assertion against the Debtors and their estates or the Liquidating Trust and their property.**

8. **Indemnification and Reimbursement Obligations.**

Subject to the occurrence of the Effective Date, the obligations of the Debtors, as of the Commencement Date, to indemnify, defend, reimburse, or limit the liability of directors, officers, or employees, against any claims, costs, liabilities or causes of action as provided in the Debtors' articles of organization, certificates of incorporation, bylaws, other organizational documents, or applicable law, shall, to the extent such indemnification, defense, reimbursement, or limitation is owed in connection with one or more events or omissions occurring before the Commencement Date, be (i) assumed and paid only to the extent of any applicable insurance coverage, and (ii) to the extent a proof of claim has been timely filed, treated as General Unsecured Claims to the extent such claims are not covered by any applicable insurance. Nothing contained herein shall affect the rights of such directors, officers or employees under any insurance policy or coverage with respect to such claims, costs, liabilities or causes of action.

For the avoidance of doubt, to the extent of the coverage provided by the D&O Insurance Policies, the Debtors would be fully liable for indemnification, defense, reimbursement, or limitation in connection with claims covered by the D&O Insurance Policies; as such, pursuant to sections 365(a) and 1123(b)(2) of the Bankruptcy Code, the D&O Insurance Policies, to the extent the contract providing for

such is determined to be an executory contract, shall be deemed assumed by the Debtors and transferred to the Liquidating Trust pursuant to Section 5.7(d) of the Plan.

### L. CONDITIONS PRECEDENT TO EFFECTIVE DATE

#### 1. Conditions Precedent to Effectiveness

The Effective Date shall not occur and the Plan shall not become effective unless and until the following conditions are satisfied in full or waived in accordance with Section 9.2 of the Plan:

> (i) The Confirmation Order, in form and substance acceptable to the Debtors and the Creditors' Committee shall have been entered and is a Final Order;

> (ii) All actions and all agreements, instruments or other documents necessary to implement the terms and provisions of the Plan are effected or executed and delivered, as applicable, in form and substance satisfactory to the Debtors; and

> (iii) All authorizations, consents and regulatory approvals, if any, required by the Debtors in connection with the consummation of the Plan are obtained and not revoked.

#### 2. Waiver of Conditions

Each of the conditions precedent in Section 1 hereof may be waived, in whole or in part, upon written notice, signed by the Debtors and the Creditors' Committee. Any such waivers may be effected at any time, without notice, without leave or order of the Bankruptcy Court and without any formal action.

#### 3. Satisfaction of Conditions

Except as expressly provided or permitted in the Plan, any actions required to be taken on the Effective Date shall take place and shall be deemed to have occurred simultaneously, and no such action shall be deemed to have occurred prior to the taking of any other such action. In the event that one or more of the conditions specified in Section 1 of the Plan have not occurred or otherwise been waived pursuant to Section 9.2 of the Plan, (a) the Confirmation Order shall be vacated, (b) the Debtors and all holders of Claims and interests, including any Equity Interests, shall be restored to the status quo ante as of the day immediately preceding the Confirmation Date as though the Confirmation Date never occurred and (c) the Debtors' obligations with respect to Claims and Equity Interests shall remain unchanged and nothing contained herein shall constitute or be deemed a waiver or release of any Claims or Equity Interests by or against the Debtors or any other person or to prejudice in any manner the rights of the Debtors or any person in any further proceedings involving the Debtors.

### M. EFFECT OF CONFIRMATION

#### 1. Post-Effective Date Assets

On and after the Effective Date, the Liquidating Trustee may dispose of the assets of the Liquidating Trust free of any restrictions of the Bankruptcy Code, but in accordance with the provisions of the Plan and the Liquidating Trust Agreement.

2. **Binding Effect**

Subject to the occurrence of the Effective Date, on and after the Confirmation Date, the provisions of the Plan shall bind any holder of a Claim against, or Equity Interest in, the Debtors and such holder's respective successors and assigns, whether or not the Claim or interests including any Equity Interest of such holder is impaired under the Plan, whether or not such holder has accepted the Plan and whether or not such holder is entitled to a distribution under the Plan.

3. **Termination of Equity Interests**

Except as provided in the Plan, the rights afforded in and the payments and distributions to be made under the Plan shall terminate all Equity Interests. Except as provided in the Plan, upon the Effective Date, Equity Interests shall be, and shall be deemed to be, terminated, and all holders of such Equity Interests shall be precluded and enjoined from asserting against the Liquidating Trust, its successors or assignees or any of its assets or properties, any other or further Claim or Equity Interest based upon any act or omission, transaction or other activity of any kind or nature that occurred prior to the Effective Date, whether or not such holder has filed a proof of Claim or proof of Equity Interest and whether or not the facts or legal bases therefor were known or existed prior to the Effective Date.

4. **Injunction or Stay**

Except as otherwise expressly provided herein or in the Confirmation Order, all Persons or entities who have held, hold or may hold Claims against or Equity Interests in the Debtors are permanently enjoined, from and after the Effective Date, from (a) commencing or continuing in any manner any action or other proceeding of any kind on any such Claim or Equity Interest against any of the Debtors or the Liquidating Trust, (b) the enforcement, attachment, collection or recovery by any manner or means of any judgment, award, decree or order against any Debtor or the Liquidating Trust with respect to such Claim or Equity Interest, (c) creating, perfecting or enforcing any encumbrance of any kind against any Debtor of the Liquidating Trust or against the property or interests in property of any Debtor or the Liquidating Trust with respect to such Claim or Equity Interest, (d) asserting any right of setoff, subrogation or recoupment of any kind against any obligation due to any Debtor or the Liquidating Trust or against the property or interests in property of any Debtor or the Liquidating Trust with respect to such Claim or Equity Interest, except as contemplated or allowed by the Plan, (e) acting or proceeding in any manner in any place whatsoever, that does not conform to or comply with the provisions of the Plan, (f) commencing, continuing, or asserting in any manner any action or other proceeding of any kind with respect to any claims which are extinguished or released pursuant to the Plan, and (g) taking any actions to interfere with the implementation or consummation of the Plan.

5. **Terms of Injunction or Stay**

Unless otherwise provided in the Confirmation Order, all injunctions or stays arising under or entered during the Chapter 11 Cases under section 105 or 362 of the Bankruptcy Code, or otherwise, that are in existence on the Confirmation Date shall remain in full force and effect until the Effective Date, provided, however, that no such injunction or stay shall preclude enforcement of parties' rights under the Plan and the related documents.

6. **Reservation of Causes of Action/Reservation of Rights**

Except as provided in the Plan, nothing contained in the Plan (including in Section 6.13 of the Plan) or the Confirmation Order shall be deemed to be a waiver or the relinquishment of any rights or causes of action that the Debtors or the Liquidating Trust may have or which the Liquidating Trust may

choose to assert on behalf of the Debtors' estates under any provision of the Bankruptcy Code or any applicable nonbankruptcy law, including, without limitation, (i) any and all Claims against any person or entity, to the extent such person or entity asserts a crossclaim, counterclaim, and/or Claim for setoff which seeks affirmative relief against the Debtors, the Liquidating Trust their officers, directors, or representatives and (ii) the turnover of any property of the Debtors' Estates.

Nothing contained in the Plan or the Confirmation Order shall be deemed to be a waiver or relinquishment of any claim, cause of action, right of setoff, or other legal or equitable defense which the Debtors had immediately prior to the Commencement Date, against or with respect to any Claim left unimpaired by the Plan. The Liquidating Trust shall have, retain, reserve, and be entitled to assert all such claims, causes of action, rights of setoff, and other legal or equitable defenses which the Debtors had immediately prior to the Commencement Date fully as if the Chapter 11 Cases had not been commenced, and all of the Debtors' legal and equitable rights respecting any Claim left Unimpaired by the Plan may be asserted after the Confirmation Date by the Liquidating Trust to the same extent as if the Chapter 11 Cases had not been commenced.

7.    **Exculpation**

**Notwithstanding anything herein to the contrary, as of the Effective Date none of the Debtors, the Liquidating Trust, the Liquidating Trustee, the members of the Creditors' Committee (solely in their capacity as such, and their respective officers, directors, employees, managing directors, accountants, financial advisors, investment bankers, agents, restructuring advisors, and attorneys, and each of their respective agents and representatives (but solely in their capacities as such) shall have or incur any liability for any Claim, cause of action or other assertion of liability for any act taken or omitted to be taken in connection with, or arising out of, the Chapter 11 Cases, the formulation, dissemination, confirmation, consummation or administration of the Plan, property to be distributed under the Plan or any other act or omission in connection with the Chapter 11 Cases, the Plan (or any prior proposed version of the Plan), the Disclosure Statement or any contract, instrument, document or other agreement related thereto; and such claims shall be deemed expressly waived and forever relinquished as of the Effective Date; provided, however, that the foregoing shall not affect the liability of any Person that otherwise would result from any such act or omission to the extent such act or omission is determined by a Final Order to have constituted willful misconduct, gross negligence, intentional fraud, or criminal conduct of any such person or entity.**

8.    **Limited Releases.**

**Effective as of the Confirmation Date but subject to the occurrence of the Effective Date, and in consideration of the services of the present and former directors, officers, members, employees, managing directors, affiliates, agents, financial advisors, restructuring advisors, attorneys and representatives of or to the Debtors, the Secured Lenders, and the members of the Creditors' Committee, who acted in such capacities after the Commencement Date (but not limited to such postpetition actions); (x) the Debtors and the Secured Lenders; (y) each holder of a Claim that votes to accept the Plan (or is deemed to accept the Plan) and (z) to the fullest extent permissible under applicable law, as such law may be extended or integrated after the Effective Date, each holder of a Claim or Equity Interest that does not vote to accept the Plan, shall release unconditionally and forever (a) each present or former director, officer, member, employee, affiliate, agent, financial advisor, restructuring advisor, attorney and representative (and their respective affiliates) of the Debtors, the Secured Lenders (solely in that capacity), and the members of the Creditors' Committee (solely in that capacity) who acted in such capacity after the Commencement Date, and each of their respective officers, directors, agents, advisors, and**

professionals (but, in each case, solely in their capacities as such) from any and all Claims or causes of action whatsoever in connection with, related to, or arising out of the Debtors' restructuring or reorganization efforts on or after January 18, 2008, the Chapter 11 Cases, the pursuit of confirmation of the Plan, the consummation thereof, the administration thereof or the property to be distributed thereunder; and (b) each present or former director of any of the Debtors' non-debtor subsidiaries organized or incorporated outside of the United States of America from any and all Claims or causes of action whatsoever through the Effective Date; *provided, however*, that the foregoing shall not operate as a waiver of or release from any causes of action arising out of the willful misconduct, gross negligence, intentional fraud, or criminal conduct of any such person or entity.

Except as provided in Section 10.8(a) of the Plan (*i.e.* the above paragraph), nothing contained in any other section of the Plan shall be deemed a release waiver or discharge of any claims, demands, debts, rights, causes of action or liabilities held by the estates or the Liquidating Trust (pursuant to Section 5.7 of the Plan) against any current or former directors or officers of the Debtors for fraud, negligence, corporate waste, abuse, mismanagement, or for breach of fiduciary or other duties under Delaware, New York, or other applicable state or federal law, including, but not limited to, any act or failure to act in connection with: (i) from January 2007 through and including January 18, 2008, a potential transaction for the merger, sale or acquisition of the BearingPoint or any component part thereof; (ii) the merger and/or acquisition of additional foreign and/or domestic subsidiaries from December 1999 through and including January 18, 2008; (iii) the operations of BearingPoint, including, without limitation, accounting, internal controls, and financial reporting from January 2000 through and including January 18, 2008; and (iv) the Debtors' secured debt financings, including, without limitation, credit facilities entered into in 2004, 2005 and 2007.

### 9. Causes of Action/Avoidance Actions/Objections

Other than any releases granted herein and by the Confirmation Order and by Final Order of the Bankruptcy Court, as applicable, from and after the Effective Date, the Liquidating Trust shall have the right to prosecute any and all Causes of Action, including, but not limited to, avoidance or equitable subordination actions, recovery causes of action and objections to Claims under sections 105, 502, 510, 542 through 551, and 553 of the Bankruptcy Code that belong to the Debtors or Debtors in Possession.

## N. JURISDICTION AND GOVERNING LAW

### 1. Retention of Jurisdiction

The Bankruptcy Court shall have exclusive jurisdiction of all matters arising out of, or related to, the Chapter 11 Cases and the Plan pursuant to, and for the purposes of, sections 105(a) and 1142 of the Bankruptcy Code, including, without limitation:

(i)     To hear and determine pending applications for the assumption or rejection of executory contracts or unexpired leases, the allowance of Claims and Administrative Expense Claims resulting therefrom and any disputes with respect to executory contracts or unexpired leases relating to facts and circumstances arising out of or relating to the Chapter 11 Cases;

(ii)    To determine any and all adversary proceedings, applications and contested matters;

(iii)     To ensure that distributions to holders of Allowed Claims and Equity Interests are accomplished as provided herein

(iv)      To consider Claims or the allowance, classification, priority, compromise, estimation, or payment of any Claim, Administrative Expense Claim, or Interest;

(v)       To hear and determine all applications for compensation and reimbursement of expenses under sections 330, 331 and 503(b) of the Bankruptcy Code;

(vi)      To hear and determine any timely objections to, or requests for estimation of Disputed Administrative Expense Claims and Disputed Claims, in whole or in part;

(vii)     To enter and implement such orders as may be appropriate in the event the Confirmation Order is for any reason stayed, revoked, modified or vacated;

(viii)    To resolve disputes as to the ownership of any Administrative Expense Claim, Claim or Equity Interest;

(ix)      To issue such orders in aid of execution of the Plan, to the extent authorized by section 1142 of the Bankruptcy Code;

(x)       To consider any amendments to or modifications of the Plan or to cure any defect or omission, or reconcile any inconsistency, in any order of the Bankruptcy Court, including, without limitation, the Confirmation Order;

(xi)      To hear and determine disputes or issues arising in connection with the interpretation, implementation or enforcement of the Plan, the Confirmation Order, any transactions or payments contemplated hereby, any agreement, instrument, or other document governing or relating to any of the foregoing or any settlement approved by the Bankruptcy Court;

(xii)     To hear and determine matters concerning state, local and federal taxes in accordance with sections 346, 505 and 1146 of the Bankruptcy Code (including, without limitation, any request by the Debtors prior to the Effective Date or request by the Liquidating Trust after the Effective Date for an expedited determination of tax under section 505(b) of the Bankruptcy Code);

(xiii)    To hear and determine all disputes involving the existence, scope and nature of the discharges granted under the Plan, the Confirmation Order or the Bankruptcy Code;

(xiv)     To issue injunctions and effect any other actions that may be necessary or appropriate to restrain interference by any person or entity with the

consummation, implementation or enforcement of the Plan, the Confirmation Order or any other order of the Bankruptcy Court;

(xv)     To determine such other matters and for such other purposes as may be provided in the Confirmation Order;

(xvi)    To hear and determine any rights, Claims or causes of action held by or accruing to the Debtors pursuant to the Bankruptcy Code or pursuant to any federal or state statute or legal theory;

(xvii)   To recover all assets of the Debtors and property of the Debtors' estates, wherever located;

(xviii)  To hear disputes concerning the Liquidating Trust;

(xix)    To enter a final decree closing the Chapter 11 Cases;

(xx)     To hear any other matter not inconsistent with the Bankruptcy Code.

## 2.     Governing Law

Except to the extent that the Bankruptcy Code or other federal law is applicable, or to the extent an exhibit to the Plan or Plan Supplement provides otherwise (in which case the governing law specified therein shall be applicable to such exhibit), the rights, duties, and obligations arising under the Plan shall be governed by, and construed and enforced in accordance with, the laws of the State of New York without giving effect to its principles of conflict of laws.

## O.     MISCELLANEOUS PROVISIONS

## 1.     Effectuating Documents and Further Transactions

On or before the Effective Date, and without the need for any further order or authority, the Debtors shall file with the Bankruptcy Court or execute, as appropriate, such agreements and other documents that are in form and substance satisfactory to them as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan. As of the effective Date, the Liquidating Trust is authorized to execute, deliver, file, or record such contracts, instruments, releases, indentures and other agreements or documents and take such actions as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan and any securities issued pursuant to the Plan.

## 2.     Withholding and Reporting Requirements

In connection with the Plan and all instruments issued in connection therewith and distributed thereon, any party issuing any instrument or making any distribution under the Plan shall comply with all applicable withholding and reporting requirements imposed by any United States federal, state or local tax law or taxing authority, and all distributions under the Plan shall be subject to any such withholding or reporting requirements. Notwithstanding the above, each holder of an Allowed Claim that is to receive a distribution under the Plan shall have the sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed on such holder by any governmental unit, including income, withholding and other tax obligations, on account of such distribution. Any party issuing any instrument or making any distribution under the Plan has the right, but not the obligation, to

not make a distribution until such holder has made arrangements satisfactory to such issuing or disbursing party for payment of any such tax obligations.

### 3.      Corporate Action

On the Effective Date, all matters provided for under the Plan that would otherwise require approval of the managers or directors of one or more of the Debtors, as the case may be, shall be in effect from and after the Effective Date pursuant to the applicable general corporation law of the states in which the Debtors are incorporated or established, without any requirement of further action by the managers or directors of the Debtors.

### 4.      Continuing Exclusivity Period

Subject to further order of the Bankruptcy Court, until the Effective Date, the Debtors shall, pursuant to section 1121 of the Bankruptcy Code, retain the exclusive right to amend the Plan and to solicit acceptances thereof.

### 5.      Plan Supplement/Exhibits and Schedules

The Plan Supplement and the documents contained therein shall be in form, scope and substance satisfactory to the Debtors and reasonably satisfactory to the Creditors' Committee, shall be filed with the Bankruptcy Court no later than five (5) Business Days before the deadline for voting to accept or reject the Plan, provided that the documents included therein may thereafter be amended and supplemented prior to execution, so long as no such amendment or supplement materially affects the rights of holders of Claims.

All exhibits and schedules to the Plan, including the Plan Supplement, are incorporated into and are a part of the Plan as if set forth in full herein.

### 6.      Payment of Statutory Fees

All fees payable under section 1930 of chapter 123 of title 28 of the United States Code, as determined by the Bankruptcy Court at the Confirmation Hearing, shall be paid on the Effective Date.

### 7.      Post-Confirmation Date Professional Fees and Expenses

From and after the Confirmation Date, the Liquidating Trust, shall, in the ordinary course of business and without the necessity for any approval by the Bankruptcy Court, pay the reasonable fees and expenses of professional persons thereafter incurred by them.

### 8.      Dissolution of the Creditors' Committee

On the Effective Date, the Creditors' Committee shall be dissolved and the members thereof shall be released and discharged of and from all further authority, duties, responsibilities and obligations related to and arising from and in connection with the Chapter 11 Cases, and the retention or employment of such Creditors' Committee's attorneys, accountants and other agents, if any, shall terminate other than for purposes of (i) filing and prosecuting applications for final allowances of compensation for professional services rendered and reimbursement of expenses incurred in connection therewith, and (ii) reviewing and objecting to the applications of other parties for the allowance of compensation for professional services rendered and reimbursement of expenses incurred in connection therewith.

9. **Exemption from Transfer Taxes**

Pursuant to section 1146(a) of the Bankruptcy Code, the issuance, transfer or exchange of notes or equity securities under or in connection with the Plan, the creation of any mortgage, deed of trust or other security interest, the making or assignment of any lease or sublease or the making or delivery of any deed or other instrument of transfer under, in furtherance of, or in connection with the Plan shall not be subject to any stamp, real estate transfer, mortgage recording or other similar tax.

10. **Expedited Tax Determination**

The Debtors and the Liquidating Trustee are authorized to request an expedited determination of taxes under section 505(b) of the Bankruptcy Code for any or all returns filed for, or on behalf of, the Debtors for any and all taxable periods (or portions thereof) ending after the Commencement Date through and including the Effective Date.

11. **Substantial Consummation**

On the Effective Date, the Plan shall be deemed to be substantially consummated under sections 1101 and 1127(b) of the Bankruptcy Code.

12. **Severability of Plan Provisions**

In the event that, prior to the Confirmation Date, any term or provision of this Plan is held by the Bankruptcy Court to be invalid, void or unenforceable, the Bankruptcy Court shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void or unenforceable, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding any such holding, alteration or interpretation, the remainder of the terms and provisions of the Plan shall remain in full force and effect and shall in no way be affected, impaired or invalidated by such holding, alteration or interpretation. Notwithstanding the foregoing, in such case, the Plan may only be confirmed without that clause or provision at the request of the Debtors and with the consent of the Creditors Committee. The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable in accordance with its terms.

13. **Notices.**

All notices, requests and demands to or upon the Debtors shall be in writing (including by facsimile transmission) to be effective and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when actually delivered or, in the case of notice by facsimile transmission, when received and telephonically confirmed, addressed as follows:

BearingPoint, Inc.
100 Crescent Court, Suite 700
Dallas, Texas 75201
Attn: John DeGroote
Telephone: (214) 459-2770
Facsimile: (214) 975-3484

– and –

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, New York  10153
Attn:    Marcia L. Goldstein
            Damon P. Meyer
Telephone:  (212) 310-8000
Facsimile:  (212) 310-8007

– and –

Weil, Gotshal & Manges LLP
700 Louisiana Street, Suite 1600
Houston, Texas 77002
Attn:    Alfredo R. Pérez
Telephone:  (713) 546-5000
Facsimile:  (713) 224-9511

## P.  MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN

### 1.  Modification of Plan

Alterations, amendments or modifications of or to the Plan may be proposed in writing by the Debtors at any time prior to the Confirmation Date, provided that (a) the Debtors have provided the Creditors' Committee with notice of such alterations, amendments or modifications and the Creditors' Committee has consented; (b) the Plan, as altered, amended or modified satisfies the conditions of sections 1122 and 1123 of the Bankruptcy Code; and (c) the Debtors shall have complied with section 1125 of the Bankruptcy Code.  The Plan may be altered, amended or modified at any time after the Confirmation Date and before substantial consummation, provided that (x) the Debtors have provided the Creditors' Committee with notice of such alterations, amendments or modifications and the Creditors' Committee has consented; (y) the Plan, as altered, amended or modified, satisfies the requirements of sections 1122 and 1123 of the Bankruptcy Code; and (z) the Bankruptcy Court, after notice and a hearing, confirms the Plan, as altered, amended or modified, under section 1129 of the Bankruptcy Code and the circumstances warrant such alterations, amendments or modifications.  A holder of a Claim that has accepted the Plan shall be deemed to have accepted the Plan, as altered, amended or modified, if the proposed alteration, amendment or modification does not materially and adversely change the treatment of the Claim of such holder.

Prior to the Effective Date, the Debtors may make appropriate technical adjustments and modifications to the Plan, subject to the consent of the Secured Lenders' Representative, without further order or approval of the Bankruptcy Court, provided that such technical adjustments and modifications do not adversely affect in a material way the treatment of holders of Claims or Equity Interests and the Secured Lenders' Representative has consented to such alteration or modification.

### 2.  Revocation or Withdrawal of the Plan

The Debtors, in consultation with the Creditors' Committee, reserve the right to revoke or withdraw the Plan prior to the Confirmation Date.  If the Debtors revoke or withdraw the Plan prior to the Confirmation Date, then the Plan shall be deemed null and void.  In such event, nothing contained herein shall constitute or be deemed a waiver or release of any Claims or Equity Interests by or against the Debtors or any other person or to prejudice in any manner the rights of the Debtors or any person in any further proceedings involving the Debtors.Prior to the Effective Date, the Debtors may make appropriate

technical adjustments and modifications to the Plan, subject to the consent of the Secured Lenders' Representative, without further order or approval of the Bankruptcy Court, provided that such technical adjustments and modifications do not adversely affect in a material way the treatment of holders of Claims or Equity Interests and the Secured Lenders' Representative has consented to such alteration or modification.

For the avoidance of doubt, the foregoing shall not effect a waiver of any rights that any party may have with respect to modification of the Plan under section 1127 of the Bankruptcy Code.

# VI.

# CERTAIN FACTORS TO BE CONSIDERED

## A.    CERTAIN BANKRUPTCY LAW CONSIDERATIONS

### 1.    Risk of Non-Confirmation of the Plan

Although the Debtors believe that the Plan will satisfy all requirements necessary for confirmation by the Bankruptcy Court, there can be no assurance that the Bankruptcy Court will reach the same conclusion or that modifications of the Plan will not be required for confirmation or that such modifications would not necessitate resolicitation of votes.

