WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile:  (212) 310-8007
Marcia L. Goldstein
Joseph H. Smolinsky

WEIL, GOTSHAL & MANGES LLP
700 Louisiana Street, Suite 1600
Houston, Texas 77002
Telephone: (713) 546-5000
Facsimile:  (713) 224-9511
Alfredo R. Pérez

Attorneys for Debtors
and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------x
                                                            :
<u>In re</u>                                                :          **Chapter 11 Case No.**
                                                            :
**BEARINGPOINT, INC., <u>et al.</u>,**                      :          **09 - 10691 (REG)**
                                                            :
          **Debtors.**                                      :          **(Jointly Administered)**
                                                            :
------------------------------------------------------------x

**DEBTORS' MOTION PURSUANT TO BANKRUPTCY CODE**
**SECTIONS 363 AND 105 AND BANKRUPTCY RULES 2002, 6004, 9007 AND**
**9014 FOR AUTHORITY TO SELL EQUITY INTERESTS IN NON-DEBTOR**
<u>**BEARINGPOINT, INC. (KOREA) AND RELATED RELIEF**</u>

# TABLE OF CONTENTS

**Page**

Relief Requested ……………………………………………………………………………1

Sale of Assets ………………………………………………………………………………2

The Stock Purchase Agreement ……………………………………………………………..3

The Relief Requested is Warranted and in the Best Interests
of the Debtors and their Estates ……………………………………………………………6

    A. Consummating the Sale Transactions Is
    a Sound Exercise of the Debtors' Business Judgment …………………………..6

    B. Sale of the Shares by Private Sale is
    Warranted under the Circumstances ……………………………………………8

    C. Sale Free and Clear of Liens, Claims,
    Encumbrances and Interests ……………………………………………………9

    D. Intercompany Obligations ……………………………………………………9

    E. Protections as a Good Faith Buyer …………………………………………10

    F. Relief Under Bankruptcy Rule 6004(h) ……………………………………11

Jurisdiction ………………………………………………………………………………11

Notice ……………………………………………………………………………………..12

## Exhibits

Exhibit A        The Stock Purchase Agreement

Exhibit B        Private Sale Order

Annex A        Proposed Order

## TABLE OF AUTHORITIES

**Page**

**Cases**

Allstate Ins. Co. v. Hughes, 174 B.R. 884 (S.D.N.Y. 1994) ...........................................................10

Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.),
   722 F.2d 1063 (2d Cir. 1983)...................................................................................................7

Cmty. Thrift & Loan v. Suchy (In re Suchy), 786 F.2d 900 (9th Cir. 1985)................................11

In re Abbotts Dairies of Penn., Inc., 788 F.2d 143 (3d Cir. 1986) ..............................................10

In re Bakalis, 220 B.R. 525 (Bankr. E.D.N.Y. 1998) ...................................................................11

In re Betty Owens Sch., 1997 U.S. Dist. LEXIS 5877 (S.D.N.Y. 1997).........................................7

In re Chateaugay Corp., 1993 U.S. Dist. LEXIS 6130 (S.D.N.Y. 1993)......................................10

In re Chateaugay Corp., 973 F.2d 141 (2d Cir. 1992) ....................................................................6

In re Condere Corp., 228 B.R. 615 (Bankr. S.D. Miss. 1998)........................................................8

In re Decora Indus., Inc., Case No. 00-4459, 2002 WL. 32332749
   (Bankr. D. Del. May 20, 2002) ................................................................................................7

In re Delaware and Hudson Ry. Co., 124 B.R. 169 (D. Del. 1991).................................................7

In re Gucci, 126 F.3d 380 (2d Cir. 1997)................................................................................. 10-11

In re Integrated Res., Inc., 147 B.R. 650 (S.D.N.Y. 1992)..............................................................7

In re Johns-Manville Corp., 60 B.R. 612 (Bankr. S.D.N.Y. 1986)..................................................7

In re Stein & Day, Inc., 113 B.R. 157 (Bankr. S.D.N.Y. 1990) ....................................................10

Smith v. Van Gorkom, 488 A.2d 858 (Del. 1985)...........................................................................7


**Statutes**

11 U.S.C. § 105..................................................................................................................................1

11 U.S.C. § 363.................................................................................................................... 1, 6, 8-10

28 U.S.C. § 157...............................................................................................................................11

28 U.S.C. § 1334.............................................................................................................................11

28 U.S.C. § 1408.............................................................................................................................11

28 U.S.C. § 1409.............................................................................................................................11

**Rules**

Rule 6004 of the Federal Rules of Bankruptcy Procedure .................................................... 1-2, 11

**Bankruptcy Case Orders**

In re Lehman Bros. Holdings Inc., Ch. 11 Case No. 08-13555 (JMP)
     (Bankr. S.D.N.Y. Feb. 24, 2009) …………………………………………………8

TO THE HONORABLE ROBERT E. GERBER
UNITED STATES BANKRUPTCY JUDGE:

BE New York Holdings, Inc. ("***BE***" and together with certain of its affiliates, as

debtors and debtors in possession in the above-captioned chapter 11 cases, the "***Debtors***," and

together with their non-debtor affiliates, "***BearingPoint***"),[1] seeks this Court's authorization to

sell its common stock (the "***Shares***") in BearingPoint, Inc. (Korea) ("***BE Korea***"), a Korean

corporation, and a direct subsidiary of debtor BE New York Holdings, Inc. and indirect

subsidiary of debtors BE and BearingPoint LLC, and to enter into related transactions, and

respectfully represents:

<u>**Relief Requested**</u>

1.      To preserve the value of the Debtors' estates, the Debtors seek, pursuant to

section 363 and 105(a) of title 11 of the United States Code (the "***Bankruptcy Code***") and Rule

6004 of the Federal Rules of Bankruptcy Procedure (the "***Bankruptcy Rules***"), an order (a)

approving (i) that certain Stock Purchase Agreement dated as of October 22, 2009 (the "***SPA***"),[2]

between BPH Corporation (the "***Buyer***"), BE, and certain other persons (collectively, the

"***Sellers***"), and (ii) certain related Ancillary Agreements (as defined below), (b) authorizing the

private sale of the Shares (the "***Sale***") pursuant to the terms set forth in the SPA, and (c)

authorizing the Debtors to perform under the SPA and consummate those transactions

contemplated in the SPA and the Ancillary Agreements (collectively with the Sale, the "***Sale***

---

[1] More information regarding the Debtors' business, their pre-arranged restructuring plan, and the
background of these chapter 11 cases, including information on BearingPoint's efforts to sell all or a
portion of its assets prior to the filing of these chapter 11 cases can be found in the Declaration of John
DeGroote Pursuant to Rule 1007-2 of the Local Bankruptcy Rules for the Southern District of New York
in Support of First-Day Motions and Applications, filed on February 18, 2009, the date the Debtors filed
their chapter 11 petitions (the "***Commencement Date***").

[2] A copy of the SPA is attached hereto as <u>Exhibit A</u>.

***Transactions***") and take such actions as are necessary in furtherance thereof.  In addition, as further specified below, given BE Korea's unfavorable financial situation and in order to minimize the Debtors' exposure to costs and liabilities associated with the wind down of BE Korea, the Debtors request that any order approving the Sale be effective immediately and that the Court waive the 10-day stay pursuant to Bankruptcy Rule 6004(h).  The proposed order is attached hereto as Annex A.

## Sale of Assets

2.      As the Court is aware, the Debtors are currently in the process of selling their assets to realize value for their creditors.  The Debtors have marketed BearingPoint's assets since 2008, when BearingPoint embarked on a comprehensive restructuring effort, which included the exploration of various strategic alternatives, including a transaction involving a sale of all or a portion of BearingPoint's assets.  At this time, an extensive sale process was initiated during which approximately 25 strategic and financial buyers expressed an interest in buying all or parts of BearingPoint.  The proposals that BearingPoint received in connection with those efforts either provided insufficient value or appeared impractical.  As a result, the Debtors filed for chapter 11 relief.

3.      Following the Commencement Date, BearingPoint continued to explore strategic transactions for the purpose of maximizing value for all parties in interest.  To that end, BearingPoint initiated a sales process during which a number of potential buyers expressed interest in all or a portion of BearingPoint's assets.  Since the Commencement Date, BearingPoint has closed the sales of a significant portion of its assets and business entities.  For example, the Debtors sold a substantial portion of assets related to their Public Services group to Deloitte LLP and a substantial portion of assets related to their Commercial Services group to

PriceWaterhouseCoopers, LLP.  In addition, BearingPoint has sold its European, Middle East and Africa business unit, its Japanese entities and its Brazilian business unit.

4. The Debtors now seek to sell their Korean entity through a stock sale.  In connection with the sale of assets of BE's parent company and its affiliates, the Shares were available to all potential purchasers beginning in March 2009.  Based on this sale process, and a review and evaluation of all proposals and letters of interest received, the Debtors have determined that the Buyer's offer presents the Debtors with the best value for the Shares.  Moreover, due to BE Korea's unfavorable financial situation and the Debtors' exposure to significant costs and liabilities associated with the wind down of BE Korea, the Debtors have determined that a sale of the Shares must be completed as quickly as possible.  As such, the Debtors seek to sell the Shares by private sale to the Buyer.  Although the Buyer's offer provides the Debtors with seemingly nominal value for the Shares, the Sale will eliminate the Debtors' wind down-related costs and liability exposure.

**The Stock Purchase Agreement**

5. The principal terms of the SPA and the Ancillary Agreements (as defined below) are as follows:[3]

**Purchase Price**          The purchase price is US $1 payable at Closing.

**Closing Conditions**      Purchaser's and Sellers' obligations to consummate the transaction are subject to certain closing conditions, including:
- entry of the Approval Order by the Bankruptcy Court;
- absence of any Applicable Law prohibiting the Closing;
- accuracy of representations and warranties, generally except as would not have a Material Adverse Effect; and
- compliance in all material respects with covenants and

---

[3] This summary is qualified in its entirety by reference to the provisions of the SPA and any documents annexed thereto, including the Ancillary Agreements (as defined below).  Unless otherwise defined herein, capitalized terms shall have the meanings ascribed to them in the SPA and/or the Ancillary Agreements.

agreements.

At Closing, the parties are required to take specified actions including delivery of executed copies of Ancillary Agreements (which in the case of the Sellers, includes a non-solicit/non-compete agreement to be executed by an individual employee of Seller Parent).

**Termination**

The SPA may be terminated by mutual written consent of the parties.

The SPA may be terminated by Purchaser or Sellers if:
- the Closing does not occur prior to November 30, 2009; or
- consummation of the transactions contemplated thereby would violate any nonappealable final order of any Governmental Authority.

**Expense Reimbursement**

N/A

**Intercompany Accounts and Intercompany Accounts Settlement Agreement**

Intercompany accounts (including shareholder loans, intercompany payables and intercompany receivables) between Sellers or any of their Affiliates, on the one hand, and BE Korea, on the other hand, shall be settled as agreed between the parties and reflected in a schedule to the SPA (irrespective of the terms of payment of such intercompany accounts). All such intercompany account balances shall be settled pursuant to the SPA at the date of the Closing.

**Non-Solicit and Non-Compete**

N/A

**Regulatory Matters**

Purchaser and Sellers must use reasonable best efforts to take all actions necessary or desirable under Applicable Law to consummate the Closing.

**Representations and Warranties**

N/A

**Transition Services**

The Sellers or their affiliates will provide specified transition services to BE Korea until November 30, 2009.

**Intellectual Property Cross License**

Certain of Sellers and their Affiliates ("***Seller Licensors***") grant to BE Korea a non-exclusive license to all intellectual property (other than trademarks and off-the-shelf software) used by BE Korea, but which intellectual property is not owned by or licensed directly to Seller Licensors. The license is limited to use within Korea and for providing certain ancillary services outside of Korea. BE Korea

|  | grants a license back to the Seller licensors to all intellectual property owned by or licensed directly to BE Korea as of the Closing Date (other than by the Seller Licensors, and other than trademarks and off-the-shelf software), to the extent licensable by BE Korea. The license is limited to use outside of Korea and for providing certain ancillary services inside Korea. |
|---|---|
| **Trademark Cross License** | Dallas Project Holdings Limited (an Affiliate of Sellers) grants to BE Korea (i) an exclusive license to use the "BearingPoint" trademark in Korea in connection with the business of BE Korea, and (ii) a non-exclusive license to use the "BearingPoint" trademark outside of Korea in connection with providing certain ancillary services.  BE Korea shall pay to Licensor yearly maintenance fee of fifty thousand dollars ($50,000) (the "***Maintenance Fee***") which the first payment shall be due on the Closing Date and the second payment shall be due one year after the Closing date only if Licensee wants to continue it.  Dallas Project Holdings Limited reserves the right for itself, its Affiliates and its licensees to provide certain ancillary services in Korea, notwithstanding the exclusivity granted to BE Korea. |

6.     In addition, the Debtors are requesting approval of certain agreements related to the SPA.  These agreements include, without limitation: (i) the Cross-License/License Agreement, (ii) the Trademark License Agreement, (iii) the Transition Services Agreement, (iv) the Intercompany Accounts Settlement Agreement, and (v) the Stock Pledge Agreement[4] (collectively, the "***Ancillary Agreements***").  The Ancillary Agreements are necessary for the Debtors to consummate the Sale Transactions, and to enable the Buyer to operate the Korean entity post-closing.

7.     Further, the SPA and Intercompany Accounts Settlement Agreement contemplate (i) a waiver and release and/or other settlement of those residual intercompany balances between the Debtors and their affiliates and BE Korea not already released, discharged,

---

[4] In connection with the Sale Transactions and pursuant to the Stock Pledge Agreement, in order to secure repayment of remaining obligations by BE Korea to BE and certain of its affiliates, at Closing, BE will hold the Shares as collateral, and the Buyer will be prohibited from transferring the shares until all of BE Korea's obligations under the Intercompany Accounts Settlement Agreement are paid and satisfied in full.

or novated to non-debtor affiliate BearingPoint International Bermuda Holdings Limited (Bermuda) pursuant to that certain *Order Pursuant to Section 363(b) of the Bankruptcy Code Authorizing the Novation of Certain Intercompany Account Balances and Granting Releases in Connection Therewith* [Docket No. 941], entered by this Court on June 23, 2009; and (ii) repayment by BE Korea to debtor BearingPoint, Inc. of $298,000, upon receipt of which BearingPoint, Inc. will provide funding to its subsidiary, BearingPoint International Holdings II Limited (Bermuda) ("***BE Bermuda***") to pay to BE Korea KRW 349,826,357, fully satisfying the loan interest owing by BE Bermuda to BE Korea (collectively, the "***Intercompany Obligations***").  The Debtors submit the proposed release, waiver, and/or settlement of the Intercompany Obligations is necessary to finalizing the sale of BE Korea, as the Purchaser would be unlikely to consummate the transaction if uncertainty related to intercompany claims between the Debtors and BE Korea remained unresolved.

**The Relief Requested is Warranted and in the
Best Interests of the Debtors and their Estates**

**A.      Consummating the Sale Transactions Is a Sound Exercise of the Debtors' Business Judgment**

8.      Ample authority exists for approval of the relief requested.  Section 363 of the Bankruptcy Code provides, in relevant part, that a debtor "after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate."  11 U.S.C. § 363(b)(1).

9.      Courts in this and other circuits, in applying this section, have required that the sale or disposition of a debtor's assets be based upon the sound business judgment of the debtor.  See In re Chateaugay Corp., 973 F.2d 141 (2d Cir. 1992) (holding that a judge determining a § 363(b) application must find from the evidence presented a good business reason

to grant such application); <u>Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)</u>, 722 F.2d 1063, 1071 (2d Cir. 1983) (same). It is generally understood that "[w]here the debtor articulates a reasonable basis for its business decisions (as distinct from a decision made arbitrarily or capriciously), courts will generally not entertain objections to the debtor's conduct." <u>In re Johns-Manville Corp.</u>, 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986). If a valid business justification exists, there is a strong presumption that "the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company." <u>In re Integrated Res., Inc.</u>, 147 B.R. 650, 656 (S.D.N.Y. 1992) (quoting <u>Smith v. Van Gorkom</u>, 488 A.2d 858, 872 (Del. 1985)), <u>appeal</u> <u>dismissed</u>, 3 F.3d 49 (2d Cir. 1993). The burden of rebutting this presumption falls to parties opposing the proposed exercise of a debtor's business judgment. <u>Id.</u> (citing <u>Aronson v. Lewis</u>, 473 A.2d 805, 812 (Del. 1984)). Once a court is satisfied that there is a sound business justification for the proposed sale, the court must then determine whether (i) the debtor has provided interested parties with adequate and reasonable notice, (ii) the sale price is fair and reasonable, and (iii) the purchaser is proceeding in good faith. <u>In re Betty Owens Sch.</u>, 1997 U.S. Dist. Lexis 5877 (S.D.N.Y. 1997); <u>accord</u> <u>In re Delaware and Hudson Ry. Co.</u>, 124 B.R. 169, 176 (D. Del. 1991); <u>In re Decora Indus., Inc.</u>, Case No. 00-4459, 2002 WL 32332749 at *3 (Bankr. D. Del. May 20, 2002).

10. The Debtors' decision to enter into the SPA, sell the Shares, and consummate the Sale Transactions is an exercise of sound business judgment. As noted above, the Debtors have extensively marketed BE Korea with potential purchasers since March 2009 and reviewed and evaluated all proposals and letters of interest received. In addition, due to continuing incurrence of wind down costs and potential exposure to related liabilities, the Debtors believe that the Sale must be completed in accordance with the expedited timeframe

described herein to preserve the value of the Debtors' estates. Moreover, the Debtors submit that any auction process would, besides jeopardizing consummation of the Sale, be duplicative of the Debtors' extensive marketing efforts, and give rise to unnecessary administrative expenses.

**B.     Sale of the Shares by Private Sale is Warranted under the Circumstances**

11.     Bankruptcy Rule 6004(f)(1) permits private sales by a debtor. Courts, including this Court in these and other cases, have allowed chapter 11 debtors to sell assets outside the ordinary course of business by private sale when the debtors demonstrate that the sale is permissible pursuant to section 363(b) of the Bankruptcy Code. <u>See, e.g.</u>, <u>In re Lehman Bros. Holdings Inc.</u>, Ch. 11 Case No. 08-13555 (JMP) (Bankr. S.D.N.Y. Feb. 24, 2009); <u>In re Condere Corp.</u>, 228 B.R. 615 (Bankr. S.D. Miss. 1998). In <u>Lehman</u>, (i) the underlying motion for which the order was entered was on notice, (ii) no objections were filed that pertained to the private sales (iii) the order entered was a final order, and (iv) in each order the court found sufficient cause to merit the expense reimbursements and accordingly authorized the private sale. The extent to which the judge focused upon the provision is not clear from the orders. A copy of the above cited order is attached hereto as <u>Exhibit B</u>.

12.     The Debtors' decision to pursue a private sale is supported by the Debtors' full exploration of potential sales of BE Korea, as well as the exigent circumstances, including the potential decline of BE Korea's value due to, among other things, increased employee and client attrition and strained operations. The time and effort associated with marketing BE Korea for sale at a public auction would needlessly duplicate the previous efforts made by the Debtors, the costs associated therewith would likely exceed any benefit of a public sale to the Debtors, their estates or their creditors, and jeopardize the Debtors' ability to maximize the proceeds

resulting from such transaction due to the significant risk BE Korea will experience an abrupt decline in value.

