WEIL, GOTSHAL & MANGES LLP
700 Louisiana Street, Suite 1600
Houston, Texas 77002
Telephone: (713) 546-5000
Facsimile: (713) 224-9511
Alfredo R. Pérez

WEIL, GOTSHAL & MANGES LLP
200 Crescent Court, Suite 300
Dallas, Texas 75201
Telephone: (214) 746-7700
Facsimile: (214) 746-7777
Yvette Ostolaza
Michelle Hartmann

Attorneys for Debtors
and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**

**SOUTHERN DISTRICT OF NEW YORK**

```
------------------------------------------------------------x
                                        :
In re                                   :      Chapter 11 Case No.
                                        :
BEARINGPOINT, INC., et al.,             :      09 - 10691 (REG)
                                        :
Debtors.                                :      (Jointly Administered)
                                        :
------------------------------------------------------------x
```

<u>NOTICE OF DEBTORS' OBJECTION TO PROOF OF
CLAIM (CLAIM NO. 417 FILED BY ACE-USA/Westchester Fire)</u>

**PLEASE TAKE NOTICE THAT:**

A hearing (the "***Hearing***") to consider the objection, dated December 22, 2009

(the "***Objection***"), of BearingPoint, Inc. and certain of its affiliates, each as debtors and debtors-

in-possession (together, the "***Debtors***") to a certain claim filed in the Debtors' chapter 11 cases

shall be held before Honorable Robert E. Gerber, United States Bankruptcy Judge, Room 621 of

the United States Bankruptcy Court for the Southern District of New York, Alexander Hamilton

Custom House, One Bowling Green, New York, New York 10004, on **January 28, 2010 at 9:45 a.m. (Eastern Time)**, or as soon thereafter as counsel may be heard.

The deadline to file any responses to the Objection is **January 11, 2010 at 4:00 p.m. (Eastern Time)** (the "*Response Deadline*").

PLEASE TAKE FURTHER NOTICE that responses, if any, to the Objection, must be in writing, must (a) conform to the Federal Rules of Bankruptcy Procedure (the "*Bankruptcy Rules*"), the Local Rules of the Bankruptcy Court for the Southern District of New York, and any case management orders in these chapter 11 cases, (b) set forth the name of the objecting party, the nature and amount of claims or interests held or asserted by the objecting party against the Debtors' estates or property, and (c) set forth the basis for the objection and the specific grounds therefore, and must be filed no later than the Response Deadline with the Bankruptcy Court electronically in accordance with General Order M-242 (General Order M-242 and the User's Manual for the Electronic Case Filing System may be found at www.nysb.uscourts.gov, the official website for the Bankruptcy Court).

Registered users of the Bankruptcy Court's case filing system must electronically file their objections and responses.  All other parties in interest must file their responses on a 3.5 inch floppy disk or flash drive, preferably in Portable Document Format (PDF), Microsoft Word or any other Windows-based word processing format (with a hard copy delivered directly to the chambers of the Hon. Robert E. Gerber), in accordance with General Order M-182 – Electronic Means for Filing, Signing, and Verification of Documents, dated June 26, 1997.

Any objections or responses must also be served upon the following parties so as to be received no later than the Response Deadline:

| *Counsel to the Debtors* | *Counsel to the Statutory Committee of Unsecured Creditors* |
|---|---|
| Weil, Gotshal & Manges LLP<br>767 Fifth Avenue<br>New York, New York 10153<br>Attn: Abigail Zigman, Esq. | Bingham McCutchen LLP<br>399 Park Avenue<br>New York, New York 10022<br>Attn: Katherine Dobson, Esq. |

Dated:  December 22, 2009
         New York, New York

                                  /s/ Yvette Ostolaza
                                 Alfredo R. Pérez
                                 WEIL, GOTSHAL & MANGES LLP
                                 700 Louisiana Street, Suite 1600
                                 Houston, Texas 77002
                                 Telephone: (713) 546-5000
                                 Facsimile: (713) 224-9511

                                 Yvette Ostolaza
                                 Michelle Hartmann
                                 WEIL, GOTSHAL & MANGES LLP
                                 200 Crescent Court, Suite 300
                                 Dallas, Texas 75201
                                 Telephone: (214) 746-7700
                                 Facsimile: (214) 746-7777

                                 Attorneys for Debtors
                                 and Debtors in Possession

WEIL, GOTSHAL & MANGES LLP
700 Louisiana Street, Suite 1600
Houston, Texas 77002
Telephone: (713) 546-5000
Facsimile: (713) 224-9511
Alfredo R. Pérez

WEIL, GOTSHAL & MANGES LLP
200 Crescent Court, Suite 300
Dallas, Texas 75201
Telephone: (214) 746-7700
Facsimile: (214) 746-7777
Yvette Ostolaza
Michelle Hartmann

Attorneys for Debtors
and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------------x
:
**In re** : Chapter 11
:
**BEARINGPOINT, INC., <u>et</u> <u>al.</u>,** : Case No. 09-10691 (REG)
:
: **Jointly Administered**
**Debtors.** :
---------------------------------------------------------------x

**DEBTORS' OBJECTION TO PROOF OF**
**CLAIM (CLAIM NO. 417 FILED BY ACE-USA/Westchester Fire)**

TO THE HONORABLE ROBERT E. GERBER,
UNITED STATES BANKRUPTCY JUDGE:

BearingPoint, Inc., et al., as debtors and debtors in possession (collectively,

"***BearingPoint***" or "***Debtor***"), respectfully represent:

1.      By this objection (the "***Objection***"), filed under 11 U.S.C. § 502(b),

Debtor objects to an approximately $25.2 million line item contained in Proof of Claim No. 417

(the "***Surety Claim***") filed by ACE-USA/Westchester Fire Insurance Company (the "***Surety***").

As detailed below, the contingency underlying the Surety's contingent claim (i.e., BearingPoint's alleged default under that certain Human Resources/Payroll Agreement No. 22191025 (the "**Contract**") and subsequent amendments thereto) has not occurred and, accordingly, Debtor is not liable. Debtor requests entry of the proposed order attached as <u>Exhibit A</u> (the "**Order**") disallowing the Surety Claim in the amount of approximately $25.2 million.

I.  **THE SURETY CLAIM AND UNDERLYING ADVERSARY PROCEEDING**

2.  The Surety Claim asserts a secured claim of $30,524,458.00 and $5,961,570.40 in unsecured funds.[1] The question whether the Surety may recover on approximately $25.2 million of the Surety Claim is intertwined with questions that are the subject of the adversary proceeding currently pending in this Court between several California state agencies and actors (collectively, the "**Defendants**") and BearingPoint (the "**Proceeding**").[2] The following facts and agreements relevant to that Proceeding are thus also relevant to this Objection.

A.  **The Indemnity Agreement and the Bond**

3.  A March 2004 indemnification agreement between the Surety and BearingPoint (the "**Indemnity Agreement**") indemnifies the Surety for liability under bonds issued by the Surety and allegedly gives rise to the Surety Claim. The Indemnity Agreement

---

[1] On December 11, 2009, BearingPoint entered into an Asset Purchase Agreement (the "**APA**") with International Business Machines Corporation, which APA includes the purchase and resolution of certain Subcontractor Agreements between TekSystems, Inc. and BearingPoint related to the CA DMV contracts (for which the Surety also had a claim concerning a related performance bond). The APA provides for the release of Bond No. K07627750 (effective date June 15, 2007), thereby mooting the Surety Claim with respect to the $6,429,023.23 claim associated with the same June 15 bond. The Surety Claim and related attachments list the relevant bonds. (True and correct copies of the Surety Claim and related attachments are attached hereto as <u>Exhibit B</u> and are incorporated by reference.) BearingPoint assumes that the Surety will withdraw the Surety Claim as to that Bond No. K07627750 line item.

[2] *See generally* BearingPoint's Second Amended Complaint for Declaratory Relief and Damages ("**Compl.**"), a true and correct copy of which is attached hereto as <u>Exhibit C</u> and incorporated by reference.

specifically provides that Debtor shall "indemnify and save harmless [Surety] from and against any and all liability, claim, demand, loss, damages, expense, cost, attorney's fees and expenses, . . . incurred by [Surety] in any action or proceeding between . . . [Surety] and any third party, which [Surety] shall at any time incur by reason of its execution of any bond or its payment of or its liability to pay any claim[.]"[3]  One of the bonds for which the Surety seeks indemnification through the Surety Claim is Performance Bond No. K07372577 (the "***Bond***"), entered into in June 2006 between BearingPoint and the Surety as a requirement of the Contract and to secure BearingPoint's performance under the same.  The Bond is backed by certain letters of credit collateralized by more than $25 million in estate cash (collectively, the "***Letter of Credit***").  The Letter of Credit constitutes the single largest remaining asset of the BearingPoint estate.

4.     Relying on this Indemnity Agreement, the Surety makes a claim against the estate for liability on the Bond and seeks a distribution from the estate based on Defendants' demand for immediate payment on the Bond.  In that regard, after its abrupt termination of the Contract on April 8, 2009, Defendants sent a letter to the Surety declaring its intention "to enforce any and all obligations related to th[e] surety agreement and Bond Number K07372577[,]" and providing "notice of [BearingPoint's] default and [the State's] intent to make a claim" on the bond.  The State further "demand[ed the Surety's] immediate payment for any and all damages that have, and continue to occur, as a result of [BearingPoint's] default."[4]  One week later, the Surety filed the Surety Claim including its approximately $25.2 million claim on the Bond.

---

[3] A true and correct copy of the Indemnity Agreement is attached hereto as <u>Exhibit D</u> and is incorporated by reference.

[4] A true and correct copy of the State's April 8, 2009 letter is attached hereto as <u>Exhibit E</u> and is incorporated herein by reference.

**B.     The Contract and Defendants' Default**

5.     The Contract's goal was to update the State of California's antiquated payroll-management system on a state-wide basis.  Important in that regard, Defendants had agreed to furnish BearingPoint with payroll and other human-resources data from its scores of discrete offices and departments so that BearingPoint could help California implement a new payroll system.  (*See* Compl. ¶¶ 1, 3 & 22-25.)  Providing BearingPoint with this essential data (the "***Legacy Information***") was key to the success of the overall project.

6.     Following certain start-up delays caused by additional tasks requested by Defendants, the project timeline was eventually reset through an amendment to the Contract.  (A true and correct copy of this "***Amendment 2***" is attached as <u>Exhibit F</u> and is incorporated by reference.)  Amendment 2 readjusted the scope of the project, particularly the schedule for the remaining phases necessary to fully implement the project, along with the payment-deliverables costs.  The amendment also modified and re-defined the tasks associated with the design, realization, final preparation, "go live," and support phases of the project.  (*See* Ex. F; *see also* Compl. ¶ 29.)  BearingPoint was thus performing on schedule following the execution of this Amendment 2.

7.     The Contract, including Amendment 2, expressly required the Defendants to provide Legacy Information in a form usable to BearingPoint by no later than July 23, 2008, so that the design could be completed by September 30, 2008.  This requirement was critical to the success of the project and was a material inducement to BearingPoint's executing the amendment.

8.     Defendants could not meet the agreed-upon deadline without spending more money for skilled staff and compensating BearingPoint beyond the budgeted amount in

order to have BearingPoint extend the project deadline beyond the "go live" date. Recognizing the problem, Defendants approached California's legislature in October 2008 for additional funding. Because California was suffering through an extreme budget crisis, however, the request was denied.

9. Indicative of California's financial distress, the State announced in or about December 2008 that it was unilaterally terminating billions of dollars of public-works contracts as a result of the State's dire fiscal plight. Shortly thereafter, the State Controller's Office stated that it would resort to paying its obligations, including State employee payroll, vendor payments, and State tax returns, in the form of "IOUs."

10. Amidst this situation and after being denied its request for additional funds from the California legislature, on or about December 3, 2008, James Butler, the Deputy Director of the Procurement Division of the California Department of General Services, on behalf of Defendants, unexpectedly issued a notice of intent to terminate the Contract. Remarkably, Defendants alleged that BearingPoint was to blame for project delays and claimed that BearingPoint had defaulted on the Contract.

### C.     Claims in the Proceeding

11. The Proceeding implicates Defendants' wrongful attempt to collect on the Bond. BearingPoint's complaint maintains, *inter alia*, that Defendants have breached the Contract, have anticipatorily breached the same, have breached the implied covenant of good faith and fair dealing, and in the alternative, that Defendants owe BearingPoint *quantum meruit* damages. (*See* Compl. ¶¶ 77-122.)

12. Defendants have not filed a proof of claim in the bankruptcy. Consequently, they presumably seek to recover on the $25.2 million Bond securing

BearingPoint's performance of the Contract by way of set-off to amounts owed BearingPoint as a result of the breach of their termination of the Contract for convenience. Specifically, Defendants breached the Contract by, among other things:

a. wrongfully labeling the termination as one for default rather than a termination for convenience in order to evade payment of amounts owed to BearingPoint;

b. failing to make timely decisions and approvals of options, alternatives, functional specifications, and technical specifications of the project;

c. demanding changes, revisions, additional customizations, work outside the project, and new requirements to the Contract and to already completed design components;

d. failing to allocate sufficient staff resources from Defendants for the project;

e. failing to provide critical data and responses about business processes;

f. failing to provide essential Legacy Information, including information about legacy processes, in a form usable to BearingPoint in the time required under the Contract;

g. failing to fully pay for deliverables completed by BearingPoint and accepted by Defendants;

h. failing to pay for work outside the scope of project requested by Defendants and performed by BearingPoint;

i. failing to compensate BearingPoint for its added expenses resulting from delays caused by Defendants; and

j. failing to pay for work that was partially complete at the time of termination.

13. These material breaches of the Contract by Defendants caused all purported delays in completion of the Contract and resulted in significant damage to BearingPoint. Moreover, these breaches have and will continue to damage BearingPoint, even though BearingPoint never defaulted with respect to its obligations under the Contract.

## II.    <u>OBJECTION</u>

14.     The Court should disallow the approximately $25.2 million of the Surety Claim stemming from the Bond because section 502(e)(1)(B) of the Bankruptcy Code precludes such a recovery. That subsection directs courts to disallow any claim for reimbursement or contribution of an entity that is liable with the debtor on or has secured the claim of a creditor to the extent that "such claim for reimbursement or contribution is contingent as of the time of allowance or disallowance of such claim for reimbursement or contribution." 11 U.S.C. § 502(e)(1)(B); 4 COLLIER ON BANKRUPTCY ¶ 502.06[2][d] (15th ed. rev. 2009).

15.     Three elements must be established for disallowance under § 502(e)(1)(B): "First, the claim must [be] for reimbursement or contribution. Second, the party asserting the claim must be 'liable with the debtor' on the claim. Third, the claim must be contingent at the time of its allowance or disallowance." *In re GCO Servs.*, LLC, 324 B.R. 459, 465 (Bankr. S.D.N.Y. 2005) (Gropper, J.) (quoting *In re Drexel Burnham Lambert Group, Inc.*, 148 B.R. 982, 985 (Bankr. S.D.N.Y. 1992) (Conrad, J.)).

16.     This case satisfies all three elements. First, the Surety Claim seeks reimbursement for "any sums it might be required to pay by reason of executing the surety bonds." (*See* Ex. B.) Second, the Surety Claim assumes that the Surety is "liable with" BearingPoint, the debtor, because the Surety would have no claim arising from the Bond unless BearingPoint had in fact breached its obligations under the Contract (which it did not). The final element is satisfied because no sum has been paid by the Surety. Moreover, the Surety Claim presupposes that BearingPoint actually defaulted under the Contract, which is a contingency that has not occurred, and which BearingPoint has steadfastly denied throughout the Proceeding. *Aetna Cas. & Sur. Co. v. Ga. Tubing Corp.*, No. 93 Civ. 3659 (LAP), 1995 WL 429018, at *4 (S.D.N.Y. July 20, 1995), *aff'd*, 93 F.3d 56 (2d Cir. 1996) (finding surety's claim based on bonds

that surety had not paid to be contingent and therefore disallowed under § 502(e)(1)(B)); *In re Early & Daniel Indus., Inc.*, 104 B.R. 963, 967 (Bankr. S.D. Ind. 1989) (guarantor guaranteed debtor's payment and performance under a lease for equipment; where guarantor had paid nothing on the claim against the debtor, bankruptcy court could "neither allow [the guarantor's] claim as a claim for reimbursement nor as a claim of subrogation"); *In re Microwave Prods. of Am., Inc.*, 118 B.R. 566, 573 (Bankr. W.D. Tenn. 1990) (stating that § 502(e)(1)(B) "disallows a contingent claim of the surety for reimbursement or contribution").

### III.    CONCLUSION

17.    For these reasons, the line item of the Surety's Proof of Claim No. 417 claiming approximately $25.2 million should be disallowed pursuant to Section 502(e)(1)(B) of the Bankruptcy Code.

18.    This Objection is without prejudice to the right of Debtor or any other interested party to object to the Surety Claim on any other ground whatsoever, and Debtor expressly reserves all further substantive and/or procedural objections they may have.  Debtor further reserves their right to amend and supplement this Objection.

### IV.    JURISDICTION

19.    This Court has jurisdiction to consider this Objection pursuant to 28 U.S.C. §§ 157 and 1334.  This matter is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

### V.    NOTICE

20.    Debtor shall serve notice of this Objection to parties in interest, including both the Surety and Defendants (as defined herein), in accordance with the Order Pursuant to Section 105(a) of the Bankruptcy Code and Bankruptcy Rules 1015(c) and 9007 Implementing Certain Notice and Case Management Procedures, dated March 5, 2009.  [Docket No. 117.]

Debtor submits that, in view of the facts and circumstances, such notice is sufficient and no other or further notice need be provided.

WHEREFORE, Debtor respectfully requests that this Court enter an Order granting the relief requested herein, and such other relief as may be just.

