# McKool Smith

A PROFESSIONAL CORPORATION • ATTORNEYS
600 Travis Street
Suite 7000
Houston, TX 77002

Basil A. Umari
Direct Dial: (713) 485-7304
bumari@mckoolsmith.com

Telephone: (713) 485-7300
Facsimile: (713) 485-7344

March 17, 2010

*Via Hand Delivery*
The Honorable Robert E. Gerber
Judge, United States Bankruptcy Court
Southern District of New York
One Bowling Green, Courtroom 621
New York, NY 10004-1408

  RE: *In re BearingPoint, Inc.*, Case No. 09-10691

Dear Judge Gerber:

  We represent John DeGroote Services, LLC as Liquidating Trustee (the "Liquidating Trustee") for the BearingPoint, Inc. Liquidating Trust. The Liquidating Trustee respectfully requests a pre-motion conference, pursuant to LBR 9056-1, in connection with a motion for summary judgment it intends to file.

  3M Company ("3M") has filed a motion for administrative expense (Docket No. 1458) seeking payment of $2.2 million (the "Motion"), a copy of which is attached hereto as *Exhibit A*. The Liquidating Trustee has filed an objection to the Motion (Docket No. 1719), a copy of which is attached hereto as *Exhibit B*.[1]

  3M's administrative claim is the largest outstanding administrative claim pending against the estates. The Liquidating Trustee intends to make an initial distribution to unsecured creditors on or about April 30, 2010. To do so, the Liquidating Trustee must set its reserves no later than April 15, 2010. Although reserving for 3M's purported administrative expense would not prevent a distribution, it would have a material impact the amount distributed to unsecured creditors.

  During a status conference held on March 5, 2010, the Court directed the administrative expense claimants and the Liquidating Trustee work together to enter into consent orders for the exchange of documents, narrowing of issues in dispute, and establishment of a schedule for presentation of any disputed issues to the Court. The Liquidating Trustee is working to that end.

---

[1] The Liquidating Trustee has also filed a complaint seeking return of approximately $1.7 million of preferential transfers received by 3M in the 90 days prior to bankruptcy. The Liquidating Trustee believes that the administrative expense claim may be decided separately from the preference issues.

*Via Hand Delivery*
The Honorable Robert E. Gerber
March 17, 2010
Page 2

However, unlike the mill-run of administrative expense requests, 3M's Motion turns on a "gating" legal issue which may be decided as a matter of law: *whether a non-exclusive copyright license constitutes a "lease" within the meaning of the Bankruptcy Code*. 3M argues that the software license is a lease and that therefore, the estate is liable, under 11 U.S.C. § 365(d)(5), for certain payments that allegedly came due under the license more than 60 days post-petition. In the alternative, 3M argues that it is entitled an administrative expense under 11 U.S.C. § 503(b) for alleged use of the license post-petition.

The Liquidating Trustee disputes that 3M is entitled to an administrative expense claim under any of these theories. First, the Liquidating Trustee disputes that a non-exclusive copyright license is a lease. Second, the Liquidating Trustee disputes that all of the payments claimed by 3M came due more than 60 days after the Petition Date. Third, the Liquidating Trustee disputes that 3M could be entitled to an administrative expense for the prepetition software license under 503(b) because, among other reasons, it did not use the license postpetition.

The issues have essentially already been briefed in 3M's Motion and the Liquidating Trustee's objection. The Liquidating Trustee respectfully submits that the Motion may be decided by the Court as a matter of law from the face of the governing contracts and indisputable facts. Accordingly, the Liquidating Trustee requests that the Court permit it to file a motion for summary judgment and set an abbreviated schedule such that, subject to the Court's availability, the matter may be decided prior to April 15, 2010.

Background

*Reseller Agreement (Missouri)*

On October 1, 2007, BearingPoint, Inc. ("BearingPoint") was awarded a contract with the State of Missouri (the "Missouri DMV Contract") to assist Missouri with implementation of a system related to its Department of Motor Vehicles records system. Under the agreement, BearingPoint was required to provide six software modules to Missouri.

On March 26, 2008, 3M and BearingPoint entered into a Reseller Agreement, granting BearingPoint the right to sell and sublicense certain software and customizations to Missouri (the "Reseller Agreement"). *Reseller Agreement*, at § 1. 3M also granted BearingPoint a non-exclusive license to access, use, modify, and create derivative works of the software and customization for the purpose of performing or supporting certain business activities of Missouri. *Id.*, at § 2. 3M was not required to provide any technical or sales support to BearingPoint or Missouri. *Id.*, at § 7. Nor was 3M required to provide BearingPoint or Missouri with upgrades, updates, enhancements, or new releases except in certain limited situations. *Id.* The agreement provides that the sublicenses granted to Missouri survived termination of BearingPoint's license upon completion of its work. *Id.*, at § 3.

