UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

———————————————————————
                                                    )
In re:                                              )         Chapter 11
                                                    )
BEARINGPOINT, INC., *et al.,*                       )
                                                    )         Case No. 09-10691 (REG)
                                                    )
                          Debtors.                  )         Jointly Administered
———————————————————————)

BENCH DECISION[1] ON LIQUIDATING
TRUSTEE'S MOTION FOR RELIEF FROM PLAN
AND CONFIRMATION ORDER

APPEARANCES:

BINGHAM McCUTCHEN LLP
*Counsel for John DeGroote Services, LLC*
399 Park Avenue
New York, NY 10022-4689
By:    Jeffrey S. Sabin, Esq. (argued)
       Sabin Willett, Esq. (argued)

McKOOL SMITH P.C.
*Counsel for John DeGroote Services, LLC*
One Bryant Park, 47th Floor
New York, NY 10036
By:    Peter S. Goodman, Esq.
       Lew LeClair, Esq.
       Robert Manley, Esq.
       Basil A. Umari, Esq.

WILLIAMS & CONNOLLY LLP
*Attorneys for F. Edwin Harbach*
725 Twelfth Street, N.W.
Washington, D.C. 20005
By:    Robert A. Van Kirk, Esq. (argued)
       George A. Borden, Esq.
       Steven M. Pyser, Esq.

---

[1]    I use bench decisions to lay out in writing decisions that are too long, or too important, to dictate in open court, but where the circumstances do not permit more leisurely drafting or more extensive or polished discussion.  Because they often start as scripts for decisions to be dictated in open court, they typically have a more conversational tone.

SIMPSON, THACHER & BARTLETT, LLP
*Attorneys for Former Directors*
425 Lexington Avenue
NY, New York 10017
By:    Paul C. Curnin, Esq. (argued)
       William T. Russell, Jr., Esq.
       Paul C. Gluckow, Esq.
       Craig S. Waldman, Esq.

ROBERT E. GERBER
UNITED STATES BANKRUPTCY JUDGE:

In this contested matter in the chapter 11 case of reorganized debtor BearingPoint,

Inc. and its affiliates, John DeGroote Services, LLC (the "**Trustee**")—the trustee of the

Liquidating Trust (the "**Trust**") established under BearingPoint's now-confirmed plan of

reorganization—moves, pursuant to section 105(a) of the Code, and Fed. R. Civ. P. 60(b)

(applicable in bankruptcy cases under Fed. R. Bankr. P. 9024), for entry of an order

granting limited relief from provisions in BearingPoint's chapter 11 Plan and

Confirmation Order.  The Trustee wishes to be relieved from requirements in each that

provide, in substance, that any claims against BearingPoint's former officers and

directors must be brought in this Court and nowhere else.  The targets of the litigation

that the Trustee wishes to bring—BearingPoint's former CEO and eight directors (the

"**Targets**")—who were the beneficiaries of the provisions in question, oppose the

motion.

The motion is granted.

I normally would be quite reluctant to modify a confirmation order—even where,

as here, there are no issues of unscrambling eggs and no detrimental reliance by the

objecting parties on the provisions in question.  But here concerns emerging from my fear

that, if litigated here, this action would be bogged down in procedural complications,

aggravated by the Supreme Court's recent decision in *Stern v. Marshall*[2] and statements

by the Targets' counsel that reinforce those concerns, now provide cause for doing so.

---

[2]     2011 U.S. LEXIS 4791, 2011 WL 2472792 (U.S. June 23, 2011).

-1-

While there is no issue, even after *Stern v. Marshall*, as to the subject matter jurisdiction of the bankruptcy court to hear this controversy, the claims here are not "core." If I require this action to be litigated here in the bankruptcy court—or, more precisely, *initially* in the bankruptcy court—there is a material risk, in my mind, that especially with the inspiration of *Stern v. Marshall*, and the Targets' pointed reminder that I wouldn't be authorized to enter final judgment,[3] this action will be tied in procedural knots by motion practice, here and in the District Court, exploiting asserted or actual inabilities on my part, as an Article I bankruptcy judge, to issue findings and orders. Here, I fear, the additional litigation resulting from my inability to fully rule will have its own *Bleak House* implications, not unlike the *Bleak House* litigation referred to by the *Stern v. Marshall* court itself.[4]

Now that I've satisfied myself that the Trustee's claims aren't frivolous, and especially if I cannot enter final judgment, there are no benefits in hearing the action here. To the contrary, requiring the Trustee to endure the procedural hurdles in starting (but evidently, not finishing) the litigation in the bankruptcy court, which the Targets have wholly ignored, can hardly be said to be in the interests of justice.