### 2.    Non-Consensual Confirmation

In the event any impaired class of claims or equity interests does not accept the Plan, a bankruptcy court may nevertheless confirm such plan at the proponent's request if at least one impaired class has accepted the Plan (with such acceptance being determined without including the vote of any "insider" in such class), and as to each impaired class that has not accepted the Plan, the bankruptcy court determines that the Plan "does not discriminate unfairly" and is "fair and equitable" with respect to the dissenting impaired Classes.  See section VIII.C.(ii) below, entitled "CONFIRMATION OF THE PLAN - Requirements for Confirmation of the Plan - Requirements of Section 1129(b) of the Bankruptcy Code." Because Class 7 (Other Subordinated Claims) and Class 8 (Equity Interests) are deemed to reject the Plan, these requirements must be satisfied with respect to these Classes.  Should any other class vote to reject the Plan, then these requirements must be satisfied with respect to those Classes as well.  The Debtors believe that the Plan satisfies these requirements.

### 3.    Risk of Non-Occurrence of the Effective Date

Although the Debtors believe that the Effective Date will occur soon after the Confirmation Date, there can be no assurance as to such timing.

### 4.    Debtors Could Withdraw the Plan

(i)    Under the Plan, the Debtors could withdraw the Plan with respect to any Debtors and proceed with confirmation of the Plan with respect to any other Debtors.

### 5.    Conversion into a Chapter 7 Case

If no plan can be confirmed, or if the Bankruptcy Court otherwise finds that it would be in the best interest of creditors, the Chapter 11 Case may be converted to a case under chapter 7 of the

Bankruptcy Code, pursuant to which a trustee would be appointed or elected to liquidate the Debtors' assets for distribution in accordance with the priorities established by the Bankruptcy Code. A discussion of the effects that a Chapter 7 liquidation would have on the recoveries of holders of claims and interests and a liquidation analysis are set forth in Exhibit D.

**B.    ADDITIONAL FACTORS TO BE CONSIDERED**

**1.    The Debtors Have No Duty to Update**

The statements contained in this Disclosure Statement are made by the Debtors as of the date hereof, unless otherwise specified herein, and the delivery of this Disclosure Statement after that date does not imply that there has been no change in the information set forth herein since that date.  The Debtors have no duty to update this Disclosure Statement unless otherwise ordered to do so by the Bankruptcy Court.

**2.    No Representations Outside This Disclosure Statement Are Authorized**

No representations concerning or related to the Debtors, the Chapter 11 Cases, or the Plan are authorized by the Bankruptcy Court or the Bankruptcy Code, other than as set forth in this Disclosure Statement.  Any representations or inducements made to secure your acceptance or rejection of the Plan that are other than as contained in, or included with, this Disclosure Statement should not be relied upon by you in arriving at your decision.

**3.    Claims Could Be More Than Projected**

As of the date hereof, approximately $2,600,000,000 in unsecured claims (excluding claims of the Senior Noteholders and the Junior Noteholders) have been asserted against the Debtors. The Debtors project that only approximately $225,171,340 in General Unsecured Claims will be Allowed by the Bankruptcy Court.  This, however, is an estimate, and recoveries based on suchprojection are not guaranteed.  The Allowed amount of Claims in each class could be significantly more than projected, which in turn, could cause the value of distributions to be reduced substantially.

**4.    Projections Based on Recovery Analysis Are Not Assured, And Actual Results May Vary**

The Recovery Analysis prepared by the Debtors and their advisors projects assets to be distributable to holders of Allowed Claims in Classes 4a, 4b, 5 and 6 in the approximate amount of $24,200,000.  Certain of the information contained in this Disclosure Statement is based on such Recovery Analysis and is, by nature, forward looking, and contains estimates and assumptions which might ultimately prove to be incorrect, and contains projections which may be materially different from actual future experiences.  There are uncertainties associated with any projections and estimates, and they should not be considered assurances or guarantees of the amount of funds or the amount of Claims in the various Classes that might be allowed.

**5.    No Legal or Tax Advice is Provided to You By This Disclosure Statement**

The contents of this Disclosure Statement should not be construed as legal, business or tax advice.  Each creditor or Equity Interest holder should consult his, her, or its own legal counsel and accountant as to legal, tax and other matters concerning his, her, or its Claim or Equity Interest.

This Disclosure Statement is <u>not</u> legal advice to you. This Disclosure Statement may <u>not</u> be relied upon for any purpose other than to determine how to vote on the Plan or object to confirmation of the Plan.

### 6. No Admission Made

Nothing contained herein shall constitute an admission of, or be deemed evidence of, the tax or other legal effects of the Plan on the Debtors or on holders of Claims or Equity Interests.

### 7. Certain Tax Consequences

For a discussion of certain U.S. federal income tax considerations to the Debtors and certain holders of Claims in connection with the implementation of the Plan, see "Certain Federal Income Tax Consequences of the Plan."

# VII.

# CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

The following discussion summarizes certain U.S. federal income tax consequences of the implementation of the Plan to the Debtors and to holders of certain Claims. The following summary does not address the U.S. federal income tax consequences to holders whose Claims are unimpaired or otherwise entitled to payment in full in cash under the Plan (e.g., Priority Non-Tax Claims, Secured Tax Claims, and Other Secured Claims), to holders of Claims extinguished without a distribution in exchange therefor, to holders of Equity Interests or generally those holders who negotiated their own settlements with the Debtors.

The following summary is based on the Internal Revenue Code of 1986, as amended (the "***Tax Code***"), U.S. Department of Treasury regulations promulgated thereunder ("***Treasury Regulations***"), judicial decisions, and published administrative rules and pronouncements of the Internal Revenue Service (the "***IRS***"), all as in effect on the date hereof. Changes in such rules or new interpretations thereof may have retroactive effect and could significantly affect the U.S. federal income tax consequences described below.

The U.S. federal income tax consequences of the Plan are complex and are subject to significant uncertainties. The Debtors have not requested a ruling from the IRS or an opinion of counsel with respect to any of the tax aspects of the Plan. Thus, no assurance can be given as to the interpretation that the IRS will adopt. In addition, this summary generally does not address foreign, state or local tax consequences of the Plan, nor does it address the U.S. federal income tax consequences of the Plan to special classes of taxpayers (such as foreign taxpayers, broker-dealers, traders that mark-to-market their securities, banks, mutual funds, insurance companies, other financial institutions, small business investment companies, regulated investment companies, real estate investment trusts, tax-exempt organizations (including, without limitation, certain pension funds), persons whose functional currency is not the U.S. dollar, persons subject to the alternative minimum tax, persons holding Claims as part of a "straddle," "hedge," "constructive sale" or "conversion transaction" with other investments, pass-through entities and investors in pass-through entities).

**Accordingly, the following summary of certain U.S. federal income tax consequences is for informational purposes only and is not a substitute for careful tax planning and advice based upon the individual circumstances pertaining to a holder of a Claim.**

**IRS Circular 230 Notice: To ensure compliance with IRS Circular 230, holders of Claims are hereby notified that: (a) any discussion of federal tax issues contained or referred to in this Disclosure Statement is not intended or written to be used, and cannot be used, by holders of Claims for the purpose of avoiding penalties that may be imposed on them under the Tax Code; (b) such discussion is written in connection with the promotion or marketing by the Debtors of the transactions or matters addressed herein; and (c) holders of Claims should seek advice based on their particular circumstances from an independent tax advisor.**

## A.    CONSEQUENCES TO THE DEBTORS

### 1.    Cancellation of Indebtedness.

In connection with the Plan, all assets of the Debtors will be transferred to the Liquidating Trust, and the Debtors and their subsidiaries (to the extent the equity in such subsidiaries is not transferred to the Liquidating Trust) will dissolve.  In connection with the implementation of the Plan, it is expected that the Debtors will incur a significant amount of cancellation of indebtedness ("***COD***") income for U.S. federal income tax purposes.

COD income is the amount by which indebtedness discharged (reduced by any unamortized original issue discount) exceeds the amount of cash and the fair market value of any other consideration given in exchange therefor.  Certain statutory or judicial exceptions can apply to limit the amount of COD (such as where the payment of the cancelled debt would have given rise to a tax deduction).  Although any COD incurred will be excluded from the taxable income of BE and its consolidated subsidiaries for U.S. federal income tax purposes under a special bankruptcy exception contained in the Tax Code, the Tax Code provides that a debtor in a bankruptcy case generally must reduce certain of its tax attributes – such as net operating loss ("NOL") carryforwards and current year NOLs, capital loss carryforwards, tax credits, and tax basis in assets – by the amount of the excluded COD.  Any reduction in tax attributes in respect of excluded COD income does not occur until after the computation of tax for the taxable year in which the COD is incurred.

## B.    CONSEQUENCES TO CERTAIN HOLDERS OF CLAIMS

### 1.    In General.

Pursuant to the Plan, holders of certain Claims will receive a Beneficial Interest in the Liquidating Trust.  For U.S. federal income tax purposes, the Liquidating Trust has been structured to qualify as a "grantor trust."  See section C below, "Tax Treatment of the Liquidating Trust and Holders of Beneficial Interests."  As a result, the receipt of a Beneficial Interest in the Liquidating Trust by a holder of a Claim generally should be treated for U.S. federal income tax purposes as the receipt of a direct undivided interest in the underlying assets of the Liquidating Trust, subject to any obligations of the Liquidating Trust, and all holders are required to report consistently therewith.  In addition, pursuant to the Plan, the Liquidating Trustee will make a good faith valuation of the assets of the Liquidating Trust, and all parties must consistently use such valuation for all U.S. federal income tax purposes.

### 2.    Consequences to Holders of Senior Noteholder Claims, Junior Noteholder Claims, and General Unsecured Claims.

In general, each holder of a Senior Noteholder Claim, Junior Noteholder Claim, or General Unsecured Claim should recognize gain or loss (although any loss with respect to such a Claim may be deferred until all Disputed Claims are resolved) in an amount equal to the difference, if any, between (i) the fair market value of its undivided interest in the Liquidating Trust Assets received in

satisfaction of its Claim (other than in respect of any Claim for accrued but unpaid interest) and (ii) the holder's adjusted tax basis in its Claim (other than any tax basis attributable to accrued but unpaid interest).  See section C below, "Tax Treatment of the Liquidating Trust and Holders of Beneficial Interests," regarding the treatment of a holder of Beneficial Interests in the Liquidating Trust as a direct owner of an undivided interest in the underlying assets for U.S. federal income tax purposes.  For a discussion of the tax consequences of any Claim for accrued but unpaid interest, see section B.4 below, "Distributions in Discharge of Accrued and Unpaid Interest."  For a discussion of the character of any gain or loss, see section B.3 below, "Character of Gain or Loss."

In addition, holders of previously Allowed Senior Noteholder Claims, Junior Noteholder Claims, and General Unsecured Claims may become entitled to an increased share of the assets of the Liquidating Trust as any Disputed Claims are resolved.  The imputed interest provisions of the Tax Code may apply to treat a portion of such increased share of assets as imputed interest.  Holders of such Claims also should consult their tax advisors regarding the possible deferral of any loss, and a portion of any gain, realized by such holders in respect of their Claims until such Disputed Claims are resolved.

In general, a holder's tax basis in its undivided interest in the Liquidating Trust Assets should be equal to its fair market value, which will reflect any obligations to which those assets are subject, and the holding period for such assets should begin on the day following the receipt of such assets.

After the Effective Date, any amount that a holder receives as a distribution from the Liquidating Trust in respect of its Beneficial Interest (other than possibly as a result of the subsequent disallowance of a Disputed Claim, as discussed above) generally should not be included in the holder's amount realized in respect of its Claim for U.S. federal income tax purposes, but should be separately treated as a distribution received in respect of its Beneficial Interest.

**3.**     **Character of Gain or Loss.**

Where gain or loss is recognized by a holder of a Claim, the character of such gain or loss as long-term or short-term capital gain or loss or as ordinary income or loss will be determined by a number of factors, including, among others, the tax status of the holder, whether the Claim constitutes a capital asset in the hands of the holder and how long it has been held, whether the Claim was acquired at a market discount, and whether and to what extent the holder previously had claimed a bad debt deduction.

**4.**     **Distributions in Discharge of Accrued and Unpaid Interest.**

In general, to the extent that any consideration received pursuant to the Plan by a holder of an Allowed Claim is received in satisfaction of accrued interest or original issue discount ("***OID***") during its holding period, such amount will be taxable to the holder as interest income (to the extent such accrued interest or OID was not previously included in the holder's gross income).  Conversely, a holder generally recognizes a deductible loss to the extent any accrued interest claimed or amortized OID was previously included in its gross income and is not paid in full.

Pursuant to the Plan, all distributions from the Debtors in satisfaction of Claims will be allocated first to the principal amount of such Claims, as determined for U.S. federal income tax purposes, and thereafter to the portion of such Claim, if any, representing accrued but unpaid interest or OID.  However, there is no assurance that the IRS will respect such allocation for U.S. federal income tax purposes.

Each holder of a Claim is urged to consult its tax advisor regarding the allocation of consideration to and the deductibility of accrued but unpaid interest or OID for U.S. federal income tax purposes.

## C.    TAX TREATMENT OF THE LIQUIDATING TRUST AND HOLDERS OF BENEFICIAL INTERESTS

### 1.    Classification of the Liquidating Trust.

The Liquidating Trust is intended to qualify as a liquidating trust for U.S. federal income tax purposes. In general, a liquidating trust is not a separate taxable entity, but rather is treated for U.S. federal income tax purposes as a "grantor trust" (i.e., a pass-through entity). However, merely establishing a trust as a liquidating trust does not ensure that it will be treated as a grantor trust for U.S. federal income tax purposes. The IRS, in Revenue Procedure 94-45, 1994-2 C.B. 684, set forth the general criteria for obtaining an IRS ruling as to the grantor trust status of a liquidating trust under a chapter 11 plan. The Liquidating Trust has been structured with the intention of complying with such general criteria. Pursuant to the Plan, and in conformity with Revenue Procedure 94-45, all parties (including, without limitation, the Debtors, the Liquidating Trustee, and the Liquidating Trust Beneficiaries) are required to treat, for U.S. federal income tax purposes, the Liquidating Trust as a grantor trust of which the Liquidating Trust Beneficiaries are the owners and grantors. The following discussion assumes that the Liquidating Trust will be so respected for U.S. federal income tax purposes. However, no ruling has been requested from the IRS and no opinion of counsel has been requested concerning the tax status of the Liquidating Trust as a grantor trust. Accordingly, there can be no assurance that the IRS would not take a contrary position. If the IRS were to challenge successfully the classification of the Liquidating Trust, the U.S. federal income tax consequences to the Liquidating Trust, the Liquidating Trust Beneficiaries and the Debtors could vary from those discussed herein (including the potential for an entity-level tax on any income of the Liquidating Trust).

### 2.    General Tax Reporting by the Liquidating Trust and Beneficiaries.

For all U.S. federal income tax purposes, all parties (including, without limitation, the Debtors, the Liquidating Trustee, and the Liquidating Trust Beneficiaries) must treat the transfer of the Liquidating Trust Assets to the Liquidating Trust in accordance with the terms of the Plan. Pursuant to the Plan, the Liquidating Trust Assets (other than any assets allocated to the Liquidating Trust Claims Reserve, discussed below) are treated, for U.S. federal income tax purposes, as having been transferred, subject to any obligations relating to those assets, directly to the holders of the respective Claims in satisfaction of their Claims, followed by the transfer by the holders to the Liquidating Trust of such assets in exchange for Beneficial Interests. Accordingly, all parties must treat the Liquidating Trust as a grantor trust of which the holders of Beneficial Interests are the owners and grantors, and treat the holders of Beneficial Interests as the direct owners of an undivided interest in Liquidating Trust Assets (other than any assets allocated to the Liquidating Trust Claims Reserve) for all U.S. federal income tax purposes.

Pursuant to the Plan, as soon as possible after the Effective Date, the Liquidating Trustee will make a good faith valuation of the Liquidating Trust Assets. All parties (including, without limitation, the Debtors, the Liquidating Trustee and the Liquidating Trust Beneficiaries) must consistently use such valuation for all U.S. federal income tax purposes. The valuation will be made available, from time to time, as relevant for tax reporting purposes.

Allocations of taxable income of the Liquidating Trust (other than taxable income allocable to the Liquidating Trust Claims Reserve, discussed below) among the Liquidating Trust Beneficiaries shall be determined by reference to the manner in which an amount of cash equal to such

taxable income would be distributed (were such cash permitted to be distributed at such time) if, immediately prior to such deemed distribution, the Liquidating Trust had distributed all its assets (valued at their tax book value, and other than assets allocable to the Liquidating Trust Claims Reserve) to the holders of the Beneficial Interests in the Liquidating Trust, adjusted for prior taxable income and loss and taking into account all prior and concurrent distributions from the Liquidating Trust. Similarly, taxable loss of the Liquidating Trust shall be allocated by reference to the manner in which an economic loss would be borne immediately after a liquidating distribution of the remaining Liquidating Trust Assets. The tax book value of the Liquidating Trust Assets for this purpose shall equal their fair market value on the Effective Date, adjusted in accordance with tax accounting principles prescribed by the Tax Code, the applicable Treasury Regulations, and other applicable administrative and judicial authorities and pronouncements.

The U.S. federal income tax obligations of a holder are not dependent on the Liquidating Trust distributing any cash or other proceeds. Therefore, a holder may incur a U.S. federal income tax liability with respect to its allocable share of Liquidating Trust income regardless of the fact that the Liquidating Trust does not make a concurrent distribution to the holder. In general, a holder of a Beneficial Interest should not be separately taxable on a distribution of cash by the Liquidating Trust.

The Liquidating Trustee will file with the IRS returns for the Liquidating Trust as a grantor trust pursuant to Treasury Regulation section 1.671-4(a). Except as discussed below with respect to the Liquidating Trust Claims Reserve, the Liquidating Trustee also shall annually send to each holder of a Beneficial Interest a separate statement setting forth the holder's share of items of income, gain, loss, deduction or credit and will instruct all such holders to report such items on their U.S. federal income tax returns or to forward the appropriate information to such holder's underlying beneficial holders with instructions to report such items on their U.S. federal income tax returns.

### 3. Tax Reporting for Liquidating Trust Assets Allocable to Disputed Claims.

Subject to definitive guidance from the IRS or a court of competent jurisdiction to the contrary (including the receipt by the Liquidating Trustee of an IRS private letter ruling if the Liquidating Trustee so requests one, or the receipt of an adverse determination by the IRS upon audit if not contested by the Liquidating Trustee), the Liquidating Trustee will (A) elect to treat any Liquidating Trust Assets allocable to, or retained on account of, Disputed Claims (the "***Liquidating Trust Claims Reserve***") as a "disputed ownership fund" governed by Treasury Regulation section 1.468B-9, and (B) to the extent permitted by applicable law, report consistently with the foregoing for state and local income tax purposes. Accordingly, the Liquidating Trust Claims Reserve will be subject to tax annually on a separate entity basis on any net income earned with respect to the Liquidating Trust Assets in such reserves, and all distributions from such reserves will be treated as received by holders in respect of their Claims as if distributed by the Debtors. All parties (including, without limitation, the Debtors, the Liquidating Trustee and the Liquidating Trust Beneficiaries) will be required to report for tax purposes consistently with the foregoing.

### D. INFORMATION REPORTING AND WITHHOLDING

All distributions to holders of Claims under the Plan are subject to any applicable tax withholding, including employment tax withholding. Under U.S. federal income tax law, interest, dividends, and other reportable payments may, under certain circumstances, be subject to "backup withholding" at the then applicable withholding rate (currently 28%). Backup withholding generally applies if the holder (a) fails to furnish its social security number or other taxpayer identification number ("***TIN***"), (b) furnishes an incorrect TIN, (c) fails properly to report interest or dividends, or (d) under certain circumstances, fails to provide a certified statement, signed under penalty of perjury, that the TIN

provided is its correct number and that it is a United States person that is not subject to backup withholding. Backup withholding is not an additional tax but merely an advance payment, which may be refunded to the extent it results in an overpayment of tax and the appropriate information is supplied to the IRS. Certain persons are exempt from backup withholding, including, in certain circumstances, corporations and financial institutions.

The foregoing summary has been provided for informational purposes only. All holders of Claims receiving a distribution under the Plan are urged to consult their tax advisors concerning the federal, state, local and foreign tax consequences applicable under the Plan.

# VIII.

# CONFIRMATION OF THE PLAN

## A.    CONFIRMATION HEARING

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court, after appropriate notice, to hold a hearing on confirmation of the Plan (the "*Confirmation Hearing*"). As set forth in the Disclosure Statement Order, the Confirmation Hearing has been scheduled for [_____], 2009, commencing at [_____] (New York time), before the Honorable Robert E. Gerber, United States Bankruptcy Judge, at the United States Bankruptcy Court for the Southern District of New York, One Bowling Green, New York New York 10004, or such other location as the Bankruptcy Court directs. The confirmation hearing may be adjourned from time-to-time by the Debtors or the Bankruptcy Court without further notice except for an announcement of the adjourned date made at the confirmation hearing or any subsequent adjourned confirmation hearing.

## B.    OBJECTIONS

Section 1128 of the Bankruptcy Code provides that any party in interest may object to the confirmation of a plan. Any objection to confirmation of the Plan must be in writing, must conform to the Bankruptcy Rules and the Local Bankruptcy Rules, must set forth the name of the objector, the nature and amount of Claims or interests held or asserted by the objector against the Debtors' estate or property, the basis for the objection and the specific grounds therefore, and must be filed with the Bankruptcy Court, with a copy to Chambers, together with proof of service thereof, and served upon (i) BearingPoint, Inc., 100 Crescent Court, Suite 700, Dallas, Texas 75201, Attn; John DeGroote, on behalf of the Debtors; (ii) Weil, Gotshal & Manges LLP, 767 Fifth Avenue, New York, New York 10153 (Attn:  Marcia L. Goldstein, Esq., and Damon P. Meyer, Esq.) and Weil, Gotshal & Manges LLP, 700 Louisiana Street, Suite 1600, Houston, Texas 77002 (Attn:  Alfredo R. Pérez, Esq.), as counsel for the Debtors, (ii) the U.S. Trustee, 33 Whitehall Street, 21st Floor, New York, New York 10004 (Attn:  Serene Nakano, Esq.); and (iv) Bingham McCutchen LLP, 399 Park Avenue, New York, New York 10022 (Attn: Jeffrey S. Sabin, Esq. and Neil W. Townsend, Esq.) and Bingham McCutchen LLP, One Federal Street, Boston, Massachusetts 02110 (Attn: Sabin Willett, Esq. and Andrew Gallo, Esq.), as counsel to the Creditors' Committee, so as to be received no later than [_____], 2009.

Objections to confirmation of the Plan are governed by Bankruptcy Rule 9014.  **UNLESS AN OBJECTION TO CONFIRMATION IS TIMELY SERVED AND FILED, IT MAY NOT BE CONSIDERED BY THE BANKRUPTCY COURT.**

## C. REQUIREMENTS FOR CONFIRMATION OF THE PLAN

### 1. Requirements of Section 1129(a) of the Bankruptcy Code

**(a) General Requirements**

At the confirmation hearing, the Bankruptcy Court will determine whether the following confirmation requirements specified in section 1129 of the Bankruptcy Code have been satisfied:

(i) The Plan complies with the applicable provisions of the Bankruptcy Code.

(ii) The Debtors have complied with the applicable provisions of the Bankruptcy Code.

(iii) The Plan has been proposed in good faith and not by any means proscribed by law.

(iv) Any payment made or promised by the Debtors or by a Person issuing securities or acquiring property under the Plan for services or for costs and expenses in, or in connection with, the Chapter 11 Cases, or in connection with the Plan and incident to the Chapter 11 Cases, has been disclosed to the Bankruptcy Court, and any such payment made before confirmation of the Plan is reasonable, or if such payment is to be fixed after confirmation of the Plan, such payment is subject to the approval of the Bankruptcy Court as reasonable.

(v) The Debtors have disclosed the identity and affiliations of any individual proposed to serve, after confirmation of the Plan, as director or officer of the Debtors, an affiliate of the Debtors participating in a Plan with the Debtors, or a successor to the Debtors under the Plan, and the appointment to, or continuance in, such office of such individual is consistent with the interests of creditors and equity holders and with public policy, and the Debtors have disclosed the identity of any insider that will be employed or retained by the Debtors, and the nature of any compensation for such insider.