**C.      Sale Free and Clear of Liens, Claims, Encumbrances and Interests**

13.      The sale of the Shares should be free and clear of any and all liens, claims, encumbrances and other interests in accordance with section 363(f) of the Bankruptcy Code, with any such liens, claims, encumbrances and other interests attaching to the proceeds of the sale.  Pursuant to section 363(f) of the Bankruptcy Code, a debtor may sell property of its estate "free and clear of any interest in such property of an entity other than the estate" if applicable nonbankruptcy law permits sale of such property free and clear of such interest, if such entity consents, if such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property, if such interest is in bona fide dispute, or if such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.  11 U.S.C. § 363(f)(1) – (5).

14.      With respect to any party asserting a lien, claim, encumbrance or other interest against the Shares, the Debtors anticipate that they will be able to satisfy one or more of the conditions set forth in section 363(f).  Thus, the sale of the Shares free and clear of liens, claims, encumbrances and other interests will satisfy the statutory prerequisites of section 363(f) of the Bankruptcy Code.

**D.      Intercompany Obligations**

15.      As above noted, in connection with the Sale, the SPA provides for the release, waiver, and/or settlement of the Intercompany Obligations.  If the Debtors were unable to release, waive, and/or settle the Intercompany Obligations, they would be unable to consummate the Sale Transactions, to the detriment of their estates and all parties in interest.  In

addition, if the Debtors were to not sell BE Korea, it would be extremely unlikely that BE Korea would be financially able to pay the Debtors on account of the Intercompany Obligations. As such, the Debtors should be authorized to release, waive, and/or settle the Intercompany Obligations, and to enter into any agreements to effectuate such release, waiver, and/or settlement so that the Sale Transactions may be consummated.

### E. Protections as a Good Faith Buyer

16. Section 363(m) of the Bankruptcy Code protects a good-faith purchaser's interest in property purchased from the debtor notwithstanding that the sale conducted under section 363(b) is later reversed or modified on appeal. Specifically, section 363(m) states that:

> The reversal or modification on appeal of an authorization under [section 363(b)] … does not affect the validity of a sale … to an entity that purchased … such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale … were stayed pending appeal.

11 U.S.C. § 363(m). Section 363(m) "fosters the 'policy of not only affording finality to the judgment of the bankruptcy court, but particularly to give finality to those orders and judgments upon which third parties rely.'" In re Chateaugay Corp., 1993 U.S. Dist. Lexis 6130, *9 (S.D.N.Y. 1993) (quoting In re Abbotts Dairies of Penn., Inc., 788 F.2d 143, 147 (3d Cir. 1986)). See also Allstate Ins. Co. v. Hughes, 174 B.R. 884, 888 (S.D.N.Y. 1994) ("Section 363(m) . . . provides that good faith transfers of property will not be affected by the reversal or modification on appeal of an unstayed order, whether or not the transferee knew of the pendency of the appeal"); In re Stein & Day, Inc., 113 B.R. 157, 162 (Bankr. S.D.N.Y. 1990) ("pursuant to 11 U.S.C. § 363(m), good faith purchasers are protected from the reversal of a sale on appeal unless there is a stay pending appeal").

17. The sale of the Shares is the result of arm's length, good-faith negotiations with the Buyer. See In re Gucci, 126 F.3d 380 (2d Cir. 1997) (a good faith purchaser is shown

by integrity of his conduct during the course of the sale proceedings); In re Bakalis, 220 B.R. 525, 537 (Bankr. E.D.N.Y. 1998) (a determination of bad faith must be based on untoward conduct by the purchaser, such as fraud or collusion) (citing Gucci, 126 F.3d 380); Cmty. Thrift & Loan v. Suchy (In re Suchy), 786 F.2d 900, 902 (9th Cir. 1985) (a good faith purchaser is one that has not engaged in conduct involving fraud or collusion nor has sought to take grossly unfair advantage of other bidders). The Buyer has not, in connection with the proposed transaction, engaged in any conduct that constitutes a lack of good faith during the Debtors' marketing and soliciting of bids for BE Korea. Accordingly, the Buyer is entitled to the protections of section 363(m) of the Bankruptcy Code.

**F.    Relief Under Bankruptcy Rule 6004(h)**

18.    Bankruptcy Rule 6004(h) provides that an "order authorizing the use, sale, or lease of property . . . is stayed until the expiration of 10 days after entry of the order, unless the court orders otherwise." FED. R. BANKR. P. 6004(h). The Debtors seek as prompt a closing as possible to preserve and maximize the Debtors' recovery from the Sale before BE Korea's assets significantly decline in value. In light of the foregoing, the Debtors request that any order approving the sale of the Shares be effective immediately by providing that the 10-day stay is inapplicable.

**Jurisdiction**

19.    Pursuant to 28 U.S.C. §§ 157 and 1334 and Standing Order M-61 of the United States District Court for the Southern District of New York, dated July 10, 1984 (Ward, Acting C.J.), the Court has exclusive jurisdiction to consider and grant the relief requested herein. A proceeding to consider and grant such relief is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## Notice

20.     The Debtors shall serve notice of this Motion to parties in interest in accordance with the Case Management Order #2.  The Debtors submit that, in view of the facts and circumstances, such notice is sufficient and no other or further notice need be provided.

WHEREFORE, the Debtors respectfully request that the Court grant the relief requested herein and such other and further relief as is just and appropriate.

Dated: October 22, 2009
     New York, New York

/s/ Alfredo R. Pérez
Marcia L. Goldstein
Joseph H. Smolinsky
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone:  (212) 310-8000
Facsimile:  (212) 310-8007

and

Alfredo R. Pérez
WEIL, GOTSHAL & MANGES LLP
700 Louisiana Street, Suite 1600
Houston, Texas  77002
Telephone: (713) 546-5000
Facsimile:  (713) 224-9511

Attorneys for Debtors
and Debtors in Possession

## Exhibit A

**The Stock Purchase Agreement**

# STOCK PURCHASE AGREEMENT

dated as of

October 22, 2009

between

**BPH Corporation,**

as Buyer

and

# BE NEW YORK HOLDINGS, INC.

as Seller

relating to the purchase and sale

of

**100% of the Common Stock**

of

**BearingPoint, Inc.(Korea)**

# TABLE OF CONTENTS

**Page**

ARTICLE 1      DEFINITIONS ................................................................. 1

     Section 1.01.      Definitions ................................................................. 1

     Section 1.02.      Other Definitional and Interpretative Provisions ......... 4

ARTICLE 2      PURCHASE AND SALE ................................................ 4

     Section 2.01.      Purchase and Sale ................................................... 4

     Section 2.02.      Closing ................................................................... 5

ARTICLE 3      REPRESENTATIONS AND WARRANTIES OF SELLER ................................................................. 5

     Section 3.01.      Existence and Power ................................................ 5

     Section 3.02.      Authorization .......................................................... 6

     Section 3.03.      Capitalization ......................................................... 6

     Section 3.04.      Ownership of Shares ................................................ 6

     Section 3.05.      Noncontravention .................................................... 6

ARTICLE 4      REPRESENTATIONS AND WARRANTIES OF BUYER ................................................................. 7

     Section 4.01.      Existence and Power ................................................ 7

     Section 4.02.      Authorization .......................................................... 7

     Section 4.03.      Noncontravention .................................................... 7

     Section 4.04.      Purchase For Investment ........................................... 8

     Section 4.05.      Financing ................................................................ 8

     Section 4.06.      Inspections; No Other Representations ....................... 8

ARTICLE 5      COVENANTS OF SELLER ........................................... 8

     Section 5.01.      Conduct of the Company ........................................... 9

     Section 5.02.      Access to Information ............................................... 9

     Section 5.03.      Resignations ......................................................... 10

     Section 5.04.      Tax Covenant ........................................................ 10

ARTICLE 6      COVENANTS OF BUYER .......................................... 10

     Section 6.01.      Confidentiality ...................................................... 10

     Section 6.02.      Access; Seller's Confidentiality ............................... 11

Section 6.03.      Trademarks; Tradenames ............................................. 11

ARTICLE 7      COVENANTS OF BUYER AND SELLER .......................... 11

Section 7.01.      Reasonable Best Efforts; Further Assurances............ 11

Section 7.02.      Certain Filings.............................................................. 11

Section 7.03.      Public Announcements ............................................... 12

Section 7.04.      Intercompany Accounts .............................................. 12

ARTICLE 8      INDEMNIFICATION.................................................... 12

Section 8.01.      Indemnification ........................................................... 12

ARTICLE 9      CONDITIONS TO CLOSING ................................... 13

Section 9.01.      Conditions to Obligations of Buyer and Seller .......... 13

Section 9.02.      Conditions to Obligation of Buyer............................. 13

Section 9.03.      Conditions to Obligation of Seller ............................ 13

ARTICLE 10      BANKRUPTCY COVENANTS ........................................... 14

Section 10.01.      Approval Order ............................................................ 14

Section 10.02.      Noncontravention........................................................ 14

ARTICLE 11      TERMINATION....................................................... 14

Section 11.01.      Grounds for Termination ........................................... 14

Section 11.02.      Effect of Termination.................................................. 15

ARTICLE 12      MISCELLANEOUS ................................................. 15

Section 12.01.      Notices ........................................................................ 15

Section 12.02.      Amendments and Waivers ......................................... 16

Section 12.03.      Expenses ..................................................................... 16

Section 12.04.      Successors and Assigns............................................... 16

Section 12.05.      Governing Law ........................................................... 17

Section 12.06.      Jurisdiction................................................................. 17

Section 12.07.      WAIVER OF JURY TRIAL....................................... 17

Section 12.08.      Counterparts; Effectiveness; Third Party Beneficiaries ................................................................ 17

Section 12.09.      Entire Agreement....................................................... 18

Section 12.10.      Severability ................................................................ 18

Section 12.11.      Specific Performance .................................................. 18

Section 12.12.      Survival of Provisions ................................................ 18

**EXHIBITS**

Exhibit A            Form of Trademark License Agreement
Exhibit B            Form of License Agreement
Exhibit C            Intercompany Accounts Settlement Agreement
Exhibit D            Share Pledge Agreement
Exhibit E            Transition Services Agreement

# STOCK PURCHASE AGREEMENT

AGREEMENT (this "**Agreement**") dated as of _22_ October 2009 between **BPH Corporation,** a Korean incorporated company with an office at 23rd Floor GangNam Finance Center, 737 Yeoksam-dong, Kangnam-ku, Seoul 135-984, Republic of Korea ("**Buyer**") and **BE New York Holdings, Inc.,** a New York corporation with its principal office located at 100 Crescent Court, Suite 700, Dallas, Texas 75201 U.S.A. ("**Seller**").

## W   I   T   N   E   S   S   E   T   H :

WHEREAS, on February 18, 2009, Seller filed a voluntary petition for relief under Chapter 11 of Title 11 of the United States Bankruptcy Code, §§ 101, et seq. (as amended) (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**"), and the case is being jointly administered for procedural purposes only under Case no. 09-10691 (REG) (the "**Bankruptcy Case**");

WHEREAS, Seller is the record and beneficial owner of all of the outstanding shares of capital stock (the "**Shares**") of **BearingPoint, Inc.(Korea),** a Korean incorporated company with an office at 23rd Floor GangNam Finance Center, 737 Yeoksam-dong, Kangnam-ku, Seoul 135-984, Republic of Korea (the "**Company**"); and

WHEREAS, Seller desires to sell the Shares to Buyer, and Buyer desires to purchase the Shares from Seller, upon the terms and subject to the conditions hereinafter set forth, in a sale pursuant to Section 363 of the Bankruptcy Code.

NOW, THEREFORE, in consideration of these premises and the mutual covenants and agreements set forth herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged by each party, the parties hereto agree as follows:

## ARTICLE 1
### DEFINITIONS

Section 1.01.    *Definitions.*    (a) As used herein, the following terms have the following meanings:

"**Affiliate**" means, with respect to any Person, any other Person directly or indirectly controlling, controlled by, or under common control with such Person; *provided* that the Company shall not be considered an Affiliate of Seller.

"**Applicable Law**" means, with respect to any Person, any federal, state or local law (statutory, common or otherwise), constitution, treaty, convention, ordinance, code, rule, regulation, order, injunction, judgment, decree, ruling or other similar requirement enacted, adopted, promulgated or applied by a Governmental Authority that is binding upon or applicable to such Person, as amended unless expressly specified otherwise.

"**Approval Order**" means an order by the Bankruptcy Court approving the transactions contemplated by this Agreement.

"**Business Day**" means a day, other than Saturday, Sunday or other day on which commercial banks in New York, New York are authorized or required by Applicable Law to close.

"**Closing Date**" means the date of the Closing.

"**Code**" means the United States Internal Revenue Code of 1986, as amended.

"**Common Stock**" means the common stock of the Company.

"**Governmental Authority**" means any transnational, domestic or foreign federal, state or local, governmental authority, department, court, agency or official, including any political subdivision thereof.

"**Intellectual Property**" means trade marks, service marks, trade names, domain names, logos, get-up, patents, inventions, registered and unregistered design rights, copyrights, semi-conductor topography rights, database rights and all other similar rights in any part of the world (including know-how) including, where such rights are obtained or enhanced by registration, any registration of such rights and applications and rights to apply for such registrations.

"**Intercompany Accounts Settlement Agreement**" means the Intercompany Accounts Settlement Agreement to be entered into by the Company, Seller and various of the Seller's Affiliates for the purpose of settling (or agreeing to settle) intercompany accounts payable and receivable between the Company, on the one hand, and Seller and its Affiliates on the other hand, and substantially in the form attached hereto as Exhibit C.

"**License Agreement**" means the Intellectual Property License Agreement among Buyer, BearingPoint, Inc. and the Seller substantially in the form of Exhibit B.

"**Lien**" means, with respect to any property or asset, any mortgage, lien, pledge, charge, security interest or encumbrance in respect of such property or asset.

"**Material Adverse Effect**" means a material adverse effect on the business, assets or results of operations of the Company, taken as whole, except any such effect resulting from or arising in connection with  (i)  this Agreement or the transactions contemplated hereby,  (ii)  changes or conditions affecting the industry in which the Company operates, or  (iii)  changes in economic, regulatory or political conditions generally.

"**Person**" means an individual, corporation, partnership, limited liability company, association, trust or other entity or organization, including a Governmental Authority.

"**Share Pledge Agreement**" means that certain Share Pledge Agreement delivered by Buyer to Seller in order to secure the performance by the Company of the Company's obligations under the Intercompany Accounts Settlement Agreement, as provided in Section 7.04 hereof, and substantially in the form attached hereto as Exhibit D.

"**Tax**" means any tax, governmental fee or other like assessment or charge of any kind whatsoever (including, but not limited to, withholding on amounts paid to or by any Person), together with any interest, penalty, addition to tax or additional amount imposed by any governmental authority (domestic or foreign) responsible for the imposition of any such tax (a "**Taxing Authority**").

"**Trademark License Agreement**" means the Trademark License Agreement between Dallas Project Holdings Limited and the Company, substantially in the form attached hereto as Exhibit A.

"**Transaction Agreements**" means this Agreement , the License Agreement, the Trademark License Agreement, the Intercompany Accounts Settlement Agreement, the Transition Services Agreement and the Share Pledge Agreement.

"**Transition Services Agreement**" means that certain Transition Services Agreement between BearingPoint, Inc. and the Company substantially in the form attached hereto as Exhibit E.

(b)     Each of the following terms is defined in the Section set forth opposite such term:

| **Term** | **Section** |
|---|---|
| Agreement | Preamble |
| Bankruptcy Case | Preamble |
| Bankruptcy Code | Preamble |
| Bankruptcy Court | Preamble |
| Buyer | Preamble |

| Term | Section |
|------|---------|
| Closing | Section 2.02 |
| Company | Preamble |
| Company Securities | Section 3.03 |
| Disclosure Schedules | Article 3 |
| e-mail | Section 12.01 |
| Losses | Section 8.01 |
| New York Courts | Section 12.06 |
| OIRR | Section 5.01 |
| Purchase Price | Section 2.01 |
| Seller Indemnities | Section 8.01 |
| Seller | Preamble |
| Shares | Preamble |

Section 1.02. *Other Definitional and Interpretative Provisions.* The words "hereof", "herein" and "hereunder" and words of like import used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement. The captions herein are included for convenience of reference only and shall be ignored in the construction or interpretation hereof. References to Articles, Sections, Exhibits and Schedules are to Articles, Sections, Exhibits and Schedules of this Agreement unless otherwise specified. All Exhibits and Schedules annexed hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth in full herein. Any capitalized terms used in any Exhibit or Schedule but not otherwise defined therein, shall have the meaning as defined in this Agreement. Any singular term in this Agreement shall be deemed to include the plural, and any plural term the singular. Whenever the words "include", "includes" or "including" are used in this Agreement, they shall be deemed to be followed by the words "without limitation", whether or not they are in fact followed by those words or words of like import. "Writing", "written" and comparable terms refer to printing, typing and other means of reproducing words (including electronic media) in a visible form. References to any agreement or contract are to that agreement or contract as amended, modified or supplemented from time to time in accordance with the terms hereof and thereof. References from or through any date mean, unless otherwise specified, from and including or through and including, respectively. References to "law", "laws" or to a particular statute or law shall be deemed also to include any and all Applicable Law.

ARTICLE 2
PURCHASE AND SALE

Section 2.01. *Purchase and Sale.* Upon the terms and subject to the conditions of this Agreement, Seller agree to sell to Buyer, and Buyer agrees to purchase from Seller, the Shares at the Closing. The purchase price for the

Shares is U.S. $1 (the "**Purchase Price**").   The Purchase Price shall be paid as provided in Section 2.02.

Section 2.02.   *Closing.*   The closing (the "**Closing**") of the purchase and sale of the Shares hereunder shall take place at the offices of Kim and Chang, 223 Naeja-dong, Jongno-gu, Seoul 110-720, Republic of Korea, as soon as possible, but in no event later than five (5) Business Days after satisfaction of the conditions set forth in Article 9, or at such other time or place as Buyer and Seller may agree.   At the Closing:

(a)    Buyer shall deliver to Seller the Purchase Price in immediately available funds by wire transfer to an account of Seller with a bank in New York City designated by Seller, by notice to Buyer, which notice shall be delivered not later than one Business Day prior to the Closing Date (or if not so designated, then by certified or official bank check payable in immediately available funds to the order of Seller in such amount);

(b)    Seller shall deliver to Buyer all share certificates representing the Shares (or an express indemnity in favor of Company in the case of any found to be missing), if they have been issued, and any and all other documentation necessary to effect the change in entry of the shareholders' register in connection with the Shares;

(c)    Seller and Buyer shall deliver to each other (i) the Trademark License Agreement, (ii) the License Agreement, (iii) the Intercompany Accounts Settlement Agreement, and (iv) the Share Pledge Agreement; and

(d)    Buyer and Seller shall provide such other duly executed documents, instruments or certificates as are reasonable necessary to be delivered pursuant to this Agreement.

ARTICLE 3
REPRESENTATIONS AND WARRANTIES OF SELLER

Except as set forth in the disclosure schedules (the "**Disclosure Schedules**"), Seller represents and warrants to Buyer that:

Section 3.01.   *Existence and Power.*   Each of the Seller and the Company is duly formed, validly existing and, if applicable, in good standing under the laws of its jurisdiction of organization and has all powers and all governmental licenses, authorizations, permits, consents and approvals required to carry on its business as now conducted, except for those licenses, authorizations, permits, consents and approvals the absence of which would not have a Material Adverse Effect.   The Company is duly qualified to do business as a foreign corporation and is in good standing in each jurisdiction where such qualification

is necessary, except for those jurisdictions where failure to be so qualified would not, individually or in the aggregate, have a Material Adverse Effect.