Dated: New York, New York
December 22, 2009

By:    /s/ Yvette Ostolaza
WEIL, GOTSHAL & MANGES LLP
700 Louisiana Street, Suite 1600
Houston, Texas 77002
Telephone: (713) 546-5000
Facsimile: (713) 224-9511
Alfredo R. Pérez

WEIL, GOTSHAL & MANGES LLP
200 Crescent Court, Suite 300
Dallas, Texas 75201
Telephone: (214) 746-7700
Facsimile: (214) 746-7777
Yvette Ostolaza
Michelle Hartmann

ATTORNEYS FOR DEBTORS AND
DEBTORS IN POSSESSION

# Exhibit A

## Proposed Order

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------- x
                       :
In re                          :         **Chapter 11**
                       :
**BEARINGPOINT, INC., <u>et al.</u>,**     :         **Case No. 09-10691 (REG)**
                       :
                       :         **Jointly Administered**
                 **Debtors.**      :
------------------------------------------------------------- x

### ORDER SUSTAINING THE DEBTORS' OBJECTION TO PROOF OF CLAIM<br>(CLAIM NO. 417 FILED BY ACE-USA/Westchester Fire)

Upon the objection (the "***Objection***"), dated December 22, 2009, of BearingPoint,

Inc. and certain of its affiliates, as debtors and debtors in possession in the above-captioned

chapter 11 cases (collectively, the "***Debtor***"), pursuant to 11 U.S.C. § 502, governing objections

to proofs of claim, all as more fully described in the Objection; and all of the proceedings before

the Court, the Court finds and determines the following:

           A.       Consideration of the Objection and the relief requested therein is a core

proceeding pursuant to 28 U.S.C. § 157(b).

           B.       Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and

1409.

           C.       The Court has jurisdiction to consider the Objection and the relief

requested therein in accordance with 28 U.S.C. §§ 157 and 1334 and the Standing Order M-61 of

the United States District Court for the Southern District of New York, dated July 10, 1984

(Ward, Acting C.J.).

           D.       Debtor has provided due and proper notice of the Objection and Hearing

to parties in interest, including, among others, ACE-USA/Westchester Fire Insurance Company,

John Chiang, in his official capacity as Controller for the State of California, the California State

Controller's Office, and the California Department of General Services (collectively, the "***Notice Parties***") in accordance with the Order Pursuant to Section 105(a) of the Bankruptcy Code and Bankruptcy Rules 1015(c) and 9007 Implementing Certain Notice and Case Management Procedures, dated March 5, 2009 [Docket No. 117], and no further notice is necessary.

   **E.**  The legal and factual bases set forth in the Objection establish just and sufficient cause to grant the relief requested therein.

   **F.**  Debtor has not breached any of the terms of the Human Resources/Payroll Agreement No. 22191025 (the "***Contract***").  Nor has Debtor breached the terms of any of the attachments to the Contract, or any subsequent amendments to the Contract.

   Therefore, it is hereby ORDERED that:

   1.  The Objection is sustained to the extent set forth herein.

   2.  Proof of Claim No. 417 is hereby disallowed in the amount of $25,230,747.17 to reflect the disallowance of the claim relating to Bond No. K07372577 (which describes an effective date of June 30, 2008).

   3.  This Court shall retain jurisdiction to hear and determine all matters arising from the implementation of this Order.

Dated: New York, New York
   January __, 2010

        _____
        HONORABLE ROBERT E. GERBER
        UNITED STATES BANKRUPTCY JUDGE

# Exhibit B

# Surety Claim

B10 (Official Form 10)(12/07)

| UNITED STATES BANKRUPTCY COURT SOUTHERN DISTRICT OF NEW YORK | PROOF OF CLAIM |
|---|---|

| Name of Debtor | Case Number 09-10691 |
|---|---|
| BearingPoint, Inc | |

NOTE *This form should not be used to make a claim for an administrative expense arising after the commencement of the case. A request of payment of an administrative expense may be filed pursuant to 11 U S C § 503.*

Name of Creditor (the person or other entity to whom the debtor owes money or property)
**ACE-USA/ Westchester Fire Insurance Company**

Name and address where notices should be sent
c/o Ballard Spahr Andrews & Ingersoll, LLP
Attention Tobey M Daluz, Esquire
919 North Market Street, 12th Floor
Wilmington, Delaware 19801
Telephone number (302) 252-4465

*[stamp: THE GARDEN CITY GROUP, INC. APR 15 2009]*

☐ Check this box to indicate that this claim amends a previously filed claim

Court Claim Number _____
(If known)

Filed on _____

Name and address where payment should be sent (if different from above)

FILED - 00417
SDNY
BEARINGPOINT, INC
09-10691 (REG)

Telephone number

☐ Check box if you are aware that anyone else has filed a proof of claim relating to your claim Attach copy of statement giving particulars

☐ Check this box if you are the debtor or trustee in this case

| 1 Amount of Claim as of Date Case Filed | $36,486,028 40 |
|---|---|

If all or part of your claim is secured, complete item 4 below however, if all of your claim is unsecured, do not complete item 4

If all or part of your claim is entitled to priority, complete item 5

☒ Check this box if claim includes interest or other charges in addition to the principal amount of claim
Attach itemized statement of interest or charges **See Schedule A attached**

5 **Amount of Claim Entitled to Priority under 11 U S C §507(a)** If any portion of your claim falls in one of the following categories, check the box and state the amount

Specify the priority of the claim

☐ Domestic support obligations under 11 U S C §507(a)(1)(A) or (a)(1)(B)

☐ Wages, salaries, or commissions (up to $10,950*) earned within 180 days before filing of the bankruptcy petition or cessation of the debtor's business, whichever is earlier -- 11 U S C § 507(a)(4)

☐ Contributions to an employee benefit plan -- 11 U S C § 507(a)(5)

☐ Up to $2,425* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use -- 11 U S C § 507(a)(7)

☐ Taxes or penalties owed to governmental units - 11 U S C § 507(a)(8)

☐ Other - Specify applicable paragraph of 11 U S C § 507(a)(___)

**Amount entitled to priority**

$ _____

*Amounts are subject to adjustment on 4/1/10 and every 3 years thereafter with respect to cases commenced on or after the date of adjustment

| 2 Basis For Claim **Indemnity Agreement** |
|---|
| (See instruction #2 on reverse side) |

| 3 Last four digits of any number by which creditor identifies debtor _____ |
|---|
| 3a Debtor may have scheduled account as _____ |
| (See instruction #3a on reverse side) |

4 **Secured Claim** (See instruction #4 on reverse side)
Check the appropriate box if your claim is secured by a lien on property or a right of setoff and provide the requested information

Nature of property or right of setoff ☐ Real Estate ☐ Motor Vehicle ☒ Other
Describe **Letter of Credit**

Value of Property $30,524,458 00 Annual Interest Rate ___ %

Amount of arrearage and other charges as of time case filed included in secured claim,
if any $ _____ Basis for perfection _____

Amount of Secured Claim $30,524,458 00 Amount Unsecured $5,961,570 40

6 Credits The amount of all payments on this claim has been credited for the purpose of making this proof of claim

7 Documents Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements You may also attach a summary Attach redacted copies of documents providing evidence of perfection of a security interest You may also attach a summary *(See definition of "redacted" on reverse side)*

DO NOT SEND ORIGINAL DOCUMENTS ATTACHED DOCUMENTS MAY BE DESTROYED AFTER SCANNING

If the documents are not available, please explain

| Date. | Signature The person filing this claim must sign it Sign and print name and title, if any, of the creditor or other person authorized to file this claim and state address and telephone number if different from the notice address above Attach copy of power of attorney, if any | FOR COURT USE ONLY |
|---|---|---|
| 4/1/09 | Tobey M Daluz, Esq *[signature]* | |

Penalty for presenting fraudulent claim Fine of up to $500,000 or imprisonment for up to 5 years, or both 18 U S C §§ 152 and 3571

# BALLARD SPAHR ANDREWS & INGERSOLL, LLP
919 NORTH MARKET STREET 12TH FLOOR
WILMINGTON DE 19801-3034
302-252-4465
FAX 302-252-4466
WWW BALLARDSPAHR COM

ATLANTA GA
BALTIMORE MD
BETHESDA MD
DENVER CO
LAS VEGAS NV
LOS ANGELES CA
PHILADELPHIA PA
PHOENIX AZ
SALT LAKE CITY UT
VOORHEES NJ
WASHINGTON DC
WILMINGTON DE

KELLY G IFFLAND
DIRECT DIAL (302) 252-4430
PERSONAL FAX (302) 355-0721
E-MAIL IFFLANDK@BALLARDSPAHR COM

April 14, 2009

**VIA OVERNIGHT MAIL**
Garden City Group, Inc
Attn BearingPoint, Inc
105 Maxess Road
Melville, NY 11747

Re: BearingPoint, Inc. Case No. 09-10691

Dear Sir/Madam

Enclosed please find one original proof of claim on behalf of ACE-USA/Westchester Fire Insurance Company to be to be filed in the above-referenced case, as well as two (2) copies of the proof of claim So that we receive acknowledgment of the receipt of this claim, kindly date-stamp the enclosed copies of the proof of claim and return to us in the accompanying self-addressed, prepaid, overnight courier envelope

Thank you for your prompt attention to this matter Should you have any questions or concerns, please do not hesitate to contact me

Sincerely,

Kelly G Iffland

KI/

cc Tobey M Daluz, Esq
Robert McL Boote, Esq

## SCHEDULE A TO PROOF OF CLAIM
## OF ACE-USA/ WESTCHESTER FIRE INSURANCE COMPANY
## ASSERTED IN THE CASE OF BEARINGPOINT, INC.

ACE-USA/ Westchester Fire Insurance Company ("ACE") is the Surety on bonds for BearingPoint, Inc ("BearingPoint")

Pursuant to, among other things, an Agreement of Indemnity, BearingPoint agreed to indemnify ACE for any sums it might be required to pay by reason of executing the surety bonds as described on the Bond List Report attached hereto  ACE reserves the right to amend this claim to include any and all additional amounts, including but not limited to attorneys' fees and costs connected with this matter, that may become due and owing to ACE [1]

---

[1]    The Bonds and Agreement of Indemnity are not attached hereto  A copy of these documents may be obtained at the expense of an interested party by submitting a written request to Tobey M  Daluz, Esq , Ballard Spahr Andrews & Ingersoll, LLP, 919 North Market Street, 12th Floor, Wilmington, Delaware 19801

BearingPoint, Inc

### Bond List of
### Westchester Fire Insurance Company and ACE USA, Inc.

| Bond Number | Effective Date | Principal | Bond Amount |
|---|---|---|---|
| K07627750 | 8/15/2007 | BearingPoint, Inc | $6,429,023 23 |
| K07372577 | 6/30/2008 | BearingPoint, Inc | $25,230,747 17 |
| K07628730 | 10/30/2008 | BearingPoint, Inc | $847,458 00 |
| K06614498 | 11/1/2008 | BearingPoint, Inc | $500,000 00 |
| K07316616 | 11/01/05 | BearingPoint, Inc | $478,800 00 |
| K06614371 | 04/13/04 | BearingPoint, Inc | $3,000,000 00 |
| | | TOTAL | $36,486,028 40 |

# Exhibit C

## Second Amended Complaint

WEIL, GOTSHAL & MANGES LLP
700 Louisiana Street, Suite 1600
Houston, Texas 77002
Telephone: (713) 546-5000
Facsimile: (713) 224-9511
Alfredo R. Pérez

WEIL, GOTSHAL & MANGES LLP
200 Crescent Court, Suite 300
Dallas, Texas 75201
Telephone: (214) 746-7700
Facsimile: (214) 746-7777
Yvette Ostolaza
Michelle Hartmann

Attorneys for Debtors
and Debtors in Possession

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| <u>In re</u> | Chapter 11 Case No. |
| **BEARINGPOINT, INC., <u>et al.</u>,** | **09 - 10691 (REG)** |
| **Debtors.** | **(Jointly Administered)** |
| **BEARINGPOINT, INC.,** | |
| **Plaintiff,** | |
| **vs.** | **Adversary Proceeding** |
| **THE STATE OF CALIFORNIA, JOHN CHIANG, in his official capacity as State Controller for the State of California, THE CALIFORNIA STATE CONTROLLER'S OFFICE, AND THE CALIFORNIA DEPARTMENT OF GENERAL SERVICES,** | **No. 09-01163-reg** |
| **Defendants.** | |

## <u>BEARINGPOINT INC.'S SECOND AMENDED COMPLAINT FOR DECLARATORY RELIEF AND FOR DAMAGES</u>

Plaintiff BearingPoint, Inc., a debtor and debtor in possession in the above-styled

chapter 11 cases ("***BearingPoint***" and together with certain affiliated debtors and debtors in possession, the "***Debtors***"),[1] by and through their attorneys, brings this Second Amended Complaint for Declaratory Relief and for Damages (the "***Complaint***") against Defendants John Chiang, in his official capacity as the California State Controller (the "***Controller***"), the California State Controller's Office (the "***Controllers Office***"), and the California Department of General Services (the "***Department***") (collectively, "***Defendants***"),[2] and alleges as follows:

## I. <u>PRELIMINARY STATEMENT</u>

1.    BearingPoint entered into Human Resources/Payroll Agreement No. 22191025 (the "***Contract***") with the Controller's Office, dated as of June 7, 2006, in order to implement a new payroll and human resources computer system for the State, coined the 21st Century Project (the "***Project***").  However, as a result of the State's budget crisis and in order to escape the payments required for a termination of the Contract *for convenience* as opposed to one *for default*, the Controller's Office and the Department, acting on its behalf and for the benefit of the State, anticipatorily repudiated and thereafter wrongfully terminated the Contract, thereby denying BearingPoint the benefit of its bargain and denying the estate funds that had been earned pre-petition.

2.    Defendants' anticipatory repudiation and improper termination should be found to be what they are—thinly veiled attempts by them to shift the blame to BearingPoint for their own material breaches in order to escape the payments associated with a termination for convenience.  At a minimum, therefore, BearingPoint is entitled to the full amounts that are to be paid by Defendants in the event of termination for convenience.  Through this action,

---

[1]  More information regarding Debtors and the background of these chapter 11 cases can be found in the Declaration of John DeGroote Pursuant to Rule 1007-2 of the Local Bankruptcy Rules for the Southern District of New York in Support of First-Day Motions and Applications, filed on February 18, 2009, the date the Debtors filed their chapter 11 petitions (the "***Commencement Date***").
[2]  BearingPoint has stipulated to dismiss its claims against the State of California (the "***State***") without prejudice.

BearingPoint seeks to recover these amounts and to obtain a declaration that, among other things, the termination by Defendants was for convenience, not as a result of default, and that Defendants' demand for immediate payment of over twenty-five million dollars on the performance bond related to the Contract (and for which BearingPoint must indemnify the surety) is not appropriate and violates the automatic stay protections afforded BearingPoint.

3.    Moreover, throughout the course of BearingPoint's performance of its obligations pursuant to the Contract, and during the implementation of the payroll and human resources system, the Controller's Office repeatedly failed to meet its obligations under the Contract and, therefore, materially breached the same. For example, the Controller's Office failed to: (i) provide what is known as "legacy information" in a form usable to BearingPoint, which information was essential to completion of the Project; (ii) co-manage the Project; (iii) make timely decisions and approvals; and (iv) provide critical data and responses concerning business processes. Furthermore, the Controller's Office demanded changes, revisions, additional customizations and new requirements to the Contract, sometimes on design components that had already been completed. These failures constitute material breaches of the Contract; increased BearingPoint's costs on the Project; and resulted in significant unanticipated and avoidable costs to BearingPoint. Through this action, BearingPoint also seeks to recover monetary damages caused by the foregoing breaches.

4.    Also, Defendants have wrongfully refused to pay BearingPoint $6,497,316.23 owed to BearingPoint as a result pre-petition performance. Specifically, Defendants held back twenty percent (20%) of the amount that was due to BearingPoint for each performance deliverable that was accepted by Defendants. These hold-back amounts are the property of BearingPoint, whether Defendants' termination was for cause, as Defendants

contend, or for convenience, as BearingPoint contends. Defendants' refusal to pay these hold-back amounts constitutes a further breach of the Contract and implicates this Court's core jurisdiction. Through this action, BearingPoint seeks to recover damages caused by the wrongful withholding and to recover the full amount of Estate property wrongfully withheld by Defendants.

5. Finally, Defendants requested and have benefited from work performed by BearingPoint that falls outside the scope of the fixed Contract. Through their conduct of requesting that BearingPoint perform work outside the time-frame and parameters of the Contract, expressly acknowledging changes to the contract's requirements, and asking BearingPoint to prepare documentation of additional expenses from Defendants' delays, additional customizations, and new requirements to the Project, Defendants agreed to compensate BearingPoint for the work it performed that was allegedly outside the scope of the Contract. BearingPoint repeatedly demanded payment for this work to no avail. Because Defendants contend that this work was outside the scope of the Contract and Defendants requested and have been unjustly enriched by the same, BearingPoint should be made whole by Defendants. Alternatively, BearingPoint seeks to recover monetary damages caused by Defendants' breach of the implied agreement to pay BearingPoint for the requested and performed work that was allegedly outside the scope of the Contract.

## II. JURISDICTION AND VENUE

6. Commencing on February 18, 2009, Debtors filed petitions for relief under chapter 11 of title 11 of the United States Code (the "***Bankruptcy Code***"). As of the date of this Complaint, Debtors continue to operate their businesses as debtors in possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code.

7.     This action is a core proceeding under 28 U.S.C. § 157(b)(2).[3]

8.     This Court has jurisdiction over this core proceeding pursuant to 28 U.S.C. § 1334 because the claims or causes of action arise under title 11 or arise in or are related to the voluntary petition for relief under chapter 11 of the Bankruptcy Code filed by plaintiff BearingPoint.  *See* 28 U.S.C. § 1334(b) (2000).[4]

9.     Venue is proper in this district, pursuant to 28 U.S.C. § 1409, because this adversary proceeding arises in or is related to the above-captioned chapter 11 cases pending in this district.