BearingPoint licensed four software modules, derived from 3M software, to Missouri. BearingPoint did not install the remaining two modules because Missouri stopped implementation of the new system due to funding problems. Upon information and belief, BearingPoint performed no work for Missouri after the petition date.

The Reseller Agreement required BearingPoint to pay 3M a license fee of $6.6 million. *Id.* at § 6. The license fee was payable in six equal installments of $1.1 million, to be invoiced on six specific dates over the course of approximately one year. *Id.* Payments were due 45 days after the invoice dates. *Id.* BearingPoint paid the first four of the six installment payments. BearingPoint failed to pay the last two installments, invoices for which were to be issued on January 1, 2009 (and thus due February 14, 2009) and April 1, 2009 (and thus due May 15, 2009).

BearingPoint did not assume either the Missouri DMV Contract or the Reseller Agreement during its bankruptcy proceedings, and the agreements were thus deemed rejected under the plan. Debtors' Second Amended Joint Plan Under Chapter 11 of the Bankruptcy Code, Dated November 2, 2009 (the "Plan"), at Art. 8.1.

*Subcontractor Agreement (Montana)*

BearingPoint also entered into a separate agreement with the Montana Department of Justice ("Montana") to implement certain software into the Montana Department of Motor Vehicles system (the "Montana DMV Contract"). BearingPoint entered into that certain Subcontractor Agreement dated December 4, 2005 (the "Subcontractor Agreement") with 3M, under which 3M performed certain subcontracting services for BearingPoint related to the Montana DMV Contract. Among other things, BearingPoint agreed to pay a $3.6 million license fee for certain software and technology to be supplied by 3M for the project. 3M was to invoice BearingPoint at the time of execution of the agreement, and upon information and belief this fee was paid in full years before the bankruptcy filing. Otherwise, 3M was compensated on an hourly basis, subject to a cap, for its services under the agreement.

There were numerous problems with 3M's software, and, prior to the petition date, 3M abandoned the job. Montana has refused to pay amounts owed to BearingPoint related to 3M's work. The Liquidating Trustee reserves the right to bring claims against 3M for its failings on the project. BearingPoint did not assume either the Montana DMV contract or the Subcontractor Agreement during its bankruptcy proceedings, and the agreements were thus deemed rejected under the Plan. *Plan*, at Art. 8.1.

Basis of Motion for Summary Judgment

1. *Section 365(d)(5) Is Facially Inapplicable Because the Reseller Agreement, a Non-Exclusive Copyright License, Is Not A Lease.*

3M invokes Section 365(d)(5) to assert administrative priority for unpaid installment payments due under the Reseller Agreement.[2] This provision applies only to leases. The Reseller Agreement is not a lease.

As 3M acknowledges, "lease" is not defined in the Bankruptcy Code. Reasoning from a generic definition in Black's Law Dictionary, 3M contends that the Reseller Agreement is a lease.[3] 3M's argument fails because the Reseller Agreement is a non-exclusive license. A non-exclusive intellectual property license is merely a covenant not to sue for infringement. *Cf. Harris v. Emus Records Corp.*, 734 F.2d 1329, 1334 (9th Cir. 1984) ("Under patent law, a license has been characterized as an agreement not to sue the licensee for infringement."). Moreover, it is black-letter law that a non-exclusive intellectual property license confers no property interest. *See Gilson v. Republic of Ireland*, 787 F.2d 655, 658 (D.C. Cir. 1986) ("It is well settled that a non-exclusive licensee of a patent has only a personal and not a property interest in the patent . . . ."); *In re Patient Educ. Media, Inc.*, 210 B.R. 237, 242-43 (Bankr. S.D.N.Y. 1997) (holding that a non-exclusive copyright license conveys only a personal interest rather than a property interest). Ironically, 3M itself went to great pains earlier in this case to make the very point that the Reseller Agreement conveyed no property interest and involved only a personal right.[4]

As a personal right/covenant not to sue, the Reseller Agreement does not fit the definition of lease. A lease confers a property interest and provides the lessee with the exclusive right of possession.[5] The Reseller Agreement does neither. It is instead a plain executory contract, to which Section 365(d)(5) does not apply.[6]

Adding further support, the Bankruptcy Code itself categorizes intellectual property licenses as executory contracts rather than unexpired leases. In particular, Section 365(n) refers

---

[2] 3M does not argue that any payments due under the Subcontractor Agreement are entitled to priority under Section 365(d)(5). Even if it did, the same arguments would generally apply because the Subcontractor Agreement is a software license agreement as well.