Facts

The facts underlying this controversy are not in dispute, and neither side requested an evidentiary hearing. On December 22, 2009, BearingPoint's reorganization plan was confirmed. The Plan provided, among other things, for the creation of the Trust, by which any claims owned by BearingPoint could be pursued.

---

[3]        *See* Ltr of Harbach counsel George Borden, dated June 24, 2011 ("**Borden Ltr.**") at 1.

[4]        *See* 2011 U.S. LEXIS 4791 at *13-14, 2011 WL 2472792 at *5.

Among those claims were claims for alleged breaches of fiduciary duty against BearingPoint's former CEO and former directors. The Trustee now wishes to bring such claims against BearingPoint's former CEO, Edwin Harbach, and eight former directors.[5]

Those claims would be brought in the context of provisions inserted into the Plan, and the related confirmation order, and rulings that I issued, late in the chapter 11 case, all as described below.

*1. The Carveout from Estate Releases*

While the Plan as a whole had the Creditors' Committee's support, the Creditors' Committee objected to provisions in the Plan, as originally put forward for confirmation, under which BearingPoint's former officers and directors would be released from any liability with respect to the management of BearingPoint on their watch. I sustained the Creditors' Committee's objections.

To address those concerns, under Article X, § 10.8(c) of the Plan, current and former officers and directors were granted only limited releases by the BearingPoint estate, and they were *not* released from claims for fraud, negligence, corporate waste, abuse, mismanagement, or breach of fiduciary or other duties in connection with four identified areas—including, most significantly, potential transactions for the acquisition of BearingPoint or its individual business units.

---

[5]    As I'm satisfied that the Trustee's claims are colorable and not a "strike suit" (and the Targets don't contend otherwise as part of their objections to the Trustee's motion), I don't need to address the specifics of the claims in any great detail. In general, the Trustee's complaint raises state law claims, under Delaware law, charging that in the period from 2007 to 2008, when BearingPoint allegedly could have been sold for far more than the company ultimately realized when its units were sold in chapter 11, the company was not sold, as an alleged consequence of the Targets' breaches of fiduciary duty incident to the company's sales process—allegedly ignoring large segments of the universe of potential buyers and deflecting opportunities to sell the business to a strategic buyer or buyer of business units. The complaint further alleges that the Targets had a personal interest in ignoring significant areas of the marketplace in connection with the marketing effort that was undertaken or allegedly should have been, resulting in an inability to obtain the best price available for BearingPoint's assets.

The claims the Trustee wishes to bring are of the type expressly carved out from the releases.

2. *Exclusive Jurisdiction of the Bankruptcy Court*

But while I ruled that claims of the type brought here would not be released, I thought that I should nevertheless retain some control over them.  For reasons set forth at length below, I required that the bankruptcy court and the district court in the Southern District of New York have exclusive jurisdiction over actions such as the one that the Trustee would like to bring.

Thus, Article XI of the Plan provides for this Court to exercise exclusive jurisdiction of future disputes "arising out of, or related to, the Chapter 11 Cases."  And Confirmation Order ¶ 34(c), captioned "Limited Releases," provides for exclusive jurisdiction for the federal courts in the Southern District of New York over the claims that weren't released.[6]

3. *Reasons for These Provisions*

As noted, those provisions arose from the pre-confirmation dispute over the original releases that had been proposed by the Debtors which would have released the former officers and directors from claims based on any alleged prepetition misconduct. The Creditors' Committee objected to those releases, and I sustained the Creditors' Committee's objection.  But consistent with my past practice, where I'd disapproved

---

[6]    It provides:

> Notwithstanding anything contained in the Plan, this Court (and the United States District Court for the Southern District of New York) shall retain exclusive jurisdiction to adjudicate any and all claims or causes or action brought by (a) the Debtors (or the Liquidating Trustee, as applicable) and the Secured Lenders or (b) each holder of a Claim or Equity Interest against any party granted a limited release in subparagraphs 34(a) and 34(b), above.

releases that were forbidden under relevant caselaw,[7] I ruled that the bankruptcy and

district courts in the Southern District of New York would have exclusive jurisdiction

over any such claims.

I explained:

> I will, however, as I did in *Adelphia*, include a
> provision in the confirmation order providing, in
> substance, that any claims brought by creditors in
> this category must be brought before me or at least a
> district judge in this district.  That, in part, is based
> on my greater familiarity with the debtors' affairs
> than a state court judge or even a federal court judge
> somewhere else in the country might have.[8]

Thereafter, I stated:

> … I think there are other factors that I should take
> into account as well and that it's appropriate for me
> to impose safeguards to insure that any permitted
> litigation really is in the best interest of the estate.
> Or, putting it differently, that potential releases
> aren't subject to the vagaries of state court jury trials
> in remote jurisdictions.[9]

And later in the Confirmation Hearing, I stated:

> On balance, I don't think I can find it to be in the
> best interests of the estate to release
> away these claims now based on the amalgam of the
> consideration or perhaps more properly, lack of
> consideration provided to date and the investigation
> that took place before giving up these claims.