(vi) Any governmental regulatory commission with jurisdiction, after confirmation of the Plan, over the rates of the Debtors, as applicable, has approved any rate change provided for in the Plan, or such rate change is expressly conditioned on such approval.

(vii) With respect to each class of claims or equity interests, each holder of an impaired claim or impaired equity interest either has accepted the Plan or will receive or retain under the Plan on account of such holder's claim or equity interest, property of a value, as of the Effective Date, that is not less than the amount such holder would receive or retain if the Debtors were liquidated on the Effective Date under chapter 7 of the Bankruptcy Code. See discussion of "Best Interests Test" below.

(viii)     Except to the extent the Plan meets the requirements of section 1129(b) of the Bankruptcy Code (discussed below), each class of claims or equity interests has either accepted the Plan or is not impaired under the Plan.

(ix)     Except to the extent that the holder of a particular claim has agreed to a different treatment of such claim, the Plan provides that administrative expenses and priority claims other than priority tax claims will be paid in full on the Effective Date and that priority tax claims will receive on account of such claims deferred cash payments, over a period not exceeding five (5) years after the date of assessment of such claims, of a value, as of the Effective Date, equal to the allowed amount of such claims.

(x)     At least one class of impaired claims has accepted the Plan, determined without including any acceptance of the Plan by any insider holding a claim in such class.

(xi)     Confirmation of the Plan is not likely to be followed by the need for further financial reorganization of the Debtors or any successor to the Debtors under the Plan, unless such liquidation or reorganization is proposed in the Plan. See discussion of "Feasibility" below.

(xii)     All fees payable under section 1930 of title 28, as determined by the court at the hearing on confirmation of the applicable Plan, have been paid or the applicable Plan provides for the payment of all such fees on the Effective Date of the applicable Plan.

(xiii)     The Debtors have not obligated themselves to provide such benefits, if any for the continuation, after the Effective Date, of payment of all "retiree benefits" (as defined in section 1114 of the Bankruptcy Code).

**(b)     Best Interests Test**

As described above, the Bankruptcy Code requires that each holder of an impaired claim or equity interest either (i) accepts the Plan or (ii) receives or retains under the Plan property of a value, as of the Effective Date, that is not less than the value such holder would receive or retain if the Debtors were liquidated under chapter 7 of the Bankruptcy Code on the Effective Date.

The first step in meeting this test is to determine the dollar amount that would be generated from the liquidation of the Debtors' assets and properties in the context of a chapter 7 liquidation case. The gross amount of Cash available would be the sum of the proceeds from the disposition of the Debtors' assets and the Cash held by the Debtors at the time of the commencement of the chapter 7 case. The next step, is to reduce that total by the amount of any claims secured by such assets, the costs and expenses of the liquidation, and such additional administrative expenses and priority claims that may result from the termination of the Debtors' business and the use of chapter 7 for the purposes of liquidation. Any remaining net Cash would be allocated to creditors and shareholders in strict priority in accordance with section 726 of the Bankruptcy Code (see discussion below). Finally, taking into account the time necessary to accomplish the liquidation, the present value of such allocations may be compared to the value of the property that is proposed to be distributed under the Plan on the Effective Date.

The Debtors' costs of liquidation under chapter 7 would include the fees payable to a chapter 7 trustee in bankruptcy, as well as those that might be payable to attorneys and other professionals that such a trustee may engage, plus any unpaid expenses incurred by the Debtors during the Chapter 11 Case and allowed in the chapter 7 case, such as compensation for attorneys, financial advisors, appraisers, accountants and other professionals, and costs and expenses of members of any statutory committee of unsecured creditors appointed by the United States Trustee pursuant to section 1102 of the Bankruptcy Code and any other committee so appointed. Moreover, in a chapter 7 liquidation, additional claims would arise by reason of the breach or rejection of obligations incurred and executory contracts or leases entered into by the Debtors both prior to, and during the pendency of, the Chapter 11 Cases.

The foregoing types of claims, costs, expenses, fees and such other claims that may arise in a liquidation case would be paid in full from the liquidation proceeds before the balance of those proceeds would be made available to pay pre-chapter 11 priority and unsecured claims. Under the absolute priority rule, no junior creditor would receive any distribution until all senior creditors are paid in full, with interest, and no equity holder receives any distribution until all creditors are paid in full, with interest. The Debtors believe that in a chapter 7 case, holders of General Unsecured Claims would receive either smaller distributions or no distributions of property. Accordingly, the Plan satisfies the rule of absolute priority.

After consideration of the effects that a chapter 7 liquidation would have on the ultimate proceeds available for distribution to creditors in a Chapter 11 Case, including (i) the increased costs and expenses of a liquidation under chapter 7 arising from fees payable to a trustee in bankruptcy and professional advisors to such trustee, (ii) the erosion in value of assets in a chapter 7 case in the context of the expeditious liquidation required under chapter 7 and the "forced sale" atmosphere that would prevail and (iii) substantial increases in claims which would be satisfied on a priority basis, the Debtors have determined that confirmation of the Plan will provide each creditor and equity holder with a recovery that is not less than it would receive pursuant to a liquidation of the Debtors under chapter 7 of the Bankruptcy Code.

Moreover, the Debtors believe that the value of any distributions from the liquidation proceeds to each class of allowed claims in a chapter 7 case would be the same or less than the value of distributions under the Plan because such distributions in a chapter 7 case may not occur for a substantial period of time. In this regard, it is possible that distribution of the proceeds of the liquidation could be delayed for a year or more after the completion of such liquidation in order to resolve the claims and prepare for distributions. In the event litigation were necessary to resolve claims asserted in the chapter 7 case, the delay could be further prolonged and administrative expenses further increased.

**The Debtors' liquidation analysis is an estimate of the proceeds that may be generated as a result of a hypothetical chapter 7 liquidation of the assets of the Debtors. The analysis is based upon a number of significant assumptions which are described. The liquidation analysis does not purport to be a valuation of the Debtors' assets and is not necessarily indicative of the values that may be realized in an actual liquidation.**

(c)      Liquidation Analysis

The Debtors' chapter 7 liquidation analysis and assumptions are set forth in Exhibit D to this Disclosure Statement.

**(d) Feasibility**

Section 1129(a)(11) of the Bankruptcy Code provides that a chapter 11 plan may be confirmed only if the Court finds that the plan is feasible. A feasible plan is one which will not lead to a need for further reorganization or liquidation of the debtor. Since the Plan provides for the liquidation of the Debtors, the Court will find that the Plan is feasible if it determines that the Debtors will be able to satisfy the conditions precedent to the Effective Date and otherwise have sufficient funds to meet its post-Commencement Date obligations to pay for the costs of administering and fully consummating the Plan and closing the Chapter 11 Cases. The Debtors believe that the Plan satisfies the financial feasibility requirement imposed by the Bankruptcy Court.

**2. Requirements of Section 1129(b) of the Bankruptcy Code**

The Bankruptcy Court may confirm the Plan over the rejection or deemed rejection of the Plan by a class of claims or equity interests if the Plan "does not discriminate unfairly" and is "fair and equitable" with respect to such class.

**(a) No Unfair Discrimination**

This test applies to classes of claims or equity interests that are of equal priority and are receiving different treatment under a plan. The test does not require that the treatment be the same or equivalent, but that such treatment be "fair."

**(b) Fair and Equitable Test**

This test applies to classes of different priority (e.g., unsecured versus secured) and includes the general requirement that no class of claims receive more than 100% of the allowed amount of the claims in such class. As to the dissenting class, the test sets different standards, depending on the type of claims or interests in such class:

(i)     Secured Claims.  Each holder of an impaired secured claim either (i) retains its Liens on the property (or if sold, on the proceeds thereof) to the extent of the allowed amount of its secured claim and receives deferred cash payments having a value, as of the effective date of the plan, of at least the allowed amount of such claim or (ii) receives the "indubitable equivalent" of its allowed secured claim.

(ii)    Claims.  Either (i) each holder of an impaired unsecured claim receives or retains under the plan property of a value equal to the amount of its allowed unsecured claim or (ii) the holders of claims and interests that are junior to the claims of the dissenting class will not receive or retain any property under the plan.

(iii)   Equity Interests.  Either (i) each equity interest holder will receive or retain under the plan property of a value equal to the greater of (a) the fixed liquidation preference or redemption price, if any, of such stock and (b) the value of the stock, or (ii) the holders of interests that are junior to the equity interests of the dissenting class will not receive or retain any property under the plan.

The Debtors believe the Plan will satisfy both the "no unfair discrimination" requirement and the "fair and equitable" requirement notwithstanding that Classes 7 (Other Subordinated Claims) and 8 (Equity Interests) are deemed to reject the Plan, because as to Classes 7 (Other Subordinated Claims) and 8 (Equity Interests), there is no class of equal priority receiving more favorable treatment and no class that is junior to such a dissenting class will receive or retain any property on account of the claims or equity interests in such class.

Should Classes 5 (Junior Noteholder Claims) or 6 (General Unsecured Claims) vote to reject the Plan, the Debtors believe the Plan would nonetheless satisfy both the "no unfair discrimination" requirement and the "fair and equitable" requirement notwithstanding that Class 5 or 6 votes to reject the Plan, because as to Classes 5 and 6, there is no class of equal priority receiving more favorable treatment and the only classes junior to such a dissenting class – Class 7 (Other Subordinated Claims) and Class 8 (Equity Interests) – will not receive or retain any property on account of the claims or equity interests in such classes.

### 3.     Alternative to Confirmation and Consummation of the Plan

If the Plan is not confirmed and consummated, the alternatives to the Plan include (i) liquidation of the Debtors under chapter 7 of the Bankruptcy Code and (ii) an alternative chapter 11 plan.

### (a)     Liquidation Under Chapter 7

If no plan can be confirmed, the Debtors' Chapter 11 Cases may be converted to cases under chapter 7 of the Bankruptcy Code, pursuant to which a trustee would be appointed to liquidate the assets of the Debtors for distribution in accordance with the priorities established by the Bankruptcy Code.  A discussion of the effects that a chapter 7 liquidation would have on the recovery of holders of claims and equity interests and the Debtors' liquidation analysis are set forth in Section VIII above, entitled "CONFIRMATION OF THE PLAN -- Requirements for Confirmation of the Plan -- Consensual Confirmation -- Best Interests Test."  The Debtors believe that liquidation under chapter 7 would result in smaller distributions being made to creditors than those provided for in the Plan because of (i) the likelihood that the remaining assets of the Debtors would have to be sold or otherwise disposed of in a

less orderly fashion over a shorter period of time, (ii) additional administrative expenses involved in the appointment of a trustee and (iii) the inability to release certain outstanding Letters of Credit. In a chapter 7 liquidation, the Debtors believe that there would be smaller distributions to holders of Series C Noteholder Claims, FFL Noteholder Claims and General Unsecured Claims, and no distribution to the holders of Junior Noteholder Claims, Other Subordinated Claims or the holders of Equity Interests.

### (b)    Alternative Plan

If the Plan is not confirmed, the Debtors (or if the Debtors' exclusive period in which to file a plan has expired, any other party in interest) could attempt to formulate a different chapter 11 plan. Such a plan might involve either a reorganization and continuation of the Debtors' business or an orderly liquidation of its assets under chapter 11. With respect to an alternative plan, the Debtors have explored various alternatives in connection with the formulation and development of the Plan. The Debtors believe that the Plan, as described herein, enables creditors and equity holders to realize the most value under the circumstances. In a liquidation under chapter 11, the Debtors' assets would be sold in an orderly fashion over a more extended period of time than in a liquidation under chapter 7, possibly resulting in somewhat greater (but indeterminate) recoveries than would be obtained in chapter 7. Further, if a trustee were not appointed, because such appointment is not required in a Chapter 11 Case, the expenses for professional fees would most likely be lower than those incurred in a chapter 7 case.

### 4.    **Nonconsensual Confirmation.**

If any impaired class of Claims entitled to vote shall not accept the Plan by the requisite statutory majority provided in section 1126(c) of the Bankruptcy Code, the Debtors reserve the right to amend the Plan in accordance with section 12.4 of the Plan or undertake to have the Bankruptcy Court confirm the Plan under section 1129(b) of the Bankruptcy Code or both. With respect to impaired classes of claims that are deemed to reject the Plan, the Debtors shall request that the Bankruptcy Court confirm the Plan pursuant to section 1129(b) of the Bankruptcy Code.

# IX.

# CONCLUSION

The Debtors believe that confirmation and implementation of the Plan is in the best interests of all creditors, and urge holders of impaired Claims in Classes 4a, 4b, 5, and 6 to vote to accept the Plan and to evidence such acceptance by returning their ballots so that they will be received no later than 4:00 p.m. (Eastern Time) on _____, 2009.

Dated: October [__], 2009

Respectfully submitted,

BEARINGPOINT, INC.

By: _____
          Name:  John DeGroote
          Title:    President, Chief Legal
          Officer and Secretary

– and –

BE NEW YORK HOLDINGS, INC.
BEARINGPOINT AMERICAS, INC.
BEARINGPOINT BG, LLC
BEARINGPOINT ENTERPRISE HOLDINGS, LLC
BEARINGPOINT GLOBAL OPERATIONS, INC.
BEARINGPOINT GLOBAL, INC.
BEARINGPOINT INTERNATIONAL I, INC. BEARINGPOINT ISRAEL, LLC
BEARINGPOINT PUERTO RICO, LLC BEARINGPOINT RUSSIA, LLC
BEARINGPOINT SOUTH PACIFIC, LLC BEARINGPOINT SOUTHEAST ASIA LLC BEARINGPOINT TECHNOLOGY
      PROCUREMENT SERVICES, LLC,
BEARINGPOINT USA, INC.
BEARINGPOINT, LLC
I2 MID ATLANTIC LLC
I2 NORTHWEST LLC
METRIUS, INC.
OAD ACQUISITION CORP.
OAD GROUP, INC.
PELOTON HOLDINGS, L.L.C.
SOFTLINE ACQUISITION CORP.
SOFTLINE CONSULTING AND
      INTEGRATORS, INC.

By: _____
          Name:  John DeGroote
          Title:    Vice President and Secretary

**Exhibit A**

**(Chapter 11 Plan)**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-----------------------------------------------------------x
In re                             :

                                  :     **Chapter 11 Case No.**

**BEARINGPOINT, INC., <u>et</u> <u>al.</u>**       :

                                  :     **09-10691 (REG)**

                                  :

           **Debtors.**           :

                                  :     **(Jointly Administered)**
-----------------------------------------------------------x


## DEBTORS' AMENDED JOINT PLAN UNDER CHAPTER 11<br>OF THE BANKRUPTCY CODE, DATED OCTOBER 5, 2009


**WEIL, GOTSHAL & MANGES LLP**
767 Fifth Avenue
New York, New York  10153
(212) 310-8509

       – and –

700 Louisiana Street, Suite 1600
Houston, Texas  77002
(713) 546-5000

Attorneys for the Debtors and
       Debtors in Possession


Dated: October 5, 2009

# TABLE OF CONTENTS

           **Page**

Article I      DEFINITION AND INTERPRETATION ................................................. 2

     A.     Definitions................................................................................................. 2

         1.1     Administrative Expense Claim ..................................................... 2

         1.2     Affiliate ........................................................................................ 2

         1.3     Allowed......................................................................................... 2

         1.4     Avoidance Actions........................................................................ 3

         1.5     Ballots .......................................................................................... 3

         1.6     Bankruptcy Code .......................................................................... 3

         1.7     Bankruptcy Court .......................................................................... 3

         1.8     Bankruptcy Rules.......................................................................... 3

         1.9     BE ................................................................................................. 3

         1.10    BearingPoint ................................................................................. 3

         1.11    BearingPoint Subsidiary Debtors................................................. 3

         1.12    BE LLC means BearingPoint, LLC ............................................ 4

         1.13    Beneficial Interests....................................................................... 4

         1.14    Benefit Plans ................................................................................. 4

         1.15    Business Day.................................................................................. 4

         1.16    Cash............................................................................................... 4

         1.17    Causes of Action .......................................................................... 4

         1.18    Chapter 11 Cases........................................................................... 4

         1.19    Claim............................................................................................. 4

         1.20    Class ............................................................................................. 4

         1.21    Class 4 Pro Rata Share ................................................................. 5

         1.22    Class 5 Pro Rata Share ................................................................. 5

         1.23    Class A/B Beneficial Interest ....................................................... 5

         1.24    Class C Beneficial Interest............................................................ 5

         1.25    Class G Beneficial Interest............................................................ 5

         1.26    Collateral...................................................................................... 5

         1.27    Commencement Date..................................................................... 5

         1.28    Confirmation Date ........................................................................ 5

1.29    Confirmation Hearing ................................................................. 5

1.30    Confirmation Order..................................................................... 6

1.31    Contingent Claim ....................................................................... 6

1.32    Credit-Linked Deposit Account ................................................. 6

1.33    Creditors' Committee................................................................. 6

1.34    D&O Insurance Policies means [TO BE PROVIDED]................ 6

1.35    Debtors....................................................................................... 6

1.36    Debtors in Possession ............................................................... 6

1.37    Disbursing Agent ....................................................................... 6

1.38    Disclosure Statement ................................................................ 6

1.39    Disclosure Statement Order ...................................................... 7

1.40    Disputed ..................................................................................... 7

1.41    Disputed Claim Amount ............................................................ 7

1.42    Distribution Record Date ........................................................... 7

1.43    Effective Date ............................................................................ 7

1.44    Equity Interest............................................................................ 7

1.45    Estates ........................................................................................ 8

1.46    Estimated Amount ..................................................................... 8

1.47    FFL Note .................................................................................... 8

1.48    FFL Noteholder........................................................................... 8

1.49    FFL Noteholder Claims ............................................................. 8

1.50    FFL SPA ..................................................................................... 8

1.51    Final Cash Collateral Order ...................................................... 8

1.52    Final Order................................................................................. 8

1.53    General Unsecured Claim .......................................................... 9

1.54    Indenture Trustees...................................................................... 9

1.55    Indenture Trustee Fees............................................................... 9

1.56    Initial Distribution..................................................................... 9

1.57    Intercompany Claim................................................................... 9

1.58    Interim Cash Collateral Orders ................................................. 9

1.59   Junior Noteholder Claim .......................................................... 9

1.60   Junior Noteholder Indenture Trustee .......................................... 10

1.61   Junior Noteholder Indenture Trustee Fees .................................. 10

1.62   LC Agent ............................................................................... 10

1.63   LC Cash Collateral Account ..................................................... 10

1.64   Letters of Credit ..................................................................... 10

1.65   Lien ....................................................................................... 10

1.66   Liquidating Trust ..................................................................... 10

1.67   Liquidating Trust Agreement .................................................... 10

1.68   Liquidating Trust Assets .......................................................... 10

1.69   Liquidating Trust Beneficiaries ................................................. 10

1.70   Liquidating Trust Claims Reserve .............................................. 11

1.71   Liquidating Trustee ................................................................. 11

1.72   Local Bankruptcy Rules ........................................................... 11

1.73   Non-Debtor Subsidiary ............................................................ 11

1.74   Other Secured Claim ............................................................... 11

1.75   Other Subordinated Claim ........................................................ 11

1.76   Person ................................................................................... 11

1.77   Plan ...................................................................................... 11

1.78   Plan Supplement ..................................................................... 11

1.79   Pre-Liquidation Letter of Credit  ............................................... 11

1.80   Prepetition Agent .................................................................... 11

1.81   Priority Non-Tax Claim ............................................................ 12

1.82   Priority Tax Claim ................................................................... 12

1.83   Pro Rata Share ....................................................................... 12

1.84   Schedules ............................................................................... 12

1.85   Secured Claim ........................................................................ 12

1.86   Secured Credit Facility ............................................................ 12

1.87   Secured Tax Claim .................................................................. 12

1.88   Senior Noteholder Claims ......................................................... 13

| | | |
|---|---|---|
| 1.89 | Series C Noteholder Indenture Trustee | 13 |
| 1.90 | Series C Noteholder Indenture Trustee Fees | 13 |
| 1.91 | Series A Note | 13 |
| 1.92 | Series A Noteholder | 13 |
| 1.93 | Series A Noteholder Claim | 13 |
| 1.94 | Series B Note | 13 |
| 1.95 | Series B Noteholder | 13 |
| 1.96 | Series B Noteholder Claim | 13 |
| 1.97 | Series C Note | 14 |
| 1.98 | Series C Noteholder | 14 |
| 1.99 | Series C Noteholder Claim | 14 |
| 1.100 | Supplemental Cash Collateral Order | 14 |
| 1.101 | Tax Code | 14 |
| 1.102 | Tax Returns | 14 |
| 1.103 | Treasury Regulations | 14 |
| 1.104 | Trust Advisory Board | 14 |
| 1.105 | Unimpaired | 14 |
| 1.106 | Unliquidated Claim | 14 |
| 1.107 | U.S. Trustee | 14 |
| 1.108 | Voting Record Date | 14 |
| B. | Interpretation; Application of Definitions and Rules of Construction | 15 |
| Article II | PROVISIONS FOR PAYMENT OF ADMINISTRATIVE EXPENSES, PRIORITY TAX CLAIMS, AND OBLIGATIONS ON ACCOUNT OF PAID TIME OFF | 15 |
| 2.1 | Administrative Expense Claims | 15 |
| 2.2 | Indenture Trustee Fees | 16 |
| 2.3 | Priority Tax Claims | 17 |
| 2.4 | Employees' Paid Time Off | 17 |
| Article III | CLASSIFICATION OF CLAIMS AND EQUITY INTERESTS, IMPAIRMENT, VOTING | 17 |

| | | |
|---|---|---|
| Article IV | TREATMENT OF CLAIMS AND EQUITY INTERESTS | 18 |
| 4.1 | Priority Non-Tax Claims (Class 1) | 18 |
| 4.2 | Secured Tax Claims (Class 2) | 18 |
| 4.3 | Other Secured Claims (Class 3) | 19 |
| 4.4 | Series C Noteholder Claims (Class 4(a)) | 19 |
| 4.5 | FFL Noteholder Claims (Class 4(b)) | 20 |
| 4.6 | Junior Noteholder Claims (Class 5) | 20 |
| 4.7 | General Unsecured Claims (Class 6) | 21 |
| 4.8 | Other Subordinated Claims (Class 7) | 21 |
| 4.9 | Equity Interests (Class 8) | 22 |
| Article V | MEANS OF IMPLEMENTATION | 22 |
| 5.1 | Settlement of Claims | 22 |
| 5.2 | Merger/Dissolution/Consolidation/Discharge | 22 |
| 5.3 | Cancellation and Termination of Existing Agreements and Equity Interests | 23 |
| 5.4 | Substantive Consolidation for Plan Purposes Only | 23 |
| 5.5 | Compromise and Settlement | 24 |
| 5.6 | Release of Funds Securing Issued Letters of Credit | 24 |
| 5.7 | The Liquidating Trust | 24 |
| Article VI | PROVISIONS GOVERNING VOTING AND DISTRIBUTIONS | 31 |
| 6.1 | Voting of Claims | 31 |
| 6.2 | Nonconsensual Confirmation | 31 |
| 6.3 | Distributions on Allowed General Unsecured Claims, Allowed Senior Noteholder Claims and Allowed Junior Noteholder Claims | 31 |
| 6.4 | Date of Distributions | 32 |
| 6.5 | Disbursing Agent | 32 |
| 6.6 | Rights and Powers of Disbursing Agent | 32 |
| 6.7 | Expenses of Disbursing Agent | 32 |
| 6.8 | Lists of Record Holders | 32 |
| 6.9 | Delivery of Distributions | 32 |

| | | |
|---|---|---|
| 6.10 | Unclaimed Distributions | 33 |
| 6.11 | Distribution Record Date | 33 |
| 6.12 | Manner of Payment | 33 |
| 6.13 | Cash Distributions | 33 |
| 6.14 | Setoffs and Recoupment | 33 |
| 6.15 | Interest on Claims | 34 |
| 6.16 | No Distribution In Excess of Allowed Amounts | 34 |
| 6.17 | Distributions After the Effective Date | 34 |
| 6.18 | Allocation of Plan Distributions Between Principal and Interest | 34 |
| Article VII | PROCEDURES FOR TREATING DISPUTED CLAIMS | 34 |
| 7.1 | Objections | 34 |
| 7.2 | No Distributions Pending Allowance | 35 |
| 7.3 | Distributions After Allowance | 35 |
| 7.4 | Resolution of Administrative Expense Claims and Claims. | 35 |
| 7.5 | Estimation of Claims | 35 |
| 7.6 | Interest | 36 |
| Article VIII | EXECUTORY CONTRACTS AND UNEXPIRED LEASES | 36 |
| 8.1 | Assumption or Rejection of Executory Contracts and Unexpired Leases | 36 |
| 8.2 | Deferred Rejection of Executory Contracts | 36 |
| 8.3 | Approval of Assumption, Rejection or Deferred Rejection of Executory Contracts and Unexpired Leases | 37 |
| 8.4 | Inclusiveness | 37 |
| 8.5 | Cure of Defaults | 37 |
| 8.6 | Bar Date for Filing Proofs of Claim Relating to Executory Contracts and Unexpired Leases Rejected Pursuant to the Plan | 38 |
| 8.7 | Bar Date for Filing Proofs of Claim Relating to the Deferred Rejection of Executory Contracts | 38 |
| 8.8 | Indemnification and Reimbursement Obligations | 38 |
| Article IX | CONDITIONS PRECEDENT TO THE EFFECTIVE DATE | 39 |

| | | |
|---|---|---|
| 9.1 | Conditions Precedent to Effectiveness | 39 |
| 9.2 | Waiver of Conditions | 39 |
| 9.3 | Satisfaction of Conditions | 40 |
| Article X | EFFECT OF CONFIRMATION | 40 |
| 10.1 | Post-Effective Date Assets | 40 |
| 10.2 | Binding Effect | 40 |
| 10.3 | Termination of Equity Interests | 40 |
| 10.4 | Injunction or Stay | 41 |
| 10.5 | Terms of Injunction or Stay | 41 |
| 10.6 | Reservation of Causes of Action/Reservation of Rights | 41 |
| 10.7 | Exculpation | 42 |
| 10.8 | Limited Releases | 42 |
| 10.9 | Causes of Action/Avoidance Actions/Objections | 43 |
| Article XI | RETENTION OF JURISDICTION | 44 |
| Article XII | MISCELLANEOUS PROVISIONS | 45 |
| 12.1 | Effectuating Documents and Further Transactions | 45 |
| 12.2 | Withholding and Reporting Requirements | 46 |
| 12.3 | Corporate Action | 46 |
| 12.4 | Modification of Plan | 46 |
| 12.5 | Revocation or Withdrawal of the Plan | 47 |
| 12.6 | Continuing Exclusivity Period | 47 |
| 12.7 | Plan Supplement | 47 |
| 12.8 | Payment of Statutory Fees | 48 |
| 12.9 | Post-Confirmation Date Professional Fees and Expenses | 48 |
| 12.10 | Dissolution of the Creditors' Committee | 48 |
| 12.11 | Exemption from Transfer Taxes | 48 |
| 12.12 | Expedited Tax Determination | 48 |
| 12.13 | Exhibits/Schedules | 48 |
| 12.14 | Substantial Consummation | 49 |
| 12.15 | Severability of Plan Provisions | 49 |