Section 3.02.  *Authorization.*  The execution, delivery and performance by Seller of this Agreement, the other Transaction Agreements and the consummation of the transactions contemplated hereby and thereby are within Seller's corporate powers and, subject to entry by the Bankruptcy Court of the Approval Order, have been duly authorized by all necessary action on the part of Seller.  Subject to entry by the Bankruptcy Court of the Approval Order, this Agreement constitutes, and each of the Transaction Agreements, when executed, will constitute, a valid and binding agreement of Seller.

Section 3.03.  *Capitalization.*  (a) The authorized capital stock of the Company consists of 226,244 shares of Common Stock.  As of the date hereof, the outstanding capital stock of the Company consists only of the Shares.

(b)  All Shares have been duly authorized and validly issued and are fully paid and non assessable.  Except as set forth in this Section 3.03, there are no outstanding (i) shares of capital stock or other voting securities of the Company, (ii) securities of the Company convertible into or exchangeable for shares of capital stock or other voting securities of the Company or (iii) options or other rights to acquire from the Company, or other obligation of the Company to issue, any capital stock, other voting securities or securities convertible into or exchangeable for capital stock or other voting securities of the Company (the items in clauses 3.03(b)(i), 3.03(b)(ii) and 3.03(b)(iii) being referred to collectively as the **"Company Securities"**).  There are no outstanding obligations of the Company to repurchase, redeem or otherwise acquire any Company Securities.

(c)  The Company does not own or control, directly or indirectly, any ownership interest in any Person or participate in any joint venture, partnership or similar arrangement.

Section 3.04.  *Ownership of Shares.*  Seller is the record and beneficial owners of all of the Shares, and will transfer and deliver to Buyer at the Closing valid title to the Shares free and clear of any Lien.

Section 3.05.  *Noncontravention.*  Subject to the Approval Order, neither the execution and delivery by Seller of this Agreement or any of the Transaction Agreements to which Seller will be a party nor the consummation by Seller of the transactions contemplated hereby or thereby will (a) conflict with or violate any provision of the charter, by-laws or other governing documents of Seller or the Company, (b) require on the part of Seller, the Company or any of their respective subsidiaries any material notice to or filing with, or any material permit, authorization, consent or approval of, any Governmental Authority except for a

share transfer report which is to be filed by the Seller with the Minister of Knowledge Economy within 30 days from the date of this Agreement, (c) conflict with, result in a breach of, constitute (with or without due notice or lapse of time or both) a default under, result in the acceleration of obligations under, create in any party any right to terminate, modify or cancel, or require any notice, consent or waiver under, any material contract or instrument to which the Company is a party or by which it is bound or to which any of its material properties or assets is subject, (d) result in the imposition of any Lien upon any Shares or (e) violate any material Applicable Law.

ARTICLE 4

REPRESENTATIONS AND WARRANTIES OF BUYER

Buyer represents and warrants to Seller that:

Section 4.01. *Existence and Power.* Buyer is a Korean incorporated company, validly existing and, if applicable, in good standing under the laws of the Republic of Korea and has all corporate powers and all material governmental licenses, authorizations, permits, consents and approvals required to carry on its business as now conducted.

Section 4.02. *Authorization.* The execution, delivery and performance by Buyer of this Agreement and the other Transaction Agreements and the consummation of the transactions contemplated hereby and thereby are within the corporate powers of Buyer and have been duly authorized by all necessary corporate action on the part of Buyer. This Agreement constitutes, and each of the other Transaction Agreements, when executed, will constitute, a valid and binding agreement of Buyer.

Section 4.03. *Noncontravention.* Neither the execution and delivery by Buyer of this Agreement or any of the other Transaction Agreements nor the consummation by Buyer of the transactions contemplated hereby or thereby will (a) conflict with or violate any provision of the charter, by-laws or other governing documents of Buyer, (b) require on the part of Buyer any material notice to or filing with, or material permit, authorization, consent or approval of, any Governmental Authority, (c) conflict with, result in breach of, constitute (with or without due notice or lapse of time or both) a default under, result in the acceleration of obligations under, create in any party any right to terminate, modify or cancel, or require any notice, consent or waiver under, any contract or instrument to which Buyer is a party or by which it is bound or to which any of its properties or assets is subject or (d) violate any material Applicable Law.

Section 4.04. *Purchase For Investment.* Buyer is purchasing the Shares for investment for its own account and not with a view to, or for sale in connection with, any distribution thereof. Buyer (either alone or together with

its advisors) has sufficient knowledge and experience in financial and business matters so as to be capable of evaluating the merits and risks of its investment in the Shares and is capable of bearing the economic risks of such investment.

Section 4.05.    *Financing.*    Buyer has, and shall have as of the Closing, sufficient cash, available lines of credit and other sources of immediately available funds to pay the Purchase Price and any other amounts to be paid by it hereunder.    Buyer acknowledges and agrees that Buyer's performance of its respective obligations under this Agreement is not in any way contingent upon the availability of financing to Buyer.

Section 4.06.    *Inspections; No Other Representations.*    Buyer is an informed and sophisticated purchaser, and has engaged expert advisors, experienced in the evaluation and purchase of companies such as the Company. Buyer has undertaken such investigation and has been provided with and has evaluated such documents and information as it has deemed necessary to enable it to make an informed and intelligent decision with respect to the execution, delivery and performance of this Agreement.    Buyer acknowledges that Seller has given Buyer complete and open access to the key employees, documents and facilities of the Company.    Buyer will undertake prior to Closing such further investigation and request such additional documents and information as it deems necessary.    Buyer agrees to accept the Shares and the Company in the condition they are in on the Closing Date based upon its own inspection, examination and determination with respect thereto as to all matters and without reliance upon any express or implied representations or warranties of any nature made by or on behalf of or imputed to Seller, except as expressly set forth in this Agreement. Without limiting the generality of the foregoing,    Buyer acknowledges that Seller makes no representation or warranty with respect to (i) any projections, estimates or budgets delivered to or made available to Buyer of future revenues, future results of operations (or any component thereof), future cash flows or future financial condition (or any component thereof) of the Company or the future business and operations of the Company or (ii) any other information or documents made available to Buyer or its counsel, accountants or advisors with respect to the Company or its businesses or operations, except as expressly set forth in this Agreement.

ARTICLE 5
COVENANTS OF SELLER

Seller agrees that:

Section 5.01.    *Conduct of the Company.*    Except as contemplated by this Agreement or as required by Applicable Law (including the Bankruptcy Code, the rules thereunder, the operation and information requirements of the Office of United States Trustee (the "**OIRR**"), or any orders entered by the Bankruptcy

Court in the Bankruptcy Cases), during the period from the date of this Agreement through the Closing, Seller shall cause the Company to conduct its business in the ordinary course consistent with past practice. Without limiting the generality of the foregoing, from the date hereof until the Closing, except as set forth in this Section 5.01 or as required by the Bankruptcy Code, the Bankruptcy Rules, the OIRR or any orders entered by the Bankruptcy Court in the Bankruptcy Cases, without the prior written consent of Buyer, which consent shall not be unreasonably withheld, conditioned or delayed, Seller will not permit the Company to:

     (a)    adopt or propose any change in its articles of incorporation;

     (b)    merge or consolidate with any other Person or acquire a material amount of assets from any other Person;

     (c)    sell, lease, license or otherwise dispose of any material assets except (i) pursuant to existing contracts or commitments or (ii) otherwise in the ordinary course consistent with past practice; or

     (d)    agree or commit to do any of the foregoing.

     Section 5.02.   *Access to Information.*  (a) From the date hereof until the Closing Date, Seller will (i) give, and will cause the Company to give, Buyer, its counsel, financial advisors, auditors and other authorized representatives reasonable access to the offices, properties, books and records of the Company and to the books and records of Seller relating to the Company, (ii) furnish, and will cause the Company to furnish, to Buyer, its counsel, financial advisors, auditors and other authorized representatives such financial and operating data and other information relating to the Company as such Persons may reasonably request, and (iii) instruct the employees, counsel and financial advisors of Seller or the Company to cooperate with Buyer in its investigation of the Company. Any investigation pursuant to this Section shall be conducted in such manner as not to interfere unreasonably with the conduct of the business of Seller or the Company. Notwithstanding the foregoing, Buyer shall not have access to personnel records of the Company relating to individual performance or evaluation records, medical histories or other information which in Seller's good faith opinion is sensitive or the disclosure of which could subject the Company to risk of liability.

     (b)    On and after the Closing Date and for a period of not more than one (1) year and on an as available basis thereafter, Seller will afford promptly to Buyer and its agents reasonable access to its books of account, financial and other records (including accountant's work papers), information, employees and auditors to the extent primarily related to the Company and necessary or useful for Buyer or, after the Closing Date, the Company in connection with any audit,

investigation, dispute or litigation, in connection with Buyer's or, after the Closing Date, the Company's compliance with Applicable Law or any other reasonable business purpose relating to the Company; *provided*, that any such access by Buyer shall not unreasonably interfere with the conduct of the business of Seller. Seller shall not destroy or otherwise cease to retain any such books, records or accounts retained by it without first providing Buyer with thirty (30) days prior written notice and the opportunity to obtain or copy such books, records or accounts during such thirty (30)-day period at Buyer's expense. Other than the costs of maintaining such information, Buyer shall bear all of the out-of-pocket costs and expenses (including attorneys' fees, but excluding reimbursement for general overhead, salaries and employee benefits) reasonably incurred in connection with its access to such information.

Section 5.03.    *Resignations.*    At or prior to the Closing Date, Seller will deliver to Buyer the resignations of all directors and the statutory auditor of the Company who will be officers, directors or employees of Seller or any of its Affiliates after the Closing Date from their position as director or statutory auditor of the Company.

Section 5.04.    *Tax Covenant.*    All transfer, documentary, sales, use, stamp, registration and other such Taxes and fees (including any penalties and interest) incurred in connection with transactions contemplated by this Agreement (including any securities transaction Tax and capital gain Tax, if any) shall be borne and paid by Buyer, and Buyer will, at its own expense, file all necessary Tax returns and other documentation with respect to all such Taxes and fees, and, if required by Applicable Law, Seller will, and will cause its Affiliates to, join in the execution of any such Tax returns and other documentation.

ARTICLE 6
COVENANTS OF BUYER

Buyer agrees that:

Section 6.01.    *Confidentiality.*    The terms of the Confidentiality Agreement shall continue in full force and effect until the Closing, at which time Buyer's confidentiality obligations shall terminate only in respect of that portion of the Confidential Information (as defined therein) of the Company. Except as set forth in the foregoing sentence, all of the provisions of the Confidentiality Agreement shall continue in full force and effect after the Closing and will survive any termination of this Agreement.

Section 6.02.    *Access; Seller's Confidentiality.*    Buyer will cause the Company, on and after the Closing Date and for a period of not more than seven (7) years thereafter, to promptly afford to Seller and its agents reasonable access to the Company's properties, books, records, employees and auditors to the extent

necessary to permit Seller to determine any matter relating to its rights and obligations hereunder or to any period ending on or before the Closing Date; *provided*, that any such access by Seller shall not unreasonably interfere with the conduct of the business of Buyer.    The Buyer shall not destroy, permit the Company to destroy or otherwise cease to retain any such books, records or accounts retained by it without first providing Seller with thirty (30) days prior written notice and the opportunity to obtain or copy such books, records or accounts during such thirty (30)-day period at Seller's expense.    Other than the costs of maintaining such information, Seller shall bear all of the out-of-pocket costs and expenses (including attorneys' fees, but excluding reimbursement for general overhead, salaries and employee benefits) reasonably incurred in connection with its access to such information.

Section 6.03.    *Trademarks; Tradenames.*    After the Closing, except as expressly permitted by the Trademark License Agreement or the License Agreement, Buyer shall not permit the Company to use any trademarks or tradenames owned by Seller or any of its Affiliates.

ARTICLE 7
COVENANTS OF BUYER AND SELLER

Buyer and Seller agree that:

Section 7.01.    *Reasonable Best Efforts; Further Assurances.*    Subject to the terms and conditions of this Agreement, Buyer and Seller will use their reasonable best efforts to take, or cause to be taken, all actions and to do, or cause to be done, all things necessary or desirable under Applicable Law to consummate the transactions contemplated by this Agreement.    Seller and Buyer agree, and Seller, prior to the Closing, and Buyer, after the Closing, agree to cause the Company, to execute and deliver such other documents, certificates, agreements and other writings and to take such other actions as may be necessary or desirable in order to consummate or implement expeditiously the transactions contemplated by this Agreement.

Section 7.02.    *Certain Filings.*    Seller and Buyer shall cooperate with one another (i) in determining whether any action by or in respect of, or filing with, any Governmental Authority is required, or any actions, consents, approvals or waivers are required to be obtained from parties to any material contracts, in connection with the consummation of the transactions contemplated by this Agreement and (ii) in taking such actions or making any such filings, furnishing information required in connection therewith and seeking timely to obtain any such actions, consents, approvals or waivers.

Section 7.03.    *Public Announcements.*    Seller and Buyer agree to obtain the prior written approval of the other party before issuing any press release or

making any public statement with respect to this Agreement or the transactions contemplated hereby and, except for any press releases and public announcements the making of which may be required by Applicable Law, will not issue any such press release or make any such public statement prior to such approval.

Section 7.04. *Intercompany Accounts.* All intercompany accounts between Seller or its Affiliates, on the one hand, and the Company, on the other hand, as of the Closing shall be settled, or agreed to be settled, in accordance with the terms of the Intercompany Accounts Settlement Agreement. In order to provide to Seller and its Affiliates collateral to secure the Company's payment obligations under the Intercompany Accounts Settlement Agreement, at the Closing Buyer shall enter into a Share Pledge Agreement with Seller and any Affiliates of Seller who are owed amounts by the Company, providing for Seller and its Affiliates (as the case may be) to hold the Shares as collateral, and prohibiting Buyer from transferring the Shares, until all of the Company's obligations under the Intercompany Accounts Settlement Agreement are paid and satisfied in full.

## ARTICLE 8
### INDEMNIFICATION

Section 8.01. *Indemnification.* Buyer hereby indemnifies and holds harmless Seller and its directors, officers, employees, agents, successors and assigns (collectively, the "**Seller Indemnities**") from and against and with respect to all losses, liabilities, obligations, damages, deficiencies, actions, suits, proceedings, demands, assessments, orders, judgments, fines, penalties, costs, and expenses (including, without limitation, reasonable fees and disbursements of lawyers, accountants, and other professional advisers) of any kind or nature whatsoever (whether or not arising out of third party claims and including all reasonable amounts paid in the investigation, defense, or settlement of the foregoing) (collectively, the "**Losses**") sustained, suffered or incurred by or made against any of the Seller Indemnities arising out of, based upon or in connection with (a) any inaccuracy in or breach of any representations or warranties given or made by Buyer in this Agreement, and/or (b) any breach of any covenant or agreement given or made by Buyer in this Agreement, and/or (c) any action or claim successfully asserted by any Governmental Authority against the Company and/or (d) any misconduct or omission of any of the Seller Indemnities other than willful misconduct or omission.

## ARTICLE 9
### CONDITIONS TO CLOSING

Section 9.01. *Conditions to Obligations of Buyer and Seller.* The obligations of Buyer and Seller to consummate the Closing are subject to the satisfaction of the following conditions:

(a)     No provision of any Applicable Law shall prohibit the consummation of the Closing.

(b)     All material actions by or in respect of or material filings with any Governmental Authority required to permit the consummation of the Closing shall have been taken, made or obtained, except for any such actions or filings the failure to take, make or obtain would not reasonably be expected to have a Material Adverse Effect.

(c)     The Bankruptcy Court shall have entered the Approval Order.

Section 9.02.     *Conditions to Obligation of Buyer.*     The obligation of Buyer to consummate the Closing is subject to the satisfaction of the following further conditions:

(a)     (i) Seller shall have performed in all material respects all of its obligations hereunder required to be performed by it on or prior to the Closing Date, (ii) the representations and warranties of Seller contained in this Agreement and in any certificate or other writing delivered by Seller pursuant hereto shall be true at and as of the Closing Date, as if made at and as of such date, with only such exceptions as would not in the aggregate reasonably be expected to have a Material Adverse Effect and (iii) Buyer shall have received a certificate signed by the chief legal officer of BearingPoint, Inc., a Delaware Corporation, to the foregoing effect.

(b)     Buyer shall have received all documents it may reasonably request relating to the legal existence of Seller and the Company, and the authority of Seller to perform this Agreement, all in form and substance reasonably satisfactory to Buyer.

Section 9.03.     *Conditions to Obligation of Seller.*     The obligation of Seller to consummate the Closing is subject to the satisfaction of the following further conditions:

(a)     (i) Buyer shall have performed in all material respects all of its obligations hereunder required to be performed by it at or prior to the Closing Date, (ii) the representations and warranties of Buyer contained in this Agreement and in any certificate or other writing delivered by Buyer pursuant hereto shall be true in all material respects at and as of the Closing Date, as if made at and as of such date and (iii) Seller shall have received a certificate signed by the representative director of Buyer to the foregoing effect.

(b)     Seller shall have received all documents it may reasonably request relating to the legal existence of Buyer and the authority of Buyer to perform this Agreement, all in form and substance reasonably satisfactory to Seller.

# ARTICLE 10
## BANKRUPTCY COVENANTS

Section 10.01. *Approval Order.* As promptly as practicable, but in no event later than two (2) Business Days after the date hereof, Seller shall file with the Bankruptcy Court a motion seeking entry of an Approval Order, and Buyer and Seller agree to use reasonable best efforts to cause the Bankruptcy Court to enter an Approval Order on or about November 3, 2009, which order shall be in form and substance satisfactory to Seller and Buyer. Seller agrees to provide to Buyer a draft of the Approval Order, and Buyer agrees to promptly advise Seller in writing of any changes that it requires for such draft Approval Order to be in form and substance satisfactory to Buyer. If Seller thereafter proposes any changes to such form of Approval Order, Seller shall promptly notify Buyer. If prior to, during or after the hearing on the motion seeking approval of such form of Approval Order, the Bankruptcy Court makes any such changes or any other modifications to such form of Approval Order, Seller and Buyer shall be required to raise any objections thereto in writing (or as otherwise permitted by the Bankruptcy Court) prior to entry of the Approval Order. Unless Seller or Buyer raises any such objections in writing (or as otherwise permitted by the Bankruptcy Court) prior to entry of the Approval Order, such Approval Order shall be deemed to be in form and substance satisfactory to each party for all purposes.

Section 10.02. *Noncontravention.* Seller covenants and agrees that the terms of any plan of reorganization or liquidation or proposed order of the Bankruptcy Court that may be filed, proposed or submitted or supported by Seller or any of its Affiliates after entry of the Approval Order or consummation of the transactions contemplated hereby shall not conflict with, supersede, abrogate, nullify, modify or restrict the terms of this Agreement or the Approval Order, or the rights of Buyer hereunder or thereunder.

# ARTICLE 11
## TERMINATION

Section 11.01. *Grounds for Termination.* This Agreement may be terminated at any time prior to the Closing:

(a)     by mutual written agreement of Seller and Buyer;

(b)     by either Seller or Buyer if the Closing shall not have been consummated on or before December 20, 2009; or

(c)     by either Seller or Buyer if consummation of the transactions contemplated hereby would violate any nonappealable final order, decree or judgment of any Governmental Authority having competent jurisdiction.