## III.     THE PARTIES

10.    At all times material hereto, BearingPoint is and has been a corporation existing under and by virtue of the laws of the State of Delaware with its principal place of business located in McLean, Virginia.  Before filing for bankruptcy relief, BearingPoint was one of the world's largest business and technology consulting, systems integration, and

---

[3] Moreover, even if the proceeding were "non-core," the Court still has jurisdiction to hear this matter because its resolution is "related to" BearingPoint's bankruptcy.  *See In re Adelphia Commc'ns Corp.*, 285 B.R. 127, 138 (Bankr. S.D.N.Y. 2002) (Gerber, J.) (exercising "related-to" jurisdiction because a judgment on the relevant claim in the underlying matter would affect the debtor's property).

[4] The test for determining whether "litigation has a significant connection with a pending bankruptcy proceedings is whether its outcome *might* have *any conceivable* effect on the bankrupt estate."  *In re Cuyahoga Equip. Corp.*, 980 F.2d 110, 114 (2d Cir. 1992); *see also In re Sterling Optical Corp.*, 302 B.R. 792, 802, 805-06 (Bankr. S.D.N.Y. 2003) (Gerber, J.) (citing *Cuyahoga* and finding the adversary proceeding to be "core" because it "affected and was uniquely affected by the bankruptcy court's core functions of determining [the creditor's] claim and administering the estate").  Here, the outcome of this adversary proceeding will clearly affect the size of the bankruptcy estate and, therefore, have a "conceivable effect" on the bankrupt estate.  The claim for the $6.5 million hold back currently in Defendants' possession certainly affects the size of the Estate and, indeed, is property or *res*, of the Estate.  Further, as the resolution of the core issues presented in this adversary proceeding has ramifications in the Debtors' chapter 11 cases, it is prudent for this Court to resolve the core bankruptcy issues raised in this Complaint.  The extent of the recoveries for all creditors depends on a uniform, consistent application of these core bankruptcy issues to these claims.  The significant core bankruptcy issues implicated by the adjudication of the Contract should be resolved by this Court and not by a court in a different jurisdiction unfamiliar with the facts underlying this bankruptcy.  Moreover, the State, through the Controller and the Controller's Office, has served on the Surety on a performance bond a notice that BearingPoint was allegedly in default, a notice of its intent to make a claim, and a demand for immediate payment for any and all damages arising from BearingPoint's alleged default on the Contract.  The bond's value exceeds $25,000,000.00, and it was issued in accordance with and as required under the Contract.  As explained *infra*, any continuing efforts by the State to enforce any alleged rights thereunder would significantly affect and necessarily reduce the size of the bankruptcy estate and threaten BearingPoint's attempts to maximize value for all stakeholders.

managed services firms. BearingPoint worked with public and private sector clients to provide business and technology strategy, systems design and architecture, applications implementation, network and systems integration, and managed services. Given BearingPoint's expertise, it was uniquely positioned to quickly and efficiently provide the skills, expertise and services needed to integrate and implement any software and information technology solution required to achieve the State's business objectives.

11.     Defendant the Controller John Chiang is a State Officer as defined by the Constitution of the State and acts as the State's chief financial officer. The Controller is sued in his official capacity.

12.     Defendant the Controller's Office is the office for the Controller. The Controller, through the Controller's Office, is responsible, among other things, for administering and maintaining the Uniform State Payroll System, the Employment History System, the Position Control System, and the Leave Accounting System (the "***Systems***") for approximately 300,000 State employees, including elected officials, legislative staff, civil servants, managers, supervisors, and California State University ("***CSU***") employees, including faculty, judges, and workers in a wide range of occupations over 150 departments and 24 CSU campuses. The Controller's Office, using the Systems, issues pay to the State employees, and audits and processes all personnel and payroll transactions for the employees of the State (the "***HR/Payroll Functions***").

13.     Defendant the Department is a California state agency charged with managing and operating the central services and business activities of the State, including the procurement and acquisition of materials, services, and other business solutions. The

Department is also responsible for the administration of certain contracts entered into by the State and its various agencies, departments, boards and commissions. Its Director is Will Bush.

## IV. FACTUAL BACKGROUND

### A. The State's Antiquated and Inefficient Systems.

14. As the administrator and manager of the Systems, the Controller's Office is the exclusive custodian of the majority of State employee data, including an official roster of State employees and information, payroll transactions on every State employee from 1975 to the present, and other personnel-related information, ranging from social security numbers, employee addresses, and civil service status to beneficiaries of benefits ("***State Personnel Data***"). This State Personnel Data enables the Controller's Office to perform the HR/Payroll Functions, which is critical to the decision-making processes necessary to effectively utilize state personnel resources. To manage the State Personnel Data and to perform the HR/Payroll Functions, the Controller's Office operates large and complex systems, all of which were developed by employees of the Controller's Office (the "***Legacy Systems***"). The past and current State Personnel Data, all past and current HR/Payroll Functions performed, the processes for performing HR/Payroll Functions, and the Legacy Systems used by the Controller's Office to manage and maintain the State Personnel Data and HR/Payroll Functions, among other things, comprise the Legacy Information (the "***Legacy Information***").

15. The Systems presently used by the State, as administered and managed by the Controller's Office, are antiquated. According to the Controller's Office, the Systems have three core problems: (a) they lack flexibility; (b) the technology is outdated and in danger of failure; and (c) they lack the necessary functionality. As a result, the Systems provide extremely limited HR/Payroll functionality and operate under a constant fear of their collapse.

16.     In or about 2000, the State concluded that the Systems, under the management and administration of the Controller's Office, were inadequate to meet the State's needs.  Specifically, the State determined that its outdated "business practices" and thirty year-old Systems needed to be eliminated or redesigned to make the entire organization operate efficiently.  At the same time, the State decided to restructure the State's HR/Payroll Functions in order to enable the efficient management of information for the proper administration of State programs.  Accordingly, in 2000-2001, the State conducted a procurement for an information technology solution to replace the State's current antiquated Systems, business practices, and HR/Payroll Functions.  The procurement effort resulted in a potential contract award for a new HR/Payroll System.

17.     Encountering an economic downturn and a looming budget deficit, funding was not allocated for fiscal year 2000-2001, and the project was cancelled.

**B.     The Procurement for the Project.**

18.     In or about 2004, the State renewed its efforts to replace its ailing and antiquated Systems, HR/Payroll Functions, and administrative infrastructure.  Specifically, in or about May 2004, the State approved and instituted the procurement process for the Project, which was to be conducted in two phases, with two separate Requests for Proposals ("***RFP(s)***") for: (i) the selection of software, and (ii) the selection of a system integrator.  The system integrator was to be the prime contractor responsible for integration, coordination, customization, training, installation, conversion, and implementation of the selected software ("***SI Services***").

19.     In or about May 2004, with active participation by the Controller's Office and on the Controller's Office's behalf, the Department issued the RFP for the Project's software program solution.  In or about May 2005, the State selected SAP Public Services, Inc.

("**SAP**") as the vendor for the Project's software solution. SAP provides a commercial off-the-shelf HR/Payroll System ("**SAP Software**"), and this system would replace the State's existing Systems. On or about May 10, 2005, the Controller's Office announced, on behalf of the State, that it had entered into an interim agreement with SAP to provide the State with the SAP Software.

20. In or about June 2005 and on behalf of the State, the Department, again with active participation by the Controller's Office, issued the RFP for a system integrator. After completing the procurement, on or about March 20, 2006, the Controller's Office announced that BearingPoint had been issued a Letter of Intent to award it the SI Services component.

## C. The Contract.

21. On or about May 27, 2006, and on behalf of the State, the Controller's Office entered into the Contract, under which the benefit of BearingPoint's bargain was payments by the State in the amount of $69,103,684.00. The Contract fixed the price, laid out the schedule, and defined the scope of the Project (the "**Scope of Project**"). The Department's Procurement Division approved the Contract on June 7, 2006. The Contract is approximately 5,000 pages in length. Given the size of the Contract, for the convenience of the Court, BearingPoint only attaches hereto, as Exhibit "A," a true and correct copy of the executed Standard Agreement form to the Contract, which, in turn, identifies the components of the Contract.

22. Under the terms of the Contract, BearingPoint was tasked with providing SI Services to the Controller's Office in order to replace the existing Systems so that the State's new system would: (i) produce accurate and timely payrolls; (ii) maintain accurate employment history and benefit administration information; (iii) provide State employees with "Employee

Self-Service" capabilities; (iv) provide integrated human resources/payroll systems; (v) provide electronic workflow processes; (vi) provide accessible management information and reporting tools; and (vii) modernize the Controller's Office's existing human resources architecture and information infrastructure. (Contract, Attach. 4, Vol. I at 2-10.)

D.     **The Required Obligations of the Controller's Office Under the Contract.**

23.     Because the Controller's Office is the exclusive custodian of the Legacy Information, the Contract required it:

    a.     to provide Legacy Information and support to BearingPoint, including a requirement to provide "the design, build, and test of the programs that extract data from legacy systems," and "conversion of the data to a format usable by the SAP system" to BearingPoint. (Contract, Attach. 4, Vol. I §§ 3(b)13.1, 3(b)13-6);

    b.     to "drive the data extract process and perform any required initial cleanup in the legacy system," (*id.* § 3(b)13-8); and,

    c.     to provide BearingPoint with the "required information, data, Documentation, and test data (supplemental to the test scenarios provided by the System Integrator) to facilitate the Contractor's performance of the work, and [to] provide such additional assistance and services as is specifically set forth in the RFP." (Contract, Attach. 2 § 62.b.)[5]

24.     Moreover, the Contract expressly required the Controller's Office to cooperate with BearingPoint, to collaborate with BearingPoint, and to assist BearingPoint to, among other things:

    a.     provide "an overall active presence at least equal to Team BearingPoint's staffing presence for the [P]roject," (Contract, Attach. 4, Vol. I at 2-10);

    b.     "assist in the implementation [of the Project]" by providing sufficient staff resources including,

        (i)     Project Managers of the Controller's Office who, among other skills and knowledge, are "knowledgeable at a high level in overall functionality, customization, and integration of HR/Payroll components;" provide "assistance to project and technical

---

[5] Attachment 2 to the Contract lists the "General Provisions" of the Contract, a true and correct copy of which is attached hereto and incorporated herein as Exhibit "1" to Exhibit A (the Standard Agreement form to the Contract).

managers to verify that the Controller's Office contractual commitments are planned and tracked;" provide "planning assistance for project sub-teams," provide "management reporting to senior management and distribution of information throughout the organization;" provide "advice and assistance in development of mitigation strategies for project risks or bottlenecks encountered;" provide "project monitoring and auditing;" carry "out staffing and rollout activities;" coordinate "communications with all departments and business partners;" and coordinate "timely review of all project deliverables[,]" (*id.* at 2-11, § 3(b)1-1);

    (ii)    Functional Team Members who are "subject matter experts (SMEs) for the Controller's Office's current personnel business process," and who have a "good understanding of the business issues and processes of the organization," (*id.* at 2-11);

    (iii)    Technical Team Members proficient in programming language and experience with database, network, and operating systems, (*id.* at 2-11, 2-12);

    (iv)    Change Management Team Members, (*id.* at 2-12); and

    (v)    Project Sponsors. (*id.* at 2-12, 2-13.)

c.    co-manage "all project activities[,]" (Contract, Attach. 3 § V, C.1.);

d.    "collaborat[e] in the operation of the Project Planning Office[,]" (*id.* § V, C.14.a); and,

e.    to give BearingPoint access to "project stakeholders and leaders to acquire needed information and data or carry out other proposed organizational change management activities." (Contract, Attach. 4, Vol. I §§ 3(b)5, 3(b)5-38.)

    25.    The Contract also obligated the Controller's Office to meet certain design obligations. For example, the Contract stated that the Controller's Office's "employees will need to ***redesign, implement and adopt new processes***." (Contract, Attach. 4, Vol. I §§ 3(b)2.4, 3(b)2-11) (emphasis added).) In executing the Contract, the Controller's Office acknowledged that BearingPoint's performance would be predicated on the Controller's Office "meeting its responsibilities in the time and manner described in the Work Plans." (Contract, Signature Page, Attach. ¶ d.) These required acknowledgements were critical to timely

implementation of the deliverables by BearingPoint under the Contract and were a material inducement to BearingPoint entering into the Contract.

## E.    Amendments to the Contract.

26.    After the Contract was executed, the Controller's Office failed to provide Legacy Information as required under the Contract (or at all), and failed to meet other obligations under the Contract. To try to move forward, the parties agreed to amend the Contract. Specifically, on or about January 9, 2008, BearingPoint and the Controller's Office, with approval from the Department's Procurement Division, entered into Amendment No. 1 to the Contract ("*Amendment 1*"). Amendment 1 was designed to serve as an interim agreement while the parties negotiated another amendment. A true and correct copy of Amendment 1 is attached hereto as Exhibit "B" and is incorporated herein by reference.

27.    Amendment 1 was also designed to affirm the responsibilities and obligations of the Controller's Office under the Contract by requiring it, "at a minimum," to perform the following:

a.    "Provide staff resources as required in the Contract for administrative support[;]"

b.    "Provide project staff resources as identified and up to the total number of State staff indicated in the [C]ontract staffing tables[;]"

c.    "Review and approve deliverables in a timely manner pursuant to the Contract[;]"

d.    "Provide data extracted from the legacy system . . . according to data needs defined by [BearingPoint] in data conversion specifications[;]" and

e.    "Facilitate access to stakeholders outside the [P]roject . . . including facilitation of legacy information gathering."

(Ex. B at 3, § 5 "Roles/Responsibilities.")

28.     Amendment 1 also readjusted the Project schedule in order to account for delays caused by the Controller's Office, thereby revising the Scope of Project, including timing and payment for certain design deliverables.  (*See* Ex. B.)

29.     As contemplated in Amendment 1, the parties then negotiated and finalized a second amendment.  On or about June 27, 2008, BearingPoint and the Controller's Office, with approval from the Department's Procurement Division, entered into Amendment No. 2 to the Contract ("***Amendment 2***").  A true and correct copy of Amendment 2 is attached hereto as Exhibit "C" and is incorporated herein by reference.  Amendment 2 again readjusted the Scope of Project, particularly the schedule for the remaining phases necessary to fully implement the Project along with the payment deliverables costs.  Amendment 2 also modified and re-defined the tasks associated with the design, realization, final preparation, and "go live" and support phases of the Project.  (*See* Ex. C.)

30.     Given the multiple and repeated failures of the Controller's Office to provide Legacy Information and otherwise meet its required obligations under the Contract, Amendment 2 expressly required the Controller's Office to provide Legacy Information in a form usable to BearingPoint by no later than July 23, 2008, such that the design could be completed by no later than September 30, 2008.  (Ex. C, App. A at 1, 2.)  Both of these requirements were critical to the success of the Project and were material inducements to BearingPoint executing the amendments.

31.     Amendment 2 also expressly acknowledged "Changes in Requirements" to the Contract, and that "[a]ny requirements believed to be new or changes from the original scope will be submitted to the Change Control Board using the approved change Control Management Process to achieve a mutually agreed resolution."  (Ex. C ¶ 5.)  By agreeing to

Amendment 2, Defendants impliedly promised that BearingPoint would be compensated for any "new" or "changed" work outside Scope of Project.  (Ex. C ¶¶ 5-6 & App. B at Phase "Realization," PD #96 (listing a price of $1.7 million for "Additional Scope Items")).)  The Contract, along with Amendments 1 and 2, shall collectively be referred to as the "***Amended Contract***."

## F.      The Defendants' Breaches of the Amended Contract.

        32.      During the term of the Amended Contract, BearingPoint fully performed all conditions, covenants, and promises and satisfied all obligations for which performance was not excused, frustrated, and/or prevented by the actions of Defendants.

        33.      In contrast, the Controller's Office repeatedly failed to perform as required by the Amended Contract.

        34.      The Controller's Office completely failed to provide critical Legacy Information in a form usable to BearingPoint in the time required under the Amended Contract. Defendants did not provide the Legacy Information by July 23, 2008, as required by the Amended Contract.  As the custodian of Legacy Information and developer of the legacy processes, this breach of the Amended Contract was particularly egregious.  The Controller's Office was the only party that could gather this information, and timely performance of that condition by the Controller's Office was essential to the success of the Project.

        35.      Initially, the Controller's Office made no attempt to refute that it had breached the Amended Contract by failing to provide timely and usable Legacy Information. Rather, on or about August 5, 2008, the Controller's Office told BearingPoint and the Project team that it was unable to timely provide the required Legacy Information in a form usable to BearingPoint.  At that time, the Controller's Office indicated that it would provide this

information by late November 2008, at least three months after the Amended Contract's required delivery date.

36.     The Controller's Office ultimately failed to deliver any Legacy Information in or around November of 2008, despite its promises to do so.  In this regard, after missing the belated November 2008 promised delivery date, the Controller's Office then promised to deliver Legacy Information in a form usable to BearingPoint by February or March of 2009, at the very earliest, which, if delivered then, would have resulted in a nine to twelve-month delay in completion of the Project.

37.     Recognizing that its failure to provide the required information would inevitably delay the Project and would damage BearingPoint, in or about early September 2008, the Controller's Office began to evaluate various Project options, including options to extend the Project or to reduce functionality in the new system.  The Controller's Office then initiated its own analysis of the potential cost impact the delay would have upon BearingPoint and began to discuss these potential cost impacts with BearingPoint.  Indeed, in early October 2008, the Controller's Office even requested that BearingPoint provide its cost estimates for the various options, which BearingPoint provided to the Controller's Office on or about October 16, 2008. *Throughout September and early October 2008, the Controller's Office reassured BearingPoint that BearingPoint would be justly and reasonably compensated for the damages suffered by BearingPoint due to the unreasonable delays caused and material breaches made by the Controller's Office, including their repeated requests for BearingPoint to perform work outside the Scope of Project*.

38.     Thus, during the late summer and fall of 2008, BearingPoint relied on Defendants' promise to compensate BearingPoint for its damages and continued to perform

work under the Contract and the additional work outside the Scope of Project, as Defendants requested.