[3] 3M also cites the definition in the Uniform Commercial Code. This definition plainly does not apply because intellectual property is not a "good." See MO. REV. STAT. § 400.2A-105 (defining "goods" to exclude general intangibles); MO. REV. STAT. § 400.9-102 (defining "general intangible" to specifically include "software"). By its terms, the Reseller Agreement is governed by Missouri law. *Reseller Agreement*, at § 33.

[4] *See 3M Company's Limited Objection to Debtors' Proposed Sale of Certain Assets* [Docket No. 384], at pp. 5-6; *3M Company's Objection to Debtors' Proposed Assumption and Assignment of Executory Contracts and Unexpired Leases in Connection With Sale of Public Service Industry Group Assets* [Docket. No 492], at pp. 5-6; *3M Company's Objection to Debtors' Second Proposed Assumption and Assignment of Executory Contracts and Unexpired Leases in Connection With Sale of Public Service Industry Group Assets* [Docket. No 550], at pp. 5-6; *3M Company's Objection to Debtors' Third Proposed Assumption and Assignment of Executory Contracts and Unexpired Leases in Connection With Sale of Public Service Industry Group Assets* [Docket. No 640], at pp. 5-6.

[5] *Cf. Chubb Group of Ins. Cos. v. C.F. Murphy & Assocs., Inc.*, 656 S.W.2d 766, 777 (Mo. App. W.D. 1983) (stating that a landlord/tenant relationship includes, among other things, creation of an estate in the tenant and transfer of exclusive possession and control).

[6] Even 3M characterizes the Reseller Agreement as an "executory contract" rather than an unexpired lease. *Motion*, at ¶ 8, p. 3.

to "an *executory contract* under which the debtor is a licensor of a right to intellectual property." 11 U.S.C. § 365(n) (emphasis added). In other instances, the Bankruptcy Code uses the more specific "unexpired lease" when referring to a lease. For example, Section 365(h), a provision structurally similar to Section 365(n), refers to "an *unexpired lease* of real property under which the debtor is the lessor." 11 U.S.C. § 365(h) (emphasis added). Thus, it is fair to infer that if intellectual property licenses were leases, Congress would have used "unexpired lease" in Section 365(n), as it did in Section 365(h).

Even if a software license could be considered a lease under certain circumstances, the Reseller Agreement should be characterized as a financing or sale transaction rather than a lease. In applying Section 365(d), courts look to the economic substance of the transaction to determine whether it is a true or bona fide lease. *See International Trade Admin. v. Rensselaer Polytechnic Institute*, 936 F.2d 744, 748-49 (2d Cir. 1991) (analyzing the true lease requirement in the context of section 365(d)(4)).

Here, the Reseller Agreement has the hallmarks of a sale transaction rather than a lease. The Reseller Agreement has no fixed time duration, though it required BearingPoint to pay $6.6 million to 3M in 6 equal installments of $1.1 million over the course of approximately one year. *Cf. Id.* at 750 (identifying prepaid rent as a factor indicating that transaction is not a true lease). The invoices submitted by 3M refer to "installment payments." The agreement's title, "Reseller Agreement," indicates that the transaction would be a sale–one "resells" what has been sold. The Reseller Agreement does not require BearingPoint to return the software to 3M. Instead, it explicitly provides that Missouri may continue to use 3M's intellectual property, as modified, even after termination of BearingPoint's license. For all these reasons, if the Reseller Agreement did involve property interests, it would be properly characterized as a sale financing contract rather than a lease.

2. *Even If The Reseller Agreement Were A Lease, The Requirements of Section 365(d)(5) Are Not Satisfied.*

Even if the Reseller Agreement were a lease, the requirements of Section 365(d)(5) are not satisfied as to one of the two unpaid installment payments sought by 3M. Further, as an equitable matter, the Court should refuse to apply Section 365(d)(5) to the payments.

Section 365(d)(5) requires the debtor to perform only those obligations "first arising from or after 60 days after the order for relief in this case." 11 U.S.C. § 365(d)(5). Here, the petition date was February 18, 2009. One of the payments claimed by 3M as an administrative expense actually came due *prepetition*, and therefore not more than 60 days after the petition date. Specifically, although not disclosed by 3M, the Reseller Agreement provided that the fifth payment was to be invoiced on January 1, 2009, and due 45 days thereafter, *i.e.* on February 14, 2009. *Reseller Agreement*, at § 6. Accordingly, Section 365(d)(5) cannot apply to it.

It is immaterial that 3M did not invoice BearingPoint for the fifth payment until July 16, 2009. Courts have held that the controlling date for Section 365(d)(5) is the due date specified in the agreement, not the invoice date. *See Guttman v. Xtra Lease, Inc. (In re Furley's Transport,*

*Inc.)*, 263 B.R. 733, 738 (Bankr. D. Md. 2001) (holding that in determining when obligation "arises" under Section 365(d)(5) (codified at the time as 365(d)(10)), the due date in the lease agreement between the parties, not the invoice date, controlled). As a matter of logic, if the invoice date controlled, a party could manipulate priority by simply waiting until the end of the 60-day period in Section 365(d)(5) before submitting its invoice. This in fact appears to be exactly what 3M did.