---

[7]     *See In re Adelphia Communications Corp.,* 368 B.R. 140, 263–269 (Bankr.S.D.N.Y. 2007)
("***Adelphia Confirmation Decision***") (citing *Deutsche Bank AG v. Metromedia Fiber Network,
Inc. (In re Metromedia Fiber Network, Inc.),* 416 F.3d 136, 142 (2d Cir. 2005) ("***Metromedia***"))
(explaining that, in the Second Circuit, third-party releases "are permissible under some
circumstances, but not as a routine matter"); *In re Chemtura Corp.,* 439 B.R. 561, 609–612
(Bankr.S.D.N.Y. 2010) ("*Chemtura*") (same).

[8]     Confirmation Hearing Transcript at 61 (transcription errors corrected).  I realize now, as noted
below, that a district judge wouldn't have the same familiarity I'd have and that, after engaging in
my gatekeeper function, I shouldn't use my familiarity—and that in each of these respects, my
reasoning back then was flawed.

[9]     Confirmation Hearing Transcript at 67.

But once more, I can and will find it to be in the
best interests of the estate to modify the plan, which
in light of the way the plan was structured, I don't
believe requi[r]es re-solicitation to provide that any
such claims if they are to be brought, be brought
before me or a district judge in this [district] for at
least several reasons that I articulated before.  I
think it's in the best interests that if claims aren't
going to be released, prospective targets have the
comfort that the validity of these claims will be
thoughtfully analyzed with the benefit of as much
knowledge of the surrounding facts as possible.

So I won't approve a full release of these claims
now but I will approve provisions of the type I
approved in *Adelphia*, that give this court exclusive
jurisdiction over any such claims.  As I said in
*Adelphia*, see 368 B.R. at 269, in a case that to be
sure, had a materially higher level of creditor
aggressiveness and discord and which involved
claims that might have been asserted vis-a-vis a
different stage in the Chapter 11 process, I'll be able
to tell the difference between legitimate claims on
the one hand and harassment, retaliation or
frivolous litigation on the other.[10]

After hearing that ruling, Counsel for the Creditors' Committee asked a clarifying

question.  He stated:

Thank you very much, your honor.  I listened very
carefully, especially to the modifications to the
plan.  I have just one issue.  To the extent that the
liquidating trustee determines as a jurisdictional
matter, that he wants to sue somebody and can only
get jurisdiction in state court, can you consider
supplementing your direction to modify the plan,
such that a scenario such as that would come to you
first for the determination of the propriety of the
claim?[11]

---

[10]    Confirmation Hearing Transcript at 76-77 (transcription errors corrected).

[11]    Confirmation Hearing Transcript at 78 (transcription errors corrected).

As I was doubtful that (under the law as it existed at the time) the concern he articulated would materialize, I declined to grant the supplemental direction in advance.  I responded:

> I have some reservations as to that… in no small part because of my view that it's a classic case of "related to"... jurisdiction, if not also "arising under" jurisdiction and that therefore,... there'd be jurisdiction under [28 U.S.C. §] 1334.  I'll give you and the trustee a reservation of rights on that issue and anybody who might feel differently as well.  But I don't, at this point, see the need for that.
>
> As my ruling hopefully reflects, I gave this a lot of thought.  I think that people can get justice in this court.  I have a number of concerns with them being litigated elsewhere.[12]

### 4. Trustee's Desire to Bring Suit

Thereafter, the Trustee determined to commence litigation against the Targets on claims that had been carved out from the releases.  The Trustee provided me with a draft complaint, and subjected it to my threshold review.  Though I expressly do not determine the merits of the claims, I'm comfortable, and find as a fact, that the claims in the complaint, which is a detailed one, are colorable, are not brought for purposes of harassment, and cannot legitimately be regarded as a strike suit.

However, the Trustee indicated that he would like to bring the action in the Virginia state court—the Circuit Court for Fairfax County, Virginia, where BearingPoint's headquarters had been located—where prosecution of the action would be violative of the Confirmation Order as it now reads.  Stated reasons, which I find to be sincere, were the ease of getting jurisdiction over all prospective defendants in Fairfax

---

[12] *Id.* (emphasis added) (transcription errors corrected).

County, Virginia,[13] that the Virginia state courts would not be as burdened as this one is,

that the action could proceed more swiftly, and that litigation would be materially less

expensive.[14]  The Trustee also observed, and I find, that the Plan modification that was

desired would not, like other plan modifications might, adversely alter creditor rights or

be inconsistent with creditor expectations.