**TABLE OF CONTENTS**
**(continued)**

**Page**

12.16   Governing Law ............................................................................. 49

12.17   Notices ........................................................................................ 49

12.18   Section Headings ......................................................................... 51

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York  10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Marcia L. Goldstein
Joseph H. Smolinsky

WEIL, GOTSHAL & MANGES LLP
700 Louisiana Street, Suite 1600
Houston, Texas  77002
Telephone: (713) 546-5000
Facsimile: (713) 224-9511
Alfredo R. Pérez

Attorneys for Debtors
and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------x

|  |  |  |
|---|---|---|
| | : | |
| **In re** | : | **Chapter 11 Case No.** |
| | : | |
| **BEARINGPOINT, INC., et al.** | : | **09-10691 (REG)** |
| | : | |
| **Debtors.** | : | **(Jointly Administered)** |
| | : | |

---------------------------------------------------------x

## DEBTORS' SECOND AMENDED JOINT PLAN UNDER
## CHAPTER 11 OF THE BANKRUPTCY CODE, DATED OCTOBER 5, 2009

BearingPoint, Inc., BE New York Holdings, Inc., BearingPoint Americas, Inc., BearingPoint BG, LLC, BearingPoint Enterprise Holdings, LLC, BearingPoint Global Operations, Inc., BearingPoint Global, Inc., BearingPoint International I, Inc., BearingPoint Israel, LLC, BearingPoint Puerto Rico, LLC, BearingPoint Russia, LLC, BearingPoint South Pacific, LLC, BearingPoint Southeast Asia LLC, BearingPoint Technology Procurement Services, LLC, BearingPoint USA, Inc., BearingPoint, LLC, i2 Mid Atlantic LLC, i2 Northwest LLC, Metrius, Inc., OAD Acquisition Corp., OAD Group, Inc., Peloton Holdings, L.L.C., Softline Acquisition Corp., and Softline Consulting and Integrators, Inc. propose the following chapter 11 plan pursuant to section 1121(a) of the Bankruptcy Code:

# ARTICLE I

## DEFINITION AND INTERPRETATION

**A.    Definitions.**

1.1    ***Administrative Expense Claim*** means any Claim constituting a cost or expense of administration of the Chapter 11 Cases Allowed under and in accordance with, as applicable, sections 330, 365, 503(b), 507(a)(2) and 507(b) of the Bankruptcy Code, including, without limitation, (a) any actual and necessary costs and expenses, incurred after the Commencement Date, of preserving the Debtors' Estates, (b) any actual and necessary costs and expenses, incurred after the Commencement Date, of operating the Debtors' businesses, (c) any indebtedness or obligations incurred or assumed by the Debtors in Possession during the Chapter 11 Cases and (d) any compensation for professional services rendered and reimbursement of expenses incurred to the extent Allowed by Final Order.  Any fees or charges assessed against the estates of the Debtors under section 1930 of chapter 123 of title 28 of the United States Code is excluded from the definition of Administrative Expense Claim and shall be paid in accordance with Section 12.8 of the Plan.

1.2    ***Affiliate*** has the meaning set forth in section 101(2) of the Bankruptcy Code.

1.3    ***Allowed*** means, with reference to any Claim against the Debtors, (a) any fixed Claim against any Debtor that has been listed by such Debtor in its Schedules (as such Schedules may be amended by the Debtors from time to time in accordance with Bankruptcy Rule 1009) as liquidated in amount and not disputed or contingent and for which no contrary proof of Claim has been filed or no timely objection to allowance or request for estimation has been interposed, (b) any timely filed proof of Claim (i) as to which no objection has been or is interposed in accordance with Section 7.1 of the Plan or such other applicable period of limitation fixed by the Bankruptcy Code, the Bankruptcy Rules, the Local Bankruptcy Rules or the Bankruptcy Court and as to which any such applicable period of limitation has expired or (ii) as to which any objection has been determined by a Final Order to the extent such objection is determined in favor of the respective holder of such Claim, (c) any Claim expressly allowed by a Final Order or under the Plan, (d) any Claim that is compromised, settled or otherwise resolved pursuant to the authority granted to the Liquidating Trustee pursuant to a Final Order of the Bankruptcy Court or under Section

7.4 of the Plan; *provided*, *however*, that (a) Claims allowed solely for the purpose of voting to accept or reject the Plan pursuant to an order of the Bankruptcy Court shall not be considered "Allowed Claims" and (b) "Allowed Claim" shall not include any Claim subject to disallowance in accordance with section 502(d) of the Bankruptcy Code. Unless otherwise specified in the Plan or by order of the Bankruptcy Court, "Allowed Administrative Expense Claim" or "Allowed Claim" shall not, for any purpose under the Plan, include interest on such Claim from and after the Commencement Date.

1.4 ***Avoidance Actions*** means any actions commenced, or that may be commenced before or after the Effective Date, pursuant to section 542, 544, 545, 547, 548, 550, 551, or 553 of the Bankruptcy Code.

1.5 ***Ballots*** means the forms distributed to each holder of an impaired Claim that is entitled to vote to accept or reject the Plan on which is to be indicated acceptance or rejection of the Plan.

1.6 ***Bankruptcy Code*** means title 11 of the United States Code, as amended from time to time, as applicable to the Chapter 11 Cases.

1.7 ***Bankruptcy Court*** means the United States Bankruptcy Court for the Southern District of New York or any other court of the United States having jurisdiction over the Chapter 11 Cases.

1.8 ***Bankruptcy Rules*** means the Federal Rules of Bankruptcy Procedure as promulgated by the United States Supreme Court under section 2075 of title 28 of the United States Code, as amended from time to time.

1.9 ***BE*** means BearingPoint, Inc.

1.10 ***BearingPoint*** means the Debtors and their non-debtor affiliates.

1.11 ***BearingPoint Subsidiary Debtors*** means the following subsidiaries of BE: BE New York Holdings, Inc., BearingPoint Americas, Inc., BearingPoint BG, LLC, BearingPoint Enterprise Holdings, LLC, BearingPoint Global Operations, Inc., BearingPoint Global, Inc., BearingPoint International I, Inc., BearingPoint Israel, LLC, BearingPoint Puerto Rico, LLC, BearingPoint Russia, LLC, BearingPoint South Pacific, LLC, BearingPoint Southeast Asia LLC, BearingPoint Technology Procurement Services, LLC, BearingPoint USA, Inc., BearingPoint, LLC, i2 Mid Atlantic LLC, i2 Northwest LLC, Metrius, Inc., OAD Acquisition Corp., OAD Group, Inc., Peloton

Holdings, L.L.C., Softline Acquisition Corp., and Softline Consulting and Integrators, Inc.

1.12 **BE LLC** means BearingPoint, LLC.

1.13 **Beneficial Interests** means a Class A/B Beneficial Interest, a Class C Beneficial Interest or a Class G Beneficial Interest in the Liquidating Trust. To the extent necessary to effectuate the provisions of this Plan, "Beneficial Interest" shall include any beneficial interest in the Liquidating Trust treated as having been received on the Effective Date under Section 4.3(c) hereof.

1.14 **Benefit Plans** means all employee benefit plans, policies and programs sponsored by any of the Debtors, including without limitation, all incentive and bonus arrangements, medical and health insurance, life insurance, dental insurance, disability benefits and coverage, leave of absence, savings plans, retirement plans, and retiree benefits (as such term is defined in section 1114 of the Bankruptcy Code). Benefit Plans shall not include any equity, bonus, stock, option or similar plans in effect on or prior to the Commencement Date.

1.15 **Business Day** means any day other than a Saturday, Sunday or any other day on which commercial banks in New York, New York are required or authorized to close by law or executive order.

1.16 **Cash** means lawful currency of the United States of America, including but not limited to bank deposits, checks and other similar items.

1.17 **Causes of Action** means any and all Claims, Avoidance Actions, and rights of the Debtors, against or with respect to any entity, including claims of a Debtor against another Debtor or affiliate.

1.18 **Chapter 11 Cases** means the cases commenced by the Debtors under chapter 11 of the Bankruptcy Code, styled as "*In re BearingPoint, Inc., et al.*" which have been jointly administered by order of the Bankruptcy Court under case number 09-10691 (REG).

1.19 **Claim** has the meaning set forth in section 101(5) of the Bankruptcy Code.

1.20 **Class** means any group of substantially similar Claims or Equity Interests classified by the Plan pursuant to section 1122 of the Bankruptcy Code.

1.21 ***Class 4 Pro Rata Share*** means, as of any distribution date under the Liquidating Trust, the ratio (expressed as a percentage) of the amount of an Allowed Series C Noteholder Claim <u>or</u> an Allowed FFL Noteholder Claim to the sum of the aggregate amount of all Series C Noteholder Claims <u>and</u> FFL Noteholder Claims.

1.22 ***Class 5 Pro Rata Share*** means, as of any distribution date under the Liquidating Trust, the ratio (expressed as a percentage) of the amount of an Allowed Junior Noteholder Claim to the sum of the aggregate amount of all Junior Noteholder Claims.

1.23 ***Class A/B Beneficial Interest*** means a beneficial interest in the Liquidating Trust to be issued to holders of Allowed Junior Noteholder Claims which entitles its holder to receive distributions from the Liquidating Trust as set forth in Section 4.6 of the Plan.

1.24 ***Class C Beneficial Interest*** means a beneficial interest in the Liquidating Trust to be issued to holders of Allowed Senior Noteholder Claims which entitles its  holder to receive distributions from the Liquidating Trust as set forth in Section 4.4 and 4.5 of the Plan.

1.25 ***Class G Beneficial Interest*** means a beneficial interest in the Liquidating Trust to be issued to holders of Allowed General Unsecured Claims, which entitles its holder to receive its Pro Rata Share of distributions from the Liquidating Trust as set forth in Section 4.7 of the Plan.

1.26 ***Collateral*** means any property or interest in property of the Estates of any of the Debtors that is subject to a Lien, charge or other encumbrance to secure the payment or performance of a Claim, which Lien, charge or other encumbrance is not subject to avoidance or otherwise invalid under the Bankruptcy Code or applicable state law.

1.27 ***Commencement Date*** means February 18, 2009, the date on which each of the Debtors filed their voluntary petitions under Chapter 11 of the Bankruptcy Code.

1.28 ***Confirmation Date*** means the date on which the clerk of the Bankruptcy Court enters the Confirmation Order on the docket with respect to the Chapter 11 Cases.

1.29 ***Confirmation Hearing*** means the hearing conducted by the Bankruptcy Court pursuant to section 1128(a) of the Bankruptcy

Code to consider confirmation of the Plan, as such hearing may be adjourned or continued from time to time.

1.30 **_Confirmation Order_** means the order or orders of the Bankruptcy Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code.

1.31 **_Contingent Claim_** means any Claim, the liability for which attaches or is dependent upon the occurrence or happening of, or is triggered by, an event, which event has not yet occurred, happened or been triggered as of the date on which such Claim is sought to be estimated or an objection to such Claim is filed, whether or not such event is within the actual or presumed contemplation of the holder of such Claim and whether or not a relationship between the holder of such Claim and the applicable Debtor now or hereafter exists or previously existed.

1.32 **_Credit-Linked Deposit Account_** shall have the meaning set forth in the Secured Credit Facility. The Debtors acknowledge and agree that all amounts in the Credit-Linked Deposit Accounts are not property of the Debtors' Estates under section 541 of the Bankruptcy Code.

1.33 **_Creditors' Committee_** means the statutory committee of unsecured creditors appointed in the Chapter 11 Cases pursuant to section 1102(a) of the Bankruptcy Code.

1.34 **_D&O Insurance Policies_** means [TO BE PROVIDED]

1.35 **_Debtors_** means BE and the BearingPoint Subsidiary Debtors.

1.36 **_Debtors in Possession_** means the Debtors in their capacity as debtors in possession in the Chapter 11 Cases under sections 1107(a) and 1108 of the Bankruptcy Code.

1.37 **_Disbursing Agent_** means the Liquidating Trustee or any entity in its capacity as a disbursing agent under Sections 6.5 and 6.6 of the Plan.

1.38 **_Disclosure Statement_** means that certain disclosure statement relating to the Plan, including, without limitation, all exhibits and schedules thereto, as the same may be amended, supplemented or otherwise modified from time to time, as approved by the Bankruptcy Court pursuant to section 1125 of the Bankruptcy Code.

1.39 **_Disclosure Statement Order_** means the order of the Bankruptcy Court approving, among other things, the Disclosure Statement and establishing certain procedures with respect to the solicitation and tabulation of votes to accept or reject the Plan.

1.40 **_Disputed_** means, with reference to any Administrative Expense Claim or Claim, any such Administrative Expense Claim or Claim (a) if any portion of such Claim is neither Allowed nor disallowed under the Plan or a Final Order nor deemed Allowed under section 502, 503 or 1111 of the Bankruptcy Code, (b) which has been or hereafter is listed by a Debtor on its Schedules as unliquidated, disputed or contingent and which has not been resolved by written agreement of the parties or a Final Order or (c) as to which the Debtors or any other party in interest has interposed a timely objection and/or request for estimation in accordance with the Bankruptcy Code, the Bankruptcy Rules and the Local Bankruptcy Rules, which objection or request for estimation has not been withdrawn or determined by a Final Order.  Prior to the earlier of the time an objection has been timely filed and the expiration of the time within which to object to such Claim set forth herein or otherwise established by order of the Bankruptcy Court, a Claim shall be considered a Disputed Claim if the amount of the Claim specified in a proof of Claim exceeds the amount of the Claim scheduled by the Debtor as not disputed, contingent or unliquidated.

1.41 **_Disputed Claim Amount_** means the Estimated Amount of a Disputed Claim, or, if no Estimated Amount exists, the amount set forth in the proof of claim relating to such Disputed Claim as the liquidated amount of such Disputed Claim.

1.42 **_Distribution Record Date_** means the date that is five (5) Business Days from and after the Confirmation Date.

1.43 **_Effective Date_** means a Business Day selected by the Debtors, in consultation with the Creditors' Committee, on or after the Confirmation Date, on which (a) no stay of the Confirmation Order is in effect and (b) the conditions precedent to the effectiveness of the Plan specified in Section 9.1 of the Plan shall have been satisfied or waived as provided in Section 9.2 of the Plan.

1.44 **_Equity Interest_** means the interest of any holders of equity securities of any of the Debtors represented by issued and outstanding shares of common or preferred stock or other instrument evidencing a present ownership interest in any of the Debtors, whether or not transferable, or any option, warrant,

contractual or other right to acquire any such interest, including, but not limited to, the warrants issued in connection with the FFL SPA.

1.45    ***Estates*** means the estates created pursuant to section 541 of the Bankruptcy Code upon the filing of the Chapter 11 Cases.

1.46    ***Estimated Amount*** means the estimated dollar value of an Unliquidated Claim, Disputed Claim, or Contingent Claim pursuant to section 502(c) of the Bankruptcy Code or as otherwise agreed to between the holder of such Claim and the applicable Debtor, or as otherwise determined by the Bankruptcy Court.

1.47    ***FFL Note*** means a note issued pursuant to the FFL SPA.

1.48    ***FFL Noteholder*** means a holder of an FFL Note.

1.49    ***FFL Noteholder Claims*** means the Claim of an FFL Noteholder under the FFL SPA.

1.50    ***FFL SPA*** means that certain Securities Purchase Agreement dated as of July 15, 2005, with the purchasers set forth in the agreement, pursuant to which BE issued $40.0 million aggregate principal amount of 0.50% Convertible Senior Subordinated Debentures, due July 2010, and common stock purchase warrants.

1.51    ***Final Cash Collateral Order*** means the *Final Order Pursuant to Sections 105, 361, 362, 363 and 364 of the Bankruptcy Code (A) Authorizing the Debtors' Use of Cash Collateral by Consent, (B) Authorizing Postpetition Letter of Credit Financing, (C) Granting Adequate Protection and (D) Scheduling a Final Hearing Pursuant to Bankruptcy Rule 4001*, entered by the Bankruptcy Court on April 20, 2009 and as amended and supplemented by the Supplemental Cash Collateral Order.

1.52    ***Final Order*** means an order or judgment of a court of competent jurisdiction that has been entered on the docket maintained by the clerk of such court and has not been reversed, vacated or stayed and as to which (a) the time to appeal, petition for certiorari or move for a new trial, reargument or rehearing has expired and as to which no appeal, petition for certiorari or other proceedings for a new trial, reargument or rehearing shall then be pending or (b) if an appeal, writ of certiorari, new trial, reargument or rehearing thereof has been sought, (i) such order or judgment shall have been affirmed by the highest court to which such order was appealed, certiorari shall have been denied or a new trial, reargument or

rehearing shall have been denied or resulted in no modification of such order and (ii) the time to take any further appeal, petition for certiorari, or move for a new trial, reargument or rehearing shall have expired; provided, however, that the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules or the Local Bankruptcy Rules, may be filed relating to such order shall not prevent such order from being a Final Order.

1.53    ***General Unsecured Claim*** means any Claim against the Debtors (as applicable) other than an Administrative Expense Claim, Professional Compensation and Reimbursement Claim, Priority Tax Claim, Priority Non-Tax Claim, Secured Tax Claim, Other Secured Claim, Series C Noteholder Claim, FFL Noteholder Claim, Junior Noteholder Claim, Other Subordinated Claim, or Intercompany Claim.

1.54    ***Indenture Trustees*** means the Junior Noteholder Indenture Trustee and the Series C Indenture Trustee.

1.55    ***Indenture Trustee Fees*** means the Junior Noteholder Indenture Trustee Fees and the Series C Noteholder Indenture Trustee Fees.

1.56    ***Initial Distribution*** shall have the meaning ascribed to it in Section 5.7(k) of the Plan.

1.57    ***Intercompany Claim*** means any Claim against any Debtor held by another Debtor or by a Non-Debtor Subsidiary or Affiliate.

1.58    ***Interim Cash Collateral Orders*** means, collectively, (i) the *Interim Order Pursuant to Sections 105, 361, 362, 363 and 364 of the Bankruptcy Code (A) Authorizing the Debtors' Use of Cash Collateral by Consent, (B) Authorizing Postpetition Letter of Credit Financing, (C) Granting Adequate Protection, and (D) Scheduling a Final Hearing Pursuant to Bankruptcy Rule 4001*, entered on February 19, 2009, (ii) the *Order Adjourning Final Cash Collateral Hearing and Supplementing and Amending Interim Cash Collateral Order*, entered on March 13, 2009, (iii) the *Second Order Adjourning Final Cash Collateral Hearing*, entered on March 30, 2009, and (iv) the *Third Order Adjourning Final Cash Collateral Hearing*, entered on April 7, 2009.

1.59    ***Junior Noteholder Claim*** means a Series A Noteholder Claim or a Series B Noteholder Claim.

1.60 ***Junior Noteholder Indenture Trustee*** means the Law Debenture Trust Company of New York and/or its successor, in either case in its or their capacity as the indenture trustee for either the Series A Notes or the Series B Notes.

1.61 ***Junior Noteholder Indenture Trustee Fees*** means the reasonable and customary fees and expenses of the Junior Noteholder Indenture Trustee as provided in the Series A Note or the Series B Note, including, without limitation, reasonable attorneys' fees and disbursements incurred by the Junior Noteholder Indenture Trustee, whether prior to or after the Effective Date.

1.62 ***LC Agent*** means Wells Fargo Bank, N.A., or any successor thereto, in its sole capacity as administrative agent for the LC Cash Collateral Account.

1.63 ***LC Cash Collateral Account*** means [TO BE PROVIDED]

1.64 ***Letters of Credit*** means any outstanding letter of credit issued pursuant to the Secured Credit Facility.

1.65 ***Lien*** has the meaning set forth in section 101(37) of the Bankruptcy Code.

1.66 ***Liquidating Trust*** means the liquidating trust established under Section 5.7 of the Plan.

1.67 ***Liquidating Trust Agreement*** means the agreement between the Debtors and the Liquidating Trustee, governing the Liquidating Trust, dated as of the Effective Date, substantially in the form set forth in the Plan Supplement.

1.68 ***Liquidating Trust Assets*** means all assets of the Debtors as of the Effective Date, including all Causes of Action, *provided, however*, that funds held in the LC Cash Collateral Account shall not be available for distribution by the Liquidating Trust until such funds have been released by the LC Agent pursuant to Section 5.7(d)(ii) of this Plan.

1.69 ***Liquidating Trust Beneficiaries*** means the holders of Series C Noteholder Claims, FFL Noteholder Claims, Junior Noteholder Claims, and General Unsecured Claims against the Debtors, in each case, as and when allowed. To the extent necessary to effectuate the provisions of this Plan, "Liquidating Trust Beneficiaries" shall include those persons treated as having received Beneficial Interests under Sections 4.3(c) of the Plan.

1.70 **_Liquidating Trust Claims Reserve_** has the meaning ascribed to it in Section 5.7(o)(ii)(4) of the Plan.

1.71 **_Liquidating Trustee_** means the trustee or co-trustees, as the case may be governing the Liquidating Trust.

1.72 **_Local Bankruptcy Rules_** means the Local Bankruptcy Rules of the United States Bankruptcy Court for the Southern District of New York, as amended from time to time.

1.73 **_Non-Debtor Subsidiary_** means any direct or indirect subsidiary of BE that is not a Debtor.

1.74 **_Other Secured Claim_** means a Secured Claim other than a Secured Tax Claim.

1.75 **_Other Subordinated Claim_** means any Claim against any of the Debtors subject to subordination, including, but not limited to, subordination under section 510 of the Bankruptcy Code.