The party desiring to terminate this Agreement pursuant to clauses 11.01(b) or (c) shall give notice of such termination to the other party.

Section 11.02. *Effect of Termination.* If this Agreement is terminated as permitted by Section 11.01, such termination shall be without liability of any party (or any stockholder, director, officer, employee, agent, consultant or representative of such party) to any other party to this Agreement; *provided* that if such termination shall result from the willful (i) failure by any party hereto to perform a covenant of this Agreement or (ii) breach by any party hereto of any representation, warranty or agreement contained herein, such party shall be fully liable for any and all damages incurred or suffered by the other party as a result of such failure or breach. The provisions of Sections 6.01, 7.03, Article 8 and Article 12 shall survive any termination hereof pursuant to Section 11.01.

ARTICLE 12
MISCELLANEOUS

Section 12.01. *Notices.* All notices, requests and other communications to any party hereunder shall be in writing (including facsimile transmission and electronic mail ("**e-mail**") transmission, so long as a receipt of such e-mail is requested and received) and shall be given,

if to Buyer, to:

**BPH Corporation**
23rd Floor GangNam Finance Center
737 Yeoksam-dong, Kangnam-ku
Seoul 135-984)
Republic of Korea
Attention: Koh, YoungChe
Facsimile No.: 82-2-3442-1500
E-mail: youngche.koh@bearingpoint.co.kr

if to Seller, to:

BearingPoint, Inc.
100 Crescent Court
Suite 700
Dallas, TX 75201
Attention: President
Facsimile No.: (214) 292-8844
E-mail: be@johndegroote.com

with a copy to:

Allen & Overy LLP
One Bishops Square
London, E1 6AD
United Kingdom
Attention:   Edward Barnett
Facsimile No.:   +44 (0)20 3088 0088
E-mail:   edward.barnett@allenovery.com

or such other address or facsimile number as such party may hereafter specify for
the purpose by notice to the other parties hereto.   All such notices, requests and
other communications shall be deemed received on the date of receipt by the
recipient thereof if received prior to 5 p.m. in the place of receipt and such day is
a Business Day in the place of receipt.   Otherwise, any such notice, request or
communication shall be deemed not to have been received until the next
succeeding Business Day in the place of receipt.

Section 12.02. *Amendments and Waivers.*   (a)  Any provision of this
Agreement may be amended or waived if, but only if, such amendment or waiver
is in writing and is signed, in the case of an amendment, by each party to this
Agreement, or in the case of a waiver, by the party against whom the waiver is to
be effective.

(b)     No failure or delay by any party in exercising any right, power or
privilege hereunder shall operate as a waiver thereof nor shall any single or partial
exercise thereof preclude any other or further exercise thereof or the exercise of
any other right, power or privilege. The rights and remedies herein provided shall
be cumulative and not exclusive of any rights or remedies provided by law.

Section 12.03. *Expenses.*   Except as otherwise provided herein, all costs
and expenses incurred in connection with this Agreement shall be paid by the
party incurring such cost or expense.

Section 12.04. *Successors and Assigns.*   The provisions of this
Agreement shall be binding upon and inure to the benefit of the parties hereto and
their respective successors and assigns; *provided* that no party may assign,
delegate or otherwise transfer any of its rights or obligations under this
Agreement without the consent of each other party hereto.

Section 12.05. *Governing Law.*   This Agreement shall be governed by
and construed in accordance with the law of the State of New York, without
regard to the conflicts of law rules of such state.

Section 12.06. *Jurisdiction.*   To the fullest extent permitted by applicable
Law, each party hereto (a) agrees that any claim, action or proceeding by such

party seeking any relief whatsoever arising out of, or in connection with this Agreement or any other Transaction Agreement or the transactions contemplated hereby or thereby shall be brought only in (i) the Bankruptcy Court, if brought prior to the entry of a final decree closing the Chapter 11 Case, and (ii) in the federal courts in the Southern District of New York and the state courts of the State of New York, County of Manhattan (collectively, the "New York Courts"), if brought after entry of such final decree closing the Chapter 11 Case, and shall not be brought, in each case, in any other state or federal court in the United States of America or any court in any other country, (b) agrees to submit to the exclusive jurisdiction of the Bankruptcy Court or the New York Courts, as applicable, pursuant to the preceding clauses (a)(i) and (ii), for purposes of all claims, actions or proceedings arising out of, or in connection with this Agreement or any Transaction Agreement or the transactions contemplated by this Agreement, (c) waives and agrees not to assert any objection that it may now or hereafter have to the laying of the venue of any such claim, action or proceeding brought in such a court or any claim that any such claim, action or proceeding brought in such a court has been brought in an inconvenient forum, (d) agrees that mailing of process or other papers in connection with any such claim, action or proceeding in the manner provided in Section 12.01 hereto shall be valid and sufficient service thereof, and (e) agrees that a final judgment in any such claim, action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by applicable Law.

Section 12.07. *WAIVER OF JURY TRIAL.* EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATED TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

Section 12.08. *Counterparts; Effectiveness; Third Party Beneficiaries.* This Agreement may be signed in any number of counterparts, each of which shall be an original, with the same effect as if the signatures thereto and hereto were upon the same instrument. This Agreement shall become effective when each party hereto shall have received a counterpart hereof signed by the other party hereto. Until and unless each party has received a counterpart hereof signed by the other party hereto, this Agreement shall have no effect and no party shall have any right or obligation hereunder (whether by virtue of any other oral or written agreement or other communication). No provision of this Agreement is intended to confer any rights, benefits, remedies, obligations, or liabilities hereunder upon any Person other than the parties hereto and their respective successors and assigns.

Section 12.09. *Entire Agreement.* The Transaction Agreements constitute the entire agreement between the parties with respect to the subject

matter of this Agreement and supersedes all prior agreements and understandings, both oral and written, between the parties with respect to the subject matter of this Agreement.

Section 12.10. *Severability.* If any term, provision, covenant or restriction of this Agreement is held by a court of competent jurisdiction or other Governmental Authority to be invalid, void or unenforceable, the remainder of the terms, provisions, covenants and restrictions of this Agreement shall remain in full force and effect and shall in no way be affected, impaired or invalidated so long as the economic or legal substance of the transactions contemplated hereby is not affected in any manner materially adverse to any party. Upon such a determination, the parties shall negotiate in good faith to modify this Agreement so as to effect the original intent of the parties as closely as possible in an acceptable manner in order that the transactions contemplated hereby be consummated as originally contemplated to the fullest extent possible.

Section 12.11. *Specific Performance.* The parties hereto agree that irreparable damage would occur if any provision of this Agreement were not performed in accordance with the terms hereof and that the parties shall be entitled to an injunction or injunctions to prevent breaches of this Agreement or to enforce specifically the performance of the terms and provisions hereof in the United States District Court for the Southern District of New York or any New York State court sitting in New York City, in addition to any other remedy to which they are entitled at law or in equity.

Section 12.12. *Survival of Provisions.* The representations, warranties, covenants and agreements contained in this Agreement and in any certificate or other writing delivered pursuant hereto shall not survive the Closing, except for the agreements set forth in Sections 5.02(b), 5.04, 6.01, 6.02, 6.03, 7.01, 7.03, Article 8 and Article 12.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed by their respective authorized officers as of the day and year first above written.

**BPH Corporation**

By: _____

Name:    Koh, YoungChe

Title:    Representative Director

**BE New York Holdings, Inc.**

By: _____

Name:    John DeGroote

Title:    President

## Exhibit B

**Private Sale Order**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------x
                                                :

In re                                  :     **Chapter 11 Case No.**
                                                :

**LEHMAN BROTHERS HOLDINGS INC.,** *et al.*,    :     **08-13555 (JMP)**
                                                :

                **Debtors.**           :     **(Jointly Administered)**
                                                :
                                                :
-------------------------------------------------------------------x

### ORDER APPROVING MOTION OF BNC MORTGAGE LLC, PURSUANT TO SECTIONS 363(b), 365(a), and 554(a) OF THE BANKRUPTCY CODE AND RULES 6004, 6006, AND 9014 OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE, AUTHORIZING (I) THE REJECTION OF CERTAIN LEASES AND SUBLEASES OF NONRESIDENTIAL REAL PROPERTY AND (II) THE SALE OR ABANDONMENT OF *DE MINIMIS* ASSETS

Upon the motion, dated February 4, 2009 (the "Motion"), of BNC Mortgage LLC

("BNC"), as debtor and debtor-in-possession, pursuant to sections 363(b), 365(a), 554(a) of title

11 of the United States Code (the "Bankruptcy Code") and Rules 6004, 6006, and 9014 of the

Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") for authorization to (i) reject

the leases set forth on Exhibit A annexed hereto (the "Leases " or "Leased Properties") and the

subleases set forth on Exhibit B annexed hereto (the "Subleases" or "Subleased Properties") and

(ii) sell or abandon certain miscellaneous assets, including fixtures, furniture, and other office

equipment ("FF&E") without further authorization of the Court, all as more fully described in

the Motion; and the Court having jurisdiction to consider the Motion and the relief requested

therein in accordance with 28 U.S.C. §§ 157 and 1334 and the Standing Order M-61 Referring to

Bankruptcy Judges for the Southern District of New York Any and All Proceedings Under Title

11, dated July 10, 1984 (Ward, Acting C.J.); and consideration of the Motion and the relief

requested therein being a core proceeding pursuant to 28 U.S.C. § 157(b); and due and proper

notice of the Motion having been provided in accordance with the procedures set forth in the

order entered September 22, 2008 governing case management and administrative procedures [Docket No. 285] and in the amended order entered February 13, 2009 governing case management and administrative procedures [Docket No. 2837] to (i) the United States Trustee for the Southern District of New York; (ii) the attorneys for the Official Committee of Unsecured Creditors; (iii) the Securities and Exchange Commission; (iv) the Internal Revenue Service; (v) the United States Attorney for the Southern District of New York; (vi) the landlords ands sublessees set forth in <u>Exhibit A</u> and <u>Exhibit B</u> to the Motion; and (vii) all parties who have requested notice in these chapter 11 cases, and it appearing that no other or further notice need be provided; and the debtors having filed a certificate of no objection; and the Court having found and determined that the relief sought in the Motion is in the best interests of BNC, its estates and creditors, and all parties in interest and that the legal and factual bases set forth in the Motion establish just cause for the relief granted herein; and after due deliberation and sufficient cause appearing therefor, it is

   ORDERED that the Motion is hereby granted; and it is further

   ORDERED that pursuant to section 365(a) of the Bankruptcy Code and Bankruptcy Rules 6006 and 9014, the rejection of the Leases, is hereby approved effective as the earlier of (i) the date BNC relinquishes possession of the Leased Properties or (ii) the date of this Order; and it is further

   ORDERED that pursuant to section 365(a) of the Bankruptcy Code and Bankruptcy Rules 6006 and 9014, the rejection of the Subleases is hereby approved effective as the date of this Order; and it is further

   ORDERED that all time periods set forth in this Order shall be calculated in accordance with Bankruptcy Rule 9006(a); and it is further

ORDERED that any rejection damage claim asserted by the counterparties to the Leases and Subleases shall be filed (subject to all of the BNC's rights, claims and defenses, including rights of setoff with respect to any such claims) on or before the final date for filing proofs of claim in BNC's chapter 11 case to be established by order of this Court, which proofs of claim shall be filed in accordance with the procedures set forth in such order; and it is further

ORDERED that the Debtors are authorized to sell the FF&E owned by BNC located at the Leased Properties and Subleased Properties without further authorization of the Court; and it is further

ORDERED that, pursuant to section 363(f) of the Bankruptcy Code, the sale of the FF&E shall be free and clear of all liens, claims and encumbrances, and any liens, claims and encumbrances thereon shall attach to the net proceeds of the sale of such FF&E with the same force and effect and asserted priority as such liens, claims and encumbrances had against the FF&E, subject to the rights, claims, defenses and objections, if any, of the BNC and all interested parties with respect thereto; and it is further

ORDERED that purchasers of the FF&E sold by BNC pursuant to this Order shall be entitled to the protections afforded by section 363(m) of the Bankruptcy Code in the event of a reversal or modification on appeal of this Order; and it is further

ORDERED that BNC is authorized to take all actions and execute all documents necessary or appropriate to effectuate the sale of any of the FF&E; and it is further

ORDERED that BNC is authorized, pursuant to section 554(a) of the Bankruptcy Code, in its sole discretion to abandon the FF&E; and it further

ORDERED that this Court shall retain jurisdiction to hear and determine all

matters arising from or related to the implementation, interpretation and/or enforcement of this

Order.

Dated: February 24, 2009
       New York, New York

                                          _/s/ James M. Peck_____
                                          UNITED STATES BANKRUPTCY JUDGE

# Exhibit A – Schedule of Leases to be Rejected

| Leased Property | Landlord | Notice Address for Landlord | Date of Execution of Lease |
|---|---|---|---|
| 1475 South Bascom Avenue Campbell, CA (Suite 101) | Creekside Business Mall LLC | Creekside Business Mall, LLC P.O. Box 4060 Menlo Park, CA 94026 | 7/14/03 |
| 22632 Golden Springs Drive Diamond Bar, CA (Suite 200/210) | Rosemead Properties, Inc. | Rosemead Properties c/o PacificWest Asset Management Co. P.O. Box 19068 Irvine, CA 92623 | 4/4/03 |
| 2655 Warrenville Road Downers Grove, IL (5th Floor of Corridors II Building) | Corridors I & II/Loudoun II SPE Feeco, L.L.C. | Corridors I & II/Loudoun II SPE Feeco, L.L.C., c/o The Alter Group Ltd. Attn: Mr. Ronald Siegel 5500 W. Howard Street Skokie, IL 60077

Lawrence M. Freedman, Ash, Anos, Freedman & Logan, L.L.C. 77 West Washington Street, Suite 1211 Chicago, IL 60602

Alter Asset Management, L.L.C. Attn: Samuel F. Gould 1980 Springer Drive Lombard, IL 60148

Lehman Brothers Bank FSB Attn: John Herman 399 Park Avenue, 8th Floor NY, NY 10022

Stroock & Stroock & Lavan LLP Attn: William Campbell, Esq. 180 Maiden Lane NY, NY 10038 | 5/13/03 |
| 500 North Central Avenue Glendale, CA (Suite 300) | GRE Glendale LLC | GRE Glendale LLC 500 N. Central-Property Manager 500 North Central Ave., Suite 225 Glendale, CA 91203 | 11/30/2003 |
| 5450 West Sahara Avenue Las Vegas, NV (Suite 200) | 5450 West Sahara LLC | 5450 West Sahara LLC Management Office, 5450 West Sahara Avenue Las Vegas, NV 89146

5450 West Sahara LLC, c/o SCI Property Management, Inc. Attn: Suzann Brent 11620 Wilshire Boulevard, Suite 300 LA, CA 90025 | 8/12/05 |

| Leased Property | Landlord | Notice Address for Landlord | Date of Execution of Lease |
|---|---|---|---|
| 1501 W. Fountainhead Pkwy<br>Tempe, AZ<br>(Suite 130) | Amberjack, LTD | AmberJack, Ltd.,<br>c/o Birtcher Arizona, LLC<br>2400 S. 55th Street<br>Tempe, AZ 85282 | 8/15/03 |
| 16400 Southcenter Parkway<br>Tukwila, WA<br>(Suites 405 and 408) | Sunray Investments LLP | Sunray Investments Partnership, c/o FANA Group of Companies<br>16400 Southcenter Parkway, #204<br>Tukwila, WA 98188 | 6/26/02 |
| 300 Galleria Officentre<br>Southfield, MI<br>(Suites 400 and 406) | Galleria Properties, LLC | Galleria Properties LLC<br>26877 Northwestern Highway<br>Southfield, MI 48033 | 10/1/04 |
| 6300 S. Syracuse Way<br>Centennial, CO<br>(Suite 110) | Legacy III Centennial, LLC | Legacy III Centennial, LLC<br>c/o Legacy Partners Commercial, Inc.<br>Attn: Asset Manager<br>4000 East Third Avenue, Suite 600<br>Foster City, CA 94404<br><br>Legacy Partners Commercial, Inc.<br>Attn: Property Manager<br>6300 S. Syracuse Way,<br>Suite 580<br>Centennial, CO 80111 | 2/9/04 |
| 4100 Midway Road<br>Carrollton, TX<br>(Suite 1110) | CB Office 10, Ltd. | CB Office 10, Ltd.<br>Attn: Mack Dennis<br>4100 International Parkway, Suite 1100<br>Carrollton, TX 75007 | 3/11/05 |
| 4100 E. Mississippi Ave.<br>Suite 1000<br>Glendale, CO | Mountain Towers Properties, LLC | Mountain Towers Properties LLC, c/o CB Richard Ellis Real Estate Services, Inc., Asset Services<br>Attn: Property Manager<br>4100 East Mississippi Ave. Suite 100<br>Glendale, CO 80246<br><br>Mountain Towers Properties, LLC<br>Attn: Kevin Fay<br>1000 Potomac Street Northwest, Suite 150<br>Washington, D.C. 20007 | 11/19/02 |
| 1225 East Fort Union Blvd.<br>Midvale, UT<br>(Suite 100) | Northwest, LLC<br>(Union Park Office Building Salt Lake City L.P.) | Northwest, LLC<br>Thomas M. Lloyd<br>6925 Union Park Center, Suite 500<br>Midvale, UT 84047 | 7/10/02 |

| Leased Property | Landlord | Notice Address for Landlord | Date of Execution of Lease |
|---|---|---|---|
| 1051 Perimeter Drive<br>Schaumburg, IL<br>(Suite 650) | Beneficiaries of North Star Trust Company Title Holding Land Trust | Beneficiaries of North Star Trust Company Title Holding Land Trust, c/o Marc Realty LLC<br>55 East Jackson Boulevard, Suite 500<br>Chicago, IL 60604 | 9/5/03 |

## Exhibit B – Schedule of Subleases to be Rejected

| Leased Property | Subtenant | Notice Address for Subtenant | Date of Execution of Sublease |
|---|---|---|---|
| 6300 S Syracuse Way, Centennial, CO (Suite 110) | Redd Shell Corporation (Subtenant)<br><br>Trustwave Holdings, Inc. (Subsublessee) | Redd Shell Corporation<br>Attn: James Paul<br>6300 South Syracuse Way<br>Suite 110<br>Centenial, CO 80111<br><br>Beth Newcomb LLC<br>Attn: Beth Newcomb<br>726 S. Gaylord Street, Denver, CO 80209<br><br>Trustwave Holdings, Inc.<br>70 W. Madison Street, Suite 1050<br>Chicago, IL 60602 | 5/24/06 |
| 4100 Midway Road Carrollton, TX (4,915 s.f.) | Aimbridge Hospitality, LP | Aimbridge Hospitality, LP<br>Attn: Leslie V. Bentley<br>4100 Midway Road, Suite 2115<br>Carrollton, TX 75007<br><br>Carla S. Moreland, Esq.<br>5112 Briargrove Lane<br>Dallas, TX 75287 | 2/08 |
| 4100 Midway Road Carrollton, TX (5,488 s.f.) | Wingspan Portfolio Advisors, LLC | Wingspan Portfolio Advisors, LLC<br>Attn: Mr. Steve Horne<br>8124 Weiss Avenue<br>Plano, TX 75025<br><br>Andrews Kurth, LLP<br>Attn: Bill Rivers<br>1717 Main Street<br>Dallas, TX 75201 | 8/14/08 |
| 4100 East Mississippi Avenue Glendale, CO (Suite 1000) | Lehman Brothers Bank, FSB | Lehman Brothers Bank, FSB<br>Attn: Chief Operating Officer<br>10350 Park Meadows Drive<br>Littleton, CO 80124<br><br>Lehman Brothers Bank<br>Attn: General Counsel<br>1000 West Street<br>Wilmington, DE 19801<br><br>Aurora Loan Services<br>Attn: Legal Department<br>10350 Park Meadows Drive<br>Littleton, CO 80124 | 5/24/07 |

| Leased Property | Subtenant | Notice Address for Subtenant | Date of Execution of Sublease |
|---|---|---|---|
| 1225 East Fort Union Boulevard Midvale, UT 84047 (Suite 100) | The Training Authorities, LLC | The Training Authorities, LLC Attn: Jim Kelly 3529 Gabel Road Billings, Montana 59102<br><br>Herndon & Sweeney, P.C. Kevin C. Sweeney, Esq. P.O. Box 80050 Billings, Montana 59102 | 3/28/08 |
| 1051 Perimeter Drive Schaumberg, IL (Suite 650) | HTC America, Inc. | HTC America, Inc. Attn: Waiman Lam 13920 Southeast Eastgate Way, Suite 400 Bellevue, WA 98005<br><br>Perkins Coie, LLP Attn: Jerry Lutz The PSE Building, 10885 N.E. Fourth Street, Suite 700 Bellevue, WA 98004 | 11/10/06 |