39. The Controller's Office failed to meet its obligations, and materially breached the Amended Contract by, among other things:

a. failing to make timely decisions and approvals of options, alternatives, functional specifications, and technical specifications of the Project;

b. demanding changes, revisions, additional customizations, work outside the Scope of Project, and new requirements to the Contract and the Amended Contract and to already-completed design components;

c. failing to allocate sufficient staff resources from the Controller's Office for the Project;

d. failing to provide critical data and responses about business processes; and;

e. failing to provide essential legacy information, including information about legacy processes, in a form usable to BearingPoint in the time required under the Contract and Amended Contract;

f. failing to fully pay for deliverables completed by BearingPoint and accepted by the Controller's Office;

g. failing to pay for work outside the Scope of Project requested by Defendants and performed by BearingPoint;

h. failing to compensate BearingPoint for its added expenses resulting from delays caused by the Controller's Office; and

i. failing to pay for work that was partially complete at the time of termination.

40. These material breaches of the Amended Contract by the Controller's Office caused all purported delays in completion of the Amended Contract and resulted in significant damage to BearingPoint.

## G. Termination of the Amended Contract.

41. In or about late October of 2008, and as California's financial situation continued to deteriorate, the Controller's Office reversed course, adopting a different strategy.

Specifically, on or about October 23, 2008, and despite acknowledging that BearingPoint had been and would continue to be materially damaged by its conduct, that BearingPoint should receive reasonable compensation, and that the Controller's Office had failed and continued in its failure to deliver the required Legacy Information in a manner usable to BearingPoint, an official of the Controller's Office stated that BearingPoint would not receive "another dollar." The same official of the Controller's Office asked BearingPoint to consider what he described as an "offramp" from the Project.

42.     Still hoping to salvage the Project and in a good faith attempt to resolve outstanding issues, including those related to Legacy Information and other breaches by the Controller's Office, in or about late October and November 2008, BearingPoint continued to work with the Controller's Office in order to propose a new solution for the Project that could include further payments to BearingPoint.

43.     Meanwhile, California's budget crisis continued to worsen.  In or about December 2008, the Controller announced that the State was unilaterally terminating billions of dollars of public works contracts as a result of the State's dire economic crisis.  Shortly thereafter, the Controller's Office stated that it would resort to paying its obligations, including State employee payroll, vendor payments, and State tax returns, in the form of "IOUs" as a result of its depleted cash position.

44.     Following BearingPoint's efforts to resolve outstanding issues and cooperate with the Controller's Office despite the Controller's Office's material breaches of the Amended Contract, on or about December 3, 2008, James Butler, the Deputy Director, Procurement Division of the Department, on behalf of the Controller's Office, unexpectedly issued a notice of intent to terminate the Amended Contract, and purported to terminate the

Amended Contract for default (the "***Notice of Default***") under Section 18 of Attachment 2 to the Amended Contract (the "***Default Section***"). Under the Default Section, either party was permitted to terminate the Amended Contract *for cause* upon notice and opportunity to cure. (Ex. 1 to Ex. A § 18.)

45. Remarkably, the Department alleged, in the Notice of Default, that BearingPoint was to blame for the purported delays in the Project and claimed that BearingPoint was in default of the Amended Contract. The Department purported to give BearingPoint thirty days to "cure" – even though the problems identified were caused by the Controller's Office and were not within the control of BearingPoint. The Notice of Default stated that, if BearingPoint did not cure the default by 3:00 p.m. on January 6, 2009, the Department would terminate the Amended Contract.

46. Due to the failure of the Controller's Office to provide Legacy Information in a timely manner, and because of its other breaches, on or about December 3, 2008, BearingPoint was forced to issue a notice of intent to terminate for default. In its notice, BearingPoint asked the Controller's Office to cure by providing the Legacy Information in a form usable to BearingPoint, as is required under the Amended Contract. Contemporaneously therewith and, given the Controller's Office's failure to provide timely Legacy Information in a form usable to BearingPoint and its estimated projection of when the Controller's Office might fulfill this obligation, on or about December 3, 2008, BearingPoint also sent a Demand for Final Decision (the "***Demand***") to both the Controller's Office and to the Department pursuant to Section 40 of Attachment 2 to the Amended Contract. Therein, BearingPoint demanded that the Controller's Office provide Legacy Information in a form usable to BearingPoint, and that it

agree to justly and reasonably compensate BearingPoint for any and all damages that had and would result from its past and projected failures.

47. On or about December 12, 2008, the Controller's Office summarily denied BearingPoint's Demand (the "***Response to Demand***"), and simply reasserted most of the claims made by the Department's Procurement Division in the Notice of Default, namely that BearingPoint allegedly was to blame for the delay in the Project and that BearingPoint allegedly was in default of the Amended Contract. The Controller's Office failed to recognize that its own breaches were the cause of any delays on the Project and wholly disregarded that, through its breaches, it had prevented, frustrated, and/or excused BearingPoint's performance under the Amended Contract.

48. On or about December 26, 2008, the Controller's Office responded to BearingPoint's notice of intent to terminate. In that response, the Controller's Office, again, refused to provide the Legacy Information as required under the Amended Contract, and refused to recognize its many material breaches.

49. On or about January 6, 2009, BearingPoint responded in detail to the Notice of Default of the Controller's Office ("***BearingPoint's Response***"), before 3:00 p.m. In BearingPoint's Response, BearingPoint provided responses to each of the purported grounds for the Notice of Default and explained in detail why BearingPoint was *not* in default. BearingPoint also informed the Department that BearingPoint maintained that any termination could only be for convenience, not for default.

50. Ignoring BearingPoint's Response, on or about January 6, 2009, at precisely 3:00 p.m., the Department served BearingPoint with a notice of termination for default ("***Notice of Termination***"). Despite the fact that BearingPoint adequately responded to

the Notice of Default, the Department's Notice of Termination falsely stated that BearingPoint had not responded to the Notice of Default. In fact, the Notice of Termination specifically represented that the Defendants' sole reason for terminating the Amended Contract was that BearingPoint had not responded. There was no other basis for the anticipatory repudiation of the Amended Contract.

51.     Because the basis for the Department's Notice of Termination was false, on or about January 9, 2009, BearingPoint demanded that the Department withdraw its Notice of Termination, which plainly was a thinly-veiled attempt to anticipatorily repudiate the Contract and Amended Contract.

52.     Notwithstanding its previous false representations, on or about February 4, 2009, the Department sent another letter to BearingPoint, now stating that the Department was really terminating the Amended Contract because BearingPoint had not "cured" the purported breaches. The Department then purported to respond to BearingPoint's Response, but did so by merely repeating the same assertions as to why BearingPoint purportedly was in default, making it patently clear that the Department had already prejudged the matter. The Department stated that it would be futile to submit further appeals regarding the termination of the Amended Contract to the Department.

## H.     Termination was for Convenience, Not Default.

53.     BearingPoint is informed, believes and, on that basis, alleges that, on behalf of and purportedly with the consent of the Controller and the Controller's Office, the Department issued the Notice of Default to cancel the Amended Contract in an effort to unlawfully veil its own defaults, not because BearingPoint was in default of the same. The Department's reason for doing so is simple – it wanted to avoid the contractual payments associated with terminating for convenience and it knew that the Controller's Office did not

possess the capability to provide skilled managers, staff, and the Legacy Information as required by the Amended Contract.

54.     Under Section 17 to Attachment 2 of the Amended Contract (the "***Convenience Section***"), the State may,

> Upon thirty (30) days prior written notice to Contractor[,] . . . terminate performance of work under this Contract for its convenience in whole or, from time to time, in part, if the Department of General Services, Deputy Director Procurement Division, or designee, determines that a termination is in the State's best interest.  The Department of General Services, Deputy Director, Procurement Division, or designee, shall terminate by delivering to the Contractor a Notice of Termination specifying the extent of termination and the effective date thereof.

(Ex. 1 to Ex. A § 17.a.)

55.     Once termination is effectuated under the Convenience Section, the State is required to pay:

a.     "fees for deliverables or services Accepted by the State and not previously paid for . . .[;]"

b.     "reasonable expenses incurred prior to the termination, including initial costs and preparatory expenses allocable thereto[;]"

c.     "reasonable cost of settling and paying termination settlement proposals under terminated subcontracts[;]" and,

d.     "reasonable storage, transportation, demobilization, unamortized overhead and capital costs, and other costs reasonably incurred by the Contractor in winding down and terminating its work."

(<u>Id.</u> § 17.c.)

56.     Instead of using the Convenience Section, BearingPoint is informed, believes and, on that basis, alleges that the State improperly has characterized its termination as one for default in order to avoid the remedies that BearingPoint would be entitled to recover under the Convenience Section.

57.     The default section of the Amended Contract (the "***Default Section***")
does not require all of the payments required under the Convenience Section.  However, it
provides that if the Amended Contract is terminated purportedly for default, but it is ultimately
determined that there was no default, the "rights and obligations of the parties shall be the same
as if the termination notice has been issued for the convenience of the State."  (Ex. 1 to Ex. A
§ 18.f.)  Thus, since BearingPoint was not in default, based on the express language of the
Amended Contract, BearingPoint is entitled to all amounts specified in Section 17.c. as
delineated above.

58.     The Controller's Office and the Department have refused and failed to
pay BearingPoint the amounts specified in Section 17.c.  The Department continues to maintain
that the termination was for default and thus that the above amounts are not owed.

59.     BearingPoint has satisfied all required claims procedures.  The State has,
on its own initiative, rendered final decisions on the disputes between the parties as delineated
above, and, accordingly, under the terms of the Amended Contract, BearingPoint is entitled to
bring this action.

**I.      The Defendants' Refusal to Pay for Completed Deliverables.**

60.     During the course of BearingPoint's performance of its obligations under
the Amended Contract, Defendants held back twenty percent (20%) of the amount that was due
to BearingPoint for each accepted deliverable.

61.     Pre-petition, on January 27, 2009, BearingPoint demanded immediate
payment from Defendants in the amount of $6,621,006.63 for completed deliverables delivered
and accepted.[6]  In so demanding, BearingPoint clarified for Defendants that BearingPoint was

---

[6] In a May 11, 2009 letter from its counsel, BearingPoint adjusted this amount to $6,497,316.23 to reflect a partial payment issued by the State on or about January 31, 2009.  A true and correct copy of the May 11, 2009 letter (along

entitled to this property whether the Amended Contract was terminated for convenience, as Defendants argue, or for default, as BearingPoint argues.  BearingPoint attached to its demand all the necessary supporting information for each deliverable, including the payment deliverable number and description, the date each deliverable was accepted by the State, the Amended Contract price for each deliverable, the partial payment amount made by the State, if any, and the balance of the Amended Contract price that was due and owing to BearingPoint for each accepted deliverable.

62.     On February 11, 2009, the Controller's Office responded to BearingPoint's demand by refusing to pay the amounts owed BearingPoint.

63.     Regardless of the reason for Defendants' termination of the Amended Contract, BearingPoint is entitled to the amounts withheld by Defendants, as those amounts were earned pre-petition, are property of the Estate, and relate to accepted deliverables for which performance has been completed.  In that regard, Attachment 2 to the Amended Contract provides that, in the event the Amended Contract is terminated for default, "the State shall pay Contract price for completed deliverables delivered and accepted."  (Ex. 1 to Ex. A § 18(e).) Similarly, Attachment 2 to the Amended Contract provides that in the event the Amended Contract is terminated for the convenience of the State, the State shall pay "[t]he Contractor fees for deliverables or services Accepted by the State and not previously paid for . . . ."  (Id. § 17(c)(i).)

64.     To date, Defendants have failed and expressly refused to pay BearingPoint the amounts owed pursuant to *either* Section 18(e) or Section 17(c)(i) of

---

with a true and correct copy of the January 27, 2009 letter) is attached hereto and incorporated herein by reference as Exhibit "H."

Attachment 2 of the Amended Contract for deliverables that were delivered and accepted by Defendants. BearingPoint has satisfied all required claims procedures.

**J.**     **Defendants' Failure to Pay For Additional Work Performed by BearingPoint For the Benefit of Defendants.**

65.     The Amended Contract is a fixed-price contract. It required BearingPoint to perform work and make specified deliverables that were within the Scope of Project. Throughout the course of BearingPoint's performance of the Contract and Amended Contract, Defendants regularly requested performance outside the Scope of Project.

66.     Defendants promised to compensate BearingPoint performance of work that was outside the Scope of Project and requested that BearingPoint provide them with documentation of additional expenses, which BearingPoint did. Based on Defendants' conduct with respect to the requested work outside the Scope of Project, BearingPoint expected and understood that Defendants agreed to pay BearingPoint for the work performed outside the Scope of Project. (*See* Ex. C ¶¶ 5-6 & App. B.)

67.     Accordingly, BearingPoint continued to perform such work for the benefit of Defendants. It also continued to engage necessary personnel and extended the duration of its performance as a result of promised future payment by Defendants.

68.     On June 3, 2009, BearingPoint, through its counsel, sent a letter to counsel for Defendants requesting payment of $23,279,472.00, which reflects the reasonable value of work that was partially complete at the time of termination, added work outside the Scope of Project that had been requested by the Controller's Office and performed by BearingPoint during the course of the Project, and additional expenses incurred by BearingPoint due to delays caused by the Controller's Office during the Project. A true and correct copy of the June 3, 2009 letter is attached hereto as Exhibit "I."

69.     BearingPoint is entitled to compensation for the work it performed for the State that was partially complete at the time of termination, the work outside the Scope of Project that Defendants had directed BearingPoint to perform (and was performed by BearingPoint), and the additional expenses BearingPoint incurred due to delays by the Controller's Office.  Specifically, Section 17 of Attachment 2 to the Amended Contract entitles BearingPoint to compensation for all reasonable expenses incurred prior to any termination for the State's convenience.  (Ex. 1 to Ex. A § 17; *see also* Ex. C ¶¶ 5-6 & App. B.)  Defendants have refused to pay any of these amounts.  BearingPoint has satisfied all required claims procedures.

## K.     The Defendants' Wrongful Conduct Concerning the Performance Bond.

70.     As part of the Contract, on June 20, 2006, the State and the Controller's Office, as obligee, BearingPoint, as principal, and Westchester Fire Insurance Company (the "***Surety***") entered into a Performance Bond (the "***Bond***"), numbered K07372577 and valued at $33,167,240.  A true and correct copy of the Performance Bond No. K07372577 is attached hereto as Exhibit "D."

71.     The Bond's term was continued through June 30, 2009 through the Continuation Certificate, dated June 23, 2008, for an amount of $25,230,747.71.  A true and correct copy of the Continuation Certificate is attached hereto as Exhibit "E."

72.     The Surety entered into an Agreement of Indemnity with BearingPoint as indemnitor on March 16, 2004, whereby BearingPoint agreed to:

> indemnify and save harmless the SURETY from and against any and all liability, claim, demand, loss, damages, expense, cost, attorney's fees and expenses, including without limitation, fees and disbursements of counsel incurred by the SURETY in any action or proceeding between the INDEMNITOR and the SURETY, or between the SURETY and any third party, which SURETY shall at any time incur by reason of its execution of any bond or its

payment of or its liability to pay any claim[.]

*See* Agreement of Indemnity ¶ 2, a true and correct copy of which is attached hereto as Exhibit "F."

73.    As collateral, BearingPoint established and funded a letter of credit with the Surety as the beneficiary.

74.    On April 8, 2009, the State, through the Controller and the Controller's Office, sent a letter to the Surety declaring their intention "to enforce any and all obligations related to th[e] surety agreement and *Bond Number K07372577*[,]" and providing "notice of [BearingPoint's] default and [the State's] intent to make a claim" on the bond. Further in the letter, the State "demand[ed the Surety's] immediate payment for any and all damages that have, and continue to occur, as a result of [BearingPoint's] default." A true and correct copy of the State's April 8, 2009 letter is attached hereto as Exhibit "G."

75.    On April 15, 2009, the Surety filed a Proof of Claim in Debtor's bankruptcy case, in which the Surety claims a secured claim in the amount of $30,524,458.00 and an unsecured claim in the amount of $5,961,570.40. Of this claimed amount, the Surety makes a claim for $25,230,747.17 related to the Bond at issue in this Proceeding.

76.    As a consequence of Defendants' April 8, 2009 letter to the Surety and the Surety's Proof of Claim, BearingPoint's indemnification obligations may have been triggered, potentially subjecting the estate to millions of dollars in liability, claims, costs, etc., despite BearingPoint's performance under the Amended Contract and the State's wrongful termination for purported default thereof. Moreover, any further effort by the State to collect on the Bond will threaten BearingPoint's ability to maximize value for all stakeholders, and any ultimate payment on the bond would have an adverse impact upon the property of the estate and expose BearingPoint to a significant risk of collateral estoppel and evidentiary prejudice.

# V.    CAUSES OF ACTION

## FIRST CLAIM

*(Declaratory Relief against All Defendants That the Termination Was For Convenience, That Defendants are Obligated to Pay the Hold-back Amount No Matter What the Reason for Termination, and That Defendants' Conduct Concerning the Surety on the Bond is Improper.)*

77.    BearingPoint realleges and incorporates by reference herein the allegations of Paragraphs 1 through 76, above.

78.    Pursuant to Fed. R. Civ. P. 57 and 28 U.S.C. § 2201, declaratory judgment relief is proper here.

79.    An actual controversy has arisen and now exists between Defendants and BearingPoint as to the parties' respective rights and obligations under the Convenience Section of the Amended Contract.  BearingPoint contends that, if Defendants intended or desired to terminate the Contract and Amended Contract, they were entitled to terminate only under the Convenience Section, and thus that BearingPoint is entitled to all of the rights and remedies identified in the Convenience Section including, but not limited to, those identified in Section 17.c.  Defendants, on the other hand, contend that they were entitled to terminate the Contract and Amended Contract under the Default Section, and that BearingPoint is not entitled to the remedies available under the Convenience Section.

80.    Further, an actual controversy has arisen and now exists because Defendants' April 8, 2009 letter constitutes a notice by Defendants to the Surety of BearingPoint's purported default, a notice to the Surety of Defendants' intent to make a claim, and a demand to the Surety for "immediate payment for any and all damages that have, and continue to occur, as a result of [BearingPoint's] default."  (*See* Ex. G.)

81.     BearingPoint desires a judicial determination that Defendants' termination of the Contract and Amended Contract was for convenience of the State and thus that BearingPoint is entitled to all of the rights and remedies contained in the Convenience Section including, but not limited to, those identified in Section 17.c., in addition to its attorneys' fees, pre-judgment interest and costs.  (*See* Ex. 1 to Ex. A.)