Section 365(d)(5) provides the Court substantial flexibility to excuse compliance "based on the equities of the case." *See* 11 U.S.C. § 365(d)(5); *In re Hayes Lemmerz Int'l, Inc.*, 340 B.R. 461, 485 (Bankr. D. Del. 2006).[7] In *Hayes Lemmerz*, the court retroactively excused compliance with the lease, holding that under the equities, the claimant should be entitled to only actual damages sustained, rather than the amounts owing under the agreement. *Id.* Here, there is no evidence that 3M suffered any actual damages. Accordingly, even if the requirements of the statute were otherwise met, the Court should order, based on the equities, that the statute does not apply.

3. *3M Is Not Entitled to an Administrative Expense Claim Under Section 503(b) Because It Did Not Confer a Benefit to the Estates as a Matter of Law.*

3M argues in the alternative that it is entitled to an administrative expense under Section 503(b) due to a benefit allegedly conferred on the estate. 3M has not demonstrated entitlement to an administrative expenses claim.

3M has provided no benefit to the Debtors' estates. The Debtors had ceased performing work for Missouri. The licenses related to Montana were paid for in full prepetition -- allowing 3M to collect an administrative expense for related to the Montana license would allow 3M to be paid twice.[8]

3M resorts to circular reasoning to justify payment for a non-existent benefit. 3M argues that "[e]ven if the Reseller Agreement were not a lease of personal property," it is entitled to an administrative priority because the agreement was necessary to the preservation of the estate.[9] But the only authority 3M cite is cases involving leases. As explained above, the Reseller Agreement is not a lease. 3M has cited no authority holding that an intellectual property license, whether or not utilized, gives rise to an administrative claim prior to rejection. Nor would such a proposition make sense. Unlike a lease, a non-exclusive intellectual property license does not

---

[7] Some courts have ruled, however, that a court cannot excuse compliance with section 365(d)(5) retroactively. *See CIT Commun. Fin. Corp. v. Midway Airlines Corp. (In re Midway Airlines Corp.)*, 406 F.3d 229, 240-41 (4th Cir. 2005).

[8] Although 3M's motion makes reference to the Subcontractor Agreement, it does not invoke its terms to assert its Section 503(b) claim. If it did, the same arguments would apply because the Subcontractor Agreement was also a non-exclusive intellectual property license. In addition, the license was not necessary to preservation of the estate and did not confer any benefit to the estate.

[9] *Motion*, at ¶ 24, p. 8.

deprive the licensor from use of the property and does not prevent them from licensing it to others.

Further, under the authority cited by 3M, there is, at best, only a presumption that the lease rate represents the value conferred to the estate. Here, the Reseller Agreement conferred no benefit to the estate. The indisputable facts will show that BearingPoint had ceased work for Missouri and did not enjoy any benefit from the license. Moreover, one of the payments claimed by 3M came due prepetition, as explained above. Even under 3M's logic, only payments coming due post-petition could reflect value conferred to the estate post-petition.

Finally, there is no merit to 3M's assertion that BearingPoint violated confidentiality requirements in the Reseller Agreement or Subcontractor Agreement. Contrary to 3M's assertions, BearingPoint did not disclose proprietary software or other confidential information to Deloitte. But even if it did, the Court may rule as a matter of law that any such claim would not be entitled to administrative expense. A claim for breach of a prepetition contract, even arising post-petition, gives rise to only an unsecured claim. *See In re Chateaugay Corp.*, 102 B.R. 335, 351 (Bankr. S.D.N.Y. 1989) ("[W]here the debtors' obligations stem from contractual liability, even a post-petition breach will be treated as a prepetition liability where the contract was executed prepetition") (internal citations omitted). Further, BearingPoint could not have transferred the software licenses to Deloitte, LLP ("Deloitte"). The licenses could not be transferred without 3M's consent and were not included in the agreements assigned to Deloitte. If Missouri and Montana have provided unauthorized access to the software installed in their systems, it is a matter between 3M, these states, and Deloitte. 3M's suggestion that BearingPoint violated federal intellectual property law likewise is groundless, and nonsensical given that BearingPoint held licenses to the intellectual property it would have supposedly infringed.

For all these reasons, the Liquidating Trustee is entitled to summary judgment that 3M is entitled to no administrative expense claim against the estates.

Thank you for your consideration of this matter.

Very truly yours,

Basil A. Umari

BAU:njj
cc: Will Tansey; Rafael X. Zahalddin-Aravena