*5.  Subject Matter Jurisdiction*

Both sides agree that each of the bankruptcy court and the district court would

have subject matter jurisdiction over the claims that would be brought, under the

"Bankruptcy Cases and Proceedings" provisions of 28 U.S.C. § 1334.[15]

*6.  Bankruptcy Judge's Ability to Enter Final Orders*

Both sides also agree that the proposed action would be a "non-core" matter under

28 U.S.C. § 157.[16]  Thus, as the Borden Letter puts it (though without further addressing

the implications), "the [Bankruptcy] Court would not be authorized to enter final

judgment."  At least without an appropriate consent (assuming that after *Stern v.*

*Marshall*, consent would still be effective), either a district judge would have to make the

factual determinations (or conduct a jury trial for that purpose),[17] or I'd have to issue

---

[13]    BearingPoint's corporate headquarters was located in Fairfax County, Virginia, and I assume,
without deciding, that all of its former officers and directors would easily be subject to in
personam jurisdiction there.

[14]    The Trustee did not provide independent evidence of the greater speed or lesser cost that the
parties would encounter if the action were litigated in Virginia.  Nor did the Targets provide any
evidence to suggest that litigation in the Southern District of New York would proceed more
quickly.  Indeed, the Targets were wholly silent on the implications of their position (stated for the
first time, as far as I can tell, only with the Borden Letter) that I "would not be authorized to enter
final judgment," with all of the additional proceedings in the district court here that would result.

[15]    Arg. Transcript at 18, 36; Targets' Br. At 8; Trustee's Br. as to Harbach at 9, 11.

[16]    Borden Ltr. at 1; Willet Ltr. at 1; Trustee's Br. as to Harbach at 12-13; Targets' Br. at 8.

[17]    The Targets say in their brief that "[a]t this stage… the Former CEO and Certain Former Directors
have not decided whether they will exercise jury trial rights," Targets' Br. at 5 n.1.  But they
"reserve all rights to do so."  *Id.*  They continue that "[i]n any event, this Court may conduct a jury

*proposed* Findings of Fact and Conclusions of Law, for a supplemental round of de novo

review by the district court.

### 7.  *Argued Benefits of Litigation in the Bankruptcy Court*

The Targets argue that there would be efficiencies, and/or other benefits, from my

hearing the case on the merits, based on the notion that I learned a lot about "the

surrounding issues" during the course of the chapter 11 case.[18]  I disagree, and find as a

fact, or mixed question of fact and law, to the contrary.

First, of course, if it will have to be an Article III district judge making the

findings, or a jury, my knowledge of facts with respect to this controversy, even if

properly obtained and used, would be of little or no value.  I will not be the trier of fact,

at least in any way that is dispositive.  And though the Targets then try to expand my

knowledge of BearingPoint affairs into some kind of knowledge by the district judges in

this district as well,[19] the Targets do not assert (nor do I think that they could) that any of

the 38 or so district judges in this district has any knowledge of the "surrounding facts,"

even assuming that such knowledge could be appropriately utilized.

Secondly, the record as to whether the Targets did anything wrong must be made

at the trial hereafter to be conducted, and on the record there presented.  It would be

manifestly improper for me to determine adjudicative facts on evidence from outside that

record, or based on knowledge or perceptions developed in the course of the earlier

---

trial with the parties' consent.  28 U.S.C. § 157(e)."  *Id.*  While 28 U.S.C. § 157(e) plainly so
provides, after *Stern v. Marshall* that statutory provision's efficacy in offering the option of
bankruptcy court jury trials on consent is no longer clear.  Additionally, of course, the Targets
have neither granted that consent nor advised that such consent would be forthcoming.

[18]    *See*, *e.g.*, Targets' Br. at 6 ("this Court's familiarity with the surrounding issues undermines the
Trustee's argument that a Virginia state court will be a more efficient forum.").

[19]    *See id.* ("Granting leave to filed the Contemplated Action in Virginia in this instance would do so
at the expense of *the thoughtful analysis and knowledge of the surrounding facts* that this Court *or
the Southern District of New York* would bring to the case…") (emphasis added).

chapter 11 case.[20]  It is one thing for judges to be making discretionary determinations

based on their knowledge of the history of the case, and, for that matter, their judicial

experience.  It is quite another for them to be making findings on disputed issues of fact

in separate plenary proceedings when the evidentiary basis on which they made those

findings (and, indeed, the quality of the judge's memory as to what he or she previously

observed) is unknown to the parties and to a reviewing court.[21]

Thirdly, while it is probably true that I learn a great deal about the debtors in

cases on my watch, and that I learned a fair amount about BearingPoint as its chapter 11

case was ongoing, there is no reason to believe that I saw enough evidence to be drawing

reliable conclusions.  It's a cliché, but still a correct observation, that what we bankruptcy

judges see in our chapter 11 cases is the tip of an iceberg.  Much goes on in a chapter 11

case, and (even more so) in connection with the management of a chapter 11 debtor, that

the judge never sees.  It would be grossly irresponsible for me to be making factual

findings as to matters as to which I saw only a small part, and where what I saw may

have had very little to do with the totality of what happened, and why.[22]

---

[20]    That would be equally true of a district judge, if he or she had any such knowledge.