1.76 **_Person_** means an individual, partnership, corporation, limited liability company, cooperative, trust, unincorporated organization, association, joint venture, government unit or agency or political subdivision thereof or any other form of legal entity or enterprise.

1.77 **_Plan_** means this Second Amended Joint Plan, including, without limitation, the exhibits and schedules hereto or contained in the Plan Supplement, as the same may be amended or modified from time to time in accordance with the provisions of the Bankruptcy Code and the terms hereof.

1.78 **_Plan Supplement_** means the supplement or supplements to the Plan containing certain documents relevant to the implementation of the Plan, and shall include, but will not be limited to, the list of executory contracts and unexpired leases to be assumed pursuant to the Plan and the Liquidating Trust Agreement.

1.79 **_Pre-Liquidation Letter of Credit_** means a letter of credit issued under the Secured Letter of Credit Facility that is drawn subsequent to the Commencement Date and unreimbursed by the Debtors prior to the Effective Date.

1.80 **_Prepetition Agent_** means Wells Fargo Foothill, LLC in its capacity as administrative agent and collateral agent under the Secured Credit Facility.

1.81 ***Priority Non-Tax Claim*** means a Claim entitled to priority in payment as specified in section 507(a)(4), (5), (6) or (7) of the Bankruptcy Code.

1.82 ***Priority Tax Claim*** means any Claim of a governmental unit of the kind entitled to priority in payment as specified in sections 502(i) and 507(a)(8) of the Bankruptcy Code.

1.83 ***Pro Rata Share*** means, as of any distribution date under the Liquidating Trust, the ratio (expressed as a percentage) of the amount of an Allowed Series C Noteholder Claim, an Allowed FFL Noteholder Claim, an Allowed General Unsecured Claim, or an Allowed Junior Noteholder Claim to the sum of the aggregate amount of all Senior Noteholder Claims, General Unsecured Claims, and Junior Noteholder Claims.

1.84 ***Schedules*** means, collectively, the schedules of assets and liabilities, schedules of executory contracts and unexpired leases, schedules of current income and expenditures and statements of financial affairs filed by the Debtors under section 521 of the Bankruptcy Code, Bankruptcy Rule 1007 and the Official Bankruptcy Forms in the Chapter 11 Cases, as may have been amended or supplemented from time to time in accordance with Bankruptcy Rule 1009 or orders of the Bankruptcy Court.

1.85 ***Secured Claim*** means any Claim that is secured by a Lien on property in which a Debtors' estates has an interest to the extent of the value of such property, as determined in accordance with section 506(a) of the Bankruptcy Code, or, in the event that such Claim is subject to a permissible setoff under section 553 of the Bankruptcy Code, to the extent of such permissible setoff, or, in either case as otherwise agreed upon in writing by the Debtors and the holder of such Claim.

1.86 ***Secured Credit Facility*** means the senior secured credit facility pursuant to that certain amended and restated credit agreement, dated as of May 18, 2007, as amended and restated on June 1, 2007, with Wells Fargo N.A., as successor administrative and collateral agent to UBS AG, Stamford Branch, consisting of term loans in the aggregate principal amount of $300 million and a letter of credit facility in an aggregate face amount at anytime outstanding not to exceed $200 million.

1.87 ***Secured Tax Claim*** means any Secured Claim that, absent its secured status, would be entitled to priority in right of payment under section 507(a)(8) of the Bankruptcy Code (determined

irrespective of any time limitations therein) and including any related Secured Claim for penalties.

1.88    ***Senior Noteholder Claims*** means FFL Noteholder Claims and Series C Noteholder Claims.

1.89    ***Series C Noteholder Indenture Trustee*** means the Bank of New York and/or its successor, in either case in its or their capacity as the indenture trustee for the Series C Notes.

1.90    ***Series C Noteholder Indenture Trustee Fees*** means the reasonable and customary fees and expenses of the Series C Noteholder Indenture Trustee as provided in the Series C Note, including, without limitation, reasonable attorneys' fees and disbursements incurred by the Series C Noteholder Indenture Trustee, whether prior to or after the Effective Date.

1.91    ***Series A Note*** means a note issued pursuant to that certain indenture, dated as of December 22, 2004, with the Bank of New York as trustee, pursuant to which BE issued $250.0 million aggregate principal amount of 2.50% Series A Convertible Subordinated Debentures, due December 15, 2024.

1.92    ***Series A Noteholder*** means a holder of the Series A Note.

1.93    ***Series A Noteholder Claim*** means a Claim of a Series A Noteholder under a Series A Note, including any claims of such Series A Noteholders arising out of the purchase or sale of such securities (which Claims are subordinated pursuant to section 510(b) of the Bankruptcy Code and are extinguished without recovery hereunder).

1.94    ***Series B Note*** means a note issued pursuant to that certain indenture, dated as of December 22, 2004, with the Bank of New York as trustee, pursuant to which BE issued $200.0 million principal amount of 2.75% Series B Convertible Subordinated Debentures, due December 15, 2024.

1.95    ***Series B Noteholder*** means a holder of a Series B Note.

1.96    ***Series B Noteholder Claim*** means a Claim of a Series B Noteholder under a Series B Note, including any claims of such Series B Noteholders arising out of the purchase or sale of such securities (which Claims are subordinated pursuant to section 510(b) of the Bankruptcy Code and are extinguished without recovery hereunder).

1.97 **Series C Note** means a note issued pursuant to that certain indenture, dated as of April 27, 2005, with the Bank of New York as trustee, pursuant to which BE issued $200.0 million aggregate principal amount of 5.00% Convertible Senior Subordinated Debentures, due April 15, 2025.

1.98 **Series C Noteholder** means a holder of the Series C Note.

1.99 **Series C Noteholder Claim** means a Claim of a Series C Noteholder under a Series C Note, including any claims of such Series Noteholders arising out of the purchase or sale of such securities (which Claims are subordinated pursuant to section 510(b) of the Bankruptcy Code and are extinguished without recovery hereunder).

1.100 **Supplemental Cash Collateral Order** means the *Supplemental Order (A) Authorizing the Debtors' Use of Cash Collateral by Consent and (B) Granting Related Relief*, entered by the Bankruptcy Court on July 23, 2009.

1.101 **Tax Code** means the United States Internal Revenue Code of 1986, as amended.

1.102 **Tax Returns** shall have the meaning ascribed to it in Section 5.7(h)(i) of the Plan.

1.103 **Treasury Regulations** means the United States Department of Treasury regulations promulgated under the Tax Code.

1.104 **Trust Advisory Board** shall have the meaning ascribed to such term in the Liquidating Trust Agreement.

1.105 **Unimpaired** means, with respect to any Claim, that such Claim is not impaired within the meaning of section 1124 of the Bankruptcy Code.

1.106 **Unliquidated Claim** means any Claim, the amount of liability for which has not been fixed, whether pursuant to agreement, applicable law or otherwise, as of the date on which such Claim is asserted or sought to be estimated.

1.107 **U.S. Trustee** means the United States Trustee appointed under section 581 of title 28 of the United States Code to serve in the Southern District of New York.

1.108 **Voting Record Date** means, _____ ___, 2009 for all creditors entitled to vote on the Plan.

**B. Interpretation; Application of Definitions and Rules of Construction.**

Unless otherwise specified, all Section, Article, schedule or exhibit references in the Plan are to the respective Section in, Article of or schedule or exhibit to the Plan or the Plan Supplement, as the same may be amended, waived or modified from time to time. The words "herein," "hereof," "hereto," "hereunder" and other words of similar import refer to the Plan as a whole and not to any particular section, subsection or clause contained in the Plan. A term used herein that is not defined herein shall have the meaning ascribed to that term in the Bankruptcy Code. The rules of construction contained in section 102 of the Bankruptcy Code shall apply to the construction of the Plan. In the event that a particular term of the Plan (including any exhibits or schedules hereto) conflicts with a particular term of the definitive documentation required to be implemented pursuant to the terms of the Plan or any settlement or other agreement contemplated hereunder, the definitive documentation shall control and shall be binding on the parties thereto. The headings in the Plan are for convenience of reference only and shall not limit or otherwise affect the provisions hereof. In computing any period of time prescribed or allowed by the Plan, unless otherwise expressly provided, the provisions of Bankruptcy Rule 9006(c) shall apply.

## ARTICLE II

## PROVISIONS FOR PAYMENT OF
## ADMINISTRATIVE EXPENSES, PRIORITY TAX CLAIMS,
## AND OBLIGATIONS ON ACCOUNT OF PAID TIME OFF

2.1 *Administrative Expense Claims*.

Except to the extent that any entity entitled to payment of any Allowed Administrative Expense Claim agrees to a less favorable treatment, or has been paid during the Chapter 11 Cases, on the latest of (i) the Effective Date, (ii) the date on which its Administrative Expense Claim becomes an Allowed Administrative Expense Claim, or (iii) the date on which its Administrative Expense Claim becomes payable under any agreement relating thereto, or as soon as practicable thereafter, each holder of an Allowed Administrative Expense Claim shall receive from the Liquidating Trust, in full satisfaction, settlement, and release of and in exchange for such Allowed Administrative Expense Claim, Cash equal to the unpaid portion of its Allowed Administrative Expense Claim. Notwithstanding the forgoing, (a) any Allowed Administrative Expense Claim based on a liability incurred by the Debtors in the ordinary course of business by the Debtors shall be paid in full and performed by the Liquidating Trust, in the ordinary course of business in accordance with the terms and conditions of any agreements governing, instruments evidencing or other documents relating to such transactions, and (b) any Allowed Administrative Expense Claim may be paid on such other terms as may be agreed on between the holder of such Claim and the Debtors. If any such Administrative Expense Claim is not billed or a request for payment is not made within forty-five (45) days after the Effective Date, such Administrative Expense Claim shall be barred.

(a)    *Professional Compensation and Reimbursement Claims*.

All entities seeking awards by the Bankruptcy Court of compensation for services rendered or reimbursement of expenses incurred through and including the Confirmation Date under sections 330, 331, 503(b)(2), 503(b)(3), 503(b)(4) or 503(b)(5) of the Bankruptcy Code shall (a) file, on or before the date that is sixty (60) after the Effective Date their respective applications for final allowances of compensation for professional services rendered and reimbursement of expenses incurred and (b) be paid in full by the Liquidating Trustee, in Cash, in such amounts as are Allowed by the Bankruptcy Court in accordance with the order relating to or allowing any such Administrative Expense Claim or upon such other terms as may be mutually agreed upon between the holder of such Administrative Expense Claim and the Debtors or, if on or after the Effective Date, the Liquidating Trustee.  The Liquidating Trust is authorized to pay compensation for services rendered or reimbursement of expenses incurred after the Confirmation Date in the ordinary course of business and without the need for Bankruptcy Court approval.

## 2.2    *Indenture Trustee Fees*

(a)    Procedure for Fixing Indenture Trustee Fees.  On or before the date that is thirty (30) days after the Effective Date, the Indenture Trustees shall serve on the Liquidating Trustee their respective final request for reimbursement of Indenture Trustee Fees.  The Liquidating Trustee shall have twenty (20) days from the date of service to file an objection to the requests on reasonableness grounds.  The request for Indenture Trustee Fees shall be Allowed in the amount either (i) as submitted, if a timely objection is not filed by the Liquidating Trustee, (ii) as agreed to by the Liquidating Trustee and the respective Indenture Trustee, or (iii) as ordered by the Court following an objection.

(b)    Series C Noteholder Indenture Trustee Fees.  Until such time as the Allowed Series C Noteholder Indenture Trustee Fees have been paid in full, all distributions from the Liquidating Trust that would otherwise be made to holders of Claims in Class 4(a) on account of their Class C Beneficial Interests will be paid directly to the Series C Noteholder Indenture Trustee without the need for, application to, or approval of, the Bankruptcy Court.

(c)    Junior Noteholder Indenture Trustee Fees.  Until such time as the Allowed Junior Noteholder Indenture Trustee Fees have been paid in full, all distributions from the Liquidating Trust that would otherwise be made on account of Class A/B Beneficial Interests will be paid directly to the Junior Noteholder Indenture Trustee without the need for, application to, or approval of, the Bankruptcy Court.  For the avoidance of doubt, until the Junior Noteholder Indenture Trustee Fees are paid in full, no holder of a Senior Noteholder Claim will be entitled to receive any distributions that would otherwise be made on account of Class A/B Beneficial Interests.

2.3     *Priority Tax Claims*.

On the later of (i) the Effective Date or (ii) the date such Priority Tax Claim becomes an Allowed Priority Tax Claim, or as soon as practicable thereafter, except to the extent that a holder of an Allowed Priority Tax Claim agrees to a less favorable treatment, each holder of an Allowed Priority Tax Claim shall receive, in full satisfaction, settlement, and release of and in exchange for such Allowed Priority Tax Claim, in the sole discretion of the Debtors, (a) Cash in an amount equal to such Allowed Priority Tax Claim, or (b) equal semi-annual Cash payments aggregating an amount equal to such Allowed Priority Tax Claim, together with interest for a period after the Effective Date at a fixed annual rate determined under applicable non-bankruptcy law, over a period not exceeding five (5) years after the Commencement Date, subject to the Liquidating Trustee's sole option to prepay the entire amount of the Allowed Priority Tax Claim; provided that the first payment under this clause (b) shall represent a percentage recovery at least equal to that expected to be received by holders of Allowed General Unsecured Claims and subject to the sole option of the Liquidating Trustee to prepay the entire amount of the Allowed Priority Tax Claim.

2.4     *Employees' Paid Time Off*

Pursuant to the Supplemental Cash Collateral Order, the Debtors or the Liquidating Trust, as the case may be, shall make payments of $4 million per month for payment of claims of the Debtors' current or former employees on account of their paid time off until all claims on account of paid time off are satisfied either through such monthly payments or in a lump-sum payment prior to the termination of the Liquidating Trust.

## ARTICLE III

## CLASSIFICATION OF CLAIMS AND
## EQUITY INTERESTS, IMPAIRMENT, VOTING

The following table designates the classes of Claims against and Equity Interests in the Debtors and specifies which of those classes are impaired or unimpaired by the Plan and entitled to vote to accept or reject the Plan in accordance with section 1126 of the Bankruptcy Code or deemed to accept or reject the Plan.

| Class | Designation | Impairment | Entitled to Vote |
|-------|-------------|------------|------------------|
| BearingPoint Class 1 | Priority Non-Tax Claims | Unimpaired | No (deemed to accept) |
| BearingPoint Class 2 | Secured Tax Claims | Unimpaired | No (deemed to accept) |

| Class | Designation | Impairment | Entitled to Vote |
|---|---|---|---|
| Bearing Point Class 3 | Other Secured Claims | Unimpaired | No (deemed to accept) |
| BearingPoint Class 4(a) | Series C Noteholder Claims | Impaired | Yes |
| BearingPoint Class 4(b) | FFL Noteholder Claims | Impaired | Yes |
| BearingPoint Class 5 | Junior Noteholder Claims | Impaired | Yes |
| BearingPoint Class 6 | General Unsecured Claims | Impaired | Yes |
| BearingPoint Class 7 | Other Subordinated Claims | Impaired | No (deemed to reject) |
| BearingPoint Class 8 | Equity Interests | Impaired | No (deemed to reject) |

## ARTICLE IV

## TREATMENT OF CLAIMS AND EQUITY INTERESTS

4.1     *Priority Non-Tax Claims (Class 1)*

(a)     <u>Impairment and Voting.</u>  Class 1 is Unimpaired by the Plan.  Each holder of an Allowed Priority Non-Tax Claim is conclusively presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan.

(b)     <u>Distributions.</u>  Except to the extent that a holder of an Allowed Priority Non-Tax Claim (i) has been paid by the Debtors, in whole or in part, prior to the Effective Date, or (ii) agrees to a less favorable treatment, each holder of an Allowed Priority Non-Tax Claim shall receive from the Liquidating Trust, in full satisfaction of such Claim, Cash in the full amount of the claim, on or as soon as reasonably practicable after the later of (a) the Effective Date, and (b) the date such claim becomes Allowed.

4.2     *Secured Tax Claims (Class 2)*

(a)     <u>Impairment and Voting.</u>  Class 2 is unimpaired by the Plan.  Each holder of an Allowed Secured Tax Claim is conclusively presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan.

(b)     Distributions.  Except to the extent that a holder of an Allowed Secured Tax Claim has been paid by the Debtors prior to the Effective Date or agrees to a less favorable treatment, each holder shall receive from the Liquidating Trust, at the sole option of the Debtors or, if after the Effective Date, the Liquidating Trustee, (a) Cash in the full amount of the Claim on or as soon as reasonably practicable following the later to occur of (i) the Effective Date and (ii) the date on which such Claim becomes Allowed, or (b) such other terms determined by the Bankruptcy Court to provide the holder deferred Cash payments having a value, as of the Effective Date, equal to such Claim.

4.3     ***Other Secured Claims (Class 3)***

(a)     Impairment and Voting.  Class 3 is unimpaired by the Plan.  Each holder of an Allowed Other Secured Claim is conclusively presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan.

(b)     Distributions.  Except to the extent that a holder of an Allowed Other Secured Claim agrees to a less favorable treatment, at the sole option of the Debtors or, if after the Effective Date, the Liquidating Trustee each holder of an Allowed Other Secured Claim shall receive from the Liquidating Trust, on or as soon as practicable after the later of the (a) Effective Date or (b) date on which such Claim becomes Allowed, in full satisfaction of such Claim, at the option of the Debtors, or, if after the Effective Date, the Liquidating Trustee (i) Cash in an amount equal to the Allowed amount of such Allowed Other Secured Claim; (ii) the proceeds of the sale or disposition of the Collateral securing such Allowed Other Secured Claim to the extent of the value of the holder's secured interest in such Collateral, (iii) the Collateral securing such Allowed Other Secured Claim, or (iv) such other distribution as necessary to satisfy the requirements of section 1124 of the Bankruptcy Code.  In the event such a Claim is treated under clauses (i) or (ii) of this Section, the Liens securing such Secured Other Secured Claim shall be deemed released as of the Effective Date.

(c)     Tax Treatment of Post-Effective Date Receipt of Collateral Proceeds.  In the event that such a Class 3 Claim is to be satisfied under clause (ii) of Section 4.3(b) by the Liquidating Trust, each holder of an Allowed Other Secured Claim shall, for federal income tax purposes, be treated as having received on the Effective Date a Beneficial Interest in the Liquidating Trust and all parties (including the Debtors, the Liquidating Trustee, and the Liquidating Trust Beneficiaries) shall report consistently therewith for federal income tax purposes.

4.4     ***Series C Noteholder Claims (Class 4(a))***

(a)     Impairment and Voting.  Class 4(a) is impaired by the Plan.  Each holder of an Allowed Series C Noteholder Claim is entitled to vote to accept or reject the Plan.

(b)     Distributions.  On the later of (i) the Effective Date, and (ii) the date on which a Series C Noteholder Claim becomes an Allowed Claim, or, in each case,

as soon thereafter as is reasonably practicable, each holder of a Series C Noteholder Claim shall receive a Class C Beneficial Interest in the Liquidating Trust. All distributions made to holders of Allowed Series C Noteholder Claims on account of their Class C Beneficial Interests will be paid directly to the Series C Indenture Trustee until such a time as the Series C Indenture Trustee Fees have been paid in full pursuant to Section 2.3(a) of the Plan.

(c)     Class C Beneficial Interest.  A Class C Beneficial Interest shall entitle its holder to receive (i) its Pro Rata Share of distributions from the Liquidating Trust, and (ii) after the Junior Noteholder Indenture Trustee Fees are paid in full pursuant to Section 2.2(c) of the Plan, an additional amount equal to its Class 4 Pro Rata Share of distributions made from the Liquidating Trust that would otherwise be made directly to holders of Junior Noteholder Claims on account of Class A/B Beneficial Interests, until such a time as all holders of Allowed Senior Noteholder Claims (*i.e.* Allowed Series C Noteholder Claims and Allowed FFL Noteholder Claims) have received, in the aggregate, pursuant to clause (i) and this clause (ii), an amount equal to the amount, in the aggregate, of all Allowed Senior Noteholder Claims.  Thereafter, any and all distributions made on account of Class A/B Beneficial Interests shall be paid directly to holders of Class A/B Beneficial Interests pursuant to Section 4.5(c).

### 4.5     *FFL Noteholder Claims (Class 4(b))*

(a)     Impairment and Voting.  Class 4(b) is impaired by the Plan.  Each holder of an Allowed FFL Noteholder Claim is entitled to vote to accept or reject the Plan.

(b)     Distributions.  On the later of (i) the Effective Date, and (ii) the date on which a FFL Noteholder Claim becomes an Allowed Claim, or, in each case, as soon thereafter as is reasonably practicable, each holder of a FFL Noteholder Claim shall receive a Class C Beneficial Interest in the Liquidating Trust.

(c)     Class C Beneficial Interest.  A Class C Beneficial Interest shall entitle its holder to receive the distribution set forth in Section 4.4(c) above.

### 4.6     *Junior Noteholder Claims (Class 5)*

(a)     Impairment and Voting.  Class 5 is impaired by the Plan.  Each holder of an Allowed Junior Noteholder Claim is entitled to vote to accept or reject the Plan.

(b)     Distributions. On the later of (i) the Effective Date, and (ii) the date on which a Junior Noteholder Claim becomes an Allowed Claim, or, in each case, as soon thereafter as is reasonably practicable, each holder of a Junior Noteholder Claim shall receive a Class A/B Beneficial Interest in the Liquidating Trust.  All distributions made on account of Class A/B Beneficial Interests will be paid directly to the Junior

Noteholder Indenture Trustee until such a time as the Junior Indenture Trustee Fees have been paid in full pursuant to Section 2.3(b) of the Plan.

(c)     Class A/B Beneficial Interests.  A Class A/B Beneficial Interest shall entitle its holder to receive its Pro Rata Share of distributions from the Liquidating Trust, provided, however, that all distributions on account of Class A/B Beneficial Interests shall be made directly to holders of Allowed Senior Noteholder Claims in accordance with Section 4.4 and 4.5 of the Plan until such time as all holders of Allowed Series C Noteholder Claims and Allowed FFL Noteholder Claims have received, in the aggregate, pursuant to clauses (i) and (ii) of Section 4.4(c) and Section 4.5(c), respectively, an amount equal to the amount, in the aggregate, of all Allowed Senior Noteholder Claims.  Thereafter, a Class A/B Beneficial Interest shall entitle its holder to receive (i) its Pro Rata Share of distributions from the Liquidating Trust, and (ii) an additional amount equal to its Class 5 Pro Rata Share of distributions made from the Liquidating Trust on account of Class C Beneficial Interests, until all Allowed Junior Noteholder Claims are paid in full.  For the avoidance of doubt, no holder of a Junior Noteholder Claim shall receive a distribution on account of its Class A/B Beneficial Interest until all Allowed Senior Noteholder Claims are paid in full.

### 4.7     *General Unsecured Claims (Class 6)*

(a)     Impairment and Voting.  Class 6 is impaired by the Plan.  Each holder of an Allowed General Unsecured Claim is entitled to vote to accept or reject the Plan.

(b)     Distributions.  On the later of (i) the Effective Date, and (ii) the date on which a General Unsecured Claim becomes an Allowed Claim, or, in each case, as soon thereafter as is reasonably practicable, each holder of a General Unsecured Claim shall receive a Class G Beneficial Interest in the Liquidating Trust.  A Class G Beneficial shall entitle its holder to receive its Pro Rata Share of distributions from the Liquidating Trust until all Allowed General Unsecured Claims are paid in full.

### 4.8     *Other Subordinated Claims (Class 7)*

(a)     Impairment and Voting.  Class 7 is impaired by the Plan.  Each holder of an Other Subordinated Claim is deemed to reject to Plan and is not entitled to vote to accept or reject the Plan.

(b)     Distributions.  Each holder of an Allowed Other Subordinated Claim shall not receive any distribution under the Plan on account of such Other Subordinated Claim.

4.9    ***Equity Interests (Class 8)***

(a)    <u>Impairment and Voting.</u>  Class 8 is impaired by the Plan.  Each holder of an Equity Interest is deemed to reject the Plan and is not entitled to vote to accept or reject the Plan.

(b)    <u>Distributions.</u>  On the Effective Date, the Equity Interests shall be cancelled and extinguished and the holders of Equity Interests shall not be entitled to, and shall not receive or retain, any property or interest in property on account of such Equity Interests under the Plan.