# **Annex A**

## **Proposed Order**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

```
------------------------------------------------------------- x
                                          :
In re:                                    :
                                          :       Chapter 11 Case No.
BEARINGPOINT, INC., et al.,               :
                                          :       09-10691 (REG)
                        Debtors.          :
                                          :       (Jointly Administered)
                                          :
------------------------------------------------------------- x
```

**ORDER (I) APPROVING THE SALE OF
DEBTORS' STOCK IN NON-DEBTOR BEARINGPOINT, INC. (KOREA),
(II) AUTHORIZING THE SALE FREE AND CLEAR OF ALL LIENS, CLAIMS,
ENCUMBRANCES AND INTERESTS, (III) AUTHORIZING AND APPROVING THE
STOCK PURCHASE AGREEMENT, (IV) APPROVING CERTAIN ANCILLARY
AGREEMENTS THERETO AND (V) GRANTING RELATED RELIEF**

**(The "*Approval Order*")**

Upon the motion, dated October 22, 2009 [Docket No. ___] (the "***Motion***"),[1] of

BearingPoint, Inc. and certain of its affiliates, as debtors and debtors-in-possession (collectively,

the "***Debtors***"), pursuant to sections 363 and 105 of chapter 11 of the United States Code (the

"***Bankruptcy Code***") and Rules 2002, 6004, 9007 and 9014 of the Federal Rules of Bankruptcy

Procedure (the "***Bankruptcy Rules***"), for an order (a) approving (i) that certain Stock Purchase

Agreement dated as of October 22, 2009 (the "***SPA***"),[2] between BPH Corporation (the "***Buyer***"),

BE New York Holdings, Inc. ("***BE***"), and certain other persons (collectively, the "***Sellers***"), and

(ii) certain related Ancillary Agreements, (b) authorizing the private sale of the Shares (the

"***Sale***") pursuant to the terms set forth in the SPA, and (c) authorizing the Debtors to perform

under the SPA and consummate those transactions contemplated in the SPA and the Ancillary

---

[1]    Capitalized terms used herein but not defined herein shall have the meaning ascribed to such terms in the SPA.

[2]    A copy of the SPA is attached hereto as Exhibit A.

Agreements[3] (collectively with the Sale, the "***Sale Transactions***") and take such actions as are necessary in furtherance thereof; and all parties in interest having been heard or having had the opportunity to be heard, regarding the SPA and the Ancillary Agreements; and the Bankruptcy Court having reviewed and considered the Motion and any objections thereto; and upon the record of these chapter 11 cases and proceedings, and after due deliberation thereon, and good cause appearing therefor:

THE COURT HEREBY MAKES THE FOLLOWING FINDINGS:[4]

A.    **Jurisdiction and Venue**.  This Court has jurisdiction over the Motion and the Sale Transactions under 28 U.S.C. §§ 157 and 1334.  This is a core proceeding under 28 U.S.C. § 157(b).  Venue of these cases and the Motion in this District is proper under 28 U.S.C. §§ 1408 and 1409.

B.    **Statutory Predicates**.  The statutory predicates for the relief sought in the Motion are sections 363 and 105(a) of the Bankruptcy Code, Bankruptcy Rules 2002, 6004, 9007 and 9014 and the applicable Local Rules for the United States Bankruptcy Court for the Southern District of New York (the "***Local Rules***").

C.    **Sale Notice**.  As evidenced by the affidavits of service filed with this Court and based upon the representations of counsel in the Motion:  (i) due, proper, timely, adequate and sufficient notice of the Motion and the Sale Transactions has been provided to all parties in interest, in light of the circumstances of the Debtors, the previous marketing of the Shares and Debtors' significant exposure to costs and liabilities stemming from BE Korea's wind down; (ii) such notice was and is good, sufficient and appropriate under the circumstances of these

---

[3]    The Ancillary Agreements include: the License Agreement, the Trademark License Agreement, the Intercompany Accounts Settlement Agreement, the Transition Services Agreement and the Share Pledge Agreement.

[4]    Findings of fact shall be construed as conclusions of law and conclusions of law shall be construed as findings of fact to the fullest extent of the law.  See Fed. R. Bankr. P. 7052.

chapter 11 cases and was provided in accordance with sections 102(1) and 363(b) of the Bankruptcy Code, Bankruptcy Rules 2002, 6004, 9006 and 9007 and the Local Rules; and (iii) no other or further notice of the Motion or of the entry of this Approval Order is necessary or shall be required.

D. **Opportunity to Object**. A reasonable opportunity to object and to be heard with respect to the sale of the Shares, the Ancillary Agreements, the Sale Transactions, the Motion and the relief requested therein has been given to all interested persons and entities, including, without limitation, the following: (i) all parties listed on the Master Services List, in accordance with the Order Pursuant to Section 105(a) of the Bankruptcy Code and Bankruptcy Rules 1015(c) and 9007 Implementing Certain Notice and Case Management Procedures, dated March 5, 2009 (the "*Case Management Order #2*") [Docket No. 117], and (ii) all applicable federal, state and local taxing and regulatory authorities.

E. **The Shares**. The Shares constitute property of the Debtors' estates and title thereto is vested in the Debtors' estates within the meaning of section 541(a) of the Bankruptcy Code. The Debtors have all right, title, and interest in the Shares that is required to transfer and convey the Shares as contemplated by the SPA.

F. **Business Justification**. The Debtors have demonstrated both (i) good, sufficient and sound business purposes and justifications for, and (ii) compelling circumstances for, the Sale Transactions being consummated other than in the ordinary course of business under Bankruptcy Code section 363(b) and before, and outside of, a plan of reorganization, and such action is an appropriate exercise of the Debtors' business judgment and in the best interests of the Debtors, their estates and their creditors. Such business reasons include, but are not limited to, the facts that: (i) the Debtors are exposed to significant costs and liabilities stemming from

BE Korea's wind down process and related potential detriment to their estates if the sale is not promptly consummated; (ii) the SPA constitutes the best value for the Shares; (iii) the SPA and the Closing (as defined in the SPA) will present the best opportunity to minimize the wind down costs of BE Korea; and (iv) unless the sale is concluded expeditiously as provided for in the Motion and pursuant to the SPA, potential creditor recoveries may be diminished.

In connection with the sale of assets of BE's parent company and its affiliates, the Shares were available to all potential purchasers beginning in March 2009, as set forth in the Motion. Based upon the record of these proceedings, all creditors and other parties in interest and all prospective purchasers have been afforded a reasonable and fair opportunity to express interest in the Shares.

No other person or entity or group of persons or entities has offered to purchase the Shares for an amount that would give equal or greater economic value to and eliminate as much cost and liability exposure for the Sellers than the value being provided and the liabilities being assumed by the Buyer pursuant to the SPA. Among other things, the Sale Transactions are the best alternative available to the Debtors to preserve their estates and thus maximize the return to their creditors. Approval of the Motion, the SPA, the Ancillary Agreements, and the Sale Transactions by this Court on the terms of this Approval Order is in the best interests of the Debtors, their creditors and all other parties in interest. No known alternative to the Sale Transactions exists that would provide a greater value to and eliminate as much cost and liability exposure for the Debtors, their creditors, or other parties in interest.

G. **Approval Order Required by Buyer.** Entry of an order approving the SPA, the Ancillary Agreements, the Sale Transactions, and all the provisions thereof, on the terms requested in the Motion and set forth in the form and substance of this Approval Order, is a

necessary and appropriate condition precedent to the Buyer's consummation of the Sale Transactions.

H.     **Consideration**.  The total consideration provided by the Buyer for the Shares is the highest and best offer received by the Debtors, and the Purchase Price constitutes reasonably equivalent value and fair consideration under the Bankruptcy Code, the Uniform Fraudulent Transfer Act, the Uniform Fraudulent Conveyance Act and the laws of the United States, any state, territory, possession thereof or the District of Columbia.

I.     **Arm's-Length Sale**.  The SPA and Ancillary Agreements and other documents and instruments related to and connected with the Sale Transactions and the consummation thereof were negotiated, proposed and entered into by the Sellers and the Buyer without collusion, in good faith and from arm's-length bargaining positions.  Neither the Buyer nor any of its affiliates, members, partners, principals, or shareholders or their respective representatives is an "insider" of any of the Debtors, as that term is defined in section 101(31) of the Bankruptcy Code.  Neither the Debtors, the Buyer nor any of its affiliates, members, partners, principals, or shareholders or their respective representatives has engaged in any conduct that would cause or permit the SPA or any Ancillary Agreements or other documents and instruments related to or connected with the Sale Transactions and the consummation thereof to be avoided, or costs or damages to be imposed, under section 363(n) of the Bankruptcy Code, or has acted in bad faith or in any improper or collusive manner with any person.  The terms and conditions of the SPA, Ancillary Agreements, and other documents and instruments related to and connected with the Sale Transactions and the consummation thereof, and the Sale Transactions themselves, including without limitation the consideration provided in respect thereof, are fair and

reasonable, and the Sale Transactions are not avoidable and shall not be avoided under section 363(n) of the Bankruptcy Code.

J. **<u>Good Faith Purchaser</u>**. The Buyer, its affiliates, members, partners, principals, and shareholders and their respective representatives have proceeded in good faith and without collusion in all respects in connection with this proceeding. Such persons are therefore entitled to all of the benefits and protections of section 363(m) of the Bankruptcy Code. Accordingly, the reversal or modification on appeal of the authorization provided herein to consummate the Sale Transactions shall not affect the validity of the Sale Transactions (including, without limitation, the Ancillary Agreements and other documents and instruments related to or connected with the Sale Transactions and the consummation thereof). No stay pending appeal of this Approval Order has been requested, and the stay contained in Fed. R. Bankr. P. 6004(h) has been and hereby is expressly and irrevocably waived as set forth in paragraph 19 below.

K. **<u>Corporate Authority</u>**. Subject to the entry of this Order, the Debtors (i) have full corporate power and authority to perform all of their obligations under the SPA, the Ancillary Agreements, and all other documents and instruments related to and connected with the Sale Transactions and the consummation thereof, and the Debtors' execution and delivery of, and performance of obligations under, the SPA, Ancillary Agreements, and other documents and instruments is hereby ratified, (ii) have all of the power, and authority necessary to consummate the Sale Transactions, (iii) have taken all action necessary to authorize, approve, execute and deliver the SPA, Ancillary Agreements, and all other documents and instruments related to or connected with the Sale Transactions and the consummation thereof and the Sale Transactions themselves, and (iv) no further consents or approvals are required to consummate Sale

Transactions or otherwise perform obligations under the SPA, Ancillary Agreements, or other documents and instruments, except for the closing conditions expressly agreed to therein.

L. **Free and Clear**. The transfer of the Shares to the Buyer under the SPA will be a legal, valid, and effective transfer, and at the Closing will vest the Buyer with all right, title, and interest of the Debtors to the Shares free and clear of all liens, claims (as defined in section 101(5) of the Bankruptcy Code), encumbrances, obligations, liabilities, demands, guarantees, actions, suits, defenses, deposits, credits, allowances, options, rights, restrictions, limitations, contractual commitments, rights of first refusal, rights of setoff or recoupment, or interests of any kind or nature whether known or unknown, legal or equitable, matured or unmatured, contingent or noncontingent, liquidated or unliquidated, asserted or unasserted, whether arising prior to or subsequent to the commencement of these chapter 11 cases, whether imposed by agreement, understanding, law, equity or otherwise (collectively, "*Interests*"), including, but not limited to, (i) those Interests that purport to give to any party a right or option to effect a setoff against or any forfeiture, modification or termination of the Debtors' interests in the Shares, or any similar rights if any; (ii) those Interests arising under all mortgages, deeds of trust, security interests, conditional sale or other title retention agreements, pledges, liens, judgments, demands, encumbrances, rights of first refusal or charges of any kind or nature, if any, (iii) those Interests that are retained by the Seller under the SPA or the Ancillary Agreements; (iv) those Interests arising in connection with any agreements, acts, or failures to act, of any of the Sellers or any of the Sellers' predecessors, affiliates, or representatives including, but not limited to, Interests arising under any doctrines of successor liability or similar theories under applicable state or federal law or otherwise. All such Interests to attach to the consideration to be received by the

Debtors in the same priority and subject to the same defenses and avoidability, if any, as of the Closing.

M. **<u>Free and Clear Findings Required by Buyer</u>**. The Buyer would not have entered into the SPA and would not have consummated the Sale Transactions, thus adversely affecting the Debtors, their estates and their creditors, if the sale of the Shares to the Buyer, were not free and clear of all Interests of any kind or nature whatsoever, as set forth in this Approval Order, or if the Buyer would, or in the future could, be liable for any of the Interests. A sale of the Shares other than one free and clear of all Interests would adversely impact the Debtors' estates, and would yield substantially less benefits for the Debtors' estates, with less certainty than the sale contemplated by the SPA. Therefore, the sale contemplated by the SPA is in the best interests of the Debtors, their estates and creditors, and all other parties in interest.

N. **<u>Satisfaction of Section 363(f) Standards</u>**. The Sellers may sell the Shares free and clear of any Interests of any kind or nature whatsoever because, in each case, one or more of the standards set forth in section 363(f)(1)-(5) of the Bankruptcy Code has been satisfied. Those holders of Interests who did not object or who withdrew their objections to the proposed sale or the Sale Transactions are deemed to have consented to the Motion and sale and assignment of the Shares to the Buyer pursuant to section 363(f)(2) of the Bankruptcy Code. Those holders of Interests who did object fall within one or more of the other subsections of section 363(f) of the Bankruptcy Code and are adequately protected by having their Interests attach to the net proceeds ultimately attributable to the Shares against or in which such Interests are asserted, subject to the terms of such Interests, with the same validity, force and effect, and in the same order of priority, which such Interests now have against the Shares or their proceeds, subject to

any rights, claims and defenses the Sellers or their estates, as applicable, may possess with respect thereto.

O. **Intercompany Obligations**. The termination, release, and/or settlement of the Intercompany Obligations is a necessary condition to consummation of the Sale. The structure of the Sale, and although the termination, release, and/or settlement of the Intercompany Obligations was not for the purpose of impairing the Agent's (as defined below) collateral, however, the Debtors acknowledge that such termination, release, and/or settlement of the Intercompany Obligations may impair such collateral. As such, the Agent reserves all rights with respect to such collateral, and nothing herein shall be deemed to prejudice the Agent's rights to its collateral or any proceeds of its collateral, provided that the transfer of any collateral to the Buyer shall be free and clear of the Agent's rights therein as otherwise set forth herein, with any such rights attaching only to the proceeds of the Sale.

P. **No Fraudulent Transfer**. The SPA and Ancillary Agreements were not entered into, and the Sale Transactions are not consummated, for the purpose of hindering, delaying or defrauding creditors of the Sellers under the Bankruptcy Code or under the laws of the United States, any state, territory, possession thereof, or the District of Columbia, or any other applicable law. Neither the Sellers nor the Buyer has entered into the SPA or the Ancillary Agreements or are consummating the Sale Transactions with any fraudulent or otherwise improper purpose. The consideration for the purchase of the Shares by the Buyer and for the other Sale Transactions that are set forth in the SPA is at least reasonably equivalent value for the purchase of such assets and for such other Sale Transactions under the Bankruptcy Code and the laws of the United States, any state, territory, possession thereof or the District of Columbia.

Q.    **Excluded Liabilities**.  Except as explicitly set forth in the SPA or the Ancillary Agreements, the transfer of the Shares to the Buyer under the SPA shall not result in the Buyer having any liability or responsibility for, or any Shares being recourse for, (i) any Interest asserted against the Sellers or against an insider of the Sellers or against any of the Debtors' Shares or any other assets of the Sellers, or (ii) the satisfaction in any manner, whether at law or in equity, whether by payment, setoff, recoupment, or otherwise, directly or indirectly, and whether from the Shares or otherwise, of any Interest, or (iii) otherwise to third parties or the Sellers.  The Debtors will release and forever discharge the Buyer and its successors and assigns from any and all claims, causes of action, obligations, liabilities, demands, losses, costs and expenses of any kind, character or nature whatsoever, known or unknown, fixed or contingent, relating to the sale and assignment of the Shares, except as explicitly set forth in the SPA or the Ancillary Agreements.

R.    **No Successor Liability**.  Without limiting the effect or scope of the foregoing, the transfer of the Shares from the Sellers to the Buyer does not and will not subject the Buyer, its affiliates, members, partners, principals, and shareholders or their respective properties (including the Shares) to any liability for Interests against the Sellers or the Sellers' Interests in such Shares by reason of such transfer or otherwise under the laws of the United States or any state, territory, possession thereof, or the District of Columbia applicable to the Sale Transaction, including, without limitation, any successor liability or similar theories.  The Sale Transactions contemplated by the SPA do not amount to a consolidation, merger or de facto merger of the Buyer and the Debtors and/or the Debtors' estates, there is not substantial continuity between the Buyer and the Debtors, there is no common identity between the Debtors and the Buyer, the Buyer is not a mere continuation of the Debtors' or their estates, and the Buyer does not

constitute a successor to the Debtors or their estates. For the avoidance of doubt, notwithstanding the consummation of the Sale Transactions and the employment by the Buyer of certain persons previously employed by the Sellers, Buyer shall not have any obligations or liabilities to any employee of the Sellers or in respect of any employee benefits owing to any employee of the Sellers by the Sellers or by any plan or program administered by the Sellers or for the benefit of the Sellers' employees except as is explicitly set forth in the SPA and Ancillary Agreements, and any obligations of the Buyer to any such person shall be limited to those obligations expressly agreed by Buyer with such person on and following the later of the Closing and the date, if any, that such person first becomes employed by Buyer.

S. **Prompt Consummation**. The Sale Transactions must be approved by the Court and consummated promptly in order to minimize the Debtors' exposure to BE Korea's wind down cost and wind down-related liabilities, to thereby preserve the value of the Debtors' estates, and to protect the "BearingPoint" brand name, for the reasons set forth in the Motion. For those reasons, time is of the essence in consummating the Sale Transactions. Accordingly, there is cause to lift the stay contemplated by Bankruptcy Rule 6004.