82.     BearingPoint further desires a judicial determination that it is entitled to payment from Defendants in the amount of $6,497,316.23 for completed deliverables that were delivered and accepted.  Defendants held back twenty percent (20%) of the amount that was due to BearingPoint for each deliverable that was delivered and accepted by Defendants.  These amounts have been and are due and owing to BearingPoint as pre-petition property no matter what Defendants' reason is for termination of the Amended Contract.  Defendants have refused to pay these additional amounts in breach of the Contract and Amended Contract.  (*See* Ex. H.)

83.     BearingPoint additionally desires a judicial determination that Defendants' actions to collect on the Bond (which actions unnecessarily trigger BearingPoint's indemnification obligations to the Surety under the Agreement of Indemnity as evidenced by the Surety's Proof of Claim) are improper and violate the automatic stay protections afforded BearingPoint.  (*See* Ex. F.)  Any effort to collect on the Bond by Defendants is impermissible at this time because the Surety's liability on the bond is contingent on BearingPoint's liability to Defendants, because the same facts are at issue regarding performance under the Contract and Amended Contract, and there is a significant risk of collateral estoppel, stare decisis, and evidentiary prejudice to BearingPoint of any resolution of liability under the Bond outside of this Court.

84.     Any and all efforts by Defendants to collect or make a claim on or recover in any way on the Bond will impact adversely, interfere with, impede, burden, frustrate or delay BearingPoint's attempts to maximize value for the stakeholders.  A judicial determination that staying Defendants' collection efforts on the Bond is necessary in order to: (i) preserve and protect BearingPoint's estate from adverse economic consequences in light of its indemnification obligation to the Surety, (*see* Ex. F), (ii) prevent any adverse collateral estoppel effect that Defendants' collection on the bond may have on this adversary proceeding, and (iii) prevent Defendants from frustrating BearingPoint's attempts to maximize value for its stakeholders.  *See In re Calpine Corp.*, 354 B.R. 45, 48-50 (Bankr. S.D.N.Y. 2006), *affirmed* 365 B.R. 401 (S.D.N.Y. 2007) (extending the automatic stay through a 105(a) preliminary injunction to prevent further efforts by a utility company to collect on a bond from a surety, where the surety had a separate indemnification agreement with the bond's principal, the bankrupt entity in the process of reorganizing under chapter 11).

85.     Accordingly, a judicial declaration is necessary and appropriate at this time under the circumstances in order that BearingPoint may ascertain its rights and duties relating to the Contract, the Amended Contract, and actions taken to collect on the Bond.

## SECOND CLAIM

### *(Breach of Contract Against All Defendants Related to the Wrongful Termination and Failure to Pay the 20% Hold-back Amount of Estate Property)*

86.     BearingPoint realleges and incorporates by reference herein the allegations of Paragraphs 1 through 85, above.

87.     The Contract and Amended Contract are valid, binding, and enforceable contracts between BearingPoint and the Controller's Office, for the benefit of the State. BearingPoint has performed all conditions, covenants, and promises under the Amended

Contract on its part to be performed, except as such performance has been excused, prevented, and/or frustrated by the actions of Defendants.

88.    While Defendants have asserted that the termination was for default under the Default Section, BearingPoint was not in default, nor could it have been. Defendants' efforts to label the termination as falling under the Default Section are, therefore, unlawful and constitute a wrongful and improper termination. At a minimum, the termination was one of convenience under the Convenience Section, and Defendants should be required to treat it as such.

89.    Defendants merely purported to terminate the Contract and Amended Contract for default in order to avoid having to pay amounts specified thereunder. In this regard, they have not (and cannot), in good faith, claim that BearingPoint was in default.

90.    Defendants have materially breached the Contract and Amended Contract by failing to pay the amounts that the State is required to pay in the event of termination under the Convenience Section, and have refused to tender payment. (*See* Ex. 1 to Ex. A; Ex. I.)

91.    Moreover, regardless of the reason for termination, Defendants owe BearingPoint but have improperly failed and refused to pay the hold-back amount. (*See* Ex. H.)

92.    As a direct and proximate result of Defendants' failures, BearingPoint has been damaged, and thus is entitled to (i) all reasonable expenses incurred prior to termination pursuant to Section 17.c in an amount to be ascertained at trial, but which BearingPoint has calculated to total in excess of twenty nine million dollars, including $6,497,316.23 due BearingPoint as a result of Defendants' failure and refusal to pay

BearingPoint the hold-back amounts that were earned pre-petition, plus pre-judgment interest and costs.  (*See* Exs. H, I.)

## THIRD CLAIM

*(Anticipatory Breach Against All Defendants For Repudiation of the Contract and Amended Contract Before the Notice and Cure Period)*

93.     BearingPoint realleges and incorporates by reference herein the allegations of Paragraphs 1 through 92, above.

94.     Defendants anticipatorily breached the Contract and Amended Contract through their repudiation of them before the time Defendants' performance was due.

95.     Defendants purported to terminate the Contract and Amended Contract for default because BearingPoint did not "cure" by 3:00 p.m. on or about January 6, 2009. However, as Defendants concede, BearingPoint responded, among other times, to Defendants' Notice of Default on or about January 6, 2009 before 3:00 p.m.

96.     The same day, Defendants completely ignored the Response and instead served BearingPoint with a Notice of Termination, falsely stating that BearingPoint had not responded to the Notice of Default.  Through the Notice of Termination, Defendants stated that BearingPoint's failure to respond resulted in Defendants' conclusion that the State had a proper basis to terminate the Contract and Amended Contract for default.  Defendants' actions resulted in an anticipatory breach of the Contract and Amended Contract.

97.     As a direct and proximate result of Defendants' anticipatory breach, disputes arose and BearingPoint was required to bring this lawsuit.  Accordingly, it has been generally damaged by incurring attorneys' fees and costs in an amount to be ascertained at trial.

# FOURTH CLAIM

### *(Breach of Contract Against All Defendants)*

98.     BearingPoint realleges and incorporates by reference herein the allegations of Paragraphs 1 through 97, above.

99.     The Contract and the Amended Contract are valid, binding, and enforceable contracts between BearingPoint and the Controller's Office, for the benefit of the State.  BearingPoint has performed all conditions, covenants, and promises under the entire Amended Contract on its part to be performed, except as such performance has been excused, prevented, and/or frustrated by the actions of Defendants.

100.     Defendants breached the Contract and Amended Contract by, among other things:

   a.     failing to make timely decisions and approvals of options, alternatives, functional specifications, and technical specifications of the Project;

   b.     demanding changes, revisions, additional customizations, work outside the Scope of Project, and new requirements to the Contract and the Amended Contract and to already-completed design components;

   c.     failing to allocate sufficient staff resources from the Controller's Office for the Project;

   d.     failing to provide critical data and responses about business processes; and;

   e.     failing to provide essential legacy information, including information about legacy processes, in a form usable to BearingPoint in the time required under the Contract and Amended Contract;

   f.     failing to fully pay for deliverables completed by BearingPoint and accepted by the Controller's Office;

   g.     failing to pay for work outside the Scope of Project requested by Defendants and performed by BearingPoint;

   h.     failing to compensate BearingPoint for its added expenses resulting from delays caused by the Controller's Office; and

i.      failing to pay for work that was partially complete at the time of
        termination.

101.    Such failures by Defendants to perform under the Contract and Amended
Contract were and are material breaches of the same, which has and will continue to damage
BearingPoint.

102.    BearingPoint requested just and reasonable compensation from the
Defendants for damages which have resulted from the Controller's Office's material breaches,
but Defendants have refused and continue to refuse to pay the same.

103.    As a direct and proximate result of the Controller's Office's breaches,
BearingPoint has been generally damaged in an amount to be ascertained at trial, but which
BearingPoint believes to total at least $29 million, plus pre-judgment interest and costs.

## FIFTH CLAIM

### *(Breach of the Implied Covenant of Good Faith and Fair Dealing against All Defendants)*

104.    BearingPoint realleges and incorporates by reference herein the
allegations of Paragraphs 1 through 103, above.

105.    BearingPoint and Defendants entered into the Contract and Amended
Contract.

106.    The Contract and Amended Contract contain an implied covenant of
good faith and fair dealing.

107.    The implied covenant imposes on Defendants the duty to have refrained
from doing anything that would render BearingPoint's performance of the Contract and
Amended Contract impossible and the duty to perform its obligations under the same frustrated.

108.    Defendants breached the implied covenant by:

a.      failing to make timely decisions and approvals of options, alternatives,
        functional specifications, and technical specifications of the Project;

b.  demanding changes, revisions, additional customizations, work outside the Scope of Project, and new requirements to the Contract and the Amended Contract and to already-completed design components;

c.  failing to allocate sufficient staff resources from the Controller's Office for the Project;

d.  failing to provide critical data and responses about business processes; and,

e.  failing to provide essential legacy information, including information about legacy processes, in a form usable to BearingPoint in the time required under the Contract and Amended Contract.

f.  failing to fully pay for deliverables completed by BearingPoint and accepted by the Controller's Office;

g.  failing to pay for work outside the Scope of Project requested by Defendants and performed by BearingPoint;

h.  failing to compensate BearingPoint for its added expenses resulting from delays caused by the Controller's Office; and

i.  failing to pay for work that was partially complete at the time of termination.

109.  As a direct and proximate result of Defendants' breach of the implied covenant of good faith and fair dealing in the Contract and Amended Contract, BearingPoint has been generally damaged in an amount to be ascertained at trial, but which BearingPoint believes to be at least $29 million, plus pre-judgment interest and costs.

## SIXTH CLAIM

### *(Quantum Meruit against All Defendants)*

110.  BearingPoint realleges and incorporates by reference herein the allegations of Paragraphs 1 through 109, above.

111.  BearingPoint and Defendants entered into the fixed-price Contract and Amended Contract, which required BearingPoint to perform work and make specified deliverables that were within the Scope of Project. Throughout the course of BearingPoint's

performance of the Contract and Amended Contract, Defendants regularly requested performance outside the Scope of Project.

112.    With the expectation and understanding that BearingPoint would be paid for the work performed outside the Scope of Project, BearingPoint continued to perform such work for the benefit of Defendants.  It also continued to engage necessary personnel and extended time of performance as a result of promised future payment by Defendants.

113.    BearingPoint was not fully paid for deliverables it completed that were accepted by the Controller's Office.  It was also not paid for deliverables and work that were partially completed at the time of termination; for work performed at the request of the Controller's Office that was outside the Scope of Project for the fixed-price Amended Contract; or for BearingPoint having to extend performance and remain engaged (at great expense) as a result of delays caused by the Controller's Office.

114.    BearingPoint requested compensation from Defendants for the reasonable value of this work, but Defendants have refused and continue to refuse to pay for any of the same.  (*See* Ex. I.)

115.    As a direct and proximate result of BearingPoint's performance of this work for which it has not been paid, Defendants have been unjustly enriched by the services provided and work performed by BearingPoint in an amount to be ascertained at trial, but which BearingPoint believes the reasonable value of which to be in excess of $29 million, plus pre-judgment interest and costs.

## SEVENTH CLAIM

### (Breach of Implied Contract against All Defendants)

116.    BearingPoint realleges and incorporates by reference herein the allegations of Paragraphs 1 through 115, above.

117.     BearingPoint and Defendants entered into the fixed-price Contract and Amended Contract, which required BearingPoint to perform work and make specified deliverables that were within the Scope of Project.  Throughout the course of BearingPoint's performance of the Contract and Amended Contract, Defendants regularly requested performance outside the Scope of Project.

118.     Defendants impliedly promised to compensate BearingPoint for performance of work that was outside the Scope of Project and requested that BearingPoint provide them with documentation of additional expenses, which BearingPoint did.  Based on Defendants' conduct with respect to the requested work outside the Scope of Project, BearingPoint expected and understood that Defendants agreed to pay BearingPoint for work performed outside the Scope of Project.  (*See, e.g.*, Ex. C ¶¶ 5-6 & App. B.)

119.     Accordingly, BearingPoint continued to perform such work for the benefit of Defendants in reliance upon Defendants' implied promise to pay.  It also continued to engage necessary personnel and extended the duration of its performance on the Project as a result Defendants' promises throughout September and early October 2008 that BearingPoint would be justly and reasonably compensated for the damages suffered by BearingPoint due to the unreasonable delays caused and material breaches made by the Controller's Office.

120.     BearingPoint requested compensation from Defendants for the reasonable value of this work, but Defendants have refused and continue to refuse to pay for any of the same.  (*See* Ex. I.)

121.     Defendants breached the implied promise to compensate BearingPoint by failing to pay for work outside the Scope of Project requested by Defendants and performed by BearingPoint.  Specifically, Defendants have not paid BearingPoint for any of the $7,382,610

owed to BearingPoint for the work performed by BearingPoint in 2007-2008 that was outside the Scope of Project. (*See id.*) Nor have Defendants paid BearingPoint for any of the additional work performed and expenses incurred by BearingPoint based upon Defendants' promises in September and October of 2008 of future payment. (*See id.*)

122. As a direct and proximate result of Defendants' breach of their implied promise to compensate BearingPoint for this work, BearingPoint has been generally damaged in an amount to be ascertained at trial, but which BearingPoint believes to be at least $7.4 million, plus pre-judgment interest and costs.

## VI. CONDITIONS PRECEDENT

123. All conditions precedent to BearingPoint's right to recover the relief sought herein have occurred, are excused, or have been waived.

## VII. CONCLUSION AND REQUESTED RELIEF

**WHEREFORE**, plaintiff BearingPoint demands judgment as follows:

a. an order that Defendants must make payments pursuant to the Convenience Section of the Contract and Amended Contract in an amount to be determined at trial;

b. an order of damages resulting from Defendants' improper anticipatory repudiation and wrongful termination of the Contract and Amended Contract in an amount to be determined at trial;

c. an order of damages for Defendants' material breaches of the Contract and Amended Contract in an amount to be determined at trial;

d. an order of damages for Defendants' material breaches of their implied promise to compensate Bearing Point for performance of work in an amount to be determined at trial;

e. certain declaratory judgments as set forth above, including an order that Defendants cannot make any claim on the referenced bond;

f. an award to BearingPoint of the reasonable value of work performed by BearingPoint at Defendants' request that remains unpaid;

g.     an award to BearingPoint of pre-judgment and post-judgment interest at the highest rate permitted by law;

h.     an award of BearingPoint's reasonable attorneys' fees, costs, and other expenses incurred in this action as permitted by law; and

i.     any other and further relief, at law or in equity, as the Court may deem just and proper.

Dated:  September 22, 2009
        New York, New York

                                        /s/ Yvette Ostolaza
                                        Alfredo R. Pérez

                                        WEIL, GOTSHAL & MANGES LLP
                                        700 Louisiana Street, Suite 1600
                                        Houston, Texas 77002-2784
                                        Telephone:  (713) 546-5000
                                        Facsimile:  (713) 224-9511

                                        and

                                        Yvette Ostolaza
                                        Michelle Hartmann

                                        WEIL, GOTSHAL & MANGES LLP
                                        200 Crescent Court, Suite 300
                                        Dallas, Texas 75201
                                        Telephone:  (214) 746-7700
                                        Facsimile:  (214) 746-7777

                                        Attorneys for Debtors
                                        and Debtors in Possession

*Co-Counsel:*

Ronald B. Turovsky
Craig S. Bloomgarden
David T. Moran

MANATT, PHELPS & PHILLIPS, LLP
11355 West Olympic Boulevard
Los Angeles, CA 90064-1614
Telephone:  (310) 312-4000
Facsimile:  (310) 312-4224

# Exhibit D

## Indemnity Agreement

Agreement of Indemnity



☐ Insurance Company of North America
☐ Pacific Employers Insurance Company
☐ Westchester Fire Insurance Company
☐ Indemnity Insurance Company of North America

ACE-USA
ACE Bond Services

Whereas the undersigned (hereinafter individually and collectively called "INDEMNITOR") desires one or more of the companies named above, as the case may be, (hereinafter called "SURETY") to execute bonds including undertakings and other obligations, including any bond or bonds predating this Agreement, (hereinafter referred to as "Bonds") on its behalf and on behalf of any of its present or future, directly or indirectly owned or controlled subsidiaries or affiliates, whether alone or in joint venture with others whether or not named herein, and any corporation, partnership or person upon the written request of any of the undersigned (collectively hereinafter referred to as "Principals") or to renew or continue and to refrain from canceling the Bonds, as the case may be, and

NOW THEREFORE, in consideration of the SURETY executing the Bonds, the INDEMNITORS agree that:

1.  PREMIUMS & COLLATERAL FOR SURETYSHIP-The INDEMNITORS shall pay or cause to be paid to the SURETY both the agreed premium and, upon written request by the SURETY at any time, collateral security for its suretyship until the INDEMNITOR shall furnish to the SURETY competent written evidence, satisfactory to the SURETY, of the termination of any past, present and future liability under any Bond. The INDEMNITOR expressly waives any right to interest which may be earned on the collateral security and further consents that the collateral security provided in consideration of suretyship may be held by the SURETY in any investment or depository that the SURETY in his sole discretion deems advisable and prudent. The Surety's election not to demand collateral at the inception of the suretyship obligation shall not operate as a waiver of the right to demand and receive such collateral at any time before liability has terminated under any Bond.

2.  INDEMNITY & COLLATERAL FOR CLAIM- The INDEMNITOR shall indemnify and save harmless the SURETY from and against any and all liability, claim, demand, loss, damages, expense, cost, attorney's fees and expenses, including without limitation, fees and disbursements of counsel incurred by the SURETY in any action or proceeding between the INDEMNITOR and the SURETY, or between the SURETY and any third party, which SURETY shall at any time incur by reason of its execution of any Bond or its payment of or its liability to pay any claim, irrespective of whether the claim is made against the SURETY as a joint or several obligor and whether the INDEMNITOR is then liable to make such payment, and to place the SURETY in funds to meet all of its liability under any Bond, promptly upon request and before the SURETY may be required to make any payment thereunder, and copy of the claim, demand, voucher or other evidence of the payment by the SURETY of any liability, claim, demand, loss, damage, expense, cost and attorney's fees, shall be prima facie evidence of the fact and amount of INDEMNITOR'S liability to the SURETY under this Agreement. Any demand upon the SURETY by the Obligee shall be sufficient to conclude that a liability exists and the INDEMNITOR shall then place the SURETY with sufficient funds in a form and amount deemed acceptable in the SURETY'S sole discretion, as collateral security to cover the liability.