[21]    Some years ago, in the *Adelphia Confirmation Decision, see* 368 B.R. at 227-231, in a section of
the opinion captioned "Can the Court Use the Knowledge It Acquired," I addressed a somewhat
similar, but analytically distinct, issue.  I there considered whether I properly could approve a
settlement based on my knowledge of the *Adelphia* chapter 11 case, and, in particular, of the
issues the parties would be litigating if the matter weren't settled.  I ultimately rejected a
contention that such was violative of due process, and determined that using my knowledge was
proper.  *See id.* at 231.  But I did so because the approval of a settlement was a *discretionary*
determination, and because of special considerations applicable to the review of settlements where
the trial judge has historically used his or her knowledge of the controversy in canvassing the
issues and making intelligent predictions as to potential outcomes.  I was not called upon to rule,
and did not rule, on whether that analysis would likewise apply in the context of deciding disputed
adjudicative facts.

[22]    In oral argument on this motion, counsel for the Targets then shifted to speak of my ability, by
reason of my knowledge of BearingPoint's underlying chapter 11 case, to *manage* the separate
plenary litigation more efficiently.  *See* Arg. Transcript at 32 ("[P]art of the consideration… goes
not just with assessing the law and assessing the facts as to the law on an adjudicative basis but in
managing the case."); *id.* at 34 ("[N]ot adjudicated facts, but facts with which you're familiar as a

*8.  Other Considerations*

BearingPoint is incorporated under the law of Delaware, whose law, as to internal corporate governance issues, presumably would apply wherever the action is litigated.  It is possibly true, but unproven and ultimately speculative, that a Virginia state court judge would have less experience in dealing with matters of Delaware corporate law than I've had.  It is similarly unproven, and even more speculative, that the Virginia state court judge would have less experience in dealing with matters of Delaware corporate governance law than the presently unknown district judge in the Southern District of New York that ultimately might have to decide the case.

I have no reason to conclude that the Virginia state court would be anything less than fair.

<u>Discussion</u>

Both sides agree that this determination is a matter of my discretion.[23]

The original limitations on the venue of any suit by the Trustee had their origin in (1) my earlier concerns at confirmation, as a factual matter, that the Debtors had then done insufficient due diligence to support a business judgment to release claims they might have against their officers and directors, and (2) my experience, over the years, that stakeholders in chapter 11 cases, unhappy with their recoveries, have more than occasionally brought frivolous litigation against estate fiduciaries.

---

result of your managing this case, this very complex case, for the last two years will be invaluable in ensuring that this case proceeds in a reasoned manner and on a reasoned schedule.").  But whether ability to manage a litigation is materially affected by knowledge of the background of the controversy is not wholly clear, and in any event, management of plenary litigation is well within the skill set of the great bulk of judges, state or federal.

[23]    *See* Arg. Transcript at 14, 30, 40.

-11-

As I noted earlier this year in a decision in the *Motors Liquidation* (formerly, *General Motors*) chapter 11 case,[24] I had dealt with issues of releases of estate fiduciaries, and why the fiduciaries want them, in published decisions five times before.[25] In these cases, I disapproved third-party releases, in whole or in part, when they could not be justified under applicable Second Circuit law, most significantly the Second Circuit's well known decision in *Metromedia*.[26]  As I stated in my earlier decisions in *Motors Liquidation, Chemtura* and *DBSD*, exculpation provisions are included so frequently in chapter 11 plans because stakeholders all too often blame others for failures to get the recoveries they desire; seek vengeance against other parties; or simply wish to second guess the decisionmakers in the chapter 11 case.[27]  But that is not to say, of course, that claims against fiduciaries never have merit, nor that those asserting them shouldn't be entitled to judicial consideration of potentially meritorious claims.

It was for that reason that I disapproved releases by third parties when they failed to satisfy the *Metromedia* requirements, and by estates when plan proponents hadn't done the requisite due diligence—but provided, as a discretionary matter, for safeguards for those who might otherwise be subjected to frivolous litigation.  In doing so, however, as my thinking evolved on the subject—as it did by the time I dealt with the issue in *Motors Liquidation* (after issuance of the Confirmation Order here)—I began to provide (there in a third party release and not estate release context, though the considerations in most respects are analogous) that subject to any applicable subject matter jurisdiction

---

[24]     447 B.R. 198 (Bankr. S.D.N.Y. 2011) ("***Motors Liquidation***").