# ARTICLE V

# MEANS OF IMPLEMENTATION

5.1    ***Settlement of Claims.***

Pursuant to Bankruptcy Rule 9019, in consideration for the classification, distribution, resolution of intercompany claims, and other benefits provided under the Plan, upon the Effective Date, the provisions of the Plan shall constitute a good-faith compromise and settlement of all Claims or controversies resolved pursuant to the Plan. All Plan distributions made to creditors holding Allowed Claims in any class are intended to be and shall be final, and, subject to the provisions of Article IV, no Plan distribution to the holder of a Claim in one class shall be subject to being shared with or reallocated to the holders of any Claim in another class by virtue of any prepetition collateral trust agreement, shared collateral agreement, subordination agreement, other similar inter-creditor arrangement or deficiency claim.

5.2    ***Merger/Dissolution/Consolidation/Discharge.***

(a)    On or as of the Effective Date or as soon as practicable thereafter and without the need for any further action, the Debtors or the Liquidating Trustee, as applicable may: (i) cause any or all of the Debtors to be merged into one or more of the Debtors, dissolved or otherwise consolidated, (ii) cause the transfer of assets between or among the Debtors, (iii) to the extent determined appropriate by the Debtors or the Liquidating Trustee, cause the reduction, reinstatement or discharge of any Intercompany Claim and any claim held against any Non-Debtor Subsidiary or Affiliate by any Debtor or by any other Non-Debtor Subsidiary or Affiliate or (iv) engage in any other transaction in furtherance of the Plan.

(b)    Current equity interests in BE's non-debtor subsidiaries may remain in BE and not be transferred to the Liquidating Trust until such non-debtor subsidiaries are liquidated.  Upon such liquidation, the proceed would be distributed to the Liquidating Trust.  The Debtors and the Creditors' Committee reserve the right to amend the Plan to effectuate this structure.

### 5.3 Cancellation and Termination of Existing Agreements and Equity Interests.

Except (a) as otherwise expressly provided in the Plan, (b) with respect to executory contracts or unexpired leases that have been assumed by the Debtors, (c) for purposes of evidencing a right to distributions under the Plan, or (d) with respect to any Claim that is reinstated and rendered unimpaired under the Plan, on the Effective Date, the Secured Credit Facility, the FFL SPA, the Series A Note, the Series B Note, the Series C Note and any indentures pursuant to which such notes were issued, all Equity Interests and other instruments evidencing any Claims against the Debtors or Equity Interests in the Debtors shall be deemed automatically cancelled and terminated without further act or action under any applicable agreement, law, regulation, order or rule and the obligations of the Debtors thereunder shall be discharged.

### 5.4 Substantive Consolidation for Plan Purposes Only

(a) Given the number of separate legal entities, the Debtors believe it would be inefficient to propose, vote on and make distributions in respect of entity-specific claims. Accordingly, the Debtors are proposing solely for administrative convenience to consolidate for certain purposes. Entry of the Confirmation Order shall constitute the approval, pursuant to section 105(a) of the Bankruptcy Code, effective as of the Effective Date, of the limited substantive consolidation of the Chapter 11 Cases for the purposes of voting, confirmation and distribution as provided in this Plan. On and after the Effective Date: (i) no distributions shall be made under the Plan on account of Intercompany Claims among the Debtors except at the discretion of the Liquidating Trustee; (ii) all guarantees by any of the Debtors of the obligations of any other Debtor arising prior to the Effective Date shall be deemed eliminated so that any Claim against any Debtor and any guarantee thereof executed by any other Debtor and any joint and several liability of any of the Debtors shall be deemed to be one obligation of the deemed consolidated Debtors; and (iii) each and every Claim filed or to be filed in the Chapter 11 Cases shall be deemed filed against the consolidated Debtors and shall be deemed one Claim against and obligation of the deemed consolidated Debtors.

(b) For the avoidance of doubt, the limited substantive consolidation contemplated herein shall not be construed as the substantive consolidation for any purpose than that described in subpart (a) of this section. The Debtors believe that no creditor will receive a recovery inferior to that which it would receive if they proposed a plan that was completely separate as to each entity. If any party in interest challenges the proposed consolidation, the Debtors, with the prior consent of the Creditors' Committee, reserve the right to establish, at the Confirmation Hearing, the ability to confirm the Plan on an entity-by-entity basis, or to make the showing that the Debtors can be substantively consolidated under applicable law.

5.5 ***Compromise and Settlement***

Pursuant to Bankruptcy Rule 9019, the Plan incorporates a proposed compromise and settlement of all issues relating to (i) the substantive consolidation of the Debtors and (ii) the amount, allowance, characterization and priority of Intercompany Claims between the various Debtors.

5.6 ***Release of Funds Securing Issued Letters of Credit***

(a) As soon as reasonably practicable, but not more than ten (10) days following the release of any Letter of Credit by the party secured by such Letter of Credit, the LC Agent shall transfer funds equal in amount to 105% of the amount of the released Letter of Credit from the LC Cash Collateral Account to the Liquidating Trust. At such time as there are no remaining outstanding Letters of Credit, the LC Agent will transfer all remaining funds in the LC Cash Collateral Account to the Liquidating Trust.

(b) If, at any point, the funds in the LC Cash Collateral Account exceed 105% of the amount of the outstanding Letters of Credit plus any fees owing to the LC Agent, the Liquidating Trustee shall have the right to withdraw any excess funds, including, without limitation, interest income earned on the LC Cash Collateral Account, and to transfer such funds to the Liquidating Trust.

5.7 ***The Liquidating Trust.***

(a) <u>Execution of Liquidating Trust Agreement</u>. On or before the Effective Date, the Liquidating Trust Agreement shall be executed by the Debtors and the Liquidating Trustee, and all other necessary steps shall be taken to establish the Liquidating Trust and the Beneficial Interests therein which shall be for the benefit of the Liquidating Trust Beneficiaries, as provided in Sections 4.3(c), 4.4, 4.5 and 4.7 of the Plan, whether their Claims are Allowed on or after the Effective Date. In the event of any conflict between the terms of this Section 5.7(a) and the terms of the Liquidating Trust Agreement, the terms of the Liquidating Trust Agreement shall govern. The Liquidating Trust Agreement may provide powers, duties and authorities in addition to those explicitly stated herein, but only to the extent that such powers, duties and authorities do not affect the status of the Liquidating Trust as a liquidating trust for United States federal income tax purposes.

(b) <u>Purpose of the Liquidating Trust</u>. The Liquidating Trust shall be established for the sole purpose of liquidating and distributing its assets, in accordance with Treasury Regulation section 301.7701-4(d), with no objective to continue or engage in the conduct of a trade or business.

(c) <u>Liquidating Trust as Successor to BE and BE LLC</u>. The Liquidating Trust shall be a successor to BE and its subsidiary, BE LLC for all purposes relating to contracts entered into by BE or BE LLC subsequent to the Commencement Date or contracts not rejected in the Chapter 11 Cases. As such, counterparties to any

such contracts transferred to the Liquidating Trust pursuant to the Plan, and counterparties to any subcontracts related to such contracts, shall be prohibited from terminating or otherwise altering the terms of such contract as a result of the transfer of such contract to the Liquidating Trust.

(d)     Liquidating Trust Assets.

(i)     The Liquidating Trust shall consist of the Liquidating Trust Assets.  On the Effective Date, the Debtors shall transfer all of the Liquidating Trust Assets to the Liquidating Trust subject to the Administrative Expense Claims, Other Priority Claims, Priority Tax Claims, and Secured Tax Claims.  Such transfer shall be exempt from any stamp, real estate transfer, mortgage reporting, sales, use or other similar tax.  Upon delivery of the Liquidating Trust Assets to the Liquidating Trust, the Debtors and their successors and assigns shall be released from all liability with respect to the delivery of such distributions.

(ii)     As soon as practicable, but not more than ten (10) days following the full or partial release or settlement of any Letter of Credit, any funds held in the LC Cash Collateral Account backstopping such Letter of Credit shall be released by the LC Agent to the Liquidating Trust.  Upon such release, such funds shall be considered Liquidating Trust Assets for all purposes under this Plan.

(e)     Governance of the Liquidating Trust.  The Liquidating Trust shall be governed by the Liquidating Trustee according to the Liquidating Trust Agreement.

(f)     The Liquidating Trustee.  The Liquidating Trustee shall be designated by the Debtors, with the consent of the Creditors' Committee.  In the event the Liquidating Trustee dies, is terminated or resigns for any reason, the Trust Advisory Board (as defined in the Liquidating Trust Agreement) shall designate a successor.

(g)     Role of the Liquidating Trustee.  In furtherance of and consistent with the purpose of the Liquidating Trust and the Plan, the Liquidating Trustee shall, among other things, have the following rights, powers and duties (i) to hold, manage, convert to Cash, and distribute the Liquidating Trust Assets, including prosecuting and resolving the Claims belonging to the Liquidating Trust, (ii) hold the Liquidating Trust Assets for the benefit of the Liquidating Trust Beneficiaries that are entitled to distributions therefrom under the Plan, whether their Claims are Allowed on or after the Effective Date, (iii) in the Liquidating Trustee's reasonable business judgment, investigate, prosecute, settle and/or abandon rights, Causes of Action or litigation of the Liquidating Trust, (iv) monitor and enforce the implementation of the Plan, (v) file all tax and regulatory forms, returns, reports and other documents required with respect to the Liquidating Trust, (vi) in the Liquidating Trustee's reasonable business judgment object to Claims, and manage, control, prosecute and/or settle on behalf of the Liquidating Trust, objections to Claims on account of which the Liquidating Trustee (as Disbursing

Agent) will be responsible (if Allowed) for making distributions under the Plan, (vii) take all actions necessary and create any documents necessary to wind up the affairs of the Debtors and their affiliates and implement the Plan, (viii) to hold, manage, and distribute Cash or non-Cash Liquidating Trust Assets obtained through the exercise of its power and authority, (ix) to act as a signatory to BE and/or BE LLC for all purposes, including those associated with the novation of contracts, and (x) take all necessary action and file all appropriate motions to obtain an order closing the Chapter 11 Cases. In all circumstances, the Liquidating Trustee shall act in the best interests of all beneficiaries of the Liquidating Trust and in furtherance of the purpose of the Liquidating Trust.

(h)    Liquidating Trustee's Tax Power for Debtors

(i)    Following the Effective Date, the Liquidating Trustee shall prepare and file (or cause to be prepared and filed), on behalf of the Debtors, all tax returns, reports, certificates, forms or similar statements or documents (collectively, "*Tax Returns*") required to be filed or that the Liquidating Trustee otherwise deems appropriate, including the filing of amended Tax Returns or requests for refunds.

(ii)    Each of the Debtors shall execute on or prior to the Effective Date a power of attorney authorizing the Liquidating Trustee to correspond with any taxing authorities on behalf of such Debtor and to sign, collect, negotiate, settle and administer tax payments and Tax Returns described in Section 5.7(h)(i) hereof.

(iii)    Following the Effective Date, the Liquidating Trustee shall have the sole right, at the Liquidating Trust's expense, to control, conduct, compromise and settle any tax contest, audit or administrative or court proceeding relating to any liability for taxes of the Debtors.

(iv)    Following the Effective Date, the Liquidating Trust shall be entitled to the entire amount of any refunds and credits (including interest thereon) with respect to or otherwise relating to any taxes of the Debtors, including for any taxable period ending on or prior to, or including, the Effective Date.

(i)    Nontransferability of Liquidating Trust Interests. The Beneficial Interests shall not be certificated and shall not be transferable.

(j)    Cash. The Liquidating Trustee may invest Cash (including any earnings thereon or proceeds therefrom) as permitted by section 345 of the Bankruptcy Code, provided, however, that such investments are investments permitted to be made by a liquidating trust within the meaning of Treasury Regulation section 301.7701-4(d), as reflected therein, or under applicable Internal Revenue Service guidelines, rulings, or other controlling authorities.

(k)     Distribution of Liquidating Trust Assets.  As soon as practicable following the Effective Date, the Liquidating Trustee shall make an initial distribution (the "*Initial Distribution*") to the holders of the Beneficial Interests of all Cash on hand in accordance with the Liquidating Trust Agreement (including any Cash received from the Debtors on the Effective Date, and treating as Cash for purposes of this section any permitted investments under Section 5.7(j) of the Plan) except such amounts (i) as would be distributable to a holder of a Disputed Claim if such Disputed Claim had been Allowed prior to the time of such distribution (but only until such Claim is resolved), (ii) as are reasonably necessary to meet contingent liabilities and to maintain the value of the Liquidating Trust Assets during liquidation, (iii) necessary to pay reasonable incurred and anticipated expenses (including, but not limited to, any taxes imposed on the Liquidating Trust or in respect of the Liquidating Trust Assets), and (iv) necessary to satisfy other liabilities incurred and anticipated by the Liquidating Trust in accordance with this Plan or the Liquidating Trust Agreement.  The Liquidating Trustee is required to distribute to the Liquidating Trust Beneficiaries, at least once per twelve-month period, the Liquidating Trust's net income plus all net proceeds from the sale or other disposition of the Liquidating Trust Assets, except that the Liquidating Trustee may retain an amount of net proceeds or net income reasonably necessary to maintain the value of the Liquidating Trust Assets, to satisfy current and projected expenses of the Liquidating Trust, or to meet Claims and contingent liabilities (including Disputed Claims).

(l)     Costs and Expenses of the Liquidating Trust.  The costs and expenses of the Liquidating Trust, including the fees and expenses of the Liquidating Trustee and its retained professionals, shall be paid out of the Liquidating Trust Assets.  Fees and expenses incurred in connection with the prosecution and settlement of any Claims shall be considered costs and expenses of the Liquidating Trust.  Notice of any cost or expense of the Liquidating Trust above [$_____], that is not reflected in an approved budget, must be provided to the Trust Advisory Board, and such expense must be approved by the Trust Advisory Board or by further order of the Bankruptcy Court.

(m)     Compensation of the Liquidating Trustee.  The individual(s) serving as or comprising the Liquidating Trustee shall be entitled to reasonable compensation approved by the Trust Advisory Board in an amount consistent with that of similar functionaries in similar roles.

(n)     Retention of Professionals by the Liquidating Trustee.  The Liquidating Trustee may retain and compensate attorneys and other professionals to assist in its duties as Liquidating Trustee on such terms as the Liquidating Trustee deems appropriate without Bankruptcy Court approval.  Without limiting the foregoing, the Liquidating Trustee may retain any professional that represented parties in interest in the Chapter 11 Cases.

(o)     Federal Income Tax Treatment of the Liquidating Trust.

(i)     Liquidating Trust Assets Treated as Owned by Creditors. For all U.S. federal income tax purposes, all parties (including, without

limitation, the Debtors, the Liquidating Trustee and the Liquidating Trust Beneficiaries) shall treat the transfer of the Liquidating Trust Assets to the Liquidating Trust as

       (1)     a transfer of the Liquidating Trust Assets directly to those holders of Allowed Claims receiving Beneficial Interests and, to the extent Liquidating Trust Assets are allocable to Disputed Claims, to the Liquidating Trust Claims Reserve, followed by

       (2)     the transfer by such beneficiaries to the Liquidating Trust of the Liquidating Trust Assets (other than the Liquidating Trust Assets allocable to the Liquidating Trust Claims Reserve) in exchange for Beneficial Interests.

Accordingly, those holders of Allowed Claims receiving Beneficial Interests shall be treated for United States federal income tax purposes as the grantors and owners of their respective share of the Liquidating Trust Assets (other than such Liquidating Trust Assets as are allocable to the Liquidating Trust Claims Reserve, discussed below). The foregoing treatment shall also apply, to the extent permitted by applicable law, for state and local income tax purposes.

     (ii)    <u>Tax Reporting</u>.

       (1)     The Liquidating Trustee shall file returns for the Liquidating Trust treating the Liquidating Trust as a grantor trust pursuant to Treasury Regulation section 1.671-4(a) and in accordance with this Section 5.7(o). The Liquidating Trustee shall also annually send to each holder of a Beneficial Interest a separate statement setting forth the holder's share of items of income, gain, loss, deduction or credit and will instruct all such holders to report such items on their United States federal income tax returns or to forward the appropriate information to their respective beneficial holders with instructions to report such items on their United States federal income tax returns. The Liquidating Trustee shall also file (or cause to be filed) any other statements, returns or disclosures relating to the Liquidating Trust that are required by any governmental unit.

       (2)     As soon as possible after the Effective Date, the Liquidating Trustee shall make a good-faith valuation of the Liquidating Trust Assets, and such valuation shall be made available from time to time, to the extent relevant, and shall be used consistently by all parties (including, without limitation, the Debtors, the Liquidating Trustee and the Liquidating Trust Beneficiaries) for all United States federal income tax purposes.

(3)     Allocations of Liquidating Trust taxable income among the Liquidating Trust Beneficiaries (other than taxable income allocable to the Liquidating Trust Claims Reserve) shall be determined by reference to the manner in which an amount of Cash representing such taxable income would be distributed (were such Cash permitted to be distributed at such time) if, immediately prior to such deemed distribution, the Liquidating Trust had distributed all its assets (valued at their tax book value, and other than assets allocable to the Liquidating Trust Claims Reserve) to the holders of the Beneficial Interests, adjusted for prior taxable income and loss and taking into account all prior and concurrent distributions from the Liquidating Trust.  Similarly, taxable loss of the Liquidating Trust shall be allocated by reference to the manner in which an economic loss would be borne immediately after a hypothetical liquidating distribution of the remaining Liquidating Trust Assets.  The tax book value of the Liquidating Trust Assets for this purpose shall equal their fair market value on the Effective Date, adjusted in accordance with tax accounting principles prescribed by the Tax Code, the applicable Treasury Regulations, and other applicable administrative and judicial authorities and pronouncements.

(4)     Subject to definitive guidance from the Internal Revenue Service or a court of competent jurisdiction to the contrary (including the receipt by the Liquidating Trustee of a private letter ruling if the Liquidating Trustee so requests one, or the receipt of an adverse determination by the Internal Revenue Service upon audit if not contested by the Liquidating Trustee), the Liquidating Trustee shall (A) timely elect to treat any Liquidating Trust Assets allocable to, or retained on account of, Disputed Claims (the "***Liquidating Trust Claims Reserve***") as a "disputed ownership fund" governed by Treasury Regulation section 1.468B-9, and (B) to the extent permitted by applicable law, report consistently with the foregoing for state and local income tax purposes.  All parties (including the Liquidating Trustee, the Debtors and the Liquidating Trust Beneficiaries) shall report for United States federal, state and local income tax purposes consistently with the foregoing.

(5)     The Liquidating Trustee shall be responsible for payment, out of the Liquidating Trust Assets, of any taxes imposed on the trust or its assets, including the Liquidating Trust Claims Reserve.  In the event, and to the extent, any Cash retained on account of Disputed Claims in the Liquidating Trust Claims Reserve is insufficient to pay the portion of any such taxes

attributable to the taxable income arising from the assets allocable to, or retained on account of, Disputed Claims, such taxes shall be (i) reimbursed from any subsequent Cash amounts retained on account of Disputed Claims, or (ii) to the extent such Disputed Claims have subsequently been resolved, deducted from any amounts otherwise distributable by the Liquidating Trustee as a result of the resolution of such Disputed Claims.

(6)     The Liquidating Trustee may request an expedited determination of taxes of the Liquidating Trust, including the Liquidating Trust Claims Reserve, or the Debtors under section 505(b) of the Bankruptcy Code for all returns filed for, or on behalf of, the Liquidating Trust or the Debtors for all taxable periods through the dissolution of the Liquidating Trust.

(p)     <u>Dissolution</u>.  The Liquidating Trustee and the Liquidating Trust shall be discharged or dissolved, as the case may be, at such time as (i) all of the Liquidating Trust Assets have been distributed pursuant to the Plan and the Liquidating Trust Agreement, (ii) the Liquidating Trustee determines, in its sole discretion, that the administration of the Liquidating Trust Assets is not likely to yield sufficient additional Liquidating Trust proceeds to justify further pursuit and (iii) all distributions required to be made by the Liquidating Trustee under the Plan and the Liquidating Trust Agreement have been made, but in no event shall the Liquidating Trust be dissolved later than three (3) years from the Effective Date unless the Bankruptcy Court, upon motion within the six month period prior to the third anniversary (or at least six (6) months prior to the end of an extension period), determines that a fixed period extension (not to exceed three years, together with any prior extensions, without a favorable private letter ruling from the Internal Revenue Service that any further extension would not adversely affect the status of the trust as a liquidating trust for United States federal income tax purposes) is necessary to facilitate or complete the recovery and liquidation of the Liquidating Trust Assets.  If at any time the Liquidating Trustee determines, in reliance upon such professionals as the Liquidating Trustee may retain, that the expense of administering the Liquidating Trust so as to make a final distribution to its beneficiaries is likely to exceed the value of the assets remaining in the Liquidating Trust, the Liquidating Trustee may apply to the Bankruptcy Court for authority to (i) reserve any amounts necessary to dissolve the Liquidating Trust, (ii) donate any balance to a charitable organization described in section 501(c)(3) of the Tax Code and exempt from United States federal income tax under section 501(a) of the Tax Code that is unrelated to the Debtors, the Liquidating Trust, and any insider of the Liquidating Trustee, and (iii) dissolve the Liquidating Trust.

(q)     <u>Indemnification of Liquidating Trustee</u>.  The Liquidating Trustee or the individual(s) comprising the Liquidating Trustee, as the case may be, and the Liquidating Trustee's agents and professionals, shall not be liable for actions taken or omitted in its capacity as, or on behalf of, the Liquidating Trustee, except those acts arising out of its or their own willful misconduct or gross negligence, and each shall be

entitled to indemnification and reimbursement for fees and expenses in defending any and all of its actions or inactions in its capacity as, or on behalf of, the Liquidating Trustee, except for any actions or inactions involving willful misconduct or gross negligence. Any indemnification claim of the Liquidating Trustee (and the other parties entitled to indemnification under this subsection) shall be satisfied solely from the Liquidating Trust Assets. The Liquidating Trustee shall be entitled to rely, in good faith, on the advice of its retained professionals.

## ARTICLE VI

## PROVISIONS GOVERNING VOTING AND DISTRIBUTIONS

6.1     *Voting of Claims*.

Each holder of an Allowed Claim in an impaired class of Claims that is entitled to vote on the Plan pursuant to Article III and Article IV of the Plan shall be entitled to vote separately to accept or reject the Plan, as provided in such order as is entered by the Bankruptcy Court establishing procedures with respect to the solicitation and tabulation of votes to accept or reject the Plan, or any other order of the Bankruptcy Court.

6.2     *Nonconsensual Confirmation.*

If any impaired class of Claims entitled to vote shall not accept the Plan by the requisite statutory majority provided in section 1126(c) of the Bankruptcy Code, the Debtors, with the consent of the Creditors' Committee, reserve the right to amend the Plan in accordance with Section 12.4 of the Plan or undertake to have the Bankruptcy Court confirm the Plan under section 1129(b) of the Bankruptcy Code or both. With respect to impaired classes of Claims that are deemed to reject the Plan, the Debtors shall request that the Bankruptcy Court confirm the Plan pursuant to section 1129(b) of the Bankruptcy Code.

6.3     *Distributions on Allowed General Unsecured Claims, Allowed Senior Noteholder Claims and Allowed Junior Noteholder Claims*.

Distributions to holders of Allowed Senior Noteholder Claims, Allowed Junior Noteholder Claims, and Allowed General Unsecured Claims shall be aggregated and treated as a single claim. At the written request of the Disbursing Agent any creditor holding multiple Allowed Senior Noteholder Claims, Allowed Junior Noteholder Claims, or Allowed General Unsecured Claims shall provide to the Disbursing Agent a single address as to which any distributions shall be sent.

6.4    ***Date of Distributions.***

In the event that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date.

6.5    ***Disbursing Agent.***

All distributions under the Plan shall be made by the Liquidating Trustee as Disbursing Agent or such other entity designated by the Liquidating Trustee as a Disbursing Agent.

6.6    ***Rights and Powers of Disbursing Agent.***

The Disbursing Agent shall be empowered to (a) effect all actions and execute all agreements, instruments and other documents necessary to perform its duties under the Plan, (b) make all distributions contemplated hereby, (c) employ professionals to represent it with respect to its responsibilities and (d) exercise such other powers as may be vested in the Disbursing Agent by order of the Bankruptcy Court, pursuant to the Plan or as deemed by the Disbursing Agent to be necessary and proper to implement the provisions hereof.