T. **Ancillary Agreements**. Consummation and delivery by the Debtors of the Ancillary Agreements are requirements of the Buyer, and the Buyer will not consummate the SPA or the Sale Transactions, thus adversely affecting the Debtors, their estates and their creditors without execution of the Ancillary Agreements.

U. **Sale in Best Interests**. Good and sufficient reasons for approval of the SPA, Ancillary Agreements, and the Sale Transactions have been articulated to the Court in the Motion and otherwise on the record in these chapter 11 cases, and the relief requested in the

Motion and set forth in this Approval Order is in the best interests of the Debtors, their estates, their creditors and other parties in interest.

**NOW, THEREFORE, IT IS ORDERED THAT:**

1. **Motion is Granted**. The Motion and the relief requested therein is **GRANTED** and **APPROVED**.

2. **Objections Overruled**. All objections to the entry of this Approval Order or the relief granted herein and requested in the Motion that have not been withdrawn, waived, or settled, or not otherwise resolved pursuant to the terms hereof, if any, hereby are denied and overruled on the merits with prejudice.

3. **Approval**. The SPA, the Ancillary Agreements, and all other documents and instruments related to and connected with the Sale Transactions and the consummation thereof, and all of the terms and conditions thereto, are hereby approved. Sellers are hereby authorized and directed to (i) execute (to the extent they are parties thereto) and deliver the SPA and the Ancillary Agreements, along with any additional instruments or documents that may be reasonably necessary or appropriate to implement the SPA and the Sale Transactions, and any prior execution by Sellers of such agreements, documents, and instruments is hereby ratified; (ii) perform all obligations under the SPA, Ancillary Agreements, and other documents and instruments related to or connected with the Sale Transactions and the consummation thereof, including but not limited to deeds, assignments, stock powers, powers of attorney, and other instruments of transfer, and consummate the Sale Transactions, and any prior performance of such obligations and any prior consummation of such Sale Transactions is hereby ratified; and (iii) take all other and further actions as may be reasonably necessary to consummate and implement the Sale Transactions and perform all obligations under the SPA, the Ancillary

Agreements, and all other documents and instruments related to and connected with the Sale Transactions and the consummation thereof, without any further corporate action or orders of the Bankruptcy Court. Without limiting the foregoing, the Sellers are hereby authorized to release, with respect to former employees of the Debtors hired by the Buyer, (i) public inspection files and any other immigration-related document, and (ii) immigration documentation in the possession of the Debtors' outside immigration counsel (including but not limited to visa applications and other related documents containing confidential information), in each case necessary or useful to the Buyer's efforts to assume, on an employee by employee basis, certain immigration-related obligations with respect to former employees of the Debtors hired by the Buyer, subject to any employee consent required under applicable law. Any and all prior acts of the Debtors in respect of the foregoing are hereby ratified. The Buyer shall have no obligation to proceed with the Closing until all conditions precedent to their obligations to do so have been met, satisfied or waived.

4. **Valid Transfer**. As of the Closing, (i) the Sale Transactions shall effect a legal, valid, enforceable and effective sale and transfer of the Debtors' Shares to Buyer, and shall vest Buyer with title to such Shares free and clear of all Interests of any kind whatsoever; and (ii) the SPA, the Ancillary Agreements, any other documents or instruments related to or connected with the Sale Transactions and the consummation thereof, and the Sale Transactions shall be enforceable against and binding upon, and not subject to rejection or avoidance by, the Sellers, any successor trustee appointed with respect thereto, and each other person and entity.

5. **Intercompany Obligations**. The Debtors shall be authorized to terminate, release, settle, and/or otherwise compromise Intercompany Obligations as provided for in the SPA and as necessary to effectuate the Sale Transactions, and to enter into any agreements

necessary to effectuate such termination, and/or settlement. Notwithstanding the foregoing, nothing herein shall be deemed to prejudice the Agent's rights to its collateral or any proceeds of its collateral.

6. **Free and Clear**. Except as expressly provided for in the SPA or this Order, pursuant to Bankruptcy Code sections 363(f) and 105(a), the Debtors are authorized and directed to transfer the Shares to the Buyer and the Buyer shall take title to and possession of the Shares, upon the Closing, free and clear of all Interests of any kind or nature whatsoever, with all such Interests to attach to the proceeds ultimately attributable to the property against or in which such Interests are asserted, subject to the terms of such Interests, with the same validity, force and effect, and in the same order of priority, which such Interests now have against the Shares or their proceeds, subject to any rights, claims and defenses the Debtors or their estates, as applicable, may possess with respect thereto. The provisions of this Order authorizing the sale and assignment of the Shares free and clear of Interests shall be self-executing, and neither the Debtors nor the Buyer shall be required to execute or file releases, termination statements, assignments, consents, or other instruments in order to effectuate, consummate and implement the provisions of this Order.

7. **Injunction**. Except as expressly permitted by the SPA or Ancillary Agreements, all persons and entities, including, but not limited to, all debt security holders, equity security holders, governmental, tax and regulatory authorities, lenders, trade creditors, contract counterparties, customers, landlords, licensors, employees, litigation claimants and other persons, holding Interests or Claims of any kind or nature whatsoever against or in the Sellers or the Sellers' interests in the Shares (whether known or unknown, legal or equitable, matured or unmatured, contingent or noncontingent, liquidated or unliquidated, asserted or unasserted,

whether arising prior to or subsequent to the commencement of these chapter 11 cases, whether imposed by agreement, understanding, law, equity or otherwise), arising under or out of, in connection with, or in any way relating to, the Sellers, the Shares, the operation of the Sellers' businesses before the Closing or the transfer of the Sellers' interests in the Shares to the Buyer, shall be and hereby are forever barred, estopped and permanently enjoined from asserting, prosecuting or otherwise pursuing Interests against the Buyer, its property, its successors and assigns, or any of its affiliates, members, partners, principals, or shareholders, successors or assigns or the interests of the Debtors in such Shares. Following the Closing, no holder of an Interest against the Debtors shall interfere with Buyer's title to or use and enjoyment of the Debtors' interests in the Shares based on or related to such Interests, and all such Interests, if any, shall be, and hereby are transferred and attached to the proceeds from the Sale Transactions in the order of their priority, with the same validity, force and effect which they have against such Debtors' Shares as of the Closing, subject to any rights, claims and defenses that the Sellers' estates and Sellers, as applicable, may possess with respect thereto.

8. **General Assignment**. As of the Closing, this Approval Order shall be construed and shall constitute for any and all purposes a full and complete general assignment, conveyance and transfer of the Shares acquired by the Buyer under the SPA and/or a bill of sale or assignment transferring indefeasible title and interest in the Shares to the Buyer. Each and every federal, state, and local governmental agency or department is hereby directed to accept any and all documents and instruments necessary and appropriate to consummate the Sale Transactions and to reflect the effectiveness of the Sale Transactions.

9. **No Successor Liability**. Neither Buyer nor its affiliates, members, partners, principals, or shareholders, successors or assigns shall, as a result of the consummation of the

Sale Transactions: (i) be a successor to the Sellers or the Debtors' estates; (ii) have, *de facto* or otherwise, merged or consolidated with or into the Sellers or the Debtors' estates; or (iii) be a continuation or substantial continuation of the Sellers or any enterprise of the Sellers. The Buyer shall not assume, nor be deemed to assume, or in any way be responsible for any liability or obligation of any of the Debtors and/or their estates including, but not limited to, any bulk sales law. Except as expressly set forth in the SPA or the Ancillary Agreements, the transfer of the Shares to Buyer under the SPA shall not result in (i) Buyer, its affiliates, members, partners, principals, or shareholders, successors or assigns, or the Shares having any liability or responsibility for any Interest against the Debtors or against an insider of the Debtors, (ii) Buyer, its affiliates, members, partners, principals, or shareholders, successors or assigns, or the Debtors' Shares having any liability whatsoever with respect to or be required to satisfy in any manner, whether at law or in equity, whether by payment, setoff or otherwise, directly or indirectly, any Interest, or (iii) Buyer, its affiliates, members, partners, principals, or shareholders, successors or assigns, or the Debtors' Shares having any liability or responsibility to the Debtors. The Motion constituted sufficient notice of the limitations set forth herein in accordance with Rule 6004-1 of the Local Rules.

10. **<u>Examples of No Successor Liability</u>**. Without limiting the generality, effect or scope of the foregoing, as a result of and following the Closing of the Sale Transactions, neither the Buyer nor its affiliates, members, partners, principals, or shareholders, successors or assigns, or the Shares shall have successor or vicarious liabilities of any kind or character, including, but not limited to, federal, state or other tax liabilities, U.S. or foreign pension liabilities, or liabilities based on any theory of antitrust, environmental, labor or employment or benefits law, alter ego, veil piercing, continuity of enterprise, mere continuation, product line, *de facto* merger or

substantial continuity, whether known or unknown, legal or equitable, matured or unmatured, contingent or noncontingent, liquidated or unliquidated, asserted or unasserted, whether arising prior to or subsequent to the commencement of these chapter 11 cases, whether imposed by agreement, understanding, law, equity or otherwise with respect to the Sellers or any obligations of the Sellers, including, but not limited to, liabilities arising, accruing or payable under, out of, in connection with, or in any way relating to or calculated or determined with respect to or based in whole or in any part upon the operation of the Business or ownership of the common stock of the Business prior to the Closing, or any taxes in connection with, or in any way relating to the cancellation of debt of the Sellers or their Affiliates. For the avoidance of doubt, notwithstanding the consummation of the Sale Transactions and the employment by the Buyer of certain persons previously employed by the Sellers, Buyer shall not have any obligations or liabilities to any employee of the Sellers or in respect of any employee benefits owing to or on behalf of any employee of the Sellers, or with respect to any plan or program administered by the Sellers or any other person or entity or administered for the benefit of the Sellers' employees, except as is explicitly set forth in the SPA and Ancillary Agreements, and any obligations of the Buyer to any such person shall be limited to those obligations expressly agreed by Buyer with such person if any, on and following the later of the Closing and the date, if any, that such person first becomes employed by Buyer.

11. **Binding Effect of Order**. This Approval Order shall be binding upon and shall govern the acts of all entities, including without limitation all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, administrative agencies, governmental departments, secretaries of state, federal, state and local officials, and all other persons and entities who may be required by operation of law, the duties

of their office, or contract, to accept, file, register or otherwise record or release any documents or instruments, or who may be required to report or insure any title or state of title in or to any of the Shares. The terms and provisions of the SPA, the Ancillary Agreements, all other documents and instruments related to or connected with the Sale Transactions and the consummation thereof, the Sale Transactions themselves, and this Approval Order shall be binding in all respects upon the Sellers, their affiliates, the Debtors' estates, all creditors thereof (whether known or unknown), all holders of equity interests in any of the Sellers, the Buyer and its affiliates, members, partners, principals, or shareholders, successors or assigns, and any and all third parties, notwithstanding any subsequent appointment of any trustee of the Debtors under any chapter of the Bankruptcy Code, as to which trustee(s) such terms and provisions likewise shall be binding.

12. **Release of Interests**. This Approval Order (i) shall be effective as a determination that, on the Closing, all Interests of any kind or nature whatsoever existing as to the Debtors' Shares prior to the Closing have been unconditionally released, discharged and terminated, and that the conveyances described herein have been effected, and (ii) shall be binding upon and shall govern the acts of all entities including without limitation, all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, administrative agencies, governmental departments, secretaries of state, federal, state, and local officials, and all other persons and entities who may be required by operation of law, the duties of their office, or contract, to accept, file, register or otherwise record or release any documents or instruments, or who may be required to report or insure any title or state of title in or to any of the Shares. On the Closing, the Debtors and persons holding an Interest in the Shares as of the Closing are authorized to execute such documents and take all

other actions as may be reasonably necessary to release their Interests in the Shares, if any, as such Interests may have been recorded or may otherwise exist.

13. **Retention of Jurisdiction**. This Court retains jurisdiction, pursuant to its statutory powers under 28 U.S.C. § 157(b)(2), to, among other things, interpret, implement, and enforce the terms and provisions of this Approval Order, all amendments thereto and any waivers and consents thereunder, including, but not limited to, retaining jurisdiction to (i) compel delivery of the Shares to Buyer; (ii) interpret, implement and enforce the provisions of this Approval Order, and any related order; and (iii) protect Buyer, its affiliates, members, partners, principals, or shareholders, successors or assigns against any Interests against the Debtors or the Shares of any kind or nature whatsoever, including, without limitation, through the grant of declaratory and injunctive relief determining that the Buyer, its affiliates, members, partners, principals, or shareholders, successors or assigns and their assets (including the Shares) are not subject to such Interests and prohibiting persons and entities from asserting such Interests against the Buyer, its affiliates, members, partners, principals, or shareholders, successors or assigns and their assets (including the Shares).

14. **Fees, Expenses and Other Obligations**. All obligations of the Debtors under the SPA, the Ancillary Agreements, and any and all of the documents delivered by the Debtors in connection with the SPA shall be paid in the manner provided in the SPA without further order of this Court. All such obligations shall constitute allowed administrative claims in each of these chapter 11 cases, with first priority administrative expense under section 507(a)(1) of the Bankruptcy Code. Until satisfied, all such obligations shall continue to have the protections provided in this Approval Order, and shall not be discharged, modified or otherwise affected by any reorganization plan for the Debtors, except by an express agreement with Buyer.

15. **Sale Proceeds**. Any and all valid and perfected Interests in the Shares shall attach to any proceeds of such Shares immediately upon receipt of such proceeds by the Sellers (or any party acting on any Seller's behalf) in the order of priority, and with the same validity, force and effect which they now have against such Shares, subject to any rights, claims and defenses the Sellers, the Debtors' estates or any trustee for any Debtor, as applicable, may possess with respect thereto, in addition to any limitations on the use of such proceeds pursuant to any provision of this Approval Order. Except as required by the SPA, no proceeds subject to an asserted security interest or lien shall be used or disbursed by the Debtors without the express consent of the party or parties asserting an security interest or lien therein or further order of the Bankruptcy Court after notice (to all parties who have asserted an Interest in such proceeds) and a hearing, consistent with the requirements of the Bankruptcy Code.

16. **No Material Modifications**. The SPA, Ancillary Agreements and any related agreements, documents or other instruments may be modified, amended or supplemented by the Debtors and the Buyer, in a writing signed by such parties, and in accordance with the terms thereof, without further order of the Court, *provided* that any (a) such modification, amendment or supplement does not have a material adverse effect on the Debtors' estates and has been agreed to between the Debtors and the Buyer and (b) such modification, amendment or supplement is filed with the Bankruptcy Court and provided on seventy-two (72) hours prior notice to its effectiveness to Bingham McCutchen LLP, as counsel for the Official Committee of Unsecured Creditors and Paul, Hastings, Janofsky & Walker LLP, as counsel for the Administrative Agent for the Debtors' prepetition secured lenders (the "*Agent*"). Any material modification, amendment, or supplement to the SPA must be approved by Order of the Bankruptcy Court following a motion on notice to all interested parties.

17.     **Subsequent Orders and Plan Provisions**.  Nothing contained in any subsequent order of this Court or any court of competent jurisdiction in these or other chapter 11 cases (including without limitation, an order authorizing the sale of assets pursuant to sections 363, 365 or any other provision of the Bankruptcy Code or any order entered after any conversion of a chapter 11 case of the Debtors to a case under chapter 7 of the Bankruptcy Code) or any chapter 11 plan confirmed in any Debtors' bankruptcy cases or any order confirming any such plan shall nullify, alter, conflict with, or in any manner derogate from the provisions of this Approval Order, and the provisions of this Approval Order shall survive and remain in full force and effect.

18.     **Failure to Specify Provisions**.  The failure specifically to include any particular provisions of the SPA or Ancillary Agreements in this Approval Order shall not diminish or impair the effectiveness of such provisions, it being the intent of the Court that the SPA and Ancillary Agreements be authorized and approved in their entirety.

19.     **No Stay of Order**.  Notwithstanding the provisions of Bankruptcy Rule 6004 or any applicable provisions of the Local Rules, this Approval Order shall not be stayed for ten (10) days after the entry hereof, but shall be effective and enforceable immediately upon entry, and the ten (10) day stay provided in such rules is hereby expressly waived and shall not apply. Time is of the essence in approving the Sale Transactions, and the Debtors and the Buyer intend to close the Sale Transactions as soon as practicable.  Any party objecting to this Approval Order must exercise due diligence in filing an appeal and pursuing a stay within the time prescribed by law and prior to Closing, or risk its appeal will be foreclosed as moot.

20. **<u>Closing Conditions and Termination Rights</u>**.  Nothing in this Approval Order shall modify or waive any closing conditions or termination rights in the SPA, and all such conditions and rights shall remain in full force and effect in accordance with their terms.

21. **<u>Allocation</u>**.  Except as may be necessary to satisfy certain tax obligations as set forth in the SPA, the Buyer shall pay proceeds of the Sale Transactions to the Sellers, collectively, to be held by BearingPoint, Inc.  The rights of all parties in interest in respect of the proper allocation of proceeds received by the Sellers on account of the Debtors' Shares are reserved, as among each of the Sellers.  No dispute relating to such allocation shall impair or delay the Buyer's right to close.  Sellers shall provide to the Agent and the Official Committee of Unsecured Creditors, on receipt, a schedule of the allocation of proceeds received by the Sellers on account of the Shares, and shall provide to the Agent and the Official Committee of Unsecured Creditors any notice or statement Seller proposes to deliver to Buyer thereunder at least seven (7) days before such delivery.  In the event of a dispute, the Agent and the Official Committee of Unsecured Creditors may seek appropriate relief from this Court and the Court shall reserve all rights to resolve such disputes relating to the allocation.  No dispute relating to the allocation of proceeds received by the Sellers on account of the Debtors' Shares shall impair or delay the Buyer's right to close or consummate the Sale Transactions.

22.     Nothing contained in this Order shall affect or impair the rights granted to the Agent pursuant to the Final Order Pursuant to Sections 105, 361, 362, 363, and 364 of the Bankruptcy Code (A) Authorizing the Debtors' Use of Cash Collateral by Consent and (B) Granting Adequate Protection, dated April 20, 2009.