3.  OTHER INDEMNITY- The INDEMNITOR shall continue to remain bound under the terms of this Agreement even though the SURETY may have heretofore or hereafter, with or without notice to or knowledge of the Principals and the INDEMNITOR, accepted or released other agreements of indemnity or collateral in connection with the execution or procurement of said Bonds, from the principals or INDEMNITOR or others. The rights, powers and remedies given the SURETY under this Agreement shall be and are in addition to and not in lieu of, any and all other rights, powers and remedies which the SURETY may have or acquire against the Principals and INDEMNITOR or others, whether by the terms of any agreement or by operation of law or otherwise.

4.  INVALIDITY- In case any of the INDEMNITORS fail to execute this Agreement, or in case the execution hereof by any of the INDEMNITORS be defective or invalid for any reason, such failure, defect or invalidity shall not in any manner affect the validity of this Agreement or the liability hereunder of any of the INDEMNITORS executing the same, but each and every INDEMNITOR so executing shall be and remain full bound and liable hereunder to the same extent as if such failure, defect or invalidity had not existed.

5.  SURETIES - All of the terms, provisions and conditions of this Agreement shall be extended to and for the benefit not only of the SURETY, (either as a direct writing company or as a co-surety or reinsurer, but also for the benefit of any surety or insurance company or companies with which the SURETY may participate as a co-surety or reinsurer and also for the benefit of any other company which may execute any bond or bonds at the request of the SURETY on behalf of any of the Principals.

6.  DECLINE EXECUTION - Unless otherwise specifically agreed in writing, the SURETY may decline to execute any bond and the Principals and INDEMNITOR shall make no claim to the contrary.

7.  CHANGES, WAIVER OF NOTICE - The SURETY is authorized and empowered, without notice to or knowledge of the INDEMNITOR, to assent to any change whatsoever in Bonds and/or the contracts or obligations covered by any said Bonds including but not limited to the time for performance and any continuations, extensions or renewals of the Bonds, the execution of any substitute or substitutes therefore, with the same or different conditions, provisions and obligees with the same or larger or smaller penalties; it being expressly understood and agreed that the INDEMNITOR shall remain bound under the terms of this Agreement even though any such assent by the SURETY does or might substantially increase the liability of the INDEMNITOR. The INDEMNITOR waives notice of the execution of Bonds, acceptance of this Agreement, default or other acts giving rise to a bond claim or liability of the SURETY under them.

8.  TERMINATION - This Agreement may be terminated by the INDEMNITOR upon twenty days' written notice sent by registered mail to the SURETY at its home office at ACE Bond Services, TL33B, 1601 Chestnut Street, Philadelphia, Pennsylvania 19103, but any such notice of termination shall not operate to modify, bar or discharge the INDEMNITOR as to the Bonds that may have been therefore executed.

9.  SEVERABILITY - If any provision or provisions of this Agreement be declared void or unenforceable under any law governing its construction or enforcement, this Agreement shall not be void or vitiated thereby, but shall be construed and enforced with the same effect as though such provision or provisions were omitted.

10. CHOICE OF LAW/FORUM - It is mutually agreed that this Agreement is deemed made in the State of New York, regardless of the order in which the signatures of the parties shall have been affixed and shall be interpreted, and the rights and liabilities of the parties determined in accordance with the laws of the State of New York. INDEMNITOR agrees that all actions or proceedings arising directly or indirectly from this Agreement shall be litigated only in courts having status within the State of New York, and consents to the personal jurisdiction and venue of any local, state or Federal Court located therein.

11. JOINT/SEVERAL - Each undersigned Indemnitor, its successors and assigns, are jointly and severally bound by the foregoing conditions of this Agreement.

12. FACSIMILE – This Agreement bearing the signature of the Indemnitor(s) shall be valid, effective and enforceable whether received by the Surety as an original or as a facsimile transmission.

IN WITNESS WHEREOF, INDEMNITOR has signed this Agreement this _16th_ day of _March_ , 2004

(Full Name & Address of INDEMNITOR)

_Bearing Point, Inc._
_11676 International Drive_
_McLean, VA 22102_

By: _David Schwiesow_ (Seal)
Name: _David Schwiesow_
Title: _Assistant Secretary_
_Bearing Point, Inc._

Attest:

By: _Sarah Tuchler_ (Seal)
Name: _Sarah Tuchler_
Title: _Assistant Secretary_
_BearingPoint, Inc._

BS-HM I/01

(over)

# Exhibit E

# Demand Letter



# JOHN CHIANG
### California State Controller

April 8, 2009

ACE Surety Underwriting Services
Westchester Fire Insurance Company
Attention: Vivian Carti
436 Walnut Street, WA 10H
Philadelphia, PA 19106-3703

Re:    Notice of Default; Right to Terminate Agreement No. 22191025

Dear Ms. Carti:

Please be advised that on January 6, 2009, the State of California delivered to BearingPoint, Inc., a Notice of Default, Right to Terminate Agreement No. 22191025, a copy of which is attached.

On June 20, 2006, Westchester Fire Insurance Company of New York entered into an agreement to answer for the default of BearingPoint. This agreement was extended to continue with full force and effect from June 30, 2008, to June 30 2009, based upon the *Continuation Certificate* executed June 23, 2008. As such, the State Controller's Office intends to enforce any and all obligations related to this surety agreement and *Bond Number K07372577*.

Since BearingPoint is in default of above-referenced contract, we are providing you notice of its default and our intent to make claim on *Bond Number K07372577*. Thus, we are demanding your immediate payment for any and all damages that have, and continue to occur, as a result of this default.

Please take notice, we expressly reserve any and all rights related to this demand or future demands. Further, this demand is not a full recitation of claims, damages, or causes of actions against any party. Nor does it waive or limit any defenses, claims of damage, or causes of actions we may later invoke.

If you have any questions, please contact me at (916) 327-8299.

Sincerely,

JAMES LOMBARD
Chief Administrative Officer
State Controller's Office

Attachment

cc:    Michael Carter, Chief Operating Officer, State Controller's Office
Richard Chivaro, Chief Counsel, State Controller's Office
Donald Scheppmann, Chief, Personnel/Payroll Services Division, State Controller's Office
David Dawson, Project Director, 21st Century Project, State Controller's Office
James Butler, Deputy Director, Procurement Division, Department of General Services

a.  Either party may, subject to the clause titled "Force Majeure" and to sub-section d. below, by written notice of default to the Contractor, terminate this Contract in whole or in part if the Contractor fails to:
    i.   Deliver the deliverables or to perform the services within the time specified in the Contract or any amendment thereto;
    ii.  Make progress, so that the lack of progress endangers performance of this Contract; or
    iii. Perform any of the material provisions of this Contract.

Pursuant to Agreement Attachment 2 – General Provisions, Paragraph 18.d. Termination for Default, the State hereby requires BearingPoint

"to transfer title, or in the case of licensed Software, license, and deliver to the State, as directed by the State, any:

    i.   Completed deliverables for which the state has made full payment,
    ii.  Partially completed deliverables, to the extent the State has made payment therefore, and
    iii. Subject to provisions of sub-section e. below, related to the terminated portion of this Contract. Nothing in this sub-section d. will be construed to grant the State rights to deliverables that it would not have received had this Contract been fully performed."

Pursuant further to Agreement Attachment 2 – General Provisions, Paragraph 18.d.iii. Termination for Default, the State hereby directs that BearingPoint "shall also protect and preserve property in its possession in which the State has an interest."

Pursuant to Agreement Attachment 2 – General Provisions, Paragraph 18.e. Termination for Default,

"The State shall pay Contract price for completed deliverables delivered and accepted. The Contractor and State shall attempt to agree on the amount of payment for other materials delivered and accepted by the State for the protection and preservation of the property, provided that where the Contractor has billed the State for any such materials, no additional charge will apply. Failure to agree will constitute a dispute under the Disputes section."

Pursuant to Agreement Attachment 2 – General Provisions, Paragraph 18.g. Termination for Default,

**Exhibit F**

**Amendment 2**

# STANDARD AGREEMENT AMENDMENT
STD. 213 A (Rev 6/03)

☒ CHECK HERE IF ADDITIONAL PAGES ARE ATTACHED  37  Pages

| AGREEMENT NUMBER | AMENDMENT NUMBER |
|---|---|
| 22191025 | 2 |
| REGISTRATION NUMBER | |

1.  This Agreement is entered into between the State Agency and Contractor named below:

STATE AGENCY'S NAME
State Controller's Office

CONTRACTOR'S NAME
BearingPoint, Inc.

2.  The term of this
Agreement is        06/07/2006        through        09/01/2010

3.  The maximum amount of this        $0.00
Agreement after this amendment is:        69,103,684.00

4.  The parties mutually agree to this amendment as follows. All actions noted below are by this reference made a part of the Agreement and incorporated herein:

This amendment is being issued to reflect revisions to project schedules and deliverables defined in the Attachment and Appendices listed below:
- Attachment: Text of Amendment 2, dated 063008 – 2 Pages
- Appendix A: Project Schedule, dated 063008 – 4 Pages, plus cover sheet
- Appendix B:  Payment Deliverables Cost, dated 063008 – 5 Pages plus cover sheet
- Appendix C: Payment Deliverables Descriptions and Expectation Criteria, dated 063008 – 5 Pages plus cover sheet
- Appendix D: – State Staffing and Infrastructure, dated 063008 – 17 Pages plus cover sheet
  (Appendix D1-SCO One-Time Staffing Costs-Implementation – 16 pages)
  (Appendix D2-System Avail Dates – 1 page)

All other terms and conditions remain the same.

All other terms and conditions shall remain the same.

IN WITNESS WHEREOF, this Agreement has been executed by the parties hereto.

CONTRACTOR

CALIFORNIA
Department of General Services
Use Only
6/30/08    GENERAL SERVICES
LEGAL SERVICES

CONTRACTOR'S NAME (If other than an individual, state whether a corporation, partnership, etc.)

BY (Authorized Signature)

DATE SIGNED (Do not type)
6-27-2008

PRINTED NAME AND TITLE OF PERSON SIGNING
Randolph Smith, Managing Director

ADDRESS
1215 K Street, 17th Floor, Sacramento, Ca 95814

DEPARTMENT OF GENERAL SERVICES
PROCUREMENT DIVISION

APPROVED

BY

DATE  6-30-08

☐ Exempt per:

STATE OF CALIFORNIA

AGENCY NAME
State Controller's Office

BY (Authorized Signature)

DATE SIGNED (Do not type)
6/27/0

PRINTED NAME AND TITLE OF PERSON SIGNING
Michael Carter, Chief Operations Officer

ADDRESS
300 Capitol Mall, Sacramento, CA 95814

Agreement No. 22191025

Amendment 2

# 1   Introduction

This Amendment 2 modifies Agreement No.22191025 regarding the remaining phases necessary to fully implement the Twenty First Century ("TFC") project as defined in RFP No. DGSCO-S1-03-0840-70. This Amendment modifies and re-defines the tasks for the Design, Realization, Final Preparation, and Go-Live and Support Phases of the TFC Project. It also establishes the critical major milestones for the remainder of the TFC Project and adjusts the schedule of payments to coincide with delivery of major project Payment Deliverables.

The following Appendices set forth the revised project schedule and payment deliverables costs and expectation criteria for all remaining phases through full implementation and support.

- Appendix A – Project Schedule for TFC Design, Realization, Final Prep and Go-Live and Support Phases

- Appendix B – Payment Deliverables Costs for TFC Realization, Final Prep and Go-Live and Support Phases

- Appendix C – Payment Deliverables Description and Expectation criteria for TFC Realization, Final Prep and Go-Live and Support Phases

- Appendix D – Cost Tables – State Staffing and Infrastructure

# 2   Definitions

Unless otherwise defined in this Amendment, all terms and conditions shall have the meanings set forth in Agreement No. 22191025.

# 3   Schedule and Scope

The parties agree to comply with and perform in accordance with the project schedule attached as Appendix A. Dates included in Appendix A are subject to change through mutual agreement by State and Contractor using the approved Change Control Management process.

# Appendix A

# Amendment 2  Project Schedule

Effective upon Department of General Services approval.

NOTE: Dates included in Appendix A are subject to change through mutual agreement by
State and Contractor  using the approved Change Control Management Process

| Line Number | Unique ID | Workstream | Task Name | Total Work (Hrs) | Baseline Start | Baseline Finish |
|---|---|---|---|---|---|---|
| 788 | 823 | Functional | CS Configuration | 47,585.13 hrs | 01/30/06 | 12/16/09 |
| 789 | 824 | Functional | Baseline Configuration (Civil Service) | 15,445.1 hrs | 01/30/06 | 12/05/08 |
| 790 | 825 | Functional | Configure OM | 1,005 hrs | 10/29/07 | 05/23/05 |
| 809 | 851 | Functional | PD #45.3 Configuration - Civil Service - 100% Complete | 120 hrs | 10/29/08 | 12/05/08 |
| 815 | 857 | Functional | PD #45.4 Configuration - Civil Service - 100% Complete and Accepted by | 0 hrs | 12/05/08 | 12/05/08 |
| 816 | 858 | Functional | CS Unit Test | 18,366 hrs | 04/28/08 | 03/25/09 |
| 837 | 879 | Functional | Functional Unit Test – Wave 1 | 3,120 hrs | 04/28/08 | 11/12/08 |
| 955 | 1002 | Functional | Functional Unit Test – Wave 2 | 2,386 hrs | 06/06/08 | 01/00/09 |
| 1042 | 1090 | Functional | Functional Unit Test – Wave 3 | 3,060 hrs | 06/27/08 | 03/25/09 |
| 1166 | 1216 | Functional | BPPs | 6,264 hrs | 02/25/08 | 04/16/09 |
| 1176 | 1226 | Functional | PD #74 BPPs - Civil Service - OM Completed and Accepted by SCO | 0 hrs | 07/14/08 | 07/14/08 |
| 1178 | 2965 | Functional | PD #92 BPPs - Civil Service - Complete Accepted by SCO | 0 hrs | 04/18/09 | 04/18/09 |
| 1185 | 1312 | Functional | PD #71.1 Configuration Scripts - Civil Service - BN 50% Completed | 0 hrs | 06/24/08 | 07/25/08 |
| 1191 | 1318 | Functional | PD #71.1 Configuration Scripts - Civil Service - BN 50% Completed and Accepted by SCO | 0 hrs | 07/25/08 | 07/25/08 |
| 1192 | 1326 | Functional | PD #72.1 Configuration Scripts - Civil Service - PY 50% Completed | 0 hrs | 07/25/08 | 07/25/08 |
| 1198 | 1392 | Functional | PD #72.1 Configuration Scripts - Civil Service - PY 50% Completed and Accepted by SCO | 0 hrs | 06/24/08 | 07/25/08 |
| 1199 | 1340 | Functional | PD #73.1 Configuration Scripts - Civil Service - TM 50% Completed | 0 hrs | 07/25/08 | 07/25/08 |
| 1205 | 1346 | Functional | PD #73.1 Configuration Scripts - Civil Service - TM 50% Completed and Accepted by SCO | 0 hrs | 07/25/08 | 07/25/08 |
| 1242 | 1350 | Functional | CSU Configuration and Unit Test | 10,258.72 hrs | 08/18/08 | 04/05/10 |
| 1243 | 1391 | Functional | CSU Configuration | 3,607 hrs | 08/18/08 | 01/29/09 |
| 1275 | 3566 | Functional | PD #101 Configuration Scripts - GSU - 100% Complete and Accepted by SCO | 0 hrs | 03/30/09 | 03/30/09 |
| 1285 | 1439 | Development | RICEFW Development - Wave 1 (Tech, Spec thru Tech UT) | 45,746.5 hrs | 09/19/07 | 11/11/08 |
| 1366 | 1525 | Conversions | Create Conversion Procedures - Group 2 | 21,625.98 hrs | 09/19/07 | 09/26/08 |
| 1389 | 1544 | Conversions | PD #24.2 Data Conversion Technical Specifications - Civil Service Complete | 0 hrs | 08/20/08 | 08/20/08 |
| 1391 | 1546 | Conversions | Legacy Programs | 11,446.98 hrs | 09/19/07 | 07/23/08 |
| 1392 | 1547 | Conversions | Initial Extract | 4,059.33 hrs | 09/19/07 | 07/22/08 |
| 1411 | 1566 | Conversions | Legacy Create/Load | 3,446 hrs | 09/19/07 | 06/16/08 |
| 1425 | 1580 | Conversions | Legacy Data Cleansing | 1,599.65 hrs | 09/19/07 | 06/17/08 |
| 1498 | 2751 | Development | RICEFW Development – Wave 2 (Tech Spec thru Tech UT) | 18,996.95 hrs | 11/01/07 | 01/07/09 |
| 1566 | 1732 | Development | RICEFW Development (Incl Retro) – Wave 3 (Tech Spec thru Tech UT) | 32,149.55 hrs | 01/07/08 | 04/03/09 |
| 1719 | 1859 | Development | PD #28.2 RICEF Technical Specifications - Civil Service - 20 Complete and Accepted by SCO | 0 hrs | 06/02/08 | 06/02/08 |
| 1720 | 1860 | Development | PD #28.3 RICEF Development and Unit Testing - Civil Service - 20 Complete and Accepted by SCO | 0 hrs | 07/11/08 | 07/11/08 |
| 1721 | 1861 | Development | PD #27.2 RICEF Technical Specifications - Civil Service - 20 Complete and Accepted by SCO | 0 hrs | 08/26/08 | 08/26/08 |
| 1725 | 2965 | Development | PD #95 RICEF Development and Unit Testing Complete - Additional Scope Items Complete and Accepted by SCO | 0 hrs | 05/28/09 | 05/28/09 |
| 1734 | 1878 | Development | GSU Development (Tech Spec through UT) | 14,634.3 hrs | 12/24/08 | 07/17/09 |
| 1759 | 1900 | Netweaver | Infrastructure Realization | 4,428.92 hrs | 09/19/07 | 05/20/09 |
| 1776 | 1919 | Netweaver | Development and Sandbox Ready | 1,174.5 hrs | 01/10/08 | 10/24/08 |
| 1780 | 1923 | Netweaver | PD #80 - Development Environment Setup (CCMS and NWDI) | 221.2 hrs | 04/14/08 | 07/31/08 |
| 1788 | 1931 | Netweaver | PD #80 - Development Environment Setup (CCMS and NWDI) Complete and Accepted by | 0 hrs | 08/12/08 | 08/12/08 |