[25]     *Id.* at 219.

[26]     *See Metromedia* , 416 F.3d at 142.

[27]     *See Motors Liquidation,* 447 B.R. at 219-21; *Chemtura*, 439 B.R. at 610; *DBSD*, 419 B.R. at 217.

limitations,[28] I'd "at least initially" have exclusive jurisdiction for any covered litigation, "so long as I'm free to abstain and consider whether that litigation would be better conducted elsewhere."[29]

Here I think I need to do exactly that.

I've canvassed the allegations the Trustee wishes to pursue, and I'm satisfied that they're colorable and the action isn't a strike suit. Thus, as the Trustee properly observes, the concerns as to which I wanted to act in a gatekeeper role have been satisfied. And the Trustee is also correct in pointing out that the request for modification of the Confirmation Order here would have no adverse effect on creditor expectations under the plan, or raise issues as to the unscrambling of eggs that often are a concern (typically considered in mootness analysis) in modifying confirmation orders after the fact. Also, the Targets never asked for the provisions in question. And they never withdrew objections or entered into a settlement contemplating the inclusion of these provisions, or otherwise took any action that could fairly be regarded as detrimental reliance. In fact, the provisions were included solely to implement *my* sense of what was appropriate, when I sustained objections by the BearingPoint Creditors' Committee to the releases the Debtors sought.

With that said, I would nevertheless be reluctant, all other things being equal, to modify the Confirmation Order in the fashion that the Trustee requests. Because confirmation orders have a particular importance in bankruptcy law, I'm generally

---

[28]    As discussed elsewhere in this Decision, *see* page 8 above and page 17 n.37 below, subject matter jurisdiction limitations aren't an issue here. Unlike claims brought by third parties in most cases, claims brought by estates, here and elsewhere, will at least normally affect the estate and provide "related to" subject matter jurisdiction under the *Pacor* test, used in the Second Circuit and others.

[29]    *Motors Liquidation*, 447 B.R. at 221.

-13-

uncomfortable modifying them, even in minor respects that do not involve the unscrambling of eggs, without good reason. If I thought the Trustee's claims could be heard expeditiously in the Southern District of New York, as I originally assumed (now, I think, erroneously), I likely would not modify my earlier order.

But here all things no longer are equal. I now believe (1) that I made a mistake of fact, in assuming that I could efficiently decide claims that the Trustee might assert; (2) that after *Stern v. Marshall*, this action, if still litigated here, would be subject to a considerably greater risk that it would be materially slowed by motion practice premised on my lack of constitutional authority to enter a final judgment; and (3) that the Targets have put me on notice that my fears of delay are likely to be justified.

First, I think that I erred in assuming that I could try these claims with the efficiency with which I've normally decided cases. I failed to consider how litigants could tie a case up in knots by exploiting their rights to an Article III judge determination when litigation against them is non-core. By itself, that mistake of fact supports Rule 60(b) relief. It's well established in this Circuit, if not also elsewhere, that a judge's mistake of fact can support an award of 60(b) relief. As the Second Circuit held in *In re 310 Associates*,[30]

> We believe that the plain language of Rule 60, the advisory committee's note to the 1946 amendment, and this Court's action in *Cappillino* all demonstrate that a bankruptcy court has the authority to reopen a judgment based on its own mistake of fact.[31]

---

[30]    346 F.3d 31.

[31]    *Id.* at 35. Such a determination is a matter of the judge's discretion. *See id.* ("the bankruptcy court did not abuse its discretion").

Second, on June 23, the *Stern v. Marshall* majority expressed views inconsistent

with the premises on which I'd imposed the requirements here.  Especially since I'd

offered to exercise exclusive jurisdiction for the Targets' protection, and because I

thought both sides had confidence in my competence and fairness, I assumed that the

probability was high that the necessary consents would be forthcoming so I could try the

case myself, thereby offering both sides the efficiencies that trial before me would entail.

And I assumed that consent to my deciding this non-core matter would be sufficient.

That was, after all, what §157 provides.[32]  And earlier decisions of the Supreme Court

had at least seemingly provided likewise.[33]

---

[32]    Section 157(c)(2) expressly provides:

> Notwithstanding the provisions of paragraph (1) of this
> subsection, the district court, with the consent of all the parties
> to the proceeding, may refer a proceeding related to a case
> under title 11 to a bankruptcy judge to hear and determine and
> to enter appropriate orders and judgments, subject to review
> under section 158 of this title.