6.7    ***Expenses of Disbursing Agent.***

Except as otherwise ordered by the Bankruptcy Court, any reasonable fees and expenses incurred by the Disbursing Agent (including, without limitation, taxes and reasonable attorneys fees and expenses) on or after the Effective Date shall be paid in Cash by the Liquidating Trust in the ordinary course of business.

6.8    ***Lists of Record Holders***

Within ten (10) days after the Effective Date, the Indenture Trustees, as applicable, shall provide the Liquidating Trustee with lists of the names and addresses of the record holders of the Series A Notes, the Series B Notes and the Series C Notes as of the Effective Date, which lists may be used by the Liquidating Trustee for the purposes of all distributions.

6.9    ***Delivery of Distributions.***

Subject to Bankruptcy Rule 9010, all distributions to any holder of an Allowed Claim or Allowed Administrative Expense Claim shall be made at the address of such holder (i) as set forth on the Schedules filed with the Bankruptcy Court, (ii) on the books and records of the Debtors or their agents, or (iii) as set forth on the lists of record holders of the Series A Notes, the Series B Notes or the Series C Notes provided by the Indenture Trustees, as applicable, unless the Debtors or the Liquidating Trustee have been notified in writing of a change of address, including, without limitation, by the

filing of a proof of Claim by such holder that contains an address for such holder different than the address of such holder as set forth on the Schedules.  Nothing in this Plan shall require the Liquidating Trustee to attempt to locate any holder of an Allowed Claim.

6.10    *Unclaimed Distributions.*

All distributions under the Plan that are unclaimed for a period of one (1) year after distribution thereof shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code and revested in the Liquidating Trust and any entitlement of any holder of any Claims to such distributions shall be extinguished and forever barred.  The Liquidating Trustee shall have no further obligation to make any distribution to the holder of such Claim on account of such Claim, and any entitlement of any holder of such Claim to any such distributions shall be extinguished and forever barred; provided, however, that the holder of such Claim may receive future distributions on account of such Claim by contacting the Liquidating Trustee at some point prior to the final distribution from the Liquidating Trust.

6.11    *Distribution Record Date.*

With respect to holders of all General Unsecured Claims against the Debtors, on the Distribution Record Date, the Claims register shall be closed and any transfer of any Claim therein shall be prohibited.  The Debtors and the Liquidating Trust shall have no obligation to recognize any transfer of any such Claims occurring after the close of business on such date.

6.12    *Manner of Payment.*

At the option of the Disbursing Agent, any Cash payment to be made hereunder may be made by a check or wire transfer or as otherwise required or provided in applicable agreements.  All distributions of Cash to the creditors of each of the Debtors under the Plan shall be made by, or on behalf of, the applicable Debtor.

6.13    *Cash Distributions.*

Except with respect to the final distribution from the Liquidating Trust, no payment of Cash less than one hundred dollars ($100) shall be made to any holder of an Allowed Claim unless a request therefor is made in writing to the Liquidating Trustee.

6.14    *Setoffs and Recoupment.*

The Debtors may, but shall not be required to, setoff against or recoup from any Claim and from any payments to be made pursuant to the Plan in respect of such Claim any claims of any nature whatsoever that the Debtors may have against the claimant, but neither the failure to do so nor the allowance of any Claim hereunder shall

constitute a waiver or release by the Debtors or the Liquidating Trustee of any such claim they may have against such claimant.

6.15    *Interest on Claims.*

Unless otherwise specifically provided for in any of the Interim Cash Collateral Orders, the Final Cash Collateral Order, the Plan or the Confirmation Order, postpetition interest shall not accrue or be paid on any Claims, and no holder of a Claim shall be entitled to interest accruing on or after the Commencement Date on any Claim. Unless otherwise specifically provided for in the Plan or the Confirmation Order, interest shall not accrue or be paid upon any Claim in respect of the period from the Commencement Date to the date a final distribution is made thereon if and after such Claim becomes an Allowed Claim.

6.16    *No Distribution In Excess of Allowed Amounts.*

Notwithstanding anything to the contrary herein, no holder of an Allowed Claim shall receive in respect of such Claim any distribution of a value as of the Effective Date in excess of the Allowed amount of such Claim.

6.17    *Distributions After the Effective Date.*

Distributions made after the Effective Date to holders of Disputed Claims that are not Allowed Claims as of the Effective Date but which later become Allowed Claims shall be deemed to have been made on the Effective Date.

6.18    *Allocation of Plan Distributions Between Principal and Interest.*

To the extent that any Allowed Claim entitled to a distribution under the Plan consists of indebtedness and other amounts (such as accrued but unpaid interest thereon), such distribution shall be allocated first to the principal amount of the Claim (as determined for United States federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of the Claim, to such other amounts.

## ARTICLE VII

## PROCEDURES FOR TREATING DISPUTED CLAIMS

7.1    *Objections*.

Except as otherwise provided in Section 7.2, as of the Effective Date, objections to, and requests for estimation of, Administrative Expense Claims and Claims against the Debtors may be interposed and prosecuted only by the Liquidating Trustee. Such objections and requests for estimation shall be served on the respective claimant and filed with the Bankruptcy Court on or shall be served and filed (i) on or before the one-hundred-and-twentieth (120th) day following the later of (x) the Effective Date and (y) the date that a proof of Claim is filed or amended or a Claim is otherwise asserted or

amended in writing by or on behalf of a holder of such Claim, or (ii) such later date as may be fixed by the Bankruptcy Court whether fixed before or after the date specified in clauses (x) and (y) above.

### 7.2 *No Distributions Pending Allowance*.

Notwithstanding any other provision hereof, if any portion of a Claim or Administrative Expense Claim is Disputed, no payment or distribution provided hereunder shall be made on account of such Claim or Administrative Expense Claim unless and until such Disputed Claim or Disputed Administrative Expense Claim becomes Allowed.

### 7.3 *Distributions After Allowance.*

To the extent that a Disputed Claim or Disputed Administrative Expense Claim ultimately becomes an Allowed Claim or Allowed Administrative Expense Claim, distributions (if any) shall be made to the holder of such Allowed Claim or Allowed Administrative Expense Claim in accordance with the provisions of the Plan.

### 7.4 *Resolution of Administrative Expense Claims and Claims.*

On and after the Effective Date, the Liquidating Trustee shall have the authority to compromise, settle, otherwise resolve or withdraw any objections to Administrative Expense Claims and Claims against the Debtors and Disputed Administrative Expense Claims and Claims against the Debtors, subject to the consent of the Trust Advisory Board for any Administrative Expense Claim and Claim over [$_____].

### 7.5 *Estimation of Claims.*

(a) The Debtors and, after the Effective Date, the Liquidating Trustee, may at any time request that the Bankruptcy Court estimate any Contingent Claim, Unliquidated Claim or Disputed Claim pursuant to section 502(c) of the Bankruptcy Code regardless of whether any of the Debtors or any other Person previously objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court will retain jurisdiction to estimate any Claim at any time during litigation concerning any objection to any Claim, including, without limitation, during the pendency of any appeal relating to any such objection. In the event that the Bankruptcy Court estimates any Contingent Claim, Unliquidated Claim or Disputed Claim, the amount so estimated shall constitute either the Allowed amount of such Claim or a maximum limitation on such Claim, as determined by the Bankruptcy Court. If the estimated amount constitutes a maximum limitation on the amount of such Claim, the Debtors or the Liquidating Trustee, as the case may be, may pursue supplementary proceedings to object to the allowance of such Claim. All of the aforementioned objection, estimation and resolution procedures are intended to be cumulative and not

exclusive of one another.  Claims may be estimated and subsequently compromised, settled, withdrawn or resolved by any mechanism approved by the Bankruptcy Court.

(b)  The amount of any Trust Assets allocable to, or retained on account of, Disputed Claims in the Liquidating Trust Claims Reserve shall be determined based on the estimation of such Disputed Claim pursuant to subsection (a) of this Section 7.5.

7.6  *Interest*.

To the extent that a Disputed Claim becomes an Allowed Claim after the Effective Date, the holder of such Claim shall not be entitled to any interest thereon.

## ARTICLE VIII

## EXECUTORY CONTRACTS AND UNEXPIRED LEASES

8.1  *Assumption or Rejection of Executory Contracts and Unexpired Leases.*

Pursuant to sections 365(a) and 1123(b)(2) of the Bankruptcy Code, all executory contracts and unexpired leases that exist between the Debtors and any person or entity shall be deemed rejected by the Debtors as of the Effective Date, except for any executory contract or unexpired lease (i) that has been assumed or rejected pursuant to an order of the Bankruptcy Court entered prior to the Effective Date and (ii) as to which a motion for approval of the assumption of such executory contract or unexpired lease has been filed and served prior to the Confirmation Date, (iii) that is subject to deferred rejection in accordance with Section 8.2, or (iv) that is specifically designated as a contract or lease to be assumed on Schedules 8.01(A) (executory contracts) or 8.01(B) (unexpired leases), which schedules shall be contained in the Plan Supplement; *provided, however*, that the Debtors reserve the right, on or prior to the Confirmation Date, to amend Schedules 8.01(A) and 8.01(B) to delete any executory contract or unexpired lease therefrom or add any executory contract or unexpired lease thereto, in which event such executory contract(s) or unexpired lease(s) shall be deemed to be, respectively, either rejected or assumed as of the Effective Date, or subject to deferred rejection as applicable.  The Debtors shall provide notice of any amendments to Schedules 8.01(A) and/or 8.01(B) to the parties to the executory contracts and unexpired leases affected thereby.  The listing of a document on Schedules 8.01(A) or 8.01(B) shall not constitute an admission by the Debtors that such document is an executory contract or an unexpired lease or that the Debtors have any liability thereunder.

8.2  *Deferred Rejection of Executory Contracts.*

Pursuant to sections 365(a) and 1123(b)(2) of the Bankruptcy Code, and subject to the agreement of the parties to such executory contract, those executory contracts specifically designated as a contract subject to deferred rejection on Schedule

8.02 shall be rejected by the Debtors as of the date set forth on Schedule 8.02 or as of a date agreed to by the Debtors and the parties to the applicable executory contract. Schedule 8.02 shall be contained in the Plan Supplement; *provided*, *however*, that the Debtors reserve the right, on or prior to the Confirmation Date, to amend Schedule 8.02 to delete any executory contract therefrom or add any executory contract thereto, in which event such executory contract(s) shall become, or shall no longer be, subject to deferred rejection as of the Effective Date. The Debtors shall provide notice of any amendments to Schedule 8.02 to the parties to the executory contracts affected thereby. The listing of a document on Schedule 8.02 shall not constitute an admission by the Debtors that such document is an executory contract or that the Debtors have any liability thereunder.

8.3 ***Approval of Assumption, Rejection or Deferred Rejection of Executory Contracts and Unexpired Leases.***

Entry of the Confirmation Order shall, subject to and upon the occurrence of the Effective Date, constitute (a) the approval, pursuant to sections 365(a) and 1123(b)(2) of the Bankruptcy Code, of the assumption of the executory contracts and unexpired leases assumed pursuant to Section 8.1 of the Plan, (b) the extension of time, pursuant to section 365(d)(4) of the Bankruptcy Code, within which the Debtors may assume, assume and assign or reject the unexpired nonresidential leases through the date of entry of an order approving the assumption, assumption and assignment or rejection of such executory contracts and unexpired leases, (c) the approval, pursuant to sections 365(a) and 1123(b)(2) of the Bankruptcy Code, of the rejection of the executory contracts and unexpired leases rejected pursuant to Section 8.1 of the Plan, and (d) the approval, pursuant to sections 365(a) and 1123(b)(2) of the Bankruptcy Code, of the deferred rejection of the executory contracts rejected pursuant to Section 8.2 of the Plan.

8.4 ***Inclusiveness***.

Unless otherwise specified on Schedules 8.01(A), 8.01(B) or 8.02 of the Plan Supplement, each executory contract and unexpired lease listed or to be listed therein shall include any and all modifications, amendments, supplements, restatements or other agreements made directly or indirectly by any agreement, instrument or other document that in any manner affects such executory contract or unexpired lease, without regard to whether such agreement, instrument or other document is listed on Schedules 8.01(A), 8.01(B) or 8.02.

8.5 ***Cure of Defaults***.

Except to the extent that different treatment has been agreed to by the non-debtor party or parties to any executory contract or unexpired lease on Schedule 8.01(A) or 8.01(B) to be assumed pursuant to Section 8.1 of the Plan, the Debtors shall, pursuant to the provisions of sections 1123(a)(5)(G) and 1123(b)(2) of the Bankruptcy Code and consistent with the requirements of section 365 of the Bankruptcy Code, within at least (20) days prior to the later of (a) the hearing on the Debtors' motion for assumption or

assumption and assignment and (b) the Confirmation Hearing, file with the Bankruptcy Court and serve by first class mail on each non-debtor party to such executory contracts or unexpired leases pursuant to Section 8.1 of the Plan, a notice, which shall include, on Schedule 8.01(A) or 8.01(B) the cure amount as to each executory contract or unexpired lease to be assumed.  The parties to such executory contracts or unexpired leases to be assumed or assumed and assigned by the Debtors shall have until the objection deadline to the Plan to file and serve any objection to assumption or the cure amounts listed by the Debtors.  If there are any objections filed, the Bankruptcy Court shall hold a hearing on a date to be set by the Bankruptcy Court.  Notwithstanding Section 8.1 of the Plan, the Debtors shall retain their rights to reject any of their executory contracts or unexpired leases that are subject to a dispute concerning amounts necessary to cure any defaults through the Effective Date.

8.6     ***Bar Date for Filing Proofs of Claim Relating to Executory Contracts and Unexpired Leases Rejected Pursuant to the Plan.***

Proofs of Claim for damages arising out of the rejection of an executory contract or unexpired lease pursuant to Section 8.1 must be filed with the Bankruptcy Court and served upon the attorneys for the Debtors or on and after the Effective Date, the Liquidating Trustee, no later than thirty (30) days after the later of (a) notice of entry of an order approving the rejection of such executory contract or unexpired lease, (b) notice of entry of the Confirmation Order, (c) notice of an amendment to Schedules 8.01(A) or (B) of the Plan Supplement (solely with respect to the party directly affected by such modification), or (d) notice of the Debtors' election to reject under Section 8.1 of the Plan.  **All such proofs of Claim not filed within such time will be forever barred from assertion against the Debtors and their estates or the Liquidating Trust and their property.**

8.7     ***Bar Date for Filing Proofs of Claim Relating to the Deferred Rejection of Executory Contracts.***

Proofs of Claim for damages arising out of the deferred rejection of an executory contract pursuant to Section 8.2 must be filed with the Bankruptcy Court and served upon the attorneys for the Debtors or on and after the Effective Date, the Liquidating Trustee, no later than thirty (30) days after the Effective Date.  Damages resulting from such deferred rejection shall be calculated based on the rejection damages as of the earlier of (a) the date of rejection, or (b) thirty (30) days after the Effective Date.  **All such proofs of Claim not filed within such time will be forever barred from assertion against the Debtors and their estates or the Liquidating Trust and their property.**

8.8     ***Indemnification and Reimbursement Obligations***.

(a)     Subject to the occurrence of the Effective Date, the obligations of the Debtors, as of the Commencement Date, to indemnify, defend, reimburse, or limit the liability of directors, officers, or employees, against any claims, costs, liabilities or causes

of action as provided in the Debtors' articles of organization, certificates of incorporation, bylaws, other organizational documents, or applicable law, shall, to the extent such indemnification, defense, reimbursement, or limitation is owed in connection with one or more events or omissions occurring before the Commencement Date, be (i) assumed and paid only to the extent of any applicable insurance coverage, and (ii) to the extent a proof of claim has been timely filed, treated as General Unsecured Claims to the extent such claims are not covered by any applicable insurance. Nothing contained herein shall affect the rights of such directors, officers or employees under any insurance policy or coverage with respect to such claims, costs, liabilities or causes of action.

(b)     Assumption of D&O Insurance Policies: For the avoidance of doubt, to the extent of the coverage provided by the D&O Insurance Policies, the Debtors would be fully liable for indemnification, defense, reimbursement, or limitation in connection with claims covered by the D&O Insurance Policies; as such, pursuant to sections 365(a) and 1123(b)(2) of the Bankruptcy Code, the D&O Insurance Policies, to the extent the contract providing for such is determined to be an executory contract, shall be deemed assumed by the Debtors and transferred to the Liquidating Trust pursuant to Section 5.7(d) of the Plan.


# ARTICLE IX

# CONDITIONS PRECEDENT TO THE EFFECTIVE DATE

### 9.1     *Conditions Precedent to Effectiveness.*

The Effective Date shall not occur and the Plan shall not become effective unless and until the following conditions are satisfied in full or waived in accordance with Section 9.2 of the Plan:

(a)     The Confirmation Order, in form and substance acceptable to the Debtors and the Creditors' Committee shall have been entered and is a Final Order;

(b)     All actions and all agreements, instruments or other documents necessary to implement the terms and provisions of the Plan are effected or executed and delivered, as applicable, in form and substance satisfactory to the Debtors; and

(c)     All authorizations, consents and regulatory approvals, if any, required by the Debtors in connection with the consummation of the Plan are obtained and not revoked.

### 9.2     *Waiver of Conditions.*

Each of the conditions precedent in Section 9.1 hereof may be waived, in whole or in part, upon written notice, signed by the Debtors and the Creditors'

Committee. Any such waivers may be effected at any time, without notice, without leave or order of the Bankruptcy Court and without any formal action.

9.3     *Satisfaction of Conditions.*

Except as expressly provided or permitted in the Plan, any actions required to be taken on the Effective Date shall take place and shall be deemed to have occurred simultaneously, and no such action shall be deemed to have occurred prior to the taking of any other such action. In the event that one or more of the conditions specified in Section 9.1 of the Plan have not occurred or otherwise been waived pursuant to Section 9.2 of the Plan, (a) the Confirmation Order shall be vacated, (b) the Debtors and all holders of Claims and interests, including any Equity Interests, shall be restored to the status quo ante as of the day immediately preceding the Confirmation Date as though the Confirmation Date never occurred and (c) the Debtors' obligations with respect to Claims and Equity Interests shall remain unchanged and nothing contained herein shall constitute or be deemed a waiver or release of any Claims or Equity Interests by or against the Debtors or any other person or to prejudice in any manner the rights of the Debtors or any person in any further proceedings involving the Debtors.

## ARTICLE X

## EFFECT OF CONFIRMATION

10.1     *Post-Effective Date Assets.*

On and after the Effective Date, the Liquidating Trustee may dispose of the assets of the Liquidating Trust free of any restrictions of the Bankruptcy Code, but in accordance with the provisions of the Plan and the Liquidating Trust Agreement.

10.2     *Binding Effect.*

Subject to the occurrence of the Effective Date, on and after the Confirmation Date, the provisions of the Plan shall bind any holder of a Claim against, or Equity Interest in, the Debtors and such holder's respective successors and assigns, whether or not the Claim or interests including any Equity Interest of such holder is impaired under the Plan, whether or not such holder has accepted the Plan and whether or not such holder is entitled to a distribution under the Plan.

10.3     *Termination of Equity Interests.*

Except as provided in the Plan, the rights afforded in and the payments and distributions to be made under the Plan shall terminate all Equity Interests. Except as provided in the Plan, upon the Effective Date, Equity Interests shall be, and shall be deemed to be, terminated, and all holders of such Equity Interests shall be precluded and enjoined from asserting against the Liquidating Trust, its successors or assignees or any of its assets or properties, any other or further Claim or Equity Interest based upon any

act or omission, transaction or other activity of any kind or nature that occurred prior to the Effective Date, whether or not such holder has filed a proof of Claim or proof of Equity Interest and whether or not the facts or legal bases therefor were known or existed prior to the Effective Date.

### 10.4    *Injunction or Stay.*

Except as otherwise expressly provided herein or in the Confirmation Order, all Persons or entities who have held, hold or may hold Claims against or Equity Interests in the Debtors are permanently enjoined, from and after the Effective Date, from (a) commencing or continuing in any manner any action or other proceeding of any kind on any such Claim or Equity Interest against any of the Debtors or the Liquidating Trust, (b) the enforcement, attachment, collection or recovery by any manner or means of any judgment, award, decree or order against any Debtor or the Liquidating Trust with respect to such Claim or Equity Interest, (c) creating, perfecting or enforcing any encumbrance of any kind against any Debtor or the Liquidating Trust or against the property or interests in property of any Debtor or the Liquidating Trust with respect to such Claim or Equity Interest, (d) asserting any right of setoff, subrogation or recoupment of any kind against any obligation due to any Debtor or the Liquidating Trust or against the property or interests in property of any Debtor or the Liquidating Trust with respect to such Claim or Equity Interest, except as contemplated or allowed by the Plan, (e) acting or proceeding in any manner in any place whatsoever, that does not conform to or comply with the provisions of the Plan, (f) commencing, continuing, or asserting in any manner any action or other proceeding of any kind with respect to any claims which are extinguished or released pursuant to the Plan, and (g) taking any actions to interfere with the implementation or consummation of the Plan.

### 10.5    *Terms of Injunction or Stay.*

Unless otherwise provided in the Confirmation Order, all injunctions or stays arising under or entered during the Chapter 11 Cases under section 105 or 362 of the Bankruptcy Code, or otherwise, that are in existence on the Confirmation Date shall remain in full force and effect until the Effective Date, provided, however, that no such injunction or stay shall preclude enforcement of parties' rights under the Plan and the related documents.

### 10.6    *Reservation of Causes of Action/Reservation of Rights.*

(a)    Except as provided in the Plan, nothing contained in the Plan (including in Section 6.14) or the Confirmation Order shall be deemed to be a waiver or the relinquishment of any rights or causes of action that the Debtors or the Liquidating Trust may have or which the Liquidating Trust may choose to assert on behalf of the Debtors' estates under any provision of the Bankruptcy Code or any applicable nonbankruptcy law, including, without limitation, (i) any and all Claims against any person or entity, to the extent such person or entity asserts a crossclaim, counterclaim, and/or Claim for setoff which seeks affirmative relief against the Debtors, the Liquidating

Trust their officers, directors, or representatives and (ii) the turnover of any property of the Debtors' Estates.

(b)     Nothing contained in the Plan or the Confirmation Order shall be deemed to be a waiver or relinquishment of any claim, cause of action, right of setoff, or other legal or equitable defense which the Debtors had immediately prior to the Commencement Date, against or with respect to any Claim left unimpaired by the Plan. The Liquidating Trust shall have, retain, reserve, and be entitled to assert all such claims, causes of action, rights of setoff, and other legal or equitable defenses which the Debtors had immediately prior to the Commencement Date fully as if the Chapter 11 Cases had not been commenced, and all of the Debtors' legal and equitable rights respecting any Claim left Unimpaired by the Plan may be asserted after the Confirmation Date by the Liquidating Trust to the same extent as if the Chapter 11 Cases had not been commenced.

10.7     *Exculpation.*

**Notwithstanding anything herein to the contrary, as of the Effective Date none of the Debtors, the Liquidating Trust, the Liquidating Trustee, the members of the Creditors' Committee (solely in their capacity as such), and their respective officers, directors, employees, managing directors, accountants, financial advisors, investment bankers, agents, restructuring advisors, and attorneys, and each of their respective agents and representatives (but solely in their capacities as such) shall have or incur any liability for any Claim, cause of action or other assertion of liability for any act taken or omitted to be taken in connection with, or arising out of, the Chapter 11 Cases, the formulation, dissemination, confirmation, consummation or administration of the Plan, property to be distributed under the Plan or any other act or omission in connection with the Chapter 11 Cases, the Plan (or any prior proposed version of the Plan), the Disclosure Statement or any contract, instrument, document or other agreement related thereto; and such claims shall be deemed expressly waived and forever relinquished as of the Effective Date; provided, however, that the foregoing shall not affect the liability of any Person that otherwise would result from any such act or omission to the extent such act or omission is determined by a Final Order to have constituted willful misconduct, gross negligence, intentional fraud, or criminal conduct of any such person or entity.**

10.8     *Limited Releases.*

(a)     **Effective as of the Confirmation Date but subject to the occurrence of the Effective Date, and in consideration of the services of the present and former directors, officers, members, employees, managing directors, affiliates, agents, financial advisors, restructuring advisors, attorneys and representatives of or to the Debtors, the Secured Lenders, and the members of the Creditors' Committee, who acted in such capacities after the Commencement Date (but not limited to such postpetition actions); (x) the Debtors and the Secured Lenders; (y) each holder of a Claim that votes to accept the Plan (or is deemed to accept the Plan) and (z) to the fullest extent permissible under applicable law, as such law may**

be extended or integrated after the Effective Date, each holder of a Claim or Equity Interest that does not vote to accept the Plan, shall release unconditionally and forever (a) each present or former director, officer, member, employee, affiliate, agent, financial advisor, restructuring advisor, attorney and representative (and their respective affiliates) of the Debtors, the Secured Lenders (solely in that capacity), and the members of the Creditors' Committee (solely in that capacity) who acted in such capacity after the Commencement Date, and each of their respective officers, directors, agents, advisors, and professionals (but, in each case, solely in their capacities as such) from any and all Claims or causes of action whatsoever in connection with, related to, or arising out of the Debtors' restructuring or reorganization efforts on or after January 18, 2008, the Chapter 11 Cases, the pursuit of confirmation of the Plan, the consummation thereof, the administration thereof or the property to be distributed thereunder; and (b) each present or former director of any of the Debtors' non-debtor subsidiaries organized or incorporated outside of the United States of America from any and all Claims or causes of action whatsoever through the Effective Date; *provided, however*, that the foregoing shall not operate as a waiver of or release from any causes of action arising out of the willful misconduct, gross negligence, intentional fraud, or criminal conduct of any such person or entity.