Dated:  New York, New York
        _____, 2009


                                    _____
                                    HONORABLE ROBERT E. GERBER
                                    UNITED STATES BANKRUPTCY JUDGE

## Exhibit A

## The SPA

**STOCK PURCHASE AGREEMENT**

dated as of

October 22, 2009

between

**BPH Corporation,**

as Buyer

and

**BE NEW YORK HOLDINGS, INC.**

as Seller

relating to the purchase and sale

of

**100% of the Common Stock**

of

**BearingPoint, Inc.(Korea)**

# TABLE OF CONTENTS

**Page**

ARTICLE 1      DEFINITIONS ................................................................ 1

     Section 1.01.      Definitions .................................................... 1

     Section 1.02.      Other Definitional and Interpretative Provisions ......... 4

ARTICLE 2      PURCHASE AND SALE ................................................. 4

     Section 2.01.      Purchase and Sale ..................................... 4

     Section 2.02.      Closing .......................................................... 5

ARTICLE 3      REPRESENTATIONS AND WARRANTIES OF SELLER ................................................................. 5

     Section 3.01.      Existence and Power ................................. 5

     Section 3.02.      Authorization ............................................ 6

     Section 3.03.      Capitalization ............................................ 6

     Section 3.04.      Ownership of Shares ................................ 6

     Section 3.05.      Noncontravention ..................................... 6

ARTICLE 4      REPRESENTATIONS AND WARRANTIES OF BUYER .................................................................. 7

     Section 4.01.      Existence and Power ................................. 7

     Section 4.02.      Authorization ............................................ 7

     Section 4.03.      Noncontravention ..................................... 7

     Section 4.04.      Purchase For Investment ......................... 8

     Section 4.05.      Financing ................................................... 8

     Section 4.06.      Inspections; No Other Representations ......... 8

ARTICLE 5      COVENANTS OF SELLER ......................................... 8

     Section 5.01.      Conduct of the Company ......................... 9

     Section 5.02.      Access to Information .............................. 9

     Section 5.03.      Resignations ............................................ 10

     Section 5.04.      Tax Covenant .......................................... 10

ARTICLE 6      COVENANTS OF BUYER .......................................... 10

     Section 6.01.      Confidentiality ........................................ 10

     Section 6.02.      Access; Seller's Confidentiality ............... 11

Section 6.03.    Trademarks; Tradenames.............................................11
ARTICLE 7       COVENANTS OF BUYER AND SELLER .........................11
Section 7.01.    Reasonable Best Efforts; Further Assurances............11
Section 7.02.    Certain Filings.............................................................11
Section 7.03.    Public Announcements ..............................................12
Section 7.04.    Intercompany Accounts ..............................................12
ARTICLE 8       INDEMNIFICATION...................................................12
Section 8.01.    Indemnification ...........................................................12
ARTICLE 9       CONDITIONS TO CLOSING .............................................13
Section 9.01.    Conditions to Obligations of Buyer and Seller..........13
Section 9.02.    Conditions to Obligation of Buyer.............................13
Section 9.03.    Conditions to Obligation of Seller............................13
ARTICLE 10      BANKRUPTCY COVENANTS ..........................................14
Section 10.01.   Approval Order ...........................................................14
Section 10.02.   Noncontravention.......................................................14
ARTICLE 11      TERMINATION..............................................................14
Section 11.01.   Grounds for Termination ..........................................14
Section 11.02.   Effect of Termination.................................................15
ARTICLE 12      MISCELLANEOUS ........................................................15
Section 12.01.   Notices ........................................................................15
Section 12.02.   Amendments and Waivers.........................................16
Section 12.03.   Expenses .....................................................................16
Section 12.04.   Successors and Assigns..............................................16
Section 12.05.   Governing Law ...........................................................17
Section 12.06.   Jurisdiction.................................................................17
Section 12.07.   WAIVER OF JURY TRIAL.......................................17
Section 12.08.   Counterparts; Effectiveness; Third Party
                 Beneficiaries ..............................................................17
Section 12.09.   Entire Agreement.......................................................18

Section 12.10.    Severability ................................................................. 18

Section 12.11.    Specific Performance .................................................. 18

Section 12.12.    Survival of Provisions ............................................... 18

## EXHIBITS

| | |
|---|---|
| Exhibit A | Form of Trademark License Agreement |
| Exhibit B | Form of License Agreement |
| Exhibit C | Intercompany Accounts Settlement Agreement |
| Exhibit D | Share Pledge Agreement |
| Exhibit E | Transition Services Agreement |

## STOCK PURCHASE AGREEMENT

AGREEMENT (this "**Agreement**") dated as of _22_ October 2009 between **BPH Corporation,** a Korean incorporated company with an office at 23rd Floor GangNam Finance Center, 737 Yeoksam-dong, Kangnam-ku, Seoul 135-984, Republic of Korea ("**Buyer**") and **BE New York Holdings, Inc.,** a New York corporation with its principal office located at 100 Crescent Court, Suite 700, Dallas, Texas 75201 U.S.A. ("**Seller**").

<h2 style="text-align:center">W I T N E S S E T H :</h2>

WHEREAS, on February 18, 2009, Seller filed a voluntary petition for relief under Chapter 11 of Title 11 of the United States Bankruptcy Code, §§ 101, et seq. (as amended) (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**"), and the case is being jointly administered for procedural purposes only under Case no. 09-10691 (REG) (the "**Bankruptcy Case**");

WHEREAS, Seller is the record and beneficial owner of all of the outstanding shares of capital stock (the "**Shares**") of **BearingPoint, Inc.(Korea)**, a Korean incorporated company with an office at 23rd Floor GangNam Finance Center, 737 Yeoksam-dong, Kangnam-ku, Seoul 135-984, Republic of Korea (the "**Company**"); and

WHEREAS, Seller desires to sell the Shares to Buyer, and Buyer desires to purchase the Shares from Seller, upon the terms and subject to the conditions hereinafter set forth, in a sale pursuant to Section 363 of the Bankruptcy Code.

NOW, THEREFORE, in consideration of these premises and the mutual covenants and agreements set forth herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged by each party, the parties hereto agree as follows:

ARTICLE 1
DEFINITIONS

Section 1.01.    *Definitions.*    (a) As used herein, the following terms have the following meanings:

"**Affiliate**" means, with respect to any Person, any other Person directly or indirectly controlling, controlled by, or under common control with such Person; *provided* that the Company shall not be considered an Affiliate of Seller.

"**Applicable Law**" means, with respect to any Person, any federal, state or local law (statutory, common or otherwise), constitution, treaty, convention, ordinance, code, rule, regulation, order, injunction, judgment, decree, ruling or other similar requirement enacted, adopted, promulgated or applied by a Governmental Authority that is binding upon or applicable to such Person, as amended unless expressly specified otherwise.

"**Approval Order**" means an order by the Bankruptcy Court approving the transactions contemplated by this Agreement.

"**Business Day**" means a day, other than Saturday, Sunday or other day on which commercial banks in New York, New York are authorized or required by Applicable Law to close.

"**Closing Date**" means the date of the Closing.

"**Code**" means the United States Internal Revenue Code of 1986, as amended.

"**Common Stock**" means the common stock of the Company.

"**Governmental Authority**" means any transnational, domestic or foreign federal, state or local, governmental authority, department, court, agency or official, including any political subdivision thereof.

"**Intellectual Property**" means trade marks, service marks, trade names, domain names, logos, get-up, patents, inventions, registered and unregistered design rights, copyrights, semi-conductor topography rights, database rights and all other similar rights in any part of the world (including know-how) including, where such rights are obtained or enhanced by registration, any registration of such rights and applications and rights to apply for such registrations.

"**Intercompany Accounts Settlement Agreement**" means the Intercompany Accounts Settlement Agreement to be entered into by the Company, Seller and various of the Seller's Affiliates for the purpose of settling (or agreeing to settle) intercompany accounts payable and receivable between the Company, on the one hand, and Seller and its Affiliates on the other hand, and substantially in the form attached hereto as Exhibit C.

"**License Agreement**" means the Intellectual Property License Agreement among Buyer, BearingPoint, Inc. and the Seller substantially in the form of Exhibit B.

"**Lien**" means, with respect to any property or asset, any mortgage, lien, pledge, charge, security interest or encumbrance in respect of such property or asset.

"**Material Adverse Effect**" means a material adverse effect on the business, assets or results of operations of the Company, taken as whole, except any such effect resulting from or arising in connection with  (i)  this Agreement or the transactions contemplated hereby,  (ii)  changes or conditions affecting the industry in which the Company operates, or  (iii)  changes in economic, regulatory or political conditions generally.

"**Person**" means an individual, corporation, partnership, limited liability company, association, trust or other entity or organization, including a Governmental Authority.

"**Share Pledge Agreement**" means that certain Share Pledge Agreement delivered by Buyer to Seller in order to secure the performance by the Company of the Company's obligations under the Intercompany Accounts Settlement Agreement, as provided in Section 7.04 hereof, and substantially in the form attached hereto as Exhibit D.

"**Tax**" means any tax, governmental fee or other like assessment or charge of any kind whatsoever (including, but not limited to, withholding on amounts paid to or by any Person), together with any interest, penalty, addition to tax or additional amount imposed by any governmental authority (domestic or foreign) responsible for the imposition of any such tax (a "**Taxing Authority**").

"**Trademark License Agreement**" means the Trademark License Agreement between Dallas Project Holdings Limited and the Company, substantially in the form attached hereto as Exhibit A.

"**Transaction Agreements**" means this Agreement , the License Agreement, the Trademark License Agreement, the Intercompany Accounts Settlement Agreement, the Transition Services Agreement and the Share Pledge Agreement.

"**Transition Services Agreement**" means that certain Transition Services Agreement between BearingPoint, Inc. and the Company substantially in the form attached hereto as Exhibit E.

(b)     Each of the following terms is defined in the Section set forth opposite such term:

| **Term** | **Section** |
| --- | --- |
| Agreement | Preamble |
| Bankruptcy Case | Preamble |
| Bankruptcy Code | Preamble |
| Bankruptcy Court | Preamble |
| Buyer | Preamble |

| Term | Section |
|------|---------|
| Closing | Section 2.02 |
| Company | Preamble |
| Company Securities | Section 3.03 |
| Disclosure Schedules | Article 3 |
| e-mail | Section 12.01 |
| Losses | Section 8.01 |
| New York Courts | Section 12.06 |
| OIRR | Section 5.01 |
| Purchase Price | Section 2.01 |
| Seller Indemnities | Section 8.01 |
| Seller | Preamble |
| Shares | Preamble |

Section 1.02. *Other Definitional and Interpretative Provisions.* The words "hereof", "herein" and "hereunder" and words of like import used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement. The captions herein are included for convenience of reference only and shall be ignored in the construction or interpretation hereof. References to Articles, Sections, Exhibits and Schedules are to Articles, Sections, Exhibits and Schedules of this Agreement unless otherwise specified. All Exhibits and Schedules annexed hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth in full herein. Any capitalized terms used in any Exhibit or Schedule but not otherwise defined therein, shall have the meaning as defined in this Agreement. Any singular term in this Agreement shall be deemed to include the plural, and any plural term the singular. Whenever the words "include", "includes" or "including" are used in this Agreement, they shall be deemed to be followed by the words "without limitation", whether or not they are in fact followed by those words or words of like import. "Writing", "written" and comparable terms refer to printing, typing and other means of reproducing words (including electronic media) in a visible form. References to any agreement or contract are to that agreement or contract as amended, modified or supplemented from time to time in accordance with the terms hereof and thereof. References from or through any date mean, unless otherwise specified, from and including or through and including, respectively. References to "law", "laws" or to a particular statute or law shall be deemed also to include any and all Applicable Law.

## ARTICLE 2
## PURCHASE AND SALE

Section 2.01. *Purchase and Sale.* Upon the terms and subject to the conditions of this Agreement, Seller agree to sell to Buyer, and Buyer agrees to purchase from Seller, the Shares at the Closing. The purchase price for the

Shares is U.S. $1 (the "**Purchase Price**"). The Purchase Price shall be paid as provided in Section 2.02.

Section 2.02. *Closing.* The closing (the "**Closing**") of the purchase and sale of the Shares hereunder shall take place at the offices of Kim and Chang, 223 Naeja-dong, Jongno-gu, Seoul 110-720, Republic of Korea, as soon as possible, but in no event later than five (5) Business Days after satisfaction of the conditions set forth in Article 9, or at such other time or place as Buyer and Seller may agree. At the Closing:

(a)    Buyer shall deliver to Seller the Purchase Price in immediately available funds by wire transfer to an account of Seller with a bank in New York City designated by Seller, by notice to Buyer, which notice shall be delivered not later than one Business Day prior to the Closing Date (or if not so designated, then by certified or official bank check payable in immediately available funds to the order of Seller in such amount);

(b)    Seller shall deliver to Buyer all share certificates representing the Shares (or an express indemnity in favor of Company in the case of any found to be missing), if they have been issued, and any and all other documentation necessary to effect the change in entry of the shareholders' register in connection with the Shares;

(c)    Seller and Buyer shall deliver to each other (i) the Trademark License Agreement, (ii) the License Agreement, (iii) the Intercompany Accounts Settlement Agreement, and (iv) the Share Pledge Agreement; and

(d)    Buyer and Seller shall provide such other duly executed documents, instruments or certificates as are reasonable necessary to be delivered pursuant to this Agreement.

ARTICLE 3
REPRESENTATIONS AND WARRANTIES OF SELLER

Except as set forth in the disclosure schedules (the "**Disclosure Schedules**"), Seller represents and warrants to Buyer that:

Section 3.01. *Existence and Power.* Each of the Seller and the Company is duly formed, validly existing and, if applicable, in good standing under the laws of its jurisdiction of organization and has all powers and all governmental licenses, authorizations, permits, consents and approvals required to carry on its business as now conducted, except for those licenses, authorizations, permits, consents and approvals the absence of which would not have a Material Adverse Effect. The Company is duly qualified to do business as a foreign corporation and is in good standing in each jurisdiction where such qualification

is necessary, except for those jurisdictions where failure to be so qualified would not, individually or in the aggregate, have a Material Adverse Effect.

Section 3.02. *Authorization.* The execution, delivery and performance by Seller of this Agreement, the other Transaction Agreements and the consummation of the transactions contemplated hereby and thereby are within Seller's corporate powers and, subject to entry by the Bankruptcy Court of the Approval Order, have been duly authorized by all necessary action on the part of Seller. Subject to entry by the Bankruptcy Court of the Approval Order, this Agreement constitutes, and each of the Transaction Agreements, when executed, will constitute, a valid and binding agreement of Seller.

Section 3.03. *Capitalization.* (a) The authorized capital stock of the Company consists of 226,244 shares of Common Stock. As of the date hereof, the outstanding capital stock of the Company consists only of the Shares.

(b) All Shares have been duly authorized and validly issued and are fully paid and non assessable. Except as set forth in this Section 3.03, there are no outstanding (i) shares of capital stock or other voting securities of the Company, (ii) securities of the Company convertible into or exchangeable for shares of capital stock or other voting securities of the Company or (iii) options or other rights to acquire from the Company, or other obligation of the Company to issue, any capital stock, other voting securities or securities convertible into or exchangeable for capital stock or other voting securities of the Company (the items in clauses 3.03(b)(i), 3.03(b)(ii) and 3.03(b)(iii) being referred to collectively as the "**Company Securities**"). There are no outstanding obligations of the Company to repurchase, redeem or otherwise acquire any Company Securities.

(c) The Company does not own or control, directly or indirectly, any ownership interest in any Person or participate in any joint venture, partnership or similar arrangement.

Section 3.04. *Ownership of Shares.* Seller is the record and beneficial owners of all of the Shares, and will transfer and deliver to Buyer at the Closing valid title to the Shares free and clear of any Lien.

Section 3.05. *Noncontravention.* Subject to the Approval Order, neither the execution and delivery by Seller of this Agreement or any of the Transaction Agreements to which Seller will be a party nor the consummation by Seller of the transactions contemplated hereby or thereby will (a) conflict with or violate any provision of the charter, by-laws or other governing documents of Seller or the Company, (b) require on the part of Seller, the Company or any of their respective subsidiaries any material notice to or filing with, or any material permit, authorization, consent or approval of, any Governmental Authority except for a

share transfer report which is to be filed by the Seller with the Minister of Knowledge Economy within 30 days from the date of this Agreement, (c) conflict with, result in a breach of, constitute (with or without due notice or lapse of time or both) a default under, result in the acceleration of obligations under, create in any party any right to terminate, modify or cancel, or require any notice, consent or waiver under, any material contract or instrument to which the Company is a party or by which it is bound or to which any of its material properties or assets is subject, (d) result in the imposition of any Lien upon any Shares or (e) violate any material Applicable Law.

## ARTICLE 4
### REPRESENTATIONS AND WARRANTIES OF BUYER

Buyer represents and warrants to Seller that:

Section 4.01. *Existence and Power.* Buyer is a Korean incorporated company, validly existing and, if applicable, in good standing under the laws of the Republic of Korea and has all corporate powers and all material governmental licenses, authorizations, permits, consents and approvals required to carry on its business as now conducted.

Section 4.02. *Authorization.* The execution, delivery and performance by Buyer of this Agreement and the other Transaction Agreements and the consummation of the transactions contemplated hereby and thereby are within the corporate powers of Buyer and have been duly authorized by all necessary corporate action on the part of Buyer. This Agreement constitutes, and each of the other Transaction Agreements, when executed, will constitute, a valid and binding agreement of Buyer.

Section 4.03. *Noncontravention.* Neither the execution and delivery by Buyer of this Agreement or any of the other Transaction Agreements nor the consummation by Buyer of the transactions contemplated hereby or thereby will (a) conflict with or violate any provision of the charter, by-laws or other governing documents of Buyer, (b) require on the part of Buyer any material notice to or filing with, or material permit, authorization, consent or approval of, any Governmental Authority, (c) conflict with, result in breach of, constitute (with or without due notice or lapse of time or both) a default under, result in the acceleration of obligations under, create in any party any right to terminate, modify or cancel, or require any notice, consent or waiver under, any contract or instrument to which Buyer is a party or by which it is bound or to which any of its properties or assets is subject or (d) violate any material Applicable Law.

Section 4.04. *Purchase For Investment.* Buyer is purchasing the Shares for investment for its own account and not with a view to, or for sale in connection with, any distribution thereof. Buyer (either alone or together with

its advisors) has sufficient knowledge and experience in financial and business matters so as to be capable of evaluating the merits and risks of its investment in the Shares and is capable of bearing the economic risks of such investment.

Section 4.05.  *Financing.*  Buyer has, and shall have as of the Closing, sufficient cash, available lines of credit and other sources of immediately available funds to pay the Purchase Price and any other amounts to be paid by it hereunder.  Buyer acknowledges and agrees that Buyer's performance of its respective obligations under this Agreement is not in any way contingent upon the availability of financing to Buyer.

Section 4.06.  *Inspections; No Other Representations.*  Buyer is an informed and sophisticated purchaser, and has engaged expert advisors, experienced in the evaluation and purchase of companies such as the Company. Buyer has undertaken such investigation and has been provided with and has evaluated such documents and information as it has deemed necessary to enable it to make an informed and intelligent decision with respect to the execution, delivery and performance of this Agreement.  Buyer acknowledges that Seller has given Buyer complete and open access to the key employees, documents and facilities of the Company.  Buyer will undertake prior to Closing such further investigation and request such additional documents and information as it deems necessary.  Buyer agrees to accept the Shares and the Company in the condition they are in on the Closing Date based upon its own inspection, examination and determination with respect thereto as to all matters and without reliance upon any express or implied representations or warranties of any nature made by or on behalf of or imputed to Seller, except as expressly set forth in this Agreement. Without limiting the generality of the foregoing,  Buyer acknowledges that Seller makes no representation or warranty with respect to (i) any projections, estimates or budgets delivered to or made available to Buyer of future revenues, future results of operations (or any component thereof), future cash flows or future financial condition (or any component thereof) of the Company or the future business and operations of the Company or (ii) any other information or documents made available to Buyer or its counsel, accountants or advisors with respect to the Company or its businesses or operations, except as expressly set forth in this Agreement.

ARTICLE 5
COVENANTS OF SELLER

Seller agrees that:

Section 5.01.  *Conduct of the Company.*  Except as contemplated by this Agreement or as required by Applicable Law (including the Bankruptcy Code, the rules thereunder, the operation and information requirements of the Office of United States Trustee (the "**OIRR**"), or any orders entered by the Bankruptcy

Court in the Bankruptcy Cases), during the period from the date of this Agreement through the Closing, Seller shall cause the Company to conduct its business in the ordinary course consistent with past practice. Without limiting the generality of the foregoing, from the date hereof until the Closing, except as set forth in this Section 5.01 or as required by the Bankruptcy Code, the Bankruptcy Rules, the OIRR or any orders entered by the Bankruptcy Court in the Bankruptcy Cases, without the prior written consent of Buyer, which consent shall not be unreasonably withheld, conditioned or delayed, Seller will not permit the Company to:

      (a)    adopt or propose any change in its articles of incorporation;

      (b)    merge or consolidate with any other Person or acquire a material amount of assets from any other Person;

      (c)    sell, lease, license or otherwise dispose of any material assets except (i) pursuant to existing contracts or commitments or (ii) otherwise in the ordinary course consistent with past practice; or

      (d)    agree or commit to do any of the foregoing.