| Line Number | Unique ID | Workstream | Task Name | Total Work (Hrs) | Baseline Start | Baseline Finish |
|---|---|---|---|---|---|---|
| 2062 | 2991 | Testing | PD #101 - User Acceptance Testing (CSU) Complete | 0 hrs | 02/23/10 | 02/23/10 |
| 2066 | 2896 | PMO | GO-LIVE AND SUPPORT | 92,424.33 hrs | 07/03/06 | 10/29/10 |
| 2100 | 2699 | Training | Training | 30,621.15 hrs | 07/03/06 | 06/15/10 |
| 2133 | 2913 | Deployment | CS Pilot Deployment | 6,082.72 hrs | 08/06/09 | 12/10/09 |
| 2135 | 2915 | Deployment | Execute CS Pilot Cutover Activities (4w) | 1,000 hrs | 08/06/09 | 09/02/09 |
| 2136 | 2916 | Deployment | CS Pilot Go-Live | 0 hrs | 09/03/09 | 09/03/09 |
| 2139 | 2918 | Deployment | PD #49.1 - Go Live - Pilot (Civil Service) Complete and Accepted by SCO | 6,120 hrs | 10/19/09 | 10/19/09 |
| 2140 | 2919 | Deployment | CS D1 Deployment | 6,120 hrs | 12/24/08 | 03/12/10 |
| 2142 | 2921 | Deployment | Execute CS D1 Cutover Activities (4w) | 1,000 hrs | 11/06/09 | 12/15/09 |
| 2143 | 2922 | Deployment | CS D1 Go-Live | 0 hrs | 12/07/09 | 12/07/09 |
| 2146 | 2924 | Deployment | PD #49.3 - Go Live - D1 (Civil Service) Complete and Accepted by SCO | 0 hrs | 01/05/10 | 01/05/10 |
| 2147 | 2925 | Deployment | CSU Pilot Deployment | 2,271.35 hrs | 02/05/10 | 04/08/10 |
| 2149 | 2927 | Deployment | Execute CSU Pilot Cutover Activities (4w) | 984.38 hrs | 02/05/10 | 03/09/10 |
| 2150 | 2928 | Deployment | CSU Pilot Go-Live | 0 hrs | 03/05/10 | 03/05/10 |
| 2153 | 2930 | Deployment | PD #46.2 - Go Live - CSU Pilot (CSU) Complete and Accepted by SCO | 0 hrs | 04/05/10 | 04/05/10 |
| 2154 | 2931 | Deployment | CS D2 Deployment | 6,078.95 hrs | 05/07/10 | 08/01/10 |
| 2156 | 2933 | Deployment | Execute CS D2 Cutover Activities (4w) | 984.38 hrs | 05/07/10 | 06/11/10 |
| 2157 | 2934 | Deployment | CS D2 Go-Live | 0 hrs | 06/07/10 | 06/07/10 |
| 2160 | 2936 | Deployment | PD #49.4 - Go Live - D2 (Civil Service) Complete and Accepted by SCO | 0 hrs | 07/02/10 | 07/05/10 |
| 2161 | 2937 | Deployment | CSU Deployment | 2,272.19 hrs | 05/07/10 | 09/01/10 |
| 2163 | 2939 | Deployment | Execute CSU Cutover Activities (4w) | 984.38 hrs | 05/07/10 | 06/11/10 |
| 2164 | 2940 | Deployment | CSU Go-Live | 0 hrs | 06/07/10 | 06/07/10 |
| 2167 | 2942 | Deployment | PD #49.5 - Go Live - CSU Complete and Accepted by SCO | 0 hrs | 07/13/10 | 07/13/10 |
| 2168 | 2943 | PMO | Support Milestones | 240 hrs | 05/07/10 | 08/26/10 |
| 2170 | 2944 | PMO | PD #50 - Support/Maintenance/Warranty 30 days (Civil Service) | 0 hrs | 07/01/10 | 07/01/10 |
| 2172 | 2945 | PMO | PD #50.2 - Support/Maintenance/Warranty 30 days (CSU) | 0 hrs | 07/28/10 | 07/28/10 |
| 2174 | 2946 | PMO | PD #51 - Support/Maintenance/Warranty 60 days (Civil Service) | 0 hrs | 07/28/10 | 07/28/10 |
| 2176 | 2947 | PMO | PD #51.2 - Support/Maintenance/Warranty 60 days (CSU) | 0 hrs | 07/28/10 | 07/28/10 |
| 2178 | 2948 | PMO | PD #52 - Support/Maintenance/Warranty 90 days (Civil Service) | 0 hrs | 08/26/10 | 08/26/10 |
| 2180 | 2949 | PMO | PD #52.2 - Support/Maintenance/Warranty 90 days (CSU) | 0 hrs | 08/26/10 | 08/26/10 |

| Phase | PD# | Payment Deliverable (PD) Description | RWS Due Date | RWS FY | SCO 6/6/08 Price ($'s) |
|---|---|---|---|---|---|
| Realization | 26.2 | RICEF Technical Specifications - CS - 20 Complete<br>Note: Date set per Amendment 1 | 2-Jun-08 | 07/08 | $750,000 |
| Realization | 27.2 | RICEF Technical Specifications - CS - 20 Complete<br>Note: Date set per Amendment 1 | 26-Jun-08 | 07/08 | $750,000 |
| Realization | 63.6 | CS Overarching Design - CE Single Pay Area Design<br>Note: Date set per Amendment 1 | 26-Jun-08 | 07/08 | $100,000 |
| Realization | 63.2 | CS Overarching Design - 3rd Party Remittance Design | 11-Jul-08 | 08/09 | $100,000 |
| Realization | 63.8 | CS Overarching Design - Out of Sequence Design | 11-Jul-08 | 08/09 | $100,000 |
| Realization | 26.3 | RICEF Development and Unit Testing - CS - 20 Complete | 11-Jul-08 | 08/09 | $1,200,000 |
| Realization | 74 | BPPs - Civil Service - OM Completed | 14-Jul-08 | 08/09 | $250,000 |
| Realization | 63.7 | CS Overarching Design - Retirement / PSR Design | 15-Jul-08 | 08/09 | $100,000 |
| BluePrint | 63.5 | Civil Service Overarching Design - Disability Design | 18-Jul-08 | 08/09 | $100,000 |
| Realization | 63.1 | CS Overarching Design - Multi-Deployment Design | 18-Jul-08 | 08/09 | $100,000 |
| Blueprint | 71.1 | Configuration Scripts - Civil Service - BN 50% Completed | 25-Jul-08 | 08/09 | $250,000 |
| Realization | 72.1 | Configuration Scripts - Civil Service - PY 50% Completed | 25-Jul-08 | 08/09 | $250,000 |
| Realization | 73.1 | Configuration Scripts - Civil Service - TM 50% Completed | 25-Jul-08 | 08/09 | $250,000 |
| Realization | 85 | BI Technical Installation Q/A Ready | 31-Jul-08 | 08/09 | $100,000 |
| BluePrint | 32 | Final Integration Test Plan and detailed testing schedule - Initial | 31-Jul-08 | 08/09 | $1,665,723 |
| Realization | 80 | Development Environment Setup Complete | 12-Aug-08 | 08/09 | $150,000 |
| Realization | 24.2 | Data Conversion Technical Specifications - CS Complete | 20-Aug-08 | 08/09 | $600,000 |
| Realization | 9 | IVR Infrastructure Design | 25-Sep-08 | 08/09 | $54,000 |
| Realization | 53 | IVR Professional Services (IVR DEVELOPMENT COMPLETE) | 25-Sep-08 | 08/09 | $655,488 |
| Realization | 23.1 | End User Training Plan - Update | 6-Nov-08 | 08/09 | $154,613 |

| Phase | PD# | Payment Deliverable (PD) Description | RWS Due Date | RWS FY | SCO 6/6/08 Price (C$) |
|-------|-----|-------------------------------------|--------------|--------|------------------------|
| Realization | 35.1 | End User Training Materials - Civil Service | 27-Jul-09 | 09/10 | $500,000 |
| Final Prep | 99 | CS User Acceptance Testing complete | 14-Aug-09 | 09/10 | $1,100,000 |
| Go Live & Su | 46 | Performance and System Testing Test Results and Sign Off | 1-Sep-09 | 09/10 | $2,000,000 |
| Go Live & Su | 49.1 | Go-Live - Civil Service Pilot COMPLETE | 19-Oct-09 | 09/10 | $2,000,000 |
| Go Live & Su | 100 | Payroll Validation C3 (CS & CSU) complete | 5-Jan-10 | 09/10 | $2,500,000 |

Appendix B

| Phase | PD# | Payment Deliverable (PD) Description | PII/S Due Date | BW'S FY | SCO 6/6/08 Price ($$) |
|---|---|---|---|---|---|
| Go Live & Su | 49.5 | Go Live Complete - CSU (w/ 1 pay cycle complete) | 13-Jul-10 | 10/11 | $1,000,000 |
| Go Live & Su | 50 | Support/Maintenance/Warranty 30 days - Civil Service | 1-Jul-10 | 10/11 | $1,000,000 |
| Go Live & Su | 50.2 | Support/Maintenance/Warranty 30 days - CSU | 1-Jul-10 | 10/11 | $650,000 |
| Go Live & Su | 51 | Support/Maintenance/Warranty 60 days - Civil Service | 29-Jul-10 | 10/11 | $2,000,000 |
| Go Live & Su | 51.2 | Support/Maintenance/Warranty 60 days - CSU | 29-Jul-10 | 10/11 | $725,000 |
| Go Live & Su | 52 | Support/Maintenance/Warranty 90 days - Civil Service | 26-Aug-10 | 10/11 | $2,106,338 |
| Go Live & Su | 52.2 | Support/Maintenance/Warranty 90 days - CSU | 26-Aug-10 | 10/11 | $700,000 |

| Phase | PD# | Payment Deliverable (PD) Description | Deliverable Expectations |
|---|---|---|---|
| Realization | 26.2 | RICEF Technical Specifications - CS - 20 Complete Note: Date set per Amendment 1 | DED Accepted |
| Realization | 27.2 | RICEF Technical Specifications - IDS - 20 Complete Note: Date set per Amendment 1 | DED Accepted |
| Realization | 63.6 | CS Overarching Design - CE Single Pay Area Design Note: Date set per Amendment 1 | DED Accepted |
| Realization | 63.2 | CS Overarching Design - 3rd Party Remittance Design | DED Accepted |
| Realization | 63.8 | CS Overarching Design - Out of Sequence Design | DED Accepted |
| Realization | 26.3 | RICEF Development and Unit Testing - CS - 20 Complete | |
| Realization | 74 | BPPs - Civil Service - OM Completed | DED Accepted |
| Realization | 63.7 | CS Overarching Design - Retirement / PSR Design | DED Accepted |
| BluePrint | 63.5 | Civil Service Overarching Design - Disability Design | DED Accepted |
| Realization | 63.1 | CS Overarching Design - Multi-Deployment Design | DED Accepted |
| Blueprint | 71.1 | Configuration Scripts - Civil Service - BN 50% Completed | |
| Realization | 72.1 | Configuration Scripts - Civil Service - PY 50% Completed | |
| Realization | 73.1 | Configuration Scripts - Civil Service - TM 50% Completed | |
| Realization | 85 | BI Technical Installation Q/A Ready | |
| BluePrint | 32 | Final Integration Test Plan and detailed testing schedule - Initial | This deliverable shall provide the details necessary to prepare for and execute Integration Testing. The plan shall include a summary of the test scenario approach, the procedures necessary to prepare for and execute the test, the templates used for testing, the readiness checklist, and the test calendar. |
| Realization | 80 | Development Environment Setup Complete | |
| Realization | 24.2 | Data Conversion Technical Specifications - CS Complete | |
| Realization | 9 | IVR Infrastructure Design | * May be removed through CR |
| Realization | 53 | IVR Professional Services (IVR DEVELOPMENT COMPLETE) | * May be removed through CR |
| Realization | 23.1 | End User Training Plan - Update | |

| Phase | PD# | Payment Deliverable (PD) Description | Deliverable Expectations |
|---|---|---|---|
| Realization | 35.1 | End User Training Materials - Civil Service | This deliverable is the final, delivery-ready training materials that have been reviewed and approved by SCO. The materials must include all aspects of the 21st Century solution including retro, CE, other complex transaction, departmental support process, departmental training responsibilities, etc. |
| Final Prep | 99 | CS User Acceptance Testing complete | This deliverable shall provide a test results report summarizing the results of User Acceptance Testing and shall quantify how the test has satisfied defined Exit Criteria, System and RTM Requirements and Support functionality. The test results report shall also inlcude a summary of outstanding testing issues and lessons learned related to this particular deliverable. |
| Go Live & Su | 46 | Performance and System Testing Test Results and Sign Off | The Deliverable will include the results of the performance and system test, identifying testing issues, and making associated recommendations, as well as successful completion of regression testing as appropriate. |
| Go Live & Su | 49.1 | Go Live - Civil Service Pilot COMPLETE | The successful execution of 1 full master pay cycle for eligible employees based on the data that was entered, exit the payroll and produce outbound files. Includes a simulation by person and a reasonableness check against previous gross pay. |
| Go Live & Su | 100 | Payroll Validation C3 (CS & CSU) complete | This deliverable shall provide a test results report summarizing the results of the Payroll Validation Cycle 3 Test and shall quantify how the test has satisfied defined Exit Criteria, System and RTM Requirements and Support functionality, including Help Desk processes and Retro payments. The test results report shall also inlcude a summary of outstanding testing issues and lessons learned related to this particular deliverable. |

| Phase | PD# | Payment Deliverable (PD) Description | Deliverable Expectations |
|-------|-----|-------------------------------------|--------------------------|
| Go Live & Su | 49.5 | Go Live Complete- CSU  (w/ 1 pay cycle complete) | The successful execution of 1 full master pay cycle for eligible employees based on the data that was entered, exit the payroll and produce outbound files. Includes a simulation by person and a reasonableness check against previous gross pay. |
| Go Live & Su | 50 | Support/Maintenance/Warranty 30 days - Civil Service | Performed 30 days of support for the CS system as per outlined in the contract. |
| Go Live & Su | 50.2 | Support/Maintenance/Warranty 30 days - CSU | Performed 30 days of support for the CSU system as per outlined in the contract. |
| Go Live & Su | 51 | Support/Maintenance/Warranty 60 days - Civil Service | Performed 60 days of support for the CS system as per outlined in the contract. |
| Go Live & Su | 51.2 | Support/Maintenance/Warranty 60 days - CSU | Performed 60 days of support for the CSU system as per outlined in the contract. |
| Go Live & Su | 52 | Support/Maintenance/Warranty 90 days - Civil Service | Performed 90 days of support for the CS system as per outlined in the contract. |
| Go Live & Su | 52.2 | Support/Maintenance/Warranty 90 days - CSU | Performed 90 days of support for the CSU system as per outlined in the contract. |

# HUMAN RESOURCES/PAYROLL RFP DGSCO-SI-03-0810-70

## COST TABLE VII - 11B - SCO ONE-TIME STAFFING COSTS - IMPLEMENTATION

*(Use additional sheets for each fiscal year to address staffing from Project Startup through complete implementation. Do not include maintenance staffing.*

**PART TWO - SUMMARY OF FTEs BY PAY CLASSIFICATION NEEDED FOR IMPLEMENTATION**

| Role | Pay Classification | Salary Rate* | Jul | Aug | Sept | Oct | Nov | Dec | Jan | Feb | Mar | Apr | May | Jun |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Fiscal Year: 2007/2008 | 103.5 | 103.5 | 103.5 | 104.5 | 104.5 | 104.5 | 105.3 | 105.3 | 105.3 | 105.3 | 105.3 | 105.3 |
| | Associate Governmental Program Analyst | | 35 | 35 | 35 | 35 | 35 | 35 | 36 | 36 | 36 | 36 | 36 | 36 |
| | Associate Information Systems Analyst (Specialist) | | 3 | 3 | 3 | 3 | 3 | 3 | 3 | 3 | 3 | 3 | 3 | 3 |
| | Associate Programmer Analyst (Specialist) | | 11 | 11 | 11 | 11 | 11 | 11 | 11 | 11 | 11 | 11 | 11 | 11 |
| | | | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 |
| | CEA II | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | Computer Operations Specialist I | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | Computer Operations Specialist II | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | Computer Operator | | 4 | 4 | 4 | 4 | 4 | 4 | 4 | 4 | 4 | 4 | 4 | 4 |
| | Data Processing Manager II | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | Data Processing Manager III | | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 |
| | Data Processing Manager IV | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | Personnel Program Advisor | | 3 | 3 | 3 | 3 | 3 | 3 | 2 | 2 | 2 | 2 | 2 | 2 |
| | Personnel Program Analyst | | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 |
| | Information Systems Technician | | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 |
| | Information Systems Technician Specialist I | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | Information Systems Technician Specialist II | | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 1 | 1 | 1 | 1 | 1 |
| | Office Technician (Typing) | | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 1 | 1 | 1 | 1 | 1 |
| | Personnel Program Advisor | | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 |
| | Secretary | | 3 | 3 | 3 | 3 | 3 | 3 | 3 | 3 | 3 | 3 | 3 | 3 |
| | Senior Information Systems Analyst (Specialist) | | 5 | 5 | 5 | 5 | 5 | 5 | 5 | 5 | 5 | 5 | 5 | 5 |
| | Senior Programmer Analyst (Specialist) | | 5.5 | 5.5 | 5.5 | 5.5 | 5.3 | 5.3 | 5.3 | 5.3 | 5.3 | 5.3 | 5.3 | 5.3 |
| | Staff Information Systems Analyst (Specialist) | | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 |
| | Staff Mgmt Auditor | | 8 | 8 | 8 | 8 | 8 | 8 | 8 | 8 | 8 | 8 | 8 | 8 |
| | Staff Programmer Analyst (Specialist) | | 9 | 9 | 9 | 9 | 9 | 9 | 9 | 9 | 9 | 9 | 9 | 9 |
| | Staff Services Manager I | | 4 | 4 | 4 | 4 | 4 | 4 | 4 | 4 | 4 | 4 | 4 | 4 |
| | Staff Services Manager II | | 4 | 4 | 4 | 4 | 4 | 4 | 4 | 4 | 4 | 4 | 4 | 4 |
| | Staff Services Manager III (Supervisory) | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | Systems Software Specialist I (Technical) | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |

Appendix D1

# HUMAN RESOURCES/PAYROLL RFP DGSCO-SI-03-0840-70

## COST TABLE VII - t1B - SCO ONE-TIME STAFFING COSTS - IMPLEMENTATION

Add additional sheets for each fiscal year to address staffing from Project Startup through complete Implementation. Do not include maintenance staffing.