[33]    *See Northern Pipeline Construction Co. v. Marathon Pipe Line Co.*, 458 U.S. 50, 92 (1982) (Chief
Justice Burger, dissenting) ("I write separately to emphasize that, notwithstanding the plurality
opinion, the Court does *not* hold today that Congress' broad grant of jurisdiction to the new
bankruptcy courts is generally inconsistent with Art. III of the Constitution.  Rather, the Court's
holding is limited to the proposition stated by Justice REHNQUIST in his concurrence in the
judgment—that a 'traditional' state common-law action, not made subject to a federal rule of
decision, and related only peripherally to an adjudication of bankruptcy under federal law, must,
*absent the consent of the litigants*, be heard by an 'Art. III court' if it is to be heard by any court or
agency of the United States.") (emphasis added).

Likewise, two decisions of the Supreme Court after *Northern Pipeline*, *Thomas v. Union Carbide
Agricultural Products Co.*, 473 U.S. 568, 584 (1985), and *CFTC v. Schor*, 478 U.S. 833, 849
(1986), had read *Northern Pipeline* to mandate consideration of the presence of consent to
adjudication by a non Article III tribunal.  *See, e.g.*, *Thomas*, 473 U.S. at 584 (*Northern Pipeline*
"establishes only that Congress may not vest in a non-Article III court the power to adjudicate,
render final judgment, and issue binding orders in a traditional contract action arising under state
law, *without consent of the litigants*, and subject only to ordinary appellate review."); *Schor*,
478 U.S. at 848-849 (finding waiver of right to Article III determination; "Our precedents also
demonstrate, however, that Article III does not confer on litigants an absolute right to the plenary
consideration of every nature of claim by an Article III court. . . .  [A]s a personal right, Article
III's guarantee of an impartial and independent federal adjudication is subject to waiver, just as are
other personal constitutional rights that dictate the procedures by which civil and criminal matters
must be tried. . . .  Indeed, the relevance of concepts of waiver to Article III challenges is
demonstrated by our decision in *Northern Pipeline,* in which *the absence of consent* to an initial

But in *Stern v. Marshall*, the majority, while repeatedly stating that Pierce had consented to the bankruptcy court's determination,[34] nevertheless found his consent, under the facts there, inadequate. As I assume that the majority would not have reached out to decide constitutional issues it did not need to decide (such as what it would do if there were a freely given and unequivocal consent), the better view, I think, is that the *Stern v. Marshall* conclusion rested on the basis that the consent there was only implied or under duress.[35] But it may now be, and it's fair to assume that it will now be argued,

---

adjudication before a non-Article III tribunal was relied on as a significant factor in determining that Article III forbade such adjudication.") (emphasis added in each case) (citations omitted).

[34] *See* 2011 WL 2472792 at *11; 2011 LEXIS 4791 at *32 ("[W]e agree with Vickie that § 157(b)(5) is not jurisdictional, and that Pierce consented to the Bankruptcy Court's resolution of his defamation claim."); 2011 WL 2472792 at *12; 2011 LEXIS 4791 at *35 ("We agree with Vickie that Pierce not only could but did consent to the Bankruptcy Court's resolution of his defamation claim."); 2011 WL 2472792 at *13; 2011 LEXIS 4791 at *37 ("Given Pierce's course of conduct before the Bankruptcy Court, we conclude that he consented to that court's resolution of his defamation claim (and forfeited any argument to the contrary).").

[35] *Stern v. Marshall* was decided in the context of a case where the Court found that the consent had been granted under duress:

> And in contrast to the objecting party in *Schor, id.,* at 855–856, 106 S.Ct. 3245, Pierce did not truly consent to resolution of Vickie's claim in the bankruptcy court proceedings. He had nowhere else to go if he wished to recover from Vickie's estate. See *Granfinanciera, supra,* at 59, n. 14, 109 S.Ct. 2782 (noting that "[p]arallel reasoning [to *Schor* ] is unavailable in the context of bankruptcy proceedings, because creditors lack an alternative forum to the bankruptcy court in which to pursue their claims").

2011 WL 2472792 at *20; 2011 LEXIS 4791 at *57. *See also* 2011 WL 2472792 at n. 3; 2011 LEXIS 4791 at *57-58 n. 8:

> Contrary to the claims of the dissent, see *post,* at —, Pierce did not have another forum in which to pursue his claim to recover from Vickie's prebankruptcy assets, rather than take his chances with whatever funds might remain after the Title 11 proceedings. Creditors who possess claims that do not satisfy the requirements for nondischargeability under 11 U.S.C. § 523 have no choice but to file their claims in bankruptcy proceedings if they want to pursue the claims at all. That is why, as we recognized in *Granfinanciera,* the notion of "consent" does not apply in bankruptcy proceedings as it might in other contexts.

that consent, no matter how uncoerced and unequivocal, will never again be sufficient for bankruptcy judges ever to issue final judgments on non-core matters. That huge uncertainty presages litigation over that issue with the potential to tie up this case, and countless others, in knots. It also would at least seemingly invite litigants to consent, see how they like the outcome, and then, if they lose, say their consents were invalid.

The alternative would be almost as bad. After having urged me to retain jurisdiction, and having argued the advantages of my keeping the case, the Targets here could move for withdrawal of the reference, or contend that I could only make proposed Findings of Fact and Conclusions of Law to the district court, with a de novo review process thereafter to follow.[36] Any such measures would result in material additional expense and delay.[37]

---

It is possible (and certainly in the interests of creditors and the bankruptcy system) that in cases where the consent cannot in any way be found to be coerced, consent will still be respected in bankruptcy cases and proceedings.

[36] *See* 28 U.S.C. §157(c)(1):

> A bankruptcy judge may hear a proceeding that is not a core proceeding but that is otherwise related to a case under title 11. In such proceeding, the bankruptcy judge shall submit proposed findings of fact and conclusions of law to the district court, and any final order or judgment shall be entered by the district judge after considering the bankruptcy judge's proposed findings and conclusions and after reviewing de novo those matters to which any party has timely and specifically objected.

[37] At argument on this motion, and again in a supplemental letter, counsel to the Trustee expressed concerns as to whether this Court would have subject matter jurisdiction over the claims against the Targets after *Stern v. Marshall*. At both times, counsel for the Targets said that subject matter jurisdiction here wouldn't be an issue, and in this respect, I agree. There is undisputable subject matter jurisdiction in the federal courts with respect to the claims the Trustee wishes to bring, under the "related to" prong of 28 U.S.C. § 1334, and the many decisions of the Second Circuit adopting the "*Pacor*" test. *See, e.g.*, *Publicker Industries, Inc. v. United States (In re Cuyahoga Equipment Corp.)*, 980 F.2d 110, 114 (2d Cir. 1992), *citing Pacor, Inc. v. Higgins*, 743 F.2d 984, 994 (3d Cir. 1984).

Subject matter jurisdiction isn't the problem; the problem is the *Bleak House* direction this case would take if prosecuted here while parties have the opportunity to complicate it interminably while jousting over my ability to issue final orders.

Third, the Borden Letter gives me no comfort in this respect, and in fact reinforces my concerns. The Borden Letter takes pains to remind me that this is not a core proceeding, and that I "would not be authorized to enter final judgment."[38] The Borden Letter's silence is deafening with respect to consent to my hearing the controversy, or any measures the Targets might take to facilitate the adjudication of this controversy in the bankruptcy court. The Borden Letter's silence likewise is deafening with respect to disclaimers of an intent to move to withdraw the reference or limit my ability to do anything more than issue *proposed* rulings. And while saying, properly, that *Stern v. Marshall* addressed an issue different from subject matter jurisdiction, the Borden Letter's silence is once more deafening with respect to any disclaimers of efforts to exploit *Stern v. Marshall* for other purposes. Far from giving me comfort that I should adhere to my earlier ruling, it presages the procedural skirmishing to come if I force the Trustee to litigate in this Court.

For all of these reasons, I will not subject the Trustee to the prospect of the *Bleak House* justice that I fear would be the consequence of denying relief from my earlier order.[39] I will not force the Trustee to jump through the additional hoops that the Trustee would encounter if forced to litigate this non-core matter in this Court.

---

[38]     Borden Ltr. At 1. It would have been better, when this motion was being argued and counsel for the Targets were making all of those arguments as to the benefits of my Court, if they had then disclosed whether they were planning to move to withdraw the reference, or to later contend that I could only issue proposed Findings of Fact and Conclusions of Law, to be followed by de novo review.

[39]     Of course, my decision here could also be regarded as garden-variety abstention. The Judicial Code provision granting subject matter jurisdiction, to both district judges and bankruptcy judges, over "Bankruptcy Cases and Proceedings," provides:

> Except with respect to a case under chapter 15 of title 11, nothing in this section prevents a district court in the interest of justice, or in the interest of comity with State courts or respect for State law, from abstaining from hearing a

<u>Conclusion</u>

With the benefit of hindsight, and new considerations coming to my attention, I see that I should not have required the Trustee to litigate in this Court.  It would have been sufficient, and preferable, for me merely to have subjected the Trustee to the gatekeeping function and any necessary further review to ensure that future litigation would be fair, and not to sentence the Trustee and the creditors that the Trustee represents to the difficulties that I fear will result here, especially in the post-*Stern v. Marshall* environment.  Whether my decision now is characterized as abstention, or as relief from my earlier order, the Trustee will not be required to bring suit in this Court.

The Trustee is to settle an order on notice consistent with this Decision.

Dated: New York, New York        _**s/Robert E. Gerber**_
     July **_11_**, 2011            United States Bankruptcy Judge

---

particular proceeding arising under title 11 or arising in or related to a case under title 11.

28 U.S.C. § 1334(c)(1).