(b)      Except as provided in Section 10.8(a) of the Plan, nothing contained in any other section of the Plan shall be deemed a release waiver or discharge of any claims, demands, debts, rights, causes of action or liabilities held by the estates or the Liquidating Trust (pursuant to Section 5.7 of the Plan) against any current or former directors or officers of the Debtors for fraud, negligence, corporate waste, abuse, mismanagement, or for breach of fiduciary or other duties under Delaware, New York, or other applicable state or federal law, including, but not limited to, any act or failure to act in connection with: (i) from January 2007 through and including January 18, 2008, a potential transaction for the merger, sale or acquisition of the BearingPoint or any component part thereof; (ii) the merger and/or acquisition of additional foreign and/or domestic subsidiaries from December 1999 through and including January 18, 2008; (iii) the operations of BearingPoint, including, without limitation, accounting, internal controls, and financial reporting from January 2000 through and including January 18, 2008; and (iv) the Debtors' secured debt financings, including, without limitation, credit facilities entered into in 2004, 2005 and 2007.

10.9      *Causes of Action/Avoidance Actions/Objections.*

Other than any releases granted herein and by the Confirmation Order and by Final Order of the Bankruptcy Court, as applicable, from and after the Effective Date, the Liquidating Trust shall have the right to prosecute any and all Causes of Action including, but not limited to, any and all avoidance or equitable subordination actions, recovery causes of action and objections to Claims under sections 105, 502, 510, 542 through 551, and 553 of the Bankruptcy Code that belong to the Debtors or Debtors in Possession.

# ARTICLE XI

# RETENTION OF JURISDICTION

The Bankruptcy Court shall have exclusive jurisdiction of all matters arising out of, or related to, the Chapter 11 Cases and the Plan pursuant to, and for the purposes of, sections 105(a) and 1142 of the Bankruptcy Code, including, without limitation:

(a)     To hear and determine pending applications for the assumption or rejection of executory contracts or unexpired leases, the allowance of Claims and Administrative Expense Claims resulting therefrom and any disputes with respect to executory contracts or unexpired leases relating to facts and circumstances arising out of or relating to the Chapter 11 Cases;

(b)     To determine any and all adversary proceedings, applications and contested matters;

(c)     To ensure that distributions to holders of Allowed Claims and Equity Interests are accomplished as provided herein;

(d)     To consider Claims or the allowance, classification, priority, compromise, estimation, or payment of any Claim, Administrative Expense Claim, or Interest;

(e)     To hear and determine all applications for compensation and reimbursement of expenses under sections 330, 331 and 503(b) of the Bankruptcy Code;

(f)     To hear and determine any timely objections to, or requests for estimation of Disputed Administrative Expense Claims and Disputed Claims, in whole or in part;

(g)     To enter and implement such orders as may be appropriate in the event the Confirmation Order is for any reason stayed, revoked, modified or vacated;

(h)     To resolve disputes as to the ownership of any Administrative Expense Claim, Claim or Equity Interest;

(i)     To issue such orders in aid of execution of the Plan, to the extent authorized by section 1142 of the Bankruptcy Code;

(j)     To consider any amendments to or modifications of the Plan or to cure any defect or omission, or reconcile any inconsistency, in any order of the Bankruptcy Court, including, without limitation, the Confirmation Order;

(k)     To hear and determine disputes or issues arising in connection with the interpretation, implementation or enforcement of the Plan, the Confirmation Order,

any transactions or payments contemplated hereby, any agreement, instrument, or other document governing or relating to any of the foregoing or any settlement approved by the Bankruptcy Court;

(l)　To hear and determine matters concerning state, local and federal taxes in accordance with sections 346, 505 and 1146 of the Bankruptcy Code (including, without limitation, any request by the Debtors prior to the Effective Date or request by the Liquidating Trust after the Effective Date for an expedited determination of tax under section 505(b) of the Bankruptcy Code);

(m)　To hear and determine all disputes involving the existence, scope and nature of the discharges granted under the Plan, the Confirmation Order or the Bankruptcy Code;

(n)　To issue injunctions and effect any other actions that may be necessary or appropriate to restrain interference by any person or entity with the consummation, implementation or enforcement of the Plan, the Confirmation Order or any other order of the Bankruptcy Court;

(o)　To determine such other matters and for such other purposes as may be provided in the Confirmation Order;

(p)　To hear and determine any rights, Claims or causes of action held by or accruing to the Debtors pursuant to the Bankruptcy Code or pursuant to any federal or state statute or legal theory;

(q)　To recover all assets of the Debtors and property of the Debtors' estates, wherever located;

(r)　To hear disputes concerning the Liquidating Trust;

(s)　To enter a final decree closing the Chapter 11 Cases;

(t)　To hear any other matter not inconsistent with the Bankruptcy Code.

# ARTICLE XII

# MISCELLANEOUS PROVISIONS

## 12.1　*Effectuating Documents and Further Transactions.*

On or before the Effective Date, and without the need for any further order or authority, the Debtors shall file with the Bankruptcy Court or execute, as appropriate, such agreements and other documents that are in form and substance satisfactory to them as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.  As of the effective Date, the Liquidating Trust is authorized to

execute, deliver, file, or record such contracts, instruments, releases, indentures and other agreements or documents and take such actions as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan and any securities issued pursuant to the Plan.

## 12.2 *Withholding and Reporting Requirements.*

In connection with the Plan and all instruments issued in connection therewith and distributed thereon, any party issuing any instrument or making any distribution under the Plan shall comply with all applicable withholding and reporting requirements imposed by any United States federal, state or local tax law or taxing authority, and all distributions under the Plan shall be subject to any such withholding or reporting requirements. Notwithstanding the above, each holder of an Allowed Claim that is to receive a distribution under the Plan shall have the sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed on such holder by any governmental unit, including income, withholding and other tax obligations, on account of such distribution. Any party issuing any instrument or making any distribution under the Plan has the right, but not the obligation, to not make a distribution until such holder has made arrangements satisfactory to such issuing or disbursing party for payment of any such tax obligations.

## 12.3 *Corporate Action.*

On the Effective Date, all matters provided for under the Plan that would otherwise require approval of the managers or directors of one or more of the Debtors, as the case may be, shall be in effect from and after the Effective Date pursuant to the applicable general corporation law of the states in which the Debtors are incorporated or established, without any requirement of further action by the managers or directors of the Debtors.

## 12.4 *Modification of Plan.*

Alterations, amendments or modifications of or to the Plan may be proposed in writing by the Debtors at any time prior to the Confirmation Date, provided that (a) the Debtors have provided the Creditors' Committee with notice of such alterations, amendments or modifications and the Creditors' Committee has consented; (b) the Plan, as altered, amended or modified satisfies the conditions of sections 1122 and 1123 of the Bankruptcy Code; and (c) the Debtors shall have complied with section 1125 of the Bankruptcy Code. The Plan may be altered, amended or modified at any time after the Confirmation Date and before substantial consummation, provided that (x) the Debtors have provided the Creditors' Committee with notice of such alterations, amendments or modifications and the Creditors' Committee has consented; (y) the Plan, as altered, amended or modified, satisfies the requirements of sections 1122 and 1123 of the Bankruptcy Code; and (z) the Bankruptcy Court, after notice and a hearing, confirms the Plan, as altered, amended or modified, under section 1129 of the Bankruptcy Code and the circumstances warrant such alterations, amendments or modifications. A holder

of a Claim that has accepted the Plan shall be deemed to have accepted the Plan, as altered, amended or modified, if the proposed alteration, amendment or modification does not materially and adversely change the treatment of the Claim of such holder.

Prior to the Effective Date, the Debtors may make appropriate technical adjustments and modifications to the Plan, subject to the consent of the Secured Lenders' Representative, without further order or approval of the Bankruptcy Court, provided that such technical adjustments and modifications do not adversely affect in a material way the treatment of holders of Claims or Equity Interests and the Secured Lenders' Representative has consented to such alteration or modification.

For the avoidance of doubt, the foregoing shall not effect a waiver of any rights that any party may have with respect to modification of the Plan under section 1127 of the Bankruptcy Code.

## 12.5 *Revocation or Withdrawal of the Plan.*

The Debtors, in consultation with the Creditors' Committee, reserve the right to revoke or withdraw the Plan prior to the Confirmation Date. If the Debtors revoke or withdraw the Plan prior to the Confirmation Date, then the Plan shall be deemed null and void. In such event, nothing contained herein shall constitute or be deemed a waiver or release of any Claims or Equity Interests by or against the Debtors or any other person or to prejudice in any manner the rights of the Debtors or any person in any further proceedings involving the Debtors.

## 12.6 *Continuing Exclusivity Period.*

Subject to further order of the Bankruptcy Court, until the Effective Date, the Debtors shall, pursuant to section 1121 of the Bankruptcy Code, retain the exclusive right to amend the Plan and to solicit acceptances thereof.

## 12.7 *Plan Supplement.*

The Plan Supplement and the documents contained therein shall be in form, scope and substance satisfactory to the Debtors and reasonably satisfactory to the Creditors' Committee, shall be filed with the Bankruptcy Court no later than five (5) Business Days before the deadline for voting to accept or reject the Plan, provided that the documents included therein may thereafter be amended and supplemented prior to execution, so long as no such amendment or supplement materially affects the rights of holders of Claims. The Plan Supplement and the documents contained therein are incorporated into and made a part of the Plan as if set forth in full herein.

12.8 **_Payment of Statutory Fees._**

    All fees payable under section 1930 of chapter 123 of title 28 of the United States Code, as determined by the Bankruptcy Court at the Confirmation Hearing, shall be paid on the Effective Date.

12.9 **_Post-Confirmation Date Professional Fees and Expenses._**

    From and after the Confirmation Date, the Liquidating Trust, shall, in the ordinary course of business and without the necessity for any approval by the Bankruptcy Court, pay the reasonable fees and expenses of professional persons thereafter incurred by them.

12.10 **_Dissolution of the Creditors' Committee._**

    On the Effective Date, any Creditors' Committee appointed in the Chapter 11 Cases shall be dissolved and the members thereof shall be released and discharged of and from all further authority, duties, responsibilities and obligations related to and arising from and in connection with the Chapter 11 Cases, and the retention or employment of such Creditors' Committee's attorneys, accountants and other agents, if any, shall terminate other than for purposes of (i) filing and prosecuting applications for final allowances of compensation for professional services rendered and reimbursement of expenses incurred in connection therewith, and (ii) reviewing and objecting to the applications of other parties for the allowance of compensation for professional services rendered and reimbursement of expenses incurred in connection therewith.

12.11 **_Exemption from Transfer Taxes._**

    Pursuant to section 1146(a) of the Bankruptcy Code, the issuance, transfer or exchange of notes or equity securities under or in connection with the Plan, the creation of any mortgage, deed of trust or other security interest, the making or assignment of any lease or sublease or the making or delivery of any deed or other instrument of transfer under, in furtherance of, or in connection with the Plan shall not be subject to any stamp, real estate transfer, mortgage recording or other similar tax.

12.12 **_Expedited Tax Determination._**

    The Debtors and the Liquidating Trustee are authorized to request an expedited determination of taxes under section 505(b) of the Bankruptcy Code for any or all returns filed for, or on behalf of, the Debtors for any and all taxable periods (or portions thereof) ending after the Commencement Date through and including the Effective Date.

12.13 **_Exhibits/Schedules._**

    All exhibits and schedules to the Plan, including the Plan Supplement, are incorporated into and are a part of the Plan as if set forth in full herein.

12.14 **Substantial Consummation.**

On the Effective Date, the Plan shall be deemed to be substantially consummated under sections 1101 and 1127(b) of the Bankruptcy Code.

12.15 **Severability of Plan Provisions.**

In the event that, prior to the Confirmation Date, any term or provision of this Plan is held by the Bankruptcy Court to be invalid, void or unenforceable, the Bankruptcy Court shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void or unenforceable, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding any such holding, alteration or interpretation, the remainder of the terms and provisions of the Plan shall remain in full force and effect and shall in no way be affected, impaired or invalidated by such holding, alteration or interpretation. Notwithstanding the foregoing, in such case, the Plan may only be confirmed without that clause or provision at the request of the Debtors and with the consent of the Creditors' Committee. The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable in accordance with its terms.

12.16 **Governing Law.**

Except to the extent that the Bankruptcy Code or other federal law is applicable, or to the extent an exhibit to the Plan or Plan Supplement provides otherwise (in which case the governing law specified therein shall be applicable to such exhibit), the rights, duties, and obligations arising under the Plan shall be governed by, and construed and enforced in accordance with, the laws of the State of New York without giving effect to its principles of conflict of laws.

12.17 **Notices**.

All notices, requests and demands to or upon the Debtors shall be in writing (including by facsimile transmission) to be effective and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when actually delivered or, in the case of notice by facsimile transmission, when received and telephonically confirmed, addressed as follows:

BearingPoint, Inc.
100 Crescent Court, Suite 700
Dallas, Texas 75201
Attn: John DeGroote
Telephone: (214) 459-2770
Facsimile: (214) 975-3484

– and –

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, New York  10153
Attn:    Marcia L. Goldstein
            Damon P. Meyer
Telephone:  (212) 310-8000
Facsimile:  (212) 310-8007

– and –

Weil, Gotshal & Manges LLP
700 Louisiana Street, Suite 1600
Houston, Texas 77002
Attn:    Alfredo R. Pérez
Telephone:  (713) 546-5000
Facsimile:  (713) 224-9511

12.18  *Section Headings.*

The section headings contained in the Plan are for reference purposes only and shall not affect in any way the meaning or interpretation of the Plan.

Dated: October 5, 2009

Respectfully submitted,

BEARINGPOINT, INC.

By:      /s/ John DeGroote
         Name:  John DeGroote
         Title:   President, Chief Legal
                  Officer and Secretary

         – and –

BE NEW YORK HOLDINGS, INC.
BEARINGPOINT AMERICAS, INC.
BEARINGPOINT BG, LLC
BEARINGPOINT ENTERPRISE HOLDINGS, LLC
BEARINGPOINT GLOBAL OPERATIONS, INC.
BEARINGPOINT GLOBAL, INC.
BEARINGPOINT INTERNATIONAL I, INC.
BEARINGPOINT ISRAEL, LLC
BEARINGPOINT PUERTO RICO, LLC
BEARINGPOINT RUSSIA, LLC
BEARINGPOINT SOUTH PACIFIC, LLC
BEARINGPOINT SOUTHEAST ASIA LLC
BEARINGPOINT TECHNOLOGY    PROCUREMENT
SERVICES, LLC,
BEARINGPOINT USA, INC.
BEARINGPOINT, LLC
I2 MID ATLANTIC LLC
I2 NORTHWEST LLC
METRIUS, INC.
OAD ACQUISITION CORP.
OAD GROUP, INC.
PELOTON HOLDINGS, L.L.C.
SOFTLINE ACQUISITION CORP.
SOFTLINE CONSULTING AND
         INTEGRATORS, INC.

By:      /s/ John DeGroote
         Name:  John DeGroote
         Title:   Vice President and Secretary

**Exhibit B**

**(Disclosure Statement Order)**

**TO BE PROVIDED**

**Exhibit C**

**(Annual Form 10-K)**

**TO BE PROVIDED**

**Exhibit D**

**(The Debtors' Liquidation Analysis)**

# Liquidation Analysis

**1.** **Introduction.**  The liquidation analysis (the "*Liquidation Analysis*") reflects the estimated Cash proceeds, net of liquidation-related costs that would be realized if the Debtors were liquidated in accordance with chapter 7 of the Bankruptcy Code.

The Liquidation Analysis is based on a number of estimates and assumptions that, although considered reasonable by the Debtors, are inherently subject to significant economic uncertainties and contingencies beyond the Debtors' control and which could be subject to material change.  **ACCORDINGLY, THERE CAN BE NO ASSURANCE THAT THE RECOVERIES FROM THE LIQUIDATION OF ASSETS REFLECTED IN THE LIQUIDATION ANALYSIS WOULD BE REALIZED IF THE DEBTORS WERE LIQUIDATED UNDER CHAPTER 7 AND ACTUAL RESULTS COULD VARY MATERIALLY FROM THOSE ESTIMATED IN THE LIQUIDATION ANALYSIS.**

The Liquidation Analysis illustrates that in a chapter 7 liquidation, holders of unsecured Claims would not receive any recovery.  The Liquidation Analysis is based on information from the Debtors' unaudited balance sheet as of August 31, 2009, with adjustments to reflect forecasted cash flow activity from September 1, 2009 through December 31, 2009, and assumes that the Debtors would commence a chapter 7 liquidation on December 31, 2009.  The Liquidation Analysis assumes the liquidation of the Debtors would commence under the direction of the Bankruptcy Court appointed trustee and would continue for a period of approximately six months.

The Liquidation Analysis assumes that the liquidation proceeds would be distributed in accordance with the priorities required by Bankruptcy Code sections 726 and 507.  Specifically, net value from the liquidation of assets after the payment of fees associated with the liquidation generally would be distributed first to satisfy secured claims to the extent of the collateral value securing such claims, in order of priority.  Next, value would flow to unsecured Claims beginning with unsecured superpriority administrative Claims, second to other unsecured administrative Claims, third to priority unsecured Claims, fourth to general unsecured Claims, and fifth to equity.

The Liquidation Analysis includes an estimate of the amount of Claims that could ultimately be Allowed Claims.  Estimates for the various types of Claims are based solely on the Debtors' estimates and do not constitute an admission of liability by the Debtors.  Unless otherwise noted herein, no order or finding has been entered by the Bankruptcy Court estimating or otherwise fixing the amount of claims at the projected levels set forth in this Liquidation Analysis.

## 2. <u>Liquidation Analysis</u>.

| Summary Asset Analysis Based on Collateral Support | | | | | | |
|---|---|---|---|---|---|---|

| ($ in millions) | | Book Value est. at 12/31/09 (Note 1) | Hypothetical Recovery | | Estimated Liquidation Value | |
|---|---|---|---|---|---|---|
| | **Note** | | Low | High | Low | High |
| Cash and Cash Equivalents | 2 | $30.5 | 100% | 100% | $30.5 | $30.5 |
| Avoidance Actions | 3 | 0.0 | | | 1.5 | 3.0 |
| | | $30.5 | | | $32.0 | $33.5 |

| Net Estimated Liquidation Proceeds | | | | | **$32.0** | **$33.5** |
|---|---|---|---|---|---|---|

| Hypothetical Liquidation Recovery of Claims Analysis | | | | | | |
|---|---|---|---|---|---|---|

**Super-Priority Administrative and Secured Claims:**

| Net Estimated Proceeds | | | | | **$32.0** | **$33.5** |
|---|---|---|---|---|---|---|

| | | | | | | |
|---|---|---|---|---|---|---|
| Secured Claims | 4 | | | | $29.6 | $29.5 |
| Recovery Amount | | | | | 29.6 | 29.5 |
| *% of Claim* | | | | | *100.0%* | *100.0%* |
| | | | | | | |
| Chapter 7 Trustee Fees & Expenses | 5 | | | | $1.2 | $1.2 |
| Recovery Amount | | | | | 1.2 | 1.2 |
| *% of Claim* | | | | | *100.0%* | *100.0%* |
| | | | | | | |
| Super-Priority Administrative Claims | 6 | | | | $7.3 | $5.5 |
| Recovery Amount | | | | | 1.2 | 2.8 |
| *% of Claim* | | | | | *16.6%* | *50.7%* |

| Net Estimated Proceeds after Super-Priority Administrative and Secured Claims | | | | | **$0.0** | **$0.0** |
|---|---|---|---|---|---|---|

**Other Claims:**

| | | | | | | |
|---|---|---|---|---|---|---|
| Administrative Claims | 7 | | | | $5.3 | $0.0 |
| Recovery Amount | | | | | 0.0 | 0.0 |
| *% of Claim* | | | | | *0.0%* | *0.0%* |
| | | | | | | |
| Priority Claims | 8 | | | | $4.4 | $1.5 |
| Recovery Amount | | | | | 0.0 | 0.0 |
| *% of Claim* | | | | | *0.0%* | *0.0%* |
| | | | | | | |
| Series C and FFL | 9 | | | | $243.5 | $243.5 |
| Recovery Amount | | | | | 0.0 | 0.0 |
| *% of Claim* | | | | | *0.0%* | *0.0%* |
| | | | | | | |
| Series A/B | 10 | | | | $452.9 | $452.9 |
| Recovery Amount | | | | | 0.0 | 0.0 |
| *% of Claim* | | | | | *0.0%* | *0.0%* |
| | | | | | | |
| General Unsecured Claims | 11 | | | | $276.3 | $84.4 |
| Recovery Amount | | | | | 0.0 | 0.0 |
| *% of Claim* | | | | | *0.0%* | *0.0%* |

| Net Estimated Proceeds for Payment of Equity Interests | | | | | **$0.0** | **$0.0** |
|---|---|---|---|---|---|---|

**3.**     <u>**Notes to Liquidation Analysis.**</u>

a.     **Note 1.**  Assets and liabilities used in this liquidation analysis are estimated as of December 31, 2009.

b.     **Note 2.**  "Cash and Equivalents" includes cash in BearingPoint's unrestricted bank accounts.  It is assumed that the $0.2 million of unrestricted cash will be fully recoverable.

c.     **Note 3.**  "Avoidance Actions" refers to estimated recovery from certain transfers of property such as preferences or fraudulent transfers or the voiding of liens created before the bankruptcy filing date.

d.     **Note 4.**  "Secured Claims" consists of outstanding claims with a perfected lien on a specific asset or group of assets, including an estimate of $29.5 million of secured debt arising from the assumed drawing of outstanding Letters of Credit.

e.     **Note 5.**  "Chapter 7 Trustee Fees & Expenses" includes assumed fees to compensate the chapter 7 Trustee equal to 3.0% of the estimated assets of the Debtors on December 31, 2009, in addition to estimated Trustee expenses of $0.3 million.

f.     **Note 6.**  "Super-Priority Administrative Claims" includes certain post-conversion chapter 7 expenses which are paid in the ordinary course of business, such as employee payroll obligations, recurring professional fees, and other trade and operating disbursements.

g.     **Note 7.**  "Administrative Claims" includes the expected recovery of certain executory contract, tax, and employee claims.

h.     **Note 8.**  "Priority Claims" includes the expected recovery from certain debts such as taxes and employee liabilities which are senior in priority to General Unsecured Claims.

i.     **Note 9.**  "Series C and FFL" consists of aggregate outstanding principal and accrued interest on the 5.0% Convertible Senior Subordinated Debenture and 0.5% Convertible Senior Subordinated Debenture as of the Commencement Date.

j.     **Note 10.**  "Series A/B" consists of aggregate outstanding principal and accrued interest on the 2.5% Series A Convertible Subordinated Debenture and 2.75% Series B Subordinated Debenture as of the Commencement Date.

k.     **Note 11.**  "General Unsecured Claims" represents remaining creditor claims without priority of payment, including executory contracts, accounts payable, litigation, and other trade and operating claims. Also included is an estimate of $50.0 million of claims that would arise from a shorter claims resolution time period, relative to the time period contemplated in the Plan.

**Exhibit E**

**(The Debtors' Prepetition Organizational Chart)**

**TO BE PROVIDED**