      Section 5.02. *Access to Information.* (a) From the date hereof until the Closing Date, Seller will (i) give, and will cause the Company to give, Buyer, its counsel, financial advisors, auditors and other authorized representatives reasonable access to the offices, properties, books and records of the Company and to the books and records of Seller relating to the Company, (ii) furnish, and will cause the Company to furnish, to Buyer, its counsel, financial advisors, auditors and other authorized representatives such financial and operating data and other information relating to the Company as such Persons may reasonably request, and (iii) instruct the employees, counsel and financial advisors of Seller or the Company to cooperate with Buyer in its investigation of the Company. Any investigation pursuant to this Section shall be conducted in such manner as not to interfere unreasonably with the conduct of the business of Seller or the Company. Notwithstanding the foregoing, Buyer shall not have access to personnel records of the Company relating to individual performance or evaluation records, medical histories or other information which in Seller's good faith opinion is sensitive or the disclosure of which could subject the Company to risk of liability.

      (b)    On and after the Closing Date and for a period of not more than one (1) year and on an as available basis thereafter, Seller will afford promptly to Buyer and its agents reasonable access to its books of account, financial and other records (including accountant's work papers), information, employees and auditors to the extent primarily related to the Company and necessary or useful for Buyer or, after the Closing Date, the Company in connection with any audit,

investigation, dispute or litigation, in connection with Buyer's or, after the Closing Date, the Company's compliance with Applicable Law or any other reasonable business purpose relating to the Company; *provided,* that any such access by Buyer shall not unreasonably interfere with the conduct of the business of Seller. Seller shall not destroy or otherwise cease to retain any such books, records or accounts retained by it without first providing Buyer with thirty (30) days prior written notice and the opportunity to obtain or copy such books, records or accounts during such thirty (30)-day period at Buyer's expense. Other than the costs of maintaining such information, Buyer shall bear all of the out-of-pocket costs and expenses (including attorneys' fees, but excluding reimbursement for general overhead, salaries and employee benefits) reasonably incurred in connection with its access to such information.

Section 5.03. *Resignations.* At or prior to the Closing Date, Seller will deliver to Buyer the resignations of all directors and the statutory auditor of the Company who will be officers, directors or employees of Seller or any of its Affiliates after the Closing Date from their position as director or statutory auditor of the Company.

Section 5.04. *Tax Covenant.* All transfer, documentary, sales, use, stamp, registration and other such Taxes and fees (including any penalties and interest) incurred in connection with transactions contemplated by this Agreement (including any securities transaction Tax and capital gain Tax, if any) shall be borne and paid by Buyer, and Buyer will, at its own expense, file all necessary Tax returns and other documentation with respect to all such Taxes and fees, and, if required by Applicable Law, Seller will, and will cause its Affiliates to, join in the execution of any such Tax returns and other documentation.

ARTICLE 6
COVENANTS OF BUYER

Buyer agrees that:

Section 6.01. *Confidentiality.* The terms of the Confidentiality Agreement shall continue in full force and effect until the Closing, at which time Buyer's confidentiality obligations shall terminate only in respect of that portion of the Confidential Information (as defined therein) of the Company. Except as set forth in the foregoing sentence, all of the provisions of the Confidentiality Agreement shall continue in full force and effect after the Closing and will survive any termination of this Agreement.

Section 6.02. *Access; Seller's Confidentiality.* Buyer will cause the Company, on and after the Closing Date and for a period of not more than seven (7) years thereafter, to promptly afford to Seller and its agents reasonable access to the Company's properties, books, records, employees and auditors to the extent

necessary to permit Seller to determine any matter relating to its rights and obligations hereunder or to any period ending on or before the Closing Date; *provided*, that any such access by Seller shall not unreasonably interfere with the conduct of the business of Buyer. The Buyer shall not destroy, permit the Company to destroy or otherwise cease to retain any such books, records or accounts retained by it without first providing Seller with thirty (30) days prior written notice and the opportunity to obtain or copy such books, records or accounts during such thirty (30)-day period at Seller's expense. Other than the costs of maintaining such information, Seller shall bear all of the out-of-pocket costs and expenses (including attorneys' fees, but excluding reimbursement for general overhead, salaries and employee benefits) reasonably incurred in connection with its access to such information.

Section 6.03. *Trademarks; Tradenames.* After the Closing, except as expressly permitted by the Trademark License Agreement or the License Agreement, Buyer shall not permit the Company to use any trademarks or tradenames owned by Seller or any of its Affiliates.


ARTICLE 7
COVENANTS OF BUYER AND SELLER

Buyer and Seller agree that:

Section 7.01. *Reasonable Best Efforts; Further Assurances.* Subject to the terms and conditions of this Agreement, Buyer and Seller will use their reasonable best efforts to take, or cause to be taken, all actions and to do, or cause to be done, all things necessary or desirable under Applicable Law to consummate the transactions contemplated by this Agreement. Seller and Buyer agree, and Seller, prior to the Closing, and Buyer, after the Closing, agree to cause the Company, to execute and deliver such other documents, certificates, agreements and other writings and to take such other actions as may be necessary or desirable in order to consummate or implement expeditiously the transactions contemplated by this Agreement.

Section 7.02. *Certain Filings.* Seller and Buyer shall cooperate with one another (i) in determining whether any action by or in respect of, or filing with, any Governmental Authority is required, or any actions, consents, approvals or waivers are required to be obtained from parties to any material contracts, in connection with the consummation of the transactions contemplated by this Agreement and (ii) in taking such actions or making any such filings, furnishing information required in connection therewith and seeking timely to obtain any such actions, consents, approvals or waivers.

Section 7.03. *Public Announcements.* Seller and Buyer agree to obtain the prior written approval of the other party before issuing any press release or

making any public statement with respect to this Agreement or the transactions contemplated hereby and, except for any press releases and public announcements the making of which may be required by Applicable Law, will not issue any such press release or make any such public statement prior to such approval.

Section 7.04. *Intercompany Accounts.* All intercompany accounts between Seller or its Affiliates, on the one hand, and the Company, on the other hand, as of the Closing shall be settled, or agreed to be settled, in accordance with the terms of the Intercompany Accounts Settlement Agreement. In order to provide to Seller and its Affiliates collateral to secure the Company's payment obligations under the Intercompany Accounts Settlement Agreement, at the Closing Buyer shall enter into a Share Pledge Agreement with Seller and any Affiliates of Seller who are owed amounts by the Company, providing for Seller and its Affiliates (as the case may be) to hold the Shares as collateral, and prohibiting Buyer from transferring the Shares, until all of the Company's obligations under the Intercompany Accounts Settlement Agreement are paid and satisfied in full.

## ARTICLE 8
### INDEMNIFICATION

Section 8.01. *Indemnification.* Buyer hereby indemnifies and holds harmless Seller and its directors, officers, employees, agents, successors and assigns (collectively, the "**Seller Indemnities**") from and against and with respect to all losses, liabilities, obligations, damages, deficiencies, actions, suits, proceedings, demands, assessments, orders, judgments, fines, penalties, costs, and expenses (including, without limitation, reasonable fees and disbursements of lawyers, accountants, and other professional advisers) of any kind or nature whatsoever (whether or not arising out of third party claims and including all reasonable amounts paid in the investigation, defense, or settlement of the foregoing) (collectively, the "**Losses**") sustained, suffered or incurred by or made against any of the Seller Indemnities arising out of, based upon or in connection with (a) any inaccuracy in or breach of any representations or warranties given or made by Buyer in this Agreement, and/or (b) any breach of any covenant or agreement given or made by Buyer in this Agreement, and/or (c) any action or claim successfully asserted by any Governmental Authority against the Company and/or (d) any misconduct or omission of any of the Seller Indemnities other than willful misconduct or omission.

## ARTICLE 9
### CONDITIONS TO CLOSING

Section 9.01. *Conditions to Obligations of Buyer and Seller.* The obligations of Buyer and Seller to consummate the Closing are subject to the satisfaction of the following conditions:

(a)     No provision of any Applicable Law shall prohibit the consummation of the Closing.

(b)     All material actions by or in respect of or material filings with any Governmental Authority required to permit the consummation of the Closing shall have been taken, made or obtained, except for any such actions or filings the failure to take, make or obtain would not reasonably be expected to have a Material Adverse Effect.

(c)     The Bankruptcy Court shall have entered the Approval Order.

Section 9.02.    *Conditions to Obligation of Buyer.*    The obligation of Buyer to consummate the Closing is subject to the satisfaction of the following further conditions:

(a)     (i) Seller shall have performed in all material respects all of its obligations hereunder required to be performed by it on or prior to the Closing Date, (ii) the representations and warranties of Seller contained in this Agreement and in any certificate or other writing delivered by Seller pursuant hereto shall be true at and as of the Closing Date, as if made at and as of such date, with only such exceptions as would not in the aggregate reasonably be expected to have a Material Adverse Effect and  (iii)  Buyer shall have received a certificate signed by the chief legal officer of BearingPoint, Inc., a Delaware Corporation, to the foregoing effect.

(b)     Buyer shall have received all documents it may reasonably request relating to the legal existence of Seller and the Company, and the authority of Seller to perform this Agreement, all in form and substance reasonably satisfactory to Buyer.

Section 9.03.    *Conditions to Obligation of Seller.*    The obligation of Seller to consummate the Closing is subject to the satisfaction of the following further conditions:

(a)     (i) Buyer shall have performed in all material respects all of its obligations hereunder required to be performed by it at or prior to the Closing Date, (ii) the representations and warranties of Buyer contained in this Agreement and in any certificate or other writing delivered by Buyer pursuant hereto shall be true in all material respects at and as of the Closing Date, as if made at and as of such date and  (iii)  Seller shall have received a certificate signed by the representative director of Buyer to the foregoing effect.

(b)     Seller shall have received all documents it may reasonably request relating to the legal existence of Buyer and the authority of Buyer to perform this Agreement, all in form and substance reasonably satisfactory to Seller.

## ARTICLE 10
### BANKRUPTCY COVENANTS

Section 10.01. *Approval Order.* As promptly as practicable, but in no event later than two (2) Business Days after the date hereof, Seller shall file with the Bankruptcy Court a motion seeking entry of an Approval Order, and Buyer and Seller agree to use reasonable best efforts to cause the Bankruptcy Court to enter an Approval Order on or about November 3, 2009, which order shall be in form and substance satisfactory to Seller and Buyer. Seller agrees to provide to Buyer a draft of the Approval Order, and Buyer agrees to promptly advise Seller in writing of any changes that it requires for such draft Approval Order to be in form and substance satisfactory to Buyer. If Seller thereafter proposes any changes to such form of Approval Order, Seller shall promptly notify Buyer. If prior to, during or after the hearing on the motion seeking approval of such form of Approval Order, the Bankruptcy Court makes any such changes or any other modifications to such form of Approval Order, Seller and Buyer shall be required to raise any objections thereto in writing (or as otherwise permitted by the Bankruptcy Court) prior to entry of the Approval Order. Unless Seller or Buyer raises any such objections in writing (or as otherwise permitted by the Bankruptcy Court) prior to entry of the Approval Order, such Approval Order shall be deemed to be in form and substance satisfactory to each party for all purposes.

Section 10.02. *Noncontravention.* Seller covenants and agrees that the terms of any plan of reorganization or liquidation or proposed order of the Bankruptcy Court that may be filed, proposed or submitted or supported by Seller or any of its Affiliates after entry of the Approval Order or consummation of the transactions contemplated hereby shall not conflict with, supersede, abrogate, nullify, modify or restrict the terms of this Agreement or the Approval Order, or the rights of Buyer hereunder or thereunder.

## ARTICLE 11
### TERMINATION

Section 11.01. *Grounds for Termination.* This Agreement may be terminated at any time prior to the Closing:

(a) by mutual written agreement of Seller and Buyer;

(b) by either Seller or Buyer if the Closing shall not have been consummated on or before December 20, 2009; or

(c) by either Seller or Buyer if consummation of the transactions contemplated hereby would violate any nonappealable final order, decree or judgment of any Governmental Authority having competent jurisdiction.

The party desiring to terminate this Agreement pursuant to clauses 11.01(b) or (c) shall give notice of such termination to the other party.

Section 11.02. *Effect of Termination.* If this Agreement is terminated as permitted by Section 11.01, such termination shall be without liability of any party (or any stockholder, director, officer, employee, agent, consultant or representative of such party) to any other party to this Agreement; *provided* that if such termination shall result from the willful (i) failure by any party hereto to perform a covenant of this Agreement or (ii) breach by any party hereto of any representation, warranty or agreement contained herein, such party shall be fully liable for any and all damages incurred or suffered by the other party as a result of such failure or breach. The provisions of Sections 6.01, 7.03, Article 8 and Article 12 shall survive any termination hereof pursuant to Section 11.01.


ARTICLE 12
MISCELLANEOUS

Section 12.01. *Notices.* All notices, requests and other communications to any party hereunder shall be in writing (including facsimile transmission and electronic mail ("**e-mail**") transmission, so long as a receipt of such e-mail is requested and received) and shall be given,

if to Buyer, to:

**BPH Corporation**
23rd Floor GangNam Finance Center
737 Yeoksam-dong, Kangnam-ku
Seoul 135-984)
Republic of Korea
Attention: Koh, YoungChe
Facsimile No.: 82-2-3442-1500
E-mail: youngche.koh@bearingpoint.co.kr


if to Seller, to:

BearingPoint, Inc.
100 Crescent Court
Suite 700
Dallas, TX 75201
Attention: President
Facsimile No.: (214) 292-8844
E-mail: be@johndegroote.com

with a copy to:

> Allen & Overy LLP
> One Bishops Square
> London, E1 6AD
> United Kingdom
> Attention: Edward Barnett
> Facsimile No.: +44 (0)20 3088 0088
> E-mail: edward.barnett@allenovery.com

or such other address or facsimile number as such party may hereafter specify for the purpose by notice to the other parties hereto. All such notices, requests and other communications shall be deemed received on the date of receipt by the recipient thereof if received prior to 5 p.m. in the place of receipt and such day is a Business Day in the place of receipt. Otherwise, any such notice, request or communication shall be deemed not to have been received until the next succeeding Business Day in the place of receipt.

Section 12.02. *Amendments and Waivers.* (a) Any provision of this Agreement may be amended or waived if, but only if, such amendment or waiver is in writing and is signed, in the case of an amendment, by each party to this Agreement, or in the case of a waiver, by the party against whom the waiver is to be effective.

(b) No failure or delay by any party in exercising any right, power or privilege hereunder shall operate as a waiver thereof nor shall any single or partial exercise thereof preclude any other or further exercise thereof or the exercise of any other right, power or privilege. The rights and remedies herein provided shall be cumulative and not exclusive of any rights or remedies provided by law.

Section 12.03. *Expenses.* Except as otherwise provided herein, all costs and expenses incurred in connection with this Agreement shall be paid by the party incurring such cost or expense.

Section 12.04. *Successors and Assigns.* The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns; *provided* that no party may assign, delegate or otherwise transfer any of its rights or obligations under this Agreement without the consent of each other party hereto.

Section 12.05. *Governing Law.* This Agreement shall be governed by and construed in accordance with the law of the State of New York, without regard to the conflicts of law rules of such state.

Section 12.06. *Jurisdiction.* To the fullest extent permitted by applicable Law, each party hereto (a) agrees that any claim, action or proceeding by such

party seeking any relief whatsoever arising out of, or in connection with this Agreement or any other Transaction Agreement or the transactions contemplated hereby or thereby shall be brought only in (i) the Bankruptcy Court, if brought prior to the entry of a final decree closing the Chapter 11 Case, and (ii) in the federal courts in the Southern District of New York and the state courts of the State of New York, County of Manhattan (collectively, the "New York Courts"), if brought after entry of such final decree closing the Chapter 11 Case, and shall not be brought, in each case, in any other state or federal court in the United States of America or any court in any other country, (b) agrees to submit to the exclusive jurisdiction of the Bankruptcy Court or the New York Courts, as applicable, pursuant to the preceding clauses (a)(i) and (ii), for purposes of all claims, actions or proceedings arising out of, or in connection with this Agreement or any Transaction Agreement or the transactions contemplated by this Agreement, (c) waives and agrees not to assert any objection that it may now or hereafter have to the laying of the venue of any such claim, action or proceeding brought in such a court or any claim that any such claim, action or proceeding brought in such a court has been brought in an inconvenient forum, (d) agrees that mailing of process or other papers in connection with any such claim, action or proceeding in the manner provided in Section 12.01 hereto shall be valid and sufficient service thereof, and (e) agrees that a final judgment in any such claim, action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by applicable Law.

Section 12.07. *WAIVER OF JURY TRIAL.* EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATED TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

Section 12.08. *Counterparts; Effectiveness; Third Party Beneficiaries.* This Agreement may be signed in any number of counterparts, each of which shall be an original, with the same effect as if the signatures thereto and hereto were upon the same instrument. This Agreement shall become effective when each party hereto shall have received a counterpart hereof signed by the other party hereto. Until and unless each party has received a counterpart hereof signed by the other party hereto, this Agreement shall have no effect and no party shall have any right or obligation hereunder (whether by virtue of any other oral or written agreement or other communication). No provision of this Agreement is intended to confer any rights, benefits, remedies, obligations, or liabilities hereunder upon any Person other than the parties hereto and their respective successors and assigns.

Section 12.09. *Entire Agreement.* The Transaction Agreements constitute the entire agreement between the parties with respect to the subject

matter of this Agreement and supersedes all prior agreements and understandings, both oral and written, between the parties with respect to the subject matter of this Agreement.

Section 12.10. *Severability.*   If any term, provision, covenant or restriction of this Agreement is held by a court of competent jurisdiction or other Governmental Authority to be invalid, void or unenforceable, the remainder of the terms, provisions, covenants and restrictions of this Agreement shall remain in full force and effect and shall in no way be affected, impaired or invalidated so long as the economic or legal substance of the transactions contemplated hereby is not affected in any manner materially adverse to any party.   Upon such a determination, the parties shall negotiate in good faith to modify this Agreement so as to effect the original intent of the parties as closely as possible in an acceptable manner in order that the transactions contemplated hereby be consummated as originally contemplated to the fullest extent possible.

Section 12.11. *Specific Performance.*   The parties hereto agree that irreparable damage would occur if any provision of this Agreement were not performed in accordance with the terms hereof and that the parties shall be entitled to an injunction or injunctions to prevent breaches of this Agreement or to enforce specifically the performance of the terms and provisions hereof in the United States District Court for the Southern District of New York or any New York State court sitting in New York City, in addition to any other remedy to which they are entitled at law or in equity.

Section 12.12. *Survival of Provisions.*   The representations, warranties, covenants and agreements contained in this Agreement and in any certificate or other writing delivered pursuant hereto shall not survive the Closing, except for the agreements set forth in Sections 5.02(b), 5.04, 6.01, 6.02, 6.03, 7.01, 7.03, Article 8 and Article 12.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed by their respective authorized officers as of the day and year first above written.

**BPH Corporation**

By: _____

    Name:    Koh, YoungChe

    Title:    Representative Director

**BE New York Holdings, Inc.**

By: _____

    Name:    John DeGroote

    Title:    President