**Fiscal Year: 2008/2009**

PART TWO

SUMMARY OF FTEs BY PAY CLASSIFICATION NEEDED FOR IMPLEMENTATION

| Role | Pay Classification | Salary Rate | Jul | Aug | Sept | Oct | Nov | Dec | Jan | Feb | Mar | Apr | May | Jun |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | 106.3 | 106.3 | 106.3 | 106.3 | 106.3 | 106.3 | 107.3 | 107.3 | 107.3 | 107.3 | 107.3 | 107.3 |
| | Associate Governmental Program Analyst | | 36 | 36 | 36 | 36 | 36 | 36 | 36 | 36 | 36 | 36 | 36 | 36 |
| | Associate Information Systems Analyst (Specialist) | | 3 | 3 | 3 | 3 | 3 | 3 | 3 | 3 | 3 | 3 | 3 | 3 |
| | Associate Programmer Analyst (Specialist) | | 11 | 11 | 11 | 11 | 11 | 11 | 11 | 11 | 11 | 11 | 11 | 11 |
| | | | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 |
| | CEA I | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | Computer Operations Specialist I | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | Computer Operations Specialist II | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | Computer Operator | | 4 | 4 | 4 | 4 | 4 | 4 | 4 | 4 | 4 | 4 | 4 | 4 |
| | Data Processing Manager II | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | Data Processing Manager III | | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 |
| | Data Processing Manager IV | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | Personnel Program Advisor | | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 2 |
| | Personnel Program Analyst | | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 |
| | Information Systems Technician | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | Information Systems Technician Specialist I | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | Information Systems Technician Specialist II | | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 |
| | Office Technician (Typing) | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | Personnel Program Advisor | | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 |
| | Secretary | | 3 | 3 | 3 | 3 | 3 | 3 | 3 | 3 | 3 | 3 | 3 | 3 |
| | Senior Information Systems Analyst (Specialist) | | 5 | 5 | 5 | 5 | 5 | 5 | 5 | 5 | 5 | 5 | 5 | 5 |
| | Senior Programmer Analyst (Specialist) | | 6.3 | 6.3 | 6.3 | 6.3 | 6.3 | 6.3 | 6.3 | 6.3 | 6.3 | 6.3 | 6.3 | 6.3 |
| | Staff Information Systems Analyst (Specialist) | | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 |
| | Staff Mgmt Auditor | | | | | | | | | | | | | |

11C FY 08 09

State of California

HUMAN RESOURCES/PAYROLL RFP DGSCO-SI-03-0840-7Q

COST TABLE VII - 11B - SCO ONE-TIME STAFFING COSTS - IMPLEMENTATION

Add additional sheets for each fiscal year to address staffing from Project Startup through complete implementation. Do not include maintenance staffing.

PART TWO
SUMMARY OF FTEs BY PAY CLASSIFICATION NEEDED FOR IMPLEMENTATION.

Fiscal Year: 2009/2010

| Role | Pay Classification | Salary Rate | Jul | Aug | Sep | Oct | Nov | Dec | Jan | Feb | Mar | Apr | May | Jun |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | 96.0 | 96.0 | 52.0 | 52.0 | 52.0 | 52.0 | 47.0 | 47.0 | 48.0 | 45.0 | 46.0 | 45.0 |
| | Associate Governmental Program Analyst | | 33 | 33 | 11 | 11 | 11 | 11 | 8 | 8 | 8 | 7 | 7 | 7 |
| | Associate Information Systems Analyst (Specialist) | | 2 | 2 | 1 | 1 | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 |
| | Associate Programmer Analyst (Specialist) | | 9 | 9 | 3 | 3 | 3 | 3 | 3 | 3 | 3 | 3 | 3 | 3 |
| | CEA I | | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | Computer Operations Specialist I | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | Computer Operations Specialist II | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | Computer Operator | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | Data Processing Manager II | | 4 | 4 | 3 | 3 | 3 | 3 | 3 | 3 | 3 | 3 | 3 | 3 |
| | Data Processing Manager III | | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | Data Processing Manager IV | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | Personnel Program Advisor | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | Personnel Program Analyst | | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 2 |
| | Information Systems Technician | | 1 | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | Information Systems Technician Specialist I | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | Information Systems Technician Specialist II | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | Office Technician (Typing) | | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 |
| | Personnel Program Advisor | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| | Secretary | | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 |
| | Senior Information Systems Analyst (Specialist) | | 3 | 3 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 2 |
| | Senior Programmer Analyst (Specialist) | | 5 | 5 | 3 | 3 | 3 | 3 | 3 | 3 | 2 | 2 | 2 | 2 |
| | Staff Mgmt Auditor | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | Staff Programmer Analyst | | 6 | 6 | 6 | 6 | 6 | 6 | 5 | 5 | 5 | 5 | 5 | 5 |
| | Staff Services Manager I (Specialist) | | 6 | 6 | 4 | 4 | 4 | 4 | 4 | 4 | 4 | 5 | 4 | 4 |
| | Staff Services Manager II (Supervisory) | | 4 | 4 | 3 | 3 | 3 | 3 | 3 | 3 | 3 | 3 | 3 | 3 |

# HUMAN RESOURCES/PAYROLL RFP DGSCO-SH-03-0840-70
## COST TABLE VII - 11B - SCO ONE-TIME STAFFING COSTS - IMPLEMENTATION

*Add additional sheets for each fiscal year to address staffing from Project Startup through complete Implementation. Do not include maintenance staffing!*

**Fiscal Year:** 2010/2011

## PART TWO
## SUMMARY OF FTES BY PAY CLASSIFICATION NEEDED FOR IMPLEMENTATION

| Role | Pay Classification | Salary Rate* | Jul | Aug | Sept | Oct | Nov | Dec | Jan | Feb | Mar | Apr | May | Jun |
|------|--------------------|--------------|-----|-----|------|-----|-----|-----|-----|-----|-----|-----|-----|-----|
| | | | 385.0 | 385.0 | 385.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| | Associate Governmental Program Analyst | | 6 | 6 | 6 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | Associate Information Systems Analyst (Specialist) | | 1 | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | Associate Programmer Analyst (Specialist) | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | CEA I | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | Computer Operations Specialist I | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | Computer Operations Specialist II | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | Computer Operator | | 2 | 2 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | Data Processing Manager II | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | Data Processing Manager III | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | Data Processing Manager IV | | 2 | 2 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | Personnel Program Advisor | | | | | | | | | | | | | |
| | Personnel Program Analyst | | | | | | | | | | | | | |
| | Information Systems Technician | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | Information Systems Technician Specialist I | | | | | | | | | | | | | |
| | Information Systems Technician Specialist II | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | Office Technician (Typing) | | 1 | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | Personnel Program Advisor | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | Secretary | | 1 | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | Senior Information Systems Analyst (Specialist) | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | Senior Programmer Analyst (Specialist) | | 2 | 2 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |

## HUMAN RESOURCES/PAYROLL RFP DGSCO-SI-03-0840-70

### COST TABLE VII - 15A - S60 ON-GOING STAFFING COSTS - SUPPORT

Add additional sheets for each fiscal year to address staffing for maintenance and system support.

Fiscal Year: 2030/2008

**PART TWO**

**SUMMARY OF FTEs BY PAY CLASSIFICATION NEEDED FOR IMPLEMENTATION**

| Role | Pay Classification | Salary Rate | Jul | Aug | Sept | Oct | Nov | Dec | Jan | Feb | Mar | Apr | May | Jun |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Phase: | | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| | Associate (Governmental) Program Analyst | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | Associate Information Systems Analyst (Specialist) | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | Associate Programmer Analyst (Specialist) | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | CEA I | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | Computer Operations Specialist | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | Computer Operations Specialist II | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | Computer Operator | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | Data Processing Manager II | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | Data Processing Manager III | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | Data Processing Manager IV | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | Personnel Program Advisor | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | Personnel Program Analyst | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | Information Systems Technician | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | Information Systems Technician Specialist I | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | Information Systems Technician Specialist II | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | Office Technician (Typing) | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | Personnel Program Advisor | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | Secretary | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | Senior Information Systems Analyst (Specialist) | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | Senior Programmer Analyst (Specialist) | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |

# HUMAN RESOURCES/PAYROLL RFP DGSCO-SI-03-0840-70
## COST TABLE VII - 15A - SCO ON-GOING STAFFING COSTS - SUPPORT

*add additional sheets for each fiscal year to address staffing for maintenance and system support.*

| Role | Pay Classification | Salary Rate | Jul | Aug | Sept | Oct | Nov | Dec | Jan | Feb | Mar | Apr | May | Jun |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Fiscal Year: | | | | | | | 2008/2009 | | | | | | |
| | Month: | | | | | | | | | | | | | |
| | Phase: | | | | | | | | | | | | | |
| | Phase: | | | | | | | | | | | | | |
| | Phase: | | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| **PART TWO** | | | | | | | | | | | | | | |
| SUMMARY OF FTEs BY PAY CLASSIFICATION NEEDED FOR IMPLEMENTATION | | | | | | | | | | | | | | |
| | Associate Governmental Program Analyst | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | Associate Information Systems Analyst (Specialist) | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | Associate Programmer Analyst (Specialist) | | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 |
| | CEA I | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | Computer Operations Specialist I | | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 |
| | Computer Operations Specialist II | | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 |
| | Computer Operator | | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 |
| | Data Processing Manager II | | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 |
| | Data Processing Manager III | | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 |
| | Data Processing Manager IV | | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 |
| | Personnel Program Advisor | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | Personnel Program Analyst | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | Information Systems Technician | | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 |
| | Information Systems Technician Specialist I | | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 |
| | Information Systems Technician Specialist II | | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 |
| | Office Technician (Typing) | | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 |
| | Personnel Program Advisor | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | Secretary | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | Senior Information Systems Analyst (Specialist) | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | Senior Programmer Analyst (Specialist) | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | Staff Information Systems Analyst (Specialist) | | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 |
| | Staff Programmer Analyst (Specialist) | | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 |
| | Staff Services Manager I | | | | | | | | | | | | | |

HUMAN RESOURCES/PAYROLL RFP DGSCO-SI-03-0840-70

COST TABLE VII - 15A - SCO ON-GOING STAFFING COSTS - SUPPORT

*Add additional sheets for each fiscal year to address staffing for maintenance and system support.*

**PART TWO**

**SUMMARY OF FTEs BY PAY CLASSIFICATION NEEDED FOR IMPLEMENTATION**

Fiscal Year: 2009/2010

| Role | Pay Classification | Salary Rate* | Jul | Aug | Sept | Oct | Nov | Dec | Jan | Feb | Mar | Apr | May | Jun |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | 0.0 | 0.0 | 43.0 | 43.0 | 43.0 | 43.0 | 43.0 | 43.0 | 43.0 | 43.0 | 43.0 | 43.0 |
| | Associate Governmental Program Analyst | | 0 | 0 | 21 | 21 | 21 | 21 | 21 | 21 | 21 | 21 | 21 | 21 |
| | Associate Information Systems Analyst (Specialist) | | 0 | 0 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 |
| | Associate Programmer Analyst (Specialist) | | 0 | 0 | 6 | 6 | 6 | 6 | 6 | 6 | 6 | 6 | 6 | 6 |
| | CEA I | | 0 | 0 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 |
| | Computer Operations Specialist | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | Computer Operations Specialist II | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | Computer Operator | | 0 | 0 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 |
| | Data Processing Manager II | | 0 | 0 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 |
| | Data Processing Manager III | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | Data Processing Manager IV | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | Personnel Program Advisor | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | Personnel Program Analyst | | 0 | 0 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 |
| | Information Systems Technician | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | Information Systems Technician Specialist I | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | Information Systems Technician Specialist II | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | Office Technician (Typing) | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | Personnel Program Advisor | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | Secretary | | 0 | 0 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 |
| | Senior Information Systems Analyst (Specialist) | | 0 | 0 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 |
| | Senior Programmer Analyst (Specialist) | | 0 | 0 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 2 |

Appendix D1

# HUMAN RESOURCES/PAYROLL RFP DGSCO-SI-03-0840-70
## COST TABLE VII - 15A - SCO ON-GOING STAFFING COSTS - SUPPORT

Add additional sheets for each fiscal year to address staffing for maintenance and system support.

| Role | Pay Classification | Salary Rate | Fiscal Year: | | | | | 2010/2011 | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | Month: Jul | Aug | Sept | Oct | Nov | Dec | Jan | Feb | Mar | Apr | May | Jun |
| | | | Phase: | | | | | | | | | | |
| | | | Phase: | | | | | | | | | | |
| | | | Phase: | | | | | | | | | | |

PART TWO
SUMMARY OF FTEs BY PAY CLASSIFICATION NEEDED FOR IMPLEMENTATION

| Pay Classification | Jul | Aug | Sept | Oct | Nov | Dec | Jan | Feb | Mar | Apr | May | Jun |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 443.0 | 443.0 | 443.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| Associate Governmental Program Analyst | 21 | 21 | 21 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Associate Information Systems Analyst (Specialist) | 1 | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Associate Programmer Analyst (Specialist) | 6 | 6 | 6 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| CEA I | 1 | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Computer Operations Specialist I | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Computer Operations Specialist II | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Computer Operator | 1 | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Data Processing Manager II | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Data Processing Manager III | 1 | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Data Processing Manager IV | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Personnel Program Advisor | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Personnel Program Analyst | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Information Systems Technician | 1 | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Information Systems Technician Specialist I | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Information Systems Technician Specialist II | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Office Technician (Typing) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Personnel Program Advisor | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Secretary | 1 | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Senior Information Systems Analyst (Specialist) | 2 | 2 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Senior Programmer Analyst (Specialist) | | | | | | | | | | | | |

| SYSTEM | Original Available Date | BE Need By Date | DTS SR # |
|---|---|---|---|
| **Solution Manager:** | | | |
| Solution Manager 4.0 | 07/01/2006 | | |
| Solution Manager App Server /DB Failover | | 05/01/2009 | |
| | | | |
| **Development:** | | | |
| Development ECC 6.0 DB Server | 07/01/2006 | | |
| GSU Dev ECC 6.0 DB Server | | 07/01/2008 | 112303 |
| Dev BI 7.0 / PI 7.0 DB Server | 07/01/2006 | | |
| Dev Enterprise Portal (EP) 7.0 DB Server | 07/01/2006 | | |
| Dev EP Upgrade for NWDI | | 07/01/2008 | 112263 |
| | | | |
| **Sandbox:** | | | |
| Sandbox ECC 6.0 / BI 7.0 / PI 7.0  DB Server | | 07/01/2008 | 112287 |
| Sanbox Enterprise Portal (EP) 7.0 DB Server | | 07/01/2008 | 112287 |
| | | | |
| **Q/A  Training  CSU:** | | | |
| Q/A ECC 6.0 DB/ TRB ECC 6.0 DB/ App Server | 04/01/2007 | | |
| QA BI 7.0 / PI 7.0 DB Server | 04/01/2007 | | |
| QA Enterprise Portal (EP) 7.0 DB Server | 04/01/2007 | | |
| Training BI 7.0 DB Server | | 05/01/2009 | |
| Training Enterprise Portal (EP) 7.0 DB Server | | 05/01/2009 | |
| CSU QA ECC 6.0 DB Server | | 09/01/2008 | 112869 |
| | | | |
| **Mercury::** | | | |
| Mercury Quality Center (QC) SQL DB Server | | 07/01/2008 | 109505 |
| Mercury Quality Center (QC) App/Web Server | | 07/01/2008 | 109505 |
| Mercury LoadRunner (LR) App/Web Server | | 01/01/2009 | |
| Mercury LoadRunner (LR) Controller | | 01/01/2009 | |
| | | | |
| **Production:** | | | |
| Production ECC 6.0 DB Server | 09/01/2007 | | |
| Prod ECC App1 Server / DB FO Server | | 11/01/2008 | 113437 |
| Prod ECC App2 Server | | 03/01/2009 | |
| Prod ECC App3 Server | | 02/01/2010 | |
| Production PI 7.0 DB / CI Server | 09/01/2007 | | |
| Prod PI 7.0 App Server / DB FO Server | 09/01/2007 | | |
| Production BI 7.0 DB / CI Server | 09/01/2007 | | |
| Prod BI 7.0 App Server / DB FO Server | | 11/01/2008 | 113439 |
| Prod Enterprise Portal (EP) 7.0 DB Server 1 | 09/01/2007 | | |
| Prod Enterprise Portal (EP) 7.0 J2EE Server 2 | 09/01/2007 | | |
| Prod Enterprise Portal (EP) 7.0 DB Server 3 | | 03/01/2009 | |
| Prod Enterprise Portal (EP) 7.0 J2EE Server 4 | | 03/01/2009